UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
 ALEXANDRA POOLOS,

                        Plaintiff,

                                                COMPLAINT

               - against -                      PLAINTIFF DEMANDS
                                               A TRIAL BY JURY

 PARAMOUNT GLOBAL; CBS BROADCASTING,
 INC.; and CBS NEWS, INC.,

                       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Plaintiff Alexandra Poolos ("Poolos" or "plaintiff"), by her attorneys, Vladeck, Raskin & Clark, P.C., complains of defendants Paramount Global ("Paramount"); CBS Broadcasting, Inc.; and CBS News, Inc. (collectively, "defendants" or "CBS") as follows:

<u>NATURE OF THE ACTION</u>

    1.    Poolos is an accomplished and highly regarded television news Producer with a 25 year-long career in journalism. In 2011, after working for several prestigious news outlets, Poolos joined <u>60 Minutes</u>, the flagship news program and one of the most successful shows in the history of television.

    2.    During her more than 10-year tenure at <u>60 Minutes</u>, Poolos developed, produced, and delivered many important and groundbreaking stories that received awards and high ratings. Poolos's job as a <u>60 Minutes</u> Producer took her around the world to provide in-depth, and often exclusive, news coverage of significant events. Her success, dogged efforts, journalistic instincts, and 24/7 availability to defendants did not go unnoticed. After working as an Associate Producer for more than six years, in 2018, defendants promoted Poolos to Producer – a rare achievement at <u>60</u>

Minutes where management routinely advised Associate Producers that there was no path to promotion.  The show's executive producers, correspondents, and senior producers regularly praised Poolos's work.  60 Minutes Correspondent Lesley Stahl ("Stahl") gave Poolos perhaps the highest compliments when she told Poolos that she "trusted" Poolos's news judgment and that Poolos produced some of her "favorite" all-time stories at 60 Minutes.

3.      Poolos managed to succeed despite CBS's clear bias against women.  For decades, defendants permitted sexual harassment and gender discrimination to fester unabated.  From the highest levels of the company, male executives, senior managers, and producers ran the network and their shows in open defiance of anti-discrimination laws and CBS's own anti-discrimination policy, acting as if they were above the law.  On or about November 2, 2022, the New York Attorney General announced that she had secured $30.5 million from CBS and former Chief Executive Officer ("CEO") Leslie Moonves ("Moonves") for concealing sexual assault allegations against Moonves, misleading investors about those allegations, and insider trading.

4.      Poolos was not spared from the toxic environment against women that has long plagued the network.  Her former supervisor, Producer Shachar Bar-On ("Bar-On"), emotionally and verbally abused and sexually harassed Poolos for years.  Throughout Poolos's tenure, male employees suffered no consequences for their actions and many still work at defendants, including Bar-On, despite well-founded allegations of abuse, sexism, and sexual harassment.

5.       Yet Poolos's career came to a screeching halt when an Associate Producer, Collette Richards ("Richards"), made false allegations against Poolos about being a "bully" and "not having boundaries," which Richards plainly fabricated to conceal her own serious deficiencies, including her outright refusal to do her job.  Applying different standards to Poolos than it had to male Producers alleged to have engaged in far more egregious misconduct, including unlawful

behavior, defendants fired Poolos in February 2022. Defendants justified their discriminatory decision based on a biased investigation that Human Resources Vice President Renee Balducci ("Balducci") conducted and information that a third party, CNN Producer Scott Bronstein ("Bronstein"), a man, provided to the network even though Bronstein was Richards's close friend, mentor, and primary reference to secure her job at 60 Minutes. At the same time, CBS refused to consider Poolos's evidence, a 10-year veteran of defendants, which undermined the allegations against her. To add insult to injury, not only did defendants fire Poolos, but they refused to pay Poolos severance in violation of contractual obligations and continued to attack her after she left.

6.      Plaintiff brings this action to remedy discrimination on the basis of her gender and retaliation for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"); the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. (the "NYSHRL"); and the Administrative Code of the City of New York § 8-101 et seq. (the "NYCHRL").

7.      Plaintiff also brings this action to remedy breach of contract in violation of New York common law.

8.      Plaintiff seeks declaratory and injunctive relief, compensatory and punitive damages, reasonable attorneys' fees and costs of this action, pre- and post- judgment interest, and other appropriate relief.

## JURISDICTION AND VENUE

9.      Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331 and 42 U.S.C. §2000e-5(f)(3).

10.     This Court has supplemental jurisdiction over plaintiff's claims under the NYSHRL, NYCHRL, and the New York Common Law pursuant to 28 U.S.C. § 1367 because

these claims closely relate to the federal claims, having arisen out of a common nucleus of operative facts, such that all claims form part of the same case or controversy.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Paramount and CBS operate and are headquartered in New York City; because plaintiff worked for defendants in New York City; and because substantial events that form the basis of this action occurred in New York.

12.     Pursuant to Section 8-502(c) of the New York City Human Rights Law, Poolos will cause to be served a copy of this Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

13.     Poolos has exhausted her administrative remedies by having timely filed a charge against defendants alleging unlawful conduct under Title VII with the United States Equal Opportunity Employment Commission (the "EEOC"); by having received a notice informing her of the right to sue under Title VII from the EEOC; and by having timely filed this action after recieving her right to sue notice.

THE PARTIES

14.     Poolos worked for defendants, and their predecessors, from 2011 until defendants fired her on February 22, 2022.  At all relevant times, Poolos was based in New York, New York.

15.     Paramount Global is a Delaware Corporation that is headquartered in New York. Paramount Global is a merged entity of CBS and Viacom and a media conglomerate operating around the world.  In or around February 2022, ViacomCBS, Inc. changed its name to Paramount Global.

16.     CBS Broadcasting, Inc. is a commercial broadcast television company, headquartered in New York, New York.  On information and belief, CBS Broadcasting is a wholly owned subsidiary of Paramount Global.

4

17.     CBS News, Inc., the news and information division of CBS Broadcasting, is headquartered in New York and has over 500 employees.  On information and belief, CBS News is a wholly owned subsidiary of CBS Broadcasting.

BACKGROUND

Plaintiff's Journalism Career

18.     Poolos is an accomplished, award-winning Producer with a 25 year-long career in journalism.

19.     Poolos received a B.A. with honors in History from Wesleyan University in 1997.

20.     After graduating, Poolos received a Bollinger Fellowship to study political science at Columbia University Graduate School of Journalism, receiving an M.A. in 2006.

21.     During her career, Poolos reported stories all over the world, including the United States, the former Yugoslavia, Rwanda, Russia, Iran, Japan, Gabon, Kenya, China, and Nigeria. She has reported from war zones, police states, natural disaster sites, and, generally, the world's most dangerous places.

22.     Before joining CBS News, Poolos worked as a Correspondent, Reporter, Editor, and Producer for prominent media organizations, including Newsday, Radio Free Europe/Radio Liberty, Frontline/World, WNYC, and CNN.

23.     Poolos has also reported for The Wall Street Journal, The Christian Science Monitor, ABC News, and the American Prospect.

24.     At Radio Free Europe/Radio Liberty in Prague, Poolos worked as a Correspondent and Editor, reporting news for an audience of 26 million that included coverage of the Kosovo conflict and the fall of Slobodan Milosevic.

5

25.     Poolos also worked for the <u>Wall Street Journal Europe</u> from Brussels, where she reported news and analysis on the Balkans and expansion of the European Union.

26.     Poolos was the Managing Editor of Women's eNews, an award-winning nonprofit news service.  In this role, she supervised the Washington bureau chief and over 100 freelance reporters; participated in strategic planning; developed a series on African women in power; and traveled to Rwanda to report on development a decade after the genocide, and her work was featured on National Public Radio's <u>Talk of the Nation</u>.

27.     Poolos was a Reporter and Producer for Frontline/World, a national public television series that focused on international issues, including covering countries and cultures rarely seen on American television.  Poolos's work for Frontline included an investigation on the transfer of Uighur Guantanamo detainees to Albania; a series on the crackdown on human rights and the independent press in Russia; and the decline of democracy in Kyrgyzstan.

