```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


ALEXANDRA POOLOS, et al.,        : Docket #23-cv-08896

                    Plaintiffs,  :

      -against-                  :

PARAMOUNT GLOBAL, et al.,        : New York, New York
                                   March 7, 2025
                    Defendants.

---------------------------------:

                    PROCEEDINGS BEFORE
                THE HONORABLE HENRY J. RICARDO
                UNITED STATES MAGISTRATE JUDGE



APPEARANCES:

For Plaintiff:       VLADECK, RASKIN & CLARK, P.C.
                     BY:  JEREMIAH J. IADEVAIA, ESQ.
                          JAMES BAGLEY, ESQ.
                     111 Broadway, Suite 1505
                     New York, New York 10006




For Defendant:       DAVIS WRIGHT TREMAINE, LLP
                     BY:  LYLE S. ZUCKERMAN, ESQ.
                          MICHAEL LYNCH, ESQ.
                     1251 Avenue of the Americas
                     New York, New York 10020




Transcription Service: Marissa Lewandowski
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com




Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

INDEX

E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None | | | | |

THE COURT: Okay. Please be seated.

Welcome back, everybody. We're here for a premotion conference in Poolos v. Paramount Global, Number 23-cv-8896.

I think we're here on the motion that's at Docket Number 107, and we're going to deal with the other motions in another Friday afternoon argument, which I'm sure everyone is looking forward to.

Why don't we start with appearances by counsel.

MR. IADEVAIA: Good afternoon, Your Honor. Jeremiah Iadevaia, James Bagley of the firm Vladeck, Raskin & Clark on behalf of the plaintiff.

MR. ZUCKERMAN: Good afternoon, Your Honor. Lyle Zuckerman from Davis Wright Tremaine on behalf of defendants. I'm here with my colleague, Michael Lynch.

THE COURT: Great. I put you in the wrong place. Sorry. I have -- I put the defendants on the left and the plaintiffs on the right, but I'm going to redo this so I --

MR. ZUCKERMAN: This was the subject of some colloquy before you took the picture.

THE COURT: Oh, it doesn't matter to me. I just want to make sure I know who everyone is.

Okay.  So we're here again to talk about comparators.  I sense that the parties have different perceptions of what constitutes a complaint for purposes of these proceedings, so maybe we ought to talk about that.

I know we didn't try to define that formally when we discussed it previously, but I think, to my way of thinking, while a complaint in this context doesn't have to take any particular form, it doesn't need to have the word complaint in it, it's more than just watercooler talk about problems in the office.  It seems to me there has to be some type of formal request for an investigation or disciplinary action before it constitutes a complaint.  But I did want to hear from the parties about that as kind of a threshold issue.

So maybe I should hear first from the plaintiff, what you think about that.

MR. IADEVAIA:  Your Honor, our position is that complaint should be defined more broadly than that.  Fundamentally, if we look at the concerns that were raised about a plaintiff in this case, in which we're comparing the situations, the concerns were, in essence, that, by being mean to her AP, she breached CBS policy.

And so other examples of concerns that were raised about male employees, including those in which they were accused of being abusive toward subordinates, should constitute complaints for purposes of comparators in this matter.

THE COURT:  Was your client subject to the more formal type of complaint?  I believe there was a Ms. Richards who lodged a complaint of some type. What level of formality was that complaint?

MR. IADEVAIA:  Ms. Richards did put her -- initially complained orally and then put her complaint into writing, Your Honor.  But the defendants here say that the decision-makers were Mr. Owens and Ms. Simon.

And so to the extent that they are aware of concerns about employees who report to them, whether it's presented to them orally or in writing, should constitute a complaint for which a comparator discovery should apply.

THE COURT:  Is there any threshold that you have to pass to trigger action by these persons in senior management?  I mean, if they're walking by the proverbial watercooler and they hear someone say, "Oh, Mr. X, what a pain," does that trigger an obligation for them to take action?

MR. IADEVAIA:  I'm not sure what triggers an obligation on behalf of CBS's managers to take action, and I'm not sure the managers themselves could define that.

But we're talking about seven individuals. We're not talking about anything that is said about anybody who works at CBS.  And for each of those individuals, there were concerns raised about them that either Mr. Owens or Ms. Simon or both were aware of.

THE COURT:  And are you suggesting that the defendant should have to review all communications that anyone had with Mr. Owens or Ms. Simon about the seven named comparators and screen them to see if they could possibly be considered complaints?

MR. IADEVAIA:  No, Your Honor.  There's ways to do very focused searches here.  Again, we've identified the individuals who were complained about, and we've identified the folks who made the complaints about them.  So we think there are very narrow searches that can be done in order to locate the information that's been requested.

THE COURT:  And I take it that wouldn't -- you're not suggesting that Defendants look at every single communication directed to Mr. Owens or

Ms. Simon that mention those individuals' names?

MR. IADEVAIA:  No, Your Honor.  I mean, when we had previously proposed search terms, that was not what we had suggested.  It's not what we're suggesting at this point.

THE COURT:  Okay.  Let me ask you here, the defendants take on this issue of what constitutes a complaint, and how do we decide whether you've made a sufficient production relating to those complaints?

MR. ZUCKERMAN:  Absolutely, Your Honor. There's a few points that you've addressed from the bench that I'd certainly like to address, including that one, of course, since you directed it to me.

First of all, we have produced every complaint that was reduced to writing about the named comparators.  We've done it.

As for what constitutes a complaint, putting aside the form of the complaint, I want to be clear what this case is about.  The plaintiff was not fired.  Indeed, she was not even disciplined for bullying or using inartful language.  She was fired for retaliation.  We've had this discussion, I think, in this courtroom before, Your Honor, in which you made a ruling in which you've said that

that ultimate decision may be for summary judgment. For purposes of discovery, you get an ability to search for sort of a broader definition of comparator.

And on that basis, you limited it to the -- to the folks that are contained in your December 12th order. We've already expanded the definition of comparative when it really is for summary judgment. That was on December 12th.

On December 13th, after they get a ruling that does not go their way, they send us a letter that says, oh, by the way, will you include these search terms now? This wasn't anything new. That wasn't on December 12th when you made your ruling. This is the third or fourth time they're back at this Court --

THE COURT: I understand that, but I'm construing their request -- I know you're saying they're asking to revise. I'm construing the request, perhaps generously, as making sure you comply with that ruling. That's how I'm construing their request.

MR. ZUCKERMAN: I assure this Court and the fact that there is a document on the docket that is calling into question me, my associate, my law

firm's integrity with respect to the production of documents, I object.  And my client --

THE COURT:  Well, I don't know whether they're questioning your integrity.  I think they're just trying to make sure the efforts was thorough.  Without questioning anyone's integrity, sometimes the search doesn't pick up everything it's supposed to, and that's the spirit in which I'm construing their --

MR. ZUCKERMAN:  I will generously accord that spirit.  At the last hearing, Your Honor, you gave us the benefit of the doubt that Counsel would do what is necessary to conduct searches, and you weren't going to dictate that.  And we've done exactly what it is that we were required to do under case law, under ethics rulings.  We've done it, and we've produced documents about all of these folks precisely in compliance with your order.

