# Exhibit 3

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------x

ALEXANDRA POOLOS,

Plaintiff,

-against-        Case No.
                 1:23:-cv-08896

PARAMOUNT GLOBAL; CBS BROADCASTING, INC.;
and CBS NEWS, INC.,

Defendants.

-------------------------------------------------x

EXAMINATION BEFORE TRIAL of Tanya Simon, taken by the Plaintiff, pursuant to Notice, held at the offices of Vladeck, Raskin & Clark, P.C., 111 Broadway, Suite 1505, New York, New York 10006 on January 28, 2025, at 10:21 a.m., before a Notary Public of the State of New York.

T. Simon

Q.    Got it.

And do the correspondents have multiple producers?

A.    They do.

Q.    And do the producers all have APs?

A.    Yes.

Q.    And do some producers have multiple APs or just one?

A.    No.  Just one.

Q.    Is part of one of your jobs to evaluate the performance of APs?

A.    Yes.

Q.    And are there formal reviews that take place at 60 Minutes?

A.    There are.

Q.    And how often do they happen?

A.    They are annual, I believe.

Q.    Are there midyear reviews?

A.    We're -- they're midseason for us.

Q.    Midseason?

A.    Yes.

Q.    Understand.

So there are midseason reviews as well as annual reviews?

A.    They just take place at the midseason mark.

T. Simon

Page 21

should go into something regardless of whether it's won an award.

Q.    If a segment that they've worked on has won an award, is that a positive?

MR. ZUCKERMAN:  Objection to form.

Q.    Do you consider that to be positive?  You can answer.

A.    No.

Q.    Who is responsible for evaluating the performance of producers at 60 Minutes?

A.    Bill Owens.

Q.    And do you have any role in evaluating the performance of producers at 60 Minutes?

A.    No.

Q.    Does Mr. Owens conduct formal reviews of producers?

A.    Yes.

Q.    And does that also happen on an annual basis?

A.    It's the same -- same time, the same process.

Q.    As it is for APs?

A.    Yes.

Q.    And do you know or have any sense of what factors Mr. Owens takes into account when

T. Simon

Page 27

A.      Not really.

Q.      What do you mean, "not really"?

A.      It was sort of a logistics, day-to-day job. I didn't review anybody at the time. There wasn't a formal reporting structure to me.

Q.      What was the role that you had before senior producer?

A.      I was a producer.

Q.      And approximately how long were you a producer?

A.      Approximately, give or take, 10 years.

Q.      And, actually, I want to go back to the time you were a senior producer.

A.      Mm-hmm.

Q.      On the digital team, who did you report to?

A.      I reported to Bill Owens and Jeff Fager.

Q.      What was Mr. Owen's title at that time?

A.      He was executive editor of 60 Minutes.

Q.      And Mr. Fager?

A.      Executive producer of 60 Minutes.

Q.      Did he have any other titles at that time?

A.      He was also chairman of CBS News, Fager was.

Q.      Mr. Fager no longer works for CBS, correct?

A.      Correct.

T. Simon

Page 28

Q.    And when did he leave?

A.    2018 or 2019.

Q.    Shortly before Mr. Owens became executive producer of 60 Minutes?

A.    Yes.

Q.    And before you became executive editor of 60 Minutes?

A.    Yes.

Q.    Got it.

And what is your understanding of the circumstances as to why Mr. Fager left?

A.    My understanding was that he was terminated because he threatened to retaliate against an Evening News reporter who was reporting on allegations against him.

Q.    What allegations was that reporter reporting on, to your knowledge?

A.    That he engaged in mis- -- I guess, bad behavior, misconduct.

Q.    Do you know specifically what kind of bad behavior, misconduct?

A.    Largely inappropriate behavior at, you know, holiday parties and socially.

Q.    Was it of a sexual nature, the allegations?

A.    Yes.

T. Simon

Page 47

Q.    Do you remember generally?

A.    I remember reading -- I don't know if that case -- if her complaint was written about somewhere that I might have read that. I didn't hear it from anyone specifically, that I remember.

Q.    Were you moved off of Mr. Radutzky's team at your request?

A.    Eventually.

Q.    And when did that happen?

A.    Sometime later, in the first few years after Ed Bradley died, a number of producers worked together on a unit that had been formed that Michael oversaw.

