# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

23-CV-08896(GHW)(JLC)

-------------------------------------------X

ALEXANDRA POOLOS,

Plaintiff,

-against-

PARAMOUNT GLOBAL, CBS BROADCASTING INC.,

and CBS NEWS INC.,

Defendants.

-------------------------------------------X

January 14, 2025

9:35 a.m.

VIDEO DEPOSITION of PLAINTIFF ALEXANDRA POOLOS, taken on behalf of Defendants pursuant to the Federal Rules of Civil Procedure and held at the offices of Davis Wright Tremaine LLP, 1251 Avenue of the Americas, New York, New York, before Marianne Witkowski-Smith, a Shorthand Reporter and Notary Public of the State of New York.

A P P E A R A N C E S:

VLADECK RASKIN & CLARK PC
Attorneys for Plaintiff
        111 Broadway, Suite 1505
        New York, New York 10006
BY:   JEREMIAH IADEVAIA, ESQ.
        BRANDON WHITE, ESQ.
        JAMES BAGLEY, ESQ.


DAVIS WRIGHT TREMAINE LLP
Attorneys for Defendants
        1251 Avenue of the Americas, 21st Floor
        New York, New York 10020
BY:   LYLE S. ZUCKERMAN, ESQ.
        MICHAEL LEONE LYNCH, ESQ.
        LISA E. DAYAN, ESQ.


ALSO PRESENT:
        DANYA AHMED, ESQ. - Paramount Global
        CARLOS KING, Legal Videographer

                *      *      *

**F E D E R A L   S T I P U L A T I O N S**

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

*     *     *

Page 4

A. POOLOS

(Ms. Dayan not present.)

VIDEO TECHNICIAN:  Good morning. We're going on the record at 9:35 a.m. on January 14, 2025.

Please note that the microphones are sensitive, may pick up whispering and private conversations.  Please mute your phones at this time.  Audio and video-recording will continue to take place unless all parties agree to go off the record.

This is Media Unit No. 1 of the video-recorded deposition of Alexandra Poolos, taken by counsel for Defendants in the matter of Alexandra Poolos vs. Paramount Global, et al. filed in the United States District Court, Southern District of New York, Case No. 23-cv-088969(GHW)(JLC).

The location of this deposition is 1251 Avenue...Avenue of the Americas, New York, New York.  My name is Carlos King, representing Veritext, and I'm the videographer.  The court reporter is

Page 5

A. POOLOS

Marianne Witkowski-Smith, also representing Veritext.

I'm not authorized to administer an oath, I'm not related to any party in this action, I'm not financially interested in the outcome.  If there are any objections to the proceedings, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearance and affiliations for the record, beginning with the noticing Attorney.

MR. ZUCKERMAN:  Lyle Zuckerman, Davis Wright Tremaine, counsel for Defendants.

MR. LYNCH:  Michael Lynch of Davis Wright Tremaine, counsel for Defendants.

MS. AHMED:  Danya Ahmed, vice president/assistant general counsel, Paramount Global.

MR. IADEVAIA:  Good morning. Jeremiah Iadevaia of the firm Vladeck, Raskin & Clark on behalf of the plaintiff, Alexandra Poolos.

Page 6

A. POOLOS

MR. BAGLEY:  James Bagley, Vladeck, Raskin & Clark, counsel for Plaintiff.

MR. WHITE:  Brandon White, Vladeck, Raskin & Clark, counsel for Plaintiff.

VIDEO TECHNICIAN:  Can the court reporter please swear in or affirm the witness.

A L E X A N D R A   P O O L O S, the witness herein, was thereupon duly sworn/affirmed by the Notary Public and was examined and testified as follows:

EXAMINATION

BY MR. ZUCKERMAN:

Q.    Good morning, Ms. Poolos.  My name is Lyle Zuckerman, as you just heard.  I'm a partner in the law firm of Davis Wright Tremaine, which firm represents the defendants, and I'll be taking most of your deposition today.

Good morning.

A.    Good morning.

Q.    Could you please just state your...your full name and your home address for the record.

Page 7

A. POOLOS

A.    My name is Alexandra Poolos, and I live at 862 Union Street, Apartment 6J, Brooklyn, New York 11215.

Q.    Do you understand that the testimony you're giving today in this deposition is under oath and has the same force and effect as if you gave it in a court of law?

A.    I do.

Q.    Do you understand that your obligation to testify truthfully today is no [differently] than if you were testifying in a court of law?

A.    I do.

Q.    Do you understand that the answers you give today may be read to the court or to a jury as a truthful and complete account of what took place?

A.    I do.

Q.    Do you understand that you must give an audible answer to each question that I ask so that the court reporter can record your answer?

A.    I do.

Q.    Okay.  So please, you know, answer

Page 8

A. POOLOS

with yeses and nos instead of shakes of the head or...or nodding, that would be helpful.

A.    Okay.

Q.    If you don't understand a question, please ask me to repeat it or to rephrase it. Only answer questions that are clear to you and that you understand.

A.    Yes.

Q.    Is that acceptable?

A.    Yes.

Q.    If you answer a question, it will mean that there's an assumption that you understood it.

Is that acceptable?

A.    Yes.

Q.    Is there any reason that you can't testify accurately, completely and truthfully today?

A.    No.

Q.    Are you under the influence of alcohol?

A.    No.

Q.    Are you under the influence of drugs?

Page 9

A. POOLOS

A.    No.

Q.    Did you take any medication that affects your memory?

A.    No.

Q.    Has your memory been affected by any illnesses?

A.    No.

Q.    Are you feeling well enough to testify today?

A.    Yes.

Q.    If you ever need a break, just let me know.  As long as there's not a question pending, I'm sure I'll be able to...to grant that request.

A.    Okay.  Thank you.

Q.    Okay.  Now, did you discussed today's deposition with anybody today?

A.    Yes.

Q.    Strike -- strike that.

Did you discussed today's deposition with anyone?

A.    Yes.

Q.    Okay.  Did you discuss it with anyone other than your current attorneys who

A. POOLOS

are here today?

A.    Yes.

Q.    Did you discuss it with anyone other than attorneys employed by Vladeck Waldman?

A.    Yes.

Q.    Okay.  And who did you discuss it with?

A.    My husband.

Q.    And for the record, what's his name?

A.    Alexander Cohn.

Q.    Okay.

A.    My older brother Nicholas Poolos, my closest friend Jennifer Baik and my other friend Abraham Velez.

Q.    Did you meet with your...your lawyers to prepare for today's deposition?

A.    Yes.

Q.    Okay.  Without telling me what you discussed, how many -- on how many occasions did you meet with your lawyers to prepare for today's deposition?

A.    Four times.

Q.    And do you recall how long you met with them on each occasion?

```
                                            Page 11
                    A. POOLOS
     A.     It was about two to three hours.
     Q.     In total or each time?
     A.     Each time.
     Q.     Okay.  And was anyone else present
at those meetings with your counsel; for
example, any of the folks that you mentioned
you discussed today's deposition with, whether
your husband, your friend, your older brother,
anybody?
     A.     My husband was present for one of
the sessions but in a totally different room.
     Q.     So he was...he was in the office but
not in the same room as you with your counsel?
     A.     No, he was in our home, it was --
     Q.     I see.
     A.     -- it was a Zoom call.
     Q.     Okay.  But he wasn't a participant
to the Zoom call, correct?
     A.     No --
     Q.     Okay.
     A.     -- he was not.
     Q.     Okay.  Have you communicated with
any current or former employee of CBS News,
CBS Corporation or Paramount Global to prepare
```

Page 12

                    A. POOLOS

for today's deposition?

A.    No.

Q.    Did you review any documents in preparation for today's deposition?

A.    Yes.

Q.    Which documents did you review?

A.    I looked at my complaint, I looked at the interrogatories, and I reviewed like sporadically some of the other notes kind of haphazardly in my Lexbe file.

Q.    The notes that you reviewed, were all of those produced to your lawyers in connection with this lawsuit?

A.    Yes.

Q.    And do you know whether all of those notes were then produced to counsel for defendants in this lawsuit?

A.    Yes.

Q.    Okay.  So you didn't review anything in preparation for today that wasn't produced to my law firm in connection with this lawsuit, correct?

A.    No.

Q.    On how many occasions did you

Page 13

A. POOLOS

discuss today's deposition with Abraham Velez?

A.    Once.

Q.    Okay.  When was that?

A.    Saturday.

Q.    Okay.  What was the sum and substance of what you discussed with Mr. Velez?

A.    We just discussed the importance of the day and he gave me a pep talk.

Q.    By the way, who is Mr. Velez?

A.    He's one of my oldest friends.  We went to college together.

Q.    Is he a lawyer?

A.    No.

Q.    And when did you have a conversation with Jennifer -- was it...was it Beek [ph] or Baik; I'm sorry?

A.    Baik.

Q.    I can't -- couldn't read my own writing, Jennifer Baik.

A.    Yes.

Q.    When did you have a conversation or conversations with Ms. Baik?

A.    On Sunday.

Page 14

A. POOLOS

Q.    Okay.  What was the sum and substance of that discussion?

A.    Again, just a conversation about being nervous about today and her giving me a pep talk.

Q.    And what about your conversation or conversations with your brother Nicholas, how many did you have with him about today's deposition?

A.    One.

Q.    And when was that?

A.    Sunday.

Q.    Okay.  What was the sum and substance of that call?

A.    I was just letting him know I had a deposition on Tuesday, and he was just giving me like a pep talk.

Q.    With either -- with any of those folks - your older brother or your friends, Jennifer or Abraham - did you discuss the facts and circumstances of this case?

A.    No.

Q.    Did you discuss with them any conversations that you had with your counsel?

Page 15

A. POOLOS

A.    Yes.

Q.    With which one of those folks did you discuss conversations with counsel?

A.    I...I told all three that I had been meeting with my attorneys ahead of deposition, but that was it.

Q.    Okay.  I think I asked you about Mr. Velez, but what about with respect to Ms. Baik, is she a lawyer?

A.    No.

Q.    Okay.  And what about your husband, on how many occasions did you have a discussion with him about today's deposition?

MR. IADEVAIA:  I'm just going to caution the witness not to disclose -- I mean, I think even the question is asking about substance of discussions.

But you can answer how many occasions.

A.    I don't know.

Q.    You don't know or you don't remember?

A.    I don't know.  We live together.

Q.    Does...does that mean you had many

Page 16

A. POOLOS

discussions?

A.    I don't know.

Q.    How do you spell Jennifer Baik's last name?

A.    B-A-I-K.

Q.    Thank you.  When did you first become aware of your obligation to preserve and produce documents relevant to this case?

A.    I don't know.

Q.    Why don't we take that in two pieces, actually.

When...when did you first become aware of your duty to preserve documents relevant to this case?

A.    I don't know.

Q.    You don't remember?

A.    I don't remember.

Q.    Did you at some point become aware that you had an obligation to preserve records?

A.    I think so.

Q.    And how did you become aware of that?

MR. IADEVAIA:  I don't want you to

Page 17

A. POOLOS

disclose any conversations that you had with counsel.  So if you can't answer the question, you can't answer the question.

A.     I can't answer the question.

Q.     Did anybody other than your counsel advise you to preserve records relevant to this case?

A.     No.

Q.     Did you become aware -- maybe I can refresh your memory just...just a little bit.

Did you become aware of your obligation to preserve records before the lawsuit in this case was filed with the court?

A.     I don't remember.

Q.     Is it possible?

A.     It's possible.

Q.     Is it possible that you didn't become aware of your obligation to preserve records relevant to this case until after a lawsuit was filed in this case?

A.     I think it is possible.  I...I don't remember.

Q.     Is there any document that would refresh your memory in this regard?

Page 18

A. POOLOS

A.    I don't know.

Q.    Have you asked any current or former CBS News, CBS Corporation or Paramount Global employee to be a witness on your behalf in this case?

A.    No.

Q.    Have your lawyers asked any current or CBS News, CBS Corporation or C -- or Paramount Global employee to be a witness for if you in this case?

DI*          MR. IADEVAIA:  I'm going to direct the witness not to answer the question if you learned that information through counsel.

Q.    So are you able to answer the question?

A.    No.

Q.    Have you asked any current or former CBS News, CBS Corporation or Paramount Global employee to submit an affidavit on your behalf in this case?

A.    Not that -- no.

Q.    How about a written statement that's unsworn?

Page 19

A. POOLOS

A.    No.

Q.    Have you ever been the plaintiff or a claimant in a legal proceeding before this proceeding?

A.    No.

Q.    Have you ever been a defendant in a legal proceeding?

A.    No.

Q.    Have you ever been deposed before?

A.    No.

Q.    Have you ever been arrested for a misdemeanor or a felony?

A.    No.

Q.    Have you ever been charged with a crime?

A.    No.

Q.    Okay.  Have you ever filed for bankruptcy?

A.    No.

        MR. ZUCKERMAN:  Okay, great.

        Okay.  We're going -- I'm going to place before you what's been marked as Exhibit 1, which is entitled Amended Complaint.  We'll have copies for your

Page 20

A. POOLOS

counsel as well.

(Whereupon, Defendants Exhibit 1, Amended Complaint Document 30, was marked for identification, as of this date.)

MR. ZUCKERMAN:  And I'm not going to ask you detailed questions about particular paragraphs right now, but feel free to, to...to page through it if you'd like.

Q.    Do you recognize this document?

A.    Yes.

Q.    Okay.  What do you understand it to be?

A.    It's my complaint that was submitted in this case.

Q.    And did you review the complaint -- did you review that document before it was filed with the court?

A.    Yes, I did.

Q.    And does it accurately summarize your claims against all of the defendants?

A.    Yes, it does.

Q.    Now, one of the claims in the complaint is that you were discriminated

Page 21

A. POOLOS

against because of your gender, correct?

A.    Yes.

Q.    Okay.  And another claim is that you were retaliated against for engaging in protected activity, correct?

A.    Yes.

Q.    You also assert a claim for breach of contract based on Defendant's decision to not pay you severance, correct?

A.    Yes.

Q.    Okay.  And then finally you assert a violation of the New York labor law, again based on the company's decision to not pay you severance, correct?

A.    Yes.

Q.    Okay.  And the factual bases for those claims are contained in that complaint, correct?

A.    Yes.

Q.    And to your knowledge as you sit here today, the complaint's factually accurate, correct?

A.    Yes.

Q.    Who do you allege unlawfully

Page 22

A. POOLOS

discriminated against you -- strike that.

Who do you believe unlawfully discriminated against you?

A.   Paramount Global unlawfully discriminated against me.

Q.   And specifically which persons associated with Paramount Global discriminated against you?

A.   Specifically the HR department, specifically my supervisor Bill Owens and other employees of 60 Minutes.

Q.   Which, quote, HR employees -- strike that.

Which employees in the HR department do you allege unlawfully discriminated against you?

A.   Renee Balducci, Cynthia Glasgow, Maria Cottone, and I also can't answer that question completely because I'm not -- I was not given information as to who any of those three women discussed my claim with and got input from.

Q.   And you also mentioned other employees of 60 Minutes.

Page 23

A. POOLOS

Who...who do you believe discriminated against you who fall into the category of other employees of 60 Minutes?

A.    Tanya Simon.  A litany of men.

Q.    Which men?

A.    Shachar Bar-On.

There are others that I just can't think of right now.

Q.    You prepared four times with your lawyers for today's deposition, correct?

A.    (Indicating.)

Q.    Yes?

A.    Yes.

Q.    And the...the gravamen of your complaint is discrimination on the basis of gender, correct?

A.    Right.

Q.    So I'll give you another minute or two to maybe gather your thoughts --

A.    Okay.

Q.    -- but it's important for us to know each person who you accuse in this lawsuit of discriminating against you.

A.    I'm going to do my best to answer

Page 24

A. POOLOS

the question as best as I can think of right now.  I already said Shachar Bar-On.

There were other men who harassed me and discriminated against me in the course of my employment at 60 Minutes, including Bob Anderson, Dan Bussell, Richard Bonin, Matt Polevoy, Will Croxton, Michael Gavshon.

I'm going to add Lesley Stahl, Jeff Fager.  And I...I can't remember others at this moment.  That's the best I can do.

Q.    Who do you believe unlawfully retaliated against you or engaged in --

(Unreportable crosstalk.)

A.    -- you know, I -- it's hard for me to answer that question because I'm not privy to who was spoken to after I left the company, but it came to my attention that over a dozen employees at 60 Minutes were speaking about me and my case and my experience at 60 Minutes.

But I do believe the HR department, in conducting an investigation of me after I left the company, and management of 60 Minutes - including Bill Owens, Tanya Simon and Lesley Stahl - were retaliating against me

Page 25

A. POOLOS

for filing this claim.

Q.    Is that...is that all you can think of at this moment?

Is that everyone you can think of at this moment, would be the proper grammar.

A.    Well, no, I would include in that list Shachar Bar-On.

Q.    I assume you claim in this lawsuit that the termination of your employment was a retaliatory action, correct?

MR. IADEVAIA:  Objection.

Go ahead, you can answer.

A.    I claim it was a discriminatory action, and yes, it was retaliatory.

Q.    Okay.  Other than the termination of your employment, was there any other action taken against you that you claim was retaliatory?

A.    Yes.

Q.    And what is that?

A.    They -- as I told you, they investigated me after I left the company.

Q.    Do you know what they were investigating?

Page 26

A. POOLOS

I'm sorry, were you finished with your answer?  I apologize.

A.    Yes, I was finished.

Q.    Okay.  Do you know what...what the company was investigating?

A.    I don't.  I wasn't privy to the investigation.

Q.    Okay.  Do you know who conducted the investigation?

A.    It was somebody in HR whose name I don't remember.

Q.    How do you know that?

A.    I read about it generally in their response to my EEOC filing.

Q.    And do you know what did the -- did someone from the Human Resources department reach out to you and ask you to be interviewed in connection with that investigation?

A.    Not that I'm aware of.

Q.    Did anyone from any of the defendants reach out to you following the termination of your employment and ask you to be interviewed in connection with any investigation?

Page 27

A. POOLOS

A.    Not that I'm aware of.

Q.    Did -- and when I say reached out to you, that could have been through your counsel.

Does that change your answer?

DI*    MR. IADEVAIA:  I'm going to instruct the witness not to answer to the extent that you know information through counsel, as it's privileged.  If you can otherwise answer the question, you can answer.

Q.    Let me ask it a different way, because that's...that's not privileged.

Were you contacted directly or indirectly, including through your counsel, to be interviewed by someone employed by one of the defendants following the termination of your employment?

A.    I don't remember.

Q.    So it could have been?

A.    Could have been, but I don't remember.

Q.    Isn't that something you'd remember?

MR. IADEVAIA:  Objection to form.

You can answer.

Page 28

A. POOLOS

A.    I don't remember.  If you're asking me should I have remembered, I can't answer that question.  I just don't remember.

Q.    What is the reason you believe you were retaliated against, for what reason were you retaliated against in your mind?

A.    I'm sorry, can you ask me that again?

Q.    Yeah, sure, I can ask it a little more technically.

You allege in the lawsuit that you were retaliated against for engaging in protected activity, correct?

A.    Yes.

Q.    What protected activity did you engage in that you claim led to the retaliation?

A.    I filed a complaint against Paramount.

Q.    What complaint are you referring to?

A.    I'm, I'm referring to my...I'm referring generally to my legal complaint, that I was discriminated against.

Q.    Is that the complaint filed in

Page 29

A. POOLOS

court, is that a different complaint?

A.    I think it's generally all of the complaints I've made; the EEOC complaint, the complaint to CBS News, that I was discriminated, against and eventually the...the filing in court.

Q.    Anything else?

A.    No.

Q.    Okay.  When you refer to the, quote, complaint to CBS News, what are you referring to?

A.    After I was fired, I eventually hired an attorney and there were conversations with CBS News attorneys, that I shouldn't have been fired and that it was a discriminatory act.

Q.    And that's the counsel that's continuing to represent you today, correct?

A.    Yes.

Q.    Okay.  So for the record, was there any, quote, complaint - as the phrase that you just used - submitted to your employer at any time prior to your termination?

A.    Was there a complaint submitted to

Page 30

A. POOLOS

CBS News before I was terminated?

Q.    That's correct.  You've mentioned EEOC charge, you mentioned the filing in court and you mentioned a, quote, complaint to CBS News which we just discussed.

A.    Yes.

Q.    All of those, quote, complaints - I'm just using your phrase, complaint - were submitted following your termination, correct?

A.    Yes.

Q.    Okay.  Was there any complaint filed prior to your termination?

MR. IADEVAIA:  Objection to form.

You can answer.

A.    I...I think my question to you would be define complaint.

Q.    Well, I'm using your phrase, complaint.

A.    Oh, okay.  Yes, I have made previous complaints to my former employer about sexual harassment, abuse and discrimination.  And in the course of my termination, I made several complaints to HR in writing, that I was not being treated fairly, and requesting to speak

Page 31

A. POOLOS

with managers at HR.

I also requested to my management at 60 Minutes that I be allowed to speak to HR at the onset and was told I was not allowed to speak to them.

Q.    Okay.  With respect to the -- by the way, anything else?

A.    Not that I can think of.

Q.    Okay.  With respect to your claim that you made a complaint about sexual harassment, when did you make that complaint?

A.    I believe...I believe it was in 2017.

Q.    And who did you complain about?

A.    Shachar Bar-On.

Q.    Okay.  Any other complaints of sexual harassment that you claim you lodged with your employer prior to termination?

A.    I complained about being harassed by a cameraman to his direct supervisor.

Q.    Who was the supervisor?

A.    Ann Marie Kross.

Q.    And when did you make that complaint?

Page 32

A. POOLOS

A.     I don't remember.

Q.     Was it before 2017 or after 2017?

A.     It was after 2017.

Q.     Was it before 2020 or after 2020?

A.     It would have been after 2020.

Q.     Okay.  Did you submit that complaint in writing?

A.     No.

Q.     Did you submit that complaint to the Human Resources department?

A.     No.

Q.     Did you submit that complaint to your supervisors?

A.     No.  Well, I'm sorry, let me answer that a different way.

Yes, because Ann Marie Kross is a senior producer and she's technically one of my supervisors.

Q.     Okay.  What did you tell Ann Marie Kross?

A.     I told her that Dan Bussell frequently made inappropriate and sexist comments about my body, that he called me baby despite me repeatedly telling him not to refer

Page 33

A. POOLOS

to me that way, that he regularly disparaged Lesley Stahl's body as being disgusting, that he talked about his sexual proclivities on work assignments, that he was very demeaning to me based on my gender.

Q. Do you know whether Ann Marie Kross relayed this information to anyone else at the company?

A. I do not know.

Q. Did you ask Ann Marie Kross to relay this information to anyone else at the company?

A. I asked Ann Marie Kross to take action. She told me that Dan was going through a rough time and we had to cut him some slack.

Q. You went through the company's annual sexual harassment training, correct?

A. Yes, I did.

Q. Okay. And you...you understood that you could report such matters to Human Resources, correct?

MR. IADEVAIA: Objection.

You can answer.

Page 34

A. POOLOS

A.    I tried on a number of occasions to raise concerns about sexual harassment and abuse with the highest levels of management, and it was made very clear to me that I was not to go to HR and that if I pursued a complaint, it would affect me negatively.

Q.    Who told you that?

A.    Alison Pepper, and I spoke about the abuse I was enduring for years with Shachar Bar-On.  She -- instead of responding that they would investigate it or even talk to Bar-on, she threatened me with taking me out of my job.

Q.    When did you have this discussion with Ms. Pepper?

A.    I don't remember the exact date.

Q.    You recorded that conversation, did you not?

A.    I did.

Q.    Okay.  We'll get back to that in just...just a moment.

Other than Alison Pepper, did anybody else tell you, in sum and substance, you shouldn't be reporting sexual harassment?

Page 35

A. POOLOS

A.     Yes.

Q.     Who?

A.     Bill Owens.

Q.     When did he say that?

A.     I don't remember the date but after my conversation with Alison.

Q.     Was it also in connection with your complaints about Mr. Bar-On?

A.     Yes, it was.

Q.     For the record, it's B-A-R, hyphen, O-N; is that correct?

A.     Dash, yes.

MR. ZUCKERMAN:  Yes.

I apologize, can you now read me back my last question and that answer?

(As read by the reporter):

QUESTION:  Was it also in connection with your complaints about Mr. Bar-On?

MR. ZUCKERMAN:  And the answer was yes?

THE REPORTER:  Yes.

BY MR. ZUCKERMAN:

Q.     Okay.  Anyone -- has it -- did

Page 36

A. POOLOS

anyone else tell you, in sum and substance, you should not be reporting sexual harassment complaints?

A.    Yes.

Q.    Who else?

A.    Lesley Stahl.

Q.    When did she say that?

A.    Numerous times.

Q.    How many times?

A.    Half a dozen.

Q.    And what discussions were you having with Lesley Stahl that prompted her to allegedly say this?

A.    Well, I remember talking with her about the complaint that was made about Michael Gavshon and she -- I discussed it with her because I was appalled by what had come out in that complaint.

And she and I discussed him, and she told me that the woman making the complaint was a horrible person who was trying to ruin his career and that women made frivolous complaints against men all the time and it was disgusting.

A. POOLOS

Q.    Did she ever say to you, do not report instances of sexual harassment --

A.    She --

Q.    -- to Human Resources?

A.    In so many words, yes.

Q.    Did she ever use those words, in sum or substance?

A.    Yes.

Q.    Okay.  What you just relayed for the record is that what you understood to mean --

A.    In --

Q.    -- do not report?

A.    -- in that instance.

In a subsequent conversation, she told me she deeply respected me for never making a formal complaint about the abuse and harassment I endured from Shachar Bar-On.

Q.    Okay.  Shachar Bar-On, fantastic.

Anyone other than the folks you just mentioned; Ms. Pepper, Bill Owens, Lesley Stahl?

A.    Yvonne Shaw.

Q.    Who is that?

A.    I don't know what her exact title

Page 38

A. POOLOS

is.  She is a senior, she's kind of the administrator of 60 Minutes.

Q.    And what did she say to you in this regard?

A.    She said that I needed to tell management.

Q.    About what?

A.    About the abuse I was enduring.

Q.    Is this again about Shachar Bar-On?

A.    Yes.

Q.    Okay.  So -- and did you tell management?

A.    Yes.

Q.    Okay.  Did you tell -- and when you say management, are you referring to Alison Pepper?

A.    Yes.

Q.    Okay.  And did you have more than one discussion with Ms. Pepper about this or just the one that you --

A.    I --

Q.    -- recorded?

A.    -- I don't remember.

I had the discussion with Alison and

Page 39

A. POOLOS

then a subsequent discussion with Bill Owens.

Q.    Did you record the conversation with Bill Owens?

A.    No.

Q.    Why did you record the conversation with Ms. Pepper and not the conversation with Mr. Owens?

MR. IADEVAIA:  Objection to form.

You can answer.

A.    I don't know.  I think at the time, I was so anxious about raising my concerns about Shachar Bar-On because I knew that it was going to be very dangerous for me to complain about him.

Q.    The discussion that you had with Ms. Pepper, did you ever complain to Ms. Pepper that Mr. Bar-On sexually harassed you?

A.    I didn't, because it became very clear to me that this was not -- that nobody was going to take my complaint seriously.

When she told me specifically that people scream at their coworkers because they get comfortable and familiar with them and

Page 40

A. POOLOS

that her solution would be to prevent me from working with Lesley Stahl, I didn't want to make it worse for myself.

Q.    Did you ever tell Ms. Pepper that Mr. Bar-On's alleged conduct was in any way based on your gender?

A.    I don't remember.

Q.    Did you record the entire conversation with Ms. Pepper?

A.    I think so.

Q.    You told Ms. Pepper that Mr. Bar-On has a temper, correct?

A.    I believe so, yes.

Q.    You told Ms. Pepper that he was "snappy with me," correct?

A.    I don't remember, but if you're telling me that's what's in the transcript...

Q.    The audiotape that you produced reflecting this conversation with Ms. Pepper is complete and unadulterated, correct?

A.    Yes.

Q.    It would be an accurate record of what you said to Ms. Pepper and what Ms. Pepper said to you, correct?

Page 41

A. POOLOS

A.     Yes.

Q.     What you alleged to Ms. Pepper in that conversation, is that the same thing you alleged to...to Bill Owens when you had a discussion with him about Shachar Bar-On?

MR. IADEVAIA:  Objection to form.

You can answer.

A.     It was more expansive.

Q.     How so?

A.     Bill told me that he thought Shachar Bar-On had a mental illness and that he himself had experienced his erratic behavior. We talked about Shachar's abuse, including Shachar telling him, telling Bill, in front of me that he hoped I got killed on assignment in Iran.

We...we just talked about, you know, the overall abuse, and Bill again reiterated that the solution to the problem was not that he would talk to Shachar or that I should go to HR but that I should leave Lesley's team.

Q.     What other abuse -- other than what you've described already, what other abuse did you describe to Mr. Owens?

Page 42

A. POOLOS

A.    I don't remember.

Q.    Do you remember anything else?

A.    I remember telling him that Bar-On was constantly demeaning to me, but we didn't -- I remember that we didn't get into too many examples because Bill kind of cut me off and said, I have no reason to doubt anything you say because I've had my own experiences with that guy and I think he's mentally ill.

Q.    You allege in the complaint that you took contemporaneous notes documenting Bar-On's sexual harassment, correct?

A.    Yes.

Q.    And you produced those notes, you -- strike that.

You produced pictures of those notes in this lawsuit, correct?

A.    Yes.

Q.    Have you produced pictures of all the notes?

A.    Yes.

Q.    Okay.  And those notes were taken in a...in a notebook, correct?

A. POOLOS

A.    Yes.

Q.    And are those pages still affixed to the notebook or have they been torn out?

A.    They've -- I've...they've been torn out.

Q.    Where are they now?

A.    I think they're with my attorneys.

RQ*    MR. ZUCKERMAN:  Okay.  So we would request the production of the originals of those notes for inspection and testing.

MR. IADEVAIA:  We'll take it under advisement.

MR. ZUCKERMAN:  Okay.  Can we mark these two exhibits as two and three.

(Reporter confirms.)

(Whereupon, Defendants Exhibit 2, Handwritten Notes Pl._203, was marked for identification, as of this date.)

(Whereupon, Defendants Exhibit 3, Handwritten Notes Pl._204, was marked for identification, as of this date.)

MR. ZUCKERMAN:  This one's two, this one's three.

MR. IADEVAIA:  Thank you.

Page 44

A. POOLOS

MR. ZUCKERMAN:  Okay.  I've got another set for you guys.

Okay.  Ms. Poolos, we've handed you what's been marked as Defendants Exhibits 2 and 3.

