# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------X
ALEXANDRA POOLOS,

                                    PLAINTIFF,

     -against-          Case Action No.:
                        23CV088969(GHW)(JLC)

PARAMOUNT GLOBAL, CBS BROADCASTING, INC.
and CBS NEWS, INC.,

                                    DEFENDANTS.
--------------------------------------------X

                    DATE:   February 13, 2025
                    TIME:   10:07 A.M.

                EXAMINATION BEFORE TRIAL of the
Defendant, PARAMOUNT GLOBAL, by a Witness,
RENEE BALDUCCI, taken by the Plaintiff,
pursuant to a Notice and to the Federal
Rules of Civil Procedure, held at
Vladeck, Raskin & Clark, 111 Broadway,
Suite 1505, New York, New York 10006,
before Amanda Larrea, a Notary Public of
the State of New York.

Page 2

A P P E A R A N C E S:

VLADECK, RASKIN & CLARK, P.C.
   Attorneys for Plaintiff
   ALEXANDRA POOLOS
   111 Broadway, Suite 1505
   New York, New York 10006
   BY:  JEREMIAH IADEVAIA, ESQ.
            -and-
        JAMES BAGLEY, ESQ.
            -and-
        BRANDON WHITE, ESQ.

DAVIS, WRIGHT, TREMAINE, LLP
   Attorneys for Defendant
   PARAMOUNT GLOBAL, CBS,
   CBS BROADCASTING, INC. and CBS NEWS, INC.
   1251 Avenue of the Americas, 21st Floor
   New York, New York 10020
   BY:  LYLE ZUCKERMAN, ESQ.
            -and-
        MICHAEL LYNCH, ESQ.

ALSO PRESENT:
   CARLOS KING
   Videographer
   VERITEXT LEGAL SOLUTIONS
   DANYA AHMED
   In-House Counsel
   PARAMOUNT GLOBAL
   ALEXANDRA POOLOS
   Plaintiff

            *         *         *

Page 3

F E D E R A L   S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

*    *    *    *

Page 4

R. BALDUCCI

THE VIDEOGRAPHER:  Good morning.  We're going on the record at 10:17 a.m. on February 13th, 2025.

Please note that the microphones are sensitive and may pick up whispering and private conversation.

Please mute your phones at this time.  Audio and video recording will continue to take place unless -- unless all parties agree to go off the record.

This is Media Unit number 1 of the video recorded deposition of Renee Balducci taken by Counsel for Plaintiffs in the matter of Alexandra Poolos versus Paramount Global, et al, filed in the United States District Court, Southern District of New York.  Case number 23CV088969(GHW)(JLC).

The location of this deposition is 111 Broadway, New York, New York.

My name is Carlos King

Page 5

R. BALDUCCI representing Veritext and I'm the videographer.  The court reporter is Amanda Larrea also representing Veritext.

I'm not authorized to -- I'm not authorized to administer an oath, I'm not related to any party in this action.  I'm not financially interested in the outcome.

Any objections to the proceedings, please state them at the time of your appearance.  Counsel and all present, including remotely, will now state their appearance and affiliations for the record beginning with the noticing attorney.

COUNSELOR IADEVAIA:  Good morning.  My name is Jeremiah Iadevaia of the firm Vladeck, Raskin & Clark on behalf of the Plaintiff, Alexandra Poolos, and with me today are my colleagues, James Bagley, and Brandon White, as well as the Plaintiff, Ms. Poolos.

Page 6

R. BALDUCCI

COUNSELOR ZUCKERMAN:  Good morning.  Lyle Zuckerman, Davis Wright on behalf of Defendants.  Here with me is colleague Michael Lynch and Paramount's in-house Counsel, Danya Ahmed.

THE VIDEOGRAPHER:  Can the court reporter please swear or affirm the witness.

R E N E E   B A L D U C C I, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

COUNSELOR IADEVAIA:

Q.   Please state your name for the record.

A.   Renee Balducci.

Q.   What is your current home address.

A.   34 Biltmore Boulevard, Massapequa, New York 11758.

Q.   Good morning, Ms. Balducci.  As I just said, my name is Jeremiah Iadevaia.

Page 7

R. BALDUCCI

I am one of the lawyers for Ms. Poolos in this matter against CBS and related entities.

Ms. Balducci, have you ever had your deposition taken before?

A.    I have not.

Q.    So you have a sense of how the day is going to go, I'm going to go through a couple of ground rules.  Hopefully that will help facilitate the day.  This is going to be a question and answer session. I'll be asking questions, you'll be giving responses and those questions and answers will be recorded by the court reporter sitting next to me.  As a result, what I ask is that you give verbal answers.  In other words, gestures, nods, shaking your head, the court reporter can't type anything when you do that, so if I could, please give verbal answers; does that make sense?

A.    It does.

Q.    Great.  Also during the day, I will do my best to not interrupt you and

Page 8

R. BALDUCCI

let you finish your answers and ask you to do the same when I ask questions so the court reporter can accurately record the back and forth between us; is that okay?

A.    Yes.

Q.    Okay.  During the day, we will take periodic breaks, but if you need a break at any time, just let -- let me know and we'll be able to accommodate you as long as there's not a question pending; does that make sense?

A.    Yes.

Q.    Okay.  And are you on any medication today that would affect your ability to testify truthfully and accurately?

A.    No.

Q.    And do you know of any reason that you would be unable today to testify truthfully and accurately?

A.    No.

Q.    Ms. Balducci, do you have a cell phone that you use for work?

A.    Yes.

Page 9

R. BALDUCCI

Q.    Okay.   How many phones do you use for work?

A.    One.

Q.    And has that been true the entire time that you've been at CBS?

A.    Yes.

Q.    And what's the phone number that you have?

A.    (917) 471-1533.

Q.    Great.  Have you used your -- strike that.  Do you have a personal cell phone?

A.    I do not.

Q.    Okay.  Do you ever use the work phone, the 917 number, to send text messages with colleagues at Paramount?

A.    Yes.

Q.    Have you ever sent or received text messages from Tanya Simons?

A.    Yes.

Q.    Have you ever sent or received text messages from Bill Owens?

A.    Yes.

Q.    Have you ever sent or received

Page 10

R. BALDUCCI

text messages from Collette Richards?

A.    Not that I can recall.

Q.    Okay.  And have you ever sent or received text message from Scott Bronstein?

A.    Not that I can recall in terms of a text message, but I use my phone for work correspondence, so I absolutely could have.

Q.    Okay.  And the text messages that you've exchanged with Ms. Simons using the work phone, did -- did you exchange text messages related to Ms. Poolos or Ms. Richards?

A.    Yes.

Q.    And do you know if those text messages were given to your counsel?

A.    Yes, they were.

Q.    Okay.  And the same question for Mr. Owens, did you exchange text messages with Mr. Owens about either Ms. Richards or Ms. Poolos?

A.    Can you repeat the question?

Q.    Sure.  The question is for

R. BALDUCCI

Mr. Owens, did you exchange text messages with him referencing the matter that's at issue in this lawsuit?

A.    Yes.

Q.    And did you turn over those text messages to your Counsel?

A.    Yes.

Q.    Are you aware of any text messages that you had with Mr. Bronstein that were not turned over to Counsel?

COUNSELOR ZUCKERMAN:

Objection.  You can answer.

A.    All of my correspondence with Mr. Bronstein has been turned over.

Q.    Okay.  And is the same true with any correspondence with Ms. Richards?

A.    Absolutely true.

Q.    Are you aware of any communications with Mr. Bronstein that you have that have been deleted?

A.    No.

Q.    And are you aware of any correspondence with Ms. Richards that has been deleted?

Page 12

R. BALDUCCI

A.    No, I would have no reason to delete any texts with either of those two.

Q.    Okay.  Did you do anything to prepare for today's deposition?

A.    I reviewed my notes, my calendar, the Complaint.

Q.    Did you do anything else other than review your notes, your calendar and the Complaint to prepare for today's deposition?

A.    Not that I can think of.

Q.    Did you meet with Counsel?

A.    I've had conversations with Counsel, yes.

Q.    Did you meet with Counsel for the purposes of preparing for today's deposition?

A.    Yes.

Q.    How many times?

A.    Once.

Q.    When did you meet?

A.    Yesterday.

Q.    Where did you meet?

A.    At their office.

Page 13

R. BALDUCCI

Q.   And who was present?

A.   Lyle, Michael and Danya.

Q.   Was anyone else there?

A.   No.

Q.   And approximately how long was that meeting?

A.   Got there at 9:00 a.m. and we wrapped up maybe 3 o'clock.

Q.   3:00 p.m.?

A.   3:00 p.m.

Q.   And during the meeting with Counsel to prepare for today's deposition, did you review any documents?

A.   Yes.

Q.   Okay.  And which documents did you review?

A.   E-mails, my calendar, the Complaint.

Q.   Any other documents besides e-mails, calendar and the Complaint?

A.   Not that I can think of.

Q.   When you say "the Complaint," you mean the lawsuit that Ms. Poolos filed in this case?

Page 14

R. BALDUCCI

A.    I do.

Q.    And when you say "calendar," what are you referring to?

A.    My -- my Outlook calendar.

Q.    And do you -- was your Outlook calendar given to Counsel in this case?

A.    Yes.

Q.    And do you know if it was produced in this matter?

A.    They have everything.

Q.    You mean your lawyers have everything?

A.    My lawyers have everything.

Q.    Okay.  What e-mails did you review?

A.    E-mails, I looked back on my e-mail exchanges with all parties involved.

Q.    Okay.  And which -- when you say "all parties involved," what do you -- who do you mean?

A.    Alex, Collette, Bill and Tanya.

Q.    Did you look at anything to prepare for today's deposition that has not been given to your Counsel?

Page 15

R. BALDUCCI

A.    No.

Q.    Alright.  Have you had discussions about your deposition today with anyone other than Counsel or any spouse?

A.    No.

Q.    Have you spoken with Bill Owens about today's deposition?

A.    No.

Q.    Have you spoken to Tanya Simons?

A.    No.

Q.    Lesley Stahl?

A.    No.

Q.    Claudia Weinstein?

A.    No.

Q.    Maria Cottone?

A.    No.

Q.    Cindy Glasgow?

A.    No.

Q.    Are you aware that other depositions have been conducted in this case already?

A.    I am aware -- I am aware that

Page 16

R. BALDUCCI

some depositions have been conducted.

Q.    And did you review any of the transcripts from those depositions?

A.    No, I did not.

Q.    And did you speak to any of the individuals who have been deposed about their depositions?

A.    Absolutely not.

Q.    You said that you reviewed the Complaint in preparation for today's deposition, the lawsuit that Ms. Poolos filed, correct?

A.    Yes.

Q.    Okay.  Was that the first time you had reviewed the Complaint?

A.    It is the first time I had reviewed the Complaint.

Q.    Okay.  And based on that review, do you have an understanding of Ms. Poolos's allegations in the case?

A.    I do.

Q.    And what's your understanding?

A.    My understanding is that Alex feels that she was wrongfully terminated.

R. BALDUCCI

Q.    And are you aware as to whether Ms. Poolos has alleged a discrimination claim?

A.    That may have been in there.

Q.    And do you recall seeing it in there?

A.    I -- I don't remember the exact language of the Complaint.

Q.    And do you know whether Ms. Poolos has alleged a claim that she was treated differently based on her gender?

A.    Yes.

Q.    Because she's a woman?

A.    Yes.

Q.    And have you discussed the lawsuit with anyone other than Counsel or a spouse?

A.    No.

Q.    Have you ever discussed a lawsuit with Mr. Owens?

A.    No.

Q.    Ms. Glasgow?

A.    No.

Q.    Ms. Simons?

Page 18

R. BALDUCCI

A.    No.

Q.    Have you discussed a lawsuit with Ms. Stahl?

A.    No.

Q.    Did you ever discuss the lawsuit with Shachar Bar-On?

A.    No.

Q.    Ms. Balducci, where do you currently work?

A.    I work for Paramount Global.

Q.    And what's your job there?

A.    My role is vice president of Human Resources.  I lead an HR Business Partner Team in support of our Corporate Advertising Sales Division.

Q.    And how long have you been in that job?

A.    About two-and-a-half years.

Q.    So approximately what year -- month, year did you take -- start that job?

A.    I left News for this position in the summer of 2022, I believe.

Q.    And why did you leave your News job?

Page 19

R. BALDUCCI

A.    Because a great opportunity presented itself.

Q.    The great opportunity being the Corporate Ad Sales position?

A.    That's correct.

Q.    And you said that you leave (sic) a HR Business Partner Team?

A.    I lead an HR Business Partner Team, correct.

Q.    How many individuals report to you currently?

A.    Two.

Q.    And who are they?  Or you can give me the titles.

A.    I have a director and I have a manager that report in to me directly.

Q.    Okay.  And within your current position for the Corporate Ad Sales Division, approximately how many employees does your team provide HR services to?

A.    Over 600.

Q.    And who do you report to?

A.    I report to the executive vice president of Human Resources.

Page 20

R. BALDUCCI

Q.    Who is that person?

A.    His name is Johan Eerenstein and he oversees the Advertising Division, HR Business Team, he also oversees all of HR operations and transformation for the full corporation and he oversees the HR Business Partner Team for the Distribution Team.

Q.    And I'm sorry, his name is Johan, what's his last name?

A.    Eerenstein.

Q.    And has Mr. Eerenstein been your supervisor the entire time that you've been in this job?

A.    No.

Q.    Who was your boss previously?

A.    Abhinav Chopra.  He was -- is now the EVP of streaming for -- for Paramount Global.  Been in that role for about a year.  Previous to that, he was the one that brought me over into the role with the Advertising Sales Division.  He was the SVP of advertising sales.

Q.    And currently, could you just

R. BALDUCCI

describe for me, generally, your responsibilities?

A.    Sure.  I lead a team of business partners in support of all of the revenue driving teams.  We are architecting their structure, transformation of their structure, we are managing leading change management.  We are handling contracts.  We are thinking about leadership succession planning.  We are dealing with employer relation issues, employee engagement, staffing.  Actually, and I have a significant role from a strategic standpoint, working with our chief operations officer designing our compensation plans so that we are driving the right behaviors for a critical part of our organization which is sales.

Q.    I'm sorry.  Which is what, sales?

A.    Sales, advertising sales.

Q.    Got it.  Thanks.

Anything else in terms of your responsibilities?

Page 22

R. BALDUCCI

A.    I -- I have a massive job.  I think those are the main points.

Q.    Okay.  You mentioned employer relation issues, what does that mean?

A.    It means that my team and I take care to ensure that our leaders are trained appropriately.  They know how to get the best out of employees.  They are -- and when there are issues that occur, we know about them and we can help steer them and guide them to get the best out of people, resolve those conflicts, move past them.

Q.    You mentioned, I think, in your list of responsibilities handling contracts, what does that -- what kind of contracts are you talking about?

A.    Employment agreements.

Q.    Does -- do you or your team currently have responsibilities for performance reviews of employees that fall within the group or groups you oversee?

A.    From what perspective?

Q.    Well, is there any formal

Page 23

R. BALDUCCI

performance review process?

A.    There -- there is a formal performance review process, yes.

Q.    And does HR -- do you or your team play a role in that formal process?

A.    Corporate drives the process.

Q.    What's that mean?

A.    It means they decide the system that we're using.  They decide what the -- what the tools are going to be that we use.  They set ultimate guidelines on timeline and how things will be orchestrated.  The business partners role, which would be my role and my teams role, is to ensure that the leaders on the ground, given they're busy and there's lots that they're dealing with, they understand what's coming from corporate, they're paying attention to it and they know how to execute it.

Q.    When you say "corporate," what does that refer to?

A.    Central -- we have a centralized -- center of excellence, one of our centralized HR groups is a Learning and

Page 24

R. BALDUCCI

Development Team, so in this particular instance, the Learning and Development Team is launching, providing the tools for actually Nancy Phillips, Head of HR, to launch the process.

Q.   And then your job as one of the leaders for a group or division within Paramount Ad Sales is to then implement what corporate HR or, yeah, corporate HR comes up with, correct?

A.   It's to help leaders navigate, yes, and to ensure that it's implemented.

Q.   Okay.  Do you, in your current position, or your team have any role or responsibilities as it comes -- as it relates to complaints that employees within Ad Sales raise?

A.   Yes.

Q.   And what are those responsibilities?

A.   They are to intake and make a determination about path forward based on what that situation is.

Q.   And what are some of the

Page 25

R. BALDUCCI

potential paths -- paths forward when an employee comes with a complaint?

A.    Wide ranging.  I mean, it depends what the complaint is.

Q.    Could you give me some examples?  I know there's a lot of variations, so I'm not asking for every manifestation or scenario --

A.    Sure.  You could have an employee that's unhappy with their boss and so they come and they want to complain about it.  In that instance, my team would listen to what the issues are and make a determination as to whether or not we need to coach them, coach them, we need to advise that their managers get involved, maybe they're making a complaint that is a red flag policy violation and we would handle that completely differently.  At that point, we would have a larger role being involved, but it really depends on the situation.

Q.    Are there times where as a result of a complaint, that you or your

Page 26

                    R. BALDUCCI
team conduct investigations?

        A.    Yes.

        Q.    And since you've been in this
position as VP within the Ad Sales Group,
approximately, how many investigations have
you and your team conducted related to
employee complaints?

        A.    Many.

        Q.    Many?  Would you say more than
ten?

        A.    I would say yes.

        Q.    More than 20?

        A.    No.  I think I'm happy with
more than ten.

        Q.    Okay.  Somewhere between 10 and
20?

        A.    Sure.

        Q.    Okay.  And in your current
position, when you -- your -- you or your
team conducts investigations, is there a
process for doing so?

        A.    There is no standard written
process.  We don't -- we don't have a
written centralized process, but we've all

Page 27

R. BALDUCCI

been trained on how to conduct an investigation. We have -- and -- and, yes. And so there's a -- yes.

Q.    Okay.  And is the -- has -- strike that.  When you say "training," what training are you referring to?

A.    I'm referring to -- I'm referring to various forms of training. There's the informal training that you get from your boss when you're coming up, right, there's training that I have received when I was at NBC Universal. There was a training on conducting investigations, and there's the guidance that you get when you have a tight -- when you're seeking knowledge from experts and you have a relationship with your expert stakeholders internally such as employment law.

Q.    Any other training?

A.    No.  I think that covers it.

Q.    Are you aware of any written resources available to HR about conducting investigations?

Page 28

R. BALDUCCI

A.    Within Paramount Global?

Q.    Yeah, within Paramount Global.

A.    I am not.

Q.    And I believe you said that everyone is sort of trained on how to conduct investigations within HR; is that fair?

A.    Yes.  Anybody that's going to conduct an investigation, has received guidance from someone in their line of management to ensure that they are capable of handling that responsibility.

Q.    And has that been the case for you?

A.    Absolutely.

Q.    And what guidance have you received on how to conduct investigations since you've been at Paramount?

A.    I have been doing my job for almost 25 years, so I can't recount to you any specific time, a specific training that I've been given, but I could assure you, I do my job well.  This is my first deposition.

Page 29

R. BALDUCCI

Q.   Okay.  What -- what is your process for conducting investigations?

COUNSELOR ZUCKERMAN: Objection.

COUNSELOR IADEVAIA:  You can answer.

COUNSELOR ZUCKERMAN:  You can answer.

THE WITNESS:  Answer?

A.   My process would be intake. First of all, intake.  So you've got -- you've got to make sure that you've got the complaint from the source, right? Sometimes you're getting it secondhand, thirdhand, can we get to the source, and then based on that information, make a determination about who else, you know, who -- who are the people that may be in the know that need to be spoken with.  What -- make a decision about what the best way to conduct that is in terms of ensuring that we keep this safe and quiet and as little friction as possible between employees and with the business, right?  We can't disrupt

Page 30

R. BALDUCCI

the business.  And then I -- you know, preparation, collect as much relevant information, get the most relevant information, make sure I'm focussed crispfully on relevant information and make a thoughtful determination.

Q.    During the time that you've been at Paramount, approximately how many investigations have you personally conducted?

A.    I mean, there's no way for me to know that.

Q.    Is it more than 20?

A.    Yes.

Q.    And the process you've just described, was that more or less your process throughout the time you've been at Paramount or have you changed it at all?

A.    That's the process.

Q.    I think you mentioned as sort of one of the elements of your process keeping the investigation quiet or words to that effect; is that right?

A.    Yeah.  We protect the

Page 31

R. BALDUCCI

confidentiality of the investigation.

Q.    And how do you go about doing so?  What are some ways that you do that?

A.    Anybody that is involved, directly involved, knows that they are to keep the conversation between us.

Q.    And how do they know that?

A.    They know that because they're told that.

Q.    And who are they told that by?

A.    If they're speaking to me, they're told by me.  If they're speaking to their manager, they're told that by their manager.

Q.    And when you say the folks involved, you're talking about the subject of the complaint, correct?

A.    I'm talking about the subject of the complaint.  I'm talking about the complain -- complainee.

Q.    The person who made the complaint?

A.    Yeah.

Q.    Anyone else?

Page 32

R. BALDUCCI

A. And anybody else that has become aware of that complaint that I am aware has become aware of the complaint.

Q. And would that include the managers who are involved, if there are any?

A. It would. Absolutely.

Q. And would that include any witnesses or folks who may have relevant information that you talk to as part of an investigation?

A. Yes.

Q. In terms of figuring out who to talk to as part of an investigation, how do you go about that for the investigations that you've done?

A. I mean, do we want to get specific or?

Q. Answer it as best you can.

A. Do -- do you want to get -- are we talking about this specific investigation?

Q. No. I'm talking about just generally what are your practices, what are

Page 33

R. BALDUCCI

ways in which you figure out who to talk to?

A.    Depending on who the complaint has come from, first of all, I make sure I get to that complainant to hear what they have to say and if there's anyone else that's -- it's now become clear that someone else is involved along the way, now -- now I have to talk to that person as well.

Q.    In terms of -- strike that. When you've conducted investigations, are there times where you review written materials or documents?

A.    Yes.

Q.    And how do you decide what documents to look at?

A.    It depends on what the -- it -- it is all depending on the circumstance that's before me.

Q.    What are some of the ways in investigations you've conducted that you determined what documents to look at?

COUNSELOR ZUCKERMAN:

Page 34

R. BALDUCCI

Objection.

THE WITNESS:  You want me to answer this question?

COUNSELOR ZUCKERMAN:  Yeah.

Yeah, to the best of your ability.

A.    I mean, I -- I -- I -- what's top of mind for me right now is this particular investigation.  So if you want me to answer that, I am happy to answer that.

Q.    When you conduct an investigation, do you ask the complaining party if there are any documents that the individual believes you should look at?

A.    Yes.

Q.    And when there is a complaint about another employee and you talk to the other employee, do you ask the subject of the complaint whether there's any documents to look at?

A.    I want to -- actually, before I answer that, I want to change my last answer.

Q.    Sure.  Go ahead.

Page 35

R. BALDUCCI

A.    I don't always need to ask if there are documents that I need to look at.

Q.    And how come?

A.    Because there may not be documents.  I may not know there are documents.  I may not even think that it's a situation that requires looking at a document.  I can't say every time I've ever done an investigation I've asked them if there were documents.  That's not at all the first question that I'm asking.

Q.    Well, I wasn't asking if it's the first question --

A.    Well, it may not be a question I ask, period, is what I'm saying.

Q.    And when you are aware that there may be documents, do you ask the person who made the complaint whether there are documents to look at?

A.    If someone specifically tells me there are documents, then I will ask them to see the documents.

Q.    Okay.  And is that true for the person who makes the complaint?

Page 36

R. BALDUCCI

A.    Yes, it could be, absolutely.

Q.    And what about the subject of the complaint?

A.    It would depend if there were -- yes, if they told me there were documents, sure.  But, again, if they were relevant.  I can also think of situations, and one very clearly in my head, where I don't -- you know, it's not always relevant to the determination that we need to make in a given moment.

Q.    In your current role is -- are you and your team involved at all in taking corrective action against employees, has that come up?

COUNSELOR ZUCKERMAN:
Objection.

A.    We're involved in advising leaders who are responsible for making decisions on corrective action.

Q.    And how do you go about advising leaders on that issue?

COUNSELOR ZUCKERMAN:
Objection.

Page 37

R. BALDUCCI

A.    That's a vague question.

Q.    Well, when is the last time you were involved in advising a leader on corrective action?

A.    Last night.

Q.    Okay.  And what was the process there?

A.    I -- I -- the process is one that I'm going to take slow because it only came to me yesterday while I was, you know, while I was busy with some other things, so my guidance was for everybody to take a beat and a minute and let's give each other the benefit of the doubt and then next week I will -- I will get in closer and have a conversation with the person that's upset and then I'll be able to give their manager better guidance on where to go from here.

Q.    Are -- have you been involved in situations where you've given recommendations as to the appropriate corrective action for a manager to take?

A.    Yes.

Q.    And have there been times where

Page 38

R. BALDUCCI

a manager has rejected your recommendation?

A.    Sure.

Q.    How many times?

A.    I could not answer that.

Q.    Would you say it's more than five times?

A.    It happens.  It doesn't happen -- I mean, we're usually pretty aligned.

Q.    Meaning you and the manager?

A.    Yeah.  Yeah.

Q.    What kind of corrective actions are available for a manager to take against an employee?

COUNSELOR ZUCKERMAN: Objection.

A.    It's, again, you're asking a very vague question.

Q.    Well, can you give me some examples, please.

COUNSELOR ZUCKERMAN:  Same objection.

A.    A corrective action could come in the form of a conversation where they're looking -- seeking to understand and then

Page 39

R. BALDUCCI

they make a -- right, so the first thing could be, I just want to bring this to your attention.  It could end there.

Q.    Okay.  What are other examples?

A.    I'm going to stay closer to you, right?  I'm -- I'm going to put this in writing.  I need to make this crystal clear to you.

Q.    What are others?

A.    Others can be discipline -- disciplinary memos.

Q.    Others?

A.    There could be I -- termination of employment.  Specific training, it really depends on the circumstance.

Q.    Can employees be suspended?

COUNSELOR ZUCKERMAN:

Objection.

A.    What do you mean by "suspended"?

Q.    Do you not understand what suspension means?

A.    What does it mean to you?

Q.    I'm asking the questions.

Page 40

R. BALDUCCI

You're a senior HR person, do you understand what the word "suspension" means?

COUNSELOR ZUCKERMAN:  Let's not get argumentative.

A.    Why don't you define it.

Q.    I'm not going to define it.  Do you understand what the word means?

A.    I -- I -- I can't think of suspensions.

Q.    Okay.  Are there situations where employees are forced to take a leave?

COUNSELOR ZUCKERMAN:  Objection.

A.    You're asking about an administrative leave, so if you asked me specifically about administrative leave, I would tell you, yes, we employ that administrative tactic.

Q.    Okay.  And when does that get implemented?

COUNSELOR ZUCKERMAN:  Objection.

A.    That gets implemented based on

Page 41

R. BALDUCCI

a situation we decide that that's a necessary course of action.  It is -- it is not a disciplinary tool.  It is an administrative tool to ensure that we have the time and the space to work through thoroughly a situation that requires investigation.

Q.    And during the time that you've been at Paramount, how many employees have been placed on administrative leave in connection with an investigation that you've been apart of?

A.    I can think of at least two.

Q.    And what were those situations?

COUNSELOR ZUCKERMAN:

Objection.  You can answer.

A.    Yeah.  The situation that I can think of was a male.  The claim was sexual harassment against another female and that person was put on administrative leave while we worked with the investigation.

Q.    Okay.  And where did that employee work?

A.    They worked for a Special

Page 42

R. BALDUCCI

Events Group.

Q.    And when did this happen, approximately what year?

A.    2021.

Q.    Did that employee -- when -- what ended up happening with that employee?

COUNSELOR ZUCKERMAN:

Objection.

A.    Ultimately that employee was terminated.

Q.    You mentioned there were two you could think of, what's the other?

A.    The one that we're dealing with today.

Q.    You're referring to Ms. Poolos?

A.    I am.

Q.    And with the other situation, the Special Events employee, what was the reason that employee was placed on an administrative leave?

A.    It was the nature of the complaint that came in.

Q.    And what do you mean by that?

A.    I mean, I had to make -- a few

Page 43

R. BALDUCCI

of us and the management involved had to make a judgment call about whether or not the manager and their subordinate can reasonably work together while we went through and assessed the validity of the claims.

Q.    Go ahead.

A.    And we determined that they should not.  That was not in the best interest in anybody involved.

Q.    And why was that?

A.    Because they could not have reasonably worked together without potentially discussing it, having it distract them from their work.

Q.    Anything else?

A.    Nope.

Q.    Okay.  And you -- I'm not asking for names of anybody, but what were the allegations of sexual harassment?

THE WITNESS:  That's a question I have to answer?

COUNSELOR ZUCKERMAN:  Yes.

THE WITNESS:  Yeah?

Page 44

R. BALDUCCI

A.    The allegations were that they put their hands on this person.

Q.    So that the male manager was accused of touching the female subordinate, correct?

A.    Correct.

Q.    And touching her without her consent?

A.    Correct.

Q.    Okay.  And as you sit here today, you cannot recall another instance besides the two that you testified to where an employee was placed on administrative leave as part of an investigation that you or your team was conducting; is that correct?

A.    I can't think of one right now.

Q.    Okay.  In your job in Ad Sales, have you or your team been involved in situations where employees were fired for allegedly breaching company policy outside of the sexual harassment situation that you just testified to?

A.    Can you repeat that question.

Page 45

R. BALDUCCI

Q.    Sure.  Actually, yeah, let me do it again.  Have you or your team been involved in any situations since you've been in Ad Sales in which an employee was fired for allegedly breaching company policies?

A.    Yes.

Q.    How many times?

A.    At least five.

Q.    And --

A.    I just thought of another administrative leave.

Q.    Okay.  We'll come back to that.

A.    Okay.

Q.    In terms of the five, generally what were the circumstances?

COUNSELOR ZUCKERMAN:

Objection.

A.    Yeah, I mean, there's -- I can't recount five different that -- you know, I can think of one that comes to my mind clearly and it was a male, involving sexual harassment of a -- a number of females.

Page 46

R. BALDUCCI

Q.    Any other instances you can recall?

A.    Performance -- performance based separation for sure.

Q.    When you say "performance based" what do you mean by that?

A.    I mean that they were not fulfilling significant and essential portions of their job and they were counseled and coached and warned and ultimately a decision was made to part ways based on performance.

Q.    Outside of the sexual harassment situation where a man was accused by a number of women of sexual harassment, are there any other instances since you've been in your Ad Sales role that you could recall in which an employee was fired for allegedly violating company policy?

A.    Nothing that comes to mind right now.

Q.    Okay.  I think you wanted to add another example of a situation in which

Page 47

R. BALDUCCI

an employee was placed on administrative leave, so please go ahead.

A.    Yes.  It was that one, that particular one.

Q.    The same person who -- in which you had said was accused by multiple women of sexual harassment?

A.    That's right.

Q.    In the sexual harassment, in that situation, did that -- did that involve allegations of touching employees without consent?

A.    It did not.

Q.    What was the nature of sexual harassment in that case?

A.    Well, this -- this was comments.  This started as comments.  Let me just think about it for a second.  Yeah. When it came to me, it was -- it was comments and it was -- it was -- there was a physical touch, not anywhere near as egregious as the other one I had mentioned, but it did happen.

Q.    And for that employee, the one

Page 48

R. BALDUCCI

where there were multiple complaints, had there been warnings given to that employee previously?

COUNSELOR ZUCKERMAN:

Objection.

A.    Yes.

Q.    And what form did those warnings take?

A.    The -- the -- the -- by the time this came to me, I had learned by my looking through -- my investigation, that this person had had a complaint before and had been disciplined and there had been a warning, so when this came up, this was, okay, this is the second time, this is now we've got a touch in there and this comment, so, you know, we had -- we -- we looked at it as a pattern of behavior.

Q.    And when it came to you and you saw there had been a warning previously and disciplinary action, what was the prior disciplinary action?

A.    They were warned and trained. Written warning and training.

Page 49

R. BALDUCCI

Q.   And what kind of training did they receive?

A.   They received, I mean, I wasn't there for it, but I know that they received training from, I believe, one of our law partners.

Q.   Was it sexual harassment training or training related to sexual harassment?

A.   I honestly don't remember.

Q.   And the -- you said a written warning, what form did that written warning take?

COUNSELOR ZUCKERMAN:
Objection.

A.   What do you mean by "what form"?

Q.   Yeah, let me ask it another way.  Has there been instances beyond this one where you're aware of a what you call a written warning that's been issued to an employee?

A.   Yeah.

Q.   And approximately how many

Page 50

R. BALDUCCI

times, is it a lot or a few?

A.    To this -- I'm sorry, to this one employee?

Q.    No.  No.  No.  Just generally, have you been involved in situations --

A.    Oh, yes.

Q.    And how many times approximately?

A.    I mean, 30-plus.

Q.    And is there a form that you use at Paramount for the written warning?

A.    There -- no, there is no standardized template that everybody needs to follow, but when -- as a HR business partner, you're -- you're doing this work all the time.  You, you know, you learn good practice.  You learn what they should look like.  You work closely with your employment law partner.  They tend to take a fairly -- a fairly consistent form, but I can't say that there is a specific template that has to be used.

Q.    And what do you believe is good practice when preparing or issuing a

Page 51

R. BALDUCCI

written warning?

COUNSELOR ZUCKERMAN:

Objection.

A.    What do you mean by -- could you be a little more specific?  What do you mean by good practice, when?

Q.    I think you mentioned that as an HR business partner or leading HR business partners, you develop good practice or good practices related to written warnings, I think that's what your testimony was?

A.    Oh, so you're just asking what I mean by that.  I mean, like the structure, like we're writing it to a specific person, we're telling them who it's from, we're making it clear what -- what we expect of them and what the infraction was.

Q.    And what are -- what -- from your vantage point in situations when you've been in involved in issuing a written warning, what is your belief as to the purpose of the written warning, and it

Page 52

R. BALDUCCI

could be multiple purposes?

A.    It's to make very clear what the infraction was and the behavior that we're expected moving forward and that this is -- there's a gravity to this.  It's serious and there will be consequences if this behavior continues.

Q.    For the other situation where someone was placed on administrative leave involving sexual harassment allegations and unwanted touching, had there been any warnings given to that employee prior to this complaint?

A.    Not that I can remember.

Q.    And you, I think described that harassment as more egregious than the harassment of the -- of the individual or alleged harassment by the individual who had multiple complaints; is that right?

A.    Let me think about the way I answer that.  The -- the -- the difference that I saw there, when I used the word "egregious," is the information that came to us in the Special Events with the

R. BALDUCCI

Special Events employee was such gross touching, like such significant violation of a person that it -- it -- a prior -- there not having been a prior warning wouldn't have changed where things ended up.

Q.    Because the allegations were so egregious?

A.    They were egregious exactly. And that is not to say that the complaint that came from the person within Ad Sales, I don't want to take away from her complaint of the touching, that was egregious to her as well.

Q.    The complaint about or that came from a person within Ad Sales, did you deal with that situation directly or did somebody on your team?

A.    I dealt with that, I stayed close to it.  There was someone on my team involved that worked -- she ran point for the group, but because of the level -- the level that that leader being accused was at, I was very close to it, very involved.

Page 54

R. BALDUCCI

Q.    What level was that person at?

A.    They were a senior vice president.

Q.    And the person who had made the complaint within Ad Sales, what was that person's title or position?

A.    She was either a director or a vice president.

Q.    And the Special Events person who had been accused of sexual harassment, what was that person's title?

A.    I think they were a director.

Q.    And the person who made the allegations of sexual harassment, what was that person's title in the Special Events situation?

A.    I don't recall.  They were more junior to the director.

Q.    And would the Special Events situation, were you directly handling it or was did somebody else?

A.    I was directly handling it.

Q.    And was that when you worked within CBS News?

Page 55

R. BALDUCCI

A.    It was.

Q.    And who was your supervisor at that time?

A.    I can't recall if it was -- it was likely Cindy Glasgow.

Q.    And in handling that situation, did you consult with Ms. Glasglow?

A.    I would always consult with my boss.

Q.    And in the Special Events situation, did you conduct an investigation?

A.    Yes.

Q.    And what did your investigation entail?

A.    I -- I -- I don't remember the details of that investigation.

Q.    Do you recall if you spoke to the, I think you said it was a woman who had made a complaint?

A.    Mm-hmm.

Q.    You did?

A.    Mm-hmm.

Q.    I just need a yes or no.

Page 56

R. BALDUCCI

A.    Yes.  Yes.  Sorry.

Q.    No problem.  And did you speak to the individual who had been accused of sexual harassment?

A.    Yes.

Q.    How many times did you speak to the complainant, do you recall?

A.    Complainant?

Q.    The person that made the complaint?

A.    I really don't recall.

Q.    And how many times --

A.    I don't think I would have to had spoken to her more than once.

Q.    And the individual who was the subject of the complaint, how many times did you speak to him?

A.    I spoke to him once, one thorough interview.

Q.    And in making a decision to place that employee on an -- the person who had been accused of sexual harassment in Special Events on an administrative leave, who -- who was the one that made that

Page 57

R. BALDUCCI

determination?

A.    The department head had made the determination.

Q.    Head?

A.    It was David Reiter.

Q.    And what department did he head?

A.    Special Events.

Q.    And then following your investigation of that complaint, did you make a recommendation as to a course of action?

A.    Yes, I did.

Q.    And what was your recommendation?

A.    Termination of employment.

Q.    And what -- and -- and who -- I think you said that employee, the Special Events employee, was ultimately fired, correct?

A.    They were.

Q.    Okay.  And what was Mr. Reiter's view on the appropriate course of action in that situation?

Page 58

R. BALDUCCI

A.    If we fired him, then David made the call.

Q.    And do you know if the Special Events employee was offered severance?

A.    Cannot recall whether they were or weren't, but that infraction it's -- that makes criteria for for cause termination.  We do not pay severance for for cause termination.

Q.    Are you aware of any situations where an employee has been terminated -- their employment has been terminated for cause and they received severance?

A.    I'm not.

Q.    And who makes, in your experience, who makes the decision as to whether there is cause or not cause for a firing?

A.    Who makes the decision as to whether it's cause or not cause?

COUNSELOR ZUCKERMAN:  I'm going to object to that, but you can answer.

A.    I'm going to do my best to

Page 59

R. BALDUCCI

answer that.  Very few things rise to the level of for cause terminations.  So it's pretty widely, I would say, understood when something is for cause or not for cause, but the way that this works is it's a conversation between myself, my boss, the business leader, my employment law partner, who is typically conferring with their boss.  So that decision is not made in a vacuum.

Q.    Would you say that it's a decision that's collectively made by the individuals or the people in the positions that you just mentioned?

COUNSELOR ZUCKERMAN:
Objection.

A.    Yes.

Q.    During the time that you've been at Paramount and its predecessors, how many situations have you been involved where there was a for cause termination?

A.    A few.

Q.    So you mentioned the Special Events person, as an example, what are the

Page 60

R. BALDUCCI

other examples?

A.    The Ad Sales employee that I gave you.

Q.    Okay.

A.    I mean, we've had people fired for stealing, but we're going back so far that I couldn't possible give you -- are you interested in -- I can think of one during my time at NBC.

Q.    I apologize, I'm focussed on Paramount, your time there.

A.    Yeah.  Yeah.  So those are the ones that come to mind.

Q.    The Special Events, the Ad Sales, was there instance of stealing or instances of stealing since you've been at Paramount?

A.    I feel like, yeah, there definitely was, but we're probably going back 15 to 17 years.  I don't remember the details of it.

Q.    Okay.  Any other situations you can recall?

A.    No.

Page 61

R. BALDUCCI

Q.    And in each of the situations that you do recall where someone was fired for cause, I believe your testimony is that the individuals were not offered severance; is that right?

A.    Correct.

Q.    Do -- I'm talking about currently now I'm switching topics a little bit, do Paramount employees have personnel files?

A.    They do.

Q.    Okay.  And are they -- what form are they in, electronic, paper, both?

A.    So our central team manages files.  I don't know what form they're in. I feel like they were in paper form forever and I believe they have transformed certainly because of Covid into something electronic.  I don't see those files. Business partners don't really see those files.

Q.    Are there occasions where you do look at an employee's personnel file?

A.    I mean, I can't -- sure.  I --

Page 62

R. BALDUCCI

I can't think of -- I honestly can't think of one.  Like this isn't something that I have to do in my day job and neither does my team.

Q.    When you're conducting an investigation about an employee complaint, do you ever look at the personnel files for purposes of your investigation?

A.    No.

Q.    Okay.  How do you go about -- strike that.  When you're conducting an investigation, is it relevant if there's been a complaint previously made about an employee?

A.    Yes.

Q.    And why is that relevant?

A.    It would signal, you know, behavior, patterns of behavior.

Q.    And in your view, is it important or does it matter if the person has been warned previously that the behavior is unacceptable?

A.    Yes, it matters.

Q.    And why is that?

Page 63

R. BALDUCCI

A.    Because if someone has been warned and then they repeat the offense, then we have a good indication that this is a pattern for them and they're not going to follow our instruction.

Q.    And how is it that you know whether there's been prior complaints about an individual?

A.    So I have to ask questions.

Q.    And what do you mean by that?

A.    I will ask their managers, I will ask employment law if they have any record, if there was another HR business partner that supported them during their tenure, I will ask them.

Q.    Is there any file, whether electronic or paper, where there would be record or records of prior complaints?

A.    No, there's nothing centralized.

Q.    And if disciplinary action had previously been taken against an employee, is there any place where that information would be stored or is stored?

Page 64

R. BALDUCCI

A.    So not typically.  I -- I feel like in -- in more recent days, you know, since -- since Paramount Global created centralized Employee Relations and centralized, you know, has a team there, I would think if that team is involved, that's a good place where you could probably go to find documentation, but that team is new.

Q.    When did that team get created?

A.    I don't know if I'm the best one to answer that.  I definitely -- after Covid, but I don't know when after Covid.

Q.    Was it while you were in your position in Ad Sales or when you were at CBS News?

A.    I don't know.  No, it was definitely when I was at CBS News because that team existed while I was at CBS News.

Q.    I think you mentioned that one of the instances of sexual harassment that you recall, I think that Ad Sales person, but you could correct me if I'm wrong, there had been a warning issued to that

Page 65

R. BALDUCCI

individual previously?

A.    Mm-hmm.

Q.    And disciplinary action in the form of a written warning?

A.    Mm-hmm.

Q.    I just need a yes or a no.

A.    Yes.  Sorry.

Q.    And how did you learn about the prior complaint?

A.    Because I inquired with that central group.  Actually, and also I asked my employee, my direct report who had a longer tenure with the group and she was able to tell me there was something and we were able to go to the central Employee Relations team and get that information and get their account of their involvement.

Q.    And was there any documentation, whether in writing, whether in paper form or electronic, about the prior complaint or complaints?

A.    Yes.

Q.    And did you review it as part of your investigation?

Page 66

R. BALDUCCI

A.    Yes.

Q.    And was there anything in writing about the prior disciplinary action?

A.    Yes.

Q.    And did you review it as part of your investigation?

A.    Yes.

Q.    Are there other instances that you can recall where you received information about prior complaints or disciplinary action from that centralized team that you mentioned beyond this person in Special Events?

A.    I mean, I might need you to repeat that question.

Q.    Sure.  Are there other instances where you received prior information about prior complaints or disciplinary action against another -- against an employee as part of an investigation from the centralized team?

A.    Yes.

Q.    How many times approximately?

Page 67

R. BALDUCCI

A.    I mean, it's hard to say.

Q.    Would you say it's more than ten times?

A.    Yes.

Q.    Okay.  When you have conducted investigations, do you ever consider the employees performance evaluations, is that something that you look at?

COUNSELOR ZUCKERMAN:

Objection.

A.    Not always.  It would depend on what the complaint was.

Q.    And -- I understand.  Let me ask a slightly different topic.  In your current job, are you at all involved in or your team involved in decisions about how much to pay an employee?

A.    Yes.

Q.    Are -- and are you involved in at all, whether to give an employee a pay increase, raises?

A.    Yes.

Q.    And what -- what kind of involvement do you have, generally

Page 68

R. BALDUCCI

speaking?

A.    Organize the process. Depending on their level, I mean, it really depends on how we're doing this.  If -- if we're doing a senior executive contract renewal or first contract, I'm going to ensure that the central Compensation Team knows what their peer says and to get that right and make sure they have their background and their career and salary history so that when they bring their recommendation, it's based off of the right information.

Q.    And who makes decisions about whether to give somebody a pay increase? Is that the manager's decision, is it HR, is it a combination?

A.    It's a -- I suppose it's a combination.

COUNSELOR IADEVAIA:  I think this is a good place for a break. We've been going more than a hour.

THE VIDEOGRAPHER:  Time is 11:23 a.m.  This marks the end of

Page 69

R. BALDUCCI

Media Unit number 1.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:  The time is 11:42 a.m. and this begins Media Unit number 2.

CONTINUED EXAMINATION BY
COUNSELOR IADEVAIA:

Q.    Ms. Balducci, we talked a little bit about your job within the Ad Sales Group, I want to focus on what was your -- your prior job.  So what was your job before you had that position?

A.    I was the vice president of Human Resources for CBS News.

Q.    And approximately how long were you in that role?

A.    A little under three years.

Q.    And from when to when?

A.    I -- okay.  Early 2020, I joined March 2020, right?  Pandemic, until -- I actually -- probably the summer of 2022, so maybe it was closer to two years than three years.

Page 70

R. BALDUCCI

Q.   And was your title the whole time the same, VP of HR?

A.   It was.

Q.   And when you joined -- was that your first job at Paramount or I guess what it was called at the time, ViacomCBS or --

A.   No.

Q.   It wasn't?

A.   No.

Q.   Okay.  How long did you work for either Paramount or its predecessor companies?

A.   In total, over 17 years.

Q.   What was your job that you had before you were VP HR at CBS News?

A.   I was with NBC Universal.

Q.   And for how long were you at NBC?

A.   Three years.

Q.   So focussing -- and what -- what -- approximately what time -- what were the years that you were at NBC?

A.   I was at NBC all of 2017.  Hold on.  2017, 2018, 2019, I left in

Page 71

R. BALDUCCI

January 2020.  Yeah, started with CBS News March.

Q.    So focussing on this period where you were at CBS News from early 2020 into the summer of 2022, was your title that whole time VP HR CBS News?

A.    Yes, it was.

Q.    Okay.  And when you joined in early 2020, who did you report to?

A.    Jose Andino.  He was an SVP of Human Resources for all of CBS News.

Q.    And did it at some point change who you reported to?

A.    It did, yes.

Q.    And how so?

A.    Jose Andino left the Company. Cindy Glasgow was moved over from another part of the Company to assume the role over CBS News.

Q.    Do you know what her title was?

A.    And station, actually.  I think and station.

Q.    And Stations?  Was Mr. Andino News and Stations or just News?

Page 72

R. BALDUCCI

A.    He was just News.

Q.    And approximately when did Ms. Glasgow become your manager, your direct manager?

A.    I don't remember exactly.  Jose was there for at least a year, if I recall.

Q.    And did it change at all for the rest of the time that you were in this role, 2020 to 2022 who your direct manager was after Ms. Glasgow?

A.    No.

Q.    Okay.  When you joined CBS News VP of HR in early 2020, did anyone report to you?

A.    Yes.

Q.    Who reported to you?

A.    I had, at the time, a director and a coordinator.  Yes, director and a coordinator.

Q.    And who was the director?

A.    Melissa McKeon.

Q.    And the coordinator?

A.    Marianna Neff.  Actually, and I had a freelancer as well, freelancer admin.

Page 73

R. BALDUCCI

Q.      Someone who was functioning as an administrative assistant?

A.      More like a transactional additional set of hands to support the team.

Q.      And during the time you were in this position within CBS News, did -- where there changes as to who reported to you?

A.      There were changes, yes.

Q.      What were those changes?

A.      Well, my role expanded.

Q.      And approximately when did your role expand?

A.      My role expanded maybe 2021 after Jose left.

Q.      And at least for now focussing on people who reported to you, how did -- how did your role change in 2021 in terms of who reported to you?

A.      So I continued to have a director -- okay, I had a director.  I promoted the coordinator to generalist and I gained -- I had to let the -- the freelance, the transactional person go and

Page 74

R. BALDUCCI

I gained a senior manager to help me with the expand of my role.

Q.    Who was that person?

A.    Taylor Gunther.

Q.    Okay.  Did who reported to you change at any other time other than what you just described to me?

A.    Yes, so that's the difference in number of resources.  Then the people changed.  So Jenny Ventura -- okay.  Sorry. They moved -- there was a decision made to move Melissa McKeon out of the role that she was in with my team over to the News Gathering Team because she -- we don't need to get into why, you let me know if you want me to get into why.  I don't...

Q.    That's fine.

A.    So I was able to back fill, so I was able to back fill.  So I hired another director.  Her name is Jenny Ventura, she came from ABC News and I have Marianna, okay, we move on.  I don't have the expansion yet.  Then Jenny and Marianna both resigned, not at the same time, but

Page 75

R. BALDUCCI

they both resigned, and my role was expanded around the same time.

Q.   And that's what you just testified to, the role expansion?

A.   Yes.

Q.   Okay.

A.   So now I'm filling -- bringing in a new senior manager over to support me in delivering for the expanded part of my role and I have no resources to help me with, no staff to help me with Network News part of my role, so I had to fill a director role and a generalist role.

Q.   And did you end up filling those positions?

A.   I filled both of them.

Q.   And who took the director role?

A.   Her name is Sheila Abner.

Q.   And the generalist role?

A.   Eda Ulutas.

Q.   Other than the individuals that you've mentioned, was there anybody else who reported to you during the time you were in your position within CBS News?

Page 76

R. BALDUCCI

A.    Yeah.  For a little while, I had someone named Talia Ritholz, who was a CBS page, but came in before any of those people were hired to just help stabilize, help me -- help me just be able to get through a day.  So she was there for a short time.

Q.    And approximately what period of time was it the case that you did not have anyone in the position of generalist or a director?

A.    That's really hard for me to remember.  I feel like it was -- it was definitely over -- so one time comparison, if we went with the time comparison of when, you know, the complaint came up about Alex and we were dealing with that, that was during this timeframe.  So it was definitely whatever year that was, I know the dates, but I don't remember the year super well.

Q.    Was it end of 2021 into 2022, does that sound right?

A.    Okay.  Yes.  Yes.  Yes.  Right,

Page 77

R. BALDUCCI

so through that whole holiday time and probably like a month before, couple of months after, yeah.

Q.    Did you ever work with somebody named Maria Cottone?

A.    Yes.

Q.    And who is that?

A.    Maria Cottone is one of my peer business partners who we -- Cindy knew, my boss knew that I had very few resources and had to deliver support for a 24-hour news organization and so she tapped Maria who sat in a different part of the business to lend some help.

Q.    And was this during that period you referred to which is late 2021 into early 2022?

A.    Correct.

Q.    Do you know whether -- I think you said this, but just to be clear, does Ms. Cottone still work for Paramount?

A.    She does.  I believe she does, yeah.

Q.    And do you know whether Ms.

Page 78

R. BALDUCCI

Cottone, before this period where she was helping, whether she had worked within CBS News previously?

A.    She did.

Q.    Do you have any sense of what timeframe she had worked there?

A.    I don't.  It predated.  We didn't both work at CBS News together.

Q.    Do you know whether she was asked to help during that time, late 2021 early 2022 because -- specifically because she had had prior experience at CBS News?

A.    It was definitely a helpful factor, but she -- she had bandwidth.

Q.    Yeah.

A.    She was on the right coast. She had bandwidth.

Q.    Could you tell me, before your job expanded, let's focus on that period at CBS News, what, generally, were your responsibilities?

A.    My responsibilities were support -- couple of things, day-to-day support for this 24/7 news organization

Page 79

R. BALDUCCI

coupled with driving organizational transformation, driving improvements in data so that we could start to make databased decisions. I would say creating a foundation for the HR Business Partner Team so that we could elevate to, from what was probably a little bit more like an under-resourced tactical HR team to a strategic business partner team. So I was working on processes. I was working on, I don't know, data validation and just what metrics do we have to tell stories. I was working on organizational transformation. You know, we had to find efficiencies. The same time we were making sure that our leaders had what they needed to lead their teams and get the best out of people.

Q. During that period of time you mentioned providing day-to-day support to a 24/7 news team?

A. Yeah.

Q. What -- what kind of day-to-day support did you provide during that time?

A. Well, as an example, Covid hit

Page 80

R. BALDUCCI

and so this was, I mean, for the first three weeks of my employment, around the clock -- around the clock phone conversations or e-mails just constantly talking to people -- first of all, trying to navigate Covid, what are our Covid rules, you know, people have to run the morning show, they actually have to get into the building and we don't have a Covid task force yet, how are we even going to get them in?  How are we going to keep them safe?  Then you look at, like, the News, 60 Minutes, they have to continue.  They're out there reporting.  What are the rules they're going to face?  What are the restrictions that they have to deal with when they travel?  It was just nonstop tactical, how do they continue to operate and navigate and unknown in the face of Covid.

Q.    And outside of any Covid-specific responsibilities, what else did day-to-day entail?

A.    Meetings with my leaders,

Page 81

R. BALDUCCI

meetings with employees, letting them know we were here as a business partner team and this is what we're here to do and they had a resource, they had a third-party that was here to support them. Help teams, managers, as well as employees navigate the various corporate and very important processes that we were putting in place to drive engagement and performance, such as unified performance reviews and midyear check-ins and completing an employee survey, engagement survey and action planning around that. I remember those very specifically.

Q. And I'm sorry if you told me this, but I don't have it in my notes, when did your job expand approximately, was it after the issues with Ms. Poolos and Ms. Richards or before?

A. I don't remember.

Q. Okay. Was it around the time that Ms. Glasgow came on board and Mr. Andino left, was it right around that time?

Page 82

R. BALDUCCI

A.    It was definitely after.  I'm trying to think of what the impetus was for that expansion.  Yeah, I think it might have been.  It might have been.

Q.    When you gave me a sense of your responsibilities before the role expanded, what changed when your role expanded?

A.    So in addition to having oversight for all network news shows and operations teams, I took on support for CBS -- the CBS News streak, so that was a 200-plus organization that was focussed on the CBS News expression via a 24-hour stream.

Q.    And it -- is it -- am I correct in saying that the kind of work you did remained more or less the same, but it was broader in the sense that now you have the news stream?

A.    Yes.  Actually and I took on one more group.

Q.    Okay.

A.    It was the News Path Group,

Page 83

R. BALDUCCI

which you could say sits in Stations and rolled up to Wendy McMahon, so now I was also working with Wendy McMahon in addition to Neeraj Khemlani, but yeah, it was the same.  It was day-to-day support for the teams, ensuring that, you know, you're getting the best out of people from a individual standpoint, a team standpoint, and then it was an org structure standpoint.  It was setting up the leadership team at the stream.  It was -- it was, you know, we had to find some -- it was finding efficiencies actually across the stream and Network News as well as News Path.

Q.    And approximately how many employees within the News Path Organization at the time around approximately?

A.    Under a hundred.

Q.    And the -- I think you said that oversight from the start and it continued was New York News and Operations?

A.    Mm-hmm.

Q.    I just need a yes or no.

Page 84

R. BALDUCCI

A.    Yes.  Yes.

Q.    And approximately how many employees was that?

A.    It was about 600.  About six.

Q.    Got it.  And in your Ad Sales job, currently how many employees fall within your ambit?

A.    About 600.

Q.    Six hundred?

A.    Mm-hmm.

Q.    And in terms of the New York News piece of -- of -- of your job, were there specific shows that you had responsibilities for?

A.    Yes.

Q.    And what were those shows?

A.    All of the shows.  All the shows.  60 Minutes, 48 Hours.  CBS This Morning, which became CBS Mornings, The Evening News.  Am I missing anything?

Q.    Sunday Morning Show?

A.    Thank you.  Sunday Morning and Saturday Morning.

Q.    And was that true throughout

Page 85

R. BALDUCCI

the time you were in that position, the two-plus years?

A.    Absolutely.

Q.    And you mentioned that you worked with someone named Neeraj and someone named Wendy McMahon; is that correct?

A.    Yes.

Q.    What was Neeraj's job during the time you were in the CBS News role?

A.    Neeraj's role was -- he was the head of CBS News.

Q.    And in what ways did you work with him?

A.    Well, I worked under Cindy. Cindy sat on his leadership team. Cindy was his primary business partner, but I would work with him. Let's just say I was dealing with an issue with The Evening News and I would work -- and we had to handle something that was pretty high level, I would work directly with Neeraj, I would bring him my communication plan, for example. Here is the communication plan,

Page 86

R. BALDUCCI

do you -- he would want to see it all, here is the timing, here is the messaging, here is what have you.  CBS Mornings decides -- CBS Mornings decides they want to re-brand and make a big change to their show, I'm showing him our plans to support that transformation from an HR standpoint.

Q.    Did you have regular meetings with Neeraj during this time?

A.    I -- yes.  I was apart of regular meetings with Neeraj.  I didn't have a one-on-one with him.

Q.    And what were the regular meetings you were apart of?

A.    There was a weekly that my boss would do with him and she would bring myself and the other VP on our team on the News side in so that, you know, that was all happening.  And once that -- that was the meeting.

Q.    And during those meetings, did you ever discuss with Neeraj and the others in attendance employees -- matters involving specific employees?

Page 87

R. BALDUCCI

COUNSELOR ZUCKERMAN:

Objection.

A.    We may have.  I -- nothing I can think about.  If there was something that he needed to know, yes.

Q.    Did you ever have a discussion -- strike that.  Were you ever part of a discussion where Mr. Neeraj was also part of it in which Ms. Poolos was discussed?

A.    I can't remember.  I cannot recall.

Q.    And were you ever part of a discussion and -- where Mr. -- or Neeraj was also part of a discussion in which Collette Richards was discussed?

A.    I don't think so, but I cannot recall.

Q.    Okay.  During the time that you were in your CBS News role whether pre- or post-expansion of that role, were you involved at all in training employees?

COUNSELOR ZUCKERMAN:

Objection.

A.    No.

Page 88

R. BALDUCCI

Q.    Okay.  Were you involved at all -- I think you testified earlier, but just to be clear, you were involved in investigation of employee complaints, correct?

A.    Yes.

Q.    During that time?

A.    Yes.

Q.    Yeah, go ahead.

A.    I am involved in investigation of employee complaints, yes.  And -- and I am coordinating, you know, we also have a inter-Employee Relations Team and we have to figure out based on bandwidth and what's going on who is going to handle what.

Q.    So just to be clear about that, was that the case when you were in your CBS News role, was there an Employee Relations Team?

A.    Mm-hmm.

Q.    Yes or no?

A.    Yes.  Yes.

Q.    And what was Employee Relations function at that time as you understood it,

Page 89

R. BALDUCCI

what did Employee Relations do?

A.    They were a centralized group of resources that were available to take -- to help alleviate bandwidth concerns from HR business partners as needed.  If something was going too particularly complex and burdensome, we could tap them and if they had the bandwidth, they would take it.  That being said, HR business partner couldn't let it go, you were right there working with them.

Q.    So even in a situation, employee complaint investigation where Employee Relations was conducting the investigation, the HR folks were still involved?

A.    Oh, yeah.  We meet with them constantly.  We meet with them all week long to get updates.

Q.    And how is it determined whether Employee Relations versus HR would take the lead on an investigation into an employee complaint?

A.    There isn't really a very clean

Page 90

R. BALDUCCI

answer to that.  You -- you're just -- it depends on the circumstances.

Q.    Outside of bandwidth, which is I think one of the factors that you mentioned before, what are the other factors?

A.    Could be availability schedule.

Q.    Bandwidth and availability schedules, anything else?

A.    It could be -- is it more of a managerial employee issue as opposed to a -- a -- something that's a clear policy violation that we know upfront.

Q.    And in which circumstances is Employee Relations more likely in that -- when that's a factor?

A.    They're more likely to be involved if it's clear policy violation and the HR -- and it's going to be so complex and the HR business partner does not have time or it -- it would just be too burdensome to take it on.

Q.    And during the time that you were in your CBS News role, was -- was

Page 91

R. BALDUCCI

employee -- were there specific people from Employee Relations that worked with CBS News or no?

A.    Yes.

Q.    And who were they?

A.    Jennifer Gordon, there was a Jennifer Gordon.  There was a Michael, there were two Michaels.  One was Rodderick and I can't think of the third Michael, the second Michael.

Q.    Anybody else from Employee Relations that -- that you worked with during the time you were in the News?

A.    I don't recall, no.

Q.    Okay.  And do you know what Ms. Gordon's position or title was beyond working in --

A.    Vice president.

Q.    And VP and Michael Rodderick?

A.    Manager maybe.

Q.    So Mr. Rodderick was in a junior position compared to Ms. Gordon?

A.    Yes.

Q.    And then the other Michael?

Page 92

R. BALDUCCI

A.    Same thing.

Q.    Manager.  During this period that you were in your role with -- within or providing services to CBS News, were there instances in which you were involved where there was corrective action taken against an employee.

A.    Yes.

Q.    And can you give me an estimate as to how many times that happened?

A.    Corrective action against an employee while I was at CBS News?

Q.    Yes.

A.    Any sort of corrective action, I mean, at least 15.

Q.    And what corrective actions do you recall taking place, the type?

A.    A few are coming to my mind, but I can think of employees that weren't getting on well, a manager and their boss, we're counseling them, warnings, warning letters, I can think of one, warnings at -- within our streaming group.  Again, coaching, counseling, warnings, those were

Page 93

R. BALDUCCI

mostly performance based.

Q.    Do you recall any corrective action that was taken as a result of an alleged policy violation during the time you were supporting CBS News?

A.    Outside of what we already discussed?

Q.    Yeah.  Right.  You testified earlier about an instance involving Special Events, you made reference to Ms. Poolos --

A.    Right, other than those, no, I can't think of any.

Q.    During the time that you were within CBS News, was there ever a situation that you were involved in in your HR capacity involving allegations of retaliation?

A.    At CBS News?

Q.    Yeah.

A.    No.

Q.    Any instances at CBS News of sexual harassment beyond what you already testified to?

A.    No.

Page 94

R. BALDUCCI

Q.     Any instances of allegations of discrimination?

A.     Not that I can think of.

Q.     I think -- just to be clear for the record, outside of what you've already testified to, Ms. Poolos and the Special Events person, during the period you were providing services to CBS News, were there any other instances of someone being placed on administrative leave as you conduct an investigation?

A.     Not that I can think of.

Q.     Okay.  Were there employees whose employment was terminated involuntarily during the time that you worked within CBS News?

A.     Outside of the ones that we discussed --

Q.     Outside of the Ms. Poolos and the Special Events person?

A.     So you're -- so like there -- there -- yeah, there -- likely.  It's hard for me to recall.

Q.     And -- and were there -- strike

Page 95

R. BALDUCCI

that.

A.   Like, I can't really think of any other specifics that weren't for performance.

Q.   And how many -- can you approximate how many times someone was let go involuntarily for performance reasons during that period that you were at CBS News?

A.   At least 15.

Q.   And in those situations, who made the decision to let the person go; what -- was it HR, was it the manager, the business leader?

A.   It's always the business leader.

Q.   And in those situations, we're talking about performance, were you -- did you make recommendations in your capacity as an HR person?

A.   Yes.

Q.   And can you think of any times during those situations where your recommendations were rejected?

Page 96

R. BALDUCCI

A.    I can't.

Q.    And in the instances at CBS News 15 or more times where someone was let go for performance reasons, were there any times where that person was not given a warning before they were let go?

A.    Say that again.

Q.    Sure.  I'm just wondering when there's a performance-based decision to let somebody go, were there instances where that person was not given a warning before the firing?

A.    No.

Q.    And when we're talking about the performance-based dismissals, were -- were there instances where those employees were not given sort of coaching -- were not given coaching?

A.    In the instances where there were dismissals, performance-based, are there instances where they weren't given coaching?

Q.    Before the firing?

A.    No, so long as we're -- like

Page 97

R. BALDUCCI

the -- using the same definition of coaching, right.

Q.    What do you mean?

A.    Your manager coaching you, your manager giving you, right, bringing the issue to your attention and, you know, advising you on what they need to see differently going forward, giving them a chance to improve, all of that.

Q.    Okay.  During the time you worked and provided -- you worked within your role -- HR role for -- that included CBS News, were you involved at all in contract renewals?

A.    I was.

Q.    And during -- so during that time, there were employees who had contracts, correct?

A.    Yes.

Q.    Did everyone have contracts?

A.    No.

Q.    And what kinds of positions did have contracts?

A.    Oh, okay.  It's different.

Page 98

R. BALDUCCI

Everywhere I work, even within Paramount, it's different, so you have to give me a second.

Q.    Sure.

A.    So it depends what kind of contract we're talking about.

Q.    What do you mean by that?

A.    That's the first thing.

Q.    Yeah.

A.    Typically, let's say outside of CBS News, if you're at Paramount, the only contracts we are giving out are executive employment agreements, and those are -- those are for the most senior executives. What I learned working at News was that we used contracts in many ways. We had executive employment agreements and then we had deals, what do we call them? I -- I can't even remember the term any more, but people would be on a whatever kind of deal. So those deals, the business affairs deals, they were more liberal and you could be a producer and above would be on one of these deals.

Page 99

R. BALDUCCI

Q.    And focussing on the CBS News piece of this and I guess what you call the business affairs deals, what involvement, if any, did you have in contract renewals?

A.    Very little.  Very little. That was something that we were working to be more involved in.  I would have to say by the time -- in my tenure, it became -- we got more involved, because it was something that was just completely being run without any HR involvement, in some cases, not even employment law involvement, so we were trying to, you know, look at the processes around that.

Q.    And when -- once HR became more involved during your tenure for CBS News, what was its involvement?

A.    The involvement would be, honestly, it's minimal.  You're challenging me to think about this right now.  That was really a process -- the Business Affairs Team worked directly with management on those deals.  We didn't really have much say.

Page 100

R. BALDUCCI

Q.    Were there instances -- during the time you were in your CBS News support position, were there instances where you had discussions with business leaders about not renewing someone's contract?

A.    I can't think of any.

Q.    And were --

A.    In terms of the BA deals, I can't think of any.

Q.    Okay.  And were there any instances where a manager sought your feedback for whether to renew someone or not?

A.    I mean, they might have.  I'm struggling to remember right now.

Q.    Okay.  During the time that you were providing HR services to CBS News, were you at all involved in decisions about compensation?

A.    Yes.

Q.    And how so?

A.    Decisions about compensation, so beyond what I -- what we discussed before in terms of a contract negotiation

Page 101

R. BALDUCCI

and making sure that we're looking at the right peer data.

Q. Well, let me ask it this way, were your responsibilities as it related to compensation when you were in your -- as you are in your Ad Sales position, were they the same or similar in your CBS News role?

A. They're the same. They're similar, yeah.

Q. And in your CBS News HR function, did you -- were you involved at all in making determinations about offering severance to employees who left?

A. Okay. Say that again.

Q. Sure. I'm wondering if your responsibilities included severance, did you play any role in the severance process?

A. In which job?

Q. The CBS News?

A. In the CBS News job?

COUNSELOR ZUCKERMAN: Objection to the base question.

COUNSELOR IADEVAIA: Sure. You

Page 102

R. BALDUCCI

can answer.

A.    Yes.  Although, there's a severance policy that guides these things, so I would be in a conversation where I would understand -- make sure I was understanding that the policy was being followed.

Q.    And for some of these business affair contracts, was there severance specified in the contracts themselves?

A.    I can't -- I believe so, but I cannot remember.  I was not -- business affairs did things a little differently and they did it outside the scope.

Q.    And for -- within your CBS support function, were you involved in any discussions as to whether or not to offer somebody severance who left involuntarily?

A.    Was I involved in discussions about severance for people that left involuntarily?

Q.    Correct.

A.    Yes.

Q.    And what was your involvement

Page 103

R. BALDUCCI

or how many times did that -- did that come up for you?

A.    I mean, it would come up every time we were separating someone, so I just --

Q.    And were there ever times where there was a decision to be made, do we offer severance or not, I mean, as opposed to something that was required under a policy?

COUNSELOR ZUCKERMAN:

Objection.

A.    Yes.

Q.    And approximately how many of those kind of conversations --

A.    Very few.

Q.    And can you -- what instances do you recall?

A.    Those instances are going to be when we know -- what we're doing is we're vocally -- when we're separating someone and it's for cause, nobody takes that lightly, and so we are all looking at each other and we're making sure that we are

Page 104

R. BALDUCCI

following -- we are -- we are -- any of our decisions and actions are to the letter of what they -- of our policies and so we will out loud, okay, this means this, right, is this consistent with how -- yes, this is consistent.

Q.    Okay.  And did you -- did you participate in any such discussions as it relates to Ms. Poolos?

A.    Yes.

Q.    And did you participate in any such discussions as it related to the individual accused of sexual harassment within Special Events?

A.    Yes.

Q.    Did you participate in any severance discussions along the lines of what we've been talking about for anybody else when you were in News?

A.    Not that I can think of.

Q.    Okay.  During the time that you've been at Paramount, I'm talking about the entire time now, did you receive any training beyond what you testified to about

Page 105

R. BALDUCCI

-- about correct -- taking corrective action or supporting the business and taking corrective action?

A.    No.

Q.    Did you receive any training on performance management of employees?

A.    Yes.  Absolutely.

Q.    And was -- what kind of training did you get, have you received on that issue?

A.    Trainings on, you know, how to deliver feedback, how to have difficult conversations, how to document.

Q.    And is that something -- is that training you receive more than once or is it once that you received it?

A.    I like to stay current, so I'm constantly reading best practices.

Q.    Yeah, and that was my other question.  When you -- when you said that you got training on delivering feedback and how to have hard conversations, what -- what -- what's the form of that training?

A.    I mean, it -- there have been a

Page 106

R. BALDUCCI

facilitator, you know, instructor-led courses, many through the years and I'm always seeking out, you know, whatever I can get my hands on.  You know, we have Gartner, where I'm always looking and reading what's the latest in Gartner and I belong to WICT.  In fact, I'm a member of WICT New York.  I'm also searching what's best out there.

Q.    What's Gartner?

A.    Gartner is -- it's one of our industry -- it's a company that gives you industry best practices.

Q.    And what is WICT?

A.    WICT is -- WICT is women in media entertainment and technology.

Q.    And is the focus on WICT on HR issues or is it broad --

A.    It's not.  It's broad, but they're bringing you best practices and management, leadership, building your brand.

Q.    And the facilitator-led courses that you recall about performance

Page 107

R. BALDUCCI

management of employees, when was the last time you took such a course?

A.    Performance management, I -- I -- I don't know.

Q.    Okay.

A.    I don't know.

Q.    And the courses that you've taken, were they online or were they in person or both?

A.    They're probably -- I remember -- I remember in-person trainings.  I remember a ton of in-person trainings at 1515.

Q.    Sorry?

A.    At 1515, our headquarters.

Q.    Meaning Paramount headquarters?

A.    Yes, Paramount headquarters.

Q.    And --

A.    You know, we were doing those every year when we were doing performance reviews.

Q.    And was there written materials?

A.    Yes, and actually there's

Page 108

R. BALDUCCI

written materials to this day, very good written materials.

Q.    Okay.  Is there other kinds of -- strike that.  Outside of what you've already testified to during the time you've been at Paramount, have you received any other trainings that were led by facilitators?

A.    I'm actively participating in Betsy Magnus Leadership Program.  It's a yearlong program across company.  Very immersive.

Q.    What's the name, Betsy?

A.    Betsy Magnus, it's a leadership program.

Q.    Go ahead.  Is it something that you volunteer for or were you selected?

A.    I was nominated.  I volunteered, but I was also nominated.

Q.    Who nominated you?

A.    Johan Eerenstein, my boss.  It's an extensive application process and I was thrilled to be accepted.

Q.    And when did you start that

Page 109

R. BALDUCCI

leadership program?

A.    I started it last September.

Q.    And how long do you anticipate it going?

A.    It's a year.

Q.    A year?

A.    Yeah, it's very prestige.

Q.    And this is something that is offered by Paramount?

A.    It's not.  It's was offered -- it's a combination -- so WICT, as I mentioned, they offer this in coordination with Center of Creative Leadership, Speak Easy, a couple of other pretty known organizations.

Q.    Organizations outside of Paramount?

A.    Yes.

Q.    During the time that you've been at Paramount, other than what you testified to already, have you participated in any facilitator-led training put on by Paramount?

A.    Can you ask that question

Page 110

R. BALDUCCI

again?

Q.    Sure.  I'm wondering if you participated in any other facilitator-led trainings at Paramount beyond what you testified to?

A.    Focussed on?

Q.    Any issues.

A.    Oh, yeah.  We're trained -- every quarter, I feel like I'm put through another three or four trainings, mandatory.

Q.    Can you give me some examples of the training?

A.    Yes, it could be harassment for the workplace.  It could be conflicts of interest and business practices statement, it could be how to handle sensitive information, communications, it varies. It's wide.

Q.    And are there any HR specific mandatory trainings that you've participated in during your time at Paramount?

A.    That are only mandatory for HR?

Q.    Yeah, for HR.

Page 111

R. BALDUCCI

A.    Definitely been put through an Employee Relations and investigation training, I just don't remember if it was Paramount or NBC Universal or Epstein Becker & Green for that matter.  I mean, they would have provided training, as well.

Q.    Okay.  You mentioned that before you got to your CBS News role, you worked for NBC Universal, correct?

A.    Yes, that's right.

Q.    And I think you said you worked there -- there for a three-year period starting in 2017 through the end of 2019 beginning of 2020?

A.    That's right.

Q.    And what was your job there?

A.    I was leading an eight-person business partner team for four networks. Bravo, E, Oxygen and Universal Kids, so I was the VP of HR for what they call the Lifestyle Network.  Lifestyle Networks, I was within their cable entertainment umbrella.

Q.    Was that your job the whole

Page 112

R. BALDUCCI

time you were at NBC or did it change?

A.    That was my job the whole time I was there.

Q.    And what position did you report to during that time?

A.    Executive vice president of HR supporting cable entertainment.

Q.    And, generally, what were your responsibilities during your time at NBCU?

A.    Significant org transformation, managing the day-to-day, employee engagement, you know, staffing, retention, managing employee issues.

Q.    And did that include responding to employee complaints?

A.    Yes.  Although, that -- NBC has very hefty resources.  As I mentioned, I had an eight-person team.  I wasn't on the front lines of issues unless they were very senior people or very consequential.

Q.    But the team members that you oversaw did handle employee complaints, correct?

A.    Yes.

R. BALDUCCI

Q.    And did you or your team at NBCU handle investigations related to employee complaints?

A.    Yes.

Q.    And would you say that you handled that on a regular basis during your three years there?

A.    Regular basis and there was no Employee Relations Team.

Q.    Okay.  What was the job you had before your job at NBCU?

A.    I was the vice president of Human Resources at Viacom, so Paramount, but we were Viacom at the time and I was overseeing HR for, God, what did we call it?  The Entertainment Group.  They were called The Entertainment Group back then.  It was Comedy Central, TV Land and Spike TV.

Q.    Did you work with Ms. Glasglow at that time?

A.    I didn't actually.  I worked with -- Whitney Delich was my boss.

Q.    And approximately how long were

Page 114

R. BALDUCCI

you in that job?

A.    Four years.  At least four years.

Q.    And, generally, what were your responsibilities in that role?

A.    Well, I was -- I was in that job for about four years and I think I was promoted -- when I got in that role, I was elevated initially and walking into it as a senior director, after two years, I was elevated to vice president, so my responsibilities grew a bit.

Q.    So tell me how they start -- again, generally, how they started and where they ended up?

A.    Help me manage the day-to-day, work with leaders, actually, that's where I got a little bit, start to build my shops more in leadership development, so building customized solutions and issues and they needed some leadership training.

Q.    Did you have any role in dealing with employee complaints during the time you were in that position at Viacom?

Page 115

R. BALDUCCI

A.    Yes.

Q.    And were you involved at all in conducting investigations related to employee complaints?

A.    Yes.

Q.    What was your job before your VP and senior director role within the Entertainment Group at Viacom?

A.    I was heading the HR function for a joint venture start-up called Epics (phonetic), so I was their head of HR at the director level.

Q.    And Epics was part of Viacom?

A.    It was.  It was a joint venture between Paramount, MGM and -- there was a management services agreement with Viacom, so they hired me under the management services agreement.

Q.    And approximately how long were you in that position?

A.    About two-and-a-half years.

Q.    And who -- what level did you report to or who did you report to?  You don't have to give me a name, but title?

Page 116

R. BALDUCCI

A.    Well interestingly, I reported to Cindy Glasgow.

Q.    And do you know what her level was at the time?

A.    She was a senior vice president.

Q.    And in that capacity, did you deal with employee complaints?

A.    Yes.

Q.    And -- and investigations related to employee complaints?

A.    Yes.

Q.    And what was your job before that?

A.    My job before that, I was -- I was an HR generalist at Epstein Becker & Green.

Q.    That's a law firm, correct?

A.    It is.

Q.    And how long were you an HR generalist at Epstein Becker?

A.    Under three years.

Q.    And who did you report to there, the title?

Page 117

R. BALDUCCI

A.    The title, I think her title was director, but she was the head of HR.

Q.    Okay.  And, generally, what were your responsibilities in that role?

A.    My responsibilities in that role were a little different because of the corporate HR Department, and so I was building processes, firm wide processes, that would then be rolled out to the office administrators in various offices to administrate.

Q.    Were you involved, at all, in dealing with employee complaints at Epstein Becker?

A.    I was.

Q.    And were you involved in conducting investigations related to Employee Relations during that time?

A.    I was not.  Although, I would have to approve termination decisions.

Q.    What was your job before you were at Epstein Becker?

A.    I was a manager of Human Resources, HR business partner, for Viacom.

Page 118

R. BALDUCCI

Q.    And how long were you in that job?

A.    Well, they only just promoted me to manager when I left, and so I spent a total of, I think, about five or six years at Viacom before I went to EBG, so I was probably in the -- in that job for, I want to say, like three or four years.

Q.    And what was the -- you said HR manager position, but --

A.    Yeah.

Q.    Yeah?  Was that the job for the three or four years?

A.    It was HR coordinator and promoted to HR manager, but, you know, dealing with day-to-day, a little bit more transactional.  I was assisting, you know, my boss and the more senior levels of my team, but I was still, you know, dealing with employees, still dealing with managers, still dealing with Employee Relations issues, writing morning letters, that's where I started writing morning letters, writing performance improvement

R. BALDUCCI

plans, making recommendations to terminate.

Q.    And were you involved in investigations at that time?

A.    Yes, definitely.

Q.    What was your job before your HR manager role?

A.    Before that, I was at -- at the network operations center for Viacom.  I started as an assistant, they promoted me to coordinator, and I was doing very broad administrative work, so I was doing orientations with employees, I was doing postings of jobs.  Literally write-up people's bios, back in the day, write them on paper and stick them on a wall and people would read them as they walked in. I would do HRIS entry, data entry.

Q.    Switching gears now.  During your time in the CBS News position focussing on that period, did Paramount or CBS Viacom, whatever it was called, have an antidiscrimination policy?

A.    Absolutely, yes.

Q.    And have you reviewed that

Page 120

R. BALDUCCI

policy?

A.    Over and over.

Q.    And do you receive training on that policy?

A.    Multiple times a year.

Q.    And is that training led -- is that training online, in person --

A.    It's online, the last few years it's online.

Q.    Got it.  And is that a Paramount training or is that a training from some other source?

A.    It's put out as a Paramount training.  I'm not sure who builds it, but it's a Paramount training and every employee goes through it.

Q.    And it doesn't matter what shows or shows you work on?

A.    Does not matter.

Q.    And what is your -- I know you're not a lawyer, but what is your understanding of what the antidiscrimination policy prohibits?

A.    It's prohibiting any negative

Page 121

R. BALDUCCI

employment action being taken against someone based on a protective characteristic, Title 7.

Q.   And what are some examples of a protected characteristic?

A.   Your age, your race, your gender, your ethnicity, your religion.

Q.   Got it.  And within the antidiscrimination policy, is there an anti-retaliation policy?

A.   There are likely -- yes, there's definitely an anti-retaliation policy in there.

Q.   And -- and what's your understanding of that anti-retaliation policy within the antidiscrimination framework?

A.   Within the antidiscrimination framework, I would actually -- I'll answer this question, but then I'll also say there's also a broad anti-retaliation policy --

Q.   And we'll talk about that, too, sure.

Page 122

R. BALDUCCI

A.    Okay.  Good.  It is that, first of all, the anti-retaliation aspect of our policy, is, I mean, arguably, the most important aspect of any of our policies because if we're going to have a work place that anybody wants to spend any time in, we need to make sure it's one where people are respected and people can do their job and part of that is making sure that they can make a complaint in good faith and they will not perceive some negative repercussion for having done that.

Q.    And so, just going back to my question about the anti-retaliation policy within the antidiscrimination policy what's your understanding of that?

A.    It's exactly that.

Q.    And in that --

A.    It's if someone takes any negative any -- you become aware that someone made a good faith complaint about you or anyone else and you take any negative action in response to that because they made that complaint, that is

Page 123

R. BALDUCCI

retaliation.

Q.    Got it.  And the antidiscrimination policy, to the extent it has the anti-retaliation provision, that deals specifically with discrimination complaints; is that your understanding?

A.    Yes.

Q.    And then you referenced a broader anti-retaliation policy, correct?

A.    Yes.

Q.    And was that policy in effect during the period that you were at CBS News?

A.    Yes, it's part of the business conduct statement.  We've been trained on this for years.

Q.    And the business conduct statement you're referring to, does it have other policies within it?

A.    It does.  It's dense.

Q.    Okay, and how often -- well, does Paramount provide training annually related to the business conduct statement?

A.    I believe so.

Page 124

R. BALDUCCI

Q.    And was that the case -- is that the case now?

A.    That's the case now.

Q.    And was it the case when you were at CBS News?

A.    I would have to assume yes. Yes, it's another one of those trainings that we're put through, I don't know, I want to say annually, it could be more often than that.

Q.    And is the training you're referring to specific to the business conduct statement or -- or something else?

A.    No, it's all of them. If you're an employee of Paramount, you have an endless number of trainings in your queue.

Q.    Right, but I'm -- I'm -- so let me ask can it a different way. My question wasn't clear. You referenced trainings related specifically to the business conduct statement, correct?

A.    Yes.

Q.    Do you know if there is one

Page 125

R. BALDUCCI

training annually provided for the business conduct statement or multiple trainings?

A.    Oh, I don't know.  I just know we are always being refreshed.

Q.    And do you recall ever receiving a training specific to the anti-retaliation provision within the business conduct statement?

A.    Yes.

Q.    And was that part of the broader business conduct training or was it its own training?

A.    I think it's part of the broader business conduct.

Q.    Okay.  And the business conduct statement, does that apply to all Paramount employees or only certain employees?

A.    All.

COUNSELOR IADEVAIA:  If we could mark as -- I'll do --

THE WITNESS:  Is this all for me?

COUNSELOR IADEVAIA:  She's going to mark it and then we're give

Page 126

R. BALDUCCI

you a copy.

THE WITNESS:  Okay.

COUNSELOR IADEVAIA:  Balducci

Exhibit 1, please.

(Whereupon, a Global Business

Conduct Statement was marked as

Balducci Exhibit 1 for identification

as of this date by the reporter.)

CONTINUED EXAMINATION BY

COUNSELOR IADEVAIA:

Q.    Ms. Balducci, I'm just going to

ask -- I'm not going to ask you a specific

question or I'm not going to ask you a

question about a specific provision, you're

free to look through it, of course, but I

wanted to just find out a couple of things.

First of all, do you recognize what's been

marked as Exhibit 1?

A.    I do.  Yup.

Q.    And what is it?

A.    This was our Global BPS, yeah.

Q.    Global Business Conduct

Statement?

A.    It is, yes, mm-hmm.

Page 127

R. BALDUCCI

Q.   And it says 2021, so it's likely this was the version that was effective in 2021?

A.   Yes.

Q.   And when you were talking about receiving training related to the Global Business Conduct Statement, would the training relate to this document --

A.   Oh, yeah.

Q.   -- Exhibit 1?

A.   Oh yeah, mm-hmm.

Q.   Okay.  And is it in this statement that the company's broader anti-retaliation policy is located?

A.   Yeah.  Absolutely.

Q.   Outside of the Global Business Conduct Statement, was there any other place where the company's broader anti-retaliation policy was located?

A.   I feel like you can find it in a couple of places.

Q.   Where at?

A.   Do you want me to look?

Q.   Well, outside of this document?

Page 128

R.  BALDUCCI

A.    Oh, outside of this document?

Q.    Yeah.  Yeah.  Yeah.

A.    Well, this lives in our intranet.

Q.    Okay.

A.    So it's there.

Q.    Okay, as the Business Conduct Statement, but available to employees through the intranet?

A.    Yes.

Q.    Okay.  And other place the broader anti-retaliation policy exists?

A.    No, not that I know of.  Not that I can think of.

COUNSELOR ZUCKERMAN:  Excuse me, I don't think he means a physical or virtual space.  I think he's asking, and correct me if I'm wrong --

Q.    Well, is there another policy that encompasses anti-retaliation?

A.    You're asking is there another policy that encompasses anti-retaliation outside of the BPS?

R. BALDUCCI

Q.    Yes.

A.    Let me make sure I understand the question because I'm not sure I do.  So there are multiple policies --

Q.    Okay.

A.    -- that have anti-retaliation, but they're -- I feel like -- so I'm assuming they're in here, those policies.

Q.    Okay.

A.    So if they're in here, then I feel like this is encompassing everything, but if I misunderstand that, then...

Q.    No, that's the question.  You said there's multiple policies that have anti-retaliation provisions, what are those policies?

A.    With the anti-harassment and discrimination.

Q.    Is there any others that you can think of?

A.    We used to have something on bullying.  I don't know if that's still in here, but I would imagine it would be here, too.

Page 130

R. BALDUCCI

Q.    Okay.   Anything else you could think of?

A.    No.   I don't think so.   I mean, I think if I'm understanding this the right way, like the way I think about this is like, employees -- the way I interpret this is employees need to be able to bring concerns about anything that is in -- in -- in -- improper in any of our policies, right?   And so there's an understanding of you being protected against retaliation for any of those things.

Q.    For any complaints about -- sorry.   Go ahead.

A.    Yeah, it could be -- could be -- what is it called?   Investor trading? What is that?   Insider trading?   I'm not the head of finance.

COUNSELOR ZUCKERMAN:   We just can't help you, that's all.

COUNSELOR IADEVAIA:   You're looking for help.

THE WITNESS:   You're like we can laugh at you, but we can't help

Page 131

R. BALDUCCI

you.

COUNSELOR IADEVAIA:  Alright, thank you.  I'm going to mark as Balducci Exhibit 2 CBS7098, please.

THE WITNESS:  Thank you.

(Whereupon, a Nondiscrimination and Anti-Retaliation Policy was marked as Balducci Exhibit 2 for identification as of this date by the reporter.)

CONTINUED EXAMINATION BY COUNSELOR IADEVAIA:

Q.    Ms. Balducci, take a --

A.    Yes.

Q.    You can take a look at the document, but my first question is do you recognize this?

A.    Yes.

Q.    And what is it?

A.    It's the Nondiscrimination and Anti-Retaliation Policy.

Q.    And was this policy or a similar version of this policy in effect during the period that you were at CBS

Page 132

R. BALDUCCI

News?

A.    Yes.  Absolutely.

Q.    Okay.  I'm going to ask you to take a look at Page 4 of the document. There's a couple of different numbers on each of these pages.  There's one that the page number is for and then below that is what we call Bates number, CBS7101; do you see that?

A.    Yup.

COUNSELOR IADEVAIA:  And for the record, I didn't say, but this document, Exhibit 2, bears bates number CBS7098 through 7102, but let's focus on Page 4 for a second.

CONTINUED EXAMINATION BY COUNSELOR IADEVAIA:

Q.    If could you please take a look where it says, do see the bold subheading The Investigation?

A.    I do.

Q.    Can you please read that, there's like three paragraphs and then I have a couple of questions.

Page 133

R. BALDUCCI

A.    Absolutely.  "The investigation" --

Q.    You don't have to read it out loud.  Just to yourself.

A.    Okay.  I was happy to.  Okay.

Q.    Okay.  So my question for you is that this description of a procedure for conducting investigations imbedded within the document is part of the non-discrimination and anti-harassment policy, correct?

COUNSELOR ZUCKERMAN: Objection.

A.    Yes.

Q.    And is it your understanding that this guidance slash procedure is applicable to investigations beyond those related to discrimination under the policy?

COUNSELOR ZUCKERMAN: Objection.

A.    Yes.  Wait, beyond those --

Q.    Beyond those discrimination and imbedded within the policy; in other words, my question is:  Is this -- is this

Page 134

R. BALDUCCI

procedure slash guidance imbedded -- that is contained within the antidiscrimination policy, is this the same kind of procedure or guidance that applies to nondiscrimination investigations?

A.     Meaning like performance?

Q.     Any kind of other investigations you might conduct?

A.     (No response.)

Q.     I mean, we can go through it. So the first line says "any reported allegations of harassment, discrimination or retaliation will be investigated fairly, promptly, thoroughly and impartially by the Human Resources Department, CBS's Compliance Department or another appropriate party in a manner that provides all parties appropriate due process and reaches conclusions based on the evidence collected."  Do you see that text?

A.     Yes.

Q.     And did I read it correctly?

A.     Yes.  And that's a hundred percent accurate.

Page 135

R. BALDUCCI

Q.    And is that accurate for investigations that -- is that the process that you understand needs to be followed when there are investigations of alleged policy violations that are not specific to discrimination?

A.    Like misconduct?

Q.    Correct.

A.    Yes.

Q.    And it would be important, in your view, to conduct any investigation of policy violations fairly; is that -- is that --

A.    Absolutely.

Q.    And promptly?

A.    Absolutely.

Q.    And thoroughly?

A.    And thoroughly.

Q.    And impartially?

A.    Yes.

Q.    Okay.  And the -- that sentence talks about "in a manner that provides all parties appropriate due process," would that guidance or procedure, in your view,

Page 136

R. BALDUCCI

apply to any investigation of alleged misconduct?

A.    Yes.  I think -- I think what we considered due process is going to -- what that actually looks like is going to be different based on the situation we're dealing with, but yes, absolutely, due process.

Q.    And okay, and what kinds of due process have you provided in investigations that you conducted?

COUNSELOR ZUCKERMAN: Objection.

THE WITNESS:  But still answer the question?

COUNSELOR ZUCKERMAN:  Yes.

A.    A thorough and thoughtful and prepared interview where the person involved, the people involved are heard and get to speak their side.

Q.    And the term that -- one of the terms that we just went through is "promptly," what does that mean to you in doing investigations?

Page 137

R. BALDUCCI

A.    Promptly, to me, is as expeditiously as we can based on the circumstances, as soon as reasonably possible.

Q.    And do you think it's important to conduct investigations promptly?

A.    Absolutely.

Q.    And how come?

A.    Because if we've been made aware, it's the right thing for everybody, if we're made aware of a potential issue that rises to the level of -- of requiring an investigation, then it keeps everybody safer to move quickly to get to the end of it.

Q.    And how does moving quickly keep everybody safer?

A.    Moving quickly allows us to get to the end of it and get people out of purgatory, emotional and mental purgatory.

Q.    Any other ways?

A.    Gives us a solution faster, gets us faster to a solution so we can address and move past.

Page 138

R. BALDUCCI

Q.    And is -- is the -- is it, in your view, important to conduct investigations in a fair manner?

A.    Absolutely.

Q.    And in a manner that's impartial?

A.    Yes.

Q.    And why is that?

A.    Because everyone deserves -- it's just what's right.

Q.    Is it important to be, in your view, in conducting these investigations, impartial as it relates to both the person who made the complaint and the person about whom the complaint is made about?

A.    Absolutely, absolutely.  I don't know who is telling the truth at the start, you know, it's one person's word against another.

Q.    And in your view, is it important that in doing these investigations that both the person who made the complaint and the person who is the subject of the complaint receive some

Page 139

R. BALDUCCI

form of due process?

A.    Yes.

Q.    And outside of being, I think you said when you were talking about what -- you said due process can vary depending on the situation, and I think you said part of that could include or would include thorough preparation for an interview of the individual, correct?

A.    That's right.

Q.    Are there other types of due process in these investigations besides being thoroughly prepared for an interview?

A.    Considering all of the facts. Bringing a third party in, you know.

Q.    What do you mean "bringing a third party in"?

A.    Conferring with my employment law partner, conferring with my boss, you know, not making a decision in isolation or recommendation in isolation, conferring with the business.

Q.    And do you think it's important to provide this due process, whatever form

Page 140

R. BALDUCCI

it is, before -- before findings are made as part of an investigation?

A.     Before making a decision to terminate?  Yes.

Q.     Okay.  If you look at the last sentence of that first paragraph under The Investigation, it says that "As part of its investigation, CBS will review relevant documents, if any, which may include e-mails and text messages."  Do you see that text?

A.     I do.

Q.     And I read it correctly?

A.     You did.

Q.     And do you consider that either guidance or procedure to be part of all investigations of misconduct that you conduct?

COUNSELOR ZUCKERMAN:
   Objection.

A.     Again, where they're relevant. It says, if any.

Q.     Okay.  And if you look at that last paragraph within The Investigation

R. BALDUCCI

section, it says "Confidentiality will be maintained throughout the investigatory process to the extent consistent with a thorough investigation, appropriate corrective action and applicable law."  Do you see that text?

A.    Mm-hmm.  Yes.

Q.    And did I read it correctly?

A.    Yes.

Q.    Okay.  And is it your understanding that that principle was applicable to any investigations of misconduct including those beyond the nondiscrimination policy?

COUNSELOR ZUCKERMAN:

Objection.

A.    Yes.

Q.    And when conducting those -- when conducting investigations, were the individuals involved notified of confidentiality?

A.    Yes.

Q.    And did you do that as a manner of practice when you conducted these

Page 142

R. BALDUCCI

investigations?

A.    Yes.

Q.    Are there times where you've done investigations and interviewed people where you haven't told them to keep it confidential?

A.    I mean, I don't -- not that I can think of.

Q.    Okay.  And then if you look at the next subheading, it's called Responsive Action, if you could take a minute to read that, please.

A.    Mm-hmm.

Q.    You have had a chance to read it?

A.    I have.

Q.    And the paragraph lists Responsive Action and I'll just read it for the record.  "Responsive action may include, for example, training, referral to counseling, monitoring of the offender, and/or disciplinary action such as warnings, reprimands, withholding of a promotion or pay increase, reduction in

Page 143

R. BALDUCCI

wages, demotion, reassignment, temporary suspension without pay or termination as CBS believes appropriate under the circumstances." Do you see that text?

A.    I see that.

Q.    And did I read it correctly?

A.    You did.

Q.    Okay. And the -- the different options in terms of responsive action, were these responsive actions available to HR and managers when dealing with misconduct beyond just the violations of the antidiscrimination policy?

COUNSELOR ZUCKERMAN:
     Objection.

A.    Are they available? I mean, I don't know that we use all of these, first of all.

Q.    Okay.

A.    I don't know if I've ever seen some of these be used. This company doesn't take money away from people. Suspension without pay, I never used that. Reassignment, there's a lot of reasons you

Page 144

R. BALDUCCI

wouldn't want to reassign someone in a situation like this.  Again, demotion, this company doesn't do that.  Yeah, I don't -- I don't -- I don't know how to -- I don't know how to answer this question.

Q.    Okay.  So in terms of responsive actions that you have seen done, you have seen training, correct?

A.    Yes, I've seen training.

Q.    And has training been provided to an employee who has been accused of policy violations outside of the antidiscrimination context?

A.    Outside of the antidiscrimination context?

Q.    Yeah.

A.    You -- I -- I don't know.  I'm confused by your question.  If you're asking me if -- if -- if training has ever been employed as a responsive action in -- in a situation of retaliation that I'm aware of?

Q.    No, I'm asking any misconduct, any policy violations?

Page 145

R. BALDUCCI

A.    Policy violation, sure, where that makes sense.

Q.    Beyond just discrimination?

A.    Yes, where that makes sense.

Q.    Okay.  And what about counseling, referral to counseling?

A.    Yeah.  Yes.  Yeah.

Q.    And monitoring of the offender?

A.    Yes.  Yes.

Q.    And disciplinary actions which I guess the first one is warnings, have you --

A.    Yes.

Q.    And reprimands?

A.    Yes.

Q.    And withholding of a promotion, have you seen that?

A.    Yeah.  Actually, yes, that I've seen.

Q.    And withholding of a pay increase?

A.    Yes.

Q.    And as disciplinary action?

A.    Yes.

Page 146

R. BALDUCCI

Q.    And my question, just to be clear, that I just went through, you've seen those actions outside of just discrimination violations, correct?

A.    I've seen them for discrimination and I -- I guess other infractions.  I mean, just...

Q.    Are you aware of different responsive actions that are taken when someone is found to violate discrimination versus the policies more generally?

A.    No.

Q.    Okay.  That's good for that document.

COUNSELOR IADEVAIA:  I think we can take a lunch break.

COUNSELOR ZUCKERMAN:  Yup. Sounds good.

THE WITNESS:  Nice.

THE VIDEOGRAPHER:  The time is 1:02 p.m.  This marks the end of Media Unit number 2.

(Whereupon, a lunch was taken.)

THE VIDEOGRAPHER:  The time is

Page 147

R. BALDUCCI

2:01 p.m. and this begins Media Unit number 3.

CONTINUED EXAMINATION BY

COUNSELOR IADEVAIA:

Q.    Ms. Balducci, can you take a look at what was previously marked as Exhibit 2, again, and turn to that Page 4 that we were looking at previously. CBS7101.  Great.  And before the lunch break, we had spent some time talking about the section under the header The Investigation, my -- my question is whether you know of any other place in writing where Paramount sets forth information related to conducting investigations?

COUNSELOR ZUCKERMAN:
Objection.

A.    No.

COUNSELOR IADEVAIA:  Okay. That's all for that document.

THE WITNESS:  Okay.

CONTINUED EXAMINATION BY

COUNSELOR IADEVAIA:

Q.    During -- I want to focus on

Page 148

R. BALDUCCI

the period that you worked for CBS News -- during that or -- providing HR services to CBS News, during that time, what was the process for an employee who wanted to make a complaint?

A.    So the process would be that they have multiple channels to make a complaint.  They can make a complaint to their supervisor.  They can make a complaint to their supervisor's supervisor if there are concerns, if the issue is with their supervisor.  They can make a complaint to HR business partner.  They can make a complaint to through open line.  You know, you can make an anonymous complaint and then you can make a complaint to our law team, I believe, and I think there's a couple of other executives that are named as people you can complain to, but I couldn't think of them by name.

Q.    And is it a requirement that a employee complaint be made in writing?

A.    No.

Q.    Can a complaint be made orally?

Page 149

R. BALDUCCI

A. Absolutely.

Q. And as -- in your role in HR during the time that you worked to provide services to CBS News, did you ever receive complaints from employees orally?

A. Yes.

Q. And when you receive an oral complaint, did you ask the employee to put the complaint in writing?

COUNSELOR ZUCKERMAN:
Objection.

A. No, not always.

Q. Did you sometimes?

A. I've -- it's possible that we could. I can't think of a specific situation.

Q. You can't think of a time you did that?

A. Right.

Q. Okay.

THE WITNESS: You okay?

CONTINUED EXAMINATION BY
COUNSELOR IADEVAIA:

Q. And were there times that you

Page 150

R. BALDUCCI

learned of an employee complaint from a business leader?  Again, I'm focussing on this period when you were in CBS News.

A.    Learned of an employee complaint through a business leader?  Yes.

Q.    And how often did that happen?

A.    I mean, it's really hard to say.  It's hard to say.  I mean, every now and then that happens.  Yeah.

Q.    And was there any guidance, instruction, policies, about when a manager who had received a complaint should raise those concerns to HR?

A.    There -- our policies, our harassment, our discrimination policies, our BCS, they all have a -- there's an elevated expectation of anyone that manages people, and so people in a people management capacity have an elevated expectation to ensure that they are not only conducting themselves the right way, but that they are speaking up when there could be instances of issues that need to be addressed and they need to bring them --

Page 151

R. BALDUCCI

they should be bringing them to Human Resources.  That's in our trainings and in our policies.

Q.    And outside of the business conduct statement, are you aware of any other policies -- well, strike that. Outside of the two that we looked at, the antidiscrimination policy and the BCS, are you aware of any other policies where managers have that obligation?

A.    All of our policies.

Q.    After HR received -- and, again, I'm talking about when you provided services, you know, HR services to CBS News, after a complaint was made, what was the next step in the process?

A.    It would -- so it would really depend on what the complaint was and who was making the complaint.

Q.    Could you give me some explanation as to what you mean by that?

A.    If a complaint was brought to HR by a manager who is letting us know that someone under their employ was -- had

Page 152

R. BALDUCCI

complained to them, then the next step would be my team would get that to that person specifically.  You would get to the source.

Q.    And if -- if an employee came directly to HR to make a complaint, what would happen?

A.    We would hear them out.

Q.    And whether you received a complaint from management or conveyed by management or from an employee directly, did HR conduct investigations any time it got a complaint?

A.    No.  Not necessarily.

Q.    And what -- what situations would it conduct a complaint versus not conduct a -- I mean an investigation --

A.    An investigation?

Q.    Yeah.

A.    I mean, it really depends. It's really very circumstantial, but perhaps if an employee is coming and they're saying I feel like I'm being unfairly paid, I feel like I should have

R. BALDUCCI

been promoted and I haven't been promoted, in those, as examples, we would be hearing them out and if -- if it was as simple as -- it could be as simple as what kind of conversation have you had with your manager, perhaps we need to coach you around how to have a conversation with your manager.

Q.    And -- but -- but your answer is whether -- whether HR conducted an investigation or not really depended on the circumstances?

A.    It -- it -- it -- yes, it always depends on the circumstance.

Q.    And is there any particular factors that would likely -- more likely have led HR to do an investigation versus not?

A.    Yes.  If -- if we -- we had reason to believe a policy had been violated, or could be -- yeah, no, policy violation.  Policy violation is typically it.  Manage -- the other thing that could happen is it's a manager -- managerial

Page 154

R. BALDUCCI

issue, an issue between a manager and an employee, but it's a pattern and it's problematic and it's not going away, we will get more involved.

Q. And when there's a complaint of a policy violation, I think just to be clear for the record, you're saying that in those situations HR is more likely to conduct an investigation, correct?

A. Could you ask that again.

Q. Yeah, sure. So when there's an alleged policy violation, I think the point you were making before is in those circumstances it's more likely that HR would get involved?

A. Yes.

Q. And conducting an investigation is --

A. Yes.

Q. -- is one possibility?

A. Yes.

Q. When a complaint was made and there was a decision for HR to be involved on some level, whether it is an -- an

Page 155

R. BALDUCCI

investigation or not, who was notified, who was notified about the complaint?

COUNSELOR ZUCKERMAN:

Objection, but you can answer.

A.    Okay, again, it depends on the situation, but no one is notified until I have a -- we have a conversation with the person and we fully understand what's going on and then you have to determine who you're going to notify and when, you know, you're protecting the integrity of the investigation.

Q.    What do you mean by "protecting the integrity of the investigation"?

A.    You're only going to tell people that absolutely have a reason to know.  And maybe that reason to know is -- is that you need to ask them a question, you need information that they might have.

Q.    And what about when one employee complains about another, do you -- did you as a matter of practice notify the person who was the subject of the complaint?

Page 156

R. BALDUCCI

A.    No, not always.

Q.    Were there complaints that you received in which you did not notify the subject of the complainant at any point?

A.    Yes.

Q.    And what were those circumstances?

A.    Employees that are just having a spat with another employee and want to come and talk about it, want to put it on record.

Q.    And when it -- when a complaint reached the level of leading to an investigation, was it your practice to notify the person who was the subject of the complaint?

A.    Yes.

Q.    And how quickly did you provide that notification?

COUNSELOR ZUCKERMAN: Objection.

COUNSELOR IADEVAIA:  You can answer.

A.    It depends.  It depends

Page 157

R. BALDUCCI

because, you know, again, you've got to get -- you get your ducks in a row.  I get my ducks in a row before I go to the subject of a complaint because that's going to -- that's going to jar them.  It's going to have an impact on them, so I want to know exactly what I need to -- I want to have one conversation with them and I want it to be clean and I want it to be thorough and so I'm letting them know as soon as I have all the information I need.

Q.    And in any investigations that you conducted of employee complaints against another employee during the time you were working with CBS News, what was the longest period of time you took to notify the subject of the complaint?

A.    I would have no way of knowing.

Q.    Was there ever times where it was more than a couple of days?

A.    I -- again, I -- it could be, sure.

Q.    Do you recall a time --

A.    Yes.

Page 158

R. BALDUCCI

Q.    When it was more than a couple of weeks?

A.    I can't remember offhand.

Q.    You don't remember that happening?

A.    I don't remember that happening.  I don't remember that happening, but again, it depends on how long it took us to get the information that we needed, if there were multiple people to talk to then there's multiple people to talk to.  That takes some time.  If that's going to happen over a holiday, for example, or people aren't available, then it's going to -- it's going to make that time a little longer.

Q.    Again, focussing on the period when you were supporting CBS News, what was the range of amount of time it took to complete investigations?

COUNSELOR ZUCKERMAN:
Objection.

A.    I have never timed the amount of time it takes to complete an

Page 159

R. BALDUCCI

investigation.

Q.    Has there ever been a time where an investigation has taken more than a week to complete?

A.    Yes.

Q.    Has there ever been a time where an investigation took more than a couple of weeks, two weeks?

A.    Yes.

Q.    Was there ever a time where an investigation took more than three weeks to complete?

A.    Yes.

Q.    Was there a time when an investigation took more than a month to complete?

A.    Could be, yes.

Q.    Do you remember any instances of that?

A.    I mean, things don't happen overnight.

Q.    Yeah, I understand, and I know that it varies, but I guess my question is as you sit here today can you remember an

Page 160

R. BALDUCCI

investigation you did that took more than a month?

A.    No, I can't.

Q.    And can you remember an investigation that you did that took more than three weeks?

A.    Well, hold on.  When you -- what do you mean in terms of -- do you mean from the receiving the complaint to making the final determination?  Is that what you mean?

Q.    Well, what do you consider to be the length of time with an investigation, when would you consider it to start and end?

A.    If you're -- if that's -- if we're agreeing that that is the start and end, then yes, this can take over a month, absolutely.

Q.    And can you tell me instances when you worked at CBS News that happened?

A.    This one.

Q.    You mean involving Ms. Poolos?

A.    Yes.

Page 161

R. BALDUCCI

Q.    Other than Ms. Poolos, can you think of anything?

A.    I don't -- I can't -- I don't know.  I honestly don't know.

Q.    You don't remember?

A.    I didn't -- no.  I didn't prep by looking at all of my investigation, so it's been a long time.

Q.    You didn't prep by what?

A.    I didn't look at any old investigations.

Q.    All of your investigations that you've done since you were -- during the -- the time you were in CBS News?

A.    Yeah.  I mean, we're talking about a lot of information from a long time ago.

Q.    Just to be clear, the only period I'm talking about right now is from early 2020 to summer of 2022 just to be clear about that.

A.    No, I get that, but that's still like, you know, multiple years ago.

Q.    Whenever you did an

Page 162

R. BALDUCCI

investigation during that time, did you do any kind of -- did you do something in writing about your investigation?

A.    Always.

COUNSELOR ZUCKERMAN:
Objection.

CONTINUED EXAMINATION BY COUNSELOR IADEVAIA:

Q.    And what would that include?

COUNSELOR ZUCKERMAN:
Objection.

CONTINUED EXAMINATION BY COUNSELOR IADEVAIA:

Q.    Or what did that include?

A.    That would include all of the -- that would include the information that came, timeline notes from conversations, that's what that would include.

Q.    And would your investigation materials that were in writing, did -- did those -- did that include a -- a findings?

A.    Findings?

Q.    Based on your investigation what you found?

Page 163

R. BALDUCCI

A.    Yeah.  Yeah, of course.

Q.    And did you prepare like a report when you completed investigations?

A.    Did I prepare -- yes.  Yes. Yes.

Q.    And who was that report given to?

A.    I work with a law team on the report.  Yes.  Yes.

Q.    And were the reports shared -- was anything in writing shared with the individuals who made the complaint?

A.    No.  Well, hold on a minute. The individuals that make the complaint aren't getting details of findings. They're getting a final findings close out letter.

Q.    And the person who was the subject of a complaint, do they receive written findings or do they receive anything in writing?

A.    They typically receive something in writing that says it's closed out.

Page 164

R. BALDUCCI

Q.    Do they receive anything in details?

A.    No.  We don't share details.

Q.    And that the -- the other written materials that are, it sounds like not shared with either the person who made the complaint or the subject of the complaint, do you have -- do you keep those files somewhere or those materials somewhere at work?

A.    I would have them in my own files.

Q.    Do -- do they get put into any kind of database at the Company that you're aware of?

A.    No, we don't have that.

Q.    Okay.  After you completed an investigation, again, focussing on this period at CBS News, what would happen -- what happened next?

COUNSELOR ZUCKERMAN:
Objection.

Q.    As part of the process?

A.    I would be conferring with my

Page 165

R. BALDUCCI

boss, employment law and with the business head.

Q.    And for what purposes?

A.    To -- to decide what action we would take.

Q.    And did you make recommendations?

A.    Yes.

Q.    Every time you completed an investigation?

A.    Yes.

Q.    And who did you share those recommendations with?

A.    With my boss, with employment law and with the business head, the decision maker.

Q.    And during the time you were at CBS, supporting CBS News, just -- I think we covered this but to be clear, outside of the Plaintiff and the events planning employee, were there any other times that you recommended that an employee be terminated as a result of the investigation?

Page 166

R. BALDUCCI

A.    Can you ask the question again?

Q.    Sure.  Other than what you already testified to with Ms. Poolos and the events person, was there ever a time following an investigation in which you recommended termination of employment?

A.    Yes.

Q.    How many times?

A.    Well, I can think of one more.

Q.    Okay.

A.    Probably one more.

Q.    And what was that?

A.    This was involving the executive producer of The Evening News.

Q.    And who is that person?

A.    Jay Shaylor.

Q.    And when -- when did this happen approximately?

A.    During -- during my tenure at CBS News, that's really the best I could tell you.

Q.    Okay.  And what were the allegations against him?

A.    The allegations, harassment.

Page 167

R. BALDUCCI

Q.    Was it sexual harassment?

A.    It wasn't.

Q.    What kind of harassment?

A.    I think it was -- it was like -- I think it was -- actually, it was -- it was discrimination and harassment.  I think it was a little more gender.

Q.    And who had made the complaint? You can tell me the title of the person or was there more than one complaint?

A.    There was more than one.

Q.    How many, do you remember?

A.    I don't remember.

Q.    And were the complaints of gender discrimination and harassment similar from the individuals who made the complaints?

A.    Mm-hmm.

Q.    I just need a yes or no.

A.    Yes.

Q.    Had Mr. Shaylor ever received a warning before his employment was ended?

A.    This -- yes.  Yes, he did.

Q.    And what --

Page 168

R. BALDUCCI

A.    He did.

Q.    And what was he warned for?

A.    I mean, now we're going way back and I think his warning was before my time, too, so this is harder for me to speak to.

Q.    Was the warning related to the conduct that he was ultimately fired for?

A.    Yes.  Although I think it was also a little harassment, bullying, it was -- there was something big that had happened before I even joined the team.

Q.    And did you conduct that investigation?

A.    No.

Q.    Who conducted that --

A.    I wasn't involved in that.  I wasn't there yet.

Q.    No, no, no, I'm sorry.  For the more recent event that led him to losing his job, did you conduct the investigation?

A.    I did not.  This was serious, significant, involved an AP, and our Employee Relations Team had bandwidth so

Page 169

R. BALDUCCI

they took it.

Q.    Do you remember who at Employee Relations?

A.    Yes, Jennifer Gordon.

Q.    Did you make any kind of recommendation in connection with that investigation?

A.    I didn't.  This -- well, this would have been Jennifer's recommendation that she brought to us.  She brings the recommendation to HR to employment law to the business.

Q.    Okay.  And who was -- who -- and the -- was the recommendation to terminate Mr. Shaylor's employment?

A.    It was to terminate him.

Q.    And that -- that recommendation was accepted or adopted, correct, that was carried out?

A.    Yes, it was.

Q.    And who made the decision to carry it out?

A.    Neeraj Khemlani.

Q.    Okay.  Outside of what you've

Page 170

R. BALDUCCI

testified to, are there any other instances that you're aware of in which a recommendation was made by Employee Relations or Human Resources to terminate the employment of someone?

A.    Not that I can think of.

Q.    During the time you were at -- providing support to CBS News, were you aware of any investigations where the recommendation by either Employee Relations or Human Resources was to issue a written warning?

A.    Yes.

Q.    And how many of those -- how many -- how many times did that happen?

A.    It's so hard to say.

Q.    More than ten times?

A.    Hard to say.

Q.    Okay.  How many times were you personally conducting the investigation where that was the outcome, a written warning?

A.    It is very hard to say.

Q.    Can you tell me any of the

Page 171

R. BALDUCCI

times that you remember that happening?

A.    Yeah, I recall -- I recall a -- one of our -- let me think about this for a second.

Q.    Sure.

A.    We had a -- I don't know if her title was VP or director in our Records Department and the team was very unhappy, was complaining.  She was saying some off color things and so, yeah, so the first thing we did with her was we -- her boss gave her feedback, recapped that conversation in writing and the second time it came up, my team put a -- a written warning in front of her.

Q.    And I'm sorry, what was this person's job?

A.    She was in our Records Department.

Q.    For CBS News?

A.    For CBS News.

Q.    And who was her --

A.    It was in the Operations Team.

Q.    Who was her manager?

Page 172

R. BALDUCCI

A.    Rick Jefferson.

Q.    And the second time these issues came to HR's attention, I think you said a written warning was issued, who drafted that written warning?

A.    One of my direct reports.

Q.    In HR?

A.    Mm-hmm.

Q.    And you said that she had made or was alleged to have made off color remarks, what were the remarks?

A.    Honestly, they were -- I don't remember them.  I don't remember them at all.

Q.    Okay.  Other than the off color remarks, was there other conduct that led her to getting a written warning?

A.    No, it was a pattern of making inappropriate comments that her team found uncomfortable and offensive.

Q.    Were there any concerns raised that the comments were racist?

A.    No.

Q.    Sexist?

Page 173

R. BALDUCCI

A.   I don't remember.

Q.   Okay.  Were there other instances or are there other instances as you sit here now where a written warning was recommended by Employee Relations or Human Resources other than what you just testified to?

A.   No.

Q.   During the time you were providing HR support for CBS News, were you involved in any investigations related to 60 Minutes employees besides Ms. Poolos?

A.   No.

Q.   And were you aware of any investigations other than related to Ms. Poolos?

A.   No.

Q.   And the employee within the Specialty Events Group that was accused of sexual harassment, what's that employee's name?

A.   I don't remember that employee's name.

Q.   And I'm sorry if you told me

Page 174

R. BALDUCCI

this, but who did that employee report to?

A.    David Reiter.

Q.    I think you did mention that

okay.  And what was Mr. Reiter's position?

A.    He was the head of Special

Events.

Q.    Did you discuss the Special

Events employee who was ultimately let go,

did you discuss that person with Neeraj?

A.    I would have let him know.  I

would have given him just, hey, here's

where we are, this is happening.

Q.    Why did you let him know?

A.    Just make sure he's across it.

Q.    Meaning he's aware of what's

going on?

A.    Often -- yeah, I mean, it's the

business leaders that will bring that to

their boss, but I will sometimes check in

and make sure because if he doesn't hear it

from them and he doesn't hear it from us

then, you know, it's not a good look.

Q.    And was Neeraj involved at all

in any of the decisions related to the

Page 175

                    R. BALDUCCI

employee within Special Events?

        A.      No.   He didn't need to be.

        Q.      Why do you say that?

        A.      Because he has an SVP head of

Special Events to make that decision.

        Q.      That's Mr. Reiter?

        A.      Yeah.

        Q.      And I think when I asked you

this earlier you said you didn't recall if

you'd spoken to Mr. Neeraj about Ms.

Poolos; is that correct?

        A.      I really don't -- I don't

recall.

        Q.      Do you recall whether Mr. Owens

told you if he spoke to Neeraj about Ms.

Poolos?

        A.      I don't recall, but I feel like

he would have.   Like that would have been

Bill go talk to Neeraj.   Go cover off with

Neeraj.   He needs to know.

        Q.      I am sorry?   I don't know that

phrase, cover off --

        A.      Like ensure he knows.

        Q.      And other than Ms. Poolos

Page 176

R. BALDUCCI

during the time that you were providing support for CBS News, was there -- and also this employee within Special Events, besides the two of them, was there any other instances of -- of a CBS News employee being placed on paid administrative leave?

A. Not that I can think of.

Q. Okay. Focussing again on that two-plus year period where you were providing HR support for CBS News, were you aware of -- of any concerns or complaints about an employee named Matt Richmond?

A. No.

Q. Were you part of -- do you know who Matt Richmond is?

A. I don't.

Q. Were you part of any discussions with Ms. Simons about Matt Richmond?

A. No, not that I can recall.

Q. Were you part of any discussions with Mr. Owens about Matt Richmond?

Page 177

R. BALDUCCI

A.    Not that I could recall.

Q.    Okay.  Were you ever made aware of a concern or a complaint at 60 Minutes by multiple producers about a senior editor?

A.    (No response.)

Q.    Just need you to say yes or no. Sorry.

A.    No, not that I -- is there a name?

Q.    Well, I'm talking about Matt Richmond, but I'm wondering if ever had discussions --

A.    Oh, if it would prompt me?  No.

Q.    Were you aware of any complaints by Ashley Velie?

A.    No, I've never heard of that name.

Q.    Were you aware of any complaints or concerns made by Draggan Mihailovic?

A.    No, I don't know that name.

Q.    How -- when you were in your role in CBS News, did you meet regularly

Page 178

R. BALDUCCI

with Mr. Owens?

A.    I did.

Q.    Did you meet --

A.    Yes.

Q.    -- regularly with Ms. Simons?

A.    I did.

Q.    And did you meet regularly with them at the same time or separately or both?

A.    Both.

Q.    Yeah.  Okay?

A.    We did, both.

Q.    Did you have regular one-on-one meetings with Mr. Owens?

A.    You're making me think about this.  Might be that we did a lot of our -- we might have done a lot of our one-on-ones actually three way, the three of us.

Q.    Meaning you with --

A.    Me, Tanya and Bill because she was helping him run the place, but I've also, for sure, had conversations one-on-one with Bill and one-on-one with Tanya.

Page 179

R. BALDUCCI

Q.    Meaning without the other?

A.    Yes.

Q.    And the meetings that you're recalling with Mr. Simons, I mean Ms. Simons and Mr. Owens, were those weekly meetings?

A.    Weekly meetings.

Q.    And did you meet by Zoom in person?

A.    Both.  Both.

Q.    Yeah, and approximately how long were those meetings each week?

A.    It's a good question.  I would think we set them for 30 minutes.

Q.    And, generally, what did you discuss with Ms. Simons and Mr. Owens at these meetings?

A.    What's going on in their business, anything I need to know about, what is it they should by focussed on from a people perspective that's coming down from corporate, things like that.

Q.    And did you discuss Ms. Poolos during any of these meetings with them?

Page 180

R. BALDUCCI

A.    Yes.

Q.    And did you discuss Ms. Poolos in connection with Ms. Richards' complaint?

A.    Yes.

Q.    Did you discuss Ms. Poolos with them about anything else during these meetings?

A.    No.

Q.    Did you discuss other employees beyond Ms. Poolos during those meetings -- 60 Minutes employees, during those meetings with Ms. Simons and Mr. Owens?

A.    Yes.  If there was something that was happening in the business that I knew about that I needed to bring to them, I would bring that.  If there was something they knew, they would bring to me.

Q.    And during those one-on-one meetings, not one-on-one because there were three of you, during those meetings that you had, outside of Ms. Poolos, do you recall any specific concerns or complaints raised about 60 Minutes employees that were discussed?

Page 181

R. BALDUCCI

A.    Yes.

Q.    And what do you recall?

A.    I recall that we had an employee who -- that -- give names?  Am I giving names?  Mark LaGanga was very upset with one of their supervising producers, I can't remember, she's sort of an operations person, Ann Marie Kross, so that name, those names, her name came up, I mean, a number of times.

Q.    Who else?

A.    I mean, that's really the one. Let me think for a second.

Q.    Sure.

A.    A problematic -- you know, I can't think of a name right now, but there was, yeah, there was actually an occasion where Bill wanted to let me know that business affairs had approached him about a -- a contract that they were going to renew and he had a concern because the producer hadn't done more than one story that year and so, you know, asked me for some guidance which I gave him, I cannot

Page 182

R. BALDUCCI

remember the name of that producer.

Q. Was it Katherine Davis?

A. That sounds right, yeah.

Q. And what was the guidance that you gave?

A. I believe I told him to have a conversation with her. You know, before you go to just not renew her contract, have you been direct with her about the fact that she's not delivering as many stories as you would expect her to.

Q. Do you know if Mr. Owens talked to her?

A. Yes, he told me he talked to her.

Q. Anybody else?

A. Not that I can think of right now.

Q. Are you aware of any concerns raised by 60 Minutes employee Shari Finkelstein or Finkelstein?

A. No.

Q. Are you aware of any concerns or complaints raised by someone named Kara

Page 183

R. BALDUCCI

Vaccaro?

A.    No.

Q.    Are you aware of any concerns or complaints about someone named David Levene?

A.    No.

Q.    Are you aware of any concerns or complaints raised by someone named Sharon Alfonsi?

A.    No.

Q.    Are you aware of any concerns or complaints raised by someone named Nicole Marks?

A.    No.

Q.    Are you aware of any concerns or complaints raised by someone named John Orthine (phonetic)?

A.    No.

Q.    Were you ever told about concerns related to a associate producer who -- on 60 Minutes who had anger management problems?

A.    Can you say more?

Q.    Sure.  Were you did Ms. --

Page 184

R. BALDUCCI

strike that.  Were you aware of any concerns or complaints about a 60 Minutes employee who slammed the door in the face of another employee?

A.    This isn't ringing a bell.

Q.    Okay.  Do you know an employee or are you familiar with an employee named Will Croxton?

A.    No.

Q.    Are you aware of any complaints or concerns about Mr. Croxton?

A.    No.

Q.    Are you aware of an employee named Michael Radutzky?

A.    No.

Q.    Are you aware of an employee named Ira Rosen?

A.    Yes.

Q.    What do you know --

A.    I just know the name.

Q.    Are you aware of any complaints or concerns about Mr. Rosen?

A.    I mean, nothing that I can think of.

Page 185

R. BALDUCCI

Q.    Are you aware of an employee named Michael Gabshon (phonetic)?

A.    No.

Q.    Are you aware of a lawsuit that was filed against CBS by ███████████ ██████████?

A.    No.  I mean, the name rings a bell, but I don't know.

Q.    Are you aware?

A.    I need more.

Q.    Are you aware of allegations made that a producer had sent his associate producer a picture in which his genitals were visible?

A.    I don't think so.

Q.    Are you aware of any allegations by an associate producer against a producer at 60 Minutes about the producer being intoxicated at work or work events?

A.    No.  I would need more information because that's not ringing a bell either.

Q.    Are you aware of any

Page 186

R. BALDUCCI

allegations of Mr. Gabshon retaliating against his associate producer?

A.    No.

Q.    I think -- let me just ask, were you ever part of any discussions about taking disciplinary action against Mr. Gabshon?

A.    No.

Q.    Were you ever a part of any discussions about firing Mr. Gabshon?

A.    No, none of this is ringing a bell.

Q.    Are you aware of any concerns or complaints about an employee named Rich Bonin?

A.    This name is ringing a bell. But I -- I don't -- I can't, so far, put together anything around it.

Q.    Are you aware of any complaints about Rich Bonin being a bully?

A.    I don't think so, no.

Q.    Are you aware of any concerns -- are you aware of any concerns or complaints about Mr. Bonin mistreating an

Page 187

R. BALDUCCI

employee due to her pregnancy?

A.    No.

Q.    Are you familiar with an employee named Dan Bussell?

A.    Only in that -- only in that I know the name and I believe that person had an issue with Ann Marie Kross at some point.

Q.    Are you aware of any concerns or complaints about Mr. Bussell?

A.    No.

Q.    Are you aware of any concerns or complaints about Mr. Bussell sexually harassing a woman or women?

A.    No.

Q.    Are you a -- was there an employee at 60 Minutes named Jennifer Dupree (phonetic) in your role?

A.    I don't recall.  I think so.  I don't recall.

Q.    And do you know if she still works at 60 Minutes?

A.    I don't know, no.

Q.    Was she let go during the time

Page 188

R. BALDUCCI

you worked there?

A.    I honestly don't know.

Q.    When you worked for CBS News was there an employee named Vanessa Fica, F-I-C-A?

A.    Do you know what her role was?

Q.    I believe she was an AP an co-producer.

A.    Name's familiar.

Q.    Do you know whether we mentioned couple of a minute ago Katherine Davis, do you know if Ms. Davis still works for 60 Minutes?

A.    I have no idea.

COUNSELOR IADEVAIA:  Just give me one second.

CONTINUED EXAMINATION BY

COUNSELOR IADEVAIA:

Q.    Outside of whatever contact and dealings you had with Ms. Poolos that's the basis of this lawsuit, did you ever have any dealings with -- any other dealings with Ms. Poolos?

A.    For the basis of this lawsuit?

Page 189

R. BALDUCCI

Outside of the basis of this lawsuit, no.

Q. Did you -- did -- are you -- before Ms. Richards -- at some point Ms. Richards made a complaint about Ms. Poolos, correct?

A. Mm-hmm.

Q. I just need a yes or no.

A. Yes.

Q. Before Ms. Richards' complaint, were you aware of any complaints or concerns about Ms. Poolos?

A. No.

Q. Were you part of any discussions with Ms. Simons or Mr. Owens about Ms. Poolos before Ms. Richards' complaint?

A. No. No negative conversations and, in fact, if I can go back to an earlier question that you asked?

Q. Sure.

A. Have I had any dealings with Alex before this complaint, as I think about it, I do feel like we've had an exchange. Yes, I just feel like we've had

Page 190

R. BALDUCCI

exchanges in the past.  We never met in person.

Q.    What were those exchanges?

A.    I don't remember.

Q.    But it was not anything negative?

A.    No, absolutely not.

Q.    Did you have any role in hiring Ms. Poolos?

A.    I didn't.

Q.    What was your understanding of her job at CBS?

COUNSELOR ZUCKERMAN:
  Objection.

A.    She was one of our producers.

Q.    And specifically for which show?

A.    For 60 Minutes and she was assigned to Lesley Stahl.

Q.    And we'll get into Ms. Richards' complaint, but did you have any knowledge of Ms. Poolos's job performance when she was there?

A.    I -- I -- let's just say this,

Page 191

R. BALDUCCI

no news is good news.

Q.    Do you know if Ms. Poolos had a contract while she worked at -- for the Company?

A.    I would imagine she did because everybody at 60 Minutes, if you were a producer or not, had a business affairs agreement.

Q.    And do you know whether Ms. Poolos's contract -- strike that.  How -- do you know what the terms of Ms. Poolos's contract was?

A.    No.

Q.    Do you know when it was most recently renewed?

A.    No.

Q.    Did you have any role in renewing Ms. Poolos's contract?

A.    I can't remember.

Q.    Do you recall having a discussion with Mr. Owens about renewing Ms. Poolos's contract?

A.    I don't.

Q.    Is it likely the case that with

Page 192

R. BALDUCCI

-- the dealings with, as it related to Ms. Poolos's contract were handled by business affairs?

A.    I would say so.

Q.    Do you know whether Ms. Poolos was promoted during the time she worked for the Company?

A.    I know that she was promoted from associate producer to producer during her tenure.

Q.    How do you know that?

A.    I know that because I was an HR person, I just know that.

Q.    Were you involved at all in the promotion decision?

A.    No.

Q.    Do you know when she was promoted?

A.    No.

Q.    Did you play a role in any performance evaluations as it related to Ms. Poolos?

A.    Absolutely not.

Q.    Do you know if she had any

Page 193

R. BALDUCCI

performance evaluations during the time that you were at -- providing support to CBS News?

A.    I sure hope she did, but no, I wasn't policing who had an evaluation and who wasn't.  I was only encouraging that everybody did the right thing and gave performance reviews.

Q.    And after the -- to your knowledge, did Mr. Owens conduct performance reviews of his producers during that time?

A.    Yeah, he -- I believe he did.

Q.    And did you have any role in the process of him conducting those reviews?

A.    Only in that I ensured he and Tanya and his senior team understood what the process was, how to navigate it and how to plan of attack and help them with communication, how to think about a communication plan.  When I came in, they weren't doing performance reviews.  Like this was -- I had to hold their hand.

Page 194

R. BALDUCCI

Q.    And when Mr. Owens did performance reviews, were they put into any kind of system, company system?

A.    Yes.  Oh, actually, that's a good question.  I don't know if it was done in a system.  I feel like they were like word documents.  They were sort of just documents that needed to be saved, I don't remember.

Q.    And did you take a look at the performance reviews either before they were given to the employer or after?

A.    No, no, no, but now that I think about it, I feel like I remember we transitioned while I was supporting 60 Minutes from those offline word documents to a system.  Got them to use a system.  So there should be now, unfortunately, everything keeps changing at this company, we've changed systems again since then, but yes, I believe that they were putting things in a system.

Q.    At some point during your tenure at CBS --

Page 195

R. BALDUCCI

A.    Yeah, yeah, yeah, I believe I helped them with that.

Q.    And in the context of an investigation related to Ms. Poolos, did you look at her performance -- any performance reviews that were available?

A.    No, I would have no reason to look at Alex's performance review.

Q.    Why do you say that?

A.    Because I don't -- I don't look at employees performance reviews.

Q.    How come?

A.    Because there's no reason for me to look at them.  If theres an issue with performance, then I'll take a look at a performance review, but there was no issue with Alex's performance such that I would need to look at her performance review before this issue arose.

Q.    And was there anything that came up during your investigation that led you to look or think you should look at any performance reviews?

A.    No.

Page 196

R. BALDUCCI

Q.    Okay.  Do you know how long Ms. Poolos worked for Paramount and its predecessors?

A.    Many years.

Q.    Do you know if it was ten or more years?

A.    It was definitely more than ten years.

Q.    And was that a factor at all in your investigation, how long she had worked for the Company?

A.    No.

COUNSELOR ZUCKERMAN:

Objection.

CONTINUED EXAMINATION BY
COUNSELOR IADEVAIA:

Q.    How come it wasn't a factor? Why didn't it matter?

COUNSELOR ZUCKERMAN:

Objection.

A.    Why didn't it matter?  It just wasn't relevant.  It wasn't relevant.

Q.    Outside of Ms. Richards' complaint and the subsequent investigation,

Page 197

R. BALDUCCI

did you have any discussions with Maria Cottone about Ms. Poolos?

A.    Can you ask that one more time?

Q.    Sure.  Outside of Ms. Richards' complaint and the investigation, did you have any discussions with Maria Cottone about Ms. Poolos?

A.    No.

Q.    And the same question, but did you have any discussions with Collette Richards about Ms. Poolos, meaning outside of the complaint and investigation?

A.    No.

Q.    Did you have any discussion with Cindy Glasgow outside of the complaint and investigation --

A.    No.

Q.    -- about Ms. Poolos?

A.    No.  Although, I just want to clarify for a second, when you say outside of this complaint and investigation where we are to include Collette's complaint that she made that came to me that I got the details of on the 30 -- the 30th?

Page 198

R. BALDUCCI

Q.    You're talking about December 30th, 2021?

A.    December 30th.

Q.    Yeah, so?

A.    So that's part of this?

Q.    Yes.

A.    Good.  Then I stick with my answer.

Q.    Sounds good.  Outside of Ms. Richards' complaint that you received in December of 2021, had you had any dealings with -- with her before then?

A.    Collette?

Q.    Yes.

A.    No.

Q.    Was she ever the topic of any discussions that you had with Mr. Owens or Ms. Simons?

COUNSELOR ZUCKERMAN:
    Objection.

CONTINUED EXAMINATION BY COUNSELOR IADEVAIA:

Q.    Let me break it up.  Did you ever have any conversations with Mr. Owens

Page 199

R. BALDUCCI

about Ms. Richards before her December 2021 complaint?

A.    Not that I recall.

Q.    Any conversations about Collette with Ms. Simons before her December 2021 complaint?

A.    No, not that I recall.

Q.    Did you have any role in hiring Ms. Richards?

A.    No, other than just approving the work that the TA Team did, no.

Q.    What do you mean the TA Team?

A.    The Talent Acquisition Team.

Q.    And at the time of Ms. Richards' complaint in December of 2021, what was her job?

A.    Ms. Richards?

Q.    Yeah.

A.    She was the associate producer working under Alex on Lesley Stahl's team.

Q.    At 60 Minutes, right?

A.    At 60 Minutes.

Q.    Did you know anything about Ms. Richards' performance at the time she

Page 200

R. BALDUCCI

made her complaint?

A.     I didn't.

Q.     Know anything about the stories that she had worked on?

A.     I didn't, no.

Q.     All right, so moving into the period now in which, you know, is basically December of 2021 through February of 2022, did you become aware of any concerns that Ms. Poolos had about Ms. Richards?

A.     That Ms. Poolos had about Ms. Richards?  I believe the first time I heard that there were concerns, that Alex had concerns with Collette wasn't until after -- I don't think that was until January.  When Bill had brought to her concerns that Collette had.  That's the first I heard that Alex had concerns with Collette.

Q.     And what concerns were you made aware of through Mr. Owens or anybody else about that Ms. Poolos had about Ms. Richards?

A.     She had perceived her work to

Page 201

R. BALDUCCI

be subpar.  She had felt that she was asking for unrealistic things in terms of time off and flexibility.  I think that was it.

Q.    And did you learn what concerns Ms. Poolos had related to Ms. Richards subpar work?

A.    I recall that she felt that she -- that her copy editing wasn't great and I think it really had to do with she wanted her to be available all the time and they -- and, you know, Collette was -- Collette thought that there should be some boundaries.

Q.    And what did you learn about Ms. Poolos's concerns about Ms. Richards taking time off?

A.    What did I learn about Alex's concerns about Collette taking time off?

Q.    Yes.

A.    I learned that there were a few instances where -- I mean, here's what I learned.  I learned that this was a situation that was -- that was like rife

Page 202

R. BALDUCCI

with challenges in that Collette was hired and was going to need some time off because she was getting married and so that had been clearly communicated.  That being said, you know, there would be a shower and there would be a wedding date, there would be things, there would be a honeymoon and Alex was struggling with the fact that she would actually need time off and thought that Collette should be more flexible.

Q.    And how did Ms. Poolos present this to you?

A.    Ms. Poolos presented this to --

Q.    Or to --

A.    -- her boss.

Q.    Mr. Owens?

A.    She presented that to her boss.

Q.    Did -- was it your understanding that Ms. Richards was given time off for her wedding?

A.    Yes.

Q.    And was it your understanding that Ms. Richards was -- strike that.

A.    If you want me to answer

Page 203

R. BALDUCCI

that -- I'm going to go back to that last answer.

Q.    Sure, go ahead.

A.    Yes, it was my understanding she was given time off for her wedding because Tanya Simons saw to it that she was going to get time off for her wedding.

Q.    And what do you mean by that?

A.    What I mean by that, as I'm sure you've seen through all of the information you've sorted through, Alex made Collette's wedding difficult for a long period of time.  She put undue stress on her because that wedding was coming. And ultimately it took Alex, also, rather than go directly at this issue with her bosses, which I would think a producer would do, think about resourcing, think about backup plans rather than ensure someone else could step in if God forbid that show landed on her wedding, she didn't.  And she -- she -- she kept this information from Lesley Stahl.  She kept it from everybody, so we got to a point where

Page 204

R. BALDUCCI

Collette had to go to Tanya Simons and say I have a wedding, I've always had a wedding and I'm feeling very pressured that I'm not going to be able to make my wedding and Tanya Simons had to assure her that she would have the time off.

Q.    And how do you know that?

A.    I know that because I've worked with these people.

Q.    Well, were you aware of it at the time of Ms. Richards' wedding?

A.    At the time of her wedding?

Q.    Yeah or around the time of her wedding?

A.    Yeah, I knew that Tanya had assured her that she would have the time off.

Q.    And how did you know that?

A.    I know that from talking to Tanya.

Q.    And your understanding is that Ms. Richards went to Ms. Simons, did Ms. Richards tell you that or Ms. Simons?

A.    Ms. Simons.

Page 205

R. BALDUCCI

Q.    And have you ever spoken to Ms. Poolos about this?

A.    No, I have not.

Q.    Has anyone, to your knowledge, spoken to Ms. Poolos about this?

A.    I would think that her manager would have, Bill -- Bill or Tanya.

Q.    Do you know if they did?

A.    I don't know.

Q.    Did they tell you that they did?

A.    No, they didn't tell me that they did.

Q.    Do you know of any specific concerns that Ms. Poolos had about Ms. Richards seeking to take time off other than what you testified to?

A.    I recall there was some frustration that she had around a drive to Georgia or something, but I can't give you details around that.  It -- it just, to me, you guys are like talking passed each other.  We've got to get you guys to talk to each other, figure this out.  There's

Page 206

R. BALDUCCI

got to be a way to sort through this. There's got to be a better way was my thoughts at the time.

Q.    Did you express that to anyone?

A.    I expressed that by asking Bill and Tanya to please get involved.  This was not something I needed to get involved in.  This was, you have a producer who I don't know of any performance issues with and an employee who is asking to be transferred to another team because she feels bullied and harassed and heckled and managers you've got to reset this.  You've got to get closer to this.  You've got to hear them both out.  You've got to form an assessment and you've got to help them move past this with a reset.

Q.    Did you have -- strike that. We'll get to more specifics.  Have you ever heard of a person named Barney Gimbel?

A.    I haven't.

Q.    Have you ever heard of any concerns or complaints about Ms. Richards by a publicist?

Page 207

R. BALDUCCI

A.    No.

Q.    Have you ever heard of any concerns or complaints about Ms. Richards where there was a threat made that a publicist or PR person was going to pull a story from 60 Minutes?

A.    No.

Q.    Are you aware of any concerns or complaints made about Ms. Richards by someone named Jason Rezaian?

A.    No.

Q.    Are you aware of any concerns or complaints about Ms. Richards by Washington Post columnist?

A.    No.

Q.    Are you aware of any complaints or concerns about Ms. Richards being rude?

A.    No.

Q.    Are you aware of any concerns made by or raised by another associate producer about Ms. Richards?

A.    No.

Q.    Aware of concern that Ms. Richards had refused training that was

Page 208

R. BALDUCCI

offered to her?

A.    No.  No.  I had never heard a complaint about Collette until Alex shared the complaint with Bill in January.

Q.    When was the first time that you learned about Ms. Richards' complaint about Ms. Poolos?

A.    I -- she had reached out on December 17th, so I knew that there was something that she wanted to speak about and I knew it had to do -- she had conveyed it was she was having trouble with her producer, Alex, I knew that.  I had needed some help and so, you know, immediately asked Maria Cottone if she could please get involved and take that account from Collette, so I -- I had known then that there was an issue.  It was not until December 30th that that meeting -- that I got the meeting notes, the meeting had happened and I got the notes and that that was because Collette, after asking for a meeting, then couldn't take a meeting for about two weeks, so that's -- that's

Page 209

R. BALDUCCI

because of her shoot schedule and Maria respected that, so it was on the 30th that I learned the details of Collette's complaint.

Q.    On the 17th, what did you know other than what you testified to?

A.    Nothing.

Q.    And how did you learn about the complaint, generally?

A.    How did I learn about --

Q.    The complaint generally on December 17th, how did it come to your attention?

A.    On December 17th, if I remember correctly, it was a combination of Collette trying to reach out to HR and Tanya Simons telling me that Collette was trying to reach out to HR.

Q.    And how did Ms. Simons communicate that to you?

A.    She either e-mailed me or texted me.

Q.    And you said you knew that Ms. Richards had reached out to HR, too,

Page 210

R. BALDUCCI

how did you know that other than from Ms. Simons?

A.    I can't remember that actually. I can't remember, but the way that -- when I go back and look at my own notes, the way that I responded to Tanya saying, oh, yeah, all good. We got her, we're going to talk to her. It seemed to me that she might have also reached out to me. But, again, I'm dealing with a lot, I got a lot going on and I immediately say, alright, I'm going to need help. Maria, can you take this one.

Q.    And do you know, was -- when Ms. Poolos was notified of Ms. Richards' complaint?

A.    Ms. Poolos would have been notified about Collette's complaint in her conversation with Bill and Tanya on the 5th of January.

Q.    And to your knowledge, was that the first time that Ms. Poolos was notified of the complaint?

A.    Yeah, to my knowledge, yes. I

Page 211

R. BALDUCCI

mean, we're talking about, like, New Year's.  This is -- is all coming in over New Year's and so if I recall correctly -- if I recall correctly, we were only in-taking on the 30th and the 31st and then you have like the New Year.  I think Monday was the 3rd and that was immediately when Alex and -- actually, now I regrouped with Bill and Tanya probably on the 3rd or the 4th, I know guys are going to speak to Alex, you know, let's -- let's -- let's be united in this, right?  Like Collette's not happy, she's, you know, asserted all of these complaints, you know, are we all on the same page.  You guys really just need to have a conversation with both of them. Tanya had already done Collette, so now she was ready to talk to Alex.  Bill wanted to be there, too, and it was, hey, let's get Alex's account.  Let's hear her side of this.  Hear her side of this based on what's come to us and then see if we can reset them.

Q.    Between December 17th and

Page 212

R. BALDUCCI

December 30th after you became aware of the complaint, did you have any discussions about it, I mean beyond what you already testified to?

A.     No.  I had a conversation with Collette.

Q.     When did you have a conversation with Collette?

A.     I had a conversation with Collette -- when did I have a conversation with Collette?  I had a conversation with Collette on the 31st of December, so I had gotten Maria's notes on the 30th, I read them through, okay, well, all right, this isn't good, but let's, you know, let's let -- let's let Tanya and Bill get in here. Then I got a call from -- I got a call from Collette or she reached out saying that she was upset so now she wanted to talk to me. Also, she knew that Maria Cottone was now going on vacation, something must have happened between her and Alex that day, and so now she's telling me things -- a very brief recap of her complaint that was, you

Page 213

R. BALDUCCI

know, elongated in her written summary. And really what she was saying was I just don't trust my manager, she treats me terribly and, you know, it's just -- this is untenable and why can't you just reassign me and I calmed her down and I said, listen, Collette, that's just not the way we do things, so what I'm going to ask you to do is I'm going to ask you to trust me. I'm going to get involved. What does that mean, I'm going to get your managers, I'm going to need you to trust me. I'm going to talk to Bill, I'm going to talk to Tanya, I'm going to ask them to talk to Alex, have a conversation, and if they believe that this can be reset, I'm going to ask you to give her the benefit of the doubt that she can do that and you need to give her a chance to show up differently. And by the time that conversation was over, Collette was on board. Thank you. I feel supported. You know, you're probably right, you know, I agree. I need to give her a chance. Thank you.

Page 214

R. BALDUCCI

Q. And this is -- your testimony is that that's what Ms. Richards said to you on December 31st?

A. 31st.

Q. When you said to -- I think your testimony was you said to Ms. Richards that's not the way we do things, what did you mean by that?

A. We don't just reassign people across teams because they're having a problem with their manager. We solve the problems. Right? We don't move them. That's not helping anything.

Q. Are you aware that Ms. Poolos raised a concern that Ms. Richards stopped doing work for her?

COUNSELOR ZUCKERMAN:

Objection.

A. No.

Q. Are you aware of Ms. Poolos raising concerns that during a busy period where they were preparing for a shoot that Ms. Richards stopped responding to e-mails from Ms. Poolos?

Page 215

R. BALDUCCI

COUNSELOR ZUCKERMAN:

Objection.

A.     No.

Q.     Did you ever tell Ms. Richards that it was okay for her not to work on one of the days in December, late December, early January?

A.     Not that I can remember.  Tanya told her that she could take the half -- the afternoon off on the 31st.

Q.     And what do you recall about that?

A.     I recall that Tanya was trying to, you know, get her account and -- and calm her down and if you were talking to Collette at that time, she was in an extremely distressed state and so -- and so saying I have all these issues, I'm bringing them to you, please help me, and at the same time, my manager is frantically texting me, incessantly texting me, and these texts are erratic.  She's unhappy with me and then all of a sudden, now she's apologizing and everything is fine.  And

Page 216

R. BALDUCCI

Tanya said just take a break.  Take a break.  Let's take the pressure off, right?  That's a tactic that we use.  Let's everybody just like separate and go into your own corners and breathe and let's come back tomorrow and figure out where we go.

Q.   And that was a discussion that you and Ms. Simons had after she had said that to --

A.   We didn't have to go all that deep, but yes.  I was aware that she gave her that guidance.

Q.   And do you know if that was communicated by Ms. Simons to Ms. Poolos?

A.   I don't.  I don't.  You would have to ask Alex that.  I mean, excuse me, Tanya that.

Q.   As the HR person who was dealing with the situation at the time, did you think it was important that Ms. Poolos know that Ms. Simons had given that guidance or direction to Collette?

A.   That's a good question.  I cannot remember.  I cannot remember.

Page 217

R. BALDUCCI

Q.    And you said there were a lot of text messages that Collette reported Ms. Poolos sending at the time, correct?

A.    Yes.

Q.    Do you know what she was texting her about?

A.    I don't.

Q.    Do you know if she was texting her about work stuff?

A.    I assume it was about work stuff.

Q.    You had no reason to believe it was personal?

A.    Right.  Right.

Q.    And were you aware as of December 31st that Ms. Poolos and Ms. Richards were preparing for a shoot to take place around January 8th?

A.    No.

Q.    Do you know if that would be a busy time for a 60 Minutes producer, associate producer?

A.    I mean, I would imagine it would be.  I don't know.  I can't speak to

Page 218

R. BALDUCCI

that.

Q.    And do you know if Ms. Poolos
tried to contact Ms. Richards the next day,
so Ms. Simons says take the afternoon, do
you know if Ms. Poolos tried to contact Ms.
Richards the next day?

A.    I don't know.

Q.    Do you know if Ms. Richards
replied or didn't reply to Ms. Poolos?

A.    I don't know.  No, I don't
know.

Q.    Do you think it would be
reasonable for a manager to be concerned if
someone who reports to them just stopped
communicating?

COUNSELOR ZUCKERMAN:
 Objection.

A.    I think there was a lot at play
here.

Q.    What do you mean by that?

A.    Alex knew that Collette was
unhappy because Collette had told her.
There was a lot at play.

Q.    So when you say "there was a

Page 219

R. BALDUCCI

lot at play," other than the statement that you made that, "Alex knew Collette was unhappy," what else do you mean by that?

COUNSELOR ZUCKERMAN: Objection.

A.    Yeah, I don't know that there's much more I can answer.

Q.    I'm just asking what you meant by it, that's all.

A.    Yeah, I just think it was a very heavy time.  Very heavy.  Sometimes you just have to look at a situation objectively and say, like, this isn't working.  We've got to figure out, like, you're not going to get anything more out of her.  She's -- she's feeling -- she's conveyed that she's feeling like she can't communicate with you and there's no boundaries and she's -- she's crumbling under the weight of it.

Q.    So why not transfer her?

COUNSELOR ZUCKERMAN: Objection.

A.    Because we didn't know yet what

Page 220

R. BALDUCCI

the problem was and if the problem was Collette, then we wouldn't want to put Collette on another team.  If the problem was Alex, then we weren't go to put anybody else under Alex's employ.  We needed to solve what the problem was.

Q.    And --

A.    Give them performance coaching, right?  That's what the goal was.  Let's coach them both to a better place.  At that point, I thought the truth was somewhere in the middle.

Q.    You mean as of December 31st?

A.    Yeah.  Even January 5th, I thought the truth was somewhere in the middle.  These two just aren't getting on. They're talking passed each other.  They're getting frustrated.  They're not bringing the best out of each other.  There's really poor communication here.  And sometimes if you could just see it from the other person's perspective you can start to get somewhere and that's what I hoped would happen.  Let it die down a little bit, it's

Page 221

R. BALDUCCI

the holidays, come back fresh in the new year and agree a new alliance, a new way to work together.

Q. But -- but you knew that at the time, and I realize it's the holidays and most -- many, many people take that time off, but there are people at 60 Minutes who work during that time, correct?

A. Yeah.

Q. Because as you said before, CBS News is 24/7 news organization, right?

A. That's right.

Q. And so when -- if Ms. Richards was unavailable, there was still work to be done, wasn't there?

COUNSELOR ZUCKERMAN:
Objection.

A. So that is a question you really have to direct to the management of that group.

Q. Right. But I guess as the HR person who was involved, my question to you is I understand your -- I think the point you're making is, look, the business

Page 222

R. BALDUCCI

people, the people who run the show have to figure out about workloads and allocations, that's not your expertise, but wouldn't you care whether the manager was aware --

A.    Yes.

Q.    -- that the employee was not -- was not working or not available to work?

COUNSELOR ZUCKERMAN:

Objection.

A.    Yes.  And I -- perhaps this is something you're going to ask Tanya Simons, I very well may have said to Tanya, Tanya make sure Alex knows.  I just can't tell you I remember doing it.

Q.    You said something to the effect of there was a lot at play around this time, December 31st, and I think you said Alex knew that Collette was unhappy. What's your -- what's your basis for saying that?

A.    Well, when I spoke to Collette, she had let me know, as she had let Maria Cottone know, that she had had conversations with Alex.  She had let Alex

Page 223

R. BALDUCCI

know how she was feeling.  She had let her know multiple times that she felt uncomfortable communicating with her, that she felt there were no boundaries and she didn't like being yelled at.  She had communicated all of those things.

Q.    That's what Ms. Richards told you at the time, correct?

A.    Yes.

Q.    And at that time you did not have Ms. Poolos' version of events, correct?

A.    I didn't.

Q.    So the only basis for saying that Ms. Poolos knew Ms. Richards was upset was what Ms. Richards was telling you?

A.    Yes.  Which we ultimately learned to be true and factually.

Q.    And how did you learn it to be true and factually?

A.    Because when I spoke with Alex, she told me.

Q.    What did Alex -- what did Alex tell you about this issue?

Page 224

R. BALDUCCI

A.    Alex told me that at some point she was having conversations with Collette and Collette complained and she thought uh-oh.

Q.    And well, what was that issue or issues?

A.    Collette -- as I recall, Collette had told her I do not feel comfortable communicating with you.  I feel mistreated and Alex thought, uh-oh, quote-unquote.  She knew.

Q.    And what -- what timeframe was Ms. Poolos talking about when she disclosed that to you?

A.    My understanding is that she was talking about the 30th.

Q.    December 30th?

A.    Excuse me.  She's talking about the 17th.  The 17th or the 30th?  No, I think it was the 30th -- I'm getting my dates mixed up.  I think she knew long before the 17th.

Q.    What -- what do you think Ms. Poolos knew long before the 17th?

Page 225

R. BALDUCCI

A.    I think those conversations.  I think Alex knew Collette was telling her before the 17th was the impetus, was the impetus for all of this.

Q.    Impetus being what?

A.    What do you mean?

Q.    I'm sorry, the impetus, I don't know what you mean by the impetus.

(Whereupon, the referred-to answer was read back by the reporter.)

Q.    I don't follow what you mean by that.

A.    Well, we're coming back to -- my point is that Alex knew before the 17th that Collette was very unhappy with her management.

Q.    And -- and -- and you're saying that based on what I think would be helpful for me to understand?

A.    I'm saying that based on the fact that Collette shared that with me and then, subsequently, in talking with Alex, she also said that.

Page 226

R. BALDUCCI

Q.    Your testimony is that Ms. Poolos told you that she knew that Ms. Richards was unhappy with her management long before December 17th?

A.    Yes.

Q.    Did she tell you that in that -- during your interview of her on January 8th?

A.    Yes.

Q.    Is there any other time she told you that?

A.    No.

Q.    Did Ms. --

A.    Actually, there was the night before.

Q.    And what did Ms. Poolos say during that conversation?

A.    Hard to remember, but, you know, I was trying to be very focussed and -- and direct and convey that there was an investigation we were -- we were going to place her on administrative leave and we would have a full opportunity to get -- to hear her account and Alex kept coming in

Page 227

R. BALDUCCI

with different comments about how terrible Collette is and this is what's been going on.  Like she went on and on and on about how horrible Collette was and Collette has been trying to make trouble for some time. So, yes, all of those things together lead me to believe that this has been going on for some time.

Q.    Okay.  Did Ms. Poolos tell you that she had problems with Ms. Richards, with Collette, because Collette wanted to travel around the time that a story was going to air on 60 Minutes?

A.    Are we talking about her honeymoon?

Q.    No, we're not talking about her honeymoon.  We're talking about in December of 2021, we're talking about you mentioned the impetus of what happened, did Ms. Poolos tell you that she was frustrated with Ms. Richards because Ms. Richards asked on multiple occasions to travel on a day that was right before or on the day of a CBS -- of a 60-minute story airing?

Page 228

R. BALDUCCI

A.    I believe so.

Q.    And is that what Ms. Poolos told you as the reason she thought that there were -- there were some issue between her and Ms. Richards?

A.    I think that I recall that she can use that as one example.

Q.    And that happened to be the example that occurred right before Ms. Richards went to HR with a complaint, correct?

A.    It may have been.

COUNSELOR IADEVAIA:  Why don't we take a break.  We've been going for a while.

COUNSELOR ZUCKERMAN:  Alright.

THE WITNESS:  Great.

THE VIDEOGRAPHER:  The time is 3:25 p.m. and this marks the end of Media Unit number 3.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:  The time is 4:06 p.m. and this begins Media Unit

Page 229

R. BALDUCCI

number 4.

Q.    Ms. Balducci, do you know if Ms. Poolos submitted a -- before filing the lawsuit, submitted a complaint with the equal employment opportunity commission?

A.    I can't recall.

Q.    Did you review any submissions that your lawyers in this case made to the EEOC before it was submitted?

A.    I can't recall.

Q.    In your job as -- in your HR role at Paramount at any point in time during your tenure, had you ever been involved in the preparation of a response that the Company filed with the EEOC?

A.    I can't recall.

Q.    Do you -- do you -- do you understand when I -- do you know what the EEOC is?

A.    Yes.

Q.    And what's your understanding?

A.    Federal Equal Employment Opportunity.

Q.    Commission?

Page 230

R. BALDUCCI

A.    Commission, yeah.

COUNSELOR IADEVAIA:  Can we mark those.  I think we're just up to three.

THE WITNESS:  Okay.

(Whereupon, a Response to an EEOC Complaint was marked as Balducci Exhibit 3 for identification as of this date by the reporter.)

COUNSELOR IADEVAIA:  If you could take a minute to look through it, I'm going to ask you one or two very basic questions, but for the -- what's been marked as Balducci 3 is a many page document that starts with Bates number CBS44 and goes through CBS119.

THE WITNESS:  Okay.

CONTINUED EXAMINATION BY COUNSELOR IADEVAIA:

Q.    So my question is:  Have you ever seen this document before?

A.    No.

Q.    Do you recall looking at the

Page 231

R. BALDUCCI

position statement that was submitted by your lawyers before -- in this matter before it was submitted to the EEOC?

COUNSELOR ZUCKERMAN:

Objection.

A.    No.

Q.    Okay.  That's all.

During this period, between late December of 2021 and the time that Ms. Poolos is told that she's being fired in February of 2022, did Ms. Poolos let you know that her friend had recently died?

A.    No.

Q.    Did anyone tell you that?

A.    No, not that I recall.

Q.    During that timeframe, did anyone say to you that Ms. Richards, because she had left before the 60 Minutes time for break for the holiday, that Ms. Poolos had to cancel her own vacation plans?

A.    No.

Q.    Did Ms. Poolos ever tell you that?

Page 232

R. BALDUCCI

A.    Not that I can recall.

Q.    And did Ms. Poolos ever tell you that during that period of time in late or in December after Ms. Richards had left, that Ms. Poolos had discovered a significant mistake that Ms. Richards had made?

A.    Not that I recall.

Q.    And that, just to put a fine point on it, that as a result of that mistake Ms. Poolos had to cancel her own holiday plans?

A.    Not that I recall.

COUNSELOR IADEVAIA:  Alright. If we can mark CBS2299.  This is Exhibit 4.

(Whereupon, an E-mail Chain was marked as Balducci Exhibit 4 for identification as of this date by the reporter.)

CONTINUED EXAMINATION BY COUNSELOR IADEVAIA:

Q.    If you could take a minute to look at the e-mail, Ms. Balducci, what's

Page 233

R. BALDUCCI

been marked as CBS -- I mean Balducci

Exhibit 4 is a two-page e-mail chain

bearing Bates number CBS2299 through 2300.

A.     Yes.

Q.     You had a chance to review it?

A.     Yes.

Q.     Okay.  And is this the e-mail

-- well, does this e-mail chain contain the

communication when you first learned that

Ms. Richards had made a complaint about Ms.

Poolos?

A.     It does.

Q.     Okay.  And you didn't -- you

were not aware of a complaint before this

e-mail chain?

A.     No, not that I could recall.

Q.     And outside of what Ms. Simons

says in the very first e-mail that starts

at the bottom of the first page and goes

into the second page, Ms. Simons writes

"One of our associate producers, Collette

Richards just called me to complain about

the producer with whom she works, Alexandra

Poolos.  My understanding is that she

Page 234

R. BALDUCCI

reached out to HR earlier today, but this is the first we've heard of it. Let me know when you have a moment to discuss. (It doesn't have to be today.)" Did you see that text?

A.    Yeah, of course.

Q.    Other than what Ms. Simons writes there, did you have any knowledge as of December 17th, 2021 of Ms. Richards' complaint?

A.    So this is something that I answered earlier in terms of -- and what I recall saying is that, I -- it is -- I also interpret based on this e-mail from Tanya to me saying that she understands she reached out to HR, but she could have meant me, but what I could tell you is whether she did or she didn't, I passed this on to Maria, so if I got a voicemail, hey, I'm trying to -- you know, I need someone, I'm an employee, I've got an issue. I never returned that call. I asked to her to talk to Maria.

Q.    Right. Understood. And I just

Page 235

R. BALDUCCI

want to confirm, I think I understand what you're saying --

A. But do I remember -- no, I don't remember.

Q. But my question is a little different. Just to be clear, other than what Ms. Simons writes in this e-mail chain, you didn't have any other knowledge of Ms. Richards' complaint as of this time?

A. No.

Q. Okay. And did Ms. Cottone have any -- I know Ms. Cottone says she had scheduled a call with Ms. Richards that's set forth in Exhibit 4, but that Ms. Richards had to put it off, do you know if Ms. Cottone spoke to Ms. Richards at any point related to the complaint? You can look at it if you want to.

A. I want to make sure I understand your question.

Q. I'm just asking if after this e-mail chain, are you aware of Ms. -- of Maria and Collette speaking at all about Collette's complaint?

Page 236

R. BALDUCCI

A.    Yes.  Maria and Collette speaking about Collette's complaint, yes, that happened on the 30th.

Q.    That happened on --

A.    Of December.

Q.    December 30th, okay.  And how did you become aware of that?

A.    They -- she told me.  Maria told me.

Q.    Maria told you.  And what did Maria tell you about that call?

A.    She sent notes.

Q.    Maria sent you notes?

A.    Maria sent full notes.

Q.    And why did Maria send you notes?

A.    Because I'm the head of HR for this group.  So she's giving me her notes. She's -- she's sharing them for transparency and at the same time saying I'm not going to be able to do anything more with this right now because I'm going on vacation, so Renee, this is for you.

Q.    And at that point, was the

Page 237

R. BALDUCCI

understanding that you would take over handling the matter?

A.    Yes.

Q.    From Maria?

A.    Yeah.

Q.    Okay.  And the notes that Maria sent, what did she say in her notes?

A.    It was -- so what she had sent really was Collette's account and Collette's account largely was that she felt -- she felt she was bullied.  She felt that her boss wasn't respecting any boundaries and, in fact, told her there were no boundaries between them and she felt heckled and she wanted to be moved to a different team.

Q.    Got it.  And you say largely Collette's account, you mean Collette submitted something in writing?

A.    That's right.

Q.    To HR?

A.    That's right.

Q.    And that was forwarded to you?

A.    That's right.

Page 238

R. BALDUCCI

Q. Okay. Was there anything else that was part of Collette's -- sorry, Maria's notes to you?

A. Not that I can -- there might have been. I just can't recall.

Q. Okay. And when Collette had initially reached out to HR, to your knowledge, on December 17th or thereabouts, did she submit anything in writing at that time?

A. She didn't.

Q. And when was the first time that you're aware of that HR received anything in writing from Collette?

A. On the 30th of December.

Q. And do you know how it came about that Collette put together something in writing, was she asked to do it, did she do it on her own?

A. I don't know.

Q. You don't know if Maria asked her to do it?

A. I don't know.

Q. And you didn't ask her to do

Page 239

R. BALDUCCI

it?

A.    I didn't ask her to do it.

COUNSELOR IADEVAIA:  Okay.  If we could mark 7775.  So we're up to 5, I think.

(Whereupon, a Written Complaint was marked as Balducci Exhibit 5 for identification as of this date by the reporter.)

CONTINUED EXAMINATION BY COUNSELOR IADEVAIA:

Q.    So please take a minute to take a look at the document.  What's been marked as Balducci Exhibit 5 is a multipage memo bearing Bates number CBS7775 to 7788.

A.    Okay.

Q.    Do you recognize what's been marked as Exhibit 5?

A.    I do.

Q.    And what is it?

A.    This is Collette's complaint that she put in writing and shared with Maria on 12/30 and was passed on to me.

Q.    Also on December 30th, correct?

Page 240

R. BALDUCCI

A.    Correct.

Q.    Got it.  And when you got the complaint, did you read it?

A.    I read it.

Q.    Yeah, did you read it on the day or you read it a few days later?

A.    I -- I definitely looked at it that day.  I mean, it's dense, but yeah.

Q.    And you have said this a couple of times, but it -- it is very clear on that first Page, 7775, Ms. Richards writes, "I am requesting to be removed from her team as soon as possible.  This is a toxic work environment."  So Ms. Richards making clear to HR on this first page that she wanted to be switched off of Ms. Poolos's team, correct?

A.    Yes, correct.

Q.    And did you, I think you testified earlier, but just to make sure, did you have a conversation with Ms. Richards on the 30th or the 31st?

A.    The 31st.

Q.    Okay.  And it was just you and

Page 241

R. BALDUCCI

Ms. Richards, was it a call?

A.     She reached out to me, yes.

Q.     She reached out to you.  At any point in time when you were talking to her, did you ever ask her if she had any positive experiences working with Ms. Poolos?

A.     I can't remember exactly our conversation, but certainly I would say yes.

Q.     Did you ask that question at some point?

A.     The conversation -- I was trying to understand what her experience was, right, and then put her on a path to positivity and working with her manager, I can't remember exactly the question -- if I asked that question, I cannot remember.

Q.     At any point between late December and early February of 2022, did Ms. Richards ever report to you that she had had positive -- any positive experiences working with Ms. Poolos?

A.     Prior to this?

Page 242

R. BALDUCCI

Q.    No, I'm talking about basically from late December through -- strike that. I think I understand your question as -- did -- did Ms. Richards ever tell you positive experiences with Ms. Poolos at all?  Did she ever tell you about that?

A.    I -- I can't recall.  I -- I thought -- I don't -- I believe she was measured in the things that she would say. I mean, I know that she was willing to give her another chance.

Q.    But you don't recall Ms. Richards expressing to you any positive experiences that she had working with --

A.    I can't.

Q.    -- Ms. Poolos?

A.    I can't.  I don't recall.

Q.    You don't recall, okay.  And you don't know if -- strike that.  Did you ask her if she had had any positive experiences?

A.    I don't remember.

COUNSELOR IADEVAIA:  If we could mark Exhibit 6, CBS7754,

Page 243

R. BALDUCCI

please.

(Whereupon, an E-mail Chain was marked as Balducci Exhibit 6 for identification as of this date by the reporter.)

CONTINUED EXAMINATION BY

COUNSELOR IADEVAIA:

Q.    What's been marked as Exhibit 6 is a one page e-mail chain bearing Bates number CBS7754.

A.    Okay.

Q.    Alright.  I'm not going to ask any questions about that.

And beyond what you already testified to, is there anything else you recall about the discussion that you had with Ms. Richards on December 31st?

A.    No.

Q.    Let -- I mean, just -- just to get the sequencing right, can you just tell me what you recall about that call?

A.    About my call.

Q.    With Ms. Richards?

A.    With Ms. Richards.

Page 244

R. BALDUCCI

Q.    On the 31st?

A.    On the 31st.  I recall that she had reached out.  She is now conveying to me that she's upset, that she feels mistreated by her manager and I'm letting her know, I know, I am aware, and I know you spoke with Maria and I saw your document and I've read it over and this is, you know, as a next step, I would like you to trust me.  We're going to bring Bill and Tanya in, allow them to have a conversation, right, so Tanya is going to talk to you.  If she -- I can't remember if she had or hadn't already and they need to talk to Alex and that would be the next step, and from there, I was already coaching her around a reset, give her the benefit of the doubt, that is what we need to do here.  So I -- I for sure conveyed to her we were not going to entertain moving her to a different team.  That wasn't an option at that point.

Q.    You conveyed that to Ms. Richards?

Page 245

R. BALDUCCI

A.    I did.

Q.    And when you say, "give her the benefit of the doubt," what do you mean by that or what did you mean about it at the time?

A.    What I meant was that managers are humans too, nobody is perfect, she needs -- Alex needs to hear how you're feeling, she needs Bill to address it with her and Tanya, and let's -- if she thinks -- if she thinks that she can, you know, make some changes in her style, let's give her a chance to do that.  Let's just not write her off now and say you just need to be moved to a different team, I need you to continue to work with her.

Q.    Anything else you recall about that discussion with Ms. Richards on the 31st?

A.    No.

Q.    How was Ms. Richards during that discussion?

A.    She was initially upset and concerned and scared frankly.  She ended in

Page 246

R. BALDUCCI

a very measured way.  I -- I recall her, you know, saying I feel supported.  Thank you and I agree with you.  I agree.  I -- I can do this.  I agree with this.

Q.    What was she scared of?  Did she say?

A.    Yeah, she was afraid of her boss treat -- continuing to treat her poorly and worse, treating her worse because she had made a complaint.

Q.    She -- did Ms. Collette -- did Ms. Richards say that to you?

A.    Yes.

Q.    What else did she say beyond what you testified to?

A.    I can't think of anything else.

Q.    After you got that call, what did you do next in connection with Ms. Richards' complaint?

A.    I ensured that Tanya was going to have a conversation with her and that Tanya and Bill were prepared to have a conversation with Alex.

Q.    And how did you do that?

Page 247

R. BALDUCCI

A.    I -- I gave them an update, I gave them a verbal update of the concerns, headlines, of the concerns that Collette had brought and advised them and then I had asked them, hey, like, here's this information -- actually I recall Bill offering -- what he had offered at the time was, you know, Alex is good.  Alex is good at her job.  He did at that time also offer, though, that this wasn't the first time that he had heard challenging feedback about Alex and her style and so I asked him what do you mean, tell me more about that. And he had mentioned an issue that had come up with the Rights Team, that I don't have details on, nor was I involved in, but there was something that had gone on with the Rights Team and -- and I feel like he might have had one other thing, but I can't put my finger on it right now.  But he -- ultimately what I took away was this isn't the first time there had been issues with the way that Alex moves through the world and converses and communicates with people

Page 248

R. BALDUCCI

and so have a conversation.

Q.    Just to be clear, you're saying that this is a discussion that you and Mr. Owens had immediately after -- well, when did you have that discussion with Mr. Owens?

A.    So what I can't remember right now is if he told me about -- no, I think he told me right then.  So I think in that one discussion with Tanya and with Bill and I advised them to have that conversation, Bill had make made it clear that, hey, Alex is good at her job so I'm surprised about this, I'm really surprised about this, however, no, there have been other complaints that have come in.  I said, all right, you know what, just go talk to Alex. Go get her account of things and then advise her to move forward in a different way with Collette.  You have to reset them. Let's see if we can reset them.  He said okay, got it.  Will do.

Q.    And when did that conversation happen between you, Tanya and Bill?

R. BALDUCCI

A.    Honestly, I can't recall.  I know that we -- I would have immediately let them know that they needed to have this conversation.  For certain, we had a conversation on the 3rd or the 4th to actually meaningfully prep for what their conversation with Alex would look like.

Q.    The -- but the time when you learned from Mr. Owens that this wasn't the first time Ms. Poolos supposedly had had issues, was that on the 3rd or the 4th or was it before then?

A.    I think -- you know what, I think that was probably the 3rd or 4th.  I think before then really all it was was me saying hey guys, you have a problem.  You've got to deal with it.  Get ready to deal with it after the holidays.  And them saying yes, we know, we've heard, we will.

Q.    And when they said we heard, meaning they heard that Collette raised concerns?

A.    Yes.

Q.    About Alex?

Page 250

R. BALDUCCI

A.    Yes.

Q.    And those -- those were communications that you had with Mr. Owens and Ms. Simons on December 31st?

A.    Yeah, for sure I was communicating with Tanya Simons on the 31st.  I don't -- I don't remember if I also communicated with Bill then.  I feel like I probably would have, but I can't recall.  I might have left it with Tanya, talk to Bill, let him know what you guys have to do and then I'll get in with him after the holiday.  I mean, at that point there wasn't anything that was code red.

Q.    What do you mean "code red"?

A.    I mean, I didn't have a retaliation claim in my hands.  I didn't -- that I needed to reach out to the executive producer of 60 Minutes.  I had a managerial and an employee issue that Tanya Simons -- I could talk to one manager.  I didn't necessarily need to get two on the phone.

COUNSELOR IADEVAIA:  Okay.  If we can mark as Exhibit 7 CBS8108,

Page 251

R. BALDUCCI

please.

(Whereupon, a Text Thread was marked as Balducci Exhibit 7 for identification as of this date by the reporter.)

CONTINUED EXAMINATION BY

COUNSELOR IADEVAIA:

Q.    Let me know once you had a chance to review it.

A.    Okay.

Q.    Okay.  So this -- is this a text thread between you and Ms. Simons?

A.    It is.

Q.    Got it.  And you wrote in the top e-mail, "Hey there, heads up.  You guys have issues brewing with Alex Poolos."  Did I read that correctly?

A.    Yes, you did.

Q.    And you write, "Her AP is miserable.  I'm going to reach out to Bill."  Do you see that text?

A.    Absolutely.

Q.    Okay.  Had you ever sent a text like that to Tanya before about another

Page 252

R. BALDUCCI

employee?

COUNSELOR ZUCKERMAN:

Objection.  You can answer.

A.    I -- we -- we converse via text.

Q.    No, I know, but have you ever alerted her -- Ms. Simons to a problem with an employee --

A.    There's issues, yeah, I likely might have.

Q.    And do you remember who?

A.    No.

Q.    And then if you look down at the -- well, it -- it -- you write, "I'm going to reach out to Bill," and I think you just testified that you believe you did talk to Bill, correct, Mr. Owens?

A.    I honestly cannot remember.

Q.    Can't remember.  And then further down Ms. Simons writes, "I just spoke with Collette.  Says she hasn't had a second to breathe this break.  They have a shoot Jan 7th and she asked me if it was okay for her to tell Alex she needs to take

Page 253

R. BALDUCCI

a break this afternoon.  I said absolutely, set the boundaries and it's NY Eve."  Which I assume it's New Year's Eve --

A.    Yeah.

Q.    Do you see that?

A.    I sure do.

Q.    And you wrote back "Excellent. Thank you."

A.    Of course.

Q.    Why?  Why did you think it was excellent?

A.    Why did I think this was excellent?

Q.    Yeah, or what did you mean by that?

A.    What I meant is great job manager for making the right call and giving her -- she made the right call. You've got -- you've got an employee in distress.  We know that you're not going to really get to talk to her manager until after the holidays.  The right call is to deescalate this.  So separate them.  Give her a few hours to herself that was -- and

Page 254

R. BALDUCCI

in here, it tells us a little bit about some of the questions you were asking earlier today.  She told me here, I'm also going to tell her to tell Alex she needs a break this afternoon, so I knew her manager was going to hear that.

Q.    Who -- I'm sorry.  I'm very confused.  Who was going to hear what?

A.    In this thread, Alex -- Tanya is conveying that -- that she advised Collette go ahead, take the rest of the day and tell Alex that she's going to take the rest of the day, so that was communicated to Alex.

Q.    That Collette had decided to take the rest of the day, did you say in your response, hey, give Alex a heads up that her -- that -- that you've given permission for Collette to take the time off?

COUNSELOR ZUCKERMAN:
  Objection.

A.    I mean, that's not here.

Q.    How come?

Page 255

R. BALDUCCI

A.   I -- I -- I don't have an answer for that.

Q.   And you said it was the right -- the right call for purposes at least in part to deescalate the situation, correct?

A.   That's right.

Q.   But couldn't it also have the effect of escalating a situation where a subordinate tells a supervisor that they're going to take a break without any explanation as to where that's coming from?

COUNSELOR ZUCKERMAN:
Objection.

A.   I think that could be how you might perceive it.  I did not perceive it that way.

Q.   Okay.  I think your testimony earlier was that Ms. Poolos was told about Collette's complaint on January 5th, correct?

A.   Correct.

Q.   Before January 5th, do you know whether Ms. Poolos attempted to have a conversation with any of her managers about

Page 256

R. BALDUCCI

her concerns about Ms. Richards?

A.   Yes.

Q.   And what do you know about that.

A.   I know that she and Tanya were going back and fourth trying to arrange a time to discuss.

Q.   And how do you know is that?

A.   I know that because I -- I don't know how I know.  I just know that.

Q.   Did Ms. Simons tell you?

A.   Yes, Tanya definitely told me that.

Q.   And what did she tell you about it?

A.   She told me that she's reached out, Alex has reached out, I need to have a conversation with her and so I'm going to do that on this day.  Let's do our prep before.  I think she actually had even said, I don't have time to talk to her today, so it's going to be tomorrow anyway, can we get some time together.

COUNSELOR IADEVAIA:  If we can

Page 257

R. BALDUCCI

mark as CBS8117.

(Whereupon, a Text Thread was marked as Balducci Exhibit 8 for identification as of this date by the reporter.)

COUNSELOR IADEVAIA:  For the record, what's been marked as Balducci Exhibit 7 (sic) is a one-page text thread bearing Bates Number CBS8117.

CONTINUED EXAMINATION BY

COUNSELOR IADEVAIA:

Q.    Is this a text thread between you and Ms. Simons on January 3rd, 2022?

A.    It is.

Q.    And in your prep yesterday, did you review this text thread?

A.    I did.

Q.    And in this text thread at the top Ms. Simons is telling you, she says, "Quick Q, (and sorry to bother), do you, me and Bill need to get on a call tomorrow to discuss Alex Poolos or do we wait until our regular Wednesday call?  She reached out to

Page 258

R. BALDUCCI

me today and I couldn't talk but would love guidance for when I do call her back tomorrow or Wednesday."  Do you see that text?

A.    Yes.

Q.    And I guess one -- one question which is the regular Wednesday call, what's that a reference to, if you know?

A.    That's my weekly with Tanya and Bill.

Q.    The weekly meeting you testified about earlier?

A.    Yes.

Q.    And this text is Ms. Simons telling you that Alex had reached out and she -- and that Ms. Simons didn't want to get back to Alex until she got guidance from you, correct?

A.    Yup.

Q.    Thank you.

Did you ever instruct Tanya not to speak to Alex at any point in time?  Did you ever give her that instruction?

A.    No.

Page 259

R. BALDUCCI

Q.    Did you ever instruct her not to speak to Alex between December 30th and, you know, when they actually met with her on January 5th?

A.    No.

Q.    Was your guidance ever wait to talk to Alex until we talk?

A.    I don't recall.

Q.    And did you ever instruct Mr. Owens to not speak to Alex until you, Tanya and Bill had a chance to talk about Collette's complaint?

A.    I don't recall.

Q.    Actually one other, in the text thread, Exhibit 7, at the bottom, well, in the second text, you write, "Yes, let's talk about her tomorrow.  I'm free at 10:30 if you guys want to chat before the 11." Do you see that text?

A.    Yeah.

Q.    And did you, in fact, have the -- a call with Tanya and Bill the following day about Ms. Poolos, January 4th?

A.    Don't recall.

Page 260

R. BALDUCCI

Q.    Okay.

A.    If it was the 4th or the 5th, I don't recall.

Q.    But you do recall having a meeting with Ms. Simons and Mr. Owens about Ms. Poolos either on the 4th or the 5th?

A.    Yes.

Q.    Okay.  And was it the three of you present for that meeting or were there other people there?

A.    It would have been the three of us.

Q.    Okay.  And was it by Zoom, in person, do you recall?

A.    I don't know.  I don't actually recall the details of that meeting.

Q.    Well, tell me anything you remember from it if you remember anything?

A.    I don't remember any details from that meeting.

Q.    Do you remember if there was a discussion --

A.    I wish I did.

Q.    -- about a plan to speak with

Page 261

R. BALDUCCI

Ms. Poolos?

A.    Well, there would have had to have been, but I don't remember details.

Q.    And you're saying there would have had to have been because that's in fact what happened?

A.    Yeah.

Q.    But you have no memory of the specifics of that meeting before meeting -- before Mr. Owens and Ms. Simons met with Alex, correct?

A.    No, I can't remember the details.  I can't.

Q.    Before -- I'm going to use first names because it's just easier with my questions.  I'm not trying to be rude to anyone.  But before Tanya and Bill spoke to Alex, had you done any investigation into the concerns that Collette had raised in her -- in her December complaint?

A.    No.

Q.    Had you spoken to anyone other than Collette about those concerns?

A.    No.

Page 262

R. BALDUCCI

Q.    Okay.

A.    There was no investigation at that point.  Remember, that's not -- our investigation didn't start yet.  Didn't start in December.  Started -- started January 7th.

Q.    And did you have any discussions on either the 4th and 5th before Tanya and Bill met with Alex about disciplinary action against Alex?

A.    We discussed there would be no disciplinary action against Alex.

Q.    Before the meeting with Alex?

A.    Definitely.

Q.    And who made that decision or was it a group decision?

A.    It was -- it was a group decision.  It was more than, you know, feeling me out for like, you know, Renee, what are you suggesting, and me making it clear, like guys, this isn't a managerial issue.  This is you having a conversation with her.  You assess and let's get them -- let's get them reset and if that

Page 263

R. BALDUCCI

conversation goes well and you tell me that goes well, we leave this alone. I don't need to meet with her. I don't need to take any other actions. There's nothing for me to investigate. Good practice would be, would say, that Tanya and Bill would check in with Collette from time to time and make sure things were going the right way. I would check in from time to time, hey, everything good? Great. Let's move on.

COUNSELOR IADEVAIA: We can mark as Exhibit 9. I'm going to need to ask every time apologize. If you could take a look, please, what's been marked as CBS780 -- or what's been marked as Balducci Exhibit 9 is a two-page e-mail chain bearing Bates number 7809 to 7810.

(Whereupon, an E-mail Chain was marked as Balducci Exhibit 9 for identification as of this date by the reporter.)

CONTINUED EXAMINATION BY

Page 264

R. BALDUCCI

COUNSELOR IADEVAIA:

Q.    Let me know once you had a chance to read it.

A.    Yeah, give me a second.  I don't think I've seen this one before.

Q.    So the earlier e-mails are dated December 30th, 2021 and December 31st, 2021 about -- and I think we reviewed at least some of these e-mails in an earlier exhibit, is that right, the earlier ones here; is that --

A.    Yes.

Q.    Okay.  I'm wanting to focus on the e-mail from Ms. Richards to you on January 5th, 2022 at 10:11 a.m.

A.    Yup.  Yup.

Q.    And Ms. Richards writes, "Hi, Renee, I have a kind of a bizarre update to share with you.  Please let me know if you have a moment sometime."  And then you write back and say call me and give your phone number; do you see that?

A.    Yeah.

Q.    Did you speak to Ms. Richards

Page 265

R. BALDUCCI

around the time of this e-mail?

A.    I don't have any recollection of this.

Q.    And do you -- did she, Ms. Richards, tell you what she refers to --

A.    As "bizarre"?

Q.    -- as her "bizarre update"?

COUNSELOR ZUCKERMAN:  You don't need to help him with the questions.

THE WITNESS:  I know, but I want to.  I know.  I know.  Just smack me every now and then.

COUNSELOR ZUCKERMAN:  For the record, that was said in a joking tone which every lawyer tells you not to do.

THE WITNESS:  Funny.

A.    I do not recall.  I have no recollection right now of her having a bizarre update and what that was.  I don't know.

Q.    And do you know, I mean this e-mail says from Ms. Richards when she

Page 266

R. BALDUCCI

refers to a bizarre update, it says it was sent at 10:11 a.m., do you know if that was before or after Ms. Simons and Mr. Owens had met with Alex?

A.    I don't.  I don't.  Now I'm curious.  I bet you the bizarre update wasn't all that bizarre.

Q.    So we're now up to January 5th and I think you testified a few minutes ago that your understanding is that Mr. Owens and Ms. Simons met with Ms. Poolos about Collette's complaint, correct?

A.    Correct.

Q.    Alright, just -- I like to just check in, between December 31st and the meeting with Alex, are there any other discussions about Ms. Richards' complaint that happened that you haven't testified to already?

A.    No, not that I can recall.

Q.    And am I correct that you were not present for Bill meeting -- Bill and Tanya's meeting with Alex, correct?

A.    That's correct.

Page 267

R. BALDUCCI

Q.    Did you get any kind of report about that meeting?

A.    I got an update.

Q.    Okay.  And who did you get an update from?

A.    I believe it was -- I don't remember if it was Bill or Tanya or Bill and Tanya, but I definitely got an update from that meeting.

Q.    And how soon after the meeting did they update you?

A.    Same day.  They would have updated me same day.  It was important, that meeting.

Q.    And what was discussed when you got that update?

A.    They had shared that they thought the meeting went very well.  They did share that in the meeting, not only did they had asked -- hold on a second.  They shared that in that meeting Bill felt like he got a message across which is, hey, you know, you need to be made aware that Collette has raised some concerns and I

Page 268

R. BALDUCCI

remember specifically him saying that he used the terms harassing and no boundaries and heckling, I remember that. I remember that he felt that Alex's response was that would never be -- that wasn't my intention. However, also, mentioning that she had concerns with Collette's performance. She had now brought those to Bill's attention and he wasn't aware of them, but he, you know, was taking her word for it and he had concern over that as well. At the end of that he asked her, though, to ensure that she managed her behavior and that she agreed that she would and so Bill felt good about it. He felt the conversation went well and that they could move on.

Q. Anything else you recall about that discussion when you got the update from Bill and -- Bill and/or Tanya?

A. Yeah. What I -- what I -- what struck me in that discussion was that while I thought Bill did a good job, it didn't -- I was concerned that the -- that the message might not be clear that there

Page 269

R. BALDUCCI

needed to be a little more gravity to the feedback to Alex in that Bill had shared with me that there had been other complaints about Alex's tone and communication and so I asked him to have one more conversation with her the next day where he could highlight that and make very clear our expectations going forward.

Q.    What else do you recall about that discussion with Bill and/or Tanya?

A.    I believe I advised that he recap his conversation in writing.

Q.    In writing to whom?

A.    To Alex so there was no question what was expected.

Q.    And is it your memory that you said that to Tanya and Bill or one of them or both or who do you remember saying that to?

A.    Hard to remember.  I mean, I would have definitely communicated that to Bill.

Q.    Directly --

A.    Yeah, definitely directly to

Page 270

R. BALDUCCI

Bill.  Tanya may have been there, but that was a directive -- was a direct recommendation to Bill.

Q.    Based on what Bill had said he said during his conversation with Alex, did you understand that Bill had not raised prior complaints or prior concerns about Alex's conduct?

A.    (No response.)

Q.    Let me try it again.  During the meet -- the January 5th meeting, was it your understanding that Bill had not conveyed to Alex that there was a concern that this had happened before?

A.    Correct.

Q.    And that's why you had suggested or advised him that he should have a follow-up discussion with Alex?

A.    Correct.

Q.    And that he then should put it in writing?

A.    Correct.

Q.    Did Mr. Owens have a follow-up discussion with Alex?

Page 271

R. BALDUCCI

A.    Yes, he did.

Q.    Do you know when he had a follow-up discussion with Alex?

A.    The very next day.

Q.    So we're up to January 6th then?

A.    Yes, we are.

Q.    And do you know if Bill sent Alex a recap?

A.    He did.

Q.    And how do you know that?

A.    I saw it.

Q.    Did you draft it?

A.    I don't remember.

Q.    Do you know who drafted it?

A.    I -- I don't remember.

Q.    Did Bill send you a draft before he sent it to Alex?

A.    I don't remember.  I don't remember.

Q.    Okay.  Did Bill tell you any specifics about Ms. Poolos's concerns related to Collette during this meeting?

A.    Yes.

Page 272

R. BALDUCCI

Q.    What did he say?

A.    That she thought that her work performance was poor, that she was making lots of mistakes and that she wanted a good amount of time off and it felt unreasonable.

Q.    Did Bill say anything else as to what Alex had told him?

A.    I -- not that I can recall.

Q.    Did Bill tell you that Alex had said that -- that Alex had told Collette previously that they would need to talk about Collette's performance issues?

COUNSELOR ZUCKERMAN:
Objection.

A.    I don't recall.

Q.    And is it your testimony -- well, let me just ask you, in terms of learning about prior concerns related to Alex prior to Collette's complaint, when was the first time that you learned those concerns?

A.    Concerns about Alex --

Q.    That predate Collette's

Page 273

R. BALDUCCI

complaint?

A.    That predate Collette's complaint, I think I found out about them on January 5th.

Q.    Okay.  And how did you find out about them?

A.    Bill.

Q.    And you found out about them before or after Bill and Tanya met with Alex?

A.    Before.

Q.    Before.  And your testimony is that you learned about it, the prior complaints from Bill, correct?

A.    Yes.

Q.    Not from Tanya?

A.    I -- I don't remember.

Q.    It could have been either.

A.    It could have been either.

Q.    And you had mentioned an issue with the Rights Team, did you at any point -- well, strike that.  On -- as of January 5th, did you do any digging into what those concerns were?

Page 274

R. BALDUCCI

A.    No.

Q.    Did you speak to anybody other than Bill and Tanya about those concerns?

A.    No.

Q.    At any point in time, did you do any investigating as to whether there had been past complaints against Alex?

A.    No.  No.  There was no reason to.  Not yet.

Q.    Did Tanya Simons ever tell you that she learned about past complaints related to Alex from Claudia Weinstein?

A.    She didn't.

Q.    During the discussions you had with Tanya and Bill in early January, did -- was there any discussion about the source of the complaints against Alex that predated Collette's?

A.    No.  I don't -- I don't remember Claudia Weinstein's name coming being any part of this.

Q.    Did Ms. Simons ever tell you that she had told Claudia Weinstein about Collette's complaint?

Page 275

R. BALDUCCI

A.    No.

Q.    Did Tanya Simons tell you that she told Claudia Weinstein about Collette's complaint on December 17th?

A.    About her complaint about what?

Q.    About Alex.

A.    No.  No.

Q.    Do you think it would be -- do you think it's appropriate if Tanya did talk to Claudia Weinstein about Alex's complaint, I mean Collette's complaint?

COUNSELOR ZUCKERMAN:

Objection.

A.    I -- I don't know -- I don't know enough about this to have a point of view.  This is a first I'm hearing this.

Q.    To your knowledge, did Ms. Weinstein have any supervisory responsibility over Alex in December of 2021?

A.    Supervisory responsibility?

Q.    Yeah.

A.    No.  Editorial standards and practices responsibility, yes.

Page 276

R. BALDUCCI

Q.    Did Collette's complaint have anything to do with editorial issues?

A.    No.  I'm sorry, are we talking -- I wonder if I'm thinking of the wrong person.

Q.    Your lawyers can't help you. What do you -- what do you mean by that, in terms of who is Claudia Weinstein?

A.    Claudia -- who is Claudia Weinstein?  I might be thinking of the wrong Claudia.  Who is Claudia Weinstein? Is she -- is she -- is she the head of Standards and Practices for the News Division or are we talking about one of Bill's directs reports?

Q.    We're talking about somebody who reports directly to Bill Owens.

A.    Okay.  So then this is -- we've got to strike some of this because I'm talking about the head of --

Q.    Okay.

A.    -- standards and practices.

Q.    Alright, to your knowledge, does Claudia Weinstein, who reports to Bill

Page 277

R. BALDUCCI

Owens, have any supervisory responsibilities over Alex Poolos?

A.    I don't think so, but I'm a little not recollecting what her role was.

Q.    I want to make sure we cover what I thought we covered before.  During your discussions with Bill and Tanya, did it ever come up that Tanya had told Claudia Weinstein that -- about Collette's complaint against Alex?

A.    No.  No.  No.  Never.

Q.    And did you ever learn that Tanya had received information from Claudia Weinstein about purported prior complaints against Alex?

A.    No.

Q.    During Bill Owens conversation with Alex on January 5th, to your knowledge, did Bill say to Alex not to discuss Collette's complaint with anyone?

A.    On January 5th?

COUNSELOR ZUCKERMAN:

Objection.

A.    I don't know.  I wasn't there.

Page 278

R. BALDUCCI

Q.    Did he ever tell you that?

A.    I don't recall.

COUNSELOR ZUCKERMAN:

Objection.

CONTINUED EXAMINATION BY

COUNSELOR IADEVAIA:

Q.    Did you ever tell him to tell Alex that?

A.    I don't recall.

Q.    Okay.  And to your knowledge, during that January 5th meeting, did Tanya tell Alex not to discuss Collette's complaint with anyone?

COUNSELOR ZUCKERMAN:

Objection.

A.    I don't recall.

Q.    And did you give an instruction to Tanya to -- to tell Alex not to discuss Collette's complaint with anyone?

A.    I don't recall.

Q.    Did -- after the meeting with Alex did either Bill or Tanya tell you that Alex had asked if she should speak with HR?

A.    They did not.  That I could

Page 279

R. BALDUCCI

recall they did not.  However, I mean, I do recall it coming up between Bill and Tanya, you know, do you need to talk to her, do you -- does she need to talk to you, do you need to talk to her and I was like absolutely not guys, unless she needs me, you guys are -- I'm done here.

Q.    So just to be clear, in other words, in discussions you had with Bill and Tanya, both either Bill or Tanya or -- both brought up the question of should you, Renee, speak to Alex directly?

A.    Mm-hmm.

Q.    I just need a yes or no.

A.    Yes.  Yes.  Likely, yes.

Q.    Okay.  And your response was no, it's not necessary?

A.    Yes.

COUNSELOR ZUCKERMAN:
    Objection.

CONTINUED EXAMINATION BY
COUNSELOR IADEVAIA:

Q.    But what was your response, why don't I say that, when they raised that

Page 280

R. BALDUCCI

question?

A.    I made it clear that this was something that they should be managing.

Q.    Okay.  You testified a few minutes ago that your understanding is, that on -- your recommendation on the next day, January 6th, 2022, that Bill spoke to Alex a second time, correct?

A.    Correct.

Q.    And did Bill tell you about that conversation?

A.    Yes, he definitely told me about the conversation.  He told me that it happened.

Q.    And did he tell you in writing or verbally or some other way or both?

A.    Probably both, yeah.

Q.    And what did he tell you about that discussion?

A.    He told me that he was clear and she agreed and -- and we could move forward.

Q.    And just to be clear for the record, when you say he said he was clear,

Page 281

R. BALDUCCI

did he say what he was clear about?

A.    I mean, he sent a -- he just, you know, it was like, hey, mission accomplished.  We know what we were going in to do and we did it.  I spoke to Alex.  I, you know, I underlined the point that she has -- this isn't the first time that we've had these conversations and I really need you to take this seriously and that she was willing to do that, so we were moving forward, he was happy about it.  They were all happy about it.  Tanya was happy about it.

COUNSELOR ZUCKERMAN:  There wasn't a question, so unless --

THE WITNESS:  Alright.

Q.    But the "all" you just referred to, are you talking about Tanya and Bill were happy?

A.    Tanya and Bill.

Q.    During the discussion that Bill had with Alex on January 6th, did Bill tell you that he told Alex he wanted Alex to start documenting Collette?

Page 282

R. BALDUCCI

A.    He didn't tell me that.

Q.    Okay.  Did he tell you that Collette was a millennial?

A.    He did not tell me that.

Q.    And did he tell you that he told Alex that he was disturbed because another associate producer had complained about Collette?

A.    He did not.

Q.    Do you -- did Bill tell you that he told Alex that she needed to sign off on his recap e-mail to make things go away?

A.    He did not.

COUNSELOR IADEVAIA:  Okay.  If we could mark as -- is it Exhibit 10?  I think, CBS3150.

(Whereupon, an E-mail Chain was marked as Balducci Exhibit 10 for identification as of this date by the reporter.)

COUNSELOR IADEVAIA:  Please take a look, Ms. Balducci, at what's been marked as Exhibit 10.

Page 283

R. BALDUCCI

And for the record, it's a one-page e-mail chain Bates stamped CBS3150.

CONTINUED EXAMINATION BY

COUNSELOR IADEVAIA:

Q.    So if you look at the bottom e-mail is an e-mail from Bill Owens to Alex dated January 6th, 2022.  Is that the e-mail that you testified about a few minutes ago where Mr. Owens recaps his discussions with Ms. Poolos?

A.    It is.

Q.    Okay.  And just to make sure, does this -- having looked at the actual e-mail, does it refresh your recollection as to whether you played any role in drafting the e-mail?

A.    It does not.

Q.    Okay.  You still don't remember if you -- if you played a role in drafting?

A.    I don't remember.

Q.    Okay.  Okay.  The meeting that Mr. Owens and Ms. Simons had with Alex the day before on January 5th, did you

Page 284

R. BALDUCCI

understand that they were taking corrective action in that meeting?

A.    Yes, by coaching her.

Q.    Okay.  And at that point in time on the -- as of the January 5th meeting, they had not heard Ms. Poolos's side of the story, correct?

A.    Well they, would.  They were going to hear it and then coach her.

Q.    So before they had heard her side of the story, your testimony is they were prepared to coach her?

A.    I mean, I think any manager should be prepared to make a decision based on how a conversation is going.  Yes.

Q.    Okay.  And in what way did they coach her during that meeting?

A.    Asking her to be more mindful.

Q.    Okay.  Anything else?

A.    I wasn't in the meeting.

Q.    Was there anything they told you about?

A.    Asking her to be mindful.

Q.    And is coaching considered a

Page 285

R. BALDUCCI

form of disciplinary action?

A.    No, it's not disciplinary.

THE WITNESS:  Am I answering too fast?

COUNSELOR ZUCKERMAN:  No, not at all.  Well, you can ask the court reporter.  She hasn't complained all day.  First time in my life, I haven't had a court reporter complain.

COUNSELOR IADEVAIA:  We can take a break, that would be good.

THE WITNESS:  Yeah?  Okay.

COUNSELOR ZUCKERMAN:  Yeah.

THE VIDEOGRAPHER:  Time is 5:09 p.m. and this marks the end of Media Unit number 4.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:  The time is 5:31 p.m. and this begins Media Unit number 5.

CONTINUED EXAMINATION BY

COUNSELOR IADEVAIA:

Page 286

R. BALDUCCI

Q.    Ms. Balducci, if you could, in that pile, find Exhibit 9 again.

A.    Sure.

Q.    And that was the exhibit bearing Bates Number 7809 to 10, an e-mail chain or the top e-mail between Ms. Balducci and Ms. Richards.  In that second e-mail where Ms. Richards refers to, "I have a kind of bizarre update to share with you," did Ms. Richards tell you on January 5th that she had heard from her former boss, Scott Bronstein?

A.    Absolutely not.

Q.    Did she tell you that, even if she didn't use his name, did she make any reference from hearing from -- from a third party about -- about her complaint against Ms. Poolos?

A.    So I can't remember what this was about.

Q.    Okay.

A.    Which tells me it was a nothing burger and there's absolutely -- what I can tell you is there's absolutely no way that

Page 287

R. BALDUCCI

she could have mentioned what she shared on the 7th on the 5th.

Q.    Why do you say that?

A.    Because she was out of her mind upset and there's no way that we would have waited two days to really get into that further, if I would have heard on the 5th what she shared on the 7th, I would have taken immediate action as I did on the 7th.

Q.    Okay.  And my question is slightly different than that.  Which is did Ms. Richards make any mention on the 5th that she had heard that Ms. Poolos had reached out to her boss, not the substance of what she -- he said, but that she had made contact with her old boss?

A.    I truly don't know.  I don't recall.

Q.    Okay.  Before the break, we were talking about events that had taken place on January 6th including Mr. Owens having a second conversation with Ms. Poolos and sending a follow-up e-mail, correct?

Page 288

R. BALDUCCI

A.    Yes.

Q.    Okay.  What happened next in connection with this situation?

A.    Okay.  You're asking what happened after Bill and Tanya -- Bill had a conversation, the second conversation with Alex and sent the follow-up e-mail?

Q.    Correct.

A.    Nothing else was happening on this front until the morning of the 7th.

Q.    Which was the next day?

A.    The next day.

Q.    Okay.  And so what happened on the 7th?

A.    On the 7th, I got a call from Collette Richards in the morning.  She was extremely upset and she had represented to me that she had gotten a call from a former boss who was also her reference for the 60 Minutes job, you know his name, Scott, and that Scott had represented to her that Alex had reached out to him and had said some -- some pretty terrible things about her, that her performance was terrible, that he had

Page 289

R. BALDUCCI

-- she had heard from her boss, Bill Owens, that Collette had made a complaint about her and that based on that complaint she had no trust in her.  The situation was much worse.  It was bad before because her performance was terrible.  Now it's much worse because she went to HR.  And so -- and -- and she relayed to me that Scott was uncomfortable with the conversation and felt the need to bring this to Collette and have her bring it to management, to her Human Resources.

Q.    Okay.  And this is a call between just you and Ms. Richards?

A.    Just me and Collette.

Q.    Okay.  And approximately how long was that call; do you have any memory?

A.    I mean, it couldn't have been more than ten minutes or so.

Q.    And were you away from the office when this call came in?

A.    I was.

Q.    Where were you?

A.    I was.  I was at Mount Snow.

Page 290

R. BALDUCCI

Q.    You were skiing?

A.    I was -- yeah, I was trying to take a day off.  I didn't take off time during the holidays.  I got this call when I had just gotten to the mountain, just gotten out of the car, so I was able to separate from my husband and just focus on this for an hour or so and meet them on the slopes about 9:30.

Q.    Other than what you just testified to, what else was discussed during that call on the 7th with Ms. Richards, what else did she say or you say?

A.    She was very upset.  She said I -- I -- I -- I -- I believe she is -- she is talking badly about my performance because I made a complaint to HR.  She is disparaging me to a former boss who could be a future reference and employer.  I -- I don't know how to work with her.  I'm -- I'm -- I'm terrified.  I don't -- I don't have any trust in my manager.  I need your help.

Page 291

R. BALDUCCI

Q.    What else did she say, if anything?

A.    That is all I recall her saying.  What I had said is, okay, take a breath, calm down, just -- just -- if -- if -- she had also let me know that Scott wanted to talk to me and he would give -- she had his phone number so I said, just do me a favor, just settle down, leave this with me, give me Scott's number and just leave this with me.  I need to have some conversations, I will come back to you.  Keep this between us.  Just, I will come back to you.

Q.    Anything else that you recall --

A.    Not that I recall.

Q.    -- during that discussion on January 7th?

A.    Yeah, I mean, that's all I could recall.  My goal was to calm her down and let her know that I would be looking into this.

Q.    What -- what happened next?

Page 292

R. BALDUCCI

What did you do next?

A.    The next thing I did was I reached out to Bill Owens and I let him know that since our conversations yesterday where everything seemed to have gone well and we all thought this was put to bed, it's now come to my attention that Alex may have reached out to Scott explaining the circumstances in the relationship and said disparaging things about Collette to him coupled with informing him that she made a complaint to HR that you brought to her, Bill, so she repeated that conversation to him, and represented to Scott that she's extremely upset and has no trust in Alex now based on it.  Bill's response was that there's no way.  There -- that's not possible, what do you mean.  Bill, you need to get to -- you need to do two things, first, you need to talk to Collette.  I can't be the middleman.  I'm not going to be the middleman on this.  Go talk to Collette.  Go hear it from her.  Right?  You've just come out of a meeting with Alex

Page 293

R. BALDUCCI

where she's representing issues with Collette.  You know, Collette had issues with Alex, go talk to both of them.  This is big.  This is potentially very troubling.  Hear Collette out and then go hear Alex out.  Bring Alex, ask her if she -- if she -- bring her the issues that I'm bringing to you, that I'm sharing with you now, ask her if there's validity to them and then instruct her to cease talking about Collette and I told them let me know how that goes and we'll -- we'll go from there.

Q.    And was this communication you had with Bill on the phone in writing or something else or both?

A.    I think it was both.  I definitely shot him a note with some very clear instructions, but I feel like we likely got on the phone, too.  I can't remember, though.

Q.    Did you notify anyone other than Bill?

A.    I don't remember.  I --

Page 294

R. BALDUCCI

Q.    Did you talk -- did you notify Ms. Simons?

A.    I don't know that I did.  I don't know if I did or didn't, but I needed Bill -- I intended for Bill to run point on this.

Q.    The communication that you had or communications that you had with Bill after you spoke with Ms. Richards the morning of the 7th, was there anything besides what you've testified to?

A.    Not that I can think of.

Q.    And at the time that Collette spoke to you, did she tell you on which day Mr. Bronstein and Ms. Poolos had spoken?

THE WITNESS:  God bless you.

A.    No, she didn't tell me what day they had spoken.  They only -- she conveyed that he was conveying that it must have happened after the conversation with Bill because Alex represented the conversation with Bill.

Q.    Which conversation with Bill?

A.    The conversation where Bill

Page 295

R. BALDUCCI
gave her feedback, which I would assume was on the 5th.

Q.    Why do you say you assume it's on the 5th?

A.    That's when he had the conversation was on the 5th.

Q.    The conversation with Ms. Poolos you're talking about on the 5th, is what you're talking about?

A.    Yes.  That was the day he shared the concerns.

Q.    Did you, at any point, believe that Ms. Poolos had made the call to Mr. Bronstein on the 6th after the second meeting with Mr. Owens?

A.    I don't think -- no, nor would that matter.

Q.    Okay.  Why wouldn't it matter?

A.    The issue that I was brought with -- faced with was potentially that a -- an employee who lives under our policies, who when was hired went through the BCS and potentially many times afterwards, was given feedback about an

Page 296

R. BALDUCCI

employee making a complaint about her management and then went and shared that complaint along with making very clear her -- how she felt about -- about it, which was that is not okay, she went to HR, she betrayed me, I have no trust in her.  I don't -- that's not relevant to me whether she did that on the 5th or 6th.  She did that after she was told about a complaint.

Q.    You said something about an employee who lives under our policies and when was hired was required to do something with the BCS, I wasn't clear on what you meant.

A.    Every employee of Paramount has to abide by the same policies.  We are trained over and over.  We talked about those policies earlier.  We looked at them.

Q.    Were those policies in effect when Ms. Poolos was hired; is that what you're saying?

A.    I'm saying they were in effect at the time that she took these actions.

Q.    Okay.  And when you got a call

Page 297

R. BALDUCCI

from Ms. Richards, did you make a determination as to whether Alex had, in fact, done what Ms. Richards was describing to you?

A.    No, I did not make a determination that she had absolutely done it.  I had made a determination that there was a strong likelihood that if she did this, if the information that just came to me is true, we have a significant problem.  We will be investigating this, but we have a significant problem.  Not a little problem, not the same problem that we were dealing with before, we have potential retaliation which we take very seriously.

Q.    In the time that you worked at CBS News, did you have any other retaliation complaints?

A.    (No response.)

Q.    Outside of this one?

A.    No, I can't think of one right now.

Q.    Do you know that there was a lawsuit filed against CBS accusing

Page 298

R. BALDUCCI

Mr. Gabshon of retaliation?

COUNSELOR ZUCKERMAN:

Objection.

A.    I don't.  I don't know who that is.

Q.    Do you know if he still works there?

A.    I don't know who that is, no.

Q.    So you had given clear instructions to Mr. Owens to speak both with Ms. Richards and Ms. Poolos, correct?

A.    (No response.)

Q.    And did Mr. Owens tell you that he, on the 7th, in fact spoke to Ms. Richards?

A.    I think so.

Q.    And what did he say about it?

A.    I don't know.  I'm not remembering.

Q.    And did Mr. Owens tell you that he spoke to Ms. Poolos on the 7th?

A.    Yes.

Q.    And what did -- what did he say about that discussion?

Page 299

R. BALDUCCI

A. He said that Alex denied a few things.

Q. Okay.

A. She had -- had focussed on -- she had said that she did not -- yes -- well, okay, I think she initially said she didn't speak to him, then after further probing, she said yes, he reached out to me, so I spoke to him, but I did not beline (phonetic) her in any way.

Q. That's what Mr. Owen's said to you about his conversation with Alex?

A. That's what I recall.

Q. Got it. And what else did he say, if anything?

A. I don't recall.

Q. And in any of these calls you -- was this on a call or was this in a text message or --

A. This would have been a phone call.

Q. But do you remember the call?

A. Yeah. We caught up on the phone.

Page 300

R. BALDUCCI

Q.    Okay.  Did you correspond with Mr. Owens about -- about his discussion with Alex in any other format other than phone?

A.    I don't recall.  Actually I am -- I am recalling.  I feel like he sent me -- he either e-mailed me or sent me a text message.  I feel like we had some exchange of what I heard versus what he heard and at some point he said these stories are not matching up, somebody is lying.  I just don't remember exactly when that was, but I know it was after he had his conversation with her because it was he who identified somebody is lying.

Q.    And those conversations you had on the 7th, did you take any notes of them?

A.    Yes.

Q.    And do you still have those notes?

A.    Any notes that I had I submitted.

Q.    Well, have you given all of your notes related to this -- to this

Page 301

R. BALDUCCI

matter to your lawyers?

A.    I have.

Q.    And were the notes you took handwritten notes?

A.    I can't re -- no, I don't think so.  I think I typed them out.

Q.    You typed them out.  So you were typing when people were talking to you or when did you make the notes, how about that, on the 7th?

A.    On the 7th.  I make my notes the same day.

Q.    After the call?

A.    Yeah.  I take my handwritten notes and translate them into something legible that's digital.

Q.    So you would have had handwritten notes?

A.    I would have and then I translate them word for word and then I get rid of handwritten.

Q.    Okay.  And the notes that you took from the discussions on -- on January 7th, were those notes then

Page 302

R. BALDUCCI

transcribed into a summary that you prepared?

A.   Well, January 7th, there were a couple of things.  There was my conversation with co -- well, hold on.  It was a quick exchange with Collette, quick exchange, you know, with Bill, a lot of exchanging in writing, so there was no reason to type notes up there, and then I had my conversation with Scott Brosnen (sic).

Q.   Bronstein?

A.   Bronstein.

Q.   Okay.  And did you take notes of your conversation with Mr. Owens about his discussion with either Ms. Richards or Ms. Poolos?

A.   No.  No.

Q.   Did Ms. Poolos ever deny having a phone call with Mr. Bronstein to you?

A.   No.

Q.   Did she volunteer to you before you even asked her that she had had a conversation with Mr. Bronstein?

Page 303

R. BALDUCCI

A.    Yes.

Q.    And that's reflected in your notes, correct?

A.    That's reflected in my note.

Q.    Well, did you -- notes that you reviewed before today's deposition, correct?

A.    Yes.

Q.    Does it say anywhere in any notes that you have that Ms. Poolos denied to Mr. Owens that she spoke to Mr. Bronstein?

A.    That's something Bill verbally told me.

Q.    Right, but did you ever put it in any of your notes?

A.    I don't recall.  I would have to go back and look at my note.

Q.    Do you think that would be important to include?  If Bill had told you that, wouldn't it be important to include that information in your notes?

COUNSELOR ZUCKERMAN:
Objection.

Page 304

R. BALDUCCI

A.    I would have to look at my notes.  For all I know, it's there.

Q.    Okay.  If he told you that, you would expect it to be there?

A.    I don't know.  I would have to look at my note.

Q.    Well, ultimately, was your conclusion that Ms. Poolos had not been truthful during the investigation?

COUNSELOR ZUCKERMAN:

Objection.

A.    Ultimately, we determined two things:  Alex had, in fact, taken retaliatory actions based on a complaint, a good faith complaint that was brought about her and she lied about it during the investigation.

Q.    And what did you conclude she lied about during the investigation?

A.    I mean, she lied about a couple of things.  She lied about disparaging Collette, which we believed to be true, and she lied about -- she misrepresented her conversation.  She misrepresented how she

Page 305

R. BALDUCCI
reached out to Bronstein.

Q.    Did she lie about anything else?

COUNSELOR ZUCKERMAN:
Objection.  Asked and answered.  You can answer.

A.    I believe that was it.

Q.    Did your investigation conclude that she lied to Mr. Owens about whether she had the call with Mr. Bronstein?

COUNSELOR ZUCKERMAN:
Objection.

A.    She had already admitted that in the same conversation.

Q.    I'm sorry, I -- mean -- admitted what?

A.    She -- in -- in the same conversation, in one conversation, she started by telling Bill she didn't talk to him and then said she did talk to him, so we already knew she talked to him.  That's not -- yeah, okay, not a great look, but she -- she, in that conversation, she admits she talked to him.  That wasn't the

Page 306

R. BALDUCCI

main lie. The lie was who reached out to who. She misrepresented. She made it seem to Bill like, oh, I talked to him so long ago, you know, I reached out to him so long ago, I reached out to him so long ago, right, which left Bill coming off that call with the impression that she didn't do this. She didn't do this. She reached out to him -- this is a misunderstanding, she reached out to him so long ago. Well, we all know, we've learned it to be true, that, of course she reached out to him so long ago initially to talk, but that's not the problem. The problem is on -- right after she got feedback about Collette complaining, she picked up the phone and called him and then shared that there was feedback given to her and then disparaged Collette and then specifically tied these things together and said I can't trust her because she went to HR. And when I look back at those notes, she said that to Scott no less than four times. She went to HR. I just can't trust her. I have no trust in

Page 307

R. BALDUCCI

her.  She's made things so much worse by going to HR.  She made her intentions very clear.

Q.   And when you're referring to notes, you're talking about Mr. Bronstein's notes?

A.   I am talking about Mr. Bronstein's notes.

Q.   Are you talking about any other notes other than Mr. Bronstein's notes?

A.   I am not.

Q.   And was there ever an audio recording presented to you in connection with this investigation of the call between Ms. Poolos and Mr. Bronstein?

A.   No.

Q.   You mentioned that Alex misrepresented how she reached out to Mr. Bronstein, who did she make that misrepresentation to?

A.   She made that misrepresentation to Bill.

Q.   And who else?

A.   And I believe she made that

Page 308

R. BALDUCCI

misrepresentation to me.

Q.    And just to be -- I want to be clear, what did she misrepresent?

COUNSELOR ZUCKERMAN:

Objection.

A.    She misrepresented that she picked up the phone and called him.  She glossed over that completely.  It was he reached out to me.

Q.    And your testimony is she told that to Mr. Owens?

A.    Yes.

Q.    And your testimony is that she told you that as well?

A.    Yes.

Q.    And when did she tell you that?

A.    She told me that when I interviewed her for 70 minutes on the 8th.

Q.    And when did -- when did you find out that she had said that to Mr. Owens, that she misrepresented that Scott had reached out to her?

A.    Once we were -- once we -- once after I had done that interview, the full

Page 309

R. BALDUCCI

intake with Alex, that full interview, then we went into a period of looking at the data we collected and our evidence to determine what we had and if we had any other questions we needed to ask and if there was anything else we needed to do, it was during that period.

Q. That Mr. Owens said to you that Ms. Poolos had misrepresented to him who had reached out to who?

A. Yeah, it didn't line up.

Q. Alright, moving back to the 7th, so your understanding is Mr. Owens had a conversation with both Ms. Richards and Mr. Bron -- sorry, and Ms. Poolos. I think you then said you spoke to Mr. Bronstein on the 7th, correct?

A. I did.

Q. And how did you speak to him?

A. Phone call.

Q. And did you take notes of that call?

A. I did.

Q. And did you take handwritten

Page 310

R. BALDUCCI

notes of that call?

A.    I took electronic notes.  I used my husband's phone for notes, I used my phone to make the call.

Q.    And what's your husband's name?

A.    Al Badsha.

Q.    And what did Mr. Bronstein say to you or tell me everything about that discussion.

A.    Yeah, so, you know, I had, you know, look, I understand that you have information that is pertinent for us here at 60 Minutes related to Collette and Alex and tell me about that and he did and he proceeded to tell me about it.

Q.    What did he tell you?

A.    He told me that they had had a conversation and Alex was very upset and, you know, continued to make -- you know, went on and on about how Collette is -- her performance is terrible and it has been terrible for a while, but now she's gone to HR and made a complaint about me and it's so much worse.  That conversation goes into

Page 311

R. BALDUCCI

circles for quite a bit of time.  They continue to go over the same types of things, like I said, you know, she talked about -- she referenced the fact that Collette made a complaint to HR no less than four times and that it eroded her trust in Collette.

Q.    That's what Mr. Bronstein told you?

A.    That's what he told me.

Q.    Did he tell you anything else?

A.    I mean, he told me that she spoke about her performance not being great and that he remarked, well, that's surprising because that wasn't the case at CNN and, you know, Alex had remarked, you know, maybe -- maybe it's the isolation, she's in Covid and maybe I -- I've not given that enough attention, you know, but, yeah, her work isn't good and she's just -- I just don't trust her.  I can't trust her. She went to HR now.  I have no trust in her.

Q.    Anything else?

Page 312

R. BALDUCCI

A.    She closed by -- by saying, you know, oh, but I -- I, you know, I do want the best for her and, you know, people like her and Lesley -- and then she talked about herself a little bit, Lesley is happy with me and I'm not in any trouble so like, all is good there, and then went back again to, you know, and he had said, oh, I hope you guys work things out.  She had also said to him do not share this conversation, which tells me she knew it was a conversation she shouldn't be having and made another comment, when he was like, well I hope you guys can work it out, she made another comment about I just can't believe she went to HR and they ended the conversation.

Q.    He ended -- you mean he ended the conversation with Ms. Poolos or with you?

A.    They -- they ended the conversation.

Q.    Got it.  What else did you and Mr. Bronstein discuss during your call?

A.    You know, he had said -- he had

Page 313

R. BALDUCCI

said that -- I asked him about his relationship to, you know, Collette and Alex and he had said that he had worked with the both of them in the past.  He's not, you know, he didn't have a close relationship with Alex, but they had, you know, just a professional relationship.  He had referred Collette who he was very fond of.  She worked for him at CNN.  He referred her at 60 Minutes, to 60 Minutes and so I knew about their relationship.  He had said he really didn't want to get involved.  I said, you know, like thank you for this.  This is important.  He's like, well, I didn't want to get involved, but I'm very concerned by the statements that Alex made.  I, you know, I felt compelled to share it with you.  Is there anything else that we discussed?  That was really it.  That was really it.

Q.    And anything you said to him other than what you testified to?

A.    I mean, only that we're taking this seriously.  This is a serious

Page 314

R. BALDUCCI

allegation and I'm going to be looking into this and I'll let you know if I need anything else from you and I'll ask you to keep this confidential.

Q.    Anything else?

A.    Not that I can remember.

Q.    At any point after you learned about this call between Mr. Poolos and Mr. Bronstein, did you do any investigation into the nature of the relationship between Mr. Bronstein and Collette?

COUNSELOR ZUCKERMAN:
 Objection.

A.    I would have no reason to.

Q.    Okay.  Did you -- do you know whether they were close on a personal level?

A.    I don't.

Q.    Did you ever ask Collette?

A.    I know they had a professional working relationship where he referred her to 60 Minutes.  She used to work for him. He would be someone maybe that was a mentor, a sponsor, might actually help

Page 315

R. BALDUCCI

connect her with opportunities.  I knew that she was -- he was a significant person in her life from a professional standpoint.

Q.    And did you inquire at all as to whether they had any personal relationship?

A.    No.

Q.    Okay.  Do you know whether Mr. Bronstein worked -- had previously worked for 60 Minutes?

A.    I -- I -- that was brought to my attention, but no.

Q.    Did you ever look into it?

A.    No, I had no reason to look into it.

Q.    Did you know whether Mr. Bronstein had been fired from 60 Minutes?

A.    No, I have no idea.

Q.    And you didn't look into that, correct?

A.    No, I have no reason to look into that.

COUNSELOR IADEVAIA:  Okay.  If

Page 316

R. BALDUCCI

we can mark as Exhibit 11, 8130, please.

(Whereupon, a Text Thread was marked as Balducci Exhibit 11 for identification as of this date by the reporter.)

COUNSELOR IADEVAIA:  Okay, what's been marked as Balducci Exhibit 11 is a one-page text exchange bearing Bates number CBS8130.

CONTINUED EXAMINATION BY COUNSELOR IADEVAIA:

Q.    Let me know when you had a chance to look at it.

A.    Yup, I'm ready.

Q.    Okay.  In that top text that you sent on January 7th, 2022, you write "Heads up.  Alex Poolos, after speaking with you Bill called Collette's PLS manager at CNN (her reference when she came here).  Told him Collette is terrible at her job, told him she told you as much, Bilk," I assume that's Bill, "referred to Collette

Page 317

R. BALDUCCI

as a millennial who went to HR to solve her problems and I don't want to ruin her career but dot, dot, dot," then you write "Bill I need you to speak to Collette and then we should talk."  And then you write "Alex's actions reflect horrendous judgement and amount to retaliation in my pov."  Do you see that text?

A.    Of course I see that.

Q.    Okay.  And this was the text message that you wrote, correct, to Mr. Owens --

A.    Yes.

Q.    -- and Ms. Simons on January 7th, 2022, right?

A.    Yes.

Q.    And was this the first communication that you had with Mr. Owens and Ms. Simons about this concern?

A.    Yes.

Q.    About the phone call between Mr. Bronstein and --

A.    Yes.

Q.    -- Ms. Poolos, correct?

Page 318

R. BALDUCCI

A.    Yes.

Q.    Okay.  And the text message that you wrote was based on what Ms. Richards had told you, correct?

A.    Correct.

Q.    And Ms. Richards was not on the call with Alex and Bron -- Scott, correct?

A.    Correct.

Q.    And you had not at the time of this text spoken to Mr. Bronstein, right?

A.    Correct.

Q.    And you had not reviewed any notes from him at that point?

A.    Correct.

Q.    And you had not reviewed text messages between Alex and Scott, correct?

A.    Correct.

Q.    But in the text message, you indicate that you had already made up your mind that Alex had disparaged Collette during her call with -- with Scott, hadn't you?

COUNSELOR ZUCKERMAN:

Objection.

Page 319

R. BALDUCCI

A.    I'm giving you my assessment at the time.  An investigation followed.

Q.    Right, but at the time, you're indicating that you believe that Alex, in fact, had done the things that Collette had said she did, right?

COUNSELOR ZUCKERMAN:

Objection.

A.    My assessment, based on the information that I had was that Collette was credible and that this likely -- this very well could have happened, so yes.

Q.    So you -- you believed before talking -- before doing any investigation that Alex had, in fact, had the call the way that Collette described it to you?

COUNSELOR ZUCKERMAN:

Objection.

A.    I believed there was a great chance of that.

Q.    Based solely on what Collette had said to you, correct?

A.    It's a little more than that.

COUNSELOR ZUCKERMAN:

Page 320

R. BALDUCCI

Objection.

CONTINUED EXAMINATION BY

COUNSELOR IADEVAIA:

Q.    What else?

A.    We've got Collette who has come from being terribly upset about the way her manager treats her to now coming around to, you know what, I can work with her and I'm going to give her the benefit of the doubt to now hysterical because she is in fear of exactly what she was afraid of, that her boss would retaliate against her for making a good faith compliant.

Q.    Is there anything else that you --

A.    That's it.

Q.    -- base your assumption that Collette was correct before you did your investigation?

COUNSELOR ZUCKERMAN:

Objection.

A.    What I told you.

Q.    Take a look at the bottom text from Mr. Owens, it's sent the same day.  "I

Page 321

R. BALDUCCI

spoke to both, two entirely different stories. Collette's is the one above and Alex says she spoke to the CNN guy (not yesterday but Wednesday) because he is a friend and she was looking for insights into Collette. She says she did not disparage her. Ever. I told Alex this was going to be in HR's hands and that she shouldn't be in touch with Collette today and we'd untangle on Monday. Someone is lying." Do you see that text?

A.    Yeah, of course I see it.

Q.    Okay. Was this the first communication that Mr. Owens had with you about his conversation with Alex about the Bronstein call?

A.    This is -- yes.

Q.    Because I think you testified before you -- you believe you spoke to him by phone on the 7th and I'm wondering was this text the first communication you had with Bill on the 7th following his discussion with Alex about the Bronstein call?

Page 322

R. BALDUCCI

A.    It may have been.

Q.    It's written that -- it's written in a way that suggests it is, correct?

A.    Yeah, it does.

Q.    Okay.  And in that text, Mr. Owens doesn't say anything about Alex being not truthful about her having a call at all with Scott Bronstein, right?

COUNSELOR ZUCKERMAN:
    Objection.

A.    Not in this text, but he said it.

Q.    Right.  And he said it when?

A.    He said it in a phone call.

Q.    And which -- on the same day or another day?

A.    I don't recall.

Q.    Were you surprised that -- when he told you later that -- that Alex had denied having the call at all, that it wasn't in his initial text about their conversation?

A.    I'm sorry.  Help me out with

Page 323

R. BALDUCCI

that again.

Q.    Sure.  Were you -- it sounds like what you're saying is that that Bill did tell you that Alex denied having the call with Scott initially and you learned about that in a phone call that presumably was after this text message, correct?

A.    Alex denied having the conversation and then admitted she had it in the same conversation.

Q.    Right.  And you found that out from Bill after this text message?

A.    Yes.

Q.    And I'm asking, were you surprised that Bill didn't include that information in his text message about the conversation?

A.    No.

Q.    How come?

A.    Because it's a text message.  We're going to have more conversation.  He's giving me his initial -- his thoughts.

Q.    He didn't say in this text message Alex lied to me about her phone

Page 324

R. BALDUCCI

call with Scott?

COUNSELOR ZUCKERMAN:

Objection.

Q.    Right?

A.    Right.

Q.    Okay, what -- after you speak to Mr. Bronstein, what happens next in the sequence of events?

A.    Okay.  After I speak with Scott, which was on the 7th, I had a conversation with my employment law counsel as well as my manager and then Bill to let them know that if this happened, we have a serious situation on our hands.  We need to go through and we need to have -- we need to have more of an investigation.  We need to have a conversation with Alex, but we also need them to be separated.  And so, I had recommended that we place Alex on paid administrative leave to give us time to conduct our investigation which would include a conversation with her where she could speak her piece.  All parties agreed that that made sense and so I reached out

Page 325

R. BALDUCCI

to Alex.

Q.    And you spoke to Ms. Poolos on the 7th, correct?

A.    I did.

Q.    And so going back, the discussion you had before you spoke to Alex, did you speak to your manager in a group setting or were -- was it just the two of you or did you have multiple calls with your manager that day?

A.    I don't recall.

Q.    And your manager was Ms. Glasglow?

A.    Yes.

Q.    And did you ask for Ms. Glasglow's feedback on putting Ms. Poolos on leave?

A.    I did.

Q.    And in doing so, what did you -- what information did you give to Ms. Glasglow?

A.    I gave her all the information that I had up until that point.

Q.    Did you tell Ms. Glasglow that

Page 326

R. BALDUCCI

you believed that Ms. Poolos had, in fact, said what she had been accused of saying?

COUNSELOR ZUCKERMAN:

Objection.

A.    I let her know everything that happened up until that point.

Q.    And what did Ms. Glasglow say about placing Ms. Poolos on a leave, a paid administrative leave?

A.    She agreed.

Q.    Did she say why she agreed?

A.    She agreed.

Q.    Did she say why?

A.    Not that I can recall.

Q.    And did you -- you said that you spoke to Mr. Owens about the administrative leave?

A.    Yes.

Q.    And did you speak to him on the phone or in some other way?

A.    I would imagine it was on the phone.

Q.    Do you remember?

A.    I can't remember.

Page 327

R. BALDUCCI

Q.    And what do you recall, if anything, about Mr. -- I mean, who -- who initiated the suggestion or recommendation that Ms. Poolos be placed on a leave?

A.    I did.

Q.    And what do you recall about Mr. Owens reaction to that recommendation, if anything?

A.    He agreed.

Q.    Did he say why he agreed?

A.    I can't recall.

Q.    Did you --

A.    I think the gravity of this potential situation was enough for everybody to agree they needed to be separated.

Q.    And was there a way to separate Ms. Poolos and Ms. Richards without placing Ms. Poolos on a paid administrative leave?

COUNSELOR ZUCKERMAN:

Objection.

A.    No.  That was not my assessment nor Bill's.

Q.    And -- and why not?  Was there

Page 328

R. BALDUCCI

other options besides placing her on a leave to separate them?

A.    That was not our decision.  You would have to ask Bill.

Q.    I'm not sure I understand.  I'm asking, you just said you initiated the recommendation to place Ms. Poolos on administrative leave and I think you said the reason that you did that was because it was important to separate Ms. Poolos and Ms. Richards and my question to you is were there other ways to separate them without placing Ms. Poolos on leave?

COUNSELOR ZUCKERMAN:

Objection.

A.    No.  I'm saying no.

Q.    And how come?

A.    Because someone else had to take on her work.

Q.    Someone had to take on whose work?

A.    Someone had to take on Alex's work so that the work could continue.

Q.    Couldn't Ms. Poolos continue to

Page 329

R. BALDUCCI

do her work?

COUNSELOR ZUCKERMAN:

Objection.

A.    That was not the decision that I made.  It's not the decision that Bill made.

Q.    Right, I understand that, what the decision was, my question is was there alternatives?

A.    No.  Nothing that would create -- nothing that -- the only other options would have -- if there were other options, they potentially would have created a ton of friction for the show.  No, this was -- this was the right thing for the business.

Q.    And what friction are you referring to?

A.    I mean, the decision was to take Alex off.  It was to have -- have her be able to -- have Collette be able to continue to work and work with someone else on this piece while we figured it out.

Q.    Well, wasn't there a discussion at the time of Ms. Richards working with --

Page 330

R. BALDUCCI

working on -- not working on a piece, not continuing on the piece?

COUNSELOR ZUCKERMAN:

Objection.

A.    What were you -- no.  No.

Q.    There was no such discussion?

A.    I -- I don't recall.  I don't recall.

Q.    Okay.  Do you know whether Alex did work on the piece during her paid administrative leave?

A.    She was only obligated to give information to her managers and transition.

Q.    Do you know if Ms. Stahl reached out to Alex and asked her to do work on the piece while she was on paid administrative leave?

A.    I have no idea, no.

Q.    Well, if she was and Ms. Poolos did do work on the piece while she was on leave, wouldn't that suggest that it was possible for Mr. Poolos to work and not have interactions with Ms. Richards?

COUNSELOR ZUCKERMAN:

Page 331

R. BALDUCCI

Objection.

A.   No, I don't think that would be the appropriate course of action.

Q.   Putting somebody on paid administrative leave is a pretty serious step, correct?

A.   It is an administrative tactic.

Q.   Right, but in the time you've been at Paramount since 2020, you're -- you've been involved in three or four situations where that's happened, correct, including Ms. Poolos?

A.   Yeah.

Q.   And the other situations involved sexual harassment, correct?

A.   They did.

Q.   Got it.

A.   They did.

Q.   Did Ms. Poolos raise concerns about being placed on administrative lever?

A.   She did.

Q.   And what did she say?

A.   I don't recall.  She wasn't happy about it.  She wanted to be put back.

Page 332

R. BALDUCCI

She wanted to be reinstated.

COUNSELOR IADEVAIA:  If we could mark as 12, CBS8133, please.

(Whereupon, a Text Thread was marked as Balducci Exhibit 12 for identification as of this date by the reporter.)

COUNSELOR IADEVAIA:  What's been marked as Balducci Exhibit 12 is a one-page text exchange bearing Bates numbers CBS8133.

CONTINUED EXAMINATION BY
COUNSELOR IADEVAIA:

Q.    Let me know when you've had a chance to review the document, please.

A.    Okay.

Q.    Is this a text exchange between you and Tanya Simons on January 7th, 2022?

A.    Looks like it.

Q.    Got it.  And in the top e-mail Ms. Simons writes, "I need guidance on an update with Collette.  She and Alex have a shoot next week and Collette told me she can't work with Alex and doesn't want to

Page 333

R. BALDUCCI

go.  Is Maria Cottone back?  If not we can discuss tomorrow."  Do you see that text?

A.    Yes.

Q.    Okay.  At that point in time when Ms. Simons sends her text had a decision been made to put Ms. Poolos on paid administrative leave?

A.    That -- possibly not.

Q.    Okay.  Further down you write, "Yeah, we can discuss.  Give me an hour." Tanya then writes "Take all the time you need."  Tanya writes Alex Poolos and then a phone number and Tanya writes, "I brought Bill up to speed."  Do you see that text?

A.    Yeah.

Q.    Do you know what Tanya brought Bill up to speed to at that point?

A.    I don't.

Q.    Is it -- is it likely that Ms. Simons brought Mr. Owens up to speed by telling him that the decision had been made to place Ms. Poolos on paid administrative leave?

COUNSELOR ZUCKERMAN:

Page 334

R. BALDUCCI

Objection.

A.    I don't know.  I don't think so.

Q.    Why don't you think so?

A.    Because I just don't know.  I don't know.

Q.    After speaking -- well, after placing Ms. Poolos on a paid administrative leave, did you conduct any investigation into the allegations that Ms. Richards had made related to the Bronstein call?

A.    I did.

Q.    And what investigation did you do?

A.    I had a thorough and extensive 70-minute conversation with Alex Poolos on Saturday.  The very next day after these allegations.

Q.    And that's January 8th?

A.    It is.

Q.    And how did you meet with Alex on the 8th?

A.    We had a phone call.

Q.    What else did you do as part of

Page 335

R. BALDUCCI

-- part of your investigation other than speak with Ms. Poolos?

A.      I had a conversation with Lesley Stahl and I reviewed all of the facts and the information that we had. Actually, no, there's more.  There's more. Scott had mentioned -- okay, after I had a conversation with Alex and I took her account and I was trying to make sense of things because they were -- they were -- the stories were not lining up, I believe Alex had actually mentioned, again, she had said in her interview with me, I didn't reach out to Scott.  So that stuck out to me as troubling.  It's two different things that I'm hearing and so I was trying to get a sense of what is true and so I reached out to Scott and I asked him if he wouldn't mind sending me his screen shot of the -- of the call from Alex coming through because if he didn't have it then that might indicate Alex was telling the truth. I also asked him to send me screen shots of their text exchanges because he already

R. BALDUCCI

referenced that there were text exchanges, so I knew those existed, I asked him to send me that.  He also mentioned he had taken notes and offered to share them with me if I was interested and I said, yeah, you've got notes, yeah, please send those over.  So I reviewed then all of that against these interviews, conferred with my boss, conferred with my legal partners, had multiple conversations with Bill and Tanya, came to a decision.

Q.    Did you do anything else other than what you testified to in terms of investigation after placing Ms. Poolos on a paid administrative leave?

A.    No, I just described.

Q.    Okay.  You spoke to Ms. Poolos on -- on the 7th to tell her that she was being placed on a leave, correct?

A.    I did.

Q.    And tell me everything you remember about that discussion?

A.    During that discussion, I had called Alex, I had let her know that a

Page 337

R. BALDUCCI

complaint had come in and that I was going to -- that we were -- we were going to be looking into. I believe she volunteered that she, is this about Collette, is this about, you know, I feel like she probably -- she asked us about Collette, is this about Scott Bronstein and -- and what I had said to her is I will -- I will have a conversation with you and we will go through this, but right now, I'm just telling you that a concern has come in, it's serious, I need time to work through it and we are placing you on an administrative leave while we go through it. I told her I would come back to her quickly so that she could be heard. She would have a chance to give a full account of her side of the story and I got back to her the very next day on a Saturday.

Q. Anything else about that call between you and Ms. Poolos --

A. No.

Q. -- on the 7th?

A. No.

Page 338

R. BALDUCCI

Q. Okay. And then you spoke with Ms. Poolos for over an hour on the 8th, correct?

A. That's right.

Q. And what did Ms. Poolos say to you about the -- who initiated the call between her and Mr. Bronstein on the 8th?

A. My recollection is that she said that he reached out to her. He called her.

Q. She said that to you --

A. I believe she said he called me, yes.

Q. Did she, during that conversation, also say that she had reached out to him before January 5th?

A. Yes.

Q. What did she say about that?

A. And that was never of dispute. She had just -- she -- she was making the point that she had reached out to him some time before any of this began. That's fine. That's neither here nor there. Did you have a conversation with him after you

Page 339

R. BALDUCCI

were told that your -- your subordinate is making a complaint about you and did you share that with that person and make disparaging comments about her for having made that call, that was what I was focussed on.

Q.    Right, I understand the substance of her call with Mr. Bronstein is an important aspect of the situation, but I want to just understand fully the concerns you had about Ms. Poolos's representations about who initiated the call because I think what you said is it was not in dispute that Ms. Poolos had reached out to Mr. Bronstein before January 5th, correct?

A.    Right.

Q.    And Ms. Ms. Poolos did not misrepresent that fact based on your investigation, that was correct, that was true?

A.    Yes.

Q.    But the -- so what is the issue with who initiated what?  What was the representation that was false?

Page 340

R. BALDUCCI

COUNSELOR ZUCKERMAN:

Objection.  You can answer again.

A.    Alex led me and Bill to believe that she did not initiate a call with Scott on the 7th when, in fact, she did.

Q.    Just to correct for the record, you mean the 5th not the 7th, right?

A.    I can't remember anymore.

Q.    And looking back --

A.    The 5th, yes, the 5th.

Q.    Okay.  And as part of your investigation, you had an opportunity to look at text messages between Ms. Poolos and Mr. Bronstein, correct?

A.    Yes.

Q.    And what did those text messages reveal -- text messages reveal about the back and forth between Ms. Poolos and Mr. Bronstein?

A.    Validated that they had been going back and forth for some time, that Alex had initiated the reach out some time earlier and that on the 5th, Scott made himself available to her via text and that

Page 341

R. BALDUCCI

Alex then picked up the phone and made a phone call to Scott, a 17-minute phone call.  That is what it revealed.

Q.    And the -- the issue with your -- your perspective of the issue with Ms. Poolos's representation of the sequence of events is that she made it seem as though she had answered a call from Mr. Bronstein on the 5th as opposed to place the call?

A.    Correct.

Q.    And what's the significance of that?

A.    The significance goes to credibility and if we go back to that business practices statement, I could find a section in there where it states that it -- it matters.  Employees -- that -- employees being truthful in an investigation matters.  You are not to mislead or misrepresent information in an investigation.

Q.    And about who called whom on the 5th did you at the time you were doing

Page 342

R. BALDUCCI

your investigation form a belief as to why Alex would lie about that?

COUNSELOR ZUCKERMAN: Objection.

A.    I mean, it goes to her intent.

Q.    What do you mean by that?

A.    It's signaling her intention.

Q.    Her intention to do what?

A.    If she called him that day and then told us she called him, that would be one thing. But to call him and then misrepresent that she called him tells me she's got something she wants to hide. She's intending to cover up her actions.

Q.    By saying that she was -- by saying that she picked up the call as opposed to placed the call?

A.    A hundred percent.

Q.    And do you know in reviewing those text messages whether Mr. Bronstein on the 5th had initiated communication that day or if it had been Ms. Poolos?

COUNSELOR ZUCKERMAN: Objection.

Page 343

R. BALDUCCI

A.    On the 5th?

Q.    Yes.

A.    Yeah, I answered this before, I know that Mr. Bronstein responded to her that morning and said, hey, I'm available if you want to talk.  That's neither here nor there.  Again, irrelevant.

Q.    Okay.  Alright.  Other than what Ms. Poolos purportedly said to you during the January 8th meeting regarding who initiated the call on the 5th, was there any other time she purportedly made a misrepresentation to you about that issue, about who initiated the call on the 5th?

A.    I don't believe so.

Q.    As part of your investigation after placing Ms. Poolos on a administrative leave, did you speak to someone name Jack Weingarten?

A.    I do recall speaking to Jack, yes.

Q.    Okay.

A.    And I do recall that I intended to cover off with Lesley so I wanted to

Page 344

R. BALDUCCI

understand is there anyone else that we need to speak to and I had a conversation with Lesley Stahl, and I had a conversation with an AP who I do believe was Jack.

Q.    And tell me about your conversation with Mr. Weingarten?

A.    I -- so I can't actually remember my conversation with Jack.

Q.    Why -- why -- sorry.  Go ahead.

A.    And I don't have notes on it.

Q.    How come you have no notes?

COUNSELOR ZUCKERMAN:

Objection.

A.    I just -- I just can't find any notes on it.  I -- I want to say because it wasn't significant.

Q.    But you don't remember?

A.    I don't remember the actual conversation -- I remember little bits of the conversation.  I remember -- I remember him -- like my goal was just to understand -- just to -- just to connect with someone who I had a sense might know what's going on and to say there is -- there is

Page 345

R. BALDUCCI

something -- there is an investigation and if you just -- if you know -- do you know anything about it, he knows nothing about it, okay, great.  There is something my office is looking into, keep this conversation between us and if anything comes your way, come to me.

Q.    So your testimony is that was the conversation that you had with Mr. Weingarten?

A.    I think so.

Q.    Did you discuss with Mr. Weingarten any complaints against -- by him related to Ms. Richards?

A.    No, I didn't know he had complaints about Ms. Richards.

Q.    Did Ms. Poolos tell you that there had -- that he had complained about her?

A.    I don't recall that.

Q.    And why were you reaching out to him, what led you to him?

A.    Because Tanya -- I cannot exactly remember.  I think it was because

Page 346

R. BALDUCCI

Tanya told me that there was an AP they worked with and I was trying to -- to get the circle tight, anybody that might know anything about this, put a confidentiality order out there.

Q.   The "circle tight," meaning what circle?

A.   When you're dealing with an investigation, anybody that has any knowledge of it, you want to put a little like, a bit of a gag order there, like don't talk about this.  Let us handle it and let us address it and make it go away. We don't want it to have a life of its own.

Q.   Was, other than keeping the circle tight as you said, was there any other purpose in reaching out to Mr. Weingarten?

A.   I cannot remember.  I don't think so.  And that's why I think I don't have notes on it because it was like a, not a very consequential...

Q.   And what was your discussion with Ms. Stahl?

Page 347

R. BALDUCCI

A.    Ms. Stahl, it was -- that was very, again, this was along the same times but that one I remember really clearly, Ms. Stahl was a little different, I believe, in that Alex had told me that she had told Lesley about Collette's complaint. She had told me that.  And so my goal in talking to Lesley was to say, Lesley, I understand that Alex may have shared some information with you about a complaint that Collette raised, is that true.  She answers, yes, it's true.  Okay, what did she tell you, I wanted to get a sense of what she knew, she told me whatever she knew.  I can't remember what that was. Then my goal was to let her know this -- there is -- there is an actual complaint. There's an official investigation that my office is handling and that she should just not have any conversations with anyone about this from here.

Q.    Anything else you remember?

A.    I did also tell her, I think I also did need to tell her, I can't

Page 348

R. BALDUCCI

remember, Bill would have already told her about the administrative leave, so I wouldn't have had to tell her that, but no, that's all.

Q. Did you ever give an instruction to Ms. Poolos not to keep everything that was being discussed in the investigation confidential?

COUNSELOR ZUCKERMAN:

Objection.

A. Yeah.

Q. When did you give her that instruction?

A. I would have given her that instruction -- I would have given her that instruction -- I might have actually told her -- I might have actually told her the night that I put her on administrative leave.

Q. Do you remember if you did?

A. I can't remember.

Q. And the -- and the January 7th was the first time you had spoken to Ms. Poolos about any of the issues related to

Page 349

R. BALDUCCI

Ms. -- Ms. Richards, correct?

A.    Yes.

Q.    Did Ms. Poolos, at any point during the paid administrative leave, ask to speak with your supervisor?

A.    She did.

Q.    And your supervisor being Cindy Glasgow?

A.    Yes.

Q.    And was Ms. Poolos ever given a chance to speak to Ms. Glasglow?

A.    As far as I know, Cindy didn't make herself available.

Q.    And were you part of any discussions about whether Ms. Glasglow would speak to Ms. Poolos?

A.    Absolutely not.

Q.    You were not part of any discussions about whether to do that or not?

A.    No, that was her call.

Q.    And I understand it was her call, but my question is did you ever have a discussion with Ms. Glasglow about it?

Page 350

R. BALDUCCI

A.    Nope.

Q.    Do you have any understanding as to why Ms. Glasgow did not speak to Ms. Poolos?

A.    I have not idea.

Q.    Do you think she should have? Do you have a view on it?

A.    I mean, it's not for me to say.

Q.    After speaking to Ms. Poolos on January 8th, did you have any other conversations with her before the firing meeting?

A.    I did not.

Q.    And did you have any e-mails with her before notifying her that the investigation had been complete?

A.    I don't think so, no.

Q.    Did Ms. Poolos ever say to you, whether on the 7th, the 8th, or some other time that there were documents that she believed you should look at as part of your investigation?

A.    No, I do not recall that.

Q.    Did you ever look at any

Page 351

R. BALDUCCI

documents at Ms. Poolos's suggestion?

COUNSELOR ZUCKERMAN:

Objection.

A.    No because she -- I have no recollection that she suggested anything.

Q.    Did you ever ask Ms. Poolos if she had text messages with Mr. Bronstein?

A.    No.  I already had the text messages from Mr. Bronstein.

Q.    Did you ask Ms. Poolos if she had notes of her conversation with Mr. Bronstein?

A.    I didn't because she never made me aware of notes.  Are there notes?

Q.    I'm just asking you if you asked her.

A.    I didn't ask Scott Bronstein either.  He told me he had notes.

Q.    Okay, but did you ask Ms. Poolos after you --

A.    I would have no reason to think she had notes.  So the answer is no.

Q.    Were Mr. Bronstein's notes an important part of the investigation from

Page 352

R. BALDUCCI

your perspective?

A.    They ultimately were an important part of the investigation, yes.

Q.    Okay.  And so why not ask Ms. Poolos if she had a set of notes of her own?

COUNSELOR ZUCKERMAN:
Objection.

CONTINUED EXAMINATION BY
COUNSELOR IADEVAIA:

Q.    You can answer.

A.    She's a journalist.  If she had notes, I would think she would have offered them to me.

Q.    Did you say to Ms. Poolos during your meeting on January 8th that she should have come to you before she spoke to Mr. Bronstein?

A.    I don't recall.  You want to expand on that?

Q.    No, I'm just asking your memory of the conversation with Ms. Poolos on January 8th if --

A.    January 8th.

Page 353

R. BALDUCCI

Q.    Did you say to Ms. Poolos she should have come to you before she spoke to Mr. Bronstein?

A.    I would have -- I do not recall, but -- I don't recall.  I don't recall.  Would I have given her guidance that I was, yeah, available and as a resource if she felt like she needed one, yes.

Q.    But you didn't reach out affirmatively to tell Ms. Poolos that on -- on -- at any point before January 7th, correct?

A.    No.

Q.    And did Ms. Poolos tell you during your meeting on January 8th that Mr. Owens had told Ms. Poolos not to speak to you?

A.    No.

Q.    You -- what are you saying no to?

A.    Can you say that again.

Q.    Yeah.  Sure.  Let me try to be clearer about it.  During your conversation

Page 354

R. BALDUCCI

with Ms. Poolos on January 8th, did Ms. Poolos say to you that she had been told by Bill Owens not to speak to you?

A.    I can't recall.

COUNSELOR ZUCKERMAN:  Now that you threw those, can we take a quick break?

COUNSELOR IADEVAIA:  Sure.

THE VIDEOGRAPHER:  Time is 6:45 p.m.  We are now off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:  The time is 7:13 p.m.  And we're back on the record.

COUNSELOR IADEVAIA:  If we could please mark that document as Balducci Exhibit 13, 6789.

(Whereupon, a Text Thread was marked as Balducci Exhibit 13 for identification as of this date by the reporter.)

CONTINUED EXAMINATION BY COUNSELOR IADEVAIA:

Page 355

R. BALDUCCI

Q.    Okay, so for -- please take a look, Ms. Balducci, at what's been marked as Balducci Exhibit 13.  It's a multipage text exchange bearing Bates numbers Bronstein 7 to Bronstein 10.

A.    Okay.

Q.    Do you recognize what's been marked as Balducci Exhibit 1?

A.    I do.

Q.    And what is it?

A.    This is my text exchange with Scott Bronstein over January 7th and 8th.

Q.    Got it.  And did you communicate with Mr. Bronstein using the 917 phone that you mentioned earlier?

A.    Yes.

Q.    Okay.  And do you still have the text messages with Mr. Bronstein?

A.    I have no idea.

Q.    Did you give those text messages to your counsel?

A.    Absolutely.

COUNSELOR IADEVAIA:  Okay. Well, we call for their production

Page 356

R. BALDUCCI

because we didn't get them.  We got them from Mr. Bronstein.

COUNSELOR ZUCKERMAN:  Okay.

Q.    Alright.  In the top text as you said dated January 7th, 2022?

A.    Yeah.

Q.    And in that text you're reaching out to Mr. Bronstein, was that the first time you had had any communication with Mr. Bronstein?

A.    It is.

Q.    And you're texting him for the purposes of scheduling a call with him, correct?

A.    Correct.

Q.    And you did -- you testified earlier, but you did, in fact, speak to Mr. Bronstein on January 7th, right?

A.    Correct.

Q.    Okay.  On January 8th, you send another text message to or you send a few text messages to Mr. Bronstein, correct?

A.    Correct.

Q.    And you ask Mr. Bronstein to

Page 357

R. BALDUCCI

send you a screen shot of your -- of his recent text exchanges with Ms. Poolos from January 5th, correct?

A.    Correct.

Q.    And so this is you reaching out to Mr. Bronstein and asking him for the screen shot of the text exchanges, right?

A.    Correct.

Q.    And then you say can I have a screen shot of -- of Ms. Poolos's incoming call to -- to Mr. Bronstein on -- on January 5th, correct?

A.    Correct.

Q.    Got it.  And this is you asking Mr. Bronstein for the screen shot of the incoming call, right?

A.    Correct.

Q.    And then you tell Mr. Bronstein that Ms. Poolos's account of that day and her and -- and -- of that day and the conversation between Mr. Bronstein and Ms. Poolos and this is the, quote, "it's very different and having a bit more info would be extremely helpful."  Do you see that

Page 358

R. BALDUCCI

text?

A.    Of course.

Q.    Why -- why do you say that to Mr. Bronstein?

A.    To explain why I'm asking him for more information than he has already willingly provided.

Q.    And at that point in time, other than the phone call that you had had with him, had he provided you any information?

A.    He had -- he had -- yes, he had given me information.  He had talked me through his account of the day, of the conversation.

Q.    Right.  Outside of that, was there any other information he had given you at that point?

A.    No.

Q.    And -- and then he -- he then ends up sending you screen shots that you had requested, correct?

A.    Correct.

Q.    At the bottom of that first

Page 359

R. BALDUCCI

page of Exhibit 13, you wrote to

Mr. Bronstein "Yes.  You are incredible.  I

appreciate the transparency and trust so

much.  All would be incredibly useful and

valuable."  Why did you tell Mr. Bronstein

that he was incredible?

        A.    He's, first of all, serving as

a whistleblower.  He is putting himself on

the line to give us information so that we

can ensure we have the best work place

possible.  He is putting himself in the

middle of something he doesn't want to on

behalf of someone else by doing the right

thing.  All impressive.  Further, he's

going out of his way to send me information

from his phone and timely.

        Q.    Sorry.  And what?

        A.    And timely.

        Q.    "Timely" meaning what?

        A.    Meaning he's responsive.

        Q.    And when you thank him for

being transparent, what did you mean by

that?

        A.    He's -- he's forthcoming.  He's

Page 360

R. BALDUCCI

providing information that we need to ensure we have the work place, the right work place for our employees.

Q.    Okay.

A.    Now, remember, the first thing I'm hearing from Collette whose got an account of what Scott Bronstein said, a third party, a neutral and professional third party from another organization that I can't think of any reason why he would he would want to be beligning (phonetic) someone in our employ.  Then he gives me an account of a situation which matches what Collette has shared that he said, so things are all lining up so far.

Q.    Well --

A.    And then I had a conversation with Alex and realized I wanted more information because there were two different stories.

Q.    When you say he's a neutral third party, what's your basis for saying that?

A.    My basis is he's not an

Page 361

R. BALDUCCI

employee of ours and I can't think of any reason why he would make up a story and want to put himself in front of CBS News Human Resources and become part of an investigation.  I can't think of why he would do that.

Q.    Well, did you make any effort to figure that out?  I mean, you testified earlier today that you didn't think his relationship with Collette was significant, whether he had a personal relationship with her?

A.    He's someone who referred an employee of his to a role with us.

Q.    Mm-hmm.

A.    And now he's letting us know that he's concerned because another -- her manager is disparaging her and potentially retaliating against her.  So his willingness to tell us that when he doesn't have to, I respect that.

Q.    I understand that, but my question is when you claim he's a neutral third party, what's your basis for saying

Page 362

R. BALDUCCI

that?

COUNSELOR ZUCKERMAN:

Objection.

A.    The guy's a journalist.  He's -- he's -- he's a respected journalist at CNN.  I have no reason to think anything.

Q.    How do you know he's a respected journalist at CNN?

A.    That was just my assessment.

Q.    Based on what?

A.    My assumption.  My assumption.

Q.    And if he and Ms. Richards have a close, personal relationship would that have been relevant to your determination as to whether he was a neutral third party?

COUNSELOR ZUCKERMAN:

Objection.

A.    No.

Q.    How come?

A.    It's just not.

Q.    At the time that Alex initially reached out to Mr. Bronstein, she was not aware of Ms. Richards' complaint, correct?

A.    At the time that Alex initially

Page 363

R. BALDUCCI

started texting Mr. Bronstein, she was not aware of the complaint that she made?

COUNSELOR ZUCKERMAN: Objection.

A.    I -- I -- I don't know.  I need you to ask the question again, but I feel like we objected, I don't --

Q.    You can still answer the question.

COUNSELOR IADEVAIA:  Do you want to just read back the question please.

(Whereupon, the referred-to question was read back by the reporter.)

CONTINUED EXAMINATION BY COUNSELOR IADEVAIA:

Q.    She was not aware of the complaint that Ms. Richards made?

COUNSELOR ZUCKERMAN:  Same objection.

A.    She was not aware -- she was not aware of the complaint that Collette had made to -- to HR, correct.

Page 364

R. BALDUCCI

Q.    After you completed the investigation, I believe your testimony was that you made a recommendation to terminate Ms. Poolos employment; is that right?

A.    That's right.

Q.    And who did you speak to about that recommendation?

A.    My employment law counsel, my boss, Bill Owens.

Q.    Anyone else?

A.    Tanya Simons.

Q.    Anyone else?

A.    Not that I can think of.

Q.    Okay.  What did you say to your boss about your recommendation?

A.    I sent my boss all of the findings along with the recommendation that spoke for itself and she supported it.

Q.    Did you send it to her by e-mail?

A.    I did.

Q.    And did you send that e-mail to anyone else other than your boss?

A.    I -- I don't -- I don't recall.

Page 365

R. BALDUCCI

Q.    Did you ever have a conversation with Ms. Glasglow about recommended firing Ms. Poolos?

A.    I would think so, yeah, I can't recall.

Q.    And did you have one or multiple conversations with Mr. Owens about whether to fire Ms. Poolos?

A.    We would have had multiple conversations.  This was going on for a couple of weeks.

Q.    Well, after you completed your investigation and had made -- come up with a recommendation to fire Ms. Poolos, how many conversations did you have with Mr. Owens about it?

A.    I can't recall.

Q.    Do you know if it was one or more than one?

A.    I can't recall.

Q.    And did you speak to Mr. Owens by phone or communicate in other ways?

A.    I can't recall.

Q.    Do you recall anything about

R. BALDUCCI

any discussions you had with Mr. Owens about your recommendation to fire Ms. Poolos?

A.    I do not.

Q.    And do you recall what Mr. Owens said to you when he got your recommendation?

A.    I don't, other than he agreed.

Q.    And who made the decision to fire Ms. Poolos?

COUNSELOR ZUCKERMAN:
Objection.

A.    Bill made the decision.

Q.    And what's your basis for saying that?

A.    The business leader makes the decision about their employee.

Q.    Do you remember a specific discussion with Mr. Owens where he tells you I'm deciding to fire Ms. Poolos?

COUNSELOR ZUCKERMAN:
Objection.

A.    No.

Q.    Do you remember generally that

Page 367

R. BALDUCCI

happening?

COUNSELOR ZUCKERMAN:

Objection.

A.     No.

Q.     Okay.  Did you ever consider a lesser punishment for Ms. Poolos --

COUNSELOR ZUCKERMAN:

Objection.

Q.     -- when making your recommendation?

COUNSELOR ZUCKERMAN:  Same objection.

A.     Once we had all of the information and we realized that there was retaliation and misrepresentation, not only in the investigation with me, but a lie to a manager, there -- there -- there was no other course of action and actually I do remember that being Bill's statement.  That I cannot -- I cannot, given she's lied to me, given what we found here, I cannot trust her to manage anyone else at 60 Minutes.  I cannot trust her to be honest with me.  I cannot trust her to manage

Page 368

R. BALDUCCI

anyone else at 60 Minutes.

Q.   And who was present for that discussion?

A.   I don't remember.  I don't remember if Tanya was there or not, but I sure was present.

Q.   And was it in person or over the phone?

A.   I don't remember.

Q.   I think you testified earlier that your recommendation to fire Ms. Poolos was based on a finding that she had retaliated against Ms. Richards and because she had made misrepresentation in the investigation; is that correct?

COUNSELOR ZUCKERMAN:
Objection.

A.   In addition to lying to her boss.

Q.   Okay.  Anything else?

A.   Nope.

Q.   And what was your understanding of what lies Ms. Poolos made to her boss?

COUNSELOR ZUCKERMAN:

Page 369

R. BALDUCCI

Objection.  Asked and answered.

A.    I've answered this question probably three times.

Q.    Okay.  So tell me one more time.

A.    She lied about disparaging Collette.  She lied about --about having reached out -- hold on a second.  She lied about disparaging Collette and she lied about initiating the phone call.  She lied about calling him that day.

Q.    Those were the lies to Mr. Owens?

COUNSELOR ZUCKERMAN:

Objection.

A.    I don't remember.  Those are the lies.

Q.    Okay.  And so what you're saying is those were lies to you and Mr. Owens --

A.    To me and Mr. Owen, yes, to me and Bill.

Q.    Okay.  Any other lies besides those two?

Page 370

R.  BALDUCCI

COUNSELOR ZUCKERMAN:

Objection.

A.    Those are the lies that stick out.

Q.    Anything else that you can remember?

COUNSELOR ZUCKERMAN:  Other than what she's testified to?

A.    Nothing.

Q.    Anything else you can say now beyond what you just said, lied about disparaging Collette and lied about calling or who initiated the call with Mr. Bronstein.

A.    Nope.

Q.    Okay.  Was Ms. -- was one of the reasons for firing Ms. Poolos because she did not keep Ms. Richards' complaint confidential?

A.    That was not the crux of the reason why we fired Ms. Poolos.

Q.    But was it a reason, whether it's the crux or any other portion of the reasons?

Page 371

R.  BALDUCCI

COUNSELOR ZUCKERMAN:

Objection.

A.    No.

Q.    And in making the determination that Ms. Poolos had retaliated against Ms. Richards, did you base that determination on anything other than what Mr. Bronstein had said to you about that phone call and his notes?

COUNSELOR ZUCKERMAN:

Objection.

A.    No.

Q.    And did Mr. Bronstein tell you that he had made his notes during his call at the same time as his call with Ms. Poolos?

A.    Yes.  He told me in the initial conversation I had with him, I have notes. I took notes.

Q.    Did he say, though, that he took notes contemporaneous with the call?

A.    Yes.

COUNSELOR IADEVAIA:  If we could mark as Balducci Exhibit 14,

Page 372

R. BALDUCCI

7827.

(Whereupon, an E-mail with Attachment was marked as Balducci Exhibit 14 for identification as of this date by the reporter.)

COUNSELOR IADEVAIA:  Yeah, please take a look through the document.

THE WITNESS:  Okay.

CONTINUED EXAMINATION BY COUNSELOR IADEVAIA:

Q.    What's been marked as Balducci Exhibit 14 is a cover e-mail and an attachment bearing Bates number CBS7827 through 7857.

A.    Okay.

Q.    Do you recognize what's been marked as Balducci Exhibit 14?

A.    Yeah.

Q.    What is it?

A.    This is -- is all my documentation and a timeline.  This is everything that I provided to Cindy and Danya.

R. BALDUCCI

Q.    And the cover e-mail on the -- on the -- on Exhibit 14, that's an e-mail from you to Ms. Glasglow and Ms. Ahmed dated January 9, 2022, correct?

A.    Yeah.

Q.    And did you do any further investigation after that date?

A.    After January 9th, it would have been reviewing -- it would have been just reviewing all of our findings at this point and aligning on path forward because once I got those text messages -- hold on a second.  When did he send me his notes?  I think I got the notes -- once I had the text messages and the notes, then it was time to just dig in and start comparing and figuring out, you know, what lined up and whether there were any other questions to ask, anyone else to talk to.

Q.    And if you turn to the next page, CBS 7828, you'll see at the top it says "Alex Poolos issue (R. Balducci notes)"; do see that?

A.    Yeah.

Page 374

R. BALDUCCI

Q.    What -- what program or system did you use to create these notes or input these notes?

A.    Likely a Word document or I don't know if this was Word or straight out of my e-mail.  I don't know.  Likely Word.

Q.    And is this the kind of document that you typically create when you do an investigation?

A.    Yeah, always.

Q.    Okay.  And the information that is contained within this summary, was -- was the information accurate as you knew it at the time?

A.    Well, I see an error right here.

Q.    Where do you see an error?

A.    On Page 7829.

Q.    Okay.

A.    So on January 5th --

Q.    You mean --

A.    -- so January 5th.  Hold on.

COUNSELOR ZUCKERMAN:  Do you mean 7828?

Page 375

R. BALDUCCI

THE WITNESS:  Hold on a second.

COUNSELOR ZUCKERMAN:  The number on the bottom right.

THE WITNESS:  Yes, thank you. Good one.  Hold on a second, if you guys can give me one second.

COUNSELOR IADEVAIA:  Yeah. Yeah.  Take your time.

A.    Oh, no.  No.  No.  No.  Oh, yeah, there's no error there.  Sorry. Apologies.

Q.    That's okay.  Just take a minute to review it and let me know if there's anything that you think is inaccurate there.

A.    Okay, I mean, I think, yeah.

Q.    Anything that you saw in there that was inaccurate?

A.    No.  No, not that I can find.

Q.    Nothing you can find.  And at the time that you created it, where you doing your best to be as accurate as possible?

A.    Yes.

Page 376

R. BALDUCCI

Q.    If you take a look at 7829 and you see under the date January 7th, you see that, 1-7?

A.    Okay.

Q.    And the first bullet point says "8am - Collette reaches out to me via e-mail and text."  Do you see that?

A.    Yup.

Q.    And was was that accurate; did Ms. Richards reach out to you via e-mail and text?

A.    I -- I have no idea.  I would assume so.

Q.    You wouldn't have wrote it if it were not true, correct?

A.    I assume -- yeah, unless there's documents you want to show me to the contrary, that must have been true.

Q.    Okay.  And do you still have that e-mail?

A.    All of my e-mails have been turned over.

Q.    And do still have that text?

A.    I've turned over everything.  I

Page 377

R. BALDUCCI

handed over everything.

COUNSELOR IADEVAIA:  Okay.  We would call for production of that e-mail and text, but we call for it.

Q.    In the description of the events on 1/7, hold on, one second, please. Is there, focussing on 1/7, is there any notation in here that -- that Mr. Owens reported to you that Alex had denied initially getting the call from or having the call with Mr. Bronstein on the 5th?

A.    So I have to read it through, but I'm going to --

Q.    Go ahead.

A.    But I'm going to respond by saying that wouldn't even have been a key piece of information.  The fact that she initially said she didn't talk to him and then said she did, we already had gone through that.  She admitted it within a minute or two.  What she lied about was that she said she made it seem like that happened so long ago.  I didn't -- I didn't just talk to him, I -- that's so long ago.

Page 378

R. BALDUCCI

And also I would never disparage Collette. Those were the lies.

Q.    Okay.  Take a look and just let me know if it's in there.

A.    Okay.  So no, it's not there.

Q.    Okay.  If you could grab Exhibit 11 for me that was previously marked.  It should be in that stack.  And do you have in front of you the text exchange on January 7th, 2022 with Mr. Owens and Ms. Simons?

A.    Yes.

Q.    Okay.  And in that bottom text does Mr. Owens say that Alex told him that she spoke to the CNN guy not yesterday, but Wednesday?

A.    Yes.

Q.    So does that at all effect your testimony that Ms. Poolos had made some kind of misrepresentation that she had spoken to or reached out to Scott way long ago?

COUNSELOR ZUCKERMAN:

Objection.

Page 379

R. BALDUCCI

A.    She's definitely lying about disparaging Collette for sure and she's saying not yesterday but Wednesday, this is -- this is -- yeah, I don't know what to make of this.

Q.    Well, doesn't this text show that Ms. Poolos was candid with Mr. -- Mr. Owens about when she spoke to Mr. Bronstein?

COUNSELOR ZUCKERMAN:
Objection.

A.    There was a lie.  We would have to -- there was a lie that Bill felt came out of that conversation.

Q.    Okay.  What is your memory of what Bill told you that lie was?

COUNSELOR ZUCKERMAN:
Objection.

A.    That she reached out to -- that she did not reach out to him.

Q.    You mean on the 5th?

COUNSELOR ZUCKERMAN:
Objection.

A.    On the 5th.

Page 380

R. BALDUCCI

Q.    Okay.  So if you could go back to Exhibit 14, please, which is your summary.

A.    Okay.

Q.    And on 1/7, if you look one, two, three, four, five, six bullet points down, says "He does this and relays that per Alex."  Do you see that?

A.    No.

Q.    Do you see the bullet point that starts with 4:15 p.m.?

A.    Yup.

Q.    The one right above it, do you see it?

A.    He does -- yes.

Q.    Okay.

A.    Let me see, what is the date of this?

Q.    Okay.  If you could go back to the page before CBS7828 and you see under the date January 5th, that first bullet point it says 11:22 a.m. and it says "Alex follows up again with Scott asking to talk that afternoon."  Do you see that?

Page 381

R. BALDUCCI

A.   Yes.

Q.   Is that accurate?

A.   "Alex follows up again with Scott asking to talk that afternoon."  I don't know.  I would have to go back to the texts.

Q.   Okay.  And wasn't it a fact that Mr. Bronstein had reached out to Alex?

A.   Yes.

Q.   On the morning of January 5th?

A.   Yes.  Yes.  Yes.

Q.   So was this a mistake?

A.   Yes.  This is a mistake, yes.

Q.   And is there any -- but there's no other information you're aware of in this summary that's a mistake?

A.   No, right, he reached out, he responds to her, she makes the phone call.

Q.   Well, he responds to her at 1122 a.m., right, that's the mistake on that first bullet point, correct?

A.   I don't know actually.

Q.   Okay.

A.   At 11:22, I would have to go

Page 382

R. BALDUCCI

back and look at notes.  I know that he reached out to her that day offering to talk, that's what I know.

Q.    And then you have a bullet point at the bottom that says "Scott texts Alex offering to talk," do you know if that's accurate?

A.    I know that Scott texted Alex offering to talk that day.

Q.    Do you know if he sent her multiple texts to speak that day?

A.    I don't know offhand.  I would have to go back and look.

Q.    If you look under the date 1/5, the same day, still on 7828, and you have a bullet point that says "1pm - Renee, Bill, Tanya weekly call."  Do you see that?

A.    Yeah.

Q.    And you wrote "Bill relays details of his conversation with Alex.  I ask Bill to follow-up again with Alex the following day and point out this is not the first time a complaint and about her interactions with other employees."

Page 383

R. BALDUCCI

A.    That's right.

Q.    "I.e. Sarah Turkard complaint and issue with members of the Rights Team. I ask that he document their conversation in writing to ensure no misunderstanding about expectations." Did I read that correctly?

A.    You did.

Q.    And where did that note come from? Where -- where -- where did --

A.    This was Bill informing me when I told him, this is something we talked about a couple of times today, when I let Bill know that there was a complaint about Alex and I wanted him to talk to her about it, he said, well, you know, she's a good employee, I'm surprised and then he said, actually, there have been a couple of other complaints that had come through.

Q.    And did he tell you on the 5th during this 1:00 p.m. meeting or did he tell you before that?

A.    I don't know.

Q.    Okay.

Page 384

R. BALDUCCI

A.    I can't recall.

Q.    And is there an employee or was there an employee at 60 Minutes named Sarah Turkard?

A.    So I don't know this -- I don't know these people nor was I part of this. He was referencing something that had happened in the past.

Q.    Got it.  Do you know of a employee named Sarah Turkard?

A.    I don't know of this person. He's telling me there was an employee at some point that made a complaint about Alex.

Q.    And did you make any effort to track down whether there had been that complaint?

A.    No, I took him at his word. He's the head of 60 Minutes.

Q.    The entries that you made on the -- in the summary for January 5th, did you use any notes to make -- make these entries?

COUNSELOR ZUCKERMAN:

Page 385

R. BALDUCCI

Objection.

A.    I can't recall.

Q.    Did you make notes to make the not -- well -- so if you take a look at the Page 7830, you describe those as notes from call with Scott Bronstein, correct?

A.    That's right.

Q.    And were those based on handwritten notes that you took or electronic notes that you took?

A.    These are based on, likely, a combination of electronic and handwritten.

Q.    Okay.  And then the next page, it says "RB convo with Alex Poolos."

A.    Yes.

Q.    And the -- the summary that you have in here, were those based on handwritten notes that you made, electronic notes or some other notes?

COUNSELOR ZUCKERMAN:

Objection.

A.    I can't remember if I went straight into typing or handwritten notes. I can't remember.

Page 386

R. BALDUCCI

Q.    When you were speaking to Ms. Poolos for -- for 70 minutes, were you taking notes during the call or at some other point?

A.    I was taking notes during the call.

Q.    And you just don't remember if you took handwritten notes or electronic notes?

A.    I don't.

Q.    And for the entries that you have in the summary in the timeline that you prepared, do you know what your sources of information were for those entries; were they notes, were they e-mails, anything else?

A.    They would have been looking at a calendar, notes, e-mails, all of those things.

Q.    Okay.  Including handwritten notes?

A.    It could have.

COUNSELOR IADEVAIA:  I'm either close to done or done, but just give

Page 387

R. BALDUCCI

me one minute, please.

THE WITNESS:  Fabulous.

COUNSELOR ZUCKERMAN:  Either way you're close to done?

COUNSELOR IADEVAIA:  Correct.

COUNSELOR ZUCKERMAN:  It's almost 8 o'clock.  This poor witness has been doing this for almost, what, ten hours, asking her the same questions.

COUNSELOR IADEVAIA:  Alright.

COUNSELOR ZUCKERMAN:  Let me get on the record.

COUNSELOR IADEVAIA:  No.  No.

COUNSELOR ZUCKERMAN:  I -- I'm not trying to get cross with you, but I do want the record to reflect that you've asked many questions multiple times and the last time you went through the questions, you waited until 8 o'clock at night, right, when we've been here since 10 o'clock in the morning.  I don't think it's fair to the witness and I want the record

Page 388

R. BALDUCCI
to reflect the time of night that it is.  That's it.  I'm not interfering with you.

COUNSELOR IADEVAIA:  You are. I mean, and that's a speaking objection, but in any event, you said it.

Just want to make sure these are the correct versions of documents and I think we're done.  Can you pull those please.

(Whereupon, an E-mail was marked as Balducci Exhibit 15 for identification as of this date by the reporter.)

CONTINUED EXAMINATION BY
COUNSELOR IADEVAIA:

Q.   Okay.  My question to you, Ms. Balducci, is -- is this a screen shot that Mr. Bronstein sent you of record of his call with Ms. Poolos?

A.   Well, I don't know.  I mean I've seen this before.

Q.   Okay.  So for the record --

Page 389

R. BALDUCCI

A.    If this matches.

Q.    Well, it's an e-mail from you to you dated January 9, 2022?

COUNSELOR ZUCKERMAN:  Just stay on the document.  He's referring to -- he's referring to the first page, I believe.

COUNSELOR IADEVAIA:  Yeah, the first page.

A.    Okay.

Q.    That's an e-mail from you to you?

A.    Okay.  Yeah.

Q.    And then attached to that is a screen shot of --

A.    Okay.

Q.    -- a phone call, is that --

A.    Okay.  Okay.  That makes more sense.

Q.    Got it.  And does that appear to be the screen shot of the call that Mr. Bronstein and Ms. Poolos had on January 5th?

A.    Seventeen minutes, yes.

Page 390

R. BALDUCCI

Q.    And that was the screen shot Mr. Bronstein sent to you, correct?

A.    Yes.

COUNSELOR IADEVAIA:  I think there's one before it.  If we can mark this please.  We're up to 16.

(Whereupon, an E-mail was marked as Balducci Exhibit 16 for identification as of this date by the reporter.)

CONTINUED EXAMINATION BY COUNSELOR IADEVAIA:

Q.    Are these handwritten notes that Mr. Bronstein sent to you?

A.    Yes, they are.

Q.    And they're the notes that you referenced that -- what he told you are the notes of the conversation with Ms. Poolos?

A.    They are.

COUNSELOR IADEVAIA:  This is different, okay.  We're going to do this as 17, please.

(Whereupon, an E-mail was marked as Balducci Exhibit 17 for

Page 391

R. BALDUCCI

identification as of this date by the reporter.)

CONTINUED EXAMINATION BY
COUNSELOR IADEVAIA:

Q.    Okay.  What's been marked as 17, are these other handwritten notes from Mr. Bronstein that he sent to you?

A.    I mean, he -- it's the same notepad.  He sent -- these are the notes he sent me.

Q.    Yeah.

A.    What's the difference in the three documents I'm looking at?  Actually, this is the same.

Q.    Want to make sure we gave you the right exhibits.  In -- if you look at the top of --

A.    Yeah.  Yeah.  Yeah.  This is -- this is definitely Bronstein.  This is all in my notes as well.

Q.    Right.  And the notes from -- on Exhibit 16 and Exhibit 17, they're different notes, but they're all from Mr. Bronstein?

Page 392

R. BALDUCCI

A.    They're all from Mr. Bronstein, yeah.

COUNSELOR IADEVAIA:  Is this the last one?  Alright.  And if we could mark this as 18, please.

(Whereupon, an E-mail was marked as Balducci Exhibit 18 for identification as of this date by the reporter.)

CONTINUED EXAMINATION BY

COUNSELOR IADEVAIA:

Q.    And is what's been marked as Exhibit 18 screen shot of text exchange between Ms. Poolos and Mr. Bronstein?

A.    It is.

Q.    And those were texts provided to you by Mr. Bronstein, correct?

A.    Correct.

COUNSELOR IADEVAIA:  Okay.  I think that's it.  We're done.

THE WITNESS:  Fabulous.

COUNSELOR ZUCKERMAN:  No questions.

THE VIDEOGRAPHER:  Okay.  We're

Page 393

R. BALDUCCI

going off the record at 7:57 p.m.
And this concludes today's testimony
given by Renee Balducci.  The total
number of Media Units is five and
will be retained by Veritext.

(Whereupon, at 7:57 P.M., the
Examination of this witness was
concluded.)

°          °          °          °

Page 394

R. BALDUCCI

D E C L A R A T I O N

I hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony.

I FURTHER CERTIFY that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified hereinbefore.

_____

RENEE BALDUCCI

Subscribed and sworn to before me this \_\_\_\_\_ day of _____ 20\_\_\_.

_____

NOTARY PUBLIC

Page 395

R. BALDUCCI

E X H I B I T S

BALDUCCI EXHIBITS:

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Global Business Conduct Statement | 126 |
| Exhibit 2 | Nondiscrimination and Anti-Retaliation Policy | 131 |
| Exhibit 3 | Response to an EEOC Complaint | 230 |
| Exhibit 4 | E-mail Chain | 232 |
| Exhibit 5 | Written Complaint | 239 |
| Exhibit 6 | E-mail Chain | 243 |
| Exhibit 7 | Text Thread | 251 |
| Exhibit 8 | Text Thread | 257 |
| Exhibit 9 | E-mail Chain | 263 |
| Exhibit 10 | E-mail Chain | 282 |
| Exhibit 11 | Text Thread | 316 |
| Exhibit 12 | Text Thread | 332 |

(Index continued on following page.)

Page 396

R. BALDUCCI

BALDUCCI EXHIBITS: (Continued)

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 13 | Text Thread | 354 |
| Exhibit 14 | E-mail with Attachment | 371-372 |
| Exhibit 15 | E-mail | 388 |
| Exhibit 16 | E-mail | 390 |
| Exhibit 17 | E-mail | 390 |
| Exhibit 18 | E-mail | 392 |

(Exhibits retained by Court Reporter.)

I N D E X

| EXAMINATION BY | PAGE |
|---|---|
| COUNSELOR IADEVAIA | 6 |

(Index continued on following page.)

Page 397

R. BALDUCCI

INFORMATION AND/OR DOCUMENTS REQUESTED

INFORMATION AND/OR DOCUMENTS          PAGE

Production of Text Messages with

Scott Bronstein and Witness          355

Production of e-mail and text

message Witness refers to in

Exhibit 14 under bullet point 1

under 1/7                            377


QUESTIONS MARKED FOR RULINGS

PAGE LINE QUESTION

(None)

Page 398

R.  BALDUCCI

C E R T I F I C A T E

STATE OF NEW YORK          )
                                     :  SS.:
COUNTY OF RICHMOND         )


I, AMANDA TARTAGLIA, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 3rd day of March 2025.


AMANDA TARTAGLIA

Page 399

**ERRATA SHEET**
**VERITEXT/NEW YORK REPORTING, LLC**

CASE NAME: Alexandra Poolos v. Paramount Global, Et Al
DATE OF DEPOSITION: 2/13/2025
WITNESSES' NAME: Renee Balducci

| PAGE | LINE (S) | CHANGE | REASON |
|------|----------|--------|--------|
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |

_____
                                    Renee Balducci

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF _____, 20__.

_____          _____
(NOTARY PUBLIC)                MY COMMISSION EXPIRES:

Page 400

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

_____

ALEXANDRA POOLOS,

　　　　　Plaintiff,

　　v.　　　　　　　　　　　　　Case No.

PARAMOUNT GLOBAL; CBS NEWS,　　23 Civ. 08896 (GHW)

INC.; and CBS BROADCASTING,　　(HJR)

INC.,

　　　　　Defendants.

_____

VIDEOTAPED DEPOSITION OF

RENEE BALDUCCI

VOLUME II

DATE:　　　　Monday, June 2, 2025

TIME:　　　　10:45 a.m.

LOCATION:　　Remote Proceeding

　　　　　　　Massapequa, NY 11758

REPORTED BY:　Ralph Fornoles

JOB NO.:　　　7407160

**Page 401**

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF ALEXANDRA POOLOS:

JEREMIAH J. IADEVAIA, ESQUIRE (by

videoconference)

Vladeck Raskin & Clark P.C.

111 Broadway

New York, NY 10006

jiadevaia@vladeck.com

(212) 403-7323

JAMES BAGLEY, ESQUIRE (by videoconference)

Vladeck Raskin & Clark P.C.

111 Broadway

New York, NY 10006

jbagley@vladeck.com

(212) 403-7300

BRANDON WHITE, ESQUIRE (by videoconference)

Vladeck Raskin & Clark P.C.

111 Broadway

New York, NY 10006

bwhite@vladeck.com

(212) 403-7300

**Page 402**

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANTS PARAMOUNT GLOBAL; CBS NEWS,

INC.; AND CBS BROADCASTING, INC.:

  LYLE ZUCKERMAN, ESQUIRE (by videoconference)

  Davis Wright Tremaine LLP

  1251 Avenue of the Americas, 21st Floor

  New York, NY 10020

  lylezuckerman@dwt.com

  MICHAEL LEONE LYNCH, ESQUIRE (by

  videoconference)

  Davis Wright Tremaine LLP

  1251 Avenue of the Americas, 21st Floor

  New York, NY 10020

  michaellynch@dwt.com

  (212) 489-8230

ALSO PRESENT:

  Alexandra Poolos, Plaintiff (by

  videoconference)

  Lee Bowry, Videographer, Cambridge Video

  Productions (by videoconference)

Page 403

I N D E X

EXAMINATION:                                              PAGE

    By Mr. Iadevaia                                  407


E X H I B I T S

NO.                DESCRIPTION                           PAGE

Balducci:

Exhibit 19        Audio Recording Placeholder

                 Cover Page                            410

Exhibit 20        Transcript of Audio Recording 415


QUESTIONS INSTRUCTED NOT TO ANSWER

           PAGE          LINE

            428            8

Page 404

R. BALDUCCI

THE REPORTER:  Good morning.  My name is Ralph Fornoles.  I'm the reporter assigned by Veritext to take the record of this proceeding.  We are now on the record at 10:45 a.m.

This is the deposition of Renee Balducci, taken in the matter of Alexandra Poolos vs. Paramount Global and others on June 2, 2025.

I'm a notary authorized to take acknowledgements and administer oaths in the state of New York.  Parties agree that I will swear in the witness remotely.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

Page 405

R. BALDUCCI

- shall constitute written stipulation of such.

At this time, will everyone in attendance please identify yourself for the record?

MR. IADEVAIA:  Sure.

Good morning, everyone.  This is Jeremiah Iadevaia.  Along with me is Brandon White and James Bagley of the law firm Vladeck Raskin & Clark on behalf of the plaintiff in this matter.

And in our room and on the Zoom is also the plaintiff, Alexandra Poolos.

MR. ZUCKERMAN:  Good morning.  Lyle Zuckerman from Davis Wright Tremaine on behalf of the defendants.

I'm here in -- well, not here in my office, but in a separate office in the same law firm is my colleague Michael Lynch.

MS. BALDUCCI:  Good morning.  I'm Renee Balducci.

THE VIDEOGRAPHER:  Lee Bowry, videographer with Veritext.

Page 406

R. BALDUCCI

THE REPORTER:  Thank you.

Michael, can you just take yourself off mute and just identify yourself just for the record?

MR. LYNCH:  Sure.  Michael Lynch of Davis Wright Tremaine and for the defendants.

THE REPORTER:  Thank you.

And I'm Ralph Fornoles.  I'm the court reporter.

Hearing no objection, I will now swear in the witness.

Renee, if you could just raise your right hand visibly on the screen.  Thank you.

WHEREUPON,

RENEE BALDUCCI, called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER:  Thank you.

You can proceed, Counsel.

//

Page 407

R. BALDUCCI

EXAMINATION

BY MR. IADEVAIA:

Q    Good morning, Ms. Balducci.

A    Good morning.

Q    I just want to confirm a couple of things that we talked about during the first day of your deposition.

Am I correct that Collette Richards is an associate producer at 60 Minutes?

A    That's correct.

Q    And she worked there at 60 Minutes in early 2022 when the events that are key to this lawsuit happened; correct?

A    That's correct.

Q    And Ms. Richards raised concerns about the plaintiff, Alexandra Poolos, including concerns directly to you; is that right?

A    That's correct.

Q    And her concerns included concerns that Alexandra Poolos had a phone call with Scott Bronstein and made negative comments about Alex -- I mean

Page 408

R. BALDUCCI

about Collette; is that right?

A    That's correct.

Q    And the phone call that took place between Ms. Poolos and Mr. Bronstein, that was the concern -- that was the basis of Collette's concern, that happened on January 5, 2022; correct?

A    Can you repeat that, please?

Q    Sure.  The phone call between Alex and Scott that was the basis of Collette's concerns, that phone call happened on January 5, 2022.  Is that right?

A    One second, please.  I believe so.

Q    Sure.

A    Yes, that's correct.

Q    Okay.  And Ms. Richards notified you about the phone call between Alex and Scott on the morning of January 7, 2022.  Is that right?

A    Yes, that's correct.

Q    And that -- January 7th, when Collette told you about the phone call,

Page 409

R. BALDUCCI

that was the first time you became aware of the January 5th call between Alex and Scott; correct?

A    That's correct.

Q    Ms. Balducci, is there anybody in the room with you today?

A    No, there isn't.

Q    Nobody in there?  Okay.  And do you have any documents that you're looking at?

A    I have the exhibits.

Q    When you say "the exhibits," do you mean the exhibits that we marked during the first day of your deposition?

A    That's correct.

Q    And in answering my questions just now, were you looking at any of those exhibits?

A    I am looking at my -- those exhibits, yes.

Q    And which exhibit were you -- or exhibits were you just looking at to answer my questions?

A    I am looking at -- you know

Page 410

R. BALDUCCI

what?  I don't know exactly which exhibit it is 'cause I've taken it out of order.

But it's -- it's documents that my counsel has provided to me, which we have talked you through in the first session.

Q    And is one of those exhibits the timeline that you sent to your colleagues at CBS that there's a cover email and then there's notes that you made?  Is that one of the exhibits?

A    That's correct.  I'm looking at the same exhibits that we have discussed numerous times, including for eight hours the last time we spoke.

MR. IADEVAIA:  Okay.  I'd like to mark as Balducci Exhibit 19 -- which I believe is the exhibit number after the last one that we marked at Ms. Balducci's deposition -- a recording that was produced by your lawyers.

(Balducci Exhibit 19 was marked for identification.)

MR. IADEVAIA:  So for the record,

Page 411

R. BALDUCCI

we're going to show the placeholder cover page and mark that as Exhibit 19.

Is it available?

MR. WHITE:  Yeah.

BY MR. IADEVAIA:

Q    Okay.  If you refresh your Exhibit Share, it should be there.  Let us know if you can see it and open it, please.

A    I don't know what I'm looking at.  I don't know what --

THE WITNESS:  Like, Lyle, what do you see on your screen?  'Cause I see, like, placeholder, the Baseball Center file name.

BY MR. IADEVAIA:

Q    That's it.

A    Okay.

MR. IADEVAIA:  If you could screen share, Brandon.

MR. WHITE:  You want a screenshot of this?

MR. IADEVAIA:  Yeah.

MR. ZUCKERMAN:  Is this under

Page 412

R. BALDUCCI

the -- in the marked exhibits folder?

MR. IADEVAIA:  Yes.

MR. ZUCKERMAN:  Mine is empty.  But I don't think it matters.  This is the audio recording; correct?

MR. IADEVAIA:  Yeah, it's just the cover page that came along with it.  But yeah.

MR. ZUCKERMAN:  That's fine.

MR. IADEVAIA:  Okay.  We're going to share it now.

BY MR. IADEVAIA:

Q    Okay.  So as you can see on the screen and what should be available in Exhibit Share is a document that is called Placeholder.  And the file name is the Baseball Center NYC 3.

We are going to play the audio file now that is associated with this cover page.  Yeah, we're going to hit play.

MR. IADEVAIA:  Go ahead.

(Audio played.)

//

Page 413

R. BALDUCCI

BY MR. IADEVAIA:

Q    I just -- we're going to listen to the whole thing.  Ms. Balducci, are you able to hear the recording?

A    I can hear it.

Q    Thank you.

MR. IADEVAIA:  Go ahead.

(Audio played.)

BY MR. IADEVAIA:

Q    Ms. Balducci, do you recognize the voices on that recording?

A    Yes, I do.

Q    And whose voices are they?

A    It's my voice and Collette Richards.

Q    And do you recognize this as the conversation that you had with -- a recording of the conversation that you had with Ms. Richards on January 7, 2022?

A    I do.

Q    And is this the conversation in which Ms. Richards first notifies you of the call that Ms. Poolos and Ms. Bronstein had on January 5th?

Page 414

R. BALDUCCI

A    Yes, it is.

Q    Have you listened to this recording before today?

A    I listened to this last Friday with my counsel.

Q    In preparation for today's deposition?

A    That's correct.  They provided it to me in preparation -- preparation for today.

Q    And before last Friday, had you ever heard this recording before?

A    Before last Friday, I didn't know that this recording existed.

Q    And when you spoke to Ms. Richards on January 7th, referring to the conversation captured on the recording, did Ms. Richards tell you that she was recording you?

A    Can you ask that question again?

Q    Sure.  Focused on this discussion you had with Ms. Richards on January 7th, before she recorded you, did she tell you she was going to record you?

Page 415

R. BALDUCCI

A    Absolutely not.  As I said, I didn't know that this existed.

Q    And as part of your investigation into any of the concerns that Ms. Richards raised about Alex Poolos, did you ever ask Ms. Richards if she had recordings that relate to this matter?

A    I absolutely did not.  I did not assume anyone is recording our conversations.

MR. IADEVAIA:  Okay.  We're going to mark as Balducci Exhibit 20 PL -- a document that starts with the Bates number PL 3011, please.

(Balducci Exhibit 20 was marked for identification.)

MR. IADEVAIA:  Just give us one minute, please.

THE WITNESS:  Michael, quick question for you.  Is the clock still running during these moments?

MR. LYNCH:  Yes.

THE WITNESS:  Good.

Page 416

R. BALDUCCI

BY MR. IADEVAIA:

Q    Sorry about that.  You should have an exhibit shared now, what's been marked as Balducci Exhibit 20, which is a transcript of the reporting that you just listened to created by court reporters.

It bears Bates Number PL 3011 to 23.  Can you let me know once you've received it, please?

A    I have it.

Q    Okay.  And, Ms. Balducci, have you seen this transcript before today?

A    I have not.

Q    If you could take a look, please, at page 2 of the transcript with Bates number PL 3012 on the bottom right hand corner.  It should also be available through screen share.

And on page 2, line 3, if you could follow along, I'm going to read for the record.

Collette Richards says:  "Okay.  So I wanted to tell you that, immediately -- remember the person I was

Page 417

R. BALDUCCI

telling you that -- at CNN?"

And you respond:  "Yes, yes. She was reaching out too, yes."  Do you see the text that I just read?

A    I do.

Q    Okay.  When you say to Collette: "Yes, yes.  She was reaching out too, yes," what did you mean by that?

A    Well, it seems to appear that I know what she's talking about.  But I -- I'm acknowledging what she's talking about.

Q    Okay.  And what do you understand Collette, Ms. Richards, to be talking about in the -- in her sentence reflected -- or her statement reflected in lines 3 through 5?

MR. ZUCKERMAN:  Just for the record, are you asking Ms. Balducci to interpret the words on the page for you?  Are you asking her about her memory of the conversation?

BY MR. IADEVAIA:

Q    Well, let's start with, Ms.

Page 418

R. BALDUCCI

Balducci, what's your memory of the discussion as it relates to the part of the transcript I just pointed out?

A    So my memory of this is that she -- what I know for a fact is I did not know about this issue until she reached out that morning when I was taking a day off and I was going on a ski trip.

That's the first time I found out that she called Scott -- Alex may have called Scott Bronstein and, you know, spoken badly about Collette.

Q    Did you and Collette discuss the fact that Ms. Poolos had reached out to Ms. Bronstein before the phone call on the 5th?

A    I can't recall.  I have no recollection.

Q    Okay.  Now, looking at the words on the page of the transcript in Collette's statements to you as reflected on lines 3 through 5, is Ms. Richards referencing to you the fact that she had told you about a discussion she had had

Page 419

R. BALDUCCI

about somebody related -- who was at CNN with you?

MR. ZUCKERMAN:  Objection.  Again, are you asking her to interpret the words on the page?

MR. IADEVAIA:  Yes, at this point, I am.

MR. ZUCKERMAN:  Okay.  For whatever that's worth, feel free to answer.

THE WITNESS:  Yeah, I mean, my attorneys asked me the same question on Friday.  I don't --

MR. ZUCKERMAN:  Do not -- Ms. Balducci, do not discuss what you and I had a discussion about during the preparation.  That's privileged; okay?

THE WITNESS:  Got it.

I have no recollection of getting any complaint like this from Collette before this day.

BY MR. IADEVAIA:

Q    Right.  And I understand that you don't recall getting any complaint from Collette that Alex had disparaged

Page 420

R. BALDUCCI

you -- I mean, disparaged Collette before January 7th.  I understand that's what you're saying; correct?

A     That's what I'm saying.

Q     Okay.  My question is slightly different, which is, do you recall having a discussion with Collette before this January 7th call in which Collette told you that Alex had reached out to Scott Bronstein?

A     I do not.

Q     And if you look at the words on the page, page 2 of this transcript, does it appear to you from what the transcript says about what Ms. Richards said -- does it appear to you that Ms. Richards is referencing a prior discussion she had with you about Alex reaching out to Scott Bronstein?

MR. ZUCKERMAN:  Objection.

BY MR. IADEVAIA:

Q     You can answer.

A     I can't answer what it -- what it appears to be.  I'm telling you my

Page 421

R. BALDUCCI

recollection is the first -- in fact -- in fact, not just my recollection, I learned about the complaint on the morning of the 7th.

Q    And again, I'm not asking about the complaint at this point.  What I'm asking about is conversation or conversations you had with Ms. Richards regarding Alex Poolos reaching out to Scott Bronstein.

A    You're asking me to interpret a transcript from a conversation from over two years ago.

It is entire -- she -- whenever she pressed record on this, it could have been partially into the conversation where she already told me about this.

I can't tell you something I don't remember.  But I can tell you when she made the complaint is when I took action.  And that was on the 7th.

Q    Did Collette ever discuss with you anyone at CNN other than Scott Bronstein?

Page 422

R. BALDUCCI

A    I have no recollection that she did.

Q    So where this transcript says "Remember the person I was telling you that -- at CNN," it is likely that Ms. Richards is referring to Scott Bronstein; correct?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  Sure.  It's likely. And like I said, she could have told me about it a moment before she pressed record.

BY MR. IADEVAIA:

Q    And you say after that:  "Yes, yes.  She was reaching out too, yes."  Do you see that text from the transcript?

A    Yes, I can see the text.

Q    Okay.  So you're agreeing with what Ms. Richards is saying to you as I just -- the portion I just read a minute ago from lines 3 to 5; correct?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  I am acknowledging her. I'm acknowledging the words.

Page 423

R. BALDUCCI

BY MR. IADEVAIA:

Q    Okay.  And you said:  "Yes, yes. She was reaching out too, yes."  So you're acknowledging there that you're remembering that Ms. Richards had told you about someone that Ms. Poolos had reached out to at CNN; correct?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  My interpretation based on reading this, is that I am acknowledging that she has told me that she reached out to someone, which could have happened a moment before she pressed record.

BY MR. IADEVAIA:

Q    And do you remember during the conversation that you had with Ms. Richards that the moment before the transcript starts here that she referenced that Alex had reached out to Scott Bronstein?

A    Well, I've told you already that I don't remember.  But you're asking me to -- to just make assumptions.  A lot of

Page 424

R. BALDUCCI

assumptions you could make if you want to go that route.

Q    At the start of the transcript, starting on page 2, line 1, the transcript states -- and this is the statement attributed to you -- "That's okay, that's okay.  I can't talk long, so tell me what's up."  Do you see that text in the transcript block starting on line 2?

A    Yes, I do.

Q    Okay.  Did that indicate to you that that was likely the beginning of the discussion that you had with Ms. Richards on January 7th that's reflected on the recording?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  Yeah, I can't -- I can't interpret that.  I think that's a -- that's a lot to assume as well.

BY MR. IADEVAIA:

Q    Okay.  Am I correct that you had no direct contact with Alex Poolos about Ms. Richards's concerns until after this discussion with Collette on January 7,

Page 425

R. BALDUCCI

2022?

A    That's correct.

Q    Okay.  And therefore, you did not give Ms. Poolos any guidance in connection with any concerns Collette had raised before January 7, 2022.  Is that right?

A    I hadn't spoken to Alex.

Q    Okay.  So you couldn't have given her any guidance if you hadn't spoken to her; right?

A    I -- I didn't -- yeah, I didn't speak to Alex.  I didn't give her any guidance.

Q    And before January 7, 2022, are you aware of anyone reminding or telling Alex that she was not supposed to retaliate against Collette Richards?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  Why would someone have to tell Alex not to retaliate at that stage?

We've been -- we've been through what the -- what the conversation was between

Page 426

R. BALDUCCI

Bill, Tanya, and Alex.

BY MR. IADEVAIA:

Q    Okay.  And I'm asking a question, whether or not you're aware of anyone saying to Alex before January 7th that she should not retaliate against Ms. Richards?

A    I --

MR. ZUCKERMAN:  Objection.

Hold on, Ms. Balducci.

THE WITNESS:  Yes.

MR. ZUCKERMAN:  Number one, objection.  Number two, this deposition is limited to questions concerning the audio tape.

This goes beyond the scope of the intended purpose of this hour of deposition.  So I ask that the questions be limited to the audio tape.

MR. IADEVAIA:  I think it is within the scope.  And I guess the question is, are you directing her not to answer?

MR. ZUCKERMAN:  How is the question about whether somebody was advised of the

Page 427

R. BALDUCCI

non-retaliation policy or words to that effect -- how does that relate to the audio tape?

MR. IADEVAIA:  I have limited time. And so if you want to have a conversation off the record, I'm willing to do that.

But I think you just have to make a decision if you're going to direct the witness not to answer.

MR. ZUCKERMAN:  No.  That's not the case, Mr. Iadevaia.  You've challenged my objection.

And I'm -- you've asserted offense to it.  And I'm asking you the basis for the defense so that I could conclude whether or not to instruct the witness not to answer.

But if you don't want to advise me of that, then yes, I will instruct the witness not to answer because I don't see a relationship between that question and the limited purpose of this deposition, which is the audio.

MR. IADEVAIA:  The relationship

Page 428

R. BALDUCCI

between the question and the audio is

making sure -- now that we have the audio,

we have a full sense of the timeline, the

audio being a critical piece of it.

MR. ZUCKERMAN:  I'm not even sure I

understand what you just said.

So I'm instructing the witness not to

answer.

It's beyond the scope of the

deposition.

BY MR. IADEVAIA:

Q    Ms. Balducci, in the timeline

that you created, which was previously

marked as Balducci Exhibit 14, which I

think you said you had in front of you --

MR. IADEVAIA:  But we can show the

witness on screen share.

BY MR. IADEVAIA:

Q    Can the entries -- actually, let

me know what you have it.  Okay.  You know

what?  Let's hold up.  I'm going to some

ask questions.  We'll come back to this.

Going back to the transcript

that -- my apologies -- which has been

Page 429

R. BALDUCCI

marked as Exhibit 20.

If you could look at page 2, again, line 11. And you can read between lines 8 and lines 21. I'm going to ask you a specific question. Did you look at it, Ms. Balducci?

A    Yes.

Q    Okay. And if you take a look specifically at line 11, Ms. Richards describes Mr. Bronstein as a friend. Do you see that?

A    Her friend, her colleague and Superior at CNN. Yes. "Who I consider a friend now," yes.

Q    Okay. Do you think it was relevant or is relevant to your investigation that Ms. Richards described Mr. Bronstein as a friend?

A    I do not.

Q    In your prior deposition, you described Mr. Bronstein as a neutral and professional third party. Do you remember that testimony?

A    I don't -- I -- I don't remember

Page 430

R. BALDUCCI
the specifics of my previous testimony.

Q    Well, I'm representing to you that that's what you said.  Do you think that someone who is a friend of somebody else can be a neutral and professional third party?

MR. ZUCKERMAN:  Objection.

You can answer.

THE WITNESS:  I think that he -- I viewed him as an objective third party as we discussed.

BY MR. IADEVAIA:

Q    Even though Ms. Richards told you that Mr. Bronstein was a friend?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  Correct.

BY MR. IADEVAIA:

Q    Ms. Balducci, you've conducted investigations beyond just the one in connection with Ms. Poolos; correct?

A    That's correct.

Q    And when you conduct investigations, do you think whether a witness is a friend of the complainant is

Page 431

R. BALDUCCI

relevant information in determining if the witness is neutral?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  I think we look at all -- I think we take a holistic look at the situation.

And as I've said before, my holistic view of the situation was that he was credible and objective.

BY MR. IADEVAIA:

Q    And whether he was a friend of Collette's, did that enter into your assessment of Mr. Bronstein's credibility?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  The word "friend" here is -- you -- you're -- you're asking me to draw conclusions about what that means. He was a professional reference.

BY MR. IADEVAIA:

Q    After she -- after Collette identified him as a friend, did you do anything to inquire further into the nature of any personal relationship that she had with Mr. Bronstein?

Page 432

R. BALDUCCI

A    There would be -- I saw absolutely no reason to do that.  I had -- I had conversations with Scott Bronstein regarding the investigation.

I found him to be incredibly credible, as you know.  I still believe him to be credible, as you know.

Q    If you turn to page 4 of the transcript, which bear Bates number 3014, please.  Scroll to page 4.  Let me know when you're there.

And at page 4, line 3, the transcript specifies that you said, Ms. Balducci:  "I think you should reach out directly.  Just look, just take -- just take a breath.  Reach out to Bill."  Do you see that text?

A    I do.

Q    Why did you say to Collette that she should reach out to Bill?

A    Why should she reach out to the executive producer who's responsible for the show with a -- with a concern that's come to her?  That's what you're asking

Page 433

R. BALDUCCI

me?

Q    Yeah.  That's all.

A    I mean, that -- that seems fairly obvious to me.  Because if you have a complaint, then you would bring it to a senior member of the team.  And that would be Bill.

Q    And Bill in this instance is Bill Owens; correct?

A    Yes.  Bill Owens.

Q    Okay.  And if you turn to the next page or scroll to page 5 and take a look at lines 13 through 18.

And I'll read for the record what this transcript says you said:  "Bill did everything he needed to do, and he looped back with me.

"So he needs to know that she just did this so that he can form a point of view on how he's going to address that with her, because I think that needs to be addressed."

Do you see that text?

A    Of course I see that text.

Page 434

R. BALDUCCI

Q    And Bill is a reference to Bill Owens here as well; correct?

A    Yes, correct.

Q    And from your point of view, why was it important that Bill form a point of view?  I'm quoting the transcript there at line 16.

A    Because Bill is the head of the show.  And Bill would address any issues that come up.

Q    And if you go back to page 4 of the transcripts and you take a look at line 13, so we're at PL 3014.

And again, a statement that the transcript attributes to you, the transcript states:  "And then I want you to try to take as much emotion out of it as possible, and just say to him, you know -- you know, you know that I've been having some challenges with my manager. It's been going on for some time.

"I did have, obviously, have a conversation with Renee Balducci and Tanya, and I understood that, you know,

Page 435

R. BALDUCCI

that she would -- it would be a conversation with Alex, and in hopes of, you know, helping her under -- you know, bringing to her attention these" --

And the transcript says Ms. Richards interjects "Yeah."

And then again, you, Ms. Balducci, starting on line 25 of page 4 -- "these issues that she needs to correct, and that we would just -- You know, I was to give her the benefit of the doubt, and you know, just you know, kind of proceed from there.  Right."

And I stopped reading on page 5, line 4 of the transcript.  Did you see the text that I just read, Ms. Balducci?

A    Yes.

Q    And you're suggesting to Ms. Richards -- at this point in the recording, you're suggesting what Ms. Richards might say to Bill Owens about Alex's call with Scott Bronstein.  Is that right?

MR. ZUCKERMAN:  Objection.

Page 436

R. BALDUCCI

THE WITNESS:  I'm suggesting that she bring him an objective view of the facts. I'm trying to get her to dial down her emotion and bring him the facts.

BY MR. IADEVAIA:

Q    Okay.  Why did you suggest to her to dial down her emotion?

A    Because I took the call and I interpreted her to be very upset, terrified, afraid of her boss, based on her -- what she understood were her boss's actions.

Q    And why did you think it was important for her not to express that emotion in a discussion with Mr. Owens?

A    I wanted her to be able to convey the facts.

Q    And you think that the emotion would interfere with that?

A    I think that she could be clearer if she could convey the facts without emotion.

Q    And was there any other reason you suggested to her to take the emotion

Page 437

R. BALDUCCI

out of her presentation to Mr. Owens?

A    No, that would be it.

Q    Focusing for a minute on page 5 of the transcript, line 2, according to the transcript, you said to Ms. Richards: "I was to give her the benefit of the doubt."

Was Ms. Richards instructed or told at some point that she was to give Alex the benefit of the doubt before you found out about the call on January 5th?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  Absolutely.

BY MR. IADEVAIA:

Q    And who told Collette to give Alex the benefit of the doubt?

A    I asked Collette to give Alex the benefit of the doubt.

Q    And why did you ask Alex to give Collette the benefit of the doubt?

A    We're going back to the initial complaint.  I feel like we've had these conversations.

But as everybody knows, Collette

R. BALDUCCI

was having issues with Alex.  That was the impetus for the conversation that Bill Owens and Tanya Simon had with her.

At that time, when she brought those concerns to HR, which ultimately I dealt with, she didn't want to work with Alex anymore.  And she was very upset and afraid of Alex.

She was terrified of Alex for all the reasons we've already talked about.

And so what I told her is, "We've got to -- you've -- you've got to give her the benefit of the doubt.

"You've got to just -- this is the first time you're bringing it to us.  You've got to trust the process.

"You've got to trust that Bill and Tanya can have a conversation with Alex.

"You've got to trust that Alex can hear this feedback and -- and alter her behavior, make the situation better."

That's what Collette was

Page 439

R. BALDUCCI

instructed to do.  And that's what I believe she was doing.

Q    Okay.  Looking still on page 5, which is Bates Stamp PL 3015, in -- on line 12, a statement attributed to you on the recording, the transcript says: "Because Bill did speak with Alex, Bill did direct her on how to proceed from here.

"Bill did everything he needed to do, and he looped back with me."  Do you see that text?

A    Yes, I see that text.

Q    Okay.  When you say that in this transcript and the recording -- you say "Because Bill did speak with Alex," what are you referring to there?

A    I'm referring to the conversation that I just described to you, where Bill addressed with Alex that Collette was struggling under Alex's leadership and management.

Q    And when did the -- your -- what is your understanding of when the

Page 440

R. BALDUCCI
conversation happened between Bill and Alex that you're referencing here?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  Yeah, I'd have to go back to my notes on the timeline.

BY MR. IADEVAIA:

Q    Okay.  So why don't we look at Exhibit 14 then, please, which is the timeline.

Okay.  If you could scroll to page 2 of the timeline, which is Bates Stamped CBS 7328, under your entries for 1/5, the second bullet point, you wrote a description of a conversation at 12:30 p.m. between Bill Owens and Tanya.  Do you see that?

A    I see that, yes.

Q    Okay.  And on January 6th, which is the next page, you talk about Bill following up with an email to Alex recapping their conversations from January 5th and January 6th.  Do you see that text?

A    Yes, I do.

Page 441

R. BALDUCCI

Q    Okay.  So going back to the transcript, which has been marked as Exhibit 20, and line 12, where you say "Because Bill did speak with Alex," which conversation or conversations are you referring to there?

A    The conversation on the 5th.

Q    Okay.  And then --

A    And then the email that he sent on the 6th.

Q    Well, on the 6th he also talked to Alex; correct?

A    I'd have to go back and look at the timeline.

Q    If you look at that timeline we were just looking at, and you look at the entry under 1/6, you reference the conversations from January 5th and January 6th.  Do you see that?

A    Yeah.  If you could just give me a minute.

Q    Sure, of course.

A    Yes.  Okay.

Q    So when you say "Because Bill

Page 442

R. BALDUCCI

did speak with Alex" on the transcript on page 5, line 12, you're referring to one of the specific conversations on the 5th or the 6th?  Are you referring to both?

A    I'm referring to both, the totality of the conversation they've had.

Q    And when you say --

MR. ZUCKERMAN:  I'm sorry, Jeremiah. I just -- I couldn't get my objection into that last question.  So it's just noted for the record.  I apologize.  Keep moving.

BY MR. IADEVAIA:

Q    Then going back to the transcript on line 12, you said "Bill did direct her" -- her meaning, I believe, Alex -- "on how to proceed from here." What did you mean by that?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  Do I answer it?

MR. ZUCKERMAN:  No, you can answer.

THE WITNESS:  Okay.  Well, the conversation was around bullying, hectoring.

Page 443

R. BALDUCCI

BY MR. IADEVAIA:

Q    And when you say "Direct Alex how to proceed here," how did -- what did you mean when you said "Bill did direct her on how to proceed"?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  The conversation was about bullying, boundaries, and hectoring. Alex raised concerns about Collette's work product and performance in that same conversation and agrees to be more mindful of her interactions with Collette.

So that's what I'm referring to, that he would be more mindful -- she would be more mindful about her interactions with Collette.

BY MR. IADEVAIA:

Q    Did you mean anything else when you said to Collette on the 7th, "Bill did direct her on how to proceed from here"?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  I mean, "Be a -- be a good, empathetic manager.  Be aware of how you're impacting the people on your team

Page 444

R. BALDUCCI

such that you can have a productive work environment.  Show some respect."

BY MR. IADEVAIA:

Q     Anything else?

A     I think that covers it.

Q     Okay.  If you take a look at the transcript on page 6 and if you look towards the bottom of the page PL 3016, and you look at line 23.

And there's a statement attributed to you according to the transcript:  "And the fact that that person was so caught off guard they called you immediately to share it."  Do you see that text?

A     No.

Q     Okay.  Looking at page 6 of the transcript, line 23.

A     Yes.

Q     Okay.  And it says "And the fact that that person was so caught off guard they called you immediately to share it."  Do you see that?

A     I do.

Page 445

R. BALDUCCI

Q    Okay.  What was your basis for saying that Mr. Bronstein was caught off guard, that -- so much so that he called you immediately to share it?

A    She had told me that.

Q    Did she tell you in the conversation on the 7th?

A    Yes.

Q    Is it reflected anywhere in the transcript?  You can look back for --

MR. ZUCKERMAN:  Objection.

THE WITNESS:  I don't know that that transcript is the totality of the conversation.

BY MR. IADEVAIA:

Q    Okay.  Do you recall her saying that to you before the -- do you recall her -- your testimony -- do you recall her saying that to you on the 7th?

A    My testimony is that that's the impression.  As I read this, that's the impression I get.

Q    Do you recall Ms. Richards telling you that on the 7th before you

Page 446

R. BALDUCCI

make your comment?

A    I don't -- we're talking -- no, I don't recall.

Q    Okay.  If you take a look again at the transcript on page -- Exhibit -- which is Exhibit 20 on page 4 of the transcript, line 3, starting with line 3 on page 4 and going to page 5, line 20, if you could read that.  I just have a couple questions.  Are you ready, Ms. Balducci?

A    I am.

Q    Okay.  In the portion of the transcript that you just read, are you giving advice to Ms. Balducci [sic] about what she should say to Bill Owens regarding the concerns she expressed to you?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  I'm giving Collette guidance.

BY MR. IADEVAIA:

Q    And why are you giving her guidance as to how to make her

Page 447

R. BALDUCCI

presentation to Bill Owens?

A    I am advising on what her next step should be, which is to bring the concern to Bill Owens.

Q    And you're telling her specifically your guidance, your advice, as to how she should present it to him; correct?

A    I am advising her -- yes -- on how to frame her conversation.  I've not asked her to verbatim do anything.

Q    And you later -- you were the lead investigator in the complaint that Collette shares with you on January 7th; correct?

A    I am.

Q    Okay.  And you were the only investigator who looked into the matters based on Collette's concerns expressed to you during this call on the 7th; right?

A    I am the investigator, yes.  And all of my findings and recommendations were reviewed with a number of people, as you know.  No decisions were made in

Page 448

R. BALDUCCI

isolation.

Q    And looking at Exhibit 14 that was previously marked, which is your timeline, did you include any entry in there about learning that Alex had spoken or -- I'm sorry.  Strike that.

MR. IADEVAIA:  You know what?  Let's just take a two-minute break.  I'm just about done.

THE VIDEOGRAPHER:  All right.  Going off the record.  The time is 10:46 a.m.

(Off the record.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 10:54 a.m.

BY MR. IADEVAIA:

Q    Ms. Balducci, just a couple questions.  One is, do -- you mentioned that it is possible that the recording that Ms. Richards created -- that she started the recording after you had spoken to her on the 7th.  Do I have that correct?

A    You do not.

Q    Okay.  Could you correct me?

Page 449

R. BALDUCCI

How did I get that wrong?

A    I said she could have.

Q    Right.  That -- sorry if I misspoke.  So your testimony is, it's possible or she could have started the recording after you had had some discussion on the 7th; correct?

A    Correct.

Q    Okay.  Do you recall any discussion with Ms. Richards on the 7th that is not -- that was not captured by the audio recording?

A    I don't.

Q    And do you recall any discussion with Ms. Richards on the 7th before the transcript that starts here on page 2?

A    I don't -- no, I don't.

Q    Is it possible that you knew that Ms. Poolos had reached out to speak to Mr. Bronstein before Collette told you about the call on the 7th?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  I mean, it's possible.  Anything's possible.

Page 450

R. BALDUCCI

BY MR. IADEVAIA:

Q    And to the best of your recollection as you sit here today, did you take any steps to either stop -- to stop Ms. Poolos from further communicating with Mr. Bronstein before January 7th?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  There's no evidence to just suggest that I knew that she was reaching out to Mr. Bronstein before January 7th.  So how could I have guided -- given her guidance?

I will say this, however.  You asked me earlier specifically why I would direct Collette when she raised this concern to me to go to Bill.

And I'm not sure I gave you a full and complete answer.

We're -- we're -- you must remember that Bill had just had a conversation with Alex about concerns that Collette brought.

BY MR. IADEVAIA:

Q    And when you say that, which conversation or conversations are you

Page 451

R. BALDUCCI

referring to that Bill had with Alex?

A    I mean, let's bring back the timeline.  It's right in your timeline.  The -- the conversation on the 5th, the conversation on the 6th.

Q    And you know that Ms. Poolos had her discussion with Mr. Bronstein on the 5th, so before any discussion that took place on the 6th; right?

MR. ZUCKERMAN:  Objection,

THE WITNESS:  I -- I don't even understand the question.

BY MR. IADEVAIA:

Q    Okay.  But I just want to be clear because I'm not sure you answered my last question.

And this is truly the last question, which is, do you have any recollection of asking Ms. -- or making -- do you have any recollection of taking any steps to stop Ms. Poolos from further communicating with Mr. Bronstein before January 7th?

MR. ZUCKERMAN:  Objection.

Page 452

R. BALDUCCI

THE WITNESS:  Do I -- again, there was a -- there was a managerial -- a direct -- a conversation between Bill Owens -- Owens, Tanya, and Alex Poolos, bringing to her attention significant concern that her associate producer was having with her, feeling threatened, feeling bullied.

I mean, so I would think that's some pretty -- that's some pretty significant action that was taken to try to improve how they were relating and probably, I would think, meaningful guidance to Alex that would inform how she moves forward.

BY MR. IADEVAIA:

Q    On January 5th?

A    On the 5th and the 6th.

Q    And do you know if any of that communication that Bill and Tanya -- and/or Tanya had with Alex was related to communications with Scott Bronstein?

A    I don't know.

THE WITNESS:  Sorry.

Page 453

R. BALDUCCI

MR. ZUCKERMAN:  Objection.

MR. IADEVAIA:  Okay.  I think that's it.  Thank you.

THE VIDEOGRAPHER:  Okay.  Any other questions, Mr. Zuckerman or --

MR. ZUCKERMAN:  No.

THE VIDEOGRAPHER:  Okay.  All right. We are off the record at 10:59 a.m.

And this concludes today's testimony given by Renee Balducci.  The total number of media used was one and will be retained by Veritext.

(Signature waived.)

(Whereupon, at 10:59 a.m., the proceeding was concluded.)

Page 454

CERTIFICATE OF DEPOSITION OFFICER

I, RALPH FORNOLES, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

RALPH FORNOLES

Notary Public in and for the

State of New York

Page 455

CERTIFICATE OF TRANSCRIBER

I, ANDREW TINGLEY-BARRAZA, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

ANDREW TINGLEY-BARRAZA

**[& - a.m.]**                                                  Page 1

| & | 2 | 3012 416:17 | 6 |
|---|---|---|---|

**&**

**&** 401:5,12,19
  405:11

**0**

**08896** 400:7

**1**

**1** 424:5
**1/5** 440:14
**1/6** 441:18
**10006** 401:7,14
  401:21
**10020** 402:7,14
**10:45** 400:16
  404:6
**10:46** 448:12
**10:54** 448:15
**10:59** 453:9,15
**11** 429:4,10
**111** 401:6,13,20
**11758** 400:18
**12** 439:6 441:4
  442:3,16
**1251** 402:6,13
**13** 433:14
  434:14
**14** 428:15
  440:9 448:3
**16** 434:8
**18** 433:14
**19** 403:8
  410:18,23
  411:3

**2**

**2** 400:15
  404:10 416:16
  416:20 420:14
  424:5,10 429:3
  437:5 440:12
  449:17
**20** 403:10
  415:14,17
  416:5 429:2
  441:4 446:7,10
**2022** 407:14
  408:8,13,21
  413:20 425:2,7
  425:16
**2025** 400:15
  404:10
**21** 429:5
**212** 401:9,16,23
  402:16
**21st** 402:6,13
**23** 400:7 416:9
  444:10,19
**25** 435:9
**29899** 454:16

**3**

**3** 412:18
  416:20 417:18
  418:23 422:22
  432:13 446:8,9
**3011** 415:16
  416:8

**3012** 416:17
**3014** 432:10
  434:14
**3015** 439:5
**3016** 444:9
**32278** 455:13

**4**

**4** 432:9,11,13
  434:12 435:10
  435:16 446:8,9
**403-7300**
  401:16,23
**403-7323** 401:9
**407** 403:3
**410** 403:9
**415** 403:10
**428** 403:14
**489-8230**
  402:16

**5**

**5** 408:8,13
  417:18 418:23
  422:22 433:13
  435:15 437:4
  439:4 442:3
  446:9
**5th** 409:3
  413:25 418:17
  437:12 440:23
  441:8,19 442:4
  451:5,9 452:17
  452:18

**6**

**6** 444:8,18
**60** 407:10,13
**6th** 440:19,23
  441:11,12,20
  442:5 451:6,10
  452:18

**7**

**7** 408:21
  413:20 424:25
  425:7,16
**7328** 440:13
**7407160** 400:20
**7th** 408:24
  414:17,24
  420:3,9 421:5
  421:22 424:15
  426:6 443:20
  445:8,20,25
  447:15,21
  448:22 449:8
  449:11,16,22
  450:7,12
  451:24

**8**

**8** 403:14 429:5

**a**

**a.m.** 400:16
  404:6 448:12
  448:15 453:9
  453:15

**[ability - attributed]** Page 2

| | | | |
|---|---|---|---|
| **ability** 454:9 455:6 | **advised** 426:25 | **alex's** 435:23 439:22 | **appears** 420:25 |
| **able** 413:5 436:17 | **advising** 447:3 447:10 | **alexandra** 400:4 401:2 | **applicable** 404:22 |
| **absent** 404:15 | **afraid** 436:11 438:9 | 402:19 404:8 405:14 407:18 | **asked** 419:12 437:18 447:12 450:14 |
| **absolutely** 415:2,10 432:3 437:14 | **ago** 421:14 422:22 | 407:23 | **asking** 417:20 417:22 419:5 |
| **accurate** 454:8 455:5 | **agree** 404:13 404:18 | **alter** 438:23 **americas** 402:6 402:13 | 421:6,8,12 423:24 426:4 427:15 431:17 |
| **acknowledge...** 404:12 | **agreeing** 422:19 | **andrew** 455:2 455:15 | 432:25 451:20 |
| **acknowledging** 417:12 422:24 422:25 423:5 423:12 | **agrees** 443:12 **ahead** 412:23 413:8 | **answer** 403:12 409:24 419:10 420:23,24 426:23 427:10 | **asserted** 427:14 **assessment** 431:14 **assigned** 404:4 |
| **action** 421:22 452:12 454:11 454:15 455:8 455:12 | **alex** 407:25 408:11,20 409:3 415:6 418:11 419:25 420:10,19 | 427:18,21 428:9 430:9 442:21,22 450:19 | **associate** 407:10 452:7 **associated** 412:20 |
| **actions** 436:13 **actually** 428:20 **additionally** 404:15 | 421:10 423:21 424:23 425:9 425:14,18,22 426:2,6 435:3 | **answered** 451:16 **answering** 409:17 **anybody** 409:6 | **assume** 415:11 424:20 **assumptions** 423:25 424:2 |
| **address** 433:21 434:10 | 437:11,17,18 437:20 438:2,8 438:9,10,21,22 | **anymore** 438:8 **anything's** 449:25 | **attendance** 405:5 **attention** 435:5 452:6 |
| **addressed** 433:23 439:21 | 439:8,17,21 440:3,21 441:5 441:13 442:2 | **apologies** 428:25 | **attorney** 454:13 455:10 |
| **administer** 404:12 | 442:18 443:3 443:10 448:6 | **apologize** 442:12 | **attorneys** 419:12 |
| **advice** 446:16 447:7 | 450:21 451:2 452:5,14,21 | **appear** 417:10 420:15,17 | **attributed** 424:7 439:6 |
| **advise** 427:19 | | | |

444:12
**attributes**
444:16
**audio** 403:8,10
412:5,19,24
413:9 426:15
426:20 427:4
427:24 428:2,3
428:5 449:13
454:7 455:3
**authorized**
404:11
**available** 411:4
412:15 416:18
**avenue** 402:6
402:13
**aware** 409:2
425:17 426:5
443:24

**b**

**b** 403:5
**back** 428:23,24
433:18 434:12
437:22 439:12
440:6 441:2,14
442:15 445:11
448:14 451:3
**badly** 418:13
**bagley** 401:11
405:10
**balducci**
400:13 403:7
404:1,8 405:1

405:22,23
406:1,18 407:1
407:4 408:1
409:1,6 410:1
410:18,23
411:1 412:1
413:1,4,11
414:1 415:1,14
415:17 416:1,5
416:12 417:1
417:20 418:1,2
419:1,15 420:1
421:1 422:1
423:1 424:1
425:1 426:1,11
427:1 428:1,13
428:15 429:1,7
430:1,19 431:1
432:1,15 433:1
434:1,24 435:1
435:9,17 436:1
437:1 438:1
439:1 440:1
441:1 442:1
443:1 444:1
445:1 446:1,12
446:16 447:1
448:1,17 449:1
450:1 451:1
452:1 453:1,11
**balducci's**
410:20
**barraza** 455:2
455:15

**baseball** 411:15
412:18
**based** 423:10
436:11 447:20
**basis** 408:7,11
427:15 445:2
**bates** 415:15
416:8,17
432:10 439:5
440:12
**bear** 432:10
**bears** 416:8
**beginning**
424:13
**behalf** 401:2
402:2 405:11
405:17
**behavior**
438:24
**believe** 408:15
410:19 432:7
439:3 442:17
**benefit** 435:12
437:7,11,17,19
437:21 438:15
**best** 450:3
454:9 455:6
**better** 438:24
**beyond** 426:17
428:10 430:20
**bill** 426:2
432:17,21
433:8,9,10,11
433:16 434:2,2

434:6,9,10
435:22 438:3
438:19 439:8,8
439:11,17,21
440:2,16,20
441:5,25
442:16 443:5
443:20 446:17
447:2,5 450:17
450:21 451:2
452:4,20
**block** 424:10
**boss** 436:11
**boss's** 436:12
**bottom** 416:17
444:9
**boundaries**
443:9
**bowry** 402:21
405:24
**brandon**
401:18 405:10
411:21
**break** 448:9
**breath** 432:17
**bring** 433:6
436:3,5 447:4
451:3
**bringing** 435:5
438:17 452:6
**broadcasting**
400:8 402:3
**broadway**
401:6,13,20

**[bronstein - concludes]**

**bronstein**
407:24 408:6
413:24 418:12
418:16 420:11
420:20 421:11
421:25 422:7
423:22 429:11
429:19,22
430:15 431:25
432:5 435:23
445:3 449:21
450:7,11 451:8
451:23 452:23
**bronstein's**
431:14
**brought** 438:5
450:22
**bullet** 440:14
**bullied** 452:9
**bullying** 442:24
443:9
**bwhite** 401:22

**c**

**c** 401:1 402:1
**call** 407:24
408:4,10,12,20
408:25 409:3
413:24 418:16
420:9 435:23
436:9 437:12
447:21 449:22
**called** 406:19
412:16 418:11

418:12 444:14
444:23 445:4
**cambridge**
402:21
**captured**
414:18 449:12
**case** 400:6
427:12
**caught** 444:14
444:22 445:3
**cause** 410:3
411:14
**cbs** 400:7,8
402:2,3 410:10
440:13
**center** 411:15
412:18
**certificate**
454:1 455:1
**certified**
404:18
**certify** 454:3
455:2
**challenged**
427:12
**challenges**
434:21
**civ** 400:7
**clark** 401:5,12
401:19 405:11
**clear** 451:16
**clearer** 436:22
**clock** 415:22

**cnn** 417:2
419:2 421:24
422:6 423:8
429:14
**colleague**
405:20 429:13
**colleagues**
410:9
**collette** 407:9
408:2,25
413:15 416:23
417:7,15
418:13,14
419:20,25
420:2,8,9
421:23 424:25
425:6,19
431:21 432:20
437:16,18,21
437:25 438:25
439:22 443:13
443:17,20
446:21 447:15
449:21 450:16
450:22
**collette's** 408:7
408:12 418:22
431:13 443:10
447:20
**come** 428:23
432:25 434:11
**comment** 446:2
**comments**
407:25

**communicating**
450:6 451:23
**communication**
452:20
**communicati...**
452:22
**complainant**
430:25
**complaint**
419:20,24
421:4,7,21
433:6 437:23
447:14
**complete**
450:19
**concern** 408:6
408:7 432:24
447:5 450:16
452:7
**concerning**
426:15
**concerns**
407:17,19,22
407:23 408:12
415:5 424:24
425:6 438:6
443:10 446:18
447:20 450:22
**conclude**
427:16
**concluded**
453:16
**concludes**
453:10

**[conclusions - disparaged]**                          Page 5

**conclusions** 431:18

**conduct** 430:23

**conducted** 430:19

**confirm** 407:6

**connection** 425:6 430:21

**consider** 429:14

**constitute** 405:2

**cont'd** 402:1

**contact** 424:23

**conversation** 413:18,19,22 414:18 417:23 421:8,13,17 423:18 425:25 427:6 434:24 435:3 438:3,20 439:20 440:2 440:15 441:6,8 442:7,24 443:8 443:12 445:8 445:15 447:11 450:21,25 451:5,6 452:4

**conversations** 415:12 421:9 432:4 437:24 440:22 441:6 441:19 442:4 450:25

**convey** 436:18 436:22

**corner** 416:18

**correct** 407:9 407:12,15,16 407:21 408:3,8 408:18,23 409:4,5,16 410:13 412:6 414:9 420:4 422:8,22 423:8 424:22 425:3 430:17,21,22 433:10 434:3,4 435:11 441:13 447:9,16 448:23,25 449:8,9

**counsel** 406:24 410:5 414:6 454:10,13 455:7,10

**couple** 407:6 446:11 448:17

**course** 433:25 441:23

**court** 400:1 406:11 416:7

**cover** 403:9 410:10 411:2 412:8,21

**covers** 444:6

**created** 416:7 428:14 448:20

**credibility** 431:14

**credible** 431:10 432:7,8

**critical** 428:5

**d**

**d** 403:1

**date** 400:15

**davis** 402:5,12 405:16 406:7

**day** 407:8 409:15 418:8 419:21

**dealt** 438:7

**decision** 427:9

**decisions** 447:25

**defendants** 400:10 402:2 405:17 406:8

**defense** 427:16

**deposition** 400:12 404:7 404:24 407:8 409:15 410:21 414:8 426:14 426:19 427:23 428:11 429:21 454:1

**described** 429:18,22 439:20

**describes** 429:11

**description** 403:6 440:15

**determining** 431:2

**dial** 436:4,8

**different** 420:7

**digital** 454:7 455:3

**direct** 424:23 427:9 439:9 442:17 443:3,5 443:21 450:15 452:4

**directing** 426:23

**directly** 407:19 432:16

**discuss** 418:14 419:15 421:23

**discussed** 410:14 430:12

**discussion** 414:23 418:3 418:25 419:16 420:8,18 424:14,25 436:16 449:8 449:11,15 451:8,9

**disparaged** 419:25 420:2

**[district - full]** Page 6

district 400:1,2
document
  412:16 415:15
documents
  409:10 410:4
doing 439:3
doubt 435:13
  437:8,11,17,19
  437:21 438:15
draw 431:18
duly 406:20
  454:5
dwt.com 402:8
  402:15

**e**

e 401:1,1 402:1
  402:1 403:1,5
earlier 450:15
early 407:14
effect 427:3
eight 410:15
either 450:5
email 410:10
  440:21 441:10
emotion 434:18
  436:5,8,16,19
  436:23,25
empathetic
  443:24
employed
  454:10,13
  455:7,10

employee
  454:12 455:9
empty 412:4
enter 431:13
entire 421:15
entries 428:20
  440:13
entry 441:18
  448:5
environment
  444:3
es 454:4
esquire 401:3
  401:11,18
  402:4,10
events 407:14
everybody
  437:25
evidence 450:9
evidentiary
  404:23
exactly 410:2
examination
  403:2 407:2
examined
  406:22
executive
  432:23
exhibit 403:8
  403:10 409:22
  410:2,18,19,23
  411:3,8 412:16
  415:14,17
  416:4,5 428:15

429:2 440:9
441:4 446:7,7
448:3
exhibits 409:12
  409:13,14,19
  409:21,23
  410:8,12,14
  412:2
existed 414:15
  415:3
express 436:15
expressed
  446:18 447:20

**f**

fact 418:6,15
  418:24 421:2,3
  444:13,21
facts 436:3,5,18
  436:22
fairly 433:5
feedback
  438:23
feel 419:10
  437:23
feeling 452:8,9
file 411:15
  412:17,20
financially
  454:14 455:11
findings 447:23
fine 412:10
firm 405:11,20

first 406:19
  407:8 409:2,15
  410:6 413:23
  418:10 421:2
  438:17
floor 402:6,13
focused 414:22
focusing 437:4
folder 412:2
follow 416:21
following
  440:21
follows 406:22
foregoing
  454:3,4 455:4
form 433:20
  434:6
fornoles 400:19
  404:3 406:10
  454:2,17
forward 452:15
found 418:10
  432:6 437:12
frame 447:11
free 419:10
friday 414:5,12
  414:14 419:13
friend 429:11
  429:13,15,19
  430:5,15,25
  431:12,16,22
front 428:16
full 428:4
  450:18

**[further - initial]**

**further** 431:23 450:6 451:23 454:12 455:9

**g**

**getting** 419:19 419:24
**ghw** 400:7
**give** 415:19 425:5,14 435:12 437:7 437:10,16,18 437:20 438:15 441:21
**given** 425:11 450:13 453:11
**giving** 446:16 446:21,24
**global** 400:7 402:2 404:9
**go** 412:23 413:8 424:3 434:12 440:5 441:14 450:17
**goes** 426:17
**going** 411:2 412:11,19,21 413:3 414:25 415:13 416:21 418:9 427:9 428:22,24 429:5 433:21 434:22 437:22 441:2 442:15

446:9 448:11
**good** 404:2 405:8,15,22 407:4,5 415:25 443:24
**guard** 444:14 444:22 445:4
**guess** 426:22
**guidance** 425:5 425:11,15 446:22,25 447:7 450:13 452:14
**guided** 450:13

**h**

**h** 403:5
**hand** 406:15 416:18
**happened** 407:15 408:8 408:13 423:14 440:2
**head** 434:9
**hear** 413:5,6 438:23
**heard** 414:13
**hearing** 406:12
**hectoring** 442:25 443:9
**helping** 435:4
**hereto** 454:13 455:10

**hit** 412:21
**hjr** 400:8
**hold** 426:11 428:22
**holistic** 431:6,8
**hopes** 435:3
**hour** 426:18
**hours** 410:15
**hr** 438:6

**i**

**iadevaia** 401:3 403:3 405:7,9 407:3 410:17 410:25 411:6 411:17,20,24 412:3,7,11,13 412:23 413:2,8 413:10 415:13 415:19 416:2 417:24 419:7 419:22 420:22 422:14 423:2 423:16 424:21 426:3,21 427:5 427:12,25 428:12,17,19 430:13,18 431:11,20 436:6 437:15 440:7 442:14 443:2,18 444:4 445:16 446:23 448:8,16 450:2

450:23 451:14 452:16 453:3
**identification** 410:24 415:18
**identified** 431:22
**identify** 405:5 406:4
**ii** 400:14
**immediately** 416:25 444:15 444:23 445:5
**impacting** 443:25
**impetus** 438:3
**important** 434:6 436:15
**impression** 445:22,23
**improve** 452:12
**include** 448:5
**included** 407:22
**including** 407:19 410:15
**incredibly** 432:6
**indicate** 424:12
**inform** 452:15
**information** 431:2
**initial** 437:22

**[inquire - looking]**                                                                 Page 8

**inquire** 431:23
**instance** 433:9
**instruct** 427:17
  427:20
**instructed**
  403:12 437:9
  439:2
**instructing**
  428:8
**intended**
  404:21 426:18
**interactions**
  443:13,16
**interested**
  454:14 455:11
**interfere**
  436:20
**interjects** 435:7
**interpret**
  417:20 419:5
  421:12 424:19
**interpretation**
  423:10
**interpreted**
  436:10
**investigation**
  415:5 429:18
  432:5
**investigations**
  430:20,24
**investigator**
  447:14,19,22
**isolation** 448:2

**issue** 418:7
**issues** 434:10
  435:10 438:2

**j**

**j** 401:3
**james** 401:11
  405:10
**january** 408:8
  408:13,21,24
  409:3 413:20
  413:25 414:17
  414:24 420:3,9
  424:15,25
  425:7,16 426:6
  437:12 440:19
  440:22,23
  441:19,19
  447:15 450:7
  450:12 451:24
  452:17
**jbagley** 401:15
**jeremiah** 401:3
  405:9 442:9
**jiadevaia** 401:8
**job** 400:20
**june** 400:15
  404:10

**k**

**keep** 442:12
**key** 407:15
**kind** 435:13
**knew** 449:19
  450:10

**know** 409:25
  410:2 411:9,11
  411:12 414:15
  415:3 416:9
  417:11 418:6,7
  418:12 428:21
  428:21 432:7,8
  432:11 433:19
  434:20,20,20
  434:25 435:4,4
  435:12,13,13
  445:13 447:25
  448:8 451:7
  452:19,24
**knowledge**
  454:9 455:6
**knows** 437:25

**l**

**law** 405:10,20
**laws** 404:23
**lawsuit** 407:15
**lawyers** 410:22
**lead** 447:14
**leadership**
  439:23
**learned** 421:3
**learning** 448:6
**lee** 402:21
  405:24
**leone** 402:10
**likely** 422:6,10
  424:13

**limited** 426:15
  426:20 427:5
  427:23
**line** 403:13
  416:20 424:5
  424:10 429:4
  429:10 432:13
  434:8,14 435:9
  435:16 437:5
  439:6 441:4
  442:3,16
  444:10,19
  446:8,9,10
**lines** 417:18
  418:23 422:22
  429:5,5 433:14
**listen** 413:3
**listened** 414:3,5
  416:7
**llp** 402:5,12
**location** 400:17
**long** 424:8
**look** 416:15
  420:13 429:3,6
  429:9 431:5,6
  432:16 433:14
  434:13 440:8
  441:14,16,17
  444:7,8,10
  445:11 446:5
**looked** 447:19
**looking** 409:10
  409:18,20,23
  409:25 410:13

411:11 418:20 439:4 441:17 444:18 448:3

**looped** 433:18 439:12

**lot** 423:25 424:20

**lyle** 402:4 405:15 411:13

**lylezuckerman** 402:8

**lynch** 402:10 405:21 406:6,6 415:24

**m**

**made** 407:24 410:11 421:21 447:25

**make** 423:25 424:2 427:8 438:24 446:2 446:25

**making** 428:3 451:21

**management** 439:23

**manager** 434:21 443:24

**managerial** 452:3

**manner** 404:24

**mark** 410:18 411:3 415:14

**marked** 409:14 410:20,23 412:2 415:17 416:5 428:15 429:2 441:3 448:4

**massapequa** 400:18

**matter** 404:8 405:12 415:9

**matters** 412:5 447:19

**mean** 407:25 409:14 417:9 419:11 420:2 433:4 442:19 443:5,19,23 449:24 451:3 452:10

**meaning** 442:17

**meaningful** 452:14

**means** 404:25 431:18

**media** 453:12

**member** 433:7

**memory** 417:22 418:2,5

**mentioned** 448:18

**michael** 402:10 405:20 406:3,6 415:21

**michaellynch** 402:15

**mindful** 443:12 443:15,16

**mine** 412:4

**minute** 415:20 422:21 437:4 441:22 448:9

**minutes** 407:11 407:14

**misspoke** 449:5

**moment** 422:12 423:14,19

**moments** 415:23

**monday** 400:15

**morning** 404:2 405:8,15,22 407:4,5 408:21 418:8 421:4

**moves** 452:15

**moving** 442:13

**mute** 406:4

**n**

**n** 401:1 402:1 403:1

**name** 404:2 411:16 412:17

**nature** 431:24

**needed** 433:17 439:11

**needs** 433:19 433:22 435:10

**negative** 407:25

**neither** 454:10 455:7

**neutral** 429:22 430:6 431:3

**new** 400:2 401:7,14,21 402:7,14 404:13 454:19

**news** 400:7 402:2

**non** 427:2

**notary** 404:11 454:18

**noted** 442:11

**notes** 410:11 440:6

**notified** 408:19

**notifies** 413:23

**number** 410:19 415:15 416:8 416:17 426:13 426:14 432:10 447:24 453:11

**numerous** 410:15

**ny** 400:18 401:7,14,21 402:7,14

**nyc** 412:18

**[oaths - please]**

| o | | | |
|---|---|---|---|
| **oaths** 404:12 | 416:23 417:7 | **p.c.** 401:5,12,19 | **performance** |
| **objection** | 417:14 418:20 | **p.m.** 440:16 | 443:11 |
| 404:15 406:12 | 419:9,17 420:6 | **page** 403:2,6,9 | **permitted** |
| 419:4 420:21 | 422:19 423:3 | 403:13 411:3 | 404:21 |
| 422:9,23 423:9 | 424:7,8,12,22 | 412:8,21 | **person** 416:25 |
| 424:17 425:20 | 425:4,10 426:4 | 416:16,20 | 422:5 444:14 |
| 426:10,14 | 428:21 429:9 | 417:21 418:21 | 444:22 |
| 427:13 430:8 | 429:16 433:12 | 419:6 420:14 | **personal** |
| 430:16 431:4 | 436:7 439:4,15 | 420:14 424:5 | 431:24 |
| 431:15 435:25 | 440:8,11,19 | 429:3 432:9,11 | **phone** 407:23 |
| 437:13 440:4 | 441:2,9,24 | 432:13 433:13 | 408:4,10,12,20 |
| 442:10,20 | 442:23 444:7 | 433:13 434:12 | 408:25 418:16 |
| 443:7,22 | 444:18,21 | 435:9,15 437:4 | **piece** 428:5 |
| 445:12 446:20 | 445:2,17 446:5 | 439:4 440:12 | **pl** 415:14,16 |
| 449:23 450:8 | 446:14 447:18 | 440:20 442:3 | 416:8,17 |
| 451:11,25 | 448:25 449:10 | 444:8,9,18 | 434:14 439:5 |
| 453:2 | 451:15 453:3,5 | 446:7,8,9,9 | 444:9 |
| **objective** | 453:8 | 449:17 | **place** 408:5 |
| 430:11 431:10 | **once** 416:9 | **paramount** | 451:10 |
| 436:3 | **open** 411:9 | 400:7 402:2 | **placeholder** |
| **obvious** 433:5 | **order** 410:3 | 404:9 | 403:8 411:2,15 |
| **obviously** | **outcome** | **part** 415:4 | 412:17 |
| 434:23 | 454:14 455:11 | 418:3 | **plaintiff** 400:5 |
| **offense** 427:14 | **owens** 433:10 | **partially** | 401:2 402:19 |
| **office** 405:19 | 433:11 434:3 | 421:17 | 405:12,14 |
| 405:19 | 435:22 436:16 | **parties** 404:13 | 407:18 |
| **officer** 454:1,2 | 437:2 438:4 | 404:17 454:11 | **play** 412:19,22 |
| **okay** 408:19 | 440:16 446:17 | 454:13 455:8 | **played** 412:24 |
| 409:9 410:17 | 447:2,5 452:5 | 455:10 | 413:9 |
| 411:7,19 | 452:5 | **party** 429:23 | **please** 405:5 |
| 412:11,14 | p | 430:7,11 | 408:9,15 |
| 415:13 416:12 | **p** 401:1,1 402:1 | **people** 443:25 | 411:10 415:16 |
| | 402:1 | 447:24 | 415:20 416:10 |
| | | | 416:16 432:11 |

440:9
**point** 419:7
421:7 433:20
434:5,6 435:20
437:10 440:14
**pointed** 418:4
**policy** 427:2
**poolos** 400:4
401:2 402:19
404:9 405:14
407:18,23
408:5 413:24
415:7 418:15
421:10 423:7
424:23 425:5
430:21 449:20
450:6 451:7,22
452:5
**portion** 422:21
446:14
**possible** 434:19
448:19 449:6
449:19,24,25
**preparation**
414:7,10,10
419:17
**prepared** 455:3
**present** 402:18
447:8
**presentation**
437:2 447:2
**pressed** 421:16
422:12 423:14

**pretty** 452:11
452:11
**previous** 430:2
**previously**
428:14 448:4
**prior** 420:18
429:21 454:4
**privileged**
419:17
**probably**
452:13
**procedural**
404:22
**proceed** 406:24
435:14 439:9
442:18 443:4,6
443:21
**proceeding**
400:17 404:5
404:20 453:16
455:4
**proceedings**
454:3,4,5,8
455:5
**process** 438:18
**produced**
404:19 410:22
**producer**
407:10 432:23
452:7
**product** 443:11
**productions**
402:22

**productive**
444:2
**professional**
429:23 430:6
431:19
**provided** 410:5
414:9
**public** 454:18
**purpose** 426:18
427:23

**q**

**qualified** 454:7
**question**
414:21 415:21
419:12 420:6
426:5,22,24
427:22 428:2
429:6 442:11
451:13,17,19
**questions**
403:12 409:17
409:24 426:15
426:19 428:23
446:11 448:18
453:6
**quick** 415:21
**quoting** 434:7

**r**

**r** 401:1 402:1
404:1 405:1
406:1 407:1
408:1 409:1
410:1 411:1

412:1 413:1
414:1 415:1
416:1 417:1
418:1 419:1
420:1 421:1
422:1 423:1
424:1 425:1
426:1 427:1
428:1 429:1
430:1 431:1
432:1 433:1
434:1 435:1
436:1 437:1
438:1 439:1
440:1 441:1
442:1 443:1
444:1 445:1
446:1 447:1
448:1 449:1
450:1 451:1
452:1 453:1
**raise** 406:14
**raised** 407:17
415:6 425:7
443:10 450:16
**ralph** 400:19
404:3 406:10
454:2,17
**raskin** 401:5,12
401:19 405:11
**reach** 432:15
432:17,21,22
**reached** 418:7
418:15 420:10

423:7,13,21 449:20

**reaching** 417:4 417:8 420:19 421:10 422:16 423:4 450:11

**read** 416:21 417:5 422:21 429:4 433:15 435:17 445:22 446:10,15

**reading** 423:11 435:15

**ready** 446:11

**reason** 432:3 436:24

**reasons** 438:11

**recall** 418:18 419:24 420:7 445:17,18,19 445:24 446:4 449:10,15

**recapping** 440:22

**received** 416:10

**recognize** 413:11,17

**recollection** 418:19 419:19 421:2,3 422:2 450:4 451:20 451:21

**recommendat...** 447:23

**record** 404:4,5 404:16 405:6 406:5 410:25 414:25 416:22 417:19 421:16 422:13 423:15 427:7 433:15 442:12 448:12 448:13,15 453:9 454:9 455:5

**recorded** 404:24 414:24 454:6

**recording** 403:8,10 404:19 410:21 412:6 413:5,12 413:19 414:4 414:13,15,18 414:20 415:11 424:16 435:21 439:7,16 448:19,21 449:7,13 454:8 455:4

**recordings** 415:8

**reduced** 454:6

**reference** 431:19 434:2 441:18

**referenced** 423:20

**referencing** 418:24 420:18 440:3

**referring** 414:17 422:7 439:18,19 441:7 442:3,5 442:6 443:14 451:2

**reflected** 417:17,17 418:22 424:15 445:10

**refresh** 411:7

**regarding** 421:10 432:5 446:18

**relate** 415:8 427:3

**related** 419:2 452:22 454:10 455:7

**relates** 418:3

**relating** 452:13

**relationship** 427:22,25 431:24

**relative** 454:12 455:9

**relevant** 429:17 429:17 431:2

**remember** 416:25 421:20 422:5 423:17 423:24 429:23 429:25 450:20

**remembering** 423:6

**reminding** 425:17

**remote** 400:17

**remotely** 404:14

**renee** 400:13 404:7 405:23 406:14,18 434:24 453:11

**repeat** 408:9

**reported** 400:19

**reporter** 404:2 404:3 406:2,9 406:11,23

**reporters** 416:7

**reporting** 416:6

**representing** 430:3

**respect** 444:3

**respond** 417:3

**responsible** 432:23

**retained** 453:12

**[retaliate - specifically]** Page 13

**retaliate**
  425:19,22
  426:7
**retaliation**
  427:2
**reviewed**
  447:24
**richards**
  407:10,17
  408:19 413:16
  413:20,23
  414:17,19,23
  415:6,7 416:23
  417:15 418:23
  420:16,17
  421:9 422:7,20
  423:6,19
  424:14 425:19
  426:8 429:10
  429:18 430:14
  435:7,20,22
  437:6,9 445:24
  448:20 449:11
  449:16
**richards's**
  424:24
**right** 406:15
  407:20 408:2
  408:14,22
  416:17 419:23
  425:8,12
  435:14,24
  447:21 448:11
  449:4 451:4,10

  453:8
**room** 405:13
  409:7
**route** 424:3
**rules** 404:23
**running** 415:22

**s**

**s** 401:1 402:1
  403:5
**saw** 432:2
**saying** 420:4,5
  422:20 426:6
  445:3,17,20
**says** 416:23
  420:16 422:4
  433:16 435:6
  439:7 444:21
**scope** 426:17
  426:22 428:10
**scott** 407:24
  408:11,21
  409:4 418:11
  418:12 420:10
  420:19 421:11
  421:24 422:7
  423:21 432:4
  435:23 452:22
**screen** 406:15
  411:14,20
  412:15 416:19
  428:18
**screenshot**
  411:22

**scroll** 432:11
  433:13 440:11
**second** 408:15
  440:14
**see** 411:9,14,14
  412:14 417:5
  422:17,18
  424:9 427:21
  429:12 432:18
  433:24,25
  435:16 439:13
  439:14 440:17
  440:18,23
  441:20 444:15
  444:24
**seems** 417:10
  433:4
**seen** 416:13
**senior** 433:7
**sense** 428:4
**sent** 410:9
  441:10
**sentence**
  417:16
**separate**
  405:19
**session** 410:7
**share** 411:8,21
  412:12,16
  416:19 428:18
  444:15,23
  445:5
**shared** 416:4

**shares** 447:15
**show** 411:2
  428:17 432:24
  434:10 444:3
**sic** 446:16
**signature**
  453:14 454:16
  455:13
**significant**
  452:6,11
**simon** 438:4
**sit** 450:4
**situation** 431:7
  431:9 438:24
**ski** 418:9
**skills** 454:9
  455:6
**slightly** 420:6
**somebody**
  419:2 426:25
  430:5
**sorry** 416:3
  442:9 448:7
  449:4 452:25
**southern** 400:2
**speak** 425:14
  439:8,17 441:5
  442:2 449:20
**specific** 429:6
  442:4
**specifically**
  429:10 447:7
  450:15

**[specifics - think]**

**specifics** 430:2

**specifies** 432:14

**spoke** 410:16 414:16

**spoken** 418:13 425:9,12 448:6 448:21

**stage** 425:23

**stamp** 439:5

**stamped** 440:13

**start** 417:25 424:4

**started** 448:21 449:6

**starting** 424:5 424:10 435:9 446:8

**starts** 415:15 423:20 449:17

**state** 404:13 454:19

**statement** 417:17 424:6 434:15 439:6 444:11

**statements** 418:22

**states** 400:1 424:6 434:17

**stenographic** 404:25

**step** 447:4

**steps** 450:5 451:22

**stipulation** 405:3

**stop** 450:5,6 451:22

**stopped** 435:15

**strike** 448:7

**struggling** 439:22

**suggest** 436:7 450:10

**suggested** 436:25

**suggesting** 435:19,21 436:2

**superior** 429:14

**supposed** 425:18

**sure** 405:7 406:6 408:10 408:17 414:22 422:10 428:3,6 441:23 450:18 451:16

**swear** 404:14 406:13

**sworn** 404:16 406:20 454:5

**t**

**t** 403:5

**take** 404:4,11 406:3 416:15 429:9 431:6 432:16,17 433:13 434:13 434:18 436:25 444:7 446:5 448:9 450:5

**taken** 404:8 410:3 452:12 454:3,11 455:8

**talk** 424:8 440:20

**talked** 407:7 410:6 438:11 441:12

**talking** 417:11 417:12,16 446:3

**tanya** 426:2 434:25 438:4 438:20 440:16 452:5,21,21

**tape** 426:16,20 427:4

**team** 433:7 443:25

**tell** 406:20 414:19,25 416:24 421:19 421:20 424:8

425:22 445:7

**telling** 417:2 420:25 422:5 425:17 445:25 447:6

**terrified** 436:11 438:10

**testified** 406:22

**testifying** 454:5

**testimony** 429:24 430:2 445:19,21 449:5 453:10

**text** 417:5 422:17,18 424:9 432:18 433:24,25 435:17 439:13 439:14 440:24 444:16

**thank** 406:2,9 406:15,23 413:7 453:4

**thing** 413:4

**things** 407:7

**think** 412:5 424:19 426:21 427:8 428:16 429:16 430:4 430:10,24 431:5,6 432:15 433:22 436:14 436:19,21 444:6 452:10

**[think - volume]**                                                        Page 15

452:14 453:3
**third**  429:23
  430:7,11
**threatened**
  452:8
**time**  400:16
  405:4 409:2
  410:16 418:10
  427:5 434:22
  438:5,17
  448:12,15
**timeline**  410:9
  428:4,13 440:6
  440:10,12
  441:15,16
  448:5 451:4,4
**times**  410:15
**tingley**  455:2
  455:15
**today**  409:7
  414:4,11
  416:13 450:4
**today's**  414:7
  453:10
**told**  408:25
  418:25 420:9
  421:18 422:11
  423:6,12,23
  430:14 437:10
  437:16 438:13
  445:6 449:21
**took**  408:4
  421:21 436:9
  451:9

**total**  453:11
**totality**  442:7
  445:14
**towards**  444:9
**transcriber**
  455:1
**transcript**
  403:10 404:18
  416:6,13,16
  418:4,21
  420:14,15
  421:13 422:4
  422:17 423:20
  424:4,5,10
  428:24 432:10
  432:14 433:16
  434:7,16,17
  435:6,16 437:5
  437:6 439:7,16
  441:3 442:2,16
  444:8,13,19
  445:11,14
  446:6,8,15
  449:17 455:3,4
**transcriptionist**
  454:7
**transcripts**
  434:13
**tremaine**  402:5
  402:12 405:16
  406:7
**trip**  418:9
**true**  454:8
  455:5

**truly**  451:18
**trust**  438:18,19
  438:22
**truth**  406:20,21
  406:21
**try**  434:18
  452:12
**trying**  436:4
**turn**  432:9
  433:12
**two**  421:14
  426:14 448:9
**typewriting**
  454:6

**u**

**ultimately**
  438:6
**under**  404:22
  411:25 435:4
  439:22 440:13
  441:18
**understand**
  404:17 417:15
  419:23 420:3
  428:7 451:13
**understanding**
  439:25
**understood**
  434:25 436:12
**united**  400:1
**upset**  436:10
  438:8

**used**  453:12
**uses**  404:21

**v**

**v**  400:6
**verbatim**
  447:12
**veritext**  404:4
  405:25 453:13
**video**  402:21
**videoconfere...**
  401:4,11,18
  402:4,11,20,22
**videographer**
  402:21 405:24
  405:25 448:11
  448:14 453:5,8
**videotaped**
  400:12
**view**  431:9
  433:21 434:5,7
  436:3
**viewed**  430:11
**visibly**  406:15
**vladeck**  401:5
  401:12,19
  405:11
**vladeck.com**
  401:8,15,22
**voice**  413:15
**voices**  413:12
  413:14
**volume**  400:14

**[vs - zuckerman]**                                                              Page 16

| vs 404:9 | 443:23 445:13 | z |
|---|---|---|
| **w** | 446:21 449:24 | **zoom** 405:13 |
| **waived** 453:14 | 450:9 451:12 | **zuckerman** |
| **want** 407:6 | 452:2,25 454:4 | 402:4 405:15 |
| 411:22 424:2 | **word** 431:16 | 405:16 411:25 |
| 427:6,19 | **words** 417:21 | 412:4,10 |
| 434:17 438:7 | 418:20 419:5 | 417:19 419:4,9 |
| 451:15 | 420:13 422:25 | 419:14 420:21 |
| **wanted** 416:24 | 427:2 | 422:9,23 423:9 |
| 436:17 | **work** 438:7 | 424:17 425:20 |
| **we've** 425:24 | 443:10 444:2 | 426:10,13,24 |
| 425:24 437:23 | **worked** 407:13 | 427:11 428:6 |
| 438:11,14 | **worth** 419:10 | 430:8,16 431:4 |
| **white** 401:18 | **wright** 402:5 | 431:15 435:25 |
| 405:10 411:5 | 402:12 405:16 | 437:13 440:4 |
| 411:22 | 406:7 | 442:9,20,22 |
| **willing** 427:7 | **written** 405:2 | 443:7,22 |
| **witness** 404:14 | **wrong** 449:2 | 445:12 446:20 |
| 404:16,17 | **wrote** 440:14 | 449:23 450:8 |
| 406:13,19 | **x** | 451:11,25 |
| 411:13 415:21 | **x** 403:1,5 | 453:2,6,7 |
| 415:25 419:11 | **y** | |
| 419:18 422:10 | **yeah** 411:5,24 | |
| 422:24 423:10 | 412:7,9,21 | |
| 424:18 425:21 | 419:11 424:18 | |
| 426:12 427:10 | 425:13 433:3 | |
| 427:17,21 | 435:7 440:5 | |
| 428:8,18 | 441:21 | |
| 430:10,17,25 | **years** 421:14 | |
| 431:3,5,16 | **york** 400:2 | |
| 436:2 437:14 | 401:7,14,21 | |
| 440:5 442:21 | 402:7,14 | |
| 442:23 443:8 | 404:13 454:19 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.