# EXHIBIT C

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

ALEXANDRA POOLOS,                )
                                 )
            Plaintiff,           )
                                 )
            vs.                  )    No. 1:23-cv-08896
                                 )        (GHW)(HJR)
PARAMOUNT GLOBAL; CBS            )
BROADCASTING, INC.; and          )
CBS NEWS, INC.,                  )
                                 )
            Defendants.          )
------------------------- )

March 19, 2025

12:09 p.m.

Deposition of SHACHAR BAR-ON, held at the offices of Davis Wright Tremaine LLP, 1251 Avenue of the Americas, New York, New York, before Laurie A. Collins, a Registered Professional Reporter and Notary Public of the State of New York.

Page 2

APPEARANCES:

VLADECK, RASKIN & CLARK, P.C.
Attorneys for Plaintiff
        111 Broadway, Suite 1505
        New York, New York 10006
BY:    JEREMIAH IADEVAIA, ESQ.
            jiadevaia@vladeck.com
        JAMES BAGLEY, ESQ.
            jbagley@vladeck.com


DAVIS WRIGHT TREMAINE LLP
Attorneys for Defendants
        1251 Avenue of the Americas
        New York, New York 10020
BY:    LYLE S. ZUCKERMAN, ESQ.
            lylezuckerman@dwt.com
        MICHAEL LEONE LYNCH, ESQ.
            michaellynch@dwt.com

ALSO PRESENT:
    DANYA AHMED, ESQ. (Paramount)
    CARLOS KING, Videographer

Page 3

THE VIDEOGRAPHER:  Good morning -- oh, good afternoon.  We're going on the record at 12:09 p.m. on March 19, 2025.

Please note that the microphones are sensitive and may pick up whispering and private conversations.                    12:09:29

Please mute your phones at this time.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit number 1 of the video-recorded deposition of Alexandra Poolos taken by counsel for plaintiffs in the matter of Alexandra Poolos versus Paramount Global, et al., filed in the United States District Court, Southern District of New York, Case Number 23-cv-08896(GHW)(HJR).           12:09:54

The location of this deposition is 1251 Avenue of the Americas, New York, New York.  My name is Carlos King representing Veritext, and I am the videographer.  The court reporter is Laurie Collins, also representing Veritext.       12:10:20

I am not authorized to administer an oath.  I am not related to any party in this

Page 4

Bar-On

action, nor am I financially interested in the outcome.

If there are any objections to the proceedings, please state them at the time of  12:10:37 your appearance.

Counsel and all present, including remotely, will now state their appearance and affiliations for the record, beginning with noticing attorney.                        12:10:45

ATTORNEY IADEVAIA:  Good afternoon, everyone.  My name is Jeremiah Iadevaia.  I'm with my colleague, James Bagley.  We are here from the firm Vladeck, Raskin & Clark on behalf of the plaintiff, Alex Poolos.       12:10:57

ATTORNEY ZUCKERMAN:  Good afternoon, Lyle Zuckerman for the defendants from Davis Wright Tremaine, here with my colleague, Michael Lynch; and in-house counsel from Paramount, Danya Ahmed.                      12:11:08

THE VIDEOGRAPHER:  Can the court reporter please swear in or affirm the witness.

S H A C H A R   B A R - O N ,

called as a witness, having been duly sworn

Page 5

Bar-On

by the notary public, was examined and

testified as follows:

THE VIDEOGRAPHER:  Proceed.

EXAMINATION BY

ATTORNEY IADEVAIA:

Q.    Good afternoon, Mr. Bar-On.  As I said

just a moment ago, me and my colleague represent

Alexandra Poolos in this case against CBS News.

Have you ever had your deposition taken  12:11:40

before today?

A.    No.

Q.    So you have a sense of how the day will

go, I'm going to go over a few ground rules for

the deposition.  Hopefully it will make things   12:11:49

easier.  And we've agreed with your counsel that

today is going to be a shorter day, but still I

think these rules are helpful.

This is going to be a question-and-

answer session.  I'm going to ask questions and   12:12:05

ask that you give responses.  The questions and

answers will be recorded by the court reporter

sitting between us.  So I will need you to give

verbal answers.  That means no gestures or nods.

Is that okay?                                     12:12:18

Page 6

Bar-On

A.    It is.

Q.    During the day I ask that you let me finish my questions even though sometimes folks anticipate what I might say, and I will my best 12:12:26 not to interrupt you while you give your answers. Is that okay?

A.    I understand.

Q.    If at any point you do not understand a question that I ask, please just let me know.  Is 12:12:39 that okay?

A.    Okay.

Q.    We will take a few breaks today, even with the short day, but if at any point you need a break, just let me know and it will be fine, so 12:12:48 long as a question is not pending.  Do you understand?

A.    I do.

Q.    Are you on any medication today that would affect your ability to testify truthfully 12:12:58 and accurately today?

A.    No.

Q.    And is there any reason that you know of why you would be unable to testify truthfully and accurately today? 12:13:10

Page 7

Bar-On

A.    I do not.

Q.    Did you do anything to prepare for today's deposition?

A.    I met with this team yesterday.                12:13:18

Q.    And where did you meet?

A.    In adjacent room.

Q.    In this office?

A.    Yes.

Q.    And you were physically present;              12:13:26
correct?

A.    Yes.

Q.    And you indicated you met with the team.  That included Lyle, Michael, and Danya?

A.    Yes.                                           12:13:38

Q.    Was there anyone else present?

A.    No.

Q.    And how long did you meet with counsel yesterday?

A.    About half a day.                              12:13:44

Q.    Half a day?

And during your meeting with counsel, did you review any documents to prepare for today's deposition?

A.    Yes.                                           12:13:54

Page 8

Bar-On

Q.    And what documents did you review?

A.    A few of my text messages, emails.

Q.    And the text messages that you reviewed, were those text messages with specific individuals?    12:14:06

A.    From what I saw, it was between me and Alexandra.

Q.    Did you review any text messages other than those between you and Alex?    12:14:16

A.    Not that I recall, no.

Q.    And, I'm sorry, you said in addition to text messages, what else did you review?

A.    A couple of emails.

Q.    And were you either a sender or recipient of the emails that you reviewed?    12:14:27

A.    Yes.

Q.    Did you meet with counsel at any other time to prepare for today's deposition other than what you just testified to yesterday?    12:14:40

A.    Is there a time frame, is there --

Q.    Well, specifically for the purposes of preparing for the deposition.

A.    No.

Q.    Did you review any documents outside of    12:14:59

Page 9

Bar-On

what you reviewed with counsel to prepare for today's deposition?

A.    I read the lawsuit over the weekend.

Q.    When you say "the lawsuit," you're         12:15:09
referring to the complaint that was filed in this matter?

A.    Yes.

Q.    Had you read the complaint before this weekend?                                          12:15:19

A.    Yes.

Q.    And how many times have you read the complaint?

A.    Back when it was more or less filed.  I was in the middle of something, so around that     12:15:27
time.  And then because I was in the middle of something, I read it once after, like a week after.  That's it.

Q.    And do you have -- I know you're not --
let me ask you:  Are you a lawyer?               12:15:41

A.    No, I'm not.

Q.    Okay.  So understanding you're not a lawyer, do you have some understanding of what Alex's claims are in this case?

A.    Very broadly, layman, yes.               12:15:51

Page 10

Bar-On

Q.    And what is your understanding?

A.    That she was fired because -- well, two things, I guess.  One was that what she did was not wrong and then that she was fired for it, while other people in similar positions, specifically men, were not.    12:16:08

Q.    Did you discuss today's deposition with Tanya Simon?

A.    No.    12:16:28

Q.    Did you discuss it with Lesley Stahl?

A.    No.

Q.    Claudia Weinstein?

A.    No.

Q.    Renee Balducci?    12:16:32

A.    No.

Q.    Bill Owens?

A.    No.

Q.    Collette Richards?

A.    No.    12:16:37

Q.    Have you discussed your deposition today with anyone at 60 Minutes?

A.    No.

Q.    Do you know or are you aware that other individuals from 60 Minutes have had their    12:16:49

Page 11

Bar-On

deposition already taken in this matter?

A.    Yes.

Q.    And did you discuss any of those

depositions with the individuals who --            12:16:58

A.    No.

Q.    -- had their depositions taken?

A.    Sorry, no.

Q.    And let me just be more specific.  Did

you discuss Lesley Stahl's deposition with her?    12:17:07

A.    No.  Oh, let me be clear.  I knew she

had a deposition, because we're in the middle of a

story.  So I knew -- dates I knew, but that was

it.

Q.    Did you discuss the substance of her    12:17:18

deposition with Ms. Stahl?

A.    No.

Q.    Did you discuss Tanya Simon's

deposition with her?

A.    No.                                       12:17:27

Q.    Bill Owens, did you discuss with him?

A.    No.

Q.    Collette Richards?

A.    No.

Q.    Renee Balducci?                          12:17:31

Page 12

Bar-On

A.    No.

Q.    Have you discussed Ms. Poolos's lawsuit with anyone at 60 Minutes, not including counsel?

A.    Ever?                                          12:17:43

Q.    Yeah.

A.    Around the time that it was filed, a lot of colleagues came and asked me -- and, you know, showed support, said it's a ridiculous lawsuit.  And, you know, I was ordered by -- I was   12:18:00 instructed by counsel, you know, not to talk about it, so I didn't.  I basically said thank you and the truth will come out, and that's all I can say. And over the months a couple other people, you know:  What's going on with this?  The truth is I    12:18:19 just didn't know, so I said I don't know.

Q.    Did you have any discussions with Lesley Stahl about this lawsuit?

A.    When it came out -- we worked together in Israel during October 7th, so we acknowledged   12:18:34 that it happened, and that was the extent of that.

Q.    Anything else you recall about those discussions?

A.    Not really.

Q.    Just please let me finish.                  12:18:45

Page 13

Bar-On

A.    I apologize.

Q.    No, no.  It's okay.  It's hard.  I understand that.  I know you're not doing it on purpose.                                                12:18:54

Have you discussed the lawsuit with Mr. Owens?

A.    No.

Q.    Have you discussed the lawsuit with Tanya Simon?                                                12:18:59

A.    No.

Q.    Have you discussed the --

A.    Sorry, I apologize.

Q.    That's okay.

A.    Sorry, at the time on October 7th, she    12:19:06
called and asked if I was okay.

Q.    Ms. Simon did?

A.    Yes.  This was obviously a shock, a very difficult time no matter what.  But that was it.                                                12:19:19

Q.    And just to be clear about that, the lawsuit was filed after October 7th -- correct? -- but sometime shortly after?

A.    Yeah, within a day of me reaching Israel.                                                12:19:34

Page 14

Bar-On

Q.    Got it.

Have you had any discussions with Collette Richards about this lawsuit?

A.    Never.                                                    12:19:40

Q.    Renee Balducci?

A.    Never.

Q.    Claudia Weinstein?

A.    No.  Again, she was one of the people that expressed support early on, just to say this    12:19:46 is unfair, but that was it.

Q.    Nothing else about any discussions with Ms. Weinstein?

A.    No.

Q.    I've mentioned all these people, but we    12:19:58 should state for the record Bill Owens is the executive producer for 60 Minutes; correct?

A.    Yes.

Q.    And he has been for some amount of time; is that right?                                      12:20:09

A.    I believe so.

Q.    And Tanya Simon, she works at 60 Minutes; correct?

A.    She does.

Q.    What's her job there?                                    12:20:15

Page 15

Bar-On

A.    She's his deputy.  I don't know what her exact title is.  She's number two.

Q.    Executive editor?

A.    Sure.                                        12:20:27

Q.    And Lesley Stahl is a correspondent at 60 Minutes; correct?

A.    Since 1991.

Q.    Do you know someone named Renee Balducci?                                      12:20:34

A.    Yes.

Q.    She worked for CBS?

A.    I don't know.  She was an HR person at some point.  She would come on our calls I think during COVID, but that -- I have never had any      12:20:42 interaction.

Q.    Have you spoken to Ms. Balducci about anything related to Ms. Poolos?

A.    No.

Q.    And Collette Richards, does she work      12:20:51 for 60 Minutes?

A.    She does.

Q.    And what's her job there?

A.    She's an associate producer.

Q.    And Claudia Weinstein, does she work      12:21:02

Page 16

Bar-On

for 60 Minutes?

A.    She does.

Q.    And what's her job there?

A.    She is -- again, I don't know what the    12:21:08
formal title is, but she's in charge of standards.

Q.    When you say "standards," what do you
mean by that?

A.    She is in charge of making sure -- she
reads all the transcripts of our interviews of    12:21:26
people we interview, and she makes sure that we
don't take anything out of context and that if
there are -- if there was something very important
to them in the interview that was said and it was
decided not to use, she would bring it up.    12:21:44

Q.    Did she supervise you at all?

A.    Well, in that capacity she is -- she's
got a supervisory role.  She's not a direct boss.

Q.    You say "in that capacity."  You mean
in connection with stories that you're working on    12:21:59
and the standards associated with them?

A.    Every story I have ever done, she has
read the transcript and, you know, weighed in this
case she thought there were issues.

Q.    I want to ask a few background    12:22:16

Page 17

Bar-On

questions.  Did you go to college?

A.    I did.

Q.    Where did you go to college?

A.    In Israel, the Hebrew University in        12:22:22
Jerusalem.

Q.    And what years were you there?  Do you
remember?

A.    It's a long time ago, '92 to '94.

Q.    And did you complete the program or        12:22:32
your program there?

A.    Yeah, got a bachelor's from there.

Q.    Was there a major or how did it work?

A.    Medieval history.

Q.    Medieval history.                          12:22:46
Did you attend any school after
graduating from Hebrew University in Jerusalem?

A.    I did.  I went to Columbia J school,
master's.

Q.    A J school, is that journalism?            12:23:01

A.    It is.

Q.    And what years were you there?

A.    '94 to '95.  It's a one-year program.

Q.    You said you received your master's?

A.    I did.                                     12:23:12

Page 18

Bar-On

Q.    Is it a master's in journalism or what's the degree?

A.    I think it's called -- it's an MS in journalism, I think.                12:23:18

Q.    Any other school besides -- or after Columbia University school of journalism?

A.    No.

Q.    You currently work at 60 Minutes; correct?                              12:23:35

A.    Yes.

Q.    What's your job there?

A.    I'm a producer.

Q.    And has that been your job the whole time you've been at 60 Minutes?     12:23:39

A.    It has.

Q.    And are you currently part of a team?

A.    I've always been on Lesley Stahl's team.  She hired me.

Q.    And you were hired as a producer;      12:23:54 correct?

A.    Yes.

Q.    You never served as an associate producer?

A.    Never on -- never at CBS.             12:24:00

Page 19

Bar-On

Q. Never at CBS.

Do you have an associate producer that you currently work with?

A. I do.                                          12:24:09

Q. And who is that?

A. Jinsol Jung.

Q. Can you tell the last name for me?

A. J-U-N-G.

Q. And is Jinsol Jung a man or woman?    12:24:19

A. She's a family.

Q. And how long has Ms. Jung -- can I refer to associate producers as APs? Is that okay?

A. It is.                                         12:24:30

Q. How long has Ms. Jung been your AP?

A. I think definitely two years, maybe coming up on three.

Q. And who was your AP before Ms. Jung?

A. Nathalie Hernandez Peel.               12:24:40

Q. For how long has Ms. Peel your AP?

A. I'd say about four years, give or take.

Q. Understood, these are estimates.

A. Yeah.

Q. That's no problem.                      12:25:00

Page 20

Bar-On

Q.    And who was your AP before Ms. Peel?

A.    Ms. Poolos.

Q.    Approximately how long was Ms. Poolos your AP?                                    12:25:12

A.    Five or six years.

Q.    And before Ms. Poolos?

A.    Meghan Frank, also for about three -- Alex was by far the longest.  Meghan, also three and four.  That's how they averaged.  Do you --    12:25:26

Q.    Yeah, please keep going.

A.    I'm trying to see if I remember the order, because there's a bunch.  Kathy Liu for a while.  She was interim because she was doing a couple of other things.  And Rebecca -- there was    12:25:47 one for a very brief time, and she left, got another job.  And then Rebecca Liss was my first AP there for the three years.

Q.    And how do you spell Rebecca's last name?                                         12:26:10

A.    L-I-S-S.

I hope I'm not forgetting anyone.

Q.    Did Ms. Liss work for the show at the time you joined or was she someone that you played a role in selecting?                             12:26:21

Page 21

Bar-On

A.    No, she was -- I mean, she was at the show, but we -- we didn't come as a -- I mean, I interviewed her.  I interviewed a bunch of people and chose her.                                            12:26:30

Q.    Did Ms. Liss, after she was your AP, continue to work for 60 Minutes?

A.    She stayed for a little bit, and then she left.

Q.    Why did she stop being your AP?      12:26:46

A.    She -- why did she stop?  I mean, we're still very close.  She -- I think she had a kid and she wanted to focus on that, and shortly after she left the show.

Q.    She was not promoted to producer at 60  12:27:04 Minutes; correct?

A.    None of my APs, with the exception of Alex Poolos, were ever promoted.  Nathalie left the show and got promoted to producer elsewhere and is back on the show as producer.  But direct  12:27:21 promotion, Alex was the only one.  It wasn't direct.  There was about a year in between, but yes.  She stayed on the show.

Q.    I'm sorry, who are you referring to there?                                                12:27:33

Page 22

Bar-On

A.    Alex.

Q.    Alex.  Got it.  We'll talk more about Ms. Poolos later.

A.    I'm sure.                                    12:27:39

Q.    You said there was someone in between Rebecca and Kathy.  Do you not recall that person's name?

A.    Menon is her last name.  I'm friends with her on social media.  She was sort of an    12:27:50 interim, and then she got a job at Google or something and she left.  Rosalyn, Roslyn Menon.  I was with her maybe a couple of months.  It was in between -- just until I found someone.

Q.    So you didn't go through an interview    12:28:10 process and select her?

A.    I selected her.  But they said, Would you work with Rosalyn, and I said yes.

Q.    Was she like a floating at that point in time, do you know?                              12:28:23

A.    I think she was trying to figure out her -- yes, what she wanted to do at the time.

Q.    Got it.  Okay.

And then Kathy Liu you said was also an interim role?                                          12:28:32

Page 23

Bar-On

A.    Kathy was an AP on team Stahl.  Again, this was a while ago, so I don't remember the exact details.

Q.    Sure.                                    12:28:38

A.    But her producer went on a year leave to write a book, Rich Bonin, so we worked together.  Then he came back, and she went back to him.  And I hired Meghan.

Q.    You hired Meghan at that time, Meghan    12:28:53 Frank?

A.    (Nods head.)

Q.    Got it.

Does Ms. Liu still work for 60 Minutes?

A.    No.                                      12:29:00

Q.    Was she ever promoted to producer at 60 Minutes?

A.    She was not, though she should have been.  She was very good.

Q.    Do you know why she wasn't?              12:29:09

A.    You know, I think there's very tight spots so...

Q.    What do you mean, "tight spots"?

A.    There's not a lot of upward mobility.

Q.    Not a lot of upward mobility for APs to  12:29:19

Page 24

Bar-On

become producers?

A.    Or producers to become executive producers.

Q.    Okay.  You were involved in hiring    12:29:34 Ms. Frank; is that right?

A.    I mean -- again, I interviewed.  She was also internal.

Q.    Where was he working before she became your AP?    12:29:47

A.    She was working for another team, for Shari, who is also a Lesley producer.

Q.    Is that Shari Finkelstein?

A.    It is.

Q.    Why was Ms. Frank considering moving at    12:29:58 that time, do you know?

A.    She wanted to do more of the type of stories that I did versus Shari.  Shari does these long features.  I do more breaking news and investigative, and she wanted to do more of that.    12:30:13 And Lesley's assistant at the time, Jenny Held, wanted to be an AP.  So the idea was Jenny got promoted to Shari, and I took over, you know, and Meghan moved to my team.

Q.    Got it.    12:30:33

Page 25

Bar-On

And why did Ms. Frank stop being your AP at some point?

A.    She got an opportunity to be a producer at NBC.  They started a new show at that time, 12:30:39 Rock Center, I believe it was called, with Brian Williams, and she moved there.  I wrote her a recommendation letter.

Q.    Did you ever have any conversations with Ms. Frank about being a producer at 60 12:30:55 Minutes?

A.    She wanted to be a producer, so I'm sure I did.

Q.    Did you ever make any recommendation that she be a producer at 60 Minutes? 12:31:07

A.    There wasn't an opportunity for that.

Q.    And when you say there wasn't an opportunity, what do you mean?  There weren't any openings?

A.    There wasn't a slot, yeah. 12:31:18

Q.    Okay.  How did it come about that you worked with Nathalie Hernandez Peel?

A.    Alex and I broke up as a team in 2017, I believe, so I needed an AP.  I went through an interview process, and I chose Nathalie, who was 12:31:55

Page 26

Bar-On

an unbelievable AP.

Q.    And was she an internal hire or external?

A.    Internal.                                    12:32:04

Q.    Where was he working before she became your AP?

A.    She was in charge of our internet and social media, which at the time was less developed than it is now.  She basically handled all that,    12:32:12 and she wanted to do -- to have more of an editorial role.  She was basically recycling stuff that other people had done.  She's an unbelievable reporter, so she got the opportunity.

Q.    And you said when she was in charge of    12:32:31 internet and social media.  You mean specifically for 60 Minutes or something more broad?

A.    Specifically for 60 Minutes in the last few years of her job.  I think before that she did something with CBS interactive.                    12:32:44

Q.    Is it Ms. Hernandez Peel?

A.    Peel.

Q.    Peel, Ms. Peel.  Is she currently a producer at 60 Minutes?

A.    She is.  She came back.                    12:32:56

Page 27

Bar-On

Q.    Do you recall when she left and what year she left, approximately?

A.    It was sometime during COVID -- well, it's whenever -- no.  I mean, it's the last two or three years.    12:33:08

Q.    And, I'm sorry, you may have said this before.  Where did she go?

A.    CNN was staffing up for a big operation online, so she got a job there, a promotion there, as a producer.  As you may know, that thing got folded very fast, so she moved to NBC for a while. I gave her recommendations both at CNN, I believe, and at NBC for sure.  And then she had an opportunity to come back so...    12:33:21    12:33:42

Q.    And Ms. Peel, was she a producer at NBC?

A.    She was a producer at CNN and NBC.

Q.    Before Ms. Peel left for CNN, did you have a discussion with her about being a producer at 60 Minutes?    12:33:53

A.    Again, nothing specific.

Q.    Nothing you can remember.  Yeah.

And when she told you that she had this opportunity at CNN, did you make any efforts to    12:34:03

Page 28

Bar-On

keep her at 60 Minutes at that time?

A.    No.  I mean, I think people move on to bigger jobs, so it should be.

Q.    Did Ms. Peel, before she left, say to    12:34:20 you ever that she wanted to be a producer specifically at 60 Minutes?

A.    I don't recall.

Q.    Did you have anything to do with Ms. Peel being hired back at 60 Minutes as a    12:34:37 producer?

A.    No.  But when I heard about it, I thought that was an unbelievably good idea.

Q.    And who does Ms. Peel work for?  Whose team is she on?    12:34:52

A.    She floated for a while, and now she works for Cecilia Vega.

Q.    When Ms. Peel was hired back at 60 Minutes, was she hired into a floating role or was she hired to work for a specific correspondent?    12:35:05

A.    She was hired for a floating role, I believe.

Q.    And then you said before Ms. Peel your AP -- well, I guess after Ms. Peel, rather, it's been Ms. Jung correct?    12:35:31

Page 29

Bar-On

A.    Yeah, yeah.

Q.    And have you had discussions with Ms. Jung about becoming a producer at 60 Minutes?

A.    She's still relatively new, so no.    12:35:41
She's also very, very good.

Q.    When did you join 60 Minutes?

A.    2006.

Q.    And who was involved, to your knowledge, in making the decision to hire you?    12:36:10

A.    Lesley Stahl.

Q.    Anyone else?

A.    I mean, it's her decision.  I was found through -- I mean, Jeff Fager interviewed me and a woman by the name of Patti -- I can't remember her  12:36:22 name -- who was the number two at the time.

Q.    In the role that Tanya Simon is now?

A.    Yeah, yeah.

        (Discussion off the record.)

Q.    Did you know Ms. Stahl before you    12:36:39
interviewed for the job of producer at 60 Minutes?

A.    I did not.

Q.    Did you know Mr. Fager?

A.    No.

Q.    And this woman Patti, did you know her    12:36:53

Page 30

Bar-On

before your interview?

A.    No.

Q.    So could you tell me generally what your responsibilities have been as a producer?    12:37:04
And if it's changed over time, just let me know.

A.    It's unbelievably the same job, since the day I set foot there almost two decades ago. I work with Lesley.  We have to do at least five stories a year -- sometimes due to logistics it    12:37:19 ends up being four -- but stories -- she has a mix.  I tend to do investigative, financial, tech, foreign, hard news, crashes.  I don't do a lot of Washington.  There's another team for that.

I have to find the stories, research    12:37:48 them, figure out the bookings -- probably the biggest part of the job -- be in charge of all research, production notes, preinterviews, decide who the characters are, what the shooting is; and then write the script, the first draft of the    12:38:13 script, and then work with her, get it on the air.

Q.    Sorry, just taking notes.

A.    Take your time.  I'm in no rush.

Q.    You mentioned that some of the topics or areas that you tend to focus on include    12:38:39

Page 31

Bar-On

crashes.  Do I have that right?

A.    Sorry, crashes means very fast turnaround stories, usually of news, like October 7th where you need to do a story within days as    12:38:49 opposed to weeks or months.

Q.    You also mentioned hard news.  What did you mean by that?

A.    As opposed to soft features, entertainment, you know, animal stories.  I don't    12:39:02 do those.  I very rarely do those.

Q.    And you mentioned investigative.  And I think earlier you compared sort of your stories of being more investigative versus Ms. Finkelstein's stories of being long form.  Can you explain what    12:39:18 you mean by "investigative" in that context?

A.    Yeah.  It can be anything that requires a lot of document work, a lot of revealing stuff that hasn't been, you know -- it's like investigative journalism, only whether it's about    12:39:37 drug companies, whether it's about tech companies, whether it's about gun manufacturers, that kind of stuff.

Q.    You said generally one of your responsibilities is to find stories.  How do you    12:39:55

Page 32

Bar-On

go about doing that, just generally?

A.    From reading in the newspaper to trying to figure out after you read in the newspaper who would be the one character who's never spoken    12:40:07 before.  I think 60 Minutes excels in not so much breaking news stories, because that's very hard now, but in getting the people involved to actually talk.

Example of that, you know, the Mossad    12:40:20 had the pager operation.  A couple months later, I interviewed -- I secured the interview, Lesley did the interview, with the agents in charge of the project.

So a lot of types just that.  Stories    12:40:33 come from all different directions.  I've got lawyers I'm in touch with.  I've got crisis managers I'm in touch with, friends, random people on airplanes.  That's true.  I got one of my best stories that way.    12:40:54

Q.    Well, I have to ask which story was that.

A.    It was called rescued.  It was about a banker in the fall of Saigon who rescued a hundred and something colleagues, and just someone who was    12:41:11

Page 33

Bar-On

involved, tangentially involved in that, gave me the stories on an airplane.

Q.    The APs who work with you I'm going to ask.                                                        12:41:25

A.    Yeah.

Q.    Do they have any role in finding stories?

A.    They certainly can.

Q.    During the time that you've been at 60    12:41:34 Minutes working with APs, have they pitched stories to you from time to time?

A.    From time to time, yeah, yeah.

Q.    And again I'll just ask generally. When you say you're responsible for research for    12:41:52 stories, what does that mean?

A.    Trying to figure out if a story is true, if it holds, if it makes sense for our format and audience.  A lot of times stories end up being too gray or complicated and just don't    12:42:06 make sense to do in our format.  That's a big part of the job.

        Talk to every single person who was ever involved on the subject to the point where I can finish their sentences or, you know, hopefully  12:42:22

Page 34

Bar-On

correct them, just to make sure there's no

mistakes, weirdness, just to figure out the best

characters because the story -- it's an interview

story at the end of the day, so you have to find    12:42:36

characters.  Find the characters, preinterview

them.

Q.    When you say "preinterview," what does

that mean?

A.    Oh, sorry, it's to interview them on --   12:42:45

either background, because it doesn't go anywhere,

and decide, A, they enrich the research of the

story; and in some cases if they end up on camera,

we call it a preinterview because the interview is

what Lesley does on camera.                          12:43:01

Q.    You mentioned characters a couple

times.  What's that reference?

A.    Sorry.

Q.    That's okay.

A.    People who are on air, people who end    12:43:09

up being on TV.

Q.    Got it.

And as the producer for stories that

Lesley Stahl ultimately serves as a correspondent,

what role do you play in preparing the script?      12:43:23

Page 35

Bar-On

A.    I always write the first pass.  If it's a crash, fast turnaround, sometimes we do it together, just if it's -- you know, if we have a date to do it.  But generally speaking I do the    12:43:41 first pass, give to her, we bat it around a couple times, and then it gets done.

Q.    When you say "give to her," you mean Ms. Stahl; correct?

A.    Yes.    12:43:58

Q.    You mentioned bookings as being an important part of the job.  What is that?

A.    Booking means figuring out who is actually going to go on TV and agree to go on TV, who the character is going to be.  In many cases a    12:44:10 story hinges on getting a booking.

Q.    You mentioned shoots and maybe logistics in connection with shoots.  What do you do as a producer in that regard?

A.    A lot of the logistics fall on the AP,    12:44:29 but we consult together:  what makes sense, the order that makes sense, either for the characters or for Lesley.

Sometimes it makes sense to start with a broad expert and kind of work your way to the    12:44:46

Page 36

Bar-On

confrontational interview, just so she can get comfortable with it because these doing a lot of stories at once.

But in terms of logistics, most of    12:44:57 it -- oh, you know, if there's locations that are special that I think are relevant, if there's examples that are relevant.  But then logistics are mainly the AP's job.

Q.    Who do you currently report to?  Who    12:45:16 are your supervisors?

A.    Editorial would be Lesley still and I guess Bill and Tanya.

Q.    That's Mr. Owens and Ms. Simon; correct?                                         12:45:31

A.    Yes, it is.

Q.    And am I right that since you've been at the show Mr. Owens has not been the executive producer the whole time; correct?

A.    Right.                                     12:45:42

Q.    Before that it was Jeff Fager?

A.    It was.

Q.    And was he your supervisor when he served as EP --

A.    Yes.                                       12:45:50

Page 37

Bar-On

Q.    -- for 60 Minutes?

A.    Sorry.  Yes.

Q.    And who was Mr. Fager's deputy?  You mentioned someone named Patti.  At some point was    12:45:57 Patti --

A.    Patti Hassler was the one who hired me -- sorry.

Q.    That's okay.  Go ahead.

A.    Patti Hassler is the name I now    12:46:04 remember.  After Patti there was Bill Owens.

Q.    Is it your understanding that Tanya Simon in her -- as Mr. Owens' deputy, has responsibilities for overseeing the associate producers?    12:46:28

A.    Yes.

Q.    What was your -- and I know I'm asking this -- I'm asking this question generally, but what was your experience like working with Jeff Fager?  How would you characterize it or describe    12:46:47 it?

ATTORNEY ZUCKERMAN:  Objection.

You can answer.  You can answer.

A.    I mean, fine.  It was 15 years so, you know.  He hired me, so, you know.  I generally had    12:46:57

Page 38

Bar-On

a pretty good relationship with him.

Q.    You said 15 years, meaning he was the EP of 60 Minutes for 15 years that you were at the show, the first 15?                                    12:47:10

A.    More or less, yeah.

Q.    Was there ever any times Mr. Fager yelled at you?

A.    Not really.

Q.    Did you observe Mr. Fager yelling at     12:47:25 others at 60 Minutes?

A.    No.

Q.    Were there times where Mr. Fager was -- or you believed he was insulting towards you?

A.    Never.                                   12:47:39

Q.    Did you ever observe Mr. Fager insulting others at 60 Minutes?

A.    No.  I want to -- he did -- it's not yelling.  He did get into fights with Lesley, editorial, in screenings and stuff, but I wouldn't  12:47:56 call them fights -- I mean, I wouldn't call it yelling.

Q.    Did they raise their voice sometimes in interacting with each other?

A.    Sometimes.                               12:48:08

Page 39

Bar-On

Q.    Are you aware of any complaints that were made against Mr. Fager?

A.    Just what I read in the, you know.

Q.    You read in the press?                    12:48:22

A.    What I read in the press during, yes, the Jericka, the whole retribution thing and Jericka and Duncan and all that stuff.

Q.    Who was Jericka and Duncan?

A.    Sorry, she was a CBS correspondent who    12:48:36 covered the Jeff Fager's various -- I can't remember, you know, vis-à-vis Ronan Farrow and all that stuff.  This was a long time ago but...that was that.

Q.    You mentioned Duncan.  What was that    12:48:53 reference?

A.    Oh, I thought that was her name.

Q.    Oh, okay.

A.    It's not Jericka Duncan?  I don't know. I may have it wrong.                          12:49:00

Q.    I just want to make sure we're covering everything.

A.    Jericka, maybe.  I don't know.  The CBS person who covered his story.

Q.    During the time that you've been at 60    12:49:08

```
                                              Page 40
                         Bar-On
Minutes, were there staff parties from time to
time, holiday parties, things like that?
     A.    Yes.
     Q.    Did you ever observe Mr. Fager touching  12:49:14
women at staff parties?
     A.    Absolutely not.
     Q.    Do you currently have a contract as a
producer at 60 Minutes?
     A.    Yes.                                      12:49:30
     Q.    And has that been the case the entire
time you've been at 60 Minutes, that you've had a
contract?
     A.    Yeah.
     Q.    And how long is your current contract     12:49:35
term, do you know?
     A.    It's three years.
     Q.    Three years.  And has that always been
the case for your contracts?
     A.    Yes.                                      12:49:45
     Q.    And when was the last time your
contract was renewed, approximately?
     A.    Recently.
     Q.    Within the last year?
     A.    Yeah.                                      12:49:54
```

Page 41

Bar-On

Q.    So your current contract won't expire until around 2028 -- is that right? -- or 2027?

A.    It's three years.  Yeah, it's three years.  I don't have it in front of me.                    12:50:05

Q.    Got it.

Again, I know you're not a lawyer, so just answer the best you can.  But do you know if under your contract if there's a way for CBS News to end the contract before the term is up?      12:50:22

A.    I don't know.  I don't know.

Q.    Do you know if there are windows in the contract that would allow CBS to terminate the contract early?

A.    I don't know.                                  12:50:35

Q.    Do you know if under your contract you can be fired for cause?

ATTORNEY ZUCKERMAN:  Objection.

You can answer.

A.    I assume.  I don't know.                       12:50:42

Q.    When your contract has been up for renewal -- and if you want to use the most recent time, can you just explain to me generally what the process is for considering whether to renew and what goes on there?                              12:50:57

Page 42

Bar-On

A.    Every three years or thereabouts they call.  They say it's time to renew your contract. There's some negotiation over money, and then it gets signed.  You know, you bat it back and forth a couple times, but then it gets signed.          12:51:15

Q.    And do you have a representative that you use in connection with your contract renewals?

A.    Bob Barnett.

Q.    And do you know who Mr. Barnett communicates with at CBS News in connection with your contract?          12:51:32

A.    It changes.  I've been there so long. I don't know the people.  I don't -- part of hiring Bob is that I don't have to deal with that part.          12:51:46

Q.    Sure.

During the time that you've been -- that Mr. Owens has been executive producer, have you ever had conversation with him about your contract?          12:52:03

A.    No.

Q.    Have you ever had conversations with Mr. Owens about whether your contract would be renewed or not?          12:52:10

Page 43

Bar-On

A.    No.

Q.    During the time you've been at 60 Minutes, has there ever been a time you were concerned your contract would not be renewed?    12:52:21

ATTORNEY ZUCKERMAN:  Objection.

You can answer.

A.    The short answer is no.  The longer answer is my first two years at the shop were a time of adjustment, getting to know how to work    12:52:36 and to learn the show.  It's very typical, pretty much what we always say about all the people who work there:  It takes about two years to figure it out.

So I think maybe the first contract or    12:52:52 thereabouts I thought is this what I want to do, is this the best fit.  I don't know if the other side felt that way, but they asked for it to be renewed.  But no, since then, no.

Q.    And currently does 60 Minutes do --    12:53:07 well, strike that.

Currently do you receive formal evaluations by Mr. Owens or other members of management at 60 Minutes?

A.    By Mr. Owens, yes.    12:53:23

Page 44

Bar-On

Q.    Do you know approximately how long that's taken place?

A.    It's about twice a year.

Q.    Twice a year.                              12:53:30

Do you know was that something that was implemented at some point during your tenure?

A.    Yes.  It wasn't from the beginning, but yeah.

Q.    Was it the case under Mr. Fager or is    12:53:36 this something that happened under Mr. Owens?

A.    It started under Jeff.  I think it was slightly less systematic or a little bit longer durations.  I think the more removed to this centralized -- you know, everything is on Okta and  12:53:57 CBSI, and all that stuff.  It's a little bit more streamlined.

Q.    What is it, Okta?

A.    It's all these -- yeah, I think that's what it's called.                              12:54:07

Q.    What is Okta?  What do you understand Okta to be?

A.    It's a digital platform that deals with a lot of our, you know, salaries, with benefits, with perks, with video, all that stuff, sort of a  12:54:19

Page 45

Bar-On

management -- it's a management platform.

Q.    Do you have access to the platform as -- for yourself personally?

A.    Yes.                                          12:54:31

Q.    Do you have access to the platform for any other employees?

A.    No.

Q.    Do you have access to that platform for Ms. Jung?                                         12:54:39

A.    No.  Not that I'm aware of, but no.

Q.    And is it your understanding that your performance evaluations are stored on that platform?

A.    I don't know.                                 12:54:53

Q.    For the period that Mr. Owens has been conducting these evaluations of you, what is the process or what has the process been?

A.    Digital form.  You write what you've accomplished.  You write your goals, or however   12:55:12 they phrase it.  And then he weighs in in writing. There's a short discussion.  And that's it.

Q.    And the discussions that you've had, has it just been you and Mr. Owens since he's been EP, when you have those performance discussions?   12:55:36

Page 46

Bar-On

A.    Yes.  I'm trying to think if Tanya was ever in.  No, I think it was just me and Bill.

Q.    In terms of the written portion of whatever Mr. Owens contributes, are you ever -- do you have access to that information?  Is it shown to you?

A.    It is.

Q.    It is shown; it's shared with you?

A.    To the best of my knowledge.  I mean, there is something there.  I don't know.  Maybe something that's not shared, but I believe yes.

Q.    Understood.

For the APs who work with you, again, generally, what are their responsibilities?

A.    I think I'd separate it into two.

Q.    Okay.

A.    First I think it's very important to say, which I'm sure you know, it's a relationship of two people, you know.  As opposed to other shops where there's a lot of people coming in and out and, you know, you can have a cast of scores on one piece and stuff, here it's really a relationship of basically two people.  There's some auxiliary but very little.

Page 47

Bar-On

So the AP does a lot, again, to -- is responsible at least for a lot.  Two things:  One is logistical, and one is editorial.  The editorial -- sometimes we call it the journalism -- is doing -- you know, they can pitch stories, they can do background research, they write notes that either go to me or go to Lesley or both.

They have to always check you journalistically.  They have to have a bigger sense of what the story is.  They have to do all the fact-checking.  So that's -- I'd say that's editorial.  There's one thing in the middle which I'll get to in a second.

Logistical is -- again, it's a team of two, so it's the grunt work.  It's making sure the crews have food, making sure the guests show up on time, making sure there's cars, making sure the editor, you know, has all the things they need, making sure -- all the logistical work that goes into television is really their job.  hiring the locations, going out for -- if Lesley wants a coffee or the guests want a coffee, that falls onto them or should fall onto them.

Page 48

Bar-On

The sort of in-between is archival, which is both editorial and logistic. It's television, and a lot of time you need background, stuff that you did not shoot. In theory they're 12:58:36 in charge of finding it, verifying it, verifying that it's true, verifying the sources of it, verifying that -- and most importantly verifying that we can use it for rights and clearances, cataloging it, making sure the editor has it and 12:58:54 understands what it is and what he can and cannot use; or she, but it's typically men.

I think that's it. I think -- that's generally it. I may forget a task or two. But it's basically -- it's a lot of the work. 12:59:13

Q. Okay. That in-between category that you described as archival, did I --

A. Yeah, archival meaning video, video.

Q. Is that, like, securing B roll, finding -- is that B roll or something more than 12:59:35 that?

A. You can call it B roll, but, you know, I think in many pieces the ability to find good footage is more than B roll. It pushes a piece forward. It's not just like some walking shot of 12:59:47

Page 49

Bar-On

someone.  It's not wallpaper.

A good AP would go out of their way to find that one piece of video that tells a story and make sure we can air it, because a lot of time  12:59:58 if it's good it means someone has to be paid for it.

Q.    You mentioned in the editorial category writing notes.  What does that means?  What is writing notes?                                            01:00:19

A.    Sometimes we interview -- especially in an investigative story or a story where we absolutely don't know the subject matter, we can interview 40 people to -- actually to learn it. We have to learn it from scratch.  Some of it is  01:00:36 done together.  I mean, we divide and -- if it works properly, we divide and conquer.

Q.    Meaning you and the AP?

A.    Me and the AP.  And then we exchange notes and thoughts.  And then if we hone in on  01:00:47 someone who is really good, we will probably do sort of a joint all or I'll call, whatever.  Those things have to be written out.

The idea -- the way Lesley works, which makes sense, is the goal is to create a research   01:01:10

Page 50

Bar-On

note.  A research note can be anywhere from 5 pages to I've had research notes that run 40 pages, that lays out the story, lays out the characters, lays out the issues, lays out the    01:01:27 problems, plays out the gray zones, lays out what we know and don't know, lays out the footage.

It basically -- if it's done right -- and it's rarely done a hundred percent -- you can take that and almost transpose it to the final    01:01:40 product.

And this is ideally done before anything happens, because we can be working on a story for five years, but Lesley comes in cold the day before shooting.  So the idea is for her to be  01:01:54 able to -- if she only read that note, she'd be able to be as expert as we were five years working on the story.

Q.    Got it.

And is it the AP's job primarily to    01:02:04 prepare that note or do you do it with the AP as the producer?

A.    In my team I write the note.

Q.    You write the note.

A.    The AP -- a lot of input from these    01:02:15

Page 51

Bar-On

previous notes go in.  The AP then reads my note, fact-checks it, maybe sure I didn't overpromise, didn't underpromise, miss something important, in my eagerness to do a story I didn't miss a spot.    01:02:31 And then I and it.  It's written as though it's a joint note, but the reality is I write it.

Q.    But before it becomes this note that then gets submitted to Ms. Stahl, there are other smaller versions of notes that are exchanged    01:02:52 between you and the AP?

A.    Yeah, basically any interview that's of any use.  You know, right now -- as you may know, I flew in from Israel in order to be here -- we're doing a story that was -- that has to do with the    01:03:11 psychology of the returning hostages.

So Jinsol has called every single psychologist who was involved directly with the hostages or, like, the big experts in the field. She writes these -- based on how those    01:03:27 conversations go, if they have anything to add, she writes a note and she gives it to me as sort of a summary -- again, you can call it a preinterview, but it's sort of before, a prepreinterview.    01:03:43

Page 52

Bar-On

It just saves time.

Q.    Does the APs that you work with have any responsibilities as it relates to the editing process?                                          01:04:00

A.    Well, they have to make sure that all the footage is in, you know, it's logged, that we know exactly what we have, what we don't have, both of stuff that we shot ourselves and of archival stuff.  So in that sense, yes.      01:04:21

Q.    And does the APs that you work with have any budget responsibilities?

A.    Yes.  They actually write the budget. I mean, every story before it's launched, there's a budget that we need to meet, ideally, or come      01:04:36 under, even better, and that's their job to prepare that.  They have all these formulas and all these -- they know how to do it.  I've never done it.

Q.    Does the AP play any role in the script  01:04:53 writing process, those who work for you, I mean?

A.    On Lesley's team, very little.  After I write my version, I give it to the AP before I give it to Lesley.  Again, this is in an ideal situation, not in these crashes that sometimes are  01:05:12

Page 53

Bar-On

a lot more condensed.

I give it to them.  They come up with ideas -- I mean, they come up with ideas, both editorial, structural, definitely facts.  You     01:05:24 know, that's where you want to catch the big fact problems, if they exist; if something's missing, if something is overstated.  We try to do stories that are complicated, so sometimes that's an issue.                                              01:05:39

Then whatever they do I choose to adopt or not adopt.  If it's facts, I do.  If it's structural, it depends.  And then it goes to Lesley.

But most of it -- I mean, that's not an     01:05:49 area where they have a lot of responsibility.

Q.    But the fact-checking is an important component of what an AP does for you?

A.    Very much.

Q.    And is there a specific form they     01:05:59 follow or you ask them to follow when doing the fact-checking, or format?

A.    Well, throughout the process -- before it becomes official -- before it becomes official, we just kind of bat it around between us, because  01:06:15

Page 54

Bar-On

they see what I've written.  I give them -- before I give Lesley anything, I give it to them.  They read it, so they catch it.  That's not formal.

Due to some AP several years ago    01:06:27 apparently really screwing up, there's now a very formalized version to do this, which is they have to submit footnotes, they have to be able to prove everything.

Again, if it's a longer format piece --    01:06:45 I mean in terms of duration of production, they can do it slower.  If it's a crash, they have to kind of do it as they -- as we go along, just because there's not enough time.  Yeah, so that's...    01:07:02

Q.    And I don't need to know who the AP was that you said really screwed up.  Was it an AP that worked on Lesley's team?

A.    No.  No.  It was ██████████ something.  I don't know her last name.    01:07:21

Q.    Okay.  Okay.  Do you know approximately when that mess-up took place?

A.    Eight, ten years ago.  I don't know.  I mean, we can find out when she worked.  But it wasn't a very long career.  So sometime during her    01:07:34

Page 55

Bar-On

time, because I just know it mainly because then we had to suddenly submit everything in writing. Before that it was less formal.

And we submit it in writing to Claudia    01:07:47 Weinstein or someone on Claudia Weinstein's team -- she sometimes works with other people -- and, if need be, to lawyers.

Q.    You mentioned before when talking about producer responsibilities that there -- I don't    01:08:10 want to characterize your testimony but there was some obligation, requirement, or expectation -- and please tell me the right word to use -- to do a certain number of stories each season.

First of all, what is the -- how would    01:08:27 you characterize it?  Is it a requirement?  an expectation?  How would you describe it?

A.    I think expectation is right.

Q.    And what is that expectation?  I just want to be explicit about it.    01:08:43

A.    Your goal is to do at least four, preferably five.

Q.    Your understanding is that applies to all producers for 60 Minutes?

A.    More or less, more or less.  Sorry,    01:08:59

Page 56

Bar-On

more or less.

Q.    How do you know about that expectation?
Is it written down somewhere?  Has someone told
you?                                                        01:09:10

A.    It's just drilled down.  It's drilled
down.  It's the standards you have to meet for
your reviews.  It's no written but -- maybe it is
written, but it's -- that's what you should hit.

Q.    Has Mr. Owens ever said that to you:  I   01:09:23
expect you to make at least four -- or have at
least four stories on the air per season?

A.    I have always hit four, usually five,
so he never had to say to me anything.

Q.    Has Ms. Stahl ever said to you the        01:09:38
expectation is you meet four stories at least a
year?

A.    She said it, not specifically about me,
because, again, it's not a problem.  But, yes, she
expects her producers to do four, preferably five  01:09:48
a year.

Q.    Has there ever been years you've been
at 60 Minutes when you were told that there was a
cap on the number of stories that would air for
particular -- for Lesley, for Lesley?               01:10:03

Page 57

Bar-On

A.    Sure.

Q.    What is that -- what was the cap?

A.    It's whatever her contract is, so it
changes.  It changes.  And the truth is we're          01:10:14
actually not told what her ultimate -- I mean, we
can guess just based on what the teams are doing,
but it's not information that we're privy to.  I
think it's her contract.  But I think as we see
the -- as years go by, she has less and less          01:10:33
producers.  We still meet the four to five target,
but there's just less of us.

Q.    Yeah, how many producers does Lesley
currently have, Ms. Stahl?

A.    Two and a half.                                  01:10:48

Q.    Two and a half?

A.    Yeah.  It's me, Shari, and Rich does
some for us and some for another team.

Q.    What other team does he work for?

A.    I believe Cecilia, but he may be a               01:10:59
floater.

Q.    But you and Ms. Finkelstein are full-
time producers for Ms. Stahl; correct?

A.    Yes.

Q.    Has there ever been a situation that            01:11:20

Page 58

Bar-On

you're aware of in a season where producers for

Ms. Stahl, whether you or other producers or

collectively, have been told no more stories this

season?                                              01:11:32

A.    Yes.

Q.    How many times has that happened over

the time you have been at 60?

A.    It happens pretty much every year.

Q.    And would that affect the ability to    01:11:41

air four to five stories for each of the

producers?

A.    It should not -- four, because that's

definitely the minimum that's been calculated,

five sometimes.  What happens is if another team    01:11:54

member, another producer, fails their

responsibility, there's obviously more spots for

the others.  But, yeah, it should not be an excuse

for not doing at least four and often five.

Q.    Have you ever had any stories that were  01:12:09

stopped because of some kind of cap?

A.    No.  I've had stories that have been

pushed to the following season, but -- but, again,

this would be after the four or five.

Q.    I think you said that Ms. Stahl's        01:12:29

```
                                            Page 59
                        Bar-On
number of producers has shrunk over time.  Was
there a time when she had more than two and a
half?
     A.    Yes.                                01:12:40
     Q.    And when was that?  When was most
recently that the case?
     A.    She had four I think as late as last
year.  At certain points she's had as many as six.
It changes.                                    01:12:58
     Q.    Before she moved to two and a half, was
the range always four to six?
     A.    Mainly four.  A few seasons she had
more.
     Q.    Other than you, Mr. Bonin, and        01:13:16
Ms. Finkelstein, who was -- who was the other
producer before the team shrunk?
     A.    I think Siddiqi.  I may be saying it
wrong.  It may be Ayesha Siddiqi.
     Q.    Does Ms. Siddiqi still work for 60    01:13:36
Minutes?
     A.    She switched to Cecilia.
     Q.    Do you have any idea how it came about
that Ms. Siddiqi would switch to Ms. Vega?
     A.    I think -- I know this not from -- I   01:13:49
```

Page 60

Bar-On

know this just from being around that Lesley's story count is reducing over the years, so she had to choose.  I think the idea was not to harm whomever was left off, so they found room for                01:14:08 them.  And also, as her stories count, some other correspondent's story count grows, so it's kind of a zero-sum game.

Q.    Am I correct that you personally have never had, since you've been at 60 Minutes, a male    01:14:28 AP?

A.    That's correct.

Q.    Have you ever shared coproducer credit with an AP who is working with you?

A.    Yes.                                                      01:14:44

Q.    How many times has that happened?

A.    We'd have to go through the list.

Q.    Has there ever been an AP who you are working with that you recommended to be a producer at 60 Minutes?                                               01:14:56

ATTORNEY ZUCKERMAN:  Objection.

You can answer.

A.    Your phrasing is a little funny.  I've told some APs that, you know, it would be great if they were producers and they should attempt to       01:15:11

Page 61

Bar-On

produce their own stories, they should definitely produce their own stories.  But I have not gone to management and said, You know -- so it depends, when you say "recommend," to whom.                01:15:22

Q.    Fair enough.

Have you ever recommended to Lesley Stahl that any of the APs who work with you be promoted to producer?

A.    I told Lesley that some APs do          01:15:32 phenomenal work and should definitely get opportunities, whether at our show or at -- she does Sunday Morning, so sometimes there.

But it's not really my place or my relationship.                                          01:15:48

Q.    Not your place or relationship to do what?

A.    With Lesley, to come and say, you know, they should be promoted.  Also that means that someone would have to be knocked off the team.    01:15:57

Q.    As a producer are there times where you work on weekends?

A.    All the time.

Q.    As a producer are there times where you work at night?                                       01:16:15

Page 62

Bar-On

A.    Yes.

Q.    Outside of normal -- business -- 9 to
5, outside of hours 9 to 5?

A.    Yes.                                        01:16:25

Q.    Are there times you work on holidays?

A.    Yes.

Q.    Do the APs on your team work nights?

A.    Sometimes.

Q.    Weekends?                                   01:16:32

A.    Sometimes.

Q.    Holidays?

A.    Yes.

Q.    Do you have any responsibilities for
evaluating the performance of APs who you work   01:16:46
with?

A.    Yes.

Q.    In what sense?  In what way?

A.    I mean, they have their own process
with Tanya.  Tanya calls me and says -- or I guess  01:17:01
Bill -- it was less formalized when Bill was
there.

        Tanya would call me and say, you know,
is there anything I need to know, is there
anything worth exploring, is this AP ready to do   01:17:16

Page 63

Bar-On

more stuff maybe at a Sunday Morning, you know, that kind of stuff.

So it's pretty informal, but obviously if there's a concern.                          01:17:29

Q.    If there's a concern, that would be an opportunity for you --

A.    I stopped because there hasn't been, so, you know, it's irrelevant.

Q.    Okay.                                               01:17:40

A.    With Tanya.

Q.    With Tanya.

Does Ms. Simon solicit your feedback or opinion as to whether APs who work with you are ready to produce on their own?                              01:17:56

A.    Informally as part of this conversation I usually offer it up.

Q.    And in discussions with Ms. Simon, have you expressed an opinion or view that APs who reported to you should -- you think should have an  01:18:11 opportunity to produce on their own?

A.    I thought a few of them were ready, a couple of them were ready.

Q.    And which ones did you say that about?

A.    Well, Nathalie and Jinsol.  Those are   01:18:23

Page 64

Bar-On

the ones I had under Simon, under Tanya.

Q.    Got it.

Before Ms. Simon was responsible for overseeing the APs, was that Mr. Owens' job?    01:18:32

A.    Yeah.

Q.    When he was deputy to Mr. Fager?

Did you ever express your view that any of the APs who worked with you should have an opportunity to produce on their own, to Mr. Owens,    01:18:43 during that time?

A.    Gotcha.  I don't remember if I did. Alex was very eager to produce, and I gave her all the room and space and time to do it.  So in that sense Bill knew.  Bill would ask, Can we    01:19:07 supplement, can we supplement, are you okay with time.

In that sense -- it's not like I came to him and said, I recommend you do it, but she wanted to do it.  It comes to me:  Do I think --    01:19:18 can I handle the load without her, do you need backup, do you need, you know -- so in that sense sometimes yes, sometimes no.

Q.    So in the conversations you're recalling with Mr. Owens about Alex specifically,    01:19:34

Page 65

Bar-On

did you ever express to him the view you thought Alex was ready to produce on her own?

A.    I didn't weigh in one way or the other. It's not my place.                01:19:46

Q.    But you did weigh in more recently in conversations with Ms. Simon about Ms. Peel and Ms. Jung?

A.    I guess, yeah.  I have a more friendly relationship with Tanya than I do with Bill.        01:20:03

Q.    So that affects the kind of conversations you have with Ms. Simon as compared to Mr. Owens?

A.    I'm sure it does.

ATTORNEY IADEVAIA:  We've been going        01:20:18
for more than an hour.  Why don't we take a
five-minute break.

THE WITNESS:  Sure.

ATTORNEY IADEVAIA:  Great.

THE VIDEOGRAPHER:  The time is 1:19        01:20:24
p.m., and this marks the end of media unit
number 1.

(Time noted:  1:19 p.m.)

Page 66

A F T E R N O O N   S E S S I O N

(Time noted:  1:49 p.m.)

THE VIDEOGRAPHER:  The time is 1:49

p.m., and this begins media unit number 2.    01:50:04

S H A C H A R   B A R - O N ,

resumed as a witness, having been previously

sworn by the notary public, was examined and

testified further as follows:

EXAMINATION CONTINUED BY

ATTORNEY IADEVAIA:

Q.    Very basic question:  When does the 60
Minutes season start and end, approximately?

A.    It's not such a basic question.

On air it is from September -- late    01:50:22
September to -- May to Memorial Day, but it starts
a little earlier just because of production.

Q.    Meaning it starts, like, in August?

A.    It does start in August.

Q.    And outside of the season, so let's say    01:50:53
June and July, are you typically working?

A.    I'd say there are about nine months
that are very, very hard and then three months
that are less hard.

Q.    And those three months are June, July,    01:51:10

Page 67

Bar-On

and August?

A.    It all depends on when your last piece is.  If your last piece is in April, you have a little more time then.  Usually, you know, at some 01:51:20 point in August you start to ramp up.

Q.    During the nine or so hard months, do you generally -- you personally -- take vacations?

A.    Christmas, that week, Christmas/New Year's week, because usually a time where, you 01:51:58 know, no one is around anyway, so it's very hard to do work; no one in terms of interview subjects and stuff like that, not people on the show.  And we are in reruns usually, so that's a good time.

Aside from that I don't take official 01:52:14 vacations unless -- no, I don't, I don't. Generally speaking.

Q.    Have the stories that you've worked on that ultimately aired on 60 Minutes won awards over the time that you've been at the show? 01:52:39

A.    Sure.

Q.    What kind of awards has the pieces you've worked on won?

A.    A couple of business awards, a couple of Emmys, two or three Emmys, one very recently. 01:52:54

Page 68

Bar-On

That's it.  Actually, relatively speaking, it's not a huge yield, but yeah.

Q.    When you say "business awards," what are you referring to?                    01:53:12

A.    I can't remember.  It's not, you know -- I think there was one business Emmy for a while there they had; I think they no longer do. Then there's these sort of lesser business awards, you know.  Oh, Overseas Press Club award I won a       01:53:29 couple of times, I believe, definitely once. Yeah.

Q.    And you said that your stories have received two or three Emmys.  Do I have that correct?                                     01:53:45

A.    Yeah.  There was --

Q.    Which stories is my question.

A.    Yeah, I figured.  Sorry I cut you off.

Q.    That's okay.  Go ahead.

A.    There is -- this year there was the       01:53:56 hostage story this year, Chinese ghost cities in 2012.  I think there were a couple of nominations that weren't wins.  I can't remember.  I'd have to go back and look.

I don't do this for the awards.  That's  01:54:19

Page 69

Bar-On

true.

Q.    The hostage story you're referring to, that was an award that you received in 2024?

A.    Yes, for a piece that aired in 2023.    01:54:31

Q.    And the Chinese ghost city, that was in, you said, 2012?

A.    I believe so.

Q.    Did you ever work on a story about attacks in Paris?    01:54:50

A.    I did.

Q.    Do you remember the year or around?

A.    I think 2015.

Q.    What was story about generally?

A.    There was a terror attack in Paris, the    01:55:00 Bataclan attack.  Our story -- there was a big issue around encryption because the terrorists were using iPhones and specifically Telegram on their iPhones.

I managed through my connections to    01:55:22 secure an interview with -- two interviews, one with the chief prosecutor of the Paris investigation -- the chief -- I can't remember his exact title, but he was in charge of the investigation.  I think it's called -- there are    01:55:38

Page 70

Bar-On

some strange names there in France.  So he was one.  It was the only interview he did, at least at the time.

And then I also managed to secure an    01:55:45 interview with the founder of Telegram.  Pavel Durov was his name.

So the piece dealt with the question of should law enforcement be allowed to break encryption, do back doors for encryption, stuff    01:56:06 like that.

Q.    And did the piece ultimately air?

A.    It did.

Q.    Was Ms. Stahl the correspondent for the piece?    01:56:17

A.    She was.

Q.    How was the experience producing that story?

ATTORNEY ZUCKERMAN:  Objection.

THE WITNESS:  Should I?    01:56:25

ATTORNEY ZUCKERMAN:  Yes.

THE WITNESS:  What do you mean?

Q.    Were there any challenges or problems that you experienced in the production of that story?    01:56:34

Page 71

Bar-On

A.    Same thing:  In terms of what?  In terms of booking, yes.  There were a lot of -- I mean, booking was very hard to book these people.  Then there were problems at the tail end in the -- 01:56:48 when we came back to edit.

There was -- before that sort of or in between that there were some issues with facts because facts were kind of changing and the French were being difficult.  There were a lot of 01:57:04 sensitivities of what we could say and not say, because it was national security.

It wasn't a pleasant experience.  There was a lot of footage not in English, which presented some problems.  I can go on. 01:57:22

Q.    What were the issues related to edit?

A.    The way I work, especially on a fast news story, is I want to know in advance what footage we have, archival footage, that is.  In a case like this, footage of the attack, footage of 01:57:48 the perpetrators, ISIS, anything we can that is germane to the story.  So besides finding the footage, there is issues of rights to this footage.

And I think, as I said earlier, you 01:58:07

Page 72

Bar-On

know, the better the footage the more likely it is to have rights issues, like some people who want to make money off it.  And in this case it was all over the world, and it was complicated.          01:58:20

The associate producer's job for the story is to find the footage, obtain the rights to the footage, and provide the editor the proper -- both.  In this very specific case, she did find the footage.          01:58:44

Q.    The "she" being Alex?

A.    "She" being your client.

She did not clear the footage.  The editor cut it, not knowing, because the assumption is, if he's getting something, it should be          01:58:57 cleared.  No one ever conveyed to him -- and this was obviously Alex's job to convey to him -- that -- what was cleared and what wasn't.  So he edited the whole thing.

The night before, she suddenly says, I          01:59:12 didn't clear the footage.  That created a big problem because this is one of these crash situations where the story basically needed to be locked in the following day, which basically meant he had to reedit the entire piece, on a day's          01:59:28

Page 73

Bar-On

notice.  And it was a very -- the lead-up to it was very difficult because of the foreign stuff, because of language issues, stuff like that so...

Q.    Was there any issues related to translation in putting that story together?                01:59:50

A.    There was -- there was a question, as far as I remember, about some of the Arabic, because obviously all these ISIS people had statements in Arabic.  And we needed the day before to kind of make sure that the translation was absolutely right.                02:00:12

So there was -- again, it was sort of last-minute archival stuff that was not done properly.                02:00:28

Q.    Did Bill Owens, in the context of your production of this story, express concerns about how -- your work producing the piece?

A.    Bill saw this happen.  Alex was MIA for a variety of reasons at that point.  It was just me and the editor.  Bill was very concerned.  In fact, it's one of the only times he's ever raised his voice on me, and rightfully so, because everything -- we were just getting surprised by the archives, by the translation, by the facts.                02:00:57                02:01:17

Page 74

Bar-On

Alex was nowhere to be found.  So that -- so he yelled -- so he was concerned.

And the Monday we had to meet Jeff and Bill.  By that point things had sort of calmed    02:01:35 down.  And they said, you know, this is -- this should not happen, and they were right.

Q.    And was Alex present for the meeting with Jeff and Bill?

A.    Yes.                                            02:01:53

Q.    So was it the four of you, meaning Jeff Fager, Bill Owens, you, and Alex?

A.    As best I recall, yeah.

Q.    In your experience as a producer working at 60 Minutes, is it unusual to have to    02:02:15 work under tight deadlines, at least some of the time?

A.    It's not unusual.

Q.    And is it unusual for APs that work with you to have to work under tight deadlines?    02:02:26

A.    Yes.  I mean, it's not unusual.

Q.    And I know this is a general question, but is it your opinion that 60 Minutes has high standards?

A.    I hope so, yeah.                                02:02:38

Page 75

Bar-On

Q.    Do you think they do?

A.    I think they do.

Q.    Yeah.  How so?  How would you -- how does that manifest itself?                02:02:45

A.    It's a show with a lot of power, a lot of viewers, high standards, you know, wants to give -- wants to advance the story, get it right, have impact on the world.  You know, I think if we put a story on the air, it should have legs and should, you know, impact the discourse.                02:03:05

Q.    Is 60 Minutes in your opinion a stressful place to work?

A.    It can be.

Q.    And in that sort of environment where people are trying to put out high-quality work and it can be stressful -- I know you're not saying it's always stressful, but it can be -- does it happen that employees yell at each other, raise their voice at each other, in communicating sometimes?                02:03:26                02:03:41

ATTORNEY ZUCKERMAN:  Objection.

A.    I've been there 20 years.

Q.    Yeah.

A.    I think I was un -- I'm under two                02:03:54

Page 76

Bar-On

different regimes, very different.  Even within the first half -- the first regime, which was, like, the majority of it, different, because, as we said, it's a show where people are age into it and never leave.  So -- so, yes.

Does it happen?  Yes.  I think it happened more under Jeff.  It happened more under Jeff early on.  I think, you know, work standards change.  I think office rules change.  I think Bill made it very clear that we are operating in an environment that's not conducive.

Have there been yelling -- yelling, heated discussions?  Sure.  Yelling -- yelling is rare, should be rare.

Q.    And you talked about two different regimes.  You mean one -- the period when Mr. Fager was EP and the period when Mr. Owens was EP?  Is that what you meant by that?

A.    Yes, yes, yes, yes.

Q.    Have you ever worked with someone named Michael Radutzky?

A.    No.  Ah, not true.  My very first story was with Michael, but I had a very tangential role.

Page 77

Bar-On

Q.    What was that story about?

A.    It was the final piece about Duke --
the Duke lacrosse players.

Q.    Got it.  Where Duke lacrosse players    02:05:42
had been I guess what turned out to be falsely
accused of rape?

A.    Correct.  We did three stories.  Ed
Bradley did two, but then he passed away.  Lesley
did the finally story.  And I literally started    02:05:54
working that week, so I had some minor
involvement.  This is 2006.

Q.    Were you ever yelled at by Michael
Radutzky?

A.    No.    02:06:14

Q.    Did you ever observe Mr. Radutzky
yelling at other employees?

A.    Yeah, well, our offices were very close
to each other.  So I heard it more than observed.

Q.    Who did you hear him yell at?    02:06:25

A.    He had an assistant, Sam Hornblower.
He yelled at him a fair amount.  He yelled at the
phone -- I mean at people he was talking to on the
phone.  That's it.  It wasn't that frequent.  I
mean, I don't -- it didn't happen a lot.  I mean,    02:06:45

Page 78

Bar-On

I didn't hear it a lot, anyway.

Q.    Have any correspondents yelled at you during the time you've been at 60 Minutes?

A.    Lesley has.                                    02:07:03

Q.    How frequently does Ms. Stahl yell at you?

A.    I don't know.  Occasionally.  I mean, probably more at the beginning, less now.

Q.    Has Ms. Stahl ever said to you a       02:07:19 phrase:  Speak English, not stupid?

A.    It's published in a book, so yes.

Q.    Is it?  I actually didn't know that.

A.    Tell it to me in English, not in stupid.                                          02:07:33

Q.    Going back to Mr. Radutzky for a minute --

A.    Sure.

Q.    -- do you know approximately when he left the show?                                  02:07:44

A.    It was under Bill, so, I mean, the period of COVID, like no one knew anything about anything.  So people, if they came and left, you didn't know.  So under Bill at some point, so last five years, I guess.                              02:07:58

Page 79

Bar-On

Q.    Did you have anything to do with Mr. Radutzky leaving 60 Minutes?

A.    No.

Q.    Do you have any knowledge as to why he left?    02:08:02

A.    No.  There was a bunch of people who left around when Bill came.  A lot of the old guard left.

Q.    Who do you recall leaving -- when you say "old guard," who are you talking about?    02:08:12

A.    Radutzky, Bob Anderson, Ira.  I'm trying to think who else.  I think a couple other people.

Q.    Is Ira Ira Rosen?    02:08:28

A.    Yes.

Q.    And Mr. Rosen, was he a producer when he was at 60 Minutes?

A.    He was.

Q.    Whose team was he on at the end of his job, employer?    02:08:38

A.    He switched.  I don't know if he was a floater.  I don't know.

Q.    And Bob Anderson, was he a producer?

A.    Very much so.    02:08:51

Page 80

Bar-On

Q.    Who did he work with?

A.    Many years with, you know, the main one, Michael Wallace.  And towards the end he was more of a floater, I believe.                                     02:09:02

Q.    Mr. Radutzky was a producer; correct?

A.    I think he was senior producer, technically.

Q.    Was there a period when you were there that you considered Mr. Radutzky to have a lot of   02:09:15 influence at the show?

            ATTORNEY ZUCKERMAN:  Objection.

            You can answer.

A.    I mean, he was a senior producer.  I don't know if a lot of influence but...              02:09:23

Q.    Was he assigned to a specific correspondent?

A.    I believe no.  I don't know, but I don't think so.  I think he did stories with everyone.                                            02:09:35

Q.    Did Mr. Radutzky have like a subunit that he oversaw?

A.    For a time, yeah.

Q.    And that was during the time Mr. Fager was EP; correct?                                   02:09:44

Page 81

Bar-On

A.    Yes.

Q.    What was his unit called, Mr. Radutzky?

A.    The Radutzky unit.

Q.    Did you ever do any stories with the    02:09:49
Radutzky unit?

A.    I did not.  I'm trying to think.  No.
I'm trying to think.  No.

Q.    Are you aware of any complaints against
Mr. Radutzky?                                     02:10:03

ATTORNEY ZUCKERMAN:  Objection.

A.    Just from reading in the newspapers.

Q.    Did any employee employee's at 60
Minutes ever convey to you any concerns they had
about working with Mr. Radutzky?                  02:10:13

A.    No.

Q.    Outside of hearing whatever you heard
being next to him in his office, did you ever
observe Mr. Radutzky treat an employee in a way
that you thought was inappropriate?               02:10:26

A.    I'm thinking.  No.  He was an odd
fellow, but no.

Q.    Did Tanya Simon ever tell you that she
had had concerns or problems when she worked with
Mr. Radutzky?                                     02:10:50

```
                                              Page 82
                        Bar-On
          ATTORNEY ZUCKERMAN:  Objection.
     A.    Not like that.  I know they worked
together and, you know, it was at times a
contentious relationship.  She didn't really say   02:11:00
anything.
     Q.    Did she ever describe Mr. Radutzky as
being abusive to you?
     A.    No.
     Q.    Did anyone ever describe him as being   02:11:08
abusive to you?
     A.    Just what you read in the press and
stuff.
     Q.    But in terms of conversations you had
or might have had with 60 Minutes employees, did   02:11:16
anyone describe Mr. Radutzky as abusive to you?
     A.    Not that I recall.
     Q.    Do you know somebody named Andrew Metz?
     A.    Sure.
     Q.    Does he work for 60 Minutes currently?   02:11:29
     A.    No.  He works for Frontline.
     Q.    Frontline?  He worked at 60 Minutes at
one point; correct?
     A.    He was Tanya's AP.
     Q.    Do you know if he was ever the AP for   02:11:41
```

Page 83

Bar-On

Mr. Radutzky?

A.    Yes.

Q.    Do you know of any concerns Mr. Metz had about Mr. Radutzky?                    02:11:54

A.    I don't know.

Q.    Did Mr. Metz ever tell you he had concerns about Mr. Radutzky?

A.    Not that I recall.

Q.    Is there somebody at 60 Minutes named    02:11:55 Michael Gavshon?

A.    Yes, there is.

Q.    And does he currently work for 60 Minutes?

A.    Yes.                                                                           02:12:04

Q.    What's his job?

A.    He's a producer.

Q.    Have you ever worked with him?

A.    No.  Oh, I'm trying to think.  No.

Q.    Does he work for a specific             02:12:13 correspondent?

A.    No.  He floats, floats for a couple of people, but, you know...

Q.    Who do you understand he floats for currently?                                 02:12:24

Page 84

Bar-On

A.    Anderson Cooper and Jon Wertheim.

Q.    Do you know if Mr. Gavshon, at least since you've been at the show, has ever been on a specific correspondent's team?                  02:12:38

A.    Yeah, he was on Bob Simon's team for many years.

Q.    And Mr. Simon passed away; correct?

A.    He did.

Q.    And since then has Mr. Gavshon been    02:12:50 assigned to a specific team, to your knowledge?

A.    As far as I know, no.  As far as I know, he did a lot of Anderson, and in recent years he's doing Jon Wertheim also.

Q.    From one producer to another, do you    02:13:03 have any opinion of Mr. Gavshon's work that you've seen?

A.    He's an unbelievable producer.

Q.    What makes you say that, for us people who don't produce?                              02:13:15

A.    I've known him since 1991, I mean from the side.  I wasn't working, obviously, at the time.  I was still in university.  So -- but he did a lot of pieces with Bob in Israel, so I was familiar with his work.  He has great story    02:13:33

Page 85

Bar-On

selection and great eye.  For many years he would just constantly win awards.  He's just a very talented individual.

Q.    Are you friends with Mr. Gavshon?    02:13:51

A.    Hello, hello.  He lives in London.  In fact, a couple -- a couple of times we ran into each other, like we were both chasing the same stories.  But we're friendly.  We're fine.

Q.    And does he ever come to the New York    02:14:05 office, to your knowledge?

A.    Occasionally.

Q.    Have you ever yelled at anyone at 60 Minutes?

A.    Yes.    02:14:24

Q.    Who have you yelled at?

A.    Your client.

Q.    Anyone else?

A.    I'm thinking.

Q.    Sure.  Please take your time.    02:14:31

A.    Again, in heated conversations, I can yell back at Lesley in the edit room, maybe a couple of times at crews in the field where they missed something or there was a need to catch their attention for something.  I don't think I've    02:14:59

```
                                          Page 86
                          Bar-On
```

ever yelled at an editor or a driver or anything like that.  I've gotten into arguments with associate producers editorially; I don't think I've ever yelled at anyone.                    02:15:18

Q.    Have you yelled at any associate producer other than Ms. Poolos?

A.    In the 20 years I've been there, probably raised my voice a couple of times, handful at best, as far as I can tell.        02:15:37

Q.    How many times do you recall yelling at Ms. Poolos?

A.    I don't recall.  I don't know.

Q.    Do you recall any specific times you yelled at her?                                   02:15:47

A.    Ms. Poolos would come to my office and plunk herself on the sofa and often start being very animated, yelling herself a lot.  This for a while there became a daily thing.  So sometimes in order to shut it down I would yell at her to stop.   02:16:14

She's a very volatile individual. She's a very aggressive individual.  She's prone to outbursts of anger, and sometimes the only way to shut it down, in order to keep on working, to stay productive, to do five stories a year, you   02:16:32

Page 87

Bar-On

have to shut her down, and that involved yelling, just because otherwise it would go on and on and on and on.

Q.    Do you remember any specific incidents    02:16:44 or conversations you had in which you had to yell to shut something down?

A.    You'd have to bring them to me.  I'm sorry.  For a while there was such a daily occurrence that people around the hall heard it,    02:16:58 her yelling at me, not the other way around.  In fact, they said, Why aren't you yelling at her back?  Literally daily.  This was around 2016-ish.

To the point where they're, like, You're some abused dog.  Why are you letting her    02:17:15 do this?  She's your subordinate.  She should not be doing this.  No one should be treated this way.

It became such a daily occurrence with her yelling at me that I don't remember the fights.  There were...    02:17:32

Q.    Who said to you that you were like an abused dog?  Did someone actually say that, use that phrase?

A.    Yeah.

Q.    What did they say?    02:17:47

Page 88

Bar-On

A.    Abused puppy, I think is what was said.

Q.    Who used that?

A.    Rachael Morehouse.

Q.    Is she the only one who said it?    02:17:54

A.    I think she was talking to someone in her office, and she said they both said it; and then she said it to me.  I don't know who the other person is.  She said you could hear Alex's yelling through the hall, I mean, even though the door was always shut.    02:18:08

Q.    Ms. Morehouse said that to you?

A.    Said what?

Q.    Said to you you could hear Alex yelling.    02:18:24

A.    No, no, no.  Oh, yes, also.  But yes.

Q.    And when did Ms. Morehouse say that to you, approximately?

A.    Around -- whenever -- around 2016-ish, maybe early 2017.  I don't know.    02:18:36

Q.    Got it.

Did Ms. Morehouse work for 60 Minutes?

A.    She did.

Q.    Yeah.  What was her job?

A.    She was an associate producer.    02:18:46

Page 89

Bar-On

Q.    What team was she on?

A.    She was with Henry Schuster, so Scott Pelley.  And then towards the end she produced a little bit.  Officially her title was associate producer.                                          02:18:57

Q.    She's no longer at 60 Minutes; correct?

A.    Yeah, yeah, yeah.  She got a promotion. She moved to NBC.  She was a senior producer at NBC.  It's very rare to get promoted in our show. I mean, very few people have that privilege.

Q.    Around 2016, this time frame you're talking about, did you have discussions with anyone else about Alex being volatile or yelling or her outbursts?                                      02:19:29

A.    I never had any conversations with anyone in any meaningful way at work about this until it got to the point where it was unbearable. That was about three weeks before we parted ways, where -- where I had a conversation with Lesley's  02:19:44 assistant at that time, Maria Rutan, who would have obviously seen a lot of this and witnessed it and knew Alex personally.

At that point I was, like, how do I find a way to get out of this relationship.  And    02:20:08

Page 90

Bar-On

she said, I don't know why you waited so long.  So

I consulted with her about that.  I don't know if

it was three weeks, or maybe it was a little

shorter.  I told Lesley that I can't work with    02:20:18

Alex anymore.

        Q.    When did you tell Lesley that?

        A.    It was before the season, so it was --

I think it was August 2017.  I'd have to look.

But whenever she -- whenever we parted ways.  I'm   02:20:35

sure you have the date.  I mean, it was done that

day.

        Q.    And who made the decision to separate

the two of you?

        A.    I mean, Lesley and -- I said, I can't    02:20:49

work with her anymore.  And she said, I'll take

care of it, and it was done.

        Q.    Did you tell Lesley why you couldn't

work with Alex anymore?

        A.    The way I said it was Alex and I do not  02:21:04

get along.  Lesley was actually surprised.  She

said, Oh, you seem to be so friendly together.  I

said, Yeah, because I never said anything and

because, you know...

                And I said it's just reached a point    02:21:20

Page 91

Bar-On

where I just can no longer work with her. I mean, she's not -- I didn't -- actually, no; actually, specifically not. I said we reached a point where we can no longer work together.          02:21:33

I said I have a lot of things to say about her. But at that point she was already sort of producing a little bit for Lesley. I didn't want to harm that.

I said, I'm sure she's got a lot of     02:21:45 stuff to say about me, but I think we should just leave it at that and part ways. And since -- the assumption is we're going to stay on the same team. I think this is just best to, like, stop it like this, but I can't -- I can't continue to work  02:21:59 like this.

I mean, this was hurting my mental -- it was hurting me physically to work with Alex at that point. I mean, I would get a knot in my stomach every day, having to deal with her. So it  02:22:15 was -- it got to the point where I basically said I don't care. I mean, I can -- whatever the volatility, whatever craziness she throws my way or at the show or whatever, I just -- I can't do it anymore.          02:22:33

Page 92

Bar-On

Lesley didn't ask any questions. She said, I'll take care of it. That afternoon Alex became a member of the team. I think she produced a couple stories later. But that was it. That 02:22:42 was the last time I had anything to do with Alex professionally, except a couple of -- you know, we consulted over crews and stuff where we were on the same team. But that was that. That was, like, it's a good day. 02:22:58

Q. After that afternoon, after you had that discussion with Ms. Stahl, your testimony is that Alex then became -- what was her job after that?

A. She stayed on the team. For a lot of 02:23:13 APs who get -- well, the number is very small, but sometimes APs who kind of graduate from being APs but aren't producers yet, they have, like, a season or two where they're still on an AP salary and head count but they produce. They are no 02:23:38 longer expected to be APs.

She was that for about a year and -- I don't remember, for a while, and then she was officially promoted.

Q. So your testimony is that she was 02:23:51

Page 93

Bar-On

not -- Ms. Poolos was not assigned to a different producer to work with; correct?

A.    Yes.

Q.    I just want to make sure I got all of    02:24:09
this.  So the conversation you had with Ms. Stahl's assistant, was that the same day that you had a conversation with Lesley Stahl that you've just testified to or a different day?

A.    No, there was about three weeks in    02:24:20
between.

Q.    Three weeks in between.  Sorry I missed that if you said it.

Tell me everything you recall about the discussion you had with the assistant.    02:24:29

A.    I met the assistant -- I mean, I'm very friendly with the assistant.  The assistant, again, her name was Maria.  She's a little older than we are.  She's kind of maternal.  She kind of holds the team together.  She's very smart and    02:24:46
very savvy in terms of life.

And, again, I think I should make very clear I had talked to no one about Alex in terms of I didn't complain, you know, I didn't stand in her way in any way.  At this point she was doing a    02:25:02

Page 94

Bar-On

lot of her own stuff anyway.

I said, I just can't go on like this, what should I do, how should I do this.  We all know Alex is very angry, very volatile.  She can    02:25:14 be nuts.  She can go crazy.  We need to -- I just need -- I need some advice, what should I do, who should I talk to.  Should I go to Lesley, should I go to, you know -- what should I do, should --

Just little brackets here:  Teams break    02:25:43 up at 60 Minutes all the time, like every year. It's very common.  As we said earlier, I inherited some APs from different teams.  That's very, very common.

But this case was a situation where    02:26:03 Alex wouldn't leave on her own, for a host of reasons.  I don't think anyone would want to be with Alex, any producer.  So I didn't want to harm Alex in any way, and she was -- you know, I just kind of wanted her out of my life at that point.    02:26:21

This was -- so the talk with Maria was should we get into anything, should we open everything, should we open it with Alex, you know, what's -- and she obviously knew because she knows everything because she knows Alex.    02:26:40

Page 95

Bar-On

She's seen Alex -- she said, Yeah, I know exactly.  I know -- I've seen Alex being angry, I've seen Alex be explosive, I've seen Alex go behind your back, I've seen Alex, you know, be   02:26:49 mean to other people.  I don't think she was a fan, but I don't think -- she's an adult.  She does -- you know, she comes to do her job.

So we devised this phrase of I have a lot of bad things to say about Alex; Alex has a   02:27:13 lot of bad things probably to say about me.  We want to split ways and just tell Lesley that and make it Lesley's problem, not Bill's problem.

I don't know if Jeff -- yeah, Jeff was still around, not Jeff's problem.  Tanya was not   02:27:32 around, in that capacity.  And that's it.  Went to -- thought about it for a little while then did it, got the nerve.

Q.    And spoke to Ms. Stahl?

A.    Yeah.  Also at that point Alex was   02:27:44 basically not doing her job, and it was really interfering with the work.  I think Lesley was, like, why isn't this stuff done, why is this stuff taking so long, what's going on here.

And, again, I never complained to   02:28:02

Page 96

Bar-On

Lesley about Alex, so she's probably her friend. So there was a point where I had to -- you know, there were a lot of things I had to address, just because things weren't getting done. And I was doing a job and a half, and Maria was doing the other half of the job.

I should say that as Alex's sense of self grew -- you know, she was very grandiose, your client. She was very into I'm producing now, I'm a producer, I'm going to be a producer and -- so she would do less and less of the logistical part of the job. That was beneath her.

The editorial part of the job she just wasn't good at, but the logistical stuff she just would say, No, I'm no longer ordering food for the crews; I'm no longer booking taxis for guests. If we were in the field, I would have do it or the crews would manage on their own.

But stuff like taxis and all that stuff fell on Maria. So she was very well aware Alex was not doing her job, because all the logistics would fell on her. Rights and clearances I think started to fall more on her, more on her archival stuff.

02:28:14

02:28:31

02:28:45

02:29:01

02:29:14

Page 97

Bar-On

In short -- so she was aware.  I don't know where I was going with this.

But I called Lesley before the season to lunch.  I said -- we talked for a little bit.    02:29:23 I don't think -- I think she knew something was up; she didn't know what.  We had some niceties. We talked a little bit about the season.  And then I said this is where we are and, you know, I have to split up with her.  She said, Not a problem.  I    02:29:39 was, like, why didn't I do this two, three years earlier?

And it was done.  And that afternoon Alex was told.  She came into my office.  She was like, Okay, I get it.  She was staying on the    02:29:53 team.  She was actually super friendly.  She said, Oh, why didn't you tell me in advance you were doing this?  I didn't have an answer.  I thought it would have been a bad idea.  And that's that.

We were actually in the middle of a    02:30:09 project that was kind of being formed.  I said, We're still in the middle of this project.  If you want to coproduce it, by all means.  I mean, we're working on this together.

She thought about it, and then she    02:30:26

Page 98

Bar-On

said, No, because I think I should go on my own; I should do my own thing, which was the right decision.  This was the Betsy DeVos story, which I ended up doing on my own with Natalie as my AP.     02:30:38

Q.    So your testimony is you offered to Alex to coproduce the Betsy DeVos story and Alex said no?

A.    Yeah, yeah.  Alex specifically said, I think I should move on and do my own thing to     02:31:00 prove myself, because this was her sort of in-between period.

Q.    Generally what was the Betsy DeVos piece about?

A.    It was about Betsy DeVos.  It was about   02:31:14 the secretary of education, Betsy DeVos.  We were pretty far along in booking her, and Alex was part of that booking process.  I think -- we're about equal in that one.  So it made sense that if she wanted she should stay.  I mean, it's...     02:31:39

Q.    Okay.  I think you testified that Alex would not leave, meaning Alex herself wouldn't voluntarily stop working with you.  Do I have that correct?

A.    That is my assumption.  I mean, that     02:32:01

Page 99

Bar-On

was the reality.  I mean, she for the last --
sorry, I may have cut you off.

Q.    That's okay.  My question was did you
have a conversation with Alex about her not          02:32:11
working with you at any point.

A.    Alex wanted to produce.  I mean, she
made that very clear.  She made it very clear in
her sense of self she was a producer, that she
should be a producer, that -- so, again, one of     02:32:26
the reasons it's very hard for APs to get promoted
in the show is because the structure is such that,
you know, during the season we're all together.
There's very distinct roles.  There's no --
there's really no path for them just in terms of    02:32:46
the work.

Definitely -- I mean, pretty much it's
nonexistent with Lesley, because Lesley is very
producer centric.  And a lot of APs, in order to
get promoted, have to write scripts and stuff, and  02:33:03
just -- there isn't a chance.

As Alex wanted to do more -- there was
a sports show at the time, briefly, and I said do
more.  I mean, I always tell my APs if you want to
do more, definitely do more, I mean, when you have  02:33:22

Page 100

Bar-On

time, but start producing for sports.  And Lesley was receptive.

So in that sense I gave her, you know, if she needed the time off, she got the time off.  I relied on interns.  I mean, there were stories where she basically did very, very little or just showed up at the end or -- so in that sense I was encouraging her, I guess, but...

I mean, in the last year and a half she did very, very, very little work for me.  She was basically doing her own thing, but I didn't have an AP, which meant that I would show up at 9 in the morning.  My kids were younger then.  I had to drop them off at school, come straight to the office at 9, and sometimes I didn't leave until 11 or 1 in the morning because I was doing my job and I was doing her job with Maria catching the slack in terms of some of the logistics.

And I think Alex was perfectly fine with the situation because it allowed her to do her job -- I mean advance her career without the question of head count or whatever or working with other correspondents.  And that's that.

So I think she -- she would have, I

Page 101

Bar-On

don't know, dragged this out until she would be officially promoted, if that were the case, but I just needed someone.  I mean, again, AP has a huge role in the show.  I mean, there's a reason why there's two of us.

Q.    During this year and a half or approximately year and a half you're describing where Alex didn't do much work on projects with you, did she get AP credit for those stories?

A.    She did.

Q.    Which stories are we talking about?

A.    One that comes to mind -- well, there's two.  One, Remington, she did very little work.  She was in and out all the time.  In fact, I remember she showed up for a shoot; and she had an opportunity to do something else that she needed for her story, and she just left -- she just left the shoot.  I said it's fine.  She asked me.

But she did very little work there.  She did some work, not nothing.  That's fine to give a producer -- to give her associate producer credit there.  A lot of it was me, way more than usual.

There was a project called Michael

Page 102

Bar-On

Lissen.  It ended up not being a story.  We ended up killing it.  I ended up killing it.  But there I just had to work with an intern.

Then there was a story, Russian -- no,    02:36:10 but then she was already gone.  I don't know. This is -- I mean, we're talking about stuff that happened seven or eight years ago so...

Q.    I understand.  I'm just interested in what you recall.                                02:36:24

So you recall her doing a little work on Remington and no work on Lissen?

A.    Pretty much no work.  Like, she didn't even bother showing up to the shoots and doing none of the research.  But, again, she would do so  02:36:38 little of the research towards the end, you know, so -- and then Remington, I remember very clearly there was -- we got a bunch of complaints.  It was an investigative story.  We got a mountain of complaints.                                        02:36:52

And I said, Alex, can you go through all of them and, you know, sort them out and decide if there's anything worth for us.  And I remember walking out and seeing a bunch of interns do it.  I said, Oh, that's interesting.  And she   02:37:02

Page 103

Bar-On

said, Oh, no I just decided that, you know, interns should do this job. It was not a job for interns.

Alex delegates a lot. I mean, that was her -- Alex likes to talk a lot about producing, not so much do. That was part of the reason we would get into these fights, that she would just sit in my office and talk while -- you know, there's an issue of productivity, four or five stories a year. And you have -- if you do four or five stories, that means another ten didn't work out.

She would just sit and talk. And if there was something to do, very often she would farm it out. The Russian stories, there was a friend of hers, this Simon Ostrovsky guy, who did a lot of the work. She would farm it to interns; she would farm it to Maria. So yeah.

Q. The Simon Ostrovsky, was that one particular story or was it multiple stories?

A. Oh, no, this was stuff she did by herself. The Russia stuff she did by herself.

Q. How do you know she was farming stuff out to Simon?

02:37:12

02:37:29

02:37:37

02:37:54

02:38:05

Page 104

Bar-On

A.    He would come to the office.  You would see him there reading all the documents, you know.  She told me she hired him.  She would say, Oh, I hired him.  At the very end I think he sent us a 02:38:16 bill for work that she said she did.  It wasn't -- over Zelenskyy, which there wasn't any evidence that that actually happened.

Q.    There wasn't any evidence that he did the work he was billing for? 02:38:36

A.    No, there was -- well, that too.  But basically -- this was around the time of her departure from the company.  There was -- and I know this only because I inherited the story, because when she left I -- sorry.  No, that's 02:38:47 fine.

When she left it was just before the Ukraine war.  She had told Bill and Lesley that she booked Zelenskyy.  And they said, Oh, well, you know Alex left -- that's how I knew she 02:39:09 left -- and they said, Please follow up on Zelenskyy because we really want him and she's got him for us and she...

I called -- I was like excellent, it's an A plus story, I'm very happy for the story. 02:39:25

Page 105

Bar-On

She had called no one.  No one had ever heard of her.  She basically lied to Bill and she lied to Lesley about that.

A couple of -- a little while later       02:39:35 Simon Ostrovsky I think sent some bill to Owens. And because I was involved in trying to figure out the Zelenskyy story, he was, like, Do you know anything about this?  I was, like, No, I don't know anything about this.                            02:39:54

But he claimed to have done work on it. So I don't know if he did or didn't.  There was no evidence of that that I could tell.

Q.    Do you blame Ms. Poolos for that bill? Do you think she was responsible for it?          02:40:04

A.    That's not my -- I don't know.  I have no idea.

Q.    Okay.  Just to be clear, you're saying that Alex lied to Bill Owens about having booked Zelenskyy?                                          02:40:21

A.    Yeah.  I mean, lied to Lesley and Bill. I mean, the way it was presented to me was this is a done deal, just call them.  I was, like, Who do I call?  They said, Well, we don't know, because, you know, she had everything.            02:40:35

Page 106

Bar-On

It took about half a day to figure out Zelenskyy's close circle.  I talked to all of them.  They're like, We never heard from this woman ever.  We've never heard from 60.  It was 02:40:47 clear that she had promised a bill of goods, which is kind of the way that she operated a lot, that she promised and then tried to backfill.

Q.    You used that phrase "backfill" in one of your emails to Lesley the day that you find out 02:40:58 that Alex was fired; correct?

A.    I don't -- fine.  I mean, if you say so, then --

Q.    You reviewed emails yesterday; right?

A.    Yes, yes, yes.    02:41:09

Q.    And there's not many emails involving you in this case.

A.    Why would there be?

ATTORNEY ZUCKERMAN:  Just let him finish the question.    02:41:14

THE WITNESS:  I apologize.

ATTORNEY ZUCKERMAN:  That's okay.

THE WITNESS:  I'm sorry.

Q.    Did you review an email yesterday in which you talked about the Zelenskyy story with 02:41:21

Page 107

Bar-On

Lesley?

A.    Yes.

Q.    And in that email do you recall using that word, backfill"?                                02:41:27

A.    I don't, but if you say so, then that makes sense.

Q.    What are other instances where Ms. Poolos did as you just described:  backfilled and then tried to compensate later?              02:41:38

A.    This was -- again, this was not me; this was -- she had promised a show the Iranian president.  Again, it was a situation where she said she got him, but it became very evident that it was not true.                                          02:41:55

She would say, Oh, I've got him.  Or maybe she was -- maybe she phrased it enough that, you know, it was like legally she didn't say, but it was pretty evident to people that that's what she said.                                              02:42:09

That turned out to be just not true. The Iranian president was -- I think he popped up on ABC, I think to everyone's surprise, even though she promised she had him.

I'm sure there were cases like that      02:42:25

Page 108

Bar-On

with me, but I can't think of an example right now.

Q.    The Iran story, was there eventually a story that Alex was a producer or coproducer on involving Iran?   02:42:30

A.    It's a totally separate story.  She did do a story about Iranian soccer, but then this was -- this was an interview with Raisi when he came to power.  This would be a couple years later.  And she said that she got it, to the point where there was another team working on it and they were told to stand down.  Then he popped up on ABC News.  So she clearly did not get it.   02:42:47

Q.    Was there ever a story aired on that topic or issue?   02:43:03

A.    On Raisi?  Yes, a couple years later. Alex was no longer on the show.  There was a story Rich Bonin did.

Q.    The story Alex had proposed doing, it never came to fruition?   02:43:15

A.    As far as I understand.  She was not involved in the booking two years later.

Q.    Got it.

But the story that she was pitching and   02:43:28

Page 109

                              Bar-On

purportedly said she had the president but didn't,

is this at a point where she had the title of

producer or was this still when she was an AP?

     A.    Which one are we talking about?  Iran    02:43:41

or Zelenskyy?

     Q.    Iran, where you say she supposedly had

the Iranian president.

     A.    I think she was already -- you know,

the thing is after that conversation in August     02:43:52

2017, I had very limited contact with Alex.  So I

didn't follow her career.  I didn't particularly

care much.  I was happy she was out of my life.

     Q.    But the Iranian president, that took

place after you had this conversation with Lesley   02:44:07

Stahl?

     A.    Sorry, which conversation?

     Q.    Let's focus for a minute on this.  Your

testimony is that Ms. Poolos falsely claimed she

had secured the Iranian president for a story, for  02:44:21

an interview.  That turned out not to be true.

          My question is did she do that at a

time after you spoke to Lesley Stahl about not

wanting to work with Alex anymore.

          ATTORNEY ZUCKERMAN:  Objection.          02:44:34

Page 110

Bar-On

You can answer.

A.    Yes, significantly after.

Q.    Going back to Zelenskyy for a moment, who told you that Alex had said she had secured an interview with Mr. Zelenskyy?    02:44:44

A.    Zelenskyy?  Lesley and Bill.  I mean, it was -- it was literally -- I mean, the war was about to start.  They said, you know, Alex has been working on it, she's got it, just go and do it.  I said, Okay, what's the contact number?  They said, Well, we don't have it because she has it.  It's a done deal.    02:45:01

Within a day it became clear not only was it not a done deal; they had never even heard of her.    02:45:16

Q.    You testified earlier, you know, to the effect of you didn't think other producers would want to work with Alex at the time you had your conversation with Lesley.  Is that -- is that correct?  Do I have that accurately?    02:46:00

ATTORNEY ZUCKERMAN:  The 2017 conversation?

ATTORNEY IADEVAIA:  Yeah, 2017, yeah.

A.    Yeah, I think that's right.    02:46:08

Page 111

Bar-On

Q.   Did you ever have any conversations with other 60 Minutes producers about whether they wanted to work with Alex?

A.   No.  I wouldn't.  It just wouldn't make 02:46:16 sense.

Q.   What is your basis for saying you didn't think other producers would want to work with her in 2017?

A.   By then she had -- again I'll say this: 02:46:36 I never complained about her.  That said, we work in a small shop.  You had editors complain about her to each other.  You had the head of the editors see her outbursts.

You heard her yelling at delivery men. 02:46:57 You heard her yelling at editors.  You heard her yelling -- well, you didn't hear her yelling at taxi drivers, but that was a thing -- and on production drivers.  You heard her yelling at crews.  You had crews who refused to work with her.

So I think -- and all -- I mean, besides all that -- that's all bad and accurate. I also think she presented herself as, like, I'm ready to be a producer.  Again, there's the 02:47:21

Page 112

Bar-On

grandiosity there.

So I think a lot of producers, when they see this, like, I wouldn't hire you as an AP because clear you would be -- you think you can just do my job and, like, it's not a very -- it can't be a productive relationship.

Even -- you know, anyone who's ready to be a producer and says so out loud as clearly as she did, you know, it just wouldn't make sense to hire such a person as a...

Q.    When did Alex start to engage in this grandiose behavior that you've described?

A.    Well, there are versions of it from the start.  I mean, how a phenomenal reporter she is and how she did all these things and how the AP job is beneath her but she'll do it for a couple of years.

I noticed very early on that she would never -- introduction letters to interviewees and stuff she would never say, I'm an AP for Lesley Stahl.  She would say, I'm producing for Lesley Stahl, which is not technically a lie, but it definitely shows sort of -- you know, no other AP of mine ever did that.  They would say, I'm an

Page 113

Bar-On

associate producer for Lesley Stahl.

As time went by, the more time went by, the more she sort of saw herself as, you know, basically this was all beneath her and -- yeah.    02:48:50

Q.    Is your testimony that she became more vocal in her grandiosity?

A.    Yes.

Q.    During the time she was an AP for you pre this 2017 break you had, did she -- did Alex    02:49:10 coproduce any stories with you?

A.    She did.

Q.    What stories?

A.    I'd need a list.  I honestly -- again, I don't do a story a year like Alex did; I did    02:49:25 five, four to five.  So I'd need a list, and we can go through it.

Q.    Do you remember any?

A.    Yep.

Q.    Which ones?    02:49:39

A.    Gorillas, which is a story she pitched. She got coproducer on that.  Pussy Riot, she got coproducer on that.  Those were stories she deserved coproducer.

There are a bunch of stories where she    02:50:04

Page 114

Bar-On

just badgered me to the point where I gave her coproducer credit:  Bibi Netanyahu, where she did next to nothing, I think -- I'm pretty sure she got coproducer credit for that.  There was a story 02:50:16 about a judge, Judge Kaczynski.  She got coproducer for that just for badgering me.

I'm sure -- I mean, I know there are more.  I just don't -- I don't remember.  Again, if you have a list, I'm more than happy to go 02:50:32 through it.

Q.   And when she was your AP, did she solo produce any stories?

A.   She did.  She did a sports story for Showtime.  I think that's it.  I think that's -- 02:50:52 I'm not -- no, maybe the first Navalny was still -- she was technically my AP, although at that time she basically did no work.

I mean, yes -- yes, she was -- she definitely was still my AP, at least when she 02:51:14 produced it; I don't know by the time it aired.

She did Navalny a couple of times, so this would be the first time, because I remember -- I remember her sort of tricking me into that one.  I think -- obviously -- and, 02:51:28

Page 115

Bar-On

again, if someone wants to do more and to advance, by all means.  I mean, that's the way the system works:  You do work for three years or four years, and then you can do our own thing.          02:51:44

If you're pitching, you're supposed to pitch to your team, to your job.  And, like, when she pitched Iran, I said, you know, go to it.  I can't -- I'm Israeli.  I can't get into Iran and be, you know, good.  It's a good story.  I can't     02:52:05 do it, so definitely.

Then she said, Oh, I think I'm going to pitch more stories.  I said, definitely, definitely; I mean, by all means.  And she said a couple of things, and she's, like, Oh, I don't     02:52:18 know, maybe this, maybe this, maybe Navalny, maybe...

So she didn't say should -- at that point she had pitched Navalny to the show, like, you know -- again, if you're working on a team,     02:52:32 that should have been a joint production of ours, but, you know -- so she kind of let me know either post fact or in a way that was kind of hypothetical.

I thought about it.  I thought it was     02:52:47

Page 116

Bar-On

sort of conniving, dishonest, which is who she is.

Q.    Just to be clear, the Iran story that was aired that she produced, is that the sports story?                                                      02:53:03

A.    Yes.

Q.    Are they the same thing?

A.    Yes.

Q.    Was that a soccer story?

A.    Yes, yes, yes.  It's a good story.    02:53:07

Q.    Yeah, how was it received?

A.    It was well received.  It was a very good story.

Q.    Did you hear of any feedback on the story from Bill Owens?                               02:53:18

A.    No.

Q.    Did you hear about any feedback that Jeff Fager had about the story?

A.    No.

Q.    Was Lesley a correspondent for the      02:53:25 story?

A.    Yes, she was.

Q.    And did Lesley ever mention her views on the story to you?

A.    She thought it was a good story.     02:53:37

Page 117

Bar-On

Q.    And the Navalny story, was Lesley the correspondent on that story?

A.    There were two of them.

Q.    The first one I'm focused on, sorry.    02:53:49

A.    Yes, yes.

Q.    That story ultimately aired, the first Navalny story?

A.    Yes.

Q.    And what was the premise of that story    02:53:57 generally?

A.    Who is Navalny, just Navalny is taking on Putin.

Q.    He's a Russian opposition to Putin; correct?    02:54:08

A.    Yes, yes.  He was.

Q.    Was.

A.    He no longer was.

Q.    He passed away?

A.    "Passed away" is a nice way to say what    02:54:13 happened to him.

Q.    And what was your view of the first Navalny story?

A.    I don't think I saw it, to be honest.

Q.    You didn't see it.    02:54:24

Page 118

Bar-On

Q.   Did you hear any feedback about that story from Bill Owens?

A.   I did not.

Q.   Tanya Simon?                                    02:54:30

A.   Was she already around?  She might not have been around yet, in that capacity.

Q.   Did you hear any feedback from Jeff Fager about the first Navalny story?

A.   No.                                             02:54:43

Q.   What about Lesley, did she ever discuss that story with you?

A.   No.

Q.   I think you mentioned at some point that Alex just wasn't showing up to do the work as   02:55:03 an AP for you; correct?

A.   Right.

Q.   When she was still your AP.

A.   Yes.

Q.   Is it your testimony that Alex was        02:55:13 doing no work at that time or she was working on things other than working with you?

A.   She was doing the bare minimum, really the bare minimum.  Whether she was doing other stuff or -- I don't know what she was doing with   02:55:27

Page 119

Bar-On

her time, but she was doing the bare minimum and less.

Q.    As your AP?

A.    As my AP.                                          02:55:33

Q.    And did you ever raise concerns about that to anyone at 60 Minutes?

A.    I did not.

Q.    You didn't discuss it with Bill Owens?

A.    I did not.                                         02:55:49

Q.    You didn't discuss it with Jeff Fager when he was still there?

A.    I did not.

Q.    You did not discuss it with Lesley Stahl; correct?                                         02:55:57

A.    I did not, until the day we parted ways in 2017.

Q.    How come?

A.    That's a good question that I've asked myself a lot.  I think -- well, I think by that    02:56:09 point she was kind of trying to do her own thing. And it was clear that we were not getting along and we were not a good match.  So I just kind of wanted her out of my life.

         And, you know, APs leave -- you know,    02:56:32

Page 120

Bar-On

APs leave around three to four years.  They just move on, and I just figured that's what's going to happen.

I tried to work with her a lot.  That was part of the explosive discussions.  I'd be, like, this isn't getting done, this should get done, why don't you do this.  We would -- and sometimes she would say, Yes, I will do it, and then it wouldn't get done.  Sometimes she would fight and...

So I tried to -- you know, we're all adults.  I tried to solve my own problems within my own team.  I don't think, you know, you should be running to management for everything.

And truthfully I think she had a terrible anger management issue.  She was volatile, she was explosive, she -- you know, and -- I don't know, call me a wuss, call me, you know, nonconfrontational.  I just didn't want to deal with it.  I just -- I just couldn't deal with it.

I mean, it literally got to the point where when I heard her footsteps I would get a knot in my stomach, because I didn't know how it

Page 121

Bar-On

would end up:  Would it up being fine, would it end up in her yelling, slamming doors, throwing folders on the floor, all things that happened, some of them publicly, lying on the floor in the    02:57:55 middle of a shoot.

She was not a reasonable person by any stretch, not towards me, not towards drivers, not towards cameramen, not towards sound men, not towards editors, not towards managers of editors    02:58:09 and cameramen, not towards Maria sometimes.

She would -- you know, she was perfectly nice to Lesley, she was perfectly nice to Bill, she was perfectly nice to Jeff.  She knew how to control herself there.                        02:58:26

But, you know, she would yell at colleagues.  She would -- we had this woman who was in charge of the internet.  She would go crazy with her for no good reason.  Anne Desilvio [sic] was her name.                                  02:58:44

And, yeah.  So I think, you know, I avoided it, I avoided it, until I reached a point where it was hurting my health, where I was not concerned about Lesley, I was not concerned about the story; I was concerned about Alex Poolos, who    02:58:55

Page 122

Bar-On

was not doing her job and just impeding.

Yeah, that was -- that was it.

Q.    Did you ever have conversations with Lesley at any point in time, Lesley Stahl, about these anger management problems you just described related to Alex Poolos?

A.    Not before 2017, between -- and basically not -- no, because then she was working for -- then she was working for Lesley, so there was no point in, you know -- no.  So, no.  I'm trying to think.  No.  Not really.  I know there's a difference between no and not really, but, no, I don't think I did.

And Alexandra was on the team for another five years after I was there, or I don't know how many years, but for -- yeah, I think five years.  So I didn't say anything.  But, I just -- you know, I just kind of coexisted with her.

I mean, we were colleagues literally on the same team, and this is a team that meets for dinner, that knows each others' spouses, that had to coordinate Lesley's complicated schedule.  You know, this is...

Alex would ask me questions.  Alex had

Page 123

Bar-On

a lot of issues with productivity and with Lesley and with this and with that, and would ask me how I would deal with it, what were my suggestions. So, you know -- but you know we kind of -- I think 03:00:29 she and I both mainly kept to ourselves.

Q. Did you have discussions with anybody at 60 Minutes about the behavior that you've just described today that you observed that Ms. Poolos engaged in other than the conversation you had 03:00:48 with Martha you mentioned and then you mentioned at some point a discussion with Rachael Morehouse, I think.

A. Yeah. I think her -- I think -- there was an assistant here that worked for the show 03:01:06 that was right outside her office who heard her constantly yelling at delivery men. So he was asking what's that about. I said I don't know.

Q. Who was that, before we go on?

A. Ali Rawaf is his story -- is his name. 03:01:22 He's a lawyer now.

I mean, it's come up a couple times since she was fired before the lawsuit. Again a couple of -- yeah, no -- after she was fired it came up. I mean, crew people would come to me and 03:01:45

Page 124

Bar-On

say, you know, We never wanted to work with you because we knew we had to deal with you, so that's why we avoided you for all these years.  So that happened.                                                      03:02:03

You know, she yelled at a couple of editors, so a couple of editors -- she yelled at an editor so bad that Matt Richmond had to go across the hall and say, You can't talk to people like that.                                            03:02:15

And, but then -- and then -- again, I don't have the timing in my head, and she wasn't such a concern after she -- after 2017 in my life. After she got fired, a couple of people were, like, what's going on, you know.  That was before   03:02:31 the lawsuit, obviously.

Q.    Who was that?

A.    No, as I said, editors, crew, you know, like what do you know, what do you hear, just people in the office, nothing interesting, no one   03:02:42 in management or anything like that.

Q.    Well, I want to be clear for the record.  The crew people you're talking about, is it one person or multiple people that told you they never wanted to work with you when you worked  03:02:54

Page 125

Bar-On

with Alex, they avoided you because they didn't like working with you, or words to that effect?

A.   Words to that effect.  That's -- you know, it was more than one person.  It was more than one person.

Q.   Okay.  And who was it?

A.   It was -- there's Eric Kirchmer, who is a sound man.  I may have his last name wrong, something like that.  There was Chris Albert, who said he would work, but he was very -- he would try and turn it off when he could -- turn it down when he could.

There were -- people just expressed concern.  There was Scott -- Scottie Osterman in California.  There was -- there may have been more.  I don't know, you know.  Yeah.

Q.   Eric Kirchmer, did he tell you this while Alex worked for 60 Minutes -- before she was fired or after she was fired?

A.   After.  No one talked to me before. Ali may have asked -- no, I don't know.  I don't know.  Maybe after.

Q.   Well, I'm asking about Eric.  Was Eric before or after?  Did you have that conversation

03:03:04

03:03:18

03:03:33

03:03:59

03:04:11

Page 126

Bar-On

with him --

A.    It was -- it's more complicated than that.  He told it to my AP, who told it to me, in Israel, this year.                          03:04:23

Q.    This year.  And your AP being Ms. Jung?

A.    Yeah.

Q.    So your testimony is Eric told Ms. Jung --

A.    Yeah.                                  03:04:31

Q.    -- in 2025 or 2024?

A.    '24, I would say.

Q.    -- that he did not want to work with you while Alex was your AP?

A.    Yes, because she yelled at him in front  03:04:41 of his children.

Q.    Did you work with Eric after Alex stopped being your AP?

A.    In Israel, that was the first time.

Q.    That was the first time --           03:04:52

A.    There may have been one more time.

Q.    But there were multiple years between when Alex was your AP and when she was fired from the show; right?

A.    Yeah, yeah, yes, there were five years.  03:05:02

Page 127

Bar-On

Q.    Then when did -- did you --

A.    And I may have worked with him -- I don't remember.

Q.    Chris Albert, did he tell you directly    03:05:13 that he turned down work when he could --

A.    Yes.

Q.    -- because of Alex?

A.    Sorry.  Yes.

Q.    Did you have one discussion with him or    03:05:23 multiple discussions with him about this issue?

A.    One that I remember.

Q.    And did that take place before or after Ms. Poolos was fired?

A.    After.                                       03:05:31

Q.    And was anybody else present for that discussion?

A.    Not that I know of.  We were setting up a shoot.  Not that -- you know -- if there was, it wasn't someone I engaged with.  Maybe was a sound    03:05:43 man.

Q.    Okay.  You mentioned someone named Scott Osterman in California.  Who is that?

A.    He now is a cameraman.  He used to be a sound man, for many years.                            03:05:55

Page 128

Bar-On

Q.   Did you speak directly with him about Alex?

A.   Yeah.  He called me after the lawsuit was filed, actually.  He said, I'm so sorry and, 03:06:06 you know, we really kind of tried to avoid working with you when she was around.  She was volatile.

Q.   That's what he told you?

A.   Yeah.  I said -- whatever.  By that point I was instructed I can't talk about it.  I 03:06:22 said, Thank you, I appreciate it, good-bye.

ATTORNEY ZUCKERMAN:  I'm sorry, let's just not discuss what lawyers told you.

THE WITNESS:  Oh, sorry.  Oh, no, okay.  This is -- 03:06:32

ATTORNEY ZUCKERMAN:  Just limit it to that.

THE WITNESS:  Okay.  Fine.

Q.   Was there any other part of your discussion with Mr. Osterman that you haven't 03:06:38 testified to already?

A.   Not that's really relevant, but something about Osterman has occurred to me, as I was thinking about it as I read the lawsuit.

Q.   Well, before we get to that -- 03:06:58

Page 129

Bar-On

A.    Okay.

Q.    -- and I'll let you testify to that.

A.    No, no, that's fine.

Q.    But just the conversation you had with   03:07:02
him where he said he was sorry and said to you, I
guess your testimony is, that we tried -- we tried
to avoid working with you when Alex was your AP,
what else did you discuss about Alex during that
discussion, if anything?                           03:07:17

A.    Nothing.

Q.    Okay.  So what did you want to say
about Mr. Osterman?  What else did you want to
say?

A.    In the lawsuit your client talks about   03:07:28
this time where she -- the very first time she
meets Lesley and Lesley makes some remark about
using your body or whatever, which was a joke,
which Alex knew was a joke, because the second we
walked out -- I was in the office -- I was present   03:07:47
for this conversation, because I was introducing
Alex to Lesley.

        The second we walked out of there, I
said, Just to be clear, you know that was a joke.
And she said, Yeah, yeah, isn't is funny Lesley   03:08:02

Page 130

Bar-On

Stahl told me to use my body.  I said, Yeah, I know, she does it to me, she does it to everyone, that's kind of her thing.

You know, so she knew it was a joke.    03:08:14
Clearly she mischaracterized it in the lawsuit as not a joke, to get the press attention that it did get.

But it occurred to me that we were in Vietnam with Scottie, who is kind of a good-    03:08:29
looking fellow, and the -- our minder there was a female, was very taken in with him.  And Alex instructed him to charm her, to kind of distract her basically by using his body.

So in fact she literally did the thing    03:08:50
that she -- that Lesley was joking about to another guy.  He didn't care.  He was fine with it.  At some point he broke character and said something about his kids.  And the minder obviously was significantly less interested at    03:09:08
that point, and Alex yelled at him, half in jest.

But it just occurs to me that if we're mischaracterizing jokes, Alex literally did what she accused Lesley doing, which obviously Lesley never intended.    03:09:25

Page 131

Bar-On

Q.    When you say "minder," what is that?

A.    Sorry.  We were in Vietnam.  And the government there makes you have someone with you, and we didn't want her to know what the story is    03:09:33 so...  So having her being distracted by this fellow was very useful to us.

Q.    Approximately when did this happen?

A.    2013/'14.

Q.    And you said Alex yelled at him.  Who    03:09:52 did she yell at?  Scottie?

A.    Yeah.  I mean, yell is -- you use the word "yell" a lot.  I think she was just like, Oh, what did you do?  You ruined it for us now.  It wasn't like -- she wasn't berating him.  It was --    03:10:05 it was half jokingly.  But, you know...

Q.    Whether I use it a lot or not I can't say.

A.    No, no, no.

Q.    I think you used the word "yell."    03:10:17

A.    Okay.

Q.    That's why I asked it the way I did.

A.    I apologize.

Q.    So your testimony, though, is what Alex says in the lawsuit Lesley in fact made that    03:10:29

Page 132

Bar-On

comment?  You're correct, she made that comment; correct?

A.    She did.

Q.    But your point is that when Lesley made  03:10:36 the comment she was joking?

A.    Not only she was joking but within 30 seconds of that comment I specifically told Alex: You know she was joking, and Alex said -- I don't remember if she said yes, but she said, Ha-Ha,  03:10:52 Lesley Stahl just told me to use my body to get a story.

She clearly knew it was a joke.  And it clearly didn't disrupt her from getting the job -- I mean taking the job.  This was before she was  03:11:05 actually hired.  She just dredged it up 20 years later for click bait, basically.

Q.    How does that make you feel?  What are your thoughts about that?

ATTORNEY ZUCKERMAN:  Objection.  03:11:21

You can answer.

A.    Terrible.  I think, you know -- I know you've studied the show.  I know you've -- between Alex and other people.  You know, Alex got so many opportunities at that show again and again and  03:11:36

Page 133

Bar-On

again.  And she was terrible at a lot of parts of her job, and she was terrible as a producer.

And yet she was, you know -- and then she just sort of brought up all this stuff that she knows is lies, half truths, mischaracterizations, solely for, you know -- she did it on herself.  She did it -- I mean, I don't know why she chose to do it.  I mean, that's -- I mean, you guys were in the room, not me.

But, I mean, she knows these things. She knows -- forget everything about me.  She knows that Lesley was lying.  She knows that that would embarrass Lesley.  She knows that Lesley went to bat for her repeatedly; she knows that if Lesley had not she would not have a job at 60 Minutes.

She would have to leave, like, all these other unbelievably talented people who did not get the opportunities that she did:  Neal Agarwal, who ended up being, like, a huge producer at Google; Andrew Metz, who is a huge producer, you know; ███████ ███████ who is a huge producer at Frontline.

People who really do unbelievable work

03:11:53

03:12:07

03:12:21

03:12:43

Page 134

Bar-On

did not get the opportunities that Alex got repeatedly and the scaffolding that Alex kept getting.

And Alex just takes zero responsibility for -- you know, she's like, Oh, you know, I have been a victim, literally from my job interview to the last day I was there.  And it's just not reality.  It's just not reality.

And, you know, how do I feel?  I mean, she went after me for whatever.  Even if she imagined some of this or convinced herself is true, which she knew it isn't.  You know, she hurt me, she hurt my kids, she hurt my wife, people who she knows personally.  And she did it on purpose, and she did it for publicity.  And she did it obviously to get money but -- so how do I feel?  I feel pretty shitty about it.  Sorry.

Q.   No, I asked you a question.

ATTORNEY ZUCKERMAN:  He asked the question.

Q.   When you say that Lesley went to bat for her repeatedly, what do you mean by that?

A.   She hired her as my AP but that -- I mean, whatever -- forget that.  I made that --

Page 135

Bar-On

(Unintelligible testimony interrupted by the reporter.)

A.    Lesley hired her.  She hired her as -- you know, as her producer.  And you know, there's that.

And, again, I know you've been doing this for a while.  I'm not the first one to say it, but I can't stress enough -- and I'm sure Alex stressed enough, because it's true -- these opportunities are so rare.  And for Lesley specifically to go to bat for someone to get this opportunity is even rarer.  I think it's happened maybe twice.

Oh, Kathy Liu is another unbelievable producer that had to go NBC just because there was just no opportunity and Lesley didn't go to bat for her.

And then year after year after year Alex was performing terribly.  You know, she had 20 to 25 percent productivity level that's expected.  She -- you know, she produced one good story, maybe, and then had a lot of problematic stories.

And Lesley stuck by her.  Lesley never

Page 136

Bar-On

said a single bad thing about her ever, never -- I mean to me.  I don't know if she said it to other people, or to anyone on the team.  Lesley is actually super loyal in that way.                    03:15:12

You know, I think Lesley was very upset when Alex left, not the circumstances, just the fact that -- you know, she went to her wedding so -- and, you know, Lesley doesn't have to do it and Lesley doesn't do it to a lot of people.  And    03:15:29 for whatever reason, she did it to Alex again and again.

And then what does Alex do?  Put these things that should never have been, you know, brought up because they're so trivial and Alex    03:15:42 knows that they're lies, basically just so that it will be in the New York Post and the Daily Mail.

Q.    We'll at some point go through the complaint and you can identify the places that are lies.  I'll give you a chance to do that.          03:16:00

But when you said Lesley Stahl doesn't do this for a lot of people, what did you mean by that?  Doesn't do what?

A.    Doesn't, I mean, help people get promoted.  I can think of two people who she did    03:16:18

Page 137

Bar-On

it to in the 20 years I'm there.  Not that she's
bad or anything, but she cares about her story
count, she cares about her life, you know.

Yeah, it's Alex and Ayesha later, who     03:16:34
was after Alex.

Q.    What did she do to help Ms. Siddiqi?

A.    No, she just -- help in the sense of
she hired her as a head count producer.  "Help"
may be the wrong word.                            03:16:56

Q.    Ayesha is a woman; correct?

A.    She is.

Q.    Do you think Ms. Siddiqi didn't deserve
the job?

A.    No, she deserved it.  She's             03:17:07
unbelievable.

Q.    So what is it that Ms. Stahl did for
Ms. Siddiqi that stands or stood out?

ATTORNEY ZUCKERMAN:  Objection, asked
and answered.                                     03:17:18

A.    You know, Lesley just has a few slots.
She can choose whoever she wants.  She is arguably
the senior-most correspondent on that show.  She
takes someone from an AP job, and most APs, as I
said like a hundred times, leave the show in order  03:17:32

Page 138

Bar-On

to advance.  If she says, I'll -- you'll be under my wing and you will advance on my team, that's a huge thing that she does.

Q.    Do you have any understanding as to why 03:17:52 Ms. Stahl did that for Alex Poolos?

A.    I think she liked Alex personally.  I never had a conversation with Lesley, so this is all speculation.  I think she liked her personally.  I think Alex talks a very good game. 03:18:06 Alex makes a lot of promises, like Iran.  And Alex has good relationships in Russia, so she did get a couple of Russia stories.  I think that's pretty much it.

And, yeah, the rest you'd have to ask    03:18:20 Lesley.

Q.    Is it your testimony that Alex had I think you said one good story.  Am I correct about that?

A.    Yes.  Well, I'd say she had -- before    03:18:33 that she had the soccer story.  That was a good story.  And the Butina story, which I actually did not see, but it was a very, very good get.  So it doesn't matter how it panned out.  It was -- I didn't see -- I didn't watch it.  I was somewhere,

Page 139

Bar-On

so I didn't watch it.  But it was a very good get.
It was an A plus get, so I count that as a good
story.

Q.    Can you think of any other stories that    03:18:56
Alex was either coproducer on or producer on was a
good story beyond the soccer story and the Butina
story?

A.    That she was coproducer?  Yeah, a
couple of stories we did together I thought were    03:19:09
pretty good, but, you know --

Q.    How about as the solo producer, then?

A.    Yeah, that's what matters.  That were
good?

Q.    Yeah.                                        03:19:23

A.    No, I don't think -- if you give me the
names -- it's not such a long list -- I'll tell
you.  But I think -- no, I think they were either
not great or were bad.

Q.    And Navalny 2 --                             03:19:32

A.    Right.

Q.    -- did you think that was a good story?

A.    I thought that was a good get.  I
thought it was a very mediocre story.  I
thought -- it was -- you know, it was a B because   03:19:40

Page 140

Bar-On

it was a good get.  Having said that, he talked to everyone that day, including, like, a huge CNN documentary which was unbelievable and I think won an Oscar.

But she did get him, as well as others. I thought the piece itself was not particularly good, not particularly interesting or insightful.

(Discussion off the record.)

ATTORNEY IADEVAIA:  We can definitely    03:20:09
take a break.  Let's go off the record.

THE VIDEOGRAPHER:  The time is 3:19 p.m., and this marks the end of media unit number 2.

(Recess taken from 3:19 to 3:48.)    03:49:12

THE VIDEOGRAPHER:  The time is 3:48 p.m., and this begins media unit number 3.

Q.    I believe before the break you had testified that at some point Alex had yelled at an editor and Mr. Richmond had intervened; is that    03:49:30
correct?

A.    Yes.

Q.    Okay.  Who's the editor that she yelled at?

A.    Sean Kelly.    03:49:38

Page 141

Bar-On

Q.    And when did that happen, approximately?

A.    Before that she yelled at other editors, but that's the one case that you're asking about.  She yelled at a bunch of editors throughout the years.  The Sean Kelly thing was around -- I believe around 2015.  That was the Paris story you were talking about, I'm pretty sure.  Again, this was a decade ago.

Q.    You could hear it or you were in the room or how did you know that she had yelled at him?

A.    This was told to me.  I was not in the room.

Sean is arguably the best editor on the show.  Maybe at that time there was one that was, like, fancier, but he's retired.  But Sean is an unbelievable editor.  He is conscientious, knows the work.  He is really one of the best.  He's the one editor you always want on a project.

And I think he was -- I think this was around the issue of the rights and the fact that basically on the day of air he had to -- day before air he had to reedit the entire piece.

03:49:47

03:50:01

03:50:14

03:50:32

03:50:47

Page 142

Bar-On

And, you know, Sean's a gentleman, never raises his voice, like, really could not be a nicer guy.

And she just exploded at him.  And I know this from him.  You know, this was over the    03:51:04 rights thing.  I know that Matt Richmond had to come and either stop it or comment afterwards: She can never speak to an editor like that ever. Sean said that he will never work with her again. That was it.    03:51:23

Q.    When did Sean say this to you?

A.    Afterwards when --

Q.    Back in 2015?

A.    Yeah, yeah, yeah.

Q.    Did you ever speak to Mr. Richmond    03:51:34 about it?

A.    No.

Q.    Did Mr. Richmond ever approach you about it?

A.    No.    03:51:39

Q.    Did you ever speak to Bill Owens about it?

A.    No.

Q.    Did you ever speak to Tanya Simon about the incident?    03:51:45

Page 143

Bar-On

A.    No.

Q.    Did you ever talk to Lesley Stahl about it?

A.    Never.                                              03:51:49

Q.    How come?  How come you didn't tell Ms. Stahl?

A.    It's the same thing, you know.  I'm her manager.  I get -- you know, if there's issues, I deal with them.  Or in this case it was dealt with   03:51:59 his by manager, by Matt Richmond.  That's it.

I didn't want to stand in Alex's way; as I said, two reasons:  A, you know, I was happy to pave the way for her to leave, as many people do.  I did not want to sabotage that in any way.   03:52:21

And second, her anger management -- I mean her anger mismanagement, however you want to call it, her anger, her volatility, was such that I just -- I just couldn't deal with it.  I literally couldn't deal with it.  And it's   03:52:35 embarrassing, but it's the truth.  It's...

I mean, she would fly, she would start yelling, she would start crying.  It was overmodulated.  And a lot of times -- there were two ways to shut it down.  And this would go on   03:52:51

Page 144

Bar-On

for 20 minutes; it could go on for 45 minutes.

Oh, and there were times she would throw stuff, she would slam doors, she would throw stuff in front of people.  As I said earlier, 03:53:03 there was one time she just lay on the ground. This was in the middle of a shoot.

And there were two ways to shut -- you know -- and the issue is besides the fact that this is not how you behave at a workplace and you 03:53:13 don't behave like that to a manager ever, and it's -- you know, we actually have a job to do at the end of the day.

So if she sits and, like, talks for 25, 45 minutes, I mean, that's a big clunk of the day, 03:53:29 and things needed to get done.  That never really concerned her, because other people would do it in the end.  But I knew I would be those other people.

You could shut it down in one of two 03:53:39 ways:  either agree with her, like, placate her, say, Oh, you're right, you might have a point, I could see it from that point of view.  There was a lot of that.

She would find some narrative that she 03:53:52

Page 145

Bar-On

believed in and it would just go and on and on and on and on and on to the point where, you know, initially it would be like no, I don't think -- at the end you would say, I definitely believe it. 03:54:03 So that was one way. Or the other way was to just yell back and be like stop it.

And then sometimes we would have discussions about it and, you know, try and let's work together, let's try and make this work. But 03:54:16 it would happen again and again and again. This was with greater and greater frequency towards the end there.

Q. Towards the end being 2016 into 2017?

A. Yes, yes, yes. Everything in terms of 03:54:30 our relationship is pre-20 -- you know, pre-August, I guess, 2017.

(Discussion off the record.)

Q. You said she lied down during a shoot. Tell me about that, please. 03:54:49

A. We were in Israel, and this was -- I guess this was already in -- this was after Trump was elected, right after Trump was elected, so I guess the very end of 2016.

We were in Israel and -- it's kind of a 03:55:06

Page 146

Bar-On

complicated setup, which I'm more than happy to go into.  She was working on one of her own stories, so she -- she asked if she could come to Israel late, she could spend some time working on her    03:55:25 story and just come for the sort of actual interview or shoot.  I said fine.  So Lesley and I flew earlier.

There was -- I'm Israeli, so we had a little party with some friends.  She -- Lesley    03:55:40 mentioned it a couple days later in the shoot, and Alex was like, How come I don't know about parties, why am I not being invited to parties, and she just -- I was like it was a personal party, and had you been there, you would have been    03:55:58 invited.  She just sat on the ground and started sulking.  And then basically we didn't talk for the rest -- you know, for the rest of the day.

And, again, this is in the middle of a shoot, you know.    03:56:16

Q.    Did other people see her sitting down and sulking or sitting down and sulking?  Was she sitting or lying?

A.    She was sitting.  Sorry, she was sitting.  I don't know -- I don't think -- no one    03:56:28

Page 147

Bar-On

said anything to me, so I don't know. She had -- in that shoot she yelled at the drivers so much to the point where -- these are CBS drivers -- they said they would never work with her ever again. 03:56:43

They'd be -- I'm sure -- I mean, for years afterwards every time I would come to Israel, they would be like, Is there an associate producer Alex Poolos? I would say, No, no, no, it's someone else. Okay. Fine. 03:56:56

And again yelling at adults. That's that. I don't know if someone else saw it. Basically that was -- we hardly talked for the rest of the shoot. Oh, no. The shoot happened, and then someone at the hotel -- she got into some 03:57:11 altercation with someone at the hotel as we were going back, so she was in a horrible mood.

The taxi picked me up before her, because we came from different places. She got in, and for literally 45 minutes she yelled at me 03:57:28 to the point where the taxi driver marked -- you know, said to CBS this had happened, to the bureau chief.

She called me at the time to say is everything okay. Yeah, Alexandra was going on and 03:57:42

Page 148

Bar-On

on and on about how, you know, Israelis are all thieves, they're all misogynists, you know, you people are this, you people are that.

She got into an altercation over money with whomever at the hotel.  And I just sat there and, like, took it.  Eventually she calmed down.

Q.    Is your testimony that Alex made anti-Semitic comments during this cab ride?

A.    Anti-Israeli comments.  I think at the    03:58:10 time the two were separate things.  She didn't say...

Q.    You're Israeli; correct?

A.    I am.

Q.    You were born in Israel?                  03:58:17

A.    Yes, I'm Israeli.

Q.    Were you offended by the comments that she made?

A.    Somewhat.  I mean, she's angry.  So, you know -- I thought it was weird.  I thought it    03:58:29 was weird that the guy was listening to us.  I thought it was overmodulated.  It was not good.

I was more offended by the fact that I'm her boss and I'm getting yelled at in this taxi for 45 minutes in front of another colleague,  03:58:48

Page 149

Bar-On

this driver.  I mean, you know, whatever.

I mean, I'm sure someone, you know, miscounted money or something.  I'm sure there was some basis or whatever, because she was so angry.    03:58:58  But the "you people" comment was not cool.

Q.    And the driver you said of the car that you were in with Alex at this time was a CBS employee?

A.    He -- it was not an employee, but we    03:59:10  have -- we rent -- we hire the same cab company.  There's one guy who's the main guy.  It wasn't him.  He was the guy who got into a fight with Alex on that shoot separately because, again, there was a money thing and he said he would never    03:59:25  work with her again.  It was one of his drivers, so affiliated with us.

Q.    If I heard this correctly, you said there was a complaint made to the bureau chief?  Did I misunderstand that?                                03:59:37

A.    Well, yeah, the bureau chief had heard of it, you know, the Tel Aviv bureau chief.  And she called me and she was, like, What's going on?  And I said, you know, whatever, it's Alex being Alex.                                                     03:59:46

Page 150

Bar-On

Q.    Tel Aviv bureau chief as in a staff employee?

A.    A staffer, yes.

Q.    Which all happened in 2015?                    03:59:55

A.    2017 -- end of 2016.  Trump was --

Q.    End of 2016?

A.    Yeah.  It was a week after Trump was elected.

Q.    Did you ever share this anecdote or          04:00:06
event or incident with Little Owens?

A.    No.

Q.    With Jeff Fager?

A.    No.

Q.    With Tanya Simon?                             04:00:18

A.    Again, I shared none of these things with anyone.

Q.    No, no, I know, but I need to ask for the record.

      Lesley Stahl?                                 04:00:28

A.    No.  But the bureau chief and I did talk about it at the time, and the driver every now and again -- you know, because he's still the driver.  I mean, I was with him two days ago and I'm going to be with him tomorrow.  The main     04:00:36

Page 151

Bar-On

driver, not the actual physical driver.

Ali says, Oh, Alex Poolos, Alex Poolos, you know, because she really -- again, she yells at adults the way no adults should ever get yelled 04:00:47 at.

Q.   Okay.  You testified to some examples of Alex's anger issues manifesting themselves. Are there other examples that you can recall as you sit here today?                                    04:01:08

A.   I'm sure there are.  I think she had -- I mean, yes, is the short answer.

Q.   What do you recall?

A.   I think -- again, I've worked there for 20 years.  I've had five or six APs, the           04:01:30 average -- out of all my APs, I have great relationships with all but one.  And the average time is about three to four years of each AP, more or less.

She in the course of her four- to          04:01:45 five-year career there -- because I guess four years she technically wasn't producer -- would switch APs constantly.  Stories about that going poorly were circulating around the floor.

A lot of it actually came from my

Page 152

Bar-On

conversations with her, because she would tell me some of this stuff.  Crews were talking about it, about her, you know.

One example was this fellow Will                04:02:13
Croxton, very meek fellow, very nice guy, kind of quiet guy.  He does internet stuff.  He was trying out to be her AP on the Butina story.  And, again, I was not there, but crews who were there -- I think this was -- I think this was again -- I'm        04:02:36
not a hundred percent sure, but it was either Chris Albert or Mark LaGanga or both said that she yelled at Will, again in public, wouldn't let him come to the shoot, criticized all his work, basically, you know, insulted him visibly very    04:02:59
publicly.

Q.    And how did you find out about this?

A.    Sorry, as I said, one -- crew people told me, crew people who were there.

Q.    Did they tell you at the time or has    04:03:10
this come to light later?

A.    Later, later.

Q.    After Alex was fired?

A.    After Alex was fired, maybe after --
I'm trying to think if it was after the lawsuit or  04:03:22

Page 153

Bar-On

not.  No, I think -- yeah, maybe after Alex was fired.

Q.    Which crew person or people told you this?                                        04:03:30

A.    I told you -- it's either -- either Chris Albert or Mark LaGanga or both.  That was one thing, yeah.

Alex had a very, very, very contentious situation with Sarah Turcotte, her AP for a little   04:03:51 bit.  The thing is she couldn't hold an AP for more than a couple months.  They would just run for the hills.

Sarah -- this is strangely -- I know this mainly from Alex, because Alex sometimes --   04:04:06 it's interesting:  Alex never complained about Collette to me.  But it was -- I don't know why, but she didn't.

She complained about some of the others.  She complained about Will Croxton.  She   04:04:21 was offended that he did something; like, he made a phone call, and she said that's unacceptable.  I don't know, it came out -- I don't remember.

Sarah Turcotte, she was -- you know -- the point with Sarah Turcotte -- I think Sarah   04:04:35

Page 154

Bar-On

Turcotte is married to some guy with a big job or something.  Again, this is all from Alex.  And Alex was -- and she had a baby with a heart defect.                                                      04:04:49

And Alex was very upset that Sarah would constantly have to take the baby to this neonatal clinic.  And she said her husband can do it, her husband has a big job, he's his own boss, why isn't her husband doing it, why is she only    04:05:03 doing it.

Again, I thought it was nuts.  I thought it was not her place to say anything.  I thought that's -- you know, it's weird.  But she said it.  And it was very obvious that she and    04:05:16 Sarah were having a tough time.  Like she would keep saying it to me:  Sarah is unprofessional. There were some door slamming.  Again, we were all on the same hall.  This was before COVID.

Q.    Did you ever speak to Sarah Turcotte    04:05:30 about Alex?

A.    Never in my life.  Sarah Turcotte applied for Alex's job, but at that point I had chosen Nathalie.  So I think -- it was awkward, so I didn't talk to her ever.  I didn't -- I say hi    04:05:46

Page 155

Bar-On

to her in the office, but that's the extent of it.

Q.    What is Sarah doing now?

A.    She is Henry Schuster's AP.  But he
lives very far away.  I never see her.                04:06:00

Q.    Did Alex hire Ms. Turcotte to be her
AP?

A.    I'm not a hundred percent sure.  Alex's
complaint was, you know -- there was a huge
turnaround of APs.  There was, you know, Jack and   04:06:15
Kate and Will and Sarah, in a very short amount of
time.  It's very unusual.

But her complaint to me was, Oh,
they're just giving me people inside the show.  I
don't get to hire my own AP; I get to just inherit  04:06:31
these people.

And I should say that it's a very
strange thing to say because in fact you do want
people from inside the show because then you don't
have to train them.  As I think I said, it takes    04:06:47
about two years to figure out the job, and
basically someone -- you know, they figure it out
by the time -- it didn't make sense on the face of
it.  But, you know, when Alex gets a theory, I
just let her run with it.                           04:07:00

Page 156

Bar-On

So, yeah.  So I think -- so I don't know if she technically was -- inherited her officially or there was a tryout.  I don't -- I don't know the details of that.  But they were 04:07:15 working together.  And then I think after that, because it went so poorly, they let Alex hire outside, and she hired I believe Collette.

Q.    Is it your understanding that Kate Morris was assigned to work for Alex as her AP?  04:07:28

A.    Again, I'm not privy to this conversation, so I don't know if it was like a real marriage, like the way I have with Nathalie or someone from inside a hundred percent or it was a temporary tryout.  04:07:44

I think Kate Morris is also friends with Alex.  I think that was a little bit I think weird to Alex.  Alex said that Kate wasn't smart enough, that she was really good on logistics but not editorially.  So that was an issue.  04:07:58

But I don't know to what extent it was like a tryout or let's see if we figure it out.  I think Jack was temporary.

Q.    Are you aware of any complaints by Jack about Alex?  04:08:14

Page 157

Bar-On

A.    Yes.

Q.    What are aware of?

A.    Very little.  This I think was said at the time.  I wonder if this was said by the crews or -- I don't think it was said by Lesley but this was around -- they worked around the soccer story.

And I think things were not going -- something happened in the story itself, you know, the Iranians pulled -- you know, bad things happen on shoots, and it was one of those cases.

And so -- Alex, when she is very stressed and pressured, her response is to sort of lash out, to release anger, to hurt someone.  So I think that that happened with Jack.  I think she just went crazy on Jack and -- but Jack doesn't take that kind of talk from someone, and Jack said, You can never, ever, ever, ever talk to me like that again.

Q.    How do you know that?

A.    I think, again, it's either I think crews told me.  I think Mark LaGanga was a crew person at the time.  I think maybe Jack gave a version of the story too at the time.

Page 158

Bar-On

Q.    To you?

A.    To me.  Jack is friendly with her.  I think they're still friends.  You know...

Q.    Did you ever have any conversations    04:09:35 with Kate Morris about working with Alex?

A.    No.  I worked with Kate Morris briefly on a story many years ago, way before the Alex thing but...

Q.    Are there any examples of Alex's anger    04:09:45 manifesting itself at 60 Minutes that you haven't testified to yet?

A.    I have to think.  There were so many cases.  There was one case with this woman named Jaime -- I think Jaime Woods.  I get them    04:10:03 confused, either Jaime Woods or Jaime Mars, one or the other.  She's a fellow AP on the show.  I'm pretty sure it's Woods.

They were -- we used to have a cafeteria, and Jaime Woods was with Bill's    04:10:18 assistant at the cafeteria getting, I don't know, coffee.  And Alex came in, and Jaime -- and Jaime said, Oh, I heard you're having, like, problems -- she was making conversation, but she something like, Oh, I heard the story is very difficult or    04:10:37

Page 159

Bar-On

the shoot was very difficult, something inane and totally just innocuous as far as I think Jaime was concerned.  But Alex exploded, but it was next to Bill's assistant.                                    04:10:51

So Alex then went to Jaime's office and yelled at her like how care you speak to me like that, how dare you speak to me like that in front of Bill's assistant.  And I think Jaime was so rattled -- Jaime at the time was Shari          04:11:06 Finkelstein's AP.

So Shari told me about this incident, and Shari said -- Shari said what does -- should she go to HR, should she not go to HR.  But -- yeah, I don't know what ended up happening.          04:11:37 Everyone was kind of talking about it for the day. It's a very chatty floor.

Q.    When did you learn about this?

A.    This was -- this was -- Alex was still around.  She was -- I don't know -- she was no          04:11:46 longer my AP.  This was a couple -- during those five years she was a producer, or four years.

The only other thing that comes up is Claudia once said that an AP came to cry to her over Alex, and Claudia went to Alex and said, you   04:12:10

```
                                                    Page 160
                            Bar-On

know, you have to apologize for -- I don't know

who the AP is -- you have to apologize to him or

her.  I assume it's Sarah Turcotte, but I don't

know.                                              04:12:30

     Q.    How do you know about that incident?

     A.    Claudia told me at some point.

     Q.    When did Claudia tell you this?

     A.    She told me -- she told me after the

lawsuit was filed.  Um...                          04:12:46

     Q.    Well, hold on.  Hold on.  I just want

to ask a couple questions.

           In what context were you talking to

Claudia that Alex came up?  What was the

discussion?                                        04:13:03

     A.    As I said before, you know, right after

the lawsuit was filed, pretty much everyone on the

show -- not everyone.  Many people on the show

came and said, We're really sorry, you know, you

don't deserve this, we know who you are.           04:13:18

           I said to everyone what I was -- I

guess whatever I was said I was told:  I can't

talk about this case at all.  I know who I am, I

know who she is.  And a couple of people -- I

mean, Claudia comes to mind -- was like, well, you  04:13:35
```

Page 161

Bar-On

know, I know, because she made an AP cry in my

office and I asked her to apologize, and she said

no.

Q.    What else did Claudia say to you?  I    04:13:46

just -- I want to be clear because at the

beginning of the deposition I had asked you about

discussions you had related to the lawsuit --

A.    Right.

Q.    -- and you told me you didn't have any    04:13:54

substantive discussions.  So I want to just be

very clear.

A.    Right.

Q.    Who have you talked to about the

lawsuit at 60 Minutes and what did they say?  You    04:14:02

have now disclosed a conversation that you had

with Claudia.  So why don't you tell me anything

else about Claudia but tell me about others.

A.    No, that's it.  It's not about the

lawsuit; it's about -- I mean, I see a difference.    04:14:10

I mean, I didn't -- I mean, you walk in after your

whole life has been laid out with lies --

right? -- and things that were not, you know --

you walk in.  You know, I'm not allowed to talk

about anything.  I'm not allowed to say anything.    04:14:26

Page 162

Bar-On

I say, I can't talk about anything.  So Claudia just said this.

Q.    Did she say anything else?

A.    No.                                              04:14:34

Q.    Okay.  Why don't we do this:  Since the filing of the lawsuit, have you had any discussions about Alex Poolos with anybody at 60 Minutes beyond what you've already testified to?

A.    Nathalie, who works at 60 Minutes, said  04:14:51 that, you know, I'm sorry, but if there's -- you know, if you ever need someone to say what a boss you are -- I was the boss -- you know, she was -- I was her boss immediately after.  I said thank you.                                              04:15:12

Again, immediately after there was, like, an outpouring, but I don't consider these discussions, you know.  I don't consider this -- I mean, I don't talk about facts, I don't talk -- I don't talk about anything.                          04:15:23

I mean, does that -- I mean, it's a workplace where I worked for for 30 years.  I get that.  And, you know, this woman who was getting every single opportunity in the show, which a lot of people didn't get, just -- you know, just lied  04:15:34

Page 163

Bar-On

and lied and lied and put all this stuff out there.

You know, they come to me.  They say, you know, we're really sorry for this, we're, you know -- I was embarrassed to walk into the office.  I mean, I was doing October 7th.  I came back.  And it happened we moved a floor.

It was embarrassing for me to walk into the place where I worked for for 20 years, where I mentored women, where I mentored colleagues, where I've done work.  Why?  Because this client of yours decided to lie.

Q.    Yeah, I understand your perspective.

A.    Right.

Q.    My question is did you have discussions with people that is not just I'm sorry this happened to you, about Alex Poolos after she filed the lawsuit.

ATTORNEY ZUCKERMAN:  I just want to make sure we understand the question, because I think there are at least three different questions that have been asked today.  One is have you discussed the lawsuit.  And most of what he's testified to that I think you're

Page 164

Bar-On

reacting to isn't actually set forth in the lawsuit.

Then there was the discussion did you have discussions about Alex Poolos.  That was like a minute ago.

Now I think you've just asked a third question.

I'm not objecting to asking those questions.  I want to make sure the witness is answering the one you want him to answer and the one that's responsive.

ATTORNEY IADEVAIA:  Yeah, I mean, I disagree, and I think there's a level of parsing happening here.

Q.    But I will ask you again --

A.    Okay.

Q.    -- what discussions did you have about Alex Poolos after the lawsuit was filed.  I'm not interested -- I know you said there's an outpouring of support --

A.    Right.

Q.    -- and people said they're sorry.  I'm not asking about that.  You've already made that clear.  But substantively what discussions did you

04:16:38

04:16:45

04:16:55

04:17:02

04:17:10

Page 165

Bar-On

have about Alex Poolos?

ATTORNEY ZUCKERMAN:  Objection.  I don't know how he can answer the question because you've excluded the outpouring and    04:17:15 that is --

ATTORNEY IADEVAIA:  I don't need him to say the outpouring.  I need --

ATTORNEY ZUCKERMAN:  My objection stands.    04:17:24

Q.    Just tell me any discussions you had about Alex, please.

A.    I understand.  But here -- when you say "outpouring," what you're talking about is -- we'll use Claudia.  You know, she said, I'm really   04:17:32 sorry this happened to you.  This is really -- you know, I'm really sorry.  And I would say, I can't talk about this.  And she'd say, I know.  You know, I had a woman -- you know -- she didn't say woman; she said AP come, and she told me this    04:17:47 story.

So I'm not discussing anything; I'm hearing this.  This is -- there's versions of that, you know.  I'm trying -- again, Nathalie said, you know, I was -- you hired me right after   04:18:01

Page 166

Bar-On

Alex -- and we know the allegations and I bet we're going to go through them next time.

But, you know, she says, like, I never hire women, I'm against children or whatever she said there.  I mean, there's a more specific way to characterize it.

You know, I hired Nathalie when she had an infant, and immediately she became pregnant and had a second kid.  We had an unbelievable relationship.  The fact that she had -- you know, based on what you put in writing and was spread all over the internet was very specific about how I don't hire women with kids or how I --

Q.   There was no such allegation.  That is not the question.

A.   Okay.  Okay.  No, no.

Q.   Please answer the question.

ATTORNEY ZUCKERMAN:  I don't know what the question is.

A.   What is the question?

Q.   My question is discussions about Alex Poolos after you filed the lawsuit.

A.   No, that --

Q.   After the lawsuit was filed.

Page 167

Bar-On

ATTORNEY ZUCKERMAN:  Other than what he's testified to.

ATTORNEY IADEVAIA:  Other than what he's testified to.                                  04:18:56

ATTORNEY ZUCKERMAN:  Fine.

A.    No.  I mean, again, I'm being -- I'm trying to think of some of the outpouring that someone then -- no, because all these APs said, We'd testify about you.  So that's not about Alex;   04:19:09 that's about me.  There was a comment from Claudia that we said.

The day it was filed, Bill Owens called me and said, you know, keep working, you know.  We know what this is, you're going to be fine, keep   04:19:30 working.  Again, it's not about Alex; it's about me and knowing me for however many years.  Lesley, the same.  We've talked about that.

If you have any -- no, you know, Jack said keep your head down and keep working.  That's   04:19:51 Jack Weingart.  That's not about Alex.

I'm thinking.  I'm not --

Q.    Sure.  That's fine.

A.    -- being difficult here.

Q.    Please take your time.                           04:20:12

Page 168

Bar-On

A.    I did not talk about it with Kate.  I did not talk about it with Will Croxton.  I think that's about it.

Q.    Okay.  And are there any other                04:20:34 instances that you're aware of of Alex expressing or acting in a way that you thought was inappropriate in terms of her anger beyond what you've testified to?

A.    I'm sure there is.  I can think of --        04:20:47 you know, I can think of others.  This is -- I'm sure there is.  I'm sure once we're done here I'll be like, oh, there's this great thing I forgot to say but -- example, this concrete example.

It was a daily occurrence.  It was            04:21:04 literally -- I mean, I can't stress enough that this was such a daily occurrence that I would hear her footsteps and I would get a knot in my stomach that I didn't know what was coming.

I mean, sometimes she was perfectly          04:21:18 nice, Alex.  You know, she can be funny.  She can be -- and the truth is a way to navigate this bomb was a lot of times, like, divert to that, you know, just have chatty conversations with her and she'd be fine.                                             04:21:33

Page 169

Bar-On

But any time it went to work, went to her responsibilities, to her doing her job, it was always -- it was not always; it was -- a lot of times it was terrible.                                04:21:42

Q.   When she was your AP, you were one of her supervisors; correct?

A.   Yes.

Q.   I mean in addition to either Tanya Simon -- I guess at the time Bill Owens right?   04:21:48

A.   Yeah.

Q.   Correct?

A.   Yes.

Q.   Didn't you think it was incumbent upon you, given this person that you've just described   04:21:56 for the last few hours, this person whose anger was uncontrollable at times, who repeatedly acted inappropriately, who was not doing her job, didn't you think it was incumbent upon you to report this person?                                       04:22:13

ATTORNEY ZUCKERMAN:  Objection.

A.   Clearly not, because I didn't do it.  I thought, you know, I'll handle it myself.  I gave her a lot of leeway initially, because, again, the two years.                                         04:22:21

Page 170

Bar-On

And I thought about your question a lot, I mean, in retrospect, like why did I put up with that stuff.  Contrary to the lies she put in there, I'm not a confrontational guy.  You can ask 04:22:30 all my other APs.

And, you know, I was just -- for two years I kind of gave her the benefit of the doubt.  After that I figured I'll manage her and in a year or two she'll -- or a year she'll be gone.  By 04:22:45 year five when I realized I'm stuck, I went to Lesley and I said, I can't do this anymore.

Q.    But you took no steps to correct her behavior; correct?

A.    Well, we -- I talked to her a lot. 04:22:55

Q.    You talked to Alex?

A.    Yes.

Q.    Outside of speaking to Alex?

A.    No.

Q.    She was promoted to producer; correct? 04:23:03

A.    Yes.

Q.    And in that role as being promoted to producer, she supervised APs; is that right?

A.    Sure.

Q.    And yet you did nothing to intervene 04:23:16

Page 171

Bar-On

with this awful behavior that you've just described for a couple of hours?

ATTORNEY ZUCKERMAN:  Objection.

A.    We're not on the same team.  It's not, you know -- no.

Q.    Did you ever have an argument with Bill Owens, you and Bill Owens?

A.    Ever, yes.

Q.    What did you say, sorry?

A.    Sorry, yes.

Q.    How many arguments have you had with Bill Owens?

ATTORNEY ZUCKERMAN:  Objection.

A.    There were a few.  So meaningful arguments, four or five.

Q.    And what were those arguments about?

A.    The first one was over -- was in financial crisis, and I got a whistleblower from Lehman Brothers.  And he made me turn that story to another team, a complicated setup but -- so I was very upset about that.

That wasn't -- I mean -- he didn't yell or anything, but it was -- it was an argument. This was in his role as Tanya Simon, as number

Page 172

Bar-On

two.

A second time was I got an interview with the head of the Mossad, Meir Dagan, who has since died.  And he delayed the broadcast by a    04:24:50 week, which I thought was a huge mistake because that way we could break news and then we ended up not breaking news.  That was a second fight.

I'm trying -- I mean, there were a couple more.  That, that -- there was that night    04:25:04 where we described in 2015 with Paris where -- oh, no, before that, in 2014 Alex and I worked on a story called the clean tech crash or something or clean tech that you can argue whether it had fact problems or not.  It had a tone problem for sure.    04:25:30

And Bill was very angry at that, because we got a lot of heat on the internet for it.  So that was -- that was -- he yelled at me on that one, and I had it coming.  I think to a certain extent Alex was to blame, but I was    04:25:47 equally to blame, so I can't -- I can't take it.

Then there was the 2015 over Paris.

I believe that's it.  I might be missing one but -- in his new role I have -- he has never yelled at me.    04:26:09

Page 173

Bar-On

Q.    Did you ever tell Alex there was a time or times that you lost your temper in an interaction with Bill Owens?

A.    He's my boss, and he is a pretty    04:26:19 intimidating guy, or at least was, in that previous role.  I lost my temper -- I mean, I was angry.  I don't think I lost it in front of him because it was not -- the power dynamic wasn't such that it allowed for that.    04:26:35

Q.    Did you ever tell Alex that you believed losing your temper with Bill Owens damaged your relationship with him?

A.    I think those fights -- yeah, I mean, I think those fights -- again, it's not -- I mean, I  04:26:46 don't think losing my temper was -- I think that these arguments did cause me to -- the first two.

ATTORNEY ZUCKERMAN:  He's asking whether you ever told Alex that, not whether it's true.    04:26:57

ATTORNEY IADEVAIA:  All right.  I mean, come on, you don't need to testify.

A.    No, no, no, you're asking --

ATTORNEY ZUCKERMAN:  Was that not your question?    04:27:07

Page 174

Bar-On

A.    I think those decisions [sic] with Bill Owens hurt my relationship with him at the time. I mean, it's not losing my temper because I didn't -- you can't lose your temper in front of your boss, but, you know -- yeah.

Q.    Did you ever engage in a contract negotiation with CBS News in which you decided to not ask for a pay increase because of concerns you had about your employment status?

A.    In my second contract, as I said, the first two years had been rough, I think I just decided to take -- yeah, I think it was like a tough time also or whatever.  So I think the lawyer suggested just to stay flat or virtually flat.

Q.    Did you ever discuss with Alex that you preferred to work with female APs because they don't ask for as much credit as male APs do?

A.    Absolutely not, false, completely false.  This is one of these cases where Alex would get a theory in her head, go over it again and again and again.  It was just not true.

Q.    Did she ever share that theory with you?

Page 175

Bar-On

A.    Yes.  She would say it in the room. And I'm sure Alex in her way, like, convinced herself that I agreed with her or that I said that.  It's a very common Alex thing to do.    04:28:37

Q.    How many times did Alex bring that up?

A.    I don't know.  Um -- I don't know.  The point is it's not true.  And I had plenty of male APs, by the way, at NBC.  I worked at ten years at NBC before -- many male APs.  I interviewed male    04:29:00 APs.  In fact, I wanted to interview -- hire a male AP for Alex's job.  It just didn't work out, not because of me.

Q.    Okay.  You testified earlier in effect -- and you can correct me if I'm wrong --    04:29:16 that Lesley went to bat for Alex multiple times. Do I have that correct?  Did I say that correctly?

A.    More or less.  I mean, she went to bat for her in the sense of she took her as a producer on her team and then stayed with her despite low    04:29:32 productivity, despite having a couple of very problematic stories, despite, you know -- I mean, those two.

Q.    Are you aware of any conversations that Lesley Stahl had with Bill Owens that you would    04:29:48

Page 176

Bar-On

consider Lesley going to bat for Alex?

A.    No.

Q.    And have you had discussions with Lesley in which she expressed concerns to you about Alex's job performance?    04:29:58

A.    At the time that she was working with us?

Q.    Yeah.

A.    You know, I think -- you know, Lesley would roll her eyes and say, you know, productivity -- Lesley was frustrated by the productivity so -- she would say -- she could say stuff like, Oh, you know, okay, you do this story, I don't know when I'm going to get a next story from Alex, it'll be in a year, you know, that kind of stuff.  It wasn't, like, a meaningful conversation.  But, you know, I think she was frustrated by the productivity.    04:30:10    04:30:24

Q.    Based on those comments?    04:30:37

A.    Yeah.  And based on the fact it's drilled to us:  four stories a year, five if you're good.

Q.    Did Lesley ever express concern to you that that the stories that Alex worked on were not    04:30:47

Page 177

Bar-On

of good quality?

A.    No.  Oh, I will say Alex herself said to me once that she had a job review with Bill -- I guess it was with Bill, or maybe it was Jeff; I don't remember -- and that they told her she was swinging from the fence or some baseball metaphor that as an Israeli I didn't know but I understood what it meant.

04:30:59

She then said that but they asked her to do some meat-and-potato stories as well.  She told me that they were worried about her productivity.  So that was -- I remember that statement because I felt it was a bunch of mixed metaphors.  But she did tell me that, that they were concerned about her productivity.

04:31:14

04:31:29

Q.    And when was that discussion?

A.    That would have been when she was a producer, probably a couple years in.  I don't know.

04:31:39

Q.    And was the conversation you had with Alex -- what was -- how did you have it?  Was it by phone?  text?  some other way?

A.    I think this was in person.  They were doing reviews or something, and she asked, How was

04:31:51

Page 178

Bar-On

mine?  And I said, Fine.  How was yours?  And she said, Well they said, you know, I'm swinging to the fences but I should also do meat-and-potato stories.                                                    04:32:04

Q.    Did Alex ever tell you at any point in time that she believed her job was in jeopardy?

A.    Yes.

Q.    When did she tell you that?

A.    Throughout, you know, because she would  04:32:10 get into fights with Lesley.  She had very low productivity.  She would often say, oh, you know, maybe I'm the next one to get fired, because there were cuts all the time throughout this period.

Q.    And Alex was never cut -- correct? --    04:32:23 until --

A.    She was never cut.

Q.    Until she got fired, she continued to work there?

A.    Yes.                                        04:32:32

Q.    So this person who your view is does -- at points didn't do her job, that you had personal experience with that, who had this serious anger problem and the stories that she did complete you thought for the most part were not of good    04:32:42

Page 179

Bar-On

quality, do you have any explanation as to how she ended up working at the show for ten years?

ATTORNEY ZUCKERMAN:  Objection, misstates testimony, and it's argumentative.   04:32:52

But go ahead.

A.   Yeah, no, I mean --

Q.   Well, do you disagree with my characterization?

A.   No, I think that's a very valid   04:32:59 question, and I think you interviewed people who were her real bosses here.  And I'm sure they -- they're in a much better position to answer this than I am.

I think it's a very forgiving show.  I   04:33:08 think it's a show that once you're in gives you a lot of opportunities.  I think -- I was never retaliatory towards her, despite what she lies about.

You know, I think -- I think she had a   04:33:20 lot of opportunities given there, and she squandered every single one of them, took no responsibility for it, and then, you know -- and then went to besmirch all these people, mainly me, having nothing to do with anything of her since   04:33:39

Page 180

Bar-On

2017.  So, yeah, I wonder that myself.

Q.    Do you wonder why or how it is that she got promoted from AP to producer?

ATTORNEY ZUCKERMAN:  Objection.                04:33:52

A.    I always wondered what would happen if they came to me and asked me about her job performance, like would I be fully honest or would I be -- just let her be just out of my life.  Or if I were fully honest, she would not have gotten   04:34:11 promoted, she would have gone after me, because that's what she does in her explosiveness.

No one ever asked me, so you, you know what, I was like 2017, you're out of my life.  I see you in the hall; I say hi to you.  If there   04:34:26 are some issues over crews or something, we can solve it, be nice to each other.  That was it.

Q.    Given the widespread problems with Alex Poolos's conduct and performance, is it surprising that Bill Owens would know nothing about that?   04:34:40

ATTORNEY ZUCKERMAN:  Objection.

A.    She manages up very, very well.

Q.    And when you say "manages up," you mean Bill Owens and who else?

A.    And Lesley.  When I went to Lesley, she   04:34:50

Page 181

Bar-On

was, like, I thought you were great friends because you're always laughing together. I think -- I think she's very good when she needs to be to manage up. She just is. But looking down, 04:35:02 it's not pretty.

Q. But you were her manager.

A. I know. But we also had a very daily relationship. You're right. You're right. And she should never have treated me the way she did. 04:35:14

ATTORNEY IADEVAIA: I think we can --

Q. Oh, I just have one clarification. Earlier today -- and I wasn't sure I heard you correctly -- you said something about -- "wuss" was the word you used. Were you saying that Alex 04:35:32 called you a wuss or you said you could call me a wuss if you want?

A. I was -- yeah, she never called me a wuss. This was me describing my own behavior.

ATTORNEY IADEVAIA: Okay. So we can 04:35:45 break for the day. Just to say for the record that we have agreed to continue the deposition on a second day, and we're working out that date. I appreciate defense counsel accommodating given the circumstances. 04:35:57

Page 182

Bar-On

ATTORNEY ZUCKERMAN:  Absolutely.

THE VIDEOGRAPHER:  We're going off the record at 4:36 p.m., and this concludes today's testimony given by Shachar Bar-On.    04:36:04 The total number of media units used was three and will be retained by Veritext.

(Time noted:  4:36 p.m.)

_____

SHACHAR BAR-ON

Subscribed and sworn to before me this ___ day of _____ 2025.

_____

Notary public

Page 183

C E R T I F I C A T E

STATE OF NEW YORK        )

                         : ss.

COUNTY OF NEW YORK       )


        I, LAURIE A. COLLINS, a Registered Professional Reporter and Notary Public within and for the State of New York, do hereby certify:

        That SHACHAR BAR-ON, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

        I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto set my hand this 31st day of March 2025.


LAURIE A. COLLINS, RPR

Page 184

- - - - - - - - - - I N D E X - - - - - - - - - - -

WITNESS:              EXAMINATION BY:              PAGE

Shachar Bar-On    Attorney Iadevaia                5

- - - - - - - - - E X H I B I T S - - - - - - - -

NO.                    DESCRIPTION              PAGE

- none -

```
                                                       Page 185


        - - - - - - - E R R A T A   S H E E T - - - - - -


     CASE:  Poolos v. Paramount Global
     DEPOSITION DATE:  March 19, 2025
     DEPONENT:  Shachar Bar-On


     PAGE/LINE(S)          CHANGE                    REASON

     ____/_____/_____/_____

     ____/_____/_____/_____

     ____/_____/_____/_____

     ____/_____/_____/_____

     ____/_____/_____/_____

     ____/_____/_____/_____

     ____/_____/_____/_____

     ____/_____/_____/_____

     ____/_____/_____/_____

     ____/_____/_____/_____

     ____/_____/_____/_____

     ____/_____/_____/_____

     ____/_____/_____/_____


                        _____
                             SHACHAR BAR-ON
     SUBSCRIBED AND SWORN TO BEFORE ME
     THIS_____DAY OF_____, 2025.


     _____  _____
     NOTARY PUBLIC          DATE COMMISSION EXPIRES
```

Page 186

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

ALEXANDRA POOLOS,                    )
                                     )
              Plaintiff,             )
                                     )
         vs.                         )    No. 1:23-cv-08896
                                     )        (GHW)(HJR)
PARAMOUNT GLOBAL; CBS                )
BROADCASTING, INC.; and             )
CBS NEWS, INC.,                      )
                                     )
              Defendants.            )
------------------------            )

April 2, 2025

12:18 p.m.

Continued deposition of SHACHAR BAR-ON, held at the offices of Davis Wright Tremaine LLP, 1251 Avenue of the Americas, New York, New York, before Laurie A. Collins, a Registered Professional Reporter and Notary Public of the State of New York.

Page 187

A P P E A R A N C E S:


VLADECK, RASKIN & CLARK, P.C.

Attorneys for Plaintiff

111 Broadway, Suite 1505

New York, New York 10006

BY:   JEREMIAH IADEVAIA, ESQ.

jiadevaia@vladeck.com


DAVIS WRIGHT TREMAINE LLP

Attorneys for Defendants

1251 Avenue of the Americas

New York, New York 10020

BY:   LYLE S. ZUCKERMAN, ESQ.

lylezuckerman@dwt.com


ALSO PRESENT:

ALEXANDRA POOLOS

PAUL BAKER, Videographer

Page 188

THE VIDEOGRAPHER:  Good afternoon.  We are going on the record at 12:18 p.m. eastern daylight time on Wednesday, April 2nd, 2025.

This is media unit 1, Volume 2, of the video-recorded deposition of Shachar Bar-On in the matter of Alex Poolos versus Paramount Global, et al.

This deposition is being held at Davis Wright Tremaine LLP located at 1251 Avenue of the Americas, New York, New York.

My name is Paul Baker, and I am the videographer.  The court reporter is Laurie Collins.  And we are both from Veritext.

Appearances will be noted on the stenographic record.  The witness has been previously been sworn.  You may proceed.

S H A C H A R   B A R - O N ,
    resumed as a witness, having been previously sworn by the notary public, was examined and testified further as follows:

EXAMINATION CONTINUED BY
ATTORNEY IADEVAIA:

Q.   Good afternoon, Mr. Bar-On.

A.   Good afternoon.

Page 189

Bar-On

Q.    You understand this is day two, a continuation of the first day of your deposition; correct?

A.    I do.                                                    12:19:51

Q.    And I had given some ground rules the first time.  Do you remember those ground rules about the deposition:  To make sure to let me fine my question and I will let you finish your answer?

A.    I do.                                                    12:20:06

Q.    Among others.

Are you on any medication today that would affect your ability to testify truthfully and accurately?

A.    No.                                                     12:20:13

Q.    And are you aware of any reason you wouldn't be able to testify truthfully and accurately today?

A.    No.

Q.    And you understand you are under oath    12:20:20 as you were the first day of your deposition; is that correct?

A.    Yes.

Q.    Other than counsel or a spouse, have you spoken to anyone about your first day of    12:20:28

Page 190

Bar-On

deposition?

A.    No.

Q.    Did you speak to Lesley Stahl about it?

A.    I said it happened, and that was it.    12:20:35

Q.    Did you discuss with Ms. Stahl any substance related to the first day of your deposition?

A.    Zero.  I told her I'm going to have to have another half.    12:20:44

Q.    Okay.  Anything else?

A.    No.

Q.    Did you speak to Bill Owens about the first day of your deposition?

A.    I haven't spoken to him at all, I mean    12:20:50 besides work stuff.

Q.    All right.  Mr. Bar-On, is there someone you work with at 60 Minutes named Matt Richmond?

A.    Yes.    12:21:03

Q.    And he currently works for 60 Minutes; is that correct?

A.    Yes.

Q.    And what's his job there?

A.    He is in charge of editors and editor    12:21:12

Page 191

Bar-On

schedules, so he assigned editors to producers and stories.

Q.    And to your knowledge does he work exclusively for 60 Minutes or does he work for other shows?    12:21:22

A.    I believe exclusively to 60 Minutes or anything -- any shows that stem from it, in case we do specials or stuff like that.

Q.    Do you know approximately how many editors report to Mr. Richmond, how big the edit team is for 60 Minutes?    12:21:35

A.    I actually don't know the number.

Q.    Are you aware of any complaints against Mr. Richmond?    12:21:47

A.    I know there was -- well, A, we all complain all the time, because there's just a certain number of editors and a certain number of producers and a certain amount of stories.  And some editors people like more than others; some editors people work with more than others.    12:22:02

Matt is very strict about basically showing no favors, showing -- basically he does it by grid.  And, you know, you can request whatever you want to request, but at the end of the day he    12:22:20

Page 192

                           Bar-On

decides.

So there's obviously always -- it's not complaints; it's just staff members talking to each other saying, Oh, I got an editor I don't like or, you know, that kind of stuff.

I know several years ago there was a meeting with a bunch of producers initiated by some producers to kind of raise this, so I know that happened.  I mean, it's more of the same.

Q.    Okay.  Who do you understand initiated that meeting with the producers?

A.    I think it was Ashley Velie.  It might have been Ashley with someone else.  I don't remember.

Q.    Does Ms. Velie still work for 60 Minutes?

A.    Yes.

Q.    And is she a producer there?

A.    She is.

Q.    Is she assigned to a team?

A.    I don't -- maybe Sharyn.  I don't know.

Q.    Sharyn is a correspondent at 60 Minutes?

A.    Sharyn Alfonsi.  But, you know, I don't

Page 193

Bar-On

know.

Q.   At the time that Ms. Velie may have initiated this meeting you say a couple years ago, was she assigned to a correspondent?   12:23:30

A.   I assume.  I don't know to -- I mean, I think she came in with Scott Pelley, and I think at some point she transitioned.  I don't know if before or after.

Q.   And Mr. Pelley is a correspondent at 60   12:23:44 Minutes?

A.   Certainly is.

Q.   How did you learn about this meeting that Ms. Velie may have organized?

A.   I think there was a group invite.  This   12:23:55 was a few years ago so -- I mean, we were all invited.  It wasn't some secret meeting.

Q.   When you say "all," who are you referring to?

A.   Producers.   12:24:06

Q.   At 60 Minutes?

A.   Yeah.

Q.   And did you attend this meeting?

A.   I did.

Q.   And do you know if Ms. Poolos attended   12:24:10

Page 194

Bar-On

this meeting?

A.    I don't -- I think so, but I don't remember.

Q.    How was this meeting conducted?  Was it  12:24:18 in person?  Was it by Zoom?  Was it something else?

A.    It was a Zoom meeting.

Q.    Do you recall how many producers were part of that meeting?                    12:24:27

A.    I don't.  I don't.

Q.    Do you know if it was more than ten?

A.    Yeah, I think it was more than ten.

Q.    And before you got to the meeting, did you have an understanding as to what Ms. Velie  12:24:37 wanted to discuss?

A.    Just Matt Richmond and editor assignment.

Q.    Do you know if that was reflected in the group invite that you believe you received?  12:24:47

A.    I mean, I knew -- we knew what the meeting was about, so it must have.

Q.    Do you recall having a discussion with anyone before the meeting about this meeting?

A.    I don't, either way.                  12:25:03

Page 195

Bar-On

Q.    And what was said during the meeting?

A.    I believe people raised the same concerns that they raise, you know, in private: You know, I don't get my editor, you know, that kind of stuff.  You know, Matt Richmond is unattentive to my requests, stuff like that.

Q.    Do you remember anything else being discussed during that meeting beyond producers raising concerns about not getting the editors that they had requested?

A.    That was the reason for the meeting, so it was all variations of that.

Q.    Was there any concerns raised about Mr. Richmond's demeanor?

A.    I'll try to think how best to answer that.  I mean, Matt is very specific.  He, you know, just calls it as it is.  He's very businesslike, you know.  He doesn't -- you know -- he's a very dry fellow, so, you know, so -- I don't remember if there were specific complaints about his demeanor, but if there were, that would have been the question.

He's not a touchy-feely guy at all. He's, like, this is the job, these are the editors

Page 196

Bar-On

I have, this is my grid, this is how -- you know, this is who we have available or not available. And mind you, he does try to give people editors they want.                                                      12:26:47

Q.    During this meeting with the producers that you've been testifying to, was there any discussion about Mr. Richmond's communication style?

A.    Just what I just said.                          12:26:57

Q.    Was there any concerns raised about him being condescending or words to that effect?

A.    I don't remember words to that effect.

Q.    Was there any concerns raised that Mr. Richmond was obnoxious?                                 12:27:14

A.    Again, this is a word you're using. He's very -- I'll just repeat it.  He's not a touchy-feely kind of guy.  So, you know, if you don't get the editor you want, he's, like, just deal with it, this is who you have.            12:27:30

So if you call that obnoxious, it's obnoxious.  I don't necessarily see it that way. And I don't know if that was actually said, that word, during the meeting.

Q.    Did anyone during the meeting describe    12:27:40

Page 197

Bar-On

Mr. Richmond as verbally abusive?

A.    No.  He isn't.

Q.    Do you have an opinion as to whether Mr. Richmond likes or dislikes Lesley Stahl?    12:27:58

A.    I don't think Matt Richmond likes many of us, but I don't have any specific -- I think Lesley is very senior.  Lesley likes certain editors and does not like certain editors.  And she likes -- she makes it known.  So when she    12:28:18 doesn't get the editors she wants, she makes it known.  I mean, that's -- I don't think it changes his opinion one way or the other.

And, again, I will say that by and large we get editors we want.    12:28:32

Q.    Do you believe that Mr. Richmond has ever been a jerk to you?

ATTORNEY ZUCKERMAN:  Objection.

A.    I think jerk -- have I gotten editors I don't like?  Yes.  Have I made it known I really    12:28:46 don't want to work with these people?  Yes.  Did I still have to deal with them?  Yes.

Q.    Did you ever believe when Mr. Richmond was communicating with you that he communicated in a way that made you feel like he was being a jerk?  12:28:57

Page 198

Bar-On

A.    I mean, I could see it.  Yeah, I could see it.  He's just, like, deal with it.  If that's a jerky kind of thing, then yes.

Q.    Have you ever had discussions with    12:29:14
Lesley Stahl about Matt Richmond not liking Ms. Stahl?

A.    No.

Q.    Have you ever had a conversation with anyone about Mr. Richmond not liking Ms. Stahl?    12:29:22

A.    I don't recall.

Q.    Did you ever speak -- when I say "speak," I mean either orally or in writing.  Did you ever have a discussion with Ms. Poolos about Mr. Richmond not liking Ms. Stahl?    12:29:42

A.    Could be.  I don't know.

Q.    Do you remember ever discussing that with Ms. Poolos?

A.    I would say if I did.  I don't remember.  Not to say it didn't happen but...    12:29:50

Q.    Was there any follow-up after the meeting that you believe Ms. Velie had initiated related to Mr. Richmond?

A.    I don't know.

Q.    Did you have any understanding that --    12:30:09

Page 199

Bar-On

strike that.

Is there someone at 60 Minutes named Draggan Mihailovich?

A.    Yes.                                          12:30:19

Q.    And what's his job at the show?

A.    He's a producer.

Q.    And he currently works for the show?

A.    Yes.

Q.    And did he work at the show at the time    12:30:25 this meeting took place that Ms. Velie initiated?

A.    Yes.

Q.    And does Mr. Mihailovich, is he on a team or is he a floater?

A.    I think now he's a floater.               12:30:37

Q.    Was he on a team a couple years ago?

A.    I don't remember.  He's been a floater for many years, actually, so he probably was not on a team.  But I don't remember.

Q.    Do you recall any discussion during       12:30:53 this Zoom meeting with the producers that Mr. Mihailovich would raise the producers' concerns about Mr. Richmond to management at 60 Minutes?

A.    I don't.  I'm thinking.  This was a      12:31:06

Page 200

Bar-On

million years ago.  He might have, again, yeah.

Q.    Focusing again on the Ashley Velie-initiated meeting with the producers, did anyone during that Zoom meeting complain that Mr. Richmond was a bully?

A.    I don't remember.

Q.    It's possible someone did?

A.    It's -- you know -- I don't remember that language said.

Q.    Do you recall if Shari Finkelstein was part of the Ashley Velie-initiated producer meeting?

A.    She was there.

Q.    And did Ms. Finkelstein say anything about Mr. Richmond during that Zoom call?

A.    I don't remember.

Q.    Did Ms. Finkelstein raise a concern that Mr. Richmond was a bully during that Zoom meeting?

A.    I don't remember.

Q.    Is it possible she did?

ATTORNEY ZUCKERMAN:  Objection.

A.    Sure, but -- it's like a meeting, like, seven years or something.

Page 201

Bar-On

Q.    During this meeting did anyone -- did any of the producers raise concerns that Mr. Richmond spoke to them in a disrespectful manner?                                    12:32:31

A.    Again, I'll just repeat what I said; before, which is he has a very specific style, it's very like take it or leave it.  If someone wants to find disrespect in it, I'm sure they can.

On the flip side you can argue the    12:32:42 opposite.  He plays no favorite.  He is there to do his job.  He doesn't want -- you know, he wants to minimize drama, not increase it, so -- so that's his style.

Q.    Were you part of any discussion with    12:32:59 Bill Owens in which any of the concerns raised during this producer meeting were then raised to Bill Owens?

A.    No.

Q.    Were you part of any discussion in    12:33:10 which the concerns about Mr. Richmond were raised to Tanya Simon?

A.    Also no.  There's no follow-up with me and Bill or Tanya about any of this.

Q.    Have you ever been part of another    12:33:27

Page 202

Bar-On

producer meeting during your tenure at 60 Minutes where a group of producers had raised concerns about a specific employee, other than this one about Mr. Richmond?                              12:33:40

A.    I'm thinking.  It's 20 years.

I don't think so.

Q.    Do you know whether there was anything that came out of the meeting that Ms. Velie had initiated with the producers related to           12:34:04 Mr. Richmond?

A.    I don't know.

ATTORNEY IADEVAIA:  All right.  I think this will be Bar-On Exhibit 1.

(Bar-On Exhibit 1, text messages, Bates-stamped PL 1927 through 1932, marked for identification.)

Q.    You can take a minute to look through the document.

A.    The whole -- all these pages?          12:35:02

Q.    I'm going to ask you about specific texts, but you're free to look at it if you want to.

So what's been marked, I'm going to say for the record, as Bar-On Exhibit 1 is a multipage  12:35:12

Page 203

Bar-On

text exchange bearing Bates numbers PLAINTIFF 1927 through 1932?

Mr. Bar-On, do you recognize what's been marked as Exhibit 1?                                    12:35:25

A.    It looks like text messages between me and I guess Alex.

Q.    Text messages between you and Ms. Poolos; correct?

A.    Uh-huh.                                                                              12:35:33

Q.    They appear to be dated February of 2021, I think, throughout the text exchange.  It's over the course of a few days in 2021; is that right?  You can take a look.

A.    Some is 2022, some is 2024.                                    12:35:49

Q.    No, let's just be clear about it.  So at the top -- the very top email is dated February 16th, 2021; correct?

A.    Yep.

Q.    And then if you go to the last page --    12:36:00 flip it over, please -- on the last page on PLAINTIFF 1932 at the very bottom there's a text dated February 24th, 2021.  Do you see that?

A.    Yep.

Q.    Okay.  So all these texts are sent in    12:36:12

Page 204

Bar-On

February of 2021; right?

A. Yeah.

Q. Okay. Great.

All right. If you take a look at the 12:36:19 text -- well, let me just -- before we go there, on the -- is it your understanding that the texts on the left side are texts from you?

A. It says my name, so yes.

Q. And they're gray, and on the document 12:36:33 the bubbles are gray that contain the text; correct?

A. Yes.

Q. And then on the right side are texts from Alex that are -- the bubbles are blue; 12:36:43 correct?

A. Yes.

Q. So if you take a look at the text dated February 21st, 2021, on the first page at 2:02 p.m., and it's a text from Ms. Poolos where she 12:36:57 writes, What is this Ashley situation?

Do you see that?

A. Yep.

Q. And then she writes, I don't feel like I have a lot to complain about because I have 12:37:13

Page 205

Bar-On

gotten really good editors so far.

Do you see that text?

A.    I do.

Q.    And then you write back:  Don't know.    12:37:21
I'm going to listen in.  It should be interesting.
And then under that you write, Insurrection.  And
Ms. Poolos writes at the bottom of that page:  Ha,
yes.

Do you see all that text?    12:37:31

A.    I do.

Q.    Do you have any understanding as to
what Ms. Poolos meant in this text when she refers
to the Ashley situation?

ATTORNEY ZUCKERMAN:  Objection.    12:37:43

A.    I assume this is about the meeting you
were talking about.

Q.    The meeting you were testifying to a
little bit ago today; correct?

A.    Yes.    12:37:52

Q.    And you wrote, And we just went through
it at 2:34 p.m. insurrection.

What did you mean by that?

A.    Just a bunch of producers talking
about -- again, I don't know what the invite was.    12:38:08

Page 206

Bar-On

I don't have it in front of me.  But I guess I'm just referring to that.

Q.    And if you turn to I think it's the fourth page of the document.  If you look in the      12:38:24 bottom right-hand corner of each page, there's a black number.

A.    Yeah.

Q.    So if you can look at the number that ends with 1930, please.                              12:38:32

A.    Okay.

Q.    I want you to take a look at the text from you on February 22nd, 2021, at 11:25 a.m. And in that text you wrote, I said my two cents. And Ms. Poolos responded, Yes, totally.  You      12:38:54 wrote, This will end up in a ball of fire. Ms. Poolos wrote, I have nothing to say except what an asshole Matt is.

If you go on to the next page, PLAINTIFF 1931, at the top in the text from you      12:39:08 February 22nd, 2021, at 11:32 a.m., you wrote, I'm conflicted because he has been a total jerk to me, but I've always gotten my editors, sometimes after pouting and barking, but still.

So if he comes to me and says, Give me      12:39:26

Page 207

Bar-On

an example of not getting your top three, I really don't have one.  Ms. Poolos writes back:  Yes, same.  I've had great editors so far, but he's obnoxious and always tells me to tell LS she has  12:39:40 to work with people she doesn't like.  You wrote back:  Exactly.

Do you see all that text that I just read?

A.    Uh-huh.    12:39:50

Q.    Before we go too far, I want to ask you a couple of questions going back to PLAINTIFF 1930, the prior page, and the text that you sent on February 22nd, 2021, at 11:25 a.m.

You wrote, I said my two cents.    12:40:04

Is this you indicating to Ms. Poolos that during this Ashley Velie meeting that you had made comments about Mr. Richmond and editors?

ATTORNEY ZUCKERMAN:  Objection.

You can answer.    12:40:20

A.    I guess.  I have no memory of saying anything there, but I guess I did say something.

Q.    You don't recall what you said; correct?

A.    No.    12:40:28

Page 208

Bar-On

Q.    And then you said, This will end up in a ball of fire, a little bit further down the page.

What did you mean by that?                    12:40:35

A.    I don't know.

Q.    Have you ever used that phrase before outside of this text?

A.    I'm sure I have.

Q.    What does that phrase mean to you?    12:40:43

A.    It means this is going to blow up, this is -- yeah, that's what it means.

Q.    When you say it's going to blow up, I don't -- what do you mean by that?  Blow up in what sense?                    12:40:55

ATTORNEY ZUCKERMAN:  Objection.

A.    This is going to lead to some fight or something like that, yeah.

Q.    Okay.  And Ms. Poolos wrote at the bottom of that page:  I have nothing to say except 12:41:07 what an asshole Matt is.

Do you agree that Mr. Richmond is an asshole?

A.    No.

Q.    Has he ever been an asshole to you?    12:41:17

Page 209

Bar-On

A.    Again, he sometimes doesn't give me the editors I want, and clearly I used the word "jerk" there.  I didn't remember.  Yeah, sometimes you don't get the editors you want, if that's an     12:41:30 asshole -- that's his job.

Q.    I'm talking about beyond not getting the editors.  I'm asking you a different question, which is Mr. Richmond's communication style.  Has Mr. Richmond ever been or acted in a way that you     12:41:46 believed was or -- strike that.  Let me start again.

I'm focusing on Mr. Richmond's communication style.  Has Mr. Richmond ever behaved in a way towards you where you believed he     12:42:00 was acting like an asshole?

ATTORNEY ZUCKERMAN:  Objection.

A.    Again, you kind of asked this before.  He doesn't give you the editors you want.  He says go deal with it.  At the moment when you're stuck     12:42:08 having to deal with an editor you don't like on a story you worked very hard to do, you're going to be angry about it, you're going to be upset about it.

In the greater scheme of life, looking     12:42:17

Page 210

Bar-On

in a room like this, no, he's just a manager who is very particular about what he wants and doesn't want and what he's willing to put up with.

As I say, you know, pouting and barking.  I mean, you know, there's -- there's always like give me someone I want.  There's back-and-forth so -- and he's just very nonplussed. He's just this is how it's going to be.

Q.    And during the producer meeting that you were on, do you recall -- that Ms. Velie had organized, do you recall any of the producers describing Mr. Richmond as an asshole?

A.    I don't remember that language exactly, I'm sorry.

Q.    On the next page, plaintiff 1931, you wrote, I'm conflicted -- as we just went through -- because he has been a total jerk to me, but I have always gotten my editors.

What do you mean, "he's been a total jerk to me"?  What do you mean by that?

A.    Sometimes he doesn't give you the editors you want.  Then you have to negotiate and fight and, you know, argue to get the editors you want.

Page 211

Bar-On

By the way, that's not true that I always got the editors I want, but I have gotten a fair amount of editors I want.

Q. Right. And in this text you say, I've always gotten my editors; right?

A. Yeah, yeah.

Q. I mean, when you write here "because he's been a total jerk," aren't you referring to the way he is communicating with you or was communicating with you at the time?

ATTORNEY ZUCKERMAN: Objection.

A. No. I'm referring to the fact you work on a story for a year sometimes and then you have to put it all together. And sometimes, you know, the stories are expensive, they're complicated. It's like you're given a Porsche and then the editor is a driver. If you have a driver who you don't trust and that's who Matt insists you get, then, you know, you're going to be mad about it.

Q. Further down Ms. Poolos writes on February 22nd, 2021, at 11:33 a.m.: But he's obnoxious and always --

A. Where?

Q. Do you see that text?

Page 212

Bar-On

A.    I do.

Q.    -- and always tells LS she has to work with people she doesn't like.  And you write back, Exactly.                                    12:44:38

What were you saying "exactly" to?

ATTORNEY ZUCKERMAN:  Objection.

A.    No, this was very -- he always says you have to work with every -- any editor that's available, not the three that Lesley wants to work  12:44:44 with.  And, as I said, Lesley does make it known she only wants to work with a certain amount of editors.  So that's what I meant.

Q.    And the "exactly," is it agreeing with Ms. Poolos that Mr. Richmond is obnoxious?      12:44:58

A.    No.  It's about the fact he says Lesley should work with any editor.

Q.    Under that text -- the "exactly" text from you there's a text from Ms. Poolos where she writes -- shortly after your "exactly" text, also  12:45:16 at 11:30 a.m. on February 22nd, 2021, Ms. Poolos writes, He and Ann K are running fiefdoms.

Do you see that text?

A.    Yes.

Q.    Who is Ann K, if you know?                12:45:31

Page 213

Bar-On

A.    Ann Marie Kross.  She's in charge of the crews.  She's his parallel, only in charge of crews.

Q.    She's Mr. Richmond's parallel?                12:45:36

A.    Yeah.

Q.    Okay.  And Ms. Kross ran crews at this time in 2021 at 60 Minutes?

A.    Yes.

Q.    That's right?                                  12:45:49

Below that Ms. Poolos writes, But let Draggan go to Tanya.

Do you see that text?

A.    I do.

Q.    And as you sit here today, do you have        12:45:57 any idea what Ms. Poolos meant by "let Draggan go to Tanya"?

ATTORNEY ZUCKERMAN:  Objection.

A.    I think just based on what she said that Draggan is going to go talk to Tanya.         12:46:06

Q.    About Mr. Richmond?

A.    Yes.

Q.    Following this producer meeting?

A.    I assume so, yeah.

Q.    Okay.  Below that you wrote, on              12:46:16

Page 214

Bar-On

February 22nd, 2021, also at 11:33 a.m.:  He's worse than she is.

Do you see that text?

A.    I do.                                              12:46:25

Q.    And what did you mean by that?

ATTORNEY ZUCKERMAN:  Objection.

A.    That he's -- that he's more inflexible with editors versus crews.

Q.    And the "he" in this text is a              12:46:40 reference to Mr. Richmond?

A.    Yes.

Q.    And the "she" is a reference to Ms. Kross?

A.    Yes.  I believe so, yeah.  That would    12:46:46 make sense.

Q.    Further down on this page, PLAINTIFF 1931, just a few minutes later on February 22nd, 2021, at 11:38 a.m., Ms. Poolos writes, That's great.  Yeah, I'm unclear on what's happening now.  12:47:09 Ms. Poolos then writes, Draggan is going to Tanya. And you write back, Yup.  You also write, Are you with April?  Do you love her?

Do you see all that text?

A.    I do.                                              12:47:27

Page 215

Bar-On

Q.    And Ms. Poolos's reference to Tanya, is it your understanding or was it your understanding she was referring to Tanya Simon?

A.    Yes.                                                    12:47:36

Q.    And you wrote "yup" in the subsequent text.  What did you mean by that?

A.    It means -- this is all kind of the same change; right?  I don't know if we are actually tweeting -- I mean texting while this    12:47:46 meeting is going on or not.  But it seems like Draggan is going to go talk to Tanya Simon.

Q.    About the concerns raised about Mr. Richmond during the meeting?

ATTORNEY ZUCKERMAN:  Objection.               12:47:59

A.    Yes.

Q.    And the text that we just went through a minute ago -- I have to find it again, sorry, the one on PLAINTIFF 1930 from you -- let me know when you're on that page.                                  12:48:29

A.    Yep.

Q.    From you on February 22nd, 2021, at 11:25 a.m., you wrote, this will end up in a ball of fire.

Did you mean, when you used that         12:48:41

Page 216

Bar-On

phrase, "ball of fire," that management would be upset at producers complaining about Mr. Richmond?

ATTORNEY ZUCKERMAN:  Objection.

A.    I don't know.  That's speculative.  I    12:48:51
don't know if that's what I meant at the time.

Q.    It's speculative in the sense that you don't recall --

A.    I don't -- yeah.  Looking back at it now, it's not what I -- you know, I thought it    12:49:01
meant this was all going to be a big blowup, not that management's going to be angry at us.  I don't see any reference to that.

Q.    When you refer to a big blowup, you mean between Mr. Richmond and the producers?    12:49:13

ATTORNEY ZUCKERMAN:  Objection.

A.    I guess so, yeah.  There's no -- again, I guess so.

Q.    Is there any other blowup you can think of other than potentially with management or with    12:49:24
Mr. Richmond?

ATTORNEY ZUCKERMAN:  Objection.

A.    You raised management.  That was not in my mind at all until you mentioned it.

(Discussion off the record.)    12:49:55

Page 217

Bar-On

Q.    This will end up in a ball of fire, that text you sent.  Your testimony is that you believe what you were referring to there is that there would be a blowup; is that correct?    12:50:07

ATTORNEY ZUCKERMAN:  Objection.

A.    Yes.

Q.    As you sit here today, you're saying that you think that would have been a reference to a blowup between producers and Mr. Richmond?    12:50:15

A.    Correct.

Q.    Do you know if HR was notified about any of the concerns stated during this meeting that Ms. Velie had arranged related to Mr. Richmond?    12:50:36

A.    I do not.

Q.    And to your knowledge did anything change with respect to the work between producers and Mr. Richmond following this meeting?

A.    It was about the same.    12:50:48

Q.    And to your knowledge did Mr. Richmond at all modify or alter his communication style with producers after this meeting?

ATTORNEY ZUCKERMAN:  Objection.

A.    It didn't with me.  I mean, he didn't    12:50:59

Page 218

Bar-On

with me.  I don't know how he deals with other people.

ATTORNEY IADEVAIA:  If we could mark this as Exhibit 2, please.                    12:51:27

(Bar-On Exhibit 2, text messages, Bates-stamped PL 1937, marked for identification.)

Q.    Mr. Bar-On, you can take a look -- a minute to read Exhibit 2.  Just let me know when    12:51:44 you're ready.

And I'll say for the record what's been marked as Exhibit 2 is a text exchange bearing Bates numbers PL 1937, just a single page.

(Pause.)                    12:52:19

A.    Okay.

Q.    Okay.  You've had a chance to review what's been marked Exhibit 2?

A.    Uh-huh.

Q.    Are these text messages between you and    12:52:23 Ms. Poolos?

A.    Yes, they are.

Q.    For the record, the text messages are all dated in Exhibit 2 February 25th, 2021; correct?                    12:52:36

Page 219

Bar-On

A.    Yes.

Q.    And that would have been -- and that was a couple days after the text we were just going through in Exhibit 1; correct?    12:52:49

A.    Yes.

Q.    You can look at Exhibit 1 if you want to verify.

A.    That's fine.  Yes.

Q.    Yes.  Okay.  All right.    12:53:00

On February 25th, 2021, at 8:50 a.m., Ms. Poolos sends you a couple of texts.  If you could focus on the one that starts with, Incidentally, Bill seemed annoyed by the editor stuff.    12:53:12

Do you see that text?

A.    I do.

Q.    Not going to bode well for Ashley.  And then you write back, I think she'll be fine, though clearly they aren't receptive to hearing    12:53:23 complaints.  Ms. Poolos writes back to you:  Yeah. He was snarky about it.  And then you wrote, I thought it was funny how we spent an hour strategizing about it and then Orissa just asks Bill and blows the thing up.    12:53:42

```
                                          Page 220
                        Bar-On
         And then you wrote, He shuts it down.
And Ms. Poolos writes, Yeah, me too, especially as
he had already mentioned it.  And then she writes,
She seems clueless sometimes.  And you wrote,      12:53:54
True.
         Do you see all that text?  Did I read
it accurately?
     A.    You did.
     Q.    Before I ask you questions about the     12:54:02
specific messages, Ms. Poolos makes a reference to
Bill, and you make a reference to Bill in the text
exchange we just went through.  Was that Bill
Owens?
     A.    Yes.                                     12:54:15
     Q.    And who is Orissa?
     A.    I think it's a typo.  It's -- I assume
it's Oriana because there's no Orissa.
     Q.    And did Oriana work for the show at the
time?
     A.    She still does.
     Q.    And what was her job at the time?
     A.    She's a producer.
     Q.    Was she assigned to a team?
     A.    No, she's an investigative producer.     12:54:31
```

Page 221

Bar-On

She works mainly with Scott but not exclusively.

Q.    And Scott is Mr. Pelley?

A.    It is, yes.

Q.    Does this text exchange refresh your        12:54:45
recollection as to whether you were part of any
discussion in which concerns related to
Mr. Richmond were raised to Bill Owens?

A.    So it seems -- I didn't remember this,
but it seems that there was, like, a staff         12:54:57
meeting.  I assume it would be on Zoom because
this is during COVID.  But yeah so -- it seems
like a staff meeting.

Again, I don't remember this at all,
but just based on context.  I don't remember this  12:55:10
happening.

Q.    So as you sit here today, you don't
recall a meeting in which Mr. Richmond was
discussed with Mr. Owens in the early 2021 time
frame?                                             12:55:27

A.    I do not.  I mean -- I mean, clearly I
say that he mentioned it or something, but yeah.

Q.    And in your text at 9:30 a.m. on the
25th of 2021, you wrote, I think she'll be fine,
though clearly they aren't receptive to hearing    12:55:43

Page 222

Bar-On

complaints.

Do you have any memory as to what you meant there?

A.    Well, I think "she'll be fine" means 12:55:51 what I said, that I didn't think it was going to be a big blowup with management because I didn't think they would care.  So it references what I said earlier about if there's a blowup it would be just internally between us and Matt, if at all. 12:56:04 So that's that part.

The "receptive to complaints," it's a place of adults, you know.  The assumption is you do your job.  It's the best place to work in television.  They don't want to hear complaining 12:56:17 all day long.  That's how it's always been; that's how it always is.

Q.    And the "they," who are you referring to?

A.    Management. 12:56:23

Q.    Who's management?  What do you mean by "management"?

A.    It would be Bill, it would be Tanya, I guess, at that point.

Q.    And Ms. Poolos wrote, Yeah, he was 12:56:31

Page 223

Bar-On

snarky about it.

Do you recall whether you had a meeting in which you were a part of and which Mr. Owens was discussed and Bill Owens was snarky about complaints?

A.    I honestly do not remember this, this meeting, at all.  I mean, something happened.

Q.    And then you wrote, I thought it was funny how we spent an hour strategizing about it.

Do you have any understanding or recollection as to what you meant by that?

A.    That would have been talking about the Ashley Velie meeting.

Q.    Meaning all the producers who were on that Zoom had spent an hour strategizing about raising concerns related to Mr. Richmond to management at 60 Minutes?

A.    Correct.

Q.    Then you said the typo is Orissa, but you meant Oriana just asked Bill and blows the thing up.  Do you have any idea what that's a reference to?

A.    Again, zero recollection of this, but it seems usually in these Zoom meetings they let

Page 224

Bar-On

producers ask questions at the end, and I guess that's what happened. And maybe Oriana raised it on her own. I don't remember.

Q. You wrote, He shuts it down.                    12:57:38

Did you mean Bill Owens shut it down?

ATTORNEY ZUCKERMAN:  Objection.

A. Yeah.

I have zero recollection of this meeting, by the way. They would happen              12:57:50 periodically.

Q. Since Tanya and Bill have been in their management roles, have there been regular meetings between producers and management?

A. As in group meetings or one-on-one?       12:58:34

Q. Yeah, group meetings.

A. There's within one or two a year, one or two a season, usually.

Q. And were there regular group meetings with the producers and Tanya Simon without Bill?    12:58:46

A. Not that I'm aware of.

Q. And were there regular group meetings between the 60 Minutes producers and Bill Owens?

A. No -- I mean, no. Usually it's like a all-hands-on-deck meeting. Unless I'm forgetting    12:59:04

Page 225

Bar-On

something, they were all just, like, the entire show at the beginning of the season, at the end of the season, at the middle of the season, if there was a big announcement on budgets or stuff like 12:59:14 that.  Yeah, and it would have been with everyone.

I don't remember any specific meeting just with producers unless it's something super specific about crews or some very technical reason, rights. 12:59:30

Q.    Did you participate in a producer meeting with Tanya Simon about Matt -- in which Matt Richmond was discussed?

A.    No.

ATTORNEY IADEVAIA:  Okay.  If we can 12:59:45 mark this as Exhibit 3, please.

(Bar-On Exhibit 3, text messages, Bates-stamped PL 1947 to 48, marked for identification.)

Q.    For the record, what's been marked as 01:00:02 Exhibit 3 is a two-page text exchange bearing Bates numbers PL 1947 to 48.

Let me know once you've had a chance to read it.

And I'll say for the record that the 01:00:23

Page 226

Bar-On

texts are dated starting March 8th, 2021, and the last text in this exhibit is dated March 9th, 2021.

(Pause.)                                           01:00:33

A.    Okay.

Q.    You've had a chance to look at both --

A.    Not all the way.  Do I need to go all the way down?

Q.    Yeah, sure, just to make sure you look    01:01:23 at it all.

(Pause.)

A.    Okay.  I have zero memory of this. Okay.

ATTORNEY ZUCKERMAN:  Did you read the    01:01:40 back side?

THE WITNESS:  Yeah, I read both sides.

Q.    What's been marked as Exhibit 3, do you recognize this as a text exchange between you and Ms. Poolos?                                        01:01:51

A.    Yes.

Q.    And I want to focus on the text on March 9th, 2021, at 9:17 a.m. from Ms. Poolos at the bottom of this first page, PL 1947.

A.    Yeah.                                       01:02:09

Page 227

Bar-On

Q.    Ms. Poolos wrote, Do you think this producer call is all about Richmond?

Do you see that?

A.    Yep.                                      01:02:15

Q.    Okay.  Then on March 9th, 2021, at 9:18 a.m. on the next page, PL 1948, you write a text: My hunch is yes because it's news, which they like; and obvious, which they like.  And she is bugging them about getting on the air.  And then   01:02:33 in parentheses per Bonin yesterday.  So this is easy.  Issue is I think the next two shows are spoken for.  Dunno.

Do you see that text?  Did I read it correctly?                                     01:02:51

A.    Yeah.

Q.    And is it your understanding that that text is actually not a response to the text question that Ms. Poolos asks about, whether the producer call was about Richmond but --        01:02:57

A.    Yeah, it's something else.  It's something from earlier.

Q.    In the text exchange?

A.    Yeah.  Yeah.  This is talking about Lesley and some news story.  I don't know which   01:03:03

Page 228

Bar-On

one.

Q.    But the next text that you write to Ms. Poolos which is dated March 9th at 9:18 a.m.: Yeah, the Tanya call is about Richmond.    01:03:14

Do you see that text?

A.    I do.

Q.    And Ms. Poolos writes back:  Ah, interesting.  There should be a producer call about AMK.    01:03:24

Do you see that?

A.    I do.

Q.    Did you understand Ms. Poolos to be referring to Ann Marie Kross when she said "AMK" there?    01:03:32

ATTORNEY ZUCKERMAN:  Objection.

A.    Yes.

Q.    Does the text that you sent -- Yeah, the Tanya call is about Richmond -- did you -- do you understand that text to mean that you were    01:03:40 anticipating a producer call with Tanya to be about Matt Richmond?

A.    I guess so.  I have no memory of such a call.

Q.    And that's my next question is do you    01:03:51

Page 229

Bar-On

recall any producer call with Tanya Simon

discussing Matt Richmond.

A.    Zero, none whatsoever.

Q.    And your text in response to Ms. Poolos    01:03:58
on March 9, 2021, 9:22 a.m., after Ms. Poolos

wrote to you:  There should be a producer call

about AMK; you wrote, And one about Yvonne and one

about Bill.

Do you see those texts?    01:04:17

A.    Yes.

Q.    And the reference to Bill is Bill

Owens?

A.    Yes.

Q.    What did you mean by that?    01:04:21

A.    It's just a joke, you know.  It's

basically making -- there should be calls about

all our managers.  Yvonne is the manager in charge

of, like, office supplies and budgets and stuff

like that.    01:04:31

Q.    And if you look towards the bottom of

the page on March 9, 2021, at 11:14 a.m., you

wrote to Ms. Poolos:  You on?  I can't see you.

Do you see that?

A.    I do.    01:04:47

Page 230

Bar-On

Q.    Is that a question to Ms. Poolos as to whether she is on this producer Zoom meeting with Ms. Simon?

ATTORNEY ZUCKERMAN:  Objection.          01:04:55

A.    I assume so.  Yeah, that makes sense.

Q.    Ms. Poolos wrote, I'm on by phone because we were just shooting.  And then you wrote, Ah, no one mentioning Matt.  And Ms. Poolos wrote, There it is.  And you wrote, There we go,    01:05:08 at 11:14 a.m. on March 9th, 2021.

Do you see those texts I just went through?

A.    I do.

Q.    And do you have any understanding as to    01:05:20 what you meant when you wrote there "There we go"?

ATTORNEY ZUCKERMAN:  Objection.

A.    I don't.  Again, by context, it would make it seem like there's a conversation about Matt.  But is there another page to this?          01:05:32

Q.    And my question is do you have any memory about what was said about Mr. Richmond during this meeting.

ATTORNEY ZUCKERMAN:  Objection.

A.    Zero.  I don't even remember this call    01:05:42

Page 231

Bar-On

taking place.

(Bar-On Exhibit 4, text messages,
Bates-stamped PL 1973 to 1974, marked for
identification.)                                    01:06:11

Q.    What's been market as Exhibit 4 is a
two-page text exchange bearing Bates numbers
PL 1973 to 1974.

Let me know once you've had a chance to
review the document.                                01:06:34

A.    Give me some time.

Q.    Sure.

(Pause.)

A.    Okay.

Q.    Okay.  So what's been marked as Exhibit   01:07:43
4, do you recognize this as a text exchange
between you and Ms. Poolos?

A.    Yes.

Q.    And based on the document am I correct
that the texts are dated June 2nd, 2021, through    01:07:52
June 4th, 2021, if you look on the next page?

A.    Sure.

Q.    And I'm going to direct you to the text
from Ms. Poolos on June 2nd, 2021, at 4:55 p.m.
Ms. Poolos writes, according to Exhibit 4:  Yeah,   01:08:14

Page 232

Bar-On

I say that.  AMK has been yelling at Collette, and she tells her how to talk to her.  And then Ms. Poolos writes, Like WTF.

And then Ms. Poolos writes, I complained to Tanya about it, and she said it's a big no-no and she'll speak to her.  And you wrote back:  Wow.  And then Ms. Poolos wrote, Yeah, she was blowing up my phone with obnoxious texts about my story last week.

And then you wrote, Would be nice if they kept Richmond in check too.  Ms. Poolos wrote, I told AMK to go complain to Bill.  And then she wrote, Yeah, Richmond is something.  And you wrote, Eye roll.

Do you see all those texts?  Did I read them accurately?

A.    You did.

Q.    Actually let me just finish this one part.  Ms. Poolos wrote, They let these support people getting away with being bullies.  They are the most uncollegial people on the floor.  And you wrote back:  True.  Throw Yvonne into that pile too.  I have to say all three of them are nice to me, but I walk on eggshells when I need to deal

Page 233

Bar-On

with them, which is silly.

Do you see all those texts?

A.   Uh-huh.

Q.   I just need a yes or no.                    01:09:28

A.   Yes.

Q.   Ms. Poolos refers to Collette in that first text I read.  Is it your understanding that is a reference to Collette Richards?

A.   Yes.                                        01:09:39

Q.   And then the reference to AMK, that's Ms. Kross; correct?

A.   Yes.

Q.   In this text exchange after Ms. Poolos writes to you, Yeah, she was blowing up my phone   01:09:50 with obnoxious texts about my story last week, you wrote, Would be nice if they kept Richmond in check too.

What did you mean by that?

ATTORNEY ZUCKERMAN:  Objection.           01:10:03

A.   I don't know.  I don't know.  On -- I don't know.  I don't have a specific knowledge of what I meant.

Q.   Do you have any memory of this text exchange with Ms. Poolos?                          01:10:17

Page 234

Bar-On

A.   Zero.

Q.   Do you have any memory of what you meant when you wrote these texts to her?

A.   No.                                01:10:23

Q.   If you look on the next page, PL 1974, at the top there's a text from you on June 2nd, 2021, at 5 p.m., in which you wrote, I slightly amended the Richmond story.  I told him Lesley really hates Lustig.  And then in a parentheses,   01:10:40 not we hate Lustig.  And that's how we got him. And then you wrote, I actually really like Lustig.

And then you wrote, Richmond really hates Lesley, which is so strange.  Whatever.  Ms. Poolos writes back on the same day at 5:02:  Yeah,   01:10:58 he despises her.  I get along fine with Yvonne and Richmond too, really, but AMK is a jerk.  It's going to be hard next year?

Do you see that those texts?

A.   Yeah.                               01:11:12

Q.   Do you have any memory as to what you meant when you referred to in your text "the Richmond story"?

A.   I do not, no.  I don't know.  I don't know.  It was me trying to get an editor over   01:11:20

Page 235

Bar-On

something.  But I don't remember the specifics of this.

Q.    And then you wrote, I told him Lesley really hates Lustig.                                        01:11:28

Is Lustig an editor?

A.    Yes, Warren.

Q.    Warren Lustig?

A.    Yep.

Q.    Okay.  He was an editor at 60 Minutes    01:11:38 at the time of this text?

A.    Still is.  Very good editor.

Q.    And the reference to Lesley here in your text, is that Lesley Stahl?

A.    Yes.                                        01:11:42

Q.    And what did you mean when you wrote, Lesley really hates Lustig, in quotes?

A.    Lesley really does not like Warren.

Q.    And then you wrote, Richmond really hates Lesley, which is so strange.  Whatever.    01:11:56

Do you see that?

A.    Yeah.

Q.    Do you have as you sit here today any memory as to what you meant by that?

A.    I think, as I said earlier, I mean,    01:12:04

Page 236

Bar-On

Lesley likes certain editors.  When she doesn't get them, she -- she goes and complains to Rich -- I mean to Matt or to management about Matt.  And I'm sure he doesn't -- he doesn't like it.  I know for a fact he doesn't like it.  So that's what this means.

Q.    And you I believe testified earlier that Mr. Richmond plays it fair, or words to that effect --

A.    Yeah.

Q.    -- when he's assigning editors.

A.    He does.

Q.    Having looked at these texts we just went through, does that in any way affect that assessment?

A.    No, not at all.  The point is in previous administrations with previous editor assignments, Lesley would get her way.  And he just says, you know, I don't care if she complains or -- this is the editors that are available; this is the editors she's going to get.

Q.    Did you ever observe that Mr. Richmond deliberately assigned editors to Ms. Stahl that he knew that Ms. Stahl did not like as a way of

Page 237

Bar-On

getting back at her?

ATTORNEY ZUCKERMAN:  Objection.

A.    That would be in Matt's head.  No.

Q.    Did you ever believe that took place?    01:13:17

A.    No.  I did -- I do think he gave

editor -- sometimes he couldn't care less about

her complaining, but I don't think he did it, you

know, maliciously -- not maliciously.  I don't

think he was trying to punish her or anything like    01:13:31

that.  But you'd have to ask him.

Q.    Is that not what you're conveying in

this text here in Exhibit 4, the text:  I slightly

amended the Richmond story?

A.    No.  This is -- I mean, I'm saying --    01:13:49

no.  I mean, I'm saying, you know, Lesley hates --

yeah, I don't know.  You can read this any way you

want.

Q.    Do you have any memory as you sit here

now what you meant by it?    01:13:59

A.    No, I don't.  We do four or five

stories a year, year after year after year after

year.  You know, this is stuff that -- this is

minutia.  This is chatting with a colleague.  This

is not, you know -- it's no indictment of anyone.    01:14:09

Page 238

Bar-On

Q.    Are you aware of any time Ms. Finkelstein raised concerns that Matt Richmond told editors that they did not have to work with her?                                              01:14:26

A.    Work with Shari or with Lesley?

Q.    Yeah, with Shari.

A.    I don't know that there was such a thing.  I don't know that there was such a thing.

Q.    Are you aware of any concerns raised by  01:14:39 Ms. Finkelstein that -- about Mr. Richmond talking to her in a condescending manner?

A.    No.  Shari works very slowly, so sometimes editors don't want to work with her because of that, because it ties them up for a  01:14:58 very long amount of time and usually prevents them from getting overtime because of how she works. So I know there are a few editors who would prefer not to work with her and -- but I don't know that it ever came from Matt.  I'd be surprised.  01:15:12

Q.    Why would you be surprised?

A.    Just because it's not how he works. He's, like, if there's a slot, this is the editors you have, this is what you do.

Q.    Are you aware from discussions with  01:15:21

Page 239

Bar-On

anyone that there was a time where Mr. Richmond in front of a group of editors said that none of them had to work with Ms. Finkelstein if they didn't want to?                                          01:15:34

A.    I don't remember any such thing.  And I'd be surprised, but I don't know.

Q.    Do you work with somebody -- well, strike that.

Is there someone who works at 60       01:15:47 Minutes named David Levine?

A.    Yes.

Q.    And what is Mr. Levine's job?

A.    He came in as an associate producer for Gavshon, and then he switched over to be an       01:15:59 associate producer for Nichole Marks.  And he's been doing more and more of his own stuff as a producer.  Currently I think he's still technically an associate producer, but he's not assigned to anyone.  So he is in that interim       01:16:21 phase where he can produce.

Q.    Produce on his own; correct?

A.    Yeah.

Q.    And you mentioned Mike -- I think you mentioned Gavshon.  That's Michael Gavshon?       01:16:34

Page 240

Bar-On

A.    Yes.

Q.    And he's a producer currently at 60 Minutes?

A.    Yes.                                                01:16:39

Q.    And he's been there for a long time?

A.    Forever.

Q.    And Nichole Marks, she's a producer at 60 Minutes?

A.    She is.                                             01:16:45

Q.    And is she assigned to a team?

A.    I think she does mainly Anderson, but I'm not -- Anderson Cooper, but I'm not a hundred percent sure she is technically assigned to him.

Q.    And Mr. Cooper is a correspondent for    01:16:58 60 Minutes?

A.    And CNN.

Q.    And CNN.

To the extent Ms. Marks does work for him, it's in his role at 60 Minutes; right?    01:17:06

A.    Yes.

Q.    Are you aware of any complaints against Mr. Levine by CBS employees?

A.    Not before I read your client's lawsuit.                                                01:17:23

Page 241

Bar-On

Q.    Were you aware of any concerns about Mr. Levine before -- notwithstanding what you read in the complaint, the lawsuit?

A.    No.                                                01:17:32

Q.    And you mentioned Sharyn Alfonsi earlier.  She's a correspondent for 60 Minutes; correct?

A.    She is.

Q.    To your knowledge did Ms. Alfonsi ever    01:17:42 raise any complaints or concerns about Mr. Levine?

A.    Just what I read in the lawsuit.

Q.    And are you aware of any concerns or complaints that Ms. Marks has raised about Mr. Levine?                                       01:17:56

A.    No.

Q.    Is there someone who works for 60 Minutes named Jon Wertheim?

A.    Yes.

Q.    And what's his job?                       01:18:08

A.    He's a correspondent.

Q.    For 60 Minutes; right?

A.    For 60 Minutes.

Q.    And are you aware of any complaints or concerns raised by Mr. Wertheim about David    01:18:16

```
                                          Page 242
```

Bar-On

Levine?

A.   No.

Q.   Were you ever told that David Levine
has a temper problem?                          01:18:26

A.   Not before I read in the lawsuit.

Q.   Outside of what you read in the
lawsuit --

A.   Never.

Q.   -- have you ever been told that?      01:18:31

A.   Sorry.  No, never.

Q.   The first day of your deposition we
spoke a little bit about Michael Radutzky;
correct?

A.   Yeah.                                 01:18:52

Q.   Mr. Radutzky was a producer on 60
Minutes; correct?

A.   Yes, and senior producer.

Q.   And a senior producer.

     And he left the show several years ago;  01:18:58
is that right?

A.   Yes.

Q.   Are you aware of any complaints or
concerns raised about Mr. Radutzky by CBS
employees?                                 01:19:08

Page 243

Bar-On

A.    Yes, from gossip and from I think it was in a couple of newspapers.  So yes, in that context.

Q.    Did you ever work with someone at 60    01:19:16
Minutes named ▆▆▆▆ ▆▆▆▆▆▆

A.    Yes.

Q.    And what was Ms. ▆▆▆▆▆▆ job at 60 Minutes?

A.    ▆▆▆▆ was in charge of booking.  I    01:19:23
actually have to say I have never directly worked with her, because she never gave me a booking. But she was a colleague, and, you know, we talked, yeah.

Q.    And Ms. ▆▆▆▆ is no longer at 60    01:19:39
Minutes; correct?

A.    Correct.

Q.    Do you recall when she left the show?

A.    A few years ago.  I don't -- I don't know the date.    01:19:46

Q.    Do you know why she left the show?

A.    Again, from newspaper reports and office gossip, she left because of some issue with Radutzky and something about abuse.

Q.    Did you ever speak to Ms. ▆▆▆▆ about    01:20:03

Page 244

Bar-On

any concerns she had related to Mr. Radutzky?

A. Never.

Q. Not including anything you learned from the press, okay, but were you -- did you ever   01:20:11 participate in a discussion or were you ever told that Ms. ████████ had raised concerns that Mr. Radutzky had twisted her arm?

A. Again, office gossip, but that was -- that was it, and never -- nothing from her.   01:20:26

Q. Nothing from Ms. ████████ directly?

A. No.

Q. Did you ever speak about that with HR?

A. No.

Q. Were you ever told or become aware,   01:20:36 outside of any press, about Ms. ████████ raising concern that Mr. Radutzky had thrown something at her?

A. Just from press, yeah. So no.

Q. Just from press?   01:20:51

A. Yeah.

Q. Did you ever discuss that with Ms. ████████

A. Never.

Q. Or HR?   01:20:56

Page 245

Bar-On

A.    No.

Q.    I believe the last time we -- the first day of your deposition we briefly discussed a former producer at 60 Minutes, Ira Rosen, but I guess let me just be clear.    01:21:11

Was there a producer at 60 Minutes named Ira Rosen?

A.    Yes.

Q.    And was he there a long time before he left?    01:21:21

A.    Yes.

Q.    And he does not currently work for 60 Minutes; right?

A.    Correct.    01:21:27

Q.    And I think your testimony last time -- but you can correct me if I'm wrong -- is around the time that Bill took over Mr. Rosen left the show?

A.    Correct.    01:21:34

Q.    And are you aware of any concerns or complaints about Mr. Rosen by CBS employees?

A.    Again, from lawsuits, articles, and the press, yes.

Q.    Did you ever have any discussions with    01:21:51

Page 246

Bar-On

Mr. Rosen about any concerns or complaints about him?

A.   No.

Q.   Did you have any discussions with Bill   01:22:00
Owens about any concerns or complaints about Mr. Rosen?

A.   No.

Q.   Any discussions with HR about concerns or complaints about Mr. Rosen?   01:22:10

A.   No.  When you say "HR," what do you mean?

Q.   Human resources, I apologize.

A.   I know.  No, no, no.

Q.   What's the -- I mean, CBS has a human   01:22:17
resources department; correct?

A.   Yeah, yeah, yeah.

Q.   What was the clarification you were looking for there?

A.   Your client made some ridiculous   01:22:25
allegations after she left, and those were investigated by HR.  That was my only ever interaction with AR -- HR ever in the history of me being in the show.  So basically any question about HR is no.   01:22:40

Page 247

Bar-On

Q.    Was there an associate producer who worked for 60 Minutes named ███████ ████████

A.    There was.

Q.    Was she assigned to a particular team?    01:22:51

A.    She was Ira's AP.  Maybe technically she was a field producer.  I don't know.  There was some issue with her title.  Yeah, she was de facto an associate producer.

Q.    And she worked with Mr. Rosen?    01:23:04

A.    She did.

Q.    And Mr. Rosen at that time, was he assigned to a particular correspondent?

A.    I don't remember.  I don't think so. He worked a lot with Steve Kroft.  Yeah, no, I    01:23:16 don't remember.

Q.    And Ms. ████████ she no longer works for 60 Minutes; correct?

A.    Correct.

Q.    Do you have any understanding of the    01:23:27 circumstances of why she left 60 Minutes?

A.    Just from office gossip.

Q.    Which --

A.    Which was, A, she was a terrible employee.  Thanks to her we had to redo and change    01:23:38

Page 248

Bar-On

to this day how we do fact-checking, because she made such a huge error.  She was rude and mean to crews.  And then she had issues with Ira.  She accused him of various things, again, just from reading from the press.    01:23:59

Q.    Did you discuss the things that Ms. ████████ accused Mr. Rosen of with others at 60 Minutes?

A.    Office gossip, so yeah.    01:24:10

Q.    What did you discuss generally?  I realize it's gossip.

A.    Gossip:  What do you know, is there -- it doesn't make sense, does it not make sense, you know, that kind of stuff, do you know, yeah.    01:24:22

Q.    What was your understanding of the allegations that Ms. ████████ made?

A.    That he was a letch.

Q.    Had you ever observed Mr. Rosen engaging in behavior that could be described as    01:24:35 him being a letch?

A.    Not really, no.

Q.    What did you --

A.    No.  We're very siloed at 60 Minutes so...    01:24:48

Page 249

Bar-On

Q.   Did you, in what you described as the office gossip, express any opinion as to whether you believed there was any merit to Ms. ███████ allegations?

01:24:57

A.   I don't remember.  I don't, you know. And if I did, it was based on nothing.

Q.   Was there a time when Mr. Rosen still worked for 60 Minutes that you and he were completing for a story about a federal judge?

01:25:13

A.   Yes.

Q.   Who was the federal judge?

A.   Judge Kozinski.

Q.   And did you end up doing a story on Judge Kozinski?

01:25:23

A.   Yes.

Q.   It was a story you worked on with Ms. Poolos; correct?

A.   Correct.

Q.   Did you come to learn that Mr. Rosen had supposedly told Ms. ███████ to act like she would sleep with the judge to get the judge to go with Ira's team?

01:25:29

A.   No, I don't know where that came from.

Q.   You never heard that before today?

01:25:43

Page 250

Bar-On

A.    That he asked her to sleep with a judge?

Q.    Yes.

A.    No.  That's ludicrous.                    01:25:49

Q.    Did you ever come to learn that ███████ had alleged that Ira had asked her to act like she would sleep with the judge to get the story?

A.    That she would sleep with a judge?  No. That she would -- that I think he asked her to be    01:26:02 flirtatious with characters in general?  Sure.

Q.    Where did you hear that from?

A.    Again, office gossip at the time.

Q.    And "at the time," would that include when you were competing with this story -- for this story with Mr. Rosen?

A.    I don't remember.  You'd have to look at dates.

Q.    Was there someone who worked at 60 Minutes named ████████  ████████                     01:26:20

A.    Yes.

Q.    And does she still work there?

A.    She does not.

Q.    When she was there, what was her job?

A.    She was an AP.  She was an AP or a              01:26:28

Page 251

Bar-On

field producer.  Yeah.  She was excellent.

Q.    And did she work with -- was she working with any particular producer?

A.    I believe she was working with Ira                01:26:47
also.  I'm not a hundred percent sure, but I'm pretty sure she was working with Ira.

Q.    Were you aware of any complaint or concern by Ms. ▮▮▮▮▮▮ about Mr. Rosen?

A.    No.                                               01:26:58

Q.    Are you aware of any concern that Ms. ▮▮▮▮▮ raised about gender discrimination related to Mr. Rosen?

A.    No.

Q.    Are you aware of any complaint or              01:27:07
concern Ms. ▮▮▮▮▮ made about Mr. Rosen sexually harassing her?

A.    No.

Q.    Do you have any understanding as to why Mr. Rosen left the show?                                 01:27:16

A.    I think Bill didn't like him personally, and I think, as I said last time, there was a group of sort of older producers from the Jeff era who, once Bill came, you know -- "took offense" is a wrong term.  They're like,     01:27:37

Page 252

Bar-On

okay, this is a new administration, maybe it's time for us to retire.

I don't know the specifics of any of these cases, but they include Ira, they include  01:27:45 Radutzky, they include Bob Anderson.  It's people who felt it was time to retire, for whatever reason, with an incoming administration.  Maybe they didn't all retire, but I don't know.

I understood ███████ -- who I have  01:28:04 talked to since on professional stuff, but I had talked to her during the years she was at the show -- left because she was not given opportunities to produce.

As I said last time repeatedly, it's  01:28:15 very rare to get the kind of opportunities that your client got.  And she's an un -- I mean, ██████████ is an unbelievable producer, and she does incredible work at Frontline.  And I feel like she felt like she wasn't getting opportunity  01:28:28 at the show and that's why she left.

Q.   Is that what she told you?

A.   No, that's kind of what I heard.  She never addressed it one way or another.  I had to deal with her recently about a story, but that was  01:28:41

Page 253

Bar-On

specifically about the story.

Q.    Did Ms. ███████ ever tell you that she believed she had been retaliated against at 60 Minutes or after she left 60 Minutes?    01:28:48

A.    No.  We never talked about her professional experience at 60 Minutes.  I just knew everyone knew she was excellent.

Q.    We talked a little bit briefly today and your first day about Michael Gavshon, a    01:29:05 long-time producer at 60 Minutes; correct?

A.    Yep.

Q.    Are you aware of any complaints or concerns about Mr. Gavshon during his employment at CBS?    01:29:14

ATTORNEY ZUCKERMAN:  Objection.

A.    Again, press and office gossip.

Q.    You're aware that there was a lawsuit filed in which there were allegations made against Mr. Gavshon?    01:29:26

A.    Yes.

Q.    And who do you understand filed that lawsuit?

A.    His AP.  I don't remember her name.

Q.    ████████  ████████ is that the person?  01:29:32

Page 254

Bar-On

A.     Sure.

Q.     You don't remember her name?

A.     I don't know her name, but yeah.

Q.     And what were the allegations, as you    01:29:40
understand them, against Mr. Gavshon?

A.     That he showed her -- that he sent her
a picture of his penis and that he would come to
shoots inebriated.

Q.     Do you have any understanding as to any    01:30:00
other allegations Ms. ████████ made against
Mr. Gavshon?

A.     Not really.  I mean, not really
because, you know -- I don't remember.  Maybe at
the time I knew a little bit more.  I think this    01:30:08
is just as COVID was marching in.  I think we had
other concerns on our minds.

Q.     And did you ever speak to Michael
Gavshon about the allegations that Ms. ████████
had made against him?                               01:30:23

A.     No.

Q.     Did you ever speak to Bill Owens about
the Gavshon allegations?

A.     No, no.

Q.     Did you ever speak to Tanya Simon about    01:30:31

Page 255

Bar-On

them?

A.    No.

Q.    Did you ever speak to Ms. Poolos about the Gavshon allegations?                                01:30:37

A.    I'm sure in office gossip at the time, sure.

Q.    Do you recall any specific discussions you had?

A.    No.                                               01:30:45

Q.    Do you recall exchanging any text messages with Ms. Poolos about Mr. Gavshon?

A.    Could be.

Q.    You don't recall anything specifically?

A.    No.  I think -- yeah, I don't recall    01:30:57 any specific -- you know, as I said, I think COVID was kind of moving in, so we were all kind of siloed in our little planets.  So we were texting. So could be.

Q.    Do you recall Ms. ████████ making    01:31:15 complaints that she had been retaliated against after she had raised concerns about Mr. Gavshon?

ATTORNEY ZUCKERMAN:  Objection.

A.    I don't.  I never read her lawsuit or anything.                                              01:31:28

Page 256

Bar-On

Q.    How did you know about the allegation that Ms. ████████ made that Gavshon had sent her a picture where his penis is visible?

ATTORNEY ZUCKERMAN:  Objection.                01:31:43

A.    It was in the New York Post.

Q.    So you read that article?

A.    I did.

Q.    Did you ever discuss it with anybody at 60 Minutes?                                                01:31:50

A.    I'm sure.  Just office gossip.

Q.    Mr. Gavshon didn't lose his job based on those allegations; correct?

ATTORNEY ZUCKERMAN:  Objection.

A.    Right.                                               01:32:00

Q.    Because he still works there?

A.    Exactly.

Q.    Did you have any view as to whether Mr. Gavshon should lose his job or not after you learned about Ms. ████████ allegations?        01:32:08

ATTORNEY ZUCKERMAN:  Objection.

A.    It's not for me to make these calls.  I don't know anything.

THE VIDEOGRAPHER:  Counsel, when you reach a good stopping point, can we go off the

Page 257

Bar-On

record?

ATTORNEY IADEVAIA:  Yeah, we can go off the record.

THE VIDEOGRAPHER:  Stand by.  The time    01:32:24 is 1:32 p.m.  We are off the record.

(Time noted:  1:32 p.m.)

Page 258

A F T E R N O O N   S E S S I O N

(Time noted:  2:07 p.m.)

THE VIDEOGRAPHER:  The time is 2:07

p.m.  We are back on the record.                    02:07:46

S H A C H A R   B A R - O N ,

resumed as a witness, having been previously

sworn by the notary public, was examined and

testified further as follows:

EXAMINATION CONTINUED BY

ATTORNEY IADEVAIA:

Q.    Before the break we were talking about

Mr. Gavshon.  Do you think -- have you observed

that Mr. Owens -- strike that.

You know what, let me mark as an          02:08:19

exhibit this document.

ATTORNEY IADEVAIA:  Are we up to 5?

THE REPORTER:  Yes.

(Bar-On Exhibit 5, text messages,

Bates-stamped PL 1861 to 62, marked for

identification.)

Q.    All right.  I'll state for the record

what's been marked as Exhibit 5 is a two-page text

exchange bearing Bates numbers PL 1861 to 62.

Please let me know once you've had a      02:08:56

Page 259

chance to look at the document.

A.    Okay.

Q.    I'll state for the record the texts are dated -- the first date in Exhibit 5 is September    02:09:03 10, 2020, and the last text is September 17, 2020.

(Pause.)

A.    Okay.

Q.    You've had a chance to review the document?                                                      02:09:52

A.    I have.

Q.    So starting on the first page, PL 1861, of Exhibit 5, if you could take a look at the text dated September 17, 2020, from Ms. Poolos:  I heard AMK is in trouble, but do not repeat.        02:10:05

Do you see those texts?

A.    Yes.

Q.    Please, please.

And then further down -- hold on one sec -- you wrote on September 17, 2020, at 6 p.m.:  02:10:23 Over what?  And then further down Alex says, First promise you won't repeat.  And then you say, Swear on a stack of bibles.  Alex writes, I've heard now from a couple of people she has been very hard on the crews.                                              02:10:48

Page 260

Bar-On

Do you see all those texts?

A.   I do.

Q.   If you go to the next page, Alex writes to you on September 17, 2020, at 6:03 p.m.:  She apparently sent some email that pissed them off. It got forwarded to Tanya, who sent it to HR.  Now HR is investigating her.

Do you see those texts?

A.   I do.

Q.   You wrote, Oy.  Won't share.  Alex writes back, Yeah, please.  Honestly, it's about time.

Do you see all those texts?

A.   I do.

Q.   And then you write on September 17, 2020, at 6:04 p.m.:  Though after they didn't fire Gavshon for sending dick pics, do they really have a leg to stand on?

Do you see that text?

A.   I do.

Q.   And did I read it accurately?

A.   You did.

Q.   And the Gavshon you're referencing in that text is Michael Gavshon; correct?

Page 261

Bar-On

A.    Correct.

Q.    And what did you mean, "they didn't fire Gavshon for sending dick pics"?

A.    Obviously -- for one, it wasn't dick    02:11:55
pics, so this was -- it was a picture of him by a fireplace -- I mean by a bonfire.

So just making a comment that they didn't do anything about that, what would they do about anything else.  I think it's -- clearly I    02:12:10
wasn't giving legal analysis here.  I didn't even characterize it properly.

Q.    When you use the term "dick pics," what do you mean by that?

ATTORNEY ZUCKERMAN:  Objection.    02:12:25

A.    A picture of someone's penis.  But, as I said, that's not what the picture really was.

Q.    What did you mean when you wrote, Do they really have a leg to stand on?

ATTORNEY ZUCKERMAN:  Objection.    02:12:42

A.    Again, what it -- I mean, what it says, like -- you know, again, I don't know what the context of -- there's not actually any elaboration of what AMK did or didn't do.  I don't know.  It's what the words are.    02:12:56

Page 262

Bar-On

Q.    Did you mean by this text that you thought it was unlikely that there would be any real action taken against Ms. Kross because they hadn't fired Mr. Gavshon over the picture he sent     02:13:05 where his penis is visible?

ATTORNEY ZUCKERMAN:  Objection.

A.    This is -- this is in a side comment of gossip to a friend.  It's not legal analysis. We're not on Court TV here.  It's just me     02:13:15 commenting, you know, casually about something. As you see, it's in the middle of two other conversations, and I don't actually know what AMK did.  So I don't think we can deduce anything from this.     02:13:29

Q.    Other than you sent this text message.

A.    That's fine.

Q.    And you used the words, though:  After they didn't fire Gavshon for sending dick pics, do they really have a leg to stand on.     02:13:38

You did write that; correct?

A.    I did.  I mean, I have no way to say I didn't, so I did.

Q.    Do you know when -- how long after this was Ms. ███████  raising concerns about     02:13:56

Page 263

Bar-On

Mr. Gavshon?

        A.    I don't.

        Q.    Do you know it's about a year after

Ms. ████████ had made her complaints about          02:14:03

Mr. Gavshon?

              ATTORNEY ZUCKERMAN:  Objection.

        A.    If you say so.  I don't know.

        Q.    And at that point, at the time that you

sent this text message, had Ms. ████████ filed her   02:14:13

lawsuit against Mr. Gavshon?

        A.    No idea.  I don't know if I knew it at

the time either.  I definitely don't know.

        Q.    Did you ever see the picture that

Mr. Gavshon sent to Ms. ████████                     02:14:27

        A.    It was in the New York Post, and I

don't know you can find it.

        Q.    And you saw it?  You personally

observed it?

        A.    I did.                                  02:14:39

        Q.    Do you know the first time you saw it?

        A.    I would assume around -- I don't.  I

mean, around the time it, you know, became news.

        Q.    After there was a public lawsuit filed?

              ATTORNEY ZUCKERMAN:  Objection.         02:14:50

Page 264

Bar-On

A.    I don't know the order, if there was a lawsuit filed or was there something before the lawsuit.  However the press got the picture is how you saw it.                                    02:15:00

Q.    Do you believe that Bill Owens protected Gavshon in connection with these allegations?

ATTORNEY ZUCKERMAN:  Objection.

A.    How would I know that?                02:15:12

Q.    Do you think that Bill favored Mr. Gavshon?

A.    I don't know that.  You talk to Bill. You can ask him.

Q.    Do you work with someone currently --    02:15:36 we're not looking at that exhibit anymore -- someone currently at 60 Minutes named Rich Bonin?

A.    Yes.

Q.    And have you worked with Mr. Bonin for an extended period of time?                    02:15:47

A.    Well, we're parallel, but yes.

Q.    What's his job at 60 Minutes?

A.    He's a producer.

Q.    And does he work for Lesley Stahl's team?                                              02:15:59

Page 265

Bar-On

A.    He does, and now he works for another team.  He spends -- he's half and half.  But yes.

Q.    For most of the time you have worked at 60 Minutes side by side, has Mr. Bonin been a producer for Lesley Stahl?                    02:16:08

A.    Yes.

Q.    Are you aware of any complaints or concerns raised against Mr. Bonin by CBS employees?                                           02:16:22

A.    No.

Q.    Are you aware of any complaints or concerns about Mr. Bonin raised by ███████

A.    No.

Q.    Are you aware of any complaints or    02:16:32 concerns raised about Mr. Bonin by Cassie Feldman?

A.    They worked briefly, and then they stopped working briefly.  It was not a good relationship.  But I never talked to him or her about it beyond the fact that they were working    02:16:45 for a short amount of time.

Q.    Was Ms. Feldman briefly Mr. Bonin's AP?

A.    She was.

Q.    Do you know anything about the reason she stopped being his AP?                          02:16:56

Page 266

Bar-On

A.    They didn't get along.

Q.    Do you know what the cause or source of them not getting along was?

A.    I don't.                                02:17:04

Q.    Are you aware or have you ever been told that Mr. Bonin is difficult to work with by -- difficult to work with as his AP?  Has anyone ever said that to you?

ATTORNEY ZUCKERMAN:  Objection.            02:17:26

A.    Difficult.  I wouldn't use that word, but yeah, I mean, you know, he can be demanding, so yeah.

Q.    Have you ever heard that Mr. Bonin makes his APs work long hours?                   02:17:43

A.    Sure.

Q.    Have you ever heard the amount of hours that Mr. Bonin expects his APs to work to be described as unreasonable?

A.    No.  And it's not something that has    02:17:58 ever come up, like he is any different than anyone else, so no.

Q.    Were you ever at a lunch with the Lesley Stahl team, meaning producers and APs, in which Mr. Bonin said that he had been interviewed    02:18:17

Page 267

Bar-On

by HR?

A.    No, I don't remember such a thing.

Q.    Were you ever part of a meeting or discussion in which Mr. Bonin said he had been    02:18:28 interviewed in connection with a complaint by █████████

A.    I have not.  First time I'm hearing about this.  They weren't working together, so I'm not sure how that would even work.  But okay.    02:18:40

Q.    Did you ever hear that Mr. Bonin had met with HR in connection with concerns raised about Ira Rosen?

ATTORNEY ZUCKERMAN:  Objection.

A.    Also no.    02:18:52

Q.    Did you ever hear that Ms. ████████ had made or raised a concern that Mr. -- that she had been told that if she had more than one kid it would damage her career?

A.    Never heard that, and I never had -- I    02:19:12 never talked to her in my life so...

Q.    Did you ever hear that from anyone?

A.    No.

Q.    And going back to Mr. Gavshon, have you ever heard that Mr. Gavshon was -- strike that.    02:19:23

Page 268

Bar-On

Did you ever hear that APs had raised complaints, other than Ms. ▮▮▮▮▮▮ about working with Mr. Gavshon?

A.    Have not.                                    02:19:36

Q.    Have you ever heard that Mr. Gavshon worked his APs exceptionally hard?

A.    No.

Q.    Are you aware of any complaints of sexual harassment against Bill Owens?        02:19:56

ATTORNEY ZUCKERMAN:    Objection.

A.    No.

Q.    Are you aware of any complaints of discrimination against Bill Owens?

ATTORNEY ZUCKERMAN:    Objection.        02:20:02

A.    No.

Q.    I know you're not a lawyer, but just what you heard.

A.    No.  I haven't heard either.  He is a very proper man.                              02:20:09

Q.    Have you ever heard any retaliation complaints against Mr. Owens?

ATTORNEY ZUCKERMAN:    Objection.

A.    No.

Q.    Have you ever heard Ms. Stahl say that    02:20:17

Page 269

Bar-On

women made frivolous complaints against men all of the time?

ATTORNEY ZUCKERMAN:  Objection.

A.    No.                                                  02:20:26

Q.    Have you ever heard Ms. Stahl say words to that effect?

A.    No.  I don't think she thinks that.

Q.    You've referenced this earlier today, but let's just sort of transition to this part.    02:20:44 At some point before Ms. Poolos's lawsuit was filed, did you become aware that Ms. Poolos had made a complaint about you?

A.    Yes.

Q.    Approximately when did you find that    02:20:56 out?

A.    You'd have to give me the date.  I was working on the Volkswagen story, so it would have been March or April of -- you'd have to give me the year.  About a few months after she was fired.  02:21:12

Q.    So we're talking 2022?

A.    Okay.  Fine.  I mean, you would know. I'm not contesting.

Q.    And what were you told about the complaint?                                              02:21:23

Page 270

Bar-On

A.    That she made a complaint and they were investigating me in regard to that.

Q.    Were you told about the allegations that she made against you?                    02:21:30

A.    Yes.

Q.    And what were you told?

ATTORNEY ZUCKERMAN:  Hold on just a second.  I just want to be sure you're not revealing what was discussed with you by the    02:21:38 employee relations employee that was investigating the complaint.  That's something you shouldn't talk about.  We've taken the position that that's privileged.

So if you've learned about the nature    02:21:53 of the complaint from someone else, that you can testify to, and not me about someone else either.

THE WITNESS:  I hear you.  And if I'm answering this wrong, then shut me down,    02:22:03 because...

I only heard because she -- because this HR person called me.  That's how I heard about it and understanding everything in there seems to be like -- whatever.  Ask.    02:22:15

Page 271

Bar-On

Q.   Let me ask you this:  Is the HR person you're talking about Jennifer Gordon?

A.   Yes.

Q.   Did you have discussions with anyone   02:22:26 else, either in employee relations or human resources, other than Ms. Gordon about Ms. Poolos's complaint?

A.   No.

Q.   Did you have any discussions about   02:22:35 Ms. Poolos's complaint with anyone in a management position at 60 Minutes?

A.   When the complaint was filed -- or whatever, when I got the phone call -- I don't know when it was filed -- Lesley -- you know, I   02:23:03 told Lesley that I have to take a break -- we were literally in the middle of something -- because I needed to deal with something.  She had already known about this.  And that's it.  That's the only one.  And then I hired a lawyer.   02:23:17

Q.   Did you ever speak to Bill Owens about the complaint that Ms. Poolos made about you?

A.   No.

Q.   Did you ever speak to Tanya Simon about the complaint?   02:23:27

Page 272

Bar-On

A.    Never.

Q.    How many times did you meet with Ms. Gordon related to Ms. Poolos's complaint?

A.    It was all by phone, and it was about four or five times.    02:23:36

Q.    And do you recall how long each of those phone discussions were, approximately?

A.    One was very long; the others were shorter.    02:23:50

Q.    And at some point did you learn that the investigation had been concluded?

A.    I did.

Q.    And how did you learn that?

A.    Ms. Gordon called me.    02:24:03

Q.    Did you receive a letter?

A.    Yes, an email.

Q.    And did the email explain that the investigation had been closed?

A.    Yes.    02:24:14

Q.    And you also had a phone call with Ms. Gordon about the investigation being closed?

A.    Yes.  I think the phone call probably came before the email, but I'm not sure.

Q.    Okay.  And do you remember    02:24:24

Page 273

Bar-On

approximately when you were told that the investigation was closed?

A.   It would say on the email.  It was about three or four months of -- after the initial call, I think.  I don't remember the exact date. It was a few months afterwards.   02:24:35

Q.   What was your understanding of the conclusion of the investigation?

A.   That they found no merit, and that was the end of that.   02:24:47

Q.   And after the phone call that you had with Ms. Gordon and the letter email that you received about the investigation concluding, did you ever have any discussions with employee relations related to Ms. Poolos?   02:25:03

ATTORNEY ZUCKERMAN:  Objection.

A.   Just to notify me that she filed with the EEOC, but that was like a year later.

Q.   Okay.   02:25:20

A.   No, as far as -- it was over and done with, as ridiculous as the whole thing was, yeah.

Q.   Outside of that call related to the EEOC filing, did you have any other discussions with employee relations about Ms. Poolos?   02:25:33

Page 274

Bar-On

ATTORNEY ZUCKERMAN:  Objection.

Q.    I'm talking about after finding out that the investigation was concluded.

A.    No, we had two conversations, the thing was over, and that was it.  That was -- yeah.    02:25:40

Q.    And the only other interaction you had with employee relations related to Ms. Poolos was notification to you that an EEOC charge had been filed?    02:25:56

A.    Well, I never talked to Gordon ever again.  There was another HR person who said that the EEOC thing was filed and then that when you guys had -- I don't know if you lost the EEOC or whatever happened there.  They said you had a    02:26:12
number of days to file a lawsuit.

Q.    So you were told both when the filing was made with the EEOC and also when we received a notice of a right to sue?

ATTORNEY ZUCKERMAN:  Objection.    02:26:23

A.    Definitely the notice of a right to sue.  I believe about the EEOC too.  It's all kind of a blur.

Q.    And who told you about the EEOC?

A.    If you say the guy's name, I'll say    02:26:34

Page 275

Bar-On

yes, but I don't remember.  Someone high up in HR.

Q.    Was it Michael Roderick?

A.    No.

Q.    Did you have any other discussions,    02:26:46
other than what you testified to, with someone in
employee relations or human resources about Alex
Poolos?

A.    Never.

Q.    Are you aware of Ms. Poolos having made  02:27:02
handwritten notes related to interactions that she
had with you?

ATTORNEY ZUCKERMAN:  Objection.

A.    Just as a result of the lawsuit.

Q.    Were you told that before -- told about  02:27:10
those notes before the lawsuit?

A.    No.

Q.    And did you read about the note -- the
handwritten notes in the lawsuit?  How did you
learn about the handwritten notes as it relates to  02:27:22
the lawsuit?

ATTORNEY ZUCKERMAN:  Just don't reveal
    discussions you've had with me, my firm, or
    Danya Ahmed.

A.    I don't know if the lawsuit actually    02:27:34

Page 276

Bar-On

specifically says that they're handwritten notes.
I think you could understand that from some of the
stuff that was written.  And the rest is stuff
that I guess I can't say.                      02:27:43

Q.    Outside of any interactions that you
had with counsel --

A.    Yeah.

Q.    -- have -- strike that.

Have you ever reviewed the notes?  Let   02:27:52
me be clear.  Have you ever reviewed Alex Poolos's
handwritten notes related to interactions with
you?

A.    I have seen one note that came up in a
filing action, so I've seen that.  I can't    02:28:17
remember which one.  Not long ago.  That was it.

Q.    Okay.  Outside of any conversations
that you may have had with counsel, has anyone
asked you questions about information that was
contained in the notes?                        02:28:33

A.    No.

Q.    Have you ever had any discussions with
Bill Owens about Alex's handwritten notes?

ATTORNEY ZUCKERMAN:  Objection.

A.    Never.                                    02:28:47

Page 277

Bar-On

Q.   Have you ever had any discussions with Tanya Simon about Alex's handwritten notes?

ATTORNEY ZUCKERMAN:  Objection.

A.   Never.                                            02:28:54

Q.   And when I say "handwritten notes," you understand what I'm referring to are the notes that Alex wrote by hand about interactions with you?  Do you understand that?

ATTORNEY ZUCKERMAN:  Objection.      02:29:03

A.   Yeah.

Q.   To your knowledge, other than any concern or complaint Ms. Poolos made, are you aware of any concerns or complaints about you by someone at 60 Minutes?                               02:29:22

A.   I'm not aware of any such concerns.

Q.   Are you aware that Ms. Poolos spoke to Alison Pepper when Ms. Poolos was an AP about concerns she had related to you?

ATTORNEY ZUCKERMAN:  Objection.      02:29:45

A.   I was made aware by the lawsuit.  I had no idea until then.

Q.   Did you ever speak with Alison Pepper about concerns that Ms. Poolos had raised about you?                                                        02:29:55

Page 278

Bar-On

ATTORNEY ZUCKERMAN:  Objection.

A.    No, not then, not now.

Q.    And have you ever spoken to -- strike that.

Are you aware that Ms. Poolos spoke to Bill Owens when she was still an AP about concerns and complaints that she had about you?

ATTORNEY ZUCKERMAN:  Objection.

A.    Just what I saw in the lawsuit.  I   02:30:14 don't even know if it's in the lawsuit.  But no.

Q.    Did you ever have a discussion with Bill Owens about concerns or complaints that Ms. Poolos had raised about you when she was still an AP?   02:30:25

ATTORNEY ZUCKERMAN:  Objection.

A.    No.

Q.    Did you speak with anyone at CBS, not including counsel or Jennifer Gordon, the investigator, about Ms. Poolos -- about the   02:30:50 investigation that was conducted in response to Ms. Poolos's complaint?

A.    Right after she got fired, when she said --

Q.    In 2022.

Page 279

Bar-On

A.    -- when she made up that stuff?  No, I didn't talk to anyone at CBS.  I was told not to by Jennifer, and I didn't.

ATTORNEY IADEVAIA:  Let's mark this as    02:31:16
Exhibit 6.

(Bar-On Exhibit 6, memo dated 5/21/22 from Gordon to Bar-On, Bates-stamped CBS 8388, marked for identification.)

Q.    What's been marked as Exhibit 6 is a    02:31:40
one-page memo bearing Bates number CBS 8388.

Mr. Bar-On, please read, and once you've completed, let me know.

(Pause.)

A.    Okay.                                    02:32:33

Q.    Do you recognize what's been marked as Exhibit 6?

A.    Yeah, yes.

Q.    And what is it?

A.    It's a letter terminating her complaint    02:32:43
against me.

Q.    You're saying terminating Ms. Poolos's complaint against you?

A.    Your client's, yeah.

Q.    Is this what you're referring to just a    02:32:53

Page 280

Bar-On

couple of minutes ago, one of the ways in which you learned the investigation had been closed?

A.    Correct.

Q.    And this is a memo that was sent to you, and it's signed by Jennifer Gordon; is that right?

A.    Yes.

Q.    And it is dated May 21st, 2022; is that correct?

A.    It is.

Q.    So in the memo -- or this letter Ms. Gordon sends to you, she writes, As you are aware, I recently conducted an investigation in connection with a complaint made by Alexandra Poolos, former producer 60 Minutes, alleging that at certain times while she worked as your associate producer you sexually harassed and bullied her.

Do you see that text?

A.    I do.

Q.    Is that an accurate statement, that you were aware as of May 21st, 2022, that Ms. Poolos had made allegations that you had sexually harassed her and bullied her?

Page 281

Bar-On

A.    I think it's ridiculous what she's claiming.  But, yes, I was made aware, because there was a real investigation involving me hiring an attorney and a very big deal, obviously.  You 02:34:00 don't get these things -- you don't take these things lightly, especially when they're such lies.

Q.    In the next sentence Ms. Gordon wrote, Specifically she alleged you made sexual jokes on two occasions. 02:34:17

Do you see that text?

A.    I do.

Q.    Is it accurate you're aware that Ms. Poolos had alleged that you had made sexual jokes on two occasions? 02:34:24

A.    I don't remember the "two occasions" part, but I remember she accused me of making sexual jokes.

Q.    Was Ms. Poolos's allegation that you had made sexual jokes true? 02:34:35

A.    Absolutely not.

Q.    Did you ever make any sexual jokes to Ms. Poolos?

A.    I don't think so.  If you've got specific examples, bring them on.  But, no, I 02:34:44

Page 282

Bar-On

don't -- no.

Q.    Then the letter says that you commented on Ms. Poolos's body and weight and how her clothes fit, including on her outfit at the 2016    02:34:59 Emmy Awards.

Do you see that text?

A.    I do.

Q.    Is it accurate you're aware that Ms. Poolos had made the allegations that you    02:35:08 commented on her body and weight and how her clothes fit?

A.    I was aware she made the accusations and the allegations.  Again, I think they were wrong, taken out of context, added stuff that was    02:35:17 just lies; just Alex being Alex.

Q.    Did you ever comment on Ms. Poolos's body?

A.    I did not comment on Alex's body. Having said that, as she does not describe in the    02:35:31 lawsuit or in this or anywhere, this is the contextual stuff.

Alex and I spent a lot of time together on the road.  That meant we had a lot of downtime, and we would do stuff like go shopping, outlet    02:35:46

Page 283

Bar-On

mall shopping.  If she would -- if I would try something, she would say if it works.  If she would try something and ask me if it works -- I'm reminded of a specific incident in Argentina where  02:36:02 we were going to buy leather outfits.  I was going to buy a jacket.  She bought a dress to impress her friend.  She asked me if it made her look slutty.

Besides that, Alex constantly worried  02:36:16 about her weight.  It was a big issue with her.  I never raised it first.  When she would raise it, which was often, I would usually just, you know -- I'd usually just kind of deflect and say, Oh, you know, I should lose some weight too, or stuff like  02:36:31 that.  I don't want to insult anyone.

So in that sense, yeah.  It was always raised by her.  I never raised it on my own, because I'm a normal human being and I don't do that.  Specifically about the Emmys, I'm sure I  02:36:48 said her dress looks nice.  But the Emmys happen in the afternoon; we're in the office in the morning.  We just get dressed with regular clothes, and then we all show up nice.  So I'm sure I said, Oh, you clean up nice or something  02:37:01

Page 284

Bar-On

like this.  So I'm sure I complimented her outfit.

But turning this upside-down the way she did with half-truths, lies, and just mischaracterizations, intentional                    02:37:15
mischaracterizations, is just, you know -- it's just lying.  And it was proven to have no merit so...

Q.    Proven to have no merit based --

A.    It was dismissed.                    02:37:30

Q.    You're talking about the public relations at Paramount; correct?

A.    Yes.  Again, we're talking about stuff that happened years and years ago, or didn't happen, as the case may be.                    02:37:41

Q.    The letter in Exhibit 6 next says, Tried to get into her hotel room during a work trip in Italy.

Were you aware of that allegation at the time of this letter?                    02:38:04

A.    Actually, this is interesting.

And if I'm saying something I shouldn't, just shut me down here.

Jennifer actually asked me --

ATTORNEY ZUCKERMAN:  No, no, that you    02:38:14

Page 285

Bar-On

cannot talk about.

THE WITNESS:  Okay.  Fine.

I don't know.  I mean, I had never pressured her to get into a hotel room.  This is based on -- when I read it in the lawsuit, I was flabbergasted.  It is so wrong, not true, never happened.  This is her making stuff out of thin air.  Never happened.  I don't know how many times I can say, you know, some things may be were misconstrued.  Never happened.

I think -- had we worked in hotel rooms?  All the time.  I don't know what she's picking up specifically about Italy?  I don't remember -- I don't remember us even working in hotel rooms in Italy.  You know, if she cares to clarify, she can, with the stuff she makes up.

But the point is, you know, we worked in hotel rooms a fair amount.  Never, ever, ever was there anything sexual or any attempt at pressuring her to do anything besides do work.

Q.    The next statement in the letter says,

Page 286

Bar-On

Ms. Poolos made an allegation that you watch pornography on a work computer while on a work trip to Washington, D.C.

Q.   Were you, as of May of 2022, aware of that allegation?

A.   I was made aware by the -- yeah, that was one of the things that came up in Jennifer's investigation.  I was aware of that.

Q.   Was that true, that allegation?

A.   It's complicated, because there's a tiny grain of truth here, but not really.  A, it was not a work computer.  It was my own personal blue Dell.

Basically what Alex is saying here -- again, usually taken out of context, the way she does -- is in 2008 -- so this would be, you know, almost 20 years ago and, like, at least five years before she showed up.  I was on a work trip for a crash in Washington, D.C.  I happened to have my personal laptop.

I remember it very well.  We were at the airport crashing.  And then Lesley said, Oh, do you have a laptop; we can start working?  I did have a private video on there, or DVD, because

Page 287

Bar-On

that's the technology at the time.  And I remember being -- the entire time she worked on the computer thinking, Oh, my God, what if she presses some button and either the DVD pops or something    02:40:49 pops up on screen.

Years later, like five years later, I happened to tell the story.  I shouldn't have. That was a mistake, which -- that was a mistake. I told the story to Alex and to other friends in    02:41:08 the room.  We were never alone in this room.  It was really more of a self-deprecating story that I was in a very embarrassed position.

The point was -- we were talking actually about how Lesley, when she types,    02:41:24 everything goes crazy on the screen, and that was the context of me telling the story.

Not only did she -- again, I should not have told that story; I'm not saying I should have.  Not only did she laugh then, but for years    02:41:40 later she would bring it up with other people. And I remember thinking, well, you know, it's kind of a personal story for you to bring up.  That's a little weird.  So she thought it was a joke then. She thought it was a joke later when she told it.    02:41:59

Page 288

Bar-On

As with various other items in this lawsuit, she takes things out of context and pretends not to understand them.  As I said last time, there was this thing Lesley said on a job interview.  It was basically Alex taking things out of context.

So maybe she really doesn't understand how the English language works, which I don't think, or she's lying.  I'm sorry I'm emotional about this.  And I shouldn't have done this but, you know.

Q.    And who else was present when you told this story to Ms. Poolos?

A.    I believe Matt Magratten.  I don't know who else was.

Q.    And did you tell that story on other occasions?

A.    I think the other occasions they brought it up or she brought it up.  I think I only told it once.  But I don't remember.  It's not like -- you know, I did it.

Q.    At the time that you told the story to Ms. Poolos, was she an associate producer?

A.    Yes.

02:42:10

02:42:21

02:42:32

02:42:44

02:42:58

Page 289

Bar-On

Q.    And she was reporting to you at that time?

A.    She was, yes.

Q.    Okay.  Was there ever a time that     02:43:08
Ms. Poolos told you that ███████████████

A.    No.

Q.    Was there a time that she told you she
███████████████████

A.    She told me that ████████████████  02:43:16
I remember it very clearly, because it's not
something that comes up usually.  That was a first
for me, the only time for me.  I remember
thinking, like, what's -- what do you do?  I
didn't know what to do or say.     02:43:30
████████████████████████
████████████████████████
███████ █████████████████
████████████████████ █████████ ██████
████████████████
██████████████████████
███████████████
██ ██████████████████
██████████████████     02:44:00

Page 290

Bar-On

██████████████████████████████████

████

A.    She was.  The issue was we were in the middle of a story that was not going well, and she  02:44:09 needed to take time off, which is totally understandable, ████████████████████████

████████    And I had to basically take all this stuff on my own.

I mean, things went so well -- so  02:44:21 poorly, actually, because in part she didn't do her job, that Bill yelled at me a lot and one of the very few times where -- I just took it.  I obviously didn't say anything.  I obviously took all the blame.  I didn't -- I didn't reveal, that,  02:44:38 you know, she was compromised in any way.  I just said it was all me, and that was it.

Q.    What was the story you were referring to?

A.    This was the Paris encryption story in  02:44:47 2015, I think.

Q.    If you look again at Exhibit 6, the letter states, from Ms. Gordon, that Ms. Poolos alleged that in 2015 she told you ████████ ████████.                                                 02:45:07

Page 291

Bar-On

And I think you just testified to this, but to be clear, you're saying that that's not true?

A.    A hundred percent not true. ███████ ███████ ███████████████████ So I never knew she███ ███████

Q.    And then the next text says, And that you advised her you -- that she would have to quit her job and live with her parents.    02:45:27

Did you say that to Ms. Poolos?

A.    More baloney, more things taken out of context, and I'm more than happy to give the exact context --

Q.    Sure.  Please do.    02:45:37

A.    -- which is why we're here.

So, again, in a relationship between a producer and an AP, we spend an incredible amount of time together.  We are on the road together.  We are in cars together.  We're in airports    02:45:49
together.  We spend a lot of time talking.  And this was no -- this was, you know -- so I did so with Alex as well.

We had two very long conversations that I remember -- maybe there are others, but two    02:46:07

Page 292

Bar-On

stick in my mind -- about family and what you do and planning and kids and all that stuff.  One was -- and, again, I don't remember the dates of the first one.                                      02:46:21

Let me stop until you read.

Q.    No.  Go ahead.  I'm listening.

A.    So we had one conversation.  Her middle brother, he's got some -- ███████████████████ ███████████████, and he was going through a   02:46:37 ████████  And he moved back to live next to his parents so they would raise the individuals.

So that was a debate about whether -- and also in the same conversation Alex was describing her childhood and the pool next to her   02:46:56 house and all that stuff.

So we had a conversation of if would she ever consider moving back to Cleveland to raise kids, like her brother did, and because she was talking about all these advantages of   02:47:13 Cleveland versus New York.

I never told her anything like this about quitting her -- you know -- I do say -- I say it to every single AP that I have, I say it, you know, family comes first.  So your family   02:47:33

Page 293

Bar-On

decisions are always more important than your work decisions.

And I say it because I was silly enough to stay in an edit room when my mom died, because I was like, oh, it will be fine, it will be fine, and I never got to say good-bye to her.  So I do firmly believe that family comes first, and I'm sure I said this to her.  If she's taking this out of context, which she clearly is, it's just Alex being Alex.

The point is -- so that was one time.

We had another conversation years later -- not years, a couple years later.  This was after we were in Israel.  I remember very clearly we were in an Israel airport.  So this would be long after ███████████████████ where she asked me if I would move back to Israel.  And that triggered its own conversation.

And, again, now she is talking about her other brother and how he moved away from his parents and separated from them and was more into his mother-in-law Viva.  And there was a whole, like, discussion about how her brother sort of turned against her parents.  So that was another

02:47:41

02:47:56

02:48:07

02:48:25

02:48:39

Page 294

Bar-On

discussion about where do people live in connection to work and stuff. That was it.

Those were the two discussions I remember; obviously never in connection to her ██████████████████ saying anything about her not being able to work. I mean, it's ridiculous.

And I think -- I don't know if I pointed this last time: After working with Alex, I hired a woman who had an infant and immediately ████████████ with another one. There was never an issue, never a problem, you know. I never had anything like this said about anything because I never did. This is just things taken out of context.

And I'm sorry I'm going on so long.

Q. The letter in Exhibit 6 also states that Ms. Poolos alleged that during this same period you yelled a her.

As of May of 2022, were you aware that Ms. Poolos had alleged that you had yelled at her?

A. I don't remember this coming up in this specific investigation, which was focused on the things above. But as I said last time, we did not have a good working relationship. I would say, as

02:48:53
02:49:06
02:49:19
02:49:31
02:49:47

Page 295

Bar-On

I said last time, she would often yell at me; in fact, mostly she would yell at me, every day, 20 minutes, 40 minutes, and sometimes the only way -- there are two ways to shut it down: either                  02:49:59 placate her, be nice, try to move it to somewhere good, like have a personal conversation or basically say, yeah, yeah, yeah, I agree, fine, I can see it your way; or just say, you know, stop it, Alex, this is enough, stop it.                           02:50:16

And then, you know -- she would get -- her eyes would bulge, she -- she would go to places adults should not go.  This would continue for 45 minutes and would be heard all across, even though the door was closed, as, you know, so, did    02:50:33 it ever --

Q.    My question is did you ever yell at Ms. Poolos.  That's the allegation I'm asking if it's true.

ATTORNEY ZUCKERMAN:  Objection.           02:50:43

A.    As I said, sometimes I would have to yell to shut it down.  Sometimes I would have to yell if she didn't do her job, repeatedly.

Q.    How frequently did you tell at Ms. Poolos when she was your AP?            02:50:52

Page 296

Bar-On

A.      It was a direct correlation to how frequently she yelled at me.  At certain points, you know, it was a couple times a week.  I don't know.  Every time I would hear her footsteps     02:51:00 coming into my office, I knew, oh, my God, this is going to blow up.  She is going to be -- she is a volatile, aggressive person.

Q.      I know you've testified --

A.      I know, but if you ask a question,     02:51:11 that's the answer.

Q.      That's not -- the question is how frequently did you yell at Ms. Poolos.

            ATTORNEY ZUCKERMAN:  He's trying to explain.                                            02:51:16

            ATTORNEY IADEVAIA:  He has.  He already has.

A.      Okay.  So that's it.  So let's --

            ATTORNEY ZUCKERMAN:  You can't cut off his question -- his answer.                      02:51:23

            (Unintelligible discussion interrupted by the reporter.)

A.      Okay.  The answer is occasionally.  I don't have a number for you.  Occasionally the only way we could get back to work -- which we     02:51:28

Page 297

Bar-On

needed to do work.  We're not producing a story a year; we're producing four or five.

I had to be, like, Enough, Alex.  And then she would storm out of the office, slam    02:51:39 doors, you know, cry, throw folders on the floor. There was a variety of responses.

Q.    And if you look at this letter, Exhibit 6, in the third paragraph the first line says, Based on the investigation, we were unable to    02:52:01 substantiate the allegations as raised.

Do you see that text?

A.    I do.

Q.    Did I read it correctly?

A.    You did.    02:52:10

Q.    So is this one way in which you were notified that Paramount had completed its investigation of Ms. Poolos's complaints against you?

A.    Yes.    02:52:21

Q.    On the second page, CBS 8389, Ms. Gordon's letter says in Exhibit 6:  At this time we consider the investigation concluded.

Do you see that text?

A.    I do.    02:52:39

Page 298

Bar-On

Q.    To your knowledge was the investigation related to Ms. Poolos's complaints after -- that were investigated after she was fired, was that investigation ever reopened, to your knowledge?    02:52:49

A.    I mean, I don't know what happened with the EEOC or something like that, so I don't know what happened afterwards.  The next time I heard about it was in the lawsuit you filed.

Q.    Did anyone ever tell you that the    02:53:02 investigation had been reopened?

A.    No.

Q.    And after this point in -- well, strike that.

Did CBS take any disciplinary action    02:53:16 against you in connection with Ms. Poolos's concerns or her complaint that was investigated as reflected in Exhibit 6?

A.    None of it happened, hence none of it -- they didn't take any response to anything    02:53:33 that didn't happen.  No.

Q.    Okay.  And did CBS take any corrective action against you?

ATTORNEY ZUCKERMAN:  Objection.

A.    There was nothing to correct.    02:53:42

Page 299

Bar-On

Q.    My question is did they take any corrective action.

A.    No.

Q.    Did anyone coach you related to Alex's    02:53:48 allegations that are reflected in Exhibit 6?

ATTORNEY ZUCKERMAN:  Objection.

A.    No.

Q.    Did you --

A.    Again, we don't think they happened    02:53:57 so...

Q.    You did testify some of the things happened.  You said it is out of context, but you did testify some did; right?

ATTORNEY ZUCKERMAN:  Objection.    02:54:05

A.    Right.  I think context creates -- is very, very important in this case.

Q.    I understand your view.

A.    That's what we're talking about.  So there's no corrective actions to things that don't    02:54:12 need to be corrected.

Q.    Did Bill Owens ever talk to you about any concerns he had in connection with the allegations that Ms. Poolos had made?

A.    Concerns about me?    02:54:31

Page 300

Bar-On

Q.    Yeah.

ATTORNEY ZUCKERMAN:  Objection.

A.    No.

Q.    Were you required to attend any           02:54:36
training as a result of Ms. Poolos's allegations
against you?

A.    I did whatever mandatory the rest of
the company does, but that's it.

Q.    Was there any special instruction to    02:54:46
you to attend training in connection with
allegations that Ms. Poolos had made?

A.    No.

Q.    Did you receive a written warning in
connection with the allegations that Ms. Poolos    02:54:59
made?

A.    I mean, besides that initial phone call
from Jennifer?

Q.    I'm asking following the investigation
did you get a written warning.                      02:55:09

A.    Everyone decided this investigation --
I mean, her accusations don't make any sense.  So,
no, I didn't get anything consequent because there
was nothing to receive.

Q.    And that includes no written warning;    02:55:21

Page 301

Bar-On

correct?

A.   That I'm aware of, no, no written warning.

Q.   When you're talking about the phone     02:55:28
call with Ms. Gordon, that's to notify you that there had been allegations?  That's what you're referring to?

A.   Yes, and to investigate them.

I'm going to get a drink of water.     02:55:37
Sorry.  Just half a second.

Q.   That's okay.  Why don't we take --

A.   No, I would rather get this done.  So I would actually rather not.

ATTORNEY IADEVAIA:  Well, why don't we     02:55:47
take a two-minute break.

THE VIDEOGRAPHER:  Stand by.  The time is 2:55 p.m.  We're off the record.

(Recess taken from 2:55 to 3:21.)

THE VIDEOGRAPHER:  The time is 3:21     03:20:53
p.m.  We are back on the record.

ATTORNEY IADEVAIA:  Okay.  If we can mark this as 7, please.

(Bar-On Exhibit 7, emails, Bates-stamped PL 3010, marked for identification.)     03:21:32

Page 302

Bar-On

Q.    What's been marked as Exhibit 7 is a one-page email chain Bates-stamped plaintiff 3010.

Mr. Bar-On, after you have a chance to review this email, please let me know.                03:21:49

(Pause.)

A.    Okay.

Q.    Okay.  So the email -- I want you to focus on the bottom email.  It's from you to Ms. Poolos, and it's dated February 28th, 2013.    03:22:07 In the subject it says, Sorry.  I apologize for the outburst.  Was uncalled for.  Will work on it. Then in the body it says, I've just been here since 8:30 dealing with China crap.

Do you see that text that I just read?  03:22:26

A.    Yeah.

Q.    And did I read it accurately?

A.    You did.

Q.    Okay.  Do you recall sending this email to Ms. Poolos?                                      03:22:33

A.    No.

Q.    Were there times that you yelled at Ms. Poolos when they were not, as you put it, prompted by Ms. Poolos yelling at you?

ATTORNEY ZUCKERMAN:  Objection.    03:22:45

Page 303

Bar-On

A.    If you have specific cases, bring them up.  I don't remember either way.

Q.    Okay.  Let's look at this email. You're apologizing to Ms. Poolos, it appears for    03:22:53 an outburst.  Was this an instance where Ms. Poolos had yelled at you first?

A.    I don't know.  I don't have any context.  I don't know what this black is.  It's an email from 12 years ago.  I'm sorry, I don't    03:23:07 remember the details.

Q.    Did you work on a story about China in 2013?

A.    We did.

Q.    And what was that story?    03:23:15

A.    It was a double story.  One was about Chinese ghost cities, and one was about a Chinese billionaire who was a real estate developer.

Q.    And were those stories both done in 2013?    03:23:31

A.    I believe so, yeah.

Q.    Were there any times you can think of where you yelled at Ms. Poolos but it was not in response to her yelling at you?

ATTORNEY ZUCKERMAN:  Objection.    03:23:44

Page 304

Bar-On

A.    There might have been cases like that where I thought she was not doing her job over and over again, and there was pressure to do a job so...                                                03:23:55

ATTORNEY IADEVAIA:  Can we mark this as 8, please.

(Bar-On Exhibit 8, handwritten notes, Bates-stamped PL 193 and 194, marked for identification.)                                  03:24:49

(Pause.)

Q.    So for the record what's been marked as Exhibit 8 is a two-page document, handwritten notes, Bates-stamped PLAINTIFF 193 and 194.

And I think you've been reading the          03:26:34 document, but please continue.  Let me know when you finish.

(Pause.)

Q.    Okay.  You've had a chance to review the document?                                             03:27:38

A.    Yeah.

Q.    I'm going to represent that these a handwritten notes produced by plaintiff in this matter.  The top of the notes are dated -- for what's been marked as Exhibit 8 dated August 5th,   03:27:51

Page 305

Bar-On

2016.

Shachar, have you -- Mr. Bar-On, sorry --

A.    That's all right.                           03:28:03

Q.    -- have you seen what's been marked as Exhibit 8 before today?

A.    No.

Q.    Okay.  You've had a chance to review the notes.  Ms. Poolos wrote in these notes that    03:28:10 she was in your office and that there was a joke with Matt Zev [phonetic] about masturbating to the image of Margot Robbie who was on the cover of Vanity Fair's August 2016 edition.

Did this happen?                           03:28:36

A.    It's Matt Lev, not Matt Zev.

Q.    Sorry.

A.    That's okay.  I don't remember this happening.

Q.    Who is Matt Lev?                           03:28:44

A.    He's an editor on the show and a friend.

Q.    He worked on the show back in 2016?

A.    He did.

Q.    When you say you don't remember, is it    03:28:55

Page 306

Bar-On

because you don't think it happened or you just don't have a recollection either way?

A.    I don't have a recollection of this incident.  I mean, it came up in the lawsuit, so 03:29:02 I've read it there.  But I don't remember this happening.

Q.    Further down in the note it says, He took the wrapper off and tried to throw it at Shachar -- I believe that "he" is a reference to 03:29:27 Matt -- who made another joke about taking off the plastic.

Do you remember that happening?

A.    No.

Q.    If you look at the second page of the 03:29:48 exhibit, Bates-stamped PL 194, the notes state, I attempted to tell Shachar that I wanted to establish a more professional way of working together.

Did Ms. Poolos ever say that to you 03:30:02 during the period she was your AP?

A.    We both talked about trying to have a more calm relationship and a more productive working relationship.  That had come up several times over the years, especially towards the end, 03:30:23

Page 307

Bar-On

because we needed to work with each other and it was not a very good relationship.

So I think we at various times both said, Let's try and make this work, let's try and 03:30:35 get this to -- I remember conversations that I had with her about it.  If she said she had it with me, I'm not questioning it.

I am questioning some -- I mean -- again, I don't remember the incident, but, you 03:30:48 know, I don't remember her making anything clear about anything.  I think that's just her adding stuff.

Q.    Can you be clear on which thing you don't believe happened?                                03:31:01

A.    Again, I don't know the entire incident.  If she was, like, you know -- I made it clear I didn't want to -- this type of talk.  I don't know what she's talking about.  I mean, I can read.  But I don't remember any such thing 03:31:14 happening.  So I don't remember the joke or any follow-up conversation.

Specifically about your question about having a more professional relationship, as I said, we both had these conversations, because I 03:31:28

Page 308

Bar-On

thought she was extremely unprofessional in how she treated me.  We had to work together.  We had to make it work.

So we had these conversations, you          03:31:37
know, I would get yelled at a couple days later, and it would always end up the same.

Q.    Did you ever tell Alex that she sounded bitter?

A.    I don't remember this.                 03:31:48

Q.    Is it possible you did?

ATTORNEY ZUCKERMAN:  Objection.

A.    Is it possible?  Sure.  I don't know.

Q.    The event that -- or the incident that Ms. Poolos describes in what's been marked as   03:31:58 Exhibit 8, is it your testimony that it did not happen that this joke was told or that you don't remember?

ATTORNEY ZUCKERMAN:  Objection, asked and answered.                                          03:32:07

A.    I don't remember.  Yeah, a couple of times, actually.

Q.    You don't remember; right?

ATTORNEY ZUCKERMAN:  No, that's not what he testified to.  Stop trying to put          03:32:11

Page 309

Bar-On

words in his mouth.  He testified a million times --

ATTORNEY IADEVAIA:  No, he didn't testify --

ATTORNEY ZUCKERMAN:  It's what he said twice.

ATTORNEY IADEVAIA:  I'm asking --

ATTORNEY ZUCKERMAN:  I wrote it down.

ATTORNEY IADEVAIA:  I'm asking --    03:32:21

ATTORNEY ZUCKERMAN:  Don't answer anymore.  It's the same question over and over.

ATTORNEY IADEVAIA:  You can't correct him not to answer the question.    03:32:22

ATTORNEY ZUCKERMAN:  I just did.

ATTORNEY IADEVAIA:  No, you can't.

ATTORNEY ZUCKERMAN:  Well, I just did.

ATTORNEY IADEVAIA:  So we're going to call the court.  This is ridiculous.    03:32:26

ATTORNEY ZUCKERMAN:  You don't get to try to put words in the witness's mouth.

ATTORNEY IADEVAIA:  Stop it, Lyle. Then I'll ask him the question.

ATTORNEY ZUCKERMAN:  You asked it    03:32:34

Page 310

Bar-On

twice.

Q.    I'm asking you the question of whether or not you were denying this happened or if you don't recall whether it happened or not.          03:32:40

ATTORNEY ZUCKERMAN:  Do not change your answer.

A.    No, I don't recall.  That's why I said I have no memory of this happening.

Is that different than how I answered?    03:32:50

ATTORNEY IADEVAIA:  If we could mark this as Exhibit 9, please.

(Bar-On Exhibit 9, handwritten notes, Bates-stamped PL 205 to 206, marked for identification.)          03:33:43

Q.    For the record, what's been marked as Exhibit 9 is a two-page document that contains handwritten notes and is bearing Bates numbers PL 205 to 206.

Let me know once you've had a chance to   03:33:56 review, please.

(Pause.)

A.    I don't understand.  I just physically don't understand what the last line means on the first page.  Start talking about what?          03:34:59

Page 311

Bar-On

ATTORNEY ZUCKERMAN:  If you can't read it, you can't read it.  Just move on.

A.    I can't read it.

(Pause.)                                03:35:31

Q.    You've had a chance to review the document?

A.    Yeah.

Q.    Is there anything in these notes that's inaccurate?                             03:35:51

ATTORNEY ZUCKERMAN:  Objection.

A.    I mean, I don't remember a lot of this. I remember some of the conversation.  I did actually go to a Natalie Portman party.  I thought it was a years later, so it's a little odd.  Yeah, 03:36:06 a lot of this I just -- I just don't remember.

Q.    Is there someone who works at 60 Minutes named Keith Sharman?

A.    There is.

Q.    Did he work at 60 Minutes in August of   03:36:25 2016?

A.    He did.

Q.    What is his job or was his job?

A.    He's a producer, I think.  I don't remember if at the time he was already a producer  03:36:32

Page 312

Bar-On

or just coming up as a producer.  He was an AP who switched over to being a producer.

Q.    He was an AP who later became a producer?                                                    03:36:41

A.    Yeah, I don't remember when.

Q.    And did you have a discussion with Mr. Sharman and Ms. Poolos about Molly Ringwald?

A.    I have zero memory of it.

Q.    And if you look further down into the    03:37:00 notes, the notes say, Then they start talking about a profile KS is doing of Nate Parker and the rape --

Do you see that text?

ATTORNEY ZUCKERMAN:  Objection.    03:37:19

A.    Yes.

Q.    -- the guy was involved in.

Do you see that text?

A.    Yeah.

Q.    Do you know if Keith Sharman ever    03:37:30 worked on a story about Nate Parker?

A.    He did.

Q.    And who was Nate Parker?

A.    Nate Parker was a young African-American -- I don't know if he was an    03:37:42

Page 313

Bar-On

actor, a director.  And he made a film -- I can't remember the name of the film; but it was his big breakthrough, and everyone was sort of -- he was a new big thing and -- yeah.                                03:37:53

Q.    Was Mr. Parker at some point accused of rape?

A.    Yes.  I mean, this part I do remember from my conversation with Keith -- and Alex was there -- which is I think after they finished this  03:38:06 glowing profile -- I think Anderson Cooper did it -- shooting it, allegations came to light that he was accused of rape.  And then the question was how to deal with it.

I think the big thing was this was     03:38:23 Keith's big, you know -- if he had been, as I said, an associate producer, and this was his first real big story.  So he was in a pickle there because he had shot all this thing, and obviously the guy wasn't going to give him another        03:38:37 interview.  And then how do you do a glowing profile of someone accused of rape.

So that was a discussion.

Q.    And the note here says, SB laughs a lot about the issue of covering up rape.            03:38:51

Page 314

Bar-On

Do you see that text?

ATTORNEY ZUCKERMAN:  Objection.

A.    Where is this?

Q.    Sure.  It's right after the sentence we    03:38:57
were just talking about.

A.    The issue of --

Q.    Covering up rape.

A.    Is that what that says?  Okay.

ATTORNEY ZUCKERMAN:  Objection.    03:39:05

A.    I can't read "covering up," but okay.

Q.    Did you have a discussion in which
Ms. Poolos and Mr. Sharman were part of in which
you talked about covering up rape?

ATTORNEY ZUCKERMAN:  Objection.    03:39:17

A.    No, there's no -- I mean, there's
nothing to cover up here.  I mean, I did say, How
are you going to cover this rape?  So I don't know
if up is -- you know, how you cover in a story,
not cover up, the opposite meaning.  How do you    03:39:27
cover a rape in a story that's supposed to be a
very positive story about this guy?

I remember that conversation.  And,
yeah, no one laughed about it, but it was just
like, ugh, what are you going to do kind of thing.  03:39:41

Page 315

Bar-On

Q.    Ms. Poolos wrote in her notes that you laughed about the rape.  Did you laugh about the rape?

ATTORNEY ZUCKERMAN:  Objection.          03:39:54

A.    Wouldn't be her first lie.  I did not. I don't laugh about rape.

Q.    Then it says in these notes:  Then they -- I can't read that next word -- start talking about furries.                              03:40:07

Do you see that?

A.    Yeah.  I don't know what that is.

Q.    You don't know what the reference to furries is?

A.    No, no.                                03:40:13

Q.    Are you aware of furries is a sexual kink where people dress up like stuffed animals?

ATTORNEY ZUCKERMAN:  Objection.

A.    Now that you say it, yes, I know there is such a thing, yes.                          03:40:23

Q.    And did you discuss that with Mr. Sharman and Ms. Poolos at some point?

ATTORNEY ZUCKERMAN:  Objection.

A.    Zero memory of it.  I don't think I did, but zero memory of it.  The only thing I    03:40:31

Page 316

Bar-On

remember is -- in this conversation is, as I said, he was doing a story about this guy.  This guy was accused of rape.  How on earth are you going to deal with it.                                        03:40:43

Q.    Deal with it for purposes of the story?

A.    Yes, yes.  Are you going to kill the story, are you going to go back, what if he doesn't let you go back.  That was -- that was the entire conversation.                                        03:40:58

Q.    And if you take a look at the second page of Exhibit 9, PL 206 --

A.    Yeah.

Q.    -- the notes state, the second -- the third line down it says in quotes:  Oh, it's like   03:41:13 we're in one of those bad CBS videos.

Do you see that text?

A.    Yeah.

Q.    Do you recall that being discussed with Ms. Poolos and Mr. Sharman?                              03:41:29

A.    I do not.

Q.    Do you recall ever saying that during a discussion with Ms. Poolos?

A.    I don't think I said -- I didn't say it.  Does it say that Keith said it?  I can't make   03:41:41

Page 317

Bar-On

this -- I don't know what this word is.  I don't remember this being said.

Q.    Do you remember Mr. Sharman making the comment?                                                    03:41:51

A.    I don't.  I don't.  Sorry.

Q.    That's okay.

You don't recall him saying that?

A.    No.

Q.    Then below the text says, Also, in          03:41:59 discussing Natalie Portman, I mentioned how she has a little dog.  And both SB and KS started making jokes about other parts of her body being little, meaning her breasts.

Do you see that, the note I just read?   03:42:14

A.    I do.

Q.    Do you recall that discussion?

A.    I don't.

Q.    Do you recall during this discussion with Mr. Sharman and Mr. Poolos talking about    03:42:21 Natalie Portman?

A.    No.

Q.    You talked about the party that you went to?

A.    No, I said -- I mean, I said -- I        03:42:27

Page 318

Bar-On

did -- I have gone to -- there was a party I went to.  So in that sense -- again, I thought it was a few years later.  I'm assuming these notes are real.                                                           03:42:40

In terms of -- yeah, so, I mean, that part is real, but I don't remember any of this conversation, except what I testified to about Keith.

ATTORNEY IADEVAIA:  If we can mark this   03:43:29 as Exhibit 10, please.

(Bar-On Exhibit 10, handwritten notes, Bates-stamped PL 266 to 68, marked for identification.)

Q.    What's been marked as Exhibit 10 is a   03:44:13 three-page document that are handwritten notes, and they're bearing Bates numbers PL 266 to 68.

(Pause.)

A.    I can't read all of it, but I'm sure you'll clarify it.                                        03:45:00

Q.    All right.  The notes are dated March 7, 2017, what's in Exhibit 10, and it says, Shachar and I were walking to the booth to meet Lesley to track.

Do you see those notes?                    03:45:15

Page 319

Bar-On

A.    Yeah.

ATTORNEY ZUCKERMAN:  Objection.

Q.    What does track mean?

A.    To do narration, to record narration.    03:45:19

Q.    For a story?

A.    Yeah.

Q.    He told me he had his office door closed and she came by and knocked and then asked him what he was doing with the door closed.  He    03:45:30 said he wanted to tell her he was in there masturbating.

Did that conversation happen between you and Ms. Poolos?

A.    Not that I recall, and I wouldn't use    03:45:43 the word "masturbating" in -- I just wouldn't say that.  I mean -- I think -- I have a vague recollection, not in the booth, but I do remember saying what did she think I was doing in there. But I think all the rest is just inventions.    03:45:58

Q.    Did you say to Alex Poolos at any time that Lesley had come by and you wanted to tell her in sum and substance that you were in the room masturbating?

ATTORNEY ZUCKERMAN:  Objection.    03:46:15

Page 320

Bar-On

A.    No, because that's ridiculous.

Q.    And the notes then say, I told him I was uncomfortable with that -- and then on the next page -- he kept talking about how he was pleasing himself.                                         03:46:30

Do you see that note?

A.    Never happened.  A, I never said the first thing, so she couldn't have said the second thing.  And if Alex was to say she was uncomfortable about something, I would immediately stop and -- you know, she said stuff about being uncomfortable about things, and I stopped so -- or we stopped doing them.                                    03:46:40

So this is just fiction.                           03:46:53

Q.    What things did Ms. Poolos say to you she was uncomfortable with that you stopped doing?

A.    At a certain point in her grandiosity she said we would never let -- she won't order food for crews again, so either I had to do it or Maria had to do it or the crews had to do it for themselves.                                              03:47:10

At some point she said, you know, she doesn't feel comfortable booking travel for guests for a show.  Once again I said, Fine.  I mean,  03:47:22

Page 321

Bar-On

there's nothing I can do.  If you're not going to do it, you're not going to do it.  Maria had to pick up -- Maria being Lesley's assistant, had to pick up that.                                          03:47:28

So those are two examples of stuff that -- when Alex didn't want to do something, Alex didn't do it.  And if she said, you know, I can't do it, you know, we didn't do it.  So this is just made up.                                     03:47:39

Q.    Your testimony is Ms. Poolos said she was not comfortable booking travel?

A.    Yes, for guests, after a certain point.  She said, Oh, I'm not comfortable doing this.

Q.    Did she explain to you what she meant   03:47:52 by not being comfortable?

A.    No, she just -- you know, at a certain point Alex fathomed herself being a producer.  She just said, I'm not going to do this anymore.  This was towards the end.  Basically it all fell on   03:48:07 Lesley's assistant.

Q.    Did she say she was uncomfortable doing it or she wasn't going to do it?

A.    I don't remember the exact words she used.  This is, you know, going back almost ten   03:48:19

Page 322

Bar-On

years.  But it was like -- no, I think she said, I'm not comfortable doing this anymore.  So the only way it would have gotten done is if -- you know, I had to ask Lesley's assistant because I don't know how to do it.

Q.    Were there other things Ms. Poolos supposedly said she was uncomfortable doing?

A.    The two things that occurred that I remember -- there might have been others -- is that and ordering food for the crews.  She felt it was beneath her and she felt like the crews, you know, were looking at her a certain way or down if she would do that.  So I had to stop.

In short, when Alex didn't want to do something, she made it very clear she doesn't want to do it.  It wasn't -- so if she would have said something like this, a hundred percent.  But I never said it, she never said it, and I'm just...

Q.    The note then says, Then while we waited for Terry and Lesley...

Who's Terry?

A.    He's an editor.

Q.    He's an editor?  And he worked at 60 Minutes in March of 2017?

Page 323

Bar-On

A.    Yes.

Q.    And Lesley is likely a reference to Lesley Stahl?

A.    Yes.                                        03:49:33

Q.    Then it says, He pretended in the tracking area outside the booth that he was going poison Lesley by defecating in her drink.

Did that happen?

A.    I have zero memory of this.               03:49:48

Q.    He acted out positioning his back end over a pretend drink and then serving it to her.

Did that happen?

A.    No.  I mean, I have zero memory of it.

(Bar-On Exhibit 11, handwritten notes, Bates-stamped PL 1578 to 1580, marked for identification.)

(Pause.)

Q.    What's been marked as Exhibit 11 is a three-page handwritten notes that are Bates-    03:51:56
stamped PL 1578 to 1580.

(Pause.)

A.    I'm having a hard time reading this so...

Q.    All right.  We'll talk through it.    03:53:16

Page 324

Bar-On

What's been marked as the handwritten notes Exhibit 11 are dated January 6, 2017.

Mr. Bar-On, have you seen what's been marked as Exhibit 11 before today?                03:53:27

A.    No.

Q.    And outside of any conversations you had with counsel, which I don't want you to tell me about, have you ever been asked about the contents of what's contained within Exhibit 11?    03:53:37

A.    I don't think I've -- no.

Q.    Okay.  The notes state, Went into Shachar's office to discuss my conversation with Jane Gary, I believe.  I brought my concerns about Bob Chaffin and the -- I can't read that word,    03:53:59 strangeness, I think, around reading out to him.

Did you have a story you worked on where there was someone involved named Bob Chaffin?

A.    Yes, but I don't know what the first    03:54:16 name is.  That's not a name I recognize.

Q.    And who is Bob Chaffin?

ATTORNEY ZUCKERMAN:  I'm sorry, I just want to -- I have no issue with you asking him the question that you asked him, but to the    03:54:25

Page 325

Bar-On

extent a lot of these notes are hard to read, I just don't want him, like, verifying what the words are, or I don't want his testimony to be understood as verifying you reading of   03:54:40 this or any of the notes here.

Q.   So I understand -- if you don't read a word the way that I do, please let me know.  Okay?  But there is a reference to Bob Chaffin.  Who is that?   03:54:54

A.   He was a lawyer.  He was a lawyer on a case involving Remington.  I don't remember all the details, but yeah.

Q.   And was there anyone involved -- strike that.

Remington is a story that you worked on at 60 Minutes?

A.   It is.

Q.   And Alex Poolos was your AP at the time?   03:55:17

A.   She was my AP at the time.

Q.   And she worked on that story?

A.   Somewhat.

Q.   And the name before -- well, strike that.

Page 326

Bar-On

Was there someone involved in the Remington story named Tanesha Gary [phonetic]?

A.   I have no recollection of that name.

Q.   The notes say, Shachar became angry and   03:55:33
said that I was lecturing him.  He kept cutting me off and snapping at me and refused to hear my point of view.  I told him that he wasn't being respectful and I felt like he was denigrating me when I was trying to figure out a real issue.   03:55:51

Do you see those notes?

ATTORNEY ZUCKERMAN:  Objection.

A.   Yeah.

Q.   Are there any of those words that I read that you can't make out?   03:55:58

A.   No, it seems -- I think you read it accurately.

Q.   Do you recall having this discussion with Ms. Poolos?

A.   I do not.   03:56:06

Q.   Is it your contention that it did not happen?

A.   I have no idea.  I have no -- I don't know who Tanesha Gary is.  Bob Chaffin is a real person.  I don't remember -- you know, I think   03:56:23

Page 327

Bar-On

part on an AP's duty is to be a fact-checker, and I think towards the end of her tenure she was actually a relatively good fact-checker. She caught a couple of things that were very good. So 03:56:40 I would listen to her.

I don't specifically know what the issue is. Either I -- you know, sometimes Alex would get on a high horse and just preach and preach and preach things that had already been 03:56:54 resolved. Again, I don't know that this is the -- I don't remember the specific case.

Q. On the second page, PL 1579.

A. Yeah.

Q. Towards the middle of the page it says, 03:57:05 I stood up for myself and told him I was not going to spend another year getting yelled at.

Do you see that text?

A. I do.

Q. Is there any words that I just read 03:57:14 that you don't make out the same way that I just read them?

A. No, that seems about right.

Q. Then the notes say, He says he never yells at me. I reminded him he yelled at me 03:57:27

Page 328

Bar-On

throughout the fall -- and I can't read that next word -- raised his voice over Netanyahu.

Outside of the one word I couldn't read, did I read that correctly?                    03:57:43

A.   It seems so.

Q.   Did you have any disagreement with how I read any of those words?

A.   I think you read them correctly.

Q.   Do you recall ever having a discussion   03:57:52 as described here in these notes with Ms. Poolos?

A.   I don't remember this specific conversation.  As I said, we both -- we did not have a good working relationship, and we both tried at various times to make it work.  You know,   03:58:05 I don't know what this specific case was.

Q.   Was there a time you yelled at Ms. Poolos about a story about Netanyahu?

A.   I don't remember.

Q.   Was there a story you worked on with   03:58:21 Ms. Poolos about Netanyahu?

A.   Yes.

Q.   And when was that, do you recall?

A.   It was right after the elections, so it would be November 2016, yeah, or early December.   03:58:31

Page 329

Bar-On

Q.    On the next page, PL 1580, the notes say, He says that he has been working very hard to control his temper.

Do you see the notes I just read?    03:58:51

A.    Uh-huh.

ATTORNEY ZUCKERMAN:  Objection.

Q.    Do you disagree with my reading of any of those notes?

A.    No.    03:58:58

Q.    Did you say that to Alex Poolos?

A.    I don't remember.  It's all incredibly self-serving, of course, but I don't remember specifically saying that.  I do -- again, as I said, I do remember us trying to make things work.    03:59:08 But this is a rendition that is obviously very, very self-serving and selective of reality, as witnessed by others.

Q.    Then the notes say, I said that I am uncomfortable with the extreme stress he has been    03:59:26 putting me under and that it is resulting in physical issues like my hair falling out.

Do you see that text?

ATTORNEY ZUCKERMAN:  Objection.

A.    I do.    03:59:42

Page 330

Bar-On

Q.    Is there any words that I just read that you disagree with how I read them?

A.    I think you read it accurately.

Q.    Did Ms. Poolos ever say that to you?    03:59:47

A.    She had a lot of ailments that she kept attributing to various things.  She had, you know, stomach worms; she had intestinal things.  Se had all these things she kept saying.  She did remark about hair loss at the time.    04:00:03

Q.    Did Ms. Poolos tell you she believed she was suffering hair loss because of the stress you were putting her under?

A.    I don't remember, but she yelled a lot of 30(b)(6).    04:00:14

Q.    Did she ever tell you that she believed she was suffering hair loss because you yelled at her?

A.    I don't remember specifically.  I'm not saying she didn't, but I don't remember    04:00:22 specifically.  I remember her having a lot of ailments and with various reasons and ways not to show up to work.

Q.    Did you ever say to Alex that she couldn't keep her job if she had a baby?    04:01:07

Page 331

Bar-On

A.    No.  That's ridiculous.

Q.    The handwritten notes that we just went through that were marked as exhibits, am I correct that you have never seen those notes before today?    04:01:39

A.    Never saw them.

ATTORNEY IADEVAIA:  If we could mark this as Exhibit 12.

(Bar-On Exhibit 12, amended complaint, marked for identification.)    04:02:03

Q.    What's been marked as Exhibit 12 is a copy of the amended complaint that was filed in this action.  Have you seen this document before today?

A.    Yes.    04:02:14

Q.    I'm going to ask you to turn -- you're free to look at the document, of course, but I'm going to ask specific questions.  If we could turn to page 36 of the document, please.

If you could look at paragraph 207.    04:02:42 I'm going to ask you a couple questions.

A.    Okay.

Q.    Let me know once you've read it.

A.    Okay.

Q.    Okay.  In paragraph 207 Ms. Poolos    04:02:50

Page 332

Bar-On

alleges that you regularly demeaned her.

Is that true?

A.    No.

Q.    She alleges that you regularly insulted  04:02:59
her.  Is that true?

A.    No.

Q.    Ms. Poolos also alleges in paragraph
207 that you frequently yelled at her.

Is that true?                             04:03:10

A.    I think we've gone through this, but
no.  I mean, we yelled -- yeah, we yelled at each
other but...

Q.    And in paragraph 207 Ms. Poolos says
that sometimes you screamed at her.            04:03:22

Is that true?

A.    Yelling and screaming, I don't know
what the difference is, but yeah.

Q.    And then Ms. Poolos also alleges in 207
that you sometimes threatened to fire her.     04:03:31

A.    It's not within my authority to fire
anyone, so I think that's -- I saw it in the notes
too.  So I think that's just a lie.  You know, we
could split up, you know, and occasionally we
discussed maybe it's time to split up because it's  04:03:45

Page 333

Bar-On

not working.

Teams split up all the time every year. It's very common. She just didn't show any inclination to want to leave. 04:03:55

Q. Could you have initiated that split-up?

A. I could have, and eventually I did.

Q. You could have initiated it before you had the discussion with Lesley Stahl I think you said in August of 2017? 04:04:05

A. Well, that was when I initiated it. Yes, I could have at any point. That's not firing. The APs stay in the show; she just switch teams.

Q. Got it. 04:04:16

A. It happens every year. Big difference.

Q. Big difference?

A. It's a huge difference, yeah.

Q. Please explain what you mean.

A. Because fire makes it seems like I 04:04:24 could say, Oh, and you're out on the street. In fact, when teams split up, which happens -- the APs usually just find another team to work with, unless no other producer is willing to work with them. 04:04:38

Page 334

Bar-On

Usually there's enough movement that everyone finds a home except for the exception of people no one wants to work with.

Q.   When APs find another producer to work with, are they punished for having left the prior producer they've worked with?

A.   Never, never.  In fact, I think a lot of her consequent APs were APs that switched teams.  I don't remember.  I'd have to go through it.  I inherited a few producers -- a few APs. It's very, very common.

I mean, people -- these are very -- you know, very personal, intense relationships, and people reach a point where they want to work with other people, they want to work on different stories.  No, it's super routine.

Q.   When you said her APs were from others, you mean Ms. Poolos's APs were from others?

A.   Until Collette.

Q.   All right.  In paragraph 208, if you could read it.  And there are various subparts, so I'm going to ask you about them.  If you would tell me --

A.   You want me to read --

Page 335

Bar-On

Q.    208(a) is the first one I'm going to ask you about.

(Pause.)

A.    Okay.                                    04:05:50

Q.    Did you ever tell Ms. Poolos to get over it when she asked you to stop yelling at her?

A.    I don't remember.  I could have.

Q.    And (b), why don't you read it, just let me know?                                    04:06:01

(Pause.)

A.    Okay.

Q.    Was there ever a time where you told Ms. Poolos you were trying to yell less frequently but that Ms. Poolos kept causing problems?    04:06:16

ATTORNEY ZUCKERMAN:  Objection.

A.    Again, this is -- this is a sliver of reality.  I mean, in reality Ms. Poolos walked into my office and yelled almost every single day. Almost every single day was a huge explosion.    04:06:33 And, you know, she was so volatile, and other people could attest to it.

Sometimes I would yell back, sometimes -- so this is all kind of in response to that.  I don't remember the specific case, the    04:06:45

Page 336

Bar-On

very selective way it's written, but that's --

that's where we are.

And, you know, sometimes I would tell

her:  Let's try and figure this out; let's try and    04:06:54

work together.  We had to work together, until I

just couldn't handle it anymore because I would

have just stomachaches every time I would hear her

footsteps coming towards my office.

Q.    In 208(c) Ms. Poolos alleges that you    04:07:10

accused her of complaining constantly and said

that she overreacted.

I realize there's a date associated

with this, but my question is did that ever occur,

whether on that day or another day?    04:07:20

A.    She explained a fair amount.  I don't

remember about the specific date, obviously.  She

explained a lot.  I don't know about overreacted.

You would have to give me specific cases or what

the specific case is about.    04:07:34

Q.    In D it says, On or about September 28,

2016, after Bar-On yelled at Poolos, she began

crying.  He told her to stop overreacting.

Did that happen?

A.    Her unprofessional behavior did include    04:07:47

Page 337

Bar-On

a fair amount of crying and yelling and throwing things.  I don't remember this incident.  If you want more, we'd have to pull up the actual incident.                                            04:07:58

Q.    Then in 208(e) the allegation is when Poolos asked Bar-On to be more respectful in October of 2016 he called her snide.

Did that happen?

A.    Again, I don't -- I mean, maybe.    04:08:12 That's so specific.  But I don't know.  I don't remember.

Q.    Do you recall ever saying that something Ms. Poolos said to you was snide?

A.    I don't remember.                   04:08:23

Q.    In 209 there's an allegation that, in the second sentence, on or about February 28th, 2013, Bar-On wrote in an email to Poolos that he was apologizing for his outburst because it was uncalled for and he promised to work on it.    04:08:43

A.    We saw the email.

Q.    So there's no reason to dispute that?

ATTORNEY ZUCKERMAN:  Objection.

A.    Well, the only thing to dispute is what brought it about and how it happened and what was  04:08:53

Page 338

Bar-On

her side of it. I noticed in that email that I was at 8:30 working in the office while she's clearly not there.

So I don't know -- I don't know the 04:09:04 context, and I don't know what -- you know -- all I know is that I was trying to make it work, that I was trying my damnedest to make it work, never complaining about her outside, never standing in her way, just trying to make it work. 04:09:16

Q. Okay. On page 37 in paragraph 211 Ms. Poolos alleges that you regularly cut her out of important communications and excluded her from meetings.

Is that true? 04:09:29

ATTORNEY ZUCKERMAN: Objection.

A. Not true. Not true. She should give the examples if she doesn't have concrete examples.

Q. And I asked it two parts, so let me 04:09:35 just be clear. Is it true that, as Ms. Poolos alleges, that you regularly cut her out of important communications?

A. No. And if she has specific examples, she can bring them. Otherwise it's, again, lies. 04:09:49

Page 339

Bar-On

Q.    And is it true that Ms. Poolos's allegation that you regularly excluded her from meetings?

A.    That is not true.  I will say two    04:09:58 things.  A, Lesley Stahl does not like to have APs in the process, in the writing process.  And in fact, after Alex requested, she was invited to these meetings, which is very rare.  So in fact it's the opposite.    04:10:14

B, Alex a lot of times just liked to sit and think and not actually do any work.  A lot of times, you know, you have to divide and conquer.  So I would be, like, I'll do this; you do that.  That would require her to do work, so it    04:10:28 would never get done.

Yeah, so I didn't exclude her for any meetings.  Were there meetings I would have done on my own because it would have saved time?  Yes.

Q.    In paragraph 213 in the second sentence    04:10:40 Ms. Poolos alleges that Bar-On once told Poolos that he had blamed Poolos for issues with the delivery of a story to protect a male editor who was actually responsible.

A.    Absolute false, absolute false,    04:10:56

Page 340

Bar-On

absolute false.  She's talking about Sean Kelly, who did a fabulous job.  She gave him bad archival information that was not cleared despite the fact that this was a constant request of mine to have          04:11:11 footage cleared before it gets to the editor.

The editor edits this whole thing. Then the night of Alex -- I don't know how it was found out that there was basically no rights to any of this stuff or a lot of the stuff he used          04:11:30 because Alex had given him uncleared stuff.  And Alex was gone -- ████████████████████████████ ██████████████████  I don't remember.  I mean, it was.

So in fact it was her problem that we covered up.  She attacked Sean, who was going          04:11:44 through a lot of personal stuff.  She attacked him so viciously that Matt Richmond had to come and tell her never to speak like that to any human being again.  And Sean said he'll never work with Alex again.          04:11:59

So in fact this is -- this is a prime example of her turning things around and lying about them.

        Q.    And what was the story?

        A.    It was the encryption -- the Paris          04:12:08

Page 341

Bar-On

encryption story.

Q.   In connection with the Paris encryption story, was there a time where Bill Owens yelled at you because you and Lesley had changed a translation?

04:12:29

A.   He yelled at -- he had one yelling when Alex was not present, because she was doing her own thing.  It was not specifically -- I don't remember if it was specifically -- translation was part of the issue.  I think the question was how -- I don't remember exactly what was the issue with translation.  There was.  We had to call a translator in at the last minute.

04:12:44

Q.   Did Mr. Owens say to you that he had lost editorial trust in you?

04:12:54

A.   He did.  And, you know, I took all the blame even though all these things were things that an associate producer has to deal with.  I took all the blames, did not say anything about Alex, who I knew █████████████████████████

04:13:08

The following week we had actually a meeting with Jeff and Bill about it and, you know, smoothed it over.

Q.   And Alex was present for that meeting?

04:13:20

Page 342

Bar-On

A.    For the meeting she was, yes.  Again, I did not throw her under the bus.  I took full responsibility.

Q.    Did Jeff Fager say something to the          04:13:28 effect of that you were editorially lying?

A.    I don't remember such a thing.  We weren't editorially lying, so I don't think he said that.  There were some questions about some facts, but no one was editorially lying.  That's a  04:13:42 big accusation that I don't think he would have made.

Q.    In paragraph 214 of Exhibit 12, Ms. Poolos alleges in the second sentence:  He told her on several occasions that he would never   04:13:56 hire a man as an associate producer because men were less likely to tolerate not getting credit for their work and women were more likely to be subordinate as compared to men.

Did you ever say that to Ms. Poolos?     04:14:10

A.    Baloney.  This is her -- again, this is things that -- these were themes that she would always bring up in her tirades, in her 45-minute long tirades.

Sometimes, as I said, you know, there     04:14:27

Page 343

Bar-On

were two ways to shut it down, either to say --
either to yell back and just stop it or to say,
Oh, I can see your point of view, I can see your
point of view.  Maybe this is what she's referring
to.  I don't think any of it is true, so I don't
think that way.

And it's true that we did not have men
APs at 60 Minutes, even though I tried to hire a
man for Alex's job but it didn't work in the last
minute for him.  I had men AP in other jobs.  I
think this is baloney and this is just not true.
Again, these are things I remember Alex saying
throughout in her tirades.

Q.   Okay.  In paragraph 215, the second
sentence, Ms. Poolos alleges that during a work
trip to Italy, Bar-On, who was intoxicated, hit on
Poolos.

Is that true?

A.   Absolutely not true, totally false,
total fiction, for a million reasons.  It just
never happened.  This is one thing that I, like,
don't even understand where she came up with this
thing, and it's ridiculous.

Q.   And then it goes on to say in that

Page 344

Bar-On

paragraph:  and pressured her to come to his hotel room.

Is that accurate?

A.    Absolutely not.  A, I never got   04:15:43 intoxicated with Alex ever.  B, I would never hit on her.  Happily married man and definitely not attracted to Alex Poolos.  Third, I would never pressure her to do anything.  Never did.  This is totally made up for -- in order to put the word   04:15:56 "sexual harassment."  I don't know where she got it; I don't know based on what.

She did this to insult me, my wife, my kids.  She knew this was all false.  I don't know why she chose the Italy trip, you know.  The   04:16:08 pressure to come to a hotel room -- you know, this is 2012.  For years afterwards we sometimes had to work in hotel rooms.  There was never an issue. This is totally made up.

Q.    In paragraph 216 Ms. Poolos alleges   04:16:25 that you encouraged her to stay at certain weights.

Did that ever happen?

A.    No.  A hundred percent no.  As I said earlier in this deposition, sometimes we used to   04:16:39

Page 345

Bar-On

go clothes shopping together just as colleagues, and, you know, she'd be like, Oh, this works well on you; or I'd said, This works well on you. And I told you the one incident in Argentina where she 04:16:52 asked me about the outfit made her -- but no.

Q.    Okay.  Outside of any time that you went shopping with Ms. Poolos, did you ever tell her which clothes accentuated her body?

A.    No.                                                   04:17:08

Q.    That same paragraph, 216, Ms. Poolos alleges that at the Emmy award ceremony in September of 2016 that you commented on her dress and its fit and told Ms. Poolos that her shoes made her legs look good.                                       04:17:25

I think you testified about this earlier today.  I just want to ask one question, which is did you tell Ms. Poolos that her shoes made her legs look good.

A.    I have zero memory of discussing her      04:17:38 shoes or her legs.  I wouldn't discuss her legs, the same way I wouldn't discuss her breasts or her neck or anything.  I definitely said, as I said to everyone who -- you know, Oh, you clean up nice; oh, you look up great.  The rest of it is her      04:17:52

Page 346

Bar-On

inventions.

Q.    Okay.  In paragraph 217 Ms. Poolos alleges that you regularly mocked Lesley Stahl's face and body.                                         04:18:04

Is that true?

A.    No.

Q.    Did that ever happen?

A.    Had I commented on her face?  Yes. Part of our job is to make sure she looks stellar    04:18:12 on TV.  If you don't understand that, then you shouldn't be a producer on our show.  And there were times there were crews that did a better job, and I would say, Oh, her face looks marbly, her face -- so I definitely would have commented in    04:18:26 order to make sure she looks the best.

That would be the only context of me -- I mean, why would I say such a thing?  It's ridiculous like...

Q.    Paragraph 217 goes on to allege that    04:18:39 you referred to Lesley Stahl as disgusting.

Did that ever happen?

A.    No.

Q.    Did you ever say that?

A.    Not that I recall.  I don't see why I    04:18:49

Page 347

Bar-On

would say that.

Q.    Did you ever say -- refer to Lesley Stahl as C U next Tuesday?

A.    Not that I remember.                    04:18:59

Q.    Do you know that phrase, "C U next Tuesday"?

A.    I do.

Q.    What do you understand that to mean?

A.    Exactly what it says in the thing.    04:19:06

Q.    The C word?

A.    Uh-huh.

Q.    Did you ever describe Lesley Stahl using the C word?

A.    Not that I ever remember.  I don't    04:19:12
think I would.

Q.    Paragraph 218 alleges -- Ms. Poolos alleges that on two occasions, including once in front of another employee, that you said that you watch pornography on your work computer.           04:19:34
      Is that accurate?

A.    Well, if this is a revision of the story I said earlier myself, it was not a work computer.  That part she just added.  And I don't remember two occasions; I remember one, and then    04:19:48

Page 348

Bar-On

one where she brought it up in front of an employee.

So it's a little bit of a mishmash, but that's -- you know, I addressed that story earlier.                    04:19:57

Q.   I know you're not a lawyer, but do you consider talking about watching pornography to a subordinate to be a form of sexual harassment?

ATTORNEY ZUCKERMAN:  Objection.        04:20:12

A.   I'm not a lawyer, and I read the room clearly wrong.  The issue wasn't about porn; it was in fact the opposite, about, like, trying to mitigate an embarrassing moment to myself.  That was the context it was told.  That was the meaning it was told.  I never explicitly said was even on that tape or anything.  So, yeah -- so there you go.

Q.   Okay.  Paragraph 220 Ms. Poolos alleges that she informed you that she was pregnant.        04:20:44

Is that accurate?

A.   It is not accurate.  ████████████

████  ████████████████████

Q.   Then 220 Ms. Poolos alleges that you responded to her to say she needed to make a major  04:20:55

Page 349

Bar-On

change if she had the baby, including quitting her

job at 60 Minutes.

Is that accurate?

A.   No, that would be nuts.                    04:21:05

Q.   The next allegation Ms. Poolos makes is

that you complained that it would be impossible

for Ms. Poolos to keep working at 60 Minutes as a

single mother.  Did you ever say that to

Ms. Poolos?                                      04:21:25

A.   No.

Q.   Then the paragraph 220 goes on to

allege that --

A.   And it wouldn't be impossible.  There

are plenty of single mothers who work at -- over   04:21:33

the years at 60 Minutes.

Q.   Then the paragraph 220 goes on to

allege that you said to Ms. Poolos that she should

move home with her parents in Cleveland or live

with her brother in Seattle.                     04:21:50

Did you say that to her?

A.   Again, she -- these are conversations I

described earlier in the deposition that were just

ruminations about where we should live and how we

should conduct our future.  This was -- this is   04:22:02

Page 350

Bar-On

just a mischaracterization where she again either does not understand English or is just taking things out of context.

Q.    Just to be clear, your testimony is you 04:22:12 did not say those comments to Ms. Poolos in connection with her saying she was pregnant?

A.    A, I didn't know she was pregnant, so I couldn't have said it in connection to her being pregnant.  And, B, all I said was the opposite: 04:22:25 Would you ever consider moving to Cleveland, because, you know, that's the way she described with whatever, the swimming pool or whatever.  So yes.  So...

Q.    Then 220 goes on to allege that you 04:22:32 said at Ms. Poolos's age she should quit because she would never have another chance to be a mother.

Did you ever say that to Ms. Poolos?

A.    No.                                   04:22:44

Q.    In paragraph 221 the allegation is that in response to a male employee's request to borrow his copy of a Vanity Fair featuring Margot Robbie on the cover you made a joke about masturbation.

Did that happen?                       04:23:09

Page 351

Bar-On

A.    As we discussed with handwritten notes, no.  I have zero recollection of this.  I wouldn't make these explicit jokes.  It doesn't make sense.

Q.    Then the allegation is that you told    04:23:18 the other employee that, yes, he could borrow the magazine but not to return it with sticky pages.

Is that accurate?

A.    I have zero recollection of this.

Q.    Okay.  Then the allegation is the    04:23:33 magazine was still in plastic and that you also kept joking about how it was time to take the wrapper off.

Did you -- did that happen?

A.    It's very juvenile, and I don't think    04:23:44 I'd say that.

Q.    Okay.  In --

A.    By the way, consequently this last line doesn't make sense, that she repeatedly asked to stop.  I mean, this is her adding stuff for the    04:23:58 lawsuit.

Q.    You're saying it's not true?

A.    It's not true.  I mean, it's never happened.  She couldn't have said these things, and she didn't.    04:24:03

Page 352

Bar-On

Q.    In paragraph 224 on page 39, Ms. Poolos alleges that in her office that you and she discussed multiple topics, including Pussy Riot, a Russian feminist rock band.                    04:24:29

Did you have discussions with Ms. Poolos about the rock band?

A.    Yes.  We did a story about them.

Q.    You worked on that story?

A.    Yeah, we both did.                    04:24:39

Q.    And Ms. Poolos too?

A.    Yes.

Q.    Okay.  The paragraph 224 goes on to say:  and discussed Parker, the actor accused of raping a female student.                    04:24:52

Did you have a discussion with Ms. Poolos about both Pussy Riot and Parker?

A.    Pussy Riot I'm sure we had many discussions, because we worked on the story. Parker, I think the one time was when Keith was    04:25:07 involved.  It was related to Keith.  I don't think we had a lot of other discussions about it.

Q.    Then the last sentence in paragraph 224:  Bar-On joked about Parker saying, quote, talk about a Pussy Riot, end quote.                    04:25:22

Page 353

Bar-On

Q.    Did you say that?

A.    I don't remember saying that.

Q.    Okay.  In paragraph 225 Ms. Poolos alleges that -- strike that.  We've covered it.    04:25:35

A.    We covered this.

Q.    Yeah.

At some point did you learn that Collette Richards had made a complaint or complaints about Ms. Poolos?    04:26:03

A.    This is many years later when Alex was fired.

Q.    And when did you first learn that Ms. Richards had made that complaint or complaints?    04:26:14

A.    I don't remember but around the -- around the time where Alex was suspended was around the time that...

Q.    And who told you?

A.    I don't remember.  There was a lot    04:26:33 of -- I mean, management was very strict about not saying anything, so I think we were trying to figure out what's going on, where did Alex disappear.

I don't think I actually knew until    04:26:46

Page 354

Bar-On

after Alex was fired and for a long time afterwards.

Q.    You actually knew what?

A.    That it was related to Collette and --    04:26:54 but I don't remember exactly.  Again, this is five years after Alex is not in my life.  You know, I don't think about Alex.  She is a parallel producer.  You know, her life doesn't really concern me.  I was happy she was gone from my life  04:27:12 after 2017, and that was the end of that.

Q.    Did you have any discussions with Collette Richards at any point in time about Alex Poolos?

A.    I have never talked to her.    04:27:23

Q.    About anything?

A.    No, we worked together on two -- on two stories.  In fact, we worked together on the Zelenskyy story -- or the Ukraine story, because Zelenskyy didn't happen.  And I think we were --    04:27:34 at the end of that -- that was very good collaboration, Collette did a good job.

And at the end all of us kind of went out.  And -- yeah.  No, we didn't talk -- we said one day we'll talk about things, and that was it,    04:27:56

Page 355

Bar-On

and we never did.

Then when Alex filed the lawsuit or when you filed -- whoever filed the lawsuit, we -- again I happened to be working with Collette, and 04:28:06 I just said -- I had just wrote her a text, you know, let's -- let's just carry on. That was it. I never talked to her besides actual work stuff.

Q. How many times have you texted Collette Richards? 04:28:22

A. For work? A fair amount. But in terms of this, just that one thing.

Q. Did Ms. Richards either initiate that discussion or respond to you?

A. I initiated it because I'm the 04:28:34 producer, and we were literally having bombs fall on our heads. I think she may have said, like, a thumbs-up or something. It was not -- I think she sent some emoji.

Q. Other than that text exchange and the 04:28:48 comment I think you said you made we'll talk about things some day --

A. Yeah, yeah.

Q. -- was there any other time you had a discussion with Ms. Richards about Ms. Poolos? 04:28:59

Page 356

Bar-On

A.    Never.   Having worked with her on the Zelenskyy thing -- or not the Zelenskyy thing, the Ukraine thing, she was so nervous and beat up and scared, and it was just -- just horrible to watch.   04:29:13

Q.    Ms. Richards is an association producer at 60 Minutes; correct?

A.    She is.

Q.    And she used to work for or with Ms. Poolos; correct?   04:29:27

A.    Yes.

Q.    And after Ms. Poolos left, who did she work with?

A.    She eventually switched to Shari.   I don't know if it was right away.   04:29:35

Q.    Shari being Shari Finkelstein?

A.    Yes.   Shari likes her a lot.

Q.    But throughout Ms. Richards entire employment, she's been on Lesley Stahl's team; correct?   04:29:51

A.    Yes.   Lesley likes her a lot.

Q.    Are you aware of any complaints about Ms. Richards?

A.    No.

Q.    Aware of any complaints by Ms. Poolos   04:29:59

Page 357

Bar-On

about Ms. Richards?

A.   Just what I read in the lawsuit.

Q.   Did Ms. Richards ever speak to you about her complaints about the time she was working with Alex?                          04:30:09

A.   I didn't -- I didn't -- not a single word with her.

Q.   Have you ever spoke to Bill Owens about Collette's complaints related to Ms. Poolos?   04:30:20

A.   No.

Q.   Have you ever spoke to Tanya Simon about Collette's complaints against Ms. Poolos?

A.   No.

Q.   Have you ever spoken to human resources   04:30:28 about Collette's complaints against Alex?

A.   I have not.

Q.   How did you find out that Ms. Poolos was being placed on a leave of absence?

ATTORNEY ZUCKERMAN:  Objection.         04:30:46

A.   The beginning or the -- I don't remember.  I think there was -- now I remember.  I remember how.  I had to print a lot of things that were from Alex and Collette, and I was wondering why that is, like why don't they print their own   04:31:09

Page 358

Bar-On

stuff.  It was for Lesley.

Then around that same time Lesley said, Oh, we're doing a story about some hostage negotiation.  It's Shari's story.  And Lesley    04:31:23 sometimes confuses us.  She calls me Rich and stuff like that.  I said, You mean Alex's story? And she said, No, the story has been moved.

So I knew something was up.  But Lesley made a point of not saying anything, and then, you   04:31:39 know, slowly people talk and we realized something was going on.  But we didn't know what until much, much, much later, in fact, until after the lawsuit was filed.

Q.    Before Ms. Poolos was fired, did you   04:31:53 discuss Ms. Poolos being placed on a leave of absence with Lesley Stahl?

A.    Lesley said once something like, Oh, you know, Alex is not here, but she'll be back. This was in terms of work flow, something or   04:32:13 other.  And I knew not to ask any question.

And then when Alex was fired, she said, Go do the Zelenskyy thing, Alex set the whole thing up and booked him, and the war was about to start, so just pick it up.  Again she said, I   04:32:33

Page 359

Bar-On

can't tell you anything, but Alex is not coming back.  And I think she sent a letter to the entire team basically saying don't ask anything.

Q.    Outside of that letter, did you ever    04:32:45 have any conversations with Ms. Stahl about Alex being fired?

A.    No.

Q.    Any discussion, anything in writing, verbal, anything with Ms. Stahl about Alex being    04:32:53 fired?

A.    Since?

Q.    At any time except, you know, putting aside that email.

A.    Well, when the lawsuit was filed, you    04:33:00 know, she said this happened.  We happened to be together in Israel for October 7th.  But, no, I mean -- no, nothing -- oh, and she knew I was -- she knew about that sexual complaint that Alex had filed that was disproven, because I think they    04:33:23 asked her about it.

Q.    Did you ever discuss directly with Ms. Stahl the allegations that Alex Poolos had made against you that were investigated by employee relations?    04:33:42

Page 360

Bar-On

A.    Never.  It's not that kind of relationship.

Q.    Meaning not that kind of relationship with Ms. Stahl?                                04:33:52

A.    Yeah, I wouldn't.

Q.    And how did you find out that Alex was being fired?

ATTORNEY ZUCKERMAN:  Objection.

A.    As I said, you know, Lesley called me,     04:33:59 said war with Ukraine is around the corner, Alex has booked Zelenskyy, she's not coming back, go pick it up, go do it.  And that was that.  And I think she said and she's going to send a note to the entire team.  I'm just repeating myself.       04:34:17

Q.    And I'm sorry if I asked this before; I just want to make sure.  Before Ms. Stahl sent her email to her team about Alex leaving, did you have any discussions with Ms. Stahl about Alex being fired, beyond what you just testified to?       04:34:35

A.    No.  And I think it was the same day that -- yeah, maybe a day apart, or very near each other.

Q.    And did Lesley ever tell you why Alex was fired?                                         04:34:45

Page 361

Bar-On

A.    No.

Q.    Did Bill Owens ever tell you?

A.    No.

Q.    Tanya Simon?                                    04:34:51

A.    No.

Q.    Are you aware of another employee at 60 Minutes outside of Alex Poolos who had been suspended or placed on administrative leave?

A.    Does Jeff count?                                04:35:12

Q.    You're talking about Jeff Fager?

A.    Yeah.  I don't know if he was just immediately fired or was he suspended.  I'm not sure.  I don't know the -- I don't know the details of that.                                        04:35:24

Q.    Other than Mr. Fager?

A.    I'm not saying there hasn't been anyone, but I don't remember.

Q.    Your understanding was Mr. Fager was --

A.    Maybe Radutzky, but I don't know, so I   04:35:35 won't -- sorry, I'll be quiet.

Q.    And did you have any involvement in the decision whether to fire Alex or not?

A.    Absolutely not.  I hadn't worked with her for over five years at that point.        04:35:51

Page 362

Bar-On

Q.    Did you have any involvement in the decision whether to place Alex on administrative leave or suspend her?

A.    None whatsoever.                                04:35:59

Q.    Were you involved at all in considering or evaluating the allegations that Ms. Richards made against Alex?

A.    I was not involved at all.  Again, we're parallel.  The only thing is occasionally    04:36:11 Alex would come to my office to ask questions and seek advice about issues she had with Lesley.  So this -- the fact that I'm involved at all is, like, shocking to me.  I was shocked by that phone call.                                                04:36:27

Q.    Shocked by the phone call to find out that Alex was being fired?

A.    No, by Jennifer what's-her-face.

Q.    By Ms. Gordon reaching out and notifying you of --                                      04:36:35

A.    Yeah.  I was like -- in 2017 I broke up -- I said I'm not working with her anymore. And as far as I'm concerned, Alex was out of my life.  I didn't have to think about her, I didn't have to care about her, with the exception of a      04:36:47

Page 363

Bar-On

couple logistical things because she was still on the team.  Anything she -- after that is her.

Q.    Were you at all involved in the decision to promote Alex from AP to producer?    04:36:58

A.    I was not.

Q.    Did anyone ask you your opinion as to whether Alex should be promoted to producer?

A.    No one ever did.

Q.    Would you be surprised to learn that    04:37:10 Bill Owens testified that he asked you and you said that you thought that Alex was ready to be a producer?

ATTORNEY ZUCKERMAN:  Objection.

A.    I don't think that -- I don't remember    04:37:19 such a conversation happening.

Q.    Go ahead, if you wanted to add something.

A.    I don't remember such a conversation happening.    04:37:30

Q.    And mostly the last -- during the first day of your deposition but some today, you testified about a number of concerns you had about Alex, including but not limited to concerns about her anger problems, her yelling at you, her not    04:37:43

Page 364

Bar-On

doing the work and so forth.  I'm not trying to summarize or capture everything.

I just want to confirm:  You never shared those concerns with Bill Owens; correct?    04:37:55

A.    I never talked to anyone about Alex ever.  I never stood in her way.  I let her do her own thing when she wanted to produce.  A lot of producers would not give the leeway that I did.  I basically gave her all the leeway in the world, in    04:38:11 part because she was so volatile I just couldn't deal; in part because I knew that was a way to get her out of my life.  That's that.

I never said anything.  The only thing I said was, as I testified last time, about a    04:38:23 couple weeks before I decided I can't work with her anymore, I consulted with Lesley's assistant.

Q.    And then you subsequently had a discussion with Lesley Stahl in which you asked Lesley to separate the two of you; correct?    04:38:37

A.    Yep.

Q.    But you didn't get into the details as to why; is that accurate?

A.    That's very accurate.  I had a sentence, as I said last time:  I have a lot of    04:38:48

Page 365

Bar-On

bad things to say about her, she has a lot of bad things to say about me, or something to that effect, I don't think that's relevant, I can't work with her anymore, you know, we have to split     04:38:58 up.  And it was done.

And, again, this happens on our show every -- every year.

Q.    Have you ever yelled at Lesley Stahl?

A.    Sure.  Last week.  This week -- no,     04:39:13 last week.  It's different.  It's not berating. It's not crazy.  It's not vindictive.  It's not personal.  It's professional, and then it goes away.  It's not throwing things.

ATTORNEY IADEVAIA:  If we could take     04:39:36 like a two-minute break.  I'm just about done.

ATTORNEY ZUCKERMAN:  Sure.

THE VIDEOGRAPHER:  Stand by.  The time is 4:39 p.m.  We are off the record.

(Recess taken from 4:39 to 5:02.)

(Attorney Lynch joins proceedings.)

THE VIDEOGRAPHER:  The time is 5:02 p.m.  We are back on the record.

Q.    Mr. Bar-On, during the period that Ms. Poolos was your -- was an AP working with you     05:02:28

Page 366

Bar-On

or for you, she solo produced stories at that time; correct?

A.    Yes.

Q.    Has there ever been another AP that    05:02:42 worked with you that solo produced a story, at 60 Minutes?

A.    I'm thinking.

Q.    Yeah, sure.

A.    There were a couple of produced Sunday    05:02:57 Morning spots, but I don't think 60 Minutes.

Q.    Was there someone who worked at 60 Minutes named Jen DePriest?

A.    Yes.

Q.    And she's not there any longer;    05:03:18 correct?

A.    Correct.

Q.    What was her job when she left?

A.    She was one of the heads of standards.

Q.    Did she report to Claudia Weinstein?    05:03:26

A.    She worked with Claudia.  I don't know who she reported to.

Q.    And she worked for 60 Minutes; correct?

A.    Yes.

Q.    What was your view of the work that Jen    05:03:37

Page 367

Bar-On

did?

A.    Spectacular.

Q.    Do you have any idea why she was let go?                                                          05:03:44

A.    No.

Q.    Did you ever hear that Ms. -- that Bill Owens was upset or annoyed at Ms. DePriest because she was critical of Scott Pelley?

A.    Never heard that.                                                          05:04:10

Q.    Did you ever work with an AP at 60 Minutes named Kathy Liu?

A.    I did.

Q.    Did you have a nickname for her?

A.    I don't remember a nickname for her.    05:04:30

Q.    Is Ms. Liu Asian, of Asian background?

A.    She is.  She's Chinese-American.

Q.    Did you ever refer to her as a little dumpling?

A.    No.                                                          05:04:42

Q.    Did you ever refer to her as dumpling?

A.    No.

Q.    Were you aware that after Alex completed a screening her first story where she solo produced that Jeff Fager said to her:  It        05:05:00

Page 368

Bar-On

must feel great to be unhooked from having to work with Shachar?

ATTORNEY ZUCKERMAN: Objection.

A.    I read that in the lawsuit.                    05:05:09

Q.    But had you heard that before?

A.    No.  This was a joke that Jeff would always say to APs as they were doing their own pieces:  Oh, you're coming up; you're going to outshine your producer.                    05:05:24

So it's once again interpreting a joke as something serious, which it was not.

Q.    Did Matt -- I think his name has come up, someone named Matt Magratten.  Does he work for 60 Minutes currently?                    05:05:43

A.    He does.

Q.    What is his job?

A.    He's a sound engineer.

Q.    Was there ever an instance at an airport where you farted on Alex?                    05:05:51

A.    I have zero recollection of this ever happening.

Q.    Was there ever a time that Mr. Matt Magratten expressed that he was upset that you had done so at an airport?                    05:06:03

Page 369

Bar-On

A.    Never.  This does no sound familiar at all.  This is not true.

Q.    Did that ever happen at an airport in China?                                                    05:06:13

A.    I have zero recollection of this happening.  I don't think this happened.

Q.    Did Mr. Matt Magratten ever tell you that he thought it was degrading for you to pass gas, be so close to Alex when you did so?        05:06:21

A.    Absolutely not.

Q.    Are you aware that Bill Owens told Alex that he thought that you had a mood disorder?

A.    Just from reading the complaint.

Q.    Had you ever heard that otherwise?    05:06:36

A.    No.

Q.    Has Mr. Owens ever said that to you?

A.    He has not.

Q.    Has anyone ever said that Mr. Owens has said that to you?                                  05:06:45

A.    No.

ATTORNEY IADEVAIA:  Okay.  I'm done. No further questions.  Thank you.

(Continued on following page.)

Page 370

Bar-On

THE VIDEOGRAPHER:  This concludes today's testimony.  The time is 5:06 p.m.  We are off the record.

(Time noted:  5:06 p.m.)                    05:07:57

_____

SHACHAR BAR-ON


Subscribed and sworn to before me this ___ day of _____ 2025.


_____

Notary public

Page 371

C E R T I F I C A T E

STATE OF NEW YORK      )

                      : ss.

COUNTY OF NEW YORK     )


I, LAURIE A. COLLINS, a Registered Professional Reporter and Notary Public within and for the State of New York, do hereby certify:

That SHACHAR BAR-ON, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 11th day of April 2025.

LAURIE A. COLLINS, RPR

Page 372

- - - - - - - - - - I N D E X - - - - - - - - - - -

WITNESS:              EXAMINATION BY:              PAGE

Shachar Bar-On    Attorney Iadevaia            188

- - - - - - - - - E X H I B I T S - - - - - - - -

BAR-ON NO.              DESCRIPTION              PAGE

Exhibit 1, text messages, Bates-stamped    202
PL 1927 through 1932

Exhibit 2, text messages, Bates-stamped    218
PL 1937

Exhibit 3, text messages, Bates-stamped    225
PL 1947 to 48

Exhibit 4, text messages, Bates-stamped    231
PL 1973 to 1974

Exhibit 5, text messages, Bates-stamped    258
PL 1861 to 62

Exhibit 6, memo dated 5/21/22 from         279
Gordon to Bar-On, Bates-stamped CBS
8388

Exhibit 7, emails, Bates- stamped PL       301
3010

Exhibit 8, handwritten notes,             304
Bates-stamped PL 193 and 194

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 373

Exhibit 9, handwritten notes,                310

Bates-stamped PL 205 to 206

Exhibit 10, handwritten notes,               318

Bates-stamped PL 266 to 68

Exhibit 11, handwritten notes,               323

Bates-stamped PL 1578 to 1580

Exhibit 12, amended complaint                331

Page 374

- - - - - - - **E R R A T A   S H E E T** - - - - - -

CASE:  Poolos v. Paramount Global
DEPOSITION DATE:  April 2, 2025
DEPONENT:  Shachar Bar-On

PAGE/LINE(S)          CHANGE                    REASON

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____


                    _____
                         SHACHAR BAR-ON
SUBSCRIBED AND SWORN TO BEFORE ME
THIS_____DAY OF_____, 2025.


_____   _____
 NOTARY PUBLIC            DATE COMMISSION EXPIRES