# EXHIBIT D

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 1:23-CV-08896 (GHW)(HJR)

- - - - - - - - - - - - - - - - - - - - - - -x

ALEXANDRA POOLOS,

                              Plaintiff,

          -against-

PARAMOUNT GLOBAL, CBS BROADCASTING, INC.,

and CBS NEWS, INC.,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - -x

                              March 13, 2025

                              10:02 a.m.

    VIDEOTAPED REMOTE DEPOSITION of SCOTT

BRONSTEIN, a Non-Party Witness in the

above-titled action, located in

Springfield, Virginia, taken before Dawn

Matera, a Certified Shorthand Reporter

and Notary Public of the State of New

York.

                    *     *     *

Page 2

APPEARANCES:

VLADECK, RASKIN & CLARK P.C.
          Attorneys for Plaintiff
          111 Broadway
          Suite 1505
          New York, New York 10006

     BY:   JEREMIAH IADEVAIA, ESQ.
           jiadevaia@vladeck.com
     BY:   BRANDON WHITE, ESQ.
           bwhite@vladeck.com

     BY:   JAMES BAGLEY, ESQ.
           jbagley@vladeck.com

     EAVES LAW FIRM
     Attorneys for the Witness
          101 North State Street
          Jackson, Mississippi 39201
     BY:   JOHN ARTHUR EAVES, ESQ.

     DAVIS WRIGHT TREMAINE LLP
          Attorneys for Defendants
          1251 Avenue of the Americas
          New York, New York 10020

     BY:   MICHAEL LEONE LYNCH, ESQ.
           michaellynch@dwt.com

Also Present:
Chelsea Gilchrist, Videographer
Alexandra Poolos, Plaintiff

Page 3

THE VIDEOGRAPHER:  Good morning. We are going on the record at 10:02 a.m. on Thursday, March 13th, 2025. Please note that this deposition is being conducted virtually.  Quality of recording depends on the quality of camera and internet connection of participants.  What is seen from the witness and heard on screen is what will be recorded.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video-recorded deposition of Scott Bronstein in the matter of Alexandra Poolos versus Paramount Global, et al., filed in the United States District Court, Southern District of New York, case number 23-CV-8896 (GHW) (HJR).

This deposition is being conducted remotely using virtual technology.  My name is Chelsea

Page 4

Gilchrist representing Veritext Legal Solutions and I am the videographer. The court reporter is Dawn Matera from the firm Veritext Legal Solutions.

I am not authorized to administer an oath. I am not related to any party in this action nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel will now state their appearances and affiliations for the record beginning with the noticing attorney.

MR. IADEVAIA: Good morning everyone. My name is Jeremiah Iadevaia and I am with James Bagley and Brandon White of the law firm of Vladeck, Raskin & Clark on behalf of the plaintiff Alexandra Poolos in this matter and also with us is the plaintiff Alexandra Poolos.

MR. EAVES: I am John Eaves with

Page 5

SCOTT BRONSTEIN the Eaves Law Firm. I am here on behalf of the deponent Scott Bronstein.

MR. LYNCH: Good morning. Michael Lynch of Davis Wright Tremaine. We represent the defendants in this action.

S C O T T  B R O N S T E I N, the Witness herein, having first been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY MR. IADEVAIA:

Q. Good morning, Mr. Bronstein. As I said a couple of times my name is Jeremiah and I am one of the lawyers for Ms. Poolos in this matter.

Mr. Bronstein, is there anybody else in the room where you are?

A. No.

Q. If at any point someone else comes into the room, will you let me know, please?

A. Sure.

Q. And Mr. Bronstein, do you have

Page 6

SCOTT BRONSTEIN

any notes in front of you?

A.    No.

Q.    Do you have any documents in front of you?

A.    No.

Q.    And do you have anything on your computer screen other than the video feed for this deposition at the moment?

A.    No.

Q.    If any of that changes, meaning if you have notes in front of you, documents, or materials on your video screen beyond this Zoom feed, will you please let me know?

A.    Sure.

Q.    Mr. Bronstein, have you ever had your deposition taken before today?

A.    No.

Q.    So you have a sense of how the day will go, I am going to go through a few ground rules that will hopefully make things easier.

This is going to be a question and answer session.  The question and

Page 7

SCOTT BRONSTEIN

answers will be recorded by the court reporter who is on the video Zoom with us.  As a result it's important that you give verbal answers and no gestures or nods.  Do you understand that?

A.    Yes.

Q.    Also during the day I ask that you let me finish my questions and I will do my best to let you finish your answers.  If we talk over each other, then the court reporter is going to have a hard time getting down what we say; is that okay?

A.    Yes.

Q.    If at any time you don't understand a question that I ask, please let me know and I will do my best to rephrase; is that okay?

A.    Yes.

Q.    During the day we will take periodic breaks, but if you need a break feel free to let me know.  As long as a question is not pending, it should be fine to take a break.  Do you understand

Page 8

SCOTT BRONSTEIN

that?

A.    Yes.

Q.    Are on any medication today that would affect your ability to testify truthfully and accurately?

A.    No.

Q.    And is there any reason that you know of that you cannot testify truthfully and accurately today?

A.    No.

Q.    Mr. Bronstein, did you do anything to prepare for today's deposition?

A.    Not really, no.

Q.    Did you meet with your counsel in preparation for today's deposition?

A.    I spoke with him about the e-mails.

Q.    I don't -- just to be clear, don't disclose the contents of the communication.  I just want to know if you met with him.

A.    Yes.

Q.    Okay.  How many times for

SCOTT BRONSTEIN

purposes of preparing for today's deposition?

A.    Once.

Q.    And when did you have that meeting?

A.    This morning.

Q.    Okay.  And approximately how long was it?

A.    Maybe half hour, 20 minutes.  20 minutes.

Q.    I'm sorry?

A.    20 minutes.

Q.    20 minutes.  And was it by phone, in person, some other way?

A.    By phone.

Q.    Was anyone else on the call other than -- strike that.

Who was on the call?

A.    John Eaves.

Q.    And you, correct?

A.    Correct.

Q.    Anybody else?

A.    No.

Q.    And did you review any

SCOTT BRONSTEIN

documents in preparation for today's deposition?

A.    Just the documents that -- yes is the answer.

Q.    And which documents did you review?

A.    The documents that were requested in your -- for this deposition.

Q.    Are you referring to the documents that your lawyer sent to my firm in response to a subpoena that we sent to you?

A.    Yes.

Q.    Did you review any other documents?

A.    No.

Q.    Outside of any discussions you had with your counsel or a spouse, have you spoken to anyone else about this deposition?

A.    No.

Q.    Have you discussed this deposition with anyone at 60 Minutes?

A.    No.

SCOTT BRONSTEIN

Q.    Have you discussed this deposition with Collette Richards?

A.    No.

Q.    Are you aware that there have been other depositions taken in this matter already?

A.    No.

Q.    Are you aware that Collette Richards had her deposition taken?

A.    No.

Q.    Did you discuss with Ms. Richards her deposition in this matter?

A.    No.

Q.    Do you have any knowledge of Ms. Poolos's claims in this lawsuit?

A.    Only what I read in the newspaper.

Q.    I know you're not -- you're not a lawyer, correct?

A.    Correct.

Q.    So with that understanding, what is your understanding of the claim or claims that Ms. Poolos has brought in

Page 12

SCOTT BRONSTEIN

this lawsuit?

A.    I am not sure how you want me to elaborate on that.  It's a lengthy lawsuit.

Q.    Have you read the filing that Ms. Poolos made in this case?

A.    I read the original complaint.

Q.    You read the original complaint.  When was the first time you read the original complaint?

A.    Sometime after it was filed.  A couple of weeks, maybe.

Q.    And if I told you the complaint was filed initially in October of 2023, is it your testimony that you reviewed it sometime within a couple of weeks of that date?

A.    I can't recall exactly when. Sometime after it was filed.  After it became public with newspapers.

Q.    Did you discuss Ms. Poolos's lawsuit with anyone?  And just to be clear, I don't want you to tell me about conversations you had with counsel.

Page 13

SCOTT BRONSTEIN

A.    No.

Q.    Have you discussed Ms. Poolos's lawsuit with Bill Owens?

A.    No.

Q.    With Tonya Simon?

A.    No.

Q.    Renee Balducci?

A.    No.

Q.    Claudia Weinstein?

A.    No.

Q.    Collette Richards?

A.    No.

Q.    Switching gears, Mr. Bronstein, did you -- just some background questions, did you attend college?

A.    I did.

Q.    And where did you go to college?

A.    Two years at Occidental College and two years at University of Denver.

Q.    And did you receive a degree from either Occidental College or University of Denver?

A.    I did.  University of Denver.

Page 14

SCOTT BRONSTEIN

Q.    And what degree did you receive from the University of Denver?

A.    B.A.

Q.    In what?

A.    A B.A., bachelor of arts.

Q.    Bachelor of Arts.  And was it in a specific major?

A.    English comparative literature.

Q.    And approximately what year did you graduate from the University of Denver?

A.    '80.

Q.    1980?

A.    Yeah.

Q.    Did you attend any school after the University of Denver?

A.    I did, graduate school.

Q.    Where did you go to graduate school?

A.    Columbia University.

Q.    And what program were you enrolled in at Columbia?

A.    The Graduate School of Journalism.

Page 15

SCOTT BRONSTEIN

Q.   Did you complete the program?

A.   I did.

Q.   And did you receive -- and when did you complete the program?

A.   '83.

Q.   And what degree did you receive?

A.   A master's in journalism.

Q.   Did you attend any school after Columbia University -- after Columbia?

A.   No.

Q.   Mr. Bronstein, are you currently employed?

A.   Self-employed currently.

Q.   And what is your business?

A.   I am a consultant.

Q.   What kind of consultant?

A.   Media communications, journalistic training.  Things like that.

Q.   And how long have you had your consultant business?

A.   Almost a year.  Not quite.

Q.   Since starting this business, have you had clients?

Page 16

SCOTT BRONSTEIN

A.    I have.

Q.    Have you had CBS as a client?

A.    No.

Q.    Are your clients entities or individuals or both?

A.    Both.

Q.    And have you had anyone who works at CBS currently as a client?

A.    No.

Q.    You said that your services include, do I have that right, media communications?

A.    Yes.

Q.    What does that mean?

A.    It could mean anything. Whatever a client is interested in with someone with journalistic training.

Q.    Well, can you give me some examples, please?  Because I just don't know what that term means.

A.    Discussing how a story can be done.  Discussing how the client could benefit from journalistic skills. Discussing stories that might be done for

Page 17

SCOTT BRONSTEIN

the client by other journalists.  It runs the full gamut of things like that.

Q.    And you also, I believe, said your consulting business includes journalist training; is that correct?

A.    Sure.

Q.    And what kind of training are you providing to journalists?

A.    Journalist training to corporate clients.

Q.    And in what way are you -- what services are you providing when you talk about journalist training to corporate clients?

A.    Any kind of communication abilities to understand what journalists are doing and how they are doing it.

Q.    You said you had your consulting business for approximately one year.  So did you start the business around March of 2024?

A.    I think around May.

Q.    May 2024?

A.    Yeah.

Page 18

SCOTT BRONSTEIN

Q.    And going back to your consulting business for a second, have you helped any clients get a story on CBS?

A.    No.

Q.    And have you helped a client pitch any material for CBS?

A.    No.

Q.    Were you employed before May of 2024?

A.    Yes.

Q.    And where were you employed?

A.    At CNN.

Q.    And how long did you work at CNN, approximately?

A.    20 years, just shy of 20 years.

Q.    A long time.  And what years did that cover approximately?

A.    2004 to 2024.

Q.    And what was your last title at CNN?

A.    Senior investigative producer and writer.

Q.    And when did you first get that

SCOTT BRONSTEIN

title, approximately?

A.    When I started 2004.

Q.    You had the title of senior investigative producer starting in 2004?

A.    I did.

Q.    And generally what were your responsibilities at CNN as a senior investigative producer?

A.    To find, generate and report, and write and produce and bring through edit and bring to air and bring online long, in-depth investigations for the network, news investigations.

Q.    And did you work for a particular show or unit within CNN?

A.    Yes, the investigative -- excuse me.  The investigative and documentary units.

Q.    And was that true the entire time that you were at CNN?

A.    Yes.

Q.    And who did you report to at the end of your employment, who was your direct supervisor?

Page 20

SCOTT BRONSTEIN

A.    At the end, the person in charge, the two people in charge of the unit, Patricia DiCarlo and Matt Lait.

Q.    Can you spell Matt's last name, please?

A.    L-A-I-T.

Q.    And what is Patricia -- what was Patricia's title at that time?

A.    Her current and continued title is executive director or executive producer for the unit.

Q.    And what was Matt Lait's title?

A.    Executive editor I believe or managing editor for the unit.

Q.    And was Patricia the executive director or executive producer for the unit the entire time you were there starting in 2004?

A.    No.

Q.    Who was in that position when you joined?

A.    There have been a lot of people in that seat.  I would have to double-check to give you precise names of

Page 21

SCOTT BRONSTEIN

everyone who has been in the seat.

Q.    How long, approximately, has Patricia been in that role?

A.    I think it's eight or nine years now.  Maybe 10.

Q.    And how long has Matt Lait been the executive editor for the investigative and documentary units, approximately?

A.    I think seven years.

Q.    Were there other senior investigative producers within the unit at the time that you left CNN?

A.    Sure, there have been many.

Q.    No, no, but at the time you left.  So we are talking May -- I believe April of 2024 or thereabouts?

A.    Yes.

Q.    And how many others were there?

A.    At the time when I left, there were two others.

Q.    And who were they?

A.    Nelli Black and Curt Devine.

Q.    And how long had Nelli been a

Page 22

SCOTT BRONSTEIN
senior investigative producer within the unit?

A.    Probably around 12 years.  But I am not exactly sure.

Q.    And is she still at CNN, do you know?

A.    She is not.

Q.    And Curt Devine, how long had he been a senior investigative producer at the time, April of 2024?

A.    He's probably had that title for about two years.

Q.    Did he work within the unit before having that title?

A.    He did.

Q.    And what was his job?

A.    He started as an intern.

Q.    And did he move from intern to senior investigative producer or were there other titles he had?

A.    He rose up through the unit and had numerous titles, eventually arriving at the top which is the senior investigative producer.

Page 23

SCOTT BRONSTEIN

Q.   And is Mr. Devine still working at CNN to your knowledge?

A.   He is.

Q.   And is he still working within the same unit?

A.   He is.

Q.   And is Patricia still in that unit as well?

A.   She is.

Q.   And Mr. Lait, is he in that unit?

A.   He is.

Q.   Are there any producers that don't have the senior as part of that title within that unit at the time that you left?

A.   Yes, but the unit has been changed some.  So I am not exactly sure who that -- there were a bunch of changes, so I am not clear.

Q.   Got it.  At the time you left, though, were there producers there?

A.   Yes.

Q.   How many?

Page 24

SCOTT BRONSTEIN

A.    I believe there were three producers.

Q.    And at the time you left, were there any associate producers?

A.    Yes.

Q.    How many, approximately?

A.    I believe two.

Q.    And outside of the producers, associate producers, senior producers, executive editor and executive producer, it was there anyone else in the unit?

A.    Oh, there is an entire digital side of the team under Matt, which comprises writers in the unit.

Q.    And how many writers were there at the time you left?

A.    I think seven, six.

Q.    Anyone else, any other positions other than those that you testified to?

A.    No.

Q.    Did you have any responsibilities on the digital side of the investigative unit?

Page 25

SCOTT BRONSTEIN

A.    Sure.

Q.    What were those responsibilities?

A.    I was a writer for many of our stories.

Q.    And when you say digital, do you mean for CNN's website or something else?

A.    Yes, CNN.com.

Q.    So you wrote stories that appeared on CNN.com?

A.    I did, many.

Q.    And did you have stories that aired on CNN through your work as a senior investigative producer?

A.    Yes.

Q.    And do you have any sense of the number of stories over the years that you worked on that aired on CNN?

A.    It's probably hundreds.

Q.    And did you -- any of the stories that you worked on, did they win any awards?

A.    They did, many.

Page 26

SCOTT BRONSTEIN

Q.    Can you give me some examples that you worked on and awards that they received?

A.    Oh my goodness.  You want me to just name a few specifics?

Q.    Yeah, just name a few specifics.  I know you're not going to cover everything.

A.    Let's see, our team did an investigation into the Minneapolis Police Department at the time of the George Floyd killing.  That won an Emmy and other awards.

Our team did a long investigation into mistreatment and delays in care at the Veterans Affairs, Veterans Department, the VA.  That series of stories, which is probably in the numbered some-70 stories over the course of a year-and-a-half, that won the Peabody Award, it won the Columbia Dupont Award, it won Emmy awards.  It won numerous awards as a series.

I could go on.  It's easy to

Page 27

SCOTT BRONSTEIN

find them.

Q.    Why did you leave CNN?

A.    There is restructuring going on at CNN currently.

Q.    And your understanding is that your job was affected by the restructuring?

A.    Yeah, it was a combination of my job was being eliminated and I also was being offered a buyout.

Q.    Did you accept the buyout?

A.    I did.

Q.    Did anyone else leave the unit at the time you left or around the time you left?

A.    There have been a series of layoffs, cuts and changes in the last 6 to 12 months.  And numerous members of the unit have been affected.

Q.    Did any of those layoffs take place around the time you left?

A.    Not right at the time I left, but there were many that followed shortly thereafter.

Page 28

SCOTT BRONSTEIN

Q.    Do you know if anybody else within the unit was offered a buyout at the time you were or around the time you were?

A.    I believe Nelli Black was.

Q.    And do you know if she accepted it or did not accept it?

A.    I believe she did.

Q.    She left around the same time that you did?

A.    Shortly thereafter.

Q.    Anyone else offered a buyout in the unit, that you know of?

A.    Well, we are not privy to exactly who was offered what.  It's a privacy issue.

Q.    But do you know?  I am just asking.

A.    One hears things.

Q.    I understand.

A.    I don't think that can be considered knowing.

Q.    Understood.  That's fine. Okay.  Did anyone else accept a buyout,

Page 29

SCOTT BRONSTEIN

to your knowledge, let me ask you that, other than Ms. Black?

A.    I believe so, but I cannot be sure.

Q.    Okay.  Where did you work before you worked at CNN?

A.    Immediately before?

Q.    Yes.

A.    Immediately I was at National Geographic.

Q.    And how long were you at National Geographic?

A.    Three years.

Q.    And what were those years approximately?

A.    Maybe 2001 to 2004, should be.

Q.    And what was your last title there at National Geographic?

A.    Producer of international documentaries.

Q.    And was that your title the whole time or did it change?

A.    The whole time.

Q.    And who did you report to at

Page 30

SCOTT BRONSTEIN

the end of your employment at National Geographic?

A.    Margaret or Maggie Burnette. She is now Maggie Stogner.

Q.    What was her title at the time you left National Geographic?

A.    I believe it was executive editor.

Q.    And what did you do in your job as a producer for international documentaries at National Geographic?

A.    I brought international documentaries from start to finish to air on the National Geographic channel or other channels that were tied to National Geographic.

Q.    And were there other producers for international documentaries at National Geographic when you were there?

A.    Sure.

Q.    Were there others that reported to Maggie Burnette?

A.    Yes.

Q.    About how many?

Page 31

SCOTT BRONSTEIN

A.    I think about a dozen.

Q.    And were there associate producers that worked within that group at National Geographic?

A.    Yes.

Q.    And approximately how many?

A.    About a dozen, I would say.

Q.    Did you personally work with the APs when you were at National Geographic?

A.    I did.

Q.    In what way, generally, did you work with APs at National Geographic?

A.    The way that producers and APs always interact, working together collegially to produce the product.

Q.    What are not -- strike that. We'll come back to that.

Why did you leave National Geographic?

A.    I had a good offer from CNN.

Q.    So you left National Geographic voluntarily, correct?

A.    I did.

Page 32

SCOTT BRONSTEIN

Q.    Where did you work immediately before you went to National Geographic?

A.    ABC News.

Q.    And for how long did you work at ABC News?

A.    About two-and-a-half, three years.

Q.    And what was your last title there?

A.    Producer.

Q.    Were you a producer the whole time?

A.    I was.

Q.    And generally what did you do in your role as a producer at ABC News?

A.    Again, generated and created and brought stories from start to finish to air on ABC News.

Q.    Were you assigned to a particular show at ABC News?

A.    Usually the magazine shows. Either Prime Time or one of the other feeder shows that fed into the evening news.

Page 33

SCOTT BRONSTEIN

Q.    And at the end of your employment at ABC News, who did you report to?

A.    David Doss.

Q.    Did you report to Mr. Doss the whole time you were at ABC News or did you report to other people?

A.    The whole time.

Q.    What was Mr. Doss's title at the time?

A.    I think executive producer.

Q.    Was he executive producer for a specific show or group?

A.    I think specifically for Prime Time.

Q.    I think you said Prime Time is or was an ABC News magazine TV show?

A.    Correct.

Q.    Did you ever work with Chris Wallace at ABC News?

A.    I did.

Q.    And what was his job?

A.    He was correspondent.

Q.    And why did you leave ABC News?

Page 34

SCOTT BRONSTEIN

A.    The entire magazine staff was being reshuffled.  I was one of a bunch of people.

Q.    Is it your testimony that you were laid off from ABC News?

A.    I think the term would be the position was eliminated.

Q.    And do you know how many other producers' jobs were eliminated by ABC News at that time, around that time?

A.    Around the time, the entire magazine was being reshuffled so there were many.

Q.    There were many meaning there were many other people let go around the same time?

A.    Correct.

Q.    And that included other producers?

A.    Correct.

Q.    And how was your working relationship with Chris Wallace, how would you characterize it or describe it?

A.    It was okay.  It was good.

Page 35

SCOTT BRONSTEIN

Q.    Was it contentious at all?

A.    It was a stressful time for the unit.  I would say a lot of people were having contentious situations there.  It was just a stressful time.

Q.    And was it stressful for you at that time?

A.    I would say for everyone.  The whole staff.

Q.    And why was that, why was it a stressful time for the unit around that time?

A.    It was around the time of 9/11.  It was a time of upheaval.  And it was also a time when the network was trying to decide what it was going to do with the magazine shows.

Q.    And when you worked at ABC News, did you work with associate producers?

A.    Sure.

Q.    And was it in the same or similar capacity that you worked with associate producers at National

Page 36

SCOTT BRONSTEIN

Geographic?

A.    Sure.

Q.    And was it the same or similar as the experience when you worked at CNN?

A.    Yes.

Q.    What was the job that you had before ABC News, immediately before?

A.    At CBS News, at 60 Minutes.

Q.    And when you were at CBS News, did you work at 60 Minutes for the whole time or did you work for other shows?

A.    60 Minutes the whole time.

Q.    And how long did you work for 60 Minutes approximately?

A.    Seven years.

Q.    And from what years approximately?

A.    I think roughly '94 to 2001, roughly.  To 2000.

Q.    Got it.  And what was your title when you joined 60 Minutes?

A.    Joined as an associate producer.

Q.    And did that change at any

SCOTT BRONSTEIN

point?

A.    It did.

Q.    How did it change?

A.    I became producer.

Q.    Approximately when did you become a producer?

A.    Maybe five years in, roughly. Four-and-a-half. Something like that.

Q.    Okay. So somewhere around 1998, 1999?

A.    Yeah.

Q.    When you joined 60 Minutes as an associate producer were you on a team?

A.    Sure.

Q.    What team were you on?

A.    I was on the overseas team based in France.

Q.    And was there a specific correspondent that you worked with or multiple correspondents?

A.    Mostly Christiane Amanpour and also Mike Wallace.

Q.    And was there a specific producer that you worked with when you

Page 38

SCOTT BRONSTEIN

started as an AP or were there multiple producers that you worked with?

A.    Multiple producers.  I worked a lot with Barry Lando.

Q.    What other producers did you work with as an AP at 60 Minutes?

A.    There were producers in Europe but I would not work directly with them. I would rub shoulders with them, if that answers it.

Q.    But you worked directly with Barry, is that the person's name?

A.    Correct.

Q.    What kind of work did you do as an AP when you worked at 60 Minutes?

A.    Again, helping find stories, helping bring stories to air through the reporting process.

Q.    And how did you go about trying to find stories?

A.    That's a complicated question.

Q.    You can give me some examples, even if you don't cover everything?

A.    Reading materials.  Working

Page 39

SCOTT BRONSTEIN
with sources.  Looking for documents.
All of those things could help generate
stories.

Q.    As an AP, did you pitch stories
to Barry?

A.    Sure.

Q.    Did you pitch stories to, is it
Christina?

A.    Christiane Amanpour.

Q.    Did you pitch stories to her
directly?

A.    Sure.

Q.    And when you say you
participated in the process to bring
stories to air, what's involved?  And
again generally is fine.  What was
involved, I am talking about when you
were at 60 Minutes as an AP?

A.    Working on the repertorial
process to try and document and report
stories out fully.

Q.    What else?

A.    It's a long process.

Q.    Sure.

Page 40

SCOTT BRONSTEIN

A.    Fairly complicated.

Q.    Can you give me some examples of the steps?

A.    Interviewing sources.  Looking at documents.  Research.  Researching history.  Researching documents and documentation.  Researching sources.

Q.    Did you have any responsibilities as an AP for securing third-party footage at 60 Minutes?

A.    Sure.

Q.    And as an AP did you have any responsibilities for fact checking stories before they aired?

A.    Sure.

Q.    And did you have any role in writing in connection with stories that aired?

A.    Sure.

Q.    What kind of writing did you do as an AP at 60 Minutes?

A.    Essentially looking at and going through scripts and working on the writing that was involved in scripts.

Page 41

SCOTT BRONSTEIN

Q. Did you conduct background interviews as part of your duties as an AP at 60 Minutes?

A. Yes.

Q. Did you ever write summaries of those background interviews?

A. Sure.

Q. And before you said you were involved in fact checking as an AP, what did that entail?

A. It's self-explanatory.

Q. Well, please explain.

A. Examining issues to determine their accuracy and their veracity.

Q. Was there a specific process when you were there at 60 Minutes for fact checking as an AP?

A. I wouldn't call it a specific process. There was a collegial process where the producer and associate producer or other team members worked together.

Q. Did you have to do an annotation of the script that was used for the story?

Page 42

SCOTT BRONSTEIN

A.    Sure.

Q.    Was that your primary responsibility as an AP when you were at 60 Minutes?

A.    It was one of many responsibilities.

Q.    No, I understand, sorry.  I asked the question the wrong way.

In terms of preparing that annotated script, was that your job as the AP or was the producer also responsible for it?

A.    Oh, the team was responsible. The producer and AP and other people who might have been involved.  For example, the correspondent.

Q.    How was your working relationship with Barry when you worked together?

A.    It was good.

Q.    And I think your testimony was at some point you were elevated to producer, correct?

A.    Correct.

Page 43

SCOTT BRONSTEIN

Q.    And did you remain in the overseas unit when you were elevated to producer?

A.    I did not.  I moved to New York.

Q.    And that was around 1998 or 1999?

A.    Yes.

Q.    And at that point in time were you assigned a team?

A.    Yes.

Q.    And whose team were you on then?

A.    That was specifically then with Mike Wallace, who I had worked with before.

Q.    And did Mr. Wallace at that time have other producers in addition to you?

A.    Sure.

Q.    Do you recall how many?  Was it three, four, if you remember?

A.    I think it was four.

Q.    Four in total or four

Page 44

SCOTT BRONSTEIN

additional?

A.    Additional, I believe.

Q.    And when you moved to New York and was the producer for Mike Wallace's team, did you have an AP or APs that you worked with?

A.    Sure.

Q.    And was there just one or multiple APs during that time?

A.    There was several.  There was one specifically who was there for a longer period.

Q.    And who were they?

A.    Paul Gallagher.

Q.    Was he the one who was there for a longer period?

A.    Yes.

Q.    And who else did you work with as an AP, when you were a producer and the person was an AP?

A.    You know, there were many APs around.  Sometimes people would come in, you know, for a time and work with Mike's team.  I can't recall them all.

Page 45

SCOTT BRONSTEIN

Q.    Got it.  Was Paul Gallagher specifically assigned to work with you?

A.    He was.

Q.    And generally speaking, what was your responsibilities as a producer on Mike Wallace's team at 60 Minutes?

A.    Again, to find, generate and bring stories to air.  I was just going to add, through the repertorial and producing process.

Q.    How did your responsibilities change when you moved from being an AP to a producer?

A.    The producer has ultimate authority more than the AP does, but it's largely a collegial team effort.

Q.    Understood.  But tell me -- let me ask you this.  Did your responsibilities as a producer change from what they had been as an AP?

A.    Sure.

Q.    And how so?

A.    I became the ultimate person to try and bring the stories to air through

Page 46

SCOTT BRONSTEIN

the repertorial process.  Finding them and working on them.

Q.    Other ways that they changed?

A.    More direct interaction with the correspondent.  But that really depends on the team.

In other words, I had always been in a collegial relationship with the correspondent and producers, so it didn't change that much.  Just my role was more of a senior person.

Q.    And how was your working relationship with Mike Wallace?

A.    It was good.

Q.    Did you have a contentious relationship with him?

A.    I think everyone at 60 Minutes at every level at times had contentious relationships with Mr. Wallace.

Q.    Tell me about your experience working with him, please.

A.    He could be -- he could demand a lot, which is a good thing.

Q.    When you say demand a lot, what

Page 47

SCOTT BRONSTEIN

are you talking about?

A.     He asked a lot of his producers through the whole process.  But he was a good boss in many ways.

Q.     When you worked as a producer at 60 Minutes, did you work nights?

A.     Sure.

Q.     Did you work on weekends?

A.     Sure.

Q.     Did you work on holidays?

A.     Sure.  The goal was not to do that too much.

Q.     But it happened?

A.     Sure.

Q.     Did Mr. Wallace ever yell at you when you worked there?

A.     No, I don't think I can say that.

Q.     Did he ever give you negative feedback?

A.     He gave everyone negative feedback.  He was that kind of person. He also gave gracious and charming and kind feedback at times.  He was a

SCOTT BRONSTEIN

complicated man.

Q.    What do you mean he was complicated?

A.    There were many sides to him.

Q.    What are the sides you're referring to?

A.    Just the ones I just said.

Q.    I don't know, remind me what you just said.

A.    He could be -- he could demand a lot.  He could also be charming and gracious.

Q.    And when he demanded a lot, do you think he had a mean streak?

A.    At times.

Q.    And did he ever direct that mean streak towards you?

A.    Sometimes.

Q.    Was he ever insulting to you?

A.    No.

Q.    In what way did the mean streak manifest as directed at you?

A.    It's a long time ago.  It's hard to recall exactly.

Page 49

SCOTT BRONSTEIN

Q.    Can you remember anything?

A.    Not really.

Q.    When you were in New York, how would you describe -- at 60 Minutes, how would you describe the working environment?

A.    It's a stressful place.  It could also be a very rewarding place and there is collegiality there as well.

Q.    Outside of Mr. Wallace in New York, was there anyone that you worked with that you would describe as being stressful to work with at 60 Minutes?

A.    No.

Q.    Did you observe at 60 Minutes, even if -- well, strike that.

At 60 Minutes, did anyone ever yell at you?

A.    No.

Q.    Did you observe anyone at 60 Minutes yelling at other employees?

A.    Not really.

Q.    What do you mean not really?

A.    I would say no, not yelling.

Page 50

SCOTT BRONSTEIN

Q.    Did you ever observe employees raising their voice at other employees at 60 Minutes?

A.    I don't think I've ever worked anywhere where someone didn't raise a voice at some point.

Q.    And that includes 60 Minutes?

A.    It does.

Q.    Did you ever observe any employees at 60 Minutes insulting employees at 60 Minutes?

A.    No.

Q.    Did you observe any conduct that you would consider to be sexual harassment when you were at 60 Minutes?

A.    No.

Q.    Did you observe, and I know you're not a lawyer, but did you observe any conduct that you believe constitutes gender discrimination when you were at 60 Minutes?

A.    No.

Q.    Why did you leave 60 Minutes?

A.    Mike was changing producers

Page 51

SCOTT BRONSTEIN

again.  It happened frequently.

Q.    Did you leave voluntarily or involuntarily?

A.    Voluntarily.

Q.    You left voluntarily?

A.    Yes.

Q.    So explain to me the connection between Mike Wallace changing producers and your departure voluntarily?

A.    Mike was changing producers and I needed to go somewhere else in order to continue my employment, so.

Q.    Did you -- did Mr. Wallace say that you were no longer going to be his producer?

A.    He did.

Q.    Did he tell you why?

A.    It was so frequent -- the answer is no, he didn't tell me why.  It was so common and so frequent, it happened routinely.  We all saw it.  We all knew it.

Q.    So no longer being Mr. Wallace's producer was not voluntary,

Page 52

SCOTT BRONSTEIN

correct?

A.   Well, he was changing producers.

Q.   And that producer he was changing was specifically you, correct?

A.   Correct, at that time.

Q.   At that time.  Did you ask to not be his producer anymore?

A.   I was okay with it.

Q.   You were okay with the decision that you wouldn't be his producer, is that what you were saying?

A.   Yes.  He could be unpleasant to work for.

Q.   And when Mr. Wallace decided that you would not be his producer anymore, did that mean that your employment at 60 Minutes ended?

A.   Not for a time.  I think about another half a season to three-fourths of a season I continued trying to work on stories with other correspondents but ultimately left.

Q.   What other correspondent -- did

Page 53

SCOTT BRONSTEIN

you work on any stories during that past season or three-quarters of the season, did you work on other stories with other correspondents that aired?

A.    No.

Q.    What other correspondents during that half or three-quarters of a season did you work with?

A.    Interacted with Lesley Stahl for a time.  Interacted with Morley Safer for a time.

Q.    Any other correspondents?

A.    Bob Simon.

Q.    Any others?

A.    No.

Q.    Did you produce any stories or attempt to produce a story with Lesley Stahl even though it didn't air?

A.    Yes.

Q.    How many?

A.    One.  We worked on one or we started to work on one.

Q.    Did that story ultimately air after you left?

Page 54

SCOTT BRONSTEIN

A.    No.

Q.    And the same question for Mr. Safer, did you work on something even though it didn't air?

A.    Discussed and moved partway into a reporting process, but that's as far as it went.

Q.    And then the same question for Mr. Simon?

A.    The same with Bob.  I had worked with Bob previously as well.

Q.    Were you upset at leaving 60 Minutes?

A.    One has mixed feelings at a time like that.

Q.    And what were your feelings at that time?

A.    They were mixed.

Q.    In what ways were they mixed? Tell me the different feelings you had.

A.    I was glad in some ways to be leaving and I was sad in some ways to be leaving.  Mixed.

Q.    And why were you glad in some

Page 55

SCOTT BRONSTEIN

ways?

A.    Mike could be unpleasant to work with at times.

Q.    Any other reasons that you were glad in some ways to leave?

A.    No.

Q.    And why were you sad in some ways to leave?

A.    It's a great place to work in terms of work product.

Q.    Any other reasons that you were sad in some ways to leave?

A.    Sure.  Comrades and colleagues.

Q.    Any particular comrades and colleagues that you were sad to no longer be working with?

A.    They are too numerous to name.

Q.    Did you ever describe your experience working at 60 Minutes as upsetting to other people?

A.    No, I don't think so.

Q.    Did you ever describe your experience working at 60 Minutes as traumatic?

Page 56

SCOTT BRONSTEIN

A.     No, I don't think so.

Q.     Did you ever describe your experience working -- strike that.

Did you ever describe your departure from 60 Minutes as unfair?

A.     Not really.

Q.     What do you mean not really?

A.     I suppose at times it felt unfair, but in the long view of things it's not unfair.  It's mixed.

Q.     Mixed for any reason other than what you already testified to?

A.     No.

Q.     Do you think that, when you say you thought there were times when you thought it was unfair, are you referring to your experience with Mr. Wallace, working for him?

A.     Yes.

Q.     I know I asked you if you ever described your experience working at 60 Minutes as traumatic and you said no. Were you traumatized by your experience working at 60 Minutes?

Page 57

SCOTT BRONSTEIN

A.    No.

Q.    Were you -- strike that.

MR. IADEVAIA:  We have been going for about an hour, why don't we take a five-minute break, if that's all right with everybody.

THE VIDEOGRAPHER:  We are going off the record.  The time is 10:59 a.m.

(Off the record.)

THE VIDEOGRAPHER:  We are going back on the record.  The time is 11:11 a.m.

BY MR. IADEVAIA:

Q.    Mr. Bronstein, when you joined 60 Minutes, who was the executive producer of the show?

A.    60 Minutes?

Q.    Yes, 60 Minutes.

A.    Don Hewitt.

Q.    And during your tenure at 60 Minutes, did that change?

A.    No.

Q.    Mr. Hewitt was the executive

Page 58

SCOTT BRONSTEIN

producer the whole time you were there, correct?

A. Correct.

Q. And did you have any interactions with Mr. Hewitt?

A. I did.

Q. And how would you characterize them?

A. Great.

Q. And during the time you were at 60 Minutes, did Mr. Hewitt have a deputy on the show?

A. Yes.

Q. And who was his deputy? And if it changed, just let me know.

A. I believe it was Phil, I can't remember Phil's last name.

Q. It was Phil the whole time?

A. Yes.

Q. And when you worked at 60 Minutes was Phil responsible for overseeing the APs?

A. No.

Q. Who was?

Page 59

SCOTT BRONSTEIN

A.    Producers were responsible for overseeing APs.

Q.    And when you were a producer at 60 Minutes, did Don Hewitt, as the executive producer, have responsibilities for overseeing the producers?

A.    Yes, to a degree.

Q.    When you worked at 60 Minutes as a producer, did have you a contract?

A.    I did.

Q.    And how many contracts did you have while working at 60 Minutes?

A.    Two, I believe.

Q.    And how long were the terms of the contract?  And if they differed, just tell me.

A.    I am not really sure.  I think it was a year-and-a-half.  It might have been two.

Q.    Each contract was a year-and-a-half?

A.    Yeah, it might have been two.

Q.    It might have been two?

A.    I can't recall.

Page 60

SCOTT BRONSTEIN

Q.    And were they contracts only as a producer or did you have contracts as an AP, too?

A.    I sort of had one -- I can't really recall.  As an AP I kind of had one, but it's so long ago, I can't really recall.

Q.    At the time that you left 60 Minutes, were you in your contract at that time or had your contract expired?

A.    I believe I was in a window, as it's called.

Q.    And within that window, were you able to terminate the contract?

A.    I believe in the window the company is able to.  I am not a lawyer. I would have to defer that to somebody else.

Q.    Got it.  So did 60 Minutes or CBS News terminate the contract during that window in connection with you leaving?

A.    I don't believe it was formally terminated.  I decided to leave as well.

Page 61

SCOTT BRONSTEIN

It was essentially my departing and moving out of the city.

Q.    And did 60 Minutes offer you opportunity to continue as a floating producer, meaning you were not assigned to a specific correspondent?

A.    There were discussions about that, but they did not pan out because there were no open positions.  No head count available.

Q.    To remain as the floating producer?

A.    Correct.

Q.    And at the time you left, you were not assigned to a specific correspondent, correct?

A.    Correct.  The decision to leave New York was a complicated one and that was part of it.

Q.    What do you mean the decision to leave New York?

A.    Well, there were -- the reasons at 60 Minutes and also personal reasons that we wanted to leave New York, which

Page 62

SCOTT BRONSTEIN
is also wrapped up in that time.

Q.    When you say New York, you're referring to New York City?

A.    Yes.

Q.    When you worked at National Geographic -- well, strike that.

When you worked at ABC News, where did you work?

A.    Washington, D.C.

Q.    Did you work with Bill Owens when you were at 60 Minutes?

A.    No.

Q.    Was he at 60 Minutes when you were there?

A.    I believe he was at CBS News in New York.  Maybe in D.C.  I am not really sure exactly where he was.

Q.    So you didn't interact with him at 60 Minutes?

A.    No.

Q.    Did you work with Tonya Simon when you were at 60 Minutes?

A.    No.

Q.    Did you know Ms. Simon?

Page 63

SCOTT BRONSTEIN

A.    Through her father, who I worked with.

Q.    When you worked at 60 Minutes, did you meet her in person?

A.    Once, I believe.

Q.    How old was she about at that time, do you remember?

A.    I don't remember.

Q.    Was she a kid or was she an adult?

A.    A young adult, I believe.

Q.    When you were at 60 minutes, did you work with someone named Claudia Weinstein or Weinstein?

A.    I knew of her.  I did not really know her personally.

Q.    Was there someone you worked with at 60 Minutes named Graham Messick?

A.    Yes.

Q.    And what was his job when you were there?

A.    Producer.

Q.    Did you work with him at all when you --

Page 64

SCOTT BRONSTEIN

A.    I did not work with him.   I knew Graham from Atlanta.

Q.    When you say from Atlanta, you had both been there at some point?

A.    Correct.  We had both worked there and lived there.

Q.    Got it.  Who was Graham's correspondent at the time you were at 60 Minutes?

A.    At that time, it was Steve Croft, I believe, that entire time.

Q.    And does Graham still work for 60 Minutes?

A.    He does.

Q.    And is he a producer still?

A.    He is.

Q.    And who is the correspondent he works for?

A.    I am not sure.

Q.    And do you stay in touch with Graham?

A.    On rare occasion.

Q.    And did you work with -- well, when you were at 60, was there someone

Page 65

SCOTT BRONSTEIN

that worked there named Henry Schuster?

A.    Sure.

Q.    And what was Mr. Schuster's job at the time?

A.    Producer.

Q.    And was he working with a specific correspondent when you were at 60 Minutes?

A.    I am not sure who his correspondent was.

Q.    Do you know if he was a floater or if he was assigned to someone, even if you don't remember the name?

A.    I believe he worked with Scott Pelley.

Q.    And to your knowledge, does Mr. Schuster still work for 60 Minutes?

A.    He is.

Q.    And is he still a producer?

A.    He is.

Q.    And does he work with a correspondent?

A.    He does.  I am not sure who that is.

Page 66

SCOTT BRONSTEIN

Q.   Not sure now who it is?

A.   Correct.

Q.   And do you stay in touch with Mr. Schuster?

A.   No.

Q.   After leaving CNN -- sorry, after leaving 60 Minutes, have you ever communicated with Claudia Weinstein?

A.   No.  I may see her on Facebook. I don't know if that could be considered a communication.

Q.   Have you ever sent her a text message?

A.   No.  No.

Q.   Have you ever received a text message from her?

A.   No.

Q.   Mr. Bronstein, do you currently have a cell phone?

A.   I do.

Q.   And how many -- do you have one cell phone or do you have multiple cell phones, currently?

A.   One.

SCOTT BRONSTEIN

Q.    And how long have you had the actual physical device that is that phone?

A.    About 10 months, I believe.

Q.    And the prior device -- I'm sorry, the current phone that you use that you've had for about 10 months, is it an iPhone?

A.    It is.

Q.    The prior phone that you had, how long did you have that device?

A.    About a year.

Q.    And was that also an iPhone?

A.    It was.

Q.    And before that -- strike that.

And what are the last -- I don't need had the whole number, but what are the last four digits associated with your current cell phone?

A.    The last four digits of my current cell phone?

Q.    Yes.

A.    2050.

Q.    How long have you had that

Page 68

SCOTT BRONSTEIN

telephone number?

A.    A number of years.  Probably more than eight years.

Q.    Was that the number associated with the iPhone that you had, that you previously had before getting the most recent device?

A.    Yes.

Q.    And the phone that you had for a one-year period, the immediately preceding phone, how long did you have the device before that phone?

A.    I changed phones almost every year.

Q.    Almost every year.  Have you ever had more than one cell phone at a time within the last 20 years?

A.    No.

Q.    And is the cell phone associated with the cell phones that you had over the last 20 years this number that ends in 2050?

A.    No.  That number maybe goes back, I am not sure, 8, 10 years roughly.

Page 69

SCOTT BRONSTEIN

I can't remember.

Q.    Eight or 10 years, okay.  Did you ever use any of the, whatever personal phone -- whatever cell phone you had that ended with 2050, did you ever use that phone to communicate with Alex Poolos?

A.    Yes.

Q.    And in what ways did you communicate, meaning the forms of communication with Ms. Poolos using that phone?

A.    Phone calls or texts.

Q.    Did you use that phone to contact Ms. Poolos regarding the hiring of Collette Richards?

A.    Yes.

Q.    Did you use that, the number associated with that cell phone to discuss -- strike that.  Strike that.

And the communications that you had with Ms. Poolos with the number ending 2050, did you produce those pursuant to the subpoena that we issued

Page 70

SCOTT BRONSTEIN

in this case?

A.    I did.

Q.    Were there any communications with Ms. Poolos that you have that were not produced?

A.    No.

Q.    The communications that you had with Ms. Poolos that were produced in this case go back to 2020; is that correct?

A.    Yes.

Q.    Were there other communications that you had with Ms. Poolos that you no longer have at this point in time?

A.    There may be.  I don't know.

Q.    Do you ever use your personal -- well, the number 2050, is it okay for me to refer to that as your personal cell phone?

A.    Yes.

Q.    Okay.  Do you ever use your personal phone to communicate with Collette Richards?

A.    Yes.

Page 71

SCOTT BRONSTEIN

Q.    And what form did you use the phone to communicate with Ms. Richards?

A.    Phone or text.

Q.    And when was the last time you sent a text message to Ms. Richards?

A.    It would be in the group that were provided to you for the deposition.

Q.    Do you know what year those text messages are from that you provided as part of the subpoena?

A.    I would have to look.  I don't know off the top of my head.  They are the ones that you have in your hands.

Q.    Did you use your personal cell phone to communicate with Ms. Richards about her joining 60 Minutes?

A.    I am sure I did.

Q.    Did you use your personal cell phone to have communications with Ms. Richards about Alex Poolos?

A.    Leading up to the employment? What period are you talking about?

Q.    At any point in time for now. We'll get more specific.

Page 72

SCOTT BRONSTEIN

A.    Sure.

Q.    So let's talk about it more specific.  Did you communicate with Ms. Richards about Alex Poolos in connection with her, with Collette joining 60 Minutes, using your personal phone?

A.    I am sure I did.

Q.    And did you do so via text message?

A.    I don't know.  I might have.  I don't know.

Q.    Did you use your -- did you ever send text messages using your personal phone to Collette Richards related to concerns Collette had about Alex Poolos?

A.    Other than what I provided to you, I don't know.

Q.    How many text messages did you provide to us?

A.    The only ones that are in my phone.

Q.    And there are two, I think, or

Page 73

SCOTT BRONSTEIN

three?

A.    Yes.

Q.    Did you exchange other text messages with Collette Richards over the time that you've known her, other than those three?

A.    I am sure there are.  I no longer have those in my phone.  I no longer know where they are.

Q.    Did you delete them?

A.    I don't know if I deleted them. I don't know if -- I did not consciously delete anything.  But over the course of changing phones, I have -- there is lots of things in my phones that are no longer there.

Q.    Did you exchange text messages with Collette Richards using the personal phone related to Collette's concerns about Alex?

A.    I don't know.

Q.    You have no memory if you did?

A.    I do not.

Q.    Okay.  Did you exchange any

Page 74

SCOTT BRONSTEIN

text messages with Collette Richards using your personal phone to discuss the call that you had with Ms. Poolos in January of 2022?

A.    I don't know.  I don't have them.

Q.    I know you don't have them. But do you recall exchanging text messages?

A.    I don't recall.

Q.    So it's possible you did and you're also saying it's possible you did not, correct?

A.    Correct.

Q.    Did you exchange text messages using your personal phone with Ms. Richards about Alex Poolos being fired from CBS?

A.    I don't recall.  I don't know.

Q.    Did you use your personal phone to exchange text messages with Collette Richards about Alex Poolos being placed on an administrative leave at 60 Minutes?

A.    I don't recall.  I don't know.

Page 75

SCOTT BRONSTEIN

Q.    And have you ever exchanged text messages with Ms. Richards using your personal phone to discuss this lawsuit?

A.    No.

Q.    Did you ever have any discussions with Ms. Richards about deleting text messages that you exchanged with her?

A.    No.

Q.    Did you ever use your personal phone, cell phone, to communicate with Renee Balducci?

A.    Yes.

Q.    Did you ever send text messages or receive text messages from Ms. Balducci?

A.    Yes.

Q.    And about what did you receive text messages or send text messages from or by Ms. Balducci?

A.    They are the items provided to you for this deposition.

Q.    You're talking about the text

Page 76

SCOTT BRONSTEIN

messages that were produced pursuant to the subpoena to my firm, correct?

A.    Correct.

Q.    Did you exchange any other text messages with Ms. Balducci other than what was produced in this case?

A.    No.

Q.    To your knowledge, were any communications that you had with Ms. Balducci deleted from your phone?

A.    No.

Q.    Do you have any reason to believe they were deleted?

A.    No.

Q.    Have you ever communicated with Tonya Simon since leaving 60 Minutes?

A.    I have never communicated with her at all.

Q.    Have you ever communicated with Bill Owens?

A.    No.

Q.    Have you ever had a phone call with Mr. Owens?

A.    I might have had a call with

SCOTT BRONSTEIN

him maybe years ago maybe when I was at 60 Minutes or maybe some short period after that.  But it was many, many years ago, if I did.

Q.    Did you ever have a phone call with Mr. Owens about Alex Poolos?

A.    No.

Q.    Did you ever exchange text messages with Mr. Owens about anything?

A.    No.

Q.    Have you ever had any -- since leaving -- strike that.

Have you had any communications in any form, either writing or orally, with Mr. Owens about Alex Poolos?

A.    No.

Q.    So are you surprised to hear that Mr. Owens testified that, during his deposition, that he had a phone call with you?

A.    I am not aware of that.

Q.    So you're saying you did not have a phone call with him?

A.    No, I am not aware of it, no.

Page 78

SCOTT BRONSTEIN

Q.    But you would be aware if you had a phone call with somebody, right?

A.    I would think so.

Q.    Just to be clear, I think you said this before, am I correct that your testimony is that you never communicated with Claudia Weinstein -- strike that.

Since leaving 60 Minutes have you communicated at all in any way with Claudia Weinstein?

A.    I don't think I ever communicated with Claudia Weinstein.

Q.    Have you ever spoke to Graham Messick about Alex Poolos?

A.    I don't believe so.

Q.    Have you ever spoke to Henry Schuster about Alex Poolos?

A.    I don't believe so.

Q.    Have you ever spoken to Rich Bonin about Alex Poolos?

A.    I may have spoken to Rich because Rich contacted me when he was interested in hiring Collette and Alex's name could have come up because they were

Page 79

SCOTT BRONSTEIN

both trying to do that.

Q.    Outside of -- we will talk a little bit about Collette's hiring at 60 Minutes, but my question for now is did you speak to Mr. Bonin about Alex Poolos at any point in time except in connection with Collette Richard's hiring?

A.    No.

Q.    Just to be clear for the record, when you were at CNN, did you have another phone beyond the one that ends with the, or another phone number beyond the one that ends with 2050?

A.    When I was at CNN?

Q.    Yeah.

A.    I don't remember what the number was.  I had an earlier phone for some number of years when I first got there, I believe.

Q.    And was that phone a CNN-issued phone?

A.    Yes.

Q.    Did you also have a personal phone at the time or you just used one

Page 80

SCOTT BRONSTEIN

cell phone?

A.    Just used one.

Q.    And at some point you changed to the number 2050?

A.    Correct.

Q.    And was that changed to a CNN device or a personal device?

A.    CNN device.

Q.    And after leaving CNN you kept the number 2050?

A.    Correct.

Q.    At any point at CNN, did you have multiple cell phones or just one cell phone?

A.    Just one.  There may have been a period of time when two would overlap when I was changing.

Q.    Do you have a personal e-mail account?

A.    I do.

Q.    And what's the -- what company or platform is it associated with?

A.    Gmail.

Q.    How long have you had your

Page 81

SCOTT BRONSTEIN

personal gmail account?

A.    Maybe a year.

Q.    And did you have a personal e-mail account before then for a year?

A.    I had an account, I never really used it until leaving CNN.

Q.    Did you use your CNN-assigned work e-mail for the majority of your communications during the time that you worked at CNN?

A.    Sure.

Q.    Did you use it for both work and personal reasons?

A.    Sure.

Q.    Did you ever use e-mail, whether it was your CNN account or gmail account, to communicate with Collette about her joining 60 Minutes?

A.    Not that I recall.

Q.    Did you ever use your e-mail -- when I say e-mail I am referring to both your gmail and the CNN e-mail account. Did you ever use your e-mail account or accounts to communicate with Collette

Page 82

SCOTT BRONSTEIN

about Alex Poolos?

A.    Can you rephrase that, please?

Q.    Sure.  I am wondering if you used any of your e-mail accounts to communicate about Alex Poolos with Collette?

A.    Not that I know of.

Q.    For purposes of the subpoena that you received, did you conduct a search of your e-mail account or accounts to look for any such communications?

A.    I am only able to search on my phone for what I had, which is what we provided you.

Q.    Right.  My question, though, is slightly different, which is did you check any e-mail accounts for correspondence that might be responsive to the subpoena?

A.    The only one I would have is my personal one with gmail and that one was not even used back then.

To answer your question, yes, I've looked.  There is nothing else I

Page 83

SCOTT BRONSTEIN

have to respond to the deposition.

Q.    Nothing else responsive to the subpoena?

A.    Correct.  Correct.

Q.    Did you ever use e-mail to communicate with Bill Owens?

A.    Not that I know of.

Q.    Did you ever use e-mail to communicate with Tonya Simon?

A.    Not that I know of.  No.

Q.    Did you ever use e-mail to communicate with Lesley Stahl?

A.    Sure.  When I was at 60 Minutes working there.

Q.    Since you left 60 Minutes, have you used e-mail to communicate with Lesley Stahl?

A.    No.

Q.    Have you communicated with Lesley Stahl at all since you left 60 Minutes?

A.    No.

Q.    Did you use e-mail to communicate with Alex Poolos?

Page 84

SCOTT BRONSTEIN

A.    I might have.  Not that I recall.

Q.    Did you use e-mail to communicate with Renee Balducci?

A.    No.  No.

Q.    Do you have any social media accounts?

A.    Sure.

Q.    What accounts do you have? With what platforms do you have accounts currently?

A.    Facebook.  Twitter or X, though I am not using that currently.

Q.    Any others?

A.    No.

Q.    Do you have a LinkedIn account?

A.    Oh, sure.

Q.    Do you have an Instagram account?

A.    I do, but I don't use it.  I have only been on it once.

Q.    Do you have Snapchat?

A.    No.  If I do, I don't use it. I briefly got it to communicate with my

Page 85

SCOTT BRONSTEIN

son, but that lasted about a day.

Q.    And do you have TikTok?

A.    No.

Q.    And about how long have you had your Facebook account?

A.    Oh, many years.

Q.    And the X account, Twitter account, about how many years?

A.    More than five.

Q.    And the LinkedIn account?

A.    Many years.

Q.    The Instagram account?

A.    I can't recall when I started that.  Maybe two years ago.

Q.    Do you ever use the Instagram account to communicate with Alex Poolos?

A.    No.

Q.    Do you ever use the Instagram account to communicate with Collette Richards about anything?

A.    No.

Q.    Do you ever use your LinkedIn account to communicate with Alex Poolos?

A.    No.

Page 86

SCOTT BRONSTEIN

Q.   Do you ever use the LinkedIn account to communicate with Alex Poolos?

A.   No, not that I recall, no.

Q.   And did you ever use the LinkedIn account to communicate with Collette Richards about anything?

A.   No.

Q.   Just to be clear, when I am asking you these questions about social media and asking about communications, I mean both any public-facing communication as well as any private messaging that you might be able to do through the platform. Is that okay?  Do you understand that?

A.   Yes.

Q.   Okay.  Did you ever use Facebook to communicate about Alex Poolos?

A.   No.

Q.   Did you ever use Facebook to communicate with Alex Poolos?

A.   No.

Q.   Do you ever use Facebook to communicate with Collette Richards for

Page 87

SCOTT BRONSTEIN

any reason?

A.    No, not that I recall.

Q.    Have you ever used WhatsApp?

A.    Sure.

Q.    You have an account currently with WhatsApp?

A.    Yes.

Q.    How long approximately what you had a WhatsApp account?

A.    Years.  Since I lived in Europe.

Q.    Do you ever use WhatsApp to communicate about work or for work purposes?

A.    No.  Only on occasion with sources.

Q.    Did you ever use WhatsApp to communicate with Alex Poolos?

A.    No.

Q.    Did you ever use WhatsApp to communicate about Alex Poolos?

A.    No.

Q.    Have you ever used WhatsApp to communicate with Collette Richards about

Page 88

SCOTT BRONSTEIN

any topic?

A.    No, not that I recall.

Q.    Have you ever used WhatsApp to communicate with Bill Owens?

A.    No.

Q.    Renee Balducci?

A.    No.

Q.    Anyone at 60 Minutes since you left your job there, have you used WhatsApp to communicate with them?

A.    No.

Q.    Have you ever used a messaging application called Signal?

A.    Sure.

Q.    Do you have, currently have an account with the Signal platform?

A.    I don't think I have an account right now.  I haven't used it in probably more than one or two years.

Q.    From when approximately did you have a Signal account?

A.    I used it a lot in Europe. When I lived in Europe it was very common to use it, and maybe when -- earlier at

Page 89

SCOTT BRONSTEIN

CNN we used it oftentimes with sources, especially international sources.

Q.    When is the last time you used Signal, approximately?

A.    Two years ago.

Q.    Did you ever use signal to communicate with Alex Poolos?

A.    Not that I recall.

Q.    Did you use Signal to ever communicate about Alex Poolos?

A.    Not that I recall, no.

Q.    Did you ever use Signal to communicate with Collette Richards?

A.    Not that I recall, no.

Q.    Did you ever message Collette Richards about an award a piece she had been working on had been nominated for?

A.    I might have, not that I recall.

Q.    Did you communicate with Ms. Richards about an award a piece she had been working on had been nominated for using Signal?

A.    Not that I recall.

Page 90

SCOTT BRONSTEIN

Q.    Did you check your Signal account to see if there were any communications responsive to the subpoena that we served?

A.    I did.

Q.    Did you check your WhatsApp to see if there were any communications responsive to the subpoena that we served?

A.    I did.

Q.    Did you ever have a communication with Collette Richards about using Signal in order to communicate?

A.    No, not that I recall.

Q.    Did you ever have a communication with Ms. Richards about using a form of communication that -- other than text message given Alex's lawsuit?

A.    No, not that I recall.

Q.    You said you had last used Signal about two years ago.  Generally, what was that communication related to?

Page 91

SCOTT BRONSTEIN

A.    Communicating with sources. Sources who were interested in remaining anonymous.

Q.    Is there something specific about Signal that helps protect anonymity for sources?

A.    Sure.  That's why reporters use it.

Q.    And in what way does it do so?

A.    It's my understanding it encrypts it from end to end.

Q.    And are there settings on Signal that you can make that allow or cause a message to delete or disappear?

A.    Sure.  That's why reporters use it.

Q.    And do you have your Signal set, or when you had a Signal account was it set in a way that messages would delete or disappear after some amount of time?

A.    I used it like that for some sources, yes.

Q.    So did you set it based on the

Page 92

SCOTT BRONSTEIN

individual source or did you have it for all of your communications using Signal?

A.    Initially, it would depend on the source.  Initially we would have a conversation about it and then set it accordingly.

Q.    And did you ever set communications that you had with Collette Richards to be deleted or to disappear using Signal?

A.    No, not that I recall.

Q.    And on any of the iPhone devices that you have, did you ever make the setting an auto-delete for communications with Collette Richards?

A.    No, not that I recall, no.

Q.    Did you ever use Signal to communicate with anyone about your phone call with Alex Poolos in early January 2022?

A.    No.

Q.    In responding to the subpoena that was issued in this case, did your lawyers conduct any search for responsive

Page 93

SCOTT BRONSTEIN

information?

A.    Can you rephrase the question?

Q.    Sure.  I think your testimony -- and let me start this way and you can correct me if I am wrong.

My understanding of your testimony is that in response to the subpoena and the documents that you produced in the case, those were located based on searches that you personally did; am I correct?

A.    Correct.

Q.    Did your lawyers, to your knowledge, separately conduct a search of any cell phone device you have or had?

A.    I don't know.  I don't think so.

Q.    Did you give your phone to your lawyers?

A.    No.

Q.    Did you -- did they create an image of your phone?

A.    No.

Q.    Did they create a backup of

Page 94

SCOTT BRONSTEIN

your phone, to your knowledge?

A.    No.

Q.    And did you give your lawyers access to any e-mail account or accounts that you have?

A.    Not that I know of.

Q.    Did you give your lawyers access to any social media accounts that you have?

A.    No, not that I know of.

Q.    At any point in time, have you been directed to not delete materials in connection with Alex Poolos's case?

A.    I'm sorry, rephrase that?

Q.    Sure.  Were you ever given instruction, an instruction not to delete materials that -- in connection with Ms. Poolos's case?

A.    No.

MR. EAVES:  We're going to object and instruct him not to answer anything between his attorneys and him.

MR. IADEVAIA:  I mean, I don't

Page 95

SCOTT BRONSTEIN

think an instruction not to delete is privileged. You're taking the position that it is?

MR. EAVES: My position is that any communications with his attorney are privileged.

MR. IADEVAIA: Okay. We will come back to that.

Q. I think I asked this, but just to make sure, have you ever had an auto-delete function set on your cell phone, to your knowledge?

A. No.

Q. And have you ever switched -- for one of your personal devices, have you ever switched the auto-delete function from auto-delete to preserve or some other setting?

A. No.

Q. When did you first meet Collette Richards?

A. I don't recall the exact date. When she began working in our unit.

Q. At CNN; is that right?

Page 96

SCOTT BRONSTEIN

A.     Yes.

Q.     And when she worked in your unit, when she first got there, what was her position?

A.     I believe her first position was as a multiplatform producer.  I believe that was her title.

Q.     And did you work with her when she was a multiplatform producer?

A.     Well, as she was becoming a member of our team, I started to work with her, as we all did.

Q.     And when she was a multiplatform producer, does the multiplatform piece of that mean she was rotating between different units?

A.     Correct.  That was as she was coming into our unit.

Q.     So one of the units that she rotated on was the unit that you worked in, the investigations unit; is that correct?

A.     Yes.

Q.     And you remember how many years

Page 97

SCOTT BRONSTEIN

ago it was, approximately, or the year, even if you don't know the exact time?

A.    It's years ago.  I don't remember exactly.  You know, when she started with the investigations team.

Q.    How long did she work at CNN, do you know?

A.    Years.  I am not sure exactly how many years.  I think maybe five years.

Q.    And at some point did she move from her role on the multiplatform team to being a full-time employee within the investigations unit?

A.    Yes.

Q.    And was that fairly early on in her tenure at CNN?

A.    Yes.

Q.    And what was her job when she worked in the investigations unit, her first job?

A.    I believe it was associate producer.

Q.    Could I call associate producer

Page 98

SCOTT BRONSTEIN

an AP; is that okay?

A.    Sure.

Q.    Was she an AP the whole time she was at CNN, when she was in a full-time role on the investigations unit?

A.    I believe she became a producer at some point, but I am not exactly sure when and what the title was.  There was kind of variations of title there.

Q.    Okay.  Focusing on the period when Ms. Richards was an AP in the investigation unit, did you work directly with her?

A.    Yes.

Q.    Did you supervise her?

A.    Yes, sure.

Q.    Was she your direct report?

A.    She reported to many of us and she worked with many of us.  So I don't think I can say I was her direct person.

Q.    And who else did she work with when she was in the investigations unit in addition to you?

Page 99

SCOTT BRONSTEIN

A.    All of the producers.

Q.    Can you just give me the names of the people who you remember?

A.    Nelli, Curt.  There were probably digital people she worked with, all of whom I can't remember.  Probably David Fitzpatrick, who was there previously.  Probably Scott Zamost who was there previously.  Probably some other producers whose names I can't recall.

Q.    And Mr. Zamost was a producer within the investigations unit?

A.    He was.

Q.    And the same for David Fitzpatrick?

A.    He was.

Q.    How many stories did you work on directly with Ms. Richards during the time she was in the investigations unit?

A.    Many.  I don't know the exact number.

Q.    Do you think it was more than 10?

Page 100

SCOTT BRONSTEIN

A.    Oh, yes.

Q.    Do you think it was more than 50?

A.    Perhaps.  Hard to say.

Q.    And did some or all of the stories that you are talking about air on CNN that you worked on with Ms. Richards?

A.    Oh, yes, most.

Q.    If you can tell me, what kind of work did Ms. Richards do when you worked together on stories at CNN?

A.    What kind?  Are you asking what her role is?

Q.    What work did she do?

A.    She would do many of the tasks that one performs as an associate producer and producer, starting with, you know, repertorial, finding sources, interviewing sources, pre-interviewing sources, looking at documents, creating the story.  Working with the team to bring the story from the beginning to end.

Q.    Can you give me some examples

SCOTT BRONSTEIN

of work that she did to bring a story from the beginning to the end when you worked on stories at CNN?

A.    Are you asking for specific stories?

Q.    We can do it by stories. Whatever is easiest for you to comment on.  You were a job reference for Ms. Richards, correct?

A.    Yes.

Q.    I think you said in text messages you thought her work was very good, correct?

A.    Yes.

Q.    I am probably understating how effusive you were about her work, right?

A.    She was very good.  Everyone on the team loved her.

Q.    Essentially I am asking what was the basis for you, in your work experience with Ms. Richards, to be positive about her as an AP?

A.    She was very hard working in everything she did.  She was very

Page 102

SCOTT BRONSTEIN

thorough in everything she did.  She was very collegial and team oriented in everything she did.  She was very -- she was a good, good colleague.  The kind of person you would want on your team.

Q.    Anything else?

A.    No.

Q.    Could you please give me some examples of Ms. Richards being hard working?

A.    There were many times that she would work long hours, go beyond the call of duty, if you will.

Q.    Can you give me specific examples of that?

A.    I can't think of specific stories because it was a while back. Literally virtually every story that the team did that she was involved in, she did exceptional work.

Q.    And can you give me any examples of the exceptional work she did?

A.    I can't think of any right now. There were many.

Page 103

SCOTT BRONSTEIN

Q.    You said one of the reasons that you believed that she was good at her job as an AP was she was thorough. Can you give me any examples of that?

A.    She was very diligent and hard working in what she did and thorough in doing the repertorial and producing tasks.

Q.    Would you give me examples of producing tasks where she was thorough?

A.    There were dozens and dozens. I can't think of anything specific to talk about.

Q.    Okay.  And you said that Ms. Richards was collegial during the time she was at CNN.  What's your basis for saying that?

A.    She was a great team member with every team she worked with, with all of us with any story that was going on.

Q.    Do you have any examples of her being a great team member?

A.    There were too many to mention. Every story we worked on.  We worked on

Page 104

SCOTT BRONSTEIN

dozens of stories.

Q.    You mentioned one example of her being a good team member?

A.    I can't think of anything specific, because there were so many.

Q.    Okay.  You mentioned that Ms. Richards was a good colleague.  Did you mean that differently than being collegial or was that the same thing?

A.    Same thing.

Q.    Were there any examples that you can think of Ms. Richards being a good colleague?

A.    Nothing specific.  In all of the interactions that the teams would have, she was a great colleague.  The kind of person you want on your team.

Q.    Are you aware of any other, any other person at CNN who thought Ms. Richards was a good colleague?

A.    Sure.

Q.    Who are you aware of?

A.    Everyone on the team.  Anybody I could name would have the same opinion.

Page 105

SCOTT BRONSTEIN

Q.    Okay.   But can you be specific, please?

A.    The executive producer Patricia DiCarlo.  The correspondent Drew Griffin. My fellow producers.  Nelli.  Fitz, when he was there.  Anybody who worked on stories with us.  Curt.

Q.    Did you have any discussions with Patricia about Collette being a good colleague?

A.    Sure, numerous.

Q.    Numerous.  Do you remember any specifically?

A.    Nothing specific.  But of course, we had many conversations.

Q.    Did you have any discussions with Nelli Black about Collette being a good colleague?

A.    Sure.

Q.    Do you recall anything specific?

A.    Nothing specific.  There were many discussions.

Q.    Do you know if, applying for

Page 106

SCOTT BRONSTEIN

the job at 60 Minutes, if Collette listed you as a reference?

A.    I believe so.

Q.    Do you know if Collette identified anyone else at CNN as a reference?

A.    I don't know.

Q.    Do you know if Collette identified anyone else within the investigative unit as a reference beyond you?

A.    I don't know.  I could certainly think of people she could have, but I don't know.

Q.    During the time that Ms. Richards worked within the investigation unit at CNN, were there formal performance evaluations done?

A.    Sure.

Q.    And were those in writing?

A.    Sure.

Q.    And did you participate in preparing the written performance evaluation for Collette Richards when she

Page 107

SCOTT BRONSTEIN
worked at CNN?

A.    No, not that I know of.

Q.    During the time that
Ms. Richards worked at CNN within the
investigation unit, did she have
responsibilities for securing third-party
material?

A.    Sure.

Q.    And what were those
responsibilities?

A.    You're talking about footage,
things like that?

Q.    Yeah, well, what do you
understand I mean when I say third-party
material, what does that mean to you?

A.    Some sort of footage or visuals
that would be obtained outside of what
CNN had shot.

Q.    Okay.  Using that definition,
did Ms. Richards have responsibilities as
an AP at CNN for securing third-party
material?

A.    At times, sure.  The whole team
would do that.  It might involve an AP

Page 108

SCOTT BRONSTEIN

doing that, it might involve my doing it or another producer doing it. The teams would do it.

Q. Did Ms. Richards during this period have responsibility for script writing?

A. I would say adding to the scripts or, you know, helping write the scripts. I wouldn't say script writing.

Usually the script writing would be done by the correspondent and producer and then the AP would work with them after.

Q. Did Ms. Richards have responsibility for fact checking as an AP at CNN?

A. Sure.

Q. Did Ms. Richards have responsibility for pitching stories as an AP at CNN?

A. Sure.

Q. Did she pitch any stories to you?

A. Sure.

Page 109

SCOTT BRONSTEIN

Q. Did any of those stories get on air?

A. I believe so. I would have to -- I can't say specifically, but I believe so.

Q. And as you sit here today, can you remember any time that happened, any specific story where that happened?

A. I can't remember specifically, no.

Q. When you worked with Ms. Richards at CNN, did you socialize with her outside of work?

A. Only on rare occasion. We lived in different cities.

Q. Where did you live and where did she live at the time?

A. She lived in Atlanta and I lived in Washington, D.C.

Q. Were there times when you were in the same city together?

A. Occasionally, sure.

Q. And when you were, did you socialize with her outside of work?

Page 110

SCOTT BRONSTEIN

A.    Occasionally, like if the team would go out for drinks or something like that.

Q.    Did you ever hang out with her when she worked at CNN, just the two of you outside of work?

A.    It's possible we got a coffee or something like that, sure, if she was in the office.  If she was in D.C. or if I was in Atlanta.

Q.    Did you ever get dinner, the two of you?

A.    Not that I recall.

Q.    Did you ever get drinks, the two of you?

A.    Not that I recall.

Q.    Did you ever go to her home?

A.    No.

Q.    Did she ever go to your home?

A.    No.

Q.    Have you ever met her husband either before they got married or after they got married?

A.    I've never met him in person

SCOTT BRONSTEIN

unless it was at a Christmas party or some event for the team.

Q.    Have you ever had dinner with her husband?

A.    No.

Q.    Has Collette ever met your wife?

A.    No.  She might have if my wife came to the office and she was there. But I don't recall if that ever happened.

Q.    Since Ms. Richards left CNN, did you stay in touch with her?

A.    On occasion.

Q.    And we are going to talk about communications that you had with Ms. Richards in connection with this lawsuit and Ms. Poolos, but have you communicated with Ms. Richards since you left CNN about anything else?

A.    Not that I recall.

Q.    Have you seen Ms. Richards in person since she left CNN?

A.    No.

Q.    Did you see her at a

Page 112

SCOTT BRONSTEIN

colleague's funeral?

A.    I might have seen her at Drew's funeral.  I can't remember if she was there.

Q.    Outside of your colleague's funeral, have you seen Ms. Richards in person?

A.    No.

Q.    Did you, at your colleague's funeral, talk to Ms. Richards?

A.    If she was there I talked to her.  I can't recall.

Q.    Did you talk with Ms. Richards about Ms. Poolos?

A.    Not that I recall, no.

Q.    Did you talk to Ms. Richards about Ms. Poolos's lawsuit at the funeral?

A.    Not that I recall.  I don't even believe that the lawsuit had been filed at the time of that funeral.  I don't know.

Q.    Since Ms. Richards left CNN, in what ways have you communicated with her?

Page 113

SCOTT BRONSTEIN

A.    Occasional phone call or an occasional text.

Q.    Have you communicated with her in any other way since she left CNN outside of text messages or phone calls?

A.    No, not that I recall.

Q.    When is the last time you communicated with Ms. Richards?

A.    The text that I provided you for the subpoena.

Q.    To the best of your memory, you haven't communicated with her at any other time since the text messages that you produced, correct?

A.    No.

Q.    You have not -- sorry, the question wasn't asked well.

Have you communicated with Ms. Richards after the text messages that you produced pursuant to the subpoena?

A.    No.

Q.    And just to be clear, in any form, meaning orally, in writing, via video, any form?

Page 114

SCOTT BRONSTEIN

A.    No.

Q.    And if we were to look on your cell phone now, would there be any text messages with Ms. Richards beyond what you've already provided to us in this case?

A.    No.

Q.    Do you consider Collette Richards a friend?

A.    Sure.

Q.    Did you consider her a friend when she left, at the time she left CNN?

A.    Sure.

Q.    And do you consider yourself to be a mentor to Collette Richards?

A.    Sure.

Q.    And did you have that view at the time Ms. Richards left CNN?

A.    Sure.

MR. IADEVAIA:    Okay.  We're going to mark an exhibit.  If you can access Exhibit Share, it's going to take a second for us to get it up.

(Bronstein Exhibit 1, Document

Page 115

SCOTT BRONSTEIN

Bates stamped Bronstein 0000006, was so marked for identification, as of this date.)

Q.    Okay.  What's been marked as Bronstein Exhibit 1 is a text exchange produced --

MR. LYNCH:  Jeremiah, I'm sorry, can you give me one minute?  I'm having trouble.

MR. IADEVAIA:  Sorry, I don't want to get ahead.  Everyone let me know when they have the document handy.

MR. LYNCH:  Thank you.

Q.    Mr. Bronstein, if you could review it while everybody is catching up, please.

A.    Yup.

(Witness reviews document.)

MR. EAVES:  I am not able to, but can you give me the name of the document?

MR. IADEVAIA:  Sure.  It's a text thread that I believe is between

Page 116

SCOTT BRONSTEIN

Mr. Bronstein and Ms. Richards.

MR. EAVES:  It's not necessary for me to see it.  I have a copy of what was produced.

MR. IADEVAIA:  Okay.

Q.    Once it was produced to us we assigned a Bates number.  So Mr. Bronstein, you should see in the bottom right-hand corner of the document what's been marked as Bronstein Exhibit 1 has a Bates, what we call a Bates number Bronstein 6.  Do you see that?

A.    I see Exhibit Bronstein 1.

Q.    And do you see below that a number 6.  Scroll down.  You may not be at the bottom of the page.

A.    Yes, okay.

Q.    You do?

A.    It looks like 0000006, something like that.

Q.    Yes, exactly.  I am going to ask you questions about this document in case that affects your glasses or not.

First of all, do you recognize

Page 117

SCOTT BRONSTEIN

what's been marked as Exhibit 1?

A.    Yes.

Q.    And what is it?

A.    This is a text thread between myself and Collette.

Q.    The top text thread says December 7th; do you see that?

A.    Yes.

Q.    The top text.  Do you know which year this is from?

A.    I don't.  I assume last year.

Q.    You assume it was December of 2023 -- I mean, 2024?

A.    I think so.

Q.    Okay.

A.    Maybe '23.  I don't know.

Q.    Okay.  We're going to ask you to check and maybe you could check during a break to just let us know what year.  I don't want to have to bring you back to confirm that or anything.  I just can't tell from the text if it was 2024 or a different year.  You can probably tell from your phone, right?

Page 118

SCOTT BRONSTEIN

Is this text thread still on your phone, to your knowledge?

A.    I believe so.

Q.    I would ask during a break if you can check the phone and see what the year is.

And the text under the next date is December 27, and again there is no year, so when you check on the December 7 text, can you also check on the December 27 text, please?

A.    Sure.

Q.    Were these texts, are they stored on the -- your personal cell phone that you were discussing earlier?

A.    Yes, they were.

Q.    Okay.    And that's the phone that ends, associated with the phone number that ends in 2050?

A.    Yes.

Q.    Did you ever exchange other text messages with Ms. Richards beyond what's reflected on Exhibit 1?

A.    I may have.    I don't know.

SCOTT BRONSTEIN

Q.    Really, as you sit here today, you have no idea whether you ever sent Collette Richards another text message other than "Happy birthday, Collette" and the one on December 27th?

A.    I am sure I did, but I don't know when and where or what they were.

Q.    And how come you no longer have those text messages?

A.    The process of changing phones year over year, lots of stuff is lost, deleted.

Also routinely as part of the reporting process, you know, many of us would delete lots of things out of our phones as we would change phones.  Just, you know, at large.  All I can tell you I don't know what was previous to this.

Q.    Do you have a specific recollection of deleting any text messages with Collette Richards?

A.    No.

Q.    Do you have a general memory of doing so?

Page 120

SCOTT BRONSTEIN

A.    Not specifically to Collette. A general memory of cleaning phones as you move, as you move along from phone to phone.  And also stuff is lost at times when you change phones, stuff is, you just don't have it any longer.  This was, you know, this is my current phone.

Q.    You have text messages on your phone with Alex Poolos that go back to 2020, right?

A.    Correct.

Q.    And those were produced in this case?

A.    Correct.

Q.    Do you have any idea why you still have the text messages with Ms. Poolos that go back to 2020 but you don't have anymore than these four text messages with Collette Richards?

A.    No, that's just what's in my phone now.

Q.    Did you take any special steps to preserve the communications you had with Alex Poolos?

Page 121

SCOTT BRONSTEIN

A.    No.

Q.    And you have text messages with Renee Balducci from 2022, correct?

A.    Correct.

Q.    And those are in your current phone, right, the device that you have now?

A.    I believe so.

Q.    And you produced those to my -- your lawyers produced them to my law firm, correct, as part of the subpoena?

A.    Correct.

Q.    Did you take any special steps to preserve the text messages that you had with Renee Balducci?

A.    No.

Q.    Do you have any explanation or knowledge as to why you have the text messages from Ms. Balducci that go back to 2022 but you only have these four text messages with Collette Richards?

A.    No, other than just the process of changing phones and cleaning phones.

Q.    In the second -- in the text

Page 122

SCOTT BRONSTEIN

message dated December 27th -- strike that.

On the right-hand side there are messages and on the left-hand side there are messages on Exhibit 1, correct?

A.    Correct.

Q.    Is it your understanding that the messages on the right-hand side are from you and the ones on the left-hand side are from Collette?

A.    Yes.

Q.    In the message from you on December 27th as reflected on Exhibit 1, you wrote, "Hey Collette!  Hoping you and your family had a joyful Christmas and that you have a wonderful New Year!  I know it's been a tough few years.  But I've no doubt you'll get through the dark times, be having more amazing adventures soon, and that your life will be full of joy again before long, if it's not already.  Dana and Lucas and I send lots of love!"

Did I read that text correctly?

Page 123

SCOTT BRONSTEIN

A.    Yes.

Q.    Who is Dana?

A.    My wife.

Q.    And is Lucas a child of yours?

A.    He is.

Q.    Did Collette have any relationship with Dana at the time that you sent this text?

A.    She knows of my wife and has probably met her at a holiday party.

Q.    And what about your son?

A.    I think she's met Lucas once at the office.

Q.    What did you mean when you wrote "I know it's been a tough few years"?

A.    Just that she -- 60 Minutes is a tough place.  And I was aware of that.

Q.    What were you aware of about 60 Minutes being a tough place as it relates to Ms. Richards?

A.    It's a difficult job and I know that she had just moved to New York and that was a big move.  Just the usual

Page 124

SCOTT BRONSTEIN
stresses of those things.

Q.    Were you referencing her experience with Alex Poolos in this text?

A.    No, not specifically.

Q.    Then you also wrote, "I've no doubt you'll get throughout dark times." What did you mean by the dark times?

A.    Exactly the same thing.  60 Minutes could be a tough place to work and New York City could be a tough city to live in.

Q.    Is there anything more specific you meant by "dark times" other than 60 Minutes is a tough place and New York City is, I don't know, I don't know what you mean by New York City is a big place?

A.    Nothing more specific.

Q.    Was it at all a reference to Alex Poolos?

A.    No, not specifically.

Q.    Was it a reference to Collette's experience working with Alex Poolos?

A.    Not specifically.  It was

Page 125

SCOTT BRONSTEIN

related to her being at 60 Minutes and having moved to New York.

Q.    What's dark about being at 60 Minutes?

A.    It's a tough -- it's a tough job for everybody there.

Q.    Did Ms. Richards tell you that her experience working at 60 Minutes was dark or tough?

A.    I believe I've had a phone call with her at some point where she talked about difficult, you know, difficult life stage.

Q.    When was that call?

A.    I don't recall, I don't know.

Q.    Was it before or after Alex was fired?

A.    It would have been way before that.  Long before.  I don't know when, though.

Q.    And what did Ms. Richards say to you during this phone call about her experience working at 60 Minutes?

A.    I don't recall.  This is years

Page 126

SCOTT BRONSTEIN

ago.  In the early time when she had gotten there, but I am not exactly sure when it was.  I know that it was tough for her early on.

Q.    I am asking what she said about it being tough?

A.    I honestly can't recall.

Q.    Did she give you any examples of how it was tough?

A.    Not that I recall.

Q.    Did she discuss with you Alex Poolos during this call?

A.    Not specifically, that I remember.

Q.    Did she say anything generally about Alex?

A.    Collette is not the kind of person to do that.  Not that I recall, no.

Q.    When you say she's not the kind of person to do that, what do you mean by that?

A.    I think she would have -- as I recall, she just had generic, you know,

Page 127

SCOTT BRONSTEIN

description of just tough time going through, more broadly like that.

Q.   When you say she's not the kind of person, what do you mean?  Not the kind of person to do what?

A.   To single out somebody as you had asked in the question.

Q.   Okay.  Just to be clear about this, outside of what you testified to, is there anything else you meant when you wrote "tough few years" in this text message to Collette?

A.   No, not specifically.

Q.   Or generally, any other meaning other than what you testified to?

A.   No.

Q.   Okay.  And then the preceding line where it talks about the dark times, is there anything else that you meant by that beyond what you've testified to?

A.   No.

Q.   Collette writes back to you on December 27th, and in her text she says, "Thank you for your kind words"; do you

Page 128

SCOTT BRONSTEIN

see that part of the text?

A.    Yes.

Q.    And then she wrote, "I feel very ready for the new year and a lot of the hardest is all behind me."

Do you see that text?

A.    I do.

Q.    And did I read it correctly?

A.    Yes.

Q.    Do you have any understanding of what she meant by "the hardest is all behind me"?

A.    I don't.  I don't know.

Q.    Assumption of what she meant when you read it?

A.    I would hate to assume whatever she meant.  I don't know what she meant.

Q.    Did you ask her in the next text, did you send her a text and say, "Hey, what do you mean the hardest is all behind you"?

A.    No.

Q.    The next sentence says, "Def ready for the fresh beginning!"

Page 129

SCOTT BRONSTEIN

Do you see that?

A.    Yes.

Q.    Did I read it correctly?

A.    Yes.

Q.    And do you have any understanding of what Collette meant by fresh beginning?

A.    I don't know exactly.

Q.    Do you know generally what she meant?

A.    No.

Q.    Did you ever ask her?

A.    No.

MR. IADEVAIA:  I think now is a good time to break, we have been going for a while and probably eat some lunch if that's okay with everybody.

THE VIDEOGRAPHER:  I'll take us off the record, Counsel, if that works and then we can discuss the break.

MR. IADEVAIA:  Yes.

THE VIDEOGRAPHER:  We are going off the record, the time is 12:31 p.m.

(Luncheon recess taken.)

Page 130

SCOTT BRONSTEIN

AFTERNOON SESSION

1:18 p.m.

S C O T T   B R O N S T E I N,

the Witness herein, was examined and

testified as follows:

THE VIDEOGRAPHER:  We are going back on the record.  The time is 1:18 p.m.

EXAMINATION (Contd) BY MR. IADEVAIA:

Q.    Mr. Bronstein, when did you first meet Alex Poolos?

A.    It was years ago.  It was when she was at CNN and it probably would have been at a time when we worked on a story together.

Q.    When Alex was at CNN you were also working at CNN; is that correct?

A.    Yes.

Q.    And do you know approximately what years that she was at CNN?

A.    I don't.

Q.    And you know where at CNN Alex worked?

A.    It's my understanding she was a

Page 131

SCOTT BRONSTEIN
booker in New York.

Q.    And did she work for a specific show or unit?

A.    I don't know.  They have different roles as bookers.  I am not sure.

Q.    Do you know if Alex worked for Anderson Cooper 360?

A.    I know she did work for that show.  But she may have worked for other shows also.  I don't know.  I think the bookers worked for multiple shows.

Q.    And do you know she worked for CNN International?

A.    I don't know.

Q.    All right.  And you said you worked on a story together.  What story did you work on together?

A.    It was a story about essentially human slavery going on in New Jersey, as I recall.

Q.    Human trafficking, is that it?

A.    Some people who were being trafficked and essentially working as

SCOTT BRONSTEIN

slave laborers in New Jersey.

Q.    And did the story ultimately air?

A.    Yes.

Q.    And did it air on a particular show?

A.    It's my recollection it aired on the AC show, but I am not sure now.

Q.    And how did it come about that the two of you were working together on that story?

A.    It's my recollection that she was a booker and had booked these folks, and I was a producer on the story and we worked together to, you know, to bring it to air.

Q.    What did Ms. Poolos do in connection with the story?

A.    She worked as a team member, as essentially part of the production team to, you know, she worked side by side to bring the thing together.

Q.    Do you recall specifically what Ms. Poolos did in connection with that

Page 133

SCOTT BRONSTEIN

story?

A.    No.  You know all of us did many tasks.

Q.    I am sure you did.  I am just asking if you recall what Ms. Poolos did in particular?

A.    No.

Q.    And what did you do on that story?

A.    Well, as the producer I would have essentially been the person, you know, spearheading the production end, gathering the, you know, the folks to be interviewed and doing research.  The regular things that a producer does that we discussed.

Q.    How often did you do work for a segment or story that appeared on the Anderson Cooper 360 show?

A.    Constantly.  Most of our stories ran at AC 360.  Either at first or a later time as well.

Q.    After that story did you have other interactions at CNN with Alex?

Page 134

SCOTT BRONSTEIN

A.    No, not that I recall.

Q.    Did you -- just to be clear, did you talk to her at all after you finished on that story while she was at CNN?

A.    Not that I specifically remember.  I am sure we would have exchanged occasional greetings or something.

Q.    And after Ms. Poolos left -- at some point Ms. Poolos left CNN, correct?

A.    Correct.

Q.    Do you know where she went next?

A.    It's my understanding she went to 60 Minutes, right?

Q.    Did you stay in touch with Ms. Poolos after she left CNN?

A.    Only on rare occasion.  Perhaps we exchanged a greeting or something like that.

Q.    Did you ever talk to her on the phone after she left CNN?

A.    Only on rare occasion until

Page 135

SCOTT BRONSTEIN
Collette was being hired.

Q.    Before Ms. Richards was being considered for a position at 60 Minutes, did you have any phone calls with Ms. Poolos after she left CNN?

A.    I don't recall specifically. It's possible we had an occasional phone call or something.

Q.    And again, focus on the period after Alex left CNN and before Collette was under consideration to be hired at 60 Minutes, did you exchange any text messages with Alex?

A.    Not that I recall.  We may have.  I don't know.

Q.    Did you speak to Ms. Poolos at the time that she was considering joining 60 Minutes?

A.    She may have asked me for, you know, my thoughts on what it was like, because I had been there, but I don't recall specifically.

Q.    Do you recall generally having that discussion with Alex?

Page 136

SCOTT BRONSTEIN

A.     Honestly, I don't remember. She may have asked me what I thought of the place or what my experience was, but I don't specifically remember that conversation.

Q.     Did you ever say to Alex that you had had a bad experience at 60 Minutes or words to that effect?

A.     We had a conversation about it, I certainly might have indicated that it's a tough place.

Q.     Did you ever tell Alex that you were traumatized by your experience at 60 Minutes, or words to that effect?

A.     No.

Q.     Did you ever tell Alex that you were in therapy because of how badly you were treated there?

A.     No.

Q.     Collette Richards at some point left CNN to join 60 Minutes, correct?

A.     Correct.

Q.     Approximately when did she leave?

Page 137

SCOTT BRONSTEIN

A.    I don't know the exact dates. I suppose it was sometime around mid-year 2022.  Mid-year 2020, maybe.

Q.    And was Collette asked to leave CNN?

A.    No.

Q.    Did she leave voluntarily?

A.    It's my understanding.

Q.    To your knowledge, was she laid off?

A.    No.

Q.    I assume you did not ask her to leave, correct?

A.    No.

Q.    Do you know if anybody else asked her to leave?

A.    Not to my knowledge.

Q.    How did you know that she -- well, strike that.

Did you know before she left that she was looking at other jobs?

A.    She informed me that she was talking to 60 Minutes at some point.

Q.    Did she inform you of that

Page 138

SCOTT BRONSTEIN

earlier in 2020, do you recall?

A.    I don't know the exact time. In the months before she left.

Q.    Did she tell you why she was considering a job at 60 Minutes?

A.    It would have been obvious why. She didn't need to tell me.

Q.    Well, I guess two questions. First of all, did she tell you?

A.    I said I was made aware that she was talking to 60 Minutes, right?

Q.    No, no, no.  The question was, did she tell you why she was considering a job at 60 Minutes?

A.    Oh, I don't specifically recall her telling me why.  I would have been able to ascertain that on my own anyway.

Q.    Okay.  And what do you mean by that?

A.    60 Minutes is a bigger shop and more, kind of a more prestigious place to be than CNN for many people.

Q.    Okay.  When Ms. Richards told you that she was considering a 60 Minutes

SCOTT BRONSTEIN

job, did she say what position or positions she was considering?

A.    I believe she would have said it was for an AP job, because that's what she was going for.

Q.    And was there a specific AP job that Ms. Richards said she was looking for or was in consideration for?

A.    Over time I learned that it was for either a spot with Lesley's team under Rich Bonin or a spot with Lesley's team under Alex.  I don't remember exactly how I learned that.  I came to know that as she was going through the motions.

Q.    When you were at 60 Minutes, did you work with Rich Bonin?

A.    No, not directly.

Q.    Did you know him when you were at 60 Minutes?

A.    Sure.

Q.    And after you left 60 Minutes, did you stay in touch with Mr. Bonin?

A.    I think I talked to him once in

Page 140

SCOTT BRONSTEIN

the entire time after leaving.

Q.    When did you talk to him?

A.    Oh, gosh, maybe it was like exchanging a holiday greeting or something like that.  I left 60 Minutes 25 years ago.

Q.    Okay.  But that wasn't the question.  The question was -- go ahead.

A.    Just, that's fine.

Q.    My question is whether you had any communications with Mr. Bonin after you left.  You said maybe once.  And your best memory is there was some sort of potential holiday greeting; do I have that correct?

A.    Right.  Outside of the period of Collette applying there.

Q.    Do you know whether the initial job that Collette applied for was for an AP position with Mr. Bonin?

A.    I don't know exactly which came first.

Q.    Did you speak to Collette about the possibility of working with Rich

Page 141

SCOTT BRONSTEIN

Bonin?

A.    I am sure I did.  I can't recall specifically when, but sure.

Q.    And what did you say about working with Rich Bonin?

A.    I can't specifically recall.  I am sure I would have said that he is an important member of the 60 Minutes team. He is a well-known, high-achieving producer.

Q.    Did you say to -- did you raise any concerns to Collette about her working with Rich Bonin?

A.    Not specifically other than, you know, he's probably -- I can't recall any specific conversation.

I could imagine I might have told her that, you know, he's known for working hard and working his team hard. But that's about it.

Q.    Did you do any -- did you contact anyone or reach out to anyone on Collette's behalf to get feedback on the possibility of Collette serving as an AP

Page 142

SCOTT BRONSTEIN

for Rich Bonin?

A.    Both Rich and Alex contacted me, so the answer is partially yes.

Q.    I am not sure I understand.

A.    Do you want to rephrase the question?

Q.    I don't know.

My question is, did you reach out to anyone about the possibility of Collette working for Rich Bonin in specifically getting feedback about the work style of Mr. Bonin?

MR. LYNCH:  Objection.

A.    I think the confusion might be in the words "reach out."  If someone calls me and I call them back, I would consider that reaching out.

Q.    I am not asking if you spoke to Rich Bonin.  Did you have any communications with anyone besides Rich Bonin trying to get feedback about the possibility of Collette Richards working for Mr. Bonin?

A.    No, not that I recall.

Page 143

SCOTT BRONSTEIN

Q.    Did anyone tell you around the time that Ms. Richards was considering working at 60 Minutes that Rich Bonin was very hard on his APs?

A.    I don't recall anybody specifically telling me that.  I think I was aware of that.

Q.    And how were you aware of that?

A.    From having known people at the shop for 25 years.  It was well known that Rich worked people hard.

Q.    Did anyone tell you that Collette Richards would be better off working with Alex Poolos as opposed to Rich Bonin?

A.    I can't recall anybody specifically telling me that.

Q.    Did you ever have a conversation with Collette about the option of working with -- working with Alex Poolos versus Rich Bonin?

A.    I believe I had a conversation like that.  I couldn't tell you when.  I believe I had a phone conversation where

SCOTT BRONSTEIN

we talked about some of those questions.

Q.   And what did you say to Collette about working with Ms. Poolos versus Mr. Bonin?

A.   Again, I can't specifically remember the conversation, but I am sure that I would have told her as I can think that it would make sense.  Working with Alex would probably have been a better or a more interesting move for her because it would have been an all women's team, meaning that Leslie, Alex and Collette would be all women.  And that can sometimes be advantageous for a bunch of reasons in the sense of story telling, story building, team work.

Q.   Did you give Collette any other feedback about the possibility of working with Ms. Poolos, beyond what you just testified to?

A.   Again, I can't recall a specific conversation, but I am sure I told her something along the lines that I had worked with Alex.  Alex seemed like a

Page 145

SCOTT BRONSTEIN

perfectly nice, good person.  I had had a perfectly fine experience with Alex at CNN.  I did not know her well.  I did not know her as a producer.  But I certainly knew she was okay to work with, as best as I could have told Collette that.

Q.   Did you ever tell Alex that you had a source who had told you about Alex potentially having an opening?

A.   Rephrase the question, please.

Q.   Sure.  The question is, did you ever tell Alex that you had a source who had told you about a potential opening on Alex's team?

A.   Not that I recall, no.

Q.   Did you reach out to Alex about Collette joining her team?

A.   Again, there is that term you're using, "reach out."  Alex contacted me and I called her back, I would guess.

Q.   Do you remember or you're assuming?

A.   Like I said, I can't remember

Page 146

SCOTT BRONSTEIN

specifically making that call.  I know that Alex and I spoke at some point on the phone.

Q.    Is it possible though that you affirmatively reached out to Alex about the possibility of Collette joining Alex's team?

A.    I suppose it's possible.  But I can't recall really.

Q.    Did you tell Collette that you believed Alex would be a good fit for Collette or words to that -- to that effect?

A.    I believe so.  As I explained, there are advantages to having an all-female, all-women team, I think.

Q.    And did you ever tell Alex during this time that you had been advised to dissuade Collette from working with Rich Bonin because of his reputation, or words to that effect?

MR. LYNCH:  Objection.

Q.    You can answer.

MR. EAVES:  You can answer.

Page 147

SCOTT BRONSTEIN

A.    I don't recall that.  I have no recollection of anything like that.

Q.    And did you tell Alex that you had told Collette that Alex had a great reputation, or words to that effect?

A.    Sorry, you kind of lost me in that.  Please rephrase.

Q.    Sure.  Did you tell Alex that you told Collette that Alex had a great reputation?

A.    I can't recall specifically, but that certainly would make sense.

Q.    How many phone calls did you have with Alex before Collette joined 60 Minutes?  About Collette joining 60 Minutes?

A.    I am going to guess and say a couple.  I am not really sure.

Q.    Is it possible you had five or more?

A.    I can't recall.  But it sounds like a lot to me.  I think it was a couple or so.

Q.    And do you recall anything

Page 148

SCOTT BRONSTEIN

specific you discussed with Alex during those phone calls?

A.    I can't recall specifically but certainly I would have sung Collette's praises as anyone at CNN would have.

Q.    And I think you testified earlier that you were a reference for Collette in connection with her seeking work at 60 Minutes, correct?

A.    That's my understanding.   I don't know.

Q.    And I think your testimony was you're not aware of whether Collette had other references from CNN for the job at 60 Minutes, correct?

A.    I don't know.   I am sure she did.

Q.    During any of your discussions with Alex about Collette joining her team, did Alex express concerns that Collette was inexperienced?

A.    No, I can't recall that.

Q.    Did you ever tell Alex during this time that you did not want Collette

Page 149

SCOTT BRONSTEIN

working for Rich Bonin?

A.    I don't recall specifically.  I doubt I would have said something that strongly.  I think I would have said it makes sense for her to be working with an all woman team.  It could be advantageous for everybody.

Q.    Focusing for a minute on your view of Collette.  Have you ever used the word "adore" to say how you feel about Collette's work or Collette as a person?

A.    I am sure I have.  Many of us at CNN use that word for Collette.

Q.    And have you ever said that you adored Collette at the time that she was applying for a job at 60 Minutes?

A.    I am sure I did.  Everyone at CNN would have said that.

Q.    And did you tell Alex that you adored Collette?

A.    I don't recall specifically, but it certainly would make sense.  We all adored Collette.

Q.    During the time that Collette

Page 150

SCOTT BRONSTEIN

worked at 60 Minutes, did she reach out to you, did she contact you or communicate with you in any way, about her work experience there?

MR. LYNCH:  Objection.

Q.    You can answer.  If someone objected, I didn't hear it, but if they did, you can answer.

A.    Can you rephrase the question more specifically, the time frame?

Q.    Well, my question is did you have conversations with Collette about her work experience at 60 Minutes, whether in writing or orally?

A.    I know we had some conversations, but I couldn't tell you when they were.  There were not that many of them.  But sure I know we had some conversations after she had left.

Q.    After she had left CNN?

A.    Yes.

Q.    And just to be clear, you and she had some conversations about her work experience at 60 Minutes; is that right?

SCOTT BRONSTEIN

A.    Yes.

Q.    Did you have more than five discussions with her about that topic?

A.    No, I would have said it's one or two.

Q.    And did you exchange text messages with her about her work experience at 60 Minutes?

A.    I can't recall.  It's possible.

Q.    Did you have any communications with Collette after she joined 60 Minutes about Alex Poolos?

A.    I can't recall specifically.  I think they were more general conversations.  Just overall experience, work.

Q.    Did you ever have any conversations with Collette Richards about Alex Poolos?

A.    I can't recall specifically.  I know that she was, that she said she was having, in some conversation she said she was, you know, having a tough time in some fashion.  And I knew that she was

Page 152

SCOTT BRONSTEIN

working for Alex.

Q.    And the conversations that you had with Collette on this topic, were they before Alex was fired from 60 Minutes?

A.    Oh, this would have been in the first six to eight months, I think, when she was in the job.

Q.    So the first six to eight months when Collette was at 60 Minutes?

A.    Yes.  So long before Alex was fired.

Q.    And did you exchange any text messages with Collette at any point in time about Alex Poolos?

A.    Not that I recall, specifically, no, but it's possible.

Q.    The conversations that you just testified, whether one or two conversations with Collette about her work experience at 60 Minutes, please tell me everything that you remember.

A.    I can't specifically remember the conversation.  I remember her saying

SCOTT BRONSTEIN

that she was having a tough time adjusting to New York, adjusting to 60 Minutes. You know, just having some difficulty in her new job.

Q. And you're saying these conversations happened toward the beginning of Collette's employment at 60 Minutes?

A. I can't specifically remember when. Sometime in the first, I would think, eight months or something.

Q. And was it Collette who reached out to you to have this discussion or did the conversation come up in some other way?

A. I can't recall, honestly.

Q. And did Collette explain to you why she was sharing these views with you about her work experience at 60 Minutes?

A. I can't specifically say.

Q. Did Collette ever identify concerns that she had in connection with her work at 60 Minutes at a bridal shower that she had?

Page 154

SCOTT BRONSTEIN

A.    No, not that I am aware of.

Q.    Did Collette ever tell you that Alex had ruined her bridal shower or words to that effect?

A.    No, not that I am aware of.

Q.    Did Collette ever tell you about concerns she had related to her wedding and taking time off around her wedding?

A.    I have a vague recollection of her saying something about her wedding, but I can't remember now, you know, what the problem was or what she experienced.

Q.    But to be clear your vague recollection is that Ms. Richards had raised some kind of concern about her wedding and potentially taking time off; do I have that right or no?

MR. LYNCH:  Objection.

A.    It's a vague recollection. Sorry.

Q.    I am just trying to understand. The vague recollection related to Collette's wedding, what is it?

Page 155

SCOTT BRONSTEIN

A.    I recall vaguely that there was some complication with her wedding, but I don't remember what.  It was a complication with her wedding vis-à-vis work.  That's about all I remember.

Q.    Did Collette ever tell you that Ms. Poolos had yelled at her in connection with taking time around her wedding?

A.    Not that I can recall.

Q.    Did Collette ever tell you about concerns she had because Alex said there should be no boundaries between she and Collette?

A.    Not that I recall.

Q.    Did Collette ever raise concerns with you that Alex yelled at her?

A.    Not that I recall, no.

Q.    Did Collette raise concerns to you that Alex was giving her a hard time about taking time off near the holidays?

A.    Not that I recall, specifically.

Page 156

SCOTT BRONSTEIN

Q.    Do you recall something, generally?

A.    Well, I have a vague recollection of there being -- I am trying to remember.  It's just a vague recollection of, you know, having to work a lot.  But honestly, it's a complaint everyone at 60 Minutes has.  And, frankly, it's a complaint all of us in journalism have.  There are not many journalists I know who don't have to work a bunch of holidays and it's kind of a regular complaint of everyone I know.

Q.    Did you ever have a discussion with -- strike that.

Have you ever had a discussion with Collette in which she told you that she wanted to drive home from New York to Georgia during the time that she was working at 60 Minutes?

A.    I don't recall that specifically, no.

Q.    Have you ever had a discussion with Collette about her making a

Page 157

SCOTT BRONSTEIN

complaint internally at CBS about Alex Poolos?

A.    Not that I recall, no.

Q.    Did you learn at some point that Collette Richards had, in fact, made a complaint about Alex to CBS?

A.    I did learn that.

Q.    When did you learn it?

A.    Alex told me that in a phone call.

Q.    Were you aware that Collette had made a complaint against Alex before you spoke to Alex on the phone?

A.    Not that I recall, no.

Q.    Is it your testimony that Collette -- strike that.

Before your call with Alex, had you spoken to Collette about Collette filing a complaint against Alex?

A.    Not that I recall specifically, no.

Q.    Do you recall generally?

A.    Not that I recall.

Q.    Did Collette tell you, did

Page 158

SCOTT BRONSTEIN

Collette -- strike that.

Has Collette ever told you that she submitted a written complaint against Alex?

MR. LYNCH:  Objection.

Q.     You can answer.

A.     Not that I recall, no.

Q.     And has Collette ever told you that she made a complaint about Alex to human resources at CBS?

A.     Not that I recall, no.

Q.     Have you had any discussions with Collette about her raising a complaint or a concern about Alex with human resources?

A.     Rephrase, please.

Q.     I am asking, have you ever had a conversation with Collette in which you discussed Collette raising a concern or a complaint about Alex with human resources at CBS?

A.     After the phone call with Alex, yes.

Q.     Before the phone call with

Page 159

SCOTT BRONSTEIN

Alex, did you, had you ever had that discussion with Collette?

A.    Not that I recall, no.

Q.    And you had a discussion with Collette before the phone call about her raising concerns to Tonya Simon regarding Alex?

A.    No, not that I recall.

Q.    Did you have a conversation or -- strike that.

Before the phone call with Alex, had you had any discussions with Collette about her making a complaint or raising a concern to CBS regarding Alex?

MR. LYNCH:  Objection.

A.    Not that I recall, no.

Q.    Did Collette tell you that she was planning to make a complaint before, before you had that phone call with Alex?

A.    Not that I recall, no.

MR. IADEVAIA:  I am going to show you another document.  We'll let everybody know when it's available on Exhibit Share.

Page 160

SCOTT BRONSTEIN

(Bronstein Exhibit 2, Document Bates stamped CBS 7775 through 88, was so marked for identification, as of this date.)

Q.    Let me know once you can see it, Mr. Bronstein.

A.    It's just coming on.

Q.    No problem.

A.    So what do you want me to look at, specifically?

Q.    Well, I am going to ask you a few questions.  I just want to make sure you have access to the document.

A.    I do.

Q.    Okay.  Does everybody have access?

MR. EAVES:  Yes.

MR. LYNCH:  Yes, I do.

Q.    So I am going to say for the record what's been marked as Exhibit 2 is a multipage document Bates number CBS 7775 through 88.

Mr. Bronstein, have you ever seen what's been marked as Exhibit 2?

Page 161

SCOTT BRONSTEIN

A.    I have not.

Q.    I am going to say for the record this is a written complaint that Ms. Richards submitted to human resources at CBS and it's her complaint, her written complaint against Alex Poolos.

Mr. Bronstein, did you have any role in drafting a written complaint that Collette submitted to CBS?

A.    No.

Q.    Did you review any written complaint before it was submitted to CBS?

A.    No.

Q.    Did Alex Poolos communicate with you at some point via text message in late 2021?

A.    Nothing other than the text we provided for the subpoena.

Q.    And did those text messages that you provided reflect that Ms. Poolos reached out to you in December of 2021?

A.    I believe so.  I don't have it right in front of me.

Q.    We will get to it in a couple

Page 162

SCOTT BRONSTEIN

of minutes.  What did Alex say to you when she reached out, if you recall?

A.    Are you talking about our phone call?  What are you talking about?

Q.    I am talking about the text message.

A.    We have to look at the text to recall exactly what she said.

Q.    Do you recall generally what she said?

A.    I believe she said she wanted to talk to me, but that's about it.

Q.    At some point you testified that you talked to her, correct?  You had a phone call with Alex?

A.    Yes.

Q.    Did you have an understanding of what Alex was reaching out to you about before you had the phone call with her?

A.    No.

Q.    Did you have any communications with Collette Richards in which you told her that Alex had reached out to you?

Page 163

SCOTT BRONSTEIN

A.    Are you talking about before the phone call?

Q.    Yeah, before the phone call. Before.

A.    No.

Q.    Just because my question was unclear let me be clear.

Before the phone call with Alex, did you tell Collette that Alex had texted you?

MR. LYNCH:  Objection.

A.    No.

Q.    Did you tell Collette that Alex had been in communication with you in any manner in any way before the phone call?

A.    I can't recall.  I don't know honestly.

Q.    Is it possible that you did?

A.    I guess it's possible.

Q.    At the time Alex texted you in December of 2021, were you aware that Collette had made a complaint against Alex?

A.    Not that I recall, no.

Page 164

SCOTT BRONSTEIN

Q.    Were you aware at the time that Alex texted you that Collette was unhappy with Alex in any way?

MR. LYNCH:  Objection.

A.    Do you want me to reply?

Q.    Yes, please.

A.    As I already testified, I was aware from some conversations I had with Collette that she was unhappy.  That she was having difficulties.

Q.    And when was the phone call you had with Alex, do you recall the date?

A.    I would have to look to be precise.  I believe it was January 5th, but of course I would want to double check to be sure.

Q.    Before the phone call with Alex, did Collette express to you that she was worried about her job security at 60 Minutes?

A.    Not that I can recall, no.

Q.    Did Collette, before the phone call with Alex, did Collette express to you that she was worried that she would

Page 165

SCOTT BRONSTEIN

be transferred off of Lesley's team?

A.    Not that I recall, no.

Q.    After you had the call with Alex, did you tell anyone about it?

A.    Well, I informed Collette, although I cannot recall exactly how that came about, and I also informed Renee Balducci after she contacted me.

Q.    After Ms. Balducci contacted you?

A.    Correct.

Q.    Did you discuss your phone call with Alex with anyone other than Collette and Renee Balducci?

A.    No.

Q.    Did you exchange multiple text messages with Alex before speaking to her on January 5th, 2022?

MR. LYNCH:  Objection.

A.    Should I reply?

Q.    Yes.

A.    There were a couple of messages.  It was during the holiday and she was reaching out.  I did not know why

Page 166

SCOTT BRONSTEIN

she was reaching out.  It was just a few texts back and forth to try and find the time to talk.  Those are in the texts that we provided you for the subpoena.

Q.    Tell me about the call between you and Alex, everything that you remember.

A.    I can't tell you anything specifically beyond the notes that I took, which were provided to you, for part of the subpoena.

Q.    Do you have any independent recollection of the phone call, as you sit here today?

A.    Beyond the notes that I took, no.

Q.    And when you refer to notes, are you referring to the handwritten notes that you took?

A.    The ones provided to you as part of the subpoena.

Q.    But they are handwritten, correct?

A.    They are.

Page 167

SCOTT BRONSTEIN

Q.    And they are handwritten notes that you personally took, correct?

A.    Correct.

Q.    And when did you take those notes?

A.    During the conversation with Alex.

Q.    As the conversation was happening; is that your testimony?

A.    Yes.

Q.    And why did you take notes of that conversation?

A.    What I was hearing was surprising to me, and my reporter's antenna went up.  And I thought I should scribble down exactly what Alex was saying.

Q.    Have you had a conversation or communication with Collette before the phone call about whether to take notes?

A.    No.

Q.    Have you had a conversation or any communication with Collette before the phone call about whether to audio

Page 168

SCOTT BRONSTEIN

record the call with Alex?

A.    No.

Q.    You took handwritten notes. Why did you not audio record the discussion?

MR. LYNCH:  Objection.

MR. IADEVAIA:  Strike that.  Let me do it differently.

Q.    Did you record, did you create an audio recording of that discussion?

A.    I did not.

Q.    And why not?

A.    Frankly, because I was sitting at a place where all I had was my pad and my pen.

Q.    Where were you sitting?  Sorry, go ahead.

A.    Doing an audio recording is something that reporters don't do lightly.  It involves determining one in two state permissions and authorizations. And it's just not something I would do like that.

Q.    Where were you when you had the

Page 169

SCOTT BRONSTEIN

phone call with Alex?

A.    I believe I was on the couch upstairs.

Q.    At your house?

A.    Correct.

Q.    Now, that's in New York or that was in New York at the time?

A.    No, I am in the Washington D.C. area.

Q.    D.C.

A.    I haven't lived in New York in 25 years.

Q.    Yeah, my mistake.  During the call with Alex, did you make that call using an iPhone?

MR. LYNCH:  Objection.

THE WITNESS:  I am not clear if I am supposed to reply when all of these objections are being made.

MR. EAVES:  Let me -- excuse my interruption, but basically, Scott, he's objecting to the form of the question, which is an objection for A later on discussion.  It is not the

Page 170

SCOTT BRONSTEIN

same as we objecting and instructing you not to answer.  That's a different situation.

So when Michael objects or someone objects, you can then answer the question.  It gives Jeremiah the opportunity to rephrase his question, so that it's admissible later.  So sorry for the interruption, but I think that will make things go smoother for you.

THE WITNESS:  Thank you.

MR. IADEVAIA:  No problem, thanks for the explanation.

Q.    So the question was the phone call that you made with Alex, what device were you using to make the phone call?

MR. LYNCH:  Objection.

A.    My phone, my cell phone.

Q.    Okay.  And that's an iPhone?

A.    It is.

Q.    And when you spoke to Alex, did you do it on a speakerphone?

A.    I can't recall precisely.  I

Page 171

SCOTT BRONSTEIN

believe I did, but I can't recall.

Q.     And was anyone else in the room with you when you made the call to Alex --

A.     No.

Q.     -- or when you had the call with Alex?

A.     No.

Q.     And was anyone on the other line, to your knowledge, when you had the call with Alex?

A.     Not to my knowledge.

Q.     Was Collette -- did Collette partake in the phone call?

A.     No.

Q.     Before the phone call, did you plan on taking notes of your discussion with Alex?

A.     No.

Q.     Can you see what's been marked as Bronstein Exhibit 3, Mr. Bronstein?

          (Bronstein Exhibit 3, Document
     bearing Bates stamp Bronstein 1, was
     so marked for identification, as of

Page 172

SCOTT BRONSTEIN

this date.)

A.    Yes, I can.

MR. IADEVAIA:  Other folks have access to it, Michael, John.

MR. LYNCH:  Yes, I can see it.

MR. IADEVAIA:  I assume you can see it, John, unless you tell me otherwise.

MR. EAVES:  Yes.

Q.    Scott, why don't you take a minute to review the document and then I am going to ask you some questions.

A.    Yeah, okay.

Q.    Do you recognize what's been marked as Bronstein Exhibit 3?

A.    I do.

Q.    And what is it?

A.    This is a text thread.

Q.    Between who and who?

A.    Between Alex and myself.

Q.    And is this the text messages you were referring to earlier today during your testimony?

A.    Yes.

Page 173

SCOTT BRONSTEIN

Q.    These are text messages that your lawyer produced to my firm pursuant to the subpoena, correct?

A.    Correct.

Q.    And where did you locate these text messages?

A.    On my phone.

Q.    On the phone associated with the number 2050?

A.    Correct.

Q.    And is what's been marked as Exhibit 3 still on your cell phone?

A.    Yes.

Q.    The top text message is dated June 8th, 2020.  Do you see that?

A.    Yes.

Q.    Am I correct the messages on the left-hand side are from Alex and the ones on the right-hand side are from you?

A.    Yes.

Q.    The first text in the thread is dated June 8th, 2020.  But to be clear, you had communicated with Alex Poolos before June 8th, 2020, right?

Page 174

SCOTT BRONSTEIN

A.    Yes.

Q.    This was not the first time you had ever communicated or had interactions with Alex, right?

A.    Correct.

Q.    In Alex's text to you, she says "Hi Scott, thanks again for all of your time last week.  Can we touch base again today?"

And you wrote back "Hi, yes, sure.  Am waiting to hear if we are on a daily deadline today.  Hopefully, we will not be and should have plenty of time. Will know more in hour or so."

And Alex writes back "Awesome. And if not today, then tomorrow."

Do you see all that text, did I read it accurately?

A.    Yes.

Q.    And what were you and Alex texting about, do you know, do you recall?

A.    It's my recollection that we were talking because at this point she

Page 175

SCOTT BRONSTEIN

knew of Collette's trying to come over there and this was the beginnings of some discussion about whether, you know, whether, what my thoughts were about Collette and vice versa.

Q.    Then the next text you say "Hi, so today not too bad.  Is late afternoon okay?"

Alex says yes and suggests a time.  And you say "Okay, good."

This is still June 8th, 2020. Did you have a phone call with Alex on that day?

A.    No, not that I know of.

Q.    On June 8th, 2020, you don't believe you did?

A.    I can't recall if we did it. It looks like we might have spoken briefly, but I can't recall.

Q.    On June 11th, which is a few days later from the prior text Alex writes "Hi, heard anything?"

And you write back "Hi, no. We've all been slammed on story airing

Page 176

SCOTT BRONSTEIN

tonight."

Alex writes back "Eek! Sorry to bug."

And then Alex writes, "Trying to push through this interview for Collette. Just a bit of a log jam because of unrelated getting the show on-the-air stuff."

Do you see those texts, did I read them correctly?

A. Yes.

Q. When Alex asks if you heard anything and you say no, do you have any idea what that's about?

A. I don't. I can't recall what she's asking about.

Q. And where Alex says "Trying to push through this interview for Collette," at the time did you have any understanding of what Alex was referring to?

A. It's my recollection they were trying to do interviews with Collette about going over there.

Page 177

SCOTT BRONSTEIN

Q.    About joining 60 Minutes?

A.    Yes.  As you can see, we were being smashed with a lot of deadlines at that time for a big story we were working on.  So my attention was quite diverted.

Q.    And on June 12th you wrote to Alex, among other things, "Below is link to yesterday's story.  FYI-Collette did a ton of work on this story.  And I was trying to remember if I ever told about her bail bond story?  It was really a remarkable project - and she did the whole thing start to finish by herself. It was amazing."

Do you see that, the words I just read?  Did I read them accurately?

A.    Yes.

Q.    And when you say "it was amazing," what were you referring to there?

A.    The bail bond story that she pulled together for CNN.

Q.    And were you telling this to Alex as part of your recommendation to

Page 178

SCOTT BRONSTEIN

Alex that Collette should join her team?

A.    Well, it was just to inform her in case she wasn't aware of the bail bond story.  It was a terrific piece of work.

Q.    You were in touch with Alex about Collette at this time because Collette wanted to work at 60 Minutes with Alex, correct?

A.    Correct.

Q.    If you look on the next page of Exhibit 3, Bronstein 2, Bates stamped Bronstein 2, on September 15th, 2020, Alex asks if you can talk.  And later on the 15th you write "Sure.  Want to talk now briefly?"

Alex writes back "On calls the rest of the afternoon.  Tomorrow a.m.?"

You write back "Sure, thanks."

And then on September 16th, 2020 Alex writes "Hi, are you free in 30?"  You say "Sure."

Did you speak to Alex on September 15th or around that time?

A.    I think we spoke around that

Page 179

SCOTT BRONSTEIN

time, but I can't remember the details.

Q.    And would this conversation likely have been about Collette Richards joining 60 Minutes?

A.    I believe so.

Q.    You don't remember anything specific about a call you had with Alex in September of 2020, though, correct?

A.    No, five years ago, I don't remember specifics.

Q.    Okay.  And then on September 27th, 2020 Alex writes to you "Hi, I'm sure you've heard the good news.  I'm thrilled.  Hopefully, she gets a good salary offer."

Is it your understanding or was it at the time your understanding that this is a reference to Collette getting an offer to work at 60 Minutes with Alex?

A.    Yes.

Q.    And then on the next page, Bates stamped Bronstein 3, you write at the top there -- is a text at the top "Hi, yes, I did.  I'm so happy for both

Page 180

SCOTT BRONSTEIN

of you guys.  I think it's really exciting, especially for her.  I commend you for making a great decision, you won't regret it.  I think you guys are such a great match and will do amazing work."

Q.    Do you see that text?  Did I read that correctly?

A.    Yes.

Q.    And was that a genuine reflection of your view of Collette working with Alex at the time?

A.    Yes.

Q.    And why did you think they would do amazing work?

A.    Because they are all good people and it sounded like a great team to me.

Q.    When you say a great match here, you mean Alex and Collette, correct?

A.    And Lesley Stahl.

Q.    And on October 2nd, 2020, you exchanges text messages with Ms. Poolos

Page 181

SCOTT BRONSTEIN

about Collette and the announcement about Collette leaving CNN to go to 60 Minutes, correct?

A.    Correct.

Q.    And then on October 12th, 2020, Alex reaches out to you asking if you would be willing to speak to a friend and colleague of hers about an opportunity to work with you at CNN, right?

A.    Correct.

Q.    And there is text from you in response a couple of days later on that topic on October 14th, 2020, right?

A.    Right.

Q.    Moving to June 3rd, 2021 there is a text from you saying "Hey Alex, great to hear from you.  Sorry, have been having some cell phone problems and am behind in messages, et cetera.  I am glad Collette did well.  She is amazing and she got married, too."

Do you see that text, did I read it correctly?

A.    Yes.

Page 182

SCOTT BRONSTEIN

Q.    Did you go to Collette's wedding?

A.    No.

Q.    In the text you say "Great to hear from you."  But there is no text from Alex.  Did Alex reach out to you in some way?

A.    I believe so, but I can't recall specifically how.

Q.    Okay.

A.    I think she might have left a voice message or -- I don't recall exactly.

Q.    And it seems from your text message that Alex had reached out about you, about openings at CNN; is that right?

A.    Yes.

Q.    And Alex replies to you later that day on June 3rd related to the position, correct?

A.    Yes.

Q.    Okay.  The next text message on this thread is dated December 31st, 2021;

Page 183

SCOTT BRONSTEIN

do you see that?

A.    Yes.

Q.    Between June 3rd, 2021 which is the prior text, and December 31st, 2021, did you have any interactions with Alex Poolos?

A.    No, not that I recall.

Q.    Any phone calls with her?

A.    No, not that I recall.

Q.    Any text messages that are not reflected in Exhibit 3?

A.    Nope, not that I recall.

Q.    Was it between June 3rd, 2021 and December 31st, 2021 that you had a conversation or conversations with Collette Richards about her struggling or having tough times at 60 Minutes?

A.    Oh, I think it was before that. I don't think it was in that window.  But I can't recall, so I don't know.

Q.    In Alex's text to you on December 31st, 2021 she writes "Hi Scott, I hope this finds you well.  Wondering if you have a few minutes to chat."

Page 184

SCOTT BRONSTEIN

Do you see that text message?

A.    Yes.

Q.    Okay.  And when you were testifying earlier about Alex reaching out to you via text, is that the text you're referring to?

A.    Yes.

Q.    And according to Exhibit 3, you write back and say "Hi Alex, great to hear from you!  Today not so good.  Is it urgent?  What about next week?  Or on the weekend possibly - tho is busy weekend."

Do you see that text, did I read it correctly?

A.    Yes.

Q.    As of this date, December 31st, 2021, are you aware of Collette Richards making a complaint against Alex Poolos?

A.    Not that I am aware of.

Q.    And Alex writes back and says "Hi, not at all urgent.  Thank you for writing back.  Next week is fine.  Just want you to run something past you confidentially."

Page 185

SCOTT BRONSTEIN

Did I read that correctly?

A. Uh-huh.

Q. I just need a yes or a no, I am sorry.

A. Yes.

Q. And you write back "Okay, sure, let's talk next week.  Monday may be good after morning meets and day settles."

Now we are on the fifth page of Bronstein 3, did I read that correctly?

A. Yes.

Q. And Alex says "Happy New Year!"

And you write back "Happy New Year!"

The next text in this thread is dated January 4th, 2022, correct?

A. Right.

Q. Did you have any communication with Collette Richards between this December 31st, 2021 text and these texts on January 4th, 2022?

A. Not that I recall.  I suppose it's possible, but not that I recall.

Q. And as of January 4th, 2022,

Page 186

SCOTT BRONSTEIN

were you aware that Collette Richards had made a complaint about Alex Poolos to CBS?

A.    Not that I know of, no.

Q.    Okay.  On January 4th, 2022 Alex writes "Is it too late for you?"

And you write "Hi.  Yes, kind a late.  Been a long day.  Have family over now.  Talk later."

And Alex writes back "Yes, of course.  Sorry!  Don't want to impose."

Do you see the text I read, and did I read them correctly?

A.    Yes.

Q.    As of January 4th then, at least according to the text, you had not spoken to Alex, correct?

A.    Correct.

Q.    January 5th, 2022 is the date that you, in fact, talked to Alex on the phone, correct?

A.    Correct.

Q.    And you're the first person between the two of you to reach out on

Page 187

SCOTT BRONSTEIN

that day, correct, between you and Alex?

MR. LYNCH:  Objection.

A.    Correct.

Q.    And you start the conversation on January 5th, 2022 with the text "Hi, maybe later this afternoon can work."

Did I read that correctly?

A.    Yes.

Q.    And at the time that you sent the text on January 5th, 2022, had you spoken to Collette Richards about a complaint she made against Alex?

A.    Not that I am aware.

Q.    As of the time of this text, January 5th, 2022, were you aware that Collette Richards had been in discussions with HR at CBS regarding Alex Poolos?

A.    Not that I am aware of.  Not that I recall.

Q.    And between December 31st, 2021, which is the first text of this thread that we have just been going through, in late 2021 through January 5th of 2022, did you have any discussions

Page 188

SCOTT BRONSTEIN
with Collette Richards at all?

A.    Not that I recall.  It's possible, but I don't remember.

Q.    And then you write "Hi, maybe later this afternoon can work."

And Alex writes back "Yes, totally."

And then at 5:38 p.m. on January 5th, 2022, you write "Hi, want to talk?"

Did I read the text correctly?

A.    Yes.

Q.    And did you speak around 5:38 p.m. on January 5th, 2022 with Alex Poolos?

A.    I would have to check the time, but I believe that's right.

Q.    And before the January 5th, 2022 call with Alex, did you have any other communications with her beyond what's reflected in this text chain between late 2021 and early 2022?

A.    No, not that I am aware of. Just what's in the text.

Page 189

SCOTT BRONSTEIN

Q.    Okay.  And do you have --
strike that.

Just to be clear, did you have
any discussion whether in writing or
verbally, with Collette Richards about
Alex's text messages as reflected in
Bronstein 3 before the phone call?

MR. LYNCH:  Objection.

A.    Not that I can recall.  It's
possible, but not that I remember.

Q.    It should still be accessible
to you, Exhibit 1, which is the text
exchange we went through with Collette
and you.  And I think I had asked if you
could check the year of the few text
messages.  Did you have a chance to do
that?

A.    I did.

Q.    Okay.  And what's the year?

A.    2023.

Q.    So the top text in Exhibit 1 is
December 7th and you're saying that it's
December 7th, 2023, correct?

A.    Correct.

Page 190

SCOTT BRONSTEIN

Q.    And then the next text is also December 7th, so I assume that's December 7th, 2023 as well?

A.    Correct.

Q.    I guess the best way is to ask, are all of the text messages reflected on Exhibit 1, were they sent in 2023?

A.    I believe so.

Q.    And when you checked your phone, were there any other text messages with Collette on the phone beyond the ones that are reflected in Exhibit 1?

A.    They were not.

Q.    Do you have an iCloud account associated with your iPhone?

A.    Only what I've started fairly recently.

Q.    Did you check your iCloud account for materials responsive to the subpoena?

A.    I did.

Q.    Do you backup your phone to the iCloud?

A.    I am getting better about it.

Page 191

SCOTT BRONSTEIN

I did not for quite sometime.

Q.    Did you as of 2021?

A.    I do not believe I did very often.

Q.    Did you as of 2022?

A.    I don't know.  I have been bad about it.  I have gotten better about it. The answer is I don't know.

Q.    Well, to the extent you haven't checked the iCloud for responsive materials to the subpoena, we request that that be done.

Do you have an iPad?

A.    No.

Q.    Do you have a laptop?

A.    It's my personal laptop that I purchased recently.

Q.    Did you have a laptop before the personal laptop you purchased?

A.    It was a CNN-issued laptop.

Q.    When did you purchase your personal laptop?

A.    I believe in like May of '24.

Q.    And do you have an external

Page 192

SCOTT BRONSTEIN

hard drive where you store electronic material?

A. No. I've stored video stories from my time at CNN on a drive.

Q. Do you have any e-mails stored on that drive?

A. No.

Q. Any text messages?

A. No.

MR. IADEVAIA: All right. Why don't we take another short break, please.

THE VIDEOGRAPHER: We are going off the record. The time is 2:36 p.m.

(Off the record.)

THE VIDEOGRAPHER: We are going back on the record. The time is 2:47 p.m.

BY MR. IADEVAIA:

Q. Mr. Bronstein, before the break we were talking a little bit about text messages and I think your testimony earlier today is that you get a new phone approximately once a year or every year,

Page 193

SCOTT BRONSTEIN

give or take; is that right?

A.    Yes.

Q.    In order for the text messages that you had with Alex from 2020 to transfer to your current phone, what needed to happen, what's your understanding of what needed to happen?

MR. LYNCH:  Objection.

A.    I am not sure I understand the question.

Q.    Sure.  You testified you switched phones.  And you testified that your car and phone has text messages that go back for a period before you got the actual device, correct, including the text messages with Alex Poolos from 2020?

A.    Correct.

Q.    What's your understanding of how those text messages transferred to the current device that you have.

A.    Other than it's the process of changing the phone over.  Stuff is supposed to move forward, right?

Q.    Meaning that your understanding

Page 194

SCOTT BRONSTEIN

is that text messages from one device would transfer over to the other device when you switched phones?

A.    They should, but it's been my experience it's not often the case.

Q.    And do you know if between 2020 and 2024, do you have any iCloud backups of your phones that would include text messages?

A.    Like I told you, you know, I've had -- I did backup less frequently back then.  I've looked in my cloud for messages and I do not see anything other than what's on my phone here.  Is that what you're asking?

Q.    Well, it's one of the questions.  Okay.  Thank you.

Before your phone call with Alex Poolos on January 5th, did you discuss with Collette whether you would call Alex in response to her text messages?

A.    Not that I recall, no.

MR. IADEVAIA:  We are going to

Page 195

SCOTT BRONSTEIN

mark another document.  We will let you know when it's up.

(Bronstein Exhibit 4, Document Bates stamped Bronstein 18, was so marked for identification, as of this date.)

Q.    Let me know once you can see it, Mr. Bronstein.

A.    I can see it.

MR. IADEVAIA:  Has everybody else got it?

MR. LYNCH:  Yes.

MR. EAVES:  Is this Exhibit 3 or 4?

MR. IADEVAIA:  I think we're up to Exhibit 4.

MR. EAVES:  I don't have it.

THE WITNESS:  It seems to take a second to drop in.

MR. IADEVAIA:  Yeah.

I will say for the record that what's been marked as Bronstein Exhibit 4 is a one-page document that was produced by Mr. Bronstein's

Page 196

SCOTT BRONSTEIN

lawyers and we added a Bates number to it of Bronstein 18.

Q.    Mr. Bronstein, can you see the document?

A.    I can, yes.

Q.    What's been marked as Exhibit 4, do you recognize it?

A.    Yes.

Q.    And what is it?

A.    This is the screen shot of the phone call from when I talked to Alex.

Q.    And who took the screen shot?

A.    I did.

Q.    And when did you take the screen shot?

A.    After our phone call.  I was requested to take that.

Q.    Requested by whom?

A.    By Renee Balducci.

Q.    Had you taken the screen shot before Ms. Balducci made her request?

A.    No, I don't believe I did.

Q.    Did you take screen shots of any other calls that you had in

Page 197

SCOTT BRONSTEIN
connection with this matter?

A.     No.

Q.     Did you take screen shots of any calls that you had with Collette Richards?

A.     No.

Q.     And you made that call, I think you testified before, using your personal cell phone, correct?

MR. LYNCH:  Objection.

A.     I am sorry, I don't understand the question.

Q.     Sure.  You made the phone call to Alex using a cell phone; is that right?

MR. LYNCH:  Objection.

A.     This is not a phone call to Alex.  This is phone call received from Alex.  Is that what you're talking about here?

Q.     Yeah, sorry, I got my prepositions messed up.  The phone call that you had with Alex on January 5th, 2022, you had using a, your personal cell

SCOTT BRONSTEIN

phone, correct?

A.    Yes.  She called me on my cell phone number.

Q.    Right.  And she called you after you had texted, you and she had exchanged texts, correct?

A.    Yes, the texts you were just discussing before the break.

Q.    Right.  On January 5th, 2022, it was you who first reached out to Alex on that day via text, right?

A.    In response to her texts, yes. She had been asking me for several days to talk with me.  And we finally found the day when I could.

Q.    Alex had reached out to you initially on the 31st and you did not talk until the 5th, correct?

A.    Correct.

Q.    How come you did not speak to each other until January 5th?

A.    Well, it was holiday time.  I was quite busy with family.

Q.    Was there any other reason?

Page 199

SCOTT BRONSTEIN

MR. LYNCH:  Objection.

A.    No.

Q.    Were you waiting to talk to Collette before you spoke to Alex?

MR. LYNCH:  Objection.

A.    No.

Q.    Is this screen shot stored on your phone currently?

A.    I believe so.

Q.    And where is it stored on your phone?

A.    In the text thread provided to Renee Balducci.

Q.    Is it stored anywhere else?

A.    Not to my knowledge.

Q.    And according to Bronstein 4, the call happened at 5:42 p.m.; do you see that?

A.    Yes.

Q.    And it lasted 17 minutes according to Bronstein 4, correct?

A.    Correct.

Q.    Do you have any reason to doubt that the call lasted about 17 minutes?

Page 200

SCOTT BRONSTEIN

A.    No.

Q.    And the phone numbers below, the 212 and the 646, those are Alex Poolos's contact numbers at the time?

A.    Correct.

Q.    You mentioned before that you had handwritten notes of the phone call you had with Alex Poolos on January 5th, 2022, correct?

A.    Yes.

Q.    Did you ever type those notes?

A.    No.

Q.    Did anyone suggest that you take notes of your call with Alex before the call?

A.    No.

Q.    Did you share the notes with anyone?

A.    When?

Q.    At any point in time.

A.    Well, I already testified that Renee Balducci, you know, reached out to me and you have the text thread back and forth where it refers to the phone notes.

Page 201

SCOTT BRONSTEIN

Q.    Did you send the notes to Renee Balducci?

A.    I did, upon her request.

Q.    Did you send the notes to anyone else other than, beyond Renee Balducci?

A.    No.

Q.    Did you send the notes to Collette Richards?

A.    No.

Q.    Did you share the notes ever with Bill Owens?

A.    No.

Q.    Tonya Simon?

A.    No.

MR. IADEVAIA:  Let's mark as Bronstein 5, the notes.

(Bronstein Exhibit 5, Document Bates stamped Bronstein 11 through 17, was so marked for identification, as of this date.)

MR. IADEVAIA:  They should be up everyone.

Q.    Mr. Bronstein, if you can take

Page 202

SCOTT BRONSTEIN

a look at what's been marked as Bronstein Exhibit 5.

For the record, it's a multipage document bearing Bates numbers Bronstein 11 through Bronstein 17.

Let me know when you're ready, Mr. Bronstein.

A.    Yeah, I am ready.

Q.    Do you recognize what's been marked as Exhibit 5?

A.    I do.

Q.    What is it?

A.    These are a copy of my handwritten notes.

Q.    Handwritten notes of what?

A.    Of the phone call with Alex Poolos on January 5th.

Q.    And I think your testimony earlier was that you took these notes during the call with Alex, correct?

A.    Correct.

Q.    At what point in time during the call did you start making notes?

A.    I can't say precisely.  It was

Page 203

SCOTT BRONSTEIN

quite near the beginning.  Alex just said a few words and I said my reporter's antenna went up and something seemed amiss and I started scribbling.  I had my notepad in front of me, which I almost always do.

Q.    What was it that Alex said that prompted you to start taking notes?

A.    I can't remember precisely.  I believe it was something about nobody can know that we're talking.  Don't tell anybody.  And that seemed amiss to me and I started writing.

Q.    Have you ever taken handwritten notes of conversations, phone conversations that you had had with Alex in the past?

A.    No, not with Alex.  No.

Q.    Have you ever taken handwritten notes of phone calls that you had with Collette Richards?

A.    No.

Q.    Have ever secretly recorded any phone calls you had with Alex Poolos?

Page 204

SCOTT BRONSTEIN

A.    No.

Q.    Have you ever secretly recorded any phone conversations you've had with Collette Richards?

A.    No.

Q.    Do you still have the originals of the notes that you took that are reflected in Exhibit 5?

THE WITNESS:  I want to confer with John about that.  So we'll have to either take a break or come back to that.

MR. IADEVAIA:  Well, I am not sure why you would need to confer with counsel.  I mean is there a privilege issue that I am not thinking of here?  Is the concern because you gave them to counsel, is that the issue?

MR. EAVES:  Could be.  Could be. I won't know until I talk to him.

MR. IADEVAIA:  All right.  We can take a quick break.

MR. EAVES:  Thank you so much.

THE VIDEOGRAPHER:  All right.

Page 205

SCOTT BRONSTEIN

We are going off the record.  The time is 3:02 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We are going back on the record.  The time is 3:04 p.m.

BY MR. IADEVAIA:

Q.    Mr. Bronstein, before we took a break at your request the question was whether you have the original version of the notes reflected in Exhibit 5?

A.    Yes, I do.

Q.    And are they in your possession at home in your house somewhere?

A.    They are.

Q.    And the notes appear to be attached to a notepad in Exhibit 5; am I seeing that correctly?

A.    You are.

Q.    Are they still attached to a notepad?

A.    They are not.  They have been removed from the notepad, the entire thing, and stapled together in a bunch.

Page 206

SCOTT BRONSTEIN

Q. Did anyone instruct you to save these notes?

A. No.

Q. Why did you save the notes?

A. They were just in my notebook where I take all kinds of notes. And when I was asked for them I provided them.

Q. Did you provide the actual notes or did you provide the screen shot of the notes?

A. I just took screen shots of the notes.

Q. In responding to the subpoena, did you take new pictures of the notes?

A. No, these were the original pictures that you are looking at. There is only one set of pictures and you're looking at them.

Q. So going back to why you held onto the original notes, did you have a discussion with Ms. Richards about keeping the original notes?

A. No.

Page 207

SCOTT BRONSTEIN

Q.    Did you have a discussion with anybody at CBS about keeping the original notes?

A.    No.

Q.    Approximately, when did you pull the notes out of the notebook?

A.    Shortly after providing them to Ms. Balducci.

Q.    So back in early 2022?

A.    Correct.

Q.    And where do you have them stored in your house?

A.    In my desk area.

Q.    Is there a file?

A.    There is a folder.

Q.    Are they in a file?

A.    There's a folder.

Q.    Is there anything in that folder beyond these notes?

A.    No.

Q.    The notepad, did it contain notes about other matters beyond the call you had with Alex Poolos on January 5th?

A.    No, it was my repertorial

Page 208

SCOTT BRONSTEIN

notebook that was about stories that I was pursuing at the time, which is why I tore these notes out.

Q.    So your reporter's notebook, you've made these notes of your conversation with Alex in a notebook that you generally use for work purposes?

A.    Correct.  I have several reporter's pads going at any time.  This is one that I grabbed.

Q.    Okay.  And did you pull the -- did you rip the notes out for anything else other than the phone call with Alex?

MR. LYNCH:  Objection.

A.    No.

Q.    Your answer is no?

A.    No.

Q.    And do you still have that notebook.  I know the notes of the call with Alex are not still in there, but do you still have that notebook?

A.    I no longer know that.  I mean have probably got 40 notepads from the last two or three years.  I don't know.

SCOTT BRONSTEIN

And I am not sure which one it would have come from now.

Q.    Okay.  The notes that you reflected in Exhibit 5, are they notes of everything that Alex said on the phone call on January 5th?

A.    As best as I can scribble it down.

Q.    So is there text in here that Alex -- strike that.

Are there things that Alex said during the phone call that are not reflected in your notes?

A.    It's certainly possible.  I can only write so fast, and I am only human.  So I was only able to document what I was able to document.

Q.    Iu78did you make choices about which information you would document and not document?

A.    No, I tried to write down every response that was made that she said.  But it is possible that I missed something.

Page 210

SCOTT BRONSTEIN

Q.    And do your notes reflect anything that you said during this discussion?

A.    No.

Q.    Do you have a memory of anything that you said during this discussion?

A.    My memory is I was just trying to listen and ask an occasional question.

Q.    Do you remember anything specific that you said during the call with Ms. Poolos?

A.    I have a vague recollection of expressing strong surprise at the things she was saying since that was not my experience.

Q.    When you say things Alex was saying, what do you mean?

A.    Well, we can go to the notes, specifically, if you would like.  But the notes, I think the notes are self-explanatory.

Q.    Well, you just expressed a thought.  And it was that you have a

Page 211

SCOTT BRONSTEIN

vague recollection of saying during the call or expressing during the call a strong surprise at some of the things or the things that Alex was saying.  And it was not your experience.  And I am trying to understand what the things are that were not in your experience?

A.    Sure, sure.  The very descriptive language about Collette's work was in stark contrast to anything I or anybody I know has experienced about Collette.

Q.    When you just said not your experience, what you mean is that was not the experience you had had working with Collette as described by Alex, right?

A.    Correct.  The only other thing I would add is, it was also surprise to hear Alex saying these things.  I had not seen that side of Alex before.

Q.    We will go through specifics in a moment.  The call lasted about 17 or the call according to Bronstein Exhibit 4, lasted 17 minutes, correct?

Page 212

SCOTT BRONSTEIN

A.    Correct.

Q.    You think looking at these notes, that this is 17 minutes worth of conversation?

MR. LYNCH:  Objection.

A.    I only have knowledge that this is what I wrote down and that the call lasted 17 minutes.  I don't have knowledge beyond that, really.

Q.    Well, are there things that you left out of your notes that were discussed, I mean outside of what you said, because I think you said there is none of that in here?

A.    As I said, I wrote as fast as I could and I pretty much wrote down what I believed, everything that was being said.

Q.    You have quotes around most of the notes, but not all of them.  What's the significance of the quotes?

A.    Yeah, it's a reporter's habit. When I feel quite certain that I've really thoroughly captured something, I put quotes on it as I am going.  When I

Page 213

SCOTT BRONSTEIN

am not entirely sure or if I think I might have missed some words, I don't put a quote around it.

In other words, for my shorthand, for reporting reasons, I know that I can rely on what's in quotes as close to verbate and I cannot do so with what's not in quotes.

Q.    Looking at the first page of Exhibit 5, Bronstein 11, at the top it says "Alex Poolos 1/5."

When did you write that part of your notes?

A.    As we were talking.

Q.    Okay.  And then under it it says "Phone notes"; am I reading that correctly?

A.    Yes.

Q.    And when did you write that piece of your note?

A.    As we were talking.

Q.    As you and Alex were talking?

A.    Yes.

Q.    And was there any reason you

Page 214

SCOTT BRONSTEIN

wrote "Phone notes" there?

A.    I always write phone notes when I am doing an interview on the phone. It's a reporter's habit.  It's so I know what this is.

Q.    Okay.  The first two lines under "Phone notes" it says, the notes I think say "'Please don't tell anyone'"; did I read that correctly?

A.    Yes.

Q.    And do the quotes mean in your notes that that is something that Alex told you?

A.    Yes.

Q.    And you put quotes around it because you believe you got it word for word; is that correct?

A.    Yes.

Q.    And then the note "'Could look bad'" is also in quotes.

Again, is that what you're saying Alex told you during the call?

A.    Yes.

Q.    And you put quotes around it.

Page 215

SCOTT BRONSTEIN

So your testimony is that was word for word what she said?

A.    Yes.

Q.    Did Alex say that at the very start of the phone call, "'Please don't tell anyone'"?

A.    It was very near.  It was either the first sentence, second sentence.  It was very near the top of our conversation.

As I said, I was grabbing my pad and trying to get in a position where I could take notes after hearing her speaking.  So it is possible that I missed a few words or phrases or something before that.  I got up and running as quick as I could.

Q.    Did Alex say anything before she said "'Please don't tell anyone'"?

A.    It's possible.  I don't know if I missed something.  I might have.

Q.    Do you have any memory of what she said?

A.    No.  My memory is I wrote down

Page 216

SCOTT BRONSTEIN

close to nearly the first thing that she said.

Q.    Did Alex during the call explain what she meant by "'Please don't tell anyone'"?

A.    If I wrote it down, she did. If I didn't write it down, I don't believe so.

Q.    And the "'Could look bad,'" did Alex explain what she meant by that during the call?

A.    I don't recall her explaining anything other than what's in the notes, so I don't know.

Q.    If we go to the next page, Bronstein 12. Actually, I'm sorry, before we do that, looking at Bronstein 11, there is a note that says, the first page again, "Wanted to talk before. Now has become a really bad situation."

There is no quotes around that text. How come?

A.    Because she was speaking quickly there and I know I missed some

Page 217

SCOTT BRONSTEIN

wording.  So I wasn't sure what I had missed.  I just wrote down what I could catch.

Q.    Okay.  So that's, your testimony is that's you paraphrasing Alex as opposed to quoting her?

A.    Correct.

Q.    If we look at Bronstein 12, the second page of Exhibit 5 it appears to me, but you can correct me if I am wrong, but all of the notes on this page are in quotes; is that accurate?

A.    I apologize, I don't have the page breaks the way you seem to.  The next thing I have after the words "Now has become a really bad situation" is "'Collette's performance is terrible.'"

So that's the next thing that I have.

Q.    "'Collette's performance is terrible.'"  No, I am sorry, I am onto the next page.  You only have one page?

A.    No, it's just that I am not sure my page breaks are the same as

Page 218

SCOTT BRONSTEIN

yours.  But if you're proceeding through, I have "'Collette's performance is terrible.'"  And then after that I have "'Her performance is really bad.'"

Q.    Yes, that's all on page 1.  It then says, "'She just made it a lot worse.  She went to HR.'"

A.    Correct.

Q.    That's all page 1.

A.    Okay.

Q.    So I am moving on to page 2.

A.    Okay.  I see.

Q.    I mean, look, I guess on page 1, "'Collette's performance is terrible'" you have that in quotes.

So my understanding is that when you do that you're writing down word for word what Alex told you; is that correct?

A.    That's correct.

Q.    Okay.  And the same would be true for the other quoted text on page 1 about Collette's performance and going to HR, correct?

Page 219

SCOTT BRONSTEIN

A.    Correct.

Q.    Okay.  Moving on to the next page, can you see the next page?

A.    I do.

Q.    Okay.  So the next page, I think, all of the notes you have on that page are quoted.

Do I have that correct?

A.    The very first line does not have quotes on it.  It looks like I was not sure if those first set of words were an exact quote or not.

Q.    Okay.  I thought there was a quote on the left there.  It looks to be some kind of smudge.  You're saying it's not quoted?

A.    I do not believe so.

Q.    So that first line for the record "It's not a legal issue" you didn't quote that because you were paraphrasing or were unsure if you got exactly what Alex said?

A.    Correct.

Q.    The rest of the notes on this

Page 220

SCOTT BRONSTEIN

page you do have in quotes, correct?

A.     Correct.

Q.     And that means that you're writing down, according to your testimony, word for word what Alex told you; is that accurate?

A.     Correct, yes.

Q.     And did you interject at all during the time -- well, strike that.

The notes that you took on page 2, was that sequentially from what Alex was saying, I mean did it happen in the order she was saying it to you?

A.     Yes.

Q.     Did you say anything in between any of the comments that Alex said to you?

A.     I don't know for sure.  I have a recollection that I expressed surprise about what she was describing as Collette's performance.  I can't say specifically what I said.

Q.     The third line down starts with "'HR,'" do you see that?  "'HR has heard

Page 221

SCOTT BRONSTEIN

my side of it now'"; do you see that text?

A.    Correct.

Q.    That's in quotes, correct?

A.    Correct.

Q.    Your testimony is that is word for word what Alex has said "'HR has heard my side of it now'"; do I have that accurate?

A.    You do.

Q.    Do you know whether as of January 5th, 2022, the time of this call, if Alex had spoken to HR?

A.    I did not know.

Q.    And then the next quoted text says or quoted -- or the next note that is quoted says "'That fleshed it out. That's good.'"

Did I read your note correctly?

A.    Yes.

Q.    And your testimony is that's what Alex said to you word for word, correct?

A.    Correct.

Page 222

SCOTT BRONSTEIN

Q.    Did you have any understanding of what Alex meant when she said "'That's fleshed it out.  That's good'"?

A.    I assume that's a reference to the HR discussion, but I am not sure.

Q.    Okay.  Let's move to the next page, Bronstein 13.  The top of the note on this next page is "'She is really struggling.'"

Let me know when you get there?

A.    I am there.

Q.    The first three notes, four notes are in quotes, correct?

A.    Yes.

Q.    And that means again that you're saying, your testimony is that you got word for word what Alex said at that point in the phone call, correct?

A.    Correct.

Q.    And it's possible that she may have said other things, but that you didn't write it down; do I have that correct?

A.    Correct.

Page 223

SCOTT BRONSTEIN

Q.    And I also have correct that you may have said something, but you didn't write down what you said, correct?

A.    Correct.

Q.    There is a line here where there is text that's crossed out, I think it says "I need to," and then it's crossed out.

Do you see that?

A.    I do.

Q.    Why did you cross that out?

A.    She said something, and I missed it.  I caught the first part of it and I did not catch the rest.  I just crossed it out because I didn't know what was being said.

Q.    If you go to the next page, Bronstein 14, at the top I believe it says "'HR is not telling me I'm in jeopardy.'"  Do you see that note?

A.    I do.

Q.    So that first note at the top of Bronstein 13 says "'HR is not telling me I'm in jeopardy.'"

Page 224

SCOTT BRONSTEIN

So again the quotes mean you wrote down exactly what Alex said, correct?

A.    Correct.

Q.    And further down on the page, the next couple of notes down, it says something it's generational?

A.    Think, that's T-H-I-N-K.

Q.    "'I think it's generational. More common with her generation.'"

So that's one statement that's in quotes, starting with "'I think'" and ending "'with her generation'"?

A.    Correct.

Q.    And then it says "To go to HR," but that's not in quotes?

A.    That's not in quotes.

Q.    And how come?

A.    That's a paraphrase.  It's the best I could get of what she said about, you know, continuing the line.

Q.    Okay.  And then the next two sets of notes -- well, let's start with the first one.

Page 225

SCOTT BRONSTEIN

'"Those older wouldn't go to HR.'" That note is quoted. So you're writing down word for word what Alex said to you?

A. Yeah, though, I think I missed a word there. I think "those who are" is what's missing. But I wrote down as quick as I could and that's as close as I could get to verbate.

Q. And then in the next note -- I want to read this just because the handwriting is a little harder to read.

"'I know it's been really hard for Collette at home'" --

A. Yes.

Q. -- "'isolated.'"

A. Yes.

Q. And can you read for me the next note?

A. "'Know it's been hard for her.'" There is an "I" missing. I know it's been hard for her. I know it's been hard for her.

Q. And again, this text is in

Page 226

SCOTT BRONSTEIN

quotes so --

A.    The best I could catch it.

Q.    -- word for word?

A.    Yes.  I mean I was writing very quickly.

Q.    In the couple of lines, the beginning of that passage "'I know it's been really hard for Collette'" there is a marking after Collette to the right, what is that mark; do you know?

A.    That looks like a dash.

Q.    If we move to Bronstein 15, the top of the page the note says, "'I blame myself'" is that again you getting word for word what Alex said to you?

A.    Those three words, yes.

Q.    Did she explain what she meant by "'I blame myself'"?

A.    She might have said more, but I was unable to capture it.

Q.    Okay.  The next line says "'But I can't have this affect my work history.'"

Do you see that text?  Did I

Case 1:23-cv-08896-GHW-HJR   Document 300-4   Filed 02/09/26   Page 228 of 362

Page 227

SCOTT BRONSTEIN

read it correctly?

A.   Yes.

Q.   Did Alex explain what she meant by that comment?

A.   If she didn't, I didn't write it down.  I wrote down everything that I could, as best I could.

Q.   Do you remember her saying anything beyond that comment other than what's in your note?

A.   No.

Q.   And then there is not quotes around the text "Maybe didn't get how bad was affecting Collette."

First of all, did I read your notes correctly?

A.   Exactly right.

Q.   Is this something that Alex said or something that you said?

A.   This is something that she said.  But it's not in quotes, I don't believe I caught everything in the phrase.

Q.   Okay.  Let's move on to the

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Page 228

SCOTT BRONSTEIN
next page 16, Bronstein 16.  At the top it says "'She's a good person, but she is really struggling with her work.'"

Did I read those notes correctly?

A.    Yes.

Q.    Again, it's quoted text, so this is what she said to you word for word?

A.    Yes.

Q.    And then the next note is, "'She can always go work with someone else.  I told her that month ago.'"

Did I read that correctly?

A.    You did.  Grammatically it looks incorrect.  It looks like I either left out an S or left out a word or something.  But as best as I could get, it was verbate.

Q.    And then under that notes it says in quotes, "'Do not share this conversation.'"

Did I read that correctly?

A.    You did.

Page 229

SCOTT BRONSTEIN

Q.   Do you have a recollection of anything Alex said around "Do not share this conversation" during the call that's not reflected in your notes?

A.   No, nothing not reflected.

Q.   Did Alex specify anyone in particular that she didn't want you to share this conversation with?

MR. LYNCH:  Objection.

A.   I don't recall her going beyond what she said.

Q.   And then the next page, the last page, which is Bronstein 17, you wrote and it's in quotes, "'I need to do a reset.'"

So that's something that Alex said, and because it's in quotes you are recording it word for word; is that accurate?

A.   Yes.

Q.   And then in quotes it says,'"It will blow over.'"

Did I read that accurately?

A.   Yes, you can see I was not sure

Page 230

SCOTT BRONSTEIN
about a word and had to rewrite it.

Q.    Did you rewrite the word during the call or --

A.    Yes, during the call.  I thought I heard something else and then realized what she said was "blow over."

Q.    What did you think she had said?

A.    I wasn't sure.  It was garbled. And then I had to hear the full sentence to understand what it said, so I could write it.

Q.    And then the next note in quotes says "'Things are good with me and Lesley.'"

Did I read that correctly?

A.    You did.

Q.    And the quote means that you got down word for word what Alex said?

A.    Yes.

Q.    And then the last note is "'She likes Collette, too.'"

Did I read that correctly?

A.    Yes.

Page 231

SCOTT BRONSTEIN

Q.    And it's quoted as well, so again, your testimony is that is word for word what Alex said to you, correct?

A.    Yes.

Q.    Is this how the call ended, with Alex saying "She likes Collette, too"?

A.    I am sure there was something else, you know, some other words exchanged, but since I did not write them down, I don't know what they are.  I don't recall.  I did my best to capture the conversation.  And I can't be sure of whatever I missed.

Q.    Do you have any memory of how the call ended, where things were left off?

A.    No, not really.

Q.    Did you offer to do anything in response to what Alex said to you during the call?

A.    No.  Frankly, I did not know what to do after that call.  It was quite bizarre.

Page 232

SCOTT BRONSTEIN

Q. Well, what did you do after the call? Strike that.

At some point you testified earlier that you spoke to Collette about the call; do I have that correct?

A. Correct. I do not know, I do not know if I texted her or called her directly. But I informed her that Alex had called me up.

Q. And how soon after the call did you notify Collette?

A. I believe it was sometime that day or the next day.

Q. Do you have any memory of reaching out to Collette after your call with Alex?

A. No, not specifically. I know I reached out to her. I don't remember how.

Q. And why did you decide to reach out to Collette after your call with Alex?

A. I was very uncomfortable with the phone call with Alex. I was bothered

Page 233

SCOTT BRONSTEIN

by it, confused by it.  I thought Collette ought to know what had transpired.

Q.    And had you agreed with Collette before the call that you would tell her about the call after it took place?

A.    Not that I recall, no.

Q.    During the call that you had with Alex, did Alex say anything positive about Collette?

MR. LYNCH:  Objection.

A.    I wrote down some of the positive things that she said.

Q.    What are the positive things that you wrote down?

A.    You just read them back to me in the notes.

Q.    Can you take a look at the notes, and let me know which of these notes you think are positive?

A.    The bottom of page 4, I believe it is.  She says I know it's been really hard for Collette at home isolated.  I

SCOTT BRONSTEIN

know it's been hard for her.  That's somewhat positive.  Maybe didn't know how bad it was affecting Collette could be construed as positive.  She's a good person is positive.  I would say those three mostly.

Q.    Did Alex say during the call with you that Lesley really liked Collette?

A.    Well, the note that I read to you where she says she likes -- you read it back to me, she likes Collette, too.

Q.    Did Alex say that Lesley really liked Collette in those words?

MR. LYNCH:  Objection.

Q.    I know it's in your notes.  But is there anything else that Alex said about Lesley really liking Collette?

A.    She might have said that.  She might have said other things that are in my notes.  I did the best I could to capture the conversation, so I don't know if I missed things.

Q.    Did Alex say to you during the

Page 235

SCOTT BRONSTEIN

call that many others at 60 Minutes really liked her, or words to that effect?

A.   I don't know.  I don't recall.

Q.   Did Alex say to you that others at the show respected Collette or words to that effect?

A.   I don't know.  That would not have surprised me since that has been my experience and experience among colleagues at CNN, but I don't know.

Q.   You don't recall if Alex said that to you one way or another, right?

A.   I don't recall.

Q.   Do you recall Alex saying to you during the call that no matter what happened that Collette would be in a good position, or words to that effect?

A.   I don't recall.  She may have, but I don't recall.

Q.   Do you recall Alex saying during the call that no matter what, Collette would get to choose what she wanted to do moving forward or words to

Page 236

SCOTT BRONSTEIN

that effect?

A.    I don't know what that means. I don't recall. I don't recall those words.

Q.    Did Alex say during the call that she thought that she and Collette had been a great team, or words to that effect?

A.    She may have. I don't recall.

Q.    Did Alex say during the call that she was really hopeful that she and Collette could get back to being a great team?

A.    I don't recall, she may have. The tone of the conversation did not strike me that way.

Q.    I want to come back to that in a minute. I am just going to ask you a few more questions about the call. Did Alex say that she wanted to continue working with Collette or words to that effect during the discussion?

A.    I don't recall her saying that.

Q.    At the start of the call, did

SCOTT BRONSTEIN

Alex say to you that she didn't want to be seen as maligning Collette?

A.    I don't recall her saying that.

Q.    Did you say during the call with Alex that Alex could never malign Collette because you thought so highly of her, or words to that effect?

A.    I don't recall saying exactly that, but it certainly is possible. That's a feeling that I and many of my colleagues at CNN would have of Collette.

Q.    Do you recall saying that to Alex during this call?

A.    I don't recall.

Q.    Did you encourage Alex to talk to you, when Alex had expressed some reluctance to do so during your call on January 5th?

MR. LYNCH:  Objection.

A.    I am not sure I understand your question, sorry.

Q.    Sure.  Did you say to Alex that she could speak to you openly about Collette during your call or words to

Page 238

SCOTT BRONSTEIN

that effect?

A.    Not that I recall.  I was mostly listening.

Q.    Did you say during the call with Alex that the environment at CNN was totally different than it was at 60 Minutes or words to that effect?

A.    I don't recall saying that. There would be truth in saying something like that, but I don't recall saying that.

Q.    Did you say during the call with Alex on January 5th that 60 Minutes is a harder environment or words to that effect?

A.    I don't recall saying that.  It would be true.

Q.    Did you say to Alex during this call on January 5th that you had personally experienced the harder environment at 60 Minutes or words to that effect?

MR. LYNCH:  Objection.

A.    I don't recall saying that.

SCOTT BRONSTEIN

Q.    Did you understand the call Alex was making to you, she was threatening Collette's job?

A.    I don't know if she was doing that or not.  I only know what she said to me.

Q.    You mentioned before the tone of the conversation, what did you mean by that?

A.    The way that she described Collette's work.  The description about Collette, and her doing her job.  The tone was very harsh and very critical. It was a surprise to hear that.

Q.    Did Alex say during the call on January 5th, that it would not be a big deal for Collette if she decided to switch teams and work with a different producer than her, or words to that effect?

A.    The note that I wrote down on that topic is what I recall her saying.

Q.    I just want to find that note.

A.    I believe it's --

Page 240

SCOTT BRONSTEIN

MR. IADEVAIA: Something has popped up about connecting a device --

A. I believe it's the one on page 6, it looks like my page 6. It's somewhat in the middle of the page.

The note is "She can always go work with someone else. I told her that months ago."

Q. Got it. At the end of the phone call with Alex on January 5th, did you offer to speak to Collette to help?

A. I don't recall specifically. That would not be outside my character. I mean, that sounds like something anyone would want to do. I don't recall specifically saying that.

Q. One of your notes, I am just trying to find the page, it's Bronstein 16, at the bottom it says "'Do not share this conversation.'"

Could you find that note, it's the second to last page of the document?

A. Yes, I see it.

Q. Okay. Is it possible that what

Page 241

SCOTT BRONSTEIN

Alex said there is do not share this conversation with Collette?

MR. LYNCH:  Objection.

A.    I can only tell you what I wrote down.  It's possible I missed words, but that's what I wrote down.

Q.    Did you, during the call with Alex, did you ask Alex how this matter would be resolved or what would happen next?

A.    No, I don't recall asking that.

Q.    Did you say to Alex that you feel bad and that you were sorry she was going through this?

A.    I recollect saying something about feeling bad for both of them and, you know, having been one of the people to encourage their partnership, I felt bad it seemed to be going badly.  I don't know exactly what I said.

Q.    On the first page of Exhibit 5, the first page of your notes you wrote "'Please don't tell anyone,'" and quoted it.

Page 242

SCOTT BRONSTEIN

Did you say anything in response to Alex asking you or telling you not to tell anyone?

A.    I don't recall what I said.  I was just trying to write down what she said.

Q.    Did you say something during the call with Alex on the 5th along the lines of, in response to her asking you to keep it confidential or please not tell anyone, did you say -- did you say you won't lie, but you will keep it confidential if you can?

MR. LYNCH:  Objection.

A.    I don't have an exact recollection.  I do know that I have said in multiple conversations, I am sure I would have said in this one, I won't lie. It's something I routinely say.  I don't know exactly what I said to her in that regard.

Q.    Do you routinely say you will keep the conversation confidential, if you can?

Page 243

SCOTT BRONSTEIN

A.    I can't say specifically which conversations I might say that.  I don't recall if I said that in this conversation or not.

Q.    When you routinely say you won't lie, what do you mean by that?

A.    I mean I don't lie.  If someone asks me to, I tell them I won't.

MR. IADEVAIA:  I am sorry, could you read back the answer?  Can you read back the answer, Dawn?

[The requested portion of the record was read back as follows:

"Answer:  I mean I don't lie. If someone asks me to, I tell them I won't."]

Q.    When you say you don't lie, lie about what?

MR. LYNCH:  Objection.

A.    Anything.

Q.    Well, in the context of, you said you routinely say in discussions you have you won't lie.  What does that mean in that context when you're using that

Page 244

SCOTT BRONSTEIN

phrase?

A.    Just exactly the words that are stated.  I won't lie.

Q.    But you don't have a memory of Alex asking for the call to be confidential or words to that effect, and you responding you won't lie, but you will keep it confidential if you can?

A.    I don't recall specifically what I said other than what I wrote down.  It is possible I said something about I won't lie.  That would be natural for me to say.  But I don't know if I said that or not.

Q.    I assume as a reporter you get asked to keep stuff confidential on a regular basis, right, when you're talking to sources?

A.    I do.

Q.    And do you say to them in response that you won't lie, but you'll keep it confidential if you can; is something that you regularly say?

A.    I have certainly said things

Page 245

SCOTT BRONSTEIN

like that.  I can't tell you if I said

those exact precise words.

Q.    Fair enough.  Fair enough.  I

understand.  But in that context when you

say I won't lie -- I am sorry, I am not

understanding how that relates to the

question of can you keep this

confidential?

A.    You asked me if I said those

words, and I just told you that those are

words that I often say, that I say to

someone.  If someone asks me to lie, I

say I won't lie.

I believe your question to me

was along those words, along those lines.

Am I misunderstanding your question?

Q.    No, I don't know.  I am not

sure where the disconnect here is.  I

mean my understanding is the fact that

you, it's not, you think it is possible.

I know not necessarily with Alex, but

that it's possible that you have said

something to folks before in response to

the question of can you keep this

Page 246

SCOTT BRONSTEIN

confidential, and you say I won't lie, but we'll keep it confidential if we can.

I think that's what you said in your testimony, do I have that correct?

A.    I suppose I said things like that.

Q.    And I guess I am just trying to understand when you say you won't lie in response to the question of keeping it confidential, what are you referring to?

MR. LYNCH:  Objection.

Q.    What does it mean in that context when you use that phrase?

A.    If someone asks me a question, I won't lie in reply.

Q.    You then spoke to Collette Richards about your call with Alex -- and I think your testimony before was that it was either on the same day that you spoke to Alex or the next day; do I have that correct?

A.    Yes.

Q.    And you don't recall if you directly called Collette or if you sent

Page 247

SCOTT BRONSTEIN

her a text message; is that correct?

A.    Correct.

Q.    What did you tell Collette about your call with Alex?

A.    I don't recall specifically.  I know that I told her that Alex had called me and that Alex had said some very bad things about her.

I wanted her to be aware that her boss was saying these highly critical things, which surprised me.  I thought she should know.

Q.    Collette should know?

A.    Yeah.

Q.    Did you have any hesitation in reaching out to Collette and notifying here?

A.    Well, maybe some.  I mean I was asked to keep this confidential and to not tell anybody.  But upon thinking about it, I felt the right thing to do is to tell Collette that somebody had said these things.  A boss of hers.  I think anybody whose boss said something like

Page 248

SCOTT BRONSTEIN

that should be made aware.  I was surprised they were being said to me.

Q.    Do you think the reverse is true, that if a subordinate complains about a boss, that the boss should be notified?

MR. LYNCH:  Objection.

A.    I don't know.  I think all subordinates say things like that about their bosses at various times.  I would guess you do.  I would guess I have.  But it's different if a boss says it to somebody outside.  It struck me as different.

Q.    Did Alex tell you during her call with you on January 5th that the reason she was reaching out to you was that she knew you had a close relationship with Collette or words to that effect?

MR. LYNCH:  Objection.

A.    I don't recall specifically. She may have said that.

Q.    And did Alex say to you during

SCOTT BRONSTEIN

the call on January 5th that -- I lost my train of thought.  Strike that question.

Other than what you testified to, what else did you discuss with Collette when you told her about the call you had with Alex?

A.    I can't recall specifically.  I gave her some detail about what Alex had said to me, the kinds of things Alex had said, which I thought was something I should do.

Q.    Did you tell Collette that you had taken notes?

A.    I don't believe I told Collette I had taken notes.  I'm not sure.

Q.    Did you read your -- go ahead.

A.    I might have told her I took notes.

Q.    You said you might have told her?

A.    I might have.

Q.    Did you read any of your notes to Collette when you notified her of this call?

Page 250

SCOTT BRONSTEIN

A.    I don't recall.  I don't think so.

Q.    Did Collette already know at the time you talked to her, notified her of the call, that you were going to be taking notes?

MR. LYNCH:  Objection.

A.    I am sorry, ask the question again?

Q.    That's okay.  Withdrawn.

How did Collette respond when you notified her of the call with Alex?

A.    I think she was quite upset.  I think she was surprised.

Q.    What did she say to you?

A.    I don't recall specifically what she said.  I recall she was surprised and upset.

Q.    Do you recall any words she used to convey that she was either surprised or upset or both?

A.    I don't recall.

Q.    Did Collette tell you what she planned to do next after learning about

Page 251

SCOTT BRONSTEIN

this call?

A.    No, not that I recall.

Q.    Did you and Collette discuss the possibility of Collette raising -- notifying CBS about the call?

A.    No, not that I recall.

Q.    Did you and Collette discuss the possibility of Collette speaking to CBS HR about the call?

A.    No, not that I recall.  It was not a long conversation, as I recall.

Q.    The call between you and Collette was not a long conversation?

A.    No.  She was quite upset.  It was not long.

Q.    When you say not long, you mean like a couple of minutes?

A.    Yeah, as I recall.

Q.    By the time you spoke to Collette to tell her about the call with Alex, were you aware that Collette had made a complaint about Alex to HR?

A.    State the timeline again, when are you asking this?

Page 252

SCOTT BRONSTEIN

Q.    So as of the -- at the time that you spoke to Collette after speaking with Alex; okay?  So I think you said that was either on -- you had your call with Collette either on the 5th or the 6th.  At that time were you aware that Collette had made a complaint about Alex to HR?

A.    Only to the degree that Alex had told me that, and I had written it down.

Q.    Did you know that from Collette as of that time?

A.    No.  Only what Alex said to me that I wrote down is my only knowledge of it.

Q.    What was the next communication you had, whether in writing or verbally, after your call with Collette regarding the Alex call?

A.    I got a text from Renee Balducci like the next day.  I don't want to be precise.  It might have been two days.  It was shortly after my

Page 253

SCOTT BRONSTEIN

conversation with Collette.

Q.    Before you got a text from Renee, did you have a discussion with Collette about not wanting you, you yourself, to get involved in the situation?

MR. LYNCH:  Objection.

A.    I can't recall, specifically. I know I did feel awkward being in the middle of this.  So I might have said something to that effect.

Q.    Did you ask Collette not to use your name in any discussions she had with CBS about the call?

A.    I don't recall specifically, but I might have said something along those lines.  Just I felt it was awkward with me being in the middle of it.

Q.    You testified that you got a text message from Renee Balducci, either the next day, or in a couple of days, but around, shortly after your call with Collette, correct?

A.    Correct.

Page 254

SCOTT BRONSTEIN

Q.    And did you have any communications in between with Collette setting up the call with Renee?

A.    I can't recall specifically.  I don't know if I just had one call with Collette or other communications.  I can't recall specifically.

Q.    And when Renee reached out to you -- I think you said you got a text message from her; is that right?

A.    You got those from the subpoena.

Q.    Right.  And what was she asking you to do initially in the text messages, if anything?

A.    Well, you have to call up the exhibit to read what she wrote me.

Q.    Do you recall?

A.    No, I don't want to recall.  I would rather go with the text that she sent me.

Q.    Did you ultimately have a phone call with Renee?

A.    I did.

Page 255

SCOTT BRONSTEIN

Q.    How many calls did you have with Renee, was it just one or was there multiple?

A.    Just one, I believe.

Q.    And tell me what you recall about that call.

A.    Well, it started with texts. She asked me specific things in the texts, so I would refer to those initially.

Q.    Your memory is that Renee had copies of your text messages when you spoke to her?

A.    No.  You can read the texts, it explains, you will see the timeline.  She asked me for things.

Q.    She asked you for things in the text message.  What I am asking about is the phone call that you had with her. That's not in the text messages.

So my question is, what did you discuss with Renee during the call?

A.    When she reached out to me and asked me questions, I replied to her

Page 256

SCOTT BRONSTEIN

questions.  She specifically asked me about the phone call with Alex, and I answered her questions.

Q.    What did you say about the phone call with Alex to Renee?

A.    I said, essentially, the same thing that I said to Collette. Generally, the kind of conversation it was.  And then Renee asked me specifics, and I replied.

Q.    Did you read your notes to Renee during your call with her?

A.    At some point, yes, I did.  She was asking me specific questions.  And I read her the notes in reply, since she was asking me specifics.

Q.    And what questions did Ms. Balducci ask you?

A.    I can't remember specifically. She was asking me what kinds of things Alex had said to me.

Q.    Any other questions besides what kinds of things Alex had said to you?

Page 257

SCOTT BRONSTEIN

A.    No, it was all about what Alex had said to me.  And she had asked me specific questions, and I would reply to her questions.

Q.    The questions that you recall are the four questions about what Alex had said to you, correct?

A.    Correct.  To my recollection there was nothing else involved in that conversation with Renee Balducci.

Q.    Did you and Renee discuss the nature of your relationship with Collette during the call?

A.    No, not that I recall.

Q.    Did Renee ask you about your relationship with Collette during the call?

A.    She may have.  And if so, I am sure I would have replied my standard thoughts about Collette.  I don't recall exactly if that was part of the conversation.  But it certainly could have happened.

Q.    Did you discuss with Renee your

Page 258

SCOTT BRONSTEIN

relationship with Alex?

A.    Not specifically.  She may have asked how I knew Alex, and I am sure I would have replied.

Q.    And do you have any memory of how you might have answered that question?

A.    I just would have given her the history from CNN and, you know, background with Collette getting hired. But I don't recall there being any detail like that.

My recollection of the phone call was she was asking a lot of questions about Alex's call to me.  It was not a long conversation.  She just had specific questions.

Q.    And during this call did you tell Renee that you and Collette had spoken prior to the call in which Collette had made, raised concerns about Alex?

MR. LYNCH:  Objection.

A.    No, I don't recollect anything

Page 259

SCOTT BRONSTEIN

like that.

Q.    Did you tell Renee during this call that you had spoken to Collette earlier prior to your call with Alex about issues or concerns she had working at 60 Minutes?

MR. LYNCH:  Objection.

A.    No, I don't recollect anything like that.

Q.    Did you take notes of your call with Renee to discuss the call with Alex?

A.    I did not.  She was largely asking me questions.

Q.    Going back for a second to the call with Alex on January 5th, did Alex say to you that she had originally reached out to you in December to get your advice, or words to that effect?

MR. LYNCH:  Objection.

A.    I can't recall specifically.

MR. IADEVAIA:  Let's mark this.

(Bronstein Exhibit 6, Document Bates stamped Bronstein 7 through 10, was so marked for identification, as

Page 260

SCOTT BRONSTEIN

of this date.)

A.    Yeah, I see it.

MR. IADEVAIA:  Everybody else has a copy?

MR. LYNCH:  Yes.

MR. EAVES:  Yes.

Q.    I think for the record, what's been marked as Bronstein Exhibit 6 it's a multipage e-mail -- I mean, text thread that was produced by Mr. Bronstein's lawyers to my firm which my firm added the Bates stamp Bronstein 7 through 10.

Mr. Bronstein, do you recognize what's been marked as Bronstein Exhibit 6?

A.    I do.

Q.    And what is it?

A.    This is the text thread with Renee Balducci.

Q.    Okay.  Outside of the text threads that are reflected in Bronstein 6, do you have any other text communications with Renee Balducci?

A.    No.

Page 261

SCOTT BRONSTEIN

Q.    And to your knowledge, were any of the communications that you had with Renee, have they been deleted or erased?

A.    Not that I know of.

Q.    And you, obviously, just described a phone call that you had with Renee Balducci.

The phone call that you described and these text messages in Bronstein 6, are those the only communications that you had with Renee Balducci?

A.    As far as I know.

Q.    And the text messages reflected in Bronstein Exhibit 6, are those still available on your cell phone?

A.    I believe so.

Q.    And that phone we are talking about is the only phone that you have, and it's the one associated with the number 2050, correct?

A.    Correct.

Q.    So if we start at the top, the text at the top is dated January 7, 2022,

Page 262

SCOTT BRONSTEIN

which would have been two days after your call with Alex Poolos, correct?

A.    Correct.

Q.    And Renee writes "Hi Scott, this is Renee Balducci from CBS News HR. Might you have two minutes for a couple quick questions?  Collette shared your new and number."

Do you see that text?  Did I read it correctly?

A.    Yes.

Q.    Do you have any idea what Renee meant by your new?

A.    I don't know.  I assumed it meant name.  I don't know.

Q.    In response you write on the same day "Hi Renee, this is Scott.  Sure can talk today.  Maybe at 4:15?  Will be between interviews."

And then Renee writes back, "Works for me.  And thank you.  I'll ring you then.  Shouldn't take long!"

Did I read those text messages accurately?

Page 263

SCOTT BRONSTEIN

A.    Yes.

Q.    And did you talk to Renee on January 7th, to the best of your memory?

A.    Yes.

Q.    And is that the phone call that you've just testified to?

A.    Yes.

Q.    On January 8th Renee writes to you again, and says or asks "Might you be willing to send me 1-A screen shot of your recent text exchanges with Alex from 1/5?  And 2-A screen shot of her incoming call to you on Wednesday evening 1/5?"

And then Renee also writes "Her account of that day and your conversation is very different, and having a bit more info would be extremely helpful."

And you write back "Hi Renee, sure can.  Do you need it tonight?"

Did I read those text messages accurately?

A.    Yes.

Q.    And then later further down you say that you will -- and I am

Page 264

SCOTT BRONSTEIN

paraphrasing here, so you can correct me if I describe it inaccurately -- you say you will send the entire text thread starting last Friday when Alex first asked if she could talk and talk confidentially, up through when she called you on Wednesday afternoon.  You also say you will send a screen shot of the call coming in.

Did you, in fact, send Renee the text thread starting that Friday, when Alex first asked to talk to you?

A.    Yes.  It's what we provided you for the subpoena.

Q.    And did you send Renee the screen shot of Alex's call coming in?

A.    Yes, it's also what you've showed me, what was provided to you for the subpoena.

Q.    Okay.  Then you write "We have not communicated since then."

Are you saying you have not communicated with Alex since the January 5th call?

Page 265

SCOTT BRONSTEIN

A.    Correct.

Q.    And have you had any communication with Alex since that call, I mean outside of the subpoena and being here for today's deposition?

A.    Have I what?

Q.    Have you had any contact with Alex after that January 5th call?

A.    No.

Q.    And then you also write "I could also send pics of my handwritten notes from call, if useful."

You offered to send those pics, but Renee hadn't asked you for pictures of the notes, correct?

A.    In our phone conversation, she was asking me specific questions and for some of her responses I read back things from my notes.  And she expressed interest in those in the phone conversation.  So this text is referring to her interest in the phone conversation.

Q.    So your testimony is that

Page 266

SCOTT BRONSTEIN

during the call with Renee you told her that you had handwritten notes and that you were reading from them in response to some of her questions?

A.    Correct.

Q.    In the text message that you wrote to Renee, it was the same one that I have been reading from, January 8th, 2022, you wrote "But I did not tape the call."  Do you see that language?

A.    I do.

Q.    Why did you tell her that in the text?

A.    In the phone call, I believe she asked me if I had taped the call and I wanted to again reiterate that I had not.

Q.    All right.  And if you turn to the next page, the second page of Exhibit 6 Bronstein, it's Bates numbered Bronstein 8 and Bronstein 9.

Is this you forwarding the materials to Renee Balducci?

A.    It is.

Page 267

SCOTT BRONSTEIN

Q.    And just for the clarity, the only materials that you sent to her are those reflected in this text exchange; is that correct?

MR. LYNCH:  Objection.

A.    Yes, correct.

Q.    And just to be clear, that was your handwritten notes that you testified to that were marked as Bronstein Exhibit 5, that included those notes, correct?

A.    Correct.

Q.    That included the screen shot of the incoming call from Alex Poolos that we've marked as Bronstein Exhibit 4; is that right?

A.    Yes.

Q.    And that included the text exchange between you and Alex Poolos, which is encompassed by Exhibit 3, but I think the version you sent to Renee starts with the December 31st text; am I right?

A.    No.  I sent a complete text threads whenever possible, so you could

Page 268

SCOTT BRONSTEIN

see the entire thing.

Q.    Well, can you take a look really quickly at Exhibit 3 for me, please?

A.    Okay.

Q.    And if you recall, the first page is a text between you and Alex dated June 8th, 2020?

A.    Right.

Q.    Did you send the -- the text thread that you sent to Renee, did it start with this June 8th, 2020 text message?

A.    No.  She was interested only in the lead-up to the conversation.

Q.    Got it.  So you sent to Renee, starting with Exhibit 3 on page 4 of that exhibit the text Alex sent to you dated December 31st, 2021, up through the text dated January 5th, 2022?

A.    Correct.  That was the section she was interested in.  She wanted to know the timeline leading up to the phone call.

Page 269

SCOTT BRONSTEIN

Q.    So just to be clear, it's those text messages, the screen shot of the incoming call and it's the handwritten notes in Exhibit 5, those were the only materials you sent to Renee, correct?

A.    Correct.

Q.    Nothing else, right?

A.    Correct.

MR. IADEVAIA:    All right.    I probably have like 15 minutes more of questioning.    Can we take a quick break and we will be almost done?

MR. LYNCH:    Sounds good.

THE VIDEOGRAPHER:    We are going off the record.    The time is 4:17 p.m.

(Off the record.)

THE VIDEOGRAPHER:    We are going back on the record.    The time is 4:31 p.m.

BY MR. IADEVAIA:

Q.    Mr. Bronstein, during your call with Alex on January 5th, 2022, did Alex discuss any of the details of the complaint that Collette had made?

Page 270

SCOTT BRONSTEIN

A.    Not to my recollection, other than what's in the handwritten notes.

Q.    Have you -- strike that.

Did you and Collette ever have a discussion, whether in writing or orally, about her, about Collette's concerns regarding Alex?

A.    Not to my recollection.  We might have had a phone call at some point, and discussed something of what she was going through.  I mostly just tried to listen as a friend.

Q.    If you could take a look again at Exhibit 3, please, which is your text exchange with Alex.

A.    Okay.

Q.    And in looking at Bronstein page 4, the fourth page of Exhibit 3 --

A.    Okay.

Q.    -- and looking at the December 31st, 2021 text messages.

A.    Okay.

Q.    So Alex initially reaches out to you and asks if you have some time to

Page 271

SCOTT BRONSTEIN

talk.  And you said today wasn't good, you know, is it possible -- well, is it urgent, or can we talk next week or the weekend.

And then Alex writes to you, "Not at all urgent.  Thank you for writing back.  Next week is fine.  Just want to run something past you confidentially."

Do you see that text message?

A.    I do.

Q.    Did I read it accurately?

A.    Yes.

Q.    Did Alex's reference in the text message to talking to you confidentially set off your reporter antenna?

A.    Well, it sounded like it was something confidential.  I didn't know exactly what to make of it.

Q.    Did you think she was texting you to talk about Collette Richards?

A.    I was not sure.  I had not heard from her in months.

Page 272

SCOTT BRONSTEIN

Q.    You hadn't heard from whom in months?

A.    From Alex.  Aside from, you know, at the end of the year when she reached out to me.  But before that I had not heard from her since like the summer.  So this is many months.

This is all part of the same thread from December 31st to, you know, into the, leading up to the phone call.  I didn't know what she wanted to talk about.

Q.    And is it your testimony that you don't remember if you talked to Collette about the text before the phone call with Alex?

MR. LYNCH:  Objection.

A.    I don't recall if I did talk to Collette or not.  It was a very busy time right then.

Q.    I am going to represent to you that Collette testified that she had had -- during her deposition she testified that she had had multiple

Page 273

SCOTT BRONSTEIN

discussions with you about Alex in the fall of 2021. Do you dispute that testimony?

MR. LYNCH: Objection.

A. I don't dispute it. I don't remember when we talked or how often.

Q. And Collette also testified that prior to your call with Alex on January 5th, that you had notified her, Collette, that Alex had reached out to you by text. Do you have any memory of that happening?

MR. LYNCH: Objection.

A. I don't remember that, but it certainly is possible.

Q. And when you spoke to Alex on January 5th, you did not disclose to Alex that you had spoken to Collette in the fall of 2021 about Collette's concerns, correct?

MR. LYNCH: Objection.

A. I don't remember if I talked to Alex about that or not. I don't know.

Q. It's not in your notes, right?

Page 274

SCOTT BRONSTEIN

A.    My notes are mostly Alex speaking.

Q.    Do you have any memory of saying that to Alex?  Do you have any memory to saying to Alex or disclosing to Alex that you had multiple discussions with Collette regarding Collette's concerns about Alex?

A.    I don't recall.  I don't know.

Q.    And during the January 5th phone call that you had with Alex, did you tell Alex that, that you had notified Collette about Alex's texts reaching out to you?

MR. LYNCH:  Objection.

A.    I am sorry, can you rephrase the question?

Q.    Sure.

MR. IADEVAIA:  Could you repeat the question, please?

[The requested portion of the record was read back as follows:

"Question:  And during the January 5th phone call that you had

Page 275

SCOTT BRONSTEIN

with Alex, did you tell Alex that, that you had notified Collette about Alex's texts reaching out to you?"]

A.    I don't recall if I told her or not.

Q.    And that's not anywhere in your notes, right?

A.    No.  You have the notes.

Q.    And Collette testified during her deposition that she thought she had spoken to you about going to Tonya related to Alex.  Do you have any memory of that conversation with Collette?

MR. LYNCH:  Objection.

A.    No, I don't have a recollection of it.  And I don't know the conversations between Collette and Tonya at all.

Q.    Was there ever a time that you spoke to Collette about this situation, other than the short phone call you've testified to notifying her of Alex's phone call?

A.    It's possible that we had some

Page 276

SCOTT BRONSTEIN

conversations, you know, as she was struggling.  But I can't tell you when they were or what they were about.

Q.    During the January 5th phone call with Alex Poolos, how come you didn't stop Alex at some point and say I am not comfortable discussing Collette in this manner with you or words to that effect?

MR. LYNCH:  Objection.

A.    Yeah, it might have been a smart thing to do.  I don't know why I didn't.  I was mostly just busy trying to write down what she said to document what she was saying.  I was so surprised.

Q.    How come you wanted to document what Alex was saying?

A.    Because I found it surprising, disturbing.

Q.    I will represent to you that Collette also testified that she communicated with you over Signal because of the lawsuit.  Do you have any memory of those communications with Collette?

Page 277

SCOTT BRONSTEIN

MR. LYNCH:  Objection.

A.    I don't, no.  I don't believe I was ever in touch with Collette about the lawsuit.

Q.    Well, let me say it in a different way.  Did you have any communications with Collette via Signal?

A.    We used Signal sometimes on our team at CNN.  And I certainly would have had some communications with her on Signal, but I don't have any recollection of having a discussion with her about this lawsuit.

Q.    Did you communicate with Collette using Signal after she left CNN?

A.    Not that I recall.

Q.    Does Signal have both a written messaging feature as well as the ability to make phone calls?

A.    It depends how good your phone is and also what your Internet bandwidth is.  Sometimes.

Q.    Did you have any phone call with Collette using Signal after she left

Page 278

SCOTT BRONSTEIN

CNN?

    A.    Not that I recall.

    Q.    Have you discussed this matter involving Alex Poolos with anybody at 60 Minutes beyond what you've testified to already?

    A.    No.

    Q.    Have you discussed this matter involving Alex Poolos with anyone at CNN?

    A.    No.

    Q.    At some point did you learn that Alex had been placed on a paid administrative leave following the phone call that you and she had?

    A.    I learned at some point.  I don't know when it was.  I believe it was quite some time after my phone call with her.

    Q.    And how did you learn about it?

    A.    I can't recall.  I don't know who told me or when.

    Q.    Did Collette Richards tell you about the administrative leave?

    A.    I don't recall.  She may have.

Page 279

SCOTT BRONSTEIN

I don't recall.

Q.   Did you have a phone call or phone calls with Collette about Alex being placed on an administrative leave?

A.   Not that I recall.

Q.   Did you have exchange text messages with Collette Richards about Alex being placed on an administrative leave?

A.   Not that I recall.  We may have, but not that I remember.

Q.   Did anyone ever tell you the reason or reasons for Alex being placed on an administrative leave?

A.   No.

Q.   Did you ever speak with Bill Owens about Alex being placed on an administrative leave?

A.   No.

Q.   Renee Balducci?

A.   No.

Q.   Tonya Simon?

A.   No.

Q.   At some point did you learn

Page 280

SCOTT BRONSTEIN

that Alex had been fired from CBS News?

A.    I mean at some point I heard that, I learned of that.  I don't know exactly when.  It was some time later.

Q.    Was it likely around the time that Alex was, in fact, fired from CBS News?

MR. LYNCH:  Objection.

A.    I don't know.  Honestly, I can't remember when I learned it.

Q.    How did you learn of it?

A.    I don't know.

Q.    Did Collette Richards tell you?

A.    She might have, but I don't remember if that's how I learned it or not.

Q.    Did you have any text messages exchange with Collette Richards about Alex being fired?

A.    Not that I know of.

Q.    Did you have a phone call or phone calls with Collette Richards about Alex being fired?

A.    Not that I know of.  We might

Page 281

SCOTT BRONSTEIN

have had one phone call at some point, but I can't remember when or what was discussed.

Q.   Do you remember anything about discussing Alex's firing with Collette at any point in time?

A.   No, not really.

Q.   Did anyone ever tell you the reason or reasons for Alex being fired from CBS News?

A.   No.

Q.   Do you know whether your lawyer has been in touch with CBS's lawyer or lawyers?

A.   I don't know.  Not to my knowledge.

Q.   Have you ever spoken to CBS's lawyer or any lawyer for CBS or lawyers for CBS?

A.   No.

MR. IADEVAIA:  I think I'm done, but let me just double check.  We just need one minute off the record, please.

Page 282

SCOTT BRONSTEIN

THE VIDEOGRAPHER:  I'll take us off.  We are going off the record.  The time is 4:46 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We are going back on the record.  The time is 4:48 p.m.

BY MR. IADEVAIA:

Q.    Mr. Bronstein, just one more question which is, did you ever disclose to Renee Balducci that you had conversations with Collette Richards in the fall of 2021 regarding Alex Poolos?

MR. LYNCH:  Objection.

A.    I don't recall.  I answered her questions, but I don't remember that coming up.

Q.    And did you disclose to Renee Balducci that you had notified Collette about texts from Alex before you spoke to Alex on the phone?

MR. LYNCH:  Objection.

A.    I don't recall if that came up or not.

Page 283

SCOTT BRONSTEIN

MR. IADEVAIA:  Okay.  I am done for now, reserving any rights based on questions that Michael may ask you.

MR. LYNCH:  Okay.  I promise this won't take long.  I only have a small handful of questions.

EXAMINATION BY MR. LYNCH:

Q.    So it's nice to meet you, Mr. Bronstein.  My name is Michael Lynch. I am an attorney at Davis Wright Tremaine and we represent the defendants in this case, Paramount Global, CBS Broadcasting, Inc. and CBS News, Inc.

So I want to draw your attention back to what has been previously marked as Bronstein Exhibit 5.

A.    Okay.

Q.    And I know we covered these handwritten notes before, but do these notes accurately reflect statements that Alexandra Poolos made to you during the January 5th phone call?

MR. IADEVAIA:  Objection.

You can answer.

Page 284

SCOTT BRONSTEIN

A.    Yes.

Q.    And I am going to cover a couple statements that were not covered previously.

If you turn to Bronstein 12, which is the second page --

A.    Okay.

Q.    -- and about halfway down, a little bit further than halfway down the page it says "I am really disappointed with her."

Did Alex Poolos say that she was really disappointed at Collette during the phone call?

A.    Yes.

Q.    Did Alexander Poolos say "It's total nightmare"?

A.    Yes, I believe I left a word "a" out of that.  I believe she said "It's a total nightmare," but I was writing very fast.

Q.    Did Ms. Poolos say "I have zero trust in her"?

A.    Yes.

Page 285

SCOTT BRONSTEIN

Q.     Did Ms. Poolos say, "I have zero trust in her word"?

A.     Yes.

Q.     During the January 5th phone call, did you have any understanding why Ms. Poolos was saying "I have zero trust in her word"?

A.     I did not.

Q.     Okay.  And if we turn to the next page, which is Bronstein 13, it says in the middle of the page "But she went to HR" did I read that correctly?

A.     Yes.

Q.     And then after that it says "That has made it much worse between us."

Did I read that correctly?

A.     Yes.

Q.     Is that a statement that Ms. Poolos said to you on that January 5th phone call?

A.     It is.

Q.     Did you find that alarming?

A.     I did.  I found it disturbing. I found it alarming.  And I found it very

Page 286

SCOTT BRONSTEIN

strange.

Q.    And in this phone call, Ms. Poolos also disparages Ms. Richards' work performance; is that right?

MR. IADEVAIA:  Objection.

A.    She does.

Q.    Did Ms. Poolos disparage Ms. Richards' work performance during this phone call?

MR. IADEVAIA:  Objection.  You can answer.

A.    Yes, she did.

Q.    And did Ms. Poolos inform you that Ms. Richards had made a complaint to HR about Ms. Poolos?

A.    Yes, she did.  It's in the notes.

Q.    I know you're not a lawyer, but did you find these comments to be retaliatory?

MR. IADEVAIA:  Objection.

A.    I don't know.  I found much of this conversation to be inappropriate and it felt wrong that someone would be

Page 287

SCOTT BRONSTEIN

saying that to me.  The whole conversation seemed strange and alarming and wrong to me.

Q.    Were you worried that Ms. Poolos may try to harm Ms. Richards' professional career?

MR. IADEVAIA:  Objection.  You can answer.

A.    Yes.

Q.    And you testified previously that you thought very highly of Ms. Richards' job performance; is that right?

A.    That is correct.

Q.    And did your colleagues at CNN also think very highly of Ms. Richards' job performance?

A.    Yes, very much.  She was very widely appreciated.

Q.    Is it possible that Ms. Richards could one day return to CNN?

MR. IADEVAIA:  Objection.  You can answer.

A.    A lot of people do come back to CNN or at least try to after going to the

Page 288

SCOTT BRONSTEIN

networks.  So yes.

Q.    Would she have been welcomed back by your team at CNN?

MR. IADEVAIA:  Objection.  You can answer.

A.    Yes, I believe so.

Q.    Are you aware that Ms. Richards got a divorce?

A.    I did learn that eventually.

Q.    I draw your attention back to Bronstein Exhibit 1.

A.    Okay.

Q.    And starting at the text that you sent to Ms. Richards on Wednesday, December 27th at 1 p.m., halfway through that text you write "But I have no doubt that you will get through the dark times."

Were you aware that Ms. Richards had just gone through a divorce at that time?

A.    I had heard that.  I did not know the details.

Q.    Were you aware that she had

Page 289

SCOTT BRONSTEIN

filed for divorce previously in the month of December 2021?

MR. IADEVAIA: Objection. You can answer.

A. I did not know the exact specifics of filing or anything like that. I was aware that she was in the process of a divorce and it was very painful.

Q. So when you write in this text "But I have no doubt that you will get through the dark times," are you referring to Ms. Richards' divorce?

A. I believe I was referring to what she was experiencing in New York at large: Difficulties at the job, difficulties in the city and difficulties with her marriage.

Q. And you testified earlier that you left CNN in 2001 for personal reasons -- I am sorry, strike that.

You testified earlier that you left 60 Minutes in 2001 for personal reasons; is that right?

Page 290

SCOTT BRONSTEIN

MR. IADEVAIA:  Objection.

A.    That's correct.  It was a multitude of factors.  As things like that often are.

Q.    Did you leave New York?

A.    We did.  My wife was pregnant and we were very interested in not raising a child in New York and we wanted to move somewhere else.  It was a big part of our decision.

Q.    Did 9/11 play any impact in that decision?

A.    It did not.  We were already -- I had already landed in Washington at that point when 9/11 hit.  But it was -- I had not been in D.C. very long when that happened.

MR. LYNCH:  I don't think I have any further questions.

MR. IADEVAIA:  Okay.  Just a couple of follow-up, Mr. Bronstein.

EXAMINATION BY MR. IADEVAIA:

Q.    At the time that you spoke to Ms. Poolos, were you considering rehiring

Page 291

SCOTT BRONSTEIN

Ms. Richards to CNN?

A.    No.

Q.    And as of right now, you don't work for CNN anymore, correct?

A.    That's correct.

Q.    You mentioned that there was multiple factors as to why you left 60 Minutes; is that correct?

A.    That's correct.

Q.    You talked about personal reasons just now with Mr. Lynch, correct?

A.    Correct.

Q.    And part of the personal reasons that you identify is that you didn't want to raise a child in New York; is that right?

A.    That's correct.

Q.    At that time, when you left 60 Minutes, did they have a Washington D.C. bureau?

A.    They did, but there were not openings there.

Q.    Did you look into openings there?

Page 292

SCOTT BRONSTEIN

A.    Sure.

Q.    And were there 60 Minutes producers when you left -- at the time you left 60 Minutes, were there producers at 60 Minutes who did work from D.C. for teams that were in New York?

A.    There is some of that.

Q.    Did you have discussions with anybody at 60 Minutes about working from D.C. as a floating producer?

A.    I had conversations with everyone I could talk to when it became clear it was not going to work out.  We just ultimately decided to move forward with other things.

Q.    And when you say that it was not going to work out, meaning not going to work out that you were going to be a producer for Mike Wallace or something else?

A.    Well, it was just not clear. And I needed to move ahead with our life. We had a son coming.

Q.    And did anyone at 60 Minutes

Page 293

SCOTT BRONSTEIN

tell you that they were not going to renew your contract when it was up?

A.    There was discussion about the contract, though it was a confusing time in terms of not knowing if the contract would be extended or not.  It was a window in the contract, which makes it unusual.

Q.    There is a window in the contract that allows CBS to terminate the contract early, correct?

A.    Correct.

Q.    And that was the discussion that was going on, is whether CBS was going to terminate the contract early during that window?

A.    Correct.

Q.    Just one more question.  On Exhibit 5, which is your notes -- if you can just pull those up?

On that first page of Exhibit 5, the note is "'Please don't tell anyone,'" and it's in quotes.  And then in quotes, the next note is "'Could look

SCOTT BRONSTEIN

bad.'"

Do you see those notes?

A.    Yes.

Q.    And I think your testimony earlier today was your reporter antenna went up when Alex said those comments; is that correct?  Do I have that accurately?

A.    Yes.

Q.    And it was at that point in time that you decided to start taking notes; is that correct?

A.    Yes.

Q.    So was it the case that you were then behind in taking notes because you didn't have the notepad ready to go when she made those comments, so then you grabbed them and you write down those two notes but that's after she had said them, correct?

MR. LYNCH:  Objection.

A.    It's correct.  I did the best I could to move quickly and start writing.

MR. IADEVAIA:  All right.  No additional questions by me.

Page 295

SCOTT BRONSTEIN

THE VIDEOGRAPHER:  I'll take us off if there is nothing further for the record.  We are going off the record at 5:03 p.m., and this concludes today's testimony given by Scott Bronstein.  The total number of media used was seven and will be retained by Veritext Legal Solutions.

(Whereupon, at 5:03 p.m., the deposition was concluded.)

Page 296

ALEXANDRA POOLOS vs.

PARAMOUNT GLOBAL, et al.

3/13/2025 - SCOTT BRONSTEIN

ACKNOWLEDGEMENT OF DEPONENT

I, SCOTT BRONSTEIN, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____     _____

SCOTT BRONSTEIN                      Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____, 20____.

_____

NOTARY PUBLIC

Page 297

I N D E X

WITNESS                 EXAMINATION BY           PAGE

SCOTT BRONSTEIN         Mr. Iadevaia               6

                       Mr. Lynch                 284

E X H I B I T S

Exhibit No.         Description                Page

Exhibit 1    Document Bates stamped 0000006     114

Exhibit 2    Document Bates stamped CBS 7775    160

             through 88

Exhibit 3    Document bearing Bates stamp       171

             Bronstein 1

Exhibit 4    Document Bates stamped Bronstein   195

             18

Exhibit 5    Document Bates stamped Bronstein   201

             11 through 17

Exhibit 6    Document Bates stamped Bronstein 7 259

             through 10

Page 298

CERTIFICATION

I, DAWN MATERA, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of March, 2025.

_____

DAWN MATERA

*       *       *

Page 299

ALEXANDRA POOLOS vs.

PARAMOUNT GLOBAL, et al.

3/13/2025 - SCOTT BRONSTEIN

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____    _____

SCOTT BRONSTEIN                 Date

**[& - 2025]**                                                                      Page 1

**&**

**&** 2:3 4:21

**0**

**0000006** 115:2 116:20 297:10
**08896** 1:4

**1**

**1** 114:25 115:6 116:11,14 117:2 118:24 122:6,14 171:24 189:13 189:22 190:8 190:13 218:6 218:10,15,23 263:11 288:12 288:16 297:10 297:14
**1/5** 213:12 263:13,14
**10** 21:6 67:5,8 68:25 69:3 99:25 259:24 260:13 297:20
**10006** 2:5
**10020** 2:17
**101** 2:12
**11** 201:20 202:6 213:11 216:19 297:18
**111** 2:4

**114** 297:10
**11th** 175:21
**12** 22:4 27:19 216:17 217:9 284:6
**1251** 2:17
**12:31** 129:24
**12th** 177:7 181:6
**13** 1:13 222:8 223:24 285:11
**13th** 3:4
**14** 223:19
**14th** 181:14
**15** 226:13 269:11
**1505** 2:5
**15th** 178:13,15 178:24
**16** 228:2,2 240:20
**160** 297:11
**16th** 178:20
**17** 199:21,25 201:20 202:6 211:23,25 212:4,9 229:14 297:18
**171** 297:13
**17th** 298:18
**18** 195:5 196:3 297:16
**195** 297:15

**1980** 14:14
**1998** 37:11 43:7
**1999** 37:11 43:8
**1:23** 1:4

**2**

**2** 160:2,21,25 178:12,13 218:12 220:12 263:13 297:11
**20** 9:10,11,13 9:14 18:17,17 68:18,22 296:17
**2000** 36:20
**2001** 29:17 36:19 289:21 289:24
**2004** 18:20 19:3,5 20:19 29:17
**201** 297:17
**2020** 70:10 120:11,18 137:4 138:2 173:16,23,25 175:12,16 178:13,21 179:9,13 180:24 181:6 181:14 193:5 193:17 194:7

268:9,13
**2021** 161:17,22 163:22 181:16 182:25 183:4,5 183:14,15,23 184:18 185:21 187:22,24 188:23 191:3 268:20 270:22 273:3,20 282:14 289:3
**2022** 74:5 92:21 121:4,21 137:4 165:19 185:17,22,25 186:6,20 187:6 187:11,16,25 188:10,15,20 188:23 191:6 197:25 198:10 200:10 207:10 221:13 261:25 266:10 268:21 269:23
**2023** 12:15 117:14 189:21 189:24 190:4,8
**2024** 17:22,24 18:11,20 21:18 22:11 117:14 117:23 194:8
**2025** 1:13 3:4 298:18

**[2050 - 60]**                                        Page 2

**2050**  67:24
  68:23 69:6,24
  70:18 79:14
  80:5,11 118:20
  173:10 261:22
**212**  200:4
**23**  3:21 117:17
**24**  191:24
**25**  140:7
  143:11 169:13
**259**  297:19
**27**  118:9,12
**27th**  119:6
  122:2,14
  127:24 179:13
  288:16
**284**  297:4
**2:36**  192:15
**2nd**  180:24

**3**

**3**  171:22,23
  172:16 173:13
  178:12 179:23
  183:12 184:9
  185:11 189:8
  195:14 267:20
  268:4,18
  270:15,19
  297:13
**3/13/2025**
  296:2 299:2
**30**  178:22

**31st**  182:25
  183:5,15,23
  184:17 185:21
  187:21 198:18
  267:22 268:20
  270:22 272:10
**360**  131:9
  133:20,22
**39201**  2:13
**3:02**  205:3
**3rd**  181:16
  182:21 183:4
  183:14

**4**

**4**  195:4,15,17
  195:24 196:8
  199:17,22
  211:25 233:23
  267:15 268:18
  270:19 297:15
**40**  208:24
**4:15**  262:19
**4:17**  269:16
**4:46**  282:4
**4th**  185:17,22
  185:25 186:6
  186:16

**5**

**5**  201:18,19
  202:3,11 204:9
  205:12,18
  209:5 213:11
  217:10 241:22

267:11 269:5
  283:17 293:20
  293:23 297:17
**50**  100:4
**5777**  298:20
**5:03**  295:5,11
**5:42**  199:18
**5th**  164:15
  165:19 186:20
  187:6,11,16,24
  188:10,15,19
  194:20 197:24
  198:10,19,22
  200:9 202:18
  207:24 209:7
  221:13 237:19
  238:14,20
  239:17 240:11
  242:9 248:17
  249:2 252:6
  259:16 264:25
  265:9 268:21
  269:23 273:10
  273:18 274:11
  274:25 276:5
  283:23 285:5
  285:20

**6**

**6**  27:18 116:13
  116:16 240:5,5
  259:23 260:9
  260:16,23
  261:11,16

266:21 297:4
  297:19
**60**  10:24 36:9
  36:11,13,15,22
  37:13 38:7,16
  39:19 40:11,22
  41:4,17 42:5
  45:7 46:18
  47:7 49:5,14
  49:16,18,21
  50:4,8,11,12,16
  50:21,24 52:19
  54:13 55:20,24
  56:6,22,25
  57:17,19,20,22
  58:12,21 59:5
  59:9,13 60:9
  60:20 61:4,24
  62:12,14,20,23
  63:4,13,19
  64:9,14,25
  65:9,18 66:8
  71:17 72:7
  74:24 76:17
  77:3 78:9 79:4
  81:19 83:14,16
  83:21 88:9
  106:2 123:18
  123:20 124:9
  124:14 125:2,4
  125:9,24
  134:17 135:4
  135:12,19
  136:8,14,22

**[60 - adult]**

137:24 138:6 138:12,15,21 138:25 139:17 139:21,23 140:6 141:9 143:4 147:15 147:16 148:10 148:16 149:17 150:2,14,25 151:9,12 152:5 152:11,22 153:3,8,20,24 156:9,21 164:21 177:2 178:8 179:5,20 181:3 183:18 235:2 238:7,14 238:22 259:7 278:5 289:24 291:8,19 292:3 292:5,6,10,25

**646** 200:4

**6th** 252:7

**7**

**7** 118:11 259:24 260:13 261:25 297:19

**70** 26:20

**7775** 160:3,23 297:11

**7th** 117:8 189:23,24 190:3,4 263:4

**8**

**8** 68:25 266:22
**80** 14:13
**83** 15:6
**88** 160:3,23 297:12
**8896** 3:21
**8th** 173:16,23 173:25 175:12 175:16 263:9 266:9 268:9,13

**9**

**9** 266:22
**9/11** 35:14 290:12,16
**94** 36:19

**a**

**a.m.** 1:14 3:4 57:10,14 178:18
**abc** 32:4,6,16 32:19,21 33:3 33:7,18,21,25 34:6,10 35:19 36:8 62:8
**abilities** 17:17
**ability** 8:5 277:19
**able** 60:15,17 82:13 86:14 115:21 138:18 209:17,18

**above** 1:18
**ac** 132:9 133:22
**accept** 27:12 28:8,25
**accepted** 28:7
**access** 94:5,9 114:23 160:14 160:17 172:5
**accessible** 189:12
**account** 80:20 81:2,5,6,17,18 81:23,24 82:11 84:17,20 85:6 85:8,9,11,13,17 85:20,24 86:3 86:6 87:6,10 88:17,18,22 90:3 91:19 94:5 190:15,20 263:16
**accounts** 81:25 82:5,11,18 84:8,10,11 94:5,9
**accuracy** 41:15
**accurate** 217:13 220:7 221:10 229:20
**accurately** 8:6 8:10 174:19 177:17 229:24 262:25 263:22 271:13 283:21

294:8
**achieving** 141:10
**acknowledge...** 296:3
**action** 1:18 4:8 5:8 298:14
**actual** 67:3 193:16 206:10
**actually** 216:17
**add** 45:10 211:19
**added** 196:2 260:12
**adding** 108:8
**addition** 43:19 98:25
**additional** 44:2 44:3 294:25
**additions** 296:6
**adjusting** 153:3 153:3
**administer** 4:7
**administrative** 74:24 278:14 278:24 279:5,9 279:15,19
**admissible** 170:9
**adore** 149:11
**adored** 149:16 149:21,24
**adult** 63:11,12

**[advantageous - alex]**                                           Page 4

**advantageous** 144:15 149:7
**advantages** 146:16
**adventures** 122:20
**advice** 259:19
**advised** 146:20
**affairs** 26:17
**affect** 8:5 226:23
**affected** 27:7 27:20
**affecting** 227:15 234:4
**affects** 116:24
**affiliations** 4:14
**affirmatively** 146:6
**afternoon** 130:2 175:8 178:18 187:7 188:6 264:8
**ago** 48:24 60:7 77:2,5 85:15 89:6 90:24 97:2,4 126:2 130:13 140:7 179:10 228:14 240:9
**agree** 3:13
**agreed** 233:5

**ahead** 115:12 140:9 168:18 249:17 292:23
**air** 19:12 30:14 32:19 38:18 39:16 45:9,25 53:19,24 54:5 100:7 109:3 132:4,6,17 176:9
**aired** 25:15,20 40:15,19 53:5 132:8
**airing** 175:25
**al** 3:19 296:1 299:1
**alarming** 285:23,25 287:3
**alex** 69:7 71:21 72:5,18 73:21 74:18,23 77:7 77:16 78:15,18 78:21 79:6 82:2,6 83:25 85:17,24 86:3 86:18,22 87:19 87:22 89:8,11 92:20 94:14 120:10,25 124:4,20,23 125:17 126:12 126:17 130:12 130:17,23

131:8 133:25 135:11,14,25 136:7,13,17 139:13 142:3 143:15,22 144:10,13,25 144:25 145:3,8 145:9,13,17,20 146:3,6,12,18 147:4,5,9,10,15 148:2,20,21,24 149:20 151:13 151:20 152:2,5 152:12,16 154:4 155:13 155:18,22 157:2,7,10,13 157:14,18,20 158:5,10,15,21 158:23 159:2,8 159:13,15,20 161:7,15 162:2 162:16,19,25 163:10,10,14 163:21,24 164:3,4,13,19 164:24 165:5 165:14,18 166:7 167:8,17 168:2 169:2,15 170:17,23 171:5,8,12,19 172:21 173:19 173:24 174:5

174:16,21 175:10,13,22 176:3,5,13,18 176:21 177:8 177:25 178:2,6 178:9,14,17,21 178:23 179:8 179:13,20 180:13,21 181:7,17 182:7 182:7,16,20 183:6 184:5,10 184:19,21 185:13 186:3,7 186:11,18,21 187:2,13,18 188:7,15,20 193:5,17 194:20,22 196:12 197:15 197:19,20,24 198:11,17 199:5 200:4,9 200:15 202:17 202:21 203:2,8 203:17,19,25 207:24 208:7 208:14,21 209:6,11,12 210:18 211:5 211:17,20,21 213:12,23 214:13,23 215:5,19 216:4

**[alex - ap]**                                                                 Page 5

| | | | |
|---|---|---|---|
| 216:11 217:6 | 262:3 263:12 | **allow** 91:14 | **answered** |
| 218:19 219:23 | 264:5,13,24 | **allows** 293:11 | 256:4 258:7 |
| 220:6,12,17 | 265:4,9 267:14 | **amanpour** | 282:16 |
| 221:8,14,23 | 267:19 268:8 | 37:22 39:10 | **answers** 7:2,5 |
| 222:3,18 224:3 | 268:19 269:23 | **amazing** | 7:11 38:11 |
| 225:4 226:16 | 269:23 270:8 | 122:20 177:15 | **antenna** 167:16 |
| 227:4,19 229:3 | 270:16,24 | 177:20 180:6 | 203:4 271:18 |
| 229:7,17 | 271:6 272:4,17 | 180:16 181:21 | 294:6 |
| 230:20 231:4,7 | 273:2,9,11,17 | **americas** 2:17 | **anybody** 5:18 |
| 231:21 232:9 | 273:19,24 | **amiss** 203:5,13 | 9:23 28:2 |
| 232:17,23,25 | 274:2,5,6,7,9 | **amount** 91:21 | 104:24 105:7 |
| 233:11,11 | 274:12,13 | **anderson** 131:9 | 137:16 143:6 |
| 234:8,14,18,25 | 275:2,2,13 | 133:20 | 143:17 203:13 |
| 235:6,13,16,22 | 276:6,7,18 | **annotated** | 207:3 211:12 |
| 236:6,11,21 | 278:5,10,13 | 42:11 | 247:21,25 |
| 237:2,6,6,14,16 | 279:4,9,14,18 | **annotation** | 278:5 292:10 |
| 237:17,23 | 280:2,7,20,24 | 41:24 | **anymore** 52:9 |
| 238:6,14,19 | 281:10 282:14 | **announcement** | 52:18 120:19 |
| 239:3,16 | 282:21,22 | 181:2 | 291:5 |
| 240:11 241:2,9 | 284:13 294:7 | **anonymity** | **anyway** 138:18 |
| 241:9,13 242:3 | **alex's** 78:24 | 91:6 | **ap** 38:2,7,16 |
| 242:9 244:6 | 90:20 145:15 | **anonymous** | 39:5,19 40:10 |
| 245:22 246:18 | 146:8 174:7 | 91:4 | 40:13,22 41:4 |
| 246:21 247:5,7 | 183:22 189:7 | **answer** 6:25 | 41:10,18 42:4 |
| 247:8 248:16 | 258:16 264:17 | 10:5 51:20 | 42:12,15 44:6 |
| 248:25 249:7,9 | 271:15 274:14 | 82:24 94:22 | 44:20,21 45:13 |
| 249:10 250:13 | 275:4,23 281:6 | 142:4 146:24 | 45:16,21 60:4 |
| 251:22,23 | **alexander** | 146:25 150:7,9 | 60:6 98:2,4,13 |
| 252:4,8,10,15 | 284:17 | 158:7 170:3,6 | 101:23 103:4 |
| 252:21 256:3,6 | **alexandra** 1:6 | 191:9 208:17 | 107:22,25 |
| 256:22,24 | 2:23 3:17 4:22 | 243:11,12,15 | 108:13,16,21 |
| 257:2,7 258:2 | 4:24 283:22 | 283:25 286:12 | 139:5,7 140:21 |
| 258:4,23 259:5 | 296:1 299:1 | 287:9,23 288:6 | 141:25 |
| 259:12,16,16 | | 289:5 | |

**[apologize - aware]**

**apologize** 217:14

**appear** 205:17

**appearance** 4:12

**appearances** 2:2 4:14

**appeared** 25:12 133:19

**appears** 217:10

**appended** 296:8

**application** 88:14

**applied** 140:20

**applying** 105:25 140:18 149:17

**appreciated** 287:19

**approximately** 9:8 14:10 17:20 18:16,19 19:2 21:3,10 24:7 29:16 31:7 36:15,18 37:6 87:9 88:21 89:5 97:2 130:20 136:24 192:25 207:6

**april** 21:18 22:11

**aps** 31:10,14,15 44:6,10,22 58:23 59:3 143:5

**area** 169:10 207:14

**arriving** 22:23

**arthur** 2:14

**arts** 14:6,7

**ascertain** 138:18

**aside** 272:4

**asked** 42:9 47:3 56:21 95:10 113:18 127:8 135:20 136:3 137:5,17 189:15 206:8 244:17 245:10 247:20 255:9 255:17,18,25 256:2,10 257:3 258:4 264:6,13 265:15 266:16

**asking** 28:19 86:10,11 100:13 101:5 101:20 126:6 133:6 142:19 158:18 176:17 181:7 194:16 198:14 241:12 242:3,10 244:6 251:25 254:14

255:19 256:15 256:17,21 258:15 259:14 265:18

**asks** 176:13 178:14 243:9 243:16 245:13 246:15 263:10 270:25

**assigned** 32:20 43:11 45:3 61:6,16 65:13 81:8 116:8

**associate** 24:5 24:10 31:3 35:20,25 36:23 37:14 41:21 97:23,25 100:17

**associated** 67:19 68:5,21 69:20 80:23 118:19 173:9 190:16 261:21

**assume** 117:12 117:13 128:17 137:13 172:7 190:3 222:5 244:16

**assumed** 262:15

**assuming** 145:24

**assumption** 128:15

**atlanta** 64:3,4 109:19 110:11

**attached** 205:18,21

**attempt** 53:18

**attend** 13:16 14:16 15:10

**attention** 177:6 283:16 288:11

**attorney** 4:16 95:6 283:11

**attorneys** 2:4 2:12,16 94:23

**audio** 3:11 167:25 168:5 168:11,19

**authority** 45:16

**authorizations** 168:22

**authorized** 4:6

**auto** 92:15 95:11,17,18

**available** 61:11 159:24 261:17

**avenue** 2:17

**award** 26:22,23 89:17,22

**awards** 25:24 26:3,14,23,24

**aware** 11:5,9 77:22,25 78:2 104:19,23

123:19,20
138:11 143:8,9
148:14 154:2,6
157:12 163:22
164:2,9 178:4
184:18,20
186:2 187:14
187:16,19
188:24 247:10
248:2 251:22
252:7 288:8,20
288:25 289:8

**awesome**
174:16

**awkward**
253:10,18

**b**

**b** 5:9 130:4
297:7

**b.a.** 14:4,6

**bachelor** 14:6,7

**back** 18:2
31:19 57:13
68:25 70:10
82:23 95:9
102:18 117:21
120:10,18
121:20 127:23
130:8 142:17
145:21 166:3
174:11,16
175:24 176:3
178:17,19

184:10,21,23
185:7,14
186:11 188:7
192:18 193:15
194:12 200:24
204:12 205:6
206:21 207:10
233:18 234:13
236:13,18
243:11,12,14
259:15 262:21
263:19 265:19
269:19 271:8
274:23 282:7
283:16 287:24
288:4,11

**background**
13:15 41:2,7
258:11

**backup** 93:25
190:23 194:12

**backups** 194:8

**bad** 136:8
175:8 191:7
214:21 216:10
216:21 217:17
218:5 227:14
234:4 241:14
241:17,20
247:8 294:2

**badly** 136:18
241:20

**bagley** 2:9 4:19

**bail** 177:12,22
178:4

**balducci** 13:8
75:14,18,22
76:6,11 84:5
88:7 121:4,16
121:20 165:9
165:10,15
196:20,22
199:14 200:23
201:3,7 207:9
252:23 253:21
256:19 257:11
260:20,24
261:8,13 262:6
266:24 279:21
282:12,20

**bandwidth**
277:22

**barry** 38:5,13
39:6 42:19

**base** 174:9

**based** 37:18
91:25 93:11
283:3

**basically**
169:22

**basis** 101:21
103:17 244:18

**bates** 115:2
116:8,12,12
160:3,22
171:24 178:12
179:23 195:5

196:2 201:20
202:5 259:24
260:13 266:21
297:10,11,13
297:15,17,19

**bearing** 171:24
202:5 297:13

**becoming**
96:11

**began** 95:24

**beginning** 4:15
100:23 101:3
128:25 129:8
153:8 203:2
226:8

**beginnings**
175:3

**behalf** 4:21 5:3
141:24

**believe** 17:4
20:14 21:17
24:2,8 28:6,9
29:4 30:8 44:3
50:20 58:17
59:14 60:12,16
60:24 62:16
63:6,12 64:12
65:15 67:5
76:14 78:16,19
79:20 96:6,8
97:23 98:8
106:4 109:4,6
112:21 115:25
118:4 121:9

**[believe - bronstein]** Page 8

125:11 139:4 143:23,25 146:15 161:23 162:12 164:15 169:3 171:2 175:17 179:6 182:9 188:18 190:9 191:4,24 196:23 199:10 203:11 214:17 216:9 219:18 223:19 227:23 232:13 233:23 239:25 240:4 245:15 249:15 255:5 261:18 266:15 277:3 278:17 284:19 284:20 288:7 289:15

**believed** 103:3 146:12 212:18

**benefit** 16:24

**best** 7:10,18 113:12 140:14 145:6 190:6 209:8 224:21 226:3 227:8 228:19 231:13 234:22 263:4 294:22

**better** 143:14 144:10 190:25 191:8

**beyond** 6:14 79:12,14 102:13 106:11 114:5 118:23 127:21 144:20 166:10,16 188:21 190:12 201:6 207:20 207:23 212:10 227:10 229:11 278:6

**big** 123:25 124:17 177:5 239:17 290:10

**bigger** 138:21

**bill** 13:4 62:11 76:21 83:7 88:5 201:13 279:17

**birthday** 119:5

**bit** 79:4 176:7 192:22 263:17 284:10

**bizarre** 231:25

**black** 21:24 28:6 29:3 105:18

**blame** 226:14 226:19

**blood** 298:14

**blow** 229:23 230:7

**bob** 53:14 54:11,12

**bond** 177:12,22 178:4

**bonin** 78:21 79:6 139:12,18 139:24 140:12 140:21 141:2,6 141:14 142:2 142:11,13,20 142:22,24 143:4,16,22 144:5 146:21 149:2

**booked** 132:14

**booker** 131:2 132:14

**bookers** 131:6 131:13

**boss** 47:5 247:11,24,25 248:6,6,13

**bosses** 248:11

**bothered** 232:25

**bottom** 116:10 116:17 233:23 240:20

**boundaries** 155:14

**brandon** 2:8 4:20

**break** 7:22,25 57:6 117:20 118:5 129:16 129:21 192:12

192:21 198:9 204:12,23 205:10 269:13

**breaks** 7:22 217:15,25

**bridal** 153:24 154:4

**briefly** 84:25 175:20 178:16

**bring** 19:11,12 19:12 38:18 39:15 45:9,25 100:23 101:2 117:21 132:16 132:23

**broadcasting** 1:9 283:13

**broadly** 127:3

**broadway** 2:4

**bronstein** 1:17 3:17 5:1,4,14 5:18,25 6:1,17 7:1 8:1,12 9:1 10:1 11:1 12:1 13:1,14 14:1 15:1,13 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1

| | | | |
|---|---|---|---|
| 41:1 42:1 43:1 | 122:1 123:1 | 185:1,11 186:1 | 243:1 244:1 |
| 44:1 45:1 46:1 | 124:1 125:1 | 187:1 188:1 | 245:1 246:1 |
| 47:1 48:1 49:1 | 126:1 127:1 | 189:1,8 190:1 | 247:1 248:1 |
| 50:1 51:1 52:1 | 128:1 129:1 | 191:1 192:1,21 | 249:1 250:1 |
| 53:1 54:1 55:1 | 130:1,11 131:1 | 193:1 194:1 | 251:1 252:1 |
| 56:1 57:1,16 | 132:1 133:1 | 195:1,4,5,9,23 | 253:1 254:1 |
| 58:1 59:1 60:1 | 134:1 135:1 | 196:1,3,4 | 255:1 256:1 |
| 61:1 62:1 63:1 | 136:1 137:1 | 197:1 198:1 | 257:1 258:1 |
| 64:1 65:1 66:1 | 138:1 139:1 | 199:1,17,22 | 259:1,23,24 |
| 66:19 67:1 | 140:1 141:1 | 200:1 201:1,18 | 260:1,9,13,14 |
| 68:1 69:1 70:1 | 142:1 143:1 | 201:19,20,25 | 260:15,22 |
| 71:1 72:1 73:1 | 144:1 145:1 | 202:1,2,6,6,8 | 261:1,11,16 |
| 74:1 75:1 76:1 | 146:1 147:1 | 203:1 204:1 | 262:1 263:1 |
| 77:1 78:1 79:1 | 148:1 149:1 | 205:1,9 206:1 | 264:1 265:1 |
| 80:1 81:1 82:1 | 150:1 151:1 | 207:1 208:1 | 266:1,21,22,22 |
| 83:1 84:1 85:1 | 152:1 153:1 | 209:1 210:1 | 267:1,10,15 |
| 86:1 87:1 88:1 | 154:1 155:1 | 211:1,24 212:1 | 268:1 269:1,22 |
| 89:1 90:1 91:1 | 156:1 157:1 | 213:1,11 214:1 | 270:1,18 271:1 |
| 92:1 93:1 94:1 | 158:1 159:1 | 215:1 216:1,17 | 272:1 273:1 |
| 95:1 96:1 97:1 | 160:1,2,7,24 | 216:18 217:1,9 | 274:1 275:1 |
| 98:1 99:1 | 161:1,8 162:1 | 218:1 219:1 | 276:1 277:1 |
| 100:1 101:1 | 163:1 164:1 | 220:1 221:1 | 278:1 279:1 |
| 102:1 103:1 | 165:1 166:1 | 222:1,8 223:1 | 280:1 281:1 |
| 104:1 105:1 | 167:1 168:1 | 223:19,24 | 282:1,10 283:1 |
| 106:1 107:1 | 169:1 170:1 | 224:1 225:1 | 283:10,17 |
| 108:1 109:1 | 171:1,22,22,23 | 226:1,13 227:1 | 284:1,6 285:1 |
| 110:1 111:1 | 171:24 172:1 | 228:1,2 229:1 | 285:11 286:1 |
| 112:1 113:1 | 172:16 173:1 | 229:14 230:1 | 287:1 288:1,12 |
| 114:1,25 115:1 | 174:1 175:1 | 231:1 232:1 | 289:1 290:1,22 |
| 115:2,6,16 | 176:1 177:1 | 233:1 234:1 | 291:1 292:1 |
| 116:1,2,9,11,13 | 178:1,12,13 | 235:1 236:1 | 293:1 294:1 |
| 116:14 117:1 | 179:1,23 180:1 | 237:1 238:1 | 295:1,7 296:2 |
| 118:1 119:1 | 181:1 182:1 | 239:1 240:1,19 | 296:4,13 297:4 |
| 120:1 121:1 | 183:1 184:1 | 241:1 242:1 | 297:14,15,17 |

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

297:19 299:2
299:24
**bronstein's**
195:25 260:11
**brought** 11:25
30:13 32:18
**bug** 176:4
**building**
144:17
**bunch** 23:20
34:3 144:15
156:13 205:25
**bureau** 291:21
**burnette** 30:4
30:23
**business** 15:16
15:22,24 17:5
17:20,21 18:3
**busy** 184:13
198:24 272:20
276:14
**buyout** 27:11
27:12 28:3,13
28:25
**bwhite** 2:8

**c**

**c** 5:9 130:4
**call** 9:17,19
41:19 74:4
76:23,25 77:6
77:20,24 78:3
92:20 97:25
102:13 113:2

116:12 125:11
125:15,23
126:13 135:9
142:17 146:2
157:11,18
158:23,25
159:6,12,20
162:5,16,20
163:3,4,9,16
164:12,18,24
165:4,13 166:6
166:14 167:21
167:25 168:2
169:2,15,15
170:17,18
171:4,7,12,15
171:17 175:13
179:8 188:20
189:8 194:19
194:22 196:12
196:17 197:8
197:14,18,19
197:23 199:18
199:25 200:8
200:15,16
202:17,21,24
207:23 208:14
208:20 209:7
209:13 210:12
211:3,3,23,24
212:8 214:23
215:6 216:4,12
221:13 222:19
229:4 230:4,5

231:6,17,22,24
232:3,6,11,16
232:22,25
233:6,7,10
234:8 235:2,17
235:23 236:6
236:11,20,25
237:5,14,18,25
238:5,13,20
239:2,16
240:11 241:8
242:9 244:6
246:18 247:5
248:17 249:2,6
249:25 250:6
250:13 251:2,6
251:10,13,21
252:5,20,21
253:15,23
254:4,6,17,24
255:7,20,23
256:3,6,13
257:14,18
258:15,16,19
258:21 259:4,5
259:11,12,16
261:7,9 262:3
263:6,14
264:10,17,25
265:4,9,13
266:2,11,15,16
267:14 268:25
269:4,22
270:10 272:11

272:17 273:9
274:12,25
275:22,24
276:6 277:24
278:15,18
279:3 280:22
281:2 283:23
284:15 285:6
285:21 286:3
286:10
**called** 60:13
88:14 145:21
198:3,5 232:8
232:10 246:25
247:7 264:8
**calls** 69:14
113:6 135:5
142:17 147:14
148:3 178:17
183:9 196:25
197:5 203:21
203:25 255:2
277:20 279:4
280:23
**camera** 3:8
**capacity** 35:24
**capture** 226:21
231:13 234:23
**captured**
212:24
**car** 193:14
**care** 26:17
**career** 287:7

**[case - clear]** Page 11

**case** 1:4 3:21 12:7 70:2,10 76:7 92:24 93:10 94:14,19 114:7 116:24 120:14 178:4 194:6 283:13 294:14

**catch** 217:4 223:15 226:3

**catching** 115:17

**caught** 223:14 227:23

**cause** 91:15

**cbs** 1:9,9 16:3,9 18:5,8 36:9,10 60:21 62:16 74:19 157:2,7 158:11,22 159:15 160:3 160:22 161:6 161:10,13 186:4 187:18 207:3 251:6,10 253:15 262:6 280:2,7 281:11 281:19,20 283:13,14 293:11,15 297:11

**cbs's** 281:14,18

**cell** 66:20,23,23 67:20,22 68:17

68:20,21 69:5 69:20 70:20 71:15,19 75:13 80:2,14,15 93:16 95:12 114:4 118:15 170:20 173:13 181:19 197:10 197:15,25 198:3 261:17

**certain** 212:23

**certainly** 106:14 136:11 145:5 147:13 148:5 149:23 209:15 237:10 244:25 257:23 273:16 277:10

**certification** 298:2

**certified** 1:20

**certify** 298:6,12

**cetera** 181:20

**chain** 188:22

**chance** 189:17

**change** 29:23 36:25 37:4 45:13,20 46:11 57:23 119:17 120:6 299:4,7 299:10,13,16 299:19

**changed** 23:19 46:4 58:16

68:14 80:4,7

**changes** 6:11 23:21 27:18 296:7

**changing** 50:25 51:9,11 52:3,6 73:15 80:18 119:11 121:24 193:23

**channel** 30:15

**channels** 30:16

**character** 240:14

**characterize** 34:24 58:8

**charge** 20:3,3

**charming** 47:24 48:12

**chat** 183:25

**check** 20:25 82:18 90:2,7 117:19,19 118:6,10,11 164:17 188:17 189:16 190:19 281:23

**checked** 190:10 191:11

**checking** 40:14 41:10,18 108:16

**chelsea** 2:22 3:25

**child** 123:5 290:9 291:16

**choices** 209:19

**choose** 235:24

**chris** 33:20 34:23

**christiane** 37:22 39:10

**christina** 39:9

**christmas** 111:2 122:16

**cities** 109:16

**city** 61:3 62:4 109:22 124:11 124:11,16,17 289:18

**claim** 11:24

**claims** 11:17,25

**clarity** 267:2

**clark** 2:3 4:21

**claudia** 13:10 63:14 66:9 78:8,11,13

**cleaning** 120:3 121:24

**clear** 8:20 12:24 23:21 78:5 79:10 86:9 113:23 127:9 134:3 150:23 154:15 163:8 169:18 173:23 189:4 267:8 269:2

**[clear - collette]**

292:14,22
**client** 16:3,9,17
  16:23 17:2
  18:7
**clients** 15:25
  16:5 17:11,15
  18:4
**close** 213:8
  216:2 225:9
  248:19
**cloud** 194:13
**cnn** 18:14,16
  18:22 19:8,16
  19:21 21:14
  22:6 23:3
  25:15,20 27:3
  27:5 29:7
  31:22 36:5
  66:7 79:11,15
  79:21 80:7,9
  80:10,13 81:7
  81:8,11,17,23
  89:2 95:25
  97:7,18 98:5
  100:8,12 101:4
  103:17 104:20
  106:6,18 107:2
  107:5,19,22
  108:17,21
  109:13 110:6
  111:12,20,23
  112:24 113:5
  114:13,19
  130:14,17,18

130:21,23
131:15 133:25
134:6,12,19,24
135:6,11
136:22 137:6
138:23 145:4
148:6,15
149:14,19
150:21 177:23
181:3,10
182:17 191:21
192:5 235:12
237:12 238:6
258:10 277:10
277:16 278:2
278:10 287:15
287:21,25
288:4 289:21
291:2,5
**cnn's** 25:8
**cnn.com** 25:12
**cnn.com.** 25:10
**coffee** 110:8
**colleague** 102:5
  104:8,14,17,21
  105:11,19
  181:9
**colleague's**
  112:2,6,10
**colleagues**
  55:14,16
  235:12 237:12
  287:15

**college** 13:16
  13:19,20,23
**collegial** 41:20
  45:17 46:9
  102:3 103:16
  104:10
**collegiality**
  49:10
**collegially**
  31:17
**collette** 11:3,9
  13:12 69:17
  70:24 72:6,16
  72:17 73:5,19
  74:2,22 78:24
  79:8 81:18,25
  82:7 85:20
  86:7,25 87:25
  89:14,16 90:13
  92:9,16 95:22
  105:10,18
  106:2,5,9,25
  111:7 114:9,16
  117:6 119:4,5
  119:22 120:2
  120:20 121:22
  122:11,15
  123:7 126:18
  127:13,23
  129:7 135:2,11
  136:21 137:5
  140:18,20,24
  141:13,25
  142:11,23

143:14,20
144:4,13,18
145:7,18 146:7
146:11,13,20
147:5,10,15,16
148:9,14,20,22
148:25 149:10
149:12,14,16
149:21,24,25
150:13 151:12
151:19 152:4
152:11,15,21
153:13,18,22
154:3,7 155:7
155:12,15,17
155:21 156:18
156:25 157:6
157:12,17,19
157:19,25
158:2,3,9,14,19
158:20 159:3,6
159:14,18
161:10 162:24
163:10,14,23
164:3,10,19,23
164:24 165:6
165:14 167:20
167:24 171:14
171:14 175:6
176:7,20,24
177:9 178:2,7
178:8 179:4,19
180:12,21
181:2,3,21

**[collette - communications]**

183:17 184:18 185:20 186:2 187:12,17 188:2 189:6,14 190:12 194:21 197:5 199:5 201:10 203:22 204:5 211:13 211:17 225:15 226:9,10 227:15 230:23 231:7 232:5,12 232:16,22 233:3,6,12,25 234:4,10,13,15 234:19 235:7 235:18,24 236:7,13,22 237:3,7,12,25 239:13,18 240:12 241:3 246:17,25 247:4,14,17,23 248:20 249:6 249:13,15,24 250:4,12,24 251:4,5,8,9,14 251:21,22 252:3,6,8,13,20 253:2,5,13,24 254:3,7 256:8 257:13,17,21 258:11,20,22 259:4 262:8

269:25 270:5 271:23 272:16 272:20,23 273:8,11,19 274:8,14 275:3 275:10,14,18 275:21 276:8 276:22,25 277:4,8,16,25 278:23 279:4,8 280:14,19,23 281:6 282:13 282:20 284:14

**collette's** 73:20 79:4 124:23 141:24 148:5 149:12 153:8 154:25 175:2 182:2 211:10 217:18,21 218:3,15,24 220:22 239:4 239:12 270:7 273:20 274:8

**columbia** 14:21 14:23 15:11,11 26:22

**combination** 27:9

**come** 31:19 44:23 78:25 95:9 119:9 132:10 153:15 175:2 198:21

204:12 209:3 216:23 224:19 236:18 276:6 276:17 287:24

**comes** 5:22

**comfortable** 276:8

**coming** 96:19 160:8 264:10 264:17 282:18 292:24

**commend** 180:3

**comment** 101:8 227:5,10

**comments** 220:17 286:20 294:7,17

**common** 51:21 88:24 224:11

**communicate** 69:7,11 70:23 71:3,16 72:4 75:13 81:18,25 82:6 83:7,10 83:13,17,25 84:5,25 85:17 85:20,24 86:3 86:6,18,22,25 87:14,19,22,25 88:5,11 89:8 89:11,14,21 90:15 92:19 150:4 161:15

277:15

**communicated** 66:9 76:16,18 76:20 78:7,10 78:13 83:20 111:19 112:25 113:4,9,13,19 173:24 174:4 264:22,24 276:23

**communicating** 91:2

**communication** 8:22 17:16 66:12 69:12 86:12 90:13,18 90:19,25 163:15 167:20 167:24 185:19 252:18 265:4

**communicati...** 15:19 16:13 69:22 70:4,8 70:13 71:20 76:10 77:14 81:10 82:12 86:11 90:4,8 92:3,9,16 95:6 111:16 120:24 140:12 142:21 151:11 162:23 188:21 254:3,7 260:24 261:3 261:12 276:25

**[communications - contrast]**

277:8,11
**company** 60:17
80:22
**comparative**
14:9
**complains**
248:5
**complaint** 12:8
12:10,11,14
156:8,10,14
157:2,7,13,20
158:4,10,15,21
159:14,19
161:4,6,7,9,13
163:23 184:19
186:3 187:13
251:23 252:8
269:25 286:15
**complete** 15:2
15:5 267:24
296:9
**complicated**
38:22 40:2
48:2,4 61:19
**complication**
155:3,5
**comprises**
24:15
**computer** 6:8
**comrades**
55:14,15
**concern** 154:17
158:15,20
159:15 204:18

**concerns** 72:17
73:20 141:13
148:21 153:23
154:8 155:13
155:18,21
159:7 258:22
259:6 270:8
273:21 274:9
**concluded**
295:12
**concludes**
295:6
**conduct** 41:2
50:14,20 82:10
92:25 93:15
**conducted** 3:6
3:24
**confer** 204:10
204:15
**confidential**
242:11,14,24
244:7,9,17,23
245:9 246:2,3
246:11 247:20
271:20
**confidentially**
184:25 264:7
271:10,17
**confirm** 117:22
**confused** 233:2
**confusing**
293:5
**confusion**
142:15

**connecting**
240:3
**connection** 3:8
40:18 51:8
60:22 72:6
79:7 94:14,18
111:17 132:19
132:25 148:9
153:23 155:9
197:2
**consciously**
73:13
**consider** 50:15
114:9,12,15
142:18
**consideration**
135:12 139:9
**considered**
28:23 66:11
135:4
**considering**
135:18 138:6
138:14,25
139:3 143:3
290:25
**constantly**
133:21
**constitutes**
50:20
**construed**
234:5
**consultant**
15:17,18,22

**consulting** 17:5
17:20 18:3
**contact** 69:16
141:23 150:3
200:5 265:8
**contacted**
78:23 142:3
145:21 165:9
165:10
**contain** 207:22
**contd** 130:10
**contentious**
35:2,5 46:16
46:19
**contents** 8:21
**context** 243:22
243:25 245:5
246:14
**continue** 3:12
51:13 61:5
236:21
**continued**
20:10 52:22
**continuing**
224:22
**contract** 59:10
59:16,21 60:10
60:11,15,21
293:3,5,6,8,11
293:12,16
**contracts** 59:12
60:2,3
**contrast** 211:11

**[conversation - correspondent]**

**conversation**
92:6 136:6,10
141:17 143:20
143:23,25
144:7,23
151:23 152:25
153:15 158:19
159:10 167:7,9
167:13,19,23
179:3 183:16
187:5 208:7
212:5 215:11
228:23 229:4,9
231:14 234:23
236:16 239:9
240:21 241:3
242:24 243:5
251:12,14
253:2 256:9
257:11,23
258:17 263:16
265:17,22,24
268:16 275:14
286:24 287:3
**conversations**
12:25 105:16
150:13,17,20
150:24 151:16
151:19 152:3
152:19,21
153:7 164:9
183:16 203:16
203:17 204:4
242:18 243:3

275:18 276:2
282:13 292:12
**convey**   250:21
**cooper**   131:9
133:20
**copies**   255:13
**copy**   116:4
202:14 260:5
**corner**   116:10
**corporate**
17:11,14
**correct**   9:21,22
11:21,22 17:6
31:24 33:19
34:18,21 38:14
42:24,25 52:2
52:6,7 58:3,4
61:14,17,18
64:6 66:3
70:11 74:14,15
76:3,4 78:6
80:6,12 83:5,5
93:6,12,13
96:18,23
101:10,14
113:15 120:12
120:15 121:4,5
121:12,13
122:6,7 130:18
134:12,13
136:22,23
137:14 140:16
148:10,16
162:15 165:12

166:24 167:3,4
169:6 173:4,5
173:11,18
174:6 178:9,10
179:9 180:22
181:4,5,11
182:22 185:17
186:18,19,22
186:23 187:2,4
189:24,25
190:5 193:16
193:18 197:10
198:2,7,19,20
199:22,23
200:6,10
202:21,22
207:11 208:9
211:18,25
212:2 214:18
217:8,11 218:9
218:20,21,25
219:2,9,24
220:2,3,8
221:4,5,6,24,25
222:14,19,20
222:24,25
223:2,4,5
224:4,5,15
231:4 232:6,7
246:5,22 247:2
247:3 253:24
253:25 257:8,9
261:22,23
262:3,4 264:2

265:2,16 266:6
267:5,7,11,12
268:22 269:6,7
269:9 273:21
287:14 290:3
291:5,6,9,10,12
291:13,18
293:12,13,18
294:8,12,20,22
296:9
**corrections**
296:6
**correctly**
122:25 128:9
129:4 176:11
180:9 181:24
184:15 185:2
185:11 186:14
187:8 188:12
205:19 213:18
214:10 221:20
227:2,17 228:6
228:15,24
230:17,24
262:11 285:13
285:17
**corresponden...**
82:19
**correspondent**
33:24 37:20
42:17 46:6,10
52:25 61:7,17
64:9,18 65:8
65:11,23 105:5

**[correspondent - def]**                                                    Page 16

108:12
**correspondents**
  37:21 52:23
  53:5,7,13
**couch** 169:3
**counsel** 4:13
  8:16 10:19
  12:25 129:20
  204:16,19
**count** 61:11
**couple** 5:15
  12:13,17
  147:19,24
  161:25 165:23
  181:13 224:7
  226:7 251:18
  253:22 262:7
  284:4 290:22
**course** 26:20
  73:14 105:16
  164:16 186:12
**court** 1:2 3:20
  4:4 7:2,12
**cover** 18:19
  26:9 38:24
  284:3
**covered** 283:19
  284:4
**create** 93:22,25
  168:10
**created** 32:17
**creating** 100:21
**critical** 239:14
  247:11

**croft** 64:12
**cross** 223:12
**crossed** 223:7,9
  223:16
**current** 20:10
  67:7,20,22
  120:8 121:6
  193:6,21
**currently** 15:14
  15:15 16:9
  27:5 66:19,24
  84:12,14 87:6
  88:16 199:9
**curt** 21:24 22:9
  99:5 105:8
**cuts** 27:18
**cv** 1:4 3:21

**d**

**d** 297:1
**d.c.** 62:10,17
  109:20 110:10
  169:9,11
  290:17 291:20
  292:6,11
**daily** 174:13
**dana** 122:23
  123:3,8
**dark** 122:19
  124:7,8,14
  125:4,10
  127:19 288:18
  289:13

**dash** 226:12
**date** 12:18
  95:23 115:4
  118:9 160:5
  164:13 172:2
  184:17 186:20
  195:7 201:22
  260:2 296:13
  299:24
**dated** 122:2
  173:15,23
  182:25 185:17
  261:25 268:8
  268:19,21
**dates** 137:2
**david** 33:5 99:8
  99:16
**davis** 2:16 5:6
  283:11
**dawn** 1:19 4:4
  243:12 298:4
  298:22
**day** 6:21 7:8,21
  85:2 175:14
  182:21 185:9
  186:9 187:2
  198:12,16
  232:14,14
  246:20,21
  252:23 253:22
  262:18 263:16
  287:21 296:17
  298:18

**days** 175:22
  181:13 198:14
  252:25 253:22
  262:2
**deadline**
  174:13
**deadlines** 177:4
**deal** 239:18
**december**
  117:8,13 118:9
  118:11,12
  119:6 122:2,14
  127:24 161:22
  163:22 182:25
  183:5,15,23
  184:17 185:21
  187:21 189:23
  189:24 190:3,3
  259:18 267:22
  268:20 270:21
  272:10 288:16
  289:3
**decide** 35:17
  232:21
**decided** 52:16
  60:25 239:18
  292:15 294:11
**decision** 52:11
  61:18,21 180:4
  290:11,13
**declare** 296:4
**deemed** 296:7
**def** 128:24

**defendants** 1:10 2:16 5:7 283:12

**defer** 60:18

**definition** 107:20

**degree** 13:22 14:2 15:7 59:8 252:10

**delays** 26:17

**delete** 73:11,14 91:15,21 92:15 94:13,17 95:2 95:12,17,18 119:16

**deleted** 73:12 76:11,14 92:10 119:13 261:4

**deleting** 75:9 119:21

**demand** 46:23 46:25 48:11

**demanded** 48:14

**denver** 13:21 13:24,25 14:3 14:12,17

**departing** 61:2

**department** 26:12,18

**departure** 51:10 56:6

**depend** 92:4

**depends** 3:7 46:7 277:21

**deponent** 5:3 296:3

**deposition** 1:16 3:5,16,23 6:9 6:18 8:14,17 9:3 10:3,9,21 10:24 11:3,10 11:13 71:8 75:24 77:20 83:2 265:6 272:24 275:11 295:12

**depositions** 11:6

**depth** 19:13

**deputy** 58:12 58:15

**describe** 34:24 49:5,6,13 55:19,23 56:3 56:5 264:3

**described** 56:22 211:17 239:11 261:7 261:10

**describing** 220:21

**description** 127:2 239:12 297:9

**descriptive** 211:10

**desk** 207:14

**detail** 249:9 258:12

**details** 179:2 269:24 288:24

**determine** 41:14

**determining** 168:21

**device** 67:3,6 67:12 68:8,13 80:8,8,9 93:16 121:7 170:17 193:16,21 194:2,3 240:3

**devices** 92:14 95:16

**devine** 21:24 22:9 23:2

**dicarlo** 20:4 105:5

**differed** 59:16

**different** 54:21 82:17 96:17 109:16 117:24 131:6 170:3 238:7 239:19 248:13,15 263:17 277:7

**differently** 104:9 168:9

**difficult** 123:23 125:13,13

**difficulties** 164:11 289:17 289:18,18

**difficulty** 153:5

**digital** 24:13,24 25:7 99:6

**digits** 67:19,21

**diligent** 103:6

**dinner** 110:12 111:4

**direct** 19:25 46:5 48:17 98:19,22

**directed** 48:23 94:13

**directly** 38:9,12 39:12 98:14 99:20 139:19 232:9 246:25

**director** 20:11 20:17

**disappear** 91:15,21 92:10

**disappointed** 284:11,14

**disclose** 8:21 273:18 282:11 282:19

**disclosing** 274:6

**disconnect** 245:19

**discrimination** 50:21

**discuss** 11:12 12:22 69:21 74:3 75:4 126:12 129:21 165:13 194:21 249:5 251:4,8 255:23 257:12 257:25 259:12 269:24

**discussed** 10:23 11:2 13:3 54:6 133:17 148:2 158:20 212:13 270:11 278:4,9 281:4

**discussing** 16:22,23,25 118:16 198:9 276:8 281:6

**discussion** 135:25 153:14 156:15,17,24 159:3,5 168:6 168:11 169:25 171:18 175:4 189:5 206:23 207:2 210:4,8 222:6 236:23 253:4 270:6 277:13 293:4 293:14

**discussions** 10:18 61:8 75:8 105:9,17

105:24 148:19 151:4 158:13 159:13 187:17 187:25 243:23 253:14 273:2 274:7 292:9

**disparage** 286:8

**disparages** 286:4

**dispute** 273:3,6

**dissuade** 146:20

**district** 1:2,3 3:20,20

**disturbing** 276:20 285:24

**diverted** 177:6

**divorce** 288:9 288:21 289:2,9 289:14

**document** 39:21 114:25 115:13,20,23 116:10,23 159:23 160:2 160:14,22 171:23 172:12 195:2,4,24 196:5 201:19 202:5 209:17 209:18,20,21 240:23 259:23 276:15,17

297:10,11,13 297:15,17,19

**documentaries** 29:21 30:12,14 30:19

**documentary** 19:19 21:9

**documentation** 40:8

**documents** 6:4 6:13 10:2,4,6,8 10:11,16 39:2 40:6,7 93:9 100:21

**doing** 17:18,18 103:8 108:2,2 108:3 119:25 133:15 168:19 214:4 239:5,13

**don** 57:21 59:5

**doss** 33:5,6

**doss's** 33:10

**double** 20:24 164:16 281:23

**doubt** 122:19 124:7 149:4 199:24 288:17 289:12

**dozen** 31:2,8

**dozens** 103:12 103:12 104:2

**drafting** 161:9

**draw** 283:15 288:11

**drew** 105:5

**drew's** 112:3

**drinks** 110:3,15

**drive** 156:19 192:2,5,7

**drop** 195:20

**duly** 5:10 298:8

**dupont** 26:22

**duties** 41:3

**duty** 102:14

**dwt.com** 2:19

**e**

**e** 5:9 8:19 80:19 81:5,9,16,21,22 81:23,24 82:5 82:11,18 83:6 83:9,12,17,24 84:4 94:5 130:4 192:6 260:10 297:1,7 299:3,3,3

**earlier** 79:18 88:25 118:16 138:2 148:8 172:23 184:5 192:24 202:20 232:5 259:5 289:20,23 294:6

**early** 92:20 97:17 126:2,5 188:23 207:10 293:12,16

**[easier - examination]**

easier  6:23
easiest  101:8
easy  26:25
eat  129:17
eaves  2:11,14
  4:25,25 5:2
  9:20 94:21
  95:5 115:21
  116:3 146:25
  160:18 169:21
  172:10 195:14
  195:18 204:20
  204:24 260:7
edit  19:12
editor  20:14,15
  21:8 24:11
  30:9
eek  176:3
effect  136:9,15
  146:14,22
  147:6 154:5
  235:4,8,19
  236:2,9,23
  237:8 238:2,8
  238:16,23
  239:21 244:7
  248:21 253:12
  259:19 276:10
effort  45:17
effusive  101:17
eight  21:5 68:4
  69:3 152:8,10
  153:12

either  13:23
  32:23 77:15
  110:23 133:22
  139:11 204:12
  215:9 228:17
  246:20 250:21
  252:5,6 253:21
elaborate  12:4
electronic
  192:2
elevated  42:23
  43:3
eliminated
  27:10 34:8,10
emmy  26:13,23
employed
  15:14,15 18:10
  18:13
employee  97:14
employees
  49:22 50:2,3
  50:11,12
employment
  19:24 30:2
  33:3 51:13
  52:19 71:22
  153:8
encompassed
  267:20
encourage
  237:16 241:19
encrypts  91:12
ended  52:19
  69:6 231:6,17

ends  68:23
  79:13,14
  118:19,20
english  14:9
enrolled  14:23
entail  41:11
entire  19:20
  20:18 24:13
  34:2,12 64:12
  140:2 205:24
  264:4 268:2
entirely  213:2
entities  16:5
environment
  49:7 238:6,15
  238:22
erased  261:4
errata  296:8
especially  89:3
  180:3
esq  2:6,8,9,14
  2:18
essentially
  40:23 61:2
  101:20 131:21
  131:25 132:21
  133:12 256:7
et  3:18 181:20
  296:1 299:1
europe  38:8
  87:12 88:23,24
evaluation
  106:25

evaluations
  106:19
evening  32:24
  263:14
event  111:3
eventually
  22:23 288:10
everybody  57:7
  115:17 125:7
  129:18 149:8
  159:24 160:16
  195:11 260:4
exact  95:23
  97:3 99:22
  137:2 138:3
  219:13 242:16
  245:3 289:6
exactly  12:19
  22:5 23:19
  28:16 48:25
  62:18 97:5,9
  98:9 116:22
  124:9 126:3
  129:9 139:14
  140:22 162:9
  165:7 167:17
  182:14 219:23
  224:3 227:18
  237:9 241:21
  242:21 244:3
  257:22 271:21
  280:5
examination
  5:13 130:10

**[examination - fairly]**

283:8 290:23 297:3

**examined** 5:11 130:5

**examining** 41:14

**example** 42:16 104:3

**examples** 16:20 26:2 38:23 40:3 100:25 102:10,16,23 103:5,10,22 104:12 126:9

**except** 79:7

**exceptional** 102:21,23

**exchange** 73:4 73:18,25 74:16 74:22 76:5 77:9 115:6 118:22 135:13 151:7 152:14 165:17 189:14 267:4,19 270:16 279:7 280:19

**exchanged** 75:2 75:9 134:9,21 198:7 231:11

**exchanges** 180:25 263:12

**exchanging** 74:9 140:5

**exciting** 180:3

**excuse** 19:18 169:21

**executive** 20:11 20:11,14,16,17 21:8 24:11,11 30:8 33:12,13 57:17,25 59:6 105:4

**exhibit** 114:22 114:23,25 115:6 116:11 116:14 117:2 118:24 122:6 122:14 159:25 160:2,21,25 171:22,23 172:16 173:13 178:12 183:12 184:9 189:13 189:22 190:8 190:13 195:4 195:14,17,24 196:7 201:19 202:3,11 204:9 205:12,18 209:5 211:24 213:11 217:10 241:22 254:18 259:23 260:9 260:15 261:16 266:20 267:10 267:15,20 268:4,18,19

269:5 270:15 270:19 283:17 288:12 293:20 293:22 297:9 297:10,11,13 297:15,17,19

**experience** 36:5 46:21 55:20,24 56:4,18,22,24 101:22 124:4 124:23 125:9 125:24 136:4,8 136:14 145:3 150:5,14,25 151:9,16 152:22 153:20 194:6 210:17 211:6,8,15,16 235:11,11

**experienced** 154:14 211:12 238:21

**experiencing** 289:16

**expired** 60:11

**explain** 41:13 51:8 153:18 216:5,11 226:18 227:4

**explained** 146:15

**explaining** 216:13

**explains** 255:16

**explanation** 121:18 170:15

**explanatory** 41:12 210:23

**express** 148:21 164:19,24

**expressed** 210:24 220:20 237:17 265:20

**expressing** 210:15 211:3

**extended** 293:7

**extent** 191:10

**external** 191:25

**extremely** 263:18

**f**

**facebook** 66:10 84:13 85:6 86:18,21,24

**facing** 86:12

**fact** 40:14 41:10,18 108:16 157:6 186:21 245:20 264:11 280:7

**factors** 290:4 291:8

**fair** 245:4,4

**fairly** 40:2 97:17 190:17

**[fall - found]**                                                                     Page 21

| | | | |
|---|---|---|---|
| **fall** 273:3,20 282:14 | **filing** 12:6 157:20 289:7 | 97:22 116:25 130:12 133:22 | **folder** 207:16 207:18,20 |
| **family** 122:16 186:9 198:24 | **finally** 198:15 | 138:10 140:23 152:8,10 | **folks** 132:14 133:14 172:4 245:24 |
| **far** 54:8 261:14 | **financially** 4:9 | 153:11 173:22 | **follow** 290:22 |
| **fashion** 151:25 | **find** 19:10 27:2 38:17,21 45:8 | 174:3 186:24 187:22 198:11 | **followed** 27:24 |
| **fast** 209:16 212:16 284:22 | 166:3 239:24 240:19,22 | 213:10 214:7 215:9 216:2,19 | **following** 278:14 |
| **father** 63:2 | 285:23 286:20 | 219:10,12,19 222:13 223:14 | **follows** 5:12 130:6 243:14 274:23 |
| **feature** 277:19 | **finding** 46:2 100:19 | 223:23 224:25 227:16 241:22 | |
| **fed** 32:24 | **finds** 183:24 | 241:23 264:5 264:13 268:7 | **footage** 40:11 107:12,17 |
| **feed** 6:9,14 | **fine** 7:25 28:24 39:17 140:10 | 293:22 | **foregoing** 296:5 |
| **feedback** 47:21 47:23,25 141:24 142:12 142:22 144:19 | 145:3 184:23 271:8 | **fit** 146:12 | **form** 71:2 77:15 90:19 113:24,25 169:23 |
| **feeder** 32:24 | **finish** 7:9,10 30:14 32:18 177:14 | **fitz** 105:6 **fitzpatrick** 99:8 99:17 | |
| **feel** 7:23 128:4 149:11 212:23 241:14 253:10 | **finished** 134:5 | **five** 37:8 57:6 85:10 97:10 147:20 151:3 179:10 | **formal** 106:19 **formally** 60:24 **forms** 69:11 |
| **feeling** 237:11 241:17 | **fired** 74:19 125:18 152:5 152:13 280:2,7 280:20,24 281:10 | | **forth** 166:3 200:25 298:8 |
| **feelings** 54:15 54:17,21 | | **fleshed** 221:18 222:4 | **forward** 193:24 235:25 292:15 |
| **fellow** 105:6 | **firing** 281:6 | **floater** 65:12 | **forwarding** 266:23 |
| **felt** 56:9 241:19 247:22 253:18 286:25 | **firm** 2:11 4:5 4:20 5:2 10:12 76:3 121:12 173:3 260:12 260:12 | **floating** 61:5 61:12 292:11 | **found** 198:15 276:19 285:24 285:25,25 286:23 |
| **female** 146:17 | | **floyd** 26:13 | |
| **fifth** 185:10 | | **focus** 135:10 | |
| **file** 207:15,17 | | **focusing** 98:12 149:9 | |
| **filed** 3:19 12:12 12:15,20 112:22 289:2 | **first** 5:10 12:10 18:25 79:19 95:21 96:4,6 | | |

**four** 37:9 43:23 43:24,25,25 67:19,21 120:19 121:21 222:13 257:7
**fourth** 270:19
**fourths** 52:21
**frame** 150:11
**france** 37:18
**frankly** 156:10 168:14 231:23
**free** 7:23 178:21
**frequent** 51:19 51:21
**frequently** 51:2 194:12
**fresh** 128:25 129:8
**friday** 264:5,12
**friend** 114:10 114:12 181:8 270:13
**front** 6:2,5,12 161:24 203:6
**full** 17:3 97:14 98:6 122:21 230:11
**fully** 39:22
**function** 95:12 95:18
**funeral** 112:2,4 112:7,11,19,22

**further** 224:6 263:24 284:10 290:20 295:3 298:12
**fyi** 177:9

**g**

**gallagher** 44:15 45:2
**gamut** 17:3
**garbled** 230:10
**gathering** 133:14
**gears** 13:14
**gender** 50:21
**general** 119:24 120:3 151:15
**generally** 19:7 31:13 32:15 39:17 45:5 90:24 126:16 127:15 129:10 135:24 156:3 157:23 162:10 208:8 256:9
**generate** 19:10 39:3 45:8
**generated** 32:17
**generation** 224:11,14
**generational** 224:8,10

**generic** 126:25
**genuine** 180:11
**geographic** 29:11,13,19 30:3,7,12,15,17 30:20 31:5,11 31:14,21,23 32:3 36:2 62:7
**george** 26:12
**georgia** 156:20
**gestures** 7:5
**getting** 7:13 68:7 142:12 176:8 179:19 190:25 226:15 258:11
**ghw** 1:4 3:21
**gilchrist** 2:22 4:2
**give** 7:5 16:19 20:25 26:2 38:23 40:3 47:20 93:19 94:4,8 99:3 100:25 102:9 102:15,22 103:5,10 115:9 115:22 126:9 144:18 193:2
**given** 90:20 94:16 258:9 295:6 296:10 298:10

**gives** 170:7
**giving** 155:22
**glad** 54:22,25 55:6 181:20
**glasses** 116:24
**global** 1:9 3:18 283:13 296:1 299:1
**gmail** 80:24 81:2,17,23 82:22
**go** 3:13 6:21,21 13:18 14:19 26:25 34:16 38:20 51:12 70:10 102:13 110:3,18,20 120:10,18 121:20 140:9 168:18 170:11 181:3 182:2 193:15 210:20 211:22 216:16 223:18 224:16 225:2 228:13 240:7 249:17 254:21 294:16
**goal** 47:12
**goes** 68:24
**going** 3:3 6:21 6:24 7:12 18:2 26:8 27:4 35:17 40:24 45:9 51:15

**[going - hard]**

57:5,8,12
94:21 103:21
111:15 114:22
114:23 116:22
117:18 127:2
129:16,23
130:7 131:21
139:6,15
147:18 159:22
160:12,20
161:3 172:13
176:25 187:23
192:14,17
194:25 205:2,5
206:21 208:10
212:25 218:24
229:11 236:19
241:15,20
250:6 259:15
269:15,18
270:12 272:22
275:12 282:3,6
284:3 287:25
292:14,18,18
292:19 293:2
293:15,16
295:4
**good** 3:2 4:17
5:5,14 31:22
34:25 42:21
46:15,24 47:5
101:14,18
102:5,5 103:3
104:4,8,14,21

105:10,19
129:16 145:2
146:12 175:11
179:14,15
180:17 184:11
185:8 221:19
222:4 228:3
230:15 234:5
235:18 269:14
271:2 277:21
**goodness** 26:5
**gosh** 140:4
**gotten** 126:3
191:8
**grabbed**
208:11 294:18
**grabbing**
215:12
**gracious** 47:24
48:13
**graduate** 14:11
14:18,19,24
**graham** 63:19
64:3,13,22
78:14
**graham's** 64:8
**grammatically**
228:16
**great** 55:10
58:10 103:19
103:23 104:17
147:5,10 180:4
180:6,18,20
181:18 182:5

184:10 236:8
236:13
**greeting** 134:21
140:5,15
**greetings** 134:9
**griffin** 105:5
**ground** 6:22
**group** 31:4
33:14 71:7
**guess** 138:9
145:22 147:18
163:20 190:6
218:14 246:8
248:12,12
**guys** 180:2,5

**h**

**h** 224:9 297:7
299:3
**habit** 212:22
214:5
**half** 9:10 26:21
32:7 37:9
52:21 53:8
59:19,22
**halfway** 284:9
284:10 288:16
**hand** 116:10
122:4,5,9,10
173:19,20
298:18
**handful** 283:7
**hands** 71:14

**handwriting**
225:13
**handwritten**
166:19,23
167:2 168:4
200:8 202:15
202:16 203:15
203:20 265:12
266:3 267:9
269:4 270:3
283:20
**handy** 115:14
**hang** 110:5
**happen** 193:7,8
220:13 241:10
**happened**
47:14 51:2,22
109:8,9 111:11
153:7 199:18
235:18 257:24
290:18
**happening**
167:10 273:13
**happy** 119:5
179:25 185:13
185:14
**harassment**
50:16
**hard** 7:13
48:25 100:5
101:24 102:10
103:6 141:20
141:20 143:5
143:12 155:22

**[hard - icloud]** Page 24

192:2 225:14
225:21,23,24
226:9 233:25
234:2
**harder** 225:13
238:15,21
**hardest** 128:6
128:12,21
**harm** 287:6
**harsh** 239:14
**hate** 128:17
**head** 61:10
71:13
**hear** 77:18
150:8 174:12
181:18 182:6
184:11 211:20
230:11 239:15
**heard** 3:10
175:23 176:13
179:14 220:25
221:9 230:6
271:25 272:2,7
280:3 288:23
**hearing** 167:14
215:14
**hears** 28:20
**held** 206:21
**help** 39:3
240:12
**helped** 18:4,7
**helpful** 263:18
**helping** 38:17
38:18 108:9

**helps** 91:6
**henry** 65:2
78:17
**hereto** 296:8
**hereunto**
298:17
**hesitation**
247:16
**hewitt** 57:21,25
58:6,12 59:5
**hey** 122:15
128:21 181:17
**hi** 174:8,11
175:7,23,24
178:21 179:13
179:25 183:23
184:10,22
186:8 187:6
188:5,10 262:5
262:18 263:19
**high** 141:10
**highly** 237:7
247:11 287:12
287:16
**hired** 135:2,12
258:11
**hiring** 69:16
78:24 79:4,8
**history** 40:7
226:24 258:10
**hit** 290:16
**hjr** 1:4 3:22
**holiday** 123:11
140:5,15

165:24 198:23
**holidays** 47:11
155:23 156:13
**home** 110:18
110:20 156:19
205:15 225:15
233:25
**honestly** 126:8
136:2 153:17
156:8 163:18
280:10
**hope** 183:24
**hopeful** 236:12
**hopefully** 6:22
174:13 179:15
**hoping** 122:15
**hour** 9:10 57:5
174:15
**hours** 102:13
**house** 169:5
205:15 207:13
**hr** 187:18
218:8,25
220:25,25
221:8,14 222:6
223:20,24
224:16 225:3
251:10,23
252:9 262:6
285:13 286:16
**huh** 185:3
**human** 131:21
131:23 158:11
158:16,21

161:5 209:16
**hundreds**
25:21
**husband**
110:22 111:5

**i**

**iadevaia** 2:6
4:17,19 5:13
57:4,15 94:25
95:8 114:21
115:11,24
116:6 129:15
129:22 130:10
159:22 168:8
170:14 172:4,7
192:11,20
194:25 195:11
195:16,21
201:17,23
204:14,22
205:8 240:2
243:10 259:22
260:4 269:10
269:21 274:20
281:22 282:9
283:2,24 286:6
286:11,22
287:8,22 288:5
289:4 290:2,21
290:23 294:24
297:4
**icloud** 190:15
190:19,24

**[icloud - involves]**

191:11 194:8

**idea** 119:3 120:16 176:15 262:13

**identification** 115:3 160:4 171:25 195:6 201:21 259:25

**identified** 106:6,10

**identify** 153:22 291:15

**image** 93:23

**imagine** 141:18

**immediately** 29:8,10 32:2 36:8 68:11

**impact** 290:12

**important** 7:4 141:9

**impose** 186:12

**inaccurately** 264:3

**inappropriate** 286:24

**include** 16:12 194:9

**included** 34:19 267:11,13,18

**includes** 17:5 50:8

**including** 193:16

**incoming** 263:13 267:14 269:4

**incorrect** 228:17

**independent** 166:13

**indicated** 136:11

**individual** 92:2

**individuals** 16:6

**inexperienced** 148:22

**info** 263:18

**inform** 137:25 178:3 286:14

**information** 93:2 209:20

**informed** 137:23 165:6,8 232:9

**initial** 140:19

**initially** 12:15 92:4,5 198:18 254:15 255:11 270:24

**instagram** 84:19 85:13,16 85:19

**instruct** 94:22 206:2

**instructing** 170:2

**instruction** 94:17,17 95:2

**insulting** 48:20 50:11

**interact** 31:16 62:19

**interacted** 53:10,11

**interaction** 46:5

**interactions** 58:6 104:16 133:25 174:4 183:6

**interest** 265:21 265:23

**interested** 4:9 16:17 78:24 91:3 268:15,23 290:8 298:15

**interesting** 144:11

**interject** 220:9

**intern** 22:18,19

**internally** 157:2

**international** 29:20 30:11,13 30:19 89:3 131:15

**internet** 3:8 277:22

**interruption** 169:22 170:10

**interview** 176:6 176:19 214:4

**interviewed** 133:15

**interviewing** 40:5 100:20,20

**interviews** 41:3 41:7 176:24 262:20

**investigation** 26:11,16 98:14 106:18 107:6

**investigations** 19:13,14 96:22 97:6,15,21 98:6,24 99:14 99:21

**investigative** 18:23 19:5,9 19:17,18 21:9 21:13 22:2,10 22:20,25 24:25 25:16 106:11

**involuntarily** 51:4

**involve** 107:25 108:2

**involved** 39:16 39:18 40:25 41:10 42:16 102:20 253:6 257:10

**involves** 168:21

**[involving - kinds]**

**involving** 278:5 278:10

**ipad** 191:14

**iphone** 67:9,14 68:6 92:13 169:16 170:21 190:16

**isolated** 225:17 233:25

**issue** 28:17 204:17,19 219:20

**issued** 69:25 79:21 92:24 191:21

**issues** 41:14 259:6

**items** 75:23

**iu78did** 209:19

**j**

**jackson** 2:13

**jam** 176:7

**james** 2:9 4:19

**january** 74:5 92:20 164:15 165:19 185:17 185:22,25 186:6,16,20 187:6,11,16,24 188:10,15,19 194:20 197:24 198:10,22 200:9 202:18

207:24 209:7 221:13 237:19 238:14,20 239:17 240:11 248:17 249:2 259:16 261:25 263:4,9 264:24 265:9 266:9 268:21 269:23 273:10,18 274:11,25 276:5 283:23 285:5,20

**jbagley** 2:10

**jeopardy** 223:21,25

**jeremiah** 2:6 4:18 5:16 115:8 170:7

**jersey** 131:22 132:2

**jiadevaia** 2:7

**job** 22:17 27:7 27:10 30:10 33:23 36:7 42:11 63:21 65:4 88:10 97:20,22 101:9 103:4 106:2 123:23 125:7 138:6,15 139:2 139:5,7 140:20 148:15 149:17 152:9 153:5

164:20 239:4 239:13 287:13 287:17 289:17

**jobs** 34:10 137:22

**john** 2:14 4:25 9:20 172:5,8 204:11

**join** 136:22 178:2

**joined** 20:22 36:22,23 37:13 57:16 147:15 151:12

**joining** 71:17 72:7 81:19 135:18 145:18 146:7 147:16 148:20 177:2 179:5

**journalism** 14:25 15:9 156:11

**journalist** 17:6 17:10,14

**journalistic** 15:20 16:18,24

**journalists** 17:2,9,17 156:12

**joy** 122:22

**joyful** 122:16

**june** 173:16,23 173:25 175:12

175:16,21 177:7 181:16 182:21 183:4 183:14 268:9 268:13

**k**

**k** 224:9

**keep** 242:11,13 242:24 244:9 244:17,23 245:8,25 246:3 247:20

**keeping** 206:24 207:3 246:10

**kept** 80:10

**kid** 63:10

**killing** 26:13

**kind** 15:18 17:8 17:16 38:15 40:21 47:23,25 60:6 98:11 100:10,13 102:5 104:18 126:18,21 127:4,6,25 138:22 147:7 154:17 156:13 186:8 219:16 256:9

**kinds** 206:7 249:10 256:21 256:24

**knew** 51:23
63:16 64:3
145:6 151:25
175:2 248:19
258:4
**know** 5:23 6:15
7:18,23 8:9,22
11:20 16:21
22:7 26:8 28:2
28:7,14,18
34:9 44:22,24
48:9 50:18
56:21 58:16
62:25 63:17
65:12 66:11
70:16 71:9,13
72:12,13,20
73:10,12,13,22
74:6,8,20,25
82:8 83:8,11
93:17 94:7,11
97:3,5,8 99:22
100:19 105:25
106:5,8,9,13,15
107:3 108:9
112:23 115:13
117:10,17,20
118:25 119:8
119:15,18,19
120:8 122:18
123:16,23
124:16,16
125:13,16,20
126:4,25

128:14,18
129:9,10
130:20,23
131:5,8,10,12
131:14,16
132:16,22
133:3,13,14
134:14 135:16
135:21 137:2
137:16,19,21
138:3 139:15
139:20 140:19
140:22 141:16
141:19 142:8
145:4,5 146:2
148:12,17
150:16,19
151:22,24
153:4 154:13
156:7,12,14
159:24 160:6
163:17 165:25
174:15,22
175:4,15
183:21 186:5
191:7,9 194:7
194:11 195:3,8
200:23 202:7
203:12 204:21
208:20,23,25
211:12 213:6
214:5 215:21
216:15,25
220:19 221:12

221:15 222:11
223:16 224:22
225:14,21,22
225:23 226:8
226:11 231:10
231:12,23
232:7,8,18
233:3,21,24
234:2,3,17,23
235:5,9,12
236:3 239:5,6
241:18,21
242:17,21
244:14 245:18
245:22 247:7
247:13,14
248:9 250:4
252:13 253:10
254:6 258:10
261:5,14
262:15,16
268:24 271:3
271:20 272:5
272:10,12
273:24 274:10
275:17 276:2
276:13 278:17
278:21 280:4
280:10,13,21
280:25 281:13
281:16 283:19
286:19,23
288:24 289:6

**knowing** 28:23
293:6
**knowledge**
11:16 23:3
29:2 65:17
76:9 93:15
94:2 95:13
118:3 121:19
137:10,18
171:11,13
199:16 212:7
212:10 252:16
261:2 281:17
**known** 73:6
141:10,19
143:10,11
**knows** 123:10

**l**

**l** 20:7
**laborers** 132:2
**laid** 34:6
137:10
**lait** 20:4 21:7
23:11
**lait's** 20:13
**landed** 290:15
**lando** 38:5
**language**
211:10 266:11
**laptop** 191:16
191:17,19,20
191:21,23

**large** 119:18 289:17

**largely** 45:17 259:13

**lasted** 85:2 199:21,25 211:23,25 212:9

**late** 161:17 175:8 186:7,9 187:24 188:23

**law** 2:11 4:20 5:2 121:11

**lawsuit** 11:17 12:2,5,23 13:4 75:5 90:21 111:18 112:18 112:21 276:24 277:5,14

**lawyer** 10:11 11:21 50:19 60:17 173:3 281:13,14,19 281:19 286:19

**lawyers** 5:16 92:25 93:14,20 94:4,8 121:11 196:2 260:12 281:15,19

**layoffs** 27:18 27:21

**lead** 268:16

**leading** 71:22 268:24 272:11

**learn** 157:5,8,9 278:12,20 279:25 280:12 288:10

**learned** 139:10 139:14 278:16 280:4,11,16

**learning** 250:25

**leave** 27:3,14 31:20 33:25 50:24 51:3 55:6,9,13 60:25 61:18,22 61:25 74:24 136:25 137:5,8 137:14,17 278:14,24 279:5,10,15,19 290:6

**leaving** 54:13 54:23,24 60:23 66:7,8 76:17 77:13 78:9 80:10 81:7 140:2 181:3

**left** 21:14,17,21 23:17,22 24:4 24:17 27:15,16 27:22,23 28:10 30:7 31:23 51:6 52:24 53:25 60:9 61:15 83:16,21

88:10 111:12 111:20,23 112:24 113:5 114:13,13,19 122:5,10 134:11,12,19 134:24 135:6 135:11 136:22 137:21 138:4 139:23 140:6 140:13 150:20 150:21 173:19 182:12 212:12 219:15 228:18 228:18 231:17 277:16,25 284:19 289:21 289:24 291:8 291:19 292:4,5

**legal** 4:2,5 219:20 295:9

**lengthy** 12:4

**leone** 2:18

**lesley** 53:10,18 83:13,18,21 180:23 230:16 234:9,14,19

**lesley's** 139:11 139:12 165:2

**leslie** 144:13

**level** 46:19

**lie** 242:13,19 243:7,8,15,18 243:18,24

244:4,8,13,22 245:6,13,14 246:2,9,16

**life** 122:21 125:13 292:23

**lightly** 168:21

**liked** 234:9,15 235:3

**likely** 179:4 280:6

**likes** 230:23 231:7 234:12 234:13

**liking** 234:19

**line** 127:19 171:11 219:10 219:19 220:24 223:6 224:22 226:22 299:4,7 299:10,13,16 299:19

**lines** 144:24 214:7 226:7 242:10 245:16 253:18

**link** 177:8

**linkedin** 84:17 85:11,23 86:2 86:6

**listed** 106:2

**listen** 210:10 270:13

**listening** 238:4

**[literally - mail]**

**literally** 102:19

**literature** 14:9

**little** 79:4
192:22 225:13
284:10

**live** 109:17,18
124:12

**lived** 64:7
87:11 88:24
109:16,19,20
169:12

**llp** 2:16

**locate** 173:6

**located** 1:18
93:10

**log** 176:7

**long** 7:23 9:9
15:21 18:15,18
19:13 21:3,7
21:25 22:9
26:15 29:12
32:5 36:14
39:24 48:24
56:10 59:15
60:7 67:2,12
67:25 68:12
80:25 85:5
87:9 97:7
102:13 122:22
125:20 152:12
186:9 251:12
251:14,16,17
258:17 262:23
283:6 290:17

**longer** 44:13,17
51:15,24 55:16
70:15 73:9,10
73:16 119:9
120:7 208:23

**look** 71:12
82:12 114:3
160:10 162:8
164:14 178:11
202:2 214:20
216:10 217:9
218:14 233:20
268:3 270:14
291:24 293:25

**looked** 82:25
194:13

**looking** 39:2
40:5,23 100:21
137:22 139:8
206:18,20
212:3 213:10
216:18 270:18
270:21

**looks** 116:20
175:19 219:11
219:15 226:12
228:17,17
240:5

**lost** 119:12
120:5 147:7
249:2

**lot** 20:23 35:4
38:5 46:24,25
47:3 48:12,14

88:23 128:5
147:23 156:8
177:4 218:7
258:15 287:24

**lots** 73:15
119:12,16
122:23

**love** 122:24

**loved** 101:19

**lucas** 122:23
123:5,13

**lunch** 129:18

**luncheon**
129:25

**lynch** 2:18 5:5
5:6 115:8,15
142:14 146:23
150:6 154:20
158:6 159:16
160:19 163:12
164:5 165:20
168:7 169:17
170:19 172:6
187:3 189:9
193:9 195:13
197:11,17
199:2,6 208:15
212:6 229:10
233:13 234:16
237:20 238:24
241:4 242:15
243:20 246:12
248:8,22 250:8
253:8 258:24

259:8,20 260:6
267:6 269:14
272:18 273:5
273:14,22
274:16 275:15
276:11 277:2
280:9 282:15
282:23 283:5,8
283:10 290:19
291:12 294:21
297:4

**m**

**made** 12:7
138:11 157:6
157:13 158:10
163:23 169:20
170:17 171:4
186:3 187:13
196:22 197:8
197:14 208:6
209:23 218:7
248:2 251:23
252:8 258:22
269:25 283:22
285:16 286:15
294:17 296:6

**magazine**
32:22 33:18
34:2,13 35:18

**maggie** 30:4,5
30:23

**mail** 80:19 81:5
81:9,16,21,22

81:23,24 82:5 82:11,18 83:6 83:9,12,17,24 84:4 94:5 260:10

**mails** 8:19 192:6

**major** 14:8

**majority** 81:9

**make** 6:22 91:14 92:14 95:11 144:9 147:13 149:23 159:19 160:13 169:15 170:11 170:18 209:19 271:21 277:20

**makes** 149:6 293:8

**making** 146:2 156:25 159:14 180:4 184:19 202:24 239:3

**malign** 237:6

**maligning** 237:3

**man** 48:2

**managing** 20:15

**manifest** 48:23

**manner** 163:16 276:9

**march** 1:13 3:4 17:22 298:18

**margaret** 30:4

**mark** 114:22 195:2 201:17 226:11 259:22

**marked** 115:3 115:5 116:11 117:2 160:4,21 160:25 171:21 171:25 172:16 173:12 195:6 195:23 196:7 201:21 202:2 202:11 259:25 260:9,15 267:10,15 283:17

**marking** 226:10

**marriage** 289:19 298:14

**married** 110:23 110:24 181:22

**master's** 15:9

**match** 180:6,20

**matera** 1:20 4:4 298:4,22

**material** 18:8 107:8,16,23 192:3

**materials** 6:13 38:25 94:13,18 190:20 191:12 266:24 267:3 269:6

**matt** 20:4,13 21:7 24:14

**matt's** 20:5

**matter** 3:17 4:23 5:17 11:7 11:14 197:2 235:17,23 241:9 278:4,9 298:16

**matters** 207:23

**mean** 16:15,16 25:8 48:3,15 48:18,22 49:24 52:18 56:8 61:21 86:12 94:25 96:16 104:9 107:15 107:16 117:14 123:15 124:8 124:17 126:22 127:5 128:21 138:19 180:21 204:16 208:23 210:19 211:15 212:13 214:12 218:14 220:13 224:2 226:5 239:9 240:15 243:7,8,15,24 245:20 246:13 247:19 251:17 260:10 265:5 280:3

**meaning** 6:11 34:15 61:6 69:11 113:24 127:15 144:13 193:25 292:18

**means** 16:21 220:4 222:16 230:19 236:3

**meant** 124:14 127:11,20 128:12,15,18 128:18 129:7 129:11 216:5 216:11 222:3 226:18 227:4 262:14,16

**media** 3:15 15:19 16:12 84:7 86:11 94:9 295:8

**medication** 8:4

**meet** 8:16 63:5 95:21 130:12 283:9

**meeting** 9:6

**meets** 185:9

**member** 96:12 103:19,23 104:4 132:20 141:9

**members** 27:19 41:22

**memory** 73:23 113:12 119:24

**[memory - minutes]** Page 31

120:3 140:14
210:6,9 215:23
215:25 231:16
232:15 244:5
255:12 258:6
263:4 273:12
274:4,6 275:13
276:24
**mention** 103:24
**mentioned**
104:3,7 200:7
239:8 291:7
**mentor** 114:16
**message** 66:14
66:17 71:6
72:11 89:16
90:20 91:15
119:4 122:2,13
127:13 161:16
162:7 173:15
182:13,16,24
184:2 247:2
253:21 254:11
255:19 266:7
268:14 271:11
271:16
**messages** 71:10
72:15,21 73:5
73:18 74:2,10
74:16,22 75:3
75:9,16,17,21
75:21 76:2,6
77:10 91:20
101:13 113:6

113:14,20
114:5 118:23
119:10,22
120:9,17,20
121:3,15,20,22
122:5,6,9
135:14 151:8
152:15 161:20
165:18,24
172:22 173:2,7
173:18 180:25
181:20 183:11
189:7,17 190:7
190:11 192:9
192:23 193:4
193:14,17,20
194:2,10,14,23
254:15 255:13
255:21 261:10
261:15 262:24
263:21 269:3
270:22 279:8
280:18
**messaging**
86:13 88:13
277:19
**messed** 197:23
**messick** 63:19
78:15
**met** 8:23
110:22,25
111:7 123:11
123:13

**michael** 2:18
5:6 170:5
172:5 283:4,10
**michaellynch**
2:19
**mid** 137:3,4
**middle** 240:6
253:11,19
285:12
**mike** 37:23
43:16 44:5
45:7 46:14
50:25 51:9,11
55:3 292:20
**mike's** 44:24
**minneapolis**
26:11
**minute** 57:6
115:9 149:9
172:12 236:19
281:24
**minutes** 9:10
9:11,13,14
10:24 36:9,11
36:13,15,22
37:13 38:7,16
39:19 40:11,22
41:4,17 42:5
45:7 46:18
47:7 49:5,14
49:16,18,22
50:4,8,11,12,16
50:22,24 52:19
54:14 55:20,24

56:6,23,25
57:17,19,20,23
58:12,22 59:5
59:9,13 60:10
60:20 61:4,24
62:12,14,20,23
63:4,13,19
64:10,14 65:9
65:18 66:8
71:17 72:7
74:24 76:17
77:3 78:9 79:5
81:19 83:14,16
83:22 88:9
106:2 123:18
123:21 124:10
124:15 125:2,5
125:9,24
134:17 135:4
135:13,19
136:9,15,22
137:24 138:6
138:12,15,21
138:25 139:17
139:21,23
140:6 141:9
143:4 147:16
147:17 148:10
148:16 149:17
150:2,14,25
151:9,12 152:6
152:11,22
153:4,9,20,24
156:9,21 162:2

164:21 177:2 178:8 179:5,20 181:3 183:18 183:25 199:21 199:25 211:25 212:4,9 235:2 238:8,14,22 251:18 259:7 262:7 269:11 278:6 289:24 291:9,20 292:3 292:5,6,10,25

**missed** 209:24 213:3 215:16 215:22 216:25 217:3 223:14 225:6 231:15 234:24 241:6

**missing** 225:8 225:22

**mississippi** 2:13

**mistake** 169:14

**mistreatment** 26:16

**misunderstan...** 245:17

**mixed** 54:15,19 54:20,24 56:11 56:12

**moment** 6:9 211:23

**monday** 185:8

**month** 228:14 289:2

**months** 27:19 67:5,8 138:4 152:8,11 153:12 240:9 271:25 272:3,8

**morley** 53:11

**morning** 3:2 4:17 5:5,14 9:7 185:9

**motions** 139:16

**move** 22:19 97:12 120:4,4 123:25 144:11 193:24 222:7 226:13 227:25 290:10 292:15 292:23 294:23

**moved** 43:5 44:4 45:13 54:6 123:24 125:3

**moving** 61:3 181:16 218:12 219:3 235:25

**multipage** 160:22 202:5 260:10

**multiplatform** 96:7,10,15,16 97:13

**multiple** 37:21 38:2,4 44:10

66:23 80:14 131:13 165:17 242:18 255:4 272:25 274:7 291:8

**multitude** 290:4

**n**

**n** 5:9,9 130:4,4 224:9 297:1

**name** 3:25 4:18 5:15 20:5 26:6 26:7 38:13 55:18 58:18 65:14 78:25 104:25 115:22 253:14 262:16 283:10

**named** 63:14 63:19 65:2

**names** 20:25 99:3,11

**national** 29:10 29:13,19 30:2 30:7,12,15,16 30:20 31:5,10 31:14,20,23 32:3 35:25 62:6

**natural** 244:13

**nature** 257:13

**near** 155:23 203:2 215:8,10

**nearly** 216:2

**necessarily** 245:22

**necessary** 116:3 296:7

**need** 7:22 67:18 138:8 185:4 204:15 223:8 229:15 263:20 281:24

**needed** 51:12 193:7,8 292:23

**negative** 47:20 47:22

**nelli** 21:24,25 28:6 99:5 105:6,18

**network** 19:14 35:16

**networks** 288:2

**never** 76:18 78:7 81:6 110:25 237:6

**new** 1:3,21 2:5 2:5,17,17 3:21 43:5 44:4 49:4 49:11 61:19,22 61:25 62:3,4 62:17 122:17 123:24 124:11 124:15,17 125:3 128:5 131:2,21 132:2 153:3,5 156:19

169:7,8,12 185:13,14 192:24 206:16 262:9,14 289:16 290:6,9 291:16 292:7 298:5

**news** 1:9 19:14 32:4,6,16,19,21 32:25 33:3,7 33:18,21,25 34:6,11 35:20 36:8,9,10 60:21 62:8,16 179:14 262:6 280:2,8 281:11 283:14

**newspaper** 11:19

**newspapers** 12:21

**nice** 145:2 283:9

**nightmare** 284:18,21

**nights** 47:7

**nine** 21:5

**nods** 7:6

**nominated** 89:18,23

**non** 1:17

**nope** 183:13

**north** 2:12

**notary** 1:21 5:11 296:14,21 298:4

**note** 3:5 213:21 214:20 216:19 221:17,20 222:8 223:21 223:23 225:3 225:11,20 226:14 227:11 228:12 230:14 230:22 234:11 239:22,24 240:7,22 293:23,25

**notebook** 206:6 207:7 208:2,5 208:7,20,22

**noted** 296:7

**notepad** 203:6 205:18,22,24 207:22 294:16

**notepads** 208:24

**notes** 6:2,12 166:10,16,18 166:20 167:2,6 167:12,21 168:4 171:18 200:8,12,15,18 200:25 201:2,5 201:9,12,18 202:15,16,20 202:24 203:9

203:16,21 204:8 205:12 205:17 206:3,5 206:7,11,12,14 206:16,22,24 207:4,7,20,23 208:4,6,13,20 209:4,5,14 210:2,20,22,22 212:4,12,20 213:14,17 214:2,3,8,8,13 215:14 216:14 217:12 219:7 219:25 220:11 222:13,14 224:7,24 227:17 228:5 228:21 229:5 233:19,21,22 234:17,22 240:18 241:23 249:14,16,19 249:23 250:7 256:12,16 259:11 265:13 265:16,20 266:3 267:9,11 269:5 270:3 273:25 274:2 275:8,9 283:20 283:21 286:18 293:20 294:3 294:12,15,19

**noticing** 4:15

**notified** 248:7 249:24 250:5 250:13 273:10 274:13 275:3 282:20

**notify** 232:12

**notifying** 247:17 251:6 275:23

**number** 3:21 25:19 67:18 68:2,3,5,22,24 69:19,23 70:18 79:13,18,19 80:5,11 99:23 116:8,12,16 118:20 160:22 173:10 196:2 198:4 261:22 262:9 295:7

**numbered** 26:20 266:21

**numbers** 200:3 200:5 202:5

**numerous** 22:23 26:24 27:19 55:18 105:12,13

**o**

**o** 5:9,9 130:4,4

**oath** 4:7

**[object - opposed]** Page 34

| | | | |
|---|---|---|---|
| **object** 94:22 | **objections** 4:10 | **oftentimes** 89:2 | 226:22 227:25 |
| **objected** 150:8 | 169:20 | **oh** 24:13 26:5 | 240:25 250:11 |
| **objecting** | **objects** 170:5,6 | 42:14 84:18 | 252:4 260:21 |
| 169:23 170:2 | **observe** 49:16 | 85:7 100:2,9 | 264:21 268:6 |
| **objection** | 49:21 50:2,10 | 138:16 140:4 | 270:17,20,23 |
| 142:14 146:23 | 50:14,18,19 | 152:7 183:19 | 283:2,5,18 |
| 150:6 154:20 | **obtained** | **okay** 7:14,19 | 284:8 285:10 |
| 158:6 159:16 | 107:18 | 8:25 9:8 28:25 | 288:13 290:21 |
| 163:12 164:5 | **obvious** 138:7 | 29:6 34:25 | **old** 63:7 |
| 165:20 168:7 | **obviously** | 37:10 52:10,11 | **older** 225:2 |
| 169:17,24 | 261:6 | 69:3 70:19,22 | **once** 9:4 63:6 |
| 170:19 187:3 | **occasion** 64:23 | 73:25 86:15,17 | 84:22 116:7 |
| 189:9 193:9 | 87:16 109:15 | 95:8 98:2,12 | 123:13 139:25 |
| 197:11,17 | 111:14 134:20 | 103:15 104:7 | 140:13 160:6 |
| 199:2,6 208:15 | 134:25 | 105:2 107:20 | 192:25 195:8 |
| 212:6 229:10 | **occasional** | 114:21 115:5 | **ones** 48:8 71:14 |
| 233:13 234:16 | 113:2,3 134:9 | 116:6,18 | 72:23 122:10 |
| 237:20 238:24 | 135:8 210:10 | 117:16,18 | 166:21 173:20 |
| 241:4 242:15 | **occasionally** | 118:18 127:9 | 190:13 |
| 243:20 246:12 | 109:23 110:2 | 127:18 129:18 | **online** 19:12 |
| 248:8,22 250:8 | **occidental** | 138:19,24 | **open** 61:10 |
| 253:8 258:24 | 13:20,23 | 140:8 145:6 | **opening** 145:10 |
| 259:8,20 267:6 | **october** 12:15 | 160:16 170:21 | 145:14 |
| 272:18 273:5 | 180:24 181:6 | 172:14 175:9 | **openings** |
| 273:14,22 | 181:14 | 175:11 179:12 | 182:17 291:23 |
| 274:16 275:15 | **offer** 31:22 | 182:11,24 | 291:24 |
| 276:11 277:2 | 61:4 179:16,20 | 184:4 185:7 | **openly** 237:24 |
| 280:9 282:15 | 231:20 240:12 | 186:6 189:2,20 | **opinion** 104:25 |
| 282:23 283:24 | **offered** 27:11 | 194:18 208:12 | **opportunity** |
| 286:6,11,22 | 28:3,13,16 | 209:4 213:16 | 61:5 170:8 |
| 287:8,22 288:5 | 265:14 | 214:7 217:5 | 181:9 |
| 289:4 290:2 | **office** 110:10 | 218:11,13,22 | **opposed** 143:15 |
| 294:21 | 111:10 123:14 | 219:3,6,14 | 217:7 |
| | | 222:7 224:23 | |

**option** 143:21
**orally** 77:15
  113:24 150:15
  270:7
**order** 51:12
  90:14 193:4
  220:14
**oriented** 102:3
**original** 12:8,9
  12:11 205:11
  206:17,22,24
  207:3
**originally**
  259:17
**originals** 204:7
**ought** 233:3
**outcome** 4:9
  298:15
**outside** 10:18
  24:9 49:11
  79:3 107:18
  109:14,25
  110:7 112:6
  113:6 127:10
  140:17 212:13
  240:14 248:14
  260:21 265:5
**overall** 151:16
**overlap** 80:17
**overseas** 37:17
  43:3
**overseeing**
  58:23 59:3,7

**owens** 13:4
  62:11 76:21,24
  77:7,10,16,19
  83:7 88:5
  201:13 279:18
**own** 138:18

**p**

**p.c.** 2:3
**p.m.** 129:24
  130:3,9 188:9
  188:15 192:15
  192:19 199:18
  205:3,7 269:16
  269:20 282:4,8
  288:16 295:5
  295:11
**pad** 168:15
  215:13
**pads** 208:10
**page** 116:17
  178:11 179:22
  185:10 195:24
  213:10 216:16
  216:20 217:10
  217:12,15,23
  217:23,25
  218:6,10,12,14
  218:23 219:4,4
  219:6,8 220:2
  220:11 222:8,9
  223:18 224:6
  226:14 228:2
  229:13,14

233:23 240:4,5
  240:6,19,23
  241:22,23
  266:20,20
  268:8,18
  270:19,19
  284:7,11
  285:11,12
  293:22 297:3,9
  299:4,7,10,13
  299:16,19
**paid** 278:13
**painful** 289:10
**pan** 61:9
**paramount** 1:9
  3:18 283:13
  296:1 299:1
**paraphrase**
  224:20
**paraphrasing**
  217:6 219:22
  264:2
**part** 23:15 41:3
  61:20 71:11
  119:14 121:12
  128:2 132:21
  166:12,22
  177:25 213:13
  223:14 257:22
  272:9 290:11
  291:14
**partake** 171:15
**partially** 142:4

**participants**
  3:9
**participate**
  106:23
**participated**
  39:15
**particular**
  19:16 32:21
  55:15 132:6
  133:7 229:8
**parties** 3:13
  298:13
**partnership**
  241:19
**partway** 54:6
**party** 1:17 4:8
  40:11 107:7,15
  107:22 111:2
  123:11
**passage** 226:8
**past** 53:2
  184:24 203:18
  271:9
**patricia** 20:4,8
  20:16 21:4
  23:8 105:4,10
**patricia's** 20:9
**paul** 44:15 45:2
**peabody** 26:22
**pelley** 65:16
**pen** 168:16
**pending** 7:24
**people** 20:3,23
  33:8 34:4,16

35:4 42:15
44:23 55:21
99:4,6 106:14
131:24 138:23
143:10,12
180:18 241:18
287:24
**perfectly** 145:2
145:3
**performance**
106:19,24
217:18,21
218:3,5,15,24
220:22 286:5,9
287:13,17
**performs**
100:17
**period** 44:13,17
68:11 71:23
77:3 80:17
98:12 108:6
135:10 140:17
193:15
**periodic** 7:22
**permissions**
168:22
**person** 9:15
20:2 44:21
45:24 46:12
47:23 63:5
98:22 102:6
104:18,20
110:25 111:23
112:8 126:19

126:22 127:5,6
133:12 145:2
149:12 186:24
228:3 234:6
**person's** 38:13
**personal** 61:24
69:5 70:18,20
70:23 71:15,19
72:7,16 73:19
74:3,17,21
75:4,12 79:24
80:8,19 81:2,4
81:14 82:22
95:16 118:15
191:17,20,23
197:9,25
289:21,24
291:11,14
**personally** 31:9
63:17 93:11
167:3 238:21
**phil** 58:17,19
58:22
**phil's** 58:18
**phone** 9:15,16
66:20,23 67:4
67:7,11,20,22
68:10,12,13,17
68:20 69:5,5,7
69:13,14,15,20
70:20,23 71:3
71:4,16,20
72:8,16,24
73:9,20 74:3

74:17,21 75:4
75:13,13 76:11
76:23 77:6,20
77:24 78:3
79:12,13,18,21
79:22,25 80:2
80:15 82:14
92:19 93:16,19
93:23 94:2
95:12 113:2,6
114:4 117:25
118:3,6,15,18
118:19 120:4,5
120:8,10,22
121:7 125:11
125:23 134:24
135:5,8 143:25
146:4 147:14
148:3 157:10
157:14 158:23
158:25 159:6
159:12,20
162:4,16,20
163:3,4,9,16
164:12,18,23
165:13 166:14
167:21,25
169:2 170:16
170:18,20,20
171:15,17
173:8,9,13
175:13 181:19
183:9 186:22
189:8 190:11

190:12,23
192:24 193:6
193:14,23
194:15,19
196:12,17
197:10,14,15
197:18,19,23
198:2,4 199:9
199:12 200:3,8
200:25 202:17
203:16,21,25
204:4 208:14
209:6,13
213:17 214:2,3
214:4,8 215:6
222:19 232:25
240:11 254:23
255:20 256:3,6
258:14 261:7,9
261:17,19,20
263:6 265:17
265:21,23
266:15 268:24
270:10 272:11
272:16 274:12
274:25 275:22
275:24 276:5
277:20,21,24
278:14,18
279:3,4 280:22
280:23 281:2
282:22 283:23
284:15 285:5
285:21 286:3

286:10
**phones** 66:24
68:14,21 73:15
73:16 80:14
119:11,17,17
120:3,6 121:24
121:24 193:13
194:4,9
**phrase** 227:24
244:2 246:14
**phrases** 215:16
**physical** 67:3
**pics** 265:12,14
**pictures** 206:16
206:18,19
265:15
**piece** 89:17,22
96:16 178:5
213:21
**pitch** 18:8 39:5
39:8,11 108:23
**pitching** 108:20
**place** 3:12
27:22 49:8,9
55:10 123:19
123:21 124:10
124:15,17
136:4,12
138:22 168:15
233:8
**placed** 74:23
278:13 279:5,9
279:14,18

**plaintiff** 1:7 2:4
2:23 4:22,24
**plan** 171:18
**planned** 250:25
**planning**
159:19
**platform** 80:23
86:14 88:17
**platforms**
84:11
**play** 290:12
**please** 3:5 4:11
5:23 6:15 7:17
16:20 20:6
41:13 46:22
82:3 102:9
105:3 115:18
118:12 145:11
147:8 152:22
158:17 164:7
192:13 214:9
215:6,20 216:5
241:24 242:11
268:5 270:15
274:21 281:25
293:23
**plenty** 174:14
**point** 5:21 37:2
42:23 43:10
50:7 64:5
70:15 71:24
79:7 80:4,13
94:12 97:12
98:9 125:12

134:12 136:21
137:24 146:3
152:15 157:5
161:16 162:14
174:25 200:21
202:23 222:19
232:4 256:14
270:11 276:7
278:12,16
279:25 280:3
281:2,7 290:16
294:10
**police** 26:11
**poolos** 1:6 2:23
3:18 4:22,24
5:17 11:25
12:7 69:8,12
69:16,23 70:5
70:9,14 71:21
72:5,18 74:4
74:18,23 77:7
77:16 78:15,18
78:21 79:6
82:2,6 83:25
85:17,24 86:3
86:19,22 87:19
87:22 89:8,11
92:20 111:18
112:15 120:10
120:18,25
124:4,20,24
126:13 130:12
132:18,25
133:6 134:11

134:12,19
135:6,17
143:15,22
144:4,20
151:13,20
152:16 155:8
157:3 161:7,15
161:21 173:24
180:25 183:7
184:19 186:3
187:18 188:16
193:17 194:20
200:9 202:18
203:25 207:24
210:13 213:12
262:3 267:14
267:19 276:6
278:5,10
282:14 283:22
284:13,17,23
285:2,7,20
286:4,8,14,16
287:6 290:25
296:1 299:1
**poolos's** 11:17
12:22 13:3
94:14,19
112:18 200:5
**popped** 240:3
**portion** 243:13
274:22
**position** 20:21
34:8 95:4,5
96:5,6 135:4

**[position - producer]** Page 38

139:2 140:21 182:22 215:13 235:19

**positions** 24:20 61:10 139:3

**positive** 101:23 233:11,15,16 233:22 234:3,5 234:6

**possession** 205:14

**possibility** 140:25 141:25 142:10,23 144:19 146:7 251:5,9

**possible** 74:12 74:13 110:8 135:8 146:5,9 147:20 151:10 152:18 163:19 163:20 185:24 188:4 189:11 209:15,24 215:15,21 222:21 237:10 240:25 241:6 244:12 245:21 245:23 267:25 271:3 273:16 275:25 287:20

**possibly** 184:13

**potential** 140:15 145:14

**potentially** 145:10 154:18

**praises** 148:6

**pre** 100:20

**preceding** 68:12 127:18

**precise** 20:25 164:15 245:3 252:24

**precisely** 170:25 202:25 203:10

**pregnant** 290:7

**preparation** 8:17 10:2

**prepare** 8:13

**preparing** 9:2 42:10 106:24

**prepositions** 197:23

**present** 2:21

**preserve** 95:18 120:24 121:15

**prestigious** 138:22

**pretty** 212:17

**previous** 119:19

**previously** 54:12 68:7 99:9,10 283:17 284:5 287:11 289:2

**primary** 42:3

**prime** 32:23 33:15,17

**prior** 67:6,11 175:22 183:5 258:21 259:5 273:9

**privacy** 28:17

**private** 86:13

**privilege** 204:16

**privileged** 95:3 95:7

**privy** 28:15

**probably** 22:4 22:12 25:21 26:19 68:3 88:19 99:6,7,9 99:10 101:16 117:24 123:11 129:17 130:14 141:16 144:10 208:24 269:11

**problem** 154:14 160:9 170:14

**problems** 181:19

**proceeding** 4:11 218:2

**process** 38:19 39:15,21,24 41:16,20,20 45:11 46:2

47:4 54:7 119:11,15 121:23 193:22 289:9

**produce** 19:11 31:17 53:17,18 69:24

**produced** 70:6 70:9 76:2,7 93:10 113:15 113:21 115:7 116:5,7 120:13 121:10,11 173:3 195:25 260:11

**producer** 18:23 19:5,9 20:12 20:17 22:2,10 22:20,25 24:11 25:16 29:20 30:11 32:11,12 32:16 33:12,13 36:24 37:5,7 37:14,25 41:21 41:21 42:12,15 42:24 43:4 44:5,20 45:6 45:14,15,20 47:6 51:16,25 52:5,9,12,17 57:18 58:2 59:4,6,10 60:3 61:6,13 63:23 64:16 65:6,20

**[producer - quotes]** Page 39

96:7,10,15
97:24,25 98:8
99:13 100:18
100:18 105:4
108:3,13
132:15 133:11
133:16 141:11
145:5 239:20
292:11,20
**producers**
21:13 23:14,23
24:3,5,9,10,10
30:18 31:4,15
34:10,20 35:21
35:25 38:3,4,6
38:8 43:19
46:10 47:3
50:25 51:9,11
52:4 59:2,7
99:2,11 105:6
292:4,5
**producing**
45:11 103:8,11
**product** 31:17
55:11
**production**
132:21 133:13
**professional**
287:7
**program** 14:22
15:2,5
**project** 177:13
**promise** 283:5

**prompted**
203:9
**protect** 91:6
**provide** 72:22
206:10,11
**provided** 71:8
71:10 72:19
75:23 82:15
113:10 114:6
161:19,21
166:5,11,21
199:13 206:8
264:14,19
**providing** 17:9
17:13 207:8
**public** 1:21
5:11 12:21
86:12 296:21
298:4
**pull** 207:7
208:12 293:21
**pulled** 177:23
**purchase**
191:22
**purchased**
191:18,20
**purposes** 9:2
82:9 87:15
208:8
**pursuant** 69:25
76:2 113:21
173:3
**pursuing** 208:3

**push** 176:6,19
**put** 212:25
213:3 214:16
214:25

**q**

**quality** 3:6,7
**quarters** 53:3,8
**question** 6:24
6:25 7:17,24
38:22 42:9
54:3,9 79:5
82:16,24 93:3
113:18 127:8
138:13 140:9,9
140:11 142:7,9
145:11,12
150:10,12
163:7 169:24
170:7,8,16
193:11 197:13
205:10 210:10
237:22 245:8
245:15,17,25
246:10,15
249:3 250:9
255:22 258:8
274:18,21,24
282:11 293:19
**questioning**
269:12
**questions** 7:9
13:16 86:10
116:23 138:9

144:2 160:13
172:13 194:18
236:20 255:25
256:2,4,15,18
256:23 257:4,5
257:6,7 258:16
258:18 259:14
262:8 265:18
266:5 282:17
283:4,7 290:20
294:25
**quick** 204:23
215:18 225:9
262:8 269:12
**quickly** 216:25
226:6 268:4
294:23
**quite** 15:23
177:6 191:2
198:24 203:2
212:23 231:24
250:14 251:15
278:18
**quote** 213:4
219:13,15,21
230:19
**quoted** 218:23
219:8,17
221:16,17,18
225:3 228:8
231:2 241:24
**quotes** 212:19
212:21,25
213:7,9 214:12

214:16,21,25
216:22 217:13
218:16 219:11
220:2 221:5
222:14 224:2
224:13,17,18
226:2 227:13
227:22 228:22
229:15,18,22
230:15 293:24
293:25

**quoting** 217:7

**r**

**r** 5:9 130:4
299:3,3

**raise** 50:6
141:12 155:17
155:21 291:16

**raised** 154:17
258:22

**raising** 50:3
158:14,20
159:7,15 251:5
290:9

**ran** 133:22

**rare** 64:23
109:15 134:20
134:25

**raskin** 2:3 4:21

**rather** 254:21

**reach** 141:23
142:9,16
145:17,20

150:2 182:7
186:25 232:21

**reached** 146:6
153:13 161:22
162:3,25
182:16 198:11
198:17 200:23
232:19 254:9
255:24 259:18
272:6 273:11

**reaches** 181:7
270:24

**reaching**
142:18 162:19
165:25 166:2
184:5 232:16
247:17 248:18
274:14 275:4

**read** 11:18 12:6
12:8,9,11
122:25 128:9
128:16 129:4
174:19 176:11
177:17,17
180:9 181:24
184:15 185:2
185:11 186:13
186:14 187:8
188:12 214:10
221:20 225:12
225:13,19
227:2,16 228:5
228:15,24
229:24 230:17

230:24 233:18
234:11,12
243:11,12,14
249:17,23
254:18 255:15
256:12,16
262:11,24
263:21 265:19
271:13 274:23
285:13,17
296:5

**reading** 38:25
213:17 266:4,9

**ready** 128:5,25
202:7,9 294:16

**realized** 230:7

**really** 8:15 46:6
49:3,23,24
56:7,8 59:18
60:6,7 62:17
63:17 81:7
119:2 146:10
147:19 177:12
180:2 212:10
212:24 216:21
217:17 218:5
222:9 225:14
226:9 228:4
231:19 233:24
234:9,14,19
235:3 236:12
268:4 281:8
284:11,14

**reason** 8:8
56:12 76:13
87:2 198:25
199:24 213:25
248:18 279:14
281:10 299:6,9
299:12,15,18
299:21

**reasons** 55:5,12
61:23,24 81:14
103:2 144:16
213:6 279:14
281:10 289:21
289:25 291:12
291:15

**recall** 12:19
43:22 44:25
48:25 59:25
60:6,8 74:9,11
74:20,25 81:20
84:3 85:14
86:4 87:3 88:3
89:9,12,15,20
89:25 90:16,22
92:12,17 95:23
99:12 105:21
110:14,17
111:11,21
112:13,16,20
113:7 125:16
125:25 126:8
126:11,19,25
131:22 132:24
133:6 134:2

135:7,15,23,24
138:2,16 141:4
141:7,16
142:25 143:6
143:17 144:22
145:16 146:10
147:2,12,22,25
148:4,23 149:3
149:22 151:10
151:14,21
152:17 153:17
155:2,11,16,20
155:24 156:2
156:22 157:4
157:15,21,23
157:24 158:8
158:12 159:4,9
159:17,21
162:3,9,10
163:17,25
164:13,22
165:3,7 170:25
171:2 174:23
175:18,20
176:16 182:10
182:13 183:8
183:10,13,21
185:23,24
187:20 188:3
189:10 194:24
216:13 229:11
231:13 233:9
235:5,13,15,16
235:20,21,22

236:4,4,10,15
236:24 237:4,9
237:13,15
238:3,9,11,17
238:25 239:23
240:13,16
241:12 242:5
243:4 244:10
246:24 247:6
248:23 249:8
250:2,17,18,20
250:23 251:3,7
251:11,12,19
253:9,16 254:5
254:8,19,20
255:6 257:6,15
257:21 258:12
259:21 268:7
272:19 274:10
275:5 277:17
278:3,21,25
279:2,6,11
282:16,24
**receive** 13:22
14:2 15:4,8
75:17,20
**received** 26:4
66:16 82:10
197:19
**recent** 68:8
263:12
**recently** 190:18
191:18

**recess** 129:25
**recognize**
116:25 172:15
196:8 202:10
260:14
**recollect**
241:16 258:25
259:9
**recollection**
119:21 132:8
132:13 147:3
154:11,16,21
154:24 156:5,7
166:14 174:24
176:23 210:14
211:2 220:20
229:2 242:17
257:9 258:14
270:2,9 275:16
277:12
**recommendat...**
177:25
**record** 3:3,14
4:15 57:9,11
57:13 79:11
129:20,24
130:8 160:21
161:4 168:2,5
168:10 192:15
192:16,18
195:22 202:4
205:2,4,6
219:20 243:14
260:8 269:16

269:17,19
274:23 281:24
282:3,5,7
295:4,5 298:10
**recorded** 3:11
3:16 7:2
203:24 204:3
**recording** 3:7
3:12 168:11,19
229:19
**refer** 70:19
166:18 255:10
**reference** 101:9
106:3,7,11
124:19,22
148:8 179:19
222:5 271:15
**references**
148:15
**referencing**
124:3
**referring** 10:10
48:7 56:17
62:4 81:22
166:19 172:23
176:21 177:20
184:7 246:11
265:22 289:14
289:15
**refers** 200:25
**reflect** 161:21
210:2 283:21
**reflected**
118:24 122:14

**[reflected - reporter's]**

183:12 188:22 189:7 190:7,13 204:9 205:12 209:5,14 229:5 229:6 260:22 261:15 267:4

**reflection** 180:12

**regard** 242:22

**regarding** 69:16 159:7,15 187:18 252:20 270:8 274:8 282:14

**regret** 180:5

**regular** 133:16 156:14 244:18

**regularly** 244:24

**rehiring** 290:25

**reiterate** 266:17

**related** 4:7 72:17 73:20 90:25 125:2 154:8,24 182:21 275:13 298:13

**relates** 123:21 245:7

**relationship** 34:23 42:19 46:9,14,17 123:8 248:20

257:13,17 258:2

**relationships** 46:20

**reluctance** 237:18

**rely** 213:7

**remain** 43:2 61:12

**remaining** 91:3

**remarkable** 177:13

**remember** 43:23 49:2 58:18 63:8,9 65:14 69:2 79:17 96:25 97:5 99:4,7 105:13 109:8 109:10 112:4 126:15 134:8 136:2,5 139:13 144:7 145:23 145:25 152:23 152:24,25 153:10 154:13 155:4,6 156:6 166:8 177:11 179:2,7,11 188:4 189:11 203:10 210:11 227:9 232:19 256:20 272:15 273:7,15,23

279:12 280:11 280:16 281:3,5 282:17

**remind** 48:9

**remote** 1:16

**remotely** 3:24

**removed** 205:24

**renee** 13:8 75:14 84:5 88:7 121:4,16 165:8,15 196:20 199:14 200:23 201:2,6 252:22 253:4 253:21 254:4,9 254:24 255:3 255:12,23 256:6,10,13 257:11,12,16 257:25 258:20 259:3,12 260:20,24 261:4,8,12 262:5,6,13,18 262:21 263:3,9 263:15,19 264:11,16 265:15 266:2,8 266:24 267:21 268:12,17 269:6 279:21 282:12,19

**renew** 293:3

**repeat** 274:20

**repertorial** 39:20 45:10 46:2 100:19 103:8 207:25

**rephrase** 7:19 82:3 93:3 94:15 142:6 145:11 147:8 150:10 158:17 170:8 274:17

**replied** 255:25 256:11 257:20 258:5

**replies** 182:20

**reply** 164:6 165:21 169:19 246:16 256:16 257:4

**report** 19:10,23 29:25 33:4,6,8 39:21 98:19

**reported** 30:22 98:20

**reporter** 1:20 4:4 7:3,12 244:16 271:17 294:6

**reporter's** 167:15 203:3 208:5,10 212:22 214:5

**[reporters - richards]**

| | | | |
|---|---|---|---|
| **reporters** 91:8 91:16 168:20 | **respected** 235:7 | **rest** 178:18 219:25 223:15 | 89:22 90:13,18 92:10,16 95:22 |
| **reporting** 38:19 54:7 119:15 213:6 | **respond** 83:2 250:12 | **restructuring** 27:4,8 | 98:13 99:20 100:8,11 |
| **represent** 5:7 272:22 276:21 283:12 | **responding** 92:23 206:15 244:8 | **result** 7:4 **retained** 295:9 | 101:10,22 102:10 103:16 |
| **representing** 4:2 | **response** 10:12 93:8 181:13 | **retaliatory** 286:21 | 104:8,13,21 106:17,25 |
| **reputation** 146:22 147:6 147:11 | 194:22 198:13 209:23 231:21 | **return** 287:21 **reverse** 248:4 | 107:5,21 108:5 108:15,19 |
| **request** 191:12 196:22 201:4 205:10 | 242:3,10 244:22 245:24 246:10 262:17 | **review** 9:25 10:7,15 115:17 161:12 172:12 | 109:13 111:12 111:17,19,22 112:7,11,14,17 |
| **requested** 10:9 196:18,19 243:13 274:22 | 266:4 **responses** 265:19 | **reviewed** 12:16 **reviews** 115:20 | 112:24 113:9 113:20 114:5 |
| **required** 296:14 | **responsibilities** 19:8 24:24 25:4 40:10,14 | **rewarding** 49:9 **rewrite** 230:2,3 | 114:10,16,19 116:2 118:23 119:4,22 |
| **research** 40:6 133:15 | 42:7 45:6,12 45:20 59:6 | **rich** 78:20,22 78:23 139:12 | 120:20 121:22 123:22 125:8 |
| **researching** 40:6,7,8 | 107:7,11,21 **responsibility** | 139:18 140:25 141:6,14 142:2 | 125:22 135:3 136:21 138:24 |
| **reserving** 283:3 | 42:4 108:6,16 108:20 | 142:3,11,20,21 143:4,12,16,22 | 139:8 142:23 143:3,14 |
| **reset** 229:16 | **responsible** | 146:21 149:2 | 151:19 154:16 |
| **reshuffled** 34:3 34:13 | 42:13,14 58:22 59:2 | **richard's** 79:8 **richards** 11:3 | 157:6 161:5 162:24 179:4 |
| **resolved** 241:10 | **responsive** 82:19 83:3 | 11:10,13 13:12 69:17 70:24 | 183:17 184:18 185:20 186:2 |
| **resources** 158:11,16,21 161:5 | 90:4,9 92:25 190:20 191:11 | 71:3,6,16,21 72:5,16 73:5 73:19 74:2,18 74:23 75:3,8 85:21 86:7,25 87:25 89:14,17 | 187:12,17 188:2 189:6 197:6 201:10 203:22 204:5 206:23 246:18 |

**[richards - scott]**

271:23 278:23 279:8 280:14 280:19,23 282:13 286:4,9 286:15 287:6 287:13,16,21 288:8,15,21 289:14 291:2

**right** 16:12 27:23 57:7 78:3 82:16 88:19 95:25 101:17 102:24 116:10 117:25 120:11 121:7 122:4,9 131:17 134:17 138:12 140:17 150:25 154:19 161:24 173:20,25 174:5 181:10 181:14,15 182:18 185:18 188:18 192:11 193:2,24 197:16 198:5 198:10,12 204:22,25 211:17 226:10 227:18 235:14 244:18 247:22 254:11,14 266:19 267:16 267:23 268:10

269:8,10 272:21 273:25 275:8 286:5 287:13 289:25 291:4,17 294:24

**rights** 283:3
**ring** 262:22
**rip** 208:13
**role** 21:4 32:16 40:17 46:11 97:13 98:6 100:14 161:9
**roles** 131:6
**room** 5:19,22 171:3
**rose** 22:22
**rotated** 96:21
**rotating** 96:17
**roughly** 36:19 36:20 37:8 68:25
**routinely** 51:22 119:14 242:20 242:23 243:6 243:23
**rub** 38:10
**ruined** 154:4
**rules** 6:22
**run** 184:24 271:9
**running** 215:18
**runs** 17:2

**s**

**s** 5:9,9 130:4,4 228:18 297:7 299:3
**sad** 54:23 55:8 55:13,16
**safer** 53:11 54:4
**salary** 179:16
**save** 206:2,5
**saw** 51:22
**saying** 52:13 74:13 77:23 103:18 152:25 153:6 154:12 167:18 181:17 189:23 210:16 210:19 211:2,5 211:20 214:23 219:16 220:13 220:14 222:17 227:9 231:7 235:16,22 236:24 237:4,9 237:13 238:9 238:10,11,17 238:25 239:23 240:17 241:16 247:11 264:23 274:5,6 276:16 276:18 285:7 287:2

**says** 117:7 127:24 128:24 174:7 175:10 176:18 184:21 185:13 213:12 213:17 214:8 216:19 218:7 221:17,18 223:8,20,24 224:7,16 226:14,22 228:3,22 229:22 230:15 233:24 234:12 240:20 248:13 263:10 284:11 285:11,15
**school** 14:16,18 14:20,24 15:10
**schuster** 65:2 65:18 66:5 78:18
**schuster's** 65:4
**scott** 1:16 3:16 5:1,3 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1

**[scott - scribbling]**

| | | | |
|---|---|---|---|
| 35:1 36:1 37:1 | 123:1 124:1 | 191:1 192:1 | 259:1 260:1 |
| 38:1 39:1 40:1 | 125:1 126:1 | 193:1 194:1 | 261:1 262:1,5 |
| 41:1 42:1 43:1 | 127:1 128:1 | 195:1 196:1 | 262:18 263:1 |
| 44:1 45:1 46:1 | 129:1 130:1 | 197:1 198:1 | 264:1 265:1 |
| 47:1 48:1 49:1 | 131:1 132:1 | 199:1 200:1 | 266:1 267:1 |
| 50:1 51:1 52:1 | 133:1 134:1 | 201:1 202:1 | 268:1 269:1 |
| 53:1 54:1 55:1 | 135:1 136:1 | 203:1 204:1 | 270:1 271:1 |
| 56:1 57:1 58:1 | 137:1 138:1 | 205:1 206:1 | 272:1 273:1 |
| 59:1 60:1 61:1 | 139:1 140:1 | 207:1 208:1 | 274:1 275:1 |
| 62:1 63:1 64:1 | 141:1 142:1 | 209:1 210:1 | 276:1 277:1 |
| 65:1,15 66:1 | 143:1 144:1 | 211:1 212:1 | 278:1 279:1 |
| 67:1 68:1 69:1 | 145:1 146:1 | 213:1 214:1 | 280:1 281:1 |
| 70:1 71:1 72:1 | 147:1 148:1 | 215:1 216:1 | 282:1 283:1 |
| 73:1 74:1 75:1 | 149:1 150:1 | 217:1 218:1 | 284:1 285:1 |
| 76:1 77:1 78:1 | 151:1 152:1 | 219:1 220:1 | 286:1 287:1 |
| 79:1 80:1 81:1 | 153:1 154:1 | 221:1 222:1 | 288:1 289:1 |
| 82:1 83:1 84:1 | 155:1 156:1 | 223:1 224:1 | 290:1 291:1 |
| 85:1 86:1 87:1 | 157:1 158:1 | 225:1 226:1 | 292:1 293:1 |
| 88:1 89:1 90:1 | 159:1 160:1 | 227:1 228:1 | 294:1 295:1,7 |
| 91:1 92:1 93:1 | 161:1 162:1 | 229:1 230:1 | 296:2,4,13 |
| 94:1 95:1 96:1 | 163:1 164:1 | 231:1 232:1 | 297:4 299:2,24 |
| 97:1 98:1 99:1 | 165:1 166:1 | 233:1 234:1 | **screen**  3:10 6:8 |
| 99:9 100:1 | 167:1 168:1 | 235:1 236:1 | 6:14 196:11,13 |
| 101:1 102:1 | 169:1,22 170:1 | 237:1 238:1 | 196:16,21,24 |
| 103:1 104:1 | 171:1 172:1,11 | 239:1 240:1 | 197:4 199:8 |
| 105:1 106:1 | 173:1 174:1,8 | 241:1 242:1 | 206:11,13 |
| 107:1 108:1 | 175:1 176:1 | 243:1 244:1 | 263:11,13 |
| 109:1 110:1 | 177:1 178:1 | 245:1 246:1 | 264:9,17 |
| 111:1 112:1 | 179:1 180:1 | 247:1 248:1 | 267:13 269:3 |
| 113:1 114:1 | 181:1 182:1 | 249:1 250:1 | **scribble**  167:17 |
| 115:1 116:1 | 183:1,23 184:1 | 251:1 252:1 | 209:8 |
| 117:1 118:1 | 185:1 186:1 | 253:1 254:1 | **scribbling** |
| 119:1 120:1 | 187:1 188:1 | 255:1 256:1 | 203:5 |
| 121:1 122:1 | 189:1 190:1 | 257:1 258:1 | |

| | | | |
|---|---|---|---|
| **script** 41:24 42:11 108:6,10 108:11 | 181:23 183:2 184:2,14 186:13 194:14 | 268:11 | **serving** 141:25 |
| | | **senior** 18:23 | **session** 6:25 |
| **scripts** 40:24 | 195:8,10 196:4 | 19:4,8 21:12 | 130:2 |
| 40:25 108:9,10 | 199:19 218:13 | 22:2,10,20,24 | **set** 91:19,20,25 |
| **scroll** 116:16 | 219:4 220:25 | 23:15 24:10 | 92:6,8 95:12 |
| **search** 82:11,13 | 221:2 223:10 | 25:16 46:12 | 206:19 219:12 |
| 92:25 93:15 | 223:21 226:25 | **sense** 6:20 | 271:17 298:8 |
| **searches** 93:11 | 229:25 240:24 | 25:18 144:9,16 | 298:18 |
| **season** 52:21 | 255:16 260:3 | 147:13 149:6 | **sets** 224:24 |
| 52:22 53:3,3,9 | 262:10 266:11 | 149:23 | **setting** 92:15 |
| **seat** 20:24 21:2 | 268:2 271:11 | **sent** 10:11,13 | 95:19 254:4 |
| **second** 18:3 | 294:3 | 66:13 71:6 | **settings** 91:13 |
| 114:24 121:25 | **seeing** 205:19 | 119:3 123:9 | **settles** 185:9 |
| 195:20 215:9 | **seeking** 148:9 | 187:10 190:8 | **seven** 21:11 |
| 217:10 240:23 | **seem** 217:15 | 246:25 254:22 | 24:18 36:16 |
| 259:15 266:20 | **seemed** 144:25 | 267:3,21,24 | 295:8 |
| 284:7 | 203:4,13 | 268:12,17,19 | **several** 44:11 |
| **secretly** 203:24 | 241:20 287:3 | 269:6 288:15 | 198:14 208:9 |
| 204:3 | **seems** 182:15 | **sentence** | **sexual** 50:15 |
| **section** 268:22 | 195:19 | 128:24 215:9 | **share** 114:23 |
| **securing** 40:10 | **seen** 3:9 111:22 | 215:10 230:11 | 159:25 200:18 |
| 107:7,22 | 112:3,7 160:25 | **separately** | 201:12 228:22 |
| **security** 164:20 | 211:21 237:3 | 93:15 | 229:3,9 240:20 |
| **see** 26:10 66:10 | **segment** 133:19 | **september** | 241:2 |
| 90:3,8 111:25 | **self** 15:15 41:12 | 178:13,20,24 | **shared** 262:8 |
| 116:4,9,13,14 | 210:23 | 179:9,12 | **sharing** 153:19 |
| 116:15 117:8 | **send** 72:15 | **sequentially** | **shop** 138:21 |
| 118:6 128:2,7 | 75:16,21 | 220:12 | 143:11 |
| 129:2 160:6 | 122:23 128:20 | **series** 26:18,24 | **short** 77:3 |
| 171:21 172:6,8 | 201:2,5,9 | 27:17 | 192:12 275:22 |
| 173:16 174:18 | 263:11 264:4,9 | **served** 90:5,10 | **shorthand** 1:20 |
| 176:10 177:3 | 264:11,16 | **services** 16:11 | 213:6 |
| 177:16 180:8 | 265:12,14 | 17:13 | **shortly** 27:24 28:12 207:8 |

252:25 253:23

**shot** 107:19 196:11,13,16 196:21 199:8 206:11 263:11 263:13 264:9 264:17 267:13 269:3

**shots** 196:24 197:4 206:13

**shoulders** 38:10

**show** 19:16 32:21 33:14,18 57:18 58:13 131:4,11 132:7 132:9 133:20 159:23 176:8 235:7

**showed** 264:19

**shower** 153:24 154:4

**shows** 32:22,24 35:18 36:12 131:12,13

**shy** 18:17

**side** 24:14,24 122:4,5,9,11 132:22,22 173:19,20 211:21 221:2,9

**sides** 48:5,6

**signal** 88:14,17 88:22 89:5,7

89:10,13,24 90:2,14,24 91:6,14,18,19 92:3,11,18 276:23 277:8,9 277:12,16,18 277:25

**signature** 298:20

**significance** 212:21

**similar** 35:24 36:4

**simon** 13:6 53:14 54:10 62:22,25 76:17 83:10 159:7 201:15 279:23

**single** 127:7

**sit** 109:7 119:2 166:15

**sitting** 168:14 168:17

**situation** 170:4 216:21 217:17 253:7 275:21

**situations** 35:5

**six** 24:18 152:8 152:10

**skills** 16:24

**slammed** 175:25

**slave** 132:2

**slavery** 131:21

**slightly** 82:17

**small** 283:7

**smart** 276:13

**smashed** 177:4

**smoother** 170:12

**smudge** 219:16

**snapchat** 84:23

**social** 84:7 86:10 94:9

**socialize** 109:13,25

**solutions** 4:3,5 295:9

**somebody** 60:18 78:3 127:7 247:23 248:14

**somewhat** 234:3 240:6

**son** 85:2 123:12 292:24

**soon** 122:21 232:11

**sorry** 9:12 42:8 66:7 67:7 94:15 113:17 115:8,11 147:7 154:22 168:17 170:10 176:3 181:18 185:5 186:12 197:12 197:22 216:17

217:22 237:22 241:14 243:10 245:6 250:9 274:17 289:22

**sort** 60:5 107:17 140:14

**sounded** 180:18 271:19

**sounds** 147:22 240:15 269:14

**source** 92:2,5 145:9,13

**sources** 39:2 40:5,8 87:17 89:2,3 91:2,3,7 91:24 100:19 100:20,21 244:19

**southern** 1:3 3:20

**speak** 79:6 135:17 140:24 178:23 181:8 188:14 198:21 237:24 240:12 279:17

**speakerphone** 170:24

**speaking** 45:5 165:18 215:15 216:24 251:9 252:3 274:3

**spearheading** 133:13

**[special - stored]** Page 48

special 120:23
121:14
specific 14:8
33:14 37:19,24
41:16,19 61:7
61:16 65:8
71:25 72:4
91:5 101:5
102:15,17
103:13 104:6
104:15 105:2
105:15,22,23
109:9 119:20
124:13,18
131:3 139:7
141:17 144:23
148:2 179:8
210:12 255:9
256:15 257:4
258:18 265:18
specifically
33:15 43:15
44:12 45:3
52:6 105:14
109:5,10 120:2
124:5,21,25
126:14 127:14
132:24 134:7
135:7,23 136:5
138:16 141:4,7
141:15 142:12
143:7,18 144:6
146:2 147:12
148:4 149:3,22

150:11 151:14
151:21 152:18
152:24 153:10
153:21 155:25
156:23 157:21
160:11 166:10
182:10 210:21
220:23 232:18
240:13,17
243:2 244:10
247:6 248:23
249:8 250:17
253:9,16 254:5
254:8 256:2,20
258:3 259:21
specifics 26:6,8
179:11 211:22
256:10,17
289:7
specify 229:7
spell 20:5
spoke 8:18
78:14,17
142:19 146:3
157:14 170:23
178:25 199:5
232:5 246:17
246:20 251:20
252:3 255:14
273:17 275:21
282:21 290:24
spoken 10:20
78:20,22
157:19 175:19

186:18 187:12
221:14 258:21
259:4 273:19
275:12 281:18
spot 139:11,12
spouse 10:19
springfield
1:19
staff 34:2 35:10
stage 125:14
stahl 53:10,19
83:13,18,21
180:23
stamp 171:24
260:13 297:13
stamped 115:2
160:3 178:12
179:23 195:5
201:20 259:24
297:10,11,15
297:17,19
standard
257:20
stapled 205:25
stark 211:11
start 17:21
30:14 32:18
93:5 177:14
187:5 202:24
203:9 215:6
224:24 236:25
261:24 268:13
294:11,23

started 19:3
22:18 38:2
53:23 85:14
96:12 97:6
190:17 203:5
203:14 255:8
starting 15:24
19:5 20:19
100:18 224:13
264:5,12
268:18 288:14
starts 220:24
267:22
state 1:21 2:12
4:11,13 168:22
251:24 298:5
stated 244:4
statement
224:12 285:19
statements
283:21 284:4
states 1:2 3:19
stay 64:21 66:4
111:13 134:18
139:24
steps 40:4
120:23 121:14
steve 64:11
stogner 30:5
stop 276:7
store 192:2
stored 118:15
192:4,6 199:8
199:11,15

**[stored - sure]**

| | | | |
|---|---|---|---|
| 207:13 | **streak** 48:15,18 | **subordinate** | **sure** 5:24 6:16 |
| **stories** 16:25 | 48:22 | 248:5 | 12:3 17:7 |
| 25:6,11,14,19 | **street** 2:12 | **subordinates** | 21:15 22:5 |
| 25:23 26:19,20 | **stresses** 124:2 | 248:10 | 23:19 25:2 |
| 32:18 38:17,18 | **stressful** 35:3,6 | **subpoena** | 29:5 30:21 |
| 38:21 39:4,5,8 | 35:7,12 49:8 | 10:12 69:25 | 35:22 36:3 |
| 39:11,16,22 | 49:14 | 71:11 76:3 | 37:15 39:7,13 |
| 40:15,18 45:9 | **strike** 9:18 | 82:9,20 83:4 | 39:25 40:12,16 |
| 45:25 52:23 | 31:18 49:17 | 90:4,9 92:23 | 40:20 41:8 |
| 53:2,4,17 | 56:4 57:3 62:7 | 93:9 113:11,21 | 42:2 43:21 |
| 99:19 100:7,12 | 67:16 69:21,21 | 121:12 161:19 | 44:8 45:22 |
| 101:4,6,7 | 77:13 78:8 | 166:5,12,22 | 47:8,10,12,15 |
| 102:18 104:2 | 122:2 137:20 | 173:4 190:21 | 55:14 59:18 |
| 105:8 108:20 | 156:16 157:17 | 191:12 206:15 | 62:18 64:20 |
| 108:23 109:2 | 158:2 159:11 | 254:13 264:15 | 65:3,10,24 |
| 133:22 192:4 | 168:8 189:3 | 264:20 265:5 | 66:2 68:25 |
| 208:2 | 209:11 220:10 | **subscribed** | 71:18 72:2,9 |
| **story** 16:22 | 232:3 236:17 | 296:16 | 73:8 81:12,15 |
| 18:4 41:25 | 249:3 270:4 | **suggest** 200:14 | 82:4 83:14 |
| 53:18,24 | 289:22 | **suggests** 175:10 | 84:9,18 87:5 |
| 100:22,23 | **strong** 210:15 | **suite** 2:5 | 88:15 91:8,16 |
| 101:2 102:19 | 211:4 | **summaries** | 93:4 94:16 |
| 103:21,25 | **strongly** 149:5 | 41:6 | 95:11 97:9 |
| 109:9 130:15 | **struck** 248:14 | **summer** 272:7 | 98:3,9,18 |
| 131:18,18,20 | **struggling** | **sung** 148:5 | 104:22 105:12 |
| 132:3,12,15,19 | 183:17 222:10 | **supervise** 98:17 | 105:20 106:20 |
| 133:2,10,19,24 | 228:4 276:3 | **supervisor** | 106:22 107:9 |
| 134:5 144:16 | **stuff** 119:12 | 19:25 | 107:24 108:18 |
| 144:17 175:25 | 120:5,6 176:9 | **suppose** 56:9 | 108:22,25 |
| 177:5,9,10,12 | 193:23 244:17 | 137:3 146:9 | 109:23 110:9 |
| 177:22 178:5 | **style** 142:13 | 185:23 246:6 | 114:11,14,17 |
| **strange** 286:2 | **submitted** | **supposed** | 114:20 115:24 |
| 287:3 | 158:4 161:5,10 | 169:19 193:24 | 118:13 119:7 |
| | 161:13 | | 126:3 131:7 |

132:9 133:5 134:8 139:22 141:3,4,8 142:5 144:7,23 145:12 147:9 147:19 148:17 149:13,18 150:19 160:13 164:17 174:12 178:15,19,22 179:14 185:7 193:10,12 197:14 204:15 209:2 211:9,9 213:2 217:2,25 219:12 220:19 222:6 229:25 230:10 231:9 231:14 237:21 237:23 242:18 245:19 249:16 257:20 258:4 262:18 263:20 271:24 274:19 292:2

**surprise** 210:15 211:4,19 220:20 239:15

**surprised** 77:18 235:10 247:12 248:3 250:15,19,22 276:16

**surprising** 167:15 276:19

**switch** 239:19

**switched** 95:15 95:17 193:13 194:4

**switching** 13:14

**sworn** 5:11 296:16 298:8

---

**t**

**t** 5:9,9,9 20:7 130:4,4,4 224:9 297:7 299:3,3

**take** 3:12 7:21 7:25 27:21 57:6 114:24 120:23 121:14 129:19 167:5 167:12,21 172:11 192:12 193:2 195:19 196:15,18,24 197:4 200:15 201:25 204:12 204:23 206:7 206:16 215:14 233:20 259:11 262:23 268:3 269:12 270:14 282:2 283:6 295:2

**taken** 1:19 6:18 11:6,10 129:25 196:21 203:15 203:20 249:14 249:16

**talk** 7:11 17:13 72:3 79:3 103:14 111:15 112:11,14,17 134:4,23 140:3 162:13 166:4 178:14,15 185:8 186:10 188:11 198:15 198:19 199:4 204:21 216:20 237:16 262:19 263:3 264:6,6 264:13 271:2,4 271:23 272:12 272:19 292:13

**talked** 112:12 125:12 139:25 144:2 162:15 186:21 196:12 250:5 272:15 273:7,23 291:11

**talking** 21:17 39:18 47:2 71:23 75:25 100:7 107:12 137:24 138:12 162:4,5,6

163:2 174:25 192:22 197:20 203:12 213:15 213:22,23 244:18 261:19 271:16

**talks** 127:19

**tape** 266:10

**taped** 266:16

**tasks** 100:16 103:9,11 133:4

**team** 24:14 26:10,15 37:14 37:16,17 41:22 42:14 43:11,13 44:6,25 45:7 45:17 46:7 96:12 97:6,13 100:22 101:19 102:3,6,20 103:19,20,23 104:4,18,24 107:24 110:2 111:3 132:20 132:21 139:11 139:13 141:9 141:20 144:12 144:17 145:15 145:18 146:8 146:17 148:21 149:7 165:2 178:2 180:18 236:8,14 277:10 288:4

**[teams - text]**

**teams** 104:16
108:3 239:19
292:7
**technology**
3:25
**telephone** 68:2
**tell** 12:24 45:18
46:21 51:18,20
54:21 59:17
100:10 117:23
117:24 119:18
125:8 136:13
136:17 138:5,8
138:10,14
143:2,13,24
145:8,13
146:11,18
147:4,9 148:24
149:20 150:17
152:23 154:3,7
155:7,12
157:25 159:18
163:10,14
165:5 166:6,9
172:8 203:12
214:9 215:7,20
216:6 233:7
241:5,24 242:4
242:12 243:9
243:16 245:2
247:4,21,23
248:16 249:13
250:24 251:21
255:6 258:20

259:3 266:13
274:13 275:2
276:3 278:23
279:13 280:14
281:9 293:2,23
**telling** 138:17
143:7,18
144:16 177:24
223:20,24
242:3
**tenure** 57:22
97:18
**term** 16:21
34:7 145:19
**terminate**
60:15,21
293:11,16
**terminated**
60:25
**terms** 42:10
55:11 59:15
293:6
**terrible** 217:18
217:22 218:4
218:15
**terrific** 178:5
**testified** 5:12
24:21 56:13
77:19 127:10
127:16,21
130:6 144:21
148:7 152:20
162:14 164:8
193:12,13

197:9 200:22
232:4 249:4
253:20 263:7
267:9 272:23
272:25 273:8
275:10,23
276:22 278:6
287:11 289:20
289:23
**testify** 8:5,9
**testifying** 184:5
**testimony**
12:16 34:5
42:22 78:7
93:5,8 148:13
157:16 167:10
172:24 192:23
202:19 215:2
217:6 220:6
221:7,22
222:17 231:3
246:5,19
265:25 272:14
273:4 294:5
295:6 296:10
298:7,10
**text** 66:13,16
71:4,6,10
72:10,15,21
73:4,18 74:2,9
74:16,22 75:3
75:9,16,17,21
75:21,25 76:5
77:9 90:20

101:12 113:3,6
113:10,14,20
114:4 115:6,25
117:5,7,10,23
118:2,8,11,12
118:23 119:4
119:10,21
120:9,17,19
121:3,15,19,21
121:25 122:25
123:9 124:4
127:12,24
128:2,7,20,20
135:13 151:7
152:14 161:16
161:18,20
162:6,8 165:17
172:19,22
173:2,7,15,22
174:7,18 175:7
175:22 179:24
180:8,25
181:12,17,23
182:5,6,15,24
183:5,11,22
184:2,6,6,14
185:16,21
186:13,17
187:6,11,15,22
188:12,22,25
189:7,13,16,22
190:2,7,11
192:9,22 193:4
193:14,17,20

**[text - thorough]**

194:2,9,22
198:12 199:13
200:24 209:10
216:23 218:23
221:3,16 223:7
225:25 226:25
227:14 228:8
247:2 252:22
253:3,21
254:10,15,21
255:13,19,21
260:10,19,21
260:23 261:10
261:15,25
262:10,24
263:12,21
264:4,12
265:22 266:7
266:14 267:4
267:18,22,24
268:8,11,13,19
268:20 269:3
270:15,22
271:11,16
272:16 273:12
279:7 280:18
288:14,17
289:11
**texted** 163:11
163:21 164:3
198:6 232:8
**texting** 174:22
271:22

**texts** 69:14
118:14 166:3,4
176:10 185:21
198:7,8,13
255:8,10,15
274:14 275:4
282:21
**thank** 115:15
127:25 170:13
184:22 194:18
204:24 262:22
271:7
**thanks** 170:15
174:8 178:19
**therapy** 136:18
**thereabouts**
21:18
**thing** 46:24
104:10,11
124:9 132:23
177:14 205:25
211:18 216:2
217:16,19
247:22 256:8
268:2 276:13
**things** 6:23
15:20 17:3
28:20 39:3
56:10 73:16
107:13 119:16
124:2 133:16
170:11 177:8
209:12 210:15
210:18 211:4,5

211:7,20
212:11 222:22
230:15 231:17
233:15,16
234:21,24
244:25 246:6
247:9,12,24
248:10 249:10
255:9,17,18
256:21,24
265:19 290:4
292:16
**think** 17:23
21:5,11 24:18
28:22 31:2
33:12,15,17
34:7 36:19
42:22 43:24
46:18 47:18
48:15 50:5
52:20 55:22
56:2,15 59:18
72:25 78:4,5
78:12 88:18
93:4,17 95:2
95:10 97:10
98:22 99:24
100:3 101:12
102:17,24
103:13 104:5
104:13 106:14
117:15 123:13
126:24 129:15
131:12 139:25

142:15 143:7
144:8 146:17
147:23 148:7
148:13 149:5
151:15 152:8
153:12 170:11
178:25 180:2,5
180:15 182:12
183:19,20
189:15 192:23
195:16 197:8
202:19 210:22
212:3,14 213:2
214:9 219:7
223:7 224:9,10
224:13 225:6,7
230:8 233:22
245:21 246:4
246:19 247:24
248:4,9 250:2
250:14,15
252:4 254:10
260:8 267:21
271:22 281:22
287:16 290:19
294:5
**thinking**
204:17 247:21
**third** 40:11
107:7,15,22
220:24
**tho** 184:13
**thorough** 102:2
103:4,7,11

**thoroughly** 212:24

**thought** 56:16 56:17 101:13 104:20 136:3 167:16 210:25 219:14 230:6 233:2 236:7 237:7 247:12 249:3,11 275:11 287:12

**thoughts** 135:21 175:5 257:21

**thread** 115:25 117:5,7 118:2 172:19 173:22 182:25 185:16 187:23 199:13 200:24 260:10 260:19 264:4 264:12 268:12 272:10

**threads** 260:22 267:25

**threatening** 239:4

**three** 24:2 29:14 32:7 43:23 52:21 53:3,8 73:2,7 208:25 222:13 226:17 234:7

**thrilled** 179:15

**thursday** 3:4

**tied** 30:16

**tiktok** 85:3

**time** 4:12 7:13 7:16 12:10 18:18 19:21 20:9,18 21:14 21:16,21 22:11 23:16,22 24:4 24:17 26:12 27:15,15,22,23 28:4,4,10 29:23,24 30:6 32:13,23 33:7 33:9,11,16,17 34:11,11,12,17 35:3,6,8,12,13 35:14,15,16 36:12,13 43:10 43:19 44:10,24 48:24 52:7,8 52:20 53:11,12 54:16,18 57:9 57:13 58:2,11 58:19 60:9,11 61:15 62:2 63:8 64:9,11 64:12 65:5 68:18 70:15 71:5,24 73:6 79:7,25 80:17 81:10 89:4 91:22 94:12

97:3,14 98:4,6 99:21 103:17 106:16 107:4 109:8,18 112:22 113:8 113:14 114:13 114:19 123:8 126:2 127:2 129:16,24 130:8,15 133:23 135:18 138:3 139:10 140:2 143:3 146:19 148:25 149:16,25 150:11 151:24 152:16 153:2 154:9,18 155:9 155:22,23 156:20 163:21 164:2 166:4 169:8 174:3,9 174:14 175:11 176:20 177:5 178:7,24 179:2 179:18 180:13 187:10,15 188:17 192:5 192:15,18 198:23 200:5 200:21 202:23 205:2,6 208:3 208:10 220:10 221:13 250:5

251:20 252:2,7 252:14 269:16 269:19 270:25 272:20 275:20 278:18 280:5,6 281:7 282:4,7 288:22 290:24 291:19 292:4 293:5 294:11

**timeline** 251:24 255:16 268:24

**times** 5:15 8:25 46:19 47:25 48:16 55:4 56:9,16 102:12 107:24 109:21 120:5 122:20 124:7,8,14 127:19 183:18 248:11 288:19 289:13

**title** 18:21 19:2 19:4 20:9,10 20:13 22:12,15 23:16 29:18,22 30:6 32:9 33:10 36:22 96:8 98:10,11

**titled** 1:18

**titles** 22:21,23

**today** 6:18 8:4 8:10 109:7 119:2 166:15 172:23 174:10

**[today - two]**                                                            Page 54

174:13,17 175:8 184:11 192:24 262:19 271:2 294:6

**today's** 8:13,17 9:2 10:2 265:6 295:6

**together** 31:16 41:22 42:20 100:12 109:22 130:16 131:18 131:19 132:11 132:16,23 177:23 205:25

**told** 12:14 138:24 141:19 144:8,24 145:7 145:9,14 147:5 147:10 156:18 157:10 158:3,9 162:24 177:11 194:11 214:14 214:23 218:19 220:6 228:14 240:8 245:11 247:7 249:6,15 249:18,20 252:11 266:2 275:5 278:22

**tomorrow** 174:17 178:18

**ton** 177:10

**tone** 236:16 239:8,14

**tonight** 176:2 263:20

**tonya** 13:6 62:22 76:17 83:10 159:7 201:15 275:12 275:18 279:23

**took** 166:11,16 166:20 167:3 168:4 196:13 202:20 204:8 205:9 206:13 220:11 233:7 249:18

**top** 22:24 71:13 117:7,10 173:15 179:24 179:24 189:22 213:11 215:10 222:8 223:19 223:23 226:14 228:2 261:24 261:25

**topic** 88:2 151:4 152:4 181:14 239:23

**tore** 208:4

**total** 43:25 284:18,21 295:7

**totally** 188:8 238:7

**touch** 64:21 66:4 111:13

134:18 139:24 174:9 178:6 277:4 281:14

**tough** 122:18 123:16,19,21 124:10,11,15 125:6,6,10 126:4,7,10 127:2,12 136:12 151:24 153:2 183:18

**toward** 153:7

**towards** 48:18

**trafficked** 131:25

**trafficking** 131:23

**train** 249:3

**training** 15:20 16:18 17:6,8 17:10,14

**transcript** 296:5,10 298:9

**transfer** 193:6 194:3

**transferred** 165:2 193:20

**transpired** 233:4

**traumatic** 55:25 56:23

**traumatized** 56:24 136:14

**treated** 136:19

**tremaine** 2:16 5:7 283:11

**tried** 209:22 270:13

**trouble** 115:10

**true** 19:20 218:23 238:18 248:5 296:9 298:9

**trust** 284:24 285:3,7

**truth** 238:10

**truthfully** 8:6 8:10

**try** 39:21 45:25 166:3 287:6,25

**trying** 35:16 38:20 52:22 79:2 142:22 154:23 156:6 175:2 176:5,18 176:24 177:11 210:9 211:6 215:13 240:19 242:6 246:8 276:14

**turn** 266:19 284:6 285:10

**tv** 33:18

**twitter** 84:13 85:8

**two** 13:20,21 20:3 21:22

**[two - using]** Page 55

22:13 24:8
32:7 59:14,20
59:23,24 72:25
80:17 85:15
88:20 89:6
90:24 110:6,13
110:16 132:11
138:9 151:6
152:20 168:22
186:25 208:25
214:7 224:23
252:24 262:2,7
294:18
**type** 200:12

**u**

**uh** 185:3
**ultimate** 45:15
45:24
**ultimately**
52:24 53:24
132:3 254:23
292:15
**unable** 226:21
**unclear** 163:8
**uncomfortable**
232:24
**under** 24:14
118:8 135:12
139:12,13
213:16 214:8
228:21
**understand** 7:6
7:17,25 17:17

28:21 42:8
86:15 107:15
142:5 154:23
193:10 197:12
211:7 230:12
237:21 239:2
245:5 246:9
**understanding**
11:23,24 27:6
91:11 93:7
122:8 128:11
129:7 130:25
134:16 137:9
148:11 162:18
176:21 179:17
179:18 193:8
193:19,25
218:17 222:2
245:7,20 285:6
**understating**
101:16
**understood**
28:24 45:18
**unfair** 56:6,10
56:11,17
**unhappy** 164:3
164:10
**unit** 3:15 19:16
20:4,12,15,18
21:13 22:3,14
22:22 23:6,9
23:12,16,18
24:12,15,25
27:14,20 28:3

28:14 35:4,12
43:3 95:24
96:4,19,21,22
97:15,21 98:7
98:14,24 99:14
99:21 106:11
106:18 107:6
131:4
**united** 1:2 3:19
**units** 19:19
21:9 96:17,20
**university**
13:21,24,25
14:3,11,17,21
15:11
**unpleasant**
52:14 55:3
**unrelated**
176:8
**unsure** 219:22
**unusual** 293:9
**upheaval** 35:15
**upset** 54:13
250:14,19,22
251:15
**upsetting** 55:21
**upstairs** 169:4
**urgent** 184:12
184:22 271:4,7
**use** 67:7 69:4,7
69:15,19 70:17
70:22 71:2,15
71:19 72:14
74:21 75:12

81:8,13,16,21
81:24 83:6,9
83:12,24 84:4
84:21,24 85:16
85:19,23 86:2
86:5,17,21,24
87:13,18,21
88:25 89:7,10
89:13 91:8,16
92:18 149:14
208:8 246:14
253:13
**used** 41:24
79:25 80:3
81:7 82:5,23
83:17 87:4,24
88:4,10,13,19
88:23 89:2,4
90:23 91:23
149:10 250:21
277:9 295:8
**useful** 265:13
**using** 3:24
69:12 72:7,15
73:19 74:3,17
75:3 84:14
89:24 90:14,19
92:3,11 107:20
145:20 169:16
170:18 197:9
197:15,25
243:25 277:16
277:25

**usual** 123:25
**usually** 32:22
  108:11

**v**

**va** 26:18
**vague** 154:11
  154:15,21,24
  156:4,6 210:14
  211:2
**vaguely** 155:2
**variations**
  98:11
**various** 248:11
**veracity** 41:15
**verbal** 7:5
**verbally** 189:6
  252:19
**verbate** 213:8
  225:10 228:20
**veritext** 4:2,5
  295:9
**versa** 175:6
**version** 205:11
  267:21
**versus** 3:18
  143:22 144:5
**veterans** 26:17
  26:18
**vice** 175:6
**video** 3:11,16
  6:8,13 7:3
  113:25 192:4

**videographer**
  2:22 3:2 4:3
  57:8,12 129:19
  129:23 130:7
  192:14,17
  204:25 205:5
  269:15,18
  282:2,6 295:2
**videotaped**
  1:16
**view** 56:10
  114:18 149:10
  180:12
**views** 153:19
**virginia** 1:19
**virtual** 3:24
**virtually** 3:6
  102:19
**vis** 155:5,5
**visuals** 107:17
**vladeck** 2:3
  4:21
**vladeck.com**
  2:7,8,10
**voice** 50:3,7
  182:13
**voluntarily**
  31:24 51:3,5,6
  51:10 137:8
**voluntary**
  51:25
**vs** 296:1 299:1

**w**

**waiting** 174:12
  199:4
**wallace** 33:21
  34:23 37:23
  43:16,18 46:14
  46:20 47:16
  49:11 51:9,14
  52:16 56:18
  292:20
**wallace's** 44:5
  45:7 51:25
**want** 8:22 12:3
  12:24 26:5
  102:6 104:18
  115:12 117:21
  142:6 148:25
  160:10,13
  164:6,16
  178:15 184:24
  186:12 188:10
  204:10 225:12
  229:8 236:18
  237:2 239:24
  240:16 252:23
  254:20 271:9
  283:15 291:16
**wanted** 61:25
  156:19 162:12
  178:8 216:20
  235:25 236:21
  247:10 266:17
  268:23 272:12

  276:17 290:9
**wanting** 253:5
**washington**
  62:10 109:20
  169:9 290:15
  291:20
**way** 9:15 17:12
  31:13,15 42:9
  48:22 78:10
  91:10,20 93:5
  113:5 125:19
  150:4 153:16
  163:16 164:4
  182:8 190:6
  217:15 235:14
  236:17 239:11
  277:7 298:15
**ways** 46:4 47:5
  54:20,22,23
  55:2,6,9,13
  69:10 112:25
**we've** 175:25
  267:15
**website** 25:8
**wedding** 154:9
  154:10,12,18
  154:25 155:3,5
  155:10 182:3
**wednesday**
  263:14 264:8
  288:15
**week** 174:9
  184:12,23
  185:8 271:4,8

**[weekend - worked]**                                                    Page 57

**weekend**
  184:13,13
  271:5
**weekends** 47:9
**weeks** 12:13,17
**weinstein** 13:10
  63:15,15 66:9
  78:8,11,13
**welcomed**
  288:3
**went** 32:3 54:8
  134:14,16
  167:16 189:14
  203:4 218:8
  285:12 294:7
**whatsapp** 87:4
  87:7,10,13,18
  87:21,24 88:4
  88:11 90:7
**whereof** 298:17
**white** 2:8 4:20
**widely** 287:19
**wife** 111:8,9
  123:4,10 290:7
**willing** 181:8
  263:11
**win** 25:23
**window** 60:12
  60:14,16,22
  183:20 293:8
  293:10,17
**withdrawn**
  250:11

**witness** 1:17
  2:12 3:10 5:10
  115:20 130:5
  169:18 170:13
  195:19 204:10
  297:3 298:7,11
  298:17
**woman** 149:7
**women** 144:14
  146:17
**women's**
  144:12
**won** 26:13,21
  26:22,23,23
**wonderful**
  122:17
**wondering**
  82:4 183:24
**word** 149:11,14
  214:17,18
  215:2,3 218:18
  218:19 220:6,6
  221:7,8,23,23
  222:18,18
  225:4,4,7
  226:4,4,15,16
  228:9,10,18
  229:19,19
  230:2,3,20,20
  231:3,4 284:19
  285:3,8
**wording** 217:2
**words** 46:8
  127:25 136:9

  136:15 142:16
  146:13,22
  147:6 154:5
  177:16 203:3
  213:3,5 215:16
  217:16 219:12
  226:17 231:10
  234:15 235:3,7
  235:19,25
  236:5,8,22
  237:8,25 238:8
  238:15,22
  239:20 241:7
  244:3,7 245:3
  245:11,12,16
  248:20 250:20
  259:19 276:9
**work** 18:15
  19:15 22:14
  25:15 29:6
  31:9,14 32:2,5
  33:20 35:20
  36:11,12,14
  38:7,9,15
  44:19,24 45:3
  47:7,9,11
  49:14 52:15,22
  53:2,4,9,23
  54:4 55:4,10
  55:11 62:9,11
  62:22 63:14,24
  64:2,13,24
  65:18,22 81:9
  81:13 87:14,14

  96:9,12 97:7
  98:14,23 99:19
  100:11,15
  101:2,13,17,21
  102:13,21,23
  108:13 109:14
  109:25 110:7
  124:10 131:3
  131:10,19
  133:18 139:18
  142:13 144:17
  145:6 148:10
  149:12 150:5
  150:14,24
  151:8,17
  152:22 153:20
  153:24 155:6
  156:7,12
  177:10 178:5,8
  179:20 180:7
  180:16 181:10
  187:7 188:6
  208:8 211:11
  226:23 228:4
  228:13 239:12
  239:19 240:8
  286:4,9 291:5
  292:6,14,18,19
**worked** 25:20
  25:23 26:3
  29:7 31:4
  35:19,24 36:5
  37:20,25 38:3
  38:4,12,16

**[worked - yeah]**

| | | | |
|---|---|---|---|
| 41:22 42:19 43:16 44:7 47:6,17 49:12 50:5 53:22 54:12 58:21 59:9 62:6,8 63:3,4,18 64:6 65:2,15 81:11 96:3,21 97:21 98:21 99:6 100:8,12 101:4 103:20,25,25 105:7 106:17 107:2,5 109:12 110:6 130:15 130:24 131:8 131:11,13,14 131:18 132:16 132:20,22 143:12 144:25 150:2 **working** 23:2,5 31:16 34:22 38:25 39:20 40:24 42:18 46:3,13,22 49:6 55:17,20 55:24 56:4,19 56:22,25 59:13 65:7 83:15 89:18,23 95:24 100:22 101:24 102:11 103:7 124:23 125:9 | 125:24 130:18 131:25 132:11 140:25 141:6 141:14,20,20 142:11,23 143:4,15,21,21 144:4,9,19 146:20 149:2,6 152:2 156:21 177:5 180:13 211:16 236:22 259:6 292:10 **works** 16:9 64:19 129:20 262:22 **worried** 164:20 164:25 287:5 **worse** 218:8 285:16 **worth** 212:4 **wrapped** 62:2 **wright** 2:16 5:6 283:11 **write** 19:11 41:6 108:9 175:24 178:15 178:19 179:23 184:10 185:7 185:14 186:8 188:5,10 209:16,22 213:13,20 214:3 216:8 222:23 223:4 | 227:6 230:13 231:11 242:6 262:17 263:19 264:21 265:11 276:15 288:17 289:11 294:18 **writer** 18:24 25:5 **writers** 24:15 24:16 **writes** 127:23 174:16 175:23 176:3,5 178:17 178:21 179:13 183:23 184:21 186:7,11 188:7 262:5,21 263:9 263:15 271:6 **writing** 40:18 40:21,25 77:15 106:21 108:7 108:10,11 113:24 150:15 184:23 189:5 203:14 218:18 220:5 225:4 226:5 252:19 270:6 271:8 284:22 294:23 **written** 106:24 158:4 161:4,7 161:9,12 252:11 277:18 | **wrong** 42:9 93:6 217:11 286:25 287:4 **wrote** 25:11 122:15 123:16 124:6 127:12 128:4 174:11 177:7 212:8,16 212:17 214:2 215:25 216:7 217:3 224:3 225:8 227:7 229:15 233:14 233:17 239:22 241:6,7,23 244:11 252:16 254:18 266:8 266:10 |

| x |
|---|
| **x** 1:5,11 84:13 85:8 297:1,7 |

| y |
|---|
| **yeah** 14:15 17:25 26:7 27:9 37:12 59:23 79:16 107:14 163:4 169:14 172:14 195:21 197:22 202:9 212:22 225:6 247:15 251:19 260:3 276:12 |

**[year - à]** Page 59

**year** 14:10
15:23 17:21
26:21 59:19,21
67:13 68:11,15
68:16 71:9
81:3,5 97:2
117:11,12,20
117:24 118:7
118:10 119:12
119:12 122:17
128:5 137:3,4
185:13,15
189:16,20
192:25,25
272:5
**years** 13:20,21
18:17,17,18
21:6,11 22:4
22:13 25:19
29:14,15 32:8
36:16,17 37:8
68:3,4,18,22,25
69:3 77:2,4
79:19 85:7,9
85:12,15 87:11
88:20 89:6
90:24 96:25
97:4,9,10,11
122:18 123:17
125:25 127:12
130:13,21
140:7 143:11
169:13 179:10
208:25

**yell** 47:16
49:19
**yelled** 155:8,18
**yelling** 49:22
49:25
**yesterday's**
177:9
**york** 1:3,22 2:5
2:5,17,17 3:21
43:6 44:4 49:4
49:12 61:19,22
61:25 62:3,4
62:17 123:24
124:11,15,17
125:3 131:2
153:3 156:19
169:7,8,12
289:16 290:6,9
291:16 292:7
298:5
**young** 63:12
**yup** 115:19

**z**

**zamost** 99:9,13
**zero** 284:23
285:3,7
**zoom** 6:14 7:3

**à**

**à** 155:5

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.