# EXHIBIT F

Page 1

1

2                  UNITED STATES DISTRICT COURT

3                  SOUTHERN DISTRICT OF NEW YORK

4

5       ALEXANDRA POOLOS,              )
                                       )
6                      Plaintiff,      )
                                       )
7               vs.                    )   No. 1:23-cv-08896
                                       )        (GHW)(HJR)
8       PARAMOUNT GLOBAL; CBS          )
        BROADCASTING, INC.; and        )
9       CBS NEWS, INC.,                )
                                       )
10                     Defendants.     )
        ------------------------       )

11

12

13

14

15                        February 5, 2025

16                        10:08 a.m.

17

18              Deposition of BILL OWENS, held at the

19        offices of Davis Wright Tremaine LLP, 1251

20        Avenue of the Americas, New York, New York,

21        before Laurie A. Collins, a Registered

22        Professional Reporter and Notary Public of the

23        State of New York.

24

25

Page 2

```
 1
 2    A P P E A R A N C E S:
 3
 4         VLADECK, RASKIN & CLARK, P.C.
 5         Attorneys for Plaintiff
 6              111 Broadway, Suite 1505
 7              New York, New York 10006
 8         BY:   JEREMIAH IADEVAIA, ESQ.
 9                 jiadevaia@vladeck.com
10              BRANDON WHITE, ESQ.
11                 bwhite@vladeck.com
12
13         DAVIS WRIGHT TREMAINE LLP
14         Attorneys for Defendants
15              1251 Avenue of the Americas
16              New York, New York 10020
17         BY:   LYLE S. ZUCKERMAN, ESQ.
18                 lylezuckerman@dwt.com
19              MICHAEL LEONE LYNCH, ESQ.
20                 michaellynch@dwt.com
21
22    ALSO PRESENT:
23         DANYA AHMED, ESQ. (Paramount)
24         ALEXANDRA POOLOS
25         CARLOS KING, Videographer
```

```
                                                      Page 3

 1

 2              THE VIDEOGRAPHER:  Good morning.  We

 3      are going on the record at 10:08 a.m. on

 4      February 5th, 2025.

 5              Please note that the microphones are      10:08:17

 6      sensitive and may pick up whispering and

 7      private conversations.

 8              Please mute your phones at this time.

 9              Audio and video recording will continue

10      to take place unless all parties agree to go

11      off the record.

12              This is media unit number 1 of the

13      video-recorded deposition of Bill Owens taken

14      by counsel for defendants in the matter of

15      Alexandra Poolos versus Paramount Global, et    10:08:41

16      al., filed in the United States District

17      Court, Southern District of New York, Case

18      Number 23-cv-088969(GHW)(JLC).

19              The location of this deposition is 1251

20      Avenue of the Americas, New York, New York.     10:09:05

21              My name is Carlos King, representing

22      Veritext, and I'm the videographer.  The court

23      reporter is Laurie Collins, also representing

24      Veritext.

25              I am not authorized to administer an     10:09:15
```

```
                                                    Page 4
 1                       Proceedings
 2        oath.  I am not related to any party in this
 3        action, nor am I financially interested in the
 4        outcome.
 5            If there are any objections to        10:09:23
 6        proceeding, please state them at the time of
 7        your appearance.
 8            Counsel and all present, including
 9        remotely, will now state their appearance and
10        affiliations for the record, beginning with   10:09:32
11        noticing attorney.
12            ATTORNEY IADEVAIA:  Good morning.  My
13        name is Jeremiah Iadevaia of the firm Vladeck,
14        Raskin & Clark on behalf of the plaintiff,
15        Alexandra Poolos, in this matter.            10:09:44
16            And just for clarification, this
17        deposition is being taken by plaintiff's
18        counsel.
19            THE VIDEOGRAPHER:  My apologies.
20            ATTORNEY WHITE:  Good morning.  Brandon  10:09:55
21        White from Vladeck, Raskin & Clark for the
22        plaintiff.
23            ATTORNEY ZUCKERMAN:  Good morning.
24        Lyle Zuckerman from Davis Wright Tremaine
25        representing defendants.  I'm here with my    10:10:02
```

Page 5

1                          Owens

2          colleague, Michael Lynch from Davis Wright

3          Tremaine; and from Paramount Global, Danya

4          Ahmed.

5                  ATTORNEY IADEVAIA:  And let me just add  10:10:10

6          for the record that the plaintiff, Alexandra

7          Poolos, is also present.

8                  THE VIDEOGRAPHER:  Can the court

9          reporter please swear in or affirm the

10         witness.                                        10:10:20

11      B I L L   O W E N S ,

12         called as a witness, having been duly sworn

13         by the notary public, was examined and

14         testified as follows:

15                 THE VIDEOGRAPHER:  You may proceed.    10:10:29

16      EXAMINATION BY

17      ATTORNEY IADEVAIA:

18         Q.   Good morning, Mr. Owens.  As I just

19      mentioned, my name is Jeremiah Iadevaia, and I'm

20      counsel for Alexandra Poolos in this case against  10:10:37

21      CBS and related corporate entities.

22                 Mr. Owens, have you ever had your

23      deposition taken before?

24         A.   I have not.

25         Q.   So you have a sense of how the day will  10:10:48

```
                                                       Page 6
 1                            Owens
 2     go, I'm going to go through a couple of ground
 3     rules that I think will, you know, sort of lay out
 4     how this will work.
 5              This is going to be a question-and-      10:10:57
 6     answer session.  I'll be asking questions; you
 7     will be giving responses.  The questions and
 8     answers will be recorded by the court reporter to
 9     my left, who will be creating a transcript.  Thus
10     I will need verbal answers from you, which means   10:11:14
11     nods and gestures will not work.
12              Do you understand?
13        A.    I do.
14        Q.    Also, during the day I will do my best
15     to let you finish your answers, and I ask that you  10:11:27
16     do your best to let me finish my questions,
17     because if we speak at the same time the court
18     reporter is going to have a hard time getting down
19     the testimony.
20              Do you understand?                        10:11:39
21        A.    Understand.
22        Q.    If at any point you don't understand a
23     question that I ask, please let me know and I'll
24     do my best to rephrase.  Is that okay?
25        A.    Perfect.                                  10:11:51
```

```
                                              Page 7
 1                      Owens
 2        Q.    Okay.  Throughout the day we will be
 3    taking periodic breaks, but if at any time you
 4    need a break, just let me know.  As long as
 5    there's not a question pending, we'll be able to    10:12:01
 6    accommodate you.  Is that okay?
 7        A.    Perfect.
 8        Q.    Are you on any medication today that
 9    would affect your ability to testify truthfully
10    and accurately?                                     10:12:11
11        A.    No.
12        Q.    Do you know of any reason why you would
13    not be able to testify truthfully and accurately
14    today?
15        A.    There is none.                            10:12:16
16        Q.    For work purposes do you use -- strike
17    that.
18              Do you have a CBS-issued cell phone in
19    connection with your employment there?
20        A.    I do.                                     10:12:35
21        Q.    Okay.  How many cell phones do you
22    have?
23        A.    One.
24        Q.    All right.  And do you have a personal
25    cell phone?                                         10:12:41
```

```
                                              Page 8
  1                        Owens
  2         A.    I do not.
  3         Q.    Okay.  Did you do anything to prepare
  4    for today's deposition?
  5         A.    Yes.  I met with my counsel on Monday.   10:12:52
  6         Q.    How many meetings did you have with
  7    counsel to prepare for today's deposition?
  8         A.    One.
  9         Q.    And that was the meeting on Monday?
 10         A.    That's right.                          10:13:03
 11         Q.    Okay.  Monday as in February 3rd?
 12         A.    Yes, sir.
 13         Q.    And how long was that meeting,
 14    approximately?
 15         A.    Four hours.                            10:13:11
 16         Q.    And who was present?
 17         A.    These two gentlemen and Danya by Zoom.
 18         Q.    Anyone else there?
 19         A.    No.
 20         Q.    Did you meet in person or in some other  10:13:20
 21    way with counsel?
 22         A.    In person with these two gentlemen and,
 23    as I said, Danya was on Zoom.
 24         Q.    During your meeting did you review any
 25    documents?                                        10:13:33
```

```
                                                   Page 9
 1                        Owens
 2          A.    I did.
 3          Q.    What documents did you review?
 4          A.    Various documents.
 5          Q.    Can you recall any specific documents    10:13:39
 6    that you reviewed?
 7          A.    There were emails.  I think it was
 8    most -- mostly emails, and maybe some texts.
 9          Q.    Anything else?  Any other documents you
10    can recall?                                          10:13:57
11          A.    Oh, yes.  Colette Richards' complaint.
12          Q.    When you say "Colette Richards'
13    complaint," do you mean a written complaint she
14    made against Ms. Poolos?
15          A.    That's correct.                          10:14:13
16          Q.    Had you seen Ms. Richards' complaint
17    before the prep session on Monday?
18          A.    I had not.
19          Q.    Any other documents you recall looking
20    at during your prep session on Monday?               10:14:30
21          A.    No.
22          Q.    Other than meeting with counsel on
23    Monday and reviewing documents during that
24    meeting, did you do anything else to prepare for
25    today's deposition?                                  10:14:41
```

```
                                              Page 10
 1                      Owens

 2         A.    No, sir.

 3         Q.    Did you discuss today's deposition with

 4    anyone outside of counsel?

 5         A.    No, sir.                        10:14:50

 6         Q.    Did you talk about your deposition with

 7    Tanya Simon?

 8         A.    No, sir.

 9         Q.    Lesley Stahl?

10         A.    No, sir.                        10:14:58

11         Q.    Claudia Weinstein?

12         A.    No, sir.

13         Q.    Renee Balducci?

14         A.    No, sir.

15         Q.    Did you discuss with Tanya Simon her   10:15:05

16    deposition that she had last week?

17         A.    No, sir.

18         Q.    Do you have any knowledge of

19    Ms. Poolos's claims in this lawsuit?

20         A.    Yes.                            10:15:18

21         Q.    What is your understanding of the

22    claims in this lawsuit?

23         A.    Wrongful termination.

24         Q.    And do you have any understanding as to

25    the specific claims that Ms. Poolos has made    10:15:30
```

```
                                                  Page 11
 1                        Owens
 2    beyond just wrongful termination?
 3              ATTORNEY ZUCKERMAN:  Objection.
 4              You can answer.
 5        A.    Yes.  Well, contextually, I guess.  I    10:15:38
 6    wouldn't know the legal term for that.  She wasn't
 7    treated the same as people that came before.
 8        Q.    Do you have any understanding as to
 9    whether she's made a discrimination complaint in
10    this case?                                          10:15:55
11        A.    I don't know that.
12        Q.    When you say that your contextual
13    understanding is that Ms. Poolos has alleged that
14    she's not been treated the same as people who have
15    come before her, do you have any understanding as   10:16:07
16    to whether she's alleged gender bias in this case?
17        A.    Yes.
18        Q.    Okay.  And what's your understanding
19    about those claims?
20        A.    Just that, that she's claimed gender      10:16:15
21    bias.
22        Q.    Have you discussed Ms. Poolos's lawsuit
23    with Tanya Simon?
24        A.    No.
25        Q.    Have you discussed her lawsuit with       10:16:27
```

```
                                          Page 12
 1                      Owens
 2    Renee Balducci?
 3         A.    No.
 4         Q.    Have you discussed her lawsuit with
 5    Maria Cottone?                              10:16:35
 6         A.    No.
 7         Q.    With Ms. Stahl?
 8         A.    No.
 9         Q.    With Claudia Weinstein?
10         A.    No.                             10:16:40
11         Q.    With Shachar Bar-On?
12         A.    No.
13         Q.    Have you discussed Ms. Poolos's lawsuit
14    with anyone not including counsel or your spouse?
15         A.    No.                             10:16:51
16         Q.    For the record, Mr. Owens, where do you
17    currently work?
18         A.    60 Minutes, CBS News.
19         Q.    And how long have you worked for CBS?
20         A.    It will be 37 years this summer.   10:17:11
21         Q.    What year did you join CBS?
22         A.    1988.
23         Q.    And at what point in time did you start
24    working specifically for 60 Minutes?
25         A.    As a producer in -- well, there was a   10:17:26
```

```
                                        Page 13
 1                      Owens
 2    program called 60 Minutes II, which is actually
 3    where I started, and that was 2001.
 4        Q.    And since 2001 have you worked for
 5    either 60 Minutes II or 60 Minutes?          10:17:48
 6        A.    Yes.  But there was also a period of
 7    time where I worked for the Evening News, where I
 8    left 60 Minutes and worked for the Evening News.
 9        Q.    What is your current title?
10        A.    Executive producer.               10:18:06
11        Q.    An executive producer for 60 Minutes;
12    correct?
13        A.    For 60 Minutes, yes.
14        Q.    And how long have you been in that job?
15        A.    Six years.                        10:18:13
16        Q.    When did you start?
17        A.    Well, I was named the executive
18    producer in February of -- what's six years ago?
19        Q.    2019?
20        A.    I can't remember if it was 2018 or   10:18:36
21    2019.  I guess 2019, yes, because I think Jeff
22    Fager was terminated.  He had been the executive
23    producer, and I -- they didn't change my title,
24    but I basically -- they didn't change my title,
25    but I was making the decisions about things that   10:18:55
```

```
                                              Page 14
 1                         Owens
 2    got on the air for that period of time.
 3         Q.    When was Mr. Fager's employment
 4    terminated?
 5         A.    I believe it was September of 2018.    10:19:03
 6         Q.    So between September of 2018 and
 7    January of 2019, you were doing the executive
 8    producer functions and role but didn't have the
 9    title; is that correct?
10         A.    Yes.  I didn't have the responsibility  10:19:19
11    of -- I wasn't the executive producer.  I was
12    making the editorial decisions about things that
13    got on television.
14         Q.    As of February of 2019, you were the
15    executive producer for 60 Minutes; is that       10:19:36
16    correct?
17         A.    Yes.
18         Q.    In your capacity as -- actually, let's
19    start with February 2019.  Who did you report to
20    at that time?                                     10:19:49
21         A.    Susan Zirinsky.
22         Q.    What was Ms. Zirinsky's title?
23         A.    President.
24         Q.    President of --
25         A.    CBS News.                              10:20:00
```

```
 1                           Owens

 2        Q.    Did it change at any point who you

 3   reported to after February of 2019?

 4        A.    Yes.  There have been different CBS

 5   News presidents.                             10:20:12

 6        Q.    Who was Ms. Zirinsky's successor as CBS

 7   News president?

 8        A.    Neeraj -- I'm going to mispronounce his

 9   name -- Khemlani -- Khemlani -- sorry.

10        Q.    Neeraj, when did Neeraj become       10:20:30

11   president of CBS News?

12        A.    I don't remember.

13        Q.    Did you report to Neeraj when he became

14   president of CBS News?

15        A.    I did.                              10:20:44

16        Q.    And is Neeraj still the president of

17   CBS News?

18        A.    He is not.  Wendy McMahon is, and I

19   report to Wendy McMahon now.

20        Q.    And when did Ms. McMahon become      10:20:56

21   president, approximately?

22        A.    A year and a half ago.

23        Q.    When you became executive producer for

24   60 Minutes in February of 2019, what were your

25   responsibilities?                             10:21:25
```

```
                                                    Page 16

                                Owens
 1
 2        A.    My responsibilities were for the
 3   broadcast, for the product that got on television
 4   every Sunday night, for the -- I was responsible
 5   for the staff, hopefully the culture.          10:21:40
 6        Q.    And when you say you were responsible
 7   for the broadcast and the product that aired, what
 8   do you mean by that?
 9        A.    The journalism that gets done, the
10   research, the writing, the okaying of stories,   10:21:58
11   screening them, an edit function, fixing them,
12   making sure they're accurate and fair.
13        Q.    And when you say you have
14   responsibility -- or you had responsibility as
15   executive producer for the staff, what do you mean  10:22:22
16   by that?
17        A.    I mean ultimately the -- who works at
18   60 Minutes.  I have say-so in terms of who gets
19   hired and who gets terminated, who gets promoted.
20        Q.    And does any staff report to you      10:22:46
21   directly?
22        A.    Producers, correspondents.
23        Q.    Anybody else?
24        A.    Not directly.
25        Q.    Does Tanya Simon report to you        10:23:02
```

```
                                          Page 17
 1                      Owens
 2    directly?
 3         A.    Yeah, Tanya does.  That's true, senior
 4    staff does.
 5         Q.    When you say "senior staff," who are    10:23:10
 6    you referring to?
 7         A.    Tanya Simon, Claudia Weinstein, Matt
 8    Polevoy, Debbie DeLuca, Matt Richmond.
 9         Q.    Anybody else currently in a senior
10    staff position?                                    10:23:34
11         A.    No.
12         Q.    Okay.  You mentioned or I mentioned
13    Ms. Simon.  What's Ms. Simons' current title?
14         A.    Executive editor.
15         Q.    And what is Ms. Simons'                 10:23:50
16    responsibilities as executive editor?
17         A.    She's my deputy.  She's involved in the
18    screening or the edit function of our stories,
19    helping me to make sure they're fair and accurate.
20    She's also directly responsible for the associate  10:24:11
21    producers, yeah, and day-to-day helping to manage
22    the broadcast along with me as my deputy.
23         Q.    In helping manage the broadcast, does
24    she help you manage staff in addition to the APs
25    that you referred to?                              10:24:34
```

```
                                             Page 18
 1                        Owens
 2        A.    Yes.
 3        Q.    How so?
 4        A.    Well, there's a million different
 5   things that come up every day.  But her direct    10:24:43
 6   responsibility are associate producers.  Deborah
 7   DeLuca is in charge of broadcast associates.  But
 8   Tanya would also be involved in when producers and
 9   correspondents are assigned to editors.
10        Q.    What do you mean, "when producers and    10:25:14
11   correspondents are assigned to editors," what is
12   that?
13        A.    So when you finish shooting your story,
14   you bring it in to one of our editors to actually
15   edit the story to get it ready for air, and you    10:25:29
16   get assigned an editor.  So each team that comes
17   in from the field gets assigned an editor.
18        Q.    The reference you make to a team, what
19   do you mean by that?
20        A.    A team would be a correspondent, a    10:25:49
21   producer, an associate producer, and a broadcast
22   associate.
23        Q.    Ms. Weinstein, what's her job?
24        A.    She's the executive story editor.
25   Claudia is in charge of reading all of the    10:26:08
```

```
                                            Page 19
 1                        Owens
 2     transcripts.  Each interview that's done, there's
 3     a transcript made of it word for word, and Claudia
 4     reads those to make sure nothing is taken out of
 5     context within our story as it gets put together.   10:26:23
 6          Q.    And does anyone report directly to
 7     Ms. Weinstein?
 8          A.    At the moment, no.
 9          Q.    Does Ms. Weinstein have any
10     responsibility for supervising producers?          10:26:37
11          A.    No.
12          Q.    Does Ms. Weinstein have any
13     responsibility for supervising associate
14     producers?
15          A.    Well, not -- not directly, but she      10:26:48
16     works closely with each team.  So she works with
17     associate producers, she work with producers, she
18     works with me and Tanya.
19          Q.    And when you say that Ms. Weinstein
20     works closely with producers and associate         10:27:02
21     producers, do you mean on the editorial side --
22          A.    That's right.
23          Q.    -- of the work?
24          A.    That's right.
25          Q.    I'm sorry, Matt -- you mentioned        10:27:13
```

```
                                            Page 20
 1                    Owens
 2    someone named Matt, and I missed his last name.
 3        A.    Polevoy.
 4        Q.    Polevoy?
 5        A.    P-O-L-E-V-O-Y.                    10:27:20
 6        Q.    What's his job?
 7        A.    He's in charge of all of our digital --
 8    or our digital platform and our social media
 9    channels.
10        Q.    And does anyone report directly to    10:27:35
11    Mr. Polevoy?
12        A.    Yes.
13        Q.    And who reports to him?
14        A.    Will Croxton.  There's three -- Brit.
15    I can't remember her last name at the moment.    10:28:02
16    There are two other people that right now I
17    can't -- oh, Sarah Shafer is one person -- another
18    person.  Janelle, and I can't remember her last
19    name right now.  And there's one other person; I
20    can't remember their name right now.            10:28:28
21        Q.    What's Mr. Croxton's job?
22        A.    Will is a producer editor for the
23    digital team.
24        Q.    And when you say "the digital team,"
25    what does the digital team do?                10:28:37
```

```
                                              Page 21
 1                         Owens
 2        A.    They produce for the digital -- 60
 3    Minutes digital platform.
 4        Q.    And you said that includes social media
 5    and that includes content that's online?        10:28:44
 6        A.    That's right.
 7        Q.    What is Debbie DeLuca's job?
 8        A.    She's the senior broadcast producer, so
 9    she is the person who sits in the control room
10    with our technical staff in the control room and   10:28:59
11    literally puts the three pieces together that air
12    on Sunday night.
13        Q.    And does anyone report directly to
14    Ms. DeLuca?
15        A.    Yes.                                      10:29:15
16        Q.    How many people, approximately?
17        A.    Well, the broadcast associates, so
18    that's probably eight people.  And then Becka
19    Chertok also does.
20        Q.    What does Ms. Chertok do?                 10:29:30
21        A.    She's sort of a deputy to Debbie.  She
22    assists in putting together the show and
23    communicating with the producing teams that are on
24    TV that week.
25        Q.    You mentioned Matt Richmond.  What's      10:29:47
```

```
                                          Page 22
 1                      Owens

 2     his job?

 3          A.    He's the senior editor, so he is in

 4     charge of all of the editors that work on the

 5     broadcast.                              10:29:56

 6          Q.    And do the editors report to

 7     Mr. Richmond?

 8          A.    They do.

 9          Q.    And approximately how many editors are

10     there now at 60 Minutes?                10:30:02

11          A.    Eight.

12          Q.    Does Mr. Richmond work for any other

13     program other than 60 Minutes?

14          A.    He does not.

15          Q.    Do you know approximately how long    10:30:16

16     Mr. Richmond has been at 60 Minutes?

17          A.    I would say as long as I've been there,

18     so probably more than 20 years.

19          Q.    Do you know how long Mr. Richmond has

20     been in a supervisory position?         10:30:34

21          A.    Yes.

22          Q.    Approximately how long?

23          A.    Eight years.

24          Q.    So was Mr. Richmond promoted into that

25     job?                                    10:30:48
```

```
                                              Page 23
 1                      Owens
 2        A.    He was.
 3        Q.    Was he an editor but not in a
 4    supervisory position previously?
 5        A.    That's correct.                 10:30:53
 6        Q.    And who promoted him?
 7        A.    Jeff Fager.
 8        Q.    Did you have any role in promoting
 9    Mr. Richmond?
10        A.    I did not.                       10:31:01
11        Q.    In terms of your relationship with the
12    president of CBS News -- actually, strike that.
13    Let me go back.
14              You've described your responsibilities
15    as executive producer generally; correct?   10:31:23
16        A.    Yes.
17        Q.    Since taking over in February of 2019,
18    have those responsibilities significantly changed?
19        A.    No.
20        Q.    Going back to your reporting        10:31:40
21    relationship with the CBS News president, let's
22    start when you first took over the role as
23    executive producer and reported to Ms. Zirinsky.
24    How often did you meet with Ms. Zirinsky to
25    discuss 60 Minutes work?                      10:31:57
```

```
                                                    Page 24
 1                         Owens
 2          A.     Weekly.
 3          Q.     And were those in-person meetings?
 4     Were they by phone?  Were they some other way?
 5          A.     Some in person, some via Zoom.  This is  10:32:09
 6     also COVID era.
 7          Q.     And what types of issues generally
 8     speaking did you discuss with Ms. Zirinsky when
 9     you were EP and she was president of CBS News?
10          A.     Many.  There was editorial questions,   10:32:26
11     stories, people's performance.
12          Q.     And when you say "people's
13     performance," you mean employees who worked for 60
14     Minutes?
15          A.     Yes.                                     10:32:45
16          Q.     Did you have discussions with
17     Ms. Zirinsky about -- at any point when she was
18     president and you were executive producer about
19     whether to renew the contracts of producers for 60
20     Minutes?                                             10:33:03
21          A.     Yes.
22          Q.     And did you have discussions with
23     Ms. Zirinsky at any point when you were in your
24     role as EP and she was president about firing any
25     producers?                                           10:33:15
```

```
                                              Page 25
 1                        Owens
 2        A.    Yes.
 3        Q.    And when you were EP and Ms. Zirinsky
 4   was president did you have any discussions with
 5   Ms. Zirinsky about taking disciplinary action    10:33:28
 6   against 60 Minutes producers?
 7        A.    I don't recall.
 8        Q.    Again focusing on this same time frame,
 9   were there any instances in which you talked with
10   Ms. Zirinsky about complaints against any         10:33:46
11   producers for 60 Minutes?
12             ATTORNEY ZUCKERMAN:  Objection.
13             You can answer.
14        A.    Well, I can't recall, but I did bring
15   something to her that I wanted to do when I was   10:34:08
16   named executive producer, and that was not to
17   renew the contract of Ira Rosen, who was a
18   producer on the broadcast.
19        Q.    We'll talk about Mr. Rosen a little bit
20   later.                                            10:34:25
21             Are there other instances you can
22   recall of discussions you had with Ms. Zirinsky
23   about firing a producer at 60 Minutes?
24        A.    There were -- yes.
25        Q.    Okay.  And what were those instances?   10:34:41
```

```
                                              Page 26
 1                      Owens
 2        A.    There was a moment in the news
 3   division -- it wasn't just 60 Minutes -- where
 4   layoffs were asked for and I had to terminate a
 5   number of people.  And those -- I had those        10:34:57
 6   conversations with Susan Zirinsky.
 7        Q.    During the time that Ms. Zirinsky was
 8   the president of CBS News and you were the EP for
 9   60 Minutes, were there any discussions you had
10   with Ms. Zirinsky about firing a producer for      10:35:14
11   misconduct besides any discussion you had about
12   Mr. Rosen?
13        A.    I can't recall.
14        Q.    Did you ever have any discussions with
15   Ms. Zirinsky about -- when she was president and   10:35:34
16   you were EP about Matt Richmond?
17        A.    No.
18        Q.    And let's go back to the discussion you
19   referenced about Mr. Rosen.  So Mr. Rosen was a
20   producer for 60 Minutes; correct?                  10:35:59
21        A.    Correct.
22        Q.    And approximately how long did he work
23   for the show?
24        A.    Longer than I did.  My guess, 30 years.
25        Q.    To your knowledge did Mr. Rosen ever    10:36:16
```

```
                                              Page 27
 1                        Owens
 2      work for another show or was he exclusive to 60
 3      Minutes?
 4           A.    He worked at ABC News.
 5           Q.    So he worked for a different employer?   10:36:26
 6           A.    That's right.
 7           Q.    Did he leave CBS to go to ABC?
 8           A.    Correct, and then came back.
 9           Q.    Came back?
10           A.    Correct.                                 10:36:36
11           Q.    Approximately when did he come back?
12           A.    I don't know.
13           Q.    When he came back, were you working for
14      60 Minutes?
15           A.    No.                                      10:36:42
16           Q.    He came back before you were at 60
17      Minutes?
18           A.    Yes.
19           Q.    Tell me about your discussion or
20      discussions with Ms. Zirinsky about Mr. Rosen.     10:36:50
21           A.    I told her that I as now the executive
22      producer of 60 Minutes I didn't want Ira working
23      on the broadcast any longer or I didn't want his
24      contract to be renewed.
25           Q.    Approximately when did you have the      10:37:10
```

```
                                              Page 28
 1                        Owens
 2     first discussion with Ms. Zirinsky about -- or any
 3     discussion about Mr. Rosen and renewing his
 4     contract or having him leave the show?
 5          A.    Very soon after I was named executive   10:37:20
 6     producer.  I don't remember exactly, but it was
 7     weeks.  I mean, probably within the first week or
 8     two.
 9          Q.    And did you tell Ms. Zirinsky why you
10     felt that way?                                     10:37:40
11          A.    Yes.
12          Q.    What did you say to her?
13          A.    That I didn't trust him.
14          Q.    Did you explain what you meant by you
15     didn't trust him?                                  10:37:49
16          A.    Yes.  I thought his journalistic
17     standards weren't up to ours.
18          Q.    And when you say "ours," what do you
19     mean?
20          A.    60 Minutes' standards.                  10:37:59
21          Q.    How would you describe 60 Minutes'
22     journalistic standards?
23          A.    Very high.
24          Q.    And other than Mr. Rosen's journalistic
25     standards, was there any other reason you gave to  10:38:16
```

```
                                             Page 29
 1                        Owens
 2    Ms. Zirinsky for not wanting Mr. Rosen to work on
 3    60 Minutes any longer?
 4          A.    I didn't think he treated people well.
 5          Q.    What did you say to Ms. Zirinsky about   10:38:27
 6    how Mr. Rosen treated people?
 7          A.    That he treated them poorly.
 8          Q.    Anything else?
 9          A.    Not professionally.
10          Q.    Anything else?                          10:38:40
11          A.    Not that I can recall.
12          Q.    And did you provide to Ms. Zirinsky any
13    examples of your concerns about Mr. Rosen's
14    treatment of others?
15          A.    Not that I can recall.                  10:38:51
16          Q.    And as you sit here today, can you
17    think of any specific instances where you believe
18    Mr. Rosen mistreated an employee?
19          A.    No.
20          Q.    And can you think of any specific       10:39:22
21    conduct that Mr. Rosen engaged in that provides
22    the basis for what you said to Ms. Zirinsky that
23    you didn't like how Mr. Rosen treated people?
24          A.    Well, there had been complaints about
25    Ira from his former associate producers.  So that  10:39:40
```

```
                                              Page 30
 1                        Owens
 2    certainly was discussed with Ms. Zirinsky, but
 3    specifics I can't recall.
 4         Q.    Which former associate producers are
 5    you referring to?                           10:39:53
 6         A.    He had a number of them.
 7         Q.    A number of APs had made complaints
 8    about Mr. Rosen?
 9         A.    At least a couple.
10         Q.    And can you think of any of them?    10:40:08
11         A.    One was ██████    Her last name was
12    maybe ████████
13         Q.    Any others?
14         A.    I think ████████  ████████
15         Q.    Anyone else?                      10:40:25
16         A.    Not that I can recall.
17         Q.    Did Ms. ████████ make any complaints
18    about Mr. Rosen?
19         A.    She did.
20         Q.    And what were her complaints?       10:40:40
21         A.    I can't recall them.  They were
22    numerous.
23         Q.    Did she explain about sexual
24    harassment?
25              ATTORNEY ZUCKERMAN:  Objection.      10:40:50
```

```
                                              Page 31

 1                     Owens

 2          You can answer.

 3      A.    I think so.

 4      Q.    Did she explain about gender

 5   discrimination?                          10:40:54

 6          ATTORNEY ZUCKERMAN:  Objection.

 7          You can answer.

 8      A.    I can't recall.

 9      Q.    Did she explain about race

10   discrimination?                          10:40:59

11          ATTORNEY ZUCKERMAN:  Objection.

12          You can answer.

13      A.    I can't recall.

14          ATTORNEY ZUCKERMAN:  By the way,

15      Mr. Owens, when I object, unless I instruct   10:41:04

16      you not to answer, you should answer.

17          THE WITNESS:  Okay.

18          ATTORNEY ZUCKERMAN:  So I'm not going

19      to repeatedly say you can answer after an

20      objection.                           10:41:15

21          THE WITNESS:  Sure.

22          ATTORNEY ZUCKERMAN:  Okay.

23      Q.    And when did Ms. ██████  make her

24   complaints?

25      A.    It was a long time ago.  I'd have to   10:41:19
```

```
                                             Page 32
  1                        Owens
  2    guess.  I mean, I wasn't the executive producer
  3    when she did.  So eight or nine years ago.
  4         Q.    Was it --
  5         A.    Is my best guess.              10:41:36
  6         Q.    Was it multiple years before you had
  7    the conversation or conversations with
  8    Ms. Zirinsky about not having Mr. Rosen work on
  9    the show?
 10         A.    My recollection is her complaints came  10:41:53
 11    to us as like a legal document, like she -- I
 12    believe she had an EEOC complaint or something
 13    like that.  So I don't recall what the timing of
 14    that was.
 15         Q.    And does Ms. ███████ still work for 60  10:42:21
 16    Minutes?
 17         A.    She does not.
 18         Q.    And what were the circumstances of her
 19    departure?
 20         A.    I don't recall.                 10:42:32
 21         Q.    Did she leave voluntarily or
 22    involuntarily?
 23         A.    I don't recall.  But I think
 24    voluntarily.
 25         Q.    You don't recall her being fired?  10:42:43
```

```
                                                    Page 33
 1                          Owens
 2          A.     I do not.
 3          Q.     You don't recall her being laid off?
 4          A.     I do not.
 5          Q.     Do you recall the reason that she gave    10:42:50
 6     for quitting, if she gave any?
 7          A.     I do not recall.
 8          Q.     ███████████  ███████████  does she still work
 9     for 60 Minutes?
10          A.     She does not.                              10:43:02
11          Q.     And approximately when did she work for
12     60 Minutes?
13          A.     Maybe -- again, I'm guessing, but 2008
14     to 2014, something like that, but that's -- I'm
15     guessing.                                             10:43:22
16          Q.     And was she Mr. Rosen's AP the whole
17     time she was at CBS?
18          A.     She was his AP.  I'm not sure it was
19     the entire time.
20          Q.     Did Ms. Schroder complain about           10:43:34
21     Mr. Rosen?
22          A.     Not to me, but I found out that she
23     had, yes.
24          Q.     What is your understanding of what she
25     complained about?                                     10:43:47
```

```
                                                    Page 34
 1                         Owens
 2        A.    The one thing that I remember is that
 3   she says that Ira told her:  You'd go deliver
 4   bad -- some bad news to me because I preferred to
 5   talk to women.  That's the only thing I can recall  10:44:04
 6   from ████████ complaint.  She did not tell me
 7   that.
 8        Q.    Who told you that?
 9        A.    I can't recall.
10        Q.    Did you find out around the time that  10:44:17
11   ████████ made the complaint?
12        A.    No.
13        Q.    When did you find that out?
14        A.    I can't recall.
15        Q.    Was it within months or years of the  10:44:24
16   complaint?
17        A.    I can't recall.
18        Q.    What's the circumstances of
19   Ms. Schroder's departure from CBS?
20        A.    She left for another job.            10:44:45
21        Q.    Did she leave voluntarily?
22        A.    She did.
23        Q.    Did she say why she left?
24        A.    Better job.
25        Q.    So you spoke to Ms. Zirinsky about    10:44:56
```

```
                                                Page 35

 1                         Owens

 2     Mr. Rosen not working on 60 Minutes; correct?

 3          A.    Correct.

 4          Q.    Do you recall how many discussions you

 5     had with Ms. Zirinsky about that topic?        10:45:05

 6          A.    One or two.

 7          Q.    And what was the reaction by

 8     Ms. Zirinsky?

 9          A.    She agreed with me.

10          Q.    Did she say why she agreed with you?    10:45:14

11          A.    That she had heard similar things.

12          Q.    And the similar things being what?

13          A.    That he was not up to 60 Minutes'

14     journalistic standards and that there had been

15     complaints made by his associate producers.        10:45:35

16          Q.    Did Ms. Zirinsky cite any specific

17     examples of those complaints in your discussions

18     with her?

19          A.    She did not.

20          Q.    After you had this discussion or these    10:45:50

21     discussions with Ms. Zirinsky, what happened with

22     Mr. Rosen's employment at CBS?

23          A.    He was not renewed.

24          Q.    Did Mr. Rosen, when he worked for CBS,

25     did he have contract -- a contract?            10:46:09
```

```
                                                    Page 36
 1                          Owens
 2          A.    He did.
 3          Q.    And what period of time did his
 4     contract run to and from?
 5          A.    I don't know.  My guess would be he had  10:46:20
 6     a three-year contract.
 7          Q.    Is a three-year term of a contract
 8     standard for producers at 60 Minutes?
 9          A.    Yes.
10          Q.    And has that been the case since you've  10:46:27
11     been executive producer?
12          A.    Yes.
13          Q.    And at the time that you spoke to
14     Ms. Zirinsky, how much time did Mr. Rosen have
15     left on his contract?                              10:46:39
16          A.    My recollection is a year or less.
17          Q.    And was Mr. Rosen fired immediately or
18     was he allowed to continue on his contract?
19          A.    My recollection is that he was told not
20     to come into the office, so he effectively stopped  10:47:09
21     working for us until his contract expired.
22          Q.    Did he continue to get paid under his
23     contract until it expired?
24          A.    I don't know.
25          Q.    Did Mr. Rosen have a contract provision  10:47:25
```

```
                                               Page 37
 1                        Owens
 2    that allowed CBS to fire him for cause?
 3         A.    I don't know.
 4         Q.    Was Mr. Rosen fired for cause?
 5         A.    I don't know.                      10:47:37
 6         Q.    Was Mr. Rosen offered severance?
 7         A.    I don't know.
 8         Q.    As executive producer for CBS News, are
 9    you involved in decisions about whether to offer a
10    departing 60 Minutes employee severance?           10:47:55
11         A.    No.
12         Q.    Who makes that decision?
13         A.    I would say the HR department and
14    employment law.  I would likely be consulted and
15    told what was going to happen.                 10:48:10
16         Q.    Are you familiar with the term "pay or
17    play"?
18         A.    No.
19         Q.    Other than Mr. Rosen -- and I'm sorry
20    if I asked you this already -- did you have      10:48:36
21    discussions with Ms. Zirinsky about firing any
22    other 60 Minutes employee?
23         A.    Just when I mentioned to you before
24    about the group of people that I had to terminate
25    that happened at each broadcast.                10:48:49
```

Page 38

1                              Owens

2         Q.    When Ms. ██████ raised her concerns,

3    was there -- did CBS conduct an investigation?

4         A.    I don't recall.

5         Q.    Do you have any memory of                  10:49:20

6    participating -- I'm sorry, go ahead.

7         A.    But likely, an HR investigation.

8         Q.    Do you know the outcome of that

9    investigation?

10        A.    I do not.                                  10:49:31

11        Q.    And did you participate in the

12   investigation?

13        A.    I don't recall.

14        Q.    Did you have any discussions with

15   Mr. Fager at the time of Ms. ██████ complaints  10:49:37

16   about Mr. Rosen's employment status?

17        A.    I don't recall.  But, again, I remember

18   seeing on a piece of paper all of her complaints

19   after some period of time.

20        Q.    And before you were executive producer  10:50:04

21   of 60 Minutes, what was your job?

22        A.    Executive editor.

23        Q.    And when did you become executive

24   editor of 60 Minutes?

25        A.    Two thousand I'm going to guess 8.        10:50:17

```
                                              Page 39
 1                       Owens
 2        Q.    Did you remain executive editor until
 3   you were promoted to executive producer?
 4        A.    Yes.
 5        Q.    Do you know who promoted you, who made    10:50:36
 6   the decision to promote you to executive producer
 7   of 60 Minutes?
 8        A.    Yes.
 9        Q.    Who made that decision?
10        A.    Jeff Fager.                              10:50:44
11        Q.    How do you know that he made that
12   decision?
13        A.    Wait.  Pardon me.  To make me executive
14   editor?
15        Q.    No, executive producer.                 10:50:53
16        A.    Oh, pardon me.  Pardon me.
17        Q.    No, that's okay.
18        A.    I honestly don't know.  That was --
19   there was a huge transition going on in the
20   company.  It was announced by Susan Zirinsky.      10:51:08
21        Q.     In terms of your interactions with
22   Neeraj while he was president, did you meet with
23   him on a regular basis?
24        A.    Yes.
25        Q.    How often, approximately?               10:51:33
```

```
                                                    Page 40
 1                      Owens
 2         A.    Weekly.
 3         Q.    And were these in-person meetings, by
 4    phone?  by Zoom?  some other way?
 5         A.    Mostly Zoom.                       10:51:44
 6         Q.    And who would attend those meetings you
 7    had with Neeraj?
 8         A.    Just he and I.
 9         Q.    And what did you discuss generally with
10    Neeraj during these meetings?               10:51:53
11         A.    The same things that I would have
12    discussed with Susan Zirinsky:  stories, staffing.
13         Q.    What types of staffing issues did you
14    discuss with Neeraj?
15              ATTORNEY ZUCKERMAN:  Objection.    10:52:11
16              You can answer.
17         A.    Everything from correspondents that I
18    was thinking about hiring to join 60 Minutes.
19    There would be, you know, questions around
20    budgets, hiring, terminations.              10:52:38
21         Q.    Did you have discussions with Neeraj
22    about disciplining 60 Minutes employees?
23         A.    No, none that I can recall.
24         Q.    When you say that you had conversations
25    with Neeraj about termination of employment of 60  10:52:59
```

```
                                              Page 41
 1                          Owens
 2      Minutes employees, which employees are you
 3      referring to?
 4           A.    He would have been aware of
 5      Ms. Poolos's termination.  I'm trying to remember   10:53:16
 6      if we had to terminate anybody else while he was
 7      there.  I think Sam Hornblower was terminated
 8      while Neeraj was still there.
 9           Q.    Anyone else?
10           A.    Not that I can recall.                   10:53:39
11           Q.    Who is Mr. Hornblower?
12           A.    Mr. Hornblower was an associate
13      producer at 60 Minutes.
14           Q.    How long was he there?
15           A.    At least ten years.                      10:53:52
16           Q.    And who made the decision to terminate
17      his employment?
18           A.    I did.
19           Q.    When did you make that decision?
20           A.    That would have been about two and a     10:54:05
21      half years ago.
22           Q.    And what was the reason for terminating
23      Mr. Hornblower's employment?
24           A.    Lack of production after, and he had a
25      warning about lack of production.                   10:54:24
```

```
                                            Page 42
 1                        Owens
 2        Q.    Any other reason beyond lack of
 3    production?
 4        A.    No.
 5        Q.    And what do you mean by "lack of      10:54:30
 6    production"?
 7        A.    When you're working at 60 Minutes,
 8    you're responsible to create -- you should create
 9    at least four if not five stories a season, and
10    Sam was not doing that.                          10:54:53
11        Q.    Was Sam on a team?
12        A.    He was.
13        Q.    And whose team was he on?
14        A.    The last team he was on was with Bill
15    Whitaker.                                         10:55:04
16        Q.    And who was the producer working with
17    Mr. Whitaker and Mr. Hornblower at that time?
18        A.    So Sam worked with Ira -- you just
19    helped me recall that -- until Ira left and then
20    Sam was given an opportunity to try to produce on 10:55:22
21    his own, and that's when the lack of production
22    became glaring.
23        Q.    So was he not on Mr. Whitaker's team at
24    that point?
25        A.    He was.                                 10:55:37
```

```
                                                  Page 43
 1                      Owens
 2       Q.    He was.  Okay.
 3             So he had been Mr. Rosen's associate
 4    producer?
 5       A.    And also a woman by the name of        10:55:42
 6    Katherine Davis, who now I recall was also
 7    terminated by me for lack of production.
 8       Q.    You said that Mr. Hornblower, before he
 9    was terminated -- his employment was terminated he
10    received a warning; is that correct?             10:56:05
11       A.    That's correct.
12       Q.    What kind of warning?  Was it oral?
13    Was it written?  Was it both?
14       A.    Definitely oral, but I believe there is
15    also -- I don't know, because I didn't see it, but  10:56:16
16    definitely oral.
17       Q.    Okay.  And who issued that warning to
18    Mr. Hornblower?
19       A.    Me.
20       Q.    How soon before he was -- his           10:56:32
21    employment was terminated did he receive his
22    warning?
23       A.    Probably nine months.
24       Q.    And did Mr. Hornblower have a contract?
25       A.    Yes.                                    10:56:52
```

```
                                              Page 44
 1                        Owens
 2        Q.    And was Mr. Hornblower's contract ended
 3   before it expired?
 4        A.    I don't recall.  He may been let go
 5   during a window in his contract.              10:57:03
 6        Q.    When you say "window in a contract,"
 7   what do you mean?
 8        A.    There are periods in some contracts
 9   where the employer has the ability to step away
10   from that contract.                          10:57:21
11        Q.    Do you know if Mr. Hornblower was
12   offered severance by CBS?
13        A.    I don't.
14        Q.    Okay.  You mentioned Katherine Davis.
15   What did she do on the show?                 10:57:36
16        A.    Producer.
17        Q.    At the time she was let go, was she
18   part of a team?
19        A.    She was on Bill Whitaker's team, yes.
20   No, pardon me.  Pardon me.  She had moved by that.  10:57:47
21   She was on Jon Wertheim's team.
22        Q.    Mr. Wertheim is a correspondent on 60
23   Minutes?
24        A.    That is correct.
25        Q.    What was the reason that Ms. Davis's    10:57:59
```

```
                                              Page 45
 1                          Owens
 2     employment was terminated?
 3          A.    Lack of production.
 4          Q.    When you say "lack of production," are
 5     you referring to the same thing you were referring  10:58:07
 6     to with Mr. Hornblower?
 7          A.    Yes.
 8          Q.    So that she didn't produce sufficient
 9     stories; is that right?
10          A.    Inadequate number of stories.           10:58:13
11          Q.    Do you know how many stories she was
12     producing on average per year that led you to that
13     conclusion?
14          A.    No more than two.
15          Q.    Did she get any kind of warning?        10:58:21
16          A.    Yes.
17          Q.    Did Ms. Davis receive any kind of
18     warning?
19          A.    Yes.
20          Q.    Please just let me finish the question.  10:58:29
21     I know you know what I'm going to ask, but the
22     court reporter...
23                And how many warnings did she receive?
24          A.    Two is my recollection.
25          Q.    And were they oral?  in writing?  both?  10:58:38
```

```
                                              Page 46
 1                        Owens

 2          A.    Both.

 3          Q.    Were you involved in issuing those

 4     warnings?

 5          A.    Yes.                          10:58:45

 6          Q.    Did you give Ms. Davis directly the

 7     oral warning?

 8          A.    Yes.

 9          Q.    And how much time between her oral

10     warning of lack of production and her being let go  10:58:51

11     passed?  How much time was there between those two

12     events?

13          A.    Probably the same.  She was warned

14     twice, so probably eight months, was probably

15     warned the beginning of the season and was let go  10:59:08

16     at the end of the season.

17          Q.    And at the time that Ms. Davis was let

18     go did she have a contract?

19          A.    I don't recall.

20          Q.    Did she have a contract before she was  10:59:25

21     let go?

22          A.    Yes.

23          Q.    Is your memory that it would have --

24     well, strike that.

25                Is it likely that contract would have   10:59:32
```

```
                                              Page 47
 1                        Owens
 2    been for three years?
 3         A.    Yes.
 4         Q.    And when she was let go, was it after
 5    the contract had expired, her most recent one, or    10:59:37
 6    was it in the middle of the contract period?
 7         A.    I don't recall.  It may have been a
 8    window.
 9         Q.    And was Ms. Davis offered severances by
10    CBS?                                                 10:59:54
11         A.    I don't know.
12         Q.    And was the termination of Ms. Davis's
13    employment considered a termination for cause?
14              ATTORNEY ZUCKERMAN:  Objection.
15              You can answer.                            11:00:05
16         A.    I don't know.
17         Q.    And was Mr. Hornblower's termination of
18    employment considered a termination for cause?
19         A.    I don't know.
20              ATTORNEY ZUCKERMAN:  Objection.            11:00:12
21         A.    I don't know.
22         Q.    So during the period that Neeraj was
23    president of CBS News and you were executive
24    producer for 60 Minutes, you mentioned three
25    employees whose employment was terminated:          11:00:37
```

```
                                                    Page 48
 1                          Owens
 2      Ms. Davis, Mr. Hornblower, and Ms. Poolos.  Was
 3      there anybody else?
 4           A.    Not that I can recall.
 5           Q.    Going back to when Ms. Zirinsky was the  11:00:56
 6      president of CBS News, did you have any
 7      discussions with her about Michael Gavshon?
 8           A.    Yes.
 9           Q.    And does Mr. Gavshon currently work for
10      60 Minutes?                                         11:01:16
11           A.    He does.
12           Q.    What's his job there?
13           A.    Producer.
14           Q.    And how long has he been a producer at
15      60 Minutes?                                         11:01:21
16           A.    I don't know.  More than 25 years.
17           Q.    And during the period that Mr. Gavshon
18      has been a producer for 60 Minutes, at least to
19      the extent you've worked there, is it your
20      understanding that Mr. Gavshon was exclusive to 60  11:01:39
21      Minutes or did he work for other shows?
22           A.    Exclusive.
23           Q.    And since you've become executive
24      producer for 60 Minutes, has Mr. Gavshon reported
25      directly to you?                                    11:01:55
```

```
                                                    Page 49
  1                          Owens
  2          A.    Yes.
  3          Q.    And before you were executive producer
  4    of 60 Minutes, Mr. Fager was in that role;
  5    correct?                                    11:02:02
  6          A.    Correct.
  7          Q.    Did Mr. Gavshon at that point report to
  8    Mr. Fager as executive producer for the show?
  9          A.    Correct.
 10          Q.    What discussions did you have with    11:02:13
 11    Ms. Zirinsky about Mr. Gavshon?
 12          A.    Many.
 13          Q.    Okay.  Please tell me what you recall.
 14          A.    Well, I mean, oftentimes she would talk
 15    about his work.  Michael is one of the most -- is  11:02:31
 16    one of the best 60 Minutes producers of all time.
 17    Susan Zirinsky is -- and I am also -- I would
 18    consider Michael a friend.  I've known him for a
 19    long time.
 20              So there would be numbers of things    11:02:51
 21    that we might talk about, probably primarily
 22    around his work product.
 23          Q.    And did you have discussions with
 24    Ms. Zirinsky about the work product of other
 25    producers at 60 Minutes?                     11:03:08
```

```
                                                    Page 50
 1                          Owens
 2          A.     Yeah.
 3          Q.     And did you have discussions about the
 4     work product of producers at 60 Minutes with
 5     Neeraj?                                      11:03:17
 6          A.     Yes.
 7          Q.     Going back to conversations you had
 8     with Ms. Zirinsky about Mr. Gavshon, did you ever
 9     have any discussions with her related to any
10     complaints against Mr. Gavshon?              11:03:31
11          A.     Yes.
12          Q.     And what complaint or complaints did
13     you have discussions with Ms. Zirinsky about
14     Mr. Gavshon?
15          A.     About a photo that he mistakenly sent  11:03:39
16     to his associate producer.
17          Q.     Who's the associate producer?
18          A.     ███████████████
19          Q.     And what photo are you referring to?
20          A.     There was a photo he meant to send to  11:03:56
21     his sister.  His best friend had just passed away.
22     It was a photo of them in middle school or high
23     school at the end of the term, and they were I
24     believe peeing on their textbooks.
25                 His friend had just passed away.  He   11:04:22
```

```
                                              Page 51
 1                      Owens

 2    came across this picture, and he meant to send it

 3    to his sister, who had also known his best friend,

 4    and he mistakenly sent it to his associate

 5    producer.                                  11:04:38

 6         Q.    And --

 7         A.    Go ahead.

 8         Q.    And the associate producer was

 9    Ms. ████████

10         A.    That's right.                   11:04:44

11         Q.    You said his friend had just passed

12    away.  You're talking about at the time he sent

13    the photo?

14         A.    That's my understanding.

15         Q.    And in the photo could you see    11:04:52

16    Mr. Gavshon -- strike that.

17              Did you see the photo that was at

18    issue?

19         A.    I did.

20         Q.    And did you see it around the time that  11:05:01

21    Ms. ██████████  had raised concerns about the photo?

22         A.    I don't know.

23         Q.    And in the photo can you see

24    Mr. Gavshon's genitals?

25         A.    I don't recall.                  11:05:16
```

```
                                                          Page 52
 1                          Owens
 2          Q.    Can you see his penis?
 3          A.    I don't recall.
 4          Q.    You said Mr. Gavshon sent the photo by
 5    mistake.  What's your basis for saying that?      11:05:24
 6          A.    He told us that.
 7          Q.    Who is --
 8          A.    Mr. Gavshon told the people who -- I
 9    was told that by HR.  And I was also told he
10    apologized immediately after he sent it when he    11:05:41
11    realized he had mistakenly sent it to ███████
12          Q.    And you were told he apologized
13    immediately to who?
14          A.    To ██████
15          Q.    Sometimes I'm going to refer to        11:05:53
16    associate producers as APs.  Is that okay?
17          A.    Perfect.
18          Q.    And who in HR told you that?
19          A.    I believe Renee Balducci.
20          Q.    And other than Mr. Gavshon telling      11:06:14
21    folks that he had mistakenly sent the photo, was
22    there any other basis that you know of to believe
23    that he had done so mistakenly?
24                ATTORNEY ZUCKERMAN:  Objection.
25          A.    I don't know.  I think he did it by     11:06:31
```

```
                                          Page 53
 1                     Owens
 2   accident.
 3        Q.    How did you learn about Ms. ███████
 4   complaint?
 5        A.    Through HR.                    11:06:45
 6        Q.    And would that have been through
 7   Ms. Balducci?
 8        A.    I believe so.
 9        Q.    And what did she say about the
10   complaint to you?                         11:06:52
11        A.    The facts, what ███████ had told her and
12   what Michael's response was.
13        Q.    Michael being Mr. Gavshon?
14        A.    Mr. Gavshon.
15        Q.    And did you have one or multiple   11:07:13
16   discussions with Ms. Balducci about Ms. ███████
17   complaints?
18        A.    Oh, I'm sure we had two or three, and
19   Susan Zirinsky was involved as well, or was it --
20   yeah, Susan Zirinsky.  I'm trying to keep my  11:07:32
21   presidents straight.
22        Q.    Was she part of the discussions that
23   you had with Ms. Balducci?
24        A.    Definitely one or two of them.
25        Q.    It's possible that you may have had one  11:07:40
```

```
                                                    Page 54
 1                          Owens
 2    or more discussions with just you and Ms. Balducci
 3    about this matter?
 4         A.    Possible.
 5         Q.    And did Ms. ████████ make any other    11:07:58
 6    complaints about Mr. Gavshon other than related to
 7    the photo?
 8         A.    Not that I'm aware.
 9         Q.    Did Ms. ████████ make a complaint that
10    Mr. Gavshon retaliated against her after she    11:08:12
11    raised concerns about the photo?
12         A.    Not that I'm aware.
13         Q.    Did Ms. ████████ raise any concerns
14    about Mr. Gavshon being drunk while working?
15         A.    She may have made an allegation about    11:08:30
16    him drinking while working.  I don't remember
17    "drunk" being the word.
18         Q.    What is your memory of what
19    Ms. ████████ made an allegation of related to
20    Mr. Gavshon drinking?                              11:08:45
21         A.    You just jogged my memory, to be
22    honest.  Just that.
23         Q.    Do you have any memory of Ms. ████████
24    making a complaint that Mr. Gavshon was passed out
25    drunk while working?                               11:08:57
```

```
                                                      Page 55
  1                         Owens
  2         A.    No.
  3         Q.    Do you have a memory of Ms. ████
  4    raising a concern that Mr. Gavshon had drank too
  5    much at a work-related event?                  11:09:07
  6         A.    I don't recall.
  7         Q.    Did Ms. ████    make a complaint that
  8    after she raised her concerns related to the photo
  9    that Mr. Gavshon stopped giving her work
 10    assignments?                                    11:09:24
 11         A.    Not that I recall.
 12         Q.    In response to Ms. ████  complaint
 13    related to Mr. Gavshon, what action did CBS take?
 14         A.    There was an investigation.
 15         Q.    And who conducted that investigation?  11:09:52
 16         A.    I believe Renee.  I'm not sure if
 17    Cynthia Glasgow was her superior at that time, but
 18    I don't think -- I don't believe Renee did it on
 19    her own.
 20         Q.    And what steps did HR take in          11:10:09
 21    connection with that investigation, if you know?
 22         A.    To talk to both parties.  That's really
 23    all I know.
 24         Q.    Were you interviewed as part of any
 25    investigation into Mr. Gavshon -- any complaints   11:10:22
```

```
                                                  Page 56
 1                        Owens
 2    about Mr. Gavshon?
 3         A.    No.
 4         Q.    Did you play any role in any such
 5    investigation?                              11:10:30
 6         A.    I mean, I was made aware of their
 7    findings.
 8         Q.    And just to be clear, what were the
 9    findings as you understand it?
10         A.    That Mr. Gavshon had sent this photo to  11:10:42
11    his associate producer by accident, had
12    immediately apologized to her.  I believe he self-
13    reported to HR.  He told myself and Tanya what had
14    happened, and I remember him saying that he was
15    mortified.  And then I think it wasn't long after  11:11:08
16    that Ms. ██████████ was looking for some settlement
17    that we heard from counsel on her behalf.
18              ATTORNEY ZUCKERMAN:  Do not discuss any
19         conversations that you had with counsel,
20         whether in-house counsel like Ms. Ahmed or  11:11:33
21         outside counsel.  Okay?
22              THE WITNESS:  Yes.
23              ATTORNEY ZUCKERMAN:  And I move to have
24         that struck at the appropriate time.
25         Q.    You said that your understanding is  11:11:47
```

```
 1                          Owens
 2    Mr. Gavshon self-reported; is that correct?
 3         A.    That's my recollection.
 4         Q.    And what do you mean, "self-reported"?
 5         A.    That he told Tanya and myself and then    11:11:56
 6    spoke to HR.
 7         Q.    And your memory is that he did so
 8    before Ms. ███████ had made a complaint?
 9         A.    Or around the same time.  But it was...
10         Q.    And what exactly did he self-report, is  11:12:20
11    your understanding?
12         A.    What he had done by mistake, sending a
13    photo to her that was meant for his sister.
14         Q.    You said that he discussed it with you
15    and Ms. Simon.  Did he do so at the same time with  11:12:36
16    both of you or separately?
17         A.    I don't recall.
18         Q.    And what did he tell you exactly?
19         A.    That he had sent a photo to his
20    associate producer that was intended for his        11:12:50
21    sister.
22         Q.    You mentioned I think a couple times
23    that Mr. Gavshon apologized immediately to -- and
24    I think you said later that he apologized to
25    Ms. ███████ correct?                                 11:13:09
```

```
                                              Page 58

 1                        Owens

 2        A.    That's what he told us, yes.

 3        Q.    That's what he told you and Ms. Simon?

 4        A.    Well, that's what he told me.

 5        Q.    Okay.                         11:13:18

 6              And to you is the apology significant?

 7    Does it matter that he apologized?

 8        A.    Yes.

 9        Q.    And why so?

10        A.    Because I think he made a mistake and   11:13:30

11    he recognized it immediately and he was working

12    with this woman and had a professional

13    relationship with her.  It's the right thing to

14    do.

15        Q.    Before Ms. ███████ complaints about   11:13:47

16    Mr. Gavshon, had there been any other complaints

17    about Mr. Gavshon?

18        A.    Not that I'm aware.

19        Q.    And did you conduct any kind of inquiry

20    or investigation to find out if there had been   11:14:01

21    prior complaints?

22        A.    No.

23        Q.    To your knowledge did anyone at CBS

24    figure out if there had been prior complaints

25    about Mr. Gavshon?                              11:14:12
```

```
                                          Page 59
 1                      Owens
 2        A.    I'm sure HR looked into it.
 3        Q.    But you don't have any firsthand
 4   knowledge?
 5        A.    I don't.                    11:14:18
 6        Q.    Were you involved in any discussions
 7   about whether to take disciplinary action against
 8   Mr. Gavshon?
 9        A.    HR had recommendations, is my memory of
10   that.                                  11:14:34
11        Q.    And what were HR's recommendations?
12        A.    That he not work with Ms. ██████
13   anymore.  But I also recall that there was now
14   another set of circumstances regarding what her
15   intentions were in terms of staying with the  11:14:51
16   company, et cetera.
17        Q.    So focusing on HR's recommendations,
18   one of the recommendations was that Ms. ██████
19   not work with Mr. Gavshon anymore?
20        A.    That's my recollection.      11:15:05
21        Q.    Was there any recommendation that any
22   disciplinary action be taken against Mr. Gavshon?
23        A.    I don't recall.
24        Q.    Did Mr. Gavshon receive any counseling
25   in connection with the complaint or complaints  11:15:20
```

```
                                              Page 60
 1                            Owens
 2    that Ms. ████████  made?
 3         A.    I don't recall.
 4         Q.    Did you counsel Mr. Gavshon?
 5         A.    We talked often.                11:15:33
 6         Q.    Did you counsel him about
 7    Ms. ████████  complaint?
 8         A.    Well, I don't know what you mean by
 9    "counsel."  We talked about what he had done, that
10    he was mortified, and that he needed to be more  11:15:44
11    careful.
12         Q.    Did Mr. Gavshon receive an oral warning
13    in connection with Ms. ████████  complaints?
14         A.    I don't recall.
15         Q.    Were you part of any discussions as to  11:16:04
16    whether to issue Ms. -- Mr. Gavshon an oral
17    warning in connection with those complaints?
18         A.    I don't recall.  But, again, there was
19    this other set of facts that were entering the
20    equation in terms of whether or not Ms. ████████  11:16:23
21    was going to remain at 60 Minutes, of her own
22    volition.
23         Q.    Whether Ms. ██████  was going to
24    remain at 60 Minutes or not, would that affect --
25    did that affect whether Mr. Gavshon received an  11:16:35
```

```
                                                    Page 61
 1                        Owens
 2    oral warning?
 3         A.    I can't recall.
 4         Q.    Did Mr. Gavshon receive a written
 5    warning in connection with Ms. ████████        11:16:47
 6    complaints?
 7         A.    I don't know.
 8         Q.    Was Mr. Gavshon at any point in time
 9    placed on a paid leave of absence in connection
10    with Ms. ████████ complaints?                  11:16:58
11         A.    I don't believe so.
12         Q.    Were you involved in any discussions
13    about whether to place Mr. Gavshon on a paid
14    administrative leave?
15         A.    I don't recall.                      11:17:09
16         Q.    Were you involved in any discussions as
17    to whether to suspend Mr. Gavshon's employment in
18    connection with Ms. ████████ complaints?
19         A.    No.
20         Q.    You were not part of any such           11:17:22
21    discussions?
22         A.    I was not.
23         Q.    And were you part of any discussions
24    with anyone about whether to fire Mr. Gavshon?
25         A.    No.                                  11:17:37
```

Page 62

1                              Owens

2           Q.    You said that HR had made

3      recommendations following the investigation into

4      Ms. ████████ complaint or complaints; correct?

5           A.    Correct.                          11:18:03

6           Q.    And recommendations included

7      recommendations as it related to Mr. Gavshon;

8      correct?

9           A.    Correct.

10          Q.    And when you say they made          11:18:11

11     recommendations, what was the effect -- well,

12     strike that.

13                As the executive producer were you

14     obligated to accept those recommendations?

15                ATTORNEY ZUCKERMAN:   Objection.    11:18:21

16          A.    No.

17          Q.    Did you agree or disagree with the

18     recommendations?

19          A.    I believe I agreed.

20          Q.    Did whatever the recommendations that  11:18:33

21     HR made get implemented or carried out?

22          A.    Again, my recollection is

23     Ms. ████████ -- her status on her -- she was --

24     she was looking for a settlement.  She was looking

25     for some way to leave us.  We also believed      11:18:57

```
                                                    Page 63
 1                          Owens
 2     Mr. Gavshon to be telling the truth about this
 3     unfortunate story.
 4          Q.    And what was the basis for your belief
 5     that he was telling the truth?              11:19:08
 6                ATTORNEY ZUCKERMAN:  Asked and
 7          answered.
 8                You can answer again.
 9          A.    That Michael was a long-time producer
10     with a great record, zero question around his    11:19:23
11     truthfulness or his reporting.  He clearly felt
12     horribly about it, was my own take.  He self-
13     reported to me.  He apologized profusely.  He
14     didn't leave out any details.
15          Q.    When HR made the recommendations as it   11:19:53
16     related -- recommendation or recommendations
17     related to Mr. Gavshon, whose decision was it
18     whether to accept those recommendations or not?
19          A.    It would have been myself, but Susan
20     Zirinsky would have had a say in that.        11:20:11
21          Q.    Did you discuss HR's recommendations
22     with Ms. Zirinsky?
23          A.    Yes.
24          Q.    What did you discuss?
25          A.    That he believed Michael's version of   11:20:24
```

```
                                                    Page 64
 1                          Owens
 2     the story.  But, again, my recollection is at this
 3     time Ms. ████████ was filing some sort of legal
 4     action against us.
 5          Q.    How did Ms. ████████ legal action      11:20:38
 6     affect whatever steps or recommendations were
 7     implemented as it related to Mr. Gavshon?
 8               ATTORNEY ZUCKERMAN:  Again just
 9          cautioning you not to reveal attorney/client
10          privileged information.                      11:20:49
11          A.    I don't know.
12               ATTORNEY IADEVAIA:  Why don't we take a
13          break now.  Is that okay?  We've been going
14          for a while.
15               ATTORNEY ZUCKERMAN:  Sure.              11:21:05
16               THE VIDEOGRAPHER:  The time is 11:22
17          a.m., and we're off the record.
18               (Recess taken from 11:22 to 1:47.)
19               THE VIDEOGRAPHER:  The time is 11:47
20          a.m., and we're back on the record.          11:46:11
21          Q.    Mr. Owens, in your capacity as
22     executive producer for the show, I believe you
23     testified earlier you have responsibilities for
24     supervising the producers at 60 Minutes; correct?
25          A.    Correct.                                11:46:29
```

```
                                              Page 65

 1                      Owens

 2        Q.    And as part of those responsibilities

 3   do you evaluate the performance of the producers?

 4        A.    Yes.

 5        Q.    And is there a formal evaluation        11:46:41

 6   process?

 7        A.    There is.

 8        Q.    How often does that take place?  Once a

 9   year?  Twice a year?  Some other duration?

10        A.    Once a year.                            11:46:50

11        Q.    What time of year does it generally

12   happen?

13        A.    The end of the year.  But, if I may,

14   every time we look at a story, the completed

15   piece, I would say that's also an opportunity for  11:47:01

16   producers to get feedback from me.

17        Q.    Focusing for just a minute on the

18   formal process, you said the end of the year.  Do

19   you mean the end of the 60 Minutes season?

20        A.    Yes.                                    11:47:16

21        Q.    Not the calendar year?

22        A.    Correct.

23        Q.    And when does the 60 Minutes season

24   start and end?

25        A.    It starts at the end of September and   11:47:21
```

```
                                                    Page 66
 1                        Owens
 2    runs through the end of May.
 3         Q.    And then approximately how long after
 4    the season ends do you provide formal feedback to
 5    producers?                                    11:47:37
 6         A.    It actually starts happening before the
 7    end of the season, so it probably starts in April,
 8    and we try to be done by the end of the season.
 9         Q.    And as part of the review process, do
10    you meet with the producers?                  11:47:54
11         A.    Yes.
12         Q.    Do you meet with them one-on-one or is
13    there other people present?
14         A.    One-on-one.
15         Q.    Has that been true since you took over  11:48:03
16    as executive producer?
17         A.    I believe so.
18         Q.    And is there anything in writing in
19    terms of feedback for the producers?
20         A.    There should be, yes.               11:48:19
21         Q.    What form does the writing take when
22    there is?
23         A.    It's a summary of the conversation
24    we've had, mostly.
25         Q.    So the written portion of the feedback  11:48:32
```

```
                                                Page 67
  1                        Owens
  2    is made after you have the one-on-one meeting?
  3         A.    Yes, and shared with the producer.
  4         Q.    And who drafts the summaries?
  5         A.    I do.                           11:48:49
  6         Q.    And before you have meetings with the
  7    producers, do you have conversations with human
  8    resources about what you're going to say or write
  9    related to the producer's performance?
 10         A.    No.                             11:49:08
 11         Q.    Do you meet or talk with the CBS News
 12    president before having those discussions with the
 13    producers?
 14         A.    No.
 15         Q.    What factors do you consider in       11:49:27
 16    evaluating the performance of producers?
 17         A.    Multiple factors.  One is number of
 18    stories.  There should be, as I said I think
 19    earlier, a minimum for a satisfactory season would
 20    be four stories.  When I was a producer, I never   11:49:48
 21    did less than six.  So production matters.
 22    Originality matters.  How those stories come to
 23    the screening room matters.
 24         Q.    Anything else matter?
 25         A.    I'm sure.  I mean, how well they're    11:50:09
```

```
                                          Page 68

 1                     Owens
 2    written, how creatively they're produced,
 3    conceived of.
 4         Q.    Anything else?
 5         A.    I'd say those are the major.        11:50:26
 6         Q.    When you say "how the stories come to
 7    the screening room," what do you mean by that?
 8         A.    When the producing teams are ready to
 9    show us the story, we have a first screening.
10    Sometimes those screenings go well, and sometimes  11:50:43
11    they don't.  Sometimes the story needs a lot of
12    work.
13            The teams have already had a lot of
14    time.  It's their idea, they've been out shooting
15    the story, they have ample budgets to shoot       11:50:56
16    stories and travel, and there's an expectation
17    that when a story comes to the screen room it
18    should be in good shape.
19         Q.    And when you say "how well written,"
20    what do you mean by that?                          11:51:13
21         A.    Well, I guess well written can be
22    subjective, but it should -- the writing should be
23    clear.  It should be laden with reporting and
24    information.  There needs to be a story arc.  What
25    we do at 60 Minutes is we tell stories.  So it     11:51:37
```

```
                                               Page 69
 1                        Owens
 2     needs to be a well-told story.
 3          Q.    And is it the producer's job to write
 4     the stories?
 5          A.    In large part, yes.              11:51:50
 6          Q.    Does how the story is ultimately -- or
 7     how stories are ultimately received, does that
 8     matter in how you evaluate producers' performance?
 9          A.    I'm sorry, ultimately received by who?
10          Q.    All right.  Let me ask it a different   11:52:09
11     way.
12                Are award nominations for segments that
13     producers work on a factor in evaluating the
14     performance of producers?
15          A.    No.                               11:52:21
16          Q.    We talked earlier, I believe, that
17     before you became executive producer at 60 Minutes
18     you were the executive editor; correct?
19          A.    Correct.
20          Q.    You know what, I'm going to hold that   11:52:49
21     for one second because I want to go back before we
22     move on.
23                You mentioned the number of stories as
24     a factor in evaluating producers; correct?
25          A.    Correct.                          11:52:59
```

```
                                             Page 70
 1                        Owens
 2       Q.    Are there producers working on the show
 3    currently who have produced fewer than four
 4    stories in a season since you've been executive
 5    producer?                                      11:53:13
 6       A.    I'm sure.
 7       Q.    Those producers were not fired because
 8    their productivity was less than four stories in a
 9    season; correct?
10            ATTORNEY ZUCKERMAN:  Objection.        11:53:24
11       A.    Correct.  But it's the consistency of a
12    lack of production that matters.  So someone might
13    have a bad year.
14       Q.    So one year in which someone is below
15    what you referred to as the minimum of four        11:53:43
16    stories generally doesn't lead to that producer
17    losing their job; correct?
18       A.    Correct.
19       Q.    And for a producer who has fewer
20    stories than you would like, do you give them      11:54:03
21    warnings?  Do they get warnings?
22       A.    Yeah.  We discussed before that
23    Katherine Davis received one, and Sam Hornblower.
24    And it would routinely come up in the end-of-
25    season conversation and my written summary.        11:54:27
```

```
                                              Page 71

 1                        Owens

 2       Q.    Which producers who currently work for

 3   60 Minutes have received warnings about their

 4   productivity?

 5            THE WITNESS:  Is that a question I      11:54:40

 6       should answer?

 7            ATTORNEY ZUCKERMAN:  Which?  Who

 8       received warnings?

 9            THE WITNESS:  Yeah.

10            ATTORNEY ZUCKERMAN:  Yeah, as long as   11:54:47

11       you're not revealing information from a lawyer

12       about those warnings.

13            THE WITNESS:  It seems like talking

14       about people who aren't involved in this

15       story, but anyway.                          11:54:57

16            ATTORNEY ZUCKERMAN:  Yes, it is.

17            THE WITNESS:  Well, I can think of two,

18       I guess:  Sarah Koch and Graham Messick.

19       Q.    And when did Ms. Koch receive her

20   warning?                                         11:55:28

21       A.    I think at the end of the year last

22   year.

23       Q.    And Mr. Messick?

24       A.    The same.

25       Q.    And have you seen a change in their    11:55:41
```

```
                                             Page 72
 1                       Owens
 2     productivity?
 3          A.    Well, we're halfway through the season,
 4     so it's too early to know.
 5          Q.    When considering the productivity of a   11:55:52
 6     producer, does the complexity of the story play a
 7     role?
 8                ATTORNEY ZUCKERMAN:  Objection.
 9          A.    It shouldn't.  It's the producer's
10     choice what story they choose to report.          11:56:04
11          Q.    Are there stories that producers work
12     on that you consider to be harder, more
13     complicated than other stories?
14          A.    Sometimes, yes.
15          Q.    And do the harder, more complicated     11:56:18
16     stories generally take more time to produce than
17     others?
18          A.    Not always.
19          Q.    Sometimes?
20          A.    Sometimes.  Producers are also supposed 11:56:26
21     to have more than one story going at a time, so
22     you may be working on something that has a higher
23     degree of difficulty at the same time you should
24     be working on something that can get on
25     television.                                        11:56:41
```

```
                                            Page 73
 1                        Owens
 2        Q.    Thanks.
 3              So let's talk about -- I want to talk
 4    about your stint as executive editor for 60
 5    Minutes.  Can you -- if you said this before, I    11:56:52
 6    apologize, but just to refresh my memory,
 7    approximately when did you get that role?
 8        A.    I'm going to guess it was like two
 9    thousand -- maybe 2006, 2008, something like that.
10        Q.    Were you promoted into that role or     11:57:10
11    what were the circumstances of you getting that
12    job?
13        A.    I was promoted.
14        Q.    And who promoted you?
15        A.    Jeff Fager.                              11:57:17
16        Q.    And Mr. Fager was at the time the
17    executive producer; is that right?
18        A.    That's right.
19        Q.    And who did you replace?
20        A.    Patti Hassler.                           11:57:26
21        Q.    What happened to Ms. Hassler?
22              ATTORNEY ZUCKERMAN:  Objection.
23        A.    She left CBS.
24        Q.    Did she leave voluntarily, do you know?
25        A.    She did, for another job.               11:57:33
```

```
                                                    Page 74
 1                          Owens
 2          Q.     And what were your responsibilities as
 3     executive editor for 60 Minutes around the time
 4     that you first took the job, assumed the role?
 5          A.     I was -- I mean, I was the deputy to     11:57:52
 6     Jeff Fager in charge of helping, as Tanya is for
 7     me, to get the stories on each week, to make sure
 8     that they're editorially sound and as well as can
 9     be told.
10             I also helped to write the promos, the     11:58:09
11     promotional material, that got on during the week,
12     the teasers at the beginning of the show when the
13     show opens up.  And I guess associate producers
14     reported directly to me.  Producers reported to
15     Jeff.  Those are the main ones.                    11:58:34
16          Q.     Were you at all involved in assisting
17     Mr. Fager in the supervision of producers during
18     the time you were executive editor?
19          A.     No.
20          Q.     Did Mr. Fager discuss with you during     11:58:59
21     the time you were executive editor the performance
22     of producers?
23          A.     Occasionally.
24          Q.     And did Mr. Fager discuss with you the
25     conduct of producers during the period you were     11:59:16
```

```
                                              Page 75
 1                        Owens
 2    executive editor?
 3          A.    I can't recall.
 4          Q.    And outside of the APs did anyone else
 5    directly report to you during the time you were     11:59:35
 6    executive editor?
 7          A.    No.
 8          Q.    And in supervising the APs as executive
 9    editor, what did that entail?
10          A.    Answering any questions they would     11:59:57
11    have; could be as mundane as about their budgets,
12    how they were putting their budgets together.  It
13    could be asking me for my advice on a story.
14          Q.    Did you evaluate their performances?
15          A.    Yes.                                    12:00:22
16          Q.    Was there a formal evaluation process
17    when you were executive editor?
18          A.    Not the entire time.  It was something
19    that was put in place, and I don't remember what
20    year that was put in place, the formal part of it.  12:00:33
21          Q.    When you were executive editor
22    supervising APs and evaluating their performances,
23    what factors did you consider in doing so?
24          A.    I mean -- each group is a team, so an
25    AP works with a producer who works with a           12:01:08
```

```
                                             Page 76

 1                        Owens
 2     correspondent, and they also work with a broadcast
 3     associate.  So you have to work together.
 4              And certain APs were better at some
 5     things than others.  Certain APs were very good at  12:01:23
 6     finding stories.  Certain APs were very good at
 7     uncovering information and real reporting.  Other
 8     APs were better with logistics.
 9              So it depends.  It was -- it's not a
10     blanket thing.                                      12:01:40
11        Q.    But the qualities you just mentioned --
12     finding stories, uncovering information,
13     logistics -- are those all factors in deciding,
14     you know, if an AP is doing a good job?
15        A.    Yes.                                        12:02:00
16        Q.    Anything else you can think of?
17        A.    I mean, collegiality, how they -- what
18     their -- how they were seen by their colleagues on
19     the floor, how they got along with editors, how
20     they got along with camera people.  We would often  12:02:19
21     time receive feedback from our camera crews and
22     editors about associate producers.
23        Q.    Anything else you can think of?
24        A.    No, that's it.
25        Q.    Is copy editing the responsibility of     12:02:35
```

```
                                        Page 77
 1                     Owens
 2    an AP?
 3         A.    Copy editing?  No.
 4         Q.    Is writing part of an AP's
 5    responsibility?                          12:02:46
 6         A.    In part, but not for broadcast.  It
 7    wouldn't be expected of an AP to write part of a
 8    script, and I can't think of a time when an AP has
 9    done that.
10         Q.    Are APs responsible for handling    12:02:57
11    logistics as it relates to traveling for the
12    purposes of a story?
13         A.    Yes.
14         Q.    When you were executive editor, did
15    producers ever come to you to discuss editorial    12:03:13
16    concerns or issues?
17         A.    Yes.
18               ATTORNEY ZUCKERMAN:  Objection.
19               You can answer.
20         A.    Yes.                          12:03:23
21         Q.    How often did that happen?  Was it
22    regular?  fairly regular?  How would you
23    characterize it?
24         A.    Fairly regular.
25         Q.    When you were executive editor, did    12:03:29
```

```
                                            Page 78
 1                      Owens
 2   producers ever come speak to you about
 3   personnel-related matters?
 4        A.    Yes.
 5        Q.    And how often did that happen?      12:03:36
 6        A.    Not regularly.
 7        Q.    And did producers during your time as
 8   executive editor ever come to you to discuss
 9   issues that you would consider administrative in
10   nature?                                         12:03:52
11        A.    I suppose, yes.
12        Q.    Going back for a minute to APs and
13   their responsibilities, are APs responsible for
14   conducting background interviews for stories?
15        A.    Yes.                                 12:04:17
16        Q.    And what is a background interview?
17        A.    To speak to characters who might be in
18   a story and basically report, find out what they
19   know, write up a summary of that.  That's included
20   in the research.                                12:04:34
21        Q.    Before you were executive editor at 60
22   Minutes, what was your job?
23        A.    I was the senior broadcast producer at
24   60 Minutes.
25        Q.    For how long did you have that role,   12:04:50
```

```
                                           Page 79
 1                    Owens
 2    approximately?
 3         A.    Approximately a year.
 4         Q.    And who did you report to as the senior
 5    broadcast producer for 60 Minutes?          12:05:02
 6         A.    Patti Hassler and Jeff Fager.
 7         Q.    And what did you do generally in that
 8    job?
 9         A.    I mentioned to you earlier that Deborah
10    DeLuca has that job now.  It's the person who goes  12:05:16
11    and works with the control room, putting together
12    the stories, the three broadcasts, for Sunday
13    night.
14         Q.    Did your responsibilities over that
15    year change materially or mostly you had the same  12:05:29
16    job for that time?
17         A.    The same job.
18         Q.    Okay.  What was your job before being
19    senior broadcast producer at 60?
20         A.    I was the senior broadcast producer of  12:05:39
21    the CBS Evening News.
22         Q.    And for what years approximately were
23    you in that role?
24         A.    2004 to 2006.
25         Q.    So when you were a senior broadcast  12:05:56
```

```
                                            Page 80
 1                         Owens
 2    producer for CBS Evening News, did you have any
 3    responsibilities for 60 Minutes?
 4         A.    None.
 5         Q.    Okay.  And who did you report to during  12:06:03
 6    that time?
 7         A.    Rome Hartman was the executive producer
 8    of the CBS Evening News.  Well, then Rome got
 9    fired, and then Rick Kaplan was the next executive
10    producer.                                            12:06:23
11         Q.    Okay.  And before you were the senior
12    broadcast producer for the Evening News, what was
13    your job?
14         A.    Producer at 60 Minutes.
15         Q.    And for how long were you a producer at  12:06:30
16    60 Minutes?
17         A.    Six years, something like that.
18         Q.    Did you work on a team during that
19    time?
20         A.    I did.                                    12:06:39
21         Q.    And did you switch teams or did you
22    stay on the same team?
23         A.    Same team.
24         Q.    Who was on the team?
25         A.    Scott Pelley was my correspondent.  My   12:06:46
```

```
                                              Page 81
                                Owens
1
2    first associate producer was a woman by the name
3    of Mishi Ebrahim, E-B-R-A-H-I-M; and my second
4    associate producer was Catherine Herrick,
5    H-E-R-R-I-C-K.                              12:07:14
6         Q.    And before you were a producer for 60
7    Minutes, what was your job?
8         A.    I was the senior White House producer
9    in Washington, D.C., for the CBS Evening News.
10        Q.    How long did you have that job,    12:07:33
11   approximately?
12        A.    Well, I was -- I was at the Morning
13   News at the White House, and then I went to the
14   Evening News for the White House.  I can tell you
15   that that whole period of time was '94 to 2000, I  12:07:45
16   think.
17        Q.    What was your job before you were a
18   White House producer or news producer?
19        A.    Uh-huh.  I was a -- I was a morning
20   news producer, CBS News, morning news producer, in  12:08:01
21   New York.
22        Q.    And before that?
23        A.    I was an assignment editor on the CBS
24   News assignment desk.
25        Q.    Before that?                      12:08:23
```

```
                                              Page 82

 1                         Owens

 2          A.    A desk assistant on the CBS News

 3     assignment desk.

 4          Q.    And before that?

 5          A.    I was a page for CBS News in the summer  12:08:30

 6     of 1988, and before that I was in college.

 7          Q.    A long time with CBS News.

 8          A.    Like an insurance salesman.

 9          Q.    Moving back to your job as executive

10     producer, are there evening -- do you work       12:08:48

11     sometimes in the evenings?

12          A.    Yes.

13          Q.    Do you have to work weekends sometimes?

14          A.    Yes.

15          Q.    How often?                             12:08:56

16          A.    Well, during the pandemic it was almost

17     every weekend, but it depends.  Many weekends.

18          Q.    And as executive producer do you ever

19     work on holidays?

20          A.    Yes.                                   12:09:09

21          Q.    As an executive editor, did you ever

22     work evenings?

23          A.    Yes.

24          Q.    How often?

25          A.    Often.                                 12:09:15
```

```
                                              Page 83
 1                        Owens
 2         Q.    And weekends?
 3         A.    Yes.
 4         Q.    Would you say you worked weekends often
 5    as executive editor?                        12:09:21
 6         A.    Yes.
 7         Q.    And did you ever work on holidays as
 8    executive editor?
 9         A.    Not often.
10         Q.    But sometimes?                    12:09:36
11         A.    There were occasions.  I mean, also
12    define holiday.  Are we talking about, like,
13    President's Day or are we talking about Christmas?
14         Q.    The question is a CBS-recognized
15    holiday.                                     12:09:51
16         A.    Oh, I see.  Yes, a CBS-recognized
17    holiday, of which there are many, yes.
18         Q.    As a senior broadcast producer, that
19    job you were in for about a year, did you work
20    nights?                                      12:10:05
21         A.    Yes.
22         Q.    Did you work weekends?
23         A.    No.
24         Q.    Did you work holidays?
25         A.    Yes.                              12:10:10
```

```
                                                Page 84
 1                          Owens
 2         Q.    And you've had various producer roles.
 3    In those producer -- at CBS News; correct?
 4         A.    Yes.
 5         Q.    And in those roles did you work nights?  12:10:18
 6         A.    Yes.
 7         Q.    And did you work nights often?
 8         A.    As needed.
 9         Q.    Did you work weekends?
10         A.    Yes.                                       12:10:30
11         Q.    Did you work holidays?
12         A.    Yes.
13         Q.    When you were a producer, did the work
14    flow change at all depending on the status of a
15    story you were working on?                           12:10:43
16         A.    No.
17         Q.    Was work more intense, less intense,
18    the same level of intensity when you were working
19    on a segment that was getting closer to being
20    broadcast?                                           12:10:54
21         A.    No.
22         Q.    Was it unusual as a producer, when you
23    had that role, to be working a lot of hours on a
24    segment before the show aired?
25              ATTORNEY ZUCKERMAN:  Objection.            12:11:07
```

```
                                              Page 85
 1                        Owens
 2        A.    Not unusual.
 3        Q.    After a segment airs, is there some --
 4   strike that.
 5              I want to just situate.  You're now     12:11:19
 6   executive producer, so you have, I assume, the
 7   ability to kind of observe this for the producers
 8   who work for you and their teams.
 9              After a show is aired on 60 Minutes, is
10   there work to be done on the show post airing?    12:11:35
11        A.    Not a lot.
12        Q.    But there can be some work?
13        A.    Yes.
14        Q.    And what kind of work can there be?
15        A.    It can be anything from getting back in  12:11:49
16   touch with characters in the story to thank them
17   to making sure, back when there were tapes, but
18   that the tapes or the data gets to archives.
19              But there's not a lot after the
20   broadcast is done, because you also have a         12:12:08
21   broadcast associate who's helping the team with
22   some of these things.
23        Q.    And is it the responsibility of
24   either -- or does the AP or the producer have
25   responsibilities to respond to any complaints or   12:12:21
```

```
                                         Page 86
 1                      Owens
 2    concerns once a story has aired?
 3         A.    Yes.
 4         Q.    What kind of -- sorry, I cut you off.
 5         A.    No, if there were concerns or        12:12:32
 6    complaints, I would also hope that the senior
 7    staff would know about them.  We should be made
 8    aware of that.  And if there's something that
 9    requires a correction or something like that, then
10    the press people need to be involved.  So it      12:12:48
11    depends what the level is.
12         Q.    During the time that you've worked at
13    60 Minutes -- so we're talking a long period of
14    time -- have there been occasions where someone
15    has yelled at you?                                 12:13:08
16         A.    Yes.
17         Q.    Okay.  Has that happened a lot?  Has it
18    happened occasionally?  How would you characterize
19    it?
20         A.    No, not a lot.  And both times were a   12:13:20
21    correspondent.
22         Q.    Who was it that yelled at you?
23         A.    Steve Kroft.
24         Q.    Have there been times when other
25    employees have insulted you?                       12:13:31
```

```
                                                 Page 87

  1                          Owens

  2         A.    Not that I know of.

  3         Q.    Did Mr. Fager ever yell at you?

  4         A.    No.

  5         Q.    Has Michael Radutzky ever yelled at     12:13:45

  6    you?

  7         A.    No.

  8         Q.    Did you ever work with Michael

  9    Radutzky?

 10         A.    Yes.                                    12:13:53

 11         Q.    And Michael Radutzky used to work at 60

 12    Minutes; correct?

 13         A.    Correct.

 14         Q.    What was his job when he worked there?

 15         A.    He was a producer, but I believe he had 12:14:03

 16    a senior producer title.

 17         Q.    Do you know how long Mr. Radutzky

 18    worked for 60 Minutes?

 19         A.    I don't, but I'm going to guess 20

 20    years.                                             12:14:13

 21         Q.    And did you ever work on any stories

 22    with Mr. Radutzky?

 23         A.    Yes.

 24         Q.    Approximately how many?

 25         A.    Five.                                   12:14:26
```

```
                                                    Page 88
 1                          Owens
 2        Q.    And in what capacity were you working
 3   with him on these stories?
 4        A.    Well, I would have been either a senior
 5   producer or executive editor.              12:14:36
 6        Q.    So Mr. Radutzky was a producer or
 7   senior producer at 60 Minutes when you were an
 8   executive producer?
 9        A.    No.
10        Q.    I'm sorry, when you were executive    12:14:43
11   editor?
12        A.    Yes.
13        Q.    Sorry, yeah.  Okay.
14             Mr. Radutzky no longer works for 60
15   Minutes; correct?                            12:14:52
16        A.    Correct.
17        Q.    Do you know when he left?
18        A.    I believe he left right around the
19   time -- or right before Mr. Fager was let go.
20        Q.    So before you became executive producer  12:15:11
21   of the show; correct?
22        A.    Correct.
23        Q.    So probably Mr. Radutzky left in 2018?
24   Is that likely correct?
25        A.    I don't know, but I believe so, yes.    12:15:21
```

```
                                                    Page 89
1                            Owens
2          Q.    And do you know whether Mr. Radutzky
3     left voluntarily or involuntarily?
4          A.    I don't know.
5          Q.    Did you have anything to do with        12:15:30
6     Mr. Radutzky's departure?
7          A.    No, not directly.
8          Q.    Did you have anything to do with it
9     indirectly?
10         A.    No.                                     12:15:45
11         Q.    Did anyone tell you why Mr. Radutzky
12    left?
13         A.    No.
14         Q.    When Mr. Radutzky was there, you were
15    executive editor.  Did Mr. Radutzky have an        12:15:59
16    influential position at 60 Minutes?
17              ATTORNEY ZUCKERMAN:  Objection.
18         A.    Yes.
19         Q.    And how so?
20         A.    He was -- again, he had been given a    12:16:13
21    senior producer title.  He had a unit, so a couple
22    of people reported in to him.  And Mr. Fager would
23    usually assign big stories:  Sullenberger or
24    Sullenberg landing the plane in the Hudson, White
25    House interviews.  He would involve Michael in      12:16:38
```

```
                                         Page 90
 1                        Owens
 2    those stories.
 3         Q.    Do you recall the time that you were
 4    executive editor, did any other producers have --
 5    other than Mr. Radutzky -- have a unit?          12:16:50
 6         A.    No.
 7         Q.    And since you've been executive
 8    producer, have any producers had a unit?
 9         A.    No.
10         Q.    And when you say "unit," what do you    12:17:02
11    mean by that?
12         A.    He had a number of people reporting in
13    to him.  I think he had a producer, associate
14    producer, he had a broadcast associate who also
15    was sort of his assistant.  And he got attached to  12:17:14
16    some of the bigger high-profile stories, by
17    Mr. Fager.
18         Q.    What was it like to work with
19    Mr. Radutzky when you worked with him?
20              ATTORNEY ZUCKERMAN:  Objection.          12:17:42
21         A.    Can you be more specific?
22         Q.    Well, did you experience any conduct
23    that you thought was abusive by Mr. Radutzky?
24         A.    Well, I thought he was incredibly
25    ineffectual, actually, as a producer.  He talked a  12:17:53
```

```
                                              Page 91
 1                        Owens
 2    lot but actually in terms of being able to get
 3    things done, he always needed a lot of help, which
 4    seemed to lead to a lot of stress around anything
 5    he was doing.                              12:18:13
 6         Q.    I want to talk a little bit about his
 7    behavior and focus on that part of working with
 8    him.
 9              Did you ever experience any
10    mistreatment by him?                       12:18:28
11         A.    No.
12         Q.    Did you ever observe Mr. Radutzky
13    mistreating anyone who worked with him?
14         A.    No.
15         Q.    Did you ever observe any conduct that  12:18:38
16    you believed constituted harassment by
17    Mr. Radutzky?
18         A.    No.
19         Q.    Did you ever observe any discrimination
20    by Mr. Radutzky?                           12:18:46
21              ATTORNEY ZUCKERMAN:  Objection.
22         A.    No.
23         Q.    Did you ever observe conduct that you
24    considered to be abusive by Mr. Radutzky?
25         A.    Borderline.                     12:18:52
```

```
                                              Page 92
 1                      Owens

 2        Q.    What do you mean by that?

 3        A.    Raising his voice.

 4        Q.    How many times did you observe

 5   Mr. Radutzky raise his voice?               12:19:04

 6        A.    I don't know.

 7        Q.    Was it numerous?

 8        A.    Numerous.

 9        Q.    Okay.  And who did you observe him

10   raising his voice to?                       12:19:09

11        A.    Sam Hornblower.

12        Q.    Else?

13        A.    Michael Kaplan.  Those are two that I

14   remember me seeing.  But I had heard of him

15   raising his voice to editors and camera people.  12:19:39

16        Q.    Did Tanya Simon ever tell you that

17   Mr. Radutzky raised his voice to her?

18        A.    No.

19        Q.    Did Ms. Simon ever complain to you or

20   raise concerns to you about Mr. Radutzky's    12:20:02

21   behavior?

22        A.    Only after the fact, after Michael was

23   done, Tanya shared with me about her time with

24   Michael in some detail.

25        Q.    What did she say?                 12:20:15
```

```
                                              Page 93
 1                        Owens
 2          A.    That he had a bad temper, that he was
 3     abusive in terms of language, not professional.
 4          Q.    Did she say how he was abusive?
 5          A.    Language, losing his temper.        12:20:31
 6          Q.    Did she say how he was not
 7     professional?
 8          A.    Same answer.
 9          Q.    Did Ms. Simon tell you whether she had
10     reported concerns about Mr. Radutzky to anybody at  12:20:47
11     60 Minutes before he left?
12          A.    No.
13          Q.    She didn't tell you?
14          A.    She did not tell me.
15          Q.    When you were executive editor, were   12:21:01
16     you aware of any complaints against Mr. Radutzky?
17          A.    No, not official complaints.
18          Q.    Were you aware of unofficial
19     complaints?
20          A.    I had -- as I just mentioned, I had    12:21:16
21     overheard that he had raised his voice and been
22     unprofessional with editors and cameramen.
23          Q.    Did any APs complain to you about
24     Mr. Radutzky when you were executive editor?
25          A.    Nope.                                  12:21:33
```

```
                                             Page 94
 1                      Owens
 2        Q.    Did any producers complain to you?
 3        A.    No.
 4        Q.    While you were executive editor, were
 5   you aware of any -- strike that.           12:21:49
 6              Was there someone who used to work for
 7   60 Minutes named ██████ ██████
 8        A.    Yes.
 9        Q.    And what was her job?
10        A.    Good question.  I forget what her title 12:22:01
11   was, but her responsibility was to work with
12   publishing houses and movie studios around books
13   and movie stars and directors and those sorts of
14   things for profiles that we might be interested
15   in.                                         12:22:26
16        Q.    And was Ms. ██████ in this role during
17   the time you were executive editor at 60 Minutes?
18        A.    Yes.
19        Q.    And Ms. ██████ doesn't work for 60
20   Minutes anymore; correct?                   12:22:37
21        A.    She does not.
22        Q.    When did she leave, approximately?
23        A.    2016 or '17, is my recollection.
24        Q.    Did Ms. ██████ make any complaints
25   during the time that she worked at 60 Minutes? 12:22:59
```

```
                                                    Page 95
 1                            Owens
 2        A.    Not to me.
 3        Q.    Are you aware of any complaints that
 4   Ms. ██████  made?
 5        A.    I read about them since she left.      12:23:06
 6        Q.    Are you aware of any complaints that
 7   Ms. ██████  made about Mr. Radutzky?
 8        A.    I read about it after she left.
 9              By the way, those two were very close
10   friends.                                          12:23:23
11        Q.    Ms. ██████   and Mr. Radutzky?
12        A.    Yep.
13        Q.    Other than reading about it after
14   Ms. ██████  left, were you aware of any complaints
15   by Ms. ██████  about Mr. Radutzky?               12:23:36
16        A.    No.
17        Q.    Has anyone ever told you that
18   Ms. ██████ complained that Mr. Radutzky touched
19   her without her permission?
20        A.    I read about that after the fact.      12:23:48
21   Nobody ever told me that.
22        Q.    While you were executive editor?
23        A.    No, sir.
24        Q.    Did you ever have a discussion with
25   Mr. Fager about Ms. ██████  raising complaints    12:23:57
```

```
                                              Page 96

 1                         Owens

 2    about Mr. Radutzky?

 3         A.    No.

 4         Q.    Did you ever hear a rumor, while you

 5    were executive editor and Ms. ████ was working    12:24:06

 6    there at 60 Minutes, that Mr. Radutzky had grabbed

 7    Ms. ████ by the arm or wrist?

 8         A.    No, but I did read about it after the

 9    fact.

10         Q.    Putting aside reading about it -- okay,  12:24:21

11    I understand you read about it -- did you ever

12    hear or were told that Ms. ████ had alleged that

13    Mr. Radutzky had twisted her arm or her wrist?

14         A.    No, I never heard that.

15         Q.    Did you ever hear or were you ever told  12:24:38

16    that Mr. Radutzky had thrown an object at

17    Ms. ████

18         A.    No.

19         Q.    What were the circumstances of

20    Ms. ████ departure from 60 Minutes, from CBS?    12:24:51

21         A.    I don't know.  I wasn't part of that

22    conversation.

23         Q.    Did anyone ever tell you?

24         A.    No.

25         Q.    Do you know whether Ms. ████ made a      12:25:05
```

```
                                            Page 97

 1                     Owens

 2    discrimination complaint to CBS?

 3              ATTORNEY ZUCKERMAN:  Objection.

 4         A.   I don't know.

 5         Q.   Have you ever yelled at an employee at    12:25:27

 6    60 Minutes?

 7         A.   No.

 8         Q.   Have you ever said, during the time

 9    that you've been at 60 Minutes, that sometimes

10    yelling is necessary as someone is producing a     12:25:40

11    story, or words to that effect?

12         A.   Not that I can recall.

13         Q.   Is it possible that you said something

14    like that?

15         A.   Can you tell me again what --           12:26:00

16         Q.   Sure, sure.  So as part of the

17    production process, did you ever say that yelling

18    may sometimes be necessary, or words to that

19    effect?

20         A.   I don't think I would say yelling is     12:26:10

21    necessary, but I would admit that people sometimes

22    can raise their voices and that can happen.

23         Q.   Other than Mr. Radutzky and Mr. Kroft,

24    did you ever observe other employees at 60 Minutes

25    yelling at another employee?                       12:26:33
```

```
                                                        Page 98
 1                             Owens
 2          A.    Not that I can recall.
 3          Q.    You mentioned that you were told I
 4    guess by Ms. Simon that she believed Mr. Radutzky
 5    had a bad temper.  Do I have that correct?      12:26:55
 6          A.    Yes.
 7          Q.    Have you been told that any other
 8    employees at 60 Minutes have a bad temper?
 9          A.    Have I been told that?
10          Q.    Yeah.                                12:27:06
11          A.    No.
12          Q.    Have you observed any other -- any 60
13    Minutes employees exhibit signs that you believe
14    constitute a bad temper?
15          A.    There's an editor that I can think of  12:27:22
16    who's no longer there.
17          Q.    Who's that?
18          A.    Rich Koppel.
19          Q.    Anyone else?
20          A.    No.                                   12:27:36
21          Q.    Is there someone at 60 Minutes named
22    Lesley Stahl?
23          A.    Yes.
24          Q.    And is she a correspondent there?
25          A.    She is.                               12:27:47
```

```
                                                    Page 99
   1                        Owens
   2        Q.    She's been at 60 Minutes for an
   3   extended period of time?
   4        A.    She has.
   5        Q.    And have you ever worked with her      12:27:51
   6   directly?
   7        A.    Yes.
   8        Q.    How many stories have you worked with
   9   her on, approximately?
  10        A.    A hundred.                             12:28:00
  11        Q.    Do you believe that Ms. Stahl has a
  12   temper?
  13        A.    No.
  14        Q.    Have you ever observed Ms. Stahl
  15   yelling at a 60 Minutes employee?                 12:28:10
  16        A.    Yelling, no.
  17        Q.    Have you ever observed her raising her
  18   voice at 60 Minutes employees?
  19             ATTORNEY ZUCKERMAN:   Objection.
  20        A.    I'd say I've seen her agitated.        12:28:19
  21        Q.    Was there a book published celebrating
  22   60 Minutes?
  23        A.    Yeah, there's been more than one.
  24        Q.    Was there one published during the time
  25   you were executive editor?                        12:28:38
```

Page 100

1                        Owens

2        A.    Yes.

3        Q.    And approximately when did that book

4   come out?

5        A.    It was -- it was an anniversary.  It      12:28:43

6   was the fiftieth anniversary, I think.  So maybe

7   like seven years ago.  Yeah, I think that's

8   probably right, seven years.

9        Q.    Did you have any involvement in working

10  on the book?                                         12:28:54

11       A.    No.

12       Q.    Who's Richard Zoglin, Zoglin, Zoglin?

13  Do you know that name?

14       A.    No.

15       Q.    Do you know if he was asked to write     12:29:05

16  the book initially?

17             ATTORNEY ZUCKERMAN:  Objection.

18       A.    Yes, I believe that is correct.

19       Q.    And did you have any involvement in

20  selecting Mr. Zoglin, Zoglin?                        12:29:15

21       A.    No.

22       Q.    Mr. Zoglin or Zoglin at the time, was

23  he a 60 Minutes employee?

24       A.    No.

25       Q.    And did Mr. Zoglin finish the book?      12:29:24

```
                                            Page 101

 1                       Owens

 2         A.    No.

 3               ATTORNEY ZUCKERMAN:  Objection.

 4         Q.    Do you know why he didn't finish the

 5    book?                                       12:29:30

 6               ATTORNEY ZUCKERMAN:  Objection.

 7         A.    I believe there was a conflict of

 8    interest with Mr. Zoglin.

 9         Q.    What it was conflict of interest?

10         A.    I think it had something to do with   12:29:36

11    Katie Couric.

12         Q.    What was that conflict?

13         A.    I don't remember.

14         Q.    Did you have any involvement in

15    deciding whether he would continue to work on the  12:29:45

16    book?

17         A.    I did not.

18         Q.    Did you have any discussions with

19    Mr. Fager about Mr. Zoglin working on the book?

20         A.    Not that I recall.                 12:29:53

21         Q.    Were you ever told by Mr. Fager or

22    anybody else that Mr. Zoglin was asked to stop

23    working on the book because he was focusing on too

24    much negative at 60 Minutes?

25         A.    No.                                12:30:04
```

```
                                             Page 102
 1                       Owens
 2        Q.    Were you ever told that Mr. Zoglin was
 3   focusing too much about the treatment of women at
 4   60 Minutes?
 5        A.    No.                            12:30:15
 6        Q.    During the time that you have worked as
 7   an executive editor at 60 Minutes, were you ever
 8   interviewed as part of an investigation into
 9   allegations of sexual harassment?
10             ATTORNEY ZUCKERMAN:  Objection.    12:30:34
11        A.    Yes.
12        Q.    How many times?
13        A.    Twice.  It was the same --
14        Q.    Set of allegations?
15        A.    No, I was asked to come in twice.  And  12:30:44
16   the allegations weren't against me.
17        Q.    Who was the person making the
18   complaints?
19        A.    I don't know that that was shared with
20   me.                                       12:30:53
21        Q.    Okay.  And what were you -- were you
22   asked about the actions of another employee?
23        A.    I was asked about the actions of other
24   employees and culture and, yes.
25        Q.    And which employees were you asked      12:31:07
```

```
                                        Page 103

 1                      Owens

 2   about?

 3           ATTORNEY ZUCKERMAN:  Can we just

 4       confirm whether or not this is an internal

 5       investigation --                        12:31:14

 6           ATTORNEY IADEVAIA:  Sure.  That's fine.

 7           ATTORNEY ZUCKERMAN:  -- or whether this

 8       was an investigation conducted by an outside

 9       law firm or law firms?

10           THE WITNESS:  It was the ivy -- it was  12:31:21

11       the Mary Jo...

12           ATTORNEY ZUCKERMAN:  This is the --

13       Q.    You're talking about an investigation

14   conducted by outside law firms?

15       A.    Yeah.                              12:31:33

16       Q.    Including Debevoise & Plimpton?

17       A.    I guess that's who it was.

18       Q.    Covington & Burling?

19       A.    I don't know.

20       Q.    If it's outside counsel, okay.  I'm not  12:31:42

21   going to ask any other questions.  I understand.

22           Have you ever been interviewed as part

23   of an investigation into sexual harassment

24   allegations in which counsel did not conduct the

25   interview?                                  12:31:53
```

Page 104

```
 1                       Owens
 2              ATTORNEY ZUCKERMAN:  Objection.
 3              You can answer.
 4         A.    I don't believe so.
 5         Q.    Were you ever interviewed in connection  12:31:58
 6    with an investigation into gender discrimination
 7    when the interview was not conducted by counsel?
 8              ATTORNEY ZUCKERMAN:  Objection.
 9              You can answer.
10         A.    I don't believe so.              12:32:08
11         Q.    Are you aware that in late 2022 the New
12    York Attorney General's Office announced that it
13    had secured 30 -- over 30 million from CBS and Les
14    Moonves?
15              ATTORNEY ZUCKERMAN:  Objection.     12:32:25
16         A.    I'm sorry, over 30 million?
17         Q.    As a settlement.
18         A.    Oh.
19              Specifically that fact, no.
20         Q.    Are you aware of any settlement that     12:32:36
21    CBS entered into in connection with a New York
22    attorney general office's investigation?
23         A.    I have read about that, yes.
24         Q.    Did you participate in that -- in any
25    AG investigation?                          12:32:50
```

```
                                             Page 105

  1                        Owens

  2        A.    No.

  3        Q.    Were you interviewed as part of any AG

  4   investigation?

  5        A.    No.                              12:32:55

  6        Q.    Were you asked to provide information

  7   as part of any AG investigation?

  8        A.    No.

  9        Q.    Has Lesley Stahl ever said to you that

 10   she didn't want emails she -- emails or text   12:33:16

 11   messages she received from Jeff Fager to become

 12   public?

 13        A.    No.

 14        Q.    Did Ms. Stahl ever tell you that she

 15   believed Mr. Fager had been abusive towards her?  12:33:31

 16        A.    No.

 17        Q.    Did Ms. Stahl ever tell you that she

 18   believed that Mr. Fager had sent her inappropriate

 19   text messages?

 20        A.    No.                              12:33:45

 21        Q.    Did Ms. Stahl ever raise a concern to

 22   you about Mr. Fager's conduct?

 23        A.    No.

 24        Q.    Did any 60 Minutes employee ever raise

 25   a concern to you about Mr. Fager's conduct?   12:33:56
```

```
                                            Page 106
  1                      Owens
  2        A.    No.
  3        Q.    Does CBS to your knowledge have an
  4   antidiscrimination policy?
  5        A.    I don't know, but I'm sure they do.    12:34:16
  6        Q.    Do you receive training on -- have you
  7   ever -- since you've been at CBS, have you
  8   received training on CBS's antidiscrimination
  9   policy?
 10        A.    Yes, I'm sure it's included in the     12:34:29
 11   training that I need to do.
 12        Q.    Okay.  When you say the training you
 13   need to do, is that training on an annual basis or
 14   some other time frame?
 15        A.    Annual.                                12:34:36
 16        Q.    And is part of that training include
 17   training related to CBS's antidiscrimination
 18   policies?
 19        A.    I believe so.
 20        Q.    I know you're not a lawyer, but what's  12:34:44
 21   your general understanding of what CBS's
 22   antidiscrimination policies prohibit or what's the
 23   policy?
 24        A.    That you cannot treat anyone
 25   differently because of their gender, race, age.   12:34:56
```

```
                                            Page 107
 1                        Owens
 2     That's probably it.  I mean, I do know that I have
 3     to take an annual thing that walks you through it
 4     and explains it all and then you have to answer
 5     the questions.                              12:35:14
 6          Q.    And the training you're talking about,
 7     is that something that's provided online or some
 8     other form?
 9          A.    Online.
10          Q.    And is it provided by CBS or is it     12:35:20
11     something else?
12                ATTORNEY ZUCKERMAN:  Objection.
13          A.    It's CBS/Paramount.
14          Q.    The training that you have to do in
15     addition to antidiscrimination policies, is there  12:35:31
16     any other kind of training that you receive?
17          A.    Sexual harassment.
18          Q.    Anything else?
19          A.    Not that I can think of.
20                ATTORNEY ZUCKERMAN:  I do want to     12:35:45
21          object to that question.
22          Q.    Does CBS to your knowledge have
23     prohibitions against retaliation?
24          A.    Yes.
25          Q.    And what's your understanding of those  12:35:57
```

```
                                        Page 108
 1                      Owens
 2    prohibitions?
 3        A.    That you cannot retaliate against
 4    another employee for -- yeah, you cannot retaliate
 5    against another employee for -- if someone were to  12:36:12
 6    have done something wrong and there was a dispute
 7    between the two that was being looked into, one
 8    employee can't then go to the other employee and
 9    threaten them or coerce them to drop whatever the
10    complaint is.                                        12:36:33
11        Q.    And are there only certain types of
12    complaints that are covered by CBS's
13    antiretaliation policy or is it your understanding
14    it's all complaints?
15        A.    I don't know.                              12:36:45
16        Q.    The training that you referred to that
17    you -- actually, strike that.
18              Have you received any training about
19    CBS's antiretaliation policy?
20        A.    I'm sure.                                  12:36:57
21        Q.    And how often do you receive that
22    training?
23        A.    Once a year.
24        Q.    And is it part of the same training
25    you're referring to when you talked about the       12:37:04
```

```
                                          Page 109
 1                      Owens
 2    antidiscrimination policy?
 3         A.    I believe so.
 4         Q.    Is there any separate training that you
 5    have received on antiretaliation that you can      12:37:12
 6    recall?
 7         A.    Not that I can recall.
 8         Q.    We've talked a little bit about
 9    Mr. Fager.  What's your understanding as to why
10    Mr. Fager left CBS?                                12:37:35
11         A.    Because he retaliated against an
12    employee.
13         Q.    And who did he retaliate against?
14         A.    Jericka Duncan.
15         Q.    Who is Ms. Duncan?                       12:37:46
16         A.    She is a CBS news correspondent.
17         Q.    In what way did Mr. Fager retaliate
18    against her?
19         A.    Jericka was assigned to report on
20    allegations against Mr. Fager, and Jeff wrote her  12:37:57
21    back a text that was threatening.
22         Q.    And when you say she was assigned to
23    report, you mean in her capacity as a journalist?
24         A.    That's right.
25         Q.    And she didn't work for 60 Minutes; is   12:38:17
```

                                                            Page 110
 1                          Owens
 2     that correct?
 3          A.    That is correct.
 4          Q.    And what allegations was she
 5     investigating, do you know?                    12:38:26
 6          A.    I think it was sexual misconduct and
 7     other workplace issues.
 8          Q.    And were you at all involved in any
 9     investigation related to allegations of
10     Mr. Fager's sexual misconduct?                 12:38:43
11               THE WITNESS:  This refers back to the
12          other thing.
13               ATTORNEY ZUCKERMAN:  Investigation
14          conducted by the outside law firms?
15               THE WITNESS:  Correct.              12:38:52
16               ATTORNEY ZUCKERMAN:  Then you can't
17          testify about that.
18          Q.    Outside of that were you involved in
19     any investigations related to Mr. Fager's alleged
20     sexual misconduct?                             12:39:01
21          A.    No.
22          Q.    You said that Mr. Fager was fired
23     because he was accused of retaliating against a
24     CBS News reporter.  What's your basis for saying
25     that?                                          12:39:19

```
                                              Page 111
 1                        Owens
 2              ATTORNEY ZUCKERMAN:  Objection.
 3        A.    That she was doing her job and he
 4    threatened her professionally.
 5        Q.    And my question is how did you learn    12:39:27
 6    that.
 7        A.    It's been -- it was in the papers.  It
 8    was published.  It was actually published by CBS
 9    News.
10        Q.    And were you consulted at all about the  12:39:39
11    decision to fire Mr. Fager?
12        A.    I was not.
13        Q.    Is there somebody that works at 60
14    Minutes named Ann Marie Kross?
15        A.    Yes.                                     12:39:53
16        Q.    How long has she worked there,
17    approximately?
18        A.    20 plus years.
19        Q.    What's her job there?
20        A.    She is the person who assigns camera    12:39:57
21    crews to producing teams.
22        Q.    And who does she report to?
23        A.    Well, you know what, I guess she
24    reports to Tanya and/or me.  I don't know.  I'm
25    not sure if there's a direct line.  Perhaps Tanya  12:40:16
```

```
                                        Page 112
 1                      Owens
 2     and myself.  I sometimes get involved in Ann
 3     Marie's work life.
 4          Q.    Does Ms. Kross work for any other CBS
 5     News programs other than 60 Minutes?          12:40:33
 6          A.    Not by definition; but sometimes she
 7     helps out Sunday Morning, but that's more as a
 8     favor than anything.
 9          Q.    Do you currently have any title other
10     than executive producer of 60 Minutes?        12:40:45
11          A.    Yes.  Supervising producer of the CBS
12     Evening News.
13          Q.    When did you get that title?
14          A.    I'm not sure.  It may have been
15     announced, like, in June.                     12:41:01
16          Q.    June of 2024?
17          A.    Yes, sir.
18          Q.    And how did it come about that you got
19     that title?
20          A.    I was asked by the current CBS News   12:41:13
21     president to reimagine the CBS Evening News, which
22     launched last week.
23          Q.    And who asked you to do that?
24          A.    Wendy McMahon, CBS News president.
25          Q.    And what do you do in your job as      12:41:33
```

Page 113

1                          Owens

2     supervising producer for the Evening News?

3          A.    Well, I came up with a new format, so a

4     new structure to the show.  I decided on the

5     anchor people, the talent of the show.  I hired     12:41:50

6     the executive producer, who will be the person who

7     day to day puts the broadcast on TV.  I hired the

8     editor -- this is a writing editor, not a tape

9     editor -- editor in chief to oversee all the

10    writing that happens on the broadcast.             12:42:14

11              So a number of things.

12         Q.    Before you took on the position of

13    supervising producer of the Evening News during

14    your time as executive producer for 60 Minutes,

15    have you worked for any other shows?               12:42:32

16         A.    Yes.  We launched a show on a platform

17    that doesn't exist anymore called Quibi.  That was

18    the platform.  That program was called 60 in 6.

19    That's it.  There were other -- there was a sports

20    program, but that was before I was the executive    12:42:52

21    producer.

22         Q.    Yeah, so during the period that you

23    were executive editor, did you have

24    responsibilities for any shows other than 60

25    Minutes?                                            12:43:01

```
                                                Page 114
 1                          Owens
 2          A.    Yes, 60 Minutes Sports.
 3          Q.    Anything else?
 4          A.    No.
 5          Q.    During the time that you were executive  12:43:10
 6    editor and Mr. Fager was executive producer, did
 7    he have responsibilities beyond 60 Minutes?
 8          A.    Yes.  He was the chairman of CBS News.
 9          Q.    And did you have any understanding as
10    to what that entailed in terms of the scope of his  12:43:26
11    work?
12          A.    Yeah.  He was in charge of the entire
13    news division while remaining executive producer
14    of 60 Minutes.
15          Q.    And was he the chairman of CBS News the  12:43:35
16    entire time that you were executive editor?
17          A.    Yes.
18          Q.    And during that time as executive
19    editor, did you ever assist Mr. Fager in
20    responsibilities for other shows beyond 60          12:43:52
21    Minutes?
22          A.    No, just the 60 Minutes Sports show.
23          Q.    If you compare your role as executive
24    editor for 60 Minutes versus Ms. Simons' role as
25    executive editor for 60 Minutes, do you think that  12:44:19
```

Page 115

```
 1                        Owens
 2   the duties and responsibilities that she has and
 3   those that you had are comparable?
 4        A.    Yes.
 5        Q.    Was Mr. Fager often busy with other    12:44:26
 6   shows beyond 60 Minutes when he was chairman of
 7   CBS News and you were executive editor?
 8             ATTORNEY ZUCKERMAN:  I did have an
 9        objection.  I apologize for jumping in the
10        middle of your question when you paused.  I    12:44:47
11        thought you were finished.
12        Q.    Go ahead.  You can answer.
13        A.    He did have other responsibilities.
14        Q.    And were there times where as executive
15   editor you were handling executive producer-type    12:44:57
16   responsibilities because Mr. Fager was tied up
17   with so many other things?
18        A.    Yes, but only on an editorial level,
19   just dealing with the stories, not in terms of
20   actual responsibility, because he still was very    12:45:15
21   much the executive producer.
22        Q.    As part of the story process, does 60
23   Minutes have something called blue sheets?
24        A.    Yes.
25        Q.    What are they?                           12:45:37
```

```
                                           Page 116
 1                         Owens
 2         A.    Blue sheets are a way to pitch a story.
 3    Usually it's one page and explains the story that
 4    team would like to tell.  It gets either approved
 5    or turned down.                         12:45:51
 6         Q.    Who approves or turns down the blue
 7    sheets -- the stories proposed via the blue
 8    sheets?
 9         A.    Right now it's myself and Tanya Simon.
10    Before when I was the executive editor, it was    12:46:02
11    Jeff Fager and myself.
12         Q.    Does 60 Minutes ever receive editorial
13    input about stories from individuals within CBS
14    News but outside of 60 Minutes?
15         A.    Occasionally.                  12:46:27
16         Q.    In what context does that come up?
17         A.    There may be a producer at another
18    program who has an idea who comes to pitch it.
19    Usually they'd like to produce it also.  That
20    doesn't happen or happens very, very, very rarely.  12:46:41
21    Other times they'll come and say, Here's a story
22    we think is good, and we might give it to a
23    producing team for them to consider.
24         Q.    As executive producer do you have
25    conversations with the CBS News president -- and    12:46:57
```

```
                                         Page 117
 1                      Owens
 2    it's been various people we've talked about.  Do
 3    you have conversations with them about the
 4    editorial content of 60 Minutes?
 5         A.    Occasionally.                    12:47:08
 6         Q.    And in what context have you had those
 7    kinds of discussions?
 8         A.    Well, sometimes it's if something --
 9    recently we did a story on whistleblowers who quit
10    the State Department over our Gaza policies.     12:47:30
11    There were various lobbies that were unhappy with
12    that that talked to not only the corporation but
13    the news division about the context of that story.
14              So that's an example of something that
15    I would talk to them about.                  12:47:48
16         Q.    On the editorial side of things, do you
17    ever need to seek the permission of someone -- of
18    the CBS News president before running a show or
19    going with a show?
20         A.    No.                              12:48:12
21         Q.    On the personal personnel side of
22    things, do you ever need to seek approval before
23    taking action from the CBS News president?
24         A.    No.
25         Q.    Any decisions that you've made to fire   12:48:21
```

```
                                          Page 118
 1                      Owens
 2    employees at CBS -- at 60 Minutes, did you need
 3    the approval of the CBS News president before
 4    doing so?
 5         A.    No.                              12:48:36
 6         Q.    Have you ever sought their approval
 7    before doing so?
 8         A.    No.  But there have been -- there have
 9    been some conversations.  But no.  Usually if HR
10    is involved.  But it's my decision.         12:48:50
11         Q.    What do you mean, "if HR is involved"?
12         A.    Meaning -- so there might be a reason
13    for someone to be let go because of lack of
14    production, and there may be a reason where
15    there's been some very clear HR violations.  The  12:49:08
16    news division president would undoubtedly know
17    about that, but still in all it would be my
18    decision.
19         Q.    Since you've been executive producer
20    for 60 Minutes, how many times have an 60 Minutes  12:49:29
21    employee been fired due to an HR violation?
22              ATTORNEY ZUCKERMAN:  Objection.
23         A.    I think since I've been executive
24    producer, once.
25         Q.    And who was that?                12:49:57
```

```
                                            Page 119
1                        Owens
2          A.    Ms. Poolos.
3          Q.    During the period that you were
4     executive editor -- it's the same question -- how
5     many 60 Minutes employees were fired due to a      12:50:13
6     purported violation of CBS policy?
7          A.    I don't know.
8          Q.    Do you know of any?
9          A.    That would be Mr. -- that would have
10    been Mr. Fager's responsibility.                   12:50:31
11         Q.    And I just want to be clear about the
12    prior question, which is during the time that
13    you've been executive producer at 60 Minutes
14    was -- other than Ms. Poolos was there anyone who
15    was fired because of a violation of CBS policy.    12:50:52
16         A.    I don't believe so.
17         Q.    Since you've become executive producer
18    at 60 Minutes, has there been any 60 Minutes
19    employees who were put on administrative leave
20    with pay?                                          12:51:35
21         A.    I don't believe so.
22         Q.    And have there been any 60 Minutes
23    employees during that same time who have been
24    suspended?
25         A.    I'm trying to think about -- no.        12:52:03
```

```
                                             Page 120
 1                       Owens
 2        Q.    Have there been any 60 Minutes
 3   employees who were placed on a leave of absence
 4   involuntarily?
 5        A.    I don't believe so.              12:52:19
 6        Q.    Since you've been executive producer at
 7   60 Minutes, I think you testified earlier that
 8   there were a couple of instances when employees
 9   received warnings in connection with their
10   productivity; correct?                      12:52:36
11        A.    Yes.
12        Q.    Have there been any other warnings
13   given to employees at 60 Minutes beyond what
14   you've already testified to since you've become
15   executive producer?                         12:52:49
16        A.    No.
17        Q.    In the couple of instances where you
18   testified about warnings given to 60 Minutes
19   employees in connection with productivity, what
20   was the process of giving them the warnings?    12:53:05
21        A.    The end-of-season evaluation.
22        Q.    Did you have a discussion with human
23   resources before you gave those warnings?
24        A.    No.
25        Q.    Did you have a discussion with human    12:53:21
```

```
                                              Page 121
 1                         Owens
 2    resources after giving those warnings?
 3         A.    Well, those -- that written summary
 4    is -- then becomes part of the human resources --
 5    it's filed with human resources.              12:53:30
 6         Q.    Have there been HR investigations
 7    conducted during the time that you have been
 8    executive producer at 60 Minutes related to a 60
 9    Minutes employee?
10         A.    Yes.  We talked about Mr. Gavshon and   12:53:57
11    Ms. ███████
12         Q.    Okay.  Other than Mr. Gavshon and
13    Ms. ███████
14         A.    I believe there has been a cameraperson
15    for something that happened on a shoot.  Dan      12:54:10
16    Bussell is his name.  That usually gets handled by
17    the unions.  But otherwise, not that I can recall.
18         Q.    What were the concerns related to
19    Mr. Bussell?
20         A.    I don't know.                         12:54:34
21         Q.    Did there happen while you were
22    executive producer?
23         A.    Yes.
24         Q.    Does Mr. Bussell still work for 60
25    Minutes?                                          12:54:44
```

```
                                              Page 122
 1                     Owens
 2        A.    He does.
 3        Q.    And he's a cameraman, you said?  I just
 4   need a yes or no.
 5        A.    Yes, sorry.                    12:54:50
 6        Q.    That's okay.
 7              And who does he report to?
 8        A.    Ann Marie Kross.
 9        Q.    And what was the result of the
10   investigation?                           12:55:05
11        A.    I think it's ongoing.
12        Q.    When was the complaint made?
13        A.    Well, it has to do with him driving
14   without a license and -- yeah.
15        Q.    Are you aware of any complaints against  12:55:23
16   Mr. Bussell for sexual misconduct?
17        A.    I am not.
18        Q.    Are you aware of any complaints against
19   Mr. Bussell for sexual harassment?
20        A.    No.                            12:55:35
21        Q.    Has anyone ever complained to you about
22   Mr. Bussell making inappropriate comments?
23        A.    I was told about -- this -- he was on a
24   shoot for Sunday Morning.  Something came to our
25   attention that he made people at the university  12:55:52
```

```
                                            Page 123
 1                       Owens
 2    uncomfortable, women.  But I don't have more
 3    specificity than that.
 4         Q.   When did you learn about that
 5    allegation?                               12:56:04
 6         A.   Maybe a month ago.
 7         Q.   And how did you learn about it?
 8         A.   From HR.
 9         Q.   Has to your knowledge that allegation
10    been looked into?                         12:56:18
11         A.   It was being looked into.
12         Q.   Is it currently being looked into?
13         A.   I don't know.  I believe so.
14         Q.   Are you aware of any other concerns
15    related to Mr. Bussell other than what you've  12:56:31
16    testified to?
17         A.   I am not.
18         Q.   Did any employee ever come to you and
19    raise concerns about him?
20         A.   Yes, but it was about his camera work,  12:56:41
21    not about any harassment.
22         Q.   Anything other than his camera work?
23         A.   No.
24         Q.   And do you know is Mr. Bussell on a
25    leave of absence from 60 Minutes during this   12:57:00
```

```
                                              Page 124
 1                      Owens

 2    investigation?

 3         A.    I don't believe so.

 4              ATTORNEY IADEVAIA:  Did you say 1

 5    o'clock?                                  12:57:17

 6              ATTORNEY ZUCKERMAN:  Yes.  It's

 7    delivered, so whenever is a good time for you

 8    for lunch.

 9              ATTORNEY IADEVAIA:  It's here.  Why

10    don't we do it now.  Fine with us.        12:57:23

11              ATTORNEY ZUCKERMAN:   Okay.

12              THE VIDEOGRAPHER:  The time is 12:58

13    p.m., and this marks the end of media unit

14    number 1.

15              (Time noted:  12:58 p.m.)        12:57:42

16

17

18

19

20

21

22

23

24

25
```

```
                                              Page 125

 1

 2          A F T E R N O O N    S E S S I O N

 3               (Time noted:  1:49 p.m.)

 4               THE VIDEOGRAPHER:  The time is 1:49

 5       p.m., and this begins media unit number 2.    01:48:20

 6   B I L L    O W E N S ,

 7          resumed as a witness, having been previously

 8          sworn by the notary public, was examined and

 9          testified further as follows:

10   EXAMINATION CONTINUED BY

11   ATTORNEY IADEVAIA:

12          Q.    Mr. Owens, did you meet Ms. Poolos

13   before or after she joined CBS?

14          A.    I think I met her when she joined CBS.

15          Q.    Did you have any role in her hiring?    01:48:37

16          A.    No.

17          Q.    Did you recommend that she be hired?

18          A.    No.

19          Q.    At the time that Ms. Poolos joined --

20   strike that.

21               Do you know what year Ms. Poolos joined

22   60 Minutes?

23          A.    I do not.

24          Q.    Does 2011 sound about right?

25          A.    Yeah.                                 01:48:58
```

```
                                            Page 126
 1                    Owens
 2        Q.    And were you at 60 Minutes at that time
 3    in 2011?
 4        A.    Yes, yes.
 5        Q.    And what was your job, again, at that    01:49:09
 6    point?
 7        A.    I think I would have been executive
 8    editor by then.
 9        Q.    And when Ms. Poolos joined 60 Minutes,
10    what was her job?                                  01:49:22
11        A.    Associate producer.
12        Q.    And so she would have reported to you;
13    correct?
14        A.    Yes.
15        Q.    And was Ms. Poolos on a team when she    01:49:30
16    joined?
17        A.    Yes.
18        Q.    And what team was she on?
19        A.    Lesley Stahl.
20        Q.    And who else was on the team?            01:49:39
21        A.    Shachar Bar-On.
22        Q.    Anyone else?
23        A.    I don't know if their BA was Ren.
24    There would have been a BA attached, but I'm not
25    sure who that was.                                 01:49:55
```

```
                                        Page 127
  1                        Owens
  2        Q.    And BA stands for?
  3        A.    Broadcast associate.
  4        Q.    And when Ms. Poolos joined 60 Minutes
  5   and was on Ms. Stahl's team -- Ms. Stahl was a      01:50:04
  6   correspondent; correct?
  7        A.    Yes.
  8        Q.    And Mr. Bar-On, what was his title?
  9        A.    However.
 10        Q.    And at some point Ms. Poolos became a   01:50:17
 11   producer at 60 Minutes; correct?
 12        A.    Yeah.  She coproduced a number of
 13   stories, and then she became a solo producer.
 14        Q.    Got it.  So between the time when she
 15   started at 60 Minutes and the time she became a    01:50:32
 16   solo producer, did she remain on Lesley Stahl's
 17   team?
 18        A.    She did.
 19        Q.    Was Mr. Bar-On her producer?
 20        A.    Yes.                                     01:50:47
 21        Q.    And did you work with her when she was
 22   an associate producer?
 23        A.    Yes.
 24        Q.    And did you form a view of her work as
 25   an associate producer?                             01:51:08
```

Page 128

```
 1                      Owens
 2      A.    Yes, I thought she was a good associate
 3  producer.
 4      Q.    And what made you think she was a good
 5  associate producer?                         01:51:15
 6      A.    Well, she worked with Shachar, who was
 7  a good producer.  They had -- they had a good
 8  track record of stories.  She was -- Alex was
 9  likable.  She and Shachar had a good relationship.
10  They'd joke with each other a lot and -- yeah,    01:51:37
11  some teams require more oversight than others, and
12  Shachar and Alex got their work done.
13      Q.    And I think you testified that at some
14  point during the time you were an executive editor
15  there became a formal review process applicable to  01:52:01
16  APs; is that correct?
17      A.    Yes.
18      Q.    And did you ever review Ms. Poolos's
19  work as an AP after the formal review process had
20  taken effect?                                01:52:14
21      A.    I think so, but I'm not positive.
22      Q.    And do you recall either generally or
23  specifically what kind of feedback you provided to
24  Ms. Poolos when she was an AP?
25      A.    I don't.                          01:52:25
```

```
                                              Page 129
 1                        Owens
 2        Q.    Do you have any reason to believe you
 3   gave her negative feedback?
 4        A.    I don't.
 5        Q.    Is it your best recollection that the    01:52:33
 6   feedback you did give her was mostly positive?
 7        A.    I'm sure.
 8        Q.    And why do you say you're sure?
 9        A.    Because Alex was a good associate
10   producer.                                           01:52:44
11        Q.    And during the time that Ms. Poolos was
12   an AP, did you receive any complaints about her?
13        A.    I don't believe so.
14        Q.    You testified before that at some point
15   Ms. Poolos became a solo producer; correct?         01:53:08
16        A.    Yeah.  There was a middle ground where
17   she coproduced stories.  I think the first story
18   that she solo produced was a story for 60 Minutes
19   Sports in Iran.
20        Q.    And at that point did she have the        01:53:27
21   producer title or this is before she had that
22   title?
23        A.    I don't recall.  She would have been
24   given full producer credit, but I don't know that
25   her contract had changed; probably not, would be    01:53:38
```

Page 130

```
 1                      Owens
 2    my guess.
 3         Q.    When you say "full producer credit,"
 4    what do you mean by that?
 5         A.    Well, for starters, you're told, yes,    01:53:46
 6    you can produce this story.  You get a green light
 7    to be the producer, so it's your responsibility.
 8    And then when the piece actually airs, there's
 9    artwork between the correspondent to shows the
10    producer's name so it's clear who did the work.    01:54:01
11         Q.    So when someone gets full producer
12    credit, it means they're identified as part of the
13    broadcast as the producer for the segment?
14         A.    Yes, sir.
15         Q.    Okay.  And you mentioned coproduced.    01:54:16
16    What does coproduce mean?
17         A.    It means that you work usually with
18    your producer but the work that you've done is
19    more than just associate producing.  So it's more
20    than just supportive; you are doing equal the    01:54:31
21    amount of reporting, researching, perhaps even a
22    story idea, and probably some of the writing as
23    well.
24         Q.    And to go from AP to producer at 60
25    Minutes with the title, is that a promotion?    01:54:50
```

```
                                             Page 131
 1                        Owens
 2         A.    Yes.
 3         Q.    So was Ms. Poolos in fact promoted to
 4    the title of producer?
 5         A.    Yes.                          01:54:57
 6         Q.    And who made that decision?
 7         A.    I think I made it -- Jeff Fager and I
 8    made it in conjunction, I believe, and Lesley
 9    Stahl would have also had a say in that.
10         Q.    When Ms. Poolos became a producer, did  01:55:11
11    she continue to work for or work on Ms. Stahl's
12    team?
13         A.    Yes.
14         Q.    And did that remain the case until
15    Ms. Poolos lost her job?                 01:55:23
16         A.    That's right.
17         Q.    Did you support the decision to make
18    Ms. Poolos a producer?
19         A.    I did.
20         Q.    And why did you support it?      01:55:38
21         A.    Because I thought she was ready to take
22    the next step.
23         Q.    What made you think she was ready?
24         A.    Her body of work as an associate
25    producer, the amount of time she had coproduced.  01:55:52
```

```
                                              Page 132
 1                          Owens
 2     She had -- I believe this to be the case -- the
 3     story that she did in Iran with Lesley, she wasn't
 4     yet a producer, but she did a good job on that
 5     story.  Her producer, Shachar, also believed that    01:56:11
 6     she was ready to be a producer.
 7          Q.    What did Mr. Fager say about Ms. Poolos
 8     becoming a producer?
 9          A.    I don't remember specifically, but I
10     know that he was in favor of it.                      01:56:32
11          Q.    And what did Ms. Stahl say?
12          A.    Lesley is always tentative about
13     promoting people, but she was on board.
14          Q.    When you say Ms. Stahl is always
15     tentative about promoting people, you mean           01:56:48
16     specifically from AP to producer?
17          A.    That's right.
18          Q.    How many of Ms. Stahl's APs have been
19     promoted to producer?
20          A.    I don't know.  There have been others,    01:57:00
21     but I couldn't give you a number.
22          Q.    Can you think of any others besides
23     Ms. Poolos?
24          A.    Ayesha Siddiqi, who doesn't work with
25     Lesley any longer, had been an AP for Lesley and     01:57:14
```

Page 133

```
 1                        Owens
 2    then went to work for me on the 60 in 6 Quibi
 3    program and is now a producer for Cecilia Vega on
 4    the Sunday show.
 5               On Lesley's team, one of her producers    01:57:35
 6    now was an AP, but I'm not sure if it was Lesley
 7    who promoted him or Mike Wallace.  But he had been
 8    an AP.  His name is Rich Bonin.
 9         Q.    Anyone else?
10         A.    Denise Cetta is a producer now.  She     01:57:58
11    had been an associate producer for Lesley.
12         Q.    Is she a producer for Lesley now?
13         A.    She is not.  She's a producer for
14    Anderson Cooper.
15         Q.    Was she ever a producer for Lesley?      01:58:13
16         A.    She was.
17         Q.    Anybody else you can think of?
18         A.    No.
19         Q.    I think we said or maybe I said earlier
20    that Ms. Stahl had worked for 60 for a long time.   01:58:34
21    Do you have a sense of how long she's been at 60?
22         A.    It would have been maybe since 1994,
23    something like that, so...
24         Q.    Over 30 years?
25         A.    Oh, yeah.                                01:59:02
```

```
                                              Page 134
 1                        Owens
 2         Q.    Is it unusual at 60 Minutes for an AP
 3    to be promoted to producer on the show?
 4         A.    It's not unusual.
 5         Q.    How many times do you think it's been    01:59:21
 6    happened since you've been executive -- how many
 7    times -- not you think.  How many times has it
 8    happened since you've been executive producer, the
 9    last six years?
10         A.    Maybe three or four.                     01:59:48
11         Q.    And who was it?
12         A.    Currently the last person, who I just
13    agreed to make a producer, is Katie Brennan.
14         Q.    Okay.  Who else?
15         A.    Michael Karzis.  Lucy Hatcher right now  02:00:06
16    is currently working as a producer.  Her contract
17    hasn't changed but likely will at the end of the
18    season.  Since I've been executive producer.
19    Maria Gavrilovic.
20         Q.    Anyone else you can think of?            02:00:44
21         A.    I'm trying to go around the offices in
22    my mind.  I think that's it.
23         Q.    How many current APs does 60 Minutes
24    employ?
25         A.    I'm going to guess it's about 25,        02:01:06
```

```
                                          Page 135
 1                        Owens
 2      something like that.
 3           Q.    Have you ever encouraged APs to leave
 4      60 Minutes --
 5           A.    Yes.  Oh, pardon me.  Sorry.          02:01:19
 6           Q.    That's okay -- and get experience
 7      producing at another show?
 8           A.    Yes.
 9           Q.    And have you ever assigned a certain
10      number of hours of experience that they might need  02:01:28
11      before coming -- being a producer at 60 Minutes?
12           A.    No, but I've talked about going to
13      other programs and producing numbers of stories.
14      I've said to many people:  Go to the Evening News
15      and go produce a hundred stories; it will be a lot  02:01:46
16      easier for you to be a producer if you do that.
17           Q.    Be a producer specifically at 60
18      Minutes?
19           A.    Pardon me, yes.
20           Q.    And why did you say that?            02:01:56
21           A.    It's experience.  There's a
22      different -- it's a different level of
23      responsibility to be a producer than to be an
24      associate producer, and when you're solo
25      producing, all of that responsibility is on you.   02:02:10
```

```
                                          Page 136
 1                    Owens
 2      Q.    And is it in your view a different
 3   responsibility or level of job to produce at 60
 4   Minutes than producing at other places?
 5      A.    Yes.                              02:02:23
 6      Q.    In what way?
 7      A.    The bar is higher.
 8      Q.    At 60 Minutes?
 9      A.    The bar is higher.  It's a higher
10   standard.                                 02:02:31
11      Q.    In what ways are the standards higher?
12      A.    It's a rigorous place.  It's from
13   getting your stories accepted, you're working with
14   some of the most experienced journalists in
15   broadcast TV.  Yeah, I mean, it's...      02:02:50
16      Q.    I'm sorry, go ahead.
17      A.    I was just going to say it's a very
18   high bar.
19      Q.    Is working at 60 Minutes in your view
20   stressful?                                02:03:05
21      A.    Can be.
22      Q.    I think we've talked earlier but just
23   to confirm, most -- well, strike that.
24            Do all the current producers at 60
25   Minutes to your knowledge have contracts?  02:03:26
```

```
                                                   Page 137
 1                          Owens
 2         A.    Yes.
 3         Q.    And are most of them if not all of them
 4    three-year term contracts?
 5         A.    I believe so.                      02:03:35
 6         Q.    And who makes the decision whether to
 7    renew -- since you've been executive producer, who
 8    makes the decision whether to renew a producer's
 9    contract?
10         A.    I do.                              02:03:47
11         Q.    Is anyone else involved in the
12    decision-making process?
13         A.    No.  Well, hold on.
14         Q.    Sure.
15         A.    A correspondent might come to me with a  02:03:58
16    concern that I was unaware of, but ultimately I
17    would make the decision.
18         Q.    And in deciding whether to renew a
19    producer's contract since you've been executive
20    producer, what factors are relevant?           02:04:11
21         A.    Amount of stories they do, production,
22    the actual empirical number, and the quality.
23         Q.    The quality of the stories?
24         A.    The quality of the stories.
25         Q.    Any other factors?                  02:04:31
```

```
                                            Page 138
 1                        Owens
 2        A.    I mean, I don't -- since I've been
 3    executive producer, I don't -- I don't want to put
 4    up with bad behavior around the staff.  It's
 5    important to me that people treat each other        02:04:52
 6    respectfully.
 7        Q.    And that's been true since you've been
 8    executive producer?
 9        A.    Yes.
10        Q.    And if you felt that a producer's        02:05:07
11    conduct was not at your level of expectation,
12    would you renew their contract?
13             ATTORNEY ZUCKERMAN:  Objection.
14             You can answer.
15        A.    It would depend on what we're talking    02:05:20
16    about.  If it's -- if they've been warned about
17    numbers of stories they've done over the course of
18    three years and they got to the end of three years
19    and they were not producing the number of stories
20    that I expected, I would terminate them.           02:05:39
21        Q.    During your tenure as executive
22    producer, was Ms. Poolos's contract renewed?
23        A.    I believe it was.
24        Q.    And at that point when her contract was
25    renewed, was she -- did she have the title of       02:06:02
```

```
                                              Page 139
 1                      Owens
 2   producer?
 3        A.    Yes.
 4        Q.    And who made the decision to renew her
 5   contract?                                  02:06:10
 6        A.    Yes.
 7        Q.    And when did you renew her contract?
 8        A.    I don't know what year it was, but it
 9   was whenever that contract was up.
10        Q.    And why did you renew Ms. Poolos's    02:06:22
11   contract?
12        A.    I liked Alex, and I thought that some
13   of the work she did was good.  She did need to do
14   and was told that she needed to be more
15   productive.  But she was a young producer.    02:06:50
16        Q.    What do you mean, "she was a young
17   producer"?
18        A.    She had only -- she had just one
19   contract cycle under her belt.
20        Q.    Did that affect your view of Ms. -- the  02:07:01
21   expectations you had of her productivity?
22              ATTORNEY ZUCKERMAN:  Objection.
23        A.    No.
24        Q.    Did you have concerns about
25   Ms. Poolos's productivity?                   02:07:24
```

Page 140

                        Owens

1                           Owens

2        A.    I did.

3        Q.    Did that affect your renewing her

4    contract?

5        A.    Clearly not.                        02:07:30

6        Q.    And how come?

7        A.    I think I just stated that I thought

8    she was a young producer and she had only been

9    through one contract cycle and that she deserved a

10   second contract to see if she would be able to do   02:07:44

11   more.

12              ATTORNEY IADEVAIA:  All right.  I'm

13        going to mark as Owens Exhibit 1.

14              (Owens Exhibit 1, contract of Poolos,

15        Bates-stamped CBS 1 to CBS 12, marked for

16        identification.)

17        Q.    You can take a look at Exhibit 1,

18   Mr. Owens.  I'm going to say for the record what's

19   been marked as Exhibit 1 is a multipage document

20   bearing Bates number CBS 1 to CBS 12.              02:08:17

21        A.    Okay.

22        Q.    Mr. Owens, once you've had a chance to

23   look at that, just let me know.

24        A.    Okay.

25              (Pause.)                              02:09:51

```
                                           Page 141
 1                      Owens
 2        A.    Okay.
 3        Q.    Do you recognize what's been marked as
 4   Exhibit 1?
 5        A.    Yes.                          02:09:54
 6        Q.    And what is it?
 7        A.    It's Alex's contract.
 8        Q.    You can see at the top on the first
 9   page that the agreement says it was made as of May
10   30th, 2021; correct?                    02:10:07
11        A.    Yes.
12        Q.    And at this point in time how long had
13   Ms. Poolos had the producer title, do you know?
14        A.    I don't know.
15        Q.    Does it sound correct that she was    02:10:22
16   promoted around or at the end of the 2018 season?
17        A.    That could well be true, yes.
18              ATTORNEY ZUCKERMAN:  Just for
19         clarification of the record, are you referring
20         to 2018/2019 or 2017/2018?             02:10:36
21              ATTORNEY IADEVAIA:  I think it would be
22         the 2017/2018, and she would have been
23         promoted at the end of the 2017/2018 season.
24        A.    That makes sense.
25        Q.    Did you ever tell Ms. Poolos yourself  02:11:05
```

```
                                           Page 142
 1                         Owens
 2     that you thought she was talented?
 3          A.    I know that I complimented Alex's work.
 4     I'm not sure that I told her she was talented.
 5          Q.    Did you ever suggest to Ms. Poolos when  02:11:20
 6     she was an AP that she discuss producing stories
 7     for Anderson Cooper at 60 Minutes?
 8          A.    I don't remember that.
 9          Q.    Is it possible you did?
10          A.    It's possible.                           02:11:38
11          Q.    Do you know whether Mr. Bar-On had
12     threatened Ms. Poolos that if she spoke to
13     Mr. Cooper he would tell Ms. Stahl?
14          A.    I never heard that.
15          Q.    And after Ms. Poolos became a producer,  02:12:01
16     you were her supervisor for most of that time
17     until she left 60 Minutes; correct?
18          A.    Correct.
19          Q.    And she reported to you for most of
20     that time; right?                                   02:12:14
21          A.    Yes.
22          Q.    What did you think of her work as a
23     producer?
24          A.    I thought she did some good stories.
25          Q.    And what stories did you think she did   02:12:25
```

```
                                              Page 143
 1                      Owens
 2     that were good?
 3          A.    She -- I remember she did a very good
 4     story on Navalny, Russian Opposition.
 5          Q.    What was good about that story?      02:12:39
 6          A.    It's difficult to operate in Russia.
 7          Q.    Anything else?
 8          A.    Lesley was pleased with it.  I think
 9     overall it was a good news story, did a good job
10     with it.                                          02:12:59
11          Q.    Any other stories that Ms. Poolos did
12     as a producer that you thought were good?
13          A.    Well, she did a very difficult story on
14     transgender rights.
15          Q.    Do you think she did a good job on that 02:13:15
16     story?
17          A.    I personally have never been so
18     involved as an executive in a story that I had to
19     get in that story.
20          Q.    So I'm asking, though, did you think    02:13:29
21     she did a good job or not.
22          A.    She did a fine job, but she needed a
23     lot of help.
24          Q.    When did that story come out?
25          A.    It was in the spring of April or May    02:13:45
```

```
                                        Page 144
 1                     Owens
 2    2017, '18.  I can't remember.
 3        Q.    So after that her contract was
 4    renewed -- right? -- Exhibit 1 that we just looked
 5    at?                                        02:14:08
 6        A.    Uh-huh.
 7        Q.    That's correct?
 8        A.    Yeah, I believe so.
 9        Q.    And it may have even been after that
10    that she was promoted to producer?  You said it    02:14:16
11    was either 2017 or 2018 that the story aired.
12        A.    Yeah.  I don't -- I can't recall what
13    year the story aired, but -- so I'm not sure what
14    the timing of that is.  But she was a producer on
15    the transgender story.                       02:14:32
16        Q.    Got it.
17              Any other stories that you thought that
18    Ms. Poolos did well as a producer?
19        A.    The story she did in Iran on the female
20    soccer team.                                 02:14:49
21        Q.    What did she do well in that story?
22        A.    Like Russia, Iran is a difficult place
23    to get into.  Just getting a visa can be
24    difficult.  But, yeah, it was well executed.
25        Q.    Any other stories you think she did a    02:15:02
```

```
                                        Page 145
 1                    Owens
 2    good job on?
 3         A.    Not that I can recall.
 4         Q.    On the transgender story that you
 5    mentioned, did Ms. Poolos need help because of the   02:15:18
 6    effect of outside groups?
 7         A.    Yeah, that was part of it, but that's
 8    part of many stories.
 9         Q.    Did you give a performance evaluation
10    to Ms. Poolos after the 2020/202160 Minutes         02:15:45
11    season?
12         A.    I don't recall, but that's likely,
13    possible.
14         Q.    Do you recall what feedback you gave to
15    Ms. Poolos?                                          02:15:59
16         A.    I think -- the one thing I can remember
17    complimenting Alex about was she took big swings
18    on stories, which is good, but that she needed to
19    do more.  And a diversity of stories would be
20    helpful to her because you need to be able to do    02:16:19
21    more than one thing at a time.
22         Q.    And did you consider that the feedback
23    that you gave to Ms. Poolos was positive,
24    negative, or something else?
25         A.    Somewhere in the middle.               02:16:35
```

```
                                              Page 146
 1                       Owens
 2        Q.    When you say that you said to her that
 3    she needed to do more stories, did you consider
 4    that you gave her a warning?
 5        A.    I wouldn't consider it an official      02:16:51
 6    warning, but it was -- it was direct feedback.
 7        Q.    And at the time you renewed
 8    Ms. Poolos's contract, which was Exhibit 1, at the
 9    end of May 2021, was Ms. Poolos's job in jeopardy?
10        A.    No.                                     02:17:21
11        Q.    If it was, you wouldn't have renewed
12    her contract, would you have?
13        A.    No.
14              ATTORNEY IADEVAIA:  If we could mark
15         this as Owens Exhibit 2, please.             02:17:29
16              (Owens Exhibit 2, spreadsheet, Bates-
17         stamped CBS 43, marked for identification.)
18        Q.    Take a minute to look.  What's been
19    marked as Owens Exhibit 2 is a two-page
20    spreadsheet that has the Bates number CBS 43.     02:17:57
21              Let me know once you're ready.
22        A.    Okay.
23        Q.    If you look on the second page in the
24    second row, there is some text.  Is that your
25    feedback to Ms. Poolos?                           02:18:50
```

```
                                          Page 147

 1                      Owens

 2        A.    Yes.

 3        Q.    And is this the summary that you

 4   prepared at the end of the 2020/2021 season in

 5   connection with your evaluation of Ms. Poolos's   02:19:00

 6   performance?

 7        A.    Yes.

 8        Q.    And was this the actual feedback that

 9   you gave to Ms. -- well, strike that.

10             Did you meet with Ms. Poolos at the end 02:19:12

11   of the season for a one-on-one evaluation?

12        A.    I believe so.  I believe it's mandatory

13   for our HR compliance, yeah -- yes.

14        Q.    And the text in this box that I was

15   just referring to in that second row, first       02:19:26

16   column, is this word for word what you said to

17   Ms. Poolos during your meeting?

18        A.    I don't know if it's word for word what

19   I said to her, but Alex would have read this also.

20   And I wrote it, and I meant it so...              02:19:38

21        Q.    During that meeting did you say

22   anything else that you can remember as you sit

23   here today beyond sum and substance what's in this

24   box?

25        A.    No, not that I can remember.  But it    02:19:50
```

```
                                              Page 148
  1                       Owens
  2    would have been -- yeah, it would have been --
  3    this would have been the sum and substance.
  4          Q.    The text in the box?
  5          A.    Yes.                            02:20:00
  6          Q.    Okay.  So you wrote -- or what's
  7    written in -- what it says in this first sentence:
  8    Alex, it is fair to say that you tackled the two
  9    stories with the highest degree of difficulty this
 10    year.  Brava.                               02:20:14
 11          Do you see that text?
 12          A.    I do.
 13          Q.    At the time you wrote it, was that an
 14    accurate statement of your view?
 15          A.    Yes.                            02:20:23
 16          Q.    And which two stories are you referring
 17    to?
 18          A.    Navalny and the trans story,
 19    transgender rights story.
 20          Q.    And then the next sentence says, I      02:20:31
 21    think you grew as a journalist this year, and that
 22    experience is invaluable.
 23          Do you see that text?
 24          A.    I do.
 25          Q.    Was that an accurate statement of your   02:20:40
```

```
                                            Page 149
 1                      Owens
 2    view at the time?
 3         A.    Yes.
 4         Q.    And what experience were you referring
 5    to when you say "that experience is invaluable"?   02:20:45
 6         A.    A, being responsible for stories from
 7    beginning to end, managing somebody, now in charge
 8    of managing people, working in places like Russia,
 9    bumping up against a story that had strong lobbies
10    attached to it.  Yeah, experience that she gained   02:21:13
11    from working on those stories.
12         Q.    You also wrote in the next sentence:
13    You and I have laughed about this, but doing a
14    diversity of stories can be very good for your
15    soul.  It will also help you do more pieces.  Not   02:21:30
16    everything needs to be the Pentagon papers.  You
17    can have a little fun.
18               Did I read that correctly?
19         A.    You did.
20         Q.    Was that an accurate statement of your   02:21:40
21    view at the time?
22         A.    Yes.
23         Q.    When you say "you and I laughed about
24    this," what do you mean by that?
25         A.    I think that I said something to the     02:21:50
```

```
                                                    Page 150
 1                          Owens
 2    extent of you should go do a story like in the
 3    Caribbean about why blue drinks are so delicious.
 4         Q.    And why did you say that?
 5         A.    Because the transgender story was a      02:22:01
 6    difficult story with a lot of internal and public
 7    pressure.
 8         Q.    When you wrote "not everything needs to
 9    be the Pentagon papers," what did you mean by
10    that?                                              02:22:20
11         A.    60 Minutes also does stories that are
12    about culture and arts and things that aren't
13    exposés.
14         Q.    When Ms. Poolos first became a
15    producer, did she have an assigned AP?            02:22:38
16         A.    I don't remember.
17         Q.    At some point she -- her assigned AP
18    became Colette Richards; correct?
19         A.    Yes, but I believe Alex hired Colette.
20    She went through an interview process.            02:22:55
21         Q.    Understood.
22               Does having an AP affect the volume of
23    stories that producers produce, come out with?
24               ATTORNEY ZUCKERMAN:  Objection.
25         A.    Yeah.  I mean, all producers work with  02:23:07
```

```
                                            Page 151
 1                      Owens
 2    an AP on stories.
 3         Q.    And was there any stories that
 4    Ms. Poolos worked on where she didn't have an AP?
 5         A.    Not that I know of.              02:23:20
 6         Q.    You also wrote, You and Colette have
 7    the potential to be a terrific team.
 8             Do you see that?
 9         A.    Yes.
10         Q.    And I witnessed that up close.      02:23:36
11             Do you see that?
12         A.    Yes.
13         Q.    And Ms. Richards was Ms. Poolos's AP at
14    the time; correct?
15         A.    Correct.                        02:23:44
16         Q.    And was it accurate that your view when
17    you wrote this was that Alex and Colette had
18    potential to be a terrific team?
19         A.    Correct.
20         Q.    And what did you witness up close that   02:23:52
21    made you say that?
22         A.    Well, I mentioned before, to this day I
23    never worked more on that story than I had to work
24    on the transgender story.  That had a lot of
25    pressures and things.  And I watched the two of   02:24:06
```

```
                                              Page 152
 1                         Owens
 2    them do their jobs well.  It was also early on in
 3    their partnership.
 4         Q.    Other than your observations in
 5    connection with the transgender story, was there   02:24:22
 6    any other basis for you to say that you witnessed
 7    up close that they had the potential to be a
 8    terrific team?
 9         A.    No.  It was based on that.
10         Q.    And then you wrote, Thank you for the   02:24:35
11    composure and professionalism that you have shown
12    over these past months.
13              Do you see that text?
14         A.    I do.
15         Q.    Was that an accurate assessment of your 02:24:43
16    view at the time?
17         A.    Yes.
18         Q.    And what did you mean when you said
19    that Ms. Poolos had composure?
20         A.    That under the stresses of, again, the  02:24:55
21    transgender story that she kept her composure.
22         Q.    And when you say that you changed her
23    for her professionalism, what did you mean by
24    that?
25         A.    That she acted in a professional manner 02:25:12
```

                                              Page 153

 1                          Owens

 2    through a difficult period of time putting

 3    together that story.

 4         Q.    In terms of compensation for producers

 5    at 60 Minutes, who makes the decision how much to   02:25:29

 6    pay them?

 7         A.    Business -- business affairs gets

 8    involved.  It depends on a number of factors.  It

 9    depends on what that person's salary was when she

10    came to us.                                          02:25:48

11              For example, if someone comes to us as

12    a full producer from ABC, they're going to be

13    making more money -- likely more money as a full

14    producer at another network show than an associate

15    producer would have been making at 60 Minutes.  So  02:26:02

16    their bases would be different.

17              There are general guidelines that

18    business affairs has that get followed.

19         Q.    Since you've been executive producer

20    for 60 Minutes, have you made decisions to give     02:26:16

21    pay increases to producers?

22         A.    Yes.

23         Q.    And have you made those decisions

24    based -- what are the factors that you consider

25    when you make those decisions -- when you've made   02:26:28

```
                                            Page 154
 1                    Owens
 2     those decisions?
 3          A.    Production, correspondent input about
 4     how valuable they are, their work product.  A
 5     number of different things.              02:26:46
 6          Q.    So merit could be a factor in giving a
 7     producer a pay increase; correct?
 8          A.    Yes.
 9          Q.    As of Exhibit 1, the May 30 -- is it
10     May 30? -- May 30th, 2021, contract with     02:26:56
11     Ms. Poolos, do you know if she received a pay
12     increase as part of that deal?
13          A.    I'm sure she did.
14          Q.    And do you know if you increased -- if
15     you made a decision to increase her pay in    02:27:14
16     connection with a merit decision?
17          A.    I'm sure she was given a pay increase
18     with her new contract.
19          Q.    And do you think it was based on merit,
20     based on her work?                       02:27:28
21          A.    Yeah.
22          Q.    Did Alex work on a story about someone
23     named Maria Butina?
24          A.    Yes.
25          Q.    And do you have any thoughts on the    02:27:42
```

```
                                            Page 155
 1                      Owens
 2    quality of that story?
 3              ATTORNEY ZUCKERMAN:  Objection.
 4         A.    I believe that was a good story.
 5         Q.    And was Ms. Poolos a producer at the    02:27:52
 6    time of that story?
 7         A.    I'm not sure if she was a producer or
 8    coproducer.  I don't recall.
 9         Q.    And did Ms. Poolos work on a story
10    about Chibok girls?                                02:28:09
11         A.    Yes.
12         Q.    Do you have any thoughts on that story?
13         A.    I do remember it but I don't remember
14    it well.
15         Q.    Good or bad?                            02:28:26
16         A.    I think good.
17         Q.    Going back to the feedback that you
18    gave Ms. Poolos as reflected in Owens Exhibit 2,
19    do you think it's notable that you told
20    Ms. Poolos, as I think you used the term "young    02:28:39
21    producer," that she had done the most difficult
22    stories of the year?
23         A.    Well, having been intimately involved
24    in one of them, yeah, that one was definitely the
25    most difficult.                                    02:28:57
```

```
                                              Page 156
 1                        Owens
 2        Q.    What do you think about a producer
 3    who's early in her producer career making stories
 4    as difficult as Ms. Poolos had made?
 5              ATTORNEY ZUCKERMAN:  Objection.        02:29:12
 6        A.    I think that Alex -- I mentioned this
 7    earlier.  I think she did try to take big swings
 8    at stories.
 9        Q.    And did she in some instances pull that
10    off?                                             02:29:28
11        A.    She did.
12        Q.    We talked a little bit about
13    Ms. Richards.  Ms. Richards, does she currently
14    work for 60 Minutes?
15        A.    She does.                              02:29:38
16        Q.    And what's her job currently?
17        A.    She's an associate producer.
18        Q.    And that's what she was hired for;
19    correct?
20        A.    That's right.                          02:29:44
21        Q.    And when did she start at 60 Minutes?
22        A.    I suppose it was this year, because
23    Alex talks about thanking Tanya for helping to
24    hire the best possible AP candidate.  So 2021.
25        Q.    So sometime during the 2020/2021        02:30:05
```

```
                                          Page 157
 1                        Owens
 2    season, likely?
 3         A.    Likely, yes.
 4         Q.    And does Ms. Richards -- is she on a
 5    team currently?                         02:30:14
 6         A.    She is.
 7         Q.    And whose team is she on?
 8         A.    Lesley Stahl and Shari Finkelstein.
 9         Q.    And have you worked directly with
10    Ms. Richards?                           02:30:25
11         A.    Yeah.
12         Q.    On how many stories?
13         A.    Probably ten.  I mean, again,
14    Ms. Richards is part of a team, as she was with
15    Alex, so worked with the team.          02:30:38
16         Q.    And what's your view of Ms. Richards'
17    work?
18         A.    I think she's terrific.  And her
19    producer, her current producer, Shari Finkelstein,
20    is one of the very best producers in the history  02:30:48
21    of 60 Minutes, and she would tell you that Colette
22    is one of her best associate producers ever.
23         Q.    Has Ms. Richards ever complained to you
24    about anyone at 60 Minutes?
25         A.    Alex.                         02:31:11
```

```
                                              Page 158
 1                    Owens
 2        Q.    Other than Ms. Poolos?
 3        A.    No.
 4        Q.    Has anyone made complaints about
 5   Ms. Richards?                            02:31:21
 6        A.    Not to me.
 7        Q.    Did Ms. Poolos make complaints to you
 8   about Ms. Richards?
 9        A.    After finding out about Ms. Richards'
10   complaint against her.                   02:31:38
11        Q.    Other than Ms. Poolos, has anyone else
12   made complaints about Ms. Richards?
13        A.    No.
14        Q.    And what concerns did Ms. Poolos raise
15   about Ms. Richards?                      02:31:58
16        A.    The one that I can remember most
17   vividly is that she called her a millennial and
18   that it was around her work ethic.
19        Q.    Anything else you can recall Ms. Poolos
20   saying about Ms. Richards?               02:32:22
21        A.    No.
22        Q.    Did you ever describe Ms. Richards as a
23   millennial?
24        A.    No.
25        Q.    So your testimony is it was Ms. Poolos  02:32:31
```

```
                                    Page 159
 1                     Owens
 2    who did that?
 3         A.    Yes.  I mean, I may have -- I don't
 4    recall saying that about Ms. Richards.
 5         Q.    Did Ms. Poolos ever raise concerns    02:32:43
 6    about Ms. Richards' fact-checking?
 7         A.    Not that I recall.
 8         Q.    Did Ms. Poolos ever raise concerns
 9    about Ms. Richards copy editing?
10         A.    No, because I don't know why an AP    02:32:57
11    would be copy editing.
12         Q.    Did Ms. Poolos ever raise concerns that
13    Ms. Richards failed to secure footage for a
14    segment?
15         A.    No.                                   02:33:09
16         Q.    Did Ms. Poolos ever raise concerns that
17    Ms. Richards did not handle the acquisition of
18    third-party material in the correct way?
19         A.    Not with me.
20         Q.    Did Ms. Poolos ever raise concerns that 02:33:18
21    Ms. Richards did not adequately manage logistics
22    for shoots?
23         A.    Not with me.
24         Q.    Did Ms. Poolos ever raise concerns that
25    Ms. Richards was not adequately conducting       02:33:32
```

```
                                           Page 160
 1                      Owens
 2    background interviews?
 3         A.    Not with me.
 4         Q.    Did Ms. Poolos ever raise concerns that
 5    Ms. Richards made inappropriate demands for      02:33:43
 6    personal travel?
 7              ATTORNEY ZUCKERMAN:  Objection.
 8              You can answer.
 9         A.    Not personal travel, but that goes back
10    to the thing that I believe Alex shared with me  02:33:54
11    was that Colette wasn't as available as she would
12    have liked her to be.
13         Q.    Did Ms. Poolos provide any more
14    specificity than that?
15         A.    She may have, but I don't recall.      02:34:07
16         Q.    Did Ms. Poolos ever tell you that
17    Ms. Richards just stopped working when they were
18    working together to prepare for a shoot?
19         A.    She did not.
20         Q.    You mentioned Shari Finkelstein?       02:34:27
21         A.    Correct.
22         Q.    And she's a producer for 60 Minutes?
23         A.    Yes.
24         Q.    Currently?
25         A.    Yes.                                   02:34:35
```

```
                                            Page 161
 1                       Owens
 2        Q.    Has she ever made any complaints or
 3   raised concerns about Ms. Richards?
 4        A.    She has not.
 5        Q.    Do you know someone named Jason        02:34:41
 6   Rezaian?
 7        A.    Jason Rezaian?  I don't know anybody,
 8   but is that the guy who was held by The Washington
 9   Post, the Iranian...
10        Q.    No?                                    02:35:02
11        A.    So no, I don't.
12        Q.    Do you know someone named Barney
13   Gimbel?
14        A.    No.
15        Q.    Did Tanya Simon ever tell you she got a 02:35:08
16   call from Mr. Gimbel about Ms. Richards?
17        A.    No.
18        Q.    Did Ms. Simon ever tell you that she
19   had received a call from somebody who represents
20   sources for a story about Ms. Richards?          02:35:25
21        A.    No.
22        Q.    Did you ever find out from Ms. Simon
23   that someone had complained about Ms. Richards and
24   specifically threatened to pull a story because of
25   Ms. Richards?                                     02:35:45
```

```
                                        Page 162

 1                        Owens

 2        A.    No.

 3        Q.    Did Ms. Simon ever tell you that

 4    someone threatened to pull all their clients from

 5    60 Minutes stories as a result of Ms. Richards'     02:35:54

 6    conduct?

 7        A.    No.

 8              (Pause.)

 9        Q.    Switch gears for a minute.   Is there

10    someone who works at 60 Minutes named Matt          02:36:17

11    Richmond?

12        A.    Yes.

13        Q.    You mentioned him earlier; correct?

14        A.    Yep.

15        Q.    He's part of the senior team for 60       02:36:24

16    Minutes?

17        A.    He is.

18        Q.    And he supervises other editors;

19    correct?

20        A.    Correct.                                  02:36:30

21        Q.    And he reports directly to you?

22        A.    He does.

23        Q.    I don't know if I asked you this

24    before, but just to make sure I do, has

25    Mr. Richmond worked at 60 Minutes for a long time?  02:36:43
```

```
                                              Page 163

 1                        Owens

 2        A.    Yes.

 3        Q.    Does he work for any other shows other

 4   than for 60 Minutes?

 5        A.    He does not.                    02:36:51

 6        Q.    Are you aware of any complaints against

 7   Mr. Richmond by CBS employees?

 8        A.    No.

 9        Q.    Has Ms. Simon ever told you about

10   complaints against Mr. Richmond?          02:37:04

11        A.    Can you clarify for me what you mean by

12   "complaint"?

13        Q.    Are you aware of any concerns raised

14   about Mr. Richmond?

15        A.    By people at 60 Minutes?       02:37:17

16        Q.    Correct.

17        A.    No.

18        Q.    Are you aware of any concerns about

19   Mr. Richmond raised by anyone?

20        A.    Well, I think what you're getting at is  02:37:25

21   have people complained about not getting the

22   editor they want.  Matt is in charge of all of the

23   editors.  People come in with their stories.  They

24   need a place to edit their stories, and sometimes

25   they get placed with an editor who's not their     02:37:43
```

```
                                          Page 164
 1                     Owens
 2    first choice.
 3              That would be the extent of any
 4    complaint I've heard against Matt Richmond.
 5         Q.   Are you aware of any concerns,        02:37:53
 6    complaints -- actually, strike that.
 7              Has Ms. Simon ever told you that anyone
 8    at 60 Minutes has commented about Mr. Richmond's
 9    tone?
10         A.   No, other than he's very binary, he's  02:38:07
11    very black-and-white, he doesn't raise his voice,
12    it's all very transactional.
13         Q.   Has anyone ever described Mr. Richmond,
14    to your knowledge, as condescending?
15         A.   No.                                    02:38:25
16         Q.   Has anyone ever raised to you that
17    Mr. Richmond lacks people skills?
18         A.   No.
19         Q.   Has anyone raised to you that
20    Mr. Richmond -- strike that.  Strike that.       02:38:39
21              Have you ever been part of a discussion
22    with human resources about Mr. Richmond?
23         A.   No.
24         Q.   Have you been told that there was a
25    group of multiple producers who raised concerns  02:38:56
```

```
                                             Page 165
  1                        Owens
  2      about Mr. Richmond?
  3           A.    No.  Hang on.  A group of multiple
  4      producers --
  5           Q.    A group of producers.            02:39:08
  6           A.    Okay.  No.
  7           Q.    Were you ever told that Mr. Richmond
  8      has been abusive?
  9           A.    No.
 10           Q.    Is there somebody at 60 Minutes named  02:39:22
 11      Ashley Velie?
 12           A.    Yes, Ashley Velie.
 13           Q.    Velie.
 14           A.    Yep.
 15           Q.    What does Ms. Velie do?  What's her  02:39:31
 16      job?
 17           A.    She's a producer.
 18           Q.    And how long has she been at 60
 19      Minutes?
 20           A.    Probably seven years, something like  02:39:42
 21      that.
 22           Q.    Does she report to you --
 23           A.    She does.
 24           Q.    -- because you're executive producer?
 25                 Is she on a team?                02:39:51
```

```
                                        Page 166
 1                      Owens

 2        A.    She is.

 3        Q.    And whose team is she on?

 4        A.    Sharyn Alfonsi.

 5        Q.    Do you have any knowledge that      02:39:58

 6   Ms. Velie organized a group of employees to speak

 7   about Mr. Richmond via Zoom?

 8        A.    No.

 9              ATTORNEY ZUCKERMAN:  Objection.

10              THE WITNESS:  Sorry.              02:40:10

11              ATTORNEY ZUCKERMAN:  No, you're good.

12        Q.    Is there a correspondent at 60

13   Minutes -- and I'm going to mispronounce his name,

14   so I'm sorry -- but Draggan Mihailovich?

15        A.    He's a producer.                   02:40:24

16        Q.    He's a producer?

17        A.    Yeah.

18        Q.    And how long has he worked at 60?

19        A.    20 years.

20        Q.    And for which -- is he on a team; and   02:40:30

21   if so, which team is he on?

22        A.    He is on Jon Wertheim's team now.

23        Q.    And are you aware of Mr. Mihailovich

24   conveying concerns about Mr. Richmond to

25   Ms. Simon?                                   02:40:50
```

Page 167

1                          Owens

2        A.    No.

3              Can I add?

4        Q.    Sure.  Go ahead.

5        A.    When I was a producer, Matt Richmond    02:40:58

6    wasn't in charge then, but there were certain

7    editors that I liked to work with.  And you would

8    get disappointed when you couldn't work with them

9    and you had to work with someone who you didn't

10   think was as good.  There's not a lot you can do    02:41:12

11   about it.  These aren't decisions made for

12   personal reasons; they're made for practical

13   reasons.

14       Q.    Are you aware of any feedback that --

15   or concern or complaint that Shari Finkelstein    02:41:29

16   provided regarding Mr. Richmond?

17       A.    No.  Well, no, no.  Actually, Shari has

18   come to me to complain that she didn't get the

19   editor she wanted and that Matt wouldn't give her

20   the editor that she wanted, yes.    02:41:47

21       Q.    How many times did she give that

22   complaint?

23       A.    Probably twice.

24       Q.    Has she ever raised concerns to you

25   about Mr. Richmond's tone?    02:41:54

```
                                             Page 168
 1                        Owens
 2        A.    No.
 3        Q.    Has she ever raised concerns to you
 4   about how he speaks to her?
 5        A.    No.                            02:42:00
 6        Q.    Has Ms. Finkelstein ever raised
 7   concerns to you that she understood that
 8   Mr. Richmond, in a meeting with editors that he
 9   supervised, said that they did not have to work
10   with Ms. Finkelstein?                     02:42:13
11        A.    No.  But I do know that there were
12   editors who went to Tom Honeysett, who was in Matt
13   Richmond's job before Matt Richmond, and Matt
14   Richmond to say that they were -- they didn't want
15   to work with Ms. Finkelstein anymore, and she was  02:42:31
16   aware of that.
17             ATTORNEY IADEVAIA:  Can you read back
18        that testimony, please.
19             (Record read.)
20        Q.    And was there a reason given for why  02:43:02
21   they didn't want to work with Ms. Finkelstein?
22        A.    Again, she is one of the greatest
23   producers in the history of 60 Minutes,
24   empirically, but she is very controlling in the
25   edit room.                               02:43:14
```

```
                                              Page 169
 1                       Owens
 2        Q.    Do you think it's likely that if a
 3   group of producers had organized a Zoom and made a
 4   complaint about Mr. Richmond that was shared with
 5   Ms. Simon that Ms. Simon would have told you about  02:43:32
 6   it?
 7              ATTORNEY ZUCKERMAN:  Objection.
 8        A.    I would have thought so.
 9        Q.    I think -- well, I can't remember at
10   this point.  Is there someone who worked for 60    02:43:48
11   Minutes named David Levine?
12        A.    Yes.
13        Q.    Does he currently work for 60 Minutes?
14        A.    He does.
15        Q.    And how long has he worked at 60        02:43:54
16   Minutes?
17        A.    I'm going to guess eight years.
18        Q.    And what what's his job there
19   currently?
20        A.    He's an associate producer who has been 02:44:05
21   given opportunities to produce stories.
22        Q.    And is he on a team?
23        A.    He currently works with Jon Wertheim
24   but doesn't -- he's attached to Jon Wertheim.
25        Q.    Does he have a producer that he works   02:44:26
```

Page 170

```
 1                    Owens
 2   with or how does it work?
 3        A.    He is doing more of his own work, so
 4   he's getting the opportunity to produce.
 5        Q.    Has he been released from his AP        02:44:41
 6   duties?
 7        A.    He has not.
 8        Q.    Does he still perform some AP duties?
 9        A.    When needed.
10        Q.    I think you said this earlier, but just  02:44:56
11   to make sure I understand it, Mr. Levine
12   performing some producer duties, is that a step up
13   for an AP?
14        A.    Yeah.
15        Q.    And does he report to you or Ms. Simon?  02:45:06
16        A.    Ms. Simon.
17        Q.    Does he do work for any other show
18   beyond 60 Minutes?
19        A.    No.
20        Q.    Are you aware of any concerns or        02:45:18
21   complaints about Mr. Levine?
22        A.    Yes.
23        Q.    What are you aware of?
24        A.    That he lost his temper at least once
25   with Jon Wertheim's broadcast associate, whose     02:45:32
```

```
                                           Page 171
 1                     Owens
 2     name is Elizabeth Germino, while she was working
 3     with David in the capacity as an AP.
 4          Q.    And Mr. Levine at that point was
 5     functioning as a producer?                    02:45:57
 6          A.    Yes.
 7          Q.    And when did this happen?
 8          A.    Maybe a year and a half ago.
 9          Q.    Where did the incident take place?
10          A.    I don't know.  Tanya brought it to my  02:46:16
11     attention.  I went and asked Jon Wertheim.  He
12     knew about it.  And then I talked to David Levine
13     about it, and he said -- he immediately said that
14     it was true and that he was in counseling,
15     therapy, as a result of it.  And I told him:    02:46:40
16     David, this is a one-strike thing, it can never
17     happen again.  He said, I understand.
18          Q.    And are you aware of any other concerns
19     or complaints about Mr. Levine other than the one
20     you just testified to?                          02:47:00
21          A.    I heard something last year.  I went to
22     Elizabeth to ask her about it, and she told me it
23     was nothing and she was fine working with him.
24     And I went to Jon Wertheim and I asked him, and he
25     said that there wasn't anything.  And I mentioned  02:47:15
```

```
                                              Page 172
 1                        Owens
 2     to David:  David, how are we doing, and he assured
 3     me that everything was going well between them.
 4          Q.    So you're aware of at least two
 5     instances of concerns related to Mr. Levine?    02:47:32
 6          A.    Yes, two things were brought to my
 7     attention, that's right.
 8          Q.    The more recent one, what did Ms. Simon
 9     say to you about the issue?
10          A.    All she said was, I heard that       02:47:46
11     something -- I believe what she said was, I heard
12     that David and Elizabeth might have had a problem.
13          Q.    And at any point in time did you learn
14     any details about the problem?
15          A.    No.                                  02:48:01
16          Q.    Did you ask anyone?
17          A.    I did.  I asked Elizabeth, who waved me
18     off and said they were fine.
19          Q.    This was the more recent incident?
20          A.    Yes.                                 02:48:12
21          Q.    So when you told Mr. Levine this is a
22     one-strike situation, what was your basis for
23     saying that?
24               ATTORNEY ZUCKERMAN:  Objection.
25          A.    That he told me that he had raised his 02:48:24
```

```
                                              Page 173
 1                       Owens
 2     voice and acted inappropriately, so that was the
 3     basis for it.
 4          Q.    Tell me everything he said to you about
 5     the incident.                              02:48:39
 6          A.    That's it, that he acknowledged that he
 7     raised his voice at her, that it was over stress
 8     and anxiety and that he was in counseling
 9     currently, undergoing therapy around this.
10              We also checked in in between with      02:49:00
11     Elizabeth and with Jon about how things were
12     going, and everybody was very affirmative that
13     things were going well.
14          Q.    You mean in between the first complaint
15     you became aware of and the second complaint?    02:49:17
16              ATTORNEY ZUCKERMAN:  Objection.
17          A.    Yes.  I wouldn't call the second one a
18     complaint.  But in between the first complaint
19     that I talked to him about where he told me he was
20     getting therapy and the second rumor, let's call  02:49:28
21     it, that something happened.
22          Q.    I think I'm confused, so let me try
23     again.
24          A.    Sure.
25          Q.    So you're aware of two instances in    02:49:39
```

```
                                          Page 174
 1                      Owens
 2     which Mr. Levine's name has been brought up in
 3     connection an incident involving Elizabeth
 4     Germino; correct?
 5          A.    Correct.                      02:49:48
 6          Q.    When was the first chronologically to
 7     happen?
 8          A.    I'm going to say it was two years ago,
 9     something like that.
10          Q.    Okay.  And tell me, who did you learn   02:49:56
11     about it?
12          A.    From Tanya Simon.
13          Q.    And what did Ms. Simon tell you about
14     it?
15          A.    That David had apparently lost his      02:50:04
16     temper and raised his voice with Elizabeth.
17          Q.    Okay.  And after learning about this
18     incident, what did you do?
19          A.    I went to Jon Wertheim to ask him if he
20     knew about it.  He knew something about it.  I     02:50:21
21     went to Elizabeth and asked her about it.  She
22     acknowledged that it had happened but that she was
23     fine, that she recognized that he is a kind of
24     anxious person.  And then I went to him, at which
25     time he told me that it had happened, that he had  02:50:42
```

```
                                           Page 175

1                          Owens

2    sought counseling, therapy, for this shortcoming.

3         Q.    Other than what you've testified to

4    about this first incident, did you learn any other

5    details about what happened?                  02:50:59

6         A.    No.

7         Q.    Did you talk to HR about this incident?

8         A.    I didn't, but I don't know if Tanya

9    did.

10        Q.    How come you didn't talk to HR about   02:51:09

11   it?

12        A.    Because -- I don't know, Tanya may

13   have.

14        Q.    You don't know, as you sit here today,

15   thought, if Tanya did; correct?                 02:51:26

16        A.    I don't know if she did or I did.

17        Q.    And outside of the conversation you had

18   with Mr. Levine, was there any other action that

19   you're aware of taken in connection with this

20   incident?                                        02:51:40

21        A.    Not that I'm aware of.

22        Q.    And then you said that you became aware

23   of another issue with Mr. Levine; correct?

24        A.    There was -- Tanya said something may

25   have happened between Elizabeth and David.  We    02:51:57
```

Page 176

1                         Owens

2     looked into it.  Elizabeth said there hadn't been

3     anything.

4          Q.    Who's the "we looked into it"?

5          A.    Tanya and myself.                      02:52:12

6          Q.    And when did this take place?

7          A.    Maybe the summer, this past summer.

8          Q.    Summer of 2024?

9          A.    Yeah.

10         Q.    What did you do to look into it?       02:52:34

11         A.    Went to Elizabeth and asked her if

12    there was anything to it, and she said there

13    wasn't and in fact said things were going well.

14         Q.    Did you do anything else to look into

15    it?                                               02:52:51

16         A.    I asked Jon Wertheim.  He didn't know

17    of anything.

18         Q.    Did you do anything else to look into

19    it?

20         A.    I asked David, and he assured me that  02:53:02

21    there hadn't been anything.

22         Q.    Anything else?

23         A.    No.

24         Q.    What steps, if you know, did Ms. Simon

25    take to look into this?                           02:53:13

```
                                              Page 177
 1                        Owens
 2        A.    I don't know.
 3        Q.    Did she tell you any steps she took?
 4        A.    I don't recall.
 5        Q.    And did you discuss the event in the    02:53:20
 6    summer of 2024 with HR?
 7        A.    No.
 8        Q.    Why not?
 9        A.    Because there was -- there wasn't
10    anything for me to tell them.                     02:53:35
11        Q.    Did you ever ask others at 60 Minutes,
12    besides the group that you've just described,
13    whether they had had concerns or problems with
14    Mr. Levine's temper?
15        A.    Yes.                                     02:53:51
16        Q.    Who did you talk to?
17        A.    Michael Gavshon, who had been his
18    producer.
19        Q.    When did you speak to Mr. Gavshon about
20    Mr. Levine's temper?                              02:53:59
21        A.    Around the first event.
22        Q.    What did Mr. Gavshon say?
23        A.    That he had never seen David lose his
24    temper but that David was an anxious soul.
25        Q.    Have you spoken to anyone else, other   02:54:17
```

Page 178

```
 1                    Owens
 2    than the folks you've mentioned, about
 3    Mr. Levine's temper?
 4        A.    No.  And I have never seen him lose his
 5    temper.                                    02:54:29
 6        Q.    Are you aware of concerns brought up
 7    about Mr. Levine for his conduct during a shoot in
 8    Mississippi?
 9        A.    No.
10        Q.    Are you aware of Mr. Levine working on   02:54:51
11    a shoot in Mississippi within the last couple of
12    years?
13        A.    Yes.
14        Q.    And when did that happen,
15    approximately?                             02:54:59
16        A.    I don't know.  You said the last couple
17    of years.  It was probably two years ago.
18        Q.    And are you aware of any concerns
19    related to Mr. Levine losing his temper on a crew
20    member during that shoot?                  02:55:12
21        A.    No.
22        Q.    Are you aware of Mr. Levine damaging a
23    police vehicle around the time of that shoot?
24        A.    No.  I think that would be something
25    I'd hear about.                            02:55:27
```

Page 179

1                              Owens

2         Q.    You mentioned I believe Sharyn Alfonsi

3    at some point today.  She's a correspondent at 60

4    Minutes?

5         A.    Correct.                        02:55:37

6         Q.    And she reports to you -- right? -- in

7    that capacity?

8         A.    She does.

9         Q.    Has Ms. Alfonsi ever given you

10   feedback, raised a concern, or made a complaint    02:55:45

11   about Mr. Levine?

12        A.    No.

13        Q.    Have you ever had a discussion with

14   Ms. Alfonsi about Mr. Levine?

15        A.    I have not.                       02:55:54

16        Q.    Has Ms. Simon ever told you that

17   Ms. Alfonsi had a concern, a complaint, or

18   provided some feedback about Mr. Levine?

19        A.    I vaguely remember something, and the

20   nexus for that would have been Sharyn and Jon      02:56:12

21   Wertheim shared Elizabeth Germino as a broadcast

22   associate.  So I vaguely remember Sharyn saying

23   something -- or Tanya telling me that Sharyn said

24   something about David to her.  I don't remember

25   what that was.                               02:56:34

Page 180

1                              Owens

2       Q.    That Sharyn -- Ms. Alfonsi had said

3    something to Ms. Simon about Mr. Levine?

4       A.    Yeah.

5       Q.    And approximately how long did that      02:56:47

6    happen?

7       A.    I don't know.  I don't -- I just -- I

8    vaguely remember something about Sharyn talking to

9    Tanya.

10      Q.    Do you have any memory at all about the  02:56:58

11   issue, even if you don't remember the specifics?

12      A.    I'm sorry, I don't.  My only guess is

13   that it was probably around the first time that

14   the David/Elizabeth issue came about.

15      Q.    When you say "the first time," you're    02:57:15

16   talking about the incident you referred to that

17   took place about two years ago?

18      A.    Yes.

19      Q.    Did you do any inquiry to figure out

20   what Ms. Alfonsi had said to Ms. Simon about       02:57:27

21   Mr. Levine?

22      A.    No.

23      Q.    Has anyone ever told you that

24   Mr. Levine has made another 60 Minutes employee

25   cry?                                               02:57:48

```
                                          Page 181
 1                        Owens
 2          A.    No.
 3          Q.    Did you get any feedback, concerns, or
 4     complaints about Mr. Levine's work on a story
 5     about Anne Frank?                          02:58:07
 6          A.    No.
 7          Q.    Does someone named Nicole Marks work
 8     for 60 Minutes?
 9          A.    She does.
10          Q.    What's her job?                 02:58:21
11          A.    A producer.
12          Q.    Does he work on a team?
13          A.    She does, Anderson Cooper.
14          Q.    Approximately how long has Ms. Marks
15     worked for 60 Minutes?                     02:58:30
16          A.    Six years.
17          Q.    Has Ms. Marks ever spoken to you about
18     Mr. Levine?
19          A.    Yes.
20          Q.    What has she said about Mr. Levine?  02:58:39
21          A.    Nothing about his temper.
22          Q.    Has she ever made a complaint or raised
23     a concern or given you feedback about him?
24          A.    Yeah.  And the feedback was that he
25     was -- the only feedback was that he was beginning  02:58:56
```

```
                                              Page 182
 1                        Owens
 2     to -- and I think that this is something that Alex
 3     and other APs can relate to -- they were tired of
 4     being an associate producer, so that he wanted to
 5     be a producer and maybe wasn't working as          02:59:12
 6     diligently at being an associate producer as
 7     Nicole would have hoped.
 8          Q.    Would you consider what Ms. Marks
 9     raised to you to be a complaint about Mr. Levine?
10          A.    No.                                      02:59:26
11          Q.    And what did you do in response to
12     Ms. Marks' feedback?
13          A.    Eventually -- not eventually but over
14     some period of time David was allowed to produce a
15     story on his own, and then Nicole hired another    02:59:42
16     associate producer.  So, yeah, David is -- he's
17     attached to Jon Wertheim, still an associate
18     producer, kind of in -- he's neither an AP nor a
19     producer right now.
20          Q.    Was Mr. Levine previously an AP for      03:00:09
21     Nicole Marks?
22          A.    Yes.
23          Q.    And why did he get moved to Jon -- and
24     Ms. Marks works on the team with Anderson Cooper;
25     correct?                                            03:00:27
```

```
                                              Page 183
 1                         Owens
 2        A.    Correct.
 3        Q.    So why did Mr. Levine get moved to
 4    Mr. Wertheim's team?
 5        A.    Like I said, it's not dissimilar to      03:00:32
 6    what happened in Ms. Poolos's case, that he
 7    started doing coproducing and then he produced a
 8    couple of his own stories.  And Jon Wertheim was
 9    happy to give him an opportunity to continue to
10    try to do that.                                    03:00:52
11        Q.    Did Ms. Marks ever say to you that she
12    overheard Mr. Levine yelling on the phone?
13        A.    No.
14        Q.    Does Mr. Levine in your view have a
15    reputation for losing his temper?                  03:01:19
16        A.    No.
17        Q.    Did Ms. Alfonsi ever communicate to you
18    that she did not want to work with Mr. Levine?
19        A.    No.
20        Q.    Did any producer ever say that to you?   03:01:30
21        A.    No.
22        Q.    Were you concerned when Ms. Marks came
23    to you and said Mr. Levine as an AP is not working
24    hard on my stuff?
25        A.    That happens quite often.                03:01:49
```

Page 184

1                           Owens

2          Q.    But were you concerned when Ms. Marks

3     brought it to you?

4          A.    Well, "concerned" is a wrong word, but

5     I realized we were -- we were going to have an      03:01:58

6     issue.  Exactly the same thing happened with

7     Shachar and Alex.

8          Q.    And your solution for that situation

9     with Ms. Marks and Mr. Levine was to move

10    Mr. Levine to a different team?                      03:02:16

11         A.    Well, he had a story idea that Jon

12    Wertheim was interested in, and so they began to

13    work.  Jon also needed producing help.  And Nicole

14    was happy to get a new associate producer.

15         Q.    Is there someone who works for 60        03:02:38

16    Minutes named Will Croxton?

17         A.    Yes.

18         Q.    And he works there currently?

19         A.    He does.

20         Q.    And what's his job?                       03:02:45

21         A.    He's a producer/editor on the digital

22    team, although these days he does more producing

23    than editing.

24         Q.    And approximately how long has he

25    worked at 60 Minutes?                                03:03:01

```
                                          Page 185
 1                      Owens
 2        A.    Eight years.
 3        Q.    And the move to do less editing and
 4   more producing, is that a promotion or something
 5   else?                                     03:03:18
 6        A.    No, something else.
 7        Q.    What would you say it is?
 8        A.    Lateral.
 9        Q.    And who does he report to?
10        A.    Matt Polevoy.                  03:03:28
11        Q.    And does Mr. Croxton exclusively do
12   work for 60 Minutes or does he do work for other
13   shows?
14        A.    60 Minutes.
15        Q.    Are you aware of any complaints or    03:03:40
16   concerns about Mr. Croxton?
17              ATTORNEY ZUCKERMAN:  Objection.
18        A.    No.
19        Q.    Have you --
20        A.    Actually, no, hold on.  Alex complained  03:03:48
21   about him.
22        Q.    What did Ms. Poolos say about him?
23        A.    That he was -- I think -- I think her
24   biggest complaint was that he wasn't well prepared
25   and wasn't working hard enough.            03:04:08
```

```
                                              Page 186
1                            Owens
2          Q.    Was Ms. Poolos working directly with
3     him at the time she conveyed these concerns?
4          A.    She was, yes.
5          Q.    What were they working on?          03:04:24
6          A.    I think Navalny.
7          Q.    That was a story that ultimately aired
8     on 60 Minutes?
9          A.    Yes.
10         Q.    And that's one that you said that      03:04:30
11    Ms. Poolos had done a good job on?
12         A.    Yes.
13         Q.    Did Ms. Poolos express concerns to you
14    that Mr. Croxton had a temper?
15         A.    No.                                   03:04:43
16         Q.    Did she express any concerns about
17    Mr. Croxton getting angry?
18         A.    No.
19         Q.    Did she express any concerns about
20    Mr. Croxton following instructions?            03:04:53
21         A.    Perhaps.
22         Q.    Outside of what you testified to, did
23    Ms. Poolos say anything else about working with
24    Mr. Croxton?
25         A.    I also seem to remember that she      03:05:09
```

```
                                          Page 187
 1                      Owens
 2    thought that he thought the story should go more
 3    one way and she thought it should go the other
 4    way.  He was working in support of her.  So that
 5    was bothersome to her, I think.            03:05:20
 6        Q.    Other than Ms. Poolos, did you --
 7    strike that.
 8            Is there anything else you recall
 9    discussing with Ms. Poolos about Mr. Croxton?
10        A.    No.                              03:05:34
11        Q.    Other than Ms. Poolos, did you receive
12    any feedback -- have you received any feedback,
13    concerns, or complaints about Mr. Croxton?
14        A.    No.
15        Q.    Have you ever received any -- have you  03:05:46
16    been engaged -- have you been in any discussions
17    about Mr. Croxton's temper?
18        A.    No.
19        Q.    About Mr. Croxton getting angry?
20        A.    No.                              03:05:56
21        Q.    About Mr. Croxton not following
22    instructions?
23        A.    No.
24        Q.    About Mr. Croxton being insubordinate?
25        A.    No.                              03:06:03
```

```
                                                  Page 188
 1                      Owens
 2        Q.    About Mr. Croxton bullying others?
 3        A.    No.
 4        Q.    Have you been involved in discussions
 5   that Mr. Croxton was challenging to manage?      03:06:10
 6        A.    No.
 7        Q.    Did Ms. Simon ever tell you that
 8   Mr. Croxton was -- that she had received feedback
 9   that Mr. Croxton was challenging to manage?
10        A.    Have not.                             03:06:26
11        Q.    Did Ms. Simon ever provide feedback to
12   you that she had heard Mr. Croxton had a bad
13   temper?
14        A.    No.
15        Q.    That Mr. Croxton would get angry?     03:06:35
16        A.    No.
17        Q.    That Mr. Croxton was insubordinate?
18        A.    No.
19        Q.    Did you ever discuss any concerns or
20   complaints about Mr. Croxton with Matt Polevoy?  03:06:46
21        A.    No, in fact the opposite.  Matt Polevoy
22   would give me feedback on his employees, Will
23   being one of them, or direct reports, and that
24   Will was very collaborative.
25        Q.    Going back to discussion or discussions 03:07:04
```

```
                                         Page 189
 1                      Owens
 2   you had with Ms. Poolos about Mr. Croxton, did you
 3   ever tell Ms. Poolos that Mr. Croxton was a
 4   complainer?
 5        A.    Not that I can recall.          03:07:18
 6        Q.    Did you tell Ms. Poolos that she did a
 7   nice job of managing or handling Mr. Croxton?
 8        A.    Perhaps.
 9        Q.    Is there somebody at 60 Minutes named
10   Nathalie Sommer?                          03:07:32
11        A.    Yes.
12        Q.    What is her job?
13        A.    She's a producer.
14        Q.    How long has she been there?
15        A.    Ten -- well, she was an associate     03:07:38
16   producer.  She probably had been a producer for 8
17   but an associate producer and involved with the
18   broadcast for 25 years.
19        Q.    And whose team is she on?
20        A.    Jon Wertheim.                   03:07:51
21        Q.    And she reports to you; correct?
22        A.    She does.
23        Q.    Did Ms. Sommer ever speak to you
24   directly about Mr. Croxton?
25        A.    No.                            03:08:03
```

Page 190

1                          Owens

2          Q.    Has she ever raised any concerns or

3     complaints about him?

4          A.    No.

5          Q.    And has anyone ever told you that        03:08:07

6     Ms. Sommer had concerns or complaints about

7     Mr. Croxton?

8          A.    No.

9          Q.    Have you ever heard of Mr. Croxton

10    slamming a door in somebody's face?            03:08:19

11         A.    No.

12         Q.    Has anyone raised a concern or made a

13    complaint about Mr. Croxton along those lines?

14         A.    Not to me.

15         Q.    Has Ms. Alfonsi ever raised concerns to  03:08:33

16    you or complained to you about Mr. Croxton?

17         A.    No.

18         Q.    And has Ms. Marks ever done so?

19         A.    No.

20               Can I add that people complain to me     03:08:45

21    about the smallest things all the time, and this

22    is the first I'm hearing about any of these

23    questions around Will Croxton.

24               ATTORNEY IADEVAIA:  Why don't we take a

25         break now.  We've been going about a while.    03:09:07

```
                                            Page 191

 1                      Owens

 2           ATTORNEY ZUCKERMAN:  Absolutely.

 3           THE VIDEOGRAPHER:  The time is 3:10

 4      p.m., and this marks the end of media unit

 5      number 2.                                    03:09:14

 6           (Recess taken from 3:10 to 3:31.)

 7           THE VIDEOGRAPHER:  The time is 3:31

 8      p.m., and this begins media unit number 3.

 9      Q.    Mr. Owens, at some point you became

10   aware that Ms. Richards had made a complaint about  03:30:19

11   Ms. Poolos; correct?

12      A.    Correct.

13      Q.    When is the first time you learned

14   about Ms. Richards complaining about Ms. Poolos?

15      A.    From Tanya Simon.                       03:30:31

16      Q.    Do you know approximately when that

17   was?

18      A.    December of -- I guess that was 2021.

19      Q.    Do you recall was it the beginning of

20   the month?  middle of the month?  end of the       03:30:42

21   month?

22      A.    Middle.

23      Q.    Do you recall the date?

24      A.    Either the 15th or the 17th, I think,

25   maybe the 17th?                                   03:30:57
```

```
                                            Page 192
 1                        Owens
 2        Q.    And what did Ms. Simon say to you?
 3        A.    That Colette was extremely upset.  It
 4   was the first that she had heard -- it was the
 5   first Tanya had heard of any of this, and that    03:31:13
 6   Alex was bullying her, making unreasonable demands
 7   around her time, setting unreasonable expectations
 8   in nearly every part of her associate producer
 9   responsibilities, and that it had crossed a line
10   and Colette couldn't deal with it anymore.        03:31:36
11        Q.    And this is what Ms. Simon told you
12   around December 17th, 2021?
13        A.    Yes, sir.
14        Q.    Did Ms. Simon tell you anything else
15   during the initial conversation you had about     03:31:47
16   Ms. Richards' complaint?
17        A.    No, other than I think we talked about
18   it needing to be -- we needed to check in with HR
19   about it and then likely find out how to approach
20   Alex about the charges.                           03:32:08
21        Q.    Do you recall having that discussion
22   with Ms. Simon at that time?
23        A.    I don't.  I'm imagining we had that
24   conversation.  That would be normal.
25        Q.    When you say "normal," how many times   03:32:30
```

```
                                           Page 193
 1                          Owens
 2     had you, in your capacity as executive producer,
 3     gone to or asked Tanya to go to HR based on a
 4     concern or complaint that an employee had made?
 5          A.    That was likely -- well, besides Tanya   03:32:55
 6     being somewhat involved in the Gavshon/███████
 7     thing, I believe this was the first time.  And
 8     because of the language that Colette was using, it
 9     seemed serious.
10          Q.    Did you reach out to Ms. Poolos in       03:33:27
11     mid-December to let her know that this complaint
12     had been made?
13          A.    I'm not sure if I did or HR did.  I
14     don't remember.  I know that Alex was made aware
15     of it in December.  I don't know when.             03:33:41
16          Q.    What's your basis for saying that?
17          A.    Because I remember it being around the
18     holidays and thinking this is unfortunate timing
19     for everybody, but it wasn't something that was
20     going to be able to wait.                          03:34:01
21          Q.    Meaning it couldn't wait until after
22     the holidays to deal with it?
23          A.    Correct, it wasn't going to -- yes,
24     correct.
25          Q.    Did you talk to Ms. Poolos at any point  03:34:17
```

```
                                        Page 194
 1                      Owens
 2    in December of 2021 about Ms. Richards' complaint?
 3         A.    I believe I did, maybe at the end of
 4    the month.
 5         Q.    Was anyone else present?           03:34:31
 6         A.    Not that I remember.
 7         Q.    How did you communicate with
 8    Ms. Poolos?
 9         A.    I think listening to her side of the
10    story.  And by this time I believe HR was    03:34:46
11    involved.  So I don't know if HR was -- talked to
12    Alex before I did.  I can't recall that.
13         Q.    Do you think it would be appropriate to
14    notify Ms. Poolos as soon as possible that a
15    complaint had been made against her?          03:35:09
16              ATTORNEY ZUCKERMAN:   Objection.
17         A.    Yeah, I mean, there are -- there are
18    some standards of rules that HR has I'm sure we
19    followed.
20         Q.    And what are those rules as they relate 03:35:23
21    to notifying the person who's been complained
22    about?
23         A.    Off the top of my head, I don't know.
24         Q.    And in December do you know if Tanya
25    Simon spoke to Ms. Poolos about Ms. Richards'    03:35:43
```

Page 195

1                         Owens

2     complaint?

3          A.    I don't recall, but I would imagine

4     that happened.

5          Q.    Why would you imagine that happened?    03:35:55

6          A.    Because I can't imagine more time

7     elapsing.

8          Q.    Why would you say that?

9          A.    Because of the serious nature of the

10    complaint.                                         03:36:10

11         Q.    Do you know whether HR spoke to

12    Ms. Poolos about Ms. Richards' complaint in

13    December of 2021?

14         A.    I believe so.

15         Q.    And what's the basis for that belief?   03:36:26

16         A.    Just my recollection.

17         Q.    What do you recollect about it?

18         A.    That I think that may have happened at

19    the very end of the month.

20         Q.    The month of December?                  03:36:40

21         A.    Yes.

22         Q.    What is your understanding of what HR

23    discussed with Ms. Poolos?

24         A.    I mean, I think it was to get Alex's

25    side of the story.                                 03:36:53

Page 196

1                          Owens

2         Q.    When you spoke to Alex -- Ms. Poolos --

3    when you spoke to her, what did Ms. Poolos say

4    about her side of the story?

5         A.    That things that she asked of Colette    03:37:13

6    weren't happening at the speed and rate of how she

7    would like them to get done, that Colette was a

8    millennial.  She -- she -- she disagreed entirely

9    with any bullying or being aggressive towards

10   Colette.                                            03:37:59

11        Q.    Anything else you recall Ms. Poolos

12   saying when she discussed her side of the story?

13        A.    I remember Alex allowing for the fact

14   that some of these projects that they worked on

15   were around significant events in Colette's        03:38:26

16   life -- I believe preparation for her wedding,

17   maybe a bridal shower; I'm pretty sure it was a

18   bridal shower -- that Alex was asking Colette to

19   be working through.

20        Q.    So your testimony is that when you       03:38:54

21   spoke to Ms. Poolos she acknowledged that she was

22   asking Ms. Richards to work through major life

23   events for Ms. Richards?

24        A.    I believe so.

25        Q.    And is it your understanding that        03:39:06

```
                                           Page 197
 1                         Owens
 2    Ms. Richards had raised a concern that she was
 3    being asked to work through these major life
 4    events?
 5         A.    At this point I don't think that I knew  03:39:18
 6    that.
 7         Q.    In December of 2021, did you speak
 8    directly to Ms. Richards about her concerns
 9    related to Ms. Poolos?
10         A.    I don't believe so.                      03:39:32
11         Q.    When you learned about Ms. Richards'
12    concerns, did you personally do any investigation
13    into them?
14         A.    No.
15         Q.    And I believe you testified earlier      03:39:53
16    that in preparing for today's deposition you
17    looked at Ms. Richards' written complaint related
18    to Ms. Poolos; correct?
19         A.    Yes.
20         Q.    Do you know when Ms. Richards submitted  03:40:03
21    the written complaint?
22         A.    I do not.
23         Q.    Do you know if it was in December of
24    2021?
25         A.    I do not.  But the first time I saw      03:40:13
```

Page 198

1                          Owens

2      that was Monday.

3           Q.    You didn't read it in 2021 or 2022?

4           A.    I did not, no.

5           Q.    How come?                          03:40:21

6                 ATTORNEY ZUCKERMAN:  Objection.

7           A.    I don't think it was provided to me.

8           Q.    Did you think it was important to

9      understand the nature of Ms. Richards' complaints

10     against Ms. Poolos in 2021 or 2022?          03:40:35

11          A.    Yes.

12          Q.    And do you think that Ms. Richards'

13     complaint would have explained the basis of

14     Ms. Richards' concerns?

15                ATTORNEY ZUCKERMAN:  Objection.    03:40:47

16          A.    I think that the HR person involved was

17     telling me what was in the complaint.

18          Q.    Did you ever ask if there was a written

19     complaint?  Did you ever ask HR?

20          A.    I didn't.                          03:40:59

21          Q.    Did you ask Tanya, Ms. Simon, if there

22     was a written complaint?

23          A.    I didn't.

24          Q.    How come?

25          A.    I don't know if this would have been --  03:41:05

```
                                            Page 199
 1                        Owens
 2    I also didn't ask if there was a written complaint
 3    in the ███████ █████████ Michael Gavshon thing.
 4    This was the first time I had been involved in
 5    something like this.                    03:41:23
 6        Q.    I think you testified that you were not
 7    aware of Ms. Richards making complaints about
 8    Ms. Poolos before mid-December 2021; is that
 9    correct?
10        A.    Yes.                          03:41:41
11        Q.    And had Ms. Simon ever told you about
12    concerns that Ms. Richards had made or raised
13    about Ms. Poolos before that time?
14        A.    I don't believe so.
15        Q.    Had you received complaints about   03:41:53
16    Ms. Poolos before December 17th, 2021?
17        A.    Again, complaint, official complaint,
18    or people complaining about something, an
19    interaction or something?
20        Q.    Let's start with what you're describing  03:42:07
21    as an official complaint.
22        A.    No.
23        Q.    Okay.  What concerns had you received
24    about Ms. Poolos before December 17th, 2021?
25        A.    Well, her producer, Shachar, thought   03:42:18
```

```
                                          Page 200
 1                        Owens
 2    that she was not as engaged as she had been prior
 3    because she was interested in becoming a producer.
 4    And I think along the lines of David Levine I had
 5    heard that there had been -- that Alex and others   03:42:37
 6    on the floor had moments of high emotion.
 7        Q.    The concerns you heard or feedback you
 8    heard from Shachar, that was before Ms. Poolos had
 9    been promoted to producer; correct?
10        A.    Yes.                                       03:43:05
11        Q.    Producing on her own; correct?
12        A.    Correct.
13        Q.    The issues that you said you think you
14    heard about Ms. Poolos and others having moments
15    on the floor, who are you talking about?  Who are   03:43:17
16    the others?
17        A.    Well, I think -- I think Will Croxton
18    was one of them.  I think Jack Weingart was
19    another one.  But I didn't see them.  These were
20    reported secondhand to me.  And there might have    03:43:40
21    been an editor also, but I can't recall who.
22        Q.    And is your testimony that you were
23    aware even secondhand of these incidents at the
24    time that -- or by the time that you found out
25    about Ms. Richards' complaint?                       03:44:12
```

```
                                              Page 201
 1                        Owens
 2        A.    Yes.  And to be clear, I never saw Alex
 3    lose her temper.
 4        Q.    When you first spoke to Ms. Simon about
 5    Ms. Richards' complaint, did Ms. Simon say        03:44:37
 6    anything about Ms. Richards no longer working with
 7    Ms. Poolos?
 8        A.    I do believe that Colette was asking to
 9    no longer work with Ms. Poolos.
10        Q.    As of the time she made her complaint    03:44:54
11    in mid-December?
12        A.    That's right.
13        Q.    And what was your reaction to that, if
14    anything?
15        A.    Let's wait and find out what all the     03:45:03
16    facts are.
17        Q.    How come you didn't separate
18    Ms. Richards and Ms. Poolos upon getting
19    Ms. Richards' complaint?
20        A.    Well, the holidays were upon us, and I   03:45:16
21    don't think that there was anything for them to
22    really be doing in the short term.
23        Q.    Outside of your discussion or
24    discussions with Ms. Simon and it sounds like
25    eventually HR, did you discuss Ms. Richards'      03:45:33
```

```
                                              Page 202
 1                        Owens
 2    complaint with anyone else?
 3         A.    Eventually with Lesley Stahl.
 4         Q.    Anyone else?
 5         A.    Not that I can recall.          03:45:52
 6         Q.    Did you ever discuss Ms. Richards'
 7    complaint with Neeraj?
 8         A.    No.
 9         Q.    So after you found out about the
10    complaint, what happened next in the sequence of   03:46:10
11    events as it relates to Ms. Richards' complaint
12    against Ms. Poolos?
13         A.    My recollection is that Renee Balducci
14    gathered facts, talked to both sides.  We came to
15    an agreement that Alex could be -- that we'd       03:46:40
16    probably have to separate them but we'd be able to
17    get through this.  I, Tanya, we, would help
18    counsel Alex around this.
19              And I wrote -- I believe I met with and
20    wrote to Alex about this, basically telling her    03:47:16
21    that, that this has been difficult, not great but
22    let's keep you and Colette separated, but we'll be
23    able to get through this, please don't reach out,
24    don't talk to her.  And Alex said, Great, I
25    understand, thank you.                             03:47:50
```

```
                                                Page 203

 1                         Owens

 2        Q.    And said that you had a conversation

 3   with her and you sent an email to her; is that

 4   right?

 5        A.    I believe that's right.  There was      03:47:57

 6   definitely an email, but I believe we also had a

 7   conversation in person.

 8        Q.    Do you recall when that conversation

 9   took place?

10        A.    January 5th.                            03:48:05

11        Q.    Okay.  When did you send the email?

12        A.    I would imagine it was the same day.

13        Q.    Okay.  What happened next?

14        A.    I think spoke to Renee.  Okay, great,

15   good.  And then my recollection is the next day I   03:48:27

16   got a call from Renee saying that Scott Bronstein,

17   who had been Colette's boss at CNN and who Alex

18   had talked to when she was hiring Colette to check

19   on her references, that Alex called him and

20   trashed Colette to him.                            03:49:01

21             And I said to Renee:  How do we know

22   this?  She said, Because he has notes.  He wrote

23   everything down.

24        Q.    Got it.

25             Then what happened?                      03:49:22
```

```
                                              Page 204
 1                       Owens
 2        A.    My recollection is I called Alex and
 3    asked her if that had happened, and she said no,
 4    that that didn't happen.
 5        Q.    What did you --                    03:49:33
 6        A.    I said, Did you call Scott Bronstein
 7    and trash Colette?  And she said, No, why would I
 8    do that?  I said, Alex, he's got notes.  And then
 9    she said, Well, I did call him, but I called him
10    to find out if there is anything more I could do  03:49:53
11    with Colette.  So she lied directly to me.
12        Q.    What part was the lie?
13        A.    Saying that she didn't call Scott
14    Bronstein in some kind of retaliatory manner,
15    trashing this woman who we just spent all this    03:50:11
16    time trying to figure out how to make this work.
17    I have never had anybody lie so directly to me at
18    work.
19        Q.    I just want to be clear so I understand
20    the concern about the lie.  Is your testimony that 03:50:25
21    Ms. Poolos lied that she even had a call with
22    Mr. Bronstein?
23        A.    Yes.
24        Q.    And is your testimony that she also
25    lied about the substance of the call?            03:50:40
```

```
                                                    Page 205
  1                          Owens
  2        A.    Yes.
  3        Q.    In terms of her purported lying about
  4   the substance of the call, what's your basis for
  5   saying that she did not accurately recount that    03:50:51
  6   conversation?
  7        A.    Well, I mean, she said she was calling
  8   to get advice about how to work with Colette
  9   better and if Colette had ever done this kind of
 10   thing with him.  And his account was that it was a 03:51:07
 11   full-on trashing of Colette based on things
 12   Collette had told us and HR, basically.
 13             So to me that smacks of retaliation.
 14        Q.    Okay.  I understand your saying there's
 15   retaliation, but I want to focus on the part where 03:51:33
 16   you say Ms. Poolos lied.  What's the basis for
 17   saying that the substance of what Ms. Poolos said
 18   the call -- let me strike that.
 19             What's the basis for saying that
 20   Ms. Poolos's version of the call was not accurate? 03:51:48
 21             ATTORNEY ZUCKERMAN:  Objection.
 22        A.    It was at complete odds with what Scott
 23   Bronstein had told Renee Balducci.
 24        Q.    Other than Mr. Bronstein having a
 25   different version of the call, was there any other 03:52:04
```

```
                                            Page 206
  1                      Owens
  2     basis to say -- or is there any other basis to say
  3     that Ms. Poolos's version of the call is
  4     inaccurate?
  5              ATTORNEY ZUCKERMAN:  Objection.      03:52:13
  6        A.   Well, starting the conversation telling
  7     me she didn't actually have a conversation with
  8     Scott Bronstein, starting with one very direct
  9     lie, misrepresentation.
 10        Q.   Anything else?                         03:52:34
 11        A.   No.
 12        Q.   Is it possible that Mr. Bronstein was
 13     not accurate in his description of the phone call?
 14              ATTORNEY ZUCKERMAN:  Objection.
 15        A.   I guess anything is possible, but      03:52:47
 16     what's his motivation?
 17        Q.   Did you inquire or explore what
 18     Mr. Bronstein's motivation might have been?
 19        A.   No, I did not.
 20        Q.   How come?                              03:53:01
 21        A.   Because it's not my place to launch an
 22     investigation.
 23        Q.   Alex at this point in time in late
 24     2021/early 2022, had worked at 60 Minutes for more
 25     than a decade; correct?                        03:53:19
```

```
                                          Page 207
1                        Owens
2          A.    Yeah.
3          Q.    And are you aware of any other
4    instances that predate this where Ms. Poolos had
5    lied?                                      03:53:29
6          A.    I am not.
7          Q.    And has anyone told you at any point
8    about any instances of Ms. Poolos lying separate
9    and apart from this Ms. Richards' complaints?
10         A.    No.                            03:53:44
11         Q.    Do you know Mr. Bronstein?
12         A.    Just by reputation.  He worked at 60
13   Minutes.
14         Q.    Did you overlap with him at 60 Minutes?
15         A.    We did not.                     03:54:01
16         Q.    What were the circumstances of
17   Mr. Bronstein's departure from 60 Minutes?
18         A.    I think he left for a bigger job at
19   CNN.
20         Q.    Was Mr. Bronstein fired from 60    03:54:09
21   Minutes?
22         A.    Not that I know of.
23         Q.    Do you think that would be relevant in
24   assessing his credibility in this matter?
25               ATTORNEY ZUCKERMAN:  Objection.  03:54:19
```

```
                                        Page 208
 1                      Owens
 2        A.    Perhaps.
 3        Q.    Did you make any efforts to figure out
 4   what the circumstances of Mr. Bronstein's
 5   departure was from 60 Minutes?              03:54:27
 6        A.    I did not.
 7        Q.    Have you ever spoken to Mr. Bronstein?
 8        A.    I think we talked after this all was
 9   settled.
10        Q.    Have you talked to him just the one     03:54:38
11   time or more than once?
12        A.    No, I think one time.
13        Q.    When did you talk to him, personally?
14        A.    I believe it was I believe after Alex
15   left us.                                            03:54:50
16        Q.    And was --
17        A.    Alex -- I'm sorry.
18        Q.    Go ahead.
19        A.    No, no.  Alex also told me that when we
20   were discussing on the 6th when I asked her about   03:54:59
21   this phone call, she also said to me -- I said,
22   Alex, it's Colette's boss, it's her ex-mentor,
23   it's the person that you called to check her out
24   originally before you hired her.  And Alex told
25   me:  Well, I'm friends with him too.  And that's    03:55:17
```

Page 209

```
 1                        Owens
 2    also not true.
 3         Q.    What's not true?
 4         A.    That they had a friendship.
 5         Q.    What's your basis for saying that?    03:55:28
 6         A.    Scott Bronstein said that they were not
 7    friends.  The first time he had ever talked to her
 8    was when she called to check on Colette to see if
 9    she was a viable AP candidate.
10         Q.    That's what Mr. Bronstein said to you?  03:55:41
11         A.    Yes.
12         Q.    That the first time they ever talked
13    was when she checked on Mr. Richards' -- called
14    him for a reference for Ms. Richards?
15         A.    I believe so.                          03:55:50
16         Q.    But you learned this information where
17    Scott Bronstein denied that Ms. Poolos and he were
18    friends after Ms. Poolos had been fired; correct?
19         A.    Yes, I believe so.
20         Q.    The conversation that you had with      03:56:07
21    Mr. Bronstein, was it by phone, in person, or some
22    other way?
23         A.    Phone.
24         Q.    And who else was on the call, if
25    anybody?                                           03:56:20
```

```
                                              Page 210
 1                       Owens
 2        A.    No one.
 3        Q.    Just the two of you?
 4        A.    Uh-huh.
 5        Q.    And was this call shortly after      03:56:23
 6   Ms. Poolos was fired or...
 7        A.    I think so.
 8        Q.    And who initiated that phone call?
 9        A.    I think he did.
10        Q.    Mr. Bronstein reached out to you?     03:56:37
11        A.    I believe so.
12        Q.    So please tell me everything about that
13   phone call that you recall.
14        A.    What I remember is basically that the
15   two of us saying that this whole thing was hard to  03:56:53
16   believe, it didn't make sense, there was no logic
17   around it, and why would Alex have acted that way.
18        Q.    What else do you recall?
19        A.    That's it.
20        Q.    Well, you I think testified before that  03:57:06
21   it came up that Mr. Bronstein denied that she and
22   he were friends.
23        A.    Yeah, that's true.
24        Q.    And also that your understanding was it
25   was the first time that Alex hadn't ever            03:57:18
```

```
                                              Page 211
 1                       Owens
 2    previously communicated with Mr. Bronstein until
 3    he checked -- until she checked Colette's
 4    references; correct?
 5              ATTORNEY ZUCKERMAN:  Objection.        03:57:32
 6         A.    I believe that to be true.
 7         Q.    Was that something that Mr. Bronstein
 8    had said to you?
 9         A.    I think it came up in that
10    conversation.                                   03:57:37
11         Q.    Is there anything else that came up in
12    that conversation?
13         A.    Not that I can recall that's relevant.
14         Q.    So you find out that Ms. Poolos had
15    spoken to Mr. Bronstein, I think you testified to, 03:57:59
16    and that was sometime in January; correct?
17         A.    Uh-huh.
18         Q.    Early January of 2022?
19         A.    Yep.
20         Q.    And you speak to Ms. Poolos.  And your  03:58:09
21    testimony is that Ms. Poolos initially lied that
22    she spoke to Mr. Bronstein and then lied about the
23    substance of the discussion; is that correct?
24         A.    Correct.
25         Q.    And the basis for that conclusion was   03:58:21
```

```
                                        Page 212
 1                       Owens
 2    that Mr. Bronstein had a different account of the
 3    events; correct?
 4              ATTORNEY ZUCKERMAN:  Objection.
 5        A.    And took contemporaneous notes.        03:58:35
 6        Q.    And how do you know that he took
 7    contemporaneous notes?
 8        A.    From Renee Balducci.
 9        Q.    Did you ever review the notes?
10        A.    She read parts of them back to me.     03:58:45
11        Q.    Ms. Balducci read them?
12        A.    Uh-huh.
13        Q.    Did you ever look at Mr. Bronstein's
14    notes?
15        A.    I did not.                             03:58:53
16        Q.    And did you ever ask Mr. Bronstein
17    before firing Ms. Poolos about how those notes got
18    created?
19        A.    No.
20        Q.    Okay.  What happened next in the       03:59:22
21    sequence of events?
22        A.     I think I told Alex I was going to need
23    to talk to HR.  I spoke to Renee.  I believe Alex
24    was put on paid leave while they concluded the
25    investigation.                                   03:59:57
```

```
                                              Page 213
 1                            Owens
 2        Q.    Who made the decision to put Ms. Poolos
 3   on a paid leave?
 4        A.    I did, at the recommendation of HR.
 5        Q.    Who in HR made that recommendation?    04:00:16
 6        A.    Renee Balducci, but I'm going to guess
 7   that she probably had to run that by her superior.
 8        Q.    Who was her superior at the time?
 9        A.    I'm going to tell you that was Cindy
10   Glasgow.                                          04:00:32
11        Q.    How was the recommendation presented to
12   you?
13        A.    We think that as we finished this
14   investigation the best thing to do was put Alex on
15   paid leave.                                       04:00:51
16        Q.    And did Ms. Balducci explain the reason
17   why she thought it was the best course of action?
18        A.    I think that she was trying to be
19   generous.
20        Q.    What do you mean?                       04:01:04
21        A.    That this was someone -- this was a 60
22   Minutes producer who had worked with us for a
23   number of years and that while we finish the
24   investigation they didn't have to but they would
25   continue paying her, after she had just lied to   04:01:21
```

```
                                                    Page 214

 1                         Owens

 2    her boss.

 3         Q.    And the lying is the conversation

 4    you've testified to a few minutes ago; correct?

 5         A.    Yes, sir, yes.                      04:01:39

 6         Q.    Where Ms. Poolos first denied speaking

 7    to Mr. Bronstein and then was not truthful about

 8    the substance of the conversation?

 9         A.    Yes.

10         Q.    How much time passed between when you   04:01:56

11    spoke to Ms. Poolos and she was placed on

12    administrative leave?

13         A.    I don't remember but I'll bet it was

14    that week, next day.

15         Q.    And at the point in time that         04:02:10

16    Ms. Poolos was placed on administrative leave,

17    was -- were you aware of Mr. Bronstein purportedly

18    taking contemporaneous notes of the conversation?

19         A.    Yes.

20         Q.    And how were you aware of that?       04:02:30

21         A.    From Ms. Balducci.

22         Q.    And you mentioned that you thought the

23    recommendation to place Ms. Poolos on paid leave

24    was generous; correct?

25              ATTORNEY ZUCKERMAN:  Objection.       04:02:51
```

```
                                              Page 215
 1                       Owens
 2        A.    Considerate.
 3        Q.    And at that point in time, had there
 4   been a determination -- when -- at the point in
 5   time when Ms. Poolos was placed on administrative   04:03:03
 6   leave, had there been a determination or a finding
 7   that Ms. Poolos had lied?
 8        A.    Well, a final determination?  Probably
 9   not.  But it sure seemed to me from the
10   information that Ms. Balducci shared that I had     04:03:26
11   been lied to.
12        Q.    And the information being that
13   Ms. Balducci --
14             ATTORNEY IADEVAIA:  Do you need
15        something?                                     04:03:35
16             ATTORNEY ZUCKERMAN:  We're just going
17        to try to make sure the outside --
18             ATTORNEY IADEVAIA:  Can we go off the
19        record a second?
20             THE VIDEOGRAPHER:  The time is 4:04       04:03:40
21        p.m., and we're off the record.
22             (Pause.)
23             THE VIDEOGRAPHER:  The time is 4:06
24        p.m., and we're back on the record.
25        Q.    Mr. Owens, did anyone ever share with    04:05:32
```

```
                                              Page 216
 1                       Owens
 2   you that Ms. Poolos had told HR that Mr. Bronstein
 3   had been fired by Mike Wallace?
 4        A.    No.
 5        Q.    Did anyone tell you that Ms. Poolos had  04:05:47
 6   shared that Mr. Bronstein had often complained
 7   about his time at 60 Minutes?
 8        A.    No.
 9        Q.    Did anyone ever tell you that
10   Ms. Poolos had reached out to Mr. Bronstein in    04:06:22
11   December of 2021 before she found out about
12   Ms. Richards' complaint?
13              ATTORNEY ZUCKERMAN:  Objection.
14        A.    Before?  No, I don't think so.
15        Q.    So going back to the sequence of       04:06:47
16   events, you said that HR recommended that
17   Ms. Poolos be placed on administrative leave
18   during the pendency of the investigation; correct?
19        A.    Correct.
20        Q.    And as your time as executive producer  04:07:05
21   of 60 Minutes, had that ever happened before?
22        A.    As executive producer, no.
23        Q.    Had that ever happened in your capacity
24   as executive editor of 60 Minutes?
25        A.    Yes.                                     04:07:18
```

```
                                                Page 217
 1                        Owens
 2        Q.    And how many times?
 3        A.    I believe once.
 4        Q.    And who was it?
 5        A.    Lara Logan and Max McClellan.        04:07:23
 6        Q.    And what were the circumstances of
 7   their -- you said they were both placed on
 8   administrative leave?
 9        A.    Paid administrative leave, like Alex,
10   for a report they did on Benghazi.  And there was  04:07:40
11   an investigation ensued.
12        Q.    What was the complaint -- or what was
13   the issue related to the report they did on
14   Benghazi?
15        A.    One of the characters had lied to them  04:08:01
16   who was in the broadcast.
17        Q.    And the story that aired on 60 Minutes
18   was based on what that character had said?
19        A.    He was one.  There were other
20   characters in the piece.  But his testimony, what  04:08:16
21   he told us, was wrong.  No, it was a lie.  They
22   lied to us.
23        Q.    Was Lara Logan fired following the
24   investigation?
25        A.    She was not immediately after the  04:08:32
```

```
                                        Page 218
 1                      Owens
 2    investigation, no.
 3         Q.    And was Mr. McClellan fired after the
 4    investigation?
 5         A.    Not immediately, no.  They both did      04:08:47
 6    lose their jobs later.
 7         Q.    What happened next after Ms. Poolos was
 8    placed on administrative leave?  Actually, before
 9    we get there, sorry, did you disagree with the
10    recommendation to place Ms. Poolos on             04:09:16
11    administrative leave?
12         A.    I did not.
13         Q.    And how come you did not?
14         A.    Because I thought she deserved to be
15    put on leave, and I thought that putting her on a  04:09:27
16    paid leave was, again, considerate.  I knew that
17    Alex was newly married, et cetera, et cetera.
18    Investigation was going to take some time.
19         Q.    Because at that point in time when
20    Ms. Poolos -- or when you got the recommendation   04:09:49
21    to place Ms. Poolos on leave, you believed that
22    Ms. Poolos had lied to you; correct?
23         A.    With the information that I had at that
24    moment, it appeared that Ms. Poolos had lied to
25    me.                                                04:10:08
```

```
                                            Page 219
 1                      Owens
 2      Q.    So what happened next in connection
 3   with Ms. Poolos's employment?
 4      A.    The investigation was concluded, and I
 5   made the determination to terminate Alex's      04:10:30
 6   employment based on, again, the fact -- not to
 7   sound like a broken record -- but nobody had ever
 8   lied to me in that manner in my time as executive
 9   producer.  If I cannot trust someone to tell me
10   the truth, how can I trust their reporting.      04:10:47
11      Q.    Who conducted the investigation?
12      A.    Renee Balducci.
13      Q.    Did you participate in the
14   investigation?
15              ATTORNEY ZUCKERMAN:  Objection.       04:11:02
16      A.    I'm sure I was asked questions, but I'm
17   not sure that there was a lot that I would have
18   known that was relevant to Alex's side or
19   Colette's side.
20      Q.    And were the results of the             04:11:20
21   investigation shared with you?
22      A.    Yes.
23      Q.    And who shared them with you?
24      A.    Renee.
25      Q.    Renee Balducci?                         04:11:29
```

```
                                          Page 220
 1                      Owens
 2        A.    Yes.
 3        Q.    And what were the results of the
 4    investigation?
 5        A.    That they believed that Alex had      04:11:35
 6    retaliated against Colette by reaching out to
 7    Scott Bronstein in the way she did, that Alex lied
 8    to me about calling Scott Bronstein and then
 9    talking about Ms. Richards in the manner that she
10    did.                                            04:12:03
11        Q.    Were there any other findings from the
12    investigation?
13        A.    There may have been, but those were --
14    those were the two that mattered most to me.
15        Q.    Was the findings put in writing?  Were 04:12:17
16    the findings put in writing?
17        A.    I don't recall.
18        Q.    How did you learn about the findings?
19    Did Ms. Balducci tell them to you?
20        A.    Yes.                                   04:12:31
21        Q.    And did she tell you over the phone?
22    in person?  Zoom?  some other way?
23        A.    It was likely Zoom.
24        Q.    Was anyone else part of that
25    discussion?                                      04:12:47
```

```
                                              Page 221
 1                          Owens
 2        A.    No.  Well, you know what, maybe Cindy
 3   Glasgow was on that call; maybe Tanya was on that
 4   call.
 5        Q.    Okay.  As part of human resources'      04:13:05
 6   investigation around conclusion of the
 7   investigation, did they make a recommendation?
 8        A.    They didn't make a recommendation.  It
 9   was kind of here are the findings, and I made the
10   decision to terminate Alex's contract.            04:13:20
11        Q.    Did Ms. Balducci say to you at any
12   point that she -- before Ms. Poolos was fired that
13   she believed Ms. Poolos should be fired?
14        A.    I don't think she said that, but I
15   think -- because, remember, we on January 5th      04:13:40
16   thought that we had come up with a way for Alex to
17   stay employed.  Everybody worked very hard to that
18   end.  So I think we were all still a bit
19   surprised.
20        Q.    Surprised by what?                      04:13:59
21        A.    By what had transpired after -- from
22   January 5th where we thought we had come up with a
23   way for Alex to remain at 60 Minutes and she
24   agreed to January 6th where she had reached out to
25   Scott Bronstein, retaliated against Colette, and   04:14:17
```

                                          Page 222

 1                          Owens

 2    lied to me.

 3               So I don't think that Renee made a

 4    recommendation per se, but I think that the facts

 5    were -- seemed very clear to everybody.          04:14:30

 6         Q.    Was there anything that was revealed in

 7    the investigation shared with you that was new or

 8    different than what you had understood by the time

 9    that Ms. Poolos was placed on administrative

10    leave?                                            04:14:48

11         A.    Not that I recall.

12         Q.    And is your testimony that the

13    conversation you had with Ms. Poolos and the email

14    that you sent, that that had happened on January

15    5th?                                              04:15:17

16         A.    Yeah, I believe so, yes.

17         Q.    And that it was only after that you

18    sent that email that Ms. Poolos then spoke to

19    Mr. Bronstein, had the call that led to her being

20    suspended?                                        04:15:35

21         A.    That's right.  And Alex -- Ms. Poolos

22    responded to the email in the affirmative:  I

23    understand.  Thank you.

24         Q.    And in making decision to fire

25    Ms. Poolos, is it significant to you that         04:15:55

```
                                              Page 223
 1                         Owens
 2     Ms. Poolos reached out to Mr. Bronstein after you
 3     had sent that email and she had confirmed she
 4     received it?
 5               ATTORNEY ZUCKERMAN:  Objection.       04:16:07
 6          A.    Is it significant to me -- pardon me
 7     to -- is it significant to me that she reached out
 8     to Mr. Bronstein after she had received the -- our
 9     conversation and an email and she acknowledged it?
10     Yes.                                            04:16:25
11          Q.    And why?
12          A.    Because for all intents and purposes
13     the matter was settled and why would she reach out
14     to him, speaking to him in that manner, about the
15     woman who brought charges against her for          04:16:43
16     bullying.  It shows a lack of judgment and -- a
17     complete lack of judgment.
18          Q.    And did you ever ask Ms. Poolos if she
19     had notes of her discussion with Mr. Bronstein?
20          A.    I didn't, but she was telling me her    04:17:14
21     version of what she said to Mr. Bronstein after
22     telling me she hadn't made the phone call.
23          Q.    And would it have mattered to you if
24     Ms. Poolos had taken contemporaneous notes of her
25     discussion with Mr. Bronstein?                    04:17:33
```

```
                                              Page 224
 1                        Owens
 2              ATTORNEY ZUCKERMAN:  Objection.
 3        A.    Maybe.
 4        Q.    Do you know if HR -- someone in HR,
 5   whether Ms. Balducci or anybody else, had asked    04:17:41
 6   Ms. Poolos if she had contemporaneous notes of her
 7   discussion with Mr. Bronstein?
 8        A.    I don't, but I also can't imagine Alex
 9   not volunteering that.
10        Q.    How many conversations did you have     04:17:55
11   with Ms. Poolos about her discussion with
12   Mr. Bronstein?
13        A.    I think just one.
14        Q.    And how many conversations did
15   Ms. Balducci have with Ms. Poolos about her        04:18:07
16   conversation with Mr. Bronstein, if you know?
17        A.    I don't know, but I think at least two.
18        Q.    And are you aware of text messages that
19   Ms. Poolos had with Mr. Bronstein about talking in
20   December of 2021?                                  04:19:05
21              ATTORNEY ZUCKERMAN:  Objection.
22        A.    I'm not.
23        Q.    Did you have any discussions with
24   Neeraj about Ms. Poolos?
25              ATTORNEY ZUCKERMAN:  Objection.         04:19:30
```

```
                                         Page 225

 1                    Owens

 2        A.    If I had any discussion, it would have

 3   been the week that she was probably put on leave,

 4   to tell him what had happened, but that would be

 5   the normal course of a conversation in a weekly      04:19:45

 6   conversation with the news division president,

 7   like what's gone on this week that matters.

 8        Q.    What did Neeraj say, if anything?

 9        A.    I don't think anything.  I don't -- he

10   didn't know Alex Poolos.  Probably asked me what     04:20:03

11   Lesley Stahl thought.

12        Q.    Did you talk to Neeraj about firing

13   Ms. Poolos?

14        A.    Not -- no, not then.  For sure not

15   then.  But the week that I terminated her, I would   04:20:28

16   have in that weekly meeting, if there had been a

17   weekly meeting.  There may have been; I'm not sure

18   if there was.  I would have told him of my

19   decision to terminate her and the why around it.

20        Q.    But you don't have a memory of whether    04:20:45

21   you did it or you didn't?

22        A.    I don't, but I'm sure that probably did

23   happen.

24        Q.    Did you take notes during those

25   meetings?                                            04:20:55
```

```
                                              Page 226
 1                      Owens
 2        A.    No.
 3        Q.    Did Neeraj take notes, to your
 4   knowledge?
 5        A.    Not to my knowledge.  My meetings with   04:21:00
 6   Neeraj were almost never in person, always over
 7   Zoom.
 8        Q.    Would you have told Neeraj before or
 9   after you notified Ms. Poolos of the decision to
10   fire her?                                            04:21:16
11             ATTORNEY ZUCKERMAN:  Objection.
12        A.    I don't know.  Probably -- I don't
13   know.
14             ATTORNEY ZUCKERMAN:  You're asking him
15        to speculate on top of speculation.            04:21:24
16             ATTORNEY IADEVAIA:  He said he's likely
17        to have had that conversation.
18             ATTORNEY ZUCKERMAN:  I just wanted to
19        explain my objection to you, counsel.  That's
20        all.                                            04:21:34
21             ATTORNEY IADEVAIA:  I get it.  I get
22        it.
23        Q.    At some point did you notify Ms. Poolos
24   that she was being fired?
25        A.    Yes.                                      04:21:44
```

```
                                          Page 227
 1                       Owens
 2        Q.    And who was part of that discussion?
 3        A.    Renee Balducci.
 4        Q.    Anyone else other than Ms. Balducci and
 5   Ms. Poolos and you?                          04:21:52
 6        A.    That's it.
 7        Q.    And how was that conversation
 8   conducted?
 9        A.    I'm afraid I can't remember if it was
10   in person; I hope it was, but I don't remember.  I  04:22:04
11   laid out the reasons why I was terminating
12   Ms. Poolos's contract.  And then it gets handed
13   over to HR to finish the conversation around
14   logistics and all of that.
15        Q.    What did you tell Ms. Poolos as the    04:22:31
16   reason that you were terminating her employment?
17        A.    I believe I told her it was as a result
18   of her retaliating against her associate producer
19   after her associate producer brought real and
20   significant concerns to us and that she lied to    04:22:48
21   me.
22        Q.    And during the discussion with
23   Ms. Poolos, did you explain to her your basis --
24   or did you explain to her or describe to her what
25   the lies were?                                 04:23:09
```

```
                                                    Page 228
 1                          Owens
 2          A.    I think I said directly that around the
 3     phone call with Scott that you said didn't happen.
 4          Q.    Anything else you said during this
 5     meeting beyond what you've just testified to?    04:23:20
 6          A.    Not that I recall.
 7          Q.    Did you take notes of that meeting with
 8     Ms. Poolos?
 9          A.    I did not.
10          Q.    Do you know if Ms. Balducci took notes?  04:23:30
11          A.    I do not know if she did.
12          Q.    Was Ms. Poolos offered the
13     opportunity -- was she offered severance?
14          A.    I don't know.  I do remember that we
15     offered her in a kind of face-saving gesture,    04:23:46
16     asked her if she would like to say she was
17     resigning.  But it was clear that she wasn't going
18     to be staying with 60 Minutes.
19          Q.    And what did Ms. Poolos say?
20          A.    I don't think she answered.  She might  04:24:07
21     have said, Let me think about it.
22          Q.    Did you ever get a response to that
23     proposal?
24          A.    I don't recall.  HR may have.  Renee
25     may have.                                        04:24:21
```

```
                                                    Page 229
 1                        Owens
 2        Q.    Do you know what the response was?
 3        A.    I believe it was that she did not want
 4   to resign.
 5        Q.    I just want to be clear about this.      04:24:34
 6   Was Ms. Poolos offered severance?
 7        A.    I don't recall.
 8        Q.    Were you involved in any discussions
 9   about whether to offer Ms. Poolos severance?
10        A.    I don't recall.                          04:24:47
11        Q.    Whose decision was it whether to offer
12   severance or not?
13        A.     I think business affairs and human
14   resources would be my guess.
15        Q.    Are you aware of any other 60 Minutes    04:24:57
16   employees, during the time that you were executive
17   producer, who were let go for whatever reason
18   involuntarily who were not offered severance?
19        A.    No.  But I think that Alex was the only
20   one terminated with cause for this reason.  I       04:25:14
21   mean, I had to make budgetary decisions around
22   some of these people who were let go, production,
23   how much people were producing, in order to let
24   them go within their contracts.  But this was a
25   different circumstance.  But I do not know if she   04:25:37
```

```
                                            Page 230
 1                      Owens
 2    was offered severance or...
 3         Q.    And was she offered the opportunity to
 4    not come to work but be paid out on the remainder
 5    of her contract?                          04:25:54
 6         A.    I don't know if that would have been a
 7    further conversation around the idea of
 8    resignation.  I don't know.
 9         Q.    Do you know if she was offered that?
10         A.    I don't know.  What I do know is she   04:26:02
11    was offered the opportunity to "resign."
12         Q.    You mentioned that you had spoken to
13    Ms. Stahl about Ms. Richards' complaint.  Did you
14    have one or multiple discussions with Ms. Stahl
15    about Ms. Richards' complaint and Ms. Poolos's    04:26:21
16    employment?
17         A.    I think there were a couple.
18         Q.    Okay.  Tell me when was the first one.
19         A.    I don't know exactly, but it would have
20    been before -- certainly before -- before the     04:26:33
21    January 5th and 6th.  We would have let Lesley
22    know that this was going on.  I don't know, HR may
23    even have reached out to her to see if she knew
24    anything.
25              And I think at the beginning Lesley was  04:26:54
```

```
                                        Page 231
 1                        Owens
 2    inclined to be supportive of Alex if there was a
 3    way to manage this, which we thought we had done
 4    on January 5th.
 5        Q.    And what did Ms. Stahl say about      04:27:18
 6    supporting Ms. Poolos initially?
 7        A.    It was just let's find out what
 8    happened, let's -- we need to talk to Alex about
 9    how to -- how to manage Colette, we should talk to
10    Colette and find out more about this, et cetera,  04:27:36
11    et cetera.  Yes, Lesley, that's happening right
12    now.  That's what's going on.
13             But, again, I think Lesley was inclined
14    at the very, very beginning to try to figure out
15    how to work this out, again, which we thought we   04:27:53
16    had done by January 5th.  But then when Lesley
17    found out the entire story.  So let's just call
18    that what we all found out on January 6th.
19             I don't want to put words in Lesley
20    Stahl's mouth, but she was angry and appalled and  04:28:14
21    also couldn't believe the bad decision-making by
22    someone who was involved in being out in the wider
23    world looking for stories for her and her team.
24        Q.    And this second discussion, was it a
25    discussion between you and Ms. Stahl?             04:28:44
```

```
                                            Page 232

 1                        Owens

 2        A.    Yes.

 3        Q.    Was there anybody else who was part of

 4   it?

 5        A.    No.                             04:28:49

 6        Q.    And when did that discussion happen?

 7        A.    It would have been probably the next

 8   week after, so whatever that week would be, like

 9   January 12th or something like that.  I'm pretty

10   sure that I remember that happening in person in   04:29:05

11   Lesley's office.

12        Q.    And was the HR investigation complete

13   at the time that you had that discussion with

14   Ms. Stahl?

15        A.    I don't believe so.               04:29:18

16        Q.    The information being given to

17   Ms. Stahl about what had purportedly taken place,

18   was that coming from you?

19        A.    It was.

20        Q.    Outside of what you just testified to   04:29:40

21   over the last hour or so, whatever the time has

22   been, do you recall any other discussions that you

23   had after learning -- between the period when you

24   learned about Ms. Richards' complaint and the time

25   when you notified Ms. Poolos that her employment   04:29:55
```

```
                                                    Page 233
 1                      Owens
 2    was terminated?
 3         A.    Conversations about Ms. Poolos?
 4         Q.    About Ms. Poolos or Ms. Richards'
 5    complaint.                                04:30:05
 6         A.    I would have likely had a conversation
 7    with Colette around the time of Alex's
 8    termination.
 9         Q.    During this period between
10    mid-December -- strike that.               04:30:22
11              When was Ms. Poolos fired?
12         A.    February, I believe.
13         Q.    Was it February 3rd?  Does that sound
14    right?
15         A.    Yeah.                           04:30:33
16         Q.    Can we say early February?
17         A.    Sure.
18         Q.    So between December 17th, 2021, which
19    is I think the time you believe you learned about
20    Ms. Richards' -- or right around then --    04:30:42
21    complaint, and when Ms. Poolos was told she was
22    being fired, which was early February 2022, how
23    many conversations did you have with Ms. Richards
24    about this situation?
25         A.    One, probably, maybe two.        04:30:59
```

```
                                              Page 234

 1                      Owens

 2      Q.    And what were those conversations?

 3      A.    It was more about what she could be

 4   doing, what her next responsibility might be.

 5      Q.    What Ms. Richards could be doing or her   04:31:15

 6   next responsibility?

 7      A.    Well, yeah, because there was -- my

 8   recollection is there was a story that they --

 9   that Alex and Colette were working on when all of

10   this transpired that Lesley wanted to finish.  My   04:31:29

11   recollection is that Shari Finkelstein came in and

12   that Colette was going to help kind of download

13   Shari on the characters, the story, and help her

14   put it together.  So I had to explain that to

15   Colette.                                           04:31:50

16      Q.    Anything else you recall about

17   discussions with Ms. Richards during this time?

18      A.    No.

19      Q.    Did you notify Ms. Richards that

20   Ms. Poolos's employment had been terminated?       04:32:03

21      A.    I don't believe it was me, no.

22      Q.    Did someone at 60 Minutes tell

23   Ms. Richards?

24      A.    It may have been Renee Balducci first

25   with a follow-up by Tanya and then perhaps a       04:32:14
```

```
                                              Page 235
 1                          Owens
 2    follow-up by me.  I'm not certain.
 3         Q.    Do you recall what Ms. Richards'
 4    reaction was?
 5              ATTORNEY ZUCKERMAN:  Objection.      04:32:26
 6         Q.    Whether it was conveyed to you; and if
 7    it was conveyed to you, tell me, by somebody else.
 8         A.    Nobody was happy with anything that was
 9    happening.
10              ATTORNEY IADEVAIA:  I think we can take  04:32:47
11         another break, if that's okay with everybody.
12              ATTORNEY ZUCKERMAN:  Sure.  Okay with
13         me.
14              THE VIDEOGRAPHER:  The time is 4:33
15         p.m., and we're off the record.           04:32:53
16              (Recess taken from 4:33 to 5:06.)
17              THE VIDEOGRAPHER:  The time is 5:06
18         p.m., and we're back on the record.
19         Q.    Mr. Owens, we've talked a little bit
20    about a producer for 60 Minutes named Shachar    05:05:22
21    Bar-On; correct?
22         A.    Yes.
23         Q.    And he's currently working for 60
24    Minutes; correct?
25         A.    He is.                                05:05:29
```

```
                                              Page 236
 1                        Owens
 2        Q.    And he's a producer on Lesley Stahl's
 3   team; right?
 4        A.    That's correct.
 5        Q.    And how long has he been at 60 Minutes?  05:05:33
 6        A.    If I had to guess, at least 15 years.
 7        Q.    Are you aware of any complaints or
 8   concerns about Mr. Bar-On by others at 60 Minutes?
 9        A.    No.  I mean, I'm aware of Alex's
10   charges but no one else.                             05:05:58
11        Q.    And what concerns did Ms. Poolos raise
12   about Mr. Bar-On?
13        A.    Some of -- I was told some of it by my
14   lawyers the other day, but I'd be happy to --
15        Q.    I don't want you to disclose anything    05:06:21
16   that your lawyers told you.
17        A.    Okay.
18        Q.    But other than anything you learned
19   through counsel, what do you understand of
20   Ms. Poolos's concerns related to Mr. Bar-On?         05:06:29
21        A.    I think it would probably be better if
22   you asked me point by point.
23        Q.    As we talked about before, Ms. Poolos
24   had been an AP for Mr. Bar-On; correct?
25        A.    Correct.                                  05:06:43
```

```
                                            Page 237
 1                        Owens
 2        Q.    From about 2011 to 2017, so six years,
 3   give or take?
 4        A.    Yes.
 5        Q.    Did Ms. Poolos ever raise concerns to    05:06:51
 6   you about Mr. Bar-On?
 7        A.    Never.
 8        Q.    Never.  Okay.
 9              Did Alison -- strike that.
10              Is there someone who used to work at 60  05:07:07
11   Minutes named Alison Pepper?
12        A.    Yes.
13        Q.    Is he currently working there?
14        A.    She does not.
15        Q.    When did she -- am I correct that she    05:07:16
16   was at 60 Minutes, then left, and then came back?
17        A.    No.
18        Q.    Okay.
19        A.    She was at 60 Minutes until I took
20   over.  She had been Jeff Fager's executive          05:07:31
21   assistant.  And there wasn't a job or
22   responsibility for her when I was there, so she
23   left CBS News.  Then she went back to CBS News but
24   not 60 Minutes.  She's gone again.
25        Q.    She's gone again?                         05:07:49
```

```
                                                    Page 238

 1                         Owens
 2              Where did she work at CBS News when she
 3      came back?
 4         A.    She worked in the talent recruitment
 5      department.                               05:08:01
 6         Q.    Are you aware of any concerns or
 7      complaints that Ms. Poolos made about Mr. Bar-On
 8      to Ms. Pepper?
 9         A.    I am not.
10         Q.    Before Ms. Poolos became a producer,  05:08:24
11      were you aware of any concerns that Ms. Poolos had
12      raised that Ms. Poolos's health had deteriorated
13      due to mistreatment by Shachar?
14         A.    No.
15         Q.    Before Ms. Poolos became a producer,  05:08:42
16      were you aware of Ms. Poolos raising a concern
17      that Shachar screamed at her?
18         A.    No.
19         Q.    Did you have a meeting with Ms. Poolos
20      before she became a producer in which she raised  05:09:00
21      concerns with you about Shachar?
22              ATTORNEY ZUCKERMAN:  Objection.
23         A.    No, not that I recall.
24         Q.    Did you ever say to Ms. Poolos that
25      Shachar did not care if Ms. Poolos got herself   05:09:22
```

```
                                        Page 239
  1                    Owens
  2    killed on assignment?
  3         A.    No.
  4         Q.    Did you ever tell Ms. Poolos that
  5    Shachar had a temper, in your experience?    05:09:35
  6         A.    No, never experienced Shachar -- I've
  7    never seen Shachar lose his temper.
  8         Q.    Did you ever tell Ms. Poolos that you
  9    believed Shachar had a mood disorder?
 10         A.    No.                               05:09:52
 11         Q.    Did you ever say to anyone that you
 12    believe that Shachar had a mood disorder?
 13         A.    No.
 14         Q.    Did you ever tell anyone that you
 15    believed that Shachar had a temper?          05:09:59
 16         A.    No.
 17         Q.    When you were executive editor and
 18    Mr. Fager was executive producer, did you ever
 19    consider not renewing Shachar's contract as a
 20    producer for 60 Minutes?                     05:10:23
 21         A.    No.
 22         Q.    Did you ever tell Ms. Poolos when she
 23    worked for -- when she was an AP and Shachar was a
 24    producer, did you ever tell her that she could
 25    switch teams if she was unhappy with Shachar?  05:10:44
```

```
                                              Page 240

  1                     Owens

  2       A.    Possibly.

  3       Q.    Do you recall doing that?

  4       A.    I don't, but I have told many APs

  5   and/or producers who are -- begin to become      05:10:58

  6   unhappy partnerships that we can figure that out.

  7       Q.    Do you have any specific memory of

  8   having that kind of discussion with Ms. Poolos?

  9       A.    I don't, but, again, it is entirely

 10   possible that that happened.                      05:11:16

 11       Q.    Are you aware of any investigation

 12   related to concerns Ms. Poolos raised about

 13   Shachar after she had left CBS?

 14       A.    Yes.

 15       Q.    What are you aware of?                   05:11:32

 16       A.    That there was an investigation.

 17       Q.    Did you participate in the

 18   investigation?

 19            ATTORNEY ZUCKERMAN:  Objection.

 20       A.    I believe I was asked some questions     05:11:43

 21   about Shachar.

 22       Q.    Who asked you those questions?

 23       A.    The woman who was in charge of the

 24   investigation.  I don't remember her name.

 25       Q.    Was that Jennifer Gordon?               05:11:53
```

```
                                              Page 241
 1                        Owens
 2        A.    Yes.
 3        Q.    And is Jennifer Gordon in HR?
 4              ATTORNEY ZUCKERMAN:  I'm sorry, can you
 5        just hold off on answering that question?    05:12:02
 6              (Pause.)
 7              ATTORNEY ZUCKERMAN:  So I think we've
 8        designated in a privilege log that documents
 9        related to this investigation was privileged,
10        which it is.  So for that reason I instruct    05:12:28
11        you not to answer questions about that
12        privileged investigation.
13              THE WITNESS:  Okay.
14              ATTORNEY IADEVAIA:  Okay, my last
15        question I don't think anyone -- we disagree    05:12:42
16        with that privilege assertion.  We don't have
17        to go back and forth about it now.  I think it
18        will be an issue that gets raised with the
19        court at some point.  But in any event my
20        question was whether Jennifer Gordon is in HR. 05:12:58
21        I assume that's an okay question.
22              ATTORNEY ZUCKERMAN:  Uh-huh.
23        A.    And honestly, I'm not sure if she works
24     in HR or some other division.  I apologize.
25        Q.    And I assume this is going to get an    05:13:24
```

```
                                           Page 242

 1                        Owens
 2      objection, so let your lawyer please object if he
 3      wants to.  What did you tell Ms. Gordon as part of
 4      this investigation?
 5                ATTORNEY ZUCKERMAN:  Objection.        05:13:37
 6                Instruct you not to answer on the basis
 7           of privilege.
 8                THE WITNESS:  Okay.
 9           Q.   If an AP had made -- during the time
10      that you were executive editor, if an AP had made  05:13:55
11      a complaint about a producer to Ms. Pepper, do you
12      think it's likely that Ms. Pepper would have told
13      you about it?
14                ATTORNEY ZUCKERMAN:  Objection.
15           A.   It's entirely possible she would have.   05:14:09
16      I think it would depend on what she believed to be
17      the charge, how serious it was.  Alison had a good
18      deal of responsibility and power while working for
19      Jeff Fager, so...
20           Q.   Are you aware of Ms. Poolos's            05:14:39
21      allegation that Shachar told her she could not
22      keep her job if she moved forward with a
23      pregnancy?
24                ATTORNEY ZUCKERMAN:  Objection.
25           A.   No.                                      05:14:58
```

```
                                              Page 243
 1                        Owens
 2        Q.    Are you aware of any outside complaints
 3   about Shachar's work, outside of CBS?
 4              ATTORNEY ZUCKERMAN:  Objection.
 5        A.    No, I'm not.                        05:15:15
 6        Q.    Has Shachar ever been counseled about
 7   his lack of editorial objectivity, to your
 8   knowledge?
 9        A.    No.
10        Q.    Have you ever counseled him about his   05:15:29
11   lack of objectivity?
12        A.    No.
13        Q.    Had Mr. Fager, to your knowledge?
14        A.    No.
15        Q.    Have you ever heard Shachar tell his   05:15:39
16   APs to leave 60 Minutes because they will never be
17   promoted?
18        A.    No.
19        Q.    Has anyone ever told you he said that?
20        A.    No.                                 05:16:01
21        Q.    Has anyone ever told you that
22   Shachar -- or alleged that Shachar keeps credits
23   away from APs?
24        A.    No.
25        Q.    Have you been made aware that        05:16:34
```

```
                                            Page 244
 1                        Owens
 2    Ms. Poolos has raised a concern that Shachar
 3    talked about pornography?
 4              ATTORNEY ZUCKERMAN:  Objection.
 5         A.   No.                           05:16:45
 6         Q.   Are you aware that Ms. Poolos has
 7    raised a concern that when she was Shachar's AP he
 8    spoke about masturbation habits?
 9              ATTORNEY ZUCKERMAN:  Objection.
10         A.   I'm not aware of that.        05:16:57
11         Q.   We talked earlier today about Ira Rosen
12    and concerns that ███████   █████   had raised about
13    him; correct?
14         A.   Yes.
15         Q.   Are you aware of complaints by   05:17:18
16    Ms. ███████  to Alison Pepper about Mr. Rosen?
17         A.   Specifically, no.
18         Q.   Are you aware of any complaints by
19    Ms. ██████  to Ms. Pepper about Mr. Rosen sexually
20    harassing her?                          05:17:39
21         A.   No.
22         Q.   Are you aware of Ms. ████████
23    complaining to Ms. Pepper about Mr. Rosen's
24    abusive behavior?
25         A.   To Alison Pepper?  No.        05:17:48
```

```
                                              Page 245
  1                        Owens
  2       Q.    Are you aware of Ms. ▮▮▮▮ making
  3   those complaints to others?
  4       A.    Yes, in the filing I talked about
  5   earlier.                                  05:18:01
  6       Q.    I think you said the EEOC filing?
  7       A.    I think that's what it was.
  8       Q.    Outside of that EEOC filing, were you
  9   aware of complaints by Ms. ▮▮▮▮ about
 10   Mr. Rosen?                                05:18:11
 11       A.    Yes.  She complained to me about his
 12   editorial being lax.
 13       Q.    How many times did Ms. ▮▮▮▮ make
 14   that complaint to you?
 15       A.    I think once.                   05:18:22
 16       Q.    And was anybody else present for that
 17   discussion?
 18       A.    I don't believe so.
 19       Q.    And did ▮▮▮▮ raise any other
 20   concerns to you besides Mr. Rosen's editorial  05:18:30
 21   standards?
 22       A.    She did not.
 23       Q.    Did Ms. ▮▮▮▮ raise concerns to you
 24   that Mr. Rosen told her not to get pregnant?
 25       A.    I did not know that.           05:18:46
```

```
                                                    Page 246
 1                        Owens
 2          Q.    Did you and Mr. Fager ever meet with
 3     Ms. ███████   about her complaints related to
 4     Mr. Rosen?
 5          A.    Yes.                          05:19:02
 6          Q.    How many times?
 7          A.    My recollection is once.
 8          Q.    Was it just the three of you or was
 9     there anyone else present?
10          A.    I believe it was the three of us.     05:19:10
11          Q.    Was it an in-person meeting?
12          A.    Yes.
13          Q.    Do you recall if you took notes during
14     that meeting?
15          A.    I don't believe I did.         05:19:16
16          Q.    Tell me about that discussion.
17          A.    It was along the lines of the
18     conversation that I had with ██████  about his lack
19     of rigor and how she was concerned about his
20     journalism not being at a level that she expected.  05:19:35
21          Q.    What else did you discuss?
22          A.    That was it.  It was about the
23     journalism, the stories, and perhaps how he
24     treated her or dismissed her concerns.
25          Q.    Did she -- during the meeting that the   05:19:55
```

```
                                              Page 247
 1                         Owens
 2      three of you had with you, Mr. Fager, and
 3      Ms. ████ -- use the word "discrimination"?
 4           A.    No.
 5           Q.    Did she use the phrase "sexual        05:20:06
 6      harassment"?
 7           A.    No.
 8           Q.    Did she ever explain directly to you
 9      about Mr. Rosen's race discrimination?
10           A.    No.                                   05:20:18
11                 ATTORNEY IADEVAIA:  Let me mark this as
12           Exhibit 3, please.
13                 (Owens Exhibit 3, emails, Bates-
14           stamped CBS 8526 and going to 8527, marked for
15           identification.)                            05:21:00
16           Q.    So if you could take a minute to look
17      at it, Mr. Owens.  Let me know once you've
18      reviewed the document.  What's been marked as
19      Owens Exhibit 3 is a multipage email chain
20      starting with CBS 8526 and going to 8527.        05:21:14
21                 (Pause.)
22           A.    Okay.
23           Q.    So if you look in the first email
24      that's part of the chain at the bottom of page 2,
25      it's an email from Ms. Pepper to Ms. ████  dated  05:22:45
```

```
                                              Page 248
1                        Owens
2     May 2nd, 2016.  Do you see that?
3          A.    I do.
4          Q.    Okay.  And then above it is a response
5     from Ms. ████████ to Ms. Pepper, also dated May      05:22:54
6     2nd, 2016.
7          A.    Yep.
8          Q.    Okay.  And then there's a response by
9     Ms. Pepper to Ms. ███████ the next day, May 3rd,
10    2016, on the first page.                             05:23:09
11         A.    Yep.
12         Q.    Then on that same day, which is May
13    3rd, 2016, Ms. ████████ writes to Ms. Pepper, and
14    in that email Ms. ████████ writes, To reiterate
15    what I said in our meeting yesterday, I suggested    05:23:32
16    working under Andy Court's supervision because the
17    three options 60 had presented me with are, to say
18    the least, a demotion.
19              Do you see that text?
20         A.    I do.                                     05:23:46
21         Q.    Do you know which options were
22    presented to Ms. ████████ that she references in
23    this email?
24         A.    My guess is Andy Court's supervision.
25    Max McClellan, and Katherine Davis are the two      05:23:57
```

```
                                                    Page 249

 1                          Owens

 2     producers that were suggested by Alison that

 3     ██████  could work with.

 4          Q.    Okay.  And --

 5          A.    Oh, and then -- sorry, we're not to the   05:24:09

 6     next paragraph yet.

 7          Q.    Yeah, I just wanted -- is that based on

 8     what this email says or your memory at the time?

 9          A.    It's the email.

10          Q.    Were you involved in discussions with      05:24:23

11     Ms. Pepper and/or Mr. Fager about offering options

12     for Ms. ██████  to work with someone other than

13     Mr. Rosen?

14          A.    I don't recall, but I may have been.

15     It's likely.                                          05:24:41

16          Q.    And at the time Max -- you said was Max

17     McClellan?

18          A.    Yes.

19          Q.    Was he a producer at 60 Minutes then?

20          A.    Yes.                                        05:24:50

21          Q.    And Katherine, is that Katherine Davis?

22          A.    Yes.

23          Q.    And she was a producer at 60 Minutes at

24     the time?

25          A.    Yes.                                        05:24:56
```

```
                                                Page 250
 1                         Owens
 2        Q.    And then in the next paragraph
 3   Ms. ████████ writes, As for Alan, he has a well-
 4   known reputation for being verbally abusive.
 5             Do you see that text?                05:25:04
 6        A.    I do.
 7        Q.    Do you know who the reference to Alan
 8   is?
 9        A.    I think that is Alan -- can I look at
10   my phone?  I could probably get the last name.   05:25:23
11        Q.    That's okay.  You can fill it in at
12   another point.  We'll leave a blank in the
13   transcript.  That's fine.
14   INFORMATION REQUESTED: _____
15   _____.    05:25:31
16        A.    I believe I know who she was referring
17   to, yes.
18        Q.    Was Alan a producer at the show at the
19   time?
20        A.    It was.                               05:25:36
21        Q.    Was it Alan Weissman?
22        A.    Oh.  No.
23        Q.    Where Ms. ██████ says, As for Alan, he
24   has a well-known reputation for being verbally
25   abusive, are you aware of such a reputation for   05:25:54
```

```
                                              Page 251
 1                        Owens
 2      Alan?
 3            A.    There was a producer who an associate
 4      producer claimed was verbally abusive.
 5            Q.    Who was the AP who made that claim?    05:26:07
 6            A.    Sarah -- sorry, hang on one second;
 7      I'll get it -- Turcotte.
 8            Q.    Ms. Turcotte had complained that Alan,
 9      the producer, was verbally abusive?
10            A.    Yes.                                   05:26:27
11            Q.    Was that known at the time -- did you
12      know that at the time that Ms. ██████ sent this
13      email?
14            A.    I don't know.
15            Q.    Were there any other instances of      05:26:39
16      allegations of Alan the producer being verbally
17      abusive?
18            A.    No.
19            Q.    Ms. ██████ goes on to say that 60's
20      suggestion that I work for Alan after enduring     05:26:55
21      Ira's sexual harassment and abusive behavior for
22      almost two years is nothing short of retaliatory.
23                  Do you see that text?
24            A.    I do.
25            Q.    And then in the next paragraph          05:27:06
```

```
                                              Page 252
 1                          Owens
 2      Ms. ▓▓▓▓▓  writes, I'm happy to speak to Bill and
 3      Jeff if that is what it now takes for me to be
 4      given a reasonable assignment after I came forward
 5      to attempt to remedy egregious sexist and          05:27:18
 6      ethically inappropriate behavior.
 7              Do you see that text?
 8         A.   I do.
 9         Q.   Do you know the meeting in which you
10      are referring to where you met with Mr. Fager and  05:27:29
11      Ms. ▓▓▓▓▓  did that meeting happen after this
12      email?
13         A.   I don't know, but I know that she
14      didn't bring up any sexist or sexual behavior.  It
15      was journalistic/ethical.  So this is new.         05:27:44
16         Q.   If you look at the top email, it's from
17      Alison Pepper to Mark Engstrom, Jeff Fager, and
18      Bill Owens dated May 3rd, 2016.  Do you see that?
19         A.   I do.
20         Q.   And this is Ms. Pepper forwarding to     05:28:01
21      you Ms. ▓▓▓▓▓  email that we just talked
22      through; correct?
23         A.   Correct.
24         Q.   So by May 3rd, 2016, you were aware
25      that Ms. ▓▓▓▓▓  had made complaints of sexual      05:28:12
```

```
                                            Page 253
 1                      Owens
 2    harassment against Mr. Rosen?
 3         A.    Well, what I was made aware of on this
 4    date was that ██████ was bringing this up I
 5    believe for the first time that I had ever heard   05:28:27
 6    of it from her.
 7         Q.    And after getting this email, what did
 8    you do, if anything?
 9         A.    I don't know.  It's -- that's seven
10    years ago.  I don't remember.                      05:28:40
11         Q.    Do you know if CBS conducted an
12    investigation?
13         A.    I believe that they did.
14         Q.    Do you know what the results of that
15    investigation were?                                05:28:52
16         A.    I don't.
17         Q.    Mr. Rosen continued to work for 60
18    Minutes for over two years after this email;
19    correct?
20         A.    That would be correct.                  05:29:09
21         Q.    Because you didn't have conversations
22    with Ms. Zirinsky about Mr. Rosen's leaving the
23    show until you became executive producer of the
24    show; correct?
25         A.    Until I had authority.                  05:29:21
```

```
                                            Page 254
  1                      Owens
  2       Q.    And that was in 2019; right?
  3       A.    That is correct, when I was made
  4   executive producer.
  5       Q.    Did you have discussions with Mr. Fager  05:29:30
  6   in 2016 about the employment status of Mr. Rosen?
  7       A.    Maybe.  I don't recall.
  8       Q.    Did you at any point say to Mr. Fager
  9   that you think that Mr. Rosen should leave the
 10   show in or around 2016?                             05:29:58
 11       A.    Well, not knowing all the facts and
 12   where we landed with all the facts, I'm not sure
 13   that I had that conversation then, but it's
 14   entirely possible that I had a conversation with
 15   Jeff Fager where I expressed that I didn't think   05:30:13
 16   that Ira was good for the show.
 17       Q.    Do you remember having that
 18   conversation?
 19       A.    I don't, but, again, it very well may
 20   have happened.                                      05:30:28
 21             ATTORNEY IADEVAIA:  If we could take a
 22         look at CBS 8456, please, 8456.
 23             If we could mark this as Owens Exhibit
 24         4.
 25             (Owens Exhibit 4, EEOC complaint re
```

```
                                                    Page 255
 1                          Owens
 2              ████████    Bates-stamped CBS 8456 through 8480,
 3         marked for identification.)
 4         Q.    What's been marked as Owens Exhibit 4
 5    is a document that's multipages bearing Bates      05:31:23
 6    numbers CBS 8456 through 8480.  And the cover of
 7    the exhibit is from the U.S. Equal Employment
 8    Opportunity Commission, and it is dated August
 9    29th, 2016 regarding the matter of ████    ██████
10    versus CBS.  And there's a signed EEOC charge       05:31:52
11    number that's addressed to Mark Engstrom.
12              Mr. Engstrom was an attorney for CBS at
13    the time; is that right?
14         A.    That is correct.
15         Q.    And you had referenced a couple of       05:32:05
16    times Ms. ████████    EEOC complaint.  Is this her
17    EEOC complaint that you're referring to?
18         A.    I guess it is, yeah.
19         Q.    Have you seen this EEOC complaint
20    before today?                                       05:32:20
21         A.    I think so.
22         Q.    Did you see it around the time that
23    Ms. -- that the EEOC filing was sent to CBS which
24    has a date of August 29, 2016?
25         A.    I don't remember that.                   05:32:38
```

```
                                              Page 256
 1                          Owens
 2        Q.    Did you have discussions with Mr. Fager
 3   about Ms. ███████   EEOC filing?
 4        A.    I don't remember, but I'm sure -- yeah,
 5   I'm sure we did.  Of course we had to have.        05:32:47
 6        Q.    Because Ms. █████  at that point
 7   reported directly to you; correct?
 8        A.    She did.
 9        Q.    And Mr. Rosen reported to Mr. Fager?
10        A.    Correct.                                05:32:56
11        Q.    At some point in time did you become
12   aware at -- at any point in time did you become
13   aware that Ms. ██████  had complained that
14   Mr. Rosen had touched her without her consent?
15        A.    I know that she charged that, yes.      05:33:20
16        Q.    Including squeezing her thighs?
17             ATTORNEY ZUCKERMAN:  What's the
18        question?
19             ATTORNEY IADEVAIA:  Whether Mr. Owens
20        was aware of Ms. ██████  allegations,        05:33:29
21        certain allegations.
22             ATTORNEY ZUCKERMAN:  Separate and apart
23        from the document?
24             ATTORNEY IADEVAIA:  Yeah.  I'm asking
25        if he knows.  The document says what the      05:33:40
```

```
                                              Page 257
 1                         Owens
 2        document says.
 3        Q.    I don't need you to review the
 4   document.
 5        A.    I know it from the document.         05:33:46
 6        Q.    To your knowledge did CBS take any
 7   disciplinary action against Mr. Rosen in response
 8   to Ms. ████████ complaints?
 9        A.    I don't know if Jeff Fager or HR did
10   anything to Mr. Rosen as a result of this.       05:34:07
11        Q.    Are you aware of anything that they did
12   as a result of -- any disciplinary action they
13   took against Mr. Rosen as a result of
14   Ms. ████████    complaints?
15        A.    I don't know that they did or didn't.   05:34:24
16             ATTORNEY IADEVAIA:  If we could mark as
17        Owens Exhibit 5, please, 8528.
18             (Owens Exhibit 5, emails, Bates-
19        stamped CBS 8528 to 8529, marked for
20        identification.)                             05:35:06
21        Q.    What's been marked as Owens Exhibit 5
22   is multipage email that bears CBS 8528 to 8529.
23             Let me know once you've completed
24   review, please.
25        A.    Okay.                                   05:35:34
```

```
                                                    Page 258
 1                        Owens
 2            (Pause.)
 3        A.    Okay.
 4        Q.    The bottom email is from Milton
 5   Williams to Mark Engstrom dated June 27, 2016, and  05:35:50
 6   in that email -- well, first of all, did you
 7   understand or do you understand Mr. Williams to be
 8   at that time Ms. ███████  lawyer?
 9        A.    I don't know that.
10        Q.    In the email Mr. Williams writes to     05:36:03
11   Mr. Engstrom, among other things:  This conduct on
12   the part of Mr. Rosen and other employees is also
13   retaliation against Ms. ███████ for complaining
14   about the discrimination and sexual harassment by
15   the company and its senior management,              05:36:25
16   particularly Mr. Rosen.
17            Do you see that text?
18        A.    Uh-huh.
19        Q.    I just need a yes or no, sorry.
20        A.    Yes.  Sorry.                             05:36:31
21        Q.    That's okay.
22            And then Mr. Engstrom -- there appears
23   to be multiple emails, but eventually this email
24   exchange is forwarded to you on June 27, 2016.
25            Do you see that?                           05:36:42
```

```
                                              Page 259
 1                    Owens
 2        A.    I do.
 3        Q.    There appears to be another email above
 4   on which you're copied on the same day, June 27,
 5   2016.                                    05:36:48
 6        A.    I see that.
 7        Q.    In late June 2016, do you recall having
 8   discussions with Mr. Fager about the status of
 9   Mr. Rosen's employment?
10             ATTORNEY ZUCKERMAN:  And just don't    05:37:02
11        testify about discussions that were with
12        Mr. Fager but also in the presence of or under
13        the direction of or otherwise privileged --
14        under the -- strike that.
15             Please don't discuss conversations you  05:37:14
16        may have had with Mr. Fager but at which CBS
17        lawyers may have been present or which would
18        otherwise be covered by the attorney/client
19        privilege.
20             THE WITNESS:  Understood.              05:37:22
21             I do not remember having a conversation
22        around this.
23        Q.    Do you remember around this time saying
24   to Mr. Fager:  I think we should fire Mr. Rosen?
25        A.    I don't remember that.               05:37:36
```

```
                                            Page 260
 1                        Owens
 2        Q.    Do you remember saying to Mr. Fager
 3   around this time:  I think we should take
 4   disciplinary action against Mr. Rosen?
 5        A.    I don't, but that may have happened.    05:37:44
 6        Q.    To your knowledge did Mr. Rosen get
 7   placed on administrative leave around June of
 8   2016?
 9        A.    I don't know that or I don't remember
10   that.                                              05:37:54
11              ATTORNEY IADEVAIA:  Okay.  If we can
12        mark 8530 as Exhibit 6.
13              (Owens Exhibit 6, emails, Bates-
14        stamped CBS 8530 to 31, marked for
15        identification.)                              05:38:30
16        Q.    What's been marked as Owens Exhibit 6
17   is a multipage email chain bearing Bates number
18   CBS 8530 to 31.
19              Let me know once you've had a chance to
20   review it.                                         05:38:45
21              (Pause.)
22        A.    Okay.
23        Q.    So I want to direct your attention to
24   the first page.  There's an email from
25   Mr. Engstrom to Milton Williams dated July 22nd,   05:39:46
```

```
                                               Page 261
 1                       Owens
 2    2016.  And toward the middle of the first
 3    paragraph there's a sentence that says, As I've
 4    explained to you in considerable detail...
 5            Do you see that?                     05:40:01
 6       A.    Yes.
 7       Q.    And then it goes on to say --
 8    Mr. Engstrom writes, CBS has fully investigated
 9    Ms. ███████ allegations of harassment,
10    discrimination, and retaliation and has absolutely  05:40:12
11    no merit to any of her claims.
12            Do you see that text?
13       A.    I do.
14       Q.    Do you have any knowledge as to the
15    basis for that assertion, that CBS had not found  05:40:20
16    any merit to Ms. ███████ claims?
17       A.    That apparently there was an
18    investigation.
19       Q.    Do you know anything else?
20       A.    I don't.  All I can tell you is that  05:40:35
21    ██████ came to me and talked about her very real
22    questions about journalism, and it turned into --
23    there are things here that she charges that she
24    never talked to me about in person.
25       Q.    Outside -- I think we talked before  05:40:58
```

```
                                              Page 262
 1                        Owens
 2    that Ms. -- among other allegations Ms. ████
 3    alleged that Mr. Rosen had touched her without her
 4    consent; correct?
 5        A.    That's right.                    05:41:11
 6        Q.    And other than Mr. Rosen denying that
 7    he had touched Ms. ████ without her consent, do
 8    you know of any other grounds for CBS's conclusion
 9    to find there is no merit to Ms. ████
10    allegations?                                05:41:27
11        A.    I think they asked the editor who was
12    in the room at the time.
13        Q.    And who was that?
14        A.    Sean Kelly.
15        Q.    Anything else?                    05:41:36
16        A.    In terms of that one allegation?
17        Q.    Specific, yeah.
18        A.    No.
19        Q.    Are you aware of any other basis for
20    CBS finding no merit to Ms. ████ allegations  05:41:47
21    other than what you've testified to?
22        A.    No.
23        Q.    Okay.  We talked earlier some about
24    Mr. Gavshon and complaint or complaints against
25    him by ████  ████  Do you remember that   05:42:16
```

```
                                              Page 263
 1                        Owens
 2    generally?
 3         A.    I do.
 4         Q.    To your knowledge did Ms. ███████ --
 5    in addition to her complaint about the photo, did   05:42:44
 6    Ms. ███████ make any complaints about retaliation
 7    by Mr. Gavshon?
 8         A.    I don't know.  I don't -- not that I
 9    know of.
10         Q.    Did Ms. ███████ allege that            05:43:00
11    Mr. Gavshon stripped her of work responsibilities?
12         A.    I don't recall.
13         Q.    Did Ms. ███████ allege that
14    Mr. Gavshon removed her from segments that she had
15    originated or had played a role in developing?     05:43:14
16         A.    I don't recall that.
17         Q.    Did Ms. ███████ allege that other
18    employees avoided her after she made her
19    complaints against Mr. Gavshon?
20         A.    I think I do remember that.            05:43:32
21         Q.    What do you remember about that?
22         A.    That that was her charge, that she said
23    that people in the London bureau were avoiding
24    her.
25         Q.    Did Ms. ███████ allege that            05:43:41
```

```
                                              Page 264
 1                          Owens
 2    Mr. Gavshon started to use two women to perform
 3    some of Ms. ██████      responsibilities?
 4         A.    I don't remember that.
 5         Q.    Did Ms. ██████   allege that one of --   05:43:59
 6    that Mr. Gavshon used Tanya Simons' administrative
 7    assistant to help Mr. Gavshon during this time?
 8         A.    I don't recall.  That may have
 9    happened.
10         Q.    And did you assign another associate   05:44:17
11    producer to assist Mr. Gavshon following
12    Ms. ██████    complaints?
13         A.    I'm sure we had to give Mr. Gavshon
14    another associate producer so he could produce his
15    stories.  I don't remember who that was, though.   05:44:35
16         Q.    Was there a time when after
17    Ms. ██████   complained that she was still
18    Mr. Gavshon's associate producer?
19         A.    I assume while the HR investigation was
20    going on she was still.                            05:44:49
21         Q.    Did you ever make the comment that you
22    would not let Mr. Gavshon's associate producer
23    destroy his storied career?
24         A.    No.
25         Q.    Did you ever make similar comments to   05:45:02
```

Page 265

1                           Owens

2    that?

3         A.    No.

4         Q.    At some point Ms. ██████ filed a

5    lawsuit against CBS; correct?                    05:45:13

6         A.    I believe that's correct.

7         Q.    And did you personally form an opinion

8    about the allegations that Ms. ██████ made

9    against Mr. Gavshon?

10               ATTORNEY ZUCKERMAN:  Objection.       05:45:28

11        A.    No.

12        Q.    No?  Okay.

13               Do you know whether Mr. Gavshon was

14   ever provided counseling for drinking too much?

15               ATTORNEY ZUCKERMAN:  Objection.       05:45:47

16        A.    I have no idea.

17        Q.    After Ms. ██████ filed her lawsuit

18   against CBS making allegations, including

19   allegations against Mr. Gavshon, was Mr. Gavshon

20   subject to any disciplinary action?              05:46:16

21        A.    There may have been some HR outreach.

22   I don't remember.

23        Q.    To your knowledge was Mr. Gavshon ever

24   put on administrative leave?

25        A.    No, I don't believe so.               05:46:36

```
                                                    Page 266
 1                          Owens
 2         Q.     During the investigation into
 3    Mr. Gavshon's conduct or the complaints that
 4    Ms. ██████     made, did CBS assign Ms. ██████
 5    work for others beyond Mr. Gavshon?              05:47:00
 6         A.     No, I don't believe so.
 7         Q.     Did Ms. ██████ say to your knowledge
 8    that she had a photo of Mr. Gavshon passed out
 9    drunk in his office?
10         A.     Not that I know of.                  05:47:18
11         Q.     Other than concerns that Ms. ██████
12    raised about Mr. Gavshon, are you aware of any
13    other complaints against him?
14         A.     I am not.
15              ATTORNEY IADEVAIA:  Okay.  I guess we  05:47:39
16         want to show some documents to the witness,
17         but these are attorneys' eyes only.  So we're
18         going to ask Ms. Poolos to step out.
19              (Ms. Poolos leaves proceedings.)
20              ATTORNEY IADEVAIA:  And just to make   05:48:05
21         sure we comply with the court's order -- not a
22         small thing -- this portion of the transcript
23         is supposed to be designated as attorneys'
24         eyes only.  If it's easier, I would be fine
25         with a separate transcript for this portion.  05:48:17
```

```
                                                      Page 267

 1     Owens - Highly Confidential - Attorneys' Eyes Only

 2          I don't know what's easier for you, but that

 3          way we can keep it separate.

 4                  ATTORNEY ZUCKERMAN:  Yeah, that's fine

 5          with us.                                  05:48:27

 6                  ATTORNEY IADEVAIA:  Okay.  Thank you.

 7                  (Page 267, line 10, through page 271,

 8          line 23, were deemed confidential and bound

 9          under separate cover.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 268

1    Owens - Highly Confidential - Attorneys' Eyes Only

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 269

1    Owens - Highly Confidential - Attorneys' Eyes Only

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 270

1    Owens - Highly Confidential - Attorneys' Eyes Only

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 271

1    Owens - Highly Confidential - Attorneys' Eyes Only

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24            (Ms. Poolos rejoins proceedings.)

25                THE VIDEOGRAPHER:  The time is 5:38      05:56:56

```
                                                Page 272

 1                        Owens

 2        p.m., and we're back on the record.

 3        Q.    The memo we just looked -- strike that.

 4   I won't say it that way.

 5              Do you know if there were any other    05:57:10

 6   investigations conducted into Mr. Gavshon's

 7   conduct?

 8        A.    I do not.

 9        Q.    Do you know if there was an

10   investigation conducted about Ms. ██████████    05:57:21

11   allegations of retaliation?

12        A.    I do not.

13        Q.    Is there somebody who works at 60

14   Minutes named Rich Bonin?

15        A.    Yes.                                  05:57:42

16        Q.    And does he currently work for 60

17   Minutes?

18        A.    He does.

19        Q.    What's his job?

20        A.    He's a producer.                      05:57:45

21        Q.    Is he on a team?

22        A.    He is.

23        Q.    Which team?

24        A.    Lesley Stahl's team.

25        Q.    And how long has Mr. Bonin worked for 05:57:52
```

```
                                                Page 273
 1                       Owens
 2    60 Minutes, approximately?
 3         A.    30 years.
 4         Q.    Are you aware of any complaints or
 5    concerns raised about Mr. Bonin?            05:58:00
 6         A.    No.  Can you be more specific?
 7         Q.    Sure.  Are you aware of any complaints
 8    or concerns about Mr. Bonin raised by Ms. █████
 9         A.    No.
10         Q.    Are you aware of any HR investigations   05:58:22
11    concerning Mr. Bonin?
12         A.    I'm not.
13         Q.    Are you aware of any complaints that
14    were raised to HR about Mr. Bonin?
15         A.    I'm not.                         05:58:37
16         Q.    Are you aware of any complaints or
17    concerns about Mr. Bonin by Casey Feldman?
18         A.    Cassie Feldman.
19         Q.    Cassie Feldman, sorry.
20         A.    That's fine.                     05:58:53
21               No.  HR complaints?  No.
22         Q.    Are you aware of any complaints or
23    concerns about Mr. Bonin by Ms. Feldman?
24         A.    I am not.
25         Q.    Does Ms. Feldman work or did she work   05:59:02
```

```
                                            Page 274

 1                      Owens

 2   for 60 Minutes?

 3        A.    She did.

 4        Q.    What was her job?

 5        A.    She had two jobs, and I'm not sure what   05:59:07

 6   order they came in.  But she was an associate

 7   producer, and she was also an association to

 8   Claudia Weinstein, who was the executive story

 9   editor.  So she was -- she helped in reading

10   transcripts and making sure things were kept in    05:59:27

11   context and fair and objective in stories.

12        Q.    Did someone work for 60 Minutes named

13   Jennifer DePriest?

14        A.    Yes.

15        Q.    And what was her job there?            05:59:43

16        A.    Her job was also as a deputy to Claudia

17   Weinstein.

18        Q.    What was Ms. DePriest's specific

19   responsibilities?

20        A.    To assist Claudia in reading all of the  05:59:59

21   transcripts of all of the interviews we did and

22   make sure they were edited in a way that was fair

23   and clear.

24        Q.    When did Ms. DePriest stop working for

25   60 Minutes?                                         06:00:17
```

```
                                            Page 275

 1                       Owens

 2       A.    Ms. DePriest was let go in September of

 3    '24.

 4       Q.    Who made the decision to let her go?

 5       A.    I did.                            06:00:28

 6       Q.    And why did you make that decision?

 7       A.    Well, I had what's known as a task.

 8    There was a certain amount of money that I needed

 9    to cut from our budget.  Jennifer was originally

10    hired -- well, she was a news associate who then  06:00:49

11    became a deputy to Claudia.  And when we started

12    60 Minutes Sports, Claudia needed help because we

13    now had another program.  And that's when Jen got

14    elevated to that.

15            60 Minutes Sports went away.  I kept      06:01:07

16    Jen around because she was good and smart, and I

17    was able to put her partly in charge of the same

18    job for the 60 Minutes and 6 Quibi platform.  Then

19    that went away.

20            So Jen was redundant.  It was Claudia      06:01:31

21    Weinstein no longer needed additional help.  So it

22    was a difficult decision to make, but...

23       Q.    Did Ms. DePriest raise any concerns

24    about the circumstances of her departure?

25       A.    Not to me.                          06:01:55
```

```
                                              Page 276
 1                     Owens

 2        Q.    Are you aware of any such concerns?

 3        A.    I'm not.

 4        Q.    Did Ms. DePriest to your knowledge

 5   raise concerns about discrimination?           06:02:03

 6        A.    Not to me.

 7        Q.    Are you aware of any concerns?

 8        A.    I'm not.

 9        Q.    To your knowledge did she raise any

10   such concerns to anyone?                        06:02:16

11        A.    Not to my knowledge.

12        Q.    Was there someone who worked for 60

13   Minutes named Vanessa Fica or Fica?

14        A.    Yes.

15        Q.    Does she work there anymore?         06:02:26

16        A.    She does not.

17        Q.    What are the circumstances of her

18   departure?

19        A.    She was let go along with I think six

20   or seven other people on the same day when I    06:02:41

21   needed to make another budget adjustment.

22        Q.    And so it wasn't her choice to leave?

23        A.    No.

24        Q.    And who made the decision to let her

25   go?                                             06:02:54
```

```
                                              Page 277

 1                        Owens

 2         A.    I did.

 3         Q.    And did Ms. Fica ever to your knowledge

 4   raise concerns about discrimination?

 5         A.    Not to me.                         06:03:03

 6         Q.    Did she raise any concerns about -- let

 7   me just be clear.  Are you -- are you aware of any

 8   such concerns at all?

 9         A.    I am not.

10         Q.    Are you aware of any concerns she       06:03:14

11   raised about wrongful termination of employment?

12         A.    I am not.

13         Q.    Katherine Davis no longer works at CBS;

14   correct?

15         A.    Correct.                           06:03:28

16         Q.    And you made the decision to let her

17   go?

18         A.    I did.

19         Q.    And to your knowledge did Ms. Davis

20   ever raise concerns about the circumstances of her   06:03:35

21   dismissal?

22         A.    No.

23         Q.    Did she ever complain about

24   discrimination to your knowledge?

25         A.    No.                                06:03:43
```

```
                                                    Page 278

 1                        Owens

 2        Q.    Okay.  Did someone named Lonny Levine

 3    work for CBS?

 4        A.    Yes.

 5        Q.    When did she stop working at the show,   06:03:51

 6    do you know?

 7        A.    Probably close to ten years ago.

 8        Q.    And do you know the circumstances of

 9    her leaving the show?

10        A.    I believe she left of her own volition.  06:04:05

11    She had been Lara Logan's executive assistant and

12    then maybe associate producer and felt like her

13    relationship with Lara had gotten too close and

14    unhealthy.

15        Q.    Going back to Mr. Bonin for just a       06:04:32

16    second, are you aware of any complaints that

17    Mr. Bonin replaced Cassie after she had a baby?

18              ATTORNEY ZUCKERMAN:  Objection.

19        A.    No.

20        Q.    Is there someone who works for 60        06:04:57

21    Minutes named Sarah Turcotte?

22        A.    Yes.

23        Q.    And you mentioned her a little while

24    ago; correct?

25        A.    I did.                                   06:05:07
```

```
                                        Page 279
  1                     Owens
  2       Q.    Does she currently work for 60 Minutes?
  3       A.    She does.
  4       Q.    What's her job?
  5       A.    She's an associate producer.         06:05:11
  6       Q.    And how long has Ms. Turcotte worked
  7   for 60 Minutes, approximately?
  8       A.    Eight years.
  9       Q.    Okay.  And did Ms. Turcotte to your
 10   knowledge ever work with Ms. Poolos?           06:05:27
 11       A.    I believe they worked on -- I don't
 12   know.  They may have worked on something together.
 13       Q.    Are you aware of any concerns that
 14   Ms. Turcotte raised about Ms. Poolos?
 15       A.    Sarah may be one of those people who -- 06:05:52
 16   yes, yes, Sarah did raise a concern about Alex
 17   being inappropriate towards her, I believe.
 18       Q.    What is your understanding of the
 19   complaint?
 20       A.    I think it was a raising of voice and   06:06:07
 21   unpleasant, unprofessional moment.
 22       Q.    And how did you learn about that
 23   purported incident?
 24       A.    My best guess -- I shouldn't be
 25   guessing.  I think Tanya Simon.                 06:06:30
```

```
                                                    Page 280
 1                           Owens
 2        Q.     When did Ms. Simon tell you about this?
 3        A.     I don't recall.
 4        Q.     Was it after Ms. Richards had made her
 5   complaint?                                       06:06:38
 6        A.     No, I think it was before.
 7        Q.     Okay.  Did she tell you in writing or
 8   orally or some other way?
 9        A.     Orally.
10        Q.     Did you do anything after learning this  06:06:52
11   information?
12        A.     I did not.
13        Q.     Do you know if Ms. Simon did?
14        A.     I don't know if Tanya spoke to Alex and
15   Sarah separately.                               06:06:59
16        Q.     Did you ever raise concerns or did
17   you -- strike that.
18               Did you ever have concerns about
19   Ms. Turcotte's credibility?
20        A.     No.  Sarah still works for the program  06:07:07
21   and works with Scott Pelley and Henry Schuster and
22   does very good work.
23        Q.     What were the circumstances of
24   Ms. Turcotte moving to Mr. Pelley's team?
25        A.     She had -- I think the Alan that I       06:07:21
```

```
                                              Page 281
  1                        Owens
  2     can't remember the last name, she had worked with
  3     someone named Alan, who I believe she claimed also
  4     she had a bad experience with about him raising
  5     his voice to her.  So she was moved to work with    06:07:40
  6     Henry Schuster, who's a producer on Scott Pelley's
  7     team.
  8          Q.     Did Ms. Turcotte ever tell you that
  9     Mr. Pelley had called her and personally tried to
 10     recruit her to his team?                            06:07:57
 11          A.     No.
 12          Q.     Did you ever say to Alex at any point
 13     that Ms. Turcotte had a dubious relationship to
 14     the truth?
 15          A.     No.                                     06:08:06
 16               ATTORNEY IADEVAIA:  If we could take a
 17          break, find out how much time is left, and so
 18          I can finish this up.
 19               THE WITNESS:  Thought you were going to
 20          say pens down the way you flipped over your    06:08:19
 21          thing.
 22               THE VIDEOGRAPHER:  The time is 6:09
 23          p.m., and we're off the record.
 24               (Recess taken from 6:09 to 6:25.)
 25               THE VIDEOGRAPHER:  The time is 6:25       06:24:24
```

```
                                                    Page 282

 1                          Owens

 2         p.m., and we're on the record.

 3         Q.    Mr. Owens, we're going to mark as Owens

 4    Exhibit 9 a document and show it to you.

 5              (Owens Exhibit 9, Richards complaint,

 6         Bates-stamped CBS 7775, marked for

 7         identification.)

 8         Q.    For the record, what's been marked as

 9    Owens Exhibit 9 is a multipage document that

10    starts with a Bates number CBS 7775.              06:24:53

11              Mr. Owens, I'm just going to ask you a

12    couple of questions about this.  First of all, is

13    this the written -- Ms. Richards' written

14    complaint that you reviewed in preparing for

15    today's deposition?                               06:25:13

16         A.    Yes.

17         Q.    And I think your testimony was -- but

18    if you could confirm -- you had not -- you've not

19    seen this complaint until you prepared for today's

20    deposition?                                       06:25:22

21         A.    That is correct.

22         Q.    Okay.  Thanks.  That's all.

23              (Owens Exhibit 10, emails, Bates-

24         stamped CBS 3150, marked for identification.)

25         Q.    What's been marked as Owens Exhibit 10  06:26:07
```

```
                                            Page 283

 1                      Owens

 2    is a one-page email chain bearing Bates number CBS

 3    3150.

 4              After you have had a chance to review

 5    it, Mr. Owens, please let me know.          06:26:18

 6              (Pause.)

 7         A.    Yeah.

 8         Q.    Okay.  The bottom email is from you to

 9    Ms. Poolos dated January 6, 2022.  Is this the

10    email you referred to earlier today when you said  06:26:53

11    that following a discussion you had with

12    Ms. Poolos you followed up by email?

13         A.    Yes.

14         Q.    Okay.  And did you draft this email,

15    Mr. Owens?                                   06:27:07

16         A.    Yes.

17         Q.    Did HR review the email before you sent

18    it?

19         A.    They may have.

20         Q.    Did HR make any suggested changes?     06:27:14

21         A.    I don't recall that.

22         Q.    And had you discussed with HR sending

23    this email before you sent it?

24         A.    I think we did talk about following up

25    with an email, yes.                          06:27:33
```

```
                                          Page 284
 1                        Owens
 2        Q.    Following up after a conversation or
 3    conversations you had with Ms. Poolos?
 4        A.    That's right.
 5        Q.    And who in HR did you have that        06:27:38
 6    discussion with?
 7        A.    That would have been Renee.
 8        Q.    And was it Ms. Balducci's suggestion or
 9    your suggestion or someone else's to send this
10    email?                                           06:27:51
11        A.    Well, it was Renee's suggestion, but I
12    knew that I needed to send this email to make sure
13    that Alex understood what we had discussed.
14        Q.    And did Ms. Balducci tell you why she
15    suggested it?                                    06:28:11
16        A.    Protocol.
17        Q.    And what do you mean by "protocol"?
18        A.    After having a conversation with
19    someone about something as serious as this, you
20    should follow up with an email.  And then Alex    06:28:24
21    wrote me back:  Thank you for this.  I completely
22    understand.  Thank you for taking the time to talk
23    this through.
24        Q.    I understand.  When you say "as serious
25    as this," what are you referring to?             06:28:40
```

```
                                              Page 285
 1                         Owens
 2          A.    The charges that were levied against
 3     Ms. Poolos.
 4          Q.    By Ms. Richards?
 5          A.    By Ms. Richards.                06:28:45
 6          Q.    Anything else?
 7          A.    No.
 8          Q.    In this email you wrote, Thanks for
 9     chatting again with me today.
10          Do you see that?                      06:28:53
11          A.    Yes.
12          Q.    Is it possible that you had
13     conversations with Ms. Poolos on a day in addition
14     to January -- well, is it possible you had more
15     than one discussion with Ms. Poolos about    06:29:05
16     Ms. Richards' complaint?
17          A.    On the 6th?  I think that's poor
18     grammar by me, frankly.  I think it should read,
19     Thanks for chatting with me today, instead of
20     thanks for chatting with me again today.    06:29:21
21               ATTORNEY ZUCKERMAN:  He may have
22          misunderstood your question but...
23               THE WITNESS:  Oh, I'm sorry.
24          Q.    Let me ask it a different way.
25               Did you have a discussion with      06:29:30
```

```
                                            Page 286
 1                       Owens
 2    Ms. Poolos about Mr. Richards' complaint on
 3    January 6th, the same day that you sent this
 4    email?
 5        A.    Yes, but I also I believe had one on      06:29:38
 6    January 5th.
 7        Q.    Okay.  The January 5th discussion, was
 8    that the first time you had spoken to Ms. Poolos
 9    about Ms. Richards' complaint?
10        A.    Yes.  And I think that I -- yes.          06:29:53
11        Q.    Okay.  And earlier you testified you
12    believed you had a discussion with Ms. Poolos in
13    December, so are you saying that that discussion
14    did not happen?
15        A.    I think that I was wrong about that.  I   06:30:04
16    think it was the 5th and the 6th.
17        Q.    Okay.
18        A.    And then the 7th, which I forgot to
19    say.  Pardon me.
20        Q.    That's okay.                              06:30:14
21              And what's refreshed your recollection?
22        A.    You.
23        Q.    Okay.  And how did I refresh your
24    recollection?
25        A.    By saying you had a conversation with    06:30:22
```

```
                                            Page 287
 1                         Owens
 2    her on the 6th, and I said yes, the 5th.  And then
 3    you said you also testified that you thought you
 4    had a conversation with her in December.  And I
 5    think that these were the two conversations that    06:30:37
 6    were about this that I remember.  And now I
 7    also -- since this was the 6th, it would have been
 8    the next day that I had a conversation about the
 9    phone call with Bronstein.
10              ATTORNEY ZUCKERMAN:  I apologize, when    06:30:56
11         he just said the word "this," he pointed to
12         the document, which the camera can see but the
13         record can't.
14              ATTORNEY IADEVAIA:  Understood.
15         Q.    The conversation that you had with       06:31:10
16    Ms. Poolos on the 5th, who was present?
17         A.    I'm not sure if that's -- if we were on
18    the phone or Zoom.  Renee may have been.  I don't
19    recall.
20         Q.    Tell me everything you remember about    06:31:27
21    the January 5th discussion.
22         A.    I was trying to find out what Alex's
23    side of the story was.
24         Q.    Because that was the first time you had
25    spoken to Ms. Poolos about Ms. Richards' concerns?  06:31:41
```

```
                                              Page 288
 1                      Owens
 2        A.    I believe so.
 3        Q.    And to your knowledge had anyone spoken
 4   to Ms. Poolos as of January 5th, 2022, about
 5   Ms. Richards' concerns?                        06:31:51
 6        A.    I'm not certain, but I think perhaps HR
 7   had.
 8        Q.    Okay.  What's your basis for saying
 9   that?
10        A.    I'm just trying to apply logic.       06:32:04
11   Nothing more than thinking that would have
12   happened.
13        Q.    And before your discussion with
14   Ms. Poolos on January 5th, are you aware that
15   Ms. Poolos had reached out to Mr. Bronstein to   06:32:19
16   discuss with him Ms. Richards?
17        A.    No.
18        Q.    Okay.  And before your meeting with
19   Ms. Poolos on January 5th, are you aware that
20   Ms. Poolos had reached out to Ms. Simon to discuss  06:32:39
21   Ms. Richards?
22              ATTORNEY ZUCKERMAN:  Objection.
23        A.    I don't recall.
24        Q.    Is it possible that you knew that?
25        A.    It's possible.                        06:32:49
```

```
                                          Page 289
 1                    Owens
 2       Q.    Is it possible that you knew that
 3   Ms. Poolos had reached out to Mr. Bronstein before
 4   your meeting with her on January 5th?
 5       A.    It's possible.                    06:33:00
 6       Q.    Focusing on that January 5th meeting,
 7   did you tell Ms. Poolos that Ms. Poolos was
 8   Ms. Richards' number-one promoter?
 9       A.    I'm sorry, did I tell Ms. Poolos that
10   Ms. Richards --                             06:33:22
11       Q.    No, let me try again.
12       A.    Pardon me.
13       Q.    Did you tell Alex -- let me get rid of
14   the formalities to make it easier.
15             Did you tell Alex that Alex was       06:33:31
16   Colette's number-one promoter?
17       A.    I don't recall that.
18       Q.    Did you ever say that, whether at this
19   meeting or another time?
20       A.    I don't recall saying that.        06:33:39
21       Q.    Is it possible you said it?
22       A.    It's possible.
23       Q.    Did you tell Alex that half of what
24   Colette said about Alex was very positive?
25       A.    I don't recall that.              06:33:56
```

```
                                            Page 290
 1                    Owens
 2       Q.    Is it possible you said that?
 3       A.    Possible?  Sure.
 4       Q.    Did Alex, in sharing her side of the
 5  story, raise concerns to you about Colette's      06:34:08
 6  temper?
 7       A.    Her temper?  No.
 8       Q.    Did Alex say that Colette acted out
 9  when she could not get her way?
10       A.    I don't recall that.              06:34:28
11       Q.    Did Alex tell you that she had told
12  Colette several times that driving her dog home
13  right before a piece aired was not okay?
14       A.    Driving her dog home?
15       Q.    Yeah.                              06:34:44
16       A.    I don't recall that.
17       Q.    Did Alex tell you that -- strike that.
18            Did Alex, during the January 5th
19  meeting and telling her side of the story, raise
20  concerns about Colette's performance?          06:35:06
21       A.    Yes.
22       Q.    And what do you recall about what she
23  said?
24       A.    Her -- Colette's availability.  Colette
25  having the characteristics of a millennial, kind  06:35:18
```

```
                                            Page 291
 1                       Owens
 2      of wanting to work, you know, 9 to 5 Monday
 3      through Friday schedule.
 4           Q.    Anything else that Alex said about
 5      Colette's performance?                      06:35:35
 6           A.    I think Alex may have said, I need to
 7      help her on a lot of things.  I get pulled in to
 8      help her with logistics or things of that nature.
 9      But it was said in a way that Alex was -- sounded
10      to me like trying to mentor her, trying to help   06:35:53
11      her.
12           Q.    Did Alex say anything else about
13      Colette during this meeting?
14           A.    Not that I can recall.
15           Q.    How did you react to the concerns that  06:36:03
16      Alex raised about Colette during this meeting?
17           A.    I wanted to listen and take them in and
18      see if there was more to it, but the -- hang on.
19      I think that Alex did acknowledge that she had
20      been short with Colette and had changed her tone   06:36:32
21      of voice and that kind of thing.  I think she
22      acknowledged that.  So we spent time talking about
23      that, how that's not okay as a manager.
24           Q.    This was during the January 5th
25      meeting?                                      06:36:47
```

```
                                        Page 292
 1                    Owens
 2        A.    Yes.
 3        Q.    Anything else you recall about that
 4    discussion?
 5        A.    No.                              06:36:50
 6        Q.    Did you say to Alex that you were
 7    troubled by the conduct Alex had described of
 8    Colette?
 9        A.    Troubled?  No.
10        Q.    Did you say that you had concerns?    06:37:04
11        A.    I said we'll have to -- yeah, we'll
12    have to think about this and how to get her
13    better, how to make her -- if this is true, how to
14    help her get better.
15        Q.    And why was it that you didn't speak to  06:37:18
16    Ms. Poolos about Ms. Richards' complaint until
17    January 5th?
18        A.    I think it was a matter of HR gathering
19    facts and sharing them with me.  I think this
20    was -- I think it was the first possible day for    06:37:38
21    me to do it.
22        Q.    "First possible day" meaning what?
23        A.    In terms of having the information that
24    would allow for this type of conversation to
25    happen.                                        06:37:55
```

```
                                                    Page 293
 1                          Owens
 2        Q.    What information are you referring to?
 3        A.    Colette's charges about how she was
 4   being treated in the workplace.
 5        Q.    When did that information get obtained,  06:38:09
 6   do you know?
 7        A.    I mean, the -- Renee Balducci and the
 8   folks at human resources, which I think was just
 9   Renee, and probably Tanya Simon also speaking with
10   Colette.  That information was accrued over time   06:38:27
11   that led to this January 5th conversation.
12        Q.    When you got a concern related to
13   Mr. Levine, who you testified about earlier today,
14   how quickly did you talk to him about that concern
15   after learning about it?                           06:38:55
16        A.    Quickly, within a couple days,
17   probably.
18        Q.    And why was that same timing not
19   applied to Ms. Poolos in terms of disclosing the
20   complaint to her?                                  06:39:10
21              ATTORNEY ZUCKERMAN:  Objection.
22        A.    That didn't have -- I don't believe it
23   didn't have an HR piece to it.
24        Q.    You didn't raise the concerns that you
25   had learned about Mr. Levine to HR; correct?       06:39:29
```

```
                                        Page 294
 1                    Owens
 2        A.    We may have -- we may have talked to
 3   them, to our HR partners, in, like, a weekly
 4   meeting, something that we were talking to them
 5   about.                                    06:39:46
 6        Q.    During the January 5th meeting that you
 7   had with Ms. Poolos, did you tell her not to
 8   discuss Colette's complaint with anyone?
 9        A.    I believe so, yes.
10        Q.    Okay.  What's your basis for believing?  06:40:03
11   Is that your memory?
12        A.    Yes.
13        Q.    Okay.  Anything else?
14        A.    No.
15        Q.    Did Ms. Simon say to Ms. Poolos not to  06:40:12
16   discuss Ms. Richards' complaint with anyone?
17             ATTORNEY ZUCKERMAN:  Objection.
18        A.    I don't know what Tanya told Alex about
19   that.
20        Q.    During the January 5th meeting was      06:40:24
21   there any discussion about whether Alex should
22   speak to HR?
23        A.    Not that I recall.
24        Q.    Did Alex ask whether she should speak
25   to HR?                                     06:40:38
```

```
                                           Page 295

 1                    Owens

 2        A.    Not that I recall.

 3        Q.    Did Alex ask whether she could speak to

 4   HR?

 5        A.    Not that I recall.              06:40:43

 6        Q.    Did you tell her not to speak to HR?

 7        A.    No.

 8        Q.    Did Ms. Simon tell her not to speak to

 9   HR?

10        A.    No.                             06:40:51

11        Q.    That you know of.

12        A.    No.

13        Q.    During the January 5th meeting, did you

14   discuss with Ms. Poolos her friend dying?

15        A.    Her friend dying?              06:41:02

16        Q.    Yeah.

17        A.    I don't recall, but that maybe

18   happened.

19        Q.    Did you say to Alex that you were sorry

20   that Alex was dealing with Colette's complaint and  06:41:13

21   performance concerns at the same time that Alex

22   was managing the death of her friend?

23        A.    If Alex told me that a friend of hers

24   had died, I definitely would have been sympathetic

25   and said, I'm sorry we're going through this while  06:41:30
```

Page 296

```
 1                    Owens
 2   you're dealing with this very personal matter.
 3       Q.    And what's your understanding of
 4   having -- the purpose of having the meeting with
 5   Alex on January 5th?  What it was purpose of doing   06:41:41
 6   that?
 7       A.    To begin to find out from Alex from my
 8   perspective what was her side of the story.
 9       Q.    Any other purpose?
10       A.    No.                                        06:41:56
11       Q.    All right.  Now that your memory's been
12   refreshed, you said I think that you had a
13   conversation with Ms. Poolos the following day on
14   January 6th; correct?
15       A.    Yes.                                        06:42:10
16       Q.    Okay.  And so who was part of that
17   discussion?
18       A.    I don't -- I don't believe anybody was.
19       Q.    Just you and Ms. Poolos?
20       A.    I believe so.                               06:42:18
21       Q.    Okay.
22       A.    In my office.
23       Q.    Tell me everything you remember about
24   that discussion.
25       A.    That we talked about Colette's charges      06:42:24
```

```
                                           Page 297
 1                        Owens
 2    Colette had made.  We talked about another time --
 3    and I can't remember if it was Sarah Turcotte or
 4    Will Croxton or who -- but there was another time
 5    that Alex had acknowledged yes, that had happened,   06:42:50
 6    where she lost her temper with someone.
 7              We were trying to set forth a plan that
 8    this was going to be it, this was -- we had talked
 9    to Alex about it, it was serious, we had talked to
10    Colette about it.                                    06:43:14
11              As I say, Alex assured me it won't be a
12    problem going forward, talked about it being --
13    we're trying to do great work, but we have to
14    be -- we have to acknowledge where she's a leader,
15    she had responsibility for someone.                  06:43:33
16              And I suggested that we're going to
17    have a productive and collaborative second half of
18    the season.  And she wrote me back quickly:  Thank
19    you.  I completely understand, and thank you for
20    your time talking this through.                      06:43:46
21         Q.    In the conversation you had with
22    Ms. Poolos on January 6th, did you tell Ms. Poolos
23    that you were going to send the email?
24         A.    Perhaps.  I don't recall.
25         Q.    And did you tell Ms. Poolos that she     06:44:03
```

```
                                           Page 298
 1                      Owens
 2    needed to acknowledge receiving it?
 3         A.    I don't recall that.
 4         Q.    And did you tell Ms. Poolos that she
 5    needed to sign off on the email that you were    06:44:17
 6    going to send to make the problem go away?
 7              ATTORNEY ZUCKERMAN:  Objection.
 8         A.    No, I don't believe I said that.
 9         Q.    Either in the January 5th conversation
10    or January 6th conversation, did you tell Alex to  06:44:30
11    call Colette?
12         A.    No.
13         Q.    Did you tell Alex to call Colette to
14    let her know -- to let Colette know that Alex had
15    spoken to you?                                   06:44:47
16         A.    I don't believe so.
17         Q.    Are you aware that Alex did call
18    Colette either on January 5th or January 6th?
19         A.    I don't recall that.
20         Q.    Are you aware that Colette recorded the  06:45:00
21    conversation between Alex and Colette on that day?
22         A.    Maybe.
23         Q.    What do you mean by "maybe"?
24         A.    I know there were -- there are texts in
25    Colette's formal complaint.  But I do think I    06:45:37
```

```
                                              Page 299
 1                        Owens
 2    remember someone mentioning that maybe Colette
 3    made a recording of a conversation.
 4         Q.   Of a conversation that she had with
 5    Ms. Poolos?                                    06:45:52
 6         A.   Yes.
 7         Q.   Do you know the substance of that
 8    discussion?
 9         A.   I don't.
10         Q.   How did you learn that Colette may have  06:45:58
11    made a recording of Ms. Poolos?
12         A.   I can't remember.
13         Q.   Is it your understanding the recording
14    was of a discussion before Colette had made her
15    complaint in December or after?              06:46:08
16         A.   I'm not sure, but I believe after.
17         Q.   Have you listened to that recording?
18         A.   I have not.
19         Q.   During your discussion with Ms. Poolos
20    on January 6th, did you tell Ms. Poolos to start  06:46:19
21    documenting Colette's performance issues?
22              ATTORNEY ZUCKERMAN:  Objection.
23         A.   I may have.
24         Q.   Did you tell Alex that Colette's
25    complaint was a millennial issue?            06:46:33
```

```
                                            Page 300

 1                     Owens

 2           ATTORNEY ZUCKERMAN:  Objection.

 3      A.    No.

 4      Q.    Did you tell Alex that you really liked

 5  her?                                    06:46:42

 6      A.    Yes, likely.

 7      Q.    Did you tell Alex that Colette needed

 8  more exposure to Ms. Stahl's temper?

 9      A.    I don't recall that.

10      Q.    Did you tell Alex that Colette needed   06:46:58

11  more exposure to Ms. Stahl's style?

12      A.    No.

13      Q.    Did you tell Alex that Colette would be

14  moved off of Ms. Stahl's team?

15      A.    No.                           06:47:10

16      Q.    Did you ever say that to Alex?

17      A.    Did I ever tell Alex that Colette was

18  going to get moved off of Stahl's team?

19      Q.    Yeah.

20      A.    Not -- not to my recollection,   06:47:21

21  especially not in the middle of an HR

22  investigation.

23      Q.    Did you tell Alex that you had heard

24  that Colette was rude to another AP?

25      A.    No.                           06:47:36
```

```
                                                    Page 301
 1                         Owens
 2        Q.    Are you aware of a complaint or concern
 3   about Colette by Jack Weingart?
 4        A.    No.
 5        Q.    Are you aware of any concern that      06:47:44
 6   Colette had turned down training that was offered
 7   to her?
 8        A.    I'm not aware of that.
 9        Q.    And did Alex tell you that before she
10   knew about Colette making a complaint that Alex      06:48:03
11   had told Colette they would need to discuss her
12   performance issues?
13        A.    I do not recall that.
14        Q.    Did Alex ever tell you that after
15   learning about Colette's complaint that Alex spoke  06:48:23
16   to Lesley Stahl?
17        A.    I don't recall that, but that may have
18   happened.
19        Q.    Did Alex tell you about that call that
20   Lesley Stahl was appalled by Colette's performance  06:48:40
21   issues?
22        A.    I don't recall the word "appalled" but
23   I also would not be surprised that upon first
24   hearing that there was a problem that Lesley would
25   be open-minded about what had happened and make     06:48:57
```

```
                                           Page 302
 1                        Owens
 2     sure that Alex got a fair hearing.
 3          Q.    Did Alex tell you about a call with
 4     Ms. Stahl that Ms. Stahl said she wanted Colette
 5     off her team?                              06:49:14
 6          A.    No.
 7          Q.    Did Alex tell you in her discussion
 8     with Ms. Stahl that she intervened to stop
 9     Ms. Stahl from moving Colette from her team?
10          A.    No.                             06:49:31
11                ATTORNEY IADEVAIA:  If we can mark as
12          Owens Exhibit 11 CBS 8128, please.
13                (Owens Exhibit 11, text messages,
14          Bates-stamped CBS 8128, marked for
15          identification.)                      06:50:44
16          Q.    Okay.  What's been marked as Owens
17     Exhibit 11 is what appears to be a text thread
18     bearing Bates numbers CBS 8128.
19                Mr. Owens, if you take a look at the
20     top text it says, Heads-up.  Alex Poolos, after  06:51:01
21     speaking with you, Bill, called Colette's PLS
22     manager at CNN, her reference when she came here.
23     Told him Colette is terrible at her job.  Told him
24     he told you as much.  Bill -- I assume that's
25     Bill -- referred to Colette as a millennial who  06:51:23
```

```
                                                     Page 303

 1                             Owens

 2      weekend to HR to solve her problems.  And I don't

 3      want to ruin her career but...  And then says,

 4      Bill:  I need you to speak to Colette, and then we

 5      should talk.  And then it says, Alex, with a typo,  06:51:38

 6      actions reflect horrendous judgment and amount to

 7      retaliation in my POV.

 8              Do you see that text?

 9          A.    I do.

10          Q.    And this was a text that was sent to    06:51:46

11      you and to Tanya; correct?

12          A.    It appears that way, yes.

13          Q.    I know it doesn't say the name of the

14      person who sent the text, but what I just read, do

15      you believe this is a text from Renee Balducci?   06:51:56

16          A.    I do.

17          Q.    And was this the first time that you

18      became aware of a phone call between Mr. Bronstein

19      and Ms. Poolos?

20          A.    Yes.                                   06:52:09

21          Q.    And at this point when Ms. Balducci

22      sends this first text message, had you spoken to

23      Alex about her call with Mr. Bronstein?

24          A.    I don't believe so, no.

25          Q.    And had Ms. Balducci spoken to Alex    06:52:31
```

```
                                              Page 304
 1                       Owens
 2   about her call with Mr. Bronstein?
 3        A.    I don't know if Renee had talked to
 4   Alex yet.
 5        Q.    And to your knowledge the factual      06:52:48
 6   information that Renee -- or purported factual
 7   information that Renee shares with you and Tanya,
 8   that first paragraph of the text that I read, to
 9   your knowledge where did that information come
10   from?                                             06:53:03
11        A.    The first information in Renee's text?
12        Q.    Yeah.
13        A.    Scott Bronstein would be my guess.
14        Q.    Do you know if anyone had spoken to
15   Ms. Poolos at this point about her version of that 06:53:22
16   phone call?
17        A.    Well, I had not.
18        Q.    Are you aware of anybody else at that
19   point?
20        A.    No.                                    06:53:31
21        Q.    If you look further down the text,
22   there's one from you to the group.  In it you
23   write, I spoke to both.  Two entirely different
24   stories.  Colette's is the one above.  And Alex
25   says she spoke to the CNN guy, not yesterday but   06:53:48
```

```
                                            Page 305

 1                       Owens
 2    Wednesday, because he is a friend and she was
 3    looking for insights into Colette.
 4             Do you see that text?
 5        A.    I do.                         06:53:58
 6        Q.    When you say "I spoke to both," are you
 7    referring to Ms. Richards and Ms. Poolos?
 8        A.    Yes.
 9        Q.    You write that Alex said she spoke to
10    the CNN guy.  That's a reference to Mr. Bronstein?  06:54:13
11        A.    Yes.
12        Q.    And then you write, She says she did
13    not disparage her, referring to Ms. Richards, I
14    assume?  Ms. Poolos did not disparage
15    Ms. Richards?                           06:54:30
16        A.    That's correct.
17        Q.    That's what Ms. Poolos told you?
18        A.    Yes.
19        Q.    Then you write, I told Alex this was
20    going to be in HR's hand and she shouldn't be in  06:54:35
21    touch with Colette today and we will untangle
22    Monday.  Then you write, Someone is lying;
23    correct?
24        A.    Correct.
25        Q.    In this text that you sent, you did not  06:54:47
```

Page 306

                              Owens

1

2    say that Alex had denied the phone call with

3    Mr. Bronstein; correct?

4              ATTORNEY ZUCKERMAN:  Objection.

5        A.    Correct, I do not include that specific   06:54:56

6    point.

7        Q.    How come?

8        A.    Because at first she said, I didn't

9    speak to him; and then she said, Well, I did, but

10   I only spoke to him because I wanted to get        06:55:10

11   information about her, ta-da, ta-da.

12              So it was -- I'm pointing out in this

13   fairly short text that this is a he said/she said.

14       Q.    When you testified earlier am I

15   correct -- well, strike that.                      06:55:30

16              I think your testimony has been that it

17   was significant that Alex denied having the phone

18   call at all with Mr. Bronstein; is that right?

19       A.    Correct.

20       Q.    And why wouldn't you have pointed that   06:55:42

21   out to HR when you're describing your conversation

22   with Alex about her discussion with Mr. Bronstein?

23              ATTORNEY ZUCKERMAN:  Objection.

24       A.    Again, this was a fast text that I'm

25   sending to Renee, who, by the way, is with her     06:55:55

Page 307

1                          Owens

2     family skiing.  I assume this is a Friday.  It was

3     first contact.

4          Q.    In the bottom of the text you say,

5     Someone is lying.                          06:56:13

6          A.    Uh-huh.

7          Q.    What did you mean by that?

8          A.    Someone wasn't telling the truth.

9          Q.    You mean either -- well, who were the

10    people who may have not been telling the truth?   06:56:19

11         A.    Colette or Alex.

12         Q.    Colette hadn't been on the call with

13    Mr. Bronstein; correct?

14         A.    Not to my knowledge, no.

15         Q.    Your understanding is Ms. Poolos spoke   06:56:31

16    to Mr. Bronstein; right?

17         A.    Yes.

18         Q.    And do you have any basis to believe

19    that Ms. Richards was on that call?

20         A.    No.                            06:56:44

21         Q.    Okay.  And so where was Ms. Richards

22    getting her version of that phone call from?

23         A.    I believe that Mr. Bronstein called

24    Ms. Richards to tell her that Alex had done what

25    she had done, and that tripped Colette to call HR.  06:56:58

Page 308

```
 1                      Owens

 2        Q.    Got it.  Okay.

 3             As of the time that you sent this text

 4   on January 7th, 2022, had you determined who you

 5   believed was lying?                          06:57:12

 6        A.    I hadn't determined, but I felt pretty

 7   strongly that Alex's story was inconsistent.  She

 8   sounded a little frantic when she talked to me.  I

 9   remember saying to her:  Alex, why would you do

10   this, a number of times.  So perhaps I hadn't made  06:57:36

11   up my mind, but I was starting to form an opinion.

12        Q.    When you spoke to Ms. Poolos about her

13   call with Mr. Bronstein, did Ms. Poolos give an

14   apology?

15        A.    I don't recall that.              06:57:56

16        Q.    Would it have been important to you if

17   Ms. Poolos had apologized?

18        A.    Well, apologize for what?  Apologize

19   for retaliating or apologize for calling someone

20   who's not within our own show and saying these    06:58:14

21   things?  I don't know what she would be

22   apologizing for.  Making the phone call at all?

23        Q.    I think you've said a couple of times

24   that you believe Ms. Poolos retaliated against

25   Ms. Richards; correct?                        06:58:33
```

```
                                          Page 309
  1                      Owens
  2        A.    Yes.
  3        Q.    And that was part -- one of the reasons
  4   that you decided to fire Ms. Poolos; correct?
  5        A.    Correct.                          06:58:39
  6        Q.    What retaliation did Ms. Poolos engage
  7   in?
  8        A.    She called someone outside of our
  9   office and trashed somebody's character.
 10        Q.    And the conclusion that Ms. Poolos   06:59:00
 11   trashed someone's character, is that -- is that
 12   the only basis to say that Ms. Poolos retaliated
 13   against Ms. Richards?
 14              ATTORNEY ZUCKERMAN:  Objection.
 15        A.    Well, I mean, how do you -- once you   06:59:16
 16   have said these things to one person, that person
 17   can then pass it on to someone else to someone
 18   else.  It's the same industry.  CNN, fairly large
 19   organization.
 20        Q.    If Ms. Poolos had not, quote/unquote,  06:59:36
 21   trashed Ms. Richards in that call with
 22   Mr. Bronstein, would that be retaliation?
 23              ATTORNEY ZUCKERMAN:  Objection.
 24        A.    If she hadn't?  I think it was -- well,
 25   legally I don't know.                          06:59:55
```

```
                                                   Page 310

 1                          Owens

 2        Q.    Okay.  But I'm talking about a manager

 3   who is making personnel decisions.

 4              ATTORNEY ZUCKERMAN:  Same objection.

 5        A.    She still would have lied to me and    07:00:01

 6   said that she hadn't called him and done something

 7   that she was told not to do.  Would it be

 8   retaliation for her just to reach out to him and

 9   have a conversation?  I don't know.

10        Q.    And the basis for concluding that she    07:00:19

11   had trashed Ms. Richards during that call with

12   Mr. Bronstein is what Mr. Bronstein had told CBS;

13   correct?

14        A.    Correct.

15        Q.    What is your understanding or -- strike    07:00:41

16   that.

17              At the time of -- around the time that

18   Ms. Poolos was fired, did you have an

19   understanding of the relationship between Colette

20   and Mr. Bronstein?                                  07:00:58

21              ATTORNEY ZUCKERMAN:  Objection.

22              Sorry, go ahead.

23        A.    Other than he had worked for her and he

24   had -- and she had come highly recommended?  No.

25        Q.    Do you know if they were friends at    07:01:07
```

```
                                            Page 311
 1                      Owens
 2    that time?
 3         A.    I do not.
 4         Q.    Do you know if they were frequently in
 5    contact with each other?                    07:01:15
 6         A.    I do not.
 7         Q.    Do you know if they hung out together,
 8    if they got together?
 9         A.    I do not.
10         Q.    Do you think that is relevant at all in  07:01:23
11    assessing whether you should credit what
12    Mr. Bronstein said about the phone call?
13              ATTORNEY ZUCKERMAN:  Objection.
14         A.    I do not.
15         Q.    Why not?                           07:01:34
16         A.    Because whether someone is friendly or
17    not, they had a professional relationship.
18    Colette was hired by Alex based on Scott
19    Bronstein's recommendation.  We trusted his
20    judgment once -- Alex did -- to hire this woman.   07:01:54
21         Q.    I think earlier today you posed the
22    question what was Mr. Bronstein's motivation to
23    lie about the call with Ms. Poolos.  Do you
24    remember that?
25         A.    I do.                              07:02:10
```

```
                                           Page 312
 1                        Owens
 2        Q.    Do you think that if Ms. Richards was
 3   angry or upset about Ms. Poolos and asked somebody
 4   that she was close with that could be a motivation
 5   for him not telling the truth?              07:02:21
 6             ATTORNEY ZUCKERMAN:  Objection.
 7        A.    I find that to be a remarkable stretch.
 8        Q.    More remarkable than a ten-year
 9   employee who never had a history of lying all of a
10   sudden lying about a phone call she had with    07:02:35
11   Mr. Bronstein?
12        A.    She lied to me.
13             ATTORNEY ZUCKERMAN:  Objection.
14             ATTORNEY IADEVAIA:  I have just a
15        couple more questions, but I think I left that 07:03:03
16        part of my outline in the other room.  So I
17        just need to go off the record a minute.  I
18        apologize, guys.
19             THE VIDEOGRAPHER:  The time is 7:04
20        p.m., and we're off the record.            07:03:14
21             (Recess taken from 7:04 to 7:15.)
22             THE VIDEOGRAPHER:  The time is 7:15
23        p.m., and we're back on the record.
24             ATTORNEY IADEVAIA:  Okay.  We're going
25        to mark as Owens Exhibit 12.              07:14:48
```

```
                                            Page 313
 1                        Owens
 2              (Owens Exhibit 12, text messages,
 3         Bates-stamped CBS 8167, marked for
 4         identification.)
 5         Q.    What's been marked as Owens Exhibit 12   07:15:05
 6    is a one-page text exchange bearing Bates number
 7    CBS 8167.
 8              Let me know once you've reviewed the
 9    text, Mr. Owens.
10              (Pause.)                                  07:15:48
11         A.    Okay.  Yeah.
12         Q.    In the text exchange -- well, first of
13    all, this is a text exchange between you and
14    someone with a number that starts with 646 on
15    January 18, 2022.                                   07:15:57
16              Based on reviewing this text exchange,
17    do you believe this is an exchange between you and
18    Tanya Simon?
19         A.    I do.
20         Q.    And if you take a look, the second-to-  07:16:11
21    last text from Ms. Simon to you says, I spoke to
22    Renee for a few minutes.  She expects there will
23    be a resolution/decision re Alex at the end of the
24    week.  She spoke to Jack and needs to speak to
25    Lesley.  And then you wrote back:  Faster than I    07:16:31
```

Page 314

```
 1                        Owens
 2     thought.
 3             Do you see that all that text?
 4         A.    I do.
 5         Q.    What was your understanding of what    07:16:38
 6     Ms. Simon meant when she wrote, She expects there
 7     will be a resolution decision re Alex at the end
 8     of the week?
 9         A.    A resolution to the investigation.
10         Q.    Ms. Simon refers to a decision.  It    07:16:52
11     says resolution/decision.  Do you know what she
12     meant by "decision"?
13         A.    I don't.  I think that she's talking
14     about resolving the investigation and passing it
15     on to us.                                        07:17:09
16         Q.    Did you have any understanding that
17     Ms. Simon was saying that HR was going to make a
18     decision about Ms. Poolos's employment?
19         A.    No.
20             ATTORNEY ZUCKERMAN:  Objection.          07:17:19
21         A.    It wouldn't have been HR's decision to
22     make that -- to terminate or not.
23         Q.    And where it says "faster than I
24     thought," where you wrote that, why did you write
25     that?  What did you mean by that?                07:17:36
```

```
                                                    Page 315
 1                           Owens
 2        A.    The resolution of this investigation
 3   was going to conclude faster than I thought.
 4        Q.    How long did you expect it to last?
 5        A.    It was only my, I guess, second time    07:17:45
 6   that I was involved in something like this, so I'm
 7   not sure what I expected; or second time as
 8   executive producer.
 9        Q.    How many discussions did you have about
10   whether to fire Ms. Poolos?                        07:18:11
11              ATTORNEY ZUCKERMAN:   Objection.
12        A.    How many discussions --
13        Q.    Well, did you have any discussions
14   about whether to fire Ms. Poolos following the
15   investigation?                                     07:18:24
16        A.    With who?
17        Q.    With anyone.
18        A.    I'm sure after listening to the
19   findings of the investigation that I talked with
20   Renee about it, that I talked with Lesley about    07:18:38
21   it, that I talked with Tanya about it.  But the
22   decision was mine.
23        Q.    And what were your discussion or
24   discussions with Renee about firing Ms. Poolos?
25        A.    Just about her findings.               07:18:50
```

```
                                                    Page 316

 1                           Owens

 2        Q.    And did you tell Renee that -- or

 3   Ms. Balducci that you intended to fire Ms. Poolos?

 4        A.    When I -- when I came to that

 5   conclusion, yes, I told her that I was going to do   07:19:02

 6   that.

 7        Q.    Okay.  And what did Ms. Balducci say in

 8   response?

 9        A.    I don't recall.

10        Q.    Did anyone push back on the decision      07:19:15

11   you made to fire Ms. Poolos?

12              ATTORNEY ZUCKERMAN:  Objection.

13        A.    Push back?  No, but I would say that

14   we -- it was -- in my mind she had crossed a clear

15   line that we've talked about already.                07:19:34

16        Q.    When you say "crossed a line," is there

17   anything other than what you've testified to

18   today?

19        A.    No.

20              ATTORNEY IADEVAIA:  Okay.  If we could     07:19:48

21        mark as Owens Exhibit 13 CBS 8172.

22              (Owens Exhibit 13, text messages,

23        Bates-stamped CBS 8172, marked for

24        identification.)

25        Q.    What's been marked as Owens Exhibit 13     07:20:22
```

```
                                           Page 317
 1                      Owens

 2    is a one-page text thread bearing Bates number CBS

 3    8172.

 4             Let me know once you've reviewed the

 5    texts.                                    07:20:43

 6         A.    Okay.

 7             (Pause.)

 8         A.    Okay.

 9         Q.    First of all, is this a text thread

10    between you and Ms. Simon?                 07:20:54

11         A.    Yes.

12         Q.    All the texts are dated January 27th,

13    2022; correct?

14         A.    Yes.

15         Q.    The second-to-last text from Ms. Simon  07:21:01

16    to you says, Have you heard from Renee at all

17    about AP?  And you write, Nope.

18             Is the reference to AP Ms. Poolos?

19         A.    I guess so.

20         Q.    Was that how you understood it at the   07:21:18

21    time?

22             ATTORNEY ZUCKERMAN:  Objection.

23         A.    I can't tell you, but probably.

24         Q.    And the reference to Renee, is that

25    Ms. Balducci?                              07:21:26
```

```
                                              Page 318
 1                        Owens
 2        A.    Yes.
 3        Q.    And had you made a decision to fire
 4   Ms. Poolos as of January 27th, 2022?
 5        A.    I don't know.                   07:21:35
 6        Q.    And what were you waiting to hear back
 7   from Renee about as of that date?
 8        A.    I don't know when I was given the last
 9   or all of the information, the comprehensive note
10   around the investigation.                  07:21:50
11        Q.    How was the comprehensive information
12   presented to you following the investigation?
13        A.    I think verbally, but I don't remember.
14        Q.    And it was a conversation you had with
15   Ms. Balducci?                              07:22:04
16        A.    I believe so.
17              ATTORNEY IADEVAIA:  I think this will
18         be our last one.  8179, please.
19              (Owens Exhibit 14, text messages,
20         Bates-stamped CBS 8179 to 8181, marked for
21         identification.)
22        Q.    For the record, what's been marked as
23   Owens Exhibit 14 is a multipage text thread
24   bearing Bates number CBS 8179 to 8181.
25              (Pause.)                         07:22:55
```

```
                                             Page 319

 1                       Owens

 2        A.    Okay.

 3        Q.    All right.  Do you recognize this as a

 4   text exchange between you, Ms. Simon, and

 5   Ms. Balducci?                                07:23:41

 6        A.    Yes.

 7        Q.    And all of the texts, according to the

 8   document, are dated February 3rd, 2022; is that

 9   right?

10        A.    That is correct.                 07:23:50

11        Q.    And does this text thread indicate that

12   you fired Ms. Poolos on this day that you're

13   sending the text?

14        A.    It appears so.  If it's not this --

15   yeah, I guess it was the 3rd, so yes.        07:24:07

16        Q.    Okay.  And if you look at the second

17   page of Exhibit 14, you wrote, Just spoke to

18   Colette.  Great call.

19              Do you see that?

20        A.    Yes.                             07:24:19

21        Q.    Was that a conversation you had with

22   Ms. Richards in which you informed her that CBS

23   had fired Ms. Poolos?

24        A.    I'm sure among other things.

25        Q.    And when you say "great call," what did  07:24:30
```

```
                                          Page 320
 1                      Owens
 2   you mean by that?
 3        A.    That she was professional.
 4        Q.    Who was professional?
 5        A.    Colette.                      07:24:37
 6        Q.    In what way was Ms. -- well, do you
 7   recall that phone call you had with Ms. Richards
 8   on the 3rd?
 9        A.    Not in great specificity, but I
10   remember that she was professional, that she felt  07:24:48
11   like this was all handled well, she felt heard.
12   And I remember her saying, I just want to do good
13   work.
14        Q.    Anything else you recall about that
15   discussion?                             07:25:08
16        A.    No.
17        Q.    And then if you look at the last page,
18   in the second-to-last text you write, You're a
19   star, Renee.
20              Do you see that text?         07:25:34
21        A.    I do.
22        Q.    What did you mean by that?
23        A.    That she's good at her job.
24        Q.    And specifically do you think that she
25   was good at her job in connection with how     07:25:45
```

```
                                              Page 321
 1                       Owens
 2    Ms. Poolos's situation was handled?
 3         A.    I think that Renee did a good job.
 4         Q.    What did Ms. Balducci do that you
 5    thought that she did a good job with?        07:25:54
 6         A.    I thought she was thorough and
 7    professional.
 8         Q.    Anything else?
 9         A.    Open-minded.  She -- all this happened
10    over the holidays and the day that she was trying  07:26:10
11    to take her family away on a ski vacation.  She
12    was always available to answer questions.  She did
13    a good job.
14         Q.    At the time that this happened in late
15    2021 and 2022, what was Renee Balducci's position?  07:26:36
16         A.    I'm not sure what her title was, but
17    she worked in CBS's human resources department.
18         Q.    Did she work for CBS News specifically?
19         A.    Yes.
20              ATTORNEY ZUCKERMAN:  Objection.       07:26:53
21         Q.    Was she responsible for shows other
22    than 60 Minutes, to your knowledge?
23         A.    I don't know.
24         Q.    You don't know.
25              Does Ms. Balducci still serve in that   07:27:01
```

```
                                               Page 322
 1                       Owens
 2    same HR capacity for CBS News?
 3         A.    She does not.
 4         Q.    Do you know why?
 5         A.    She was transferred to CBS Sports.    07:27:09
 6         Q.    And do you know who made the decision
 7    to transfer her?
 8         A.    I think she asked to be moved.
 9         Q.    Did her transfer have anything to do
10    with Ms. Poolos's situation?                     07:27:23
11         A.    No.
12              ATTORNEY IADEVAIA:  Okay.  I think we
13         are done.  Let me just confer for one minute.
14         But I think that's it.
15              THE WITNESS:  Great.                    07:27:37
16              THE VIDEOGRAPHER:  The time is 7:28
17         p.m., and we're off the record.
18              (Recess taken from 7:28 to 7:33.)
19              THE VIDEOGRAPHER:  The time is 7:33
20         p.m., and we're back on the record.          07:32:51
21         Q.    Mr. Owens, was there someone who used
22    to work for 60 Plus named Michael Rey?
23         A.    Yes.
24         Q.    Does 60 Plus still exist?
25         A.    It does not.                            07:33:08
```

```
                                              Page 323
 1                        Owens

 2        Q.    Does Mr. Rey work for CBS News?

 3        A.    He worked for 60 Minutes.

 4        Q.    He currently works for 60 Minutes?

 5        A.    He does.                          07:33:17

 6        Q.    When did he join 60 Minutes?

 7        A.    He worked at 60 Minutes II probably 25

 8    years ago as a broadcast associate and then an AP.

 9    He was at the Evening News for a while as an

10    investigative producer.  He came back across when   07:33:44

11    we started the Quibi platform show that ultimately

12    turned into streaming show 60 in 6 and now is

13    currently a producer at the Sunday broadcast.

14        Q.    For 60 Minutes?

15        A.    For 60 Minutes.                   07:34:04

16        Q.    And was he laid off from 60 Plus?

17              ATTORNEY ZUCKERMAN:  Objection.

18        A.    No.

19        Q.    Did he transfer from 60 Plus to 60

20    Minutes?                                    07:34:15

21        A.    Yes, that's my recollection.

22        Q.    Okay.  And do you recall approximately

23    when Mr. Rey joined 60 Minutes?

24        A.    In his current capacity, two seasons

25    ago, maybe.  No, it was more than that.     07:34:30
```

```
                                          Page 324
 1                      Owens
 2        Q.    Was it around the time that Ms. Poolos
 3    was fired?
 4        A.    Perhaps, could be.
 5        Q.    Does he work for a team?          07:34:49
 6        A.    He does.
 7        Q.    Whose team?
 8        A.    Cecilia Vega.
 9        Q.    Was there ever any discussion about
10    Mr. Rey joining Ms. Stahl's team?          07:34:57
11        A.    No.  Lesley Stahl was starting to do
12    less stories per season.  We hired Cecilia.  She
13    needed full-time producing teams, and Michael Rey
14    was the first person she worked with.  She
15    professionally fell in love with him, and they   07:35:21
16    have a great collaboration.
17        Q.    Did you ever suggest to Lesley Stahl
18    that she interview Mr. Rey?
19        A.    No.
20        Q.    Did you ever suggest to Mr. Rey that   07:35:30
21    she interview with Ms. Stahl?
22        A.    No.
23        Q.    Okay.  Just one more question, which is
24    beyond what you testified to today, focusing on
25    the period between when you first learned about   07:35:43
```

```
                                             Page 325
 1                       Owens
 2     Ms. Richards' complaint in mid-December of 2021
 3     and when Ms. Poolos was fired in early February of
 4     2022, are there any other discussions that you
 5     recall having about Ms. Poolos's circumstances     07:35:57
 6     that you haven't testified to today?
 7               ATTORNEY ZUCKERMAN:  Objection.
 8          A.    No.
 9          Q.    Nothing else you can remember?
10          A.    No.                                     07:36:07
11               ATTORNEY IADEVAIA:  Okay.  Okay.  I'm
12          done.
13               THE WITNESS:  Thank you.
14               ATTORNEY ZUCKERMAN:  We have no
15          questions.                                    07:36:21
16               (Continued on following page.)
17
18
19
20
21
22
23
24
25
```

```
                                                    Page 326
  1                        Owens
  2            THE VIDEOGRAPHER:  We're going off the
  3       record at 7:37 p.m. and this concludes today's
  4       testimony given by Bill Owens.  The total
  5       number of media units used was three and will  07:36:32
  6       be retained by Veritext.
  7            (Time noted:  7:37 p.m.)
  8            _____
  9                    BILL OWENS
 10

 11   Subscribed and sworn to before me

 12   this ____ day of _____ 2025.

 13

 14   _____

      Notary public

 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
 25
```

Page 327

1

2                    C E R T I F I C A T E

3    STATE OF NEW YORK      )

4                            : ss.

5    COUNTY OF NEW YORK     )

6

7              I, LAURIE A. COLLINS, a Registered

8         Professional Reporter and Notary Public

9         within and for the State of New York, do

10        hereby certify:

11             That BILL OWENS, the witness whose

12        deposition is hereinbefore set forth, was

13        duly sworn by me and that such deposition

14        is a true record of the testimony given by

15        the witness.

16             I further certify that I am not

17        related to any of the parties to this

18        action by blood or marriage and that I am

19        in no way interested in the outcome of this

20        matter.

21             IN WITNESS WHEREOF, I have hereunto

22        set my hand this 14th day of February 2025.

23

24

25        LAURIE A. COLLINS, RPR

Page 328

```
 1
 2     - - - - - - - - - I N D E X - - - - - - - - - -
 3     WITNESS:            EXAMINATION BY:            PAGE
 4     Bill Owens          Attorney Iadevaia            5
 5
 6     - - - - - - - - - E X H I B I T S - - - - - - - -
 7     OWENS NO.              DESCRIPTION            PAGE
 8
 9     Exhibit 1, contract of Poolos,
10     Bates-stamped CBS 1 to CBS 12
11     Exhibit 2, spreadsheet, Bates- stamped
12     CBS 43
13     Exhibit 3, emails, Bates- stamped CBS
14     8526 and going to 8527
15     Exhibit 4, EEOC complaint re ██████
16     Bates-stamped CBS 8456 through 8480
17     Exhibit 5, emails, Bates- stamped CBS
18     8528 to 8529
19     Exhibit 6, emails, Bates- stamped CBS
20     8530 to 31
21     Exhibit 7, email, Bates-stamped CBS
22     8451
23     Exhibit 8, memo dated 10/11/19 from
24     Roderick to ██████ Bates-stamped CBS
25     8452 to 8453
```

Page 329

1

2      Exhibit 9, Richards complaint,

3      Bates-stamped CBS 7775

4      Exhibit 10, emails, Bates- stamped CBS

5      3150

6      Exhibit 11, text messages,

7      Bates-stamped CBS 8128

8      Exhibit 12, text messages,

9      Bates-stamped CBS 8167

10     Exhibit 13, text messages,

11     Bates-stamped CBS 8172

12     Exhibit 14, text messages,

13     Bates-stamped CBS 8179 to 8181

14

15

16

17

18

19

20

21

22

23

24

25

Page 330

1
2      - - - - - - - E R R A T A   S H E E T - - - - - -
3

CASE:  Poolos v. Paramount Global
4    DEPOSITION DATE:  February 5, 2025
     DEPONENT:  Bill Owens
5

PAGE/LINE(S)        CHANGE              REASON
6
____/_____/_____/_____
7
____/_____/_____/_____
8
____/_____/_____/_____
9
____/_____/_____/_____
10
____/_____/_____/_____
11
____/_____/_____/_____
12
____/_____/_____/_____
13
____/_____/_____/_____
14
____/_____/_____/_____
15
____/_____/_____/_____
16
____/_____/_____/_____
17
____/_____/_____/_____
18
____/_____/_____/_____
19
20
                    _____
21                        BILL OWENS
22   SUBSCRIBED AND SWORN TO BEFORE ME
     THIS_____DAY OF_____, 2025.
23
24
     _____  _____
25   NOTARY PUBLIC            DATE COMMISSION EXPIRES

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.