28.     At CNN, Poolos was an Editorial Producer for <u>Anderson Cooper 360</u> ("AC360") and CNN International.  At AC360, Poolos served as one of the show's top Editorial Producers and produced interviews and stories on a range of topics, including the Arab Spring protests; the 2010 Haitian earthquake; and an exclusive interview with a high-ranking member of a Mexican drug cartel.  She also produced on location coverage of the tsunami in Japan, the BP oil spill, and tornados in Missouri.

29.     Before joining CBS, Poolos received prestigious awards for her work, including two Emmy awards and two Peabody awards.  Poolos was also a finalist for a Dart Award for Excellence in Coverage of Trauma and received two Nation Institute Investigative grants and a Pulitzer Center Reporting Fellowship.

<u>Poolos's Successful Career at Defendants</u>

30.     Plaintiff joined defendants as an Associate Producer for <u>60 Minutes</u> in October 2011.

31.     <u>60 Minutes</u>, currently in its 55th season, is an American television news magazine broadcast on CBS and is widely regarded as the pinnacle of broadcast news and investigative journalism. CBS News' website describes <u>60 Minutes</u>, which premiered on CBS in 1968, as the "most successful broadcast in television history."  <u>60 Minutes</u> has won more Emmy Awards than any other primetime broadcast, including a special Lifetime Achievement Emmy, and over its tenure has won almost every major broadcast journalism award.  <u>60 Minutes</u> has finished among Nielsen's annual top-10 list for a record 23 consecutive seasons.

32.     In her role as an Associate Producer, Poolos worked on stories for Correspondent Stahl.  Stahl, who joined the program over 30 years ago, is, according to the CBS News website among "one of America's most honored and experienced broadcast journalists."

33.     In May 2018, CBS promoted Poolos to Producer.  Poolos was one of the few Associate Producers ever promoted to Producer at <u>60 Minutes</u>, and during her tenure management routinely advised Associate Producers that there was no path to promotion.

34.     Poolos's work at <u>60 Minutes</u> included investigations and in-depth news stories about survivors of Boko Haram (a portrait of a group of young women who survived kidnapping by Boko Haram and who returned to school after years of captivity); female soccer players in Iran; China's real estate market; mobile money in Kenya; the Russian activist group Pussy Riot; transgender health issues; and the Paris terror attacks.

35.     Poolos broke significant news on several occasions, including an investigation into Russian agent Maria Butina ("Butina"), who was accused of trying to influence United States

7

policies for the Kremlin.  Poolos was able to achieve unprecedented access for the segment and secured an exclusive on camera interview of Butina while she was in federal prison. Before the Butina interview, on information and belief, 60 Minutes had not been able to report from a federal prison for over a decade.

36.     On multiple occasions, Poolos produced interviews with Russian opposition leader Alexey Navalny ("Navalny"), which included securing (i) in 2017, Navalny's first major, televised interview with an American journalist in Russia and (ii) in 2020, his first televised interview in Germany after surviving a poisoning using the chemical weapon Novichok.

37.     For the 2020 Navalny interview, Poolos successfully traveled with Stahl to Germany at a time when the country had blocked all travelers from the United States due to Covid restrictions.

38.     On the CBS News website, Stahl's bio page prominently features the interviews with Navalny as examples of recent significant stories.

39.     Poolos regularly received positive feedback regarding her performance.  For example, on multiple occasions, former Executive Producer of 60 Minutes Jeff Fager ("Fager") complimented her work.

40.     In 2013, after 60 Minutes aired her first co-produced story, Fager wrote to the team responsible for the story, including Poolos:  "That was another incredible story.  I loved it.  What a year you've have had."

41.     Fager told Poolos that her story about Iran in November 2016 was "terrific" and one of the "best pieces" from Iran in the show's history.

42.     After promoting Poolos in or around 2018, Fager told her that he had no doubt she would be a "great" Producer.

8

43.     Stahl gave Poolos perhaps the best endorsement that a Correspondent can give to a Producer when she told Poolos that she "trusted" Poolos's news judgment.

44.     Stahl also said that Poolos produced some of her favorite stories of her career, including the segment about "The Chibok Girls," and described Poolos's investigation for the Butina story as "fantastic" and a "classic" 60 Minutes story.

45.     The current Executive Producer for 60 Minutes, Bill Owens ("Owens"), also praised Poolos work.

46.     After the first screening of the story "Revolution in Iran," which Poolos produced, Owens told a room full of 60 Minutes employees that Poolos should be "commended" for her tenacity in developing and producing the story.

47.     In 2019, Owens told Poolos that she regularly "swung for the fences" and that he admired her tenacity and ambition in pursuing important stories.

48.     In 2020, at the final screening of "Putin's Public Enemy," another story that Poolos produced, Owens told her that the piece was excellent and flawlessly delivered despite the many production challenges.  On information and belief, another Senior Producer stated that the delivery of the story was "heroic."

49.     During Poolos's performance review in 2021, Owens told her that she frequently produced the hardest stories at the show, that her work was excellent, that she performed at a high-level, and that she needed minimal supervision.

50.     On information and belief, Tanya Simon, the former Executive Editor of 60 Minutes Sports, said that a story Poolos produced should be "the benchmark for sports stories."

51.     Senior Producers regularly described Poolos's work as rigorous and ground-breaking.

52.     After learning that Poolos was leaving 60 Minutes in February 2022, a Senior Producer told Poolos that her hard work always showed up on the screen; that her compassion for her subjects was singular; and that the show would be "poorer without [her]."

53.     Poolos also received praise for being collegial and collaborative.  For example, Owens told her on several occasions that he liked her as a person and that she was relatable and down-to-earth.  Stahl told Poolos that her upbeat personality made working together easy.

54.     Poolos's work at 60 Minutes has received numerous awards and other recognition including  a Gracie Award for "The Chibok Girls" in 2020; an Emmy Award for Outstanding Business and Economic Reporting in a News Magazine for "China's Real Estate Bubble" in 2014; two Emmy nominations for Outstanding Edited Interview and Outstanding Writing for "Putin's Public Enemy" in 2021; an Emmy nomination for Outstanding Edited Interview for "The Challenger" in 2018; and an Emmy nomination for Outstanding Business and Economic Reporting News Magazine for "The Future of Money" in 2015.

Poolos's Employment Agreement

55.     During Poolos's tenure, CBS Producers typically worked under the terms of a written employment contract, and Poolos worked under such a contract between 2011 and 2022.

56.     CBS (and its predecessor companies) and Poolos agreed to numerous contract extensions after original contract expired, with her most recent contract extension effective from May 30, 2021, for a period of three years until May 25, 2024 (the "Agreement").

57.     The Agreement provided that if CBS fired Poolos without cause, Poolos was entitled to severance.

58.     The Agreement specified that Poolos would not be entitled to severance if she breached any provision of the Agreement, failed to perform her obligations, or was incapacitated.

59.     Even though CBS fired Poolos (as described below) and none of these circumstances occurred, CBS has refused to pay her severance.

<u>Defendants Suspended and Fired Poolos</u>

60.     During a virtual meeting on or about January 5, 2022, Owens and <u>60 Minutes</u> Executive Editor Tanya Simon ("Simon") told Poolos that an Associate Producer that she supervised, Richards, had complained about her.

61.     Richards had supposedly asserted that Poolos was a "bully" who did not "respect boundaries." As set forth below, those allegations are meritless.

62.     Poolos spoke with Owens about the complaint again on January 6, 2022. After mandating that Poolos send an email confirming that Owens had counseled her to be mindful about her tone, Owens stated that the matter was closed and that CBS would take no further action in connection with Richards's complaint.

63.     The next day, on or about January 7, 2022, Owens asked to speak with Poolos.

64.     During a call, Owens asked Poolos if she had spoken to a CNN Producer, Bronstein, about Richards and, if so, whether she had done so to retaliate against Richards.

65.     Poolos told Owens that she had spoken to Bronstein but denied retaliating against Richards.

66.     Poolos explained that, over the holiday break, she had reached out to Bronstein for advice about how to handle the problems she was having with Richards as explained below, but that she and Bronstein did not speak until early January 2022.