The sorts of complaints that are cited in this letter really are absurd, and I don't use that lightly, that phrase.  In addition to just being water talk -- watercooler talk, these are complaints in which the folks -- quote/unquote complaints -- in which the folks who testified about them, they said they weren't reduced to writing.  One of the

witnesses said --

THE COURT:  I read the exhibits.  I read the 140-some pages of deposition testimony.  And I do -- I plan to go through these individuals one by one today, so we're here for a long time.  So you'll get to address each of them individually.

I just wanted to hear -- I just wanted to get your general take on what constitutes a complaint.

MR. ZUCKERMAN:  Right.  So the purposes -- for purposes of this case, even if we're going to go outside the definition of what ultimately will be a comparative, which is someone who retaliated against someone else, it certainly is not every gripe against, for example, the video coordinator who doesn't give the videographer their choice of cameramen.  That is an ordinary, everyday workplace complaint.

That is not the kind of complaint that rises to the level of a human resources matter, of an employee relations matter, one that could ultimately result in discipline against somebody else.  None of these things do.  These are just the ordinary workplace gripes of employees who are frustrated in their daily activities.

That is not discoverable.  We would produce a gazillion documents if that was the case.  It makes no sense.  So it would have to be something --

THE COURT:  Well, how would you define -- so how do you define a complaint?  How do we know whether something that somebody says to a superior or to someone in management or someone in HR constitutes a complaint or does not constitute a complaint?

MR. ZUCKERMAN:  Well, I don't think that's the question, Your Honor, respectfully.  I think the question is whether it's a complaint that goes to the issue of making someone a comparator, right.

So if somebody is complaining formally that the content of the story that they're putting on air, it somehow violates a journalistic ethic, we can all agree that's a complaint.  It's a formal complaint that may be even be lodged against a producer who didn't do their job.  That has nothing to do with this case.

THE COURT:  Understood.  I'm trying to define how do we know which are the types of complaints that do have something to do with this case.

MR. ZUCKERMAN:  Well, from our perspective,

they should be complaints that allege retaliatory conduct under any policy.  I'm happy to extend that to complaints of gender discrimination.  But I think that's as far as we go, honestly.

THE COURT:  Okay.  I think I understand your position.

MR. ZUCKERMAN:  Thank you.  Sorry for being a bit emotional, but, you know, my client's been dragged down to this court, now the third time, over the same issue after we give and give and give. It's getting a bit tiresome.

THE COURT:  I understand.  You're all zealous advocates.  That's fine.  But we'll try and get through this and come to some resolution.

As I said, I'm going to go through each of the individuals because I've been given testimony and information about them, and we'll do it one by one.

I did want to start, though, with this Exhibit H, which I actually found quite interesting and thought that this actually might be helpful in defining the universe of complaints.  The plaintiff submitted this.

So why don't I ask counsel for Ms. Poolos, what can you tell me about this Exhibit H, how you

obtained it, was it produced in litigation, et cetera?

MR. IADEVAIA: Yes, Your Honor. This was -- Exhibit H was produced pursuant to a FOIL request that Plaintiff made to the New York State's Attorney General's Office. There's a publicly known investigation that the New York Attorney General's Office did in connection -- or about CBS, that, as far as we can tell, that investigation covered a period from 2020 through 2022 or 2023. It resulted in, I think, a $30 million settlement that CBS paid.

And so this was the first document that we -- or part of the first production that we received from the AG's office. Copies of the document were provided to Defendants, and we have subsequently received other materials that we think are relevant to this particular issue.

THE COURT: Did Defendants produce this document to you?

MR. IADEVAIA: They did not, Your Honor.

THE COURT: Okay.

MR. IADEVAIA: And this is part of our concern is this is a document which, unlike most cases, Defendants do not have a centralized location of materials. They have to go and look for stuff.

They obviously had spent a lot of time in responding to the AG's office inquiries and document demands and putting materials together. We had no idea that it existed, and that goes for other materials that we've received from the AG's office.

THE COURT: Okay. Now -- so let me ask Defendants some questions about this Exhibit H.

This, candidly, seems like the sort of document you should have produced a long time ago. What can you tell me about this Exhibit H, who prepared it, if there's a custodian for this document, how it was prepared?

MR. ZUCKERMAN: Sure. First of all, let me respond to Your Honor's first comment. All of the information contained in this document that relates to 60 Minutes' employees has been produced.

THE COURT: And that may be, and we'll get to that. And just so there's no surprise, I'm going to order you to produce an unredacted version of this, at least as to the CBS News division arose.

But we probably could have saved a lot of time and effort over identifying the complaints and what was the universe of complaints if you had produced these documents to the plaintiff and said, we undertook an effort to identify all the

complaints, and here they are.

MR. ZUCKERMAN:  Yeah.  First of all, Your Honor, Your Honor has already ruled that the scope of discovery for purposes of comparators is 60 Minutes.

THE COURT:  I understand that, and I'm not going back on that.  But I do think that because this list doesn't break out 60 Minutes as a division, it only breaks out CBS News, and my understanding is that 60 Minutes is part of CBS News, that by giving Plaintiff the information about all the CBS News complaints, you want to pick up all the 60 Minutes complaints.

MR. ZUCKERMAN:  We know which ones are 60 Minutes.  And if Your Honor is going to order that we produce the document unredacted, it should be consistent with the Court's prior order that we produce documents related to 60 Minutes' folks. And, again, once the redactions are removed, Plaintiff's counsel will see they already have all of those documents.

Now, as for --

THE COURT:  Which, hopefully, ought to alleviate their concern.  That's my point.  It seems to me if there's a -- if there's a suggestion that

you haven't produced all the complaints you should have produced, one good way to try to address that might be to share with the plaintiff a list of complaints you prepared for another purpose, for the AG.

MR. ZUCKERMAN:  Well, this was filed in a confidential way, Your Honor.  We didn't expect the Attorney General to produce it.  And, in fact, the Attorney General is supposed to be getting back to us soon in our inquiry as to why this was produced pursuant to a FOIL request.  And my firm wasn't the firm that prepared this or submitted this or worked on this matter, so I don't -- I don't have the information to give you as to kind of the genesis of the document.

But what I can tell you is, again, there is no information in this document that Ms. Poolos' counsel doesn't already have.  So to the extent you're going to order -- Your Honor is going to order we produce the unredacted, we request that it be limited to 60 Minutes' complainants or complainers, either way, consistent with Your Honor's prior order and, perhaps, that will give them the confidence that the representations that we've been making are accurate.

THE COURT:  Okay.  I think I've heard your position.

MR. ZUCKERMAN:  I'm sorry.  I forgot one thing.

THE COURT:  I'm sorry.  Go ahead.

MR. ZUCKERMAN:  Is there a way to make this attorneys' eyes only, given the confidential nature of it?  I mean, even the Attorney General blacked it out.

THE COURT:  No, I don't think that's appropriate.  I entered attorneys' eyes only for information that was subject to the European data privacy laws.  Although, as I see it, it now seems that same information seems to be in a publicly filed New York State Court complaint.

I think that -- first of all, from my reading of Ms. Poolos' transcript, she seems to know a lot about what went on at CBS anyway.  I'm not sure you're hiding anything from her.  And I think she needs to be able to evaluate the completeness of your production because there's a major issue here.  So I'm not going to restrict this to attorneys' eyes only.

I'm going to direct you to produce this Exhibit H with unredacted entries for every

complaint that arose in the CBS News division.