Q.    What was that unit?

A.    I think it was called the Radzutsky unit.

Q.    Was the Radutzky unit formed shortly -- around the time or shortly after Mr. Bradley had passed away?

A.    I believe so.

Q.    I'm sorry, when did Mr. Bradley pass away?

A.    In 2006, I believe, in November.

Q.    How for long did you work within the Radutzky unit?

A.    Just a few years.

Q.    Okay. And at that point in time, you were

T. Simon

Page 48

still an AP, or had you --

A.      I was a producer.

Q.      You were a producer?

A.      Yes.  Yes.

Q.      Okay.  And approximately how many other producers worked within the Radutzky unit?

A.      Two or three, maybe.

Q.      And at that point, who did Mr. Radutzky report to?

A.      Jeff Fager.

Q.      And at what point did Mr. Owens become executive editor at 60 Minutes?

A.      That, I don't know, I'm afraid.

Q.      Was Mr. Owens executive editor during the period that you worked within the Radutzky unit?

A.      I don't remember.

Q.      And at some point you stopped working within the Radutzky unit?

A.      Yes.

Q.      And how did that come about?

A.      I think the Radutzky unit was sort of dissolved because it wasn't -- there was sort of no need for it.

Q.      Did you stop working before it was dissolved, or as a result of it being dissolved --

T. Simon

Page 51

Q.    Yeah, I'm just asking what was the result of that conversation.

A.    I believe he had a conversation with Michael, and I continued working for him.

Q.    Continued working for Mr. Radutzky?

A.    Right, for Radutzky.

Q.    Does Mr. Radutzky still work for CBS?

A.    He does not.

Q.    And approximately when did he stop working for CBS?

A.    I believe it was around 2018, '19, in that time frame.

Q.    And why did Mr. Radutzky leave CBS, if you know?

A.    I don't know.

Q.    Was he fired?

A.    I don't know.

Q.    Okay.

              MR. IADEVAIA:  All right.  I think I'd like to take a break, if that's okay with everybody.

              MR. ZUCKERMAN:  Yeah, that's fine.

              THE VIDEOGRAPHER:  The time is 11:18 a.m., and this marks the end of Media Unit Number 1.

T. Simon

Page 54

you said that Ms. Gordon had made an allegation that you were present for this incident, but was something happening that led HR to reach out to you in that moment?

MR. ZUCKERMAN:  Objection.

You can answer.

A.    My understanding at the time was that they were going through her allegations and asking people about them if they were named in the -- in her allegations.

Q.    Allegations made by Ms. Gordon?

A.    Right.  Right, right.

Q.    And your belief is that Ms. Gordon at that time was not actually working at CBS?

A.    I don't believe she was.

Q.    Okay.  Is there someone who works for 60 Minutes named Michael Gavshon?

A.    Yes.

Q.    And what is his job there?

A.    He's a producer at 60 Minutes.

Q.    How long has he been at 60 Minutes?

A.    He has been at 60 Minutes many, many years. Twenty-plus, I believe.

Q.    Was he there when you joined?

A.    Yes.

T. Simon

Page 91

A.    After.

Q.    Are you aware of any other complaints against Mr. Richman beyond what you've testified to?

A.    No.

Q.    Are you aware of any complaints against Mr. Richman by Ashley Velie?

A.    I believe she falls in the category when I said other people had raised things and I couldn't remember their names.  I think one of them might have been Ashley.

Q.    Are you aware that there was a group of producers who met and discussed concerns about Mr. Richman?

A.    Yes.

Q.    And how are you aware of that?

A.    Because I believe they told us.

Q.    Who's "they"?

A.    A group of producers, but I don't remember which ones were part of that group.

Q.    How many producers?

A.    I don't know.  A handful.

Q.    Was it five -- was it more than five?

A.    I don't know.

Q.    Was it more than ten?

T. Simon

Page 101

BY MR. IADEVAIA:

Q.     Ms. Simon, you had mentioned before the lunch break multiple instances in which concerns were raised about Mr. Richman.  Do you recall that testimony generally?

A.     Yes.

Q.     In any of those discussions that you were part of, did anyone ever describe Mr. Richman as being a bully?

A.     No.

Q.     And did anyone ever say that Mr. Richman had acted in an abusive manner?

A.     No.

Q.     Did anyone use words like "bully"?

A.     No.

Q.     Did anyone use words like "abusive"?

A.     No.

Q.     Okay.  Is there somebody who works at 60 Minutes named Draggan Mahailovich?

A.     Draggan Mahailovich, yes.

Q.     Okay.  And what's his job there?

A.     He's a producer.

Q.     And he works for 60 Minutes?

A.     He does.

Q.     Okay.  And does he report -- what team is

T. Simon

Page 103

Q.    Did you ever say to anyone that you thought complaints against Mr. Richman were unfair or a similar word?

A.    I don't think "unfair" characterizes what I think about them.

Q.    Okay.  And did you ever say to Ms. Poolos that you believe that folks who work with Mr. Richman need to take into account his personality?