Q.    Are these the notes that you were just -- oh, strike...strike that.

We've marked for you what's Exhibits 2 and 3.  Is Exhibit 2 -- does that reflect the handwritten notes in the notebook we were just referring to?

A.    Yes.

MR. IADEVAIA:  Objection.

Go ahead.

THE WITNESS:  Oh, sorry.

MR. IADEVAIA:  That's okay.

THE WITNESS:  Yes.

BY MR. ZUCKERMAN:

Q.    Same question for Exhibit 3.

MR. IADEVAIA:  Objection, same objection.

Go ahead.

A.    It wouldn't have been the same notebook but yes.

Page 45

A. POOLOS

Q.   These are -- am I accurate that these pages are from like a stenograph notebook?

A.   Yes.

Q.   Okay.  Now, the documents are -- the notes are dated.  Exhibit 2 is dated 12/6/16 and Exhibit 3 is dated 12/16/2021.

Do you see that?

A.   Yes.

Q.   Okay.  Were these notes taken temp -- contemporaneously on those dates?

MR. IADEVAIA:  Objection.

You can answer.

A.   Yes.

Q.   How many different notebooks -- strike that.

Do you know whether these notes were taken with the same pen?

A.   I'd say it's very unlikely.

Q.   Because they were taken five years apart, correct --

A.   Yeah.

Q.   -- according to your testimony today?

Page 46

A. POOLOS

A.    Yes.

Q.    Okay.  Did you rip these pages out of the notebook in connection with this lawsuit, like you needed to produce the notes?

A.    No.

Q.    Okay.  So how did you keep all these loose pieces of paper, were they in a folder, were they in a notebook?

MR. IADEVAIA:  Objection.

Go ahead, you can answer.

A.    I kept notes related to Shachar Bar-On.  I would rip them out and put them in like a manila folder that I kept at home.

Q.    Have you produced all of the notes in that manila folder to your lawyers in this lawsuit?

A.    Yes.

Q.    And have all of those notes been produced to Defendants in this lawsuit?

A.    Yes.

Q.    And when you had this discussion with Ms. Pepper about Mr. Bar-On, you had been working with Mr. Bar-On for about five years by that point; is that correct?

Page 47

A. POOLOS

A.    I don't know.

Q.    Your complaint at paragraph 226 alleges that you had this discussion with Ms. Pepper on January 13, 2017, and the complaint's in front of you if you want to refresh your memory.

A.    Can you tell me which page?

Q.    I don't know which page but the...the paragraph number is 226.

A.    Okay.  Thank you.

MR. IADEVAIA:  I think it's page 39.

THE WITNESS:  Okay.

(Document review.)

Okay.  Can you ask me the question again, please?

BY MR. ZUCKERMAN:

Q.    Sure.

First of all, is that paragraph accurate to the best of your recollection today, that you had this discussion with Ms. Pepper on January 13, 2017?

A.    Yes, I believe so.

Q.    Okay.  As of that date, you had been working with Mr. Bar-On for approximately

Page 48

A. POOLOS

fifty -- five years; is that correct?

A.    I guess it would be more like five and a half.

Q.    Okay.  So I, I'm correct -- strike that.

You did not complain to Ms. Pepper that Bar-On was sexually harassing you or treating you -- or mistreating you because you're a woman, correct?

MR. IADEVAIA:  Objection.

You can answer.

A.    I don't believe I talked about the specific instances of sexual harassment, but I don't know that I didn't say he was abusing me because I was his subordinate and a woman.  I don't remember.

Q.    You don't remember, but the...the transcript -- the recording would be an accurate reflection of the complete discussion that you had with Ms. Pepper, correct?

A.    Yes.

Q.    Okay.  And Ms. Pepper asked if you wanted to switch teams, correct?

A.    I...I think she told me I had to

Page 49

A. POOLOS

switch teams.

Q.    That would also be in this recording, correct --

A.    Yes.

Q.    -- if it exists?

A.    Yes.

Q.    And you told Ms. Pepper in response that you would think about it?

A.    I don't remember.

I think when we had the discussion, I objected to the concept that I should switch teams.

Q.    When's the last time you listened to this recording?

A.    It's been years.

Q.    You did make clear to Ms. Pepper repeatedly that you didn't want her to tell anyone about this discussion that you had with her, correct?

A.    After she told me I would have to leave Lesley's team, I became terrified that I was going to face negative repercussions, so I asked her not to discuss it with anyone.

Q.    Did you report to anyone at the

Page 50

A. POOLOS

company that Ms. Pepper instructed you that you needed to leave the team?

MR. IADEVAIA:  Objection to form.

You can answer.

Q.    Or if "instructed" is not word -- the correct word, you can let me know what the correct word would be.

A.    Are you asking whether I told anybody else at 60 Minutes whether I had had this conversation with Alison and she had told me I needed to leave the team?

Q.    Correct.

A.    I don't remember.

Q.    Isn't it true that the first thing that you said to Ms. Pepper was that you wanted Ms. Pepper to keep this confidential?

A.    I don't...I don't know.

Q.    You're alleging in this lawsuit that you complained to Ms. Pepper, and you believe that is in some way relevant to this lawsuit, correct?

A.    Yes.

Q.    And you met with your attorneys four times before coming here today to testify,

Page 51

A. POOLOS

correct?

A.    Yes.

Q.    Did you have any occasion to review the recording in preparation for today's deposition since it's important to your case?

MR. IADEVAIA:  Objection.

You can answer.

A.    I didn't review the recording.

Q.    And you don't recall telling Ms. Pepper to keep the discussion confidential?

A.    I don't remember telling her that. I also don't remember not telling her that.

Q.    This case is important to you, is it not?

A.    Yes.

Q.    You've thought about it a lot, have you not?

A.    Yes.

Q.    I would assume you've strived to remember as many details as possible, correct?

MR. IADEVAIA:  Objection.

You can answer.

A.    Yes.

Page 52

A. POOLOS

Q.    Is there anything that, between now and the date of a trial in this action of what happens, that would refresh your memory as to this discussion?

(Technical interruption.)

Q.    Is there anything that would refresh your memory as to your discussion -- you know what, strike that.

Did you tell Ms. Pepper you were recording the conversation?

A.    No.

Q.    Do you have a habit of recording conversations with -- without participants knowing?

A.    No.

MR. IADEVAIA:  Objection.

Go ahead.

THE WITNESS:  Sorry.

BY MR. ZUCKERMAN:

Q.    Over the course of your 60 Minutes employment, how many conversations with colleagues did you record?

A.    Two.

Q.    And were both of those produced to

Page 53

A. POOLOS

your attorneys in connection with this lawsuit?

A.    Yes.

Q.    Now, in the complaint you allege that Ms. Pepper shared the complaint that you made to her with then Executive Editor Owens; is that correct?

A.    Yes.

Q.    Okay.  Do you know what exactly Ms. Pepper shared with Mr. Owens?

A.    I don't.

Q.    Okay.  And you later met with Mr. Owens about this subject?

A.    Yes.

Q.    Were you upset that Ms. Pepper shared the conversation with Mr. Owens?

A.    I don't remember feeling that way. I remember feeling very worried.

Q.    Whether you instructed Ms. Pepper to not share the conversation, you didn't want the conversation shared with Mr. Bar-On, correct?

MR. IADEVAIA:  Objection.

You can answer.

Page 54

A. POOLOS

A.    When I understood that nobody was going to investigate Shachar Bar-On or send me to HR to file a complaint, I -- I'm sure I didn't want him to be told about the conversation because he would just be even meaner to me, and in fact he told me on several occasions that I better not go to Alison about our issues.

Q.    And did, as far as you know -- well, strike that.

Do you recall when you met with Mr. Owens about this?

A.    I don't.

Q.    Did you ever record -- did you record that conversation with Mr. Owens?

A.    No, I did not.

Q.    Okay.  I may have asked you this before, and if I did I apologize.

You did not complain or file a report with Human Resources about Mr. Bar-On's alleged conduct, correct?

A.    I didn't, because it was pretty obvious I shouldn't.

Q.    For all the reasons you've already

Page 55

A. POOLOS

testified about; is that correct?

A.    For those reasons and because it was a very clear and very well-known understanding, policy of management, that no one went to HR with a complaint, you went to Alison, Bill and Jeff, and that if you went to HR you would be jeopardizing your employment.

Q.    Did you ever go to HR to file a complaint about anyone or anything?

A.    No.

Q.    Did you, are you -- do, do you know what -- strike that.

Is there not an anonymous reporting mechanism that you could have used to report Mr. Bar-On's alleged actions?

MR. IADEVAIA:  Objection to form.

You can answer.

A.    I don't know if there was an anonymous option available to me at the time, but it wouldn't have been anonymous --

(Unreportable crosstalk.)

A.    -- by nature of the fact that I was his only direct report, so there was no way it would have been anonymous.

Page 56

A. POOLOS

Q.    You -- do you know of something called Open Line, are you aware of something called Open Line?

A.    No.

Q.    Never heard that before?

A.    No.

Q.    Okay.  Have you read the...the company's anti-harassment policy during your employment?

A.    I did the online -- I don't know what they're called, online tests?  I don't know.

Q.    Did you read the anti-harassment policy at any time during your employment?

A.    Yes.

Q.    Did you read the global standards of business conduct at any time during your employment?

A.    I think so.

Q.    Okay.  So other than the...the cameraman and Mr. Bar-On, did you file any other complaints with the company about sexual harassment?

MR. IADEVAIA:  Objection to form.

Page 57

A. POOLOS

You can answer.

A.    I told Bill Owens that I was being bullied and harassed by Bob Anderson.

Q.    Who's Bob Anderson?

A.    Bob Anderson is a former producer at 60 Minutes.

Q.    When did you disclose this to Bill Owens?

A.    I don't know the exact date.

Q.    Can you give me an approximate date, a year?

A.    I, I don't -- I can't say for sure, but I think it was either 2017...it might have been 2018.

Q.    And what did you tell Mr. Owens at that time?

A.    I told him that Bob Anderson was, you know, going full hog on me and attacking me and preventing me from doing my job.

Q.    What does full hog mean?

A.    He was unloading his temper on me.

Q.    Okay.  Did...did you tell Mr. Owens that he was sexually harassing you?

A.    I believe Bob Anderson made that

Page 58

A. POOLOS

clear in front of me and Bill Owens.

Q.    My question's different.

Did you tell Mr. Owens that you...you believed Mr. Anderson was sexually harassing you?

A.    No, I don't think I did.

I did however tell Shachar Bar-On that I was being sexually harassed by Bob Anderson.

Q.    And did you tell Mr. Bar-On that in around the same time, 2017 or 2018?

A.    No, that would have been an earlier incident.

Q.    Okay.  When was that?

A.    I couldn't say for sure.  I would say my best guess - and it is a guess - would be like 2016.

Q.    Did you report Bob Anderson's actions, either the alleged actions in 2016 or the alleged actions in 2017, slash, 2018, to the Human Resources department of the company?

A.    No.

Q.    Okay.  What, what...what actions do you claim Bob Anderson took against you in

A. POOLOS

2016 that you're now referring to as sexual harassment?

A.    He said in front of a roomful of people that I was a girl and that he and his whole team had issues with a girl trying to best them and that that just wasn't going to be possible on his watch.

Q.    Anything else?

A.    I think he called me that problematic girl.

Q.    Anything else?

A.    You know, there was a whole conversation with Jeff Fager, Bill Owens, Shachar Bar-On, Bob Anderson - and maybe somebody else who I can't remember - where Bob just ripped into me in front of them, a lot of the same kind of stuff, who did I think I was, some girl trying to take his story away from him.

Q.    The alleged incidents with the cameraman, that's not something you included in your EEOC charge, correct?

A.    No.

Q.    That's not something you included in

Page 60

A. POOLOS

your complaint in this action, correct?

A.    No.

Q.    And the alleged incidents with Bob Anderson, that's not something you included in your EEOC charge, correct?

A.    No.

Q.    And it's not something you included in your complaint in this action, correct?

A.    No.

Q.    Why not?

A.    My complaint and my EEOC charge were meant to have examples of discrimination and harassment.  It was in no way meant to be an exhaustive list.  There's just too many to count.

Q.    Are you suing the defendants for sexual harassment in this action based on actions allegedly taken by Bob Anderson?

A.    It's part of the bigger picture.

Q.    Are you suing the defendants in this lawsuit for conduct allegedly taken by Bob Anderson?

MR. IADEVAIA:  Objection.

You can answer.

Page 61

A. POOLOS

A.    I'm suing the company for an environment of discrimination and sexual harassment that I endured that was done by a number of employees, some examples of which are in the complaint and some of which are not.

Q.    Which cause of -- do you know what a cause of action is?

A.    No.

Q.    Okay.  If you look in your complaint - and I think we went over these at the beginning of the deposition - your causes of action or your claims against the defendants were for -- are for gender discrimination, retaliation, breach of contract and a violation of the New York labor law.

Remember those questions and answers?

A.    Yes.

Q.    Where's your claim for sexual harassment?

MR. IADEVAIA:  Objection.

You can answer.

Page 62

A. POOLOS

A.    My description of sexual harassment is part of my discrimination claim.

MR. ZUCKERMAN:  Okay, thank you.  Do you recall when you were hired -- could we take ten --

MR. IADEVAIA:  Yeah, of course.

MR. ZUCKERMAN:  -- or five minutes even?

MR. IADEVAIA:  Sure.  Why don't we take ten, it's -- we've been going an hour; is that okay?

VIDEO TECHNICIAN:  The time is 10:43 a.m. and this marks the end of Media Unit No. 1.

(Recess taken.)

VIDEO TECHNICIAN:  The time is 10:56 a.m. and this begins Media Unit No. 2.

BY MR. ZUCKERMAN:

Q.    Backing up just a little bit, Ms. Poolos, you were hired by CBS News in October 2011; is that correct?

A.    Yes.

Q.    Do you recall who you interviewed

Page 63

A. POOLOS

with?

A.    Yes, I interviewed with Alison Pepper, I interviewed with Shachar Bar-On, I interviewed with Lesley Stahl and I interviewed with Bill Owens.

Q.    Did you have any interviews with folks in the HR group?

A.    No.

Q.    Okay.  In the complaint - and you can refer to it if you'd like - at paragraph 204 you claim that during your interview with Ms. Stahl she asked you if you would use your body to secure stories.

Do you recall that?

A.    (Document review.)

Yes.

Q.    Did you recall that before you read the...paragraph 204?

A.    Yes.

Q.    Okay.  During either the application process or at any time during your employment, did you ever submit a complaint to HR concerning that comment?

A.    I complained to Shachar Bar-On about

Page 64

A. POOLOS

it.

Q.    At the time it happened?

A.    Immediately after.

Q.    Did you have that discussion with Mr. Bar-On once you were employed by the company or while you were an applicant?

A.    While I was an applicant.

Q.    Do you know whether he passed that conversation on to anyone else at the company?

A.    I doubt it.  He laughed at me.

Q.    Okay.  During your employment, did Lesley Stahl ever ask you to use your body to secure a story?

A.    I remember one time where she...at least one time -- no, more than one time, where she told me to go turn on my feminine charms to - you know, I don't know what the word would be - to work someone up.

Q.    Is that the phrase she used?

A.    No, she -- I mean, the feminine charms, some version of that, or like go flirt with that person or something like that.

Q.    Did you complain about that to management at the time?

Page 65

A. POOLOS

A.   No.

Q.   Or to HR?

A.   No.

Q.   Do you know who made the decision to hire you?

A.   I think it was Bill Owens.

Q.   And you were hired in the title of associate producer for 60 Minutes, correct?

A.   Yes.

Q.   And just sort of briefly, what were your duties and responsibilities as an associate producer?

A.   I was specifically hired to work with Shachar Bar-On as his number two, with Lesley Stahl.  I functioned -- I...I worked on every aspect of the editorial process of getting a story on air.

My duties included coming up with story ideas.  They included vetting story ideas of other people.  They included reporting a story, arranging all the logistics for a story, managing an edit, working with - excuse me - working with Shachar Bar-On to write a script, managing third-party footage.

Page 66

A. POOLOS

APs were in charge of fact-checking stories. I was in charge of working with Shachar on social media representations of the story, managing the crews for travel. APs manage the budget for a story.

I was kind of like Lesley's right hand on shoots, everything from getting her Diet Cokes to making sure she had the correct transportation, monitoring interviews, vetting people we were putting on air before we put them on air.

I'm sure I'm forgetting things.

Q.    And was Mr. Bar-On in that -- did he hold the title of producer at that time?

A.    Yes.

Q.    Okay. So you directly reported to him?

A.    I reported to him and to Lesley and to Bill and to Jeff.

Q.    All direct reports?

A.    They were who I understood to be my bosses.

Q.    Clear enough, thank you. Getting back to the concern that you expressed about

Page 67

A. POOLOS

Mr. Bar-On in -- I think you said either 2016 or 2017; is that correct?

A.    Yes.

Q.    Okay.  You were promoted the following year, in May of 2018, from associate producer to producer; is that correct?

A.    A year and a half later.

Q.    And your title at that point, your promoted title as producer, that continued to be for Lesley's team, correct?

A.    Yes.

Q.    Okay.  And did Mr. Bar-On work on Lesley's team or did Mr. Bar-On at that point, May 2018, work for a different team?

A.    No, he's only ever worked for Lesley Stahl.

Q.    Okay.  Did there come a point in time in your employment working at 60 Minutes that you ceased working directly on the same team with Mr. Bar-On?

A.    Once I was promoted.

Q.    Is that the May 2018 promotion?

A.    Yes, although I was working part of the -- sort of part of the process of being

Page 68

A. POOLOS

promoted at 60 Minutes is you needed to have a correspondent buy in on your promotion.  They had to be the one to say I want this person to be my producer.  So to do that, you have to kind of like...it's like show you can do the job, so you need to -- while you're still an associate producer, you need to produce your own stories for that correspondent.

So initially, the first story I produced for Lesley was a story in Iran and I was still working full time for Shachar, but then --

Q.   Was that pushed -- was that -- I'm going to let you finish your answer, I just want to make sure I have the timing down.

That's -- the Iran story, did you produce that in the title of associate producer or in the title of producer post your May 2018 promotion?

A.    No, it was prior, it was -- I had to do stories like that as an associate producer but I was given -- it's...it's not an official promotion, it's a -- you're -- when the piece airs, they have this thing called the book

Page 69

A. POOLOS

which says the title of the piece and produced by. So my name appeared on that book as produced by, but I was still being paid and my title was still as associate producer.

Q. Okay. Just following the official promotion in May 2018, following that, did you continue to work on the same team as Mr. Bar-On for any period of time?

A. I worked on Lesley's team, but I was not working in -- with Shachar on stories.

Q. Okay. And despite that you worked...you stopped working with Mr. Bar-On on stories, you continued to -- you remained friends with him.

Is that a fair characterization?

MR. IADEVAIA: Objection.

You can answer.

A. He was never my friend.

Q. Okay. And are you aware that your attorneys have produced well over a hundred pages of text messages with Mr. Bar-On in 2020 and 2021?

A. Yes.

Q. And have you -- did you review those

Page 70

A. POOLOS

text messages before they were produced?

A.    No, not really.

Q.    Would you disagree with...with the characterization of those text messages as reflecting you maintaining a friendly relationship with Mr. Bar-On?

A.    No.

MR. IADEVAIA:  Objection.

THE WITNESS:  Sorry.

MR. IADEVAIA:  It's okay.

MR. ZUCKERMAN:  I'm sorry, can you read me the question?

(As read by the reporter):

QUESTION:  Would you disagree with the characterization of those text messages as reflecting you maintaining a friendly relationship with Mr. Bar-On?

ANSWER:  No.

THE WITNESS:  Can I answer that?  I had a collegial relationship with him.

BY MR. ZUCKERMAN:

Q.    Okay.  Do -- are you aware of

Page 71

A. POOLOS

whether any other 60 Minutes employee complained to the company that Mr. Bar-On treated them differently based on gender?

A.    I don't know whether anyone complained to the company, but I have heard complaints myself from others.

Q.    Now, when you -- in connection with your May 2018 promotion to producer, did you have to apply for that?

A.    I had to -- I didn't -- there wasn't an official application process, but I had to advocate for myself for it.  It didn't happen out of the blue.

Q.    Did you interview for the position?

A.    I wouldn't call them interviews.  I had discussions about the position.

Q.    Who made the decision to promote you, if you know?

A.    Lesley Stahl, Bill Owens, Jeff Fager and Alison Pepper.

Q.    So they all collectively made the decision to promote you?

A.    Yes.

Q.    Okay.  And who did you report to in

Page 72

A. POOLOS

your role as producer?

    A.    Lesley, Bill, Jeff and Alison.

    Q.    Okay.  Do you recall when Bill Owens became executive producer?

    A.    No, I don't know the date.

    Q.    Would February 2019 sound about right to you?

    A.    I don't know.

    Q.    Okay.  Were you pleased when he was -- with his promotion to executive producer?

          MR. IADEVAIA:  Objection.

          You can answer.

    A.    I had mixed feelings about it.

    Q.    You thought it was a quote, great day, end quote, for 60 Minutes, did you not --

          MR. IADEVAIA:  Objection.

    Q.    -- referring to his promotion to executive producer?

          MR. IADEVAIA:  Objection.

          You can answer.

    A.    Like I said, I had ambivalent feelings.  In some ways I thought it was a great thing, in other ways I worried about the

Page 73

A. POOLOS

future of the show.

Q.    What were -- sum and substance, what worries did you have about the future of the show in...in connection with Mr. Owens' --

A.    I didn't --

Q.    -- ascension to executive producer?

A.    -- didn't know that Bill Owens had the capacity to run the show, and Lesley was very much not in favor of him being promoted and actively worked against that.

Q.    And shortly after his promotion, he named Tanya Simon as executive editor...editor of 60 Minutes; is that correct?

A.    Yes.

Q.    In the role of producer, how many stories is one expected to produce per season?

A.    Well, there's a ramp-up to that.  So in your initial contract, the expectation is that you'll get one or two stories done a year.  And then as you become more seasoned and able to juggle the workload, you're expected to do three and in -- you know, the highest achievers could do four.

Q.    Is this reflected in a written

Page 74

A. POOLOS

document anywhere, what you just testified to?

A.    Not that I know of.

Q.    How did you become aware of these standards?

A.    Shachar mostly.

Q.    Anyone else tell you this?

A.    No.

Q.    How many -- for how many full seasons were you a producer for 60 Minutes?

A.    Three.

Q.    Okay.  In any of those three seasons, had you ever produced four stories?

A.    No, but the understanding of the work I was producing for 60 Minutes was I was producing atypical, highly investigative, demanding stories that nobody would expect me to produce three or four of those.

Q.    Who told you that nobody would expect you to produce three or four stories --

MR. IADEVAIA:  Objection.

Q.    -- in a season?

MR. IADEVAIA:  Objection.

You can answer.

A.    Bill told me at some point that --

Page 75

A. POOLOS

(Reporter clarification.)

A.    Bill Owens told me at some point, maybe more than once, that I was taking on the hardest stories on the floor and that they required more time than regular stories.

Q.    Did Bill tell you that you were not expected to produce three or four stories per season?

A.    Bill did not say that in those specific words, but Bill told me there was no issue with my story count.

Q.    He never told you that he had a concern about the number of stories you were producing, is that your testimony?

MR. IADEVAIA:  Objection.

You can answer.

A.    I remember Bill telling me he was concerned about me taking on stories that were too hard and I needed to do what he called blue-umbrella stories, that were like -- which is a reference to like a story you would do on a beach, that would be lighter and easier and would allow me to do more.

Q.    Because he wanted you to produce

Page 76

A. POOLOS

more stories, correct?

In fact, that's something you said to Jack Weingart, is it not?

MR. IADEVAIA:  Objection.

A.    I don't know if I said that to Jack.

I know Bill was concerned that I was doing stories that were too hard and he wanted me to lighten up and go easier, but I don't have any recollection of Bill saying you're not meeting our expectations.

Q.    Did he say they were too hard because you couldn't handle that difficulty of a story?

A.    No.

Q.    Okay.

A.    He said that they were the hardest stories anybody was doing on the floor and I was doing them very well.

Q.    Okay.  Who is -- do you recall...do you recall completing a 2021 performance review?

A.    Yes.

Q.    Do you recall writing in that performance review, quote, Tanya has been a

Page 77

A. POOLOS

terrific support this year in many ways but in particular helping me to hire the best possible AP candidate, end quote?

A.    I don't remember writing that but...

Q.    Did you think -- do you recall believing...as of June 2021, believing that Collette [Richard] was the best -- Collette Richards was the best possible associate producer?

A.    Yes, I do.

Q.    Okay.  And do you recall Bill writing in that performance review, quote, you and I have laughed about this, but doing a diversity of stories can be very good for your soul.  It will also help you do more pieces, end quote?

You recall that?

A.    Yes.

Q.    And by that, you understood Bill to mean that you needed to do more stories, correct?

A.    I understood that I needed to lighten up some of the investigations I was doing.

Page 78

A. POOLOS

Q.    I'm going to place before you a text thread that was produced by your attorneys. I'm not going to mark it right now, I'm going to see if it refreshes your recollection.

And I would direct you -- it's Plaintiff's 002136, and I would direct you to the text thread of 6/15/2021.

A.    Okay.  And how far do you want me to read?

Q.    Well, there's a quote in there about three-quarters of the way down the...down the page, a text from you to Jack Weingart - W-E-I-N-G-A-R-T - which says, quote, he did say I need to do more stories though, end quote.

Do you see that?

A.    Yes.

Q.    Does that refresh your memory as to whether you believed that Bill Owens, in the performance review, was telling you that you need to do more stories, you need to produce more stories?

MR. IADEVAIA:  Objection.

You can answer.

Page 79

A. POOLOS

A.    I don't remember Bill saying to me, in the performance review, you need to do more stories, Alex.  I think what I was saying to Jack is Bill thinks that if I lighten up taking on these harder stories, then I'll be doing more stories.

But it was an under -- it was understood that producers who had only been in that role for a few years needed time to understand the ebb and flow of the show and how to balance a major investigation with a lighter feature.

Q.    And you had -- sorry.

A.    And I think with Jack I was probably being denigrating to myself.

Q.    Okay.  You hired Collette Richards to work as your AP in or about October 2020; is that correct?

A.    Yes.

Q.    And you interviewed her?

A.    Yes.

Q.    On more than one occasion, correct?

A.    Yes.

Q.    And as your AP, she reported

Page 80

A. POOLOS

directly to you, correct?

A.    Yes.

Q.    Okay.  Did you speak to any of Collette's references before determining whether to hire her?

A.    Yes.

Q.    Did you speak to someone named Scott Bronstein?

A.    Yes, repeatedly.

Q.    How many times do you believe you spoke to Mr. Bronstein?

A.    Oh, jeez, I don't know.  Maybe more than six, maybe less than twelve.

Q.    And again, I'm just referring to speaking with Mr. Bronstein about Collette's application for employment.

A.    Yes, he initiated contact with me, because she was official -- she had officially applied to be an AP for Richard Bonin, who was another one of Lesley's producers.  And Scott Bronstein used to work at 60 Minutes, so he had some relationships still there.

I don't remember when he initially reached out to me, but he reached out to me to

Page 81

A. POOLOS

say he had checked around about Richard Bonin and had heard really bad things and that in the course of somebody telling him really bad things about Bonin, they had mentioned, hey, Alex is going to have an AP opening and she -- she's great and she would be...she would be who I would recommend your friend work with.

So Scott Bronstein reached out to me to say I do not want her going to Richard Bonin; can you ask to interview her? And I told him, no, I can't ask to interview her because, A, another colleague is already down the road with her, and B, I don't even have an opening yet. We have to wait 'til I have an opening.

Q. Okay. But at some point you spoke to Mr. Bronstein several times about Collette Richards?

A. Yeah, he --

Q. I didn't ask you what it was about.

And did he give you an assessment of her performance; yes or no?

A. On multiple occasions, yes.

Q. Okay. And did you under -- by the

Page 82

A. POOLOS

way, for the record, who...who was Mr. Bronstein at that time?

A.    Mr. Bronstein was a producer at CNN who I had worked with and knew when I had previously worked at CNN, and we had stayed friendly.

Q.    Okay.  And did you know whether Collette...Collette was also friendly with Mr. Bronstein at the time you were having these discussions about her application for employment?

A.    I knew that they had a very close personal relationship.

Q.    Okay.  And you...you relied in part on his assessment of her in making a decision to hire Ms. Richards, correct?

A.    Almost exclusively.

Q.    Okay.  And in the first few months after Ms. Richards became your associate producer, her job performance was good, correct?

MR. IADEVAIA:  Objection.

You can answer.

Q.    Well, I'll...I'll ask it a different

Page 83

A. POOLOS

way since your client -- your counsel objected.

In the first few months after Collette became your AP, how was her job performance?

A.    In the first few months she didn't work on the initial story I was working on because Tanya didn't think she was ready to take on a story as a solo AP, so they had to back her up with a more experienced AP.

The next story we worked on she solo AP'd it, and she had very clear strengths on that story and very clear weaknesses.

Q.    In the first month of her employment you wrote to Matthew Magratten, who's a sound engineer, that Collette was doing a great job so far, did you not?

MR. IADEVAIA:  Objection.

You can answer.

A.    I don't remember.

Q.    Is it possible you texted that to Matthew --

(Unreportable crosstalk.)

A.    Magratten, yes.

Page 84

A. POOLOS

Q.    Who is Matthew Magratten, for the record?

A.    Matthew Magratten is a staff sound technician.

Q.    Do you ever recall texting Mr. Magratten, quote, Collette is the best, I'm restraining myself from being too nice off the bat, end quote?

A.    I don't remember sending that.

Q.    Does that sound like something you would say in or about October 26, 2020?

MR. IADEVAIA:  Objection.

You can answer.

A.    I don't know if it -- I don't -- I mean, I can't say whether it sounds like something I would say or not.  I'm...I am kind of an enthusiastic person.

Q.    Do you remember texting to Mr. Magratten...Magratten --

A.    Magratten.

Q.    -- that Collette is, quote, fantastic, end quote, and a, quote, breath of fresh air, end quote, and, quote, gets a lot of stuff done, making my life a lot easier?

Page 85

A. POOLOS

Do you recall texting that?

MR. IADEVAIA:  Objection.

You can answer.

A.    I don't recall texting that.

Q.    Do you recall believing that at the time, in or about November of 2020?

A.    I recall really liking her and being very positive about her to senior management and to people we worked with and to -- being very encouraging to her.

Q.    In fact, in your 2021 performance review you refer to Collette as the best possible AP, correct?

MR. IADEVAIA:  Objection.

You can answer.