67.     Bronstein and Richards were close friends and had worked together at CNN and Bronstein, a former <u>60 Minutes</u> employee, had recommended Richards not only for the job at <u>60 Minutes</u>, but to work specifically with Poolos.

11

68.     On the same day, on or about January 7, 2022, Human Resources ("HR") reached out to Poolos about Richards's complaint for the first time, and HR Vice President Balducci informed Poolos that CBS was suspending her and that her "job was on the line." Balducci refused to tell Poolos why she was being suspended. When Poolos asked whether the decision related to her communication with Bronstein, Balducci said this was not the reason.

69.     Balducci and Poolos spoke for approximately one hour on or about January 8, 2022.

70.     Balducci told Poolos on January 8 and January 9, 2022, that she would be in touch the following week, but she did not follow up with Poolos for almost a month.

71.     On or about February 3, 2022, Owens and Balducci told Poolos that CBS was firing her effective immediately.

72.     Owens and Balducci pressured Poolos to resign, but she declined to do so.

73.     Later that same day, February 3, 2022, Poolos received a memorandum stating that CBS had fired her because she purportedly violated CBS policy by bullying Richards; by retaliating against Richards after she complained; by discussing Richards's complaints with others; and by not being truthful.

74.     These allegations are false or so exaggerated that bias is the only explanation.

75.     Indeed, after defendants had fired Poolos she received a text message from Stahl that directly contradicts these assertions. Stahl texted plaintiff to express "the affection and respect EVERYONE feels" for Poolos, "especially [Stahl]."

<u>Defendants Applied Discriminatory Standards To Poolos</u>

76.     Defendants assert several grounds for firing Poolos, which are rife with contradictions, inconsistencies, and exaggerations.

A.     <u>Richards Had Performance Problems</u>

77.     Poolos began supervising Richards in or around October 2020 when Richards was a new Associate Producer.

78.     Before Richards joined <u>60 Minutes</u>, Poolos had good relationships with other Associate Producers she supervised and, to her knowledge, they did not make complaints about her.

79.     On the contrary, Associate Producers who worked with Poolos described her as supportive and one of the most collaborative producers at the show.

80.     Poolos had serious concerns about Richards's performance.

81.     Richards frequently made significant errors in fact-checking and often fought back when Poolos provided her constructive feedback, including insisting that important facts were correct when they were not and, as Richards admitted, "lash[ing] out" at Poolos when she did not immediately approve of Richards's ideas.

82.      Richards also failed to show attention to detail in several aspects of her work, including copy-editing her work.

83.     On several occasions, Richards also failed to complete important tasks such as securing necessary footage for a segment, handling the acquisition of third-party material, managing logistics for shoots, and conducting background interviews.

84.     As described below, Richards also failed to manage the application process for international travel for several <u>60 Minutes</u> employees and then went out of town for the holiday, which required Poolos to cancel her own holiday plans to address the problem.

B.      <u>CBS Ignored Poolos's Complaints about Richards</u>

85.     Before learning about Richards's complaint on or about January 5, 2022, Poolos attempted to raise concerns about Richards.

86.     On January 3, 2022, when Poolos reached out to Executive Editor Simon to discuss her concerns about Richards, Simon stated she was too busy to discuss the concerns that day but promised to speak to Poolos by phone the following day.

87.     On January 4, 2022, Simon cancelled the scheduled call and told Poolos that she needed to speak to both Poolos and Owens.

C.      <u>Richards Made Her Complaint to Cover Up Her Deficiencies</u>

88.     Contrary to Richards's complaint that Poolos was a "bully," on several occasions, Richards expressed appreciation for her support. For example, Richards sent a text message to Poolos thanking Poolos for "having [her] back" and, on another occasion, wrote, "Thank you for your support!"

89.     Poolos also defended Richards on multiple occasions, including making complaints on her behalf to other departments (even though Poolos later learned that Richards was criticizing other departments while failing to complete her own work).

90.     While Richards complained that Poolos had no boundaries, in the past, Poolos had gone out of her way to make sure Richards was able to take off time, including instances when doing so jeopardized finalizing segments and airing them.  For example, Poolos asked to have the

broadcast date for a story delayed so that Richards could take nine days off for her wedding in May 2021 and successfully advocated for Richards to take time off.

91.     As a result of delaying the story, Poolos ensured that CBS did not replace Richards with another Associate Producer, even though protecting Richards might have jeopardized her relationship with Stahl.

92.     Poolos also helped keep private Richards's vacation request during a critical period for the show so that others would not develop a negative opinion of Richards for making this unusual request.  In particular, Poolos was worried that if Stahl learned of the change, she would be upset, would deny Richards the time off, and would develop a negative opinion of her.

93.     In late December 2021, however, Poolos was unable to accommodate another instance in which Richards requested to leave town during a critical period at the show, when 60 Minutes was planning to air a story about Trevor Noah ("Noah") on or about Sunday, December 19, 2021.

94.     Stahl interviewed Noah for the segment and Poolos produced the story.  Richards repeatedly asked Poolos for time off to drive her dog home on the Saturday before the Noah story aired; the day the show actually aired on Sunday; or on the Monday after it did.

95.     Poolos told Richards that leaving then was not feasible because she proposed traveling on important days for producing the show and correcting any factual errors in the broadcast that might need to be addressed.

96.     By the standards of 60 Minutes, Richards's request was extraordinary, as it was commonplace for Correspondents, Producers, and Associate Producers to be intensely working on a segment and making changes during the period immediately before broadcast and immediately following it.

15

97.     Poolos offered as a compromise that Richards instead travel sometime on Tuesday, Wednesday, or Thursday after the show aired, even though this would have required Poolos to complete Richards's work on another story, in an attempt to resolve the issue.  Richards rejected her suggestion, purportedly because her husband was not able to travel on those days.

98.     When Richards asked again to take the time off, which she had done several times, and Poolos said she could not because it would interfere with preparing the story for broadcast and addressing concerns post-broadcast, Richards became very upset.  Under the circumstances, including Richards's relentless requests, her erratic behavior, and her inflexibility, Poolos believed that she had no choice but to agree that Richards could travel on the day she demanded to do so. Richards left town on the day before the Noah story aired.

99.     Poolos also suggested that they plan to discuss Richards's job performance and how to move forward after the holidays. Poolos encouraged Richards to advocate for herself and told her that if she felt that working with Poolos was not a good fit, she could speak to Simon about working on another team at 60 Minutes and would not be penalized.

100.     After Richards left for vacation, Poolos discovered an error for an upcoming story. Stahl and her team members required visas to travel to Russia for a story, but after Richards left, Richards told her that Stahl's passport needed to be renewed.  Without a passport, Stahl would not get the visa she needed, and obtaining the visa was a core responsibility of an Associate Producer that Richards did not handle before leaving for vacation.  As a result of Richards's oversight, Poolos was forced to cancel her own vacation plans to renew Stahl's passport.

101.     Following the Noah segment, when Richards and Poolos were working together on another story with a tight deadline, Poolos asked Richards to copy edit her background interviews

more carefully than she had previously so that she could give them to Stahl as research for the story.  Copy editing is a fundamental duty for an Associate Producer.

102.    Richards began to complain that Poolos was not treating her well after Poolos asked her to do her job.  In response, Poolos offered Richards additional support, including extending the deadlines and suggesting that she have a Broadcast Associate assist Richards, so that Richards felt less stressed.

103.    Shortly thereafter, Richards stopped working, and in late December 2021, Richards failed to respond to Poolos's requests for Richards to complete her work, hand it over for Poolos to complete, or otherwise communicate with Poolos.

104.    At the time, Richards and Poolos had an exclusive interview with an American hostage recently released from a prison in Myanmar, which was scheduled for January 5, 2022. Richards and Poolos were on a deadline and behind schedule to submit materials to Stahl for review before the interview, and Richards's insubordination jeopardized this important story.

105.    Poolos did not immediately report her concerns about Richards because she did not want to bother Executive Editor Simon during her vacation and was worried that if she reported Richards's conduct to Stahl, CBS would take disciplinary action against Richards.