Now, let me make it clear, that does not mean I'm going back on my prior ruling.  I'm not saying you have to produce the underlying documents for the complaints that took place in CBS news outside of 60 Minutes.  But I do think the plaintiff needs some assurance that someone at CBS has undertaken to identify all the complaints of sexual harassment and gender-based discrimination or retaliation, as I understand from this heading, so they can be confident that what you're saying is accurate, that, in fact, they have all the complaints from 60 Minutes.

And I'd like you to provide to the plaintiff some additional information about this chart, including who prepared it, a general description of how it was prepared, and whether there's some central repository of complaints involving 60 Minutes that are maintained either at 60 Minutes, at CBS News, at CBS more broadly, or Paramount.  We could have avoided a lot of this by providing that information to the plaintiff.

Okay.  Why don't we go on to the particular comparators, and we'll go through it.  I think -- just to give a preview, I think the way I'll end up

coming out, but obviously, I'll hear from Counsel, is there might be some cleanup production and searches that have to be made. But, by and large, from reading the deposition excerpts myself, I did not see indications that there are a lot of additional documents that need to be produced. There may need to be some, but I was not convinced there are a lot.

So why don't we go through it one by one, and we'll start with Michael Gavshon. So the -- turning to counsel for the plaintiffs, I understand a complaint has been produced by a Ms. Vinograd, and there were two letters about the closure of the investigation. I looked at the lawsuit document that you submitted. You cited particular paragraphs that you said referred to additional complaints. Those paragraphs seem to be -- seem to me to be additional communications about the same complaint.

So help me understand how you're using separate complaints in this context.

MR. IADEVAIA: Yes, Your Honor. So the only complaint the Plaintiff has is the initial complaint that was submitted by email. That complaint doesn't refer to any person by name. It doesn't specify who it's against. It doesn't

specify any of the details of what that complaint is about.

The other significant concern on Plaintiff's side is that the lawsuit makes very clear that there were internal complaints about retaliation.  There is no reference in any of the materials that Defendants have produced about retaliation.  There is no reference in the materials that Defendants have produced about an investigation related to retaliation.

Ms. Vinograd specifically alleges in her complaint that, after she received notification that the investigation was closed, she made additional complaints, including about retaliation.

As defense counsel has just stressed to Your Honor, the defendant's position is that no one is a comparator unless there are retaliation complaints.  And while Plaintiff very much disputes that argument, Mr. Gavshon becomes particularly significant because he was accused of engaging in gender-based discrimination and harassment and then accused of engaging in retaliation in response to those complaints.

And to be more specific, Your honor, in paragraph 35 of the lawsuit, Ms. Vinograd

specifically raised concerns -- I mean specifically references that she speaks to employee relations in more detail about her underlying complaint.

In paragraph 39, there is a written email that she quotes in block form in which she's writing to employee relations about concerns that she has.

And, I mean, it goes on.  In paragraph 50, there's a complaint in writing by her -- or reference to a complaint in writing by Ms. Vinograd after the internal investigation is purportedly concluded about retaliation and we don't have any of those materials.

Your Honor, with Mr. Gavshon in particular, there cannot be a dispute under any definition that there were complaints made against him.  There was not only internal complaints and an internal -- or multiple internal investigations, there was also a lawsuit.  To have three documents that relate to that issue in a case where Defendants are saying no one is comparable except those accused of retaliation, to me, shows a huge gap in the production.

We've noticed the deposition of the employee relations person who conducted the investigation.  We've been told by defense counsel,

and while we're still meeting in conferring, that defense counsel is going to assert privilege over the vast majority of that investigation. There's not one privilege log, you know, where there's a document listed related to the Gavshon -- Mr. Gavshon investigation.

Given the significance of this particular comparator and given the relation or the similarities with what's at issue in Ms. -- in plaintiff's case, we believe additional material needs to be produced.

THE COURT: All right. I'll ask Defendant about the retaliation piece of it. My sense is that, to the extent you need information about what I'll call the initial complaint, the sending of the photo, it seems to me you have what you need for that. You have Mr. Owens' testimony that the determination was made that Gavshon sent the picture by mistake. Certainly, the complaint itself shows the basis upon which that decision was probably made. But I take your point about the retaliation complaint, so let me ask the defendants about that.

Even if you've produced enough about -- to identify what happened with the initial Gavshon complaint, it doesn't seem like you've produced

anything about her subsequent retaliation claim. And maybe you could tell me more about what you've done to try to find that.

MR. LYNCH: So let me address your question first by going back to your previous question that you posed to Plaintiff's counsel.

I believe the way you framed your question to Plaintiff's counsel was accurate and gets to the heart of the parties' dispute when it comes to the Gavshon documents. And that is whether the complaint and your December 12th ruling that we were ordered -- you know, that Defendants were ordered to produce documents sufficient to show complaints made, responses thereto, and the reasons therefore, we produced the initial complaint. So they have all the information about the initial complaint in the documents that we've produced.

In order to obtain that document, we had to run our own ESI searches, targeted searches to find that document. After we found it, we produced it. We also produced the closure letters that the company sent to both Mr. Gavshon and Ms. Vinograd --

THE COURT: Do you know if those closure letters were after the additional retaliation claim, as asserted by the plaintiff?

MR. LYNCH:  I am not aware of any retaliation claim by Ms. Vinograd.  She makes that allegation in a complaint filed in New York State Court that was subsequent to all of these events.  But she --

THE COURT:  Well, it quoted emails that she sent to people internal.  Unfortunately, I don't have it in front of me, but I did read it.  There were emails quoted to specific -- you know, from Ms. Vinograd to specific recipients saying things along the lines of, you know, "I don't want to be in the same office as this guy.  I answered the phone."  You know, they're quoted in the complaint.

So I'm just trying to see, was there follow up done as to those emails and with the recipient of those emails.

MR. LYNCH:  So Defendants do not interpret those emails as asserting any type of retaliation claim.  We see those as communications regarding the original complaint, and they were, you know, communications with an investigator and with HR about following up on her initial complaint.  So I don't view those emails as asserting some new claim of, you know, retaliation.

THE COURT:  All right.  I think on this

one, I've been persuaded that there are, arguably, two different complaints.

As to the initial complaint, which concerns the transmission of an inappropriate photo by text, I'm satisfied that the defendants have produced what they need to.  I'm not entirely satisfied that the defendants have produced what they need to in response to the email inquiries that Ms. Vinograd made about her assertions of retaliation.

Now, I don't know what there is to produce. You may come back and you may say you searched and you didn't find anything, and I'm not prejudging that.  But -- but I am directing you to make some follow-up inquiries.  And, again, I don't want to micromanage exactly how you do it, but it seems to me, elements of that follow-up would include checking the email files, assuming you still have them, of the recipients of Ms. Vinograd's emails that the plaintiffs cite in their letter, as cited in the complaint.  Following up with whoever was in charge of the investigation at the time to see if there was follow-up from that.

You may come back and you may say there was nothing, but it seems to me you should at least make that effort to search for them.  So I think that

takes care Gavshon.

Why don't we move on to Matthew Richman. So, turning to the plaintiff, I understand you're saying there was -- there was nothing produced relating to complaints for Matthew Richman. But when I read the testimony excerpts that you attached with your motion, it didn't seem to me like there were any written documents, at least based on the testimony that you filed.

What I saw -- and, obviously, I want to give you a chance to tell me if I've misunderstood it. But what I saw was Ms. Simon testified there were no formal complaints against Mr. Richman. She said the controversy dealt -- there were conversations about the way he assigned editors to producers. But she certainly seemed to suggest at page 82 of her deposition, that there weren't written communications about this. She said she spoke about this and heard that Mr. Richman was snippy, but that that was sort of the extent of it in her mind.