A.    I don't recall.

Q.    Did you ever say that to anybody about Mr. Richman?

A.    Possibly.

Q.    Is there someone who works for CBS named David Levine?

A.    Yes.

Q.    And what is Mr. Levine's job?

A.    He's currently an associate producer.

Q.    And approximately how long has he worked at 60?

A.    I don't know.  10 years, 15 years -- I'm not sure.

Q.    Has he had any job at 60 other than associate producer?

A.    He's been an associate producer in London

T. Simon

Page 117

A.    No.

Q.    Did anyone ever tell you that Mr. Wertheim had complained about Mr. Levine?

A.    No.

Q.    Is there someone who works on the show named Will Croxton?

A.    Yes.

Q.    And what's Mr. Croxton's job?

A.    He works on the digital 60 Minutes Overtime team.

Q.    And does he have a title that you know of?

A.    I believe he's now digital producer.

Q.    And who does he report to?

A.    He reports to Matt Polevoy.

Q.    And who does Mr. Polevoy report to?

A.    Bill Owens.

Q.    And how long has Mr. Croxton been at CBS?

A.    I don't know.

Q.    Did he overlap with Ms. Poolos?

A.    Yes.

Q.    Do you think he's been there for more than 10 years?

A.    Yes.

Q.    And does Mr. Croxton do work for any show other than 60 Minutes?

T. Simon

Page 146

A.      Yes.

MR. ZUCKERMAN:  Objection.

Q.      And as I read, the date is May 30th, 2021, correct?

A.      Yes.

Q.      Okay.  So at that point in time, you were executive editor for 60 Minutes?

A.      Yes.

Q.      And does this at all refresh your recollection as to whether you were involved in discussions about whether to renew Ms. Poolos's contract?

A.      No.

Q.      Okay.  And did you have discussions with Mr. Owens about Ms. Poolos's performance in 2021, do you recall?

A.      I don't recall if it was in 2021, specifically.  We had discussions about her productivity.  I had discussions with Lesley Stahl about her performance and productivity.

Q.      And when did you have those discussions?

A.      I believe sometime in 2021 time frame.

Q.      Okay.  And you don't recall if it was before or after Ms. Poolos's contract was renewed?

A.      I don't recall.

T. Simon

Page 147

Q.      And May 30th would have been after the completion of that season, correct?

A.      Yes.

Q.      So as of May 30th, 2021, Mr. Owens and others at 60 Minutes would have been aware of Ms. Poolos's productivity, correct?

A.      Yes.

Q.      For that season, that prior season?

A.      Yes.

Q.      All right.  You said you had discussions with Mr. Owens about Ms. Poolos's performance. Tell me about those discussions.

A.      I don't remember them being extensive discussions.  It was just on our radar when producers underperformed in terms of the number of stories they produced.  We kept track of how many stories each producer did, and she was consistently under that number.

Q.      And did you ever communicate any concerns about Ms. Poolos's production to her?

A.      I did.

Q.      You did?  And how many times did you do that?

A.      I believe once.

Q.      And when did you do that?

T. Simon

Page 148

A.      I believe that it was -- I'm not entirely sure.  It might have been around the time she was interviewing AP candidates.  I don't know when it was.  I know that I had the conversation with her.

Q.      Okay.  And I think you said you spoke to Ms. Stahl about Ms. Poolos's performance, right?

A.      Yes.

Q.      How many times did you have a discussion with Ms. Stahl about Ms. Poolos's performance?

A.      Once.

Q.      And when was that?

A.      It was sometime in 2021.

Q.      And what was the discussion?

A.      Lesley had called me to say that she wasn't happy with Alex's productivity, she didn't produce enough stories, and the stories that she did produce took too much work by Lesley in the edit room, that the scripts required too much assistance and it took too long.

Q.      And do you know if Ms. Stahl spoke to Ms. Poolos about this concern -- or these concerns?

A.      I don't know.  She asked me if I would say something.

Q.      And was that the reason you spoke to Ms. Poolos?

T. Simon

Page 149

A.      Yes, I believe so.

Q.      Okay.  Any other discussions you had about Ms. Poolos's performance beyond what you've testified to?

A.      With Bill and Lesley?

Q.      With anyone.

A.      Not formal conversations, you know, like that.

Q.      Did you have any discussions with Ms. Poolos about her performance other than the productivity one you've just described?

A.      In terms -- we're talking performance.  Can you explain what you mean?

Q.      Well, what's the hesitation?  Did you have other kinds of concerns about Ms. Poolos that you don't think qualify as performance?

A.      I had one conversation with her that I'm not sure qualifies as performance.  It could qualify more as temperament or work style.