A.    I can't say whether I did, because I'm not reading the performance review.

Q.    Do you recall whether you had -- as you sit here today, do you recall whether you had that impression of her --

A.    I --

Q.    -- in 2021, that she was the best possible AP?

A.    Yes.

Page 86

A. POOLOS

Q.    Okay.   Prior to January 2022, you never raised any issue about Collette's performance to Bill Owens, correct?

MR. IADEVAIA:  Objection.

You can answer.

A.    No.

Q.    That's not correct?

A.    No, I did not raise any concerns.

Q.    Okay.  And prior to January 2022, you did not raise any concerns about Collette's performance to Tanya Simon, correct?

MR. IADEVAIA:  Objection.

You can answer.

A.    No, I did not.

Q.    And prior to 2022, you didn't raise any performance issue with Collette's performance with anyone at the company, correct?

A.    No.

MR. IADEVAIA:  Objection.

You can answer.

A.    No, that's not correct.

Q.    Okay.  To whom, if anyone, did you

Page 87

A. POOLOS

raise a concern about Collette's performance prior to January 2022?

A.    To Collette.

Q.    Okay.

A.    To Matthew Magratten, to Jack Weingart and to Nicole Young.

Q.    Who's Nicole Young?

A.    She's a senior producer at 60 Minutes.

Q.    Is she on Lesley's team?

A.    No.

Q.    Is she on any team?

A.    She's on Scott Pelley's team.

Q.    Okay.  Do you have any documents to reflect that you raised performance concerns about Collette to Collette?

A.    I have emails with her in which I tried to provide her with feedback about her performance.

Q.    Were those emails produced in this lawsuit?

A.    I believe so.

Q.    Jack Weingart, he was an associate producer, correct?

Page 88

A. POOLOS

A.    Yes.

Q.    So he was Collette's peer?

A.    Yes.

Q.    And what team was he on?

A.    He had worked with me on a Lesley story. He was primarily on Bill Whitaker's team but he often worked with Lesley, with her teams, on by big, big...big stories where they needed him. He was kind of like a senior AP. They had him train all the other APs.

Q.    Did Collette work for...for Jack?

A.    Collette --

Q.    Let me rephrase that. Did -- I apologize, because that could be a vague question.

Did Collette report to Jack?

A.    She refused to -- it's not she refused to engage with Jack, because she sought Jack out a lot, but she refused training with Jack.

Q.    I'm asking about a reporting relationship.

Was Jack Collette's supervisor?

A.    No.

Page 89

A. POOLOS

Q. Okay. Was Nicole Collette's supervisor?

A. No.

Q. Who was Collette's supervisor other than you?

A. Lesley, Bill, Tanya.

Q. Why did you think it was appropriate to discuss Collette's performance with Jack or Nicole or anyone else to whom she did not directly report?

MR. IADEVAIA: Objection.

You can answer.

A. I was seeking advice, when Collette's performance was not up to par, of how -- and when she began making unreasonable requests, of how best to manage the situation. I didn't want to raise a concern to Lesley, first and foremost because Lesley would have taken a very -- she wouldn't have taken it well. And I didn't want to make a formal complaint about her performance because I was afraid that it would negatively affect her, and I was hopeful that we could work through some of my concerns.

Page 90

A. POOLOS

Q.    So, I'm sorry, prior to 2022 did you raise concerns about her -- Collette's performance with Tanya Simon?

A.    I did not -- I don't think I raised concerns about her performance, but I did speak with Tanya about Collette's complaints, that she had been spoken to in an abusive manner by Ann Marie Kross.  And I also raised a similar concern to Senior Producer Claudia Weinstein, when Collette complained that she was being abused by the Rights department.

Q.    Same question with respect to Mr. Owens.  Did you report to Bill Owens -- did you raise with Bill Owens, prior to January 2022, a concern about Collette's job performance?

A.    No.

Q.    Okay.  Prior to Collette serving as your AP during your 60 Minutes employment, who else served in that title, reporting to you?

A.    I had temporary APs.  So I didn't have an official AP, I had whoever they would assign to me on a story-by-story basis.

Q.    Okay.  Did Sarah Turcotte ever

A. POOLOS

perform AP services for you?

A.    Yes.

Q.    Did Will Croxton perform AP services for you?

A.    Not exactly.  Sarah Turcotte was my official AP on one story.  Will Croxton was like...he was kind of like a researcher, second AP, but he was not the official AP.

Q.    Okay.  What about Jack Weingart?

A.    Yes.

Q.    He was an official AP for you?

A.    Yes.

Q.    And what about Kate Morris?

A.    Well, just to be clear, when we say official, temporary but the AP, yes.  And Kate Morris worked on two stories with me.

Q.    Are you aware that at least three associate producers who worked with you prior to Collette working with you complained about inter -- inappropriate interactions with you?

MR. IADEVAIA:  Objection.

You can answer.

A.    No.

Q.    Did you ever yell at Sarah Turcotte?

Page 92

A. POOLOS

A.    I don't remember.

Q.    Is it possible you did?

A.    I don't know.

Q.    Did you ever yell at her in front of everyone on a set?

A.    Not that I remember.

Q.    Okay.  You agree that would be unacceptable conduct, correct?

MR. IADEVAIA:  Objection.

You can answer.

A.    No.

Q.    So it's acceptable to yell at subordinates?

MR. IADEVAIA:  Objection.

You can answer.

A.    I mean, it happens a lot at 60 Minutes, and in a high-pressure situation on set, if somebody's doing something that's hazardous it's acceptable.

Q.    Are you aware that Sarah's baby had a heart condition?

MR. IADEVAIA:  Objection.

You can answer.

A.    It's ringing a bell.

Page 93

A. POOLOS

Q.    Do you recall telling her that she couldn't attend certain of her baby's doctors' appointments?

A.    No.

Q.    That would be unacceptable, correct?

MR. IADEVAIA:    Objection.

You can answer.

A.    I think it depends on context.

Q.    Were you aware that you made Sarah cry on numerous occasions?

A.    No.

Q.    Were you aware that Sarah complained to management about you?

A.    I was aware that Sarah wanted to switch off my team and work with Scott Pelley. I discussed that decision with Bill Owens, who said that Sarah had a habit of being untruthful to management and making switches and quoting people who never said things to her.

Q.    Did you know -- just yes or no, did you know her to be an untruthful person?

A.    Yes.

Q.    Okay.  How about Will Croxton, did

Page 94

A. POOLOS

you know him to be an untruthful person?

A.    Yes.

Q.    Did you know that Will Croxton complained to management about the way you treated him?

A.    I do actually, yes.

Q.    And what about Jack Weingart, do you know him to be a untruthful person?

A.    I wouldn't say that about Jack.

Q.    Okay.  Are you aware of whether he complained to you about -- complained to management about the way you treated him in the lobby of a hotel in Iran?

A.    No.

Q.    You're not aware.

Did you ever yell at Jack?

A.    We had an argument in...in Iran, yes.

Q.    Okay.  And you're aware that members of the Rights team have complained about inappropriate interactions with you, correct?

MR. IADEVAIA:  Objection.

You can answer.

A.    I'm not really sure.  I've had

Page 95

A. POOLOS

conversations with the head of the Rights team, where he told me I was one of his favorite people to work [on], on the floor.

Q.    You --

A.    To work with.

Q.    -- you audio-recorded an interaction with a member of the Rights team, correct?

MR. IADEVAIA:  Objection.

You can answer.

Q.    You recall having a conversation with Renee Balducci concerning complaints that we haven't discussed yet from Collette concerning you?

MR. IADEVAIA:  Objection.

You can answer.

A.    I'm sorry, are you asking me whether I recall speaking with Renee Balducci about Collette Richards complaining about me?

Q.    Yes.

A.    Yes.

Q.    And you recorded one of those discussions, correct?

A.    I recorded the discussion.

Q.    Okay.  So it was just one

Page 96

A. POOLOS

discussion?

A.    Yes.

Q.    Okay.  And do you recall - just trying to refresh your memory - telling Ms. Balducci at that time that you were aware of disputes with the Rights team and you acknowledged concerns that you had yelled at them?

MR. IADEVAIA:  Objection.

You can answer.

A.    I remember telling -- discussing with Renee that the Rights team and I had had arguments but that the head of the Rights team had told me I was one of his favorite people to work with.

Q.    Who is Aieska Hoyos?

A.    She was someone who Josh Ravitz had hired as one of his subordinates who he later fired.

Q.    That's an interesting way of putting it.  Are you aware that she complained to you about manage -- she complained to management about her interactions with you?

A.    No.

Page 97

A. POOLOS

Q.    She was a member of the Rights team, correct?

A.    Yes.

Q.    Okay.  You don't recall Claudia Weinstein speaking with you about your interactions with Aieska?

A.    No, I recall speaking with Claudia about unfair work that the Rights team was putting on APs and that a lot of APs were complaining about it.

Q.    You don't recall Claudia asking you to apologize to Aieska and you refusing to apologize?

MR. IADEVAIA:  Objection.

You can answer.

A.    I don't remember that.

Q.    Okay.  And Josh Ravitz was a member of the Rights team, correct?

A.    He was the head of the Rights team.

Q.    Do you ever yell at Josh Ravitz?

A.    I don't remember.

Q.    Do you recall telling Renee Balducci in this one conversation that you recorded that you did recall and admit to yelling at

Page 98

A. POOLOS

Josh and fighting with him?

A.   I...I don't remember.

Q.   Are you aware that Josh complained to management about you?

A.   I wasn't aware at the time that he complained to management about me, but when Renee brought up there had been another complaint, I assumed that's who she was talking about.

Q.   Who is Joanna Palmer?

A.   She's part of the Rights team.

Q.   She reported to Josh Ravitz?

A.   I don't know.

Q.   And you worked with her when you were dealing with clearance issues for the Trevor Noah story, correct?

A.   Yes.

Q.   Did you ever yell at Joanna over the phone?

A.   I don't remember that.  I remember making a complaint against the entire Rights team on Collette's behalf to Claudia Weinstein.

Q.   Are you aware of whether Joanna

Page 99

A. POOLOS

complained to her supervisor about the way you treated her?

A.    I do not know that.

Q.    Okay.  Now, in December 2021 Collette Richards complained about her interactions working -- your interactions working with her, correct?

MR. IADEVAIA:  Objection.

You can answer.

A.    I don't know what date she officially complained.

Q.    You...you became aware at some point that she did file a complaint?

A.    Yes, I did.

Q.    About you?

A.    Yes.

Q.    Okay.  And you're now aware that Collette complained to HR about you?

A.    I was aware then because that's what I was told.

Q.    Okay.  And the complaint was lodged in or about mid December 2021; is that accurate?

MR. IADEVAIA:  Objection.

A. POOLOS

A.    I don't know.

Q.    You don't know or you don't remember?

A.    I don't know when she lodged the complaint.

Q.    Okay.  Do you recall Collette telling you in or about mid December 2021 that she didn't like how you spoke to her?

A.    I remember Collette becoming very upset when I told her for the third time she couldn't drive her dog home and that it was a no-go, she couldn't leave work early and take vacation early, because we had a story airing. And I remember in the course of a very lengthy phone conversation, that she became very upset and said she didn't feel like she could talk to me.

And we discussed that, and I said I didn't want her to feel that way and would she like to take some time and then we'd revisit the topic, but that when we revisited the topic we would also have to talk about some of the performance concerns.  And I also told her if she didn't feel comfortable talking to me

Page 101

A. POOLOS

in a few days, I would check back in with her a week later.  And she agreed that that was a good solution.

Q.    My question was different.

My question was do you recall whether she...she told you that she didn't like how you spoke to her?

A.    I don't remember those exact words, but I do remember her saying she was very upset with what I was saying to her.

Q.    And you're now aware that Collette also complained about you to Tanya Simon close in time to the HR complaint that she filed about you, correct?

A.    I think my understanding, and I might be wrong, is that she got off the phone with me -- I also, in the course of talking to her, said that if she felt after we had had another conversation that she couldn't express herself or that she wasn't being heard, that she should go speak to Tanya and Tanya was -- would be a great advocate for her.  And she told me at the time that that wasn't necessary, but I became later aware that she

Page 102

A. POOLOS

got off the phone with me and called Tanya.

Q.    Okay.

A.    Or called HR; I don't know who she called first.

Q.    And you're aware now that Collette sent a fourteen-page written complaint to Human Resources in or about late December 2021?

A.    I'm aware that she filed a complaint to Human Resources.  I don't know how long it is.

Q.    Collette got married during the time that she worked for you, correct?

A.    Yes.

Q.    And she had a bridal shower preceding that?

A.    Yes.

Q.    And the bridal shower, do you recall that being on April 10, 2021?

A.    I don't remember.

Q.    Do you recall it being in April 2021?

A.    I don't, I honestly don't remember.

Q.    Do you recall what year the bridal

Page 103

A. POOLOS

shower --

A.    It would have been before she got married, so sometime in 2021.

Q.    When did Collette first tell you about her bridal shower?

A.    I have no idea.

Q.    The bridal shower was on a Saturday, correct?

A.    I think so.

Q.    And you scheduled a shoot for that same Saturday?

A.    Bill Owens asked me to schedule a shoot for that Saturday.

Q.    Do you recall when he instructed you to do that?

A.    At a screening a couple days before, he told us that we would be rescreening our piece on Monday and over the weekend we had to get additional B-roll for the screening.

Q.    And you texted Collette numerous times while she was at her bridal shower, correct?

A.    Yes.

Q.    Some -- several of the text messages

A. POOLOS

criticized her for making a mistake, correct?

MR. IADEVAIA:  Objection.

You can answer.

A.    Yes.

Q.    You...you texted her on what you refer to in those text messages as, quote, her special day, correct?

MR. IADEVAIA:  Objection.

You can answer.

A.    I don't remember.

Q.    And you texted her to...to criticize her for some deficiency, yet you also wrote that the alleged mistakes, quote, weren't a big deal, end quote, correct?

MR. IADEVAIA:  Objection.

You can answer.

A.    I...I reached out to Collette because I had received calls from a senior producer about a catastrophe in delivering the footage, and I had to reach out to Collette before I spoke with the cameraman to find out what she had instructed him.

She had made a pretty significant mistake and it was the second time she had

Page 105

A. POOLOS

made the same mistake, and she jeopardized our ability to rescreen the piece with Bill and thereby not do what Bill had told us to do.

Q.    Do you recall texting to her, quote, these kinds of mistakes are annoying but they aren't that big a deal in the big picture, so please forget about it for now; I really do feel bad that your special day is being affected by this?

Do you recall texting that?

A.    I don't remember.

Q.    I'm going to -- did you, during her bridal shower, ask her to perform any work?

A.    I...I don't remember.  I remember asking her to explain to me why the cameraman wasn't going to deliver footage and to clarify why I was getting yelled at by Ann Marie Kross that the cameraman should have been given different instructions.

Q.    Did you need her to perform any work that day?

A.    I did.

Q.    What specifically?

A.    I needed her to explain to me what

Page 106

A. POOLOS

had happened.

Q.    Couldn't you have received that explanation the following day or the day after as opposed to, quote, ruining her special day?

MR. IADEVAIA:  Objection.

You can answer.

A.    No, the footage had to get in, and she had given incorrect instructions to the cameraman and we were going to miss an extremely important deadline.  I wasn't going to call a cameraman without calling my number two first, to make sure I understood what had happened.

Q.    So if it was an extremely huge deal, according to your testimony, why did you write to her not a big deal in the big picture, please forget it -- please forget about it for now?

MR. IADEVAIA:  Objection.

You can answer.

A.    I don't remember what text I sent her when, but I think that that text was sent after I had cleared up the problem and had found a solution, and I genuinely did feel bad

Page 107

A. POOLOS

that this was happening on her bridal shower even though it was very clear to me that she had made a pretty significant mistake.

And it was the second time she had made that mistake and I was starting to become concerned about her attention to detail. She had jeopardized a very fraught screening, and I was trying to downplay it for her because I felt bad.

Q. How...how long into this text thread with her on her [bridal day] did you ask her to do anything as opposed to just simply berate her and apologize purportedly for interfering her special -- on her -- with her special day?

MR. IADEVAIA: Objection.

You can answer.

A. I don't remember when we spoke on the phone, so I don't remember when she explained to me why she had made this choice and why she had given these faulty instructions to a cameraman.

Q. The cameraman needed to upload the, the...the footage, correct?

Page 108

A. POOLOS

A.    Yes.

Q.    And the -- he couldn't do so at the hotel for one reason or another?

A.    No.  She had instructed the cameraman not to upload it and to Federal Express it, so it would arrive after our screening.

Q.    You're not aware that the cameraman had to go home to upload the footage?

A.    I'm...I'm aware that the cameraman elected to go home to upload the footage.  He was staying at a five star hotel that never had problems uploading footage.

I think it might also have been that by the time he got around to uploading, they had loaded out of the room, but also I seem to remember that I called the hotel and they offered to give him a special high-speed upload portal or Wi-Fi thing, but he elected -- he chose to go home and do it from the comfort of his home.

Q.    So this was something you were able to handle?

A.    Not until I understood what she had

Page 109

A. POOLOS

instructed him.

Q.    You -- in these text threads, you called David, quote, a piece of work, end quote, and that you, quote, never wanted to work with him again, end quote.

Who is David?

A.    I don't know.

Q.    You told Collette to, quote, start visualizing these guys as mules and aren't ever to be trusted, end quote.

Who are you referring to?

A.    I assume I was referring to the guys who were working on that shoot.

Q.    Did you visualize Collette as a mule?

MR. IADEVAIA:  Objection.

A.    No.

Q.    You also called these guys, quote, lazy, correct?

MR. IADEVAIA:  Objection.

A.    I don't know.

Q.    You also said David, quote, lied and that, quote, he's a real jerk, correct?

MR. IADEVAIA:  Objection.

Page 110

A. POOLOS

A.    I don't know.

Q.    If you had, do you believe that was appropriate behavior from a supervisor?

MR. IADEVAIA:  Objection.

A.    If he lied about her to me, then I think it would be appropriate to say he lied.

Q.    Do you think it's appropriate to refer to folks working with or for you as mules?

A.    In the context of them refusing to do work, I don't know.

Q.    Did you ever tell Collette, quote, there are no boundaries; if I need you, I need you, end quote?

A.    No.

Q.    Now, Collette got married about a month later, in May 2021, correct?

A.    I believe so.

Q.    When did you first become aware that Collette would be married in May of 2021?

A.    I don't know.

Q.    You became aware in the fall of 2020, does that sound accurate?

A.    I don't know.

Page 111

A. POOLOS

Q.    Did you expect Collette to work on her wedding day?

A.    No.

Q.    Did you expect Collette to be available to answer questions or address issues by phone or email or text?

A.    No.

Q.    Did you bring up with her the possibility that the transgender healthcare story might air on May 9, the day of her wedding -- I'm sorry, the day after her wedding?

A.    That's what I was told.

Q.    I'm asking you, did you bring up that possibility with her, Collette?

A.    I believe we were both told by management in a screening that that was a potential air date.

Q.    Okay.  Did you have discussions with Collette about the possibility of the transgender healthcare story airing on May 9?

A.    Yes, we strategized together how to push back the air date so it didn't conflict with her wedding.

Page 112

A. POOLOS

Q.    How many times did you have this discussion with her, about the possibility that the story would air on May 9?

A.    I couldn't say.

Q.    More than five times?

A.    I...I honestly don't remember.

Q.    Is it possible it was more than five times?

A.    I have no idea.

Q.    Is it possible it was more than ten times?

A.    I...I have no idea.

Q.    Could it be more than ten times?

MR. IADEVAIA:  Objection, she's -- asked and answered.

Go ahead.

A.    I have no idea.

Q.    Well, could it be more than a million times?

MR. IADEVAIA:  Objection.

A.    I...I honestly don't know.  I know she was extremely, extremely worried, and I think she brought it up to me...I'll say several times.  She wanted a definitive

Page 113

A. POOLOS

answer, that I could move the air date, and it was not something that was within my decision-making powers, but I promised her that I would find a solution with Tanya to change the air date without Lesley finding out.

Q.    Did you tell Collette not to tell Tanya about her wedding date?

A.    No.

Q.    Did you tell Collette not to tell Lesley about her wedding date?

A.    Yes.

Q.    Why did you do that?

A.    Because I was -- Lesley wanted the story to air on May 9, and I was afraid that if Lesley found out that Collette would be unavailable, that she would have replaced her with another AP and that it would have reflected badly on Collette.

Q.    Why did Lesley want that story to air on that particular date?

MR. IADEVAIA:  Objection.

You can answer.

Q.    If you know.

Page 114

A. POOLOS

A.    She was extremely, extremely anxious about a very controversial story.  There was a lot of outside pressure not to air the story, and Lesley wanted to get it on the air immediately.  She was asking me over and over, when are they going to put it on, can they get it on, why aren't they putting it on May 9?

Q.    Were you...have you had an opportunity to review Collette's HR complaint about you?

A.    I reviewed it when I looked at their response to the EEOC filing but I haven't looked at it since.

Q.    Do you recall, on or about December 31, 2021, that Collette told you by email that you were mistreating her?

A.    I don't remember the exact date but I remember her responding to an email of mine, saying she felt mistreated.

Q.    And right after receiving that email, you texted Scott Bronstein, correct?

A.    No, I think I texted Scott Bronstein when Collette told me she was no longer going to work on a story that we were under deadline

A. POOLOS

for.

Q.    Do you recall texting Scott Bronstein on New Year's Eve 2021?

A.    Yes.

Q.    And do you recall that Collette sent the email to you, claiming that you were mistreating her, in the afternoon of New Year's Eve 2021?

A.    I recall she emailed, in response to me asking her to do her work differently, that she felt mistreated.  And then I recall her saying, when I tried to offer her a compromise, that she would no longer be working.

Q.    What I'm asking you is how soon after you received that email from Collette did you call Scott Bronstein?

A.    I don't know --

Q.    Or text, I apologize.

A.    I don't know what the exact times are.

Q.    More than an hour?

A.    I...I honestly don't know.

Q.    More than three hours?

A. POOLOS

A.    I don't know.

Q.    It was same day, correct, December 31?

A.    If you say so.

Q.    Do you have a recollection of calling or texting Scott Bronstein on New Year's Eve?

A.    I do --

MR. IADEVAIA:  Objection.

Go ahead.

A.    I do, but I don't remember when Collette emailed me.

Q.    Does 2:39 p.m. sound accurate?

A.    I don't know.

Q.    When you texted Scott Bronstein, you wanted to follow up with a phone call with him, correct?

A.    Yes.

Q.    And did you expect to discuss Collette with him?

A.    Yes, I was hoping to get his advice.

Q.    What was so important that you -- what was so important to discuss at 3:00 p.m. on New Year's Eve with Scott Bronstein --

A. POOLOS

MR. IADEVAIA:  Objection.

Q.    -- concerning Collette?

MR. IADEVAIA:  Sorry.

MR. ZUCKERMAN:  No, no that was my fault.

Q.    Concerning Collette.

MR. IADEVAIA:  Objection.

You can answer.

A.    She had walked off a story that we were shooting in just a couple days, she had refused to give me her work product.  The story was in jeopardy, I was panicking, and I didn't want to go to Lesley and get Collette into trouble.

I was hoping that because Scott had a close relationship with her and knew her and knew me, that he could give me some advice on how to approach Collette in a way that would make her feel better and we could get things back on track.

Q.    Would it refresh your recollection if I told you that you texted Scott Bronstein fifteen minutes after Collette sent you the email complaining about the way you were

Page 118

A. POOLOS

treating her?

A.    No.

Q.    It's just a coincidence that you texted Bronstein after she complained about you, purportedly, according to your testimony, to discuss these deficiencies?

MR. IADEVAIA:  Objection.

You can answer, if you understand.

A.    It's not a coincidence that I texted Scott after she stopped working.

Q.    That wasn't my question, but I appreciate the gloss you're putting on it.

MR. IADEVAIA:  Objection.  Come on.

Q.    Why didn't you report -- if this was such a huge problem, she was refusing to work, that's insubordination, is it not?

A.    Yes.

Q.    How did you not report that to Bill, to Lesley, to Tanya or to anyone actually employed by 60 Minutes to whom Collette reported directly or indirectly?

A.    I --

MR. IADEVAIA:  Objection.

You can answer.

Page 119

A. POOLOS

A.   I was trying to keep her from getting into serious trouble and seeing if I could, you know, fix the situation.

Q.   Prior to December 31, 2021, had you ever reached out to Scott Bronstein to discuss Collette's alleged job deficiencies?

A.   No.

Q.   And shortly after New Year's, on January 4 you received a meeting invite to attend a meeting with Bill and Tanya; is that correct?

A.   After I had requested to speak with Tanya, yes.

Q.   Did you know what the meeting -- well, strike that.

After you received that meeting invite, you again texted Scott Bronstein, correct?

A.   I don't know.

Q.   You don't remember?

MR. IADEVAIA:  Objection.

Go ahead, you can answer.

A.   I don't.

Q.   Do you recall texting him and

Page 120

A. POOLOS

saying, is it too late for you, meaning is it too late for you to speak?

MR. IADEVAIA:  Objection.

You can answer.

A.    I...I remember texting him on Monday; I don't remember what I texted him.

Q.    Do you recall it being almost 8:00 at night when you texted him on that day?

A.    No.

Q.    And you didn't speak to him that day, you spoke to him at some point shortly thereafter, correct?

A.    Yes.

Q.    Okay.  Now, on January 5, Bill and Tanya met with you to discuss Collette's complaint about you, correct?

A.    Yes.

Q.    Do you...do you recall meeting at about lunchtime, 12:30?

A.    I don't know.

Q.    How long did that meeting last?

A.    I think it was like...I don't know, maybe an hour.

Q.    And was it in person or by Zoom?

Page 121

A. POOLOS

A.    It was by Zoom.

Q.    Did you record the meeting?

A.    No.

Q.    Did you take any notes of that meeting?

A.    I don't remember.

Q.    Is it possible that you took notes of that meeting?

A.    I don't know, I guess I -- it might be possible, but I don't remember taking notes.

Q.    Do you understand that those notes would be responsive to Defendants' discovery requests in this action?

A.    Absolutely.

RQ*        MR. ZUCKERMAN:  So if you have those notes, please produce those to your attorneys.

Q.    And did they -- they informed you that Collette had filed a complaint with Human Resources?

A.    They...they didn't say that.  They said Collette went to HR.

Q.    Okay.  Did they say anything else?

Page 122

A. POOLOS

A.    They said that Collette said I was bullying her and hectoring her.

Q.    Did they say anything else?

A.    Bill brought up the bridal shower and asked me to clarify why I had reached out to Collette.  Bill asked me about my experience with Collette and I expressed my concerns about her performance and my concerns that she wouldn't take no for an answer when she was making extraordinary requests for personal accommodations.

And we spoke about Collette saying to me that she had felt it was a real struggle to work at 60 Minutes and that she had a lot of issues with the COVID compliance that she work from home and that she felt she wasn't having an easy time adjusting.

Q.    Okay.  Do you recall anything else that was said in that meeting?

A.    Bill told me he was highly concerned about Collette's performance and her personal requests.  I asked Bill if I could speak to HR.  He told me no.  He expressed sympathy, because my dear friend had died recently, and

Page 123

A. POOLOS

he said I'm very sorry you've been dealing with this situation while you're mourning your friend. And then he just said I'll get back to you.

Q.    Okay. Did...did either Bill or Tanya ask you not to discuss the HR complaint with anyone else?

A.    No.

Q.    Did they ask you not to discuss the matter with anyone else?

A.    No.

Q.    So if they testified to that, they'd be incorrect?

A.    Yes.

Q.    Would they be lying?

A.    Yes.

Q.    Okay. Now, immediately following this meeting you texted Bronstein again, didn't you, and told him that you could talk later that day?

A.    I don't --

MR. IADEVAIA:  Objection.

You can answer.

A.    I don't know that I texted him

Page 124

A. POOLOS

immediately following the meeting.  I remember calling Lesley, but also Scott reached out to me on that day and asked me if he could call me later, and I think I responded to his text and said that was okay.

Q.    And you in fact called him later that day, correct?

A.    He texted me again and I responded to his text with a phone call.

Can I...can I just take a break to run to the bathroom?

MR. ZUCKERMAN:  Oh, yes, absolutely --

MR. IADEVAIA:  Of course.

MR. ZUCKERMAN:  -- absolutely.

VIDEO TECHNICIAN:  The time is 12:01 p.m. and this marks the end of Media Unit No. 2.

(Recess taken.)

VIDEO TECHNICIAN:  The time is 12:10 p.m. and this marks the beginning of Media Unit No. 3.

BY MR. ZUCKERMAN:

Q.    I'd like to focus, Ms. Poolos, on

Page 125

A. POOLOS

the January 5 conversation that you had with Scott Bronstein.

At that point, how long had you known Mr. Bronstein, approximately?

A.    Fifteen years maybe?

I'm not sure.  Over ten.

Q.    And did you testify earlier that you worked with him?

A.    Yes.

Q.    And was that at CNN?

A.    Yes.

Q.    Okay.  Did you work for him; in other words, did you report to him?

A.    I didn't -- technically he was in a different unit.  We teamed up -- I brought his unit a story and he produced the story with me --

Q.    Okay.

A.    -- but he wasn't my supervisor.

Q.    Do you know him to be a truthful person?

A.    No.

Q.    Do you consider him to have integrity in his professional dealings?

Page 126

A. POOLOS

A.    No.

Q.    When you spoke to him in 2021, at the end of 2021 and the beginning of 2022, did you think he was a truthful person then?

A.    Yes.

MR. IADEVAIA:  Objection.

Go ahead.

Q.    And did you think that he had integrity in his professional dealings then?

MR. IADEVAIA:  Objection.

You can answer.

A.    I didn't think about his professional dealings.

Q.    Do you have any reason to believe that he would lie under oath?

A.    Yes.

Q.    What's your reason?

A.    I think he has lied about his interactions with me and I think he has lied about his interactions with Collette Richards.

Q.    Okay.  Any other reason?

A.    I believe he lied to me.

Q.    About something related to this lawsuit?

Page 127

A. POOLOS

A.    Yes.

Q.    Okay.  And what was that?

A.    He told me quite explicitly that he wanted to help, that I could never malign Collette to him in any way and that he adored her and that I should use him as a listening ear and that he wanted to do whatever he could to improve things between us.

Q.    Okay.

A.    And I don't believe that he said any of those things to me with any honesty.  I think he was lying to me then.

Q.    For how -- do you recall speaking for approximately seventeen minutes with him on that date?

A.    I honestly don't know.

Q.    Okay.  Do you -- are you able to guesstimate how long the...the call lasted?

A.    I thought it was around ten minutes but I don't know.

Q.    Do you recall telling Mr. Bronstein, quote, please don't tell anyone, end quote, about that call because, quote, it could look bad, end quote?

Page 128

A. POOLOS

MR. IADEVAIA: Objection.

You can answer.