106.     Instead, as described below, Poolos reached out to Richards's mentor, friend, and primary job reference, CNN producer Bronstein, but due to the holidays, Bronstein and Poolos did not speak until early January 202.

107.    Managers at 60 Minutes agreed that Richards had performance problems and that her complaints against Poolos were baseless.  For example, during the virtual call with Owens and Simon on or about January 5, 2022, Owens expressed that he was deeply troubled by Poolos's performance assessment of Richards and agreed with her concerns.

17

108.    The next day, on or about January 6, 2022, Owens asked for more information about Richards's performance, and Poolos told Owens that Richards had not participated in training that 60 Minutes offered for its new Associate Producers.  Owens said that Richards's decision was unacceptable and asked Poolos to begin documenting Richards's performance problems.

109.    Also, during the same discussion on or about January 6, 2022, Owens told Poolos that she would not have to meet with HR about Richards's complaint, that he did not want Poolos "walking on eggshells," and that Richards had made a complaint because she wanted to change teams.  Owens also dismissed Richards's complaint as "a millennial issue."

110.    On information and belief, others raised concerns about Richards's performance. For example, on information and belief, multiple outside parties made serious complaints to senior management and another Producer about Richards's volatile temper and lack of professionalism. On information and belief, senior management and the Producer did not notify Human Resources about those concerns.

D.    Poolos Did Not Retaliate Against Richards

111.    Poolos did not engage in retaliatory conduct against Richards.

112.    Owens and Balducci criticized Poolos for speaking to CNN Producer Bronstein about Richards after CBS advised her of the complaint.  However, contrary to their assertion, Poolos reached out to Bronstein first well before she knew Richards had complained about her to management.  Before Richards's complaint about her, in late December 2021, Poolos contacted Bronstein, a former 60 Minutes employee and the primary reference for Richards that helped her land the job.

113.    Bronstein had repeatedly called Poolos when Richards was interviewing at <u>60</u> <u>Minutes</u> with a different Producer and told Poolos that he thought Richards was a better fit for her than the other Producer.  Bronstein also frequently told Poolos that he adored Richards.

114.    Poolos had sought Bronstein's advice over the holiday break about how to have a better professional relationship with Richards and exchanged text messages with him but was unable to speak with him over the holidays.

115.     After the holidays, in early January 2022, Bronstein sent Poolos a text message to let her know he was available to speak and, to follow up from her earlier outreach in December 2021.  Poolos called Bronstein on or about January 5, 2022.

116.    CBS also exaggerated the significance of Poolos's discussion with Bronstein. While CBS primarily relies on this call as a basis for firing Poolos, neither Richards nor CBS accused Poolos of unlawful retaliation.

117.     Instead, CBS asserted that Poolos violated policies by purportedly telling Bronstein that Poolos was "disappointed" with, and lacked trust in, Richards because Richards spoke to HR about her concerns.

118.    As Owens acknowledged, it would be nonsensical for Poolos to attempt to retaliate against Richards through Bronstein when she knew that Richards and Bronstein were close friends frequently in contact with each other, Bronstein had told her on multiple occasions that he adored Richards, and Bronstein had served as Richards's primary reference for her job.  Indeed, at the start of the call, Bronstein told Poolos that she could never malign Richards to him because he thought so highly of Richards and encouraged Poolos to speak openly with him about Richards's performance.

119.    CBS also accused Poolos of making negative comments about Richards's performance.  During her discussion with Bronstein on January 5, 2022, while she was certainly frustrated with Richardson's conduct and her effort, Poolos also spoke positively about Richards, saying that she was well-liked by other employees, including Stahl, and expressed sympathy for Richards over her difficulties in adjusting to 60 Minutes.    Poolos also told Bronstein that she hoped to continue working together with Richards and that Richards would have the choice of what she wanted to do.

120.    Also, Poolos discouraged others from retaliating against Richards.  For example, on or about January 5, 2022, Poolos told Stahl about Richards's complaint.  In response, Stahl stated that she was "outraged," and that Richards should have spoken to her first before raising concerns outside of the team.

121.    Stahl told Poolos that she wanted to "get rid of" Richards and remove Richards from her team. Poolos, however, advised Stahl not to remove Richards because it might be perceived as retaliatory and that they should instead allow the process to proceed.

122.    Stahl also said that she "respected" Poolos for not having formally complained about her former supervisor, male Producer Bar-On, and, instead, had "focus[ed] on [her] work."

E.    CBS Claimed That Poolos Was Untruthful

123.    CBS accused Poolos of lying during the investigation, but the February 3, 2022 report sent to her about her firing, did not provide a single example of Poolos being untruthful during the investigation.

124.    Moreover, in determining that Poolos purportedly lied during the investigation, as described below, CBS relied on a third party, Bronstein.  In contrast, CBS disregarded the information that Poolos, a 10-year employee, attempted to provide.

F.   <u>Poolos Was Not Instructed to Keep the Complaints Against Her Confidential</u>

125.   The February 3, 2022 report also asserts that Poolos violated CBS policy by discussing Richards's complaint with others.

126.   Poolos was not aware of any obligation to maintain confidentiality of Richards's complaint.

127.   As set forth above, on or about January 5, 2022, Simon and Owens told Poolos about Richards's complaint and Poolos had a follow up meeting with Owens the next day on or about January 6 about Richards's concerns.  At no time during either of those discussions did Simon or Owens tell Poolos not to communicate with others about Richards's concerns.

128.   To the contrary, on or about January 6, 2022, Poolos told Owens that she had discussed Richards's complaint with Stahl.  Far from criticizing her, Owens expressed his support for Poolos doing so, stating that it was "the right thing to do" for Poolos to tell Stahl and that he had intended to tell her to do so.  Owens told Poolos that Stahl was "in [her] corner" and thought Richards's behavior was "outrageous."  Owens also told Poolos that he believed that Richards had only complained to HR so she could switch teams.

129.   HR also did not provide any instructions to Poolos about Richards's concerns on January 5 and 6, 2022, including, but not limited to, directions about what Poolos could disclose to others.  Poolos heard nothing from HR until late in the day on January 7, 2022, after she spoke to Bronstein.

130.   On January 5, 2022, at the end of her conversation with Owens and Simon, Poolos specifically asked if she could speak to HR.  Owens told her not to reach out to HR and he would get back to her.

G.      Defendants Failed to Cite Any Applicable Policy That Poolos Purportedly Violated

131.    Defendants claim that they fired Poolos for violating policies but did not tell her which policy or policies she supposedly breached.  Instead, defendants made generic references to supposed policy violations.

132.    Defendants have a Non-Discrimination and Anti-Harassment Policy (the "Non-Discrimination Policy").

133.    The Non-Discrimination Policy prohibits discrimination and harassment based on "race, color, ethnicity, national origin, religion, sex (including pregnancy, childbirth, breastfeeding or related medical conditions), age, physical disability, mental disability, medical condition, ancestry, alienage or citizenship status, marital status, familial status, caregiver status, creed, genetic information, height or weight, sexual orientation, military or veteran's status, gender, gender identity, gender expression, transgender status, status as a victim of domestic violence, sexual violence or stalking, sexual and reproductive health decisions, or any other characteristic protected by law."

134.    The Anti-Discrimination Policy also prohibits retaliation against an individual for engaging in "protected activity."

135.    No one has accused Poolos of violating the anti-discrimination or the anti-harassment laws.  Nor have defendants asserted that Richards or anyone else made a protected complaint concerning Poolos.

H.      Defendants' Bogus Investigation

136.    Defendants' investigation concerning Poolos's conduct violated its policies. To the extent Defendants' Non-Discrimination Policy was applicable, Defendants failed to follow those procedures set forth in the policy.

22

137.    Defendants' Non-Discrimination Policy provides "all parties appropriate due process."  The Non-Discrimination Policy states that the investigation will include review of evidence collected, including interviews with the parties involved and review of documents.  At all steps, defendants failed to apply these procedures to Poolos.