And, again, Mr. Owens also testified, at page 163, that he was not aware of any complaints against Richman, complaints per se, as he understood that in his deposition. As far as he was concerned,

the things he heard about Mr. Richman was that people griped about which editors were assigned to them, but they never discussed this with HR.

And then Balducci, of course, said she was not aware of complaints against Richman.

So I just wasn't seeing in your showing any reason to conclude there are additional documents, but I wanted to give you a chance to address that.

MR. IADEVAIA:  Yes, Your Honor.  I mean, part of the challenge on our side is that, without documents, we have no way to challenge Defendant's witnesses' testimony.  So that's important on multiple levels.

Secondly, Ms. Simon testified to up to 20 different producers complaining about Mr. Richman. Plaintiff was part of a Zoom call that took place where a dozen producers registered complaints.  And our client -- the plaintiff testified about that interaction and saying that the concerns were not limited to him being snippy, but being abusive and inappropriate.

There's a pattern that Ms. Simon testified to of women making complaints about how Mr. Richman behaved and conducted himself, not just in connection with assigning editors, but also in how

he was communicating with female producers, including instructing producers that they didn't have to -- instructing editors that they didn't have to work with a female producer.

I understand, Your Honor, that Ms. -- my memory of Ms. Simon's testimony is that she told Bill Owens about some of the complaints, and that she told HR and Mr. Owens.  I don't have the specific page, but it is located in Plaintiff's Exhibit C between pages 80 to 99.

Your Honor, I understand the -- yeah, on page 94 of line 12 --

THE COURT:  Whose deposition are you talking about?

MR. IADEVAIA:  Ms. Simon, Exhibit C.

THE COURT:  94, you said?

MR. IADEVAIA:  Yes, Your Honor.

THE COURT:  Okay.  I got it.

MR. IADEVAIA:  Line 12, "Did you ever talk to HR about this Zoom call concerning Mr. Richman?

"Answer:  I believe so."

THE COURT:  Okay.

MR. IADEVAIA:  Your Honor, I also will say that, in the materials that have been produced by the AG's office, they summarize the problem that

goes to the heart of Plaintiff's claims.  What the AG's office says is that their investigation revealed systematic problems with CBS's then existing HR structure and its responses to allegations of sexual harassment.  On several occasions, supervisors and managers failed to immediately report or act on sexual harassment complaints.  Further, in several cases, CBS relied on mere warnings or executive coaching for those accused of sexual harassment, even when the accusations were found by CBS to be credible.

Your Honor, part of what we're saying here is that when a complaint was made about a woman, it was treated differently than when complaints were made about men.  I understand there needs to be lines drawn in distinguishing between rumor and gossip and when employees actually go to their managers and say, "Hey, I got a problem here."  But with Mr. Richman, we have that in spades.

I've --

THE COURT:  Well, not even going to your manager and saying, "I have a problem here," it seems to me, rises in the level of a complaint.  And that managers are there to solve the day-to-day problems of the workplace.  And it can't be that

every time someone comes to a manager with a problem about a colleague or a coworker or someone in a different department, that that rises to the level of something that HR needs to keep track of or that needs to get produced in litigation as a complaint. That's -- that's what I'm struggling with.

MR. IADEVAIA:  I understand, Your Honor. And in this case with Mr. Richman, we're -- we're talking about potentially in excess of 20 different producers, so much so that they organized a Zoom call to have with Ms. Simon, and Ms. Simon brought those concerns to HR.

And she talks about two other instances where women producers go to her and say, "We don't like how he's talking to us.  It's condescending. It's not professional."

THE COURT:  All right.  Let me hear from the defendants on this, on Mr. Richman.

And I noticed that the transcript sometimes refer to him as Richmond.  I wasn't sure if that was a court reporter error or -- I just want to get his name right.

MR. IADEVAIA:  It's Richman, Your Honor.

THE COURT:  All right.  Thank you.

But let me hear from the defendants on Mr.

Richman.

MR. LYNCH:  So with regard to Mr. Richman, the company does not have any complaints against him.  We -- this is exactly the type of, you know, watercooler talk that was -- has been mentioned before.

You know, Plaintiff's counsel said that, you know, without documents, they can't challenge our witnesses' testimony.  But if documents don't exist, we can't produce them.

THE COURT:  That is the dilemma here, isn't it?  Based on what I've seen, I'm not going to direct any further production or searches with respect to Mr. Richman.

Let's go on to David Levine.  I understand here, according to the plaintiffs, no documents were produced.  I gather the testimony, as -- as I read it, the testimony that the plaintiff submitted was Ms. Poolos said that he had a bad temper.  Ms. Simon said specific complaints were not brought to her, but that she heard in broad terms from Owens that he -- he might have had some anger issues.  There was an issue -- there was an incident in -- with a shoot in Mississippi, but Ms. Simon, again, said no direct complaint was made to her.

Simon testified that she spoke with Levine directly, Levine said it would not happen again. He was, I think, seeking some professional help with that. And, again, Ms. Simon said there were no notes. No notes were taken, and she did not discuss it with HR.

Mr. Owens, again, testified about temper issues. He heard about something from Ms. Simon. And, again, Owen (sic) said he did not discuss it with HR and he never -- he didn't hear of any issue. Again, there was -- there was argument -- there was, in his mind, a question about there -- whether there was a second incident. But he asked, I think it was Ms. Germino who said it was nothing.

So I guess what I'm trying to figure out is, on that record, what makes you think there are additional documents that you're entitled to that you don't have?

MR. IADEVAIA: Because, Your Honor, there was testimony from Defendants about complaints related to Mr. Levine. There was a concern that led Mr. Owens to say to Mr. Levine, I think his testimony is, "This is a one-strike thing. You get a warning." There was a subsequent complaint about Mr. -- Mr. Levine and nothing happened.

Your Honor, again, I think what we're asking for -- and I understand Defendants have said that they did searches, but what we're asking for is the ability to confirm that this information does not exist.  And Plaintiff -- in vast majority of cases, Courts allow Plaintiffs to propose search terms in order to look for relevant information.  We have no understanding of what Defendants did to locate or try to locate the data.  And, again, it goes to the heart of Plaintiff's case.

THE COURT:  Let me hear from Defendants on Mr. Levine.

MR. LYNCH:  Just like with Richman, the company doesn't have any record of a written complaint against Mr. Levine.  The testimony that was elicited from Bill Owens and Tanya Simon relate to managerial concerns, concerns between Tanya Simon addressing -- or Tanya Simon addressing concerns that were brought to her attention orally about her direct report.  There was no complaint that -- there was no testimony about any type of written complaint about Levine.

THE COURT:  Yeah.  That was -- that was my read of the record as well, and I did read this deposition testimony.  So as to Mr. Levine, I'm not

going to order any further production or search.

Let's turn to Ira Rosen.  My understanding of the record here is that Defendants produced certain documents, complaints by a Ms. Nosheen, but that there wasn't any production about a Ms. Schonder, who was also mentioned in the testimony. There was testimony by Mr. Owens about not renewing his contract.

And so let me ask the plaintiff, I think this is one where I might be persuaded that you need a little something more, but can you help me get specific about what you're looking for?