Q.      And when was that?

A.      At the time that she was interviewing candidates to be her associate producer.

Q.      Okay.  Who was present for that conversation?

A.      Just the two of us.

T. Simon

Page 150

(Reporter clarification.)

A.    Sorry.

Just the two of us.

Q.    And how did you have that conversation?

A.    On the phone.

Q.    And what did you -- what did you say?  What did Ms. Poolos say?

A.    I recall it being a very friendly conversation and I just gave her sort of the guidance to be mindful of not being as sort of top-down in her treatment of her APs.  There was a sense of rigidity, and as she was hiring someone new, to be mindful of not being as -- the only way I can think of it is sort of top-down.

Q.    And you said this conversation you had with her around the time that you -- that Ms. Poolos hired Ms. Richards?

A.    Was in the process of interviewing candidates where ultimately she hired Collette.

Q.    And before you had the discussion with Ms. Poolos, had you spoken to Mr. Owens about your feedback?

A.    I don't believe so.  But I'm not sure it was.  I don't remember.

Q.    And had you spoken to HR about these

T. Simon

Page 157

and being able to suggest changes and alterations and issues of fairness.

Q.    Did any of the stories that Ms. Poolos produced or served as an AP on win awards?

A.    I'm sure.

Q.    And did any -- were any nominated for awards?

A.    I'm sure.

Q.    Who is Collette Richards?

A.    Collette Richards is an AP at 60 Minutes now, who was hired by Alex to be her AP.

Q.    And is Collette -- Ms. Richards, is she on a team currently?

A.    She is.

Q.    And whose team is she on?

A.    She's still on Lesley's team.

Q.    And does she work with a specific producer?

A.    Yes.

Q.    And who is that?

A.    She works with Shari Finkelstein.

Q.    And has that been the case since Ms. Poolos was fired?

A.    I don't know if -- it wasn't immediate. Shari's AP, at the time, left to go take another job in documentaries.  She was more interested in

T. Simon

Page 158

that.

So Shari went through a process of hiring a new AP but had worked with Collette on a story that she had taken over after Alex left. And they had worked well together, and she was impressed and liked her and was inclined to hire her as her AP.

Q. And does Ms. Richards, as an AP, report to you?

A. Yes.

Q. And she also reports to Ms. Finkelstein --

A. Yes.

Q. -- and Ms. Stahl?

A. Yes.

Q. And what do you think of Ms. Richards' performance?

A. It's been very good. I, during her last performance review, consulted with Shari to get feedback from her, and it was all incredibly positive. She was beyond happy with her.

Q. Did Ms. Richards ever complain to you about anyone at CBS?

A. She complained to me about Alex Poolos.

Q. Other than --

A. Oh, other than?

Q. No, no. Sorry, I didn't mean to cut you

T. Simon

Page 162

A.      I think something about her sort of gruff attitude, bedside manner kind of way of talking. But I don't remember it being specific to Collette.

Q.      Have you ever received any complaints about Ms. Richards?

A.      Not since I was on a Zoom with Bill and Alex Poolos, when she complained about her to us.

Q.      Okay.  Other than any concerns or complaints Ms. Poolos made about Ms. Richards, are you aware of any other complaints or concerns about Ms. Richards?

A.      I'm not.

Q.      And what did Ms. Poolos say about Ms. Richards when she was raising her concerns?

A.      She was raising her concerns to us when we called a Zoom with her to inform her that Collette has raised -- made allegations about her and the environment that she created.

        So we told Alex that Collette had said that Alex was bullying, and that she had no boundaries, and that it was an untenable work situation.

        And Alex had said that Collette's performance was subpar, that her work product or her performance on the Trevor Noah piece was disappointing, that she wasn't sort of making the

T. Simon

Page 163

effort that she could, that there had been issues around wanting to drive home in December for the Christmas holidays, and that she just generally wasn't impressed with her performance or her work ethic.

Q.    Did Ms. Poolos raise concerns about Ms. Richards' fact-checking?

A.    She raised concerns about her copyediting, not her fact-checking.

Q.    What did Ms. Poolos say about her copyediting?

A.    That she had to make corrections.

Q.    That Ms. Poolos had to make corrections of Ms. Richards' work?

A.    Yes.

Q.    Have you -- has anyone else raised concerns about Ms. Richards' copyediting?

A.    No.

Q.    Okay.  Did Ms. Poolos raise concerns that Ms. Richards failed to secure footage for a segment?

A.    I believe she said something about a ball being dropped on a rights and clearances issue. I don't recall the specifics or if she even gave us the specifics.

T. Simon

Page 169

a complaint about Ms. Poolos, correct?