A.    No, I --

Q.    Okay. Do you --

A.    -- remember telling him --

MR. ZUCKERMAN: I...I've been -- just, Counsel -- just a second.

I...I've been -- I think up to date, up to now, when I'm asking the witness whether she recalls an event and she says no and then pivots to saying what she does recall and goes on for paragraphs, I've allowed it, but I'm also trying to be mindful of the time. And I want to ask that she just answer the question that's being asked.

And you have full opportunity to ask cross-examination, as you know, and if she wants to provide an answer that's a little bit different from the question, that's...that's your time to ask her questions.

MR. IADEVAIA: I think it's completely appropriate for the witness,

Page 129

A. POOLOS

when asked a question - whether yes or no or otherwise - to provide explanation about what her answer signifies or means.

MR. ZUCKERMAN:  That I don't necessarily disagree with, but when I ask do you recall whether you ate an apple, and she's saying I do remember all sorts of other things about the lunch and starts talking about other things, that's not responsive.

So I...I'm just asking the witness to try her best to answer the specific question I am asking, that's all.

MR. IADEVAIA:  I mean, I think generally that is fine, but I disagree with the...the insinuation that she hasn't been.

BY MR. ZUCKERMAN:

Q.   Did you tell Mr. Bronstein, quote, you wanted to talk before, now it's become a really bad situation, end quote?

MR. IADEVAIA:  Objection.

You can answer.

A.   No.

Page 130

A. POOLOS

Q. Do you recall telling Mr. Bronstein, quote, Collette's performance is terrible, her performance is really bad, end quote?

A. No.

MR. IADEVAIA: Objection.

Q. Do you recall telling Mr. Bronstein, quote, she just made it a lot worse, she went to HR, end quote?

MR. IADEVAIA: Objection.

You can answer.

A. No.

Q. Do you recall telling Mr. Bronstein, quote, I'm really disappointed in her, end quote?

MR. IADEVAIA: Objection.

You can answer.

A. No.

MR. ZUCKERMAN: Do you recall -- what...what's the objection, by the way, just so -- in case I can fix it?

MR. IADEVAIA: Well, you keep referring to quotes. Quoting who, from where?

MR. ZUCKERMAN: Well, I'm just

Page 131

A. POOLOS

indicating to the witness that I'm not asking her whether she said these things in sum and -- or sum -- well, strike that.

Your...your objection is that there may be a document that I'm not --

MR. IADEVAIA:  I don't know --

MR. ZUCKERMAN:  -- showing her?

MR. IADEVAIA:  Yes, correct.

MR. ZUCKERMAN:  Okay, got it.

BY MR. ZUCKERMAN:

Q.    Continuing, did you tell Mr. Bronstein that you had, quote, zero trust in her, zero trust in her word, end quote?

MR. IADEVAIA:  I'm just going to have a standing objection to the --

MR. ZUCKERMAN:  Yeah.

MR. IADEVAIA:  -- references to "quote."

BY MR. ZUCKERMAN:

Q.    Okay.  So I'll tell you what, do you recall -- let me back up.

Do you recall saying anything in sub -- sum and substance that approximates any of the quotes I've given you to date?

Page 132

A. POOLOS

MR. IADEVAIA:  Objection.

Go ahead.

A.    I don't know.  You just asked me a series of --

Q.    Sure, let's --

(Unreportable crosstalk.)

A.    -- I don't -- if you can let me finish, please.

I don't understand what sum and substance means.  Like, are you saying did I say some version of this?

Q.    Yeah, that would be accurate.

A.    So then do you want me to --

Q.    Let's go -- you want to go through them again?

A.    Can I please just ask for instructions first?

Q.    Well, you don't get to ask me questions.  I ask you questions.

A.    No, no, I'm trying to ask how to answer the question the way you want.  You just --

Q.    Well, I'm telling you, let's go back through them again --

Page 133

A. POOLOS

A.    Can I please finish?  I...I keep trying to finish.  You told Jeremiah that I answer too long, and then you're going to say in sum or substance.

And what I want to know is, do you want me to answer what I remember saying or do you want me to just say yes or no?

Q.    I'll ask you afterwards what you remember saying --

A.    Okay.

Q.    -- okay?

A.    Yeah, that's helpful.

Q.    Do you remember saying in sum or substance to Mr. Bronstein during this conversation on January 5, please don't tell anyone about the call because it could look bad?

A.    I'm really sorry to do this, sir. What do you mean by sum or substance?

Do you mean like in general, like did I say something like that?

Q.    Did you say something along those lines?

A.    I asked him not to discuss it with

Page 134

A. POOLOS

Collette after he offered to speak to Collette on my behalf. I told him I thought it wouldn't -- that Collette should feel empowered in the process and it probably wouldn't be good if he was pressuring her.

Q. Thank you. Did you tell Mr. Bronstein in sum or substance during that call, you wanted to talk with him before, now it's become a really bad situation?

A. I remember telling him that I had wanted to get his advice but that things had escalated.

Q. Is that the word you used, "escalated"?

A. I think so.

Q. Okay. Do you recall telling Mr. Bronstein in sum and substance, Collette's performance is terrible, her performance is really bad?

A. No.

Q. Do you recall telling Mr. Bronstein in sum and substance, she just made it a lot worse, she just went to HR?

A. No.

Page 135

A. POOLOS

Q.    Do you recall telling Mr. Bronstein in sum or substance, I'm really disappointed in her?

A.    No.

Q.    Do you remember telling Mr. Bronstein in sum or substance, you had zero trust in her, zero trust in her word?

A.    Excuse me.

No.

Q.    Do you recall telling Mr. Bronstein in sum or substance, she went to HR, that's made it much worse between us?

A.    No.

Q.    Okay.  Now, when you told Mr. Bronstein that things had escalated, what did you mean by that?

A.    I don't remember exactly what I told him but it was something to the effect of things have escalated, she's gone to management, or something like that.

Q.    And do you recall whether he asked what you meant by going to management?

A.    No.  I remember saying that to him in the context of I don't want to malign her,

A. POOLOS

and him saying you could never malign her to me because we think -- I think the world of her, what's going on, I'm so sorry to hear things are bad, kind of thing.

Q.    Did you attempt to malign her in that call?

A.    No.

Q.    Did you say anything derogatory about her work performance in that call?

A.    I believe I said that she was struggling to adapt to the way things were done at 60 Minutes.  And he -- I remember him saying, oh -- I said something like, you know, it's...it's totally different here than it is at CNN, everything is done differently, it's a much harder environment.  And I remember him saying, you don't have to tell me that, like I experienced it personally.

Q.    In this case, the defendant produced...produced handwritten notes from Mr. Bronstein of his call with you.

Did you have occasion to review those notes?

MR. IADEVAIA:  Objection.

Page 137

A. POOLOS

You can answer.

A.      I did.  I think they were in the EEOC response from CBS.

Q.      And do you have any reason to believe that his notes were not contemporaneously made at the time of your call?

A.      Yes.

Q.      And what's that reason?

A.      They don't reflect the conversation I had with him.

Q.      Is any part of his notes accurate, to the best of your memory?

A.      I...I don't know.  I don't remember what all the notes said, but I do remember that there were enormous swaths of our conversation that were not in those notes and I do remember that his notes were not things I said, some of his notes at least.

Q.      Do you have any recollection of the items that were missing or the topics that were missing from those notes?

A.      Yes.  He didn't include our initial conversation, where he encouraged me to speak

Page 138

A. POOLOS

with him openly and said that nothing I could say about her would malign her to him. He didn't include the praise I heaped on Collette as a person. He didn't include me saying that I thought we had been a great team and that I was really hopeful we could get back to being a great team and that I wanted to continue working with her. He didn't include that I said it was going to be Collette's decision where she ended up, and that while I was hopeful we could work through things, ultimately it was not going to be a big deal for her if she decided to switch teams.

I don't think he included what I said about Lesley loving her or that she was enormously respected, and I know he didn't include that this was a very common occurrence that people switch teams and it was...it was totally up to her, what she wanted to do.

Q. You seem to have an excellent recall of what wasn't in his notes. I asked you before this about what was in his notes that you disagree with.

Do you have a recollection now?

Page 139

A. POOLOS

MR. IADEVAIA:  Objection.

You can answer.

A.    No, and I think it's harder to have somebody recite verbatim what somebody's notes are, but I read his notes once and saw that he didn't make any notes about the positive stuff I said about her or just really what the overall context of the call was, and I believe he mischaracterized the call and misrepresented it.

Q.    Okay.  Now, do you...do you think it would have been important for Mr. Bronstein to include in his notes your comment that Lesley, who ultimately you all work for, loves her?

MR. IADEVAIA:  Objection.

You can answer.

A.    I think it would have been important for him to include that I was saying that Collette's reputation at the show was good and that I hadn't sullied her reputation in any way.

Q.    Including to note that Lesley Stahl loved her, using your phrase, correct?

A.    Right.

Page 140

A. POOLOS

Q.    Okay.  Now, the next day after this call with Mr. Bronstein, you informed Collette that you knew about her HR complaint, correct?

A.    I --

MR. IADEVAIA:  Objection.

You can answer.

A.    I was instructed by Bill Owens to call her and tell her that I had spoken with Bill and Tanya about her concerns and that I had shared my concerns with them and that we would -- I guess we would...we would talk later; I can't remember.

Q.    Did you discuss in this conversation with Collette any of the concerns she expressed to Bill and Tanya or any of the concerns that you expressed about her to Bill and Tanya?

A.    No, I was told by Bill not to do that.

Q.    So you were told by Bill to just call her and let her know the conversation was had but to not get into the substance?

A.    Yes, Bill had told me that I was to call Collette, tell her I had spoken to them,

Page 141

A. POOLOS

had heard about her concerns and that I had shared my concerns.  And then Bill instructed me, from that point forward when working with Collette, I was to document her.

Q.    And did you do that, meaning did you document her?

A.    I...I didn't work with her anymore.

Q.    How would you describe your tone of voice during that phone call with Collette?

A.    Neutral.

Q.    You don't believe your tone was threatening?

MR. IADEVAIA:  Objection.

You can answer.

A.    No.

Q.    Or foreboding?

MR. IADEVAIA:  Objection.

You can answer.

A.    No.

Q.    Is it possible that a reasonable person in Collette's shoes would have interpreted your call as threatening or foreboding?

MR. IADEVAIA:  Objection.

Page 142

A. POOLOS

You can answer.

A.     No.

Q.     Were you trying to dissuade her from complaining about you again?

A.     No, I was following the instructions of my supervisor.

Q.     Do you have those instructions from your supervisor in writing anywhere?

A.     He told me verbally.

Q.     Did you take notes of that call?

A.     Not that I remember.

Q.     And you didn't record that call?

A.     No.

Q.     And you didn't make a note to yourself, hey, I have to call Collette?

A.     No, I just remember him saying, hey, when we...when we get off this call, can you please call her and just let her know we've talked, tell her you shared -- you know, you heard about her concerns, you shared [her] concerns and we would talk later.

MR. ZUCKERMAN:  I think this is a good time to break, five minutes before the agreed-upon hour.

**Page 143**

A. POOLOS

MR. IADEVAIA:  Sure.

MR. ZUCKERMAN:  I hope that's acceptable.

THE WITNESS:  Yeah.

MR. ZUCKERMAN:  Okay, perfect.

VIDEO TECHNICIAN:  The time is 12:26 p.m. and we're off the record.

(Luncheon Recess)

**Page 144**

A. POOLOS

A F T E R N O O N   S E S S I O N

VIDEO TECHNICIAN:  The time is 1:26 p.m. and we're back on the record.

(Mr. Bagley not present.)

A L E X A N D R A   P O O L O S, resumed as a witness, was further examined and testified as follows:

FURTHER EXAMINATION

BY MR. ZUCKERMAN:

Q.    Okay.  Good afternoon, Ms. Poolos. Continuing the deposition, I'd like to focus on the second meeting that you had with Bill Owens concerning Collette's complaint, which occurred on January 6, 2021.

Do you recall that meeting?

A.    Yes.

Q.    Okay.  Did you record that meeting?

A.    No.

Q.    Do you have any notes of that meeting?

A.    No.

Q.    Was that meeting scheduled by Bill Owens?

A.    Yes, I believe so.

Page 145

A. POOLOS

Q.    He had sent you sort of a follow-up email?

A.    I think his assistant contacted me.

MR. ZUCKERMAN:  Okay.  We can mark that as --

(Reporter interjection.)

MR. ZUCKERMAN:  -- four.

(Whereupon, Defendants Exhibit 4, Email Chain CBS_3150, was marked for identification, as of this date.)

MR. ZUCKERMAN:  I'll give you a minute to just read the email.

THE WITNESS:  Okay.

(Document review.)

Okay.

BY MR. ZUCKERMAN:

Q.    Do you recognize this to be an email chain between you and Bill Owens which follows up on the second meeting you had with Bill?

A.    I think so.

Q.    If I can refer you to the original email on that chain, from Bill to you, he writes in part, quote, we talked extensively about Collette's complaints about your tone

Page 146

A. POOLOS

and manner as well as at least one other instance from your time at 60 when this came up, and you have assured me that it won't be a problem going forward, end quote.

Did I read that accurately?

A.    Yes.

Q.    Okay.  Was the other instance that Bill was referring to a clash with someone on the Rights team?

A.    I don't know.

Q.    Did you know at the time and you just don't remember now?

A.    I think so.

Q.    Do you recall whether you ever followed up with Bill and said I'm not clear what you're referring to in this email about one other instance?

A.    No.

Q.    Okay.  Now, you had described the meeting with Bill in previous testimony.  And my takeaway from it was that there was a large percentage of that time in which you focused on and you said Bill was focusing on Collette's deficiencies.  In this email, Bill

Page 147

A. POOLOS

writes that there was an extensive discussion about your, Ms. Poolos, tone and manner.

Do you, is that -- is Bill's description of that in this email accurate or inaccurate?

MR. IADEVAIA:  Objection.

You can answer.

A.    I don't know.  I don't -- I know that the majority of the call, or the Zoom session, with Bill and Tanya was -- the majority of it was not about Collette's complaint, and I know that the follow-up call that I had with Bill prior to this email was not about her complaint but about his concerns about her.

Q.    Do you believe Bill to be a truthful person?

A.    No.

Q.    Okay.  And do you believe him to be not truthful with respect to you in this...in this matter specifically?

A.    I believe him to not be truthful about me and I believe him to be historically not a truthful person.

Page 148

A. POOLOS

Q.    Why do you believe he's not been truthful concerning you?

A.    Well, this email -- he told me verbally over the phone that he was going to send me an email and I had to sign off on it for HR to go away.  So he pressured me and manipulated me, and it wasn't like a -- the email itself wasn't truthful or reflecting what he had told me over the phone.

Q.    Why do you -- what's his motivation for being untruthful as it relates to you?

MR. IADEVAIA:  Objection.

You can answer.

Q.    What...what do you believe his motivation --

A.    Discrimination.

Q.    Okay.  On the basis of your gender?

A.    Yes.

Q.    Any other reason why he's being untruthful as it relates to you?

A.    I'm trying to think of a diplomatic way to put this.

Bill's first and only concern is himself and protecting himself.

Page 149

A. POOLOS

Q.    So self-preservation?

A.    Yes.

Q.    Okay.  If you recall, earlier in today's testimony I asked you whether a series of folks, including those who were temporary APs or otherwise that you had worked with, were truthful.  And you told me at least a handful of those were folks who you believed to be untruthful.

Do you remember that testimony?

A.    Yes.

Q.    What's those folks' motivations for being untruthful as it relates to you?

MR. IADEVAIA:  Objection.

You can answer.

A.    Bill told me himself -- Bill told me that Will Croxton had gone to him to complain that I wasn't making him a full-time AP on that -- the story we were working on because he already had a full-time job and I...I didn't think he would have the time, and Tanya had told me I had to tell him that.

And Bill -- or Will Croxton went to Bill and said that -- according to Bill, that

Page 150

A. POOLOS

it was his story, not my story, and that I wasn't treating him fairly. And Bill pulled me aside in the hallway and said what did -- you know, what happened here?

And I told him Tanya told me I had to break this news to him and she was afraid to tell him because of his temper, and I did, and he can still work on the story. I'm also going to arrange to make sure he has access to the shoot in Florida, I'm going to pull every string so he can be present. And Bill said you're handling everything exactly right, please document him, he has a bad habit of complaining.

Q. I'm not...I'm not clear I quite understood your answer to my question, which is, is Will someone who you believe is untruthful?

A. On just one example of him telling management that the Maria Butina story was his story, yes, that's a completely inaccurate thing to say.

Q. Okay. Are -- would any of those people -- do you believe any of those people

Page 151

A. POOLOS

lied with respect to their report to the company that you mistreated them?

MR. IADEVAIA:  Objection.

You can answer.

A.    Well, I don't know -- I've never seen any of the complaints, so I don't know exactly what their complaints were.

I believe Jack Weingart to be a very truthful, straightforward person.  Sarah Turcotte, Bill Owens told me himself that she had a terrible relationship with the truth and was a known liar, and she did lie to me about the process of switching teams.  She made up something about Scott Pelley specifically calling her on the phone.

Q.    Do you think she lied about the substance of her complaint about you?

MR. IADEVAIA:  Objection.

You can answer.

A.    Again, I don't know what her complaint was --

Q.    Okay.

A.    -- but she lied to me about switching off the team, and when she left the

Page 152

A. POOLOS

team she told me, I want to switch off the team because I want to be able to pick up my kids at 3:00 and Lesley will never let me do that and the other producer's based in South Carolina, so he doesn't care.

And we had a really good parting of ways, where she said you're one of the best producers I've worked for, I love working with you.  So if she then went to complain about me and say I was a horrible person, then yes, I think she was lying.

Q.    I understand, and I'm just speaking hypothetically, that -- or generally, that on occasion people may have a motivation to not be a hundred percent truthful.

I guess what I'm asking is, are either Josh Ravitz, Will Croxton, Sarah Turcotte, Aieska Hoyos or Joanna Palmer are -- do you believe that any of them would lie in this lawsuit as it relates to the allegations you've made against your employer?

MR. IADEVAIA:  Objection.

You can answer.

A.    Do I believe that any of them would

Page 153

                    A. POOLOS

lie about allegations I've made?

    Q.    Let me put it a different way.

          Do any of them have reason to lie

about you and your employment?

          MR. IADEVAIA:  Objection.

          You can answer.

    A.    Yes.

    Q.    Okay.  And is that reason because

any of them are discriminating against you?

          MR. IADEVAIA:  Objection.

          You can answer.

    A.    I'm sorry, I don't understand the

question --

    Q.    Sure --

    A.    -- is that -- is their lying --

    Q.    -- I'll explain it.

    A.    -- explained by discrimination, is

that what you mean?

    Q.    You...you said Bill Owens, one of

the reasons for which he's lying - one of the

reasons - is that he's discriminating against

you.

          So I'm asking you whether either

Mr. Ravitz, Mr. Croxton, [Mr.] Turcotte,

A. POOLOS

Ms. Hoyos or Ms. Palmer have lied about you and that their motivation is discrimination against you?

A.    Yes.

MR. IADEVAIA:  Objection.

Q.    Which of those folks do you believe have lied about you and -- motivated by discrimination?

A.    It's difficult to answer that question without actually seeing their complaints about me, but I think Jeff -- Josh Ravitz would have been discriminating.  Will Croxton has a history of losing his temper on women, including me, and then complaining about them.  I don't know what Sarah Turcotte's complaint was against me, I don't know about the two other Rights people.

I do know that Josh told me later that his subordinate -- and I...I can't remember how to pronounce her name, Aieska, that she was not doing her job and blaming others and that they had to let her go.

Q.    During the second meeting that you had with Mr. Owens on January 6, about

Page 155

A. POOLOS

Collette's complaint, did you tell Mr. Owens that you had spoken to Mr. Bronstein the prior evening?

A.    No.

Q.    Why not?

A.    I didn't think to.

Q.    Well, why not?

A.    He didn't ask me if I had spoken with anyone.

Q.    You didn't think it was important or relevant to tell him that?

A.    No.

I had never been instructed not to talk to anybody, so I didn't think I needed to report who I spoke to.

Q.    Didn't you think it would look bad that you called someone from outside the organization to talk about, from your perspective, the job performance of a current employee?

A.    No.  I thought that it was a good thing to do because it was someone who knew her, who cared about her and had her best interests at heart.

Page 156

A. POOLOS

Q.    Lesley knew about her, correct?

A.    Lesley knew about --

Q.    Collette.  I'm using your phrases, that's all.

A.    Yes.

Q.    Okay.  And Lesley cared about her, correct?

A.    I don't know.  You'd have to ask Lesley if she cared about her.

Q.    Okay.  And Lesley thought highly of her, correct?

A.    I don't think Lesley thought highly of her after she found out that she had made a complaint --

Q.    Okay.  Well --

A.    -- so it's hard for me to say what she felt before then, because I only heard about what she didn't --

Q.    But you...you understand -- you're a smart person, you understand what I'm getting at, right; which is, I'm trying to understand why -- how it's possible that you went to nobody in authority at the company about alleged performance deficiencies but yet felt

Page 157

A. POOLOS

no compunction about going to folks outside of the company and going to peers of Collette's who have no responsibility for her whatsoever.

So what I'm asking is, isn't there anyone - whether it's Bill, whether it's Lesley, whether it's Tanya - who fits the same description that you just had for Bronstein; someone who knows her, cares about her and wants her to improve?

MR. IADEVAIA:  Objection.

You can answer.

A.    I did try to talk to Tanya and she didn't have time to talk to me.  I did not tell Lesley because when Lesley found out about Collette's performance issues, she told me explicitly she wanted her off her team and she was outraged, and I knew from working with Lesley for...at that point, over ten years, that this would make Collette's situation far worse and it wasn't a solution.  It was a bad idea to go to somebody like Lesley and it was a bad idea to go to Bill, because it would have resulted in Collette being punished.

Q.    So you --

Page 158

A. POOLOS

A.    Going to Scott Bronstein would result in no punishment for Collette.  It was the safest person to ask for advice.

Q.    Is that how you were trained as a manager, to take performance issues to folks outside of the employer...employer relationship?

A.    I was never trained as a manager.

Q.    Okay.  So you were trying to protect Collette --

A.    Correct.

Q.    -- by going to Bronstein?

A.    Yes.

Q.    And you were trying to protect Collette by never reporting to anyone at the company that had -- she had performance deficiencies --

MR. IADEVAIA:  Objection.

Q.    -- correct?

MR. IADEVAIA:  You can answer.

A.    Yes.

Q.    Okay.  As a manager, as -- you as a manager, you would want subordinates reporting to you, if they were not doing well, to

Page 159

A. POOLOS

receive coaching and feedback and improve their performance, correct?

A.    I would want them to improve their performance without having a negative record.

Q.    Are you an expert in job performance management?

MR. IADEVAIA:  Objection.

You can answer.

A.    No.  Like I said, I've never had any training.

Q.    That's my point, you've never had any training.

Are you --

A.    I only --

(Unreportable crosstalk and reporter interjection.)

Q.    I don't have a question pending.

Did you ever seek out anybody at the company who had performance management training, to help you performance-manage Collette?

A.    I had three people that I could reach out to.  Tanya, who I reached out to, who told me she was too busy to talk to me.

Page 160

A. POOLOS

Lesley, who would have just punished Collette, unequivocally.  And Bill, who would have had a very negative opinion of Collette.

Q.    Okay.  So with respect to what you just said about Lesley, that's speculation, correct?

MR. IADEVAIA:  Objection.

You can answer.

A.    It's my personal experience, how she responds when people aren't doing their job well or when they are asking for -- asking to leave a story early or take too much personal time off.  I've seen what she does.

Q.    Who has Lesley treated in that way?

A.    I mean, Lesley was not a fan of Sarah Turcotte's.

Q.    I didn't ask who she was a fan of, I just want to know who she --

A.    No, I was going to finish.

Lesley wanted Sarah Turcotte off her team because she felt Sarah Turcotte took too much time off and left work early.  Again, another situation where I didn't even tell Lesley that Sarah was switching the team, but

Page 161

A. POOLOS

Lesley approached me and said she wanted her off her team.

I've heard Lesley speak about others as not being dedicated or hard-working enough. Lesley's told me repeatedly that she doesn't have tolerance for people who don't understand what the job is and the nature of the job at 60 Minutes. Lesley has an unbelievable temper and I've been --

MR. ZUCKERMAN:  This is not -- this is -- I'm sorry, this is not responsive, I -- my -- hold on, let me just...let me just get this on the record --

MR. IADEVAIA:  I didn't say anything.

MR. ZUCKERMAN:  -- and you can respond.

I...I know, the camera can't see you looking like you were going to butt in.  I asked --

MR. IADEVAIA:  I didn't say anything.

MR. ZUCKERMAN:  -- for -- I know you didn't --

Page 162

A. POOLOS

MR. IADEVAIA: Okay --

MR. ZUCKERMAN: -- because I didn't let you, I jumped in first.

MR. IADEVAIA: I wasn't going to.

MR. ZUCKERMAN: I asked the witness to identify people who were treated by Lesley Stahl in the manner described. I didn't ask about Lesley's temper, I didn't ask about Lesley's temperament generally. I want to know which people she -- the witness testified in her, quote, personal experience she's seen Lesley treat people that way. I just want to know who it is. That's all I want to know.

She's identified one person, Sarah Turcotte, I wrote that down. I just want to know who else, that's it.

MR. IADEVAIA: And my response to that is that what she --

MR. ZUCKERMAN: I'd like her response to it but go ahead.

MR. IADEVAIA: Well, then what is the point in talking to me? I mean, you're making a statement --

Page 163

A. POOLOS

MR. ZUCKERMAN:  I...I'm listening to you.

MR. IADEVAIA:  -- for the record and then cutting me off before I can say anything.

The witness was explaining the basis for her concern about going to Lesley Stahl.  That was what she was doing.  She identified a specific individual, and I think if you let her finish she will identify other instances that support that concern.

MR. ZUCKERMAN:  And that's the answer I want.  I want the answer limited to --

MR. IADEVAIA:  Right.

MR. ZUCKERMAN:  -- identifying people that Lesley Stahl treated in that way.

If you want to ask her why Lesley -- why she had these concerns, you should feel free to do that in cross-examination. I didn't ask her that question, and I just want to get this done within the

Page 164

A. POOLOS

appropriate time frame, that's all.

So I think we're in agreement, she's going to continue and tell me everyone else Lesley Stahl's treated that way.

MR. IADEVAIA:  Go ahead, you can answer.

THE WITNESS:  The question is who else has Lesley Stahl --

MR. ZUCKERMAN:  You said it was your personal --

THE WITNESS:  -- punished for not doing their job or, or --

BY MR. ZUCKERMAN:

Q.    You said that you did not -- your testimony was that you did not raise Collette's performance deficiencies with her actual supervisors because you were concerned that those supervisors would react negatively and perhaps punish her, and you mentioned Lesley and you mentioned Bill, and you said it was your personal experience with Lesley.  So I want to know -- my question was, who has Lesley treated in the manner that you just described, and you mentioned Sarah Turcotte.

Page 165

A. POOLOS

And I just want to know who else, if anybody?

A.    She treated Shachar Bar-On that way, she treated all of her producers that way, she --

Q.    Literally all of her producers?

A.    Rich Bonin for sure.  Sara -- there was another producer named Sara whose last name I'm not remembering who she was horrible to.  And I can't remember all the APs, but everybody has had their experience with her. And she told me, I'm going to get rid of Collette, and I had to beg her not to do that.

Q.    Did you ever go to HR and say, hey, I need some help in performance-managing my subordinate?

A.    No, I didn't.

Q.    You responded to Bill's email a short while after he sent it - and again I'm referring to Defendants Exhibit 4 - saying, (as read):

Thank you for this.  I completely understand.  And thank you for all your time

Page 166

A. POOLOS

talking this through - right?

Is that correct?

A.    Yes.

Q.    Were you instructed to write that?

A.    I was instructed that Bill would send me an email, and I needed to respond in the affirmative for the matter to be dropped. So I had to acknowledge his email and I had to acknowledge the content of his email. And he told me, this is how I'm going to prevent this from becoming an investigation.

Q.    Did you feel, on January 6, that you had ever interacted with a colleague with an inappropriate tone, using an inappropriate tone?

A.    I felt that I had had one instance with Collette, and...and other than that, I...I wasn't sure.

Q.    Okay. Now, on the next day, January 7, Bill Owens asked to speak with you again, correct?

A.    Yes.

Q.    And he asked you, among other things, if you had called Collette's former

Page 167

A. POOLOS

boss at CNN; is that correct?

A.    Yes.

Q.    Tell me everything that you told Bill Owens during that meeting -- well, strike that.

Was it a phone call that you had with Bill?

A.    Yes.

Q.    Okay.  Did you record that call?

A.    No.

Q.    Did you take notes during that call?

A.    No.

Q.    So tell me everything Bill Owens said to you and everything that you said to Bill Owens about your phone call with Bronstein.

A.    I remember Bill saying did you shit-talk Collette to her former boss, and I said something like, no, I didn't shit-talk her but I did talk to him, this was the guy that recommended I hire her.  And he said was it smart of you to call him?

And I remember saying, well, I was looking for advice, I reached out to him

A. POOLOS

before I ever knew she had gone to HR and I was hoping to get advice and keep things from getting out of control.

And...and then I remember him saying, well, something like Collette's called HR and said you were shit-talking her, and then there was something about him saying none of this makes any sense, why you would...why you would say awful things about her to a guy who really liked her, that doesn't make sense to me, because he wouldn't have been receptive to it.

And I think I said something to him like, exactly, I -- I thought he would have been -- I reached out to him initially for his help, to give me advice on how to make things better.

And then he just said Renee -- something like you're going to have to talk to Renee, she's skiing, she's on a ski vacation, you'll probably hear from her on Monday.

Q.    And for the record, is that Renee Balducci?

A.    Yes.

Page 169

A. POOLOS

Q.    And who is Renee Balducci?

A.    She works in HR.

Q.    Okay.  Anything else you remember about what you said to Bill or what Bill said to you on that call?

A.    Oh, yes, I do.  Bill was very concerned about whether I had quoted him and any of the stuff he had said about Collette the day before.

Q.    Quoted to Bronstein?

A.    Yes.

Q.    Okay.  And what did you say in response?

A.    I said no.

Q.    Okay.  Anything else you remember?

I'm just -- I'm not suggesting there's anything else, I just want to give you the full opportunity to tell --

A.    No, he was -- he, he --

(Unreportable crosstalk.)

Q.    Sorry, we have -- you know, we just can't talk --

A.    Yes.

Q.    -- over each other because of the

Page 170

A. POOLOS

court reporter.

(Reporter interjection.)