138.    At the outset of the investigation, the investigator, Balducci, made clear that she was not interested in hearing from Poolos.  When Poolos described her concerns about Richards's performance, Balducci ignored them or defended Richards.   For example, in response to Poolos's statements that she offered Richards extra help and more time to improve her copy editing, Balducci criticized Poolos for having done so via email and stated that she expected managers to have those discussions over the phone.

139.    Incredibly, Balducci also said that Poolos should accept that Richards did not have the ability to do copy editing and instead focus on what Richards did well.  Copy editing was one of Richards's duties and a basic skill for any professional journalist.

140.    Balducci levied other unjustified criticism against Poolos, including scolding Poolos for not calling her when Poolos learned about Richards's complaint. Certainly, it is not incumbent on Poolos, who had been accused of wrongdoing, to reach out to HR.  In any event, Poolos had wanted to call Balducci, but Simon and Owens had specifically instructed her not to do so.  Nonetheless, Balducci refused to accept this explanation.

141.    Poolos repeatedly offered email communications and text messages to counter Richards's false statements, including messages that demonstrated that Poolos cared about Richards's well-being and health.  CBS, including Balducci, however, refused to consider evidence from Poolos.  In contrast, as set forth below, Balducci not only considered Bronstein's notes and text messages when firing Poolos, she primarily relied on them in making the decision.

142.    CBS failed to follow its procedures in conducting the investigation in other ways. It took several days, if not weeks, for HR to contact Poolos about Richards's complaint, and no one gave Poolos instructions in the interim not to discuss the complaint with anyone else.   Yet CBS purportedly fired Poolos for not complying with those rules, which it failed to share with her.

143.    Also, rather than act promptly as set forth in defendants' Non-Discrimination Policy, CBS took nearly a month to conduct its so-called investigation.

144.    During the meeting on or about January 8, 2022, and by email the next day on January 9, 2022, Balducci told Poolos that she would "reconnect" with her the following week.

145.    After the January 9, 2022, email, however, Balducci had no contact with Poolos until February 3, 2022, when CBS fired her.   There was no explanation for the delay and CBS never gave Poolos another opportunity to respond to the allegations and purported evidence against her.

146.    In an email to Balducci on January 8, 2022, Poolos requested to speak with Balducci's supervisor Cynthia Glasgow ("Glasgow").   On January 9, 2022, Balducci responded that Glasgow was aware of Poolos's circumstances and copied Glasgow on the email.   That same day, on January 9, 2022, Poolos asked again to speak to Glasgow, who was now part of the email exchange.   Glasgow ignored her and never replied to her.

147.    CBS credited Bronstein, a third party and a man, over Poolos even though she had worked for the company for more than a decade.   On February 3, 2022, Balducci told Poolos that in making the decision to fire Poolos, she relied on notes that CNN Producer Bronstein purportedly created and screenshots of his text messages.   Balducci told Poolos that Bronstein sent these materials to her three or four days after Poolos spoke to him.

148.    When Poolos asked Balducci why no one followed up with her about the investigation, Balducci said that there was no reason to do so because she had spoken to Bronstein. CBS never showed Poolos the notes that Bronstein provided to Balducci nor asked her whether she had her own notes reflecting her conversation and communications with Bronstein.

149.    Balducci also was wrong about key facts.  For example, during the firing meeting on February 3, 2022, Balducci emphasized that she had copies of the text messages between Bronstein and Poolos.  On information and belief, Balducci mentioned the text messages as evidence Poolos had been untruthful about contacting Bronstein first.  To the contrary, during the investigation, Poolos candidly told Owens and Balducci that she had spoken to Bronstein about Richards and that she had contacted him before she was aware of Richards's complaint.  If Balducci had spoken to Poolos a second time, she would have understood that Poolos had not misrepresented the sequence of the events.

I.    Defendants Failed to Apply Corrective Action

150.    Defendants did not comply with their corrective action process.

151.    In the Non-Discrimination Policy, there are several responsive actions that defendants may take when there is a finding of misconduct.  Responsive action includes training, referral to counseling, monitoring of the offender, warnings, reprimands, withholding of a promotion or pay increase, prospective reduction of wages, demotion, reassignment, temporary suspension without pay, or termination of employment.

152.    Defendants took virtually no lesser steps before firing Poolos even though she had worked for defendants for 10 years without any incident.

153.    Defendants did provide Poolos with "counseling" regarding her "tone."  But defendants suspended Poolos within days of the counseling and, ultimately, fired her.  In contrast

to defendants' treatment of men, there was no warning or other chances for Poolos to improve her supposed misconduct.

J.       Defendants' Biased Conduct

154.     As set forth below, defendants' investigation, suspension of, and firing of Poolos was discriminatory.

155.     Defendants did not treat Poolos as it had similarly situated male employees accused of far more egregious misconduct.

K.       Defendants' Other Improper Conduct

156.     During the firing meeting on February 3, 2022, Owens and Balducci tried to pressure Poolos into resigning because, on information and belief, if she did so, CBS would have no obligation to pay severance and pursuing legal claims would be more challenging.

157.     After telling Poolos that CBS was firing her, Balducci told Poolos she could "resign" instead.  As an enticement to resign, Balducci proposed that Poolos write an email that Balducci would approve to say good-bye to Senior Producers.  Owens said it would be "much better" for Poolos if she resigned and that she should listen to Balducci. Poolos asked for a day to consider the suggestion, but Balducci refused and set a 4:00 p.m. deadline that same day.  Poolos did not agree to resign.

158.     This was the first time that Poolos had ever been accused of violating company policies in the course of more than 10 years of employment.

159.     Poolos is not aware of CBS firing male 60 Minutes employees based on a single complaint from a subordinate about behavior that was not alleged to constitute unlawful discrimination or retaliation.  In contrast with its harsh treatment of Poolos, CBS has declined to

take any meaningful disciplinary action in response to serious allegations of misconduct against male employees.

160.    For example, until recently, Neeraj Khemlani ("Khemlani"), a man, was CBS News Co-President.

161.    On information and belief, during Khemlani's tenure, there were multiple complaints made against him, including complaints of discrimination against women and employees of color.  Instead of firing Khemlani, defendants gave him multiple chances, including offering him training.

162.    For example, in May 2022, multiple news outlets reported that CBS News employees had complained about the workplace culture, and specifically about Khemlani's conduct.

163.    On information and belief, instead of firing Khemlani, defendants offered him counseling in response to the complaints about his treatment of CBS employees.

164.    On information and belief, in January 2023 Khemlani was the subject of multiple complaints to HR, which led to an internal investigation focused on his treatment of women and employees of color.  Khemlani was not fired as a result of those complaints.

165.    In or around the spring or summer of 2023, Khemlani was accused of being verbally abusive toward multiple female executives, including CBS Chief Financial Officer Stacey Benson and a female Executive Vice President.

166.    On information and belief, instead of firing Khemlani, when the two women complained, CBS ordered Human Resources to closely monitor Khemlani and his meetings with colleagues.

27

167.     On August 13, 2023, Khemlani announced that he was voluntarily resigning from his position as President of CBS News and that he had signed a "multi-year, multi-platform first look deal" with CBS to develop content for the network.

168.     Despite the many complaints about his abusive behavior from CBS employees, particularly women and people of color, Khemlani has faced no meaningful consequences for his abusive behavior and remains associated with CBS.

<u>CBS's Long History of Sexism and Sexual Misconduct</u>

169.     CBS's lenient treatment of Khemlani despite the serious accusations against him is far from an isolated incident.

170.     To the contrary, CBS has a long history of shielding men from answering for their misconduct, including unlawful conduct.  Sexism and misogyny defined the workplace of CBS, including CBS News, over many years.

171.     Several publications, including <u>The New Yorker</u> magazine, <u>The New York Times</u>, and <u>The Washington Post</u>, exposed the sexual harassment and gender discrimination that CBS permitted to fester unabated for decades.

172.     From the highest levels of the company, male executives and senior managers, including the former CEO Moonves and the former Executive Producer of <u>60 Minutes</u> Fager, ran the network in open defiance of the anti-discrimination laws and CBS's anti-discrimination policy, acting as if they were above the law.