MR. IADEVAIA:  Yes, Your Honor.  We're looking for complaints that were raised by Gabrielle Schonder.  Our understanding is Ms. Schonder was an AP for Mr. Rosen, that she'd raised concerns about gender-based discrimination and sexual harassment, that she raised concerns both while she worked for CBS and after she left CBS that she had made -- made complaints about Mr. Rosen.  We have no documentation of any of those complaints.  So that's one category where we believe we're missing information.

The second category is that Mr. Owens testified that he may have pushed to force out Mr.

Rosen during the time he was number two at the show. We have no documents on that issue.

And we also have testimony from Mr. Owens that he says that he decided to get rid of Mr. Rosen when he took over as head of the show. We have no documents about that, beyond what's in his personnel file. And in his personnel file is a one-page form that says he's going to be moved to pay-or-play status, which, as we understand it, means he would be getting paid under his contract to not do any work. And so we asked for any -- we asked for his con- -- we're asking for his contract. We're asking for any severance that was offered to him.

Mr. Rosen was accused of very serious sexual harassment by Ms. Nosheen, and we understand also by Ms. Schonder, that if he were given this pay-or-play option to work -- for nine or ten months to work -- to not have to work and be at home, we should know that. We should know what his contract says about letting him go and what the -- whether there's a for-cause provision in there. And we should know as to whether or not he received any severance.

Plaintiff in this case, who was not accused of any unlawful conduct, was not offered severance.

Her contract was terminated early.  She was not put on pay-or-play, and so the contrasting treatment is very much relevant to the gender discrimination claim.

THE COURT:  Okay.  I think I understand that.

And for Defendant's benefit, I think I'm inclined to ask you to look a little harder for any complaint by Schonder.  The testimony, at least from Ms. Poolos, was that she went to HR and to CBS News legal.  That's at 369.  Now, I realize just because she says it doesn't make it so, but it's at least worth investigating because she did give that specific -- specific information.

And as for Mr. Rosen, I think I've been persuaded that you should produce at least his contract and any document to show whether he got severance or maybe just tell the plaintiff that he didn't, if that's the answer.  I don't know.

But I want to hear you out, if there's something further you wish to say about Mr. Rosen.

MR. LYNCH:  Well, leading up to this motion, we -- Plaintiff's counsel, in an email, that we would consider looking for documents related to Mr. Rosen's exit in early 2018 and -- as well as Mr.

Radutzky's, who we'll get to, exit before that. Maybe I have those dates swapped, but ...

And Plaintiff's counsel just said, we understand your position. We're going to raise it to the Court, even though we had asked them for clarity on exactly what documents they were looking for related to the exit of those two individuals. And the fact that Bill Owens testified that, once he was promoted to executive producer, one of the very first things he did was push Mr. Rosen out of 60 Minutes.

So we're willing to look for those documents. We just want to have an understanding of exactly what Plaintiff is expecting, so that after we produce it, they don't come back to us again and ask for more, which is --

THE COURT: I understand.

And by the way, discovery ends next week. Everyone knows that, right? Okay.

So fair enough. I guess that's why we have these conferences, so that we hear from each side and try to give you some clarity in terms of what to produce, and I think I've tried to clarify it.

It seems like they're looking for Rosen's contract. They're looking for any documents

revealing, evidencing, showing what, if any, severance he received. Obviously, if there is no severance, it seems to me you can tell them that, and that are -- they may ask you to put that in some evidentiary form. But I hope you can work that out between yourselves.

And I was persuaded that Defendants should -- should take some additional steps to locate any complaint, whatever form it may have taken, that was filed by Ms. Schonder in light of the fact that, certainly, Mr. Owens seemed to be aware of the allegations, and Ms. Poolos testified that, in fact, she went to human resources and CBS News legal. So one of the suggestions I would make for Defendants is look at human resources and look at CBS News legal, ask around, ask the people who were in charge of fielding complaints at that time, if they're still there, or if they aren't still there, the people who succeeded to those responsibilities, and give the plaintiff some idea of what you did to search.

Okay. Why don't we go to Mr. Radutzky, if I'm pronouncing it correctly. Now, I do understand that one of the issues with Mr. Radutzky is that he left in 2018 and that, I think, Ms. Gordon left in

2015.  So I do have concerns, at least some of the allegations about Mr. Radutzky might be too old to be relevant, but the Gordon complaint might not be, and maybe your focus is on the Gordon complaint.

So what -- so, for the plaintiff, what can you tell me about Mr. Radutzky and specifically what you're looking for?

MR. IADEVAIA:  Yes.  Yes, Your Honor.  So, I mean, there's plenty of information out there about Mr. Radutzky being abusive, aggressive, and sexist.  There is testimony, as Your Honor, I think just acknowledged, from Ms. Simon that she had received a phone call from HR specifically asking her about a complaint that Vicki Gordon had made about Mr. Radutzky that included screaming and yelling and twisting an arm and throwing a paperweight at her.

Your Honor had specifically extended the date range as it relates to Mr. Radutzky to complaints that were raised on January 1, 2015 to the present.  Our understanding is that Ms. Gordon made at least some of her complaints about Mr. Radutzky in 2015 before she left.

What we're asking for is any documents that reflect that complaint.  We're also seeking any

documents about Ms. Gordon leaving, including if there -- and this touches on an issue that's raised in another letter motion that is pending before Your Honor -- any type of settlement or severance agreement with Ms. Gordon. And we're also looking for any documents concerning Mr. Radutzky's departure in 2018.

THE COURT: Well, let me ask about your theory for why you need severance with Ms. Gordon. Ms. Gordon was the complainant, not the party against whom the complaint was lodged. That doesn't seem analogous to your client in this situation.

MR. IADEVAIA: Correct, Your Honor. But what we do believe it could show, depending on what the deal is, it could show an acknowledgment. There are different ways that companies can acknowledge that there's a problem or there was some wrongdoing. And if they paid a settlement to Ms. Gordon and didn't take any disciplinary action against Mr. Radutzky, based on allegations that Ms. Gordon had made, we believe that that supports Plaintiff's claims that men who were alleged to have engaged in worse behavior than anything than she supposedly did were treated better and differently.

THE COURT: Okay. Let me just look at my

notes to see if I have other questions for you.

Well, let me ask Defendants.  It seems to me, I -- I did -- and I assume this is why you asked me to set an earlier deadline for Mr. Radutzky, because you had this Simon complaint in mind.  A complaint was made.  It wasn't clear to me from the testimony whether it was a written complaint or a formal complaint.  It may be, because it was a bit old, and that the witness testimony wasn't as reliable.

But what can you tell me about efforts to locate any complaint made by Ms. Gordon about Mr. Radutzky?

MR. LYNCH:  Sure.  So Defendants, again, have no record of a written complaint against Radutzky by Ms. Gordon.  We've taken extensive efforts to look for such a complaint.  I would note that the press reports that Plaintiff's counsel relies on, they themselves state that Ms. Gordon never went to HR.  And they talk -- they report on what appear to be oral conversations between Ms. Gordon and the former executive producer at the time.  So we have --

THE COURT:  Is that Ms. Fager or --

MR. LYNCH:  Fager.

THE COURT:  Fager.  Sorry.

MR. LYNCH:  So we have not been able to find any document.  We've checked with HR.  We've checked with employee resources, and we haven't been able to find any document.

And I would just like to briefly talk about the severance agreement that came up about Ms. Gordon's potential separation agreement or whether she has a severance agreement.  So that is actually the subject of a letter motion that Defendants have not yet responded to that we are responding to on Monday at noon.  So I don't think it's appropriate to have a ruling before we have a chance to respond to that.