A.    Yes.

Q.    And when was the first time that you learned about Ms. Richards complaining about Ms. Poolos?

A.    When she called me to complain.

Q.    Who called you?

A.    Collette Richards called me.

Q.    And approximately when did Ms. Richards call you?

A.    Sometime in December -- mid-December.

Q.    Was it December of 2021?

A.    Yes.

Q.    And you said mid-December?

A.    Yes.

Q.    And you said it was a call.  Was there anyone else on the call besides you and Ms. Richards?

A.    No.

Q.    And did Ms. Richards ever make a written complaint, to your knowledge?

A.    She did.

Q.    And did you -- when did you see that written complaint?

A.    She sent it to me and I -- sometime after

T. Simon

Page 170

we talked, but I don't know the date.

Q.      So in the call that you had with Ms. Richards in mid-December of 2021, tell me everything you remember about that discussion.

A.      She told me that she was having a really hard time working with Alex and that it took a lot for her to call me.  And she wasn't sure, you know, how to go about it and how I'd react, but that she felt that she was sort of at her wit's end, and that Alex created such a toxic environment that she didn't want to work with her anymore.

She was crying, said that Alex was unrelenting, yelling at her, berating her, putting her down, just wouldn't ever stop calling and asking for things.  She never had a weekend off, whatever she did was never good enough, that it was hot and cold, and that she did not want to work with her anymore.

She said that there had been arguments about whether she could drive down to wherever her family is in the south -- I believe Atlanta -- on a weekend.  There had been arguments about her wedding, and that she just felt she couldn't do it anymore.

Q.      Anything else you recall about what

T. Simon

Page 171

Ms. Richards said during this call?

A.      That she believed that Alex was abusive towards her.

Q.      Anything else?

A.      That Alex -- that Collette, on the particular story they were working on at that time, had done the lion's share of the background calls and was doing a huge volume of work.  Alex was on very few of them and -- and criticized her, you know, typos, and was copyediting but not contributing substantially to the actual work or the calls, and that she just, I think, felt burnt out.

Q.      Anything else?

A.      No.  All along those lines.

Q.      What did you say to Ms. Richards during this call?

A.      I listened, mostly.  Mainly I remember listening.  I told her that nobody should have to work in an environment they consider to be hostile or toxic, that what she was saying was concerning and that I would raise it with HR, which she had told me she'd already done.  She had already placed a call to them or sent an email, I'm not sure which.  So she had already reached out to HR.  She

T. Simon

Page 172

had not heard back from them at that point.

And I told her that I needed to figure out, you know, just the idea of switching teams, that that wasn't something I had an immediate answer for, and that I would consult, you know, with Bill, with HR, and that we would all -- that I would circle back.

Q.   Anything else that you said to Ms. Richards during this call?

A.   Not that I remember, specifically.

Q.   Do you remember how long the discussion was with Ms. Richards?

A.   I don't.

Q.   How did you leave it at the end of the call with Ms. Richards, or how was it left?

A.   That I would contact HR, talk to Bill, and let her know about next steps and how we would proceed.

Q.   Did Ms. Richards accuse Ms. Poolos of unlawful discrimination during this call?

A.   I don't recall her using those words.

Q.   At any point in time did Ms. Richards accuse Ms. Poolos of unlawful discrimination?

A.   Not that I recall in those words.

Q.   Do you understand that Ms. Richards ever

T. Simon

Page 174

wouldn't be illegal in the behavior that she was describing.

Q.    Did you ever have any conversations with anyone about whether the conduct that Ms. Poolos was accused of engaging in by Ms. Richards was illegal?

            MR. ZUCKERMAN:  Except for lawyers.

Q.    Except for lawyers, yes.

A.    Except for lawyers?

Q.    Yes.

A.    In terms of illegal, no.

Q.    Did you have a discussion with Ms. Poolos about Ms. Richards' concerns or complaint?

A.    In January, yes.

Q.    And how come you didn't talk to Ms. Poolos before January?

A.    I called -- the first call I made was to Bill Owens to tell him what had happened.  I then emailed HR.  HR then took up the matter.  And at that point, it was in their hands.

Q.    Did you discuss with Mr. Owens communicating with Ms. Poolos about the complaint before January?

A.    I don't recall having that -- I don't recall about whether it would have been before

T. Simon

**Page 175**

January.

Q.    Did you further explore transferring Ms. Richards to a different team?

A.    Not at -- no, I did not.  The first thing that we wanted to do was let HR do what they do.

Q.    What do you mean by that?

A.    They needed to -- they were going to conduct some sort of query or investigation, I suppose.  They said that they would reach out to Collette.