A.    He just asked me that question a couple times, you didn't tell him all the stuff I said about her?

Q.    So you...you told Bill Owens that you didn't disparage Collette in your discussions with Bronstein, correct?

MR. IADEVAIA:  Objection.

You can answer.

A.    I told Bill I didn't shit-talk her.

Q.    Okay.  Well, did you disparage her?

A.    I don't think I did.

Q.    Okay.  How come you didn't answer that question "no"?  Why do you...why did you answer the question, "I don't think I did"?

A.    Oh, no reason.  No, I didn't.

Q.    Were you uncertain when you answered the question to begin with?

A.    I was thinking about shit-talk.

Q.    Okay.  Well, I'm asking about disparage.

A.    No, I understand.  No, I did not disparage her.

Page 171

A. POOLOS

Q.    What's your definition of disparage?

A.    Saying mean things about somebody's person, like making fun of them, being cruel about who they are as people.

Q.    What about being -- describing their job performance as negative, do you think that's disparagement?

A.    No.

Q.    Okay.  Did you talk negatively to Mr. Bronstein -- strike that.

Did you describe Collette's job performance negatively to Mr. Bronstein?

A.    I said that she was struggling to adjust to the way things were done at 60 Minutes --

Q.    And --

A.    -- and that she was struggling in the environment and she was struggling with being solely dependent on me and not having friends, because she was working from home.

I can't remember anything else.

Q.    Did you say anything negative about Collette personally?

A.    No.

Page 172

A. POOLOS

Q.    Did you say anything negative, other than what you've testified to, about Collette's job performance?

A.    I said that it was a very different place than CNN and it was a lot harder to -- I didn't say survive but like it was a lot harder to...to handle things and that she was struggling with that.

Q.    Did you give Mr. Bronstein any specifics about how that struggle manifested itself for Collette?

A.    I did.  I said that she was struggling working from home and that she felt really isolated.  I said that I felt she was struggling socially because she didn't have peers and she was too dependent on me.  And I think I might have said something -- that she was struggling because she wasn't getting the normal interaction she would have gotten with Lesley because of the COVID situation.

Q.    So these are things that, to my mind, don't seem super critical - would you agree - of her...of her job performance?

A.    Well, I think saying that she's

Page 173

A. POOLOS

struggling to adapt to the norms of 60 Minutes is a negative thing to say about her job performance.

Q.    So it's not something you would have said to Lesley or Bill?

A.    That she's not --

MR. IADEVAIA:  Objection.

You can answer.

A.    No, no, I wouldn't have.

Q.    Now, that same day you were placed on administrative leave pending an investigation, correct?

A.    Yes.

Q.    Is, is that something told to you -- strike that.

Did Renee Balducci tell you that?

A.    Yes.

Q.    Okay.  And were you interviewed as part of an investigation?

A.    I had -- yes, I was.

Q.    You were interviewed by Renee on January 8, which was a Saturday?

A.    Yes.

Q.    Okay.  And you recorded that -- was

Page 174

A. POOLOS

that Zoom or telephone?

A.    That was telephone.

Q.    And you recorded that telephone call?

A.    Yes.

Q.    Okay.  Now, I...I think you said Renee -- you were told Renee was skiing, on vacation; is that correct?

A.    Yes.

Q.    Do you know whether she was on vacation on January 8, when you had this discussion, or was she back at work?

A.    I don't know.  She called me Friday night and said I'm putting you on suspension, and I asked her why and she said I can't tell you why.  And I said does this have to do with my call with Scott Bronstein, and she said no, it's something much, much worse that's come to my attention.  And then she just said I'll be in touch.

And then I emailed her the next day, to say that I wanted to know why I was being suspended because I didn't know what I had done.  And she said, okay, I'll call you.  And

Page 175

A. POOLOS

I don't remember when she called, but I feel like it was in the evening.

Q.    Okay.  Thanks for that.  So the, this -- the phone call you're just describing, that was Friday night?

A.    The first phone call was Friday night --

Q.    Okay.

A.    -- for a couple minutes, yeah.

Q.    Okay.  And do you know where she was at that time?  Was she at --

A.    I don't know.

Q.    You don't know if she was still on vacation or not?

A.    I have no idea.

Q.    When Bill told you she was on vacation, what day was that?

A.    Friday morning.  He said I don't think she can call you until Monday, I think she's on vacation.

Q.    Okay.  Do you know where she was vacationing?

A.    No, I don't.

Q.    And where did she call you, at your

Page 176

A. POOLOS

home or in the office?

A.    She called me on my cell phone.  I was at home.

Q.    You were at home, okay.  And you, you didn't -- okay.  So that was Friday night.

And then you spoke with Renee substantively on Saturday?

A.    I spoke with her for about an hour.

Q.    On Saturday?

A.    I believe so.

Q.    Okay.  And was that a Zoom call or a phone call?

A.    She called my cell.

Q.    Okay.  And that call you recorded, correct?

A.    Yes.

Q.    Okay.  But the Friday-night call you didn't recall -- sorry, strike that.

The Friday-night call you did not record?

A.    No.

Q.    Do you have notes about the Friday-night call?

A.    No.

Page 177

A. POOLOS

Q.    Do you have notes of the Saturday call?

A.    No.

Q.    Now, on Saturday, do you...do you know whether she was calling you from vacation or from her office or from her home?

A.    She didn't say.

Q.    And you didn't ask?

A.    No.

Q.    Did you ever raise your voice with Renee during the telephone interview on Saturday?

A.    I don't think so.

Q.    When Renee asked you about your phone call with Scott Bronstein, did you tell Renee that Scott had called you as opposed to you calling him?

A.    I think I told her he had texted me that day and that I had initially texted him several days before, but I can't remember if I said that, and then, you know, we texted and he called me or if I said I called him, I don't remember.

Q.    But the recording you made is a

Page 178

A. POOLOS

true, complete, unadulterated recording of the discussion that you had with Renee, correct?

A.    Yes.

Q.    Now, at some point you said to Renee that your call with Bronstein was, quote, a mistake, stupid, naive, it was born of idiocy, end quote, correct?

A.    Yes.

MR. IADEVAIA:  Objection.

You can answer.

A.    Yes.

Q.    And you believed that to be the truth when you said it, correct?

A.    Yes.

Q.    Why?

Strike that, let me -- why did you believe that your call to Bronstein was a mistake, stupid, naive, it was born of idiocy?

A.    I think I was naive to believe that Scott had good intentions and that he wasn't going to twist my words and not represent the call accurately.  And I think it was a mistake for me to have thought that I could have managed the situation with Collette without

Page 179

A. POOLOS

reporting her behavior.

Q.    And when did you learn the results or the outcome of the investigation?

A.    I think it was...I think it was February 3, 2022.

Q.    And what were those results?

A.    That I was being fired.

Q.    And who...who informed you of that decision?

A.    Bill Owens.

Q.    Was this by phone, was it by Zoom?

A.    It was by Zoom.

Q.    Okay.  And was anyone else on that Zoom meeting?

A.    Renee Balducci.

Q.    Okay.  Anyone else?

A.    No.

Q.    And did you record that Zoom?

A.    No.

Q.    Did you take notes of that Zoom?

A.    No.

Q.    Was...was anyone else listening in on that Zoom?

A.    My husband was in the room.

Page 180

A. POOLOS

Q.    Okay.  Anyone else?

A.    No.

Q.    Did you have -- was there a lawyer who listened in?

I'm not referring to your counsel who are sitting at this table today.

A.    I don't think so.

Q.    Do you have like a media lawyer?

A.    Yes, I do.

Q.    And what's his or her name?

A.    Paul Julian [ph].

Q.    Was Paul listening in on that Zoom?

A.    I don't think so.

Q.    Was he present at your house that day?

A.    I was in Miami, on vacation.

Q.    Okay.  Was he on vacation with you?

A.    No.

Q.    Did you...do you recall connecting anyone else into that Zoom or perhaps FaceTiming someone and holding it up?

A.    No.

Q.    Okay.  At some point you had written a text to someone - I can pull it out - that

Page 181

A. POOLOS

says, quote, the lawyer says he was kind of shocked at how they are reinventing a new narrative, end quote.

Does that...is that text familiar to you?

A.    Not at all.

Q.    Okay.

A.    I don't know who it's to, I don't know what it's in reference to.

Q.    Okay.  Do you -- so putting aside the text, do you recall someone telling you that they were shocked at how they - I assume that means the company - are reinventing a new narrative?

A.    No.  I remember talking about the termination with Paul Julian, because Bill told me I should resign and I asked Paul --

MR. IADEVAIA:  Whoa, whoa, whoa. I'm, I'm --

THE WITNESS:  Sorry, yeah, I -- I'm not -- sorry.

DI*    MR. IADEVAIA:  This is a lawyer-client communication, so I'm directing the witness not to answer it.

Page 182

A. POOLOS

MR. ZUCKERMAN:  I'm sorry, just which attorney was she referring to there?

MR. IADEVAIA:  You were referring to Mr. Julian, correct?

THE WITNESS:  Yes.

BY MR. ZUCKERMAN:

Q.    Do you have an engagement letter with Mr. Julian that covers this case against CBS at all?

A.    Paul has represented me probably for over a decade, so we have an ongoing professional relationship.  He negotiated all my contracts.

Q.    Is...is Paul an agent or an attorney or both?

A.    He's an attorney.

Q.    Does he work for you as an attorney or as an agent and he just happens to have the background of an attorney?

A.    He's not my agent, he doesn't act as my agent.  He advises me on legal contracts.

Q.    Have you ever signed an engagement letter with Paul?

A.    I don't know, I don't know.

Page 183

A. POOLOS

Q.    Have you ever paid Paul for legal services?

A.    Yes.

Q.    And does he send you an itemized invoice with the work that he's done?

A.    He's invoiced me, yes.

Q.    Has Paul ever held himself out to any third party as acting as your lawyer?

A.    Yes, with CBS.

Q.    Okay.  And has he acted as your lawyer in connection with this dispute you have with the defendants in this case?

A.    Yes.

Q.    How so?

Again, without describing communications you had, what...what is his role with respect to your -- or what was...what was or what is his role with respect to your complaints against the defendants in this case?

A.    It's my understanding that he reached out to someone at CBS News - I don't know if it was HR or if it was somebody in the Legal Department - about my suspension.  And

Page 184

A. POOLOS

it's my understanding that he reached out to
CBS News to decline their offer for me to
resign.

Q.    Okay.

A.    And I also think that he spoke with
CBS News about my exit paperwork.

MR. ZUCKERMAN:  Okay.  I'm going to
place before you, without marking it,
Plaintiff's 002210, which is a text thread
produced by your counsel in this case, and
I would ask you to look at the text third
from the bottom.  Feel free to share it
with your counsel, of course.

We may have another copy for you,
Jeremiah, hold on.  We do.

MR. IADEVAIA:  What page are we on?
Here, I can just see it...okay.

BY MR. ZUCKERMAN:

Q.    I'm just going to quote the relevant
part for the record, (as read):

The HR woman told -- or
women told when she fired me
that there was no reason to
speak to me after she spoke

Page 185

                    A. POOLOS

to - in brackets - Bronstein.

She was rather huffy about it

too.  Both Alex and my lawyer

remember her saying that - end

quote.

        Do you see that text?

A.    I do.

Q.    Okay.  Does that refresh your recollection as to whether, quote, your...your lawyer was on the Zoom call?

A.    I...I honestly don't remember.  I mean, I see the text and I see I'm saying that, but I don't remember him being on the Zoom call.

Q.    Is it possible and you just don't remember it?

A.    I didn't start the Zoom call, so I don't know how I could have added him on the Zoom call.

Q.    Okay.  Could he have witnessed the Zoom call and you just don't remember?

A.    It's possible, I just don't remember.

        Do you want me to keep reading?

Page 186

A. POOLOS

Q.     No, that's okay.  Thank you.

The text thread is...is -- looks like it's with someone named Niko, N-I-K-O.

Who...who is that?

A.     That's my brother.

Q.     Okay.  Oh, you referred to him as Nick earlier in the testimony?

A.     Yeah, Nicholas, but his family nickname is Niko.

Q.     Yeah.  Okay.  All right.  At some point you received like a letter closing out the investigation.

Do you recall that?

A.     Yes.

Q*     Okay.  Before we get to that, in the text I had just showed you, where it says at the end both Alex and my lawyer remember her saying that, what else did...what else did this lawyer say about the interaction or the, the meeting with...with Renee Balducci?

DI*          MR. IADEVAIA:  I'm going to object and direct the witness not to disclose the contents of her conversation with counsel.

MR. ZUCKERMAN:  Well, she disclosed

Page 187

A. POOLOS

it in a non-privileged email, so -- or text.  So right now, perhaps - perhaps, perhaps - there's an argument for a limited waiver, but there's definitely not an argument for no waiver.

So she disclosed it in a text to Niko.  I want to know what else she told Niko or anyone else about what this lawyer opined with respect to the interaction she had with Renee Balducci.

MR. IADEVAIA:  Well, I -- can you read back the prior question that I objected to, please.

(As read by the reporter):

QUESTION:  Before we get to that, in the text I had just showed you, where it says at the end both Alex and my lawyer remember her saying that, what else did...what else did this lawyer say about the interaction or the meeting with "RB"?

MR. ZUCKERMAN:  Renee Balducci.

Page 188

A. POOLOS

MR. IADEVAIA: So my objection is to the question about what the lawyer said, not about what Ms. Poolos said about -- to her brother about that conversation.

MR. ZUCKERMAN: Oh, I...I understand your objection --

MR. IADEVAIA: Okay.

MR. ZUCKERMAN: -- and I disagree with it, because any -- once the lawyer -- once she reveals the contents of a conversation that otherwise might be privileged, I'm entitled to explore all of that conversation, its subject matter, who it was said to, everything.

MR. IADEVAIA: And we...we disagree very much and --

MR. ZUCKERMAN: Okay. So that's fine. You instructing her not to answer?

MR. IADEVAIA: I'm instructing her not to answer.

MR. ZUCKERMAN: Okay. We'll mark that in the record.

Oh, let's mark this first, before...before we give it to the witness,

Page 189

A. POOLOS

Defendants Exhibit 5, which I'll hand to counsel. It's a February 3 letter to Alex Poolos from Renee -- sorry, Renee Balducci.

(Whereupon, Defendants Exhibit 5, Termination Letter Pl.7-8, was marked for identification, as of this date.)

BY MR. ZUCKERMAN:

Q. Do you recognize this document?

A. Yes, I do.

Q. What is it?

A. It's my termination letter, I think.

Q. And did you receive it on or about the date that it's dated at top?

A. Yes.

Q. Okay. Who do you believe made the decision to fire you?

A. Bill Owens and Renee Balducci.

Q. Okay. What's your basis for believing --

A. And possibly Cynthia Glasgow.

Q. When you say possibly, are you speculating?

A. Well, Renee told me...Renee Balducci

Page 190

A. POOLOS

told me that she would have to discuss the case with her manager, and then she later told me her manager was Cynthia Glasgow.

Q.    How many interactions, if any, did you have with Cynthia Glasgow during your employment with 60 Minutes?

A.    I emailed her -- I was on an email chain with her when I specifically requested to speak with her.

Q.    And when was that?

A.    That was either the same day or the following day, after my call with Renee Balducci.

Q.    The Saturday call or the Friday call?

A.    The Saturday call.  It was either that Saturday or Sunday.

Q.    Okay.  So -- and how did you know Cynthia Glasgow?

How did you know to email her?

A.    I didn't email her.  Renee -- I told Renee that I wanted -- I emailed Renee and said I would like to speak with your manager, and Renee responded to me and Cc'd Cynthia and

A. POOLOS

said my manager is aware.  And then I wrote back, I would like to speak with her.

Q.    And how did Cynthia respond?

A.    She never respond.

Q.    Okay.  And is that the only interaction you had with Cynthia during your 60 Minutes employment?

A.    I couldn't say.  I don't...I don't know if she was part of trainings or I, I --

Q.    But nothing you remember, sitting here today?

A.    Nothing I remember, sitting here today.

Q.    Okay.  What's your basis for believing that Bill Owens made the decision to fire you?

A.    He told me, I'm firing -- I'm letting you go.

Q.    Okay.  Anything else?

A.    Renee told me that in addition to discussing the situation with her manager, she would be discussing it with Bill.

Q.    Okay.  Do you have any other basis for believing that Bill Owens made the

Page 192

A. POOLOS

decision to fire you?

I'm not suggesting -- when I ask these questions, I'm not suggesting that there is. I just want to be sure that I'm exhausting your memory and you have the opportunity to give a full and complete answer, or full and accurate answer.

A. No, just the termination call, he seemed to take ownership of the process of terminating me.

Q. Okay. And what's your basis for believing that Renee Balducci made the decision to fire you, I guess together with Bill?

A. Because I asked Renee why she didn't contact me a second time. We were supposed to have another conversation, she had told me that verbally and in writing. And she said that she had decided there was no point in talking to me again.

Q. Okay. So you're referring to, after you spoke with Renee on that Saturday as part of the investigation, you wanted to have another discussion with her and she said it's

Page 193

A. POOLOS

not necessary.

Did I accurately --

A.    No.

Q.    Okay, go ahead.  Why don't you fix what I tried to summarize.

A.    No, she told me in the call, I'll...I'll be in touch with you again.  And then when I sent her emails, asking to speak to her manager, she said I will reach out to you next week, and then she didn't.

I had been expecting to hear from her to have a follow-up call, so when they fired me I said, Renee, you told me you would have another call with me; why didn't you talk to me again?  And she said there was no point, I decided there was no point to speak to you again.

Q.    Okay.  Thank you, I appreciate that.

Okay.  Same question, is there any other basis on which you believe Ms. Balducci made the decision to fire you?

A.    Just the...the call I had with her on that Saturday, where she said she was -- that my job was at risk and she would be

Page 194

A. POOLOS

weighing factors and that she would be, you know, talking to her manager and to Bill.

And then in the termination call, when she told me she had made a decision not to speak to me again and she -- that she...she made it seem like she had made up her mind after that call, that she was going to fire me.

Q.    What specifically -- what is the context of this phrase "weighing factors," what specifically did she say in that regard?

A.    I don't know what she specifically said, I just remember her saying something like I have to talk this through with my manager and with Bill.  And I asked her, are you going to call Lesley?  And she said, I don't know.  And I said, well, I think Lesley would be available to speak with you.  And she said, I don't know if I'm going to call her.

Q.    Okay, great.  Okay.  Again, I just want to make sure I've exhausted your memory.

Is there any other basis on which you believe Renee Balducci made the decision to fire you?

Page 195

A. POOLOS

A.    Not that I can think of.

Q.    Okay.  Do you believe Bill Owens made the decision to fire you in whole or in part because of your gender?

A.    In whole.

Q.    In whole.

And what's your basis for that belief?

A.    I was treated very differently than men who've done horrible things, who never get suspended and definitely don't ever get fired. Bill prevented me from speaking to HR, Bill misled me and manipulated me, and I believe Bill wanted to give my job to a male friend of his.

Q.    Do you know who has your -- strike that.

Do you know who replaced you after you were terminated?

A.    Eventually another former AP was promoted to replace me, and I am forgetting her name.

Q.    Okay.  When --

A.    Ayesha...I can't remember her last

A. POOLOS

name.

Q. Tell you what, I'll ask the court reporter to just leave a blank in the transcript and if you remember, feel free to free fill --

A. Oh, I remember, Ayesha Siddiqi, S-I -- S-I-D-D-I-Q-I.

Q. Thank you. When you...when you just testified that Bill prevented you from speaking with HR, is that the incident you -- or the occurrence that you talked about, when Bill first called you about the complaint related to Collette?

A. Yes, in that Zoom call I specifically asked if I could tell my side of the story to HR, and he said no.

(Brief off-record discussion.)

MR. ZUCKERMAN: Okay. When you testified that Bill misled you -- I'm sorry, I should have wrote it down.

(Brief off-record discussion.)

BY MR. ZUCKERMAN:

Q. I'm sorry. When Bill said that he -- that you had, that he had -- when you

Page 197

A. POOLOS

said that Bill had misled you and manipulated you, is that also in connection with Collette's complaint about you?

A.    It's in...it's in reference to the whole situation.

Q.    With Collette?

A.    Yes.

Q.    Okay.

A.    And being fired, all of it.

Q.    Okay.  And you said that men were treated differently than you.  I will ask you specifics about it, but for right now can you list those men for me, for the record?

A.    To the best of my recollection, Shachar Bar-On, Ira Rosen, Michael Radutzky, Michael Gavshon, Bob Anderson, Rich Bonin, Jeff Fager, Bill Owens, Will Croxton, David Levine, Matt Richmond, Dan Bussell.  That's what I can remember right now.

Q.    Okay.  Thank you.  Are you aware whether any of the people you just named, the men that you just named, were determined to have lied during the course of a company run internal investigation?

A. POOLOS

MR. IADEVAIA:  Objection.

You can answer.

A.    Am I aware of whether anyone was found to have lied or am I aware of whether anyone had lied?

Q.    The former.

A.    I don't know.  I'm...I'm not privileged to their HR records.

Q.    Are you aware of any of those men that you identified...are you aware whether any of those men that you identified had been found by the company to have engaged in retaliation, in violation of company policy?

MR. IADEVAIA:  Objection.

You can answer.

A.    I don't know.

Q.    Okay.  Which of those men, if any, held the title of producer?

A.    Okay.  Shachar Bar-On is a producer. Michael Gavshon, Ira Rosen, Michael Radutzky, Rich Bonin.  Bill Owens has producer in his title, as did Jeff Fager.  Will Croxton, I think, has a producer title.  David Levine has an associate producer title, I think.

Page 199

A. POOLOS

Q.    Okay.    Are all of the folks you just mentioned -- were they employed by 60 Minutes?

A.    Yes.

Q.    Okay.    To whom did Bar-On report at the time you claim he engaged in inappropriate workplace conduct?

A.    Lesley Stahl, Bill Owens, Jeff Fager and Alison Pepper.

Q.    Same question for Ira -- if you need me to repeat it, I'm happy to, but same question for Ira Rosen.

A.    Ira Rosen, I don't know who his correspondent was.    So he would have reported to whoever that correspondent was, but management would have been the same, Alison, Bill, Jeff.

Q.    Same question for Gavshon.

A.    Again, I don't know -- Gavshon worked for more than one correspondent, so he would have reported to more than one.    Bill Owens, Jeff Fager at one point, Alison Pepper.

Q.    Same question for Radutzky.

A.    Same answer with the correspondents, I don't know who they were.    Same answer for

Page 200

A. POOLOS

Radutzky with the three managers.

Q.    And...and Bill Owens reported to whom at the time you claim he engaged in inappropriate workplace conduct?

MR. IADEVAIA:  Objection.  Who?

MR. ZUCKERMAN:  Bill Owens.

MR. IADEVAIA:  NO, no, no, I'm sorry, you asked who did "he" report to?

MR. ZUCKERMAN:  Report to at --

MR. IADEVAIA:  Who's the "he"?  Sorry, I just want to --

MR. ZUCKERMAN:  Bill Owens.

MR. IADEVAIA:  Oh, sorry, okay.

THE WITNESS:  Bill Owens would have reported to Jeff Fager at one point.

BY MR. ZUCKERMAN:

Q.    Well, at the point -- I just want to be clear.  We're talking about the point at which you believe Bill Owens engaged in inappropriate workplace conduct and was treated better than you.

A.    Well, there's three managers, so Jeff Fager, Susan Zirinsky and Neeraj Khemlani, but like that would have been not

Page 201

A. POOLOS

all at the same time.

Q.    Okay.  At the times that Bill Owens engaged in...in this alleged inappropriate conduct, what was his title?

You said it had -- I think you said it had producer in his title but I don't think you gave us his title.

A.    He, he was...he was executive editor and at one point and executive producer --

Q.    Okay.

A.    -- at another point.

Q.    Okay.  And what about Mr. Fager, what was his title or titles at the time you claim he engaged in inappropriate conduct and was treated better than you?

A.    I think he was, I think his title was -- like he was like the head of CBS News --

Q.    Okay.

A.    -- and then the executive producer of 60 Minutes.

Q.    And to whom did Mr. Fager report, if you know, as head of CBS News?

A.    David Rhodes, and then he

Page 202

A. POOLOS

reported -- I think he reported to somebody before David, but I don't know who that was.

Q.    And as executive producer, I think was the title you said?

A.    He...he had those two titles concurrently.

Q.    I see.  Thank you.  And finally Will Croxton, was he a producer at the time you claim that he engaged --

A.    He was --

Q.    -- in inappropriate conduct and was treated better than you?

A.    He, Will, was a digital producer. His boss -- bosses would have been Matt Polevoy, Tanya Simon, Bill Owens, and I think that's it.

And I, I'm sorry, Lyle -- I think I made a mistake because all of those producers I mentioned, when Tanya Simon was promoted they also, in -- when those times overlapped they would have reported to her too, when she stepped into Bill's role.

Q.    Okay.  Got it.

A.    So like Michael Gavshon reported to

Page 203

A. POOLOS

her.

Q.    Okay.  Did any of the alleged conduct that you're referring to that these men engaged in occur after Bill Owens was promoted into his current position?

MR. IADEVAIA:  Objection.

You can answer.

A.    I think so, yes.

Q.    Okay.  Which of these men engaged in inappropriate conduct after Mr. Owens was promoted into his current position?

MR. IADEVAIA:  Object, same objection.

Go ahead.

A.    Okay.  So I, I think...I think Michael Gavshon, Richard Bonin, Shachar Bar-On, Matt Richman, Will Croxton, David Levine, Dan Bussell, I think.  And maybe Ira Rosen and Michael Radutzky, but I don't know the dates.

Q.    Were you aware of this alleged inappropriate conduct at or about the time it occurred?

A.    Sometimes, yes.

Page 204

A. POOLOS

Q.    And did you report any of it to Human Resources?

MR. IADEVAIA:  Objection.

You can answer.

A.    No.

Q.    And did you report it to the anonymous tip line that we talked about earlier today?

A.    No.

MR. IADEVAIA:  Objection.

You can answer.

A.    No, I didn't.

Q.    Are you aware of anyone employed by any of the defendants who lied in the course of an HR investigation?

A.    Well --

Q.    You know what, let, let me -- I, I -- it was confusing before and you corrected me, and I appreciate it.  Let me...let me correct myself here, if you don't mind, because I think it would make it easier.

Are you aware of anyone employed by any of the defendants who one of those defendants knew had lied in the course of an

Page 205

A. POOLOS

HR investigation?  Meaning that it was known to the company, the lie was known to the company.

MR. IADEVAIA:  Objection.

You can answer.

Q.    Do you understand the question?

A.    I'm sorry, I'm -- can I just rephrase it --

Q.    Yeah, please.

A.    -- see if I'm right?

Q.    Sure.

A.    You're asking was I aware that any of the people I've named lied to Human Resources?

Q.    No, we -- we've gone over that, I'm -- so aside from what you've already testified to, are you aware of any other -- any instance in which the company, one of the defendants, became aware that any employee lied during the course of any investigation, HR investigation?

MR. IADEVAIA:  Objection.

You can answer.

A.    I...I wouldn't know.  I don't know.

Page 206

A. POOLOS

Q.    Okay.  Are you aware of anyone employed by any of the defendants who one of the defendants knew had retaliated against someone who filed an internal HR complaint?

MR. IADEVAIA:  Objection.

You can answer.

A.    Yes.

Q.    Do you understand the question?

A.    Yes.

Q.    Okay.  And your...your answer is yes?

A.    Yes.

Q.    Who's that?

A.    Michael Gavshon retaliated against his subordinate when she filed a complaint against him.

Q.    And who was the subordinate?

A.    ███████████████

Q.    Okay.  And how did you become aware of -- can you pronounce the last name for me, of the subordinate?

A.    ████████  I think that's how you --

Q.    ████████  okay.

A.    -- pronounce it, ████████

Page 207

A. POOLOS

Q.    How did you become aware of Ms. ██████████ complaint?

A.    Two ways.  One, everyone was talking about it at the show, so there was a lot of discussion, and then eventually it was made public in a New York Times article.

Q.    And what's, what's the summary or what's the -- what was the gravamen of her complaint, as you understood it?

A.    I think it, it had two -- a couple parts to it.  One was that he had texted her a photo of his penis and that she had some kind of documentation of his becoming blackout drunk and that he had a really severe temper.

Q.    And how -- what was your understanding of the nature of the retaliation by Gavshon towards her?

A.    He kicked her off of all of her stories and prevented her from working.

Q.    And about when did this occur?

A.    I don't know the dates.

Q.    And Mr. Gavshon at that time, was he stationed in the United Kingdom to perform work?

Page 208

A. POOLOS

A.    I think he's still based in London but he comes to the U.S., as I remember, often to finish stories and edit and get them screened.

Q.    And...and what's your understanding of the current employment circumstances of this woman whose name I'm going to have trouble pronouncing again, but Mr. Gavshon's --

A.    ███████████████

Q.    Yes.

A.    I don't know when she left 60 Minutes.  I think she's currently working for the New York Times.

Q.    Do you know why she left 60 Minutes?

A.    I think because of what happened between her and Gavshon.

Q.    Well, when you say "I think," do you know why or are you speculating?

A.    My understanding is that she settled some kind of lawsuit with the company.

Q.    What I'm asking is, what were the circumstances surrounding her departure from 60 Minutes, if you know?

Page 209

A. POOLOS

A.    My understanding is...is that she was removed from working at 60 Minutes.

Q.    And what -- how did you come to that understanding?

A.    That's what people said to me and that's what I read in the New York Times article.

Q.    I'm going to quote the...the French parliamentarian who's seeking the...the chief office up there.  What people, what people said that?

Do you know the clip I'm referring to --

A.    I'm sorry.

Q.    -- Mr. Poilievre?

A.    Oh, I'm sorry, I don't.

Q.    Okay.  Well, I tried to lighten the mood a little bit.  So what --

A.    I appreciate it.

Q.    -- what...what people told you this?

A.    Shachar Bar-On, Richard Bonin.  I remember talking about her situation with Lesley Stahl.  I remember talking about her situation with an editor -- oh, what's his

A. POOLOS

name?  Matt...I can't remember his last name.
I remember discussing it with the AP that they
replaced ████████ with after she made her
complaint, Kate Morris, Jack Weingart, Maria
Gavrilovic, Matthew Magratten, Mark LaGanga.
That's who I'm remembering right now.

Q.    Okay, okay.  So other than
Mr. Gavshon, is there anyone else who you
believe the company had -- one of the
defendants had become aware had engaged in
retaliation?

MR. IADEVAIA:  Objection.

You can answer.