173.     <u>The New Yorker</u> magazine detailed the gender-based toxic culture at CBS through two articles in July and September 2018.

174.     <u>The New Yorker</u> magazine's July 2018 article stated that four women "described forcible touching or kissing during business meetings"; two claimed that "Moonves physically

intimidated them or threatened to derail their careers"; and that several women said that Moonves "became cold or hostile after they rejected his advances, and that they believed their careers suffered as a result."

175.   The New Yorker articles reported that at least 12 women had accused Moonves, the long-time head of CBS, of sexual misconduct.

176.   Moonves resigned shortly after the magazine published its second article in September 2018.

177.   Following the first article in July 2018, CBS hired outside counsel to investigate the allegations of gender bias and sexual harassment.  After completing the investigation in or around November 2018, a copy of outside counsel's draft written report, which is 59 pages, was leaked to The New York Times.

178.   According to The New York Times, outside counsel's draft report states that Moonves "'engaged in multiple acts of serious nonconsensual sexual misconduct in and outside of the workplace, before and after he came to CBS in 1995."

179.   The New York Times further reported that outside counsel found that Moonves "'received oral sex from at least [four] CBS employees under circumstances that sound transactional and improper to the extent that there was no hint of any relationship, romance, or reciprocity.'"

180.   Before the articles in The New Yorker, CBS had already been forced to fire Charlie Rose ("Rose") in 2017. Rose had served as co-anchor of CBS This Morning since 2012 and a correspondent for 60 Minutes.

181.   The Washington Post reported that eight women at PBS, where Rose hosted a talk show, had accused Rose of "making lewd phone calls, walking around naked in their presence, or

groping their breasts, buttocks or genital areas." The <u>Washington Post</u> subsequent to Rose's firing reported that an "additional 27 women – 14 CBS News employees and 13 who worked with him elsewhere – said Rose sexually harassed them."

182.   <u>60 Minutes</u> followed the example set at the highest level of the company and emerged as the breeding ground for the network's misogynistic culture. As <u>The New Yorker's</u> July 2018 article stated, "[30] current and former employees of CBS [said] that such behavior [against women] extended from Moonves to important parts of the corporation, including CBS News and '<u>60 Minutes</u>.'"

183.   That same article reported: "During Moonves's tenure, men at CBS News who were accused of sexual misconduct were promoted, even as the company paid settlements to women with complaints."

184.   Also, on or about November 2, 2022, the New York Attorney General announced that she had secured $30.5 million from CBS and Moonves for concealing sexual assault allegations against Moonves, misleading investors about those allegations, and insider trading.

185.   It was well-known that sexual harassment and other forms of sexism were commonplace at <u>60 Minutes</u> during the period Don Hewitt ("Hewitt") was the show's Executive Producer.

186.   Among many other examples, on information and belief, Hewitt fired correspondent Meredith Vieira ("Vieira") in 1991 on the basis of gender. Vieira worked as a correspondent on the show from 1989 to 1993. Viera asked Hewitt to allow her to remain working only part-time after the birth of her second child. Rejecting Vieira's request, Hewitt fired her. He later commented on her firing in an interview: "I need someone who can pull his or her own

weight."  Unsurprisingly, in 2018, Viera said that, during her time at <u>60 Minutes</u>, "[t]here was sexism, for sure."

187.    A female employee also accused Hewitt of repeatedly sexual assaulting her around the same time as Hewitt dismissed Vieira. According to <u>The New York Times</u>, CBS paid the employee a settlement of over $5 million in the years following the accusation.

188.    Hewitt's successor as head of <u>60 Minutes</u> continued the tradition of gender discrimination and sexual harassment.  Fager, who ultimately spent 36 years at CBS, replaced Hewitt as Executive Producer of <u>60 Minutes</u> in 2004.

189.    In September 2018, CBS fired Fager amid similar allegations of sexual harassment and misconduct as had faced Hewitt.

190.    CBS attributed the termination of Fager's employment to a threatening text message that he had sent to a national correspondent for CBS News who was covering allegations against him of sexual misconduct.

191.    The message read: "If you repeat these false accusations without any of your own reporting to back them up, you will be responsible for harming me. Be careful. There are people who lost their jobs trying to harm me and if you pass on these damaging claims without your own reporting to back them up that will become a serious problem." According to CBS, Fager's clear threat violated company policy.

192.    But alongside Fager's text message, the same article in <u>The New Yorker</u> magazine that exposed Moonves's mistreatment of women had also reported that "[n]ineteen current and former employees told [the magazine] that Jeff Fager . . . allowed harassment in the [news] division."

193.    Additionally, "[s]ix former employees told [the magazine] that Fager, while inebriated at company parties, would touch employees in ways that made them uncomfortable." Moreover, The New Yorker reported that Fager protected other men "accused of misconduct, including men who reported to him."  According to the New York Times, the draft report stated that "Mr. Fager had behaved inappropriately with colleagues in several instances."

Defendants Applied Different Standards to Male Employees than Female Employees

194.    Defendants routinely applied different standards to male employees, including Producers and Editors, than it does to female employees, including Poolos.

195.    Several male 60 Minutes Producers and Editors have been the subject of complaints based on abusive and sexist behavior and, in some cases, sexual harassment.  On information and belief, defendants did not suspend or fire them in response to those complaints even though many of the allegations were corroborated based on documentary evidence and witness accounts.

196.    Shachar Bar On: As set forth below, Poolos's former male supervisor, 60 Minutes Producer Shachar Bar-On, emotionally abused and sexually harassed her for years.  CBS discouraged Poolos from raising complaints and Bar-On still works for CBS.

197.    Ira Rosen: Another longtime male Producer for 60 Minutes, Ira Rosen ("Rosen"), was accused of sexually harassing his female Associate Producer.

   a.    Rosen's Associate Producer alleged that she complained to management that Rosen had subjected her to numerous sexual comments and suggested that she flirt with sources.

   b.    On information and belief, other women also reported that Rosen had engaged in similar misconduct.

   c.    The Associate Producer, who filed a complaint with the Equal Employment Opportunity Commission, alleged that after she complained about Rosen, CBS removed her from assignments and subjected her to baseless criticisms.

32

d.     On information and belief, CBS did not suspend or fire Rosen for the alleged misconduct.

198.   <u>Michael Radzutsky</u>: A female Senior Producer at <u>60 Minutes</u> alleged that Michael Radutzky ("Radutzky"), a male Producer, threatened to throw furniture at her and twisted her arm behind her back, causing her to scream.

a.     On information and belief, Fager was aware of the incident, stated he would address the matter with Radutzky directly, and told the female Producer not to inform HR.

b.     Fager then asked the female Producer to apologize to Radutzky.

c.     CBS did not fire or otherwise discipline Radutzky for his blatant misconduct, including, physical assault against a female employee.

199.   <u>Michael Gavshon</u>: It was well known that Michael Gavshon ("Gavshon"), a longtime male Producer for <u>60 Minutes</u>, was frequently abusive towards staff.

a.     In 2019, Gavshon sent an old photograph via text message of himself and a friend urinating on a campfire to a female Associate Producer, Cassandra Vinograd ("Vinograd").  Gavshon's penis was visible in the picture.

b.     Vinograd reported the incident to Human Resources and Susan Zirinsky, the then-President of CBS.

c.     Vinograd also reported Gavshon's excessive drinking and violent temper and provided HR a photograph of Gavshon passed out in her office as a result of drinking too much.

d.     Vinograd further alleged that Gavshon retaliated against her for her protected complaints, including stripping her of all work responsibilities.

e.     On information and belief, defendants did not suspend Gavshon for a single day even though there was photographic evidence that he engaged in inappropriate conduct.

f.     Instead, on information and belief, defendants permitted Gavshon to continue working and gave him counseling for his substance abuse.

g.     Defendants accepted Gavshon's explanation that he sent her the photograph of his penis while urinating "by accident."

h.    Reflecting defendants' biased view, Stahl told Poolos that Vinograd was fabricating the allegations against Gavshon to get "money." Stahl also said she did not believe that Gavshon did anything wrong and that Vinograd was trying to destroy his career.

i.    Vinograd filed a lawsuit against CBS based on this mistreatment.

j.    On information and belief, Gavshon continues to work for defendants.