THE COURT:  Fair enough.  I won't -- I won't issue any ruling now about -- I guess it was Ms. Gordon's severance that we're talking about.

Sorry.  Go ahead.

MR. IADEVAIA:  Your Honor, I know there's been a lot of emphasis placed on written complaints, and I understand, in part, why that is, because we're raising concerns about document production.

THE COURT:  Exactly.  You're asking for the production of documents.

MR. IADEVAIA:  But, Your Honor, in the case

of Ms. Poolos, the reason Defendants claim now that Plaintiff was fired was a phone call that she had with a third party, and all of the correspondence about that phone call was done orally.

Now, it led to the generation of documents because the decision-makers communicated with each other. But the way in which this works, of course, is that it is not always put into writing the complaint itself. And in the case of Mr. Radutzky, we have Ms. Simon testifying that HR called her to ask her about that complaint.

So I do think there is a basis here to believe that information exists about the complaint. It's hard to see how HR would be reaching out to somebody and saying, what's going on here, and there is zero written record of it.

THE COURT: Well, and that's -- and that's really what I'm trying to get at here. From my reading of the testimony, it does seem like a lot of these communications took place by phone or by in-person conversation without a lot of writing. And you might argue from that, that that represents an inadequate human resources process and that the company is -- procedures are flawed, and I'm obviously not here to make a ruling on that.

But if that is true, then I think it, unfortunately, leaves you with the problem of a lack of documents for me to direct them to produce. That's what I'm struggling with here, and I'm trying to give them -- I'm trying to focus on something as specific as I can because I don't want to -- I've given them some directions to look for particular things.  I've given them directions to go to particular places, but I'm reluctant to tell them, just go rummage around everywhere looking for something.  I need to get more specific.

MR. IADEVAIA:  I understand that, Your Honor, and I appreciate the effort to dig into the details here.  I know there's a lot.

I think our view, of course, is that one way to do that is search terms.  I understand the Court's not -- it doesn't appear this Court is going to order them to run Plaintiff's proposed searches, but I do think that is a way to test this.  I think there are ways to do it in a very narrow way, if we get the names of the folks who, you know, were around then.  So that's -- you know, I guess, fundamentally, that's the concern for a lot of these named comparators.

THE COURT:  Okay.  I think with this one,

unfortunately, it's old, and I suspect that's why the deponents didn't remember a lot about it.  And I've heard Defendants say that they made searches for it.

I would ask you to describe to the plaintiff -- you don't have to give it to me, but to describe to the plaintiff, at least in general terms, what you did to look for this complaint so we can try to bring this to a closure.  I'm not -- as Plaintiff anticipated, I'm not going to impose a particular search regime or search strategy here, but I do think the plaintiff at least deserves some assurance that an appropriate effort was made.  So there's not a specific production I'm asking you to make, but I do want you to offer some more information to the plaintiff on this one.

Okay.  Let's go to Shachar Bar-On.  As I understand from Plaintiff's motion, there was -- there was a document produced.  It was a closing letter concerning the complaint made by the plaintiff in this case.  Mr. Owens testified, at page 236 of his deposition, that he was not aware of any complaints against Mr. Bar-On, other than the complaint asserted by Ms. Poolos.  I understand Ms. Poolos spoke about a conversation with a Ms. Pepper,

but I didn't see anything, at least that was submitted to me, indicating that those communications were in writing.

So my question for the plaintiff is: Is there something that leads you to believe that there were additional complaints against Mr. Bar-On, you know, beyond whatever resulted in the closing letter that you have?

MR. IADEVAIA: I mean, Your Honor, it's not anything different than what we've discussed before for these other individuals. Ms. Poolos testified that she made a complaint in 2017 to a person named Alison Pepper, and that about Mr. Shachar -- I mean about Mr. Bar-On and that -- and that shortly thereafter, that Ms. Poolos spoke to Mr. Owens. Ms. Poolos testified that Ms. Pepper told Mr. Owens about the concerns that Ms. Poolos had raised.

Ms. Pepper initially denied the conversation, according to CBS, that she had with Ms. Poolos. Ms. Poolos had a recording of it. Ms. Poolos did not have a recording of her conversation with Mr. Owens, but he has denied that conversation.

And so the request here is not that I have a specific -- a basis to say there's a written communication or communications about this complaint

in 2017.  The concern is that -- that Defendants have not done an adequate search for the information.

As it relates to the 2022 investigation, Defendants have produced a single-page or two-page document of the findings of the investigation. Plaintiff is seeking -- because Defendants have relied on that investigation, Plaintiff is seeking the contents of that investigation, which is subject to a motion currently pending before Your Honor.

THE COURT:  Okay.  Going back to the 2017 -- I'll call it a complaint, the conversation with Ms. Pepper that I understand was recorded, do you know if your client had any written follow-up with Ms. Pepper or anyone else at that time?

MR. IADEVAIA:  I don't believe so, Your Honor.  I mean, we can double-check that, but I don't believe so.

THE COURT:  Okay.  I think, based on what I've heard, there's not any additional production I'm going to direct with respect to Mr. Bar-On.

Let's go to Mr. Croxton.  As I understand it, there have not been documents produced about Mr. Croxton.  I've read the testimony about Mr. Croxton. I gather he was a subordinate to Ms. Poolos.  Mr.

Simon testified that he didn't recall Ms. Poolos making any complaints about Mr. Croxton.  When asked about what Ms. Silvio had to say, Ms. Simon testified that she raised complaints about Mr. Croxton's work quality but not his temper, and that that's certainly what, at least she understood, Ms. Poolos to be complaining about.

When Mr. Owens was asked about that, his recollection was at least similar.  He remembered Ms. Poolos complaining that Mr. Croxton was not working hard enough, didn't seem sufficiently prepared for his work, but he didn't remember hearing Ms. Poolos express concerns about Mr. Croxton's temper.

Is there anything more to suggest that there was some -- there was documents that you haven't gotten about this?

MR. IADEVAIA:  Yes, Your Honor.  So, specifically about Ms. Simon's testimony, she testified that there was a producer -- someone who served as a producer and a correspondent, Ms. Silvio, who had made complaints about Mr. Croxton, that there were problems in that area, generally, and that, ultimately, Ms. Silvio was let go.

So we believe that there is likely some

information in writing related to Ms. Silvio's concerns about Mr. Croxton.  I understand that Ms. Simon characterized it as Your Honor described her testimony, but that doesn't mean that there may not be more in those records.

THE COURT:  Has anyone deposed Ms. Silvio about this?

MR. IADEVAIA:  We have not, Your Honor.

THE COURT:  Okay.  Let me hear from the defendants.

MR. LYNCH:  So Defendants have absolutely no evidence of any complaint against Mr. Croxton. Defendants have produced a complaint that Mr. Croxton lodged against Ms. Silvio; that was in his personnel file.

From Ms. Simon's testimony, it appears that she -- Ms. Silvio took issue with his performance because she was a manager and he was a subordinate, but there is no evidence that she had ever filed any type of complaint or put in writing any type of complaint, other than performance-related feedback about Mr. Croxton.

THE COURT:  Because Mr. Croxton was a subordinate to Ms. Silvio, it was -- and was he below Ms. Poolos in the hierarchy?

MR. LYNCH:  So, yes.  Mr. Croxton worked on one story with Ms. Poolos, and was Ms. Poolos' direct report for that story.