I did not put into motion any attempt to find a different team for her at that point.  There wasn't an obvious solution, and I didn't want to do anything before the matter had been discussed and dealt with through their channel -- through the HR channels.

Q.    So you said that your first call was to Mr. Owens; is that right?

A.    Yes.

Q.    And was it the same day or a different day?

A.    The same day.

Q.    And did you speak to Mr. Owens by phone or some other way?

A.    By phone.

Q.    And tell me about that discussion,

T. Simon

Page 176

everything you remember he said and you said.

A.     I called him to say that I had just gotten a very troubling call from Collette, who was very emotional and crying, and describing what she said was abusive conduct by Alex, that she said she didn't want to work with her anymore, that it was toxic.  It was just to bring him in the loop to what had happened, and he said, "Make sure to tell HR," which I did.

Q.     Anything else you remember about that discussion?

A.     No.

Q.     Before you reached out to Mr. Owens, did you contact Claudia Weinstein about Ms. Richards' complaint?

A.     Before I talked to Bill Owens?

Q.     Yeah.

A.     I don't believe so.

Q.     And before you talked to HR, did you -- or communicate with HR about Ms. Richards' complaint, did you talk to Ms. Weinstein?

A.     I don't believe so -- or I don't remember.

Q.     Did you -- other than speaking to Mr. Owens and, I guess, talking to HR, did you talk to anybody else about Ms. Richards' complaint in

T. Simon

Page 177

December of 2021?

A.      I don't know.

Q.      Did you talk about Ms. Richards' complaint with anyone other than Mr. Owens or HR at any point in time?

A.      I spoke with Claudia Weinstein not about the complaint but about some prior conduct.

Q.      What -- and how did you speak to Ms. Weinstein about this?

A.      Partially on text.

Q.      And how else?

A.      Possibly in person.  But I don't recall specifics.

Q.      And what did you and Ms. Weinstein talk about?

A.      Well, I couldn't remember who Alex's AP had been before Collette.  At some point HR had asked me whether I knew if there had been issues before. And since I hadn't been in the job that long, I wasn't aware of anything specific.

Q.      And so you reached out to Ms. Weinstein?

A.      Mm-hmm -- yes.

Q.      So tell me everything you remember about those communications with Ms. Weinstein.

A.      I remember asking her if she remembered who

T. Simon

Page 178

Alex's AP was before Collette.  And she said it was Sarah Turcotte, and that Sarah would cry almost every day that she was working with Alex, that there was some issue where she hadn't let Sarah take her -- I don't know if it was her kid to kindergarten or her son to the doctor, and so she was unhappy in that role.

She mentioned an occasion in which somebody from rights and clearances complained that Alex had yelled at them inappropriately.  And I believe Claudia reported that, at the time, to Jeff Fager, and either he or Claudia, from what I understand, told Alex that she had to apologize to that person.

Q.    Anything else?

A.    And she talked about her from her perspective, whenever her -- when Alex's pieces were going into the final stages of production, there always seemed to be complications, whether it was with rights and clearances or other things.

Q.    That's what Ms. Weinstein said to you?

A.    Yeah.

Q.    And just to be clear --

A.    Yes.

Q.    -- it was Ms. Weinstein who told you about someone complaining from rights and clearance,

T. Simon

Page 179

correct?

A.      Yes.

Q.      And it was Ms. Weinstein who told you that she'd reported it to Mr. Fager?

A.      I believe so, yes.

Q.      And it was Ms. Weinstein who said that Mr. Fager had told Ms. Poolos to apologize?

A.      I'm not clear whether Mr. Fager said that Alex should apologize or whether Claudia told Jeff that she told Alex to apologize, but he was made aware.

Q.      Okay.  Did Ms. Weinstein share anything else with you beyond what you've testified to in this conversation or --

A.      Beyond rights and clearances issues, she talked about her productivity, and how from her perspective, Lesley didn't always seem fully prepared in the interviews that she was doing on Alex's pieces.

Q.      Anything else Ms. Weinstein said?

A.      Not that I remember.

Q.      Do you know whether anyone told Ms. Poolos that Ms. Turcotte had cried every day, quote/unquote?

A.      I don't know.  That was before my time in

T. Simon

Page 186

about Ms. Poolos before this mid-December

complaint?

A.      I don't believe so.

Q.      And had you received complaints from other

APs about Ms. Poolos before Ms. Richards'

complaint?

A.      Not directly from APs about her.

Q.      Did you receive them indirectly?

A.      I had heard about instances.

Q.      What were those instances you heard about?

A.      I heard that she lost her temper and yelled

at an associate producer in Iran on the soccer

story.