A.    It's a, it's like a tricky...it's a
tricky question.  I'm trying to think.

Well, I think --

Q.    I'm not -- I'm definitely not trying
to trick you.  So the elements of the question
are that you're aware of an instance in which
the -- one of the defendants became aware that
an employee engaged --

A.    Right.

Q.    -- in retaliation in violation of
its policies.

Page 211

A. POOLOS

A.    Okay.  I think Michael Radutzky retaliated.  I think --

Q.    Again, while I appreciate your answer saying you think he did, what I'm asking is, are you aware that the company concluded whether Mr. Radutzky engaged in retaliation?

MR. IADEVAIA:  Objection.

You can answer.

A.    Oh, I...I don't know.  I don't think I would be able to know.

Q.    Okay.  So just now, going back to Mr. Gavshon, are you aware of whether the company concluded that Mr. Gavshon engaged in retaliation?

MR. IADEVAIA:  Same objection.

Go ahead.

A.    I don't know.

Q.    Who do you believe Mr. Radutzky retaliated against?

A.    ████████████████████

Q.    The same woman?

A.    Yes.

Q.    Did he do so -- did Mr. Radutzky do

Page 212

A. POOLOS

so in --

A.    Oh, I'm so sorry, you didn't ask about Gavshon, you asked about Radutzky?

Q.    Yes.

A.    I'm sorry.

Q.    Okay.  No worries.

A.    I take that back.  Can I?

Q.    Yes.

A.    Mr. Radutzky, I understand, retaliated against ███████████ and I think ███████████████

Q.    And how did you come to that understanding?

A.    There -- I understood from discussing it with people at work.

Q.    Were any of those people at work HR employees?

A.    No.

Q.    Were any of them executives of the company?

A.    You know, I couldn't say for sure, but I think I talked about it with Tanya but I really couldn't say for sure.

Q.    Okay.

Page 213

A. POOLOS

A.    And I think Bill and I talked about Radutzky and Rosen at one point, but I...I couldn't remember exactly.

Q.    You can't remember now, you mean?

A.    Yeah, I know we had a conversation with Lesley about those two, but I can't remember -- it was negative about them, but I can't remember exactly what he said.

Q.    Other than you -- your complaint against Shachar Bar-On made following the termination of your employment, are you aware of any other employee complaints against Shachar Bar-On?

A.    HR complaints?

Q.    Yeah.

A.    I don't know.

I know the AP that replaced me told me that she had a lot of issues with him, but I don't know whether she escalated it to HR.

Q.    Do you know what those -- were those issues related to inappropriate conduct in the workplace or were those issues related to a conflict, working-relationship conflict that she had with Shachar Bar-On?

Page 214

A. POOLOS

A.    I remember her telling me that Shachar would take credit for her work, that he cut her out of important meetings with Lesley Stahl and that he was trying to prevent her from advancement.

MR. ZUCKERMAN:  Okay.  It's almost been an hour and a half.  Do you want to take a quick break?

MR. IADEVAIA:  Sure, let's take a break.

MR. ZUCKERMAN:  Yeah, okay.

THE WITNESS:  Thank you.

VIDEO TECHNICIAN:  The time is 2:40 p.m. and this marks the end of Media Unit No. 3.

(Recess taken.)

VIDEO TECHNICIAN:  The time is 3:05 p.m. and this begins Media Unit No. 4.

MR. ZUCKERMAN:  I'm placing before the witness what's been marked as Defendants Exhibit 6, entitled CBS News "Staff Agreement."

(Whereupon, Defendants Exhibit 6,

Page 215

A. POOLOS

Staff Agreement CBS_1-12, was marked for identification, as of this date.)

BY MR. ZUCKERMAN:

Q.    I will not be quizzing you on any particular provision, but do you recognize that document?

A.    Yes, I do.

Q.    And for the record, what is it?

A.    This is the contract -- I think it was...I think it was my last contract.

Q.    Okay.  And if you could turn to the last page, let me know if that's your signature that appears.

A.    That's my electronic signature, yes.

Q.    Okay.  And if there's a date on there, does that seem to accurately reflect the date on which you signed it?

A.    I see a date on this document at the bottom, but I don't see a date saying [where] I signed it.

Q.    Okay.  Is that the May 2021 staff agreement?

A.    Yes, it's the...it's the May 30, 2021 staff agreement, and there is a date at

Page 216

A. POOLOS

the bottom.

Q.    Okay.  Is...is this the contract that you claim in this lawsuit was breached?

A.    Yes.

Q.    And you entered into this contract with CBS News Inc., correct?

A.    Yes.

Q.    Okay.  How do you believe CBS News breached this agreement?

A.    They breached my contract by not paying me severance and I believe they breached this contract by terminating me.

Q.    With respect to the latter, was the -- is...is it your view that CBS News Inc. was not permitted to terminate your employment for any reason prior to its expiration?

A.    Was it my understanding that they could terminate me for any reason at all or --

Q.    Correct.

A.    I didn't know that.

Q.    Do you know that, sitting here today?

A.    Yes.

Q.    And so sitting here today, is it

Page 217

A. POOLOS

your view that CBS News Inc. was permitted by this contract to terminate your employment at any time and for any reason?

A.    I don't know.

Q.    Okay.  That's all I have for that document.

A.    Okay, thank you.

Q.    Thank you.  Did Tanya Simon ever make a -- any derogatory comment regarding your gender?

A.    I, I remember -- I don't remember specifically what she said, but I remember Tanya being very upset with me for taking a story from Michael Gavshon, and I remember she was very angry at Lesley and I and kind of accused us of stamping our little feet or something.

Q.    And that phrase - and I'll use the phrase we talked about before - in sum and substance, that phrase "stamping your little feet," did you take that to be gendered?

A.    Yes.

Q.    Okay.  Anything else with respect to Tanya Simon?

Page 218

A. POOLOS

A.    I, I remember Tanya -- no, I don't remember.  I remember other conversations with Tanya but I don't remember in regards to your question.

Q.    Did Maria Cottone ever make any derogatory comments regarding your gender?

A.    Not that I can remember.

Q.    Did Renee Balducci ever make any derogatory comments regarding your gender?

A.    Yes.

Q.    What comment or comments did she make?

A.    In my phone call with her on that Saturday, I remember her just giving me a really hard way to go about everything I said to her and telling me that I was a bully, and I remember her kind of saying that I mishandled everything and -- that's what I remember.

Q.    Okay.  Did Cindy Glasgow ever make any derogatory comment regarding your gender?

A.    Not that I can remember.

Q.    Did Bill Owens ever make any derogatory comment regarding your gender?

Page 219

A. POOLOS

A.    Yes.

Q.    What did he say?

A.    Bill Owens has told me in the past that I was a good girl and to be a good girl. That's what I can remember.

Q.    On how many occasions did he use the phrase "good girl" with you?

A.    I don't remember.  Maybe a handful.

Q.    Do you remember the first time he used that phrase with you?

A.    No.

Q.    Do you remember any of the times that he used that phrase with you?

A.    I remember him saying that around me securing this Iran story and I think a later Iran story that I was working on --

Q.    Did you --

A.    -- but, but I can't -- but that doesn't mean there weren't other times, I'm just not remembering them specifically.

Q.    What was the con -- if you remember, what was the context of this phrase "good girl" which he made allegedly in connection with you securing the Iran story?

Page 220

A. POOLOS

A.    Like you're being a good girl kind of thing, that was the imply -- implication.

Q.    For having secured the story?

A.    Yes.

Q.    Okay.  Any other...is there any other instance you remember him using that phrase?

A.    I don't remember.

Q.    Okay.  And any other derogatory comments you recall by Bill Owens regarding your gender, other than what you've already testified to?

A.    I don't remember.

Q.    I know we discussed this a little bit before.  I think I just have one...one question about this.  You claim -- strike that.

You asserted post-termination workplace complaints to CBS, correct?

A.    I'm sorry, can you ask --

Q.    Sure.

You asserted a complaint about your employment following your discharge, correct?

A.    Yes.

Page 221

A. POOLOS

Q.    Okay.  And that was communicated to your employer by your -- through your counsel, correct?

A.    Yes.

Q.    Okay.  And do you recall that communication first occurring in a phone call between your counsel and Ms. Ahmed, who's sitting next to me, on or about February 25, 2022?

A.    I don't know.

Q.    Do you know whether it was in a phone call that that complaint was --

A.    I think so.

Q.    -- submitted?

A.    I think so.

Q.    I'm not sure I got all this information before, so I just want to follow up on a couple quick things.

David Levine, was he an associate producer?

A.    I believe he still is an associate producer, yes.

Q.    Okay.  And has he always reported to -- well, to whom did he report during your

Page 222

A. POOLOS

employment?

A.    He reported to Michael Gavshon, he then reported to Nichole Marks, and concurrently with both of those producers he reported to Bill Owens, Tanya -- and Tanya Simon.

Q.    Okay.  And Matthew Richman, what was his title during your employment?

A.    He was -- I think his title was like senior editor for 60 Minutes.

Q.    And do you know to whom he reported?

A.    Bill Owens and Tanya Simon.

Q.    Okay, great.  Who was Jennifer - and I may butcher the last name - Janisch, J-A-N-I-S-C-H?

A.    Who was she?

Q.    Who is she?

A.    Who is she?

She's a friend of mine.

Q.    In what profession is she employed?

A.    She is a director, filmmaker, journalist.

Q.    Okay.  And when you say a friend of yours, did you meet her through work or do you

Page 223

A. POOLOS

know her personally through your neighborhood or college or you grew up with her in grammar school?

A.    I met her, I met her socially...I think a decade ago, maybe longer.

Q.    Did you meet her in a professional environment the first time you met her or in a social environment?

A.    A social environment.

Q.    What was that environment?

A.    A bowling alley.

Q.    And were you there for -- with your work colleagues or were you there with --

A.    No, I was there with friends.

Q.    Okay.  Who's Jennifer McGee?

A.    That's a childhood friend from high school.

Q.    And what's her profession?

A.    I think she works for a nonprofit.

Q.    By the way, was Jennifer Janisch ever a reporter?

A.    She was a producer.

Q.    A producer.

Do you know who -- by whom she was

Page 224

A. POOLOS

employed?

A.    CBS News.

Q.    And do you know when she was employed as a producer by CBS News?

A.    I do not.

Q.    Who is Jill Baza, Bazer [ph]?

A.    Bazar.

Q.    Okay.  B-A-Z-A-R, for the record.

A.    Jill Bazar is a friend through college circles.

Q.    And is she employed in journalism?

A.    No, she's a teacher.

Q.    Okay.  Who's Kerry Rubin?

A.    Kerry Rubin is a producer at CNN.

Q.    How long has she held that role; do you know?

A.    I think sixteen years.

Q.    Who is Mark Carnahan, C-A-R-N-A-H-A-N?

A.    A friend from college.

Q.    And what's his profession?

A.    He works in the banking sector.

Q.    Who is Mohamed Bazzi, B-A-Z-Z-I?

A.    He's a very old friend of mine, he

A. POOLOS

is a professor at NYU.

Q.    Was he ever a journalist for Newsday?

A.    Yes.

Q.    When was that?

A.    I don't know what years he was there.

Q.    And does he teach journalism at NYU?

A.    He runs the Kevorkian Center, which is the center on Middle East studies.  I think it's Middle East studies.

Q.    Okay.  Who is Moises, M-O-I-S-E-S, Velasquez-Manoff?

A.    He's a friend of mine, he is a reporter for the New York Times.

Q.    And how did you first meet Moises?

A.    I first met Moises at Columbia University.

Q.    You were both students?

A.    Yes.

Q.    Okay.  Who is Rita Parikh, P-A-R-I-K-H?

A.    Rita is a friend from high school.

Q.    Okay.  Two more, almost done.

Page 226

A. POOLOS

Who is Sabrina Parke, with an E at the end of Parke?

A.    Sabrina Parke is a producer for Luminant Media.

Q.    And who is Simon Ostrovsky?

A.    Simon Ostrovsky is a journalist.

Q.    Okay.  Do you recall a text thread that was produced in this litigation between you and Ben Finley?

A.    No, I...I don't know which text thread you're referring to.

Q.    Who is Ben Finley?

A.    Ben Finley is a friend of mine who is a freelance producer for MSNBC.

Q.    Did he ever work for CNN?

A.    Yes.

Q.    Was he a senior editorial producer at CNN?

A.    At one point, yes.

Q.    And was that between, to the best of your recollection, spring of 2020 and winter of 2024?

A.    I don't know.

Q.    Do you know if he just recently --

Page 227

A. POOLOS

well, strike that.  Let me see if I can refresh your memory.

Do you...do you recall a text thread with him in which you had written about Lesley Stahl, quote, she's awful, hate her, you probably saw that bitch Collette?

A.    I don't remember.

Q.    Does that sound like something you would write to Ben Finley?

MR. IADEVAIA:  Objection.

You can answer.

A.    I...I don't know what the context is of that comment.

Q.    Do you recall sending a picture of Collette from your Twitter in...in this text thread and writing, (as read):

Look at this crazy photo my friend just found of the AP.  I wish I had seen this before I hired her.

A.    Yeah.

MR. IADEVAIA:  Object -- objection.

Go ahead.

A.    I didn't take that -- I don't think

Page 228

A. POOLOS

I took that from my Twitter, I think I forwarded that from another friend.

Q.    Well, why were you circulating that photo of Collette?

A.    Why was I circulating that photo of Collette?

My friend sent it to me initially because she thought it had come from the same group of photos that had shown up in a Daily Mail article.

Q.    But why were you sending it to other people?

MR. IADEVAIA:  Objection.

You can answer.

A.    Why was I sending it to other people?

Q.    Yes.

A.    I had no reason to not send it.

Q.    But what was your reason for sending it?

A.    I thought it was a funny photo.

Q.    Any other reason?

A.    No.

Q.    I think I asked you about this

Page 229

A. POOLOS

before; I'm sorry.

Who, who is Jenn...and it's B-A-I-K?

A.    She's one of my closest friends.

Q.    And what's her profession?

A.    She is retired.

Q.    Was she a journalist?

A.    No.

Q.    Do you know what her profession was before retirement?

A.    She was some kind of, I think, compliance officer for Morgan Stanley.

Q.    Okay.  Okay.  After your employment with CBS News ended on February 3, did you collect unemployment insurance benefits?

A.    Yes.

Q.    For how long did you collect those benefits?

A.    I think six weeks.

Q.    And when did you start looking for a new job following the end of your employment with CBS News?

A.    Immediately.

Q.    What was the next job you held immediately after the cessation of your

Page 230

A. POOLOS

employment with CBS News?

A.    I was a producer for a Netflix series on the Cold War.

Q.    Were you employed by a production company?

A.    Yes.

Q.    Do you remember the name of that company?

A.    Luminant Media.

Q.    And for how long did you hold that position?

A.    A year.

Q.    Was that the only position you held during that one year?

A.    Yes.

Q.    And when I say position, whether it's employment or as an independent contractor.

A.    That was the only job that I was paid for, but I was looking for other opportunities.

Q.    Okay.  Did you -- were you going to school during this period?

A.    No.

Page 231

A. POOLOS

Q.    Were you volunteering anywhere during this period?

A.    No.

Q.    What sorts of jobs were you looking for, following the end of your employment with CBS News?

A.    I was looking for jobs in the news industry and in the documentary world.

Q.    Any particular jobs?

A.    I applied for a lot of jobs, I applied for a job with ABC News.  They were launching a long...a long-form unit with Hulu. I applied for a long-form -- like kind of a similar job with CNN.  I -- I'm trying to remember all the other places.

I was looking for freelance opportunities at Frontline.  I interviewed with independent production companies.  I'm trying to remember where else.

PB -- I think I applied for something at PBS but I can't remember.

Q.    Did you produce to your counsel all records which would reflect your efforts to gain employment after your separation from CBS

Page 232

A. POOLOS

News?

A.    Yes, I did.

Q.    Okay.  We -- did you become employed by PBS, WNET?

A.    Not technically, I was employed by Ruckus Media that was a subcontractor for a PBS project.

MR. ZUCKERMAN:  Okay.

(Whereupon, Defendants Exhibit 7, Résumé, Pl._24-25, was marked for identification, as of this date.)

MR. ZUCKERMAN:  I'm going to place before the witness what's been marked as Defendants Exhibit 7, which purports to be your CV.

Q.    Is that what that is?

A.    Yes.

Q.    Okay.  Are there any updates to it since that was produced to your attorneys and forwarded onto us?

A.    Yes.  I am co-directing an additional documentary in Ukraine with my co-director, Simon Ostrovsky, so I could add that.

Page 233

A. POOLOS

Q.    Are you employed by an entity, like a production company or a news agency or anything, with respect to that project?

A.    Technically, no.  We have secured some development funding from a couple of nonprofit groups.  And they are paying my co-director, who is going to -- who hasn't yet but will be paying me, but he's not my employer.

Q.    Okay.  Is there anything else you'd like to --

A.    No.

Q.    -- add to that résumé?

A.    No, that's...that's it, and then the...the documentary that's listed has slightly changed in focus but not enough for it to be a meaningful change.

Q.    Is that the one at the top with the "Redacted" --

A.    Yeah.

Q.    -- stamp?

A.    Yeah.

Q.    How, how...how much time have you been spending in Ukraine in connection with

Page 234

A. POOLOS

the current project?

A.    I just returned.  I was there for about two weeks in December.  I was there in twenty -- let's see.  I was there in 2023 several times, maybe on three different trips, one of which was with the Netflix team, and I'll be going back...maybe next month, we'll see.

Q.    Well, stay safe.

How much time each week do you think you're spending on this project?

A.    Well, it's two projects that I'm -- they're both about Ukraine, so probably -- I mean, when we're actively shooting, it's like a 70-hour, 80-hour week.  We took a break over the holidays and I took a break because of this process.  So once we get back it will be, you know, like a 40-hour, 50-hour week.

Q.    Who is Arienne [ph] - if I'm pronouncing that correctly - Day, D-A-Y?

A.    Adrienne.

Q.    Oh, it's a typo.  Adrienne Day, that would be easier to pronounce.

A.    Adrienne Day is a friend of mine.

Page 235

A. POOLOS

Q.    Does Adrienne work in journalism or production?

A.    She has been a journalist but she's now -- I think she's like some sort of communications person at Columbia.

Q.    How did you first meet her?

A.    I met her at Columbia.

Q.    As a student?

A.    Yes.

Q.    Okay.  Do you recall writing a message to her which stated, (as read):

         Job sucks because my
      bosses hate me.  I have been
      told today by a woman no less
      that I am aggressive.

A.    I remember complaining to her, yes.

Q.    Who were the bosses that hated you?

A.    Well, it was one boss who had called me aggressive and then later apologized and said she didn't mean that word.

Q.    Okay.  Who was that?

A.    Sarah Huisenga, H -- it's a funky name, H-S-U -- H-S-U-I-E-N-G-A [sic].

Q.    And by whom was she employed?

Page 236

A. POOLOS

A.    Luminant Media.

Q.    Okay.  And I assume you were employed by the same employer?

A.    Yes, she was my supervisor.

Q.    Did you complain about her statement to you with anyone at the company, [Luminary]?

A.    No I spoke directly to her about it.

Q.    Did you have any other workplace complaints in regard to Luminary?

A.    Luminant.

No.

Q.    Luminant, okay.

I may have asked you this at the beginning, and if I did I apologize, I'm not trying to trick you.

Have you asked anyone to be a witness for you in this lawsuit?

A.    No, I have not.

MR. ZUCKERMAN:  Okay.

MR. IADEVAIA:  Maybe after this exhibit we can just take a short break?

MR. ZUCKERMAN:  Absolutely.

MR. IADEVAIA:  Okay.

MR. ZUCKERMAN:  I'm going to do

Page 237

A. POOLOS

both, Jeremiah, interrogatory responses. There's only probably ten questions, total, so I can do them both if you can wait.

MR. IADEVAIA:  Yeah, yeah, I'm okay.

MR. ZUCKERMAN:  Okay.

THE WITNESS:  Yeah, that's fine.

(Whereupon, Defendants Exhibit 8, Plaintiff's Amended Responses to Interrogatories, was marked for identification, as of this date.)

(Whereupon, Defendants Exhibit 9, Plaintiff's Supplemental Responses to Interrogatories, was marked for identification, as of this date.)

MR. ZUCKERMAN:  This one's number eight and number nine.

BY MR. ZUCKERMAN:

Q.    Okay.  The first document I would ask you to look at, Ms. Poolos, is -- has been marked as Defendants Exhibit 8, entitled "Plaintiff's Amended Responses To Defendants' First Set Of Interrogatories."

Do you see that?

Page 238

A. POOLOS

A.    Yes, I do.

Q.    Okay.  And if you can leaf to the very last page, it's titled "Verification."

A.    Okay.

Q.    Is that your signature on the verification page?

A.    Yes.

Q.    Okay.  And you understood that by signing this, you were representing that everything in the responses was true, correct?

MR. IADEVAIA:  Objection.

You can answer.

A.    That I believed them to be true, yes.

Q.    And did you review all the responses before you signed the verification?

A.    Yes, I did.

Q.    And everything in -- I'm sorry.

Was everything accurate, to the best of your understanding, in this document at the time you signed it?

A.    Yes.

Q.    Okay.  Are you currently aware of anything in response to the interrogatories

Page 239

A. POOLOS

that's no longer accurate?

MR. IADEVAIA:  Objection.

I mean, you're going to have to review it.

Do you want her to look through it?

MR. ZUCKERMAN:  Maybe we just do that at like a break if she wants to leaf through it.

MR. IADEVAIA:  Okay.  I mean, I'm not sure I'm going to agree to do that off the record, but I understand what you're saying.

MR. ZUCKERMAN:  Okay.

MR. IADEVAIA:  We'll think about it.

BY MR. ZUCKERMAN:

Q.    Without revealing the details of any privileged discussions you had with your attorneys, did you provide information to your attorneys in order to respond to these interrogatories?

A.    Yes.

Q.    So if can ask -- direct your attention to Interrogatory No. 10.

A.    In this same document?

Page 240

A. POOLOS

Q. Yes, in the same document, Exhibit 8, which is on page 16. I just want to verify something. Interrogatory No. 10 asks you to identify all persons that you supervised during your employment.

Do you see that?

A. Yes.

Q. Okay. In response you identified Collette Richards, Will Croxton, John -- Jack Weingart, Kate Morris and Wren Woodson, Wren, W-R-E-N, Woodson.

Is there any reason you didn't identify Sarah Turcotte?

A. I must have forgotten.

Q. Was it because she complained about you?

MR. IADEVAIA: Objection.

You can answer.

A. I had no idea she had complained about me. I was never told.

Q. At the time you signed the verification --

A. I --

Q. -- you were not aware that Sarah

Page 241

A. POOLOS

complained about you?

A.    No.

Q.    Okay.  If I can have you take a look now at the document marked Defendants 9, which is the Supplemental Response to Defendants' First Set of Interrogatories, same -- feel free to leaf through it, but same question with respect to the final page.

Is that your signature on the verification page?

A.    Yes.

Q.    And did you review these responses before you signed the verification?

A.    Yes.

Q.    Was everything accurate, to the best of your understanding, at the time you signed it?

A.    Yes, I believe so.

Q.    Okay.  If I can refer you to Interrogatory No. 1, it asks you to identify people who you believe have knowledge of the facts underlying the claims asserted in this lawsuit or any of the defenses that were raised.  I'll let you get to that, page 3.

Page 242

A. POOLOS

A.    Page 3?

Q.    Yeah.  Okay.  You've already testified at length about Bill Owens, but is there anything other than what you've already testified about -- strike that.

Other than what you've already testified about, does Bill Owens have any additional information that you think is relevant to your claims?

MR. IADEVAIA:  Objection.

You can answer.

A.    Do I think Bill Owens has additional information about my claims?

Q.    So you've listed these individuals as people with knowledge of facts relevant to your claims or to the company's defenses.  And I don't want you to have to repeat everything you've already said about the folks we've been talking about, which includes Bill Owens, Tanya Simon, Lesley Stahl, Alison Pepper, Shachar Bar-On, Collette Richards, Scott Bronstein, Renee Balducci, Maria Cottone, Cynthia Glasgow, Jeff Fager, Ira Rosen, Michael Radutzky, Michael Gavshon, Will

Page 243

A. POOLOS

Croxton, David Levine, Matthew Richman,

████████████████████ Jack Weingart, Matthew

Magratten.  I think that's it.

With respect to those folks --

A.    The folks you just named?

Q.    Yeah, that I just named, because you've testified about them.

A.    Okay.

Q.    Do those people have any additional information that you claim is relevant to...to your claims in this case?

MR. IADEVAIA:  Objection.  I don't even know how she can answer that question.

Q.    Yeah, you know what, let's do it in reverse and then let me think about that, honestly.

How about this.  Who's Jennifer Gordon?

A.    I think Jennifer Gordon works in HR but I'm not sure.

Q.    And what...what information does this person have that's relevant to your claims?

A. POOLOS

A.    My understanding is she conducted the investigation into me after I was terminated.

Q.    Okay.  I skipped one, I'm sorry.

Claudia Weinstein, who is she?

A.    Claudia Weinstein is a senior producer at 60 Minutes.

Q.    And what information does she have relevant to your claims?

A.    I think she might have information about Scott Bronstein, because I believe they were friends and in contact about Collette Richards' employment.

Q.    With 60 Minutes?

A.    With 60 Minutes and, and...and having her work with me.

Q.    Does Claudia have information about your interactions with Mr. Bronstein?

A.    I'm not sure.

Q.    Okay.  Skipping down to Neeraj Khemlani.

A.    Yes.

Q.    What information does Neeraj Khemlani have -- Khemlani have about your

Page 245

A. POOLOS

claims in this action?

A.    I don't know specifically what information he has, but he's -- he was the head of the news division, so I'm certain he's privy to things I wasn't privy to.

Q.    Who is ███████████

A.    ███████████    was a senior producer at the show.

Q.    When you say the show, what are you referring to?

A.    60 Minutes.

Q.    What information does she have about your claims in this action?

A.    She has information about the differential treatment of men at 60 Minutes.

Q.    Who is Mehmet Dilsiz, D-I-L-I-S-Z [sic]?

A.    I think -- I don't...I don't know exactly what his job is, but I think he works in upper management at the company.

Q.    60 Minutes, CBS News?

A.    He's not at 60 Minutes.  I believe he's -- I'm not sure what his exact title is but he has some...I think he has some

Page 246

A. POOLOS

oversight over CBS News.

Q.    What information does he have about your claims in this lawsuit?

A.    Again, I don't know.

Q.    Okay.  Who's George Cheeks?

A.    At the time, I think George Cheeks was the head of CBS.

Q.    What information does he have about your claims in this lawsuit?

A.    I don't know but he was Bill Owens' supervisor.

Q.    Who's Bob Bakish?

A.    Bob Bakish, I think he was -- his title was like he was the head of the whole company.

Q.    What information does he have about your claims in this lawsuit?

A.    I don't know but he would have been one of Bill's bosses.

Q.    Who's Wendy McMahon?

A.    Wendy McMahon is now one of the executives in charge of the company.

Q.    What information does she have about your claims in this lawsuit?

Page 247

A. POOLOS

A.    I believe Bill had to report to her as part of his management claim -- or his chain.

Q.    Who is Mark LaGanga...LaGanga?

A.    Mark LaGanga is a staff cameraman for 60 Minutes.

Q.    What information does he have about your claims in this action?

A.    Mark LaGanga is aware of the ways men are treated differently than women at CBS News.

Q.    And you haven't spoken to him about being a witness in this case?

A.    No.

Q.    Who is ███████████████

A.    ██████████████ was an associate producer at 60 Minutes for...I believe Michael Radutzky and Ira Rosen.

Q.    What information does Gabrielle have about your claims in this case?

A.    Gabrielle has her own experience of the ways that women are discriminated against at the company.

Q.    How do you know that?

Page 248

A. POOLOS

A.    She's told me.

Q.    Did you have those discussions with her during your employment, after your employment or both?

A.    Both.

Q.    Okay.  Have you asked her to be a witness in this case?

A.    No.

Q.    Who's Frank Divine?

A.    Frank Divine was a senior producer at 60 Minutes.

Q.    And what does he know about your claims in this case?

A.    I don't know what he was privy to. I know that he was part of a senior producer conversation when I was fired and he contacted me to express his disappointment that I had been fired.

Q.    Who's Kate Morris?

A.    Kate Morris is an associate producer at 60 Minutes.

Q.    What information does she have about your claims?

A.    Kate Morris worked with Michael

Page 249

A. POOLOS

Radutzky.  She was the person who replaced ███████ when ███████ was prevented from working on her stories, and Kate's aware of what happened to me.

Q.    Who's Nicole Young?

A.    Nicole Young is a senior producer at the show.

Q.    And what information does she have about your claims?

A.    Nicole is aware of the issues I was having with Collette Richards prior to her filing a complaint and she's aware of -- has her own experience and is aware of the discriminatory treatment of women at the show.

Q.    Who's Matthew Lev?

A.    Matthew Lev is an editor at 60 Minutes.

Q.    And what information does he have about your claims in this action?

A.    He witnessed the sexual harassment [of] Shachar Bar-On, he spoke to me about Michael Radutzky.

Q.    I...I think you said witnessed the sexual harassment of Shachar Bar-On.

Page 250

A. POOLOS

Did you mean by Shachar Bar-On?

A.    Yes --

Q.    Okay.

A.    -- he witnessed Shachar Bar-On sexually harassing me.

Q.    And who is Barney Gimble?

A.    Barney Gimble is a partner in a communication firm whose name I cannot remember.

Q.    And what information does he have about your claims in this action?

A.    Barney Gimble filed his own complaints about Collette Richards, when I was suspended, with Tanya Simon.

Q.    So did Barney work for a communications firm that was a vendor of CBS News?

A.    No, he worked for a communications -- or he works for a communications firm and he was managing the interview with one of his clients on our show, and he had threatened to pull his client out of the interview and pull all of his firm's clients from appearing on 60 Minutes based on

Page 251

A. POOLOS

his communications with Collette Richards.

Q.    And who was his client?

A.    Dan -- I think his name was Danny Fenster.

Q.    Who is Jason Rezaian, R-E-Z-I-A-N [sic]?

A.    Jason Rezaian is a Washington Post columnist.

Q.    What information does he have about your claims in this case?

A.    He made a separate complaint about Collette Richards and her behavior.  He was interviewed in the same piece.

Q.    Who did Jason and Barney file these complaints with?

A.    My understanding is that Barney Gimble spoke with Tanya Simon.  I don't know who Jason Rezaian complained to, only that he told me he complained about Collette Richards' performance and behavior to someone senior, but I don't know who it was.