200.    <u>David Levine</u>: David Levine ("Levine") is a man and currently an Associate Producer for <u>60 Minutes</u>.

a.    Several female employees have complained about Levine, including about his serious anger problems often directed at women.

b.    On information and belief, Levine yelled at a junior female employee, which caused her to cry.

c.    On information and belief, a female Correspondent complained about Levine to Owens, and CBS did not punish Levine.

d.    To the contrary, Owens and others have rewarded Levine. For example, in 2021 and 2022, CBS allowed Levine to solo produce several stories, which is often the opportunity offered to Associate Producers that management is considering for promotion to Producer.

201.    <u>Will Croxton</u>: Will Croxton ("Croxton") is a Producer and Editor for <u>60 Minutes Overtime</u>.

a.    It was widely known that Croxton had a serious temper and would on occasion act insubordinate and hostile.

b.    On one occasion, Executive Editor Simon told Poolos to inform Croxton that he would no longer be the lead Associate Producer on one of her stories and instead would be in a supporting Associate Producer role.

c.    Simon told Poolos that she was afraid of Croxton getting angry at her and appreciated Poolos handling the matter, and that Croxton refused to follow instructions regularly.

d.    On information and belief, on another occasion, Croxton slammed the door in the face of a female producer at whom he was angry.

    e.      CBS repeatedly looked the other way when it came to complaints about Croxton and his behavioral problems.  On information and belief, Croxton still works for defendants.

202.    <u>Matthew Richman</u>: Matthew Richman ("Richman") is a Senior Editor responsible for supervising other Editors.

    a.      On information and belief, several Editors and Producers have raised concerns about his behavior, including a female Producer who organized a group of Producers to make a complaint about Richman to Owens and Simon.

    b.      During a Zoom call that Poolos was part of, several Producers complained about Richman's abusive conduct.

    c.      Simon later told Poolos that the complaints were unfair and that the Producers needed to account for his personality.

    d.      On information and belief, defendants took no action against Richman despite the complaints, and he continues to work for them.

<u>Poolos Was Harassed and Abused by a Male Supervisor</u>

203.    During her employment at <u>60 Minutes</u>, defendants forced Poolos to face sexual harassment.

204.    For example, when Poolos interviewed for her job at <u>60 Minutes</u>, sexual harassment was so commonplace that in her job interview with Stahl, Stahl asked Poolos if she would use her body to secure stories.  Poolos has never heard a Correspondent suggest that a man use his body to get a story.

205.    Poolos worked for <u>60 Minutes</u> Producer Bar-On from 2011 to 2017.

206.    Bar-On repeatedly subjected Poolos to emotional abuse and sexual harassment over the course of several years as documented in her contemporaneous notes.

207.    Bar-On regularly demeaned and insulted Poolos.  For example, Bar-On frequently yelled and, sometimes, screamed at Poolos and threatened to fire her.

35

208.     Poolos tried repeatedly to stop the mistreatment, but Bar-On was sometimes hostile toward her and, on other occasions, he was dismissive.  For example:

a.     In September 2016, Bar-On told Poolos to get over it when she asked him to stop yelling at her;

b.     In September 2016, Bar-On blamed Poolos for his abusive conduct, claiming that he was trying to yell less frequently, but that Poolos kept causing problems;

c.     On or about September 6, 2016, Bar-On accused Poolos of complaining constantly and said that she overreacted;

d.     On or about September 28, 2016, after Bar-On yelled at Poolos, she began crying; he told her to stop "overreacting"; and

e.     When Poolos asked Bar-On to be more respectful in October 2016, he called her "snide."

209.     Bar-On acknowledged his abusive conduct towards Poolos.  For example, on or about February 28, 2013, Bar-On wrote in an email to Poolos that he was apologizing for his "outburst" because it "was uncalled for" and he promised to "work on it."

210.     Far from improving his treatment of Poolos, he continued to sexual harass and verbally abuse her.

211.     Bar-On tried to sabotage Poolos's work, regularly cutting her out of important communications and excluding her from meetings.

212.     He also blocked Poolos from advancing at 60 Minutes, including by failing to properly give her co-producer credit for segments where she made substantial contributions.

213.     Bar-On also pressured Poolos to accept blame for his errors even though she was not at fault for the problems. Bar-On once told Poolos that he had blamed Poolos for issues with the delivery of a story to protect a male editor who was actually responsible.

214.   Bar-On made sexist comments to Poolos.  For example, he told her on several occasions that he would never hire a man as an Associate Producer because men were less likely to tolerate not getting credit for their work and women were more likely to be subordinate as compared to men.

215.   Bar-On sexually harassed Poolos.  For example, during a work trip to Italy, Bar-On, who was intoxicated, hit on Poolos, and pressured her to come to his hotel room.

216.   Bar-On regularly commented about Poolos's body and weight, encouraging her to "stay" at certain weights and telling her which clothes accentuated her body.  For example, on or about September 22, 2016, at the Emmy Awards ceremony, Bar-On commented on Poolos's dress and its fit and told Poolos that her shoes made her legs look good.

217.   Bar-On also made derogatory comments about the physical appearance of other women.  For example, he regularly mocked Stahl's face and body and referred to her as "disgusting" and a "see you next Tuesday" (which was a euphemism for "cunt").

218.   Bar-On told Poolos on two occasions, including once in front of another employee, that he watched pornography on his work computer.

219.   Bar-On also told Poolos that he bought pornography off the street during a work trip to Washington, D.C. with Stahl.  Bar-On said to Poolos that he had been watching pornography on his work computer one night and was extremely anxious the next morning because Stahl asked to use his laptop at the airport, and he was unsure if he had closed the window with the pornography.

220.   In March 2016, Poolos informed Bar-On that she was pregnant. He responded that Poolos needed to make a major change if she had the baby, including quitting her job at 60 Minutes. Bar-On explained that it would be "impossible" for Poolos to keep working at 60 Minutes as a

single mother and that she should move home with her parents in Cleveland or live with her brother in Seattle.  Bar-On also said that at her age, Poolos should quit because she would probably never have another chance to be a mother.

221.    Bar-On made inappropriate and vulgar sexual comments about women in front of Poolos.  For example, on or about August 5, 2016, in response to a male employee's request to borrow his copy of a Vanity Fair featuring Margot Robbie on the cover, Bar-On made a joke about masturbation.  Bar-On told the other employee that "yes," he could borrow the magazine, but not to return it with "sticky" pages.  The magazine was still in plastic and Bar-On also kept joking about how it was time to "take the wrapper off," meaning not wear a condom. Poolos asked repeatedly for him to stop, but Bar-On refused.

222.    On the same day that Bar-On made a joke about masturbation, August 5, 2016, Poolos told Bar-On that she wanted to have a more professional relationship and asked him to stop yelling at her, threatening to fire her, and making inappropriate comments. Bar-On responded that Poolos sounded "bitter."

223.    Also, on or about August 29, 2016, Bar-On and Producer Keith Sharman ("Sharman") joked in front of Poolos in Bar-On's office about actress Natalie Portman and her "little" body parts, plainly referencing her breasts.   Bar-On and Sharman also talked about a story Sharman was working on about actor Nate Parker ("Parker") and covering up rape. Bar-On repeatedly laughed about the story. Poolos, who was uncomfortable, tried to change the topic, but Bar-On would not let her.  At one point, Sharman said, "It's like we are in one of those bad CBS videos," meaning they were a textbook example of harassment and how not to behave.

224.    In or around October 2016, Bar-On made a joke about rape.  In Poolos's office, Bar-On and she discussed multiple topics including Pussy Riot, a Russian feminist protest rock

band, and Parker, the actor accused of raping a female student. Bar-On joked about Parker saying, "talk about a Pussy Riot."