THE COURT:  Okay.  Yeah.  I -- from what I've seen in the -- in the records submitted to me and what I've heard, I haven't seen a basis to require any additional production relating to Mr. Croxton.

This takes us to the next issue that the plaintiff raised, which has to do with involuntary departures from 60 Minutes.  And, as I understand it, Plaintiffs are looking for information about certain categories of employees, the named comparators, senior producers, senior editors, producers and editors, who left involuntarily and whether they were offered severance.

My perception -- and you might correct me if I perceive it incorrectly, my perception is what you're asking for now is slightly different from what we talked about in the fall, where at least I thought you were asking about complaints made about this category of people, as opposed to whether they received severance.  But maybe you can just help me understand how these things fit together.

MR. IADEVAIA:  Yes, Your Honor.  I mean,

this does relate to the same document request that was at issue back in December.  That request seeks information related to individuals who were involuntarily let go during the period between January 1, 2019, and the present in the positions that Your Honor mentioned.

The request was specific for documents to reflect who made the decision, the decision-making process, when the decision was made, the reasons for the decision, and whether the employee received a severance package.

Your Honor, during the conference itself, and I don't have the transcript in front of me, I believe that we were focused on the substance of that request and had not limited it to situations where there were complaints.  The reason for this request -- I mean, there's a comparator piece in terms of the gender component, but also Plaintiff has alleged a breach of contract and a New York Labor Law claim based on the failure to offer her severance.  And so the circumstances under which other folks were offered severance or not severance, we believe is relevant to the case.

THE COURT:  But if -- if the people -- if the other folks -- let's assume there were other

people who were offered severance and who left involuntarily, which I assume could include an economic layoff or any number of circumstance.  If there weren't complaints made against them, that at least are arguably comparable to the nature of the complaint made against Poolos -- and we'll define comparable in a generous fashion for purposes of this discussion -- I'm having trouble seeing why that's relevant.

MR. IADEVAIA:  Because, Your Honor, first of all, we think it's a very small group of individuals, and as Your Honor had observed during the argument, there really is unlikely to be any kind of burden on Defendants, anything that is significant.

But our -- our point is, Your Honor, we'd like to see, in those situations where people were let go, were they offered severance, why or why not. So we do think it's relevant.  Defendants are free to argue on summary judgment that they're not comparable.  This is discovery, and we're not talking about a large volume or scope of people.

THE COURT:  Let me hear from the defendants on this.

MR. ZUCKERMAN:  Well, what you didn't hear

from the plaintiff was him -- Plaintiff's Counsel was him answering your question about what's relevant.  What he talked about was burden.  Those are two different issues.

The circumstances under which people in the same job category left are not probative of any of the issues that the plaintiff will have to marshal evidence about to defeat our motion for summary judgment, and it's not probative of any evidence of any claim or defense.  It would have to be put forth before a jury.

Moreover, just -- I think Your Honor is aware of this, but Ms. Poolos was on a contract, working subject to a contract.  And so there was a contract interpretation under Don (phonetic) as to whether she was entitled to severance.  I don't know that all of these people listed here by their title have a contract, have the same contract, whether it has the same exceptions.  They're all individualized circumstances.

But to just ask for blanket information about anyone who left in case somebody left under some sort of bad -- this -- I mean, I don't want to go into sort of the law school -- this is a law school fishing expedition.  But this is

demonstrating exactly what they've said in the letter. They don't have comparator evidence because it doesn't exist. So they're coming to the Court time and time again to just continue to broaden, as best as they can, your initial rulings in an effort, in a desperate bid to try to find something that they think they can make an argument about. This is well beyond, well beyond even a generous definition of comparators.

THE COURT: Let me focus on the distinction you made between employees with contracts and employees that don't have contracts. I understand Ms. Poolos had a contract. She was an associate producer at one time and then became a producer.

As a general matter, do the employees with these titles -- senior producer, senior editor, editor, producer -- have contracts?

MR. ZUCKERMAN: I don't know the answer to that. I'm sorry.

MR. IADEVAIA: Your Honor, there's testimony from Mr. Owens that if -- certainly, we can supplement the submission, that producers and senior producers have contracts at 60 Minutes. I can't say about the editors. I don't know the answer to that.

And I'll say that my understanding is that CBS does its very best to make sure the contracts are uniform or as close as possible.

THE COURT:  All right.  This is a close call, but I think I will direct the defendants to produce information about -- and we have to put a time frame on this, right, it can't be like forever. But information about individuals with these titles who had contracts and whether they received severance within the same time frame as Ms. Poolos' dismissal.  And we're not going to go back to eternity on this.

So does Plaintiff have a proposal for what's a reasonable time frame?

MR. IADEVAIA:  Your Honor, that the document request had been from 20- -- January 1, 2019 to the present, during a period when Mr. Owens was the executive producer of the show.  If -- if Your Honor wants to limit that, you know --

THE COURT:  Well, let me hear from the defendants on this.

MR. LYNCH:  So I would definitely want to limit the time frame because there was a global pandemic starting in 2020, and that there were employees who were laid off in the course of the

pandemic who may have obtained severance.  So I would limit the time frame to 2022.

And I would also ask that the Court consider basing limitations on why employees left.  So if an employee voluntarily resigned or if an employee was laid off in a mass reduction in force, I'm not sure of what -- any relevance those severance agreements would have in this case.

THE COURT:  No, I agree with that.  I agree with that.  And the plaintiff's request was for people who left involuntarily and, further, if the reason for the involuntary separation was primarily an economic reason or reduction in force, I agree, that's completely irrelevant.

These would have to be people who were let go for some reason having to do with their performance.  And I'm not saying you have to produce every document on that.  These are people who had contracts who were let go -- when was Ms. Poolos let go?

MR. LYNCH:  February of 2022.

THE COURT:  All right.  So we'll say from 20- -- the beginning of 2020, going forward, but they have to -- they have to have these titles, they have to have had contracts, and it had to be a

performance-related termination, not an economic-related termination. And what -- what you have to provide for those individuals is documents sufficient to show whether they got severance and what it was. And maybe if your answer is they didn't get severance, you can just tell the plaintiff that. The plaintiff is imagining that a lot of people got severance. Maybe the answer is they didn't. I just don't know.

Okay.

MR. LYNCH: Your Honor, I just --

THE COURT: Yes?

MR. LYNCH: I missed the time frame you said, so what was --

THE COURT: The beginning of 2020. Okay.

All right. Next, we have the question of documents pertaining to the role of Owens and Simon concerning the complaints that are made. And I am scratching my head a little bit on this one because I don't know what documents the plaintiffs are really looking for.

It certainly seemed to me, from the subset of the deposition testimony that I read, that you examined Ms. Simon and Mr. Owens extensively about what they knew and what their roles were in

investigating and responding to complaints. So I'm just -- I'm not sure what you're looking for or what specifically I should be telling the defendants to produce.

MR. IADEVAIA: Your Honor, what we're looking for is because -- because testimony is not -- doesn't replace documents. And we, again, believe it's imperative in a case like this to be able to test the testimony of -- of the key decision-makers in this case, and that's Mr. Owens and Ms. Simon. And our request is for a limited search for the named comparators and Mr. Owens and Ms. Simon.

THE COURT: Let me ask to hear from Defendants on that.