        I heard that a soundman said that she's the

only producer he wouldn't work with anymore because

she yelled at him in front of his children and he

thought that it was humiliating.

        I heard about the HR -- not HR, sorry --

the rights and clearances situation.

        I clearly heard about Sarah Turcotte.

        I can't think of others.

Q.      Had you heard about Sarah Turcotte before

this text exchange reflected in Exhibit 2?

A.      Not that I can recall with any specificity.

Q.      Did you hear about the rights and clearance

T. Simon

Page 230

was her.  I would tell them if it wasn't something that had been a direct complaint to me.

Q.    And did you tell Ms. Balducci that you had solicited information from Ms. Weinstein about past complaints related to Ms. Poolos?

A.    I don't remember.

Q.    In the text exchange, Ms. Weinstein says -- in response to your text, can you -- your text was, "Can you remind me who the R&C person is that Alex yelled at" and Ms. Weinstein wrote, "I think it was Aieska Hoyos, who left CBS News and then came back to do a slightly different R&C type job."

And then Ms. Weinstein writes, "Want me to ask Josh Ravitz to confirm that it was Aieska. I would be careful in what I say and ask for confidentiality.  I think he's had his own share of bad experiences with her."

Do you see that text?

A.    I do.

Q.    And then you wrote, "No, it's okay. Thanks.  I'm pretty sure it was her."

Do you see that text?

A.    I do.

Q.    Did you ever do any investigation to figure out if that was correct, that it was --

T. Simon

Page 233

that you had told her about?

A.    I think you can ask her.

Q.    Okay.  And you don't recall the discussion that you had with Ms. Weinstein after these texts?

A.    I don't recall -- I don't recall that I did have one with her.

Q.    You don't even know if you did have one?

A.    Right.

Q.    Okay.  You and Mr. Owens and Ms. Poolos met by -- virtually on January 5th, 2022, correct?

A.    Yes.

Q.    And do you recall when that meeting took place, what time of day?

A.    Well, according to the Zoom invite, it took place at 12:30.

Q.    Okay.  Do you have an independent recollection of that?

A.    No.

Q.    Okay.  And could you just tell me everything you recall that was discussed at that meeting, please.

A.    I recall that Bill told Alex that Collette had made some concerning allegations that she was being bullied, that there were no boundaries, and that he told Alex that that kind of behavior

T. Simon

Page 234

couldn't continue and we need to treat people with respect.

Q.    Anything else you recall about what was said during that meeting?

A.    I recall that then Alex, I believe, talked about performance concerns that she had about Collette.

Q.    And what performance concerns did Ms. Poolos raise during this meeting?

A.    That her performance was subpar, that her performance on the Trevor Noah story was disappointing, that she had dropped the ball on a rights and clearances issue, that she wasn't giving it her all, I believe, and, I believe, she talked about the drive down to Atlanta in December.

Q.    Anything else you remember Ms. --

A.    Not that I remember.

Q.    Just got to let me finish.

A.    Oh, sorry.

Q.    That's no problem.

Anything else you remember about what Ms. Poolos said during this meeting regarding Ms. Richards' performance?

MR. ZUCKERMAN:  Objection.

A.    I don't.

T. Simon

Page 235

Q.    What else was said during the meeting beyond what you've testified to?

A.    I believe that Bill said to Alex that those performance concerns were troubling and that he would look into them, I think he said, but that those performance concerns were troubling.

Q.    The performance concerns Ms. Poolos had raised about Ms. Richards --

A.    Yes.

Q.    -- were troubling?

A.    Yes.

Q.    Anything else you recall being said or discussed during this meeting?

A.    I seem to recall it sort of ending with Bill saying, like, let's just, you know, keep treating people well in the workplace, you know, we need people to treat each other with respect.

Q.    Anything else you recall?

A.    Not that I recall.

Q.    Do you recall Ms. Poolos saying about Ms. Richards that Ms. Richards often became upset if she didn't get her way on personal requests?

A.    I don't recall that.

Q.    And do you recall during this meeting Mr. Owens telling Ms. Poolos that Ms. Richards had

T. Simon

Page 238

resources reached out to Ms. Poolos?

A.      I don't know what the time frame was for their, like -- for the -- for their intake call with her or -- I'm not sure what you're asking.

Q.      To your knowledge, did HR ever give instructions to Ms. Poolos, as of January 5th about Ms. Richards' complaint?

MR. ZUCKERMAN:  Objection.

You can answer.

A.      I wasn't on any calls with HR and Alex, so I don't know what was said.

Q.      Did you consider the conversation that you and Mr. Owens had with Ms. Poolos on January 5th, 2022, to be formal disciplinary action against Ms. Poolos under CBS policies?