Q.    Who is █████████████

A.    ███████ was an associate producer for Ira Rosen.

Page 252

A. POOLOS

Q.    And what information does ▓▓▓▓ have about your claims in this case?

A.    ▓▓▓▓ has experience with discriminatory -- with the discriminatory workplace at 60 Minutes.

Q.    Who is Sara Kuzmarov?

A.    Sara Kuzmarov is -- I think she's now a producer on the medical unit at CBS News, but she used to be an associate producer at 60 Minutes who managed all the awards submissions.

Q.    What information does she have about your claims in this action?

A.    She has information about how my work was prevented from being submitted for awards.

Q.    And by your work, are you referring to work that resulted in...in an interview by Lesley Stahl?

A.    Well, pieces I produced with Lesley, yes.

Q.    So Lesley's work as well as your work?

A.    Pieces I produced with Lesley, yes,

Page 253

A. POOLOS

it's Lesley's work as well.

Q.    Lesley ever complain that she had work that was prevented from being submitted for awards?

A.    Lesley -- A, I don't know, because Lesley and I weren't talking; but, B, Lesley had no idea that there were pieces that management had said they were going to submit.

Sara had reached out to me to say can you start preparing your submissions, your essays, and then told me that they had -- they weren't going to submit them.

Q.    Who else besides you had an understanding that pieces were going to be submitted for awards and then ultimately were not submitted for awards, if anyone?

A.    Collette Richards, Sara Kuzmarov and Bill Owens, maybe Tanya Simon too.

Q.    Okay.  Which pieces?

Is "pieces" the right phrase, "stories"?

A.    You can say both.

Q.    Okay.

A.    I can't remember which pieces

Page 254

A. POOLOS

specifically.  I think it was transgender healthcare, and I think they were maybe submitting that piece or maybe submitting a collection of pieces for newswomen -- New York Newswomen awards, I think.

Q.    Transgender healthcare, that was the...that was the story that GLAAD, G-L-A-A-D, was very upset about, correct?

A.    Yes.

Q.    They were...they expressed their upset about it both before and after it aired; is that correct?

A.    Yes.

Q.    Who is Yvonne Shaw?

A.    Yvonne Shaw is a senior, she's -- I don't know if her title is producer, but she's considered part of senior management at 60 Minutes.

Q.    What information does she have about your claims in this case?

A.    She's aware of my harassment by Shachar Bar-On and she's aware of my, you know, being suspended and terminated.

Q.    And finally, who's Michael Rey?

Page 255

A. POOLOS

A.    Michael Rey is now a producer at 60 Minutes.

Q.    And what information does he have about your claims in this case?

A.    I believe he's aware of how I was treated with discrimination at 60 Minutes, and I believe he's aware that Bill Owens was going to give him my job.

Q.    Did he...did he receive your job?

A.    From what I understand, Bill told him he was working on it, and I think that Lesley interviewed him but was talked out of giving him the position.

Q.    Okay.  Of all of the folks listed in Interrogatory No. 1, none of them you have asked to be a witness in this case, correct?

A.    No.

Q.    Okay.  Have you spoken to any of them --

A.    So --

Q.    I'm sorry, I'll...I'll finish the question.

Have you contacted or communicated any of them -- with any of them concerning

Page 256

A. POOLOS

your lawsuit or the allegations in this complaint?

MR. IADEVAIA: Ever?

MR. ZUCKERMAN: Ever.

MR. IADEVAIA: Objection.

You can answer.

THE WITNESS: Yes.

MR. ZUCKERMAN: Okay. Want to take that break now? I know you've been --

MR. IADEVAIA: Sure.

MR. ZUCKERMAN: -- waiting and I went a little bit longer than I thought.

MR. IADEVAIA: No problem.

VIDEO TECHNICIAN: The time is 3:53 p.m. and this marks the end of Media Unit No. 4.

(Recess taken.)

VIDEO TECHNICIAN: The time is 4:08 p.m. and this marks the beginning of Media Unit No. 5.

MR. ZUCKERMAN: Thanks.

BY MR. ZUCKERMAN:

Q. While we were off the record, Ms. Poolos, you indicated that there was some

Page 257

A. POOLOS

testimony regarding the last series of questions and answers that you wanted to -- I don't know if it's clarify or amplify, so --

A.    Yes.

Q.    -- feel free.

A.    I wanted to add to my answers about a few of the people you asked me about.

You asked me about Neeraj Khemlani. In addition to me believing he has knowledge about my specific set of circumstances, I believe he has overall knowledge about the culture of discrimination at CBS News and at 60 Minutes. And I believe he has knowledge about his own behavior, sexually harassing and abusing female subordinates. And I believe he has knowledge about not being held accountable for his actions by the company.

Mehmet Dilsiz, George Cheeks, Bob Bakish and Wendy McMahon, in addition to having knowledge about my particular situation, I believe they have knowledge about many of the cases of discrimination and sexual harassment at 60 Minutes and the differential treatment of men and the ways that men are not

Page 258

A. POOLOS

held accountable or are treated very differently than women.

In particular, I also think George Cheeks, Mehmet, Bob Bakish and Wendy McMahon know how Neeraj -- how HR and management covered up Neeraj's abuse of subordinate women and sexual harassment of subordinate women and how he was not punished for his behavior.

Q.    Anything else?

A.    I don't think so.

Q.    During the break that we just took, did you discuss this matter with your counsel?

MR. IADEVAIA:  You can answer.

A.    Yes.

Q.    And did your counsel remind you of the information you just gave us today on the record just a couple minutes ago?

A.    I discussed with my counsel that I felt I had misunderstood -- I wasn't answering the question you were asking me.

Q.    Is it that you misunderstood the question or is it that you wanted to provide more information to supplement your responses?

A.    I misunderstood the question.  I

Page 259

A. POOLOS

thought you were specifically asking about my termination.

Q.    Okay.  If I can refer you to the next document, marked as Defendants 9.

A.    I think I'm in Defendants 9.

Q.    Nope, you're on Defendants 9, my apologies.  If I can refer you to the response to Interrogatory No. 2.

And if you look at page 7, where it continues, the last paragraph before the names are listed, this is an interrogatory in which you've identified current or former employees of Defendants with whom you have communicated or whom you have contacted about your intention to pursue legal claims against the defendants or your pursuit of such claims since February 3, 2022.

Do you see that?

A.    Yes.

Q.    Okay.  So have you spoken with Magratten about this lawsuit?

A.    Yes.

Q.    Was your attorney present during that discussion?

Page 260

A. POOLOS

A.    No.

Q.    And what did you discuss with Magratten?

A.    I discussed with Matt Magratten -- I talked with him about the articles that came out after the lawsuit was filed, I talked with him about my termination and I talked with him about the discriminatory treatment I endured. I -- that's what I can remember right now.

Q.    Did you take any notes of that discussion?

A.    I don't think I did.

Q.    Did you record that discussion?

A.    I don't think I did.

RQ*    MR. ZUCKERMAN:  Okay.  If you did either of those things, those documents would be responsive to our --

THE WITNESS:  Yes.

MR. ZUCKERMAN:  -- discovery requests, so I would ask that you pass them along to your counsel.

Q.    Okay.  How about Weingart, have you spoken with him about the lawsuit, Jack Weingart?

Page 261

A. POOLOS

A.    Yes, I have.

Q.    And was your attorney present for that discussion?

A.    No.

Q.    By the way, I'm sorry, with respect to Magratten, when did that discussion happen?

A.    I talked with Matt after -- like immediately after I was fired, so that would have been either that day or the next day, and then I think we talked like -- I couldn't tell you what dates but a handful of times since then, but we haven't been in touch for almost a year now.

Q.    Okay.  All right.  So moving on but back to Mr. Weingart, I think you testified your attorney was not present for that discussion, correct?

A.    Yes.

Q.    Okay.  When did that discussion occur?

A.    I talked with Jack to tell him I had been fired.  We talked several times in the immediate aftermath of me being fired, and I haven't talked to him in a while but -- I

Page 262

A. POOLOS

couldn't tell you the dates, but definitely we talked and/or, you know, texted with each other.

Q.   What was the subject of the discussions and texts?

A.   Well, initially a lot of it was my -- the state of my mental health.  After I was fired he was...he was a godsend.

Sorry.

MR. IADEVAIA:  It's okay, take your time.

A.   I don't know if I would have gotten through that time if he hadn't have been such a good friend.  He was very upset that I had been fired and thought it was par for the course at 60 Minutes and how they treat women. He supported me when I was considering hiring an attorney and bringing a lawsuit but we haven't spoken in a while.

Sorry.

Q.   No, don't be sorry.

Do you still have the texts between you and Mr. Weingart, or...or emails or whatever written communications you have?

Page 263

A. POOLOS

A.    I believe they were all turned over to you.

Q.    Okay.

A.    This is where I'm going to look really horrible.

Q.    You want a minute?

A.    No, I'm okay.

Q.    Okay.

A.    I'm okay, thank you.

Q.    Okay.  We're just moving down the list.  Have you spoken with Mark LaGanga about this lawsuit?

A.    Yes, I have.

Q.    And when did you speak to him about it?

A.    I spoke with him sometime after I was fired.  We've spoken several times since then.

Q.    And what was nature -- or what was the subject matter of those discussions?

A.    The subject matter was discussing the unfair treatment and him just being emotionally supportive of me, probably more so the latter than anything.

Page 264

A. POOLOS

Q.    Okay.  I'm not -- just for the last few and for Mr. LaGanga too, if...if your attorney was present at any of these discussions, just let me know.

A.    Okay, I will.

Q.    Okay.  I'm not going to keep asking you that.

So moving on to ██████████ have you spoken to her about this lawsuit?

A.    Yes, I have.

Q.    And when was that and what was the subject matter of the discussion?

A.    We spoke -- she contacted me after the press picked up the filing and just texted me that she was very sorry about what I had been going through.

We met once for coffee sometime after that, maybe a month later, and she just expressed a lot of disappointment and told me she had gone through a similar experience at 60 Minutes.

And then we spoke another time on the phone, kind of about her experience at 60 Minutes and what had happened to her and

Page 265

A. POOLOS

how she had been harassed and retaliated against, and then also talking about other professional opportunities for me.

Q.    Did you record or take notes of this discussion with Ms. ▇▇▇▇▇

A.    No, I did not.

Q.    And if I asked you this, I apologize.

Did you record or take notes of your discussion with or discussions with Mr. LaGanga?

A.    No, I did not.

Q.    Okay.  Have you spoken with Kate Morris about this lawsuit?

A.    Yes, I have.

Q.    And when did you have those discussions and what was the subject matter of them?

A.    In a similar vein as Jack Weingart, I talked with Kate sometime -- you know, pretty soon after I had been fired, and we talked about the unfair treatment, we talked about her own experiences being treated badly at 60 Minutes and we talked about, you know,

Page 266

A. POOLOS

my intention to bring a lawsuit.

Q.    And I skipped one name, which is Nicole Young.

Did you speak with Ms. Young about this lawsuit?

A.    I spoke with Nicole Young after I was fired and I spoke with Nicole Young about my intention to sue.

Q.    Did you take any notes or record that call?

A.    No, I did not.

Q.    And with respect to ███████████ have you spoken to her about this lawsuit?

A.    Yes, I have.

Q.    And when did you have that conversation or conversations and what was the subject matter of them?

A.    ████████ contacted me when news of the lawsuit became public, to express her empathy. We spoke on the phone just about -- at that point the lawsuit had already been filed, so we just talked about -- I just remember her saying, you know, I'm so sorry, I know how hard this is.

Page 267

A. POOLOS

Q.    And lastly, with respect to Mori Rothman, have you spoken with her about this lawsuit -- is it a "her"?

A.    It's a "he".

Q.    He.

A.    I -- Mori was my AP on that Netflix series, so -- and then he also was a cameraman on the PBS documentary I produced.  So I let him know when the lawsuit became public and told him, you know, about my experience.

Q.    Okay.  Do you know Jennifer DePreist?

A.    Do I know Jennifer DePreist?

Q.    Yeah.

A.    Yes, I do.

Q.    Who is that?

A.    Jennifer DePreist was -- I don't know what her title was but she was a producer -- like I don't know if her title was producer or not, but she worked in the Standards team within 60 Minutes.

Q.    Okay.  And have you discussed this lawsuit with her?

A.    I discussed being fired with her,

Page 268

A. POOLOS

because she contacted me right after I was fired.  She was part of the management team that was notified.

I don't know that I have -- I don't think that we were in touch when I filed the lawsuit, so I don't think I talked to her about any of that.

Q.    Okay.  Thank you.  One cleanup question on your...your CV.

Did there come a point in time when you became employed or engaged by Warner Brothers...is it Entertainment, perhaps?

A.    Oh, yes.

Q.    Okay.

A.    I'm so sorry.

Q.    No worries.

A.    I'm really sorry, I completely forgot.  I knew there was something else.

Yes, I was employed by CNN as a freelance producer starting...I think in April of this year -- or 2024 and have officially been taken off their books as of last week.

Q.    How many stories did you produce for CNN?

Page 269

A. POOLOS

A.    I don't know.  I was a segment producer and also freelanced as an editorial producer for Fareed Zakaria, GPS.

(Reporter clarification.)

THE WITNESS:  Fareed, F-A-R-E-E-D, Zakaria, Z-A-K-A-R-I-A, G-P-S.

I think probably I produced less than ten segments.

BY MR. ZUCKERMAN:

Q.    And you said you worked -- I think the phrase you used was "taken off their books" as of last week.

A.    Yeah.

Q.    What does...what does that mean?

A.    It -- so when you're a freelancer at CNN, you know, you're not free -- you're not -- I mean, it depends on the situation.

But in my situation, I wasn't freelancing for them on a daily basis, I was filling in for people who were taking leave. So I filled in during a management sabbatical for like six continuous weeks and then they would hire me to come in when people were taking vacations.

Page 270

A. POOLOS

As part of employment, you're kind of like on that particular show's budget line. And so the executive producer of the show called me and said, I hate to do this, I have to take you off my budget line because we have to -- everybody's cutting out their budgets. I'm hoping I can bring you back, but at present we're just...we're being told to get everybody off the books.

So I think what that means is like I'm no longer going to be in their system, like I won't be getting CNN email.

Q.    Okay.  Did you ever run into Mr. Bronstein while you were working in this role?

A.    I don't think Mr. Bronstein works for CNN anymore.

Q.    Okay.

A.    I think he was let go.

Q.    Okay.  Move on to another topic. What's the total dollar amount of damages you're seeking in this lawsuit?

MR. IADEVAIA:  Objection.

I...I mean, there's damages

Page 271

A. POOLOS

specified in interrogatory responses. Some damages are not subject to calculation, they have to be determined by the jury or the court.

Q.    Well, what are you looking for in this case?

A.    What am I looking for in my dream vision or like what specific number do I have in mind?

Q.    Yeah, what specific number do you have in mind?

A.    That's something I have to discuss with my attorney.

Q.    So you don't have one in mind?

A.    I believe I gave a number initially, prior to filing a lawsuit with CBS, but --

DI*          MR. IADEVAIA:  And I'm going to -- that was for settlement purposes and instruct the witness not to discuss it.

MR. ZUCKERMAN:  Yeah, that's fine.

THE WITNESS:  Yeah.

BY MR. ZUCKERMAN:

Q.    So do you recall having a text exchange with Jenn B-A-I-K...

Page 272

A. POOLOS

A.    Baik --

Q.    Baik.

A.    -- like B-E-C-K.

Q.    Yeah, that's what confusing.

A.    I know, you want to say "Bake."

Q.    Exactly.

A.    Yeah.

Q.    ...In about February 2022, in which you told her, quote, I want a lot of money, like a lot?

A.    I don't know.

Q.    You don't remember that?

A.    I don't remember texting her that in 2022.

Q.    Well, do you remember thinking to yourself, I want a lot of money --

A.    Yes.

Q.    -- out of this case?

A.    Yes.

Q.    What did a lot of money mean to you then?

MR. IADEVAIA:  Objection.

You can answer.

A.    I -- at that time, I...I think I

Page 273

A. POOLOS

felt that millions would be appropriate.

Q.    And did you calculate that in some way?

A.    Well, my lost -- my contract alone was like worth a half a million.  I was pretty aware of the fact that it was going to be very hard for me to find employment that would make up for the salary I made at 60 Minutes, so that was another big chunk, and that is true.

And then just the absolute, you know, emotional havoc it caused and I believe, you know, the professional damage it did to me.

Q.    Are you seeking any money for medical expenses that you incurred as a result of any actions that you claim were taken by the defendants?

A.    It would be nice to have some of my therapy covered because I had a lot of it.

Q.    What do you think that totals through today?

A.    Probably hundreds of thousands of dollars.

Q.    And do you have any documents to

Page 274

A. POOLOS

support those costs; invoices, payments?

A.    Sure, I pay therapists.

RQ*        MR. ZUCKERMAN:  Okay.  We call for the production of any documents used to support the claim for medical expenses.

MR. IADEVAIA:  We'll take it under advisement.

BY MR. ZUCKERMAN:

Q.    Are you seeking any money in this case for the loss of benefits?

A.    Well, I consider the benefits I received from CBS News as part of my compensation, so yes.

Q.    Do you have any round figure as to what that amounts to?

A.    Well, there was my healthcare costs and there was contributions to my retirement plan which stopped, so I...I don't know how much that is.

Q.    Any other components to that healthcare costs -- is...is that the therapy you just talked about or are these additional healthcare costs as well?

A.    Additional healthcare costs.

Page 275

A. POOLOS

Also my, you know, paid time off.

Q.    After you, you were separated from -- strike that.

Were you -- did you participate in the CBS News group healthcare plan, insurance?

A.    You mean COBRA?

Q.    No, during your employment.

A.    Yes.  Yes, I did.

Q.    Okay.  And then following your employment, did you exercise your rights under COBRA --

A.    I --

Q.    I'm sorry, let me finish that question because it's going to -- did you -- following your termination from CBS News Inc., did you continue your group healthcare benefits by exercising your rights under COBRA?

A.    No, I couldn't afford COBRA.

Q.    Okay.  Did you become eligible for any other employer's group health plan following your termination with CBS News?

A.    Yes, my husband's.

Q.    Okay.  How soon after your

Page 276

A. POOLOS

termination from CBS News did you become eligible for your husband's group -- husband's employer's group healthcare plan?

A.   I don't know exactly.  I don't know how fast we set that up.

Q.   Okay.  Were you at least eligible to participate right away even if you didn't set it up for a bit -- a time later?

A.   I...I don't know.  I mean, it's my understanding that most health insurances, if you have a change-of-life scenario, that you can be added but I don't know the specifics of his plan.

Q.   Okay.  When did you first anticipate bringing this lawsuit against the defendants?

MR. IADEVAIA:  Objection.

You can answer.

A.   I think it was sometime in 2023.

Q.   Didn't you retain your current law firm in February of 2022?

A.   I think so, I think it was towards the end of February 2022 --

Q.   Okay.

A.   -- but I couldn't say for sure.

Page 277

A. POOLOS

Q.    Do you recall when you returned your work phone to CBS News?

A.    I don't know the exact date but I believe it was within the first week.  There was an issue of CBS News not porting my phone number back to me, but I think we figured that out within like five days, maybe seven days.

Q.    Does February 8, [2023] sound about right, when you returned your phone to CBS News?

A.    I, I...I think so but I...I don't know.

Q.    Okay.  Did you -- had you retained your current law firm prior to February 8, [2023]?

A.    I don't think so.

Q.    Well, I'll represent to you that Plaintiff's counsel, your counsel, sent a letter saying that they were retained on -- sent a note on February 16, saying they had been retained by you as of February 16.

So with that in mind, does it help narrow down the dates when you may have retained your current counsel?

Page 278

A. POOLOS

MR. IADEVAIA:  Objection.

You can answer.

A.    Well, it makes me think I didn't retain them by February 8, because I remember once we decided --

MR. IADEVAIA:  Whoa, whoa --

THE WITNESS:  Okay.  Sorry.

MR. IADEVAIA:  -- please don't disclose any conversations with counsel.

THE WITNESS:  Okay.

BY MR. ZUCKERMAN:

Q.    Would you have any documents which would reflect the date on which you engaged your current counsel?

A.    I don't know.

Q.    Now, you didn't make a copy of all of your text messages relevant to this case, correct?

MR. IADEVAIA:  Objection.

What...what are you referring to?

Q.    Well, there are -- you didn't preserve all of the text messages on all of your phones that contains information related to your claims in this case, correct?

Page 279

A. POOLOS

MR. IADEVAIA:  Objection.

Q.    You can answer.

A.    I have one phone.  I don't remember whether I backed it up or not before I had to give it back to CBS.  I do know CBS instructed me to keep everything on the phone and that they would keep the phone as is.

Q.    Are you aware that there is sort of a month's long gap in the text messages that were on your phone, particularly with respect to messages that you had with Collette Richards?

MR. IADEVAIA:  Objection.

A.    I'm aware that there were some missing months with...I think everyone on my phone.

Q.    What -- do you remember which months those were?

A.    No, I don't, but I thought it spoke to the fact that I hadn't backed up my phone in a couple months.

Q.    Now, would it refresh your memory if I suggested to you that the gap in the messages with Collette occurred between March

Page 280

A. POOLOS

23, 2021 and May 17, 2021?

MR. IADEVAIA:  Objection.

You can answer.

A.    No.

Q.    Would it refresh your memory that that's the same period that included Collette Richards' bridal shower and wedding?

MR. IADEVAIA:  Objection.

You can answer.

A.    It doesn't refresh my memory about whether there were text messages with her on my phone or not.

Q.    Do you have any other text messages between the dates of March 23, 2021 and May 17, 2021 on your phone?

MR. IADEVAIA:  Objection.

A.    Any other messages with Collette?

Q.    With anybody, any text messages.

MR. IADEVAIA:  Objection.

Go ahead.

A.    I have no idea.  I don't think so, I don't think I have any messages on my phone going that far back.

Q.    And did you have any text messages

Page 281

A. POOLOS

on your phone during that period, on the work phone that you returned to CBS?

MR. IADEVAIA:  Objection.

You can answer.

A.    I have no idea.

Q.    Okay.  Can you think of any reason there would be this gap other than you didn't back up the phone in the cloud?

MR. IADEVAIA:  Objection.

Go ahead.

A.    No, I don't think there's any other reason.

Q.    How would -- how do you back up text messages in the cloud, what...what do you do on the phone?

A.    I...I actually don't backup messages on the cloud, but I would have synced it and backed them up on my own computer, or it would have...it would have automatically synced any time I, you know, plugged in my phone to my computer to charge.

Q.    This is a home computer?

A.    Yeah.

Q.    Have you searched your home computer

Page 282

A. POOLOS

for text message that are relevant to this case?

A.    Yes.

Q.    And have you found any text messages with Collette between March 23, 2021 and May 17, 2021 on your home computer?

A.    I don't know.

MR. IADEVAIA:  Objection.

Go ahead.

Q.    Did you delete text messages on your phone between the dates that we've been discussing?

MR. IADEVAIA:  At any point in time?

MR. ZUCKERMAN:  Yeah, at any time point in time.

MR. IADEVAIA:  Objection.

Go ahead.

A.    I don't remember deleting messages off my phone, during that period of time.

Q.    Who is Alex Weininger, W-E-I-N-I-N-G-E-R?

A.    She's a friend of mine.

Q.    Okay.  How did you meet her?

A.    I met her at CNN.

Page 283

A. POOLOS

Q.    Okay.  And what's her profession?

A.    She's a lawyer.

Q.    Is she an in-house lawyer at CNN, for CNN?

A.    No.

Q.    What does she do for CNN?

A.    She doesn't work at CNN anymore.

Q.    Okay.

A.    She was a producer at CNN and then she --

Q.    Okay.

A.    -- she left journalism and went to law school.

Q.    I see.  And does she practice law now?

A.    Yes.

Q.    Is she your attorney?

A.    No.

Q.    Was she ever your attorney?

A.    No.

Q.    Okay.  Who is Andrew Levine?

A.    Andrew Levine is a friend of mine from college.

Q.    Okay.  What's his profession?

Page 284

A. POOLOS

A.    He's a lawyer.

Q.    And is he your lawyer?

A.    He's my friend.

Q.    Okay.  So is that a no?

A.    No, he is not, I -- he is not my lawyer.

Q.    Was he ever your lawyer?

A.    No.

Q.    Okay.  Did you ever take the SIM card out of your work telephone that you returned to CBS?

A.    Yes.

Q.    When did you do that?

A.    When I returned the phone.

Q.    And where is the SIM card now?

A.    I don't know, I think -- I don't know actually.

Q.    Did you hand it over to your counsel?

A.    I...I don't know.

Q.    Did you put it in a different phone?

A.    I think I used it initially when I signed up for a new phone plan, but I...I don't remember where it is now.

Page 285

A. POOLOS

It was...it was my SIM card with my phone number that I gave to CBS to put in their phone so I could maintain my phone number.

Q.   Do you recall what provider CBS News had on the phone that you used for work; was it Verizon, was it AT&T?

A.   I think it was Verizon.

Q.   And when you were texting with Collette Richards particularly in this time frame of March to May 2021, did you both have iPhones?

A.   I actually don't know if she had an iPhone or an Android.

Q.   Do you recall whether, you know, the messages would pop up for both of you in blue, which would signal an iPhone, or for one of you in green, which would signal an Android?

MR. IADEVAIA:  Objection.

Go ahead.

A.   I'm sorry, but like, honestly, I...I never know the difference, so -- because you can get both even with an iPhone user.

Q.   Was there any other information from

Page 286

A. POOLOS

your phone that was missing perhaps as a result of failing to back it up, like pictures or videos, notes you took, anything of the sort?

MR. IADEVAIA:  Objection.

You can answer.

A.    I don't know.

Q.    You don't know because you never investigated that?

A.    Yes, I've never -- I wouldn't even know how to investigate that.

MR. ZUCKERMAN:  Okay.

MR. IADEVAIA:  And objection to that question retroactively.

Q.    You would agree, would you not, that text messages between you and Collette Richards during the period of March to May 2021 would be highly relevant to this lawsuit, correct?

A.    No, I would not agree.

Q.    Even though those are the occasions on which she had a bridal shower and wedding and complained about the way in which you treated her?

Page 287

A. POOLOS

MR. IADEVAIA: Objection.

Go ahead.

A.    It's my understanding she did not complain about how I treated her around her wedding and in fact she was very appreciative. And from what I understand, the messages between her and I during her bridal shower were included in her complaint.

Q.    So just getting back to my question, you wouldn't agree with my statement that text messages during that period would be relevant to your claims and/or the company's defenses in this matter?

MR. IADEVAIA: Objection.

Go ahead and answer.

A.    No, because Renee Balducci told me explicitly when I spoke with her that Collette's claims against me were not something she was that focused on and that it would have been a nonissue, and Bill Owens also told me he felt I had handled that situation as best as I could.

Q.    And if you had the text messages to reflect all the conversation with -- back and

Page 288

A. POOLOS

forth between you and Collette, that would bear on/that would be relevant to what you just testified to, correct?

MR. IADEVAIA:  Objection.

Go ahead.

A.    He does have those text messages.

Q.    I'm asking you whether in your -- your understanding is that those text messages during that period with Collette Richards would be relevant to your claims and/or the company's defenses in this case?

MR. IADEVAIA:  Objection.

You can answer.

A.    My understanding was that Collette's complaints against me were no longer relevant.

However, I see your point, and I'm sure it was useful for Bill to be able to read the text exchange between Collette and I, if he did read it.

Q.    Okay.  You can understand, can you not, how someone in my position would find it a little suspicious that text messages between you and Collette during this period that covered her wedding and shower are missing?

Page 289

A. POOLOS

MR. IADEVAIA:  Objection.

You can answer.

A.    I mean, I think it's very hard to hold somebody accountable for missing text messages, and the same could be said of Collette Richards, who apparently has no text messages.

Q.    Collette Richards didn't file a lawsuit against you, correct?

A.    Collette --

MR. IADEVAIA:  Objection.

Go ahead.

A.    Collette Richards filed a very significant complaint against me.  And I'm going to assume that she was advised, either by your law firm or by CBS News, that she should preserve all the evidence because of this lawsuit.

Q.    Just answering my question for a second, Collette Richards didn't file a lawsuit against you, correct?

A.    She did not.

Q.    Okay.  Speaking of which, I had asked you if you were ever a defendant in a

Page 290

A. POOLOS

lawsuit.

Do you know someone named Jean Rigzud, R-I-G-Z-U-D [sic]?

A.    Jean...Jean who?

Q.    Oh, Rigaud, R-A-G -- sorry, let me...let me spell it for you.

Yeah, R-I-G-A-U-D.

A.    I, I...I don't know who that is.

Q.    Okay.  No one by that name sued you for anything?

MR. IADEVAIA:  Objection.

Go ahead.

A.    I don't think so.

Q.    Okay.

A.    I don't know.

Q.    You testified previously that you met with your counsel four times in preparation for today.

What dates did you meet your counsel on?

A.    Okay.  I met them on Sunday, I met them last week --

Q.    Sunday, meaning two days prior to today?

Page 291

A. POOLOS

A.    Correct --

Q.    Okay.

A.    -- two days ago.

I met them last Thursday, I met them a week ago today, and I think I met them the prior Friday.

MR. ZUCKERMAN:  Okay.  All right. Let's take five minutes, make sure I don't have any cleanup, and then we'll shift gears and be out of here.

MR. IADEVAIA:  Okay.

VIDEO TECHNICIAN:  The time is 4:46 p.m.  We're going off the record.

(Recess taken.)

(Ms. Dayan enters.)

VIDEO TECHNICIAN:  The time is 5:01 p.m. and we're back on the record.

EXAMINATION

BY MS. DAYAN:

Q.    Ms. Poolos, my name is Lisa Dayan. I'm going to ask you some additional questions today.  All of the instructions you've received from Mr. Zuckerman still apply.

A.    Okay.

Page 321

A. POOLOS

actively putting a story on the air, so he wanted to know why I had to go see a doctor and I told him it was because I was ▮▮▮▮▮▮. And he told me that if I pursued the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I couldn't keep my job and that I should leave New York and go live with my parents or my brother.

Q. Was anyone else present when you had this conversation?

A. No.

Q. Where did it take place?

A. In his office.

Q. Do you recall the date?

A. No, I don't, not off the top of my head.

Q. In relation to when you had the ▮▮▮▮▮▮▮ was it months before, weeks before?

A. It was -- I don't know about months. It was definitely weeks.

Q. Did Mr. Bar-On actually tell you to have an ▮▮▮▮▮▮?

A. He told me I couldn't be employed by 60 Minutes if I had the ▮▮▮ and I should think very seriously about what I was going to

Page 322

A. POOLOS

do.

Q.    Did you tell anyone at 60 Minutes about that conversation with Mr. Bar-On?

A.    I told some colleagues, yes.

Q.    Who did you tell?

A.    I told Maria Gavrilovic, I told Matthew Magratten, I told Jack Weingart, I told Nicole Young, I told Kate Morris.  I think I told Sarah Turcotte.  I can't remember other names right now.