225.     On or about March 7, 2017, Bar-On described to Poolos an interaction he had with Stahl when Stahl knocked on his office door, which was closed. When Bar-On met Stahl, Stahl asked him what he was doing with the door closed, and Bar-On joked to Poolos that he wanted to tell Stahl that he was in the office masturbating. Poolos told Bar-On that his comment made her uncomfortable.

### Defendants Ignored Poolos's Complaints

226.     On or about January 13, 2017, Poolos complained about Bar-On's abusive behavior to Senior Producer Alison Pepper ("Pepper").

227.     Poolos expressed that she was worried about speaking out against Bar-On because she was concerned that it would harm her career.

228.     Poolos also told Pepper that Bar-On's abuse was causing her to experience "extreme health issues." For example, at the time, she had discovered several bald spots on her scalp and was experiencing serious gastrointestinal problems.

229.     Pepper made excuses for Bar-On's misconduct and said that individuals become more casual in the workplace after working together for many years.

230.     When Poolos responded that screaming at your subordinates was not casual behavior, Pepper threatened her and stated that Poolos could ask to transfer off the team.

231.     Poolos did not want to stop working with Stahl, who was at the time one of the most senior and well-respected Correspondents on the show, because she was worried that doing so would negatively affect her career, including by derailing her opportunity for a promotion.

232.    Pepper shared Poolos's complaint with then-Executive Editor Owens, who later met with Poolos.

233.    During the meeting between Owens and Poolos, they discussed comments Bar-On had made in front of Owens, including that Bar-On did not care if Poolos "got [herself] killed" on assignment in Iran.

234.    Owens told Poolos that he was not surprised by her complaints about Bar-On's behavior, since he had had his own experiences with Bar-On's "temper" and believed that Bar-On had a mood disorder.

235.    Owens said that Poolos could transfer to another team, but that she would be unable to continue working with Stahl as an Associate Producer.

236.    Owens also said that Poolos needed to tell Stahl directly that she wanted to transfer due to Bar-On's behavior.

237.    Thus, Owens placed the burden on Poolos to give up her role or have a difficult conversation with Stahl, either of which could have hurt her career.

238.    Owens did not offer any other options such as Owens's reporting Bar-On to HR or Owens's speaking to Bar-On or Stahl.

239.    Neither Owens nor anyone else at defendants ever investigated Poolos's complaint against Bar-On.

240.    As set forth above, Stahl complimented Poolos for not formally raising her complaints about Bar-On.

241.    Bar-On's mistreatment of Poolos was widely known at 60 Minutes.  For example, after Poolos screened her first solo-produced story in 2013, Fager commented that she must feel good to be "unhooked" from Bar-On, alluding to his abusive behavior.

40

CBS Retaliated Against Poolos

242.    Defendants' adverse treatment of Poolos continued even after her firing.

243.    During their purported investigation of Poolos's allegations after receiving notice of her intent to pursue legal claims against the company, defendants intentionally sought to malign Poolos personally and professionally.

244.    On information and belief, defendants solicited negative information about Poolos from colleagues both within and outside of the company in an attempt to undermine her well-documented success and good reputation within her industry.

245.    On information and belief, CBS also attempted to dismiss Poolos's legitimate allegations of sexual harassment against her former supervisor Bar-On by soliciting positive statements about him and bolstering his own unfounded criticisms of Poolos.

246.    CBS also withdrew stories produced by Poolos from consideration for industry awards after she complained about her firing.

FIRST CAUSE OF ACTION

Discrimination Under Title VII

247.    Plaintiff repeats and realleges paragraphs 1 through 246 of this Complaint as if fully set forth herein.

248.    By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of her employment on the basis of her gender in violation of Title VII.

249.    Defendants acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

250.    As a result of defendants' discriminatory acts, plaintiff has suffered and will

41

continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## SECOND CAUSE OF ACTION

## Retaliation Under Title VII

251.    Plaintiff repeats and realleges paragraphs 1 to 250 of this Complaint as if fully set forth herein.

252.    By the acts and practices described above, defendants have retaliated against plaintiff in the terms, conditions, and privileges of her employment for her protected activity in violation of Title VII.

253.    Defendants have acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

254.    As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer economic damage, irreparable injury, emotional distress, reputational injury, and other compensable damages.

## THIRD CAUSE OF ACTION

## Discrimination Under the NYSHRL

255.    Plaintiff repeats and realleges paragraphs 1 through 254 of this Complaint as if fully set forth herein.

256.    By the acts and practices described above, defendants have discriminated against plaintiff in the terms, conditions, and privileges of her employment on the basis of her gender.

257.    Defendants acted with malice and reckless indifference to plaintiff's rights under the Executive Law.

258.    As a result of defendants' discriminatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

## FOURTH CAUSE OF ACTION

### Retaliation under the NYSHRL

259.    Plaintiff repeats and realleges paragraphs 1 through 258 of this Complaint as if fully set forth herein.

260.    By the acts and practices described above, defendants have retaliated against plaintiff for her protected activity in violation of NYSHRL.

261.    Defendants have acted with malice and/or reckless indifference to plaintiff's rights protected under state law.

262.    As a result of defendants' retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury and other compensable damages.

## FIFTH CAUSE OF ACTION

### Discrimination Under the NYCHRL

263.    Plaintiff repeats and realleges paragraphs 1 through 262 of this Complaint as if fully set forth here.

264.    By the acts and practices described above, defendants have discriminated against plaintiff in the terms, conditions, and privileges of her employment on the basis of her gender.

265.    As a result of defendants' discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation, and other compensable damage unless and until this Court grants relief.

43

266. In addition, plaintiff is entitled to punitive damages and other remedies as may be appropriate under the NYCHRL.

## SIXTH CAUSE OF ACTION

### Retaliation Under the NYCHRL

267. Plaintiff repeats and realleges paragraphs 1 through 266 of this Complaint as if fully set forth herein.

268. By the acts and practices described above, defendants have discriminated against plaintiff due to her protected activity in violation of NYCHRL.

269. Defendants retaliated against plaintiff with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

270. As a result of defendants' retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury and other compensable damages.

## SEVENTH CAUSE OF ACTION

### Breach of Contract

271. Plaintiff repeats and realleges paragraphs 1 to 270 of the Complaint as if fully set forth herein.

272. The employment contract between defendants and plaintiff obligates CBS to pay her specified severance if CBS terminates her employment without cause.

273. Defendants did not have cause to terminate plaintiff's employment.

274. Defendants have not paid plaintiff the severance that they owed to her under the employment contract.

44

275.    By the acts and practices described above, CBS breached the employment agreement with Poolos by failing to pay her severance.

276.    CBS has breached their obligations under the employment agreement, whereby plaintiff has suffered and will continue to suffer damages unless and until this Court grants relief.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiff respectfully requests that this Court enter a Judgment:

(a)    Declaring that the acts and practices complained of herein violate the Title VII, the NYSHRL, and the NYCHRL;

(b)    Enjoining permanently restraining defendant from violating Title VII, the NYSHRL, and the NYCHRL;

(c)    Directing defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d)    Awarding plaintiff damages to make her whole for all earnings she would have received but for defendants' discriminatory treatment, including, but not limited to, wages, commissions, bonuses, pension and retirement, health care coverage and other lost benefits, including future lost wages and benefits;

(e)    Awarding plaintiff all amounts owed as severance under the employment agreement;

(f)    Awarding plaintiff compensatory damages for mental anguish, emotional distress, humiliation, and damage to reputation;

(g)    Directing defendants to pay an additional amount as punitive damages for their willful and/or reckless disregard of plaintiff's statutory rights;

(h)     Awarding plaintiff damages to compensate for any adverse tax consequences;

(i)     Awarding pre-judgment interest;

(j)     Awarding plaintiff attorneys' fees, costs, and disbursements; and

(k)     Awarding plaintiff such additional relief as the Court may deem just and proper.

<u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.


Dated: October 10, 2023
       New York, New York


                              VLADECK, RASKIN & CLARK, P.C.


                         By: _____
                              Jeremiah Iadevaia
                              111 Broadway, Suite 1505
                              New York, New York 10006
                              (212) 403-7300