MR. LYNCH: So this is another issue that was not properly raised in this motion because we didn't come to an impasse on this. I, like Your Honor, don't exactly know what this request means. I don't know that there would be documents about the role that Mr. Owens played in any given termination. I mean, Plaintiff's counsel knows this because their own client was terminated. They know what the termination documents look like. They know what the personnel file documents look like. They're not --

terminations are not signed off on a physical document by Mr. Owens or Ms. Simon.

So these are -- I'm not sure what this means, and I think it's improperly before the Court on this motion.

THE COURT:  Yeah.  I just -- I don't know what to direct them to do.  It seems like you're asking them to just conduct searches for Simons and Owens and the names of the individuals, which seems overly broad for me.  So I'm going to deny this request.

MR. IADEVAIA:  I mean, Your Honor, just for the record, I know you've already made your ruling, so I'm not thinking I'm going to convince you other --

THE COURT:  That's okay.  You can go ahead. We've been here long enough.  It's all right.

MR. IADEVAIA:  I mean, look, we did not include specific proposed search terms because they had been rejected previously.  None of the requests had -- had been the person's name -- Mr. Owens, Ms. Simon connected to the person's names.  There were other ways that those searches were limited.  We don't know the burden on Defendants because Defendants haven't told us.

And there are -- it is commonplace and typical to do those types of searches.  These are the key decision-makers in Ms. Poolos' case.  We do not believe this issue was not exhausted.  It flows out of Your Honor's decision and the issues previously discussed.  And the difference here is that we've narrowed it in a way that we think is reasonable and focused on what they knew and what they did in writing.

THE COURT:  Sure.  And you're obviously entitled to discovery on that subject, and you've taken deposition testimony.  I'm just having a hard time thinking of what type of document there would be that defines or lays out the role each of them played in the termination.  It seemed to me they were the top two people in the organization, and they had to have a say in whoever got terminated if they were above a certain level.

So I just don't think this is definitive enough for me to direct them to do anything.  So let's move on.

I think -- there was a letter -- there was an issue raised with respect to a March 5 supplemental letter that raised some issues concerning Ms. Richards and her -- her text

messages.  Without prejudice to -- and the defendants say I shouldn't consider it.  Without prejudice to whatever else you may present on this, it just doesn't seem sufficiently related to the dispute you raised in Docket Number 107 for me to consider it today, other than it's generally a complaint that you think the defendants haven't produced enough documents.  It didn't -- I mean, Ms. Richards is not a comparator, as far as I can tell. She's the complainant against Ms. Poolos.

Let's turn to the question of redactions. I'm not going to try and figure that out today, but it appears to me that more than 30 days have passed since these depositions were taken.  I realize there might be a dispute as to whether Defendants have had the transcript for 30 days.  I'm not going to try and sort that out today.

The guidance I will give you, though, is that the redactions need to be much, much, much more limited than what we've seen.  I think we're past the point where the comparators' names can appropriately be redacted.  I think their names have been in the public record for some time now.

Whether complainants against the comparators, if they didn't go public with those

complaints, should have their names redacted is a different question.  I might view that differently.  But, finally, we're going to have to cut back on the redactions here.

And I'm having -- I'll hear from the defendants on this, but I'm having trouble seeing why anything that's in the state court complaint against Mr. Gavshon should be redacted.  But there may be some -- some nuance that I'm not seeing on that.  Again, I'm not ruling today, but I just -- I just wanted to --

MR. LYNCH:  Oh, sorry.  I thought you --

THE COURT:  Yeah.

MR. LYNCH:  So is that an exhibit to the plaintiff's letter motion?  Which exhibit is that?

THE COURT:  The plaintiffs, at some point -- and I think it was -- it wasn't in connection with this motion.  But at some point -- I think it was probably in connection with the motions presented in the fall.  I believe they attached the state court complaint against Mr. Gavshon.  I mean, I have it somewhere, and it has an ECF tag on it, and I gather it's available in the New York State Court filing system.

MR. LYNCH:  Your Honor, I would just like

to say, just because one plaintiff's -- one employment law firm filed that on the public docket does not mean it's okay for it to continue to be posted on the docket.

From what I understand, the individuals in the picture, at least Mr. Gavshon, is under 18 in that picture.  There are also two different -- there's two men depicted in that picture:  One of them is not even a party in this litigation or employee of Defendants.  So I just don't -- I think the privacy concerns should weigh in favor of us keeping that document -- at least the images in that document redacted.

THE COURT:  Okay.  As I said, I'm not planning to try and decide that today, but I at least wanted to hear from you on that.  Thank you.

All right.  So we're almost there.  As I mentioned, we do have a end-of-discovery deadline that's coming up.

Could one or both of you -- it doesn't matter who goes first -- just tell me where does discovery stand?  What are you planning to do in the next week?

MR. IADEVAIA:  Your Honor, we've been in discussion with Defense counsel for several weeks

now about needing additional time for discovery. Plaintiff has completed or mostly completed five depositions, but she has noticed five more.  Some of those depositions had to be rescheduled at Defendant's witnesses' requests, which Plaintiff, of course, is willing to accommodate.  Two of the depositions are -- the parties are disagreeing, but meeting and conferring about them.  The other deposition is going to take place next week.

The other issue is that, based on production that was made after depositions, Plaintiff, and I believe Defendants have agreed to do this, is going to allow Plaintiff to recall two of the witnesses for the limited purposes of asking questions related to the recently produced materials.

And there's, I'd say, five non-deposition issues between the parties, approximately.

THE COURT:  In addition to the ones you've already filed motions on?

MR. IADEVAIA:  Yes, Your Honor.

And that the parties have at least been in discussion about a stipulation that would extend discovery for 30 days without the right to make any new document requests or interrogatories but to

complete or deal with the current pending issues.

THE COURT:  Okay.  Is there anything Defendants wish to add to that?

MR. ZUCKERMAN:  No, Your Honor.

THE COURT:  I was just trying to get a sense.  I mean, obviously, I'll consider your request when I receive it.  But, you know, discovery does have to end here.

And if you want an extension, I will want you to maybe set forth in your letter motion some of what you've just told me:  What's noticed already, what is something you had scheduled before, but you rescheduled because of convenience of witnesses or whatever, whatever it may be.  Because what I will want to hear from you is the sense -- and I think you picked up on, which is any additional discovery is really just cleanup and is not new discovery.  That's what I'll want to hear from you, and I'll want to have some specifics about who are the witnesses, when are you planning to do them, and what remains outstanding.  And, obviously, there's some follow-up from today's hearing, and I recognize that'll take time; although, my sense was none of it was too onerous.  Defendants may disagree.

So that's what I'll want to see in any

extension request.  I'm not saying no, but I haven't said yes yet either.  I'm going to want to see a really detailed schedule of how we bring discovery to a close before I approve another extension.

Okay.  Is there anything further for today?

MR. IADEVAIA:  Nothing for Plaintiff, Your Honor.

MR. ZUCKERMAN:  No.  Nothing from Plaintiff -- nothing from Defendant, Your Honor.

THE COURT:  It's so late in the day, we've forgotten who we represent, but that's okay.  I thank the parties for their presentation and their patience on this Friday afternoon.

We're adjourned.  Thank you.

C E R T I F I C A T E

I, Marissa Lewandowski, certify that the foregoing transcript of proceedings in the case of Poolos v. Paramount Global, et al, Docket #1:23-cv-08896-GHW-HJR, was prepared using digital transcription software and is a true and accurate record of the proceedings.


Signature *Marissa Lewandowski*
_____
                Marissa Lewandowski


Date:       March 13, 2025