A.      I don't know.

Q.      Before the January 5th meeting, had you had conversations with HR or Mr. Owens about whether the meeting you were having with Ms. Poolos on January 5th was to give her or issue some type of formal disciplinary action?

A.      My understanding was that it was to make her aware of the complaint and to tell her to stop behaving that way.

Q.      And this was, just to be clear, the first

T. Simon

**Page 243**

Q.    Did you have -- would you participate in any discussions about Mr. Owens sending this email to Ms. Poolos?

A.    Not that I recall, no.

Q.    Did you see a draft of this email before Mr. Owens sent it to Ms. Poolos?

A.    I don't believe so.

Q.    Okay.  Did you have any discussions with -- were you part of any discussions with Mr. Owens and/or HR as of January 6th in which you talked about taking formal disciplinary action against Ms. Poolos?

A.    At this stage, right here?

Q.    Yeah.

A.    No.

Q.    Had you been part of any discussions about firing Ms. Poolos as of this time, January 6th?

A.    No.

Q.    And had you been part of any discussions as of January 6th about placing Ms. Poolos on a leave of absence?

A.    No, I had not.

Q.    And on January 5th, during the meeting that you participated in with Mr. Owens and Ms. Poolos, was there any discussion at that meeting about

T. Simon

**Page 259**

C E R T I F I C A T E

I, TENEJA SOLTAU, hereby certify that the Examination Before Trial of TANYA SIMON was held before me on the 28th day of January, 2025; that said witness was duly sworn before the commencement of her testimony; that the testimony was taken stenographically by myself and then transcribed by myself; that the party was represented by counsel as appears herein;

That the within transcript is a true record of the Examination Before Trial of said witness;

That I am not connected by blood or marriage with any of the parties; that I am not interested directly or indirectly in the outcome of this matter; that I am not in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of February, 2025.

_Teneja Soltau_
_____
TENEJA SOLTAU

**Page 261**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

ALEXANDRA POOLOS,                )
                                 )
            Plaintiff,           )
                                 )
       vs.                       )   No. 1:23-cv-08896
                                 )        (GHW)(HJR)
PARAMOUNT GLOBAL; CBS            )
BROADCASTING, INC.; and          )
CBS NEWS, INC.,                   )
                                 )
            Defendants.          )
------------------------         )

                    March 11, 2025

                    4:56 p.m.

       Continued deposition of TANYA SIMON,
    held at the offices of Davis Wright Tremaine
    LLP, 1251 Avenue of the Americas, New York,
    New York, before Laurie A. Collins, a
    Registered Professional Reporter and Notary
    Public of the State of New York.

Page 304

Simon

testifying about earlier today; right?

A.   Correct, correct.

Q.   You don't recall other discussions beyond that one?                          05:49:26

A.   No, just that, that one call, yes.

Q.   At some point Alex -- there was a decision that Alex's employment would end; correct?

A.   Correct.                              05:49:44

Q.   And who made that decision?

A.   My understanding is that Bill made the final decision based on the -- what HR had discovered in their inquiry.

Q.   What was the basis for that understanding?                          05:50:06

A.   Sorry?

Q.   What was the basis for your understanding that Bill had made the final decision based on HR's findings?  Did someone tell you that?                          05:50:16

A.   I'm trying to remember whether I was on a call when they were discussed.  I believe Bill told me after the fact that that was a decision that he had made.                          05:50:32

Page 305

Simon

Q.    And was anybody else on that call that you had with Bill when he told you about the decision?

A.    No.                                    05:50:42

Q.    And did he tell you what the findings were by HR?

A.    I remember him telling me what his understanding was, which was that HR found that the outreach and the conversation with Scott    05:51:07 Bronstein was retaliatory and in that regard a violation of company policy and that he felt that Alex had lied to him after one of their conversations when he told her the matter was closed and then she went on and called Scott.    05:51:34

That's my recollection.

Q.    And did Bill say to you what Alex had supposedly lied to him about?

A.    I believe about the timeline or the nature of her call to Scott Bronstein.    05:51:50

Q.    Did he say what the lie was about the timeline?

A.    I don't recall.

Q.    Did he say what the lie was about the nature?    05:52:03

Page 340

C E R T I F I C A T E

STATE OF NEW YORK      )

                       : ss.

COUNTY OF NEW YORK    )

I, LAURIE A. COLLINS, a Registered Professional Reporter and Notary Public within and for the State of New York, do hereby certify:

That TANYA SIMON, the witness whose continued deposition is hereinbefore set forth, was previously duly sworn and that such continued deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of March 2025.

LAURIE A. COLLINS, RPR