Q.    Did you tell anyone with any supervisory authority about this alleged discussion with Mr. Bar-On?

A.    No.

Q.    Did you tell anyone in Human Resources about that discussion with Mr. Bar-On?

A.    No.

MS. DAYAN:  Before -- I have a few more exhibits to go through.  I just want to take a quick bathroom break.

VIDEO TECHNICIAN:  The time is 5:42 p.m.  We are off the record.

(Recess taken.)

Page 323

A. POOLOS

E V E N I N G   S E S S I O N

VIDEO TECHNICIAN:  The time is 5:54 p.m. and we're back on the record. A L E X A N D R A   P O O L O S, resumed as a witness, was further examined and testified as follows:

MR. IADEVAIA:  All right.  Before we get started, this is Plaintiff's counsel. I am designating as confidential the testimony that -- the question and answers and testimony that Ms. Poolos has given since Ms. Dayan has started questioning the witness, which all relate to the client -- to Plaintiff's emotional distress, and we reserve our right to seek a higher level of a confidentiality designation.

The second thing I want to say for the record is that we have not objected or directed the witness not to answer questions related to her health that goes back several decades.  The reason for that is because we are seeking to avoid having Plaintiff re-called for her deposition.

Page 355

A. POOLOS

seeking an order about from the court, one of which includes or will include a dispute concerning privilege logs.

And we learned some information today that we believe makes us entitled to production of additional documents, so we're just reserving our right to re-call the witness with respect to matters that arise out of those discovery issues.

MR. IADEVAIA:  And in response to that, we want to make clear that we very much object to re-calling the witness on those grounds.

Defendants have had the privilege log and redaction log from Plaintiff for several weeks.  There's been no concerns raised about any of the items or materials listed on those logs.

I also have some questions for redirect.  So I don't know who's defending that, but it's not related to emotional distress if that factors into who's doing it.

Okay.  I will just make clear for

Page 356

A. POOLOS

the record, my name's Jeremiah Iadevaia of Vladeck Raskin & Clark.  I had introduced myself much earlier today.  I am counsel for the witness, Plaintiff Alexandra Poolos.

EXAMINATION

BY MR. IADEVAIA:

Q.    Ms. Poolos, do you recall earlier today, several hours ago, that you provided a list of male employees of CBS in response to defense counsel's question about individuals who you assert were treated better than you at CBS?

A.    Yes.

Q.    Okay.  And was one of those individuals Dan Bussell?

A.    Yes.

Q.    And could you just really quickly -- what was Mr. Bussell's job at 60 Minutes when you were there?

A.    He was a staff cameraman.

Q.    And to your knowledge, does Mr. Bussell still work for CBS?

A.    Yes.

Page 357

A. POOLOS

Q.   Okay.  And what misconduct do you allege that or assert that Mr. Bussell engaged in?

A.   Mr. Bussell sexually harassed me on numerous occasions.  He would constantly comment on my breasts and my body.  He called me baby, his baby, despite me publicly asking him to stop speaking to me that way.

He would make fun of and express disgust about Lesley's body when he was filming interviews of her.  He regularly talked about his sexual proclivities in front of me.  He interfered with field shoots to address his sexual needs.

You couldn't get away from Dan Bussell saying something or hugging you or massaging your shoulders when you worked with him.

Q.   And did you raise concerns about Mr. Bussell's conduct that you just testified to, to anyone at 60 Minutes?

A.   Yes.

Q.   And who?

A.   Ann Marie Kross.

Page 358

A. POOLOS

Q.    And what did you raise concerns to Ms. Kross about?

A.    I told her about Dan sexually harassing me, I told her about him ripping apart Lesley's body and I told [him] about his general inappropriate conduct.

Q.    And did you observe or see Mr. Bussell engage in any of the conduct you've just described in front of any managers at 60 Minutes?

A.    He behaved that way in front of my supervisor, Shachar Bar-On, and he was calling me these names in a large staff gathering which would have been attended by Bill Owens.

Q.    Okay.  One of the individuals I believe you identified as a male employee who you assert was treated better than you was Mr. Richman; is that correct?

A.    Yes.

Q.    Okay.  And what improper, inappropriate conduct do you allege Mr. Richman engaged in?

A.    Mr. Richman was abusive to a lot of producers on the floor.  He would send abusive

Page 359

A. POOLOS

emails, he was just constantly saying inappropriate and awful things.  A group of at least twelve, if not more, producers got together on a Zoom call to discuss his inappropriate and abusive behavior.  I was part of that call, and our complaints were taken to management.

I never heard what management's official response was, but when I raised the issue with Tanya Simon at a later date she told me that she and Bill weren't going to do anything because this was just Richman's personality.

Q.    And who else do you recall was part of the Zoom meeting that you referenced involving Mr. Richman, or about Mr. Richmond?

A.    Ashley Velie, Shari Finkelstein, Draggon Mihailovich, Nicole Young.  There were a lot of us, I can't remember all the names.

Q.    Okay.  And at the time of this Zoom meeting, what was Mr. Richmond's position?

A.    He was a senior editor for 60 Minutes.

Q.    And did Mr. Richmond at that time

Page 360

A. POOLOS

supervise anybody else?

A.    He supervised all the editors.

Q.    And approximately how many editors are we talking about; do you know?

A.    At least ten but probably less than twenty.

Q.    And does Mr. Richmond, to your knowledge, continue to work for CBS?

A.    Yes.

Q.    And to your knowledge, did CBS take any action in response to the concerns that were raised about Mr. Richmond?

A.    No.

Q.    Okay.  I believe one of the men you identified was Will Croxton; is that correct?

A.    Yes.

Q.    And does Mr. Croxton currently work for CBS, to your knowledge?

A.    Yes.

Q.    Okay.  And what is the misconduct that you allege Mr. Croxton engaged in?

A.    He became irate and very threatening to me when I informed him that because he had a full-time job, working for overtime, he

Page 361

A. POOLOS

wouldn't be able to be the primary associate producer on the story I was producing. I thought he was going to hit me. He -- and I...I had to give him this news because Tanya Simon, who was his supervisor or one of his supervisors, told me she was afraid to break the news to him because she was afraid of him.

He was irate when I brought him on an interview with...with Maria Butina. He was inappropriate in a staff screening of that piece. I was told that he slammed the door in the face of another female producer.

I raised concerns about...about Will Croxton with Tanya Simon and with his direct supervisor, Matt Polevoy, who told me he was aware that Will Croxton had serious issues but that he wasn't going to do anything about it.

Q. To your knowledge, did CBS take any action in response to any concerns raised about Mr. Croxton?

A. No.

Q. You mentioned just a moment ago that you were told that Mr. Croxton slammed the door in the face a female producer; is...is

Page 362

A. POOLOS

that accurate?

A.    Yes.

Q.    And who was that female producer?

A.    Nathalie Sommer.

Q.    I believe you also identified in your list David Levine; is that correct?

A.    Yes.

Q.    And does Mr. Levine currently work for CBS, to your knowledge?

A.    Yes.

Q.    And Mr. Levine's position, I believe you testified to earlier, is associate producer; is that right?

A.    Yes.

Q.    Okay.  And what misconduct do you allege at that Mr. Levine engaged in?

A.    Mr. Levine was very abusive to his female producer.  He was abusive to his -- to an assistant of a correspondent, to the point where the correspondent made a complaint about him to Bill Owens.  He was generally known to be a guy who had a terrible temper and erupted on anyone and everyone.

Q.    Okay.  You mentioned --

Page 363

A. POOLOS

A.    And just to add --

Q.    Sorry, go ahead.

A.    -- he is officially an associate producer, but he was technically promoted because he no longer has to do associate producer things, he's allowed to kind of act like a solo producer.

Q.    You mentioned a female producer in connection with Mr. Levine.

Who were you referring to?

A.    Nichole Marks.

Q.    And you mentioned an assistant of a correspondent in connection with Mr. Levine.

Who were you referring to?

A.    I don't know her name.

Q.    And you mentioned that there was a complaint made to Mr. Owens about Mr. Levine, correct?

A.    Yes.

Q.    And you said that Mr. Levine has been promoted in a sense, so that he doesn't have the same limitations or responsibilities as most associate producers; is that correct?

A.    Yes.

Page 364

A. POOLOS

Q.   And to your knowledge, was he given additional responsibility, as you described, before or after the complaint to Mr. Owens?

A.   After.

Q.   Okay.  You mentioned Mr. Gavshon earlier today; is that correct?

A.   Yes.

Q.   And I think you provided some testimony that I'm not going to go through again now.  Do you know if Mr. Gavshon still works for -- or strike that.

Is it your understanding that Mr. Gavshon still works for Defendants?

A.   Yes.

Q.   And to your knowledge, did Defendants take any action in response to the complaints about Mr. Gavshon's conduct?

A.   No.

Q.   Okay.  I believe you identified among this list Michael Radutzky; is that correct?

A.   Yes.

Q.   And what is the misconduct that you allege or assert that Mr. Radutzky engaged in?

Page 365

A. POOLOS

A.    Mr. Radutzky was known to be a very abusive and sexist manager.  He managed a unit within CBS -- or within 60 Minutes called the Investigative Unit.  He was considered to be one of the worst people amongst a crowd of bad people to work with.

I'm aware that he threw -- I think he threw a paperweight at a woman and that he physically assaulted her.  I've heard stories of him being very abusive to women within his unit and screaming and yelling at them.  I was told explicitly to stay out of Michael Radutzky's way because he could do no harm.

Q.    You mentioned that your understanding is Mr. Radutzky threw a paperweight at a woman.

Is there a specific woman you're referring to?

A.    

Q.    And at the time of this incident, is your understanding that Ms. Gordon worked for CBS?

A.    She was a senior producer for 60 Minutes.

Page 366

A. POOLOS

Q.    And the physical assault that you referenced, do you have -- who...who is it your understanding that Mr. Radutzky physically assaulted?

A.    ████████████████

Q.    And in what way is it your understanding that he physically assaulted her?

A.    I think he twisted her arm.

Q.    And do you know whether or do you have any basis to believe that Mr. Radutzky -- there were complaints made about Mr. Radutzky to management at CBS or 60 Minutes?

A.    Yes, I believe ██████████████ and others complained about Radutzky's treatment of them.

Q.    And do you know to whom or do you have an understanding as to whom they made the complaints to?

A.    Bill Owens and Jeff Fager.

Q.    And at the time, what was Mr. Fager's position?

A.    He was executive producer and the head of CBS News.

Page 367

A. POOLOS

Q.    And at the time, what was Mr. Owens' position?

A.    He was executive editor.

Q.    And do you have any understanding as to what Mr. Fager or Mr. Owens did in response to the complaints?

A.    I think they penalized the women making the complaints.

Q.    To your knowledge, did they take any action against Mr. Radutzky?

A.    No.

Q.    Does Mr. Radutzky still work for CBS?

A.    No.

Q.    Do you have -- what's your understanding as to the circumstances of his departure?

A.    I think he retired.

Q.    I believe you mentioned earlier Ira Rosen; am I correct, you mentioned him on that list?

A.    Yes.

Q.    Okay.  And what are you asserting as the misconduct that Mr. Rosen engaged in?

Page 368

A. POOLOS

A.    Ira Rosen sexually harassed his female subordinates and was abusive towards them.

Q.    And are there -- which female subordinates are you referring to?

A.    ████████████    and Gabrielle ████████

Q.    Okay.  And are you -- do you have any knowledge of any complaints that Ms. Nosheen made about Mr. Rosen?

A.    I believe she made an official HR complaint and also went to management; went to Bill and to Jeff and I think to Alison Pepper.

Q.    And do you know whether Ms. Nosheen made any external complaints about Mr. Rosen's conduct?

A.    I think she made an EEOC complaint.

Q.    Your understanding is that Ms. Nosheen filed a complaint with the Equal Employment Opportunity Commission?

A.    Yes.

Q.    And that complaint was about Mr. Rosen's misconduct, including sexual harassment?

A. POOLOS

A.    Yes.

Q.    Okay.  And, I'm sorry, ▮▮▮▮▮▮ what's her last name?

A.    ▮▮▮▮▮▮

Q.    ▮▮▮▮▮▮  okay.

And do you have any understanding as to whether Ms. ▮▮▮▮▮ made any complaints against Mr. Rosen?

A.    Yes, she did.

Q.    And do you know to whom she complained?

A.    I think she complained to HR and to -- and spoke to CBS News attorneys.

Q.    Okay.  And do you know whether any action was taken against Mr. Rosen for the conduct alleged by Ms. ▮▮▮▮▮?

A.    No.

Q.    You don't know or --

A.    No, there was no -- as far as I know, there was no action taken against him.

Q.    Okay.  And in response to the concerns raised by Ms. ▮▮▮▮▮ are you aware of any action that was taken against Mr. Rosen?

Page 370

A. POOLOS

A.    No, there was no action taken, but Ms. ███████ was retaliated against by the company for making the complaint.

Q.    And in what way was Ms. ████████ retaliated against for making the complaint?

A.    She was told her complaint would be confidential but it was shared with Bill Owens, and he took away stories from her and generally harassed her.  And she would be contacted by CBS lawyers every time there was a negative story in the press about CBS News and 60 Minutes, as to whether she was leaking. And she was just in general kind of harassed and intimidated for making her complaint.

Q.    Okay.  On the list of individuals, you mentioned Rich Bonin; do I have that correct?

A.    Yes.

Q.    And Mr. Bonin, does he currently work for CBS to your knowledge?

A.    Yes, he does.

Q.    And at the time of the alleged missing conduct, what was Mr. Bonin's position?

Page 371

A. POOLOS

A.    He was a producer for Lesley Stahl.

Q.    So he worked for 60 Minutes?

A.    Yes.

Q.    Okay.  What is...what is the --
Mr. Bonin's misconduct that you assert?

A.    He told ███████████ that she
shouldn't have more than one children -- one
child and that it would negatively affect her
career.  I witnessed him on several occasions
being very inappropriate in physical touch
with female subordinates.  He often said
sexist and sexually-harassing things.

Q.    What sexist and sexually-harassing
thing -- what sexist things did Mr. Bonin say?

A.    He called Lesley all sorts of sexist
names, like the B-word and the C-word.  He
often talked about whether women were good
enough to be producers.

Q.    When you say the B-word, just so
it's clear, what word are you referring to?

A.    "Bitch."

Q.    And when you say the C-word, what
word are you referring to?

A.    "Cunt."

Page 372

A. POOLOS

Q.    And are you saying that you heard Mr. Bonin say those words?

A.    Yes.

Q.    Are you aware of any complaints against Mr. Bonin for any of the misconduct that you've just described?

A.    I know that ████████████ made a complaint against him.  I don't know whether his other female APs complained about him officially.

Q.    How do you know that ██████ made a complaint against Mr. Bonin?

A.    He announced it to a luncheon with Lesley's entire team and told the entire team about ██████ entire complaint.

Q.    And were you present at that lunch?

A.    Yes.

Q.    And did Mr. Bonin, at that lunch, announce to whom the complaint had been made?

A.    He talked about the complaint against -- ██████ complaint against Ira Rosen and he talked about the complaint against him.  He said it had been made to Bill - I'm not sure if he said Jeff - and HR.

Page 373

A. POOLOS

Q.    Okay.  I believe in the list that you mentioned earlier today, you mentioned Jeff Fager; is that correct?

A.    Yes.

Q.    And what conduct or misconduct are you asserting that Mr. Fager engaged in?

A.    Sexual harassment, discrimination, abuse.

Q.    What sexual harassment are you referring to?

A.    I witnessed him groping female employees, I witnessed him abusing Lesley Stahl verbally.  And he protected a lot of men there.

Q.    When you say protected a lot of men there, what do you mean by that?

A.    I mean he never held men accountable for their sexual harassment or abuse.

Q.    And the sexual harassment that you mention in connection with Mr. Fager, do you know whether he was disciplined or punished for engaging in such conduct?

A.    I don't think he was.

Q.    Does Mr. Fager still work for CBS?

Page 374

A. POOLOS

A.    No.

Q.    And what was said about Mr. Fager's departure when he left?

A.    We were told that he sent an inappropriate text message to a CBS News reporter.

Q.    And what was that text message?

A.    He told her not to report on him, or something to that effect.

Q.    And in your testimony earlier today you mentioned Bill Owens as an example of a man who was treated better than...than you have been; is that correct?

A.    Yes.

Q.    And what did you mean -- what's the misconduct that you allege Mr. Owens has engaged in?

A.    I witnessed Mr. Owens behaving inappropriately towards women at parties, he spoke inappropriately to me.  And I believe he protected men at 60 Minutes.

Q.    And when you say that you observed Mr. Owens behaving inappropriately towards women at parties, what do you mean?

Page 375

A. POOLOS

A.    He would get very drunk and very handsy.  He called female correspondents, like Clarissa Ward, very drunk and -- chewing her out on the phone.  He would lose his temper.

Q.    When you say handsy, what do you mean by that?

A.    Like...like just touching women, hugging them, embracing them.

Q.    What -- just I wasn't clear on what you meant when you talked about Clarissa Ward and Mr. Owens' conduct towards her.

Could you explain that, please?

A.    Clarissa told me that Bill Owens would call her, drunk, and ream her out all the time when she was employed by CBS News.

Q.    Mr. Owens -- you're saying that Ms. Ward told you that Mr. Owens called her while he was drunk?

A.    Correct.

Q.    And would ream her out.

What do you mean, ream her out?

A.    He said -- he would be incoherently yelling at her.

Q.    Do you know whether Ms. Ward ever

Page 376

A. POOLOS

complained about Mr. Owens' conduct?

A.    I don't know.

Q.    In the list of individuals that you mentioned, I believe you also mentioned Mr. Bar-On; is that correct?

A.    Yes.

Q.    Okay.  What conduct do you allege that Mr. Bar-On...Bar-On engaged in?

A.    Sexual harassment, abuse, intimidation, discrimination.

Q.    Okay.  And can you give examples of his sexual harassment?

A.    He would regularly dissect my body and tell me to lose weight or stay at the weight I was at.  He would comment on the clothes I was wearing and how they accentuated my body.  He talked to me repeatedly about his masturbation experiences.  He tried to get me to have sex with him on assignment.  He told me I couldn't be a single mom.

He talked about other women.  He talked about Natalie Portman's breasts, he talked about Margot Robbie.  He called Lesley the C-word often, he called her body

Page 377

A. POOLOS

disgusting.

He used to corner me in places and basically fart on me, to humiliate me.  He threatened my job constantly.  He prevented me for applying for promotions.  He told me I wasn't allowed to speak to management about him.  He regularly tried to get me to take blame for his own shortcomings with management.

He made fun of women who had been raped.  He would come in my office and pick things up and throw them around when he was angry.  He told me he wouldn't care if I was murdered on assignment in Iran.  He belittled me, he called me names.  That's what I can think of right now.

Q.    And were there any witnesses to any of Mr. Bar-On's conduct that you've just described?

A.    Yes.

Q.    And who were those witnesses; and for each of the witnesses, what did they witness?

A.    Matthew Magratten witnessed Bar-On

Page 378

A. POOLOS

telling me about buying illegal pornography and watching it on his CBS News computer and masturbating.

Matthew Magratten witnessed him boxing me into a corner and farting on me on a...on a shoot in China.  Matthew Magratten regularly witnessed him speaking to me in a derogatory way.

Matthew Lev witnessed a conversation with Shachar talking about -- trying to pressure Matthew Lev into saying that he would masturbate to a cover of Margot Robbie and talking about condoms and ejaculation on her image.

Keith Sharman witnessed Shachar talking about sexualized topics and even commented that it felt like it was a bad harassment training video.

Aaron Tomlinson also witnessed what he did in China.

Q.    What did he do in China?

A.    He cornered me -- it was one of many times he had done this to me, but he cornered me in front of the crew and farted on me.

Page 379

A. POOLOS

Q.    And the examples that you just gave of Mr. Bar-On's misconduct, are...are there other examples that you at this moment can't recall?

A.    Yes.

Q.    Okay.  And is the same true for the other men that you testified about today?

A.    Yes.

MR. IADEVAIA:  Okay.  I don't have other questions right now.

EXAMINATION

BY MR. ZUCKERMAN:

Q.    I just want to follow up on two of those individuals your counselor asked you about, one of which the last name is -- is it Bonin?

A.    Bonin.

Q.    Bonin, okay.  And you said that he had told an entire team about a compliant at a lunch.

Did I characterize that accurately?

A.    It was -- Lesley Stahl would host end-of-season like lunches or sometimes team dinners.  So it was one of those like team

Page 380

A. POOLOS

meals, it was a lunch.

Q.    Okay.  What year was this?

A.    I don't remember the year.

Q.    What month would it have been in if it was end of season?

A.    It would have been like in the spring sometime, probably...I would think May when the season was officially over.

Q.    And just refresh my memory, I apologize, what...what complaint did he tell the entire team about?

A.    He came to the lunch and said something to the effect of, well, I just got back from meeting with HR, I -- something like I've got news to share, and then he told us about ███████ complaints against Ira Rosen and her complaint against him and he told us, you know, what he had discussed with HR.

Q.    Is it possible that this occurred in 2016?

A.    I...I can't say.  I'm going to guess it was around the time she made her complaint.

Q.    Okay.  And did...did you report this matter to Human Resources?

Page 381

A. POOLOS

A.    I reported it to Shachar Bar-On and said that he shouldn't have been making fun of ▮▮▮▮ to us.

Q.    I'm referring to - I'm not sure we're talking about the same thing - Mr. Bonin's announcement, or conversation I'll call it, to the entire team about...about this complaint.

Did you report that Mr. Bonin engaged in that discussion to HR?

A.    No, I didn't.

Q.    Did you report it to anybody?

A.    Just to Shachar Bar-On, we talked about it.  Oh, and Shari Finkelstein talked about it with us too.

Q.    What did you say to Mr. Bar-On about it?

A.    I said that was crazy.

Q.    Anything else?

A.    I can't believe he's mocking her to everyone.  And then Shari was walking with us, we were walking back from the lunch, and Shachar said have I ever sexually harassed you, and I said yes.  And then I remember

Page 382

A. POOLOS

Shari saying, like, this just seems so crazy to me.

Q.   This was a discussion the three of you were having on the way back from this lunch?

A.   To the office, yeah.

Q.   Okay.  Do you recall everyone who was at that lunch?

A.   No.  I remember Lesley, Shachar, Rich, Shari, but I wouldn't be able to say who their APs were at the time.

Q.   Anyone else you remember, as you sit here today --

A.   No.

Q.   -- who was present at the lunch?

A.   I...I don't remember.

Q.   Was anyone from Human Resources present at the lunch?

A.   No.

Q.   Do you know whether this matter was reported to Human Resources by anybody?

A.   I don't know.

Q.   Okay.  And you also mentioned that Mr. Owens had taken -- I think the phrase you

A. POOLOS

used was taken stories away from Ms. █████████ is that correct?

    A.    Yes.

    Q.    Do you -- had -- what stories did he take away from her?

           (Ms. Dayan exits.)

    A.    I don't know the specific stories. She just told me that he stopped approving her stories and he would take her ideas and give them to other producers.

    Q.    Well, if you don't know [who] the stories are, who...who would be able to tell us who the stories -- what the stories are?

    A.    Gabrielle, █████████████

    Q.    Okay. And how do you know that Mr. Owens did that for an improper reason?

           MR. IADEVAIA:  Objection.

           You can answer.

    A.    ████████████████████ was like literally the star AP of the show and a very high performer who was on a track to become -- be promoted and become a producer. And she told me after she made her complaint about Ira Rosen, she -- her career at 60 Minutes took a

Page 384

A. POOLOS

nosedive and she was put under a lot of pressure until she eventually left.

Q.     So you heard this from Ms. ████████

A.     Yes.

Q.     Do you have any other source -- is there any other source for your contention that Mr. Owens took stories away from Ms. ████████ for...for an improper reason?

A.     I mean, I, I...I heard that specific point from her, but it was widely known on the floor that things weren't going well for her anymore.  She wasn't getting stories on the air.

Q.     It was widely known by whom?

A.     By 60 Minutes staffers.

Q.     Like whom?

A.     Like people who worked with her, like Rachael Morehouse, Jack Weingart, Maria Gavrilovic.  I think even Shachar commented about it to me.

Q.     Do you have personal knowledge of why Mr. Owens allegedly took stories away from Ms. ████████

                MR. IADEVAIA:  Objection.

Page 385

A. POOLOS

You can answer.

A.    I only have her account.

Q.    Okay.  And do you know what year this occurred, "this" being Mr. Owens taking stories away from Ms. ████████

A.    I don't, I don't know what year.  It would have been following the ████████████ complaint.

Q.    Was it before or after the COVID shutdown?

A.    I think it would have been before.

Q.    Was it before or after Mr. Owens was promoted to his current title?

A.    I --

MR. IADEVAIA:  Objection.

You can answer.

A.    I don't know but I think it overlapped.

Q.    Okay.  Did you report to HR any of the matters, any of the incidents, any of the facts that you just recounted to your own counsel?

A.    No.

Q.    You also claim that Mr. Fager was

Page 386

A. POOLOS

fired because he told someone not to report on him, is what I think the phrase you used was.

Who was the woman that you're referring to there?

A.    Her -- she was a report -- she is a reporter.  I -- I'm going to misremember her name, it was either Durica [ph] or Jurica [ph].

She reached out to him for comment about the ongoing reporting about his tenure, and I think he told her like you better not report about me or you better not continue this.

Q.    Is that a 60 Minutes reporter, a CBS News reporter?

A.    CBS News.

Q.    Okay.  So he...he said to her, in sum and substance, don't report about the internal matters concerning my -- "my," meaning Mr. Owens' employment?

A.    Mr. Fager.

Q.    Mr. Fager's employment, apologies.

A.    I think he said something -- I...I don't know specifically what the text was, but

Page 387

A. POOLOS

he texted her something when she reached out to him for comment, saying that she better not report on it.

Q.    And...and comment about what?  I'm trying to get at what it was that --

A.    He was being investigated by The New Yorker for allowing an environment of sexual harassment and for engaging in his own sexual harassment and discrimination and abuse.

MR. ZUCKERMAN:  Great, okay.  Thank you.

Can I have two minutes with my client outside and --

MR. IADEVAIA:  Yeah, of course.  We can just stay here.

MR. ZUCKERMAN:  Yeah, yeah, please.

VIDEO TECHNICIAN:  The time is 7:29 p.m.  We're off the record.

(Recess taken.)

VIDEO TECHNICIAN:  The time is 7:35 p.m. and we're back on the record.

MR. ZUCKERMAN:  This is Lyle Zuckerman again.  I have no further cross of Plaintiff's counsel's direct, so I

Page 388

A. POOLOS

believe we are concluded for today.

MR. IADEVAIA:  We're concluded.

MR. ZUCKERMAN:  Thank you,
Ms. Poolos, appreciate it.

THE WITNESS:  Thank you.

VIDEO TECHNICIAN:  We are going off
the record at 7:35 p.m. and this concludes
today's testimony given by Alexandra
Poolos.  The total number of media units
used was five and will be retained by
Veritext.

(Whereupon, the examination of this
witness was concluded.)

Page 389

ALEXANDRA POOLOS vs. PARAMOUNT GLOBAL, et al.

1/14/2025 - ALEXANDRA POOLOS

ACKNOWLEDGEMENT OF DEPONENT

I, ALEXANDRA POOLOS, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.


_____     _____

ALEXANDRA POOLOS                      Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20____.



_____

NOTARY PUBLIC

```
                                                Page 390
```

**E X H I B I T S**

**DEFENDANTS EXHIBITS:**

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Amended Complaint Document 30 | 20 |
| Exhibit 2 | Handwritten Notes Pl._203 | 43 |
| Exhibit 3 | Handwritten Notes Pl._204 | 43 |
| Exhibit 4 | Email Chain CBS_3150 | 145 |
| Exhibit 5 | Termination Letter Pl.7-8 | 189 |
| Exhibit 6 | Staff Agreement CBS_1-12 | 214 |
| Exhibit 7 | Résumé Pl._24-25 | 232 |
| Exhibit 8 | Amended Responses to Interrogatories | 237 |
| Exhibit 9 | Supplemental Responses to Interrogatories | 237 |
| Exhibit 10 | Spring Fertility Records CBS_787-97 | 314 |
| Exhibit 11 | Shari Gelber Records CBS_879-87 | 317 |
| Exhibit 12 | Evolution Progress Notes CBS_4295/302/308 | 324 |

(Continued)

Page 391

E X H I B I T S
(Cont'd)

DEFENDANTS EXHIBITS:

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 13 | Email Exchange Pl._1529-30 | 330 |
| Exhibit 14 | Evolution Progress Note CBS_4319 | 334 |
| Exhibit 15 | Email Pl._1569 | 339 |
| Exhibit 16 | Text Chain Pl._2091-2 | 342 |
| Exhibit 17 | Email/Redactions Pl._2628 | 345 |
| Exhibit 18 | Email/Redactions Pl._2630 | 348 |

I N D E X

| EXAMINATION BY | PAGE |
|---|---|
| MR. ZUCKERMAN | 6, 379 |
| MS. DAYAN | 291 |
| MR. IADEVAIA | 356 |

Directions:  18, 27, 181, 186, 271, 338, 342, 344, 344
(Continued)

Page 392

I N D E X
(Cont'd)
INFORMATION AND/OR DOCUMENTS REQUESTED

DESCRIPTION                                                    PAGE

Original handwritten/contemporaneous notes.  43

Any notes taken during January 5 meeting.   121

Notes/recording of discussion/Magratten.    260

Any documents supporting claim for medical  274
expenses.


QUESTIONS MARKED FOR A RULING

PAGE/LINE    QUESTION

186/16    Q.  Okay.  Before we get to that, in
            the text I had just showed you, where
            it says at the end both Alex and my
            lawyer remember her saying that, what
            else did...what else did this lawyer
            say about the interaction or the, the
            meeting with...with Renee Balducci?

344/18    Q.  Has your husband ever threatened
            to leave you?

Page 393

C E R T I F I C A T E

STATE OF NEW YORK          )

                          )ss.:

COUNTY OF NEW YORK         )


        I, MARIANNE WITKOWSKI-SMITH, a Notary Public within and for the State of New York, do hereby certify:

        That ALEXANDRA POOLOS, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

        I FURTHER CERTIFY that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto set my hand this 28th day of January, 2025.


*Marianne Witkowski-Smith*

_____

MARIANNE WITKOWSKI-SMITH

```
                                              Page 394

ALEXANDRA POOLOS vs. PARAMOUNT GLOBAL, et al.

1/14/2025 - ALEXANDRA POOLOS

                 E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____


_____     _____
ALEXANDRA POOLOS                         Date
```

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.