# EXHIBIT H

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

ALEXANDRA POOLOS,                    )
                                     )
            Plaintiff,               )
                                     )
            vs.                      )    No. 1:23-cv-08896
                                     )       (GHW)(HJR)
PARAMOUNT GLOBAL; CBS                )
BROADCASTING, INC.; and             )
CBS NEWS, INC.,                      )
                                     )
            Defendants.              )
------------------------             )

February 25, 2025

10:09 a.m.

Deposition of COLLETTE RICHARDS, held at the offices of Davis Wright Tremaine LLP, 1251 Avenue of the Americas, New York, New York, before Laurie A. Collins, a Registered Professional Reporter and Notary Public of the State of New York.

Page 2

A P P E A R A N C E S:

VLADECK, RASKIN & CLARK, P.C.

Attorneys for Plaintiff

111 Broadway, Suite 1505

New York, New York 10006

BY:    JEREMIAH IADEVAIA, ESQ.

jiadevaia@vladeck.com

BRANDON WHITE, ESQ.

bwhite@vladeck.com

JAMES BAGLEY, ESQ.

jbagley@vladeck.com

DAVIS WRIGHT TREMAINE LLP

Attorneys for Defendants

1251 Avenue of the Americas

New York, New York 10020

BY:    LYLE S. ZUCKERMAN, ESQ.

lylezuckerman@dwt.com

MICHAEL LEONE LYNCH, ESQ.

michaellynch@dwt.com

A P P E A R A N C E S (continued):

ALSO PRESENT:

DANYA AHMED, ESQ. (Paramount)

ALEXANDRA POOLOS

ANTON EVANGELISTA, Videographer

Page 4

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 10:09 a.m. on February 25th, 2025.

Please note that the microphones are    10:10:09 sensitive and may pick up whispering and private conversations.

Please mute your phones at this time.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit 1 of the video-recorded deposition of Collette Richards taken by counsel for plaintiff in the matter of Alex Poolos versus Paramount Global, et al., filed    10:10:32 in the United States District Court, Southern District of New York, Case Number 1:23-cv-08896(GHW)(HJR).

The location of the deposition is Davis Wright Tremaine, 1251 Avenue of the Americas    10:11:01 in New York City.

My name is Anton Evangelista, representing Veritext, and I am the videographer.  The court reporter is Laurie Collins from the firm Veritext.    10:11:11

Page 5

Proceedings

I am not authorized to administer an oath.  I am not related to any party in this action, nor am I financially interested in the outcome.                                          10:11:21

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present will now state their appearances and affiliations for the     10:11:27 record, beginning with the noticing attorney.

ATTORNEY IADEVAIA:  Good morning.  My name is Jeremiah Iadevaia, and I'm here with my colleagues Brandon White and James Bagley of the firm Vladeck, Raskin & Clark on behalf  10:11:40 of the plaintiff in this matter.  And also with us is the plaintiff, Alex Poolos.

ATTORNEY ZUCKERMAN:  Good morning.  Lyle Zuckerman from Davis Wright Tremaine.  I'm here on behalf of defendants.  I'm here     10:11:54 with my colleagues, Michael Lynch, and with in-house counsel for Paramount, Danya Ahmed.

THE VIDEOGRAPHER:  And will the court reporter please swear in the witness and then counsel may proceed.                       10:12:06

Page 6

Richards

C O L L E T T E   R I C H A R D S ,

called as a witness, having been duly sworn

by the notary public, was examined and

testified as follows:

EXAMINATION BY

ATTORNEY IADEVAIA:

Q.    Good morning, Ms. Richard.  I introduced myself off the record and I just said it on the record.  As mentioned, my name is   10:12:24 Jeremiah Iadevaia, and, together with the team of lawyers here, we represent Ms. Poolos in this matter against CBS and related corporate entities.

Ms. Richards, have you ever had your deposition taken before?   10:12:40

A.    No.

Q.    So you have a sense of how the day's going to go, I'm going to go through a couple of ground rules for the deposition.  This is going to be a question-and-answer session, and the   10:12:52 questions and answers will be recorded by the court reporter to my left.  As a result, I'll need verbal answers from you, so yeses or nos or some explanation and not gestures or nods.  Understood?

A.    Yes.   10:13:09

Page 7

Richards

Q.    During the day I will do my best not to interrupt you when you're responding to a question, and I ask that you do your best not to interrupt me so that the court reporter can accurately record the back-and-forth.  Is that okay?        10:13:20

A.    Yes.

Q.    If you do not understand a question that I ask, just let me know and I'll do my best to rephrase it.  Is that okay?        10:13:31

A.    Yes.

Q.    During the day we will take periodic breaks, but if you need a break just let me know and, as long as a question is not pending, it will be no problem to take a break.  Okay?        10:13:44

A.    Understood.

Q.    Are you on any medication today that would affect your ability to testify truthfully and accurately?        10:13:55

A.    No.

Q.    Is there any reason that you know of that you would be unable or are unable today to testify truthfully and accurately?

A.    No.        10:14:04

Page 8

Richards

Q.   Did you do anything to prepare for today's deposition?

A.   Yes.

Q.   What did you do?                              10:14:09

A.   I prepared yesterday with counsel.

Q.   And where did you prepare yesterday?

A.   In a conference room in this building on this floor.

Q.   And who was present for that              10:14:21
preparation?

A.   Lyle and Michael.

Q.   Was anyone else --

A.   And Danya and Laura Sack.

Q.   Was anybody else present?              10:14:34

A.   No.

Q.   How long was the meeting yesterday?

A.   About four or five hours.

Q.   And did you review documents during that meeting?                              10:14:46

A.   Yes.

Q.   And what documents did you review?

A.   My original complaint to HR.

Q.   Anything else?

A.   Various emails.                              10:14:55

Page 9

Richards

Q.    Anything else?

A.    No.

Q.    Did you listen to any recordings?

A.    No.                                        10:15:02

Q.    Did you read any transcripts of recordings?

A.    No.

Q.    Other than your original complaint and various emails, did you review anything else    10:15:13 yesterday in preparation for today's deposition?

A.    No.

Q.    Outside of yesterday's meeting with counsel that you've just testified to, did you do anything else to prepare for today's deposition?    10:15:29

A.    No.

Q.    Did you have any other meetings with counsel to prepare for today's deposition besides the one yesterday?

A.    I don't know if an interview I did with    10:15:48 them prior to yesterday counts as preparation, but I don't think so.

Q.    Did you discuss today's deposition with anyone other than your counsel?

A.    No.                                        10:16:04

```
                                              Page 10
                         Richards
       Q.    Did you discuss today's deposition with
Bill Owens?
       A.    No.
       Q.    Tanya Simon?                          10:16:08
       A.    No.
       Q.    Lesley Stahl?
       A.    No.
       Q.    Claudia Weinstein?
       A.    No.                                   10:16:15
       Q.    Renee Balducci?
       A.    No.
       Q.    Maria Cottone?
       A.    No.
       Q.    Cindy Glasgow?                        10:16:23
       A.    No.
       Q.    Scott Bronstein?
       A.    No.
       Q.    Are you aware that other depositions
have already taken place in this case?            10:16:29
       A.    Yes.
       Q.    Have you reviewed any of the
transcripts of those depositions?
       A.    No.
       Q.    Have you reviewed the lawsuit that was  10:16:43
```

Page 11

Richards

filed in this case by my law firm?

A.    Yes.

Q.    When did you first review it?

A.    When it was first put out, filed.    10:16:51

Q.    Got it.

And have you reviewed it since then?

A.    No.

Q.    Did you review it in preparation for today's deposition?    10:17:00

A.    No.

Q.    Is the answer no?

A.    No.

Q.    And do you have any understanding -- and I know you're not a lawyer, but do you have    10:17:12 any understanding of what Ms. Poolos's legal claims are in this case?

A.    Yes.

Q.    What's your understanding?

A.    My understanding is that she has filed    10:17:23 a claim against the company based on gender discrimination.

Q.    Any other understanding of her claims beyond that?

A.    Not beyond that.    10:17:33

Page 12

Richards

Q. Have you discussed Ms. Poolos's lawsuit with Tanya Simon?

A. No.

Q. Have you discussed Ms. Poolos's lawsuit 10:17:48 with Bill Owens?

A. No.

Q. With Cindy Glasgow?

A. No.

Q. With Maria Cottone? 10:17:54

A. No.

Q. With Renee Balducci?

A. No.

Q. With Lesley Stahl?

A. No. 10:18:01

Q. With Claudia Weinstein?

A. No.

Q. With Shachar Bar-On?

A. No.

Q. With Scott Bronstein? 10:18:07

A. No.

Q. I want to ask some very basic background questions. Did you attend college?

A. Yes.

Q. Where did you go to college? 10:18:23

```
                                          Page 13
                        Richards
        A.    I went to two colleges.  I went to
   Augusta State University and then I transferred
   and went to Georgia State University, where I
   graduated.                                   10:18:30
        Q.    When did you graduate?
        A.    2015.
        Q.    And what degree did you get from
   Georgia State?
        A.    Communications.                   10:18:35
        Q.    And what kind of degree?  Is that a
   bachelor of arts?
        A.    Uh-huh.
        Q.    I need a yes or no.
        A.    Yes.                               10:18:42
        Q.    Thanks.
              Did you attend any school after
   graduating from Georgia State?
        A.    No.
        Q.    Where do you work currently?       10:18:48
        A.    60 Minutes.
        Q.    And that's part of Paramount; is that
   right?
        A.    Yes.
        Q.    When did you join 60 Minutes?      10:18:55
```

Page 14

Richards

A.    In October of 2020.

Q.    And when you joined what was your title?

A.    Associate producer.                    10:19:04

Q.    And were you part of a team when you joined?

A.    Yes.

Q.    And who was part of that team in addition to you?                              10:19:13

A.    Lesley Stahl and Alex Poolos.

Q.    And what is Ms. Stahl's -- what was Ms. Stahl's title at the time?

A.    Correspondent.

Q.    And Ms. Poolos?                         10:19:26

A.    Producer.

Q.    And has your title remained till today associate producer?

A.    Yes.

Q.    And you're still on Ms. Stahl's team;   10:19:38 is that correct?

A.    Yes.

Q.    And Ms. Poolos is no longer the producer; correct?

A.    Correct.                                10:19:46

Page 15

Richards

Q.    And who is the current producer you work with?

A.    Shari Finkelstein.

Q.    And is it the case that you went from    10:19:51
working with Ms. Poolos to working with Ms. Finkelstein?

A.    Yes.

Q.    There was no one in between?

A.    No.    10:19:59

Q.    When you joined who did you report to?

A.    Technically I reported to Tanya Simon, and Alex Poolos was my, I guess, manager.

Q.    Okay.  And Tanya Simon, what's -- is she still at 60 Minutes?    10:20:26

A.    Yes.

Q.    What's her title?

A.    Executive editor.

Q.    Do you continue to report to Ms. Simon?

A.    Yes.    10:20:34

Q.    And Ms. Poolos is no longer at 60 Minutes; correct?

A.    Correct.

Q.    Do you report or is your manager Ms. Finkelstein at this point?    10:20:41

```
                                              Page 16
```

                                Richards

A.    Yes.

Q.    Any other changes during the time that you worked at 60 Minutes in who you reported to other than the change from Ms. Ms. Poolos to    10:20:51 Ms. Finkelstein?

A.    No.

Q.    When you joined as an associate producer for 60 Minutes, what were your responsibilities?    10:21:04

A.    My responsibilities were to research stories, to fact-check our reporting, to handle logistics for shoots, to find third-party material for our stories, to prepare our correspondent for interviews.    10:21:37

Q.    Any other responsibilities?

A.    There are various other things that come up on a story, but those are the main things that I can think of.

Q.    And since joining, have your    10:21:48 responsibilities changed in any significant way?

A.    No.

Q.    They remain more or less the same today that they were when you joined?

A.    Yes.    10:21:57

Page 17

Richards

Q.    When you say "research stories," what do you mean by that?

A.    So it's everything from finding stories that we could work on to looking for relevant reporting that's already been done about a story, finding characters that could potentially be good for us to talk to both on background and potentially on camera, to find related literature that we could consider, and find out timelines that could work for us to produce a piece.  That's about it.

Q.    You mentioned characters.  What does characters mean in this context?

A.    A person that could speak on camera.

Q.    Just -- it's okay, but just let me finish, just because the reporter will have a hard time.

A.    Okay.

Q.    I know sometimes you anticipate my question.  I get it.

Okay.  When you say fact-check reporting, what do you mean by that?

A.    So through the process of doing interviews with people, they may say something in

Page 18

Richards

an interview on camera, and we have to confirm
that that is correct.

Q.    Anything else when you say "fact-
checking" what you mean?                          10:23:14

A.    Yeah, anything that we say in our
narration by the correspondent all has to be fact-
checked.

Q.    Anything else when you say "fact-
checking" that you mean beyond what you've         10:23:28
testified to?

A.    I don't think anything beyond what I've
said.

Q.    You said handle logistics for shoots.
What are shoots?                                   10:23:37

A.    When we go and interview people or we
go and do B roll for our story.

Q.    What's B role?

A.    It's anything that typically doesn't
have a character in it, so someone that we're not  10:23:51
interviewing, like it could be exteriors of the
building, landscape.

Q.    And what kinds of logistics have you
been responsible for handling in connection with
shoots since you've been at 60 Minutes?           10:24:08

```
                                            Page 19
                         Richards
     A.    You mean since I've been at 60 Minutes
the entire team or under --
     Q.    Since you've been at 60 Minutes.  I
know generally you're not going to give me every      10:24:21
single thing you do.
     A.    So logistics is any time we're setting
up a shoot where we would need a cameraman, a
sound man, and our correspondent.  So there are
many times where we fly internationally and          10:24:35
domestically, and we need to get our crew there
and our correspondent there.
          We need to have a location in order for
us to shoot in.  We need to find a way to get our
interview subjects to that location, and we need     10:24:51
to plan out how many days that will take, where we
will stay, what flights we will go on, how much
money the excess baggage will cost for our crew.
          And any shoot will have its own
individual challenges and things that are            10:25:10
different amongst one story to another.
     Q.    And when traveling internationally, as
part of that process, does that include ensuring
that folks have the appropriate documentation to
be able to travel?                                   10:25:30
```

```
                                              Page 20
```

                    Richards

A.    Yes.

Q.    Things like passports?

A.    Yes.

Q.    You mentioned one of your                10:25:39
responsibilities has been securing third-party
material for stories.  Do I have that correct?

A.    Yes.

Q.    Okay.  What does that mean?

A.    So that means anything that we did not   10:25:49
shoot with our cameras or photos that we did not
take or anything that's coming from outside of our
own content is third party.

Q.    Got it.

      And is there a process that you follow   10:26:05
in order to secure that third-party material for
stories?

A.    Yes.

Q.    What's that process?

A.    There's also someone that works on this  10:26:14
with me, a broadcast associate, who has a strong
hand in this as well.  And so -- can you repeat
the question?

Q.    Sure.  What's the process for securing
the third-party material?                      10:26:31

Page 21

Richards

A.    So we would look to see what we need in order to tell the story.  So sometimes that means we need images from, like, Getty Images, which is a common third-party site that we have a company    10:26:42 subscription to.  And sometimes we will get photos or videos from our interview subjects as it relates to their story.  And sometimes there's things from other agencies that we will need to get.    10:27:01

So there's a process of looking at what is available and putting that into our internal system.  And we organize that in a third-party document that is given to our in-house third -- or in-house rights and clearances team.  And that's    10:27:17 reviewed before screenings and is ultimately is finished when the story is delivered.  And that stands as record for what is in the story and what is not.

Q.    And you mentioned a rights and    10:27:33 clearances team.  Generally what is your understanding of what that team does?

A.    So our team is a woman named Joanna Palmer, and she is a person that reviews everything and gives us guidance on the different    10:27:47

Page 22

Richards

things that we have in the story and if we need to -- if we need -- if we need to consider different images or anything for rights. But there -- they -- they help us figure out what we 10:28:05 need to either license or not.

Q. Does the rights and clearances team, at least to the extent that you've worked with them, help navigate questions of copyright and intellectual property? 10:28:22

A. Yes.

Q. Yes? Okay.

You mentioned that one of your responsibilities is to prepare a correspondent -- or the correspondent, I guess in this case 10:28:41 Ms. Stahl. What did you mean by that? What does that mean?

A. So before we go on interview shoots, the producer and I work together to come up with a research packet. And we put relevant articles in 10:28:53 it, and we put background notes in it, and we -- there's usually some sort of summary in there about the stories so that she can read that and know everything that she needs to know before going in and sitting down to do interviews. 10:29:12

Page 23

Richards

Q.    And as an AP do you actually conduct background interviews?

A.    Yes.

Q.    Does the producer also conduct background interviews?                                10:29:34

A.    Yeah.

Q.    As an AP do you have any responsibilities that involve writing or drafting documents?                                10:30:05

A.    Yes.

Q.    And what kind of responsibilities do you have?

A.    I will write -- depending on the story, I will write summaries about a certain topic that   10:30:13 may go into a background briefing for the correspondent.  I will write up pitches.  I will write up notes.

Q.    What kind of notes?  What do you mean by that?                                10:30:36

A.    Like notes from interviews that we've done, gather research about stories that we're looking into considering.

Q.    Am I correct that you not only gather the research but then sometimes will summarize or   10:30:53

Page 24

Richards

write something about the research?

A.    Yes.  It depends.

Q.    I want to sort of switch topics a little bit.  Where did you work before you got to  10:31:10 60 Minutes?

A.    At CNN.

Q.    And when you were in college, did you do any kind of internship with CNN?

A.    Yes.  10:31:25

Q.    What was your internship?

A.    I did an internship in the summer with the domestic unit in Atlanta.

Q.    When you say "domestic unit," what do you mean?  10:31:38

A.    So I was part of the field unit team, so the unit that has the correspondents.  And whenever breaking news would happen, they would deploy to whatever is happening.

Q.    And domestic units means news that is  10:31:50 covered in the United States?

A.    Yes.

Q.    Okay.  And how long was your internship, approximately?

A.    About three or four months.  10:31:58

Page 25

Richards

Q.    And you graduated in 2015.  Was the internship during your last year?

A.    It was during the summer when I was finishing.                                          10:32:11

Q.    Did you continue to work for CNN after the internship?

A.    Yes.

Q.    And what was your next role there?

A.    My next role there, I got a job as a   10:32:18
production assistant at the company's sister network, HLN, at the Dr. Drew show.

Q.    And what did you do as a production assistant during your time at the Dr. Drew show?

A.    That was a live news show, so I helped   10:32:37
the producers with putting together what is called a voice-over.  It's images that, like, come up on screen when we're talking about a specific topic, whether if it's, like, a plane crash, show plane crash images, whatever, whatever the subject is.   10:32:59

        Also help get together the packages for the day.  A package is a put-together collection of interviews, natural sound.  It could be about three minutes long.  And then during the live show we would just make sure that everything timed out   10:33:17

```
                                        Page 26
```

Richards

how it needed to.

Q.    And how long were you in that job as production assistant at the Dr. Drew show?

A.    About a year.                          10:33:31

Q.    Who did you report to on that show?

A.    Bill Dubrow was the executive producer.

Q.    I mentioned someone's name before, Scott Bronstein.  Did he work at CNN at the same time that you did?                          10:33:54

A.    Yes.

Q.    Did he work on that show with you?

A.    No.

Q.    Why did you end up leaving your job as production assistant for the Dr. Drew show?          10:34:06

A.    The show was canceled, and I got a job at CNN as an associate producer in the cross-platform group.

Q.    What was the cross-platform group at the time?                          10:34:19

A.    So at the time it was a group that had maybe a dozen APs that would rotate through different groups at CNN, and so you would work with one team for six months and then move to another team.                          10:34:34

Page 27

Richards

Q.    And generally what were your responsibilities during the time you worked for the cross-platform group?

A.    So it changed with different 10:34:45 departments that I worked with.  When I was working with the video production team, we were in charge of sort of curating the cnn.com home page. So we were working on putting together video in order to program it on the cnn.com website. 10:35:03

And then from there I moved to the investigative unit.

Q.    You mean that was your next role at CNN?

A.    I had a rotation in that job with the 10:35:19 investigative unit.

Q.    Got it.  So you started with the video production and the website, and then you moved to the investigative unit?

A.    Right, as a cross-platform associate 10:35:29 producer.

Q.    Got it.

And how long did you perform services for the investigative unit?

A.    So I was on a rotation with them under 10:35:37

```
                                                  Page 28
```

Richards

that cross-platform role for six months, and then they extended an offer for me to work for them for full-time.  So that started in about January of 2017.  And then I was with that unit until I left 10:35:49 to come to 60 Minutes.

Q.    Got it.  Okay.

Just going back to the video production work you did when you were part of the cross-platform group, who did you report to then?    10:36:02

A.    Oh, gosh.

Q.    If you don't remember and it comes to you later, you can tell me.

A.    I don't remember the manager's name.

Q.    When you were in the investigative unit 10:36:17 I guess during your rotation there, who did you report to?

A.    Patricia DiCarlo.

Q.    What was her role?

A.    Executive producer.    10:36:27

Q.    What was she executive producer of?

A.    The investigative unit.

Q.    And during the period that you were doing the rotation for the investigative unit, what were your responsibilities generally?    10:36:38

Page 29

Richards

A.    Research, working with the producing teams whenever the correspondent was doing a package to find relevant video and stills and help the editor do the package in time for air, which usually happened in the evening and prime time slots.    10:36:57

Q.    And when you moved to -- I guess from the rotational role within the investigative unit to a full-time position there, did your responsibilities change?    10:37:23

A.    They grew over time.

Q.    And generally in what ways did they expand?

A.    They expanded by I got more assignments where I would research and write stories and produce stories on my own.  I worked on long-form investigative pieces and also breaking news pieces.    10:37:34

Q.    Anything else?    10:38:02

A.    That's generally it.

Q.    And when you were in the -- you moved to the full-time position when you first moved into it around January of 2017, who did you report to?    10:38:14

```
                                              Page 30
                        Richards

     A.     Can you repeat the question?

     Q.     Sure.  So when you moved to the full-
time role within the investigative unit I think
you said around January of 2017, who did you          10:38:22
report to?

     A.     Patricia DiCarlo.

     Q.     Did that change at any point?

     A.     No.

     Q.     Did you work with Scott Bronstein at      10:38:32
CNN?

     A.     Yes.

     Q.     Okay.  When did you -- for what period
of time did you work with him, approximately?

     A.     From January 2017 until I left in         10:38:39
October of 2020.

     Q.     And what was his job at the time?

     A.     He was a senior producer in the
investigative unit.

     Q.     Was he a senior producer the whole        10:38:54
period from January 2017 to October 2020?

     A.     Yes.

     Q.     Generally what did you observe him
doing?  What was his job function?

     A.     So he and another producer both had the   10:39:07
```

```
                                                  Page 31
```

Richards

same title of senior producer in that unit.  So

they would take the lead on finding stories for

the team to work on and mostly traveled with the

correspondent whenever there was a reason to          10:39:23

travel for a story or for breaking news and then

writing the script with the correspondent and

ultimately producing the pieces with the

correspondent.

     Q.    And who was the other senior producer?    10:39:43

     A.    Nellie Black.

     Q.    Did you work with -- more with

Mr. Bronstein or more with -- Nellie Black, you

said?

     A.    Yes.                                    10:39:53

     Q.    -- Ms. Black?  Did you work more with

one versus the other?

     A.    Both equally.

     Q.    And what work did you do with the

senior producers, Mr. Bronstein and Ms. Black?      10:40:04

     A.    Do you want me to name the stories that

I worked on?

     Q.    Sure, you can start there.

     A.    We -- one of the big things that I

worked on with Nellie was the Uber sexual assault    10:40:15

Page 32

Richards

story that we did.  That was a couple different stories that ultimately came out, so that was a long-form story that we did.

A story that I did with Scott Bronstein  10:40:27 and Curt Divine, who was another producer on that team -- oh, Curt Divine works on all of the stories as well.  We worked as a team together on everything.

So the other story that I did that I  10:40:42 was starting to talk about was a look into the original border cases that happened under the Obama Administration.  It was a long look at land records, and we looked at all the different eminent domain cases.  It was a lot of document  10:41:04 reviewing, so we did that.

Other stories that we did.  We did a story about after George Floyd the Minneapolis Police Department.  We worked on that.  We did stories on the EPA and Scott Pruitt.  10:41:25

Q.   Any others that you can recall?

A.   Not that I can recall off the top.

Q.   The story related to Mr. Floyd and the aftermath, which senior producer or producers did you work with?  10:41:46

Page 33

Richards

A.    That was Curt Divine.  There was another writer -- I believe it was Scott Glover -- and Scott Bronstein.

Q.    And the EPA Scott Pruitt story, which producer or senior producers did you work with?    10:41:55

A.    That was Scott Bronstein.

Q.    When you were working as an AP within the investigation unit between January 2017 and October 2020, how many other APs were there, if any?    10:42:14

A.    None.

Q.    You were the only AP?

A.    Yes.

Q.    On the EPA Scott Pruitt story that you worked on with Mr. Bronstein, what were some of the things you did in connection with that story?    10:42:21

A.    At that point I was working mostly on putting the package together and helping with research.    10:42:41

Q.    When you say related to the EPA Scott Pruitt story putting the package together, what do you mean by that?

A.    So ultimately we would put together a three- or four-minute news piece that would air on    10:42:54

Page 34

Richards

various CNN shows.  So that's what I mean by "a package."  So we would put together various interviews that we did, sound from be it, like, Scott Pruitt speaking.  I don't remember exactly                    10:43:11 what was in that piece but things like that.

Q.    Is it essentially a way to promote or market the story?

A.    It's a way to report the story.

Q.    A way to report it.  Okay.                    10:43:22

And other than you and Mr. Bronstein, who else worked on that EPA story?

A.    Drew Griffin.  Drew Griffin was the correspondent we worked for that was the front of all of our work.  He was the leader.                    10:43:38

Q.    Anyone else work on it?

A.    Patricia DiCarlo oversees everything we do.  She's the executive producer of everything.

Q.    Anybody else?

A.    Whoever edited the piece.                    10:43:49

Q.    And the story you mentioned about the border cases involving the Obama Administration and eminent domain, what kind of work did you do on that story with Mr. Bronstein and Mr. Divine?

A.    I was reading court cases that                    10:44:09

Page 35

Richards

originally happened when the federal government

was trying to take various landowners' land in

order to build the border wall.

Q.    Anything else you recall about the work    10:44:21

you did on that story?

A.    Just any related research.

Q.    Was there any traveling involved with

the border cases that you participated in?

A.    Not that I participated in.    10:44:31

Q.    And on the EPA case, did you travel at

all?

A.    No.

Q.    And on the George Floyd case, what kind

of work did you do there; I mean the stories, not    10:44:45

the case.

A.    Can you repeat it, then?

Q.    Sure.  Let me repeat the question.

The George Floyd story and the

aftermath, what work did you personally do on that    10:44:52

story?

A.    We were looking at reports from the

Minneapolis Police Department.  We were working

with talking to -- I don't remember all the

different sources, but we were speaking with    10:45:04

Page 36

Richards

people to try and gather complaints that were made against the Minneapolis Police Department and looking at available court records at the time and putting together a report that ultimately talked    10:45:19 about complaints against the Minneapolis Police Department.

I also worked on producing the piece that aired to capture all of our reporting.

Q.    Why did you end up leaving CNN?    10:45:40

A.    I was reached out to by a recruiter on LinkedIn to consider a job at 60 Minutes.

Q.    Who was the recruiter?

A.    I don't remember.

Q.    And when did that recruiter reach out    10:45:57 to you?

A.    About February 2020.

Q.    And what was the job that the recruiter reached out about?

A.    Initially they asked me if I wanted to    10:46:10 be a producer for Tony Dokoupil, but I said that that was something I was not interested in.  As we continued talking, they said openings were coming up at 60 Minutes and that could be a good fit for me.  So I said I was interested in that, and they    10:46:28

Page 37

Richards

continued to work with me on that.

Q.    At the time what was Tony Dokoupil's position?

A.    He was an anchor.                          10:46:38

Q.    An anchor for 60 Minutes?

A.    CBS Mornings.

Q.    Oh, okay.  So the recruiter initially reached out to you about a job at CBS Mornings?

A.    Uh-huh.                                    10:46:51

Q.    I see.

A.    Yes.

Q.    And why were you not interested in that job?

A.    I didn't want to work in the morning.    10:46:58

Q.    Do the days start earlier?  Is that the idea?

A.    Yes.  I didn't want to work on a morning show.

Q.    Was there any other reason -- well, was   10:47:06 the time of the day when it started the reason or what do you mean you didn't want to work on a morning show?

A.    I didn't want to work on live news, and I didn't want to work on a morning show.      10:47:17

```
                                              Page 38
                        Richards
        Q.    Is there something specific about a
morning show?
        A.    Generally working on a morning show
means you wake up at 2 a.m.  You essentially work   10:47:25
overnight.
        Q.    And did the recruiter present you with
any other potential positions beyond the role on
the morning show?
        A.    The 60 Minutes.                        10:47:44
        Q.    And when were you first presented with
a 60 Minutes position by a recruiter?
        A.    In that phone call.
        Q.    The same phone call?
        A.    Yes.                                    10:47:56
        Q.    And what was the position that person
talked to you about, the recruiter?
        A.    An associate producer at 60 Minutes.
        Q.    Was it an associate producer role for a
specific team or producer?                           10:48:07
        A.    I don't remember what they told me at
that first convo.
        Q.    Okay.  Did you have subsequent
conversations with the recruiter about a role as
an AP at 60 Minutes?                                 10:48:16
```

```
                                              Page 39
                    Richards

     A.    Yes.

     Q.    Okay.  And were you ever presented a
specific role or job beyond being an AP at 60?

           ATTORNEY ZUCKERMAN:  Objection.        10:48:27

           You can answer.  If I object, please
     answer the question unless I tell you not to
     answer the question.  Okay?

           THE WITNESS:  Okay.

           Can you repeat it?                      10:48:33

     Q.    Sure.  Were you ever presented a
specific job at 60 Minutes?

           ATTORNEY ZUCKERMAN:  Objection.

     Q.    By a recruiter.

     A.    Initially I was told that I would be    10:48:42
interviewing with Rich Bonin, who was a producer
for Lesley Stahl.

     Q.    And approximately when were you told
that?

     A.    I believe that had to have been         10:48:56
February of 2020.

     Q.    And did you indicate an interest in
that position?

     A.    Yes.

     Q.    So please describe me sort of the       10:49:10
```

Page 40

Richards

sequence of events that took place in connection

with the position with the -- or potential

position with Mr. Bonin.

ATTORNEY ZUCKERMAN:  Objection.          10:49:19

You can answer.

A.    Yes.  So I started interviewing with

Rich Bonin right before the coronavirus pandemic.

And once that shut the world down, that interview

processing stopped.  A few months later I started    10:49:34

hearing from the recruiter again, who said that

two positions were available and I could hear from

another producer as well.  And so I then started

interviewing again with Rich Bonin and then

started interviewing with Alex Poolos.             10:49:56

Q.    How many interviews did you have with

Mr. Bonin?

A.    I don't recall exactly how many.

Q.    Was it more than two?

A.    It could be.                               10:50:14

Q.    Were you ever offered a position to

work with Mr. Bonin?

A.    I was presented with a call from the

recruiter, who asked me what I would do if I was

offered a role with Rich Bonin.  And I said that I   10:50:32

Page 41

Richards

actually preferred to work with Alex because I was

most interested in working with her and the types

of stories that she was doing.

Q.    And what stories were you referring to?    10:50:46

A.    Alex was working on human rights-type

stories and international stories, and I liked the

work that she was doing.

Q.    And when approximately did you have

that phone call with the recruiter where you were    10:51:01

presented with that question?

A.    Early fall of 2020.

Q.    Were there any reasons you didn't want

to work with Mr. Bonin?

A.    He was working on a lot of politics,    10:51:19

and I was more so interested in working on

different subject matter.  I gravitated more

toward the idea of working with Alex, was my

primary reason why I wanted to work with her.

Q.    Did you do any kind of due diligence or    10:51:45

research on your own about the potential of

working with Mr. Bonin?

ATTORNEY ZUCKERMAN:  Objection.

You can answer.

A.    Not that I recall.    10:52:04

```
                                            Page 42
```

Richards

Q.    Did you ever receive any feedback about Mr. Bonin that he was difficult to work with, around this time in 2020?

A.    Can you repeat the question?                10:52:23

Q.    Sure.  I'm asking if you had any feedback about Mr. Bonin being difficult to work with.

A.    I had heard that.

Q.    What did you hear?                          10:52:33

A.    I had heard that he may have been difficult.

Q.    What else did you hear other than he may have been difficult?

A.    Nothing extensive.                          10:52:46

Q.    Whether extensive or not, did you hear any specifics?

A.    No.

Q.    Did you hear anything generally other than he may be difficult?                       10:52:53

A.    Not that I recall.

Q.    Did you ever hear that Mr. Bonin was difficult to work with as a woman?

         ATTORNEY ZUCKERMAN:  Objection.

A.    Not that I recall.                          10:53:09

Page 43

Richards

Q.    Anything generally about that topic?

A.    Not that I recall.

Q.    Did you hear anything about complaints that others had made about Mr. Bonin?                10:53:23

A.    Not that I remember.

Q.    Not anything generally?

A.    No.

Q.    Other than what you've testified to, is there any other reason that you preferred working    10:53:45 with Ms. Poolos over Mr. Bonin?

A.    Nothing to add.

Q.    Is there anything else, though?

A.    Can you rephrase the whole question?

Q.    Sure.  The question is whether other    10:54:00 than what you've already testified to is there any other reason you had for preferring to work with Ms. Poolos over Mr. Bonin.

A.    No.

Q.    Did you have any discussions -- in the    10:54:22 2020 time frame we've been talking about, did you have any discussions with Mr. Bronstein about working at 60 Minutes?

A.    Yes.

Q.    And what discussions did you have with    10:54:33

```
                                        Page 44
                        Richards
him?
     A.    I let him know that a recruiter had
reached out to me and I was considering the job.
And I knew that he had worked at 60 Minutes          10:54:39
before, so I asked him his opinion if that would
be a good move for me.
     Q.    What did he say?
     A.    He said it was a great place to work.
It was obviously a top -- top news organization     10:54:51
and it's certainly something I should look into.
     Q.    Did Mr. Bronstein tell you at all about
his experience working at 60 Minutes?
     A.    Briefly, yes.
     Q.    What did he say?                          10:55:05
     A.    He said that he got to work on some big
stories and that it was something that he really
loved getting to do but he was ultimately -- I
believe he was let go from the company.
     Q.    Is your understanding he was let go      10:55:23
involuntarily?
     A.    Yes.
     Q.    And did he ever tell you what happened?
     A.    Not that I remember.
     Q.    Do you remember anything about it?        10:55:33
```

```
                                              Page 45
                         Richards
```

A.    No.

Q.    When he was at 60 Minutes, did he tell you -- was he a producer there?  an AP?  Do you know?                                          10:55:49

A.    I believe he was an AP and then a producer.

Q.    And did he tell you who he worked with at 60 Minutes?

A.    He worked for Christiane Amanpour and    10:55:56 then Mike Wallace.

Q.    Beyond what you testified to, did you have other discussions with Mr. Bronstein about working at 60 Minutes?

A.    No.  He was a job reference for me.    10:56:16

Q.    And how did it come about that he was your job reference?

A.    I asked if he would be a reference for me.

Q.    And what did he say?                10:56:28

A.    He said yes.

Q.    Did you have other job references for positions you sought at 60 Minutes beyond Mr. Bronstein?

A.    Yes, yes.  Another mentor of mine, Mary  10:56:38

Page 46

Richards

Lynn Ryan, who was the bureau chief at CNN when I started my internship.

Q.    Had you worked with Ms. Ryan outside of the internship at CNN?                                    10:56:57

A.    Directly, no.

Q.    Indirectly?

A.    No.

Q.    Any other references for the 60 Minutes job or jobs you sought?                                    10:57:14

A.    Not that I remember.

Q.    Did you discuss with Mr. Bronstein the possibility of working with Mr. Bonin?

A.    Yes.

Q.    And what did you discuss with him?     10:57:27

A.    I told him I was interviewing with both Rich and Alex, and I asked him what he thought might be a good option for me.

Q.    What did he say?

A.    He said that Alex's stories looked like     10:57:43 something that I wanted to work on and that it could be a good thing for me to work with her and that while Rich was mostly doing politics and that's not something I really wanted to work on.

Q.    Did Mr. Bronstein say anything else     10:58:05

Page 47

Richards

about working with either Ms. Poolos or Mr. Bonin?

A.    He said that Rich might be a bit difficult to work with.

Q.    What did he say about that?                10:58:19

A.    Not anything beyond much of what I have already said that I can remember.

Q.    You have no memory of what -- of any specifics or details he gave about Mr. Bonin being difficult to work with?                10:58:36

A.    I don't remember specifics or details.

Q.    Do you remember anything?

A.    I remember he said he might be more of a difficult person to work with.

Q.    You don't recall, as you sit here                10:58:43 today, any explanation as to why he said that?

ATTORNEY ZUCKERMAN:  Objection.

A.    No.

Q.    Other than what you've testified to, did Mr. Bronstein say anything else about the                10:59:06 possibility of working with Mr. Bonin?

A.    Not that I can recall.

Q.    Did Mr. Bronstein say anything else beyond what you've testified to about the possibility of working with Ms. Poolos?                10:59:18

```
                                        Page 48
                         Richards
        A.    Not that I can recall.
        Q.    Did you ever have a conversation with
Ms. Poolos that recruiting had called to see if
you would take a position with Mr. Bonin?        10:59:39
        A.    Will you ask it again?
        Q.    Sure.  Did you have a conversation with
Ms. Poolos, telling her that recruiting had called
you to see if you would take a position with
Mr. Bonin?                                        10:59:52
        A.    Yes.
        Q.    Okay.  Tell me about that conversation.
              ATTORNEY ZUCKERMAN:  Objection.
        A.    I don't remember a lot of detail.  I
remember telling her -- updating her about how the  11:00:01
recruiter had asked me if I wanted to work with
Rich, and I told her what I told the recruiter,
that I wanted to work with her.
        Q.    Do you recall anything else about that
discussion with Ms. Poolos?                       11:00:16
        A.    No.
        Q.    Did you ask Ms. Poolos to speak with
the recruiter?
        A.    I don't remember.
        Q.    It's possible that you did, but you   11:00:26
```

Page 49

Richards

don't recall?

A.    I don't recall.

Q.    Did Mr. Bronstein ever tell you that he had reached out specifically to Ms. Poolos to ask   11:00:39 her to consider you as an associate producer?

A.    Will you -- will you say it again?

Q.    Sure.  Did Mr. Bronstein ever tell you that he had reached out to Ms. Poolos to ask her to consider you as an AP?                           11:00:52

A.    I don't recall.

Q.    Did you have discussions with anyone other than Mr. Bronstein at CNN about the possibility of working with Mr. Bonin?

A.    I don't recall.                             11:01:13

Q.    Did you have discussions with anyone outside of CNN about the possibility of working with Mr. Bonin?

A.    No.

Q.    And other than the discussion that    11:01:30 you've described -- or discussions you've described with Mr. Bronstein, did you talk to -- strike that.

Other than Mr. Bronstein, did you talk with anyone else at CNN about possibly working   11:01:42

Page 50

Richards

with Ms. Poolos?

A.    I talked to my mentor, Mary Lynn Ryan, about the possibility of going to 60 Minutes.  So that would have included working with Alex or Rich.                                                    11:01:57

Q.    Anyone else other than Mr. Bronstein or your mentor?

A.    Not that I recall.

Q.    Tell me about the discussion or discussions you had with your mentor about going to 60 Minutes and working with potentially Alex or Rich.                                                     11:02:10

A.    I don't remember.

Q.    Do you remember anything about that discussion?                                                 11:02:21

A.    I would have told her:  Hey, I'm looking at going to work at 60 Minutes; what do you think of that.  To that extent I don't remember the details.                                        11:02:35

Q.    Did your mentor give you any feedback about Ms. Poolos?

A.    No.

Q.    Did your mentor give you any feedback about Mr. Bonin?                                            11:02:50

```
                                            Page 51
```

Richards

A.    No.

Q.    You testified that Mr. Bronstein said that Mr. Bonin might be difficult to work with. Did anyone else say that to you in 2020?    11:03:04

A.    Not that I recall.

Q.    Did Mr. Bronstein ever tell you how he came to learn or his basis for believing that Mr. Bonin was difficult?

A.    I don't recall.  I don't know.    11:03:22

Q.    Do you know if Mr. Bronstein ever worked with Mr. Bonin directly?

A.    I don't know.

Q.    Did Mr. Bronstein tell you that?

A.    Tell me what?    11:03:30

Q.    Tell you that he had worked with Mr. Bonin.

A.    I don't know.

Q.    Well, I'm asking if he ever told you that.    11:03:36

ATTORNEY ZUCKERMAN:  Objection.

A.    I don't -- I don't recall him ever telling me that.

Q.    Okay.  That's different than I don't know.    11:03:43

Page 52

Richards

ATTORNEY ZUCKERMAN:  That's not what she testified to originally, but go ahead.

ATTORNEY IADEVAIA:  All right.  Well, let me just be clear for the record.                11:03:47

Q.    Did Mr. Bronstein tell you at any point in time that he had worked with Mr. Bonin?

A.    I don't know.

Q.    You don't know if he told you or you don't remember?                                  11:03:57

A.    Can you start over?

ATTORNEY IADEVAIA:  Can we repeat the question, please?

THE REPORTER:  We're talking the original question on this line?                            11:04:00

ATTORNEY IADEVAIA:  No, I think just the last question I asked.

(Record read.)

Q.    Did Mr. Bronstein ever tell you -- I don't think this is a difficult question.        11:04:19

ATTORNEY ZUCKERMAN:  We don't need the commentary.  She's doing the best that she possibly to answer your questions, which frankly are duplicative and confusing.  But go ahead.                                                11:04:30

```
                                             Page 53
                         Richards
             ATTORNEY IADEVAIA:  I think this is a
        very straightforward question.
        Q.    Did Mr. Bronstein tell you that he had
   worked with Mr. Bonin?                          11:04:35
             ATTORNEY ZUCKERMAN:  She's answered
        that.
             But you can answer it again.
        A.    I don't recall.
        Q.    Okay.  Thank you.                    11:04:39
             Did Mr. Bronstein tell you at any point
   that he had worked with Ms. Poolos?
        A.    Yes.
        Q.    Did he tell you that in 2020?
        A.    Yes.                                 11:04:53
        Q.    And what did he say about working --
   did he say anything about his experience working
   with Ms. Poolos?
        A.    He said he remembered working on a
   story with her when she was at CNN.            11:05:02
        Q.    Did he say anything else?
        A.    He said he remembered it being
   generally fine or positive.
        Q.    Anything else?
        A.    Not that I recall.                   11:05:15
```

Page 54

                    Richards

Q.    Did he tell you what story they worked on together?

A.    Yes, but I don't remember what it was.

Q.    And did he describe at all how closely    11:05:25
they worked together on that story?

A.    I don't remember.

Q.    Was it your understanding at the time that Ms. Poolos had worked at CNN previously?

A.    Yes.                                        11:05:43

Q.    And did you have any understanding of what her job had been when she was there?

A.    Yes, at the time.

Q.    And what was it?

A.    She worked at Anderson Cooper's show, I    11:05:51
believe.

Q.    Do you know what her job was there?

A.    No.

Q.    Do you know what years approximately she had been there?                                11:06:01

A.    I don't know.

Q.    Does Mr. Bronstein still work for CNN?

A.    No.

Q.    Do you know how long approximately he worked there or had worked there?               11:06:14

Page 55

Richards

A.    Approximately 15 years.

Q.    Do you know if he had jobs other than working in the investigative unit at CNN?

A.    No.                                                 11:06:31

Q.    You don't know if he did or he did not have any other jobs, to your knowledge?

A.    I don't know.

Q.    Okay.  Thank you for answering my question.                                               11:06:39

            ATTORNEY IADEVAIA:  If we could mark as Richards Exhibit 1.

            (Richards Exhibit 1, résumé of Richards, Bates-stamped CBS 7240, marked for identification.)                                   11:07:05

Q.    What's been marked as Richards Exhibit 1 is a one-page document Bates-stamped CBS 7240.

            Ms. Richards, do you recognize Exhibit 1?

A.    Yes.                                                 11:07:17

Q.    And what is it?

A.    It's my résumé.

Q.    And was it the résumé that you submitted to 60 Minutes in connection with your application to work as an AP there?              11:07:25

```
                                             Page 56
                        Richards

     A.     Yes.

     Q.     And you can take a minute, but can you

confirm that the information that's contained in

this résumé is accurate?                       11:07:33

     A.     Yes.

     Q.     It's accurate?

     A.     Yes.

     Q.     Okay.  Thank you for answering my

question.                                      11:07:39

          ATTORNEY ZUCKERMAN:  Why are you saying

     that to her?  I don't understand.

          ATTORNEY IADEVAIA:  I'm just thanking

     the witness for answering the question.

          ATTORNEY ZUCKERMAN:  Well, you don't    11:07:45

     need to do that.  She's going to answer --

          ATTORNEY IADEVAIA:  I --

          ATTORNEY ZUCKERMAN:  Let me just

     finish.  She's going to answer all of your

     questions to the best of her ability.       11:07:51

          ATTORNEY IADEVAIA:  I don't think she

     is.

          ATTORNEY ZUCKERMAN:  But thanking her

     in a mocking tone is not appropriate.

          ATTORNEY IADEVAIA:  I'm not mocking     11:07:56
```

```
                                        Page 57
                    Richards
her.  I'm not mocking her.
        ATTORNEY ZUCKERMAN:  There's no reason
to say it, Jeremiah.  There's just no reason.
        ATTORNEY IADEVAIA:  There's no reason    11:07:56
to make a speaking objection.
        ATTORNEY ZUCKERMAN:  I'm not making a
speaking objection.
        ATTORNEY IADEVAIA:  You are talking --
        ATTORNEY ZUCKERMAN:  I am having a       11:08:00
conversation with you about the way you're
treating the witness.
        ATTORNEY IADEVAIA:  I am treating the
witness fine.
        ATTORNEY ZUCKERMAN:  If you think it's   11:08:08
the right time to take a break so that you
might be able to gather yourself instead of
becoming frustrated with the witness, I'm
happy to give you that break.
        ATTORNEY IADEVAIA:  You don't have to    11:08:17
give me a break.  I take breaks when I like to
take breaks.
        THE WITNESS:  Well, I would like to
take a break.
        ATTORNEY ZUCKERMAN:  There you go.       11:08:20
```

Page 58

Richards

ATTORNEY IADEVAIA:  Okay.  You can have a break.

THE VIDEOGRAPHER:  We are now off the record.  The time on the video monitor is    11:08:25
11:08 a.m.

(Recess taken from 11:08 to 11:29.)

THE VIDEOGRAPHER:  We are now back on the record.  The time on the video monitor is
11:29 a.m.                                             11:29:33

Q.    You may have said this before, but when did you start working at 60 Minutes?

A.    In October of 2020.

Q.    During the time that you've been at 60 Minutes, have you raised concerns about the    11:29:47 conduct of other employees there?

ATTORNEY ZUCKERMAN:  Objection.

You can answer.

A.    What do you mean by "other"?

Q.    Not you.                                        11:30:00

A.    I raised a complaint about Alex Poolos.

Q.    Okay.  Anybody else?

A.    No.

Q.    Did you ever raise concerns about Ann Marie Kross?                                      11:30:15

```
                                              Page 59
```

Richards

ATTORNEY ZUCKERMAN:  Objection.

You can answer.

A.    Yes.

Q.    Okay.  So let me ask you again.  Did    11:30:18
you raise any concerns about employees other than
Ms. Poolos and Ms. Kross?

ATTORNEY ZUCKERMAN:  Objection.

A.    Raise concerns to who?

Q.    To anyone.                              11:30:30

A.    I had a concern at one point about a
small thing with Ann Marie Kross.

Q.    Anyone else?

A.    Alex Poolos.

Q.    Anyone else?                           11:31:06

A.    No.

Q.    Okay.  What was your concern about
Ms. Kross?

A.    I don't remember a lot of details.
There was an issue with discussing crews with her.  11:31:18

Q.    What was the issue?

A.    I remember she was upset at one point
when we had a discussion about crews.

Q.    What was she upset about?

A.    I don't remember the details.          11:31:42

                                        Page 60

                          Richards

Q.    Do you remember anything about it?

A.    I remember her being frustrated.

Q.    Did she tell you she was frustrated?

A.    I got -- I don't remember that she said    11:31:54
that she was frustrated.

Q.    What was your basis for understanding
she was frustrated?

A.    She used a tone that implied she was
frustrated.                                         11:32:08

Q.    Approximately when did this happen?

A.    I don't remember exactly.  Sometime in
2021.

Q.    And did she use this tone with you once
or more than once?                                  11:32:31

A.    I don't remember.

Q.    It could have been multiple times?

A.    I don't remember.

Q.    And who did you raise your concerns
about Ms. Kross to?                                 11:32:44

A.    I told Alex.

Q.    What did you tell Alex?

A.    I said I had a conversation with Ann
Marie where she was I perceived to be upset and I
was having a difficult time.                        11:33:05

```
                                        Page 61
                        Richards
     Q.    What else did you say to Alex about
this?
     A.    I don't remember.
     Q.    Did you explain to Alex in what way you   11:33:14
were having a difficult time?
     A.    I don't remember what I would have
said.
     Q.    And what -- was this -- was this
about -- I'm sorry, what is Ms. Kross's job --    11:33:31
does she work for 60 Minutes?
     A.    Yes.
     Q.    Is she still there?
     A.    Yes.
     Q.    And what's her job there?              11:33:39
     A.    She manages the crews.
     Q.    And in what way as an AP do you work
with Ms. Kross?
     A.    I discuss crew availability and book
crews to go to shoots.                           11:33:56
     Q.    This issue that arose in 2021, was it
in connection with a specific story?
           ATTORNEY ZUCKERMAN:  Objection.
           You can answer.
     A.    I don't remember what story.          11:34:13
```

Page 62

Richards

Q.    Do you remember what shoot?

A.    No.

Q.    Do you recall any of the details about the discussion that you and Ms. Kross were having    11:34:35 that led you to go to Ms. Poolos?

A.    I don't remember.

Q.    Did you ever raise concerns to Ms. Poolos about interactions that you had with the rights -- the clearance and rights group that    11:34:59 you had mentioned earlier?

A.    Would you say the beginning of the question again?

ATTORNEY IADEVAIA:  Could you repeat the question, please?  Thanks.    11:35:08

(Record read.)

A.    Yes.

Q.    What concern or concerns did you raise?

A.    I don't remember specific details.  I remember trying to understand the process of the    11:35:31 rights and clearances department and expressed trying to learn more about it.  I don't remember details.

Q.    How many discussions did you have with Ms. Poolos about any concerns you had about    11:35:51

Page 63

Richards

interactions with the rights and clearance group?

A.    I don't remember.

Q.    Do you know if Ms. -- strike that.

Did Ms. Poolos tell you whether she had    11:36:05
a conversation with Tanya Simon about your
interaction or interactions with Ann Marie Kross?

A.    Yes.  I remember that.

Q.    What do you remember about it?

A.    I remember generally that she had    11:36:23
spoken to Tanya.  I don't remember more details.

Q.    So you remember that Ms. Poolos spoke
to Ms. Simon about your interactions with
Ms. Kross, but you don't remember anything else;
correct?                                    11:36:39

A.    I don't -- I don't remember much about
this.

Q.    Do you use a cell phone currently?

A.    Yes.

Q.    How many cell phones do you use?    11:37:01

A.    I have my personal phone and my work
phone.

Q.    And has that been true since you've
been at 60 Minutes starting in October of 2020?

A.    Yes.                                11:37:17

```
                                         Page 64
```

                    Richards

Q.    Okay.  So for your personal phone can you just give me the last four digits of that number, please?

A.    4826.                                          11:37:32

Q.    And approximately how long have you had the device you currently have that you identify as your personal phone?

A.    I've had that phone number since I was 14.                                                 11:37:52

Q.    Got it.  And the device itself that you currently use, how long have you had that device?

A.    The device -- I got a new phone in October of '24.

Q.    And the prior device that you used as       11:38:09
your personal phone associated with that number that ends in 4826, how long did you have that device?

A.    I had that device from approximately May 2021 until I got the new device.                  11:38:24

Q.    In October of 2024?

A.    Yes.

Q.    Were you able to transfer the data that was on the prior device that you had between May of 2021 and October 2024 onto the new device?      11:38:40

```
                                            Page 65
              Richards

     A.    Yes.

     Q.    Do you know if any data was lost?

     A.    I do not know.

     Q.    Do you ever use your personal phone for    11:38:57

work?

     A.    Yes.

     Q.    And what kinds of things do you use

your personal phone for work to do?

     A.    Calls, emails, texts.                       11:39:07

     Q.    And who do you text using your personal

phone for work purposes?

           ATTORNEY ZUCKERMAN:  Objection.

     A.    The people that I work with.

     Q.    Who is that?                                11:39:25

     A.    Shari Finkelstein.

     Q.    Who else?

     A.    Crews that we hire.

     Q.    Who else?

     A.    Ann Marie Kross.                            11:39:39

     Q.    Who else?

     A.    Tanya Simon.

     Q.    Who else?

     A.    Editors that we work with.

     Q.    Who else?                                   11:39:48
```

Page 66

Richards

A.    I mean, anyone that I work with.

Q.    Have you used your personal cell phone to text message with Bill Owens?

ATTORNEY ZUCKERMAN:  Objection.    11:40:13

A.    Yes.

Q.    Have you used your personal cell phone to exchange text messages with Alex Poolos?

A.    Yes.

Q.    Have you used your personal cell phone    11:40:29 to exchange text messages with Renee Balducci?

A.    Yes.

Q.    Have you used your personal cell phone to exchange text messages with Maria Cottone?

A.    I don't remember.                          11:40:48

Q.    Have you used your personal cell phone to exchange text messages with Scott Bronstein?

A.    Yes.

Q.    Did you use your personal cell phone to communicate with Mr. Bronstein about Alex Poolos?    11:41:37

A.    Yes.

Q.    And in what way?

ATTORNEY ZUCKERMAN:  Objection.

A.    Can you clarify the question?

Q.    Sure.  Sure.  Did you send -- exchange    11:41:46

Page 67

Richards

text messages with Mr. Bronstein about any concerns you had related to Ms. Poolos?

A.    I don't remember.

Q.    Did you exchange any text messages with    11:42:07
Mr. Bronstein about -- using your personal phone, about this lawsuit?

A.    No.

Q.    Did you exchange any text messages with Mr. Bronstein about -- using your personal phone,    11:42:19
about Ms. Poolos and Mr. Bronstein speaking to each other?

ATTORNEY ZUCKERMAN:  Objection.

A.    Can you clarify that, please?

Q.    Sure.  At some point did you become    11:42:35
aware that Mr. Bronstein and Ms. Poolos had a phone call in early January of 2022?

A.    Yes.

Q.    Did you exchange text messages with
Mr. Bronstein about that call?    11:42:49

A.    I don't remember.

Q.    Is it possible that you did?

ATTORNEY ZUCKERMAN:  Objection.

A.    I don't remember.

Q.    Did you exchange text messages with    11:43:04

Page 68

Richards

Mr. Bronstein on your personal phone about Ms. Poolos being fired?

A.    No.

Q.    Did you exchange text messages with  11:43:16 Mr. Bronstein on your personal cell phone about Ms. Poolos taking an administrative leave of absence?

A.    No.

Q.    You said before that you did exchange  11:43:32 text messages with Mr. Bronstein about Ms. Poolos, so my question is about what did you exchange text messages with Mr. Bronstein related to Ms. Poolos.

A.    I don't remember the details.  I remember I at some point probably reached out to  11:43:50 him and asked to speak.

Q.    When did you reach out to him?

A.    Specifically regarding what?

Q.    Ms. Poolos.

A.    That had to have been sometime in the  11:44:07 fall of '21.

Q.    Approximately how many text messages did you exchange with Mr. Bronstein related to Ms. Poolos?

A.    I don't remember.  11:44:24

Page 69

Richards

Q.    Was it more than five?

A.    I don't remember.

Q.    Was it more than ten?

A.    I don't remember.                              11:44:30

Q.    Did you communicate, using your personal phone and text message with Mr. Bronstein, about the complaint you filed against Ms. Poolos?

ATTORNEY ZUCKERMAN:  Objection.         11:44:44

A.    I don't remember.

Q.    Did you communicate with Mr. Bronstein using your personal phone via text message in the -- in December of 2021 related to Ms. Poolos?

A.    I don't remember.                              11:45:04

Q.    Did you communicate with Mr. Bronstein using your personal phone via text message about Alex in January of 2022?

A.    I don't remember.

Q.    Did you ever record -- make audio      11:45:26 recordings of any of your discussions with Mr. Bronstein at any point in time?

A.    No.

Q.    Do you have on your personal phone any text messages you exchanged with Mr. Bronstein      11:45:51

Page 70

Richards

about Alex?

A.    I do not.

Q.    And why not?

ATTORNEY ZUCKERMAN:  Objection.    11:46:00

A.    Because my phone on my personal phone, the settings were by default set to auto delete after one year.

Q.    What kind of personal phone do you currently have?    11:46:15

A.    It's an iPhone.

Q.    And did you have an iPhone between -- the prior device that you had right before getting this new one in October of 2024?

A.    Yes.    11:46:27

Q.    Yes is the answer?

A.    Yes.

Q.    So your testimony is that the auto delete function was set on the prior device by default?    11:46:38

A.    That's what I believe.

Q.    Did you set it to auto delete?

A.    I don't think so.

Q.    Is your phone still set to an auto delete function?    11:46:52

Page 71

Richards

A.    No.

Q.    When did you -- did you turn off the auto delete function?

ATTORNEY ZUCKERMAN:  Objection.    11:46:57

A.    Yes.

Q.    Okay.  When did you turn it off?

ATTORNEY ZUCKERMAN:  Objection.

A.    I made sure that all devices that I used were turned to never delete after I was given    11:47:07 a legal hold.

Q.    And when did you get the legal hold?

A.    After this lawsuit was filed.

Q.    And when was that?

A.    The lawsuit was filed in October of    11:47:20 2023, and it came shortly thereafter.

Q.    Was that the first time you had received a legal hold?

A.    Yes.

Q.    Outside of your personal cell phone and    11:47:45 your work cell phone, do you have any other electronic devices that you use for purposes of communicating with other people?

A.    No.

Q.    Do you have an iPad?    11:48:00

```
                                                Page 72
                          Richards

     A.    No.

     Q.    Do you have a laptop?

     A.    I have a work laptop.

     Q.    Do you have a personal laptop?        11:48:06

     A.    I recently got a personal laptop.

     Q.    When did you get it?

     A.    Christmas of 2024.

     Q.    Did you ever use your personal cell

phone to communicate with Tanya Simon about Alex   11:48:29

Poolos?

     A.    Yes.

           ATTORNEY ZUCKERMAN:  Hold on.  I just

     want to make sure it's a drill.

           ATTORNEY IADEVAIA:  Sure.             11:48:42

           (Pause.)

           ATTORNEY ZUCKERMAN:  It says the fire

     drills are complete for the day, so we will be

     spared any more deafening tones.

           ATTORNEY IADEVAIA:  Are we good to go?  11:49:01

           ATTORNEY ZUCKERMAN:  I am good, yes.

     Q.    Before Christmas of 2024, had you had a

personal laptop during the time you've worked at

60 Minutes?

     A.    No.                                  11:49:13
```

Page 73

Richards

Q. And have you ever had an iPad during the time that you've worked at 60 Minutes?

A. No.

Q. Have you had a personal desktop at any time during the time you've worked at 60 Minutes?    11:49:21

A. No.

Q. Approximately what period of time did you communicate with Tanya Simon using your personal device about Alex Poolos?    11:49:43

A. In December of 2021.

Q. Any other time outside of December 2021?

A. Not that I recall.

Q. In January of 2021?    11:49:57

A. January 2022?

Q. Sorry, you're correct, January 2022.

A. Yes then.

Q. Yes then as well?

A. Can we start over with this?    11:50:07

Q. Sure. My question is did -- I think you testified earlier that you communicated with Tanya Simon about Alex using your personal phone; is that correct?

A. Yes.    11:50:18

```
                                              Page 74
                         Richards
     Q.    And my question is what time period did
you do so, and I think you said in December of
221; is that correct?
     A.    Yes.                               11:50:24
     Q.    Did you in January of 2022?
     A.    I don't remember exactly when I would
have continued talking to Tanya about this matter.
     Q.    Did you use your personal cell phone to
communicate via text message with Tanya Simon      11:50:42
about Alex Poolos?
     A.    Yes.
     Q.    Did you use your personal cell phone to
communicate via text message with Bill Owens about
Alex Poolos?                                  11:50:59
     A.    Yes.
     Q.    Did you use your personal cell phone to
communicate via text message about Alex with Renee
Balducci?
     A.    To text message?                   11:51:15
     Q.    Yeah.
     A.    I don't remember.
     Q.    Do you have any of the text messages
you exchanged with Tanya Simon about Ms. Poolos?
     A.    I do not.                          11:51:33
```

Page 75

Richards

Q.    And when were those text messages deleted, if you know?

A.    According to the settings that I had, it would have been a year after it occurred.    11:51:43

Q.    So to the extent that the text messages were exchanged in December of 2021, your understanding is they would have been deleted in December of 2022?

A.    That's my understanding.    11:51:59

Q.    And just to be clear for the record, you personally did not set the auto delete function?  Is that your testimony?

A.    I don't believe that I did.

Q.    Outside of any conversations you may    11:52:26
have had with counsel, have you had discussions with anybody else about the auto delete function on your phone?

A.    No.

Q.    Have you ever had any conversations    11:52:38
with Scott Bronstein about the auto delete function on your phone?

A.    No.

Q.    Have you had any discussions with Scott Bronstein about deleting text messages?    11:52:48

```
                                              Page 76
                         Richards

       A.    No.

             ATTORNEY ZUCKERMAN:  Objection.

       Q.    On your phone iPhone are you able to go

in and delete individual text messages?          11:53:05

       A.    That is a function of an iPhone.

       Q.    And you know how to do that?

       A.    Yes.

       Q.    Did you ever do that with any of your

communications with Mr. Bronstein about          11:53:16

Ms. Poolos?

       A.    No.

       Q.    Did you ever do that in connection with

any of your text message communications about

Ms. Poolos with Mr. Owens?                       11:53:26

       A.    No.

       Q.    Did you ever do that in connection with

any of your text message communications about

Ms. Poolos with Ms. Simon?

       A.    No.                                 11:53:38

       Q.    Did you ever do that in connection with

any text communications you had related to

Ms. Poolos?

       A.    No.

       Q.    You testified that you have a work    11:54:13
```

Page 77

Richards

phone, and I think you said you've had the work
phone since you started at CBS; is that right?

A.    Yes.

Q.    And what's that phone number?                11:54:22

A.    I don't know.

Q.    Do you ever use the work -- your work
phone to communicate about work-related issues?

A.    Occasionally.

Q.    Do you ever use the work phone to send    11:54:36
text messages?

A.    Occasionally.

Q.    Did you ever use the work phone to
communicate with Alex Poolos?

A.    I don't remember.                          11:54:47

Q.    Did you ever use the work phone to
communicate with Tanya Simon?

A.    I don't remember.

Q.    Did you ever use the work phone to
communicate with Bill Owens?                    11:55:02

A.    I don't remember.

Q.    Did you ever use the work phone to
communicate with or have you ever used the work
phone to communicate with Renee Balducci?

A.    I don't remember.                          11:55:08

Page 78

Richards

Q.    Have you ever used the work phone to communicate with Maria Cottone?

A.    I don't remember.

Q.    Have you ever used your work phone to    11:55:15 communicate with Scott Bronstein?

A.    I don't remember.

Q.    Have you ever sent text messages to Mr. Bronstein using the work phone?

A.    I don't remember.                       11:55:24

Q.    Do you have on your cell phone currently text messages with Mr. Bronstein?

A.    I don't know.

Q.    Do you currently have any text messages -- strike that.                      11:55:44

ATTORNEY IADEVAIA:  What was the question that I asked?

(Record read.)

Q.    Let me just be clear.  Do you have any text messages with Mr. Bronstein currently on your    11:55:57 personal phone?

A.    I don't know.

Q.    Do you have any text messages with Mr. Bronstein currently on your work phone?

A.    I don't know.                           11:56:08

```
                                              Page 79
                       Richards

     Q.    Do you have any text messages currently

on your personal phone with Mr. Owens?

     A.    I don't know.

     Q.    Do you have any text messages with      11:56:18

Mr. Owens currently on your work phone?

     A.    I don't know.

     Q.    Do you have any text messages with

Ms. Simon currently on your personal phone?

     A.    Yes.                                    11:56:31

     Q.    Do you have any text messages with

Ms. Simon currently on your work phone?

     A.    I don't know.

     Q.    Generally what are the text messages

you have with Ms. Simon currently on your personal  11:56:44

cell phone?

           ATTORNEY ZUCKERMAN:  Objection.

     A.    She asked if I could work on a project,

and I responded.

     Q.    Anything else?                          11:56:55

     A.    I don't know anything else.

     Q.    Do you have any text messages currently

on your personal phone with Renee Balducci?

     A.    I don't know.

     Q.    Do you have any text messages currently  11:57:19
```

```
                                              Page 80
```

Richards

on your work cell phone with Renee Balducci?

A.    I don't know.

Q.    Have you ever searched your work cell phone for communications that might relate to this   11:57:37 case?

A.    Can you rephrase the question?

Q.    I'm asking if you've searched your work cell phone for any communications that might relate to this case.                                       11:58:03

A.    Search for what purpose?

Q.    For any purpose.

A.    I haven't looked through my phone.

Q.    Have you given your phone to your lawyers to conduct a search?                              11:58:19

A.    No.  My phone was imaged.  I don't know if that's what you're asking.

Q.    Your phone was imaged in connection with this lawsuit, is your understanding?

A.    Yes.                                               11:58:34

Q.    Have you conducted any search yourself for information that might be relevant to this lawsuit on your personal phone?

A.    No.

Q.    And approximately when was your phone   11:58:52

```
                                        Page 81
```

Richards

imaged?

A.    I don't remember when exactly.  Perhaps the fall.  I don't remember when that happened.

Q.    Was it after the lawsuit was filed?    11:59:09

A.    Yes.

Q.    So after the fall of 2023?

A.    Yes.

Q.    Do you know if it was imaged in 2024 at some point, the year 2024?    11:59:21

A.    It could have been.

Q.    Since the time your phone was imaged, did you have any communications using your personal phone about Alex Poolos?

A.    No.    11:59:50

Q.    And I just want to be clear, because maybe I wasn't before.  The imaging that took place, was it an imaging of your personal cell phone?

A.    No.    12:00:00

Q.    Has there been an imaging of your personal cell phone to your knowledge?

A.    No.

Q.    Was there an imaging of your work phone?    12:00:10

```
                                              Page 82
                        Richards
     A.    Yes, that's what I'm referring to.
     Q.    The auto delete function that you were
talking about earlier, I believe we were talking
about it in connection with your personal phone;    12:00:27
is that right?
     A.    Yes.
     Q.    Did your work phone have an auto delete
setting?
     A.    I don't think it did.                     12:00:35
     Q.    At any point in time did you adjust the
function for deleting or not deleting text
messages on your work phone?
     A.    No.
     Q.    So when you received the work phone, is   12:00:54
it your understanding that the device was set up
so there was no auto deleting mechanism?
     A.    That's my understanding.
     Q.    And is your work phone also an iPhone?
     A.    Yes.                                       12:01:10
     Q.    And has that always been the case --
     A.    Yes.
     Q.    -- since you joined CBS?
     A.    Yes.
     Q.    What social media accounts do you         12:01:21
```

Page 83

Richards

currently have, if any?

A.    I have an Instagram account, I have a
Facebook account, I have a Twitter account, and I
have a TikTok account.                                    12:01:35

Q.    Have you had the Instagram account
since you've been at 60 Minutes?

A.    Yes.

Q.    And the Facebook account?

A.    Yes.                                                12:01:47

Q.    And the Twitter account?

A.    Yes.

Q.    And the TikTok account?

A.    Yes.

Q.    With the Facebook account, Facebook    12:02:01
allows you to post content publicly -- correct? --
that's available to the public?

A.    Facebook in general --

Q.    Yeah.

A.    -- or my specific Facebook?                         12:02:15

Q.    Well, why don't we start Facebook in
general.

A.    Yes, Facebook you can post publicly on.

Q.    Okay.  And do you have some different
setting on your Facebook account?                         12:02:26

```
                                                   Page 84
                            Richards
     A.    My Facebook account I believe is
private.
     Q.    On Facebook through your account are
you able to direct message someone?               12:02:31
     A.    Yes.
     Q.    Have you ever used Facebook to
communicate about work, whether it's a post that's
available on your general feed or through direct
messaging?                                         12:02:47
           ATTORNEY ZUCKERMAN:  Objection.
           You can answer.
     A.    I believe I've used my Facebook account
to reach out to someone before.  I don't remember
a hundred percent.                                 12:02:55
     Q.    Have you ever used your Facebook
account to communicate about Alex Poolos?
     A.    I don't think so.
     Q.    Have you ever used the direct messaging
function to do so?                                 12:03:07
     A.    I don't think so.
     Q.    Did you ever communicate with
Mr. Bronstein using Facebook?
     A.    I don't think so.
     Q.    Have you ever used Facebook to          12:03:21
```

```
                                        Page 85
```

                        Richards
communicate with Mr. Owens?

     A.    No.

     Q.    Ms. Simon?

     A.    No.                                        12:03:27

     Q.    Ms. Stahl?

     A.    No.

     Q.    Renee Balducci?

     A.    No.

     Q.    Maria Cottone?                             12:03:31

     A.    No.

     Q.    Scott Bronstein?  I already asked that
question.

     A.    I don't think so.

     Q.    Your Instagram account, is that private   12:03:39
or public?

     A.    Private.

     Q.    Through Instagram are you able -- your
Instagram account are you able to direct message
someone?                                             12:03:53

     A.    People that I follow.

     Q.    Have you ever used Instagram to
communicate about work at 60 Minutes?

     A.    I don't remember a specific instance,
but it's possible I reached out to someone, trying   12:04:08

```
                                         Page 86
                        Richards
to communicate with them for a story.
     Q.    Have you ever used Instagram to
communicate about Alex Poolos?
     A.    No.                                    12:04:16
     Q.    When I say "communicate," I mean
whatever way, whether posting to your feed or
direct communication.  Do you understand that's my
question?
     A.    I understand that's your question.     12:04:26
Thank you for clarifying it.
     Q.    Sure.
           Did you ever -- have you ever used
Instagram to communicate with Scott Bronstein?
     A.    I don't think so.                      12:04:35
     Q.    Have you ever used Instagram to
communicate with Mr. Bronstein about Alex Poolos?
     A.    No.
     Q.    Have you used Instagram to communicate
with Bill Owens?                                  12:04:45
     A.    No.
     Q.    Tanya Simon?
     A.    No.
     Q.    Ms. Stahl?
     A.    No.                                     12:04:50
```

```
                                              Page 87
                        Richards
      Q.    Alex Poolos?
      A.    Maybe when we were working together.
      Q.    Do you recall anything specific?
      A.    No.                                 12:04:56
      Q.    Did you communicate using Instagram
with Ms. Balducci?
      A.    No.
      Q.    Ms. Cottone?
      A.    No.                                 12:05:06
      Q.    Is your Twitter or X account, is that
public or private?
      A.    I believe it's public.
      Q.    And through your X account do you have
the ability to direct message someone?          12:05:21
      A.    Yes.
      Q.    Have you ever used your X account for
purposes of communicating about work?
      A.    Yes.
      Q.    And have you ever used your X account   12:05:33
to communicate about Alex Poolos?
      A.    I don't think so.
      Q.    Have you ever used your X account to
communicate with Scott Bronstein?
      A.    I don't think so.                   12:05:45
```

```
                                         Page 88
```

Richards

Q.    Have you ever used your X account to communicate with Bill Owens?

A.    No.

Q.    Ms. Simon?                                    12:05:51

A.    No.

Q.    Ms. Stahl?

A.    No.

Q.    With Ms. Poolos?

A.    Maybe when we were working together.    12:05:56

Q.    Ms. Balducci?

A.    No.

Q.    Ms. Cottone?

A.    No.

Q.    Do you have a LinkedIn account?        12:06:04

A.    Yes.

Q.    Have you had your LinkedIn account since you've been at 60 Minutes?

A.    Yes.

Q.    And through your LinkedIn account are    12:06:13
you able to send direct messages to folks?

A.    Yes.

Q.    Have you ever used your LinkedIn account to communicate about work?

A.    Yes.                                          12:06:27

```
                                            Page 89
                        Richards
     Q.    And to whom have you communicated about
work using LinkedIn?
     A.    I don't remember exactly who.  I just
know at some point I reached out to someone to try   12:06:38
to connect with them for something.
     Q.    Have you ever used your LinkedIn
account to communicate about Alex Poolos?
     A.    I don't think so.
     Q.    Have you ever used your LinkedIn        12:06:51
account to communicate with Scott Bronstein?
     A.    I don't know.
     Q.    Have you ever used your LinkedIn
account to communicate with Bill Owens?
     A.    No.                                     12:07:03
     Q.    Tanya Simon?
     A.    No.
     Q.    Ms. Stahl?
     A.    No.
     Q.    Ms. Balducci?                           12:07:07
     A.    No.
     Q.    Ms. Cottone?
     A.    No.
     Q.    Ms. Poolos?
     A.    I don't think so.                       12:07:12
```

Page 90

Richards

Q.    This I truly don't know.  Does TikTok have the option to communicate directly with someone?

A.    Yes.                                                12:07:24

Q.    Okay.  Have you ever used TikTok to communicate about work?

A.    No.

Q.    Have you ever used TikTok to communicate about Alex Poolos?                        12:07:30

A.    No.

Q.    Have you ever used TikTok to communicate with Scott Bronstein?

A.    No.

Q.    Have you ever used TikTok to          12:07:37 communicate with Mr. Owens?

A.    No.

Q.    Ms. Simon?

A.    No.

Q.    Ms. Stahl?                                          12:07:43

A.    No.

Q.    Ms. Poolos?

A.    No.

Q.    Ms. Balducci?

A.    No.                                                12:07:46

```
                                            Page 91
                        Richards

     Q.    Ms. Cottone?

     A.    No.

     Q.    Have you ever used WhatsApp?

     A.    Yes.                             12:08:00

     Q.    Do you currently use WhatsApp?

     A.    Yes.

     Q.    Do you ever use WhatsApp for work?

     A.    Yes.

     Q.    How long have you had WhatsApp,    12:08:07
approximately?

     A.    Approximately nine years.

     Q.    So before you got to 60 Minutes?

     A.    Yes.

     Q.    Have you had just one account with   12:08:21
WhatsApp or have you had multiple accounts?

     A.    I think just one.

     Q.    And have you used WhatsApp to
communicate about work?

     A.    Yes.                             12:08:38

     Q.    And have you used WhatsApp to
communicate about Alex Poolos?

     A.    I don't think so.

     Q.    Have you used WhatsApp to communicate
with Scott Bronstein about anything?      12:08:49
```

```
                                              Page 92
                        Richards
        A.      I don't remember.
        Q.      Have you used WhatsApp to communicate
at any point with Bill Owens?
        A.      I don't think so.                12:09:01
        Q.      Have you used WhatsApp to communicate
with Ms. Simon?
        A.      I don't think so.
        Q.      With Ms. Balducci?
        A.      No.                              12:09:08
        Q.      With Ms. Cottone?
        A.      No.
        Q.      With Lesley Stahl?
        A.      Yes.
        Q.      And what have you communicated with  12:09:14
Ms. Stahl using WhatsApp, generally?
        A.      Work.
        Q.      When you say "work," do you mean
stories that you're working on?
        A.      Yes.                             12:09:23
        Q.      Other than stories, anything else with
Ms. Stahl?
        A.      No.
        Q.      Have you used WhatsApp for any purpose
as it relates to 60 Minutes other than stories  12:09:33
```

```
                                              Page 93
                         Richards
that you're working on?

        A.     Can you say that again?

        Q.     Sure.  What you used WhatsApp to

communicate, since you've been at 60 Minutes,        12:09:43

about anything related to your job there other

than stories?

        A.     No.

        Q.     Are you familiar with a communication

application called Signal?                           12:10:01

        A.     Yes.

        Q.     What is your basic understanding of

Signal?

        A.     It's an encrypted app.

        Q.     Have you ever used Signal?            12:10:08

        A.     Yes.

        Q.     Have you ever used Signal to

communicate about work?

        A.     Yes.

        Q.     Do you currently have an account with 12:10:13

Signal?

        A.     Yes.

        Q.     And have you had an account with Signal

since you joined 60 Minutes?

        A.     Yes.                                  12:10:22
```

```
                                            Page 94
                        Richards
     Q.    Have you communicated using Signal
about Alex Poolos?
     A.    No.
     Q.    Have you communicated using Signal with  12:10:30
Scott Bronstein?
     A.    Yes.
     Q.    And what did you communicate with
Mr. Bronstein about generally, using Signal?
     A.    He congratulated me for being nominated  12:10:40
for a DuPont award.
     Q.    He did it using Signal?
     A.    Yes.
     Q.    Do you know why he used Signal to
communicate that to you?                            12:10:52
     A.    Yes, because it was after the lawsuit.
     Q.    What do you mean by that?
     A.    Obviously after the lawsuit was filed
there were orders to not speak to people about the
lawsuit or anything like that, so I was not         12:11:10
speaking to him in general.
     Q.    When did you receive the nomination?
     A.    This was in January of last year, maybe
February.
     Q.    January or February of 2024?             12:11:30
```

```
                                              Page 95
```

Richards

A.    Yeah.

Q.    And the directive not to speak to people, was that -- was the first time you received that direction after Ms. Poolos filed her lawsuit?    12:11:39

A.    Yes.

Q.    Had you communicated with Mr. Bronstein using Signal prior to Ms. Poolos's lawsuit?

A.    No.    12:11:53

Q.    Have you communicated with Mr. Bronstein using Signal beyond him congratulating you for the DuPont award?

A.    No.

Q.    Is the message that you received via Signal from Mr. Bronstein still available in your account?    12:12:08

A.    I don't think so.  I don't know.

Q.    For purposes of this case, have you looked through your Signal account for communications that might be relevant --    12:12:22

A.    No.

Q.    -- to the case?

        To your knowledge has your lawyers?

A.    No.    12:12:32

```
                                              Page 96
                         Richards
     Q.    When Mr. Bronstein sent you the
message, did you respond to it?
     A.    I said thank you.
     Q.    Were there any other communications you  12:12:44
had with Mr. Bronstein through Signal?
     A.    No.  We spoke briefly on Signal and
said hello, and he congratulated me; and that was
the end of our phone call.
     Q.    So you used Signal to call each other?  12:13:00
     A.    Yeah.
     Q.    Did you use Signal to message each
other in writing?
     A.    Not beyond what I have shared.
     Q.    Got it.  So there was both a message    12:13:11
that he sent to you and you responded and then a
phone call, all using Signal?
     A.    Yes.
     Q.    Okay.  When was that call?
     A.    It had to have been around the time of  12:13:21
the award nomination.
     Q.    January 2024, give or take?
     A.    Approximately.
     Q.    How long was your call with him?
     A.    I don't remember exactly.  It was a     12:13:33
```

Page 97

Richards

short phone call.

Q.    And how did it come about that you and Mr. Bronstein were communicating via Signal?

ATTORNEY ZUCKERMAN:  Objection.        12:13:45

A.    I don't remember.

Q.    Did he suggest it?  Did you suggest it?  Something else?

ATTORNEY ZUCKERMAN:  Objection.

A.    It wasn't a suggestion.        12:13:52

Q.    Okay.  Did you have any communication, whether it's a discussion or in writing, with Mr. Bronstein about using Signal to communicate?

A.    No.

Q.    And your testimony is that's the only        12:14:13 time you ever received any written communication from Mr. Bronstein using Signal; correct?

A.    Yes.

Q.    During the time that you spoke to Mr. Bronstein in or about January of 2024, did you        12:14:25 discuss Alex Poolos at all?

A.    No.

Q.    Did you discuss this lawsuit?

A.    No.

Q.    Do you have an app for Signal on one of        12:14:34

Page 98

Richards

your phones?

A.    Yes.

Q.    Is it on both your phones or one of the phones?                                                    12:14:52

A.    I don't know if it's on both my phones.

Q.    Is it on your personal phone?

A.    Yes.

Q.    So you don't know if it's on your work phone?                                                      12:14:59

A.    I don't know.

Q.    And WhatsApp, is that also an app that is on one or both of your phones?

A.    I know it's on my personal phone.  I don't know if it's on my work phone.              12:15:09

Q.    Have you had any in-person meetings -- or strike that.

Have you had any in-person interactions with Mr. Bronstein since you joined 60 Minutes?

A.    In person?                                                           12:15:36

Q.    Yeah.

A.    I saw him at our correspondent from CNN's funeral.

Q.    When was that?

A.    That was January of '22 or -- sorry,              12:15:46

```
                                            Page 99
                       Richards
let me think about the date first again.
     Q.    Sure.  Go ahead.
     A.    That was January 2023.  Sorry.
     Q.    And when you saw him did you talk to      12:16:07
him?
     A.    I saw him at the funeral, so, yeah, I
talked to him.
     Q.    Did you talk at all about Ms. Poolos?
     A.    Yes.                                      12:16:19
     Q.    What did you talk about?
     A.    We talked briefly about how I am doing
much better since I am now -- was now working on a
different team.  And I talked about how much of a
nightmare it was to work with her and let him know  12:16:35
that things were much better for me.
     Q.    What else did you say about Ms. Poolos?
     A.    That's all I recall.
     Q.    Did you tell him specifically what you
meant by "a nightmare"?                             12:16:49
     A.    I don't remember everything that I
said.
     Q.    Did you talk at all about the lawsuit?
     A.    The lawsuit wasn't filed.
     Q.    Did you talk at all about Ms. Poolos     12:16:56
```

Page 100

Richards

leaving 60 Minutes?

A.    I don't think so.

Q.    Did you talk about Ms. Poolos getting

fired?                                          12:17:06

A.    I don't think I would have talked about

that.

Q.    Did you talk to Mr. Bronstein about his

phone call with Ms. Poolos?

A.    I don't think so.                         12:17:14

Q.    Any other in-person interactions that

you've had with Mr. Bronstein since you joined 60

Minutes?

A.    No.

Q.    Have you had any communications with     12:17:30

Mr. Bronstein using any videoconferencing platform

since you've been at 60 Minutes?

A.    No.

Q.    Have you ever communicated with

Mr. Bronstein during that time using Zoom?         12:17:44

A.    I don't think so.

Q.    Using Microsoft Teams?

A.    No.

Q.    Since joining 60 Minutes, have you had

any phone calls with Mr. Bronstein outside of the   12:17:54

Page 101

Richards

one that you've testified to using Signal?

A.    No.

Q.    Have you had any phone calls with
Mr. Bronstein since joining 60 Minutes using your    12:18:10
personal phone?

A.    Yes.

Q.    And when was the last time you had a
phone call with him using your personal phone?

A.    That phone call where he congratulated    12:18:21
me for the award.

Q.    Any other time?

A.    Any other time since when?

Q.    Since you joined 60 Minutes.

A.    I spoke to him a handful of times over    12:18:32
the years.

Q.    Since joining 60 Minutes?

A.    Yes.

Q.    Did you have phone calls with
Mr. Bronstein about Alex Poolos?                      12:18:41

A.    Yes.

Q.    When were those phone calls,
approximately?

A.    I don't know.

Q.    Did you have calls with Mr. Bronstein    12:18:47

Page 102

Richards

about Alex Poolos in the fall of 2021?

A.    Yes.

Q.    Did you have calls with Mr. Bronstein about Alex Poolos in the winter of 2021?                12:19:00

A.    Yes.

Q.    Did you have calls with Mr. Bronstein about Alex Poolos in January of 2022?

A.    Yes.

Q.    What did you discuss related to    12:19:18 Ms. Poolos with Mr. Bronstein via phone in the fall of 2021?

A.    At some point in the fall of 2021, I had spoken to Scott about how I was having a very difficult time at work, and I was asking for any    12:19:34 advice that he could give me about how to deal with what I was dealing with.

Q.    And do you know what month in 2021 you had a call with Mr. Bronstein along those lines for the first time?                12:19:54

A.    I don't know when that would have been.

Q.    How many of those calls did you have with Mr. Bronstein, approximately?

A.    I don't know.

Q.    You said a handful; is that right?    12:20:02

Page 103

Richards

A.    I was referring to a handful of times that I spoke to him since I left CNN.

Q.    And in the winter of 2021, what did you discuss with Mr. Bronstein about Ms. Poolos?    12:20:17

A.    I told him about how awful my experience had been.

Q.    Okay.

A.    I can go on.

Q.    Please do.    12:20:39

A.    This was an utter nightmare for me.  I had gotten to the point where I was waking up every single day, like, gasping for air under so much anxiety from constant stress of just being berated and yelled at and no matter what I was    12:21:21 trying I couldn't -- sorry, this is -- I don't want to be emotional about this, but this is, like, the worst experience, every single day, completely unrelenting.

The way that she treated me, I was    12:21:45 completely isolated, trying my best to figure out a way to just keep going.  And I had gotten to the point where I was just completely -- I didn't know what to do, and I didn't know where to look.

The only person I really communicated    12:22:08

Page 104

Richards

with at the show because of COVID, because of not being in person, was Alex.  I spent every single day suffering in silence.  I didn't know what to do.                                                    12:22:44

I don't know what question I'm answering.  This is overwhelming so...

Q.   The question was what did you discuss about Alex with Mr. Bronstein in the winter of 2021.                                              12:22:55

A.   So I would have told him about how I had constantly been working nonstop, how she yelled at me all of the time, how on one hand she would say she loved working with me and the next hand she would say -- she would get upset about    12:23:18 things I didn't even understand why she was upset about it.

And I was looking to figure out, like, what am I -- what can I even do, like how do I handle this.  And so I would have shared with him    12:23:37 the things that were going on.

Q.   When you say shared with him the things that were going on, did you share with him specific examples of your concerns about how Ms. Poolos was treating you?                      12:23:57

Page 105

Richards

A.    Yeah.  I don't know what exactly I would have said.

Q.    You submitted a written complaint to human resources in late December of 2021; correct?    12:24:19

A.    Yes.

Q.    And in that written complaint you identified examples of Ms. Poolos mistreating you; correct?

A.    Yes.    12:24:31

Q.    One of those examples was related to or in connection with your bridal shower; is that right?

A.    Yes.

Q.    Did you discuss your concerns about    12:24:38 Ms. Poolos's conduct related to the bridal shower with Mr. Bronstein in the fall or winter of 2021?

A.    I believe I would have told him.

Q.    Did you discuss with Mr. Bronstein any concerns you had about your wedding and    12:24:53 Ms. Poolos?

A.    Yes, I would have -- I believe I did.

Q.    Did you discuss with Mr. Bronstein in 2021 concerns you had about traveling for the holidays?    12:25:11

Page 106

Richards

ATTORNEY ZUCKERMAN:  Objection.

A.    I don't -- I don't know.

Q.    You mean you don't remember as you sit here today if you did or you didn't?                    12:25:22

A.    I'm saying I don't remember.

Q.    Did you discuss with Mr. Bronstein in 2021 concerns you had about Ms. Poolos giving you feedback on your copy editing?

A.    I don't think so.                             12:25:44

Q.    Did you discuss with Mr. Bronstein in 2021 concerns you had with Ms. Poolos about any other specific incidents other than what you've just testified to?

A.    I'm sorry, can you say that again?          12:26:04

Q.    Yeah, I'm asking if you talked to Mr. Bronstein in 2021 about any other incidents other than what you've testified to already.

A.    I don't think so.

Q.    Did you speak to Mr. Bronstein in 2021    12:26:22 about filing a complaint with human resources?

A.    I don't remember.

Q.    Did you speak with Mr. Bronstein in 2021 about making a complaint against Ms. Poolos formally at CBS?                                      12:26:39

Page 107

Richards

A.    Is that the same question you just asked?

Q.    No, I was asking -- let me try again.

A.    Can we start over with that question,    12:26:46 please?

Q.    So I'm asking did you have any conversations with Mr. Bronstein in 2021 about filing a complaint against Ms. Poolos.

A.    I don't remember.    12:26:56

Q.    Did you discuss with Mr. Bronstein the possibility of speaking to Tanya Simon about Ms. Poolos?

A.    I think so.

Q.    And what did you discuss with him?    12:27:05

A.    I don't -- I don't remember what all I discussed with him.

Q.    And were these discussions all done over the phone?

A.    Yes.    12:27:15

Q.    Was there any discussions that you had with him in any other format other than using the phone in 2021?

A.    No.

Q.    Did you take notes of any of those    12:27:25

Page 108

Richards

discussions?

A.   I don't remember.  I don't think so.

Q.   Did you record any of those discussions?                                    12:27:31

A.   No.

Q.   And focused on the period of fall 2021 through the end of 2021, how many conversations did you have with Mr. Bronstein, approximately, about Ms. Poolos?                    12:27:45

A.   I don't remember exactly.  A few.

Q.   Do you think it was more than five?

A.   No.

Q.   More than two, though?

A.   I don't know.                    12:28:03

Q.   More than one?

A.   Maybe.

Q.   Other than Mr. Bronstein in 2021, did you have discussions with anyone else about Ms. Poolos?                    12:28:22

ATTORNEY ZUCKERMAN:  Objection.

Q.   Outside of 60 Minutes.

A.   I don't remember.

ATTORNEY IADEVAIA:  Why don't we take a break.  We've been going a while.                    12:28:40

Page 109

Richards

(Discussion off the record.)

THE VIDEOGRAPHER:  We are now off the record.  The time on the video monitor is 12:28 p.m.                                    12:28:50

(Time noted:  12:28 p.m.)

Page 110

A F T E R N O O N   S E S S I O N

(Time noted:  1:36 p.m.)

THE VIDEOGRAPHER:  We are now back on

the record.  The time on the video monitor is  01:36:53

1:36 p.m.

C O L L E T T E   R I C H A R D S ,

resumed as a witness, having been previously

sworn by the notary public, was examined and

testified further as follows:

EXAMINATION CONTINUED BY

ATTORNEY IADEVAIA:

Q.    Ms. Richards, earlier you had testified

that around October of 2024 you replaced your

personal cell phone; correct?                     01:37:05

A.    Yes.

Q.    Do you still have the old device, the

one that you replaced?

A.    No.

Q.    What did you do with it?                01:37:13

A.    I traded it in with my carrier.

Q.    Earlier you had testified about a

communication you had with Mr. Bronstein using

Signal in the early part of 2024; correct?

A.    Yes.                                    01:37:32

Page 111

Richards

Q.    2024 or --

A.    2024.

Q.    2024.  Got it.

Who reached out to who first on Signal?  01:37:37

A.    Scott reached out to me.

Q.    And how did Mr. Bronstein, if you know, know to communicate with you via Signal?

A.    He just did because phone numbers populate on the app like it does on WhatsApp.    01:37:53

Q.    And just to confirm -- I think you testified this earlier -- you did not have any communication with him, whether in writing or orally, about communicating via Signal; correct?

A.    No.                                          01:38:05

Q.    Do you consider Mr. Bronstein to be your friend?

A.    He's a work friend, someone that I worked with for a while as a colleague.  He served as a mentor for me.                               01:38:23

Q.    At any point in time would you have considered him a friend, even if the relationship's changed at this point?

A.    As I said, he's a work friend.  He's not someone -- for example, I didn't invite him to  01:38:39

Page 112

Richards

my wedding, and I've seen him, like, three times in person specifically only for work.

Q.   Did you ever describe him to anyone at 60 Minutes as a friend?                    01:38:49

A.   No, I don't think so.

Q.   I think your testimony was earlier -- but please correct me if I'm wrong -- that you use your personal cell phone to text about work; correct?                                        01:39:09

A.   Yes.

Q.   Are there times where you text sources for a story that you exchange text messages with sources?

A.   On my personal phone?                  01:39:20

Q.   Yes.

A.   Yes.

Q.   Are there times you use your personal phone to sends texts with characters or potential characters for a story?                       01:39:29

A.   Yes.

Q.   Are there times where you communicate using your work phone -- I'm sorry, your personal phone -- I'm focused on your personal phone -- your personal phone to communicate with publicists  01:39:41

Page 113

Richards

about stories?

A.    No.

Sorry, can we go back?  What do you mean, "a publicist"?                                    01:39:48

Q.    A PR person.

A.    Like for a specific story we're working on?

Q.    Correct, yeah.

A.    Yeah, sometimes we would speak to          01:39:55 publicists for a story.

Q.    Got it.  Did you ever text publicists for purposes of a story?

A.    That I'm working on?

Q.    Yeah.                                        01:40:03

A.    Can you define, like -- I don't understand this question, like...

Q.    I'm interested in knowing the kinds of communications you have about work using your personal phone.                                    01:40:16

A.    Yeah.

Q.    So you said that you've used your personal phone to communicate via text with sources for a story; correct?

A.    Yes.                                         01:40:24

Page 114

Richards

Q.    And you've used your phone to communicate with -- via text message with potential characters for a story; correct?

A.    Yes.                                    01:40:32

Q.    And my question was whether you ever communicate with PR reps for the purposes of the stories that you're working on using your personal phone and text messages.

A.    Yes.                                    01:40:44

Q.    Do you ever make any efforts to keep the work-related text messages that were on your personal phone?

A.    What do you mean, "keep"?

Q.    So you talked earlier about auto delete  01:40:58 function on your personal phone.  For communications that you've had related to sources for a story, what do you do with those communications, if anything?

A.    I don't do anything specific.          01:41:10

Q.    Did you ever save any text messages related to work from your personal phone?

ATTORNEY ZUCKERMAN:  Objection.

A.    I don't think so.

Q.    Did you ever store electronically in    01:41:23

Page 115

Richards

another location text messages that you exchange with sources or characters for a story?

A.    I don't think so.

Q.    During the time that you've worked at    01:41:43
60 Minutes, have you recorded any discussions that you've had without the other person who's part of the conversation knowing?

A.    Yes.

Q.    How many times have you done that?    01:41:53

A.    I don't know exactly how many.  A handful.

Q.    Have you done it in connection with Alex Poolos?

A.    Yes.    01:42:04

Q.    How many times?

A.    I don't know exactly how many times but a handful.

Q.    Have you ever recorded a conversation with somebody at 60 Minutes without the other    01:42:12
person knowing that is not related to Alex Poolos?

A.    Yes.

Q.    And how many times have you done that?

A.    I believe once.

Q.    And what was that conversation?    01:42:22

```
                                           Page 116
```

Richards

A.    I recorded my conversation with Renee Balducci.

Q.    Is there any other time that you've secretly recorded a conversation with someone at 60 Minutes other than conversations you've had with Alex and this discussion with Renee?

A.    I don't think so.

Q.    So when you were answering my question earlier about handful of times you've made a recording, you were talking about specifically of Ms. Poolos?

A.    Yes.

Q.    When did you record her?

A.    I made the decision that after I went to HR and filed a complaint that I was going to record conversations that I had with her.

Q.    How many conversations did you have with her after that?

A.    I don't know how many exactly but a handful, maybe -- maybe five or six.

Q.    And do you still have those recordings?

A.    Yes.

Q.    And have you given them to your lawyers?

Page 117

Richards

A.    Not yet.

ATTORNEY IADEVAIA:  Well, we ask for them to be produced.

Q.    Where are they stored?                01:43:41

A.    On my phone.

Q.    Did you make the recordings with your iPhone?

A.    With my work iPhone, yes.

Q.    You made them with your work iPhone?    01:43:50

A.    Uh-huh.

Q.    Okay.

And approximately when did you make those recordings?

A.    They would have ranged from the time    01:43:59
that I contacted HR with my complaint until the last time that I spoke with Alex.

Q.    When did you contact HR with your complaint?

A.    This would have been in the middle of    01:44:12
December of 2021.

Q.    Around December 17th?  Does that sound right?

A.    Around then.

Q.    You made the recordings using your      01:44:37

Page 118

Richards

work-issued iPhone; correct?

A.    Yes.

Q.    All of the recordings?

A.    Uh-huh.                                          01:44:43

Q.    I just need a yes or no, sorry.

A.    Yes.

Q.    And you have the same work phone that you were originally issued?  You don't have a new device; it's the same device?                          01:44:57

A.    Correct.

Q.    Did you ever tell human resources that you had recorded discussions with Alex Poolos?

A.    I don't remember.

Q.    Did you ever give copies of the            01:45:26 recordings to human resources?

A.    I don't think so.

Q.    Did you tell Tanya Simon that you had recorded conversations with Alex Poolos?

A.    I don't think so.                              01:45:39

Q.    Did you give her copies of the recordings?

A.    No.

Q.    Did you ever tell Bill Owens that you had recordings of conversations with Alex Poolos?  01:45:46

Page 119

Richards

A.    I don't think so.

Q.    Did you give him copies of the recordings?

A.    No.                                          01:45:51

Q.    Just so we're clear, you've not recorded anybody else that you work with at 60 Minutes other than Ms. Poolos and the one discussion with Ms. Balducci; is that correct?

A.    I believe so, yes.                           01:46:12

Q.    And I think I asked you this earlier, but did you ever record any discussions you had with Mr. Bronstein?

A.    No.

Q.    Focusing on your personal cell phone,   01:46:40
your testimony earlier was that there was an auto delete function set.  You believe that it was set by default.  Do I have that correct?

A.    Yes.

Q.    When did you first notice that your    01:46:52
phone was deleting text messages?

A.    I believe I first noticed that when I had to look into it for the legal hold.

Q.    Before that time you never noticed that older text messages were no longer there?       01:47:09

Page 120

Richards

A.    I am not in the habit of going through old messages in my phone, so I was not paying attention to that.

Q.    And it never came up for stories that you were working on that you needed to look at an older text message that you couldn't find?

A.    No.

Q.    You referenced shortly before the lunch break that you had had some number of phone calls with Mr. Bronstein in the fall and winter of 2021 about Ms. Poolos; correct?

A.    Yes.

Q.    Did you ever tell Tanya Simon that you had had those calls with Mr. Bronstein?

A.    I don't think so.

Q.    Did you ever tell HR?

A.    I don't think so.

Q.    And just to be specific, did you tell Renee Balducci about --

A.    Are you talking about specifically before...

Q.    Yeah, I'm talking specifically about the calls you described before the lunch break in which I think what you testified to was that you

Page 121

Richards

raised concerns about how Alex was treating you directly to Mr. Bronstein.  Let me start again.  Okay.  That's a lot.

Q.    Am I correct that you had phone calls    01:48:39
with Scott Bronstein in 2021 before you made a complaint to HR about Ms. Poolos?

A.    Yes.

Q.    And my question is did you disclose the fact that you had had those phone calls with    01:48:54
Mr. Bronstein to Tanya Simon.

A.    I don't think so.

Q.    And did you disclose that you had those calls with Mr. Bronstein to Mr. Owens?

A.    I don't think so.    01:49:05

Q.    Did you disclose that you had had those phone calls to Renee Balducci?

A.    I don't think so.

Q.    Did you disclose that you had those phone calls to Maria Cottone?    01:49:13

A.    I don't think so.

Q.    When you worked at CNN with Mr. Bronstein, did he have any responsibility for evaluating your work as an AP?

A.    No.    01:49:39

Page 122

Richards

Q.    Did he ever review your work?

A.    In what capacity?

Q.    As a producer working -- or senior producer that's working on stories with you.    01:49:49

A.    The capacity would be I would do some sort of assignment and I would give it to him.

Q.    And then would he provide feedback?

A.    Yeah.

Q.    When you worked at CNN with    01:50:08 Mr. Bronstein, did you ever socialize with him outside of work?

A.    No.

Q.    Did you ever have drinks with him?

A.    With the whole team.    01:50:15

Q.    And that would include both you and him?

A.    Correct.

Q.    Did you ever go out to drinks with just the two of you?    01:50:23

A.    No.

Q.    Did you ever have dinner with just you and Mr. Bronstein?

A.    No.

Q.    Have you ever been to his home?    01:50:27

Page 123

Richards

A.    No.

Q.    Did you ever have -- engage in an activity with Mr. Bronstein outside of work where it was just the two of you?                    01:50:36

A.    No.

Q.    Have you ever met any -- strike that.

Does Mr. Bronstein have kids?

A.    Yes.

Q.    Have you ever met his kids?          01:51:01

A.    No.

Q.    Is Mr. Bronstein married?

A.    Yes.

Q.    Have you ever met his spouse?

A.    No.                                   01:51:07

(Richards Exhibit 2, text messages, Bates-stamped Bronstein 6, marked for identification.)

Q.    If you could take a minute to look at it, Ms. Richards.                            01:51:54

I'm going to state for the record what's been marked as Richards Exhibit 2 is a one-page text thread Bates-stamped Bronstein 6.

A.    Okay.

Q.    Let me know once you've had a chance to  01:52:08

Page 124

                    Richards

review.

            (Pause.)

    A.    Okay.

    Q.    Do you recognize what's been marked as    01:52:39
Exhibit 2?

    A.    Yes.

    Q.    What is it?

    A.    What year is this?

    Q.    I don't know.  This was produced by    01:52:47
Mr. Bronstein.

    A.    Okay.  It's a text message exchange.

    Q.    Text exchange between who and who?

    A.    Myself and Scott Bronstein.

    Q.    Got it.                                  01:52:59

          And do you know if these text messages
are still -- are on your phone?

    A.    I don't know.

    Q.    Were they at some point, though?

    A.    Yes.                                     01:53:06

    Q.    In Mr. -- I believe Mr. Bronstein's
text messages are on the right-hand side of the
document and yours are on the left.  Does that
appear to be the case?

    A.    Yes, it does.                            01:53:28

Page 125

Richards

Q.    Okay.  And Mr. Bronstein in his second message writes, hi, Collette.  Hoping you and your family have a joyful Christmas and that you have a wonderful new year.  I know it's been a tough few years, but I no doubt -- I have no doubt you will get through the dark times, be having more amazing adventures soon, and that your life will be full of joy again before long if it's not already.

Do you see that text?

A.    Yes, I'm reading it.

Q.    Do you have any idea what Mr. Bronstein is referencing when he talks about dark times and tough few years?

ATTORNEY ZUCKERMAN:  Objection.

A.    I would imagine that he's referring to the terrible thing that I went through working for Alex Poolos.

Q.    Anything else that you're aware of that he might be referencing?

A.    I mean, it was a difficult time when I was working at CNN.  My wedding was postponed from 2020 to 2021.  That was a hard time.  So that could be additional dark times.

Q.    Is there anything else it could be

01:53:42

01:53:59

01:54:08

01:54:18

01:54:50

Page 126

Richards

referring to, do you know?

A.    Not that I can think of.

Q.    Before joining 60 Minutes and any of
the sort of lead-up to getting the job there, had    01:55:10
you ever interacted with Alex Poolos?

A.    Before getting the job?  I interviewed
with her.

Q.    I'm saying before the job application
process.                                             01:55:21

A.    No.

Q.    No?

And was there to your knowledge a
posted position that was available -- that there
was a job available to work with Alex in 2020 when   01:55:33
you sought a position to be her AP?

ATTORNEY ZUCKERMAN:  Objection.

A.    I don't understand the phrasing of this
question.

Q.    Yeah, let me ask again.              01:55:46

Was there a job posting that there was
this open position with Ms. Poolos at the time
that you applied for a job there?

ATTORNEY ZUCKERMAN:  Objection.

A.    Yes, there was a job posted that I     01:55:54

Page 127

Richards

applied for.

Q.    Okay.  And where did you see that job posting?

A.    On -- I don't remember who the Paramount -- who the parent company was at the time, but the CBS News online job portal.

Q.    And did you have any communications with Ms. Poolos about working for her at 60 Minutes before this posting was made on the CBS News job site?

A.    Well, the posting was made originally months prior.  If you recall earlier conversation, I initially started interviewing with Rich Bonin. So I would have applied to that position before Alex's position was open.  So I want to make sure I understand the timeline you're asking me about.

Q.    I'm asking whether you approached Alex about working for her before there was a job posting.

A.    No.

Q.    And do you know if Mr. Bronstein approached Ms. Poolos before there was a job posting, about you working there?

A.    No, I don't know I would have.

Page 128

Richards

Q.   Did anyone in human resources ever encourage you to be positive about a potential job offer from Rich Bonin?

A.   No.                                          01:57:20

ATTORNEY ZUCKERMAN:  Objection.

Q.   I believe your testimony earlier today was that you had made a complaint to HR about Ms. Poolos around mid-December of 2021; is that right?                                          01:57:38

A.   Yes.

Q.   Did you ever speak to Bill Owens about concerns you had related to Ms. Poolos before you made that complaint in December of 2021?

A.   No.                                          01:57:48

Q.   Did you ever spoke to Maria Cottone about Alex Poolos before your complaint in December of 2021?

A.   No.

Q.   And did you ever speak to Renee          01:57:59
Balducci about Alex Poolos before your complaint in December of 2021?

A.   No.

Q.   Did you have any discussions with Tanya Simon about concerns you had related to Ms. Poolos  01:58:11

Page 129

Richards

before your complaint in December of 2021?

A.    I spoke to Tanya about the fact that I was complaining about Alex to HR at the same time.

Q.    And outside of the communications you had with Ms. Simon at the same time, did you have anything -- strike that.    01:58:30

Did you have any discussions with Ms. Simon before December 2021 related to concerns about Ms. Poolos?    01:58:44

A.    I don't think so, no.

Q.    Do you know someone named Cindy Glasgow?

A.    I don't think so.

Q.    Did you ever speak to her in connection with the issues that you raised about Ms. Poolos?    01:58:58

A.    That doesn't sound familiar to me.

Q.    Do you know if Ms. Glasgow was at the time Ms. Balducci's boss?

A.    I have no idea.    01:59:13

Q.    But you don't recall having any direct interactions with Ms. Glasgow; correct?

A.    No.

Q.    Did you complain to anyone at 60 Minutes about Ms. Poolos before December of 2021?    01:59:29

Page 130

Richards

A.    No.

Q.    You worked for Ms. Poolos from approximately October of 2021 until -- I'm sorry, October of 2020 until early 2022; is that correct?    01:59:53

A.    Yes.

Q.    During that time did Ms. Poolos raise any concerns to you about your work?

A.    It wasn't until much later in our time together that she started to raise issues with --    02:00:14 she had an issue with the way that I would copy edit, so that came to light much, much later in around November/December of '21.

Q.    Okay.  Outside of copy editing, were there any other concerns that Ms. Poolos raised to    02:00:38 you that she had about your work?

A.    Overall she was complimentary of the work that I was doing.  She expressed a concern about how I had organized her footage to be either uploaded or sent to our editor that she had gotten    02:00:55 very upset with me about.  I don't remember other instances of her raising concerns about my work.

Q.    Nothing beyond what you've just testified to; correct?

A.    Not that I remember.    02:01:14

Page 131

Richards

Q.    What concerns did Ms. Poolos raise about copy editing?

A.    She said that I needed to be more careful with copy editing background notes.    02:01:24 During this process, though, sometimes she would introduce errors herself.

Q.    On how many occasions did Ms. Poolos raise concerns to you about copy editing?

A.    I remember maybe one or two times.    02:01:43

Q.    Did she raise those concerns in connection with specific stories that you were working on together?

A.    Yes.  This started to come up when we were working on the Danny Fenster story, the    02:01:58 American hostages.  But this was also in and around the time when I had raised my complaint with HR.

Q.    When did you and Ms. Poolos first start working on the Danny Fenster/American hostage    02:02:14 story?

A.    I believe it started in December of '21.

Q.    And how did Ms. Poolos express the concerns she had about copy editing?    02:02:30

Page 132

Richards

ATTORNEY ZUCKERMAN:  Objection.

A.    Do you mean the physical way she expressed them?

Q.    Yes, how did she do it?  Did she do it in person?  Did she do it via email?  some other way?

A.    Over the phone.  Mostly in email.

Q.    Did Ms. Poolos express concerns about your copy editing in connection with any story other than the American hostages story?

A.    No.

Q.    And what specifically did Ms. Poolos say about your copy editing?

A.    I believe that this was a vehicle for her to further try and torment me.  I think that she felt like I was at a complete breaking point with being able to deal with the intensity and irrationality that she was being like all of the time.

And so I felt like she was finding any teeny, tiny thing to get upset at me about when she was overloading me with work and I was nonstop working through the holidays, constantly without a break.

Page 133

Richards

And I was -- I had so much on my plate, and she was creating sort of this scenario where, oh, I would send her a document that had a thousand words in it of me hand typing notes for a    02:04:06 background interview that I did of which that I would do three or four in a day and have to turn them over to her.

Her background interviews I was doing by myself and hand typing, and she wanted them as    02:04:23 fast as possible and would say something like, Oh, send me your notes.  And I would send them as fast as I could.

And if I had so much as a typo, I missed a comma, I made something not a proper    02:04:37 noun, she would use that as an opportunity to say you really need to work on your copy editing.  And this is largely just for our background work.  I don't -- this was not for publication, and this was for getting our notes ready for eventually    02:04:54 putting together something that we would give Lesley, of which we had time to do.

Q.    Okay.  I just want to be clear.  What did Ms. Poolos say to you about your copy editing?

A.    That I needed to pay better -- closer    02:05:11

Page 134

Richards

attention to copy editing.

Q.    Did she say anything else?

A.    I don't remember the details.  I
summarized what I remember from the experience.    02:05:24

Q.    And when Ms. Poolos provided you this
feedback, did she highlight or flag the places
where she thought there were copy editing
mistakes?

A.    I don't remember exactly.    02:05:41

Q.    And you said that these materials
ultimately had to go to Lesley Stahl; is that
right?

A.    They could.

Q.    You mentioned that you were working --    02:06:06
I think your phrase was "nonstop."

A.    Uh-huh.

Q.    What period of time are you referring
to?

A.    I'm referring to -- well, that specific    02:06:13
time was December.  I barely took Christmas off,
Christmas day.  I was working on New Year's Eve.
I was working every single day for ten-something
hours a day at the very least.

Q.    What were you working on at that time?    02:06:47

Page 135

Richards

A.    At that time I was doing background calls with about half dozen to a dozen different potential people that we were going to look at maybe having as an on-camera character.    02:06:59

Q.    For what story?

A.    This was for the American hostages story, the Danny Fenster story.

Q.    Was there a planned shoot in connection with the Danny Fenster story in December of 2021?    02:07:17

A.    There was a shoot upcoming in -- I believe we were trying to do something in January.

Q.    Was it January 5th or 6th or 7th?

A.    I don't remember what day it was set for.    02:07:32

Q.    Was it early January?

A.    I think so.

Q.    And in December did you also work on a story about Trevor Noah?

A.    Yes.    02:07:42

Q.    And did that story air on CBS --

A.    Yes.

Q.    -- on 60 Minutes?

A.    Yes.

Q.    And when did it air?    02:07:47

Page 136

Richards

A.    I believe it was December 19th.

Q.    And do you do work on the Trevor Noah story up until the time that it aired?

A.    Yes.                                        02:07:57

Q.    And what kind of work did you do on the story during that time?

A.    I did the standard function of my job, which was at that point looking for, finding, verifying video and material that we would    02:08:11 ultimately include in that story and fact-checking the piece, preparing the footnoted document that would be turned in of the script.

Q.    And is it fair to say that the work went quickly from Trevor Noah to work on the    02:08:28 American hostages story in December?

A.    I would -- I would imagine yes.  I don't remember exactly the overlap.  But I think we were starting one while we were finishing another.                                        02:08:44

Q.    And was there any other stories or projects you were working on at that time in December besides the Trevor Noah piece that aired and the American hostages story?

A.    I remember that there was -- we were    02:08:56

Page 137

Richards

trying to submit Russian visas to try and get them in. I don't remember much about what the circumstances were of why that was going on at the time, but that was another thing that was going 02:09:11 on.

Q. When you say "Russian visas," what was that about?

A. We were trying to get visas approved to do a story in Russia, so I was collecting 02:09:30 passports of, like, who we could potentially take.

Q. At that time who was 60 Minutes considering bringing on this trip?

A. I don't remember the crew members that it was, but it would have likely have been a staff 02:09:50 crew: myself, Alex, and Lesley.

Q. And was there any issue in connection with getting the visas approved in December of 2021? Did anything come up?

A. Yes. 02:10:15

Q. What happened?

A. Lesley's passport was expired.

Q. And when did you learn that?

A. I don't remember when.

Q. Were you in New York at the time that 02:10:27

Page 138

Richards

you learned that or were you not in New York at that time?

A.    I don't remember.

Q.    And do you know how that issue was    02:10:33 resolved?

A.    This was something that Alex got very, very upset about.  She was mad at me and also our broadcast associate, Wren Woodson, at the time for allowing Lesley's passport to expire.    02:11:04

This was something that I don't understand why she was so upset about.  I didn't understand what appeared to me as some sort of arbitrary deadline of we needed to get all of these passports in and try and get this visa    02:11:23 application done.

It was very confusing as to where the urgency was coming from because it was something that had been submitted also months prior.

Q.    What had been submitted months prior?    02:11:44

A.    We had submitted -- I don't remember exactly the details of this, but I believe we had submitted visa applications in August of that year.

Q.    When was the trip to Russia planned    02:12:06

Page 139

Richards

for?

A.    We didn't have a planned trip.

Q.    Do you know if Ms. Poolos took any
steps in connection with Ms. Stahl's passport in    02:12:18
December of 2021?

A.    I believe what you might be referring
to is that Alex went to the passport office and
got her passport renewed for Lesley.

Q.    And is that something that you normally  02:12:34
would take care of?

A.    That is not something that I believe
would be my job.

Q.    Do you know whether Ms. Poolos changed
her holiday plans in order to make that happen?    02:12:46

A.    I don't know.

Q.    Were you aware that Alex was trying to
get the visa applications submitted because the
Moscow bureau chief said they needed to be in
before the holidays?                               02:13:11

A.    I don't remember.

Q.    And were you aware that Alex was
worried because if they weren't submitted in time
that there would be a multiple-week delay in
getting approval?                                  02:13:29

Page 140

Richards

A.    I don't remember what the extent of this was.

Q.    During this December time frame when you were working I think you said nonstop, was Ms. Poolos working nonstop during that period too?    02:13:44

A.    I don't really know what she was doing.

Q.    Do you have any reason to believe she was not working?

A.    No.    02:13:56

Q.    Did you take any days off around Christmas?

A.    I don't remember.  I think I may have taken Christmas day off.

Q.    Any other days?    02:14:23

A.    I don't remember.  I don't think so.

Q.    Was there a point in time in December of 2021 when you traveled from New York to someplace to spend time with your family?

A.    Yes.    02:14:41

Q.    And when was that?

A.    I left on Saturday.  I think it would have been December 18th.  I left in the afternoon, and then I finished driving to Georgia December 19th and arrived sometime I think the afternoon.    02:14:54

```
                                              Page 141
                        Richards
     Q.    Did Ms. Poolos raise concerns to you at
any point about your fact-checking?
     A.    No.
     Q.    Did she ever raise concerns to you        02:15:19
about fact-checking in connection with the Trevor
Noah story?
     A.    Not that I remember.
     Q.    Were you part of any discussions about
the script for the Trevor Noah story referring to    02:15:31
Mr. Noah as, quote/unquote, not white?
     A.    That was not a discussion that I was
weighing in on.
     Q.    What do you mean by that?
     A.    That was language written that I          02:15:49
believe when we had screened the story the
language was described as Trevor Noah was not
white and not American, something -- something to
that effect.  And then when Lesley went to go
record her studio, they decided to change it to     02:16:14
say he was biracial.
     Q.    Were you present for Ms. Stahl
expressing concerns to you about this to
Ms. Poolos?
           ATTORNEY ZUCKERMAN:  Objection.          02:16:33
```

Page 142

Richards

A.   No.

Q.   Do you know whether Ms. Stahl yelled at Ms. Poolos about this issue?

A.   No, I don't know.                          02:16:38

Q.   Was there any fact-checking issue that came up surrounding the size of a crowd in Washington, D.C.?

ATTORNEY ZUCKERMAN:  Objection.

A.   No.                                        02:16:50

Q.   Was there ever a time that Ms. Poolos raised a concern to you that you had miscalculated the size of a crowd in D.C. by thousands of people?

A.   I don't remember that.                     02:17:02

Q.   In connection with copy editing, did Ms. Poolos ever offer you an opportunity to do training?

A.   I don't remember.

Q.   Did Ms. Poolos ever offer you an          02:17:17
opportunity to do training at any point about anything?

A.   I don't remember.

Q.   Did you ever reject an offer to do training provided specifically for new associate   02:17:31

Page 143

Richards

producers?

A.    No, I have no memory of that.

Q.    Did you ever reject any training that was offered to you during your time at 60 Minutes?    02:17:40

A.    I don't recall any.

Q.    Did Ms. Poolos ever offer you extra time to provide your write-ups in order to avoid the concerns she had about copy editing?

A.    Yes, I think so.    02:18:01

Q.    And what did she say about that?

A.    I don't remember the exact details, but I think she would have said something like:  You can get it to me a little bit later or perhaps the next day.  Again, I don't remember details of    02:18:13 exactly the extended time frame.

Q.    Did you ever work with someone named -- strike that.

Do you know of someone at 60 Minutes named Jack Weingart?    02:18:27

A.    Yes.

Q.    Does he currently work at 60 Minutes?

A.    Yes.

Q.    And did he work there when Ms. Poolos worked there?    02:18:34

Page 144

Richards

A.    Yes.

Q.    And what's his job?

A.    He's an associate producer.

Q.    And has he been in that role the whole    02:18:38
time you've been at 60 Minutes?

A.    Yes.

Q.    Have you ever worked with him?

A.    No.

Q.    Have you ever had interactions with    02:18:44
him?

A.    Yes.

Q.    Are you aware of any concerns that he's
raised about you?

A.    No.    02:18:51

Q.    Was there ever occasions where you got
angry at Ms. Poolos?

A.    No.

Q.    Did you ever pitch a story to
Ms. Poolos about housing for veterans?    02:19:05

A.    I don't remember but -- I don't
remember.

Q.    Did you ever pitch a story to
Ms. Poolos in which Ms. Poolos rejected the idea?

A.    Yeah.    02:19:21

Page 145

Richards

Q.    How many times did that happen?

A.    I don't know.

Q.    Would you say it was more than five times?                                                        02:19:25

A.    I don't think so.

Q.    Was there ever an occasion when Ms. Poolos rejected a story idea and you were upset with her for doing so?

A.    No.                                                        02:19:35

Q.    You mentioned before that Ms. Poolos had raised a concern about securing footage to get to an editor -- correct? -- or editors.  Do I have that right?

A.    Yes.                                                        02:20:14

Q.    What kind of footage are you talking about?

A.    I'm talking about when we would shoot either an interview or B roll and then we need to get that to the editor.                                                        02:20:23

Q.    What was the purpose in getting the footage to the editor?

A.    So they could work with it.

Q.    And how many occasions did Ms. Poolos express concern about your securing the footage to  02:20:34

Page 146

Richards

get to the editor?

ATTORNEY ZUCKERMAN:  Objection.

A.    There were two times that this came up.

Q.    Were they in connection with different   02:20:49
stories, the two times?

A.    It was the same story.

Q.    What was the story?

A.    The transgender health care story.

Q.    And approximately what period of time   02:21:00
did you work on that story with Ms. Poolos?

A.    From about the end of December of 2020
until it aired I think in April -- no, not April,
I'm sorry, May something in 2021.

Can we take a break for a moment?   02:21:20

Q.    Sure.  That's fine.

THE VIDEOGRAPHER:  We are now off the
record.  The time on the video monitor is 2:21
p.m.

(Recess taken from 2:21 to 2:41.)   02:41:09

THE VIDEOGRAPHER:  We are now back on
the record.  The time on the video monitor is
2:41 p.m.

Q.    Ms. Richards, did you ever tell
Mr. Bronstein that you had made recordings of Alex   02:41:31

Page 147

Richards

Poolos?

A.    I don't remember.

Q.    Did you ever discuss with Mr. Bronstein

about whether you should be recording Ms. Poolos?   02:41:40

A.    I don't remember.

Q.    Did Mr. Bronstein ever suggest to you

that you should record Ms. Poolos?

A.    I don't remember.

Q.    I think right before the break we were   02:41:53

talking about getting footage to the editor and

there were a couple of instances you recall when

Ms. Poolos had raised concerns about how you had

handled that.  Do I have that correct?

A.    Yes.                                       02:42:21

Q.    When was the first instance?

A.    The first time was when we had done an

interview.  This was during still a COVID-type era

when we were doing Zoom remote interviews.  And

our subject was in Atlanta, where I was living at   02:42:37

the time, and our correspondent and Alex were in

New York.  And they were doing the interview from

New York, and I was with the subject in Atlanta.

        And so the location where I was with

the subject was a hotel in Atlanta, and at the     02:42:57

Page 148

Richards

time we were looking to maybe upload the footage from the hotel to what is our Sony Ci workspace with our editors get our footage and store our footage.                                              02:43:19

And the speed in the hotel was not fast enough to upload, so the cameraman told me that it would be fastest if he overnighted an external drive of the footage to the editor and they could then work with the material the next day.          02:43:38

Q.   Could you spell for us the system you referred to, something C?

A.   Yeah, Sony, S-O-N-Y space C-I.

Q.   So what was the concern that Ms. Poolos raised in connection with this footage that I          02:43:58 guess relates to when you were in Atlanta?

A.   So this was one of the times -- this is an example that also lays into the other instances that happened where she would get very, very upset about something and, like, fly off the handle over   02:44:19 something I didn't even understand was an issue.

This was also one of the first shoots I had ever worked on.  The cameraman told me what would work logistically the best, and I thought that that would work so that's what we did.        02:44:41

Page 149

Richards

And she was very, very, very upset and yelling, telling me that it was a terrible, terrible thing and how could I do this, and one thing after another, and this is a disaster, and 02:44:56 how could this happen, and nonstop just losing it over the fact that we needed to overnight it instead of uploading it and I should have somehow found a way that the internet would have been faster and I needed to tell her of these issues. 02:45:14

I didn't know that this was an issue. I had listened to the cameraman say what would work best, and I thought, okay, that's what we'll do. And I didn't know there was a problem. And she got very, very, very upset and yelled at me 02:45:29 about this.

Q. And Ms. Poolos expressed to you that she was upset because she wanted the footage to get to the editor faster and the way to do that was to upload versus sending it via FedEx? 02:45:46

A. Yeah, she wanted it to get there faster.

Q. And was there any reason why she wanted to get the footage to the editor faster?

A. She wanted the editor to start working 02:45:58

Page 150

Richards

with it as soon as possible.  At the time I don't remember us even having a screening date or having discussed really even screening the piece.  So she just wanted it to be that way.                    02:46:13

Q.    Your testimony is -- your view is it was arbitrary?

A.    My view is it was arbitrary and she wanted it to be.

Q.    And just to be clear, your testimony is  02:46:27 that Ms. Poolos yelled at you in connection with this incident involving the footage in Atlanta?

A.    Yes.

Q.    So did she do that over the phone?  How did she -- when did she --                           02:46:42

A.    Over the phone she was upset with me.

Q.    Okay.  And then when was the next instance?

A.    Of this -- of this nature, perhaps one of the biggest times that this happened was the    02:46:59 day of my bridal shower in April.  The prior day we had been setting up a B roll shoot that again this was a remote setup.

The shoot itself was in California with one of our interview subjects.  And a client of   02:47:21

Page 151

Richards

hers and that client's parent and they were going to have some sort of discussion on camera about their therapies and things like that that we were going to use for B roll.                                    02:47:37

So we were setting all this up.  The actual B roll shoot was going to take place on Saturday.  That was the day I had my bridal shower, and Alex knew that.  We had been setting up with a cameraman about how to -- of course    02:47:53 where this would happen in a rented location and what we were going to do, what time, coordinating all of those efforts.

The cameraman said that he had shot in that hotel before and it's best just to overnight   02:48:14 the footage because that's fastest.  Also when you work with a freelance crew, we pay them by the hour and to pay them to drive home and upload footage takes a long time.  So the cameraman said it's best to FedEx overnight the footage and the    02:48:33 editor can work with it the following morning.

And so Saturday I go to my bridal shower, and I -- earlier that morning I was working -- I may have started around like 7 or 7:30 in the morning, checking in with the team and  02:48:56

Page 152

Richards

I think making sure everything would go smoothly.

Then I took off to go to my bridal shower. And I start getting, like, a ton of messages from Alex saying that something has gone     02:49:14 horribly wrong because we can't upload footage and the shoot hadn't started yet and that this was a disaster and now Ann Marie Kross is involved and how could I do this and I need to -- I'm, like, what am I supposed to do?                           02:49:36

And she's just going on and on and on about how much of a disaster this is and how -- not stopping and saying, like, We're gearing up for this to air and things are going to fall through the cracks and you can't, like, lose     02:49:50 focus. Every --

I couldn't breathe right at any point. Any small thing, like, ever that I did, it wasn't even -- we didn't even have a screening date. We hadn't even -- so she felt it important to tell me     02:50:14 that I am going to let things fall through the cracks and this -- I don't even understand what the problem is. I don't understand what I can do to help. I'm just being told that it's a mess.

I'm, like, okay. And I get on the Zoom     02:50:36

Page 153

Richards

to watch and I'm, like, okay I'm watching this. And she just continues to act like everything's fine. She was like, I'm sorry I ruined your day. I think it was this one. This may have been a 02:50:59 time when she was, like, it affects more than you. Like, she didn't get to go to an acupuncture appointment or something because it ran long. I don't even know.

It was a prime example of how no matter 02:51:15 what I did there was always something going wrong over nothing.

Q. Okay. I have some questions. So was this the same issue that Ms. Poolos had raised concerns about previously in which the footage was 02:51:36 being FedEx'd as opposed to uploaded?

A. Yes, similar.

Q. And the prior time did Ms. Poolos say to you that she -- that she didn't want you to approve the camera folks sending footage via 02:51:54 FedEx?

A. I don't remember what she said.

Q. Did Ms. Poolos tell you, in connection with that first incident, that you should let her know if this issue were to come up again? 02:52:20

Page 154

Richards

A.    Yes.

Q.    And did you let her know before the cameraperson FedEx'd the footage the second time it happened?                                    02:52:31

A.    No.

Q.    How come?

A.    Because I thought that we were doing what we were supposed to do.

Q.    And you said that there was -- you        02:52:39 weren't sure that there was even a screening scheduled.  Do I have that correct?

A.    Yeah, I don't remember exactly what our timeline was when this was going on, but I don't think that we had a screening date for this at        02:52:54 this point.

Q.    You don't think there was a screening date scheduled for the upcoming week?

A.    I don't think so.

Q.    Do you know whether Bill Owens had        02:53:05 requested that this footage to be included in the next screening?

A.    Yeah.

Q.    And how did you know that?

A.    Because I remember this was some sort        02:53:19

Page 155

Richards

of add that they wanted.

Q.    What do you mean by that?  I'm sorry, I don't follow.

A.    They wanted us to go back and do this B roll.    02:53:29

Q.    Did Bill Owens say that to you?

A.    He would have said that in the screening that we all participated in.

Q.    That you would have been part of?    02:53:46

A.    Yeah.

Q.    Got it.  And that Ms. Poolos would have been part of?

A.    Yeah.

Q.    I don't know if you said this, but when did this second incident occur?    02:53:52

A.    This was when my bridal shower would have been in, like, April.

Q.    April of which year?

A.    '21.    02:54:04

Q.    '21.

The first incident, did that also happen in early 2021?

A.    Yes.

Q.    You testified about text messages that    02:54:14

Page 156

Richards

Ms. Poolos sent to you.  Did you include those text messages as part of your submission to HR when you made your complaint about her?

A.    Yes, I did.                                          02:54:26

Q.    Did you include all of the text messages that you believed were relevant to that issue?

A.    Yes.

Q.    Where were those text messages stored    02:54:35 at the time?

A.    My phone.

Q.    An your personal iPhone?

A.    Yes.

Q.    And do you have those text messages    02:54:46 still?

A.    No.

Q.    And those were deleted, as far as you understand it?

A.    I believe so.                                        02:54:58

Q.    And do you believe -- well, how did they get deleted, if you know?

A.    Probably with the auto delete function of my phone.

Q.    Focusing on the second incident that    02:55:19

Page 157

Richards

took place on the day of your bridal shower, did you have any phone calls with Ms. Poolos on that day?

A.    I think I may have talked to her on the    02:55:28
phone.  I don't remember.  That was a horrible day.

Q.    And did Ms. Poolos yell at you on the phone on that day?

A.    I don't remember.  I feel like I would    02:55:41
have remembered if it continued on the phone.

Q.    Going back again -- I just want to ask another question related to the text messages.  So were the text messages made into screenshots and then included in the document or were they    02:56:00
attachments to the document?

A.    Screenshots that I put in the document.

Q.    Do you still have those screenshots?

A.    Yes.

Q.    And where are those?    02:56:10

A.    In my phone.

Q.    Where?  In your personal phone?

A.    Yeah.

Q.    And where in your phone?  Is it, like, part of the camera or is it saved somewhere else?    02:56:23

Page 158

Richards

A.    It's part of the camera roll.

Q.    During the time that you worked with Ms. Poolos, were there ever any issues about acquiring third-party material for a story that    02:56:48 you were working on?

A.    I didn't think there were any major issues.

Q.    Was there any minor issues?

A.    I think with any story there's issues    02:56:59 with trying to find footage that we need.

Q.    Were there any issues securing footage related to the Trevor Noah story?

A.    I think what you might be referring to is, like, one piece of footage we were trying to    02:57:17 get.

Q.    What was that footage?

A.    There was -- we were trying to figure out how to get this Jay Leno clip from a long time ago.    02:57:33

Q.    And what about in connection with trying to secure that footage?

A.    I don't remember the super fine details of that.  I remember, like anything, this is something where a small matter turns into an    02:57:49

Page 159

Richards

enormous ordeal.

So we were at some point considering different clips from Trevor Noah earlier appearances in the U.S. on U.S. television. And I 02:58:06 think what we figured out was the Jay Leno piece was one of or maybe the first time he appeared on, like, American late night television.

And ultimately she decided that she wanted to include that clip, so we needed to 02:58:25 either figure out where it was, how we could get our hands on it, either -- because we found it on YouTube somewhere but, like, can we use that for fair use. And these are very standard things that happen with any story. 02:58:45

Q. And was there any hiccups or problems in the process?

A. There was some -- I remember there being some sort of debate of whether we could fair use it or ultimately we needed to license it. We 02:58:58 received guidance that perhaps NBC -- I think it was NBC who originally had that -- would push for us to license it.

Q. Do you know if Ms. Stahl really wanted the Jay Leno footage? 02:59:14

Page 160

Richards

A.    I don't remember how much she wanted it or not.

Q.    Was there any problem in connection with securing this footage as it related to the   02:59:25 CBS clearance and rights team?

A.    I remember we needed to figure out how to either license it and pay for it and then we needed to get, like, the best resolution possible from them.  I don't -- I don't remember, like,   02:59:42 other details about it.  It was a long time ago.

Q.    Do you not remember some things because it happened a long time ago?

A.    Well, this is -- this wasn't that big of an ordeal.  I don't remember licensing every   03:00:00 single clip of footage I ever worked on, is more so what I mean.

Q.    Did you raise any concerns about the clearance and rights department in connection with this footage?   03:00:17

A.    I don't remember.

Q.    Did it turn out that you had missed or ignored an email from the clearance and rights team related to this footage?

A.    I don't remember.   03:00:32

Page 161

Richards

Q. Did Ms. Poolos say to you in connection with the NBC footage that you should not be complaining about others if you dropped the ball?

A. I don't remember.                          03:00:43

Q. You testified earlier about Ann Marie Kross and some interaction or interactions with her in which you were concerned about her tone; correct?

A. Uh-huh.                                    03:01:01

Q. I just need a yes or no, sorry.

A. Yes.

Q. Did you tell Alex that Ann Marie Kross had made you so upset that you cried?

A. I don't remember the characterization      03:01:17
of that. I -- look, I viewed this incident at this point Alex had already yelled at me several times in our working relationship, and we were at a point where she was telling me that I need to yell at her and we're allowed to do this and it's   03:01:33
okay to yell.

And so when I had a conversation with Ann Marie where she was -- had raised her voice at me and I had told Alex this, she made it a very big deal. She said, She can't talk to you like   03:01:51

Page 162

Richards

that, she can't talk to you like that, and I'm going to tell Tanya that this happened, she can't -- I felt like she was using this as some sort of vehicle to act like she has my back and 03:02:06 that it's -- it felt strange to me, as I tried to say it wasn't that big of a deal, like, it was a heated conversation. She was upset, and I was struggling with it. I found it all very odd but... 03:02:29

Q. When you say that you believed this was a vehicle that Ms. Poolos was using to show that she had your back, was this a belief that you had at the time it happened or did you form that belief later? 03:02:42

A. No, I felt at the time, because she was -- she was the one who was treating me terrible. So the fact that she had this sort of outsized reaction to this, I felt like she was trying to make up for how she had been treating me 03:02:55 all along.

Q. Did you say that to anybody at the time?

A. No. I didn't have anyone to talk to at the time. I was completely isolated. 03:03:05

Page 163

Richards

Q.    Did you say it to Mr. Bronstein at the time?

A.    No.

Q.    When you say you were completely    03:03:18
isolated -- you said that a couple times -- what did you mean by that?

A.    I didn't know anyone else really at the company.  The people I would interact with were few and far between.  I was in Atlanta.  This was    03:03:31
during COVID time.  It wasn't -- like, I wasn't moved yet.  We weren't in the office yet by the time we had moved.  So my window into how the company functioned was primarily through the way that Alex treated me.    03:03:47

Q.    Just so we're clear, are you in any way suggesting that Alex was responsible for you being isolated?

A.    I think she -- I think it worked in her favor, but I don't -- I'm not suggesting that she    03:04:03
should fix the fact that we can't be in the office because of COVID.

Q.    Do you know somebody named Barney Gimbel?

A.    That name sounds familiar to me.  I    03:04:39

Page 164

Richards

think -- was he -- was he on Danny Fenster's team? Can I ask that? I don't know. It sounds familiar.

Q. Let me ask you, was there a PR person 03:04:56 or publicist name Barney Gimbel that you worked with and Alex worked with in connection with the American hostages story?

A. Yeah.

Q. And does Barney Gimbel sound like that 03:05:07 person?

A. Yeah, that had to be the person.

Q. Did you ever speak to him directly?

A. I think so.

Q. How many times? 03:05:15

A. I don't know.

Q. What was his involvement in the story about American hostages?

A. I think he worked -- I think he may have been working with Danny Fenster to some 03:05:23 effect with media. I don't remember to what extent.

Q. Was he a senior PR person in connection with that story? Was he a senior PR person for Danny Fenster? 03:05:43

Page 165

Richards

A.    I guess so.

Q.    And did you ever have a conversation with him in which you discussed whether Alex would be continuing to work on the story?    03:05:53

A.    I know that when all of this was happening that someone had to explain to him or -- yeah, him, about the fact that a different producer was coming in to work on this because she had been suspended.  That very well may have    03:06:13 been -- I think I had that conversation.

This was also during the most traumatic time of my life, so I don't remember having -- I don't remember the details of, like, talking to him.  It sounds vaguely familiar.    03:06:30

Q.    Did you say that Ms. Poolos would not be -- or strike that.

What did you tell him about Ms. Poolos's participation in the story moving forward?    03:06:43

A.    As I said, I don't remember the details of that conversation in detail.

Q.    And is it your testimony this was the most traumatic time of your life because of Ms. Poolos?    03:06:59

Page 166

Richards

A.    Yeah.

Q.    Was there anything else that caused this trauma for you?

A.    No.                                             03:07:03

Q.    During any discussion you had with Mr. Gimbel, did Mr. Gimbel say that he was going to pull the story?

A.    I don't remember.

Q.    Did you have conversations with anyone    03:07:25 else outside of 60 Minutes about Ms. Poolos no longer working on a story?

A.    Not that I can remember.

Q.    Did you have discussions with anyone outside of 60 Minutes about Ms. Poolos's either    03:07:41 being suspended or placed on administrative leave besides Mr. Gimbel?

A.    I mean, I confided in, like, my family about what was going on, so I don't know if that counts, like, I kept them updated about what was    03:07:59 going on in my life with this.  But in a work capacity, I don't think so.

Q.    Did you talk to any sources about Ms. Poolos continuing to work on the American hostages story?                                     03:08:13

Page 167

Richards

A.    I'm trying to remember what all was going on.  I think that there was another interview subject that had spoken with Alex that needed to be informed that a different producer 03:08:25 was going to be working on it.  I think that was Jason Rezaian.  Beyond that I don't think there was anyone else in the story that needed to be informed of this change.

Q.    Did you speak to Jason?                03:08:38

A.    I think by that point Shari Finkelstein was working on it; and I don't remember exactly, but I think maybe Shari had had that conversation with him with me.

Q.    The two of you were on the call?       03:08:53

A.    I think so.  I believe that that's the way that would have happened.

Q.    Who did the talking to Jason?  Was it you?  Was it Shari?

A.    I don't know.                          03:09:04

Q.    What was said on your side of things about Alex's participation?

A.    I don't remember.

Q.    And how did Jason react?

A.    I don't -- I don't have strong memories 03:09:18

Page 168

Richards

about this.  All I generally remember is I wanted to follow close instruction about how to speak with people in the middle of the story, and I was advised that I should just say that we have a new    03:09:31 producer coming to work on the story and we need to move forward in this way.

So I remember that, and I remember taking that very seriously.

Q.    Who gave you that advice or guidance?    03:09:47

A.    I believe that either Renee would have given me guidance about that and -- yeah, I believe Renee would have told me to just go about it that way.

Q.    And the conversation that you had with    03:10:08 Barney Gimbel, did you do that by yourself or was someone else on the call?

A.    I don't remember.

Q.    And at the time you had the call with Mr. Gimbel, had you received the guidance you    03:10:19 referenced from Ms. Balducci?

A.    Again, I don't remember the timeline of this.  I remember vaguely that the people in the story had to be informed about it.

Q.    And on the call with Mr. Gimbel, do you    03:10:35

Page 169

Richards

recall Mr. Gimbel's reaction to learning that Ms. Poolos would not be working on the story?

A.    I vaguely remember him expressing some confusion.                                          03:10:50

Q.    Anything else?

A.    I don't remember.

Q.    Did he ever express to you on the phone that he was upset?

A.    I don't remember this, and I don't want    03:10:58 to speculate.

Q.    Did he express that he was angry?

ATTORNEY ZUCKERMAN:  Objection.

A.    I don't remember.

Q.    Do you know whether after your call    03:11:24 with Mr. Gimbel if he raised concerns about that call with Tanya Simon?

A.    I don't -- I don't remember.  I remember vaguely that maybe he talked to Tanya because he wanted to know more about the    03:11:41 circumstances of the producer change.  But that sounds like a vague -- sorry, I vaguely remember something about that, but I don't know the details of that.

Q.    Do you know whether Mr. Gimbel raised    03:11:57

Page 170

Richards

concerns about how you had communicated during your call with him?

A.    Will you say that again?

Q.    Sure.  Do you know whether Mr. Gimbel    03:12:07 had raised concerns about how you had communicated with him during the call?

A.    I don't -- I don't know anything about that.

Q.    Do you know whether Jason Rezaian had    03:12:20 raised concerns about how you had communicated with him during your call with him?

A.    I don't know that that ever happened, and I don't know anything about it if it did.

Q.    You raised concerns about Ms. Poolos in    03:12:47 mid-December of 2021.  You've already testified to that; correct?

A.    Yes.

Q.    Who did you first approach about those concerns at 60 Minutes -- or at CBS?    03:12:57

A.    I reached out to our HR representative, who I believe was Maria Cottone.

Q.    And when did you reach out to Ms. Cottone?

A.    I believe it was December 16th.    03:13:18

Page 171

Richards

Q.    And what did you -- did you actually -- did you email Ms. Cottone?  Did you talk to her on the phone?  How did you initially connect with her?                                                      03:13:30

A.    So I reached out to who I thought was our HR person, I think a woman named Mariana.  And then she was no longer there.  And then Renee -- and then I was told to reach out to Renee, and Renee connected me to Maria.             03:13:44

Q.    And how did you communicate with Mariana?  How did you try to communicate with her?

A.    Email.

Q.    And what did you say in that email?

A.    That I needed to speak with someone in   03:13:55 HR, something to that effect.

Q.    Did you say anything specific about Alex?

A.    I don't think I would have said specifics in an email.                                    03:14:03

Q.    How did you communicate with Renee at that time?

A.    In email.

Q.    Email.  And more or less the same thing, that you needed to talk to someone?          03:14:14

Page 172

Richards

A.    Yes, correct.

Q.    And nothing specific about Ms. Poolos at that point?

A.    Correct.                                    03:14:22

Q.    And then you got connected with Maria Cottone.  How did you reach out to her?

A.    I somehow got on a phone call with her. Either she told me to call her or she called me.

Q.    And was that on December 16th?          03:14:34

A.    Yes.

Q.    And how long was your call with her?

A.    I believe I talked with her on December 16th.  That may have been more of the preliminary call.  I had a longer conversation with her I     03:14:46 think a couple days later.  I think in the next week was when I had the conversation of the most substance.

Q.    So focusing on the preliminary call, what do you recall about that call?                03:15:06

A.    I don't -- I don't remember the preliminary part as much.  I think -- yeah, I don't remember what exactly the preliminary call was about.  I don't remember if she was wanting to schedule it for that next week or if we had some    03:15:27

```
                                          Page 173
```

Richards

level of conversation to start and then we

finished the next week.

Q.    Did you mention Ms. Poolos by name

during that call on December 16th with          03:15:37

Ms. Cottone?

A.    Yeah, I would imagine.  I would imagine

that I did.

Q.    I think you mentioned earlier around

the same time you talk to Tanya Simon; is that    03:15:51

correct?

A.    Yes.

Q.    Do you know which day you talked to

Ms. Simon?

A.    I did the same day.                        03:15:57

Q.    On December 16th?

A.    Yes.

Q.    Did you speak to Ms. Simon by phone or

some other way?

A.    I told her I needed to talk to her, and  03:16:06

I talked to her by phone.

Q.    Did you send her an email or a text?

A.    I believe it was an email.

Q.    And you talked to her on the same day

or the next day, I'm sorry?                      03:16:19

Page 174

Richards

A.    The same day.

Q.    The same day?

A.    I'm pretty sure.

Q.    Approximately how long was that call    03:16:23
that you had with Ms. Simon?

A.    I don't remember exactly how long it
was.

Q.    What did you discuss?

A.    I told her what I had been through with    03:16:33
Alex.  I told her that I was at a complete loss
and didn't know what to do anymore.  So I walked
her through what I went through regarding the
incidents of the bridal shower and how she was
treating me about my wedding and how she got very    03:16:51
upset with me about booking -- small things like
booking the Comedy Cellar.

And I was very, very upset because the
breaking point for me was around when we were
finishing up the Trevor Noah story.  In December    03:17:16
Alex and I were on the phone, and she was -- this
was after some point when she was yelling at me
and telling me that -- I told her, I was, like, I
don't know what to do anymore.  You tell me that
you like working with me, but you yell at me and    03:17:35

Page 175

Richards

it's okay to yell at me, this is how it is, you should yell at me. And I repeatedly tell you I don't want to be in a workplace relationship where we yell at each other.                                    03:17:50

And she went into this long -- this long explanation of this is who she is and she yells at everyone and this is what it's like and it's okay. This is -- the thing that really sent me over the edge where I realized I needed to talk  03:18:07 to HR and talk to Tanya about this was her yelling at me about needing to be in a car. And she would say things like, I have never been confronted with a situation where an AP needs to be in a car.

It just got to the point where I didn't  03:18:28 even know how to function. And what ultimately scared me the absolute most after a year of being so beaten down was that she said, If you don't want to work with me anymore, we can go to Tanya and we can -- it's okay, you can stay at 60       03:18:56 Minutes and, you know, we'll handle it.

And so that to me felt like she was trying to take the very little agency that I had away from me. And so -- because at that point I'm just trying to survive. I'm trying to do my job.  03:19:13

Page 176

Richards

I'm trying to, like, not have a day where I feel like everything's going to come to an end over literally nothing.

So I had no other choice but to -- the    03:19:28 absolute last thing on earth I ever wanted to be in this position was to have to go to HR, but what other recourse I had.

And I also went to Tanya because I wanted her to know that I needed to speak with HR    03:19:46 and I had to tell her about what was happening.  I simply couldn't take this anymore.

Q.    The agency that you're concerned about Ms. Poolos taking away, what do you mean by that?

A.    Switching teams.  So she was saying if    03:20:04 you didn't want to work with the producer anymore you could request to switch teams, you could request to go work with someone else.  And as Alex explained this to me, this is something that happens at the end of the season in and around May    03:20:20 when people -- again, this is how she's explaining this process to me and how little bit I knew of it is you can go to Tanya -- you as the AP can go to Tanya and request to work with a different producer.    03:20:38

Page 177

Richards

And so the fact that she was inserting herself now into this process of, oh, we can go, when I'm the one saying that I'm unhappy with how she's been treating me and I'm having this                03:20:51 terrible time and then she's trying to go to Tanya about this?

I became very, very, very concerned about her trying to I don't know what.  But her trying to control what I know she -- I feel like        03:21:08 she felt like I was at a complete and utter breaking point.  And she wanted to control my ability to get out of it.

Q.    When you submitted -- well, strike that.                                                                      03:21:26

When you spoke to Tanya on December 16th, did you tell Tanya that you wanted to switch teams?

A.    Yeah.

Q.    And when you submitted your written        03:21:34 complaint to HR, did you say that you wanted to switch teams?

A.    Yes.

Q.    The conversations that you've identified as being your breaking point, was that   03:21:46

Page 178

Richards

a conversation you had about traveling around the holidays?

A.    I think that may have been what brought it up.                                                         03:21:57

Q.    And during that conversation did Ms. Poolos express concern about your traveling plans?

A.    I had -- she expressed concern over everything.  So I knew at some point in December I   03:22:12 would need to take a weekend to drive to Atlanta because I had a dog and we couldn't fly with her. So sometime in October I sent her I think an email that said, Hey I'm going to need to travel to Georgia at some point in December, as a heads-up   03:22:33 that I would need to do that.

And so I had -- back to the point of the conversation being at my breaking point, I was trying to figure out with Alex, okay, I need to travel, what is the best way that we can do this,   03:22:59 and this is when she started getting very, very upset with me, as I described earlier.  And I shut down and said, I feel like a punching bag to you.

Then that's when the conversation continued on and, as I described earlier, she was   03:23:19

Page 179

Richards

saying all the things about she is who she is, she yells at people and that's okay, and if I want to leave working from her -- or with her we can handle that.                                                03:23:39

Q.    Do you know when the break was for 60 Minutes at the holidays at that time?

A.    There's no exact break, really.

Q.    There's no break?

A.    People work with within their teams to    03:23:56 figure out, okay, when they need to finish their work and when they will take time off.

Q.    And the conversation you had with Ms. Poolos that led to -- I guess you saying culminated in her saying you don't have to -- you    03:24:15 don't have to continue to work with me, were you asking for a specific day to leave?

A.    I was hoping and asking to be in a car on Saturday and Sunday or all day Sunday or Saturday, and I was making sure that was okay with    03:24:37 her.

Q.    Got it.

Do you remember what days in December Saturday and Sunday?

A.    Yeah, the 18th and the 19th.  The    03:24:50

Page 180

Richards

Trevor Noah story was airing on the 19th.

Q.    Did Ms. Poolos express concern about you traveling on those days because of the Trevor Noah story?                                    03:25:02

A.    Yeah, she expressed concern about something potentially going on and we needed to be on standby in case something going wrong, and me being in a car was unacceptable for that.

Something else about that was she        03:25:16 wanted to make -- oftentimes the social media copy that we need to approve for -- that's going to run in conjunction with the piece will sometimes come on Saturday.  So I waited until all of that came, and we reviewed that.                          03:25:32

And then I left to start driving halfway, and I was reachable the entire time I was in the car; and then was in the car on Sunday, and then the piece aired Sunday night.  She was concerned about something potentially happening     03:25:50 that would somehow disrupt the celebrity profile piece.

Q.    Okay.  I know you ultimately -- well, strike that.

Did you ultimately drive on either the   03:26:04

Page 181

Richards

18th or 19th?

A.    Yeah, I did.

Q.    Did Alex -- Ms. Poolos ultimately sign off on that?                                              03:26:11

A.    I don't remember if she said, Yeah, go ahead and do it, but she was upset that I was doing it.

Q.    But you ended up doing the thing that you wanted to do; correct?                              03:26:22

ATTORNEY ZUCKERMAN:  Objection.

A.    Yes, I drove to Georgia on Saturday and Sunday.

Q.    Did Ms. Poolos -- when you were speaking about it I think you said on December   03:26:35 16th -- was that the day that you had that call that led to the breaking point that you described?

A.    I don't remember the exact date of the breaking point phone call.  I don't know that that was December 16th.                                           03:26:45

Q.    Did Ms. Poolos, during that call that you did have about your travel around the holidays, did she suggest that you travel on a different day?

A.    She suggested that I travel on Monday   03:27:01

Page 182

Richards

or Tuesday, which I was not able to do because my husband needed to work on those working days.

Q.    Got it.

And did you say that to Ms. Poolos?    03:27:14

A.    I did.  And she became upset.  She said she was trying everything she could to accommodate me and would say things like she had never been confronted with a situation where an associate producer needs to be in the car during the week of   03:27:28 air.

Q.    Do you know of any situations where that's happened?

A.    Yes, because -- something that I didn't include in my original complaint to HR was the   03:27:40 fact that Kate Morris had reached out to me when all of this happened.  Specifically related to the car incident she reached out.  She's an associate producer who had a close relationship with Alex.

And she texted me and asked if I could   03:28:03 talk.  This was in the week leading up to the 19th, so sometime around the 15th or the 16th of December.  And so I spoke with her on the phone. And she reached out and said, I need you to know that the way you're being treated is terrible and   03:28:21

Page 183

Richards

it's okay for you to be in a car on the weekend. There's nothing for you to do.  And the way she's treating you, I can't stand by and let this continue to happen without you knowing that this   03:28:38 is -- that this is not okay and it's not normal.

Q.    What else did you discuss with Ms. Morris other than what you just testified to?

A.    I thanked her for reaching out to me, because up until that point I couldn't answer the   03:28:53 question of if I was completely suffering alone or because Alex seemed to make it that this is the way everything is and the way that she's treating me is normal and it's not that bad.  And Kate told me that it was -- it was in fact not okay and not   03:29:09 how everyone's life at 60 Minutes was.

So I really appreciated her going out on a limb to -- and I told her how isolated I felt because I didn't know anyone else, and I thanked her profusely for doing that.  She also told me   03:29:29 the way Alex treated me over my bridal shower was not okay and completely over the top.

She said she and Jack Weingart had talked about it before but he was reluctant to say anything to me and didn't want to get involved.   03:29:46

Page 184

Richards

But she felt it was bad enough to reach out to me about.

And I didn't want her to have to get dragged into this because it meant so much to me    03:29:57 that she would do that because at that point I felt so like what am I even doing?  I don't know that I even -- I don't even know how to exist when everything that I do is attacked.

And so I felt so comforted in her    03:30:24 reaching out to me, even though she had a relationship with Alex.  That's how bad it was.

Q.    Do you know how she knew about Alex's supposed mistreatment of you?

A.    She knew about Alex's mistreatment of    03:30:39 me because Alex would tell her about how she would get so mad at me about random little things.  And Kate thought it was unreasonable.

Q.    Had you communicated with Kate before then?    03:30:51

A.    Not about this at all, no.

Q.    And that text message that she sent you, was that on your work phone or personal phone?

A.    My personal phone.    03:31:03

Page 185

Richards

Q.    Do you still have it?

A.    No.

Q.    Was this a text message you believe was auto deleted?                                                    03:31:09

A.    Yes.

Q.    Did you ever speak to Jack Weingart about Alex Poolos?

A.    No.

Q.    Did you ever have any other                    03:31:22 conversations with Kate Morris about Alex?

A.    Not about this.  After the lawsuit was filed -- or, excuse me, let me go back.

The only other time I talked to Kate about this after Alex -- at some point when Alex    03:31:38 was either suspended or had been let go, I let Kate know that I never included her in my complaint because I didn't want her to be involved.  That was the extent of that.

Then after the lawsuit was filed, at    03:31:56 some point she came by my office and asked how I was doing.  And I didn't speak very much with her about it.

Q.    How did you communicate with Kate to let her know that you had not mentioned her    03:32:14

Page 186

Richards

reaching out to you either when Alex was suspended or Alex was fired?

A.    It was some point whenever I had run into her in the office in person.  It may -- we    03:32:24 started going into the office, like, semiregularly, like, that year or so.  It was just sometime when I ran into her.

Q.    Was there anything in writing about that communication?    03:32:36

A.    No, not to my knowledge.

Q.    And what did you talk about beyond what you've already testified to?

A.    In that --

Q.    That discussion, yeah.    03:32:49

A.    I don't remember anything.

Q.    And then the discussion you had with Kate after Ms. Poolos had filed the lawsuit, tell me everything you remember about that discussion.

A.    Everything I remember about it was I    03:33:04 asked her if she knew that Alex was going to be filing a lawsuit, and she said that she didn't know.

Q.    Anything else you discussed?

A.    It was a very brief conversation,    03:33:24

Page 187

Richards

because I really didn't want to discuss it.

Q.    Did you discuss Alex's lawsuit with anyone else, not including counsel?

A.    Not in detail, no.                    03:33:37

Q.    Did you discuss it not in -- whether it's in detail or not, who else did you discuss it with?

A.    People asked me about it because it was public in the newspapers.  So when people would    03:33:48 ask me about it, I said, yeah, this is awful, but I can't talk about it.  My family obviously know about it.  People would randomly ask me about it.

Q.    Anyone at 60 Minutes?

A.    Yeah.                               03:34:04

Q.    Who?  Do you remember?

A.    People that asked me how I'm doing?

Q.    No, people that asked you about the lawsuit, whatever the question was in connection with the lawsuit but asked you or brought up the    03:34:20 lawsuit.

A.    I mean, a number of people reached out to me to support me with it.

Q.    So people at 60?

A.    Uh-huh.                             03:34:31

Page 188

Richards

Q.    Did they do so in messages?

A.    Email, text, in the office, just your standard sort of I'm so sorry that this terrible thing continues to be terrible.                03:34:44

Q.    Got it.

And do you have copies of those text messages still?

A.    I don't know.  Maybe.

Q.    Okay.  And the emails -- were the text    03:34:55 messages sent to your personal phone --

A.    Yes.

Q.    -- or your work phone?

All of them would have been your personal phone?                03:35:02

A.    Yes.

Q.    Do you ever really use your work phone?

A.    Not really.

Q.    And the emails you were referencing, were those emails sent to you at your CBS email    03:35:17 account?

A.    Yeah.

Q.    So I think we got a little bit off track.  I wasn't clear on when you spoke to Tanya on December 16th what it is that you said and what    03:35:37

Page 189

Richards

it is that she said, so if you could please let me know.

ATTORNEY ZUCKERMAN:  Objection.

Q.    You can answer.                                    03:35:45

A.    I'm happy to re-explain what we talked about.

Q.    Yeah, please, because I think you also talked about other things.  So I wasn't clear on what it was that specifically you said and          03:35:55 specifically what Tanya said.

A.    Yeah.  So I emailed Tanya, most likely, and said, Hi, I need to speak to you about something urgent, is probably the nature of what I emailed her.  Then we got on the phone, and I          03:36:07 explained to her the experience that I had been having with Alex and that I was at a point where I could -- I was at a complete loss and I didn't know what to do.

So I told her about the experience of          03:36:22 my bridal shower.  I told her about how she would wage this what are you going to do if you can't work on your wedding day campaign against me, constantly leading up to my wedding.

I told her about how she would yell at     03:36:38

Page 190

Richards

me and get upset about small and minor things. And I probably told her also about the Comedy Cellar event. I told her about how I could no longer do this.                                    03:36:58

And then I told her about how Alex wanted -- how I was mostly terrified because now Alex was trying to control my ability to come to her and say I no longer wanted to work with her because Alex had recently suggested that we could    03:37:15 go to Tanya and asked for me to be moved to a different team.

So Tanya expressed that she was very, very sorry to hear that I was going through this and that she -- and I also let her know that I had    03:37:29 reached out to HR. Tanya let me know that she was going to reach out to HR. And she expressed her support and that they were going to figure out what was going on. And she was apologetic about how bad this had been for me.                        03:37:52

Q.    Anything else you recall about that discussion?

A.    That's what I can recall.

Q.    Okay. When was the next discussion that you had about your concerns related to       03:38:17

                              Page 191

Richards

Ms. Poolos following your discussion with Ms. Simon on I think you said December 16th?

ATTORNEY ZUCKERMAN:  Objection.

A.   I would have had some sort of        03:38:32
conversation with HR.

Q.   And is that the more substantive one you referenced earlier with Ms. Cottone?

A.   Yes.  I had a substantive conversation with Maria Cottone.  I believe this was sometime   03:38:44
the following week.

Q.   We're still in December?

A.   We're still in December.  It very well could have been on December 20th or the 21st.  It was very shortly after the Trevor Noah story   03:39:08
aired.

Q.   Was that conversation by phone or some other means?

A.   By phone.

Q.   And was there anyone on the call other   03:39:18
than you and Ms. Cottone?

A.   No.

Q.   And approximately how long was that call?

A.   It was -- it was a substantive call.  I   03:39:24

Page 192

Richards

don't remember exactly how long it was.  I can -- I can tell you my memory of the phone conversation.

Q.    Please do.                          03:39:35

A.    I would have run through the same events that I did with Tanya.  So that would have included the bridal shower incident, her constant use of the what if you need to work on your wedding day, her -- I got into more detail with    03:39:54 Maria on the phone than I did with Tanya, so I was telling her in detail about what happened and how she would get very upset with me and how distressful it was that she would create this scenario of what are you going to do if I need you   03:40:17 on your wedding day and we -- I've never been confronted with a situation where an associate producer is going to get married during the season and what am I going to do -- when I would ever raise something like can we tell someone at the    03:40:34 show that I have a wedding date?

I told her months and months prior about this and is there anything that we can do, and she would always say, I'll tell Tanya when the time is right.  I would ask, Okay, how do I put in  03:40:51

Page 193

Richards

a time-off request?  And she would say, Oh, we'll handle this.

And I would say, Okay, can we do anything about letting them know that I have a    03:41:04 wedding -- my wedding coming up.  And she would get very upset when she would even bring up the conversation and say, What am I supposed to do? Tell Lesley Stahl her associate producer has to get married?    03:41:20

Like, it was always this horribly shameful thing, the fact that I had a wedding, and that she would leverage this against me as something that would impede me from working and that I wasn't dedicated enough, all the while I'm    03:41:34 working 10, 12, 14 hours a day, I'm working every weekend of my life, I'm so dedicated to getting -- working on this story, I --

Q.    I just want to make sure, because I don't want to have to go through it again, you're    03:41:49 saying you said all of this to Maria --

A.    I'm saying I'm saying all of this to Maria.  Do you want me to go into this level of detail?

Q.    That's fine.  I think I want you to    03:42:01

Page 194

Richards

describe the phone call.  So if that's what you said to Maria, that's fine.  I just want to make sure.

A.    This is certainly what I said to Maria, 03:42:07 because this was largely one of the main things that was so utterly distressful about working with your client.

Q.    Understood.

A.    So I would explain to her the way this 03:42:19 was persistent and go on.  Then I told her about how I -- she would get upset about everything and anything, and it would always turn into her yelling at me.

Then I would say, I don't want to yell 03:42:38 at her.  And she would say, Oh, you can yell at me.  That's okay.  That's who I am and that's totally fine; we're allowed to -- we're allowed to have disagreements, which I think any reasonable person understands that there are disagreements in 03:42:58 a workplace.

And I also made this point in my conversation with Tanya and with Maria that I've worked in breaking news.  I've done this my entire career.  I've done investigative stories.  I've 03:43:15

Page 195

Richards

worked long hours.  That's what I wanted to do.

This was something entirely different.
And so I wanted to make that characterization in
this conversation with Maria.  So I told her about    03:43:25
that.

I told her about how she got very upset
with me over booking the Comedy Cellar.  I told
her about how she was upset with me about needing
to be in a car over the weekend and about this        03:43:45
specific breakdown phone conversation that we had
and how that was really my breaking point and how
she was trying to take away my agency with trying
to control me going to Tanya.

Q.    And how did the call end?  Did Maria     03:44:06
say anything about next steps?

A.    She said that I should put it all also
in writing and that that will help them.  So I put
that in writing.  And she told me that she was
going to start talking to Bill and Tanya about it     03:44:28
and that they would need to do some review.

Q.    Did Maria say anything else during this
discussion?

A.    Not that I remember.

Q.    At the time that you had your call with    03:44:51

Page 196

Richards

Tanya, did you have notes that you were using to tell Tanya about the things that Alex had done?

A.   I don't think so.

Q.   Did you use anything for purposes of reminding yourself as to what had happened when you had the conversation with Tanya?    03:45:07

A.   I don't think so.  It was very present in my mind.

Q.   And when you spoke to Maria Cottone, did you use any notes?    03:45:20

A.   I don't remember.

Q.   Did you use anything to refresh your memory as to what happened when you spoke to Ms. Cottone?    03:45:33

A.   I don't remember.

Q.   Did you speak with Scott Bronstein about your discussions with Tanya Simon on or about December 16th?

A.   I don't remember.    03:45:50

Q.   Did you speak to Scott Bronstein about your conversation with Maria Cottone in -- I know you don't know the exact date but mid to late December?

A.   I don't remember.  I don't think so.    03:46:00

Page 197

Richards

Q.    Did you have any conversations with Scott Bronstein about your interactions with HR between December 16th and before you learned about his phone call with Alex?                    03:46:22

A.    I don't remember.

Q.    Did you send any text messages to Scott Bronstein about conversations you had with HR between mid-December and when you found out about the phone call?                                03:46:40

A.    I don't remember.

Q.    To the extent you did have text messages, those were -- they don't exist anymore; correct?

ATTORNEY ZUCKERMAN:  Objection.      03:46:54

You can answer.

Q.    You don't have any?

A.    I communicated with him on my personal phone, and that would be in a time frame I do not have text messages anymore.                   03:47:05

Q.    Because those have been deleted; right?

A.    Correct.

Q.    What was the next interaction you had with either HR or 60 Minutes management regarding Alex after -- you know, following this discussion    03:47:22

Page 198

Richards

with Ms. Cottone?

A.    They let me know at some point that they were going to be speaking with her.

Q.    Who let you know that?                03:47:33

A.    I don't remember who let me know that. I think it may have been Renee or Maria.

Q.    What did they tell you about speaking with Alex?

A.    That they were going to speak with Alex    03:47:48 and that -- I don't remember anything else from that, just that they were going to speak with her.

Q.    The conversation where you discussed your travel plans in mid-December with Alex, did you record that conversation?                03:48:15

A.    No.

Q.    Did you start recording your conversations with Alex after you spoke to Tanya on the 16th?

A.    I started recording conversations with    03:48:27 her after I filed my complaint with HR.

Q.    When you say filed your complaint, what are you talking about?

A.    When I contacted HR.  I don't remember exactly the date that we start -- that we, like,    03:48:43

Page 199

Richards

spoke next that I recorded the phone call.  I don't remember.  But I just remember that I made the decision that after I went to HR I needed to record conversations.                                      03:48:57

Q.    I just want to be clear.  When you say after you went to HR, you're talking about on December 16th?

A.    Yes, December 16th.  What I am saying -- and I want to be clear -- is I don't        03:49:07 know when the first one was.

Q.    But it was sometime after that December 16th contact with HR?

A.    Correct.

Q.    Before the new year, did you have any       03:49:32 other discussions with HR beyond what you've testified to, before January 1th, 2022?

A.    I don't remember the exact timeline of how many times I talked to them.

Q.    "Them" being --                              03:49:51

A.    HR, "them" being HR.

Q.    And who in HR did you talk to about your concerns related to Alex Poolos?

A.    Renee and Maria.

Q.    And was there a time you stopped           03:50:04

Page 200

Richards

talking to Maria and started talking exclusively

to Renee?

A.    Yes.

Q.    When was that?                          03:50:11

A.    I don't remember when it was, but I

believe Maria was going on vacation or something

like that, so Renee let me know that she was

picking it up.

Q.    At some point did you have a discussion  03:50:22

with Ms. Balducci along the lines of what you had

had with Maria Cottone, explaining the details

your concerns?

A.    I don't remember if I had an extensive

conversation with her, yeah.                  03:50:32

Q.    Did you have a discussion with

Ms. Cottone about your request to switch teams?

A.    Sorry, can you rephrase that?

Q.    Sure.  Did you have a conversation with

Ms. Cottone about your request to switch teams?  03:50:48

ATTORNEY ZUCKERMAN:  Objection.

A.    Yes, because I would have told her I

wanted to switch teams.

Q.    What did Ms. Cottone say?

A.    I think in the initial conversation she  03:50:56

Page 201

Richards

said it's something they would have to look into.

Q.    Did you ever have any other conversations with Ms. Cottone about switching teams?                                                03:51:05

A.    I talked with someone in HR about it. I don't remember if at that point it was Renee or Maria.

Q.    When did that conversation happen?

A.    Sometime in that later December window.  03:51:17

Q.    And what was that discussion?

A.    Someone asked me if I would be -- they told me about how the process of switching teams matters with -- another producer has to be open and need an AP or someone would need to be   03:51:39 switching, because it's a very specific head count situation.

So they let me know that they were looking into a way for me to switch teams at 60 Minutes, but they also offered me -- they also   03:51:55 asked me if I would be open to working on a different show, like Saturday morning or something else.  And I said that, no, I wanted to stay at 60 Minutes.

Q.    Did anyone discourage you from       03:52:11

```
                                                    Page 202
                         Richards
switching teams?
      A.    I don't -- I don't recall that
happening.  I don't know that that happened.
      Q.    Did anyone suggest that you could      03:52:22
not -- or strike that.
            Did anyone tell you you could not
switch teams?
      A.    I don't -- I don't recall being told
that.                                              03:52:30
            (Discussion off the record.)
            THE VIDEOGRAPHER:  We are now off the
      record.  The time on the video monitor is 3:52
      p.m.
            (Recess taken from 3:52 to 4:24.)      04:24:52
            THE VIDEOGRAPHER:  We are now back on
      the record.  The time on the video monitor is
      4:24 p.m.
      Q.    Okay.  Ms. Richards, during the call
that you had with Ms. Poolos around mid-December   04:25:10
of 2021 in which you discussed, among other
things, your travel plans for the holiday, did
Ms. Poolos raise concerns with you during that
discussion about your job performance?
      A.    I think she brought up something about 04:25:32
```

Page 203

Richards

how she needs to be able to give me feedback.

Q.    Did she say anything during that call about your job performance other than giving you feedback?                                                      04:25:51

A.    No.  I remember her telling me that she really liked working with me and she wants to be able to give me feedback.

Q.    And during that call with Ms. Poolos did Ms. Poolos say to you that if you wanted to    04:26:14 talk to somebody else about how things were going that you could speak to Ms. Simon?

A.    Can you say it again?

Q.    Sure.  Did Ms. Poolos say to you during the same discussion that if you felt like you    04:26:31 wanted to talk to somebody else about how things were going that you could talk to Tanya Simon?

ATTORNEY ZUCKERMAN:  Objection.

You can answer.

A.    Maybe.                                      04:26:42

Q.    Did she say that Tanya Simon could be a resource to you?

A.    Yes.  My memory of this, though, is that she continued to say we could go to Tanya.

Q.    And during this discussion did you say    04:27:00

Page 204

Richards

to Alex that you felt that you were not at the point where you needed to switch teams?

A.    I believe I said I wanted to figure it out.                                                    04:27:13

Q.    Tell me what you think you said about it.

A.    I think I said that I wanted to figure out how to work together, something to that effect.  I did not explicitly tell her that I    04:27:34 wanted to switch teams in this phone call.

Q.    Did you tell her during this call that you were not ready to switch teams?

A.    I don't remember exactly what I said, but I said something to the effect that I wanted    04:27:49 to figure out how to work together.

Q.    During the time that you worked as AP and Ms. Poolos was the producer you were assigned to work with, did you have any positive experiences working with her?                                    04:28:11

A.    Yeah.  When we first started working together, I was very excited to come to the show, and I was very glad that she hired me.  It was a huge honor to be chosen to work at the show.

So we first started out, we worked on    04:28:26

Page 205

Richards

the Navalny piece together that went fine.  We started looking into a story about contact tracing, and that was -- that was fine.  That was in the fall of 2020 before -- we were looking into   04:28:40 what stories to do and things were going fine.

And then we started working on the transgender health care story.  And at the very early beginning it was -- it was okay.  And then when we turned into the new year and as time went   04:29:02 on from, like, those early months, things started to really take a turn.  And that's when the behavior from her started to happen.

Q.   And just to be clear, when you talk about the new year and the early months, you're   04:29:21 talking going from 2020 to 2021?

A.   Correct.

Q.   Between those early months in 2021 until Alex was fired, did you have any positive experiences working with her?   04:29:42

A.   There were okay experiences.

Q.   Which experiences are you referring to?

A.   What I would refer to as okay experiences were days when it wasn't some sort of -- when it was more of a normal day going about   04:30:12

Page 206

Richards

work and there wasn't some sort of incident. Positive experience was just having a normal day.

Q. You talked about Ms. Poolos supposedly yelling at you frequently. Did anyone else -- has anyone else during the time you've worked at 60 Minutes yelled at you? 04:30:38

A. Not the way that she ever did, no.

Q. But did anyone yell at you at all?

A. The incident that we have talked about before where Ann Marie Kross and I had a conversation that is characterized as her yelling at me, again, I explained the way that I felt like that interaction was sort of used as her ability to make up for the fact that she yells at me all the time. 04:30:52 04:31:09

Outside of that, no one has yelled at me at 60 Minutes.

Q. And have you observed anyone at 60 Minutes yelling at someone else that's not you? 04:31:23

A. No.

Q. Have you ever seen Lesley Stahl yell at anyone?

A. No.

Q. When you met with HR at any point that 04:31:43

Page 207

Richards

you had discussions with them regarding

Ms. Poolos, did anyone ever ask you if you had had

positive experiences working with Alex?

A.    I don't remember.                                04:31:56

Q.    Did you ever tell anyone in HR about

any positive experiences you may have had with

Alex?

A.    I don't recall doing that.

Q.    Did Tanya Simon ever ask you if you had  04:32:03

had positive experiences working with Ms. Poolos?

A.    I don't remember that being something

that happened.

Q.    And did you ever tell Ms. Simon about

positive experiences you had with Ms. Poolos?      04:32:22

A.    I don't have a memory of that.

Q.    Did Bill Owens ever ask you if you had

had positive experiences with Alex?

A.    I don't remember that happening.

Q.    And did you ever tell Mr. Owens that      04:32:34

you had had positive experiences with Ms. Poolos?

A.    I don't remember that happening.

Q.    Did you ever tell Ms. Poolos that the

work/life balance at 60 Minutes was better than it

had been at CNN?                                      04:32:50

Page 208

Richards

A.    I don't remember a specific conversation that we had about this.  I vaguely remember sometime saying that because of the nature of the 60 Minutes job versus the    04:33:07 breaking -- the very heavy breaking news balance at CNN I could have talked about how the work/life balance was better at some point at 60 Minutes.

But I don't have a -- I don't have, like, a specific memory of having this    04:33:29 conversation.

Q.    Did you ever send text messages to Ms. Poolos indicating that you appreciated her?

A.    Yes.

Q.    And what did you text her about where    04:33:40 you expressed appreciation?

A.    I don't have a specific memory, but I'm sure that I've -- as we worked on things together I said that I appreciated her for something or another.    04:33:56

Q.    And when you said that to her, did you mean it?  Was it an honest reflection of how you felt?

A.    I believe that I would have said something that I meant and that I appreciated her    04:34:07

Page 209

Richards

for something.  That doesn't mean other things

can't be happening at the same time.

Q.   Did you ever send a text message or

text messages to Ms. Poolos thanking her for   04:34:20

having your back?

A.   Yes.

Q.   And how many times did you do that?

A.   I don't know.

Q.   And when did you or what were the   04:34:32

circumstances under which you thanked Ms. Poolos

for having your back?

A.   I vaguely remember sometime during the

reporting of the transgender story the team had

gotten some heat from people when they heard word   04:34:54

about the fact that we were doing the story, and I

had expressed something about her having my back

when we were going through that.

Q.   And did you mean it at the time?

A.   Yeah.   04:35:12

Q.   Do you know whether Ms. Poolos ever

praised you to others at 60 Minutes?

A.   Yes, she told me she did.

Q.   And what did she tell you about that?

A.   I don't remember the specific details,   04:35:30

Page 210

Richards

but I remember there were times when she let either Lesley or Bill know during the transgender health care story that I was doing a really good job and that we -- she was happy with my work and things were going well, something to that effect. I don't remember the details.    04:35:43

Q.    Do you know if Ms. Poolos praised you to others at 60 Minutes outside of the transgender health story?    04:36:01

A.    I don't have a memory.  I don't know. It's possible.

Q.    Did you explain to HR that Ms. Poolos told you there are no boundaries when it came to you and her?    04:36:24

A.    Yes, that was something I included.

Q.    And did Ms. Poolos say that to you?

A.    Yeah.

Q.    How many times did she say it?

A.    I don't remember exactly.    04:36:33

Q.    Was it more than once?

A.    Maybe.

Q.    What do you remember about what she said about that issue?

A.    My memory of this is I believe this    04:36:42

Page 211

Richards

came up when we talked after -- the week sometime after the bridal shower incident.  I -- we had a sort of debriefed conversation.  I don't remember all the details about it.  But I believe I said     04:36:59 something like I feel like there are no boundaries, and she said there are no boundaries; if I need you, I need you.

Q.    Did she say that in person?  over the phone?  some other way?                         04:37:18

A.    Over the phone.

Q.    Did you record that conversation?

A.    No.

Q.    Did you take notes of it?

A.    No.                                    04:37:24

Q.    And your memory is that conversation happened in April of 2021?

A.    Yes.

Q.    Outside of that one time, did she say it again?                                       04:37:41

A.    I don't remember.

Q.    You've mentioned a few times today that you had concerns about Ms. Poolos's communications with you related to your wedding; correct?

A.    Yes.                                   04:37:57

Page 212

Richards

Q.    When did you get married?

A.    In May of 2021.

Q.    Got it.

And was your wedding date at all    04:38:05
affected by anything Ms. Poolos did or said?

A.    My actual wedding day?  No.

Q.    Did you work on your wedding day?

A.    No, I did not.

Q.    Did you take any time off after your    04:38:17
wedding?

A.    I took that Monday off.

Q.    Did you ever take any -- did you take
any kind of -- did you take a honeymoon?

A.    Yeah, I took a honeymoon in July.    04:38:26

Q.    How many days did you take off then?

A.    The show is in repeats in July, and
that is generally when we are off-line for that
month.  So I went away for about five days.

Q.    And in communicating with you about    04:38:49
your wedding, did Ms. Poolos tell you that she was
concerned that Lesley Stahl would replace you as
AP if she learned that your wedding day could be
on one of the potential airing dates?

A.    I don't -- I don't know what you're    04:39:08

Page 213

Richards

saying with this question, but...

Q.    Let me ask you, did Ms. Poolos ever say to you she was worried in connection with your wedding that Ms. Stahl would replace you as AP on   04:39:21 the transgender story?

A.    I don't remember.

Q.    And did Ms. Poolos ever tell you that she didn't want you to be replaced on the transgender story because you had worked so hard   04:39:34 on the story?

ATTORNEY ZUCKERMAN:  Objection.

A.    I don't remember her saying this like this.  Again, it was something where I -- she would bring it up and say that this was a terrible   04:39:53 thing that I had this wedding date, of which was planned before I even, like, took the job at 60 Minutes.

She would come up with all kinds of different things to say about, like, why this was   04:40:12 bad, whether it was -- that could keep us from airing on a weekend if they wanted to air that weekend and because, like, you need to be working on this because you've worked on it for so long.

So she would -- she just would bring up   04:40:33

Page 214

Richards

any number of reasons why it was important for me

to be available at all times and was very

concerned about the fact that I had a wedding

coming up.                                        04:40:49

Q.    And other than the potential of the air

date and the potential of replacing you as AP for

that story, was there other reasons that

Ms. Poolos said to you that she was concerned

about the date you were getting married?          04:41:08

ATTORNEY ZUCKERMAN:  Objection.

A.    Can you rephrase the question?  It's a

little confusing.

Q.    Sure.  You had said before that

Ms. Poolos would come up with all sorts of reasons  04:41:19

to raise concerns about the date of your wedding.

I think you've identified a couple.  One is that,

you know, she didn't -- she said something about

you being replaced, she said something about the

air dates.  Was there any other reason she brought  04:41:33

up?

ATTORNEY ZUCKERMAN:  Objection.

A.    Well, you brought up that she said that

I would be replaced.  I don't recall her

telling -- making -- saying that as much.         04:41:41

Page 215

Richards

Q.    Okay.  So then other than the air date, what were the other reasons Ms. Poolos brought up?

A.    Primarily the air date.  It also -- it really focused on, like, what are you going to do     04:41:51 if it needs to air then, what are you going to do. It was just this constant sort of open-ended "what if" thing over and over and over again.

Q.    Okay.  Outside of the air date, was there any other reason that Ms. Poolos gave you     04:42:09 for articulating concern?

A.    Not that I can think of.

Q.    Did Ms. Poolos tell you that she was discussing her concerns about your wedding date with Tanya Simon?     04:42:28

A.    She told me that -- because I had asked her several times what I needed to do, like if I needed to tell Tanya about it.  And she also insisted that she needed to be the one to tell Tanya about it.  So that's what she would say     04:42:43 about it is she needed to wait for the right time to tell Tanya about my wedding.

Q.    And did Ms. Poolos explain to you at any point why she believed she was the one that needed to tell Tanya?     04:42:56

Page 216

Richards

A.    I don't remember a specific reason why she thought that.

Q.    Okay.  Anything generally?

A.    I feel like generally it probably would have been because she wanted to control -- part of the narrative was she wanted to control, like, when Lesley would know that I had a wedding coming up and she didn't want that to impede the story getting done and she didn't want the people at the show to worry about the story getting done because of my wedding.

So she just didn't want people to know about it, was my perception.

Q.    Did she say why she didn't want people to know?

ATTORNEY ZUCKERMAN:  Objection.

A.    Why she didn't want people to know that I'm getting married?

Q.    Yeah.

A.    Was what I was just saying.

Q.    Anything else?

A.    Not that I can think of.

Q.    And I asked you before if you had taken time off after your wedding.  Did you take time

Page 217

Richards

off been before your wedding?

A.    I was able to take off Wednesday, Thursday, and Friday the week of my wedding.

Q.    And those were the only days you could    04:44:06 take off before your wedding?

A.    Yes.

I may have worked half the day on Wednesday.  I don't remember.

Q.    Moving back to around the holidays in    04:44:30 2021, so late 2021, did you say to Alex that you were upset or frustrated not being able to get a full two weeks off for the holidays?

A.    I don't remember being upset about two weeks off.                                         04:44:46

Q.    Did Ms. Poolos say to you at any point that in a staff call she had with Mr. Owens that he was focused on teams that had only screened one piece since September?

A.    In this -- in this specific phone call    04:45:07 you're referring to?

Q.    No, no, at any point in late 2021 did Ms. Poolos say that to you.

A.    Yeah, at certain times when Alex would get upset with me, she would eventually come down    04:45:19

Page 218

Richards

and say that she's sorry she got upset, she's under a lot of pressure because we didn't do -- we didn't have enough stories and she felt like she was under a lot of pressure to be producing.    04:45:35

Q.    Did she ever tell you exactly that she had been part of a staff call where Mr. Owens had said that for teams that had only screened one piece since September they were on his radar?

A.    That sounds vaguely familiar, but I    04:45:51 don't remember that specifically.

(Richards Exhibit 3, email with attachment, Bates-stamped CBS 733 through CBS 7747, marked for identification.)

Q.    Okay.  What's been marked as Richards    04:46:36 Exhibit 3 is a one-page email and then an attachment that bears Bates number CBS 733 all the way through CBS 7747.

Ms. Richards, do you recognize what's been marked as Exhibit 3?    04:46:55

A.    Yes.

Q.    And what is it?

A.    It is my internal written complaint.

Q.    The first page of this exhibit is a cover email from you to Ms. Cottone dated December    04:47:10

Page 219

Richards

30th, 2021, and the subject is written narrative with examples.  And attached to this is the complaint that you submitted to Ms. Cottone December 30th; is that right?                04:47:29

    A.    Yes.

    Q.    Is this the first time you had submitted a written complaint about Ms. Poolos?

    A.    Yes.

    Q.    Am I correct that you prepared the          04:47:44 written complaint at Ms. Cottone's direction or suggestion?

    A.    Yes.

    Q.    Was that at some point during a substantive call you had with her sometime after    04:47:57 December 16th?

    A.    Yes.

    Q.    You wrote, This is a very detailed narrative.  I wanted to be thorough -- in the cover email -- and include dates and details to      04:48:11 explain how pervasive this has been.  I hope this is helpful.  I am happy to explain anything further from here.

            I included all the times we discussed over the phone and one extra incident, but there    04:48:23

Case 1:23-cv-08896-GHW-HJR    Document 300-8    Filed 02/09/26    Page 221 of 446

Richards

are other smaller things that have happened throughout this year.

Do you see that text?

A.    I do.                                        04:48:30

Q.    Which of the incidents that is in the written complaint was not something you talked about with Ms. Cottone?

A.    I don't remember.  Well, I put it in here so...                                       04:48:43

Q.    When you say "in here," you mean the written complaint?

A.    The written complaint.

Q.    You don't recall which of those incidents was not something you discussed with her   04:48:51 on the phone?

A.    Right.

Q.    When you say there are smaller things that have happened throughout the year, what did you mean by that?                               04:48:58

A.    I meant that I wanted to convey the message that these are the big events that have happened but it's not -- but there are also days where it's just hostile in general.

Q.    Do you mean anything else by that?     04:49:15

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Page 221

Richards

A.    No.

Q.    So if we could turn to the next page of Exhibit 3, looking at 7734, who drafted this complaint?                                                    04:49:33

A.    Me.

Q.    Did you have any assistance in drafting it?

A.    No.

Q.    Duh review it with anyone before you    04:49:38 submitted it to HR?

A.    Not to my knowledge.

Q.    Did you send a draft to Scott Bronstein?

A.    I don't think so.                         04:49:47

Q.    Did you discuss the draft of this complaint with Scott Bronstein?

A.    I don't think so.

Q.    Did you discuss with Scott Bronstein the complaint after you submitted it?        04:49:57

ATTORNEY ZUCKERMAN:  Objection.

A.    I don't remember discussing it.

Q.    And what, if anything, did you use to prepare this complaint?

ATTORNEY ZUCKERMAN:  Objection.        04:50:17

Page 222

Richards

A.    My memory of the events and the text messages attached and the emails I forwarded.

Q.    What emails are you referring to that you forwarded?                                                    04:50:31

A.    I don't remember which emails I forwarded her and what they were about.

Q.    And who are you talking about in terms of forwarding emails?  Who did you forward them to?                                                                  04:50:45

A.    Maria Cottone.

Q.    And the text messages you're referring to, are they the text messages that are in this document?

A.    Yes.                                                              04:50:56

Q.    Are there any other text messages you're referring to?

A.    No.

Q.    And did you use any handwritten notes to prepare this complaint?                                      04:51:04

A.    No.

Q.    Did you use any typed notes that you had made to prepare this complaint?

A.    I don't think so, no.

Q.    And this complaint includes incidents    04:51:23

Page 223

Richards

that had happened several months earlier; correct?

A.    Yes.

Q.    And so you were doing -- you prepared your concerns about those incidents based on your    04:51:32 memory and any of the text messages that you included in here; correct?

A.    Yes.

Q.    On the first page you wrote in the -- under the subsection that says general overview in    04:52:08 the third line down you write, She -- and I assume that's a reference to Ms. Poolos --

A.    Uh-huh.

Q.    -- manipulates situations to paint things in her favor.    04:52:23

Do you see that?

A.    Yeah.

Q.    What did you mean by that?

ATTORNEY ZUCKERMAN:  Just objection.

ATTORNEY IADEVAIA:  The document speaks    04:52:31 for itself.  It says -- I can read it.  That's fine.  I don't care.

Q.    She lies and manipulates things to paint things in her favor.

What did you mean by that?    04:52:39

Page 224

Richards

A.    That she lies and manipulates.

Q.    What had Ms. Poolos lied about, at the time you wrote this?

A.    There were times when we were working    04:52:49 on stories that she -- her conduct was questionable to me.

Q.    Okay.  Give me as many examples as you can think of.

(Pause.)    04:54:02

A.    There were times when we were working on stories and particularly an instance on the transgender health care story about when I was speaking with one source and that -- like off the record but able for me to share with Alex.    04:54:20

And I told her what this person had said, and her immediate reaction was, Oh, we should go tell so-and-so.  And I said, No, he specifically said we should not tell this other person.  And she was like, Oh, no, that's fine; we    04:54:39 can do that.

Those types of things were concerning to me when working on things.

Q.    And did Ms. Poolos end up disclosing the information?    04:54:52

Page 225

Richards

A.    After I told her that I was not comfortable with that.

Q.    She did?

A.    She did not.                                04:54:57

Q.    She did not?

A.    To my knowledge, anyway.

Q.    So did she lie in that circumstance?

A.    She was trying to be manipulative in that circumstance.                                 04:55:05

Q.    In what way?

A.    She wanted to take off-the-record information and give it to somebody else and only after me saying that we should not do that.

Q.    Are there any other circumstances that  04:55:15 led you to say that Ms. Poolos lies and manipulates situations to paint things in her favor?

(Pause.)

A.    Her entire treatment of me with telling  04:56:10 me that this is just the way things are, that it's okay, we should just yell at each other, that everyone's life is like this at 60 Minutes, that I can't talk to Tanya, that Lesley Stahl would be appalled that I have a wedding, that it was    04:56:31

Page 226

Richards

unreasonable for an associate producer to get

married during the season is all a complete and

utter lie and a manipulation tactic that she used

to keep me completely submissive to every beck and    04:56:47

whim that she ever needed of me.  It was a blatant

act of her character.

Q.    And you think that Ms. Poolos was

completely manufacturing these purported

statements?                                           04:57:06

A.    That it's unreasonable for someone to

have a life event during season?  Yes.

Q.    Do you think that Ms. Poolos believed

that?

ATTORNEY ZUCKERMAN:  Objection.               04:57:16

A.    Do I think Ms. Poolos believed that it

was unreasonable to have a life event during --

during the course of a season?

Q.    Yeah.

A.    Do I think she believed that?  I don't   04:57:28

know what she believes and doesn't believe.

Q.    In the first sentence of the general

overview section you say, She has verbally

recognized multiple times that I am a hard worker,

and she manipulates my level of dedication to work    04:57:46

Page 227

Richards

by assigning me intense workloads to accomplish unreasonable timelines, often over weekends and holidays.

Do you see that text?                                    04:57:55

A.    I do.

Q.    What did you mean by that?

A.    I mean that this was sort of the dynamic that we had where she would get upset about something and then say that she loves    04:58:08 working with me, that she's sorry she got upset, that she's under pressure or that such-and-such story is difficult so she's sorry that she got upset and that I'm doing a great job and that she knows how hard I work and so she would just    04:58:29 continue to give me things and I rarely objected along the way.

I would regularly work very late.  I would regularly work on the weekends.  So her ability to continue to give me things to do didn't    04:58:41 end because I rarely would say that I needed time to take a break.  And it was only until in late December after I had complained that I had ever stood up to her and said that I was needing -- needing a break and more time burnt out.    04:59:07

Page 228

Richards

Q.    That was the only time you got a break?
Is that what you're saying?

A.    That's not what I'm saying.

Q.    Okay.  So what finally happened when    04:59:16
you, quote/unquote, stood up to her?

A.    I remember in late December of 2021 I
was exhausted and continuing to work.  And Tanya
had reached out to me and just to check in on how
I was doing, and I told her that I was exhausted.    04:59:41
So I took some -- I took the rest of New Year's
Eve off to take a break.  And I also told Alex in
or around that time that I was unhappy with how
she was -- how I was being treated.

Q.    And that was December 31st that you    05:00:05
told Alex that?

A.    Around that time.  It could have been
the 30th or the 31st.

Q.    We'll come back to that discussion.
When you were working on the weekends,    05:00:19
do you know if Alex was working?

A.    I don't know.

Q.    And do you have any idea if she was
working?

A.    I think sometimes she was.    05:00:31

Page 229

Richards

Q.    On these holidays you're referencing here, what holidays are you talking about?

A.    That was naïve, so that's what I was talking about.                                                   05:00:41

Q.    Any other holidays you're talking about?

A.    During the week of Christmas.

Q.    Did you work on Christmas?

A.    I think I worked on Christmas Eve.    05:00:49

Q.    But on Christmas?

A.    I don't know.  I don't think so.

Q.    Any other holidays you're referring to there?

A.    In that, no.                                                                                                         05:00:59

Q.    Did you observe Ms. Poolos working hard during the time she was your producer and you were her AP?

ATTORNEY ZUCKERMAN:  Objection.

A.    We had a hard job, and there were    05:01:14 times, certainly, that she was working hard.

Q.    And that included working long hours, by Ms. Poolos?

A.    Yes.

Q.    And that included working weekends?    05:01:23

Page 230

Richards

A.    Yes.

Q.    You write a few sentences down under general overview:  She pressures me to overly contact my colleagues when she wants an answer.    05:01:37

A.    Yes.

Q.    Do you see that text?

A.    I do.

Q.    What did you mean by that?

A.    What I mean by that is I would reach    05:01:44 out to someone like Ann Marie Kross about a crew and she would want me to call, text, and email, instead of just sending an email within an hour if we don't hear, call, text, email, if we don't hear -- if we don't, you know -- it was --    05:01:59 everything was the most urgent thing in the entire world at all times.

Q.    Do you mean anything else by it other than what you just testified to?

A.    That's what I mean.    05:02:11

Q.    You wrote, She is never satisfied with anything.

        What do you mean by that -- what did you mean by that at the time?

A.    What I meant by that at the time is she    05:02:21

Page 231

Richards

was never satisfied with anything, constantly pushing. It's in connection with that sentence: She calls, texts, and emails; asked me to call, text, and email.                                        05:02:39

Q.    Did you mean anything else by that sentence other than what you just testified to?

A.    I don't think so.

Q.    You then wrote, She tells me to call, text, and email colleagues and sources until they   05:02:50 pick up the phone or answer.

Do you see that text?

A.    Uh-huh.

Q.    What did you mean by that?

A.    What I wrote.                                     05:02:57

Q.    Did you mean anything else other than you're saying that Ms. Poolos asked you to follow up with colleagues and sources repeatedly?

ATTORNEY ZUCKERMAN:  Objection.

A.    Yes, borderline, like, obsessively.      05:03:09

Q.    Do you mean anything else by that sentence?

A.    No.

Q.    When you wrote, She is unreasonable about nearly everything, what did you mean?       05:03:21

Page 232

Richards

A.    I mean that everything -- small, medium, and large -- is a problem -- it is not a problem but she makes something into a problem at all times.  At this point it was impossible to understand the urgency of anything based on her demeanor because everything was something to be freaked out about by her.

Q.    Further down in bold you wrote, I am requesting to be removed from her team as soon as possible.

A.    Uh-huh.

Q.    This is a toxic work environment.

Do you see that?

A.    Yes.

Q.    Was it accurate that you were requesting to be removed from her team?

A.    Yes.

Q.    And that was true as of December 30th, 2021, the date of this complaint?

A.    Yes.

Q.    At any point in time did you agree to continue trying to work on Ms. Poolos's team?

ATTORNEY ZUCKERMAN:  Objection.

You can answer.

05:03:34

05:03:59

05:04:06

05:04:13

05:04:28

Page 233

Richards

A.    After Alex was spoken to by Bill and Tanya, I was told about her being spoken to.  And they asked me to -- if I would be open to finding a way to work with her.  I was very distressed    05:04:46 about that.  I said that I was willing to do that for now but I really wanted to find a way to be on another team.

Q.    And who did you say that to?

A.    I remember saying that to HR.  That    05:05:06 likely was Renee.

Q.    Did you say that to Tanya as well?

A.    I believe so.

Q.    Did you say that to Bill as well?

A.    I believe so.    05:05:21

Q.    Did you say it to anybody else besides Renee, Tanya, and Bill?

A.    I don't remember.

Q.    So if you turn to the next page, CBS 7735, if you could take -- take whatever time you    05:05:55 need to review it, but could you just confirm for me that the information that you wrote here is -- was accurate at the time that you wrote it?

A.    Yes.

Q.    It was accurate?    05:06:09

Page 234

Richards

A.    Yes.

Q.    Then if you turn to the next page, 7736, there are what appear to be screenshots of text messages.  Are those the text messages you    05:06:24 testified about earlier today?

A.    Yes.

Q.    And these are text messages between you and Ms. Poolos on the day of your bridal shower?

A.    Yes.    05:06:34

Q.    Got it.

And these are the screenshots of those text messages which you say are still in your phone?

A.    Yes.    05:06:41

Q.    Okay.  Did you take screenshots of other text messages with Alex Poolos beyond those that are in this document?

ATTORNEY ZUCKERMAN:  Objection.

Q.    You can look through the document to    05:06:49 see what else is here.

A.    Would you repeat the question?

Q.    Sure.  I'm wondering if you've taken screenshots of other text messages with Alex Poolos beyond what's in Exhibit 3.    05:07:07

Page 235

Richards

ATTORNEY ZUCKERMAN:  Objection.

A.    I don't remember if I have any more screenshots of text messages.

Q.    If you did have those screenshots of     05:07:21 text messages with Alex, would they be on your personal phone still?

A.    Yeah.

Q.    And would they be in that same location, in the camera?                          05:07:32

A.    Uh-huh.

Q.    The camera roll?

A.    Yes.

Q.    And have you looked for -- in connection with this case, have you looked for any  05:07:39 such screenshots?

A.    No.

Q.    To your knowledge has your lawyers look for any such screenshots?

A.    No.                                          05:07:50

Q.    Did you take screenshots of any text messages that you exchanged with Scott Bronstein at any point in time?

A.    No.

Q.    Did you take any text messages -- I'm    05:08:01

Page 236

Richards

sorry, did you take any screenshots of text messages that you've exchanged with Tanya Simon?

A.    No.

Q.    Did you take screenshots of text    05:08:11 messages that you took of communications with Bill Owens?

A.    No.

Q.    Did you take screenshots of text messages that you exchanged with Renee Balducci?    05:08:24

A.    No, I don't think so.

Q.    And if you look under the text messages, there's a blurb -- there's some text in italics.  Do you see that?

A.    Yes.    05:08:41

Q.    We're talking about 7736.  It's at the bottom of the page.  Do you see that?

A.    Yes.

Q.    Is that text that you drafted?

A.    Yes, I wrote that.    05:08:48

Q.    Was it accurate at the time that you drafted it?

A.    Yes.

Q.    If you turn to the next page, 7737, these are more text messages between you and    05:08:56

Page 237

Richards

Ms. Poolos; correct?

A.   Yes.

Q.   They're the screenshots of those text messages; correct?                                    05:09:04

A.   Yes.

Q.   And these are the text messages that you exchanged with Ms. Poolos on the day of your bridal shower; correct?

A.   Yes.                                    05:09:11

Q.   And turning to the next page, 7738, it's the same thing -- right? -- text messages with Ms. Poolos that you exchanged on the day of your bridal shower; is that right?

A.   Yes.                                    05:09:22

Q.   And 7739, it's the same thing; is that correct?

A.   Yes.

Q.   And then 7740, same thing?

A.   Yes.                                    05:09:33

Q.   7741, is that also the same thing?

A.   Yes.

Q.   And 7742, is that also the same thing?

A.   Yes.

Q.   And then 7743 has text messages between   05:09:47

Page 238

Richards

you and Ms. Poolos that you took screenshots on the day of your bridal shower; is that right?

A.    Yeah.

Q.    And below that is texts that you    05:10:01
drafted; is that correct?

A.    Yes.

Q.    And it was accurate at the time that you drafted it; right?

A.    Yes.    05:10:07

Q.    Okay.  Moving on to the next page, 7744, there's bold text about three lines down. It says, no boundaries comment.

Do you see that text?

A.    Yes.    05:10:29

Q.    And then there's text following that bold.  Was that text that you had drafted?

A.    Yes.

Q.    Was the text accurate at the time that you drafted it?    05:10:38

A.    Yes.

Q.    And that was a conversation you had had with Ms. Poolos on April 14th, according to the document; right?

A.    Yeah, according to the document, yes.    05:10:53

Page 239

Richards

Q.    Got it.

And so that was, what, like seven and a half months before you drafted this?  This document you drafted -- you submitted on December 30th?    05:11:06

A.    Yes.  That was six or seven months prior.

Q.    Six or seven months prior.

And your testimony is you didn't make any note about the discussion you had with Ms. Poolos on April 14th; correct?    05:11:19

A.    Yeah, I don't -- I don't remember having notes of it.

Q.    And then below that there's in bold a heading:  consistent and frequent threatening what-if scenarios.    05:11:32

Do you see that?

A.    Yes.

Q.    And there's text.  I assume you drafted that text?    05:11:42

A.    Yes.

Q.    And this is the section of the complaint that relates to your concerns about Ms. Poolos's conduct in connection with your    05:11:49

Page 240

Richards

wedding; correct?

A.    Yes.

Q.    And at the time that you drafted it --
it starts on 7744; it goes on to the next page,    05:11:54
7745 -- was the text -- what you put in here
accurate?

A.    Yes.

Q.    And other than what you have in this
write-up about your wedding, this section we're    05:12:14
talking about, were there any other concerns you
had related to Ms. Poolos's treatment of you in
connection with your wedding?

A.    Would you say the beginning of the
question again?    05:12:25

Q.    Yeah, sure.  The question is other than
what you have in writing here, did you have any
other concerns related to Ms. Poolos's treatment
of you in connection with your wedding.

A.    I believe I summarized this as detailed  05:12:37
as possible for when I submitted it so...

Q.    Several lines down -- one, two, three,
four, five, six, seven, eight -- ninth line down
there's a quoted text.  It says, Well, I need you
to work.    05:13:08

Page 241

Richards

Do you see that?

A.    Uh-huh.

Q.    We can't air the piece without you. What if they slate it to air May 9?  There is a    05:13:12 possibility it could be slated then, end quote.

Do you see that text?

A.    I do.

Q.    What was the basis for the quotations?

ATTORNEY ZUCKERMAN:  Objection.    05:13:27

A.    Because I say she would say things like, so I put it in quotations as she would say things like.

Q.    Got it.  So you're not actually quoting something that you know for certain she said in    05:13:36 that specific way?

ATTORNEY ZUCKERMAN:  Objection.

Q.    Let me ask it a different way.  Did you record that discussion with Ms. Poolos?

A.    No.    05:13:47

Q.    Did you take notes of that discussion with Ms. Poolos?

A.    No.

Q.    Then further down you say -- you wrote, I calmly responded.  Scared to speak.  Quote,    05:13:54

Page 242

Richards

Alex, I can't work on my wedding day, end quote.

Do you see that?

A.    Where?

Q.    It's just a couple lines down from    05:14:03
where we were just looking.  So do you --

A.    Say the part that you want me to find
again.

Q.    Sure.  The sentence starts with "I
calmly responded."    05:14:16

ATTORNEY ZUCKERMAN:  Ten lines down,
all the way to the right.

Q.    Where we were --

A.    Oh, sorry, I found it.

Q.    That's okay.  You wrote, I calmly    05:14:34
responded.  Scared to speak.  Quote, Alex, I can't
work on my wedding day, end quote.

Do you see that?

A.    I do.

Q.    And what was the basis for the quoted    05:14:41
text there?

ATTORNEY ZUCKERMAN:  Objection.

A.    I'm saying what I remember her saying
to me.

Q.    Well, I think here you're saying what    05:14:49

Page 243

Richards

you supposedly said to Ms. Poolos; right?

A.     Yes.

Q.     You didn't have notes; correct?

A.     No.                                    05:14:58

Q.     We can go through each quote, but I
don't think we need to do that.  Are the quotes
then your best memory of what was said -- what you
said or what she said when it's quoted?

A.     Yes.  The way that I wrote this was I     05:15:13
was explaining the nature of the conversation that
I remembered having with her about this.

Q.     Below this write-up about your concerns
in connection with your wedding, there's bolded
text that says Comedy Cellar.  Do you see that?     05:15:43

A.     Yes.

Q.     And is this text that starts on 7745
and briefly goes on to 7746, is that text that you
drafted?

A.     Yes.                                    05:15:53

Q.     And was it accurate at the time you
drafted it?

A.     Yes.

Q.     When you put together this May -- I'm
sorry, December 30th written complaint, did you     05:16:01

Page 244

Richards

attempt to be as detailed as you could be?

A.    Yes.  I wanted to include as much detail as I remembered.

Q.    And you tried to be as accurate as you    05:16:15 could when you put it together; correct?

A.    Yes.

Q.    And then when we look at the next page, 7746 there's a header in bold:  controlling behavior and fully taking away my agency.    05:16:30

Do you see that text?

A.    I do.

Q.    And is the text that follows an accurate -- was it accurate at the time that you wrote it?    05:16:45

A.    Yes.

Q.    Do you know if you said anything in this write-up about traveling with your dog?  Was that part of the write-up?

A.    I don't remember if I put my dog in    05:16:52 this specific write-up, but the fact that I needed to drive because of my dog was the reason that I needed to drive over the weekend.

Q.    And how come you didn't include it in the write-up?    05:17:05

Page 245

Richards

A.   I didn't think the dog detail was relevant.  I don't think I made mention of the dog.

Q.   You can look through it.  It's okay.   05:17:13
Go ahead.  Let me know.

A.   Well, I should read it from the beginning to end to make sure --

Q.   Sure.

A.   -- so it will take me a minute.   05:17:22

Q.   That's fine.

(Pause.)

A.   Okay.  I finished reading that.  I do not make mention of the dog.

Q.   And your testimony is you did not   05:19:52
because you didn't think it was relevant?

A.   Yeah, I didn't think my dog was relevant.

Q.   Was there any other reason?

A.   No.   05:19:59

Q.   In this write-up do you say that Ms. Poolos had suggested that you travel -- you say that Ms. Poolos had suggested that you travel on alternative days than the one -- than the one you proposed -- right? -- Tuesday or Wednesday?   05:20:18

Page 246

Richards

A.    Sorry, will you rephrase that?

Q.    Yeah, sure.  That's fair.  I'm going to strike it.

If you look toward the bottom of the    05:20:30 page 7746 --

A.    Yeah.

Q.    -- you write, She said -- I assume that is a reference to Ms. Poolos -- quote, If it doesn't work out with me, you can go to Tanya, and  05:20:40 I will support you in that.  We can tell her it didn't work out, you aren't trapped, you don't have to leave 60 Minutes.

Was that what Ms. Poolos said to you on the date of this conversation?    05:20:59

A.    Yes.

Q.    You didn't have notes or a recording of that discussion; correct?

A.    No.

Q.    And you write -- just because it came    05:21:06 up earlier on 7746, you write, On Thursday, December 16th...  And then you proceed to describe the discussion about travel and everything else that goes with it.

Does that refresh your recollection    05:21:18

Page 247

Richards

that you had that discussion with Alex on the 16th?

A.    Yes.

Q.    No reason to doubt that that's when you 05:21:28 had that discussion with her -- correct? -- since you wrote it in this document?

A.    Yeah, that should be when I had that.

Q.    Then if you look at 7747, one, two, three, four, five, six, seven, eight -- nine lines 05:21:51 down you wrote, The next day on Friday, I decided to talk to Tanya before HR.

Do you see that text?

A.    Uh-huh.

Q.    Why did you decide to talk to Tanya 05:21:59 before going to HR -- before talking to HR?

A.    Because I wanted to talk to both of them, so I reached out to Tanya.

Q.    Was there any particular reason that you decided to talk to Tanya before HR? 05:22:11

A.    No.

Q.    And you wrote right after that sentence:  I spoke to Tanya about how extensive the treatment has been and that I told Alex not to speak to me this way several times and I needed 05:22:36

Page 248

Richards

help.

Do you see that text?

A.    Yes.

Q.    How many times had you told Alex not to   05:22:42
speak to you in the way that you were objecting
to?

A.    At least four or five times.

Q.    And then you wrote, Tanya wrote to HR
for guidance and let me know that HR would be   05:23:00
contacting me on the following Monday.

Do you see that text?

A.    I do.

Q.    And you knew that because Ms. Simon
told you that; correct?   05:23:10

A.    Yes.

Q.    Under it you wrote, other examples of
unreasonable reactions.  Do you see that header?

A.    Yes.

Q.    And is this your write-up about the   05:23:18
copyright issue that you had testified to earlier?

A.    Yes.

Q.    Was there any other concerns other than
what's embodied in this write-up about Ms. Poolos
and the copyrighting issue?   05:23:39

Page 249

Richards

A.    Can you rephrase that?

Q.    Sure.  I'm just wondering if there's anything beyond what's here, what you wrote up, regarding concerning about copyrighting and Ms. Poolos that you had.                    05:23:51

A.    I don't think so.

Q.    Then under current situation you wrote, Alex assigned me ten background interviews to do on my own from December 23rd to December 31st and a major portion of a research note dissecting the U.S. policy related to hostage negotiations and wrongful detentions.                    05:24:04

Do you see that text?

A.    I do.                    05:24:22

Q.    Were the background interviews in connection with the American hostage story?

A.    Yes.

Q.    Was that the story that had a shoot that was scheduled in early January?                    05:24:31

A.    That -- I don't remember when that was ultimately scheduled, but there was a shoot eventually going to happen for it.

Q.    And at the time you wrote it, do you know when that shoot was scheduled?                    05:24:47

Page 250

Richards

A.    I don't remember when the shoot was scheduled compared to this.

Q.    And the research note that you're referring to here, was that also in connection with the American hostage story?    05:24:55

A.    Yes.

        (Richards Exhibit 4, emails, Bates-
        stamped CBS 7754, marked for identification.)

Q.    What's been marked as Richards Exhibit    05:26:03
4 is a one-page email chain bearing Bates number
CBS 7754.

        Ms. Richards, is this an email chain
between you and Ms. Balducci and Ms. Cottone
dated -- the first date is December 30th, 2021,    05:26:20
through December 31st, 2021?

A.    Yeah.

Q.    Is this notifying you that Ms. Cottone
is going to be away and that you should speak to
Ms. Balducci moving forward?    05:26:33

A.    Yes.

Q.    Is this the time or around the time
that you started speaking to Ms. Balducci instead
of Ms. Cottone?

A.    Yes.    05:26:40

Page 251

Richards

(Richards Exhibit 5, emails with attachment, Bates-stamped CBS 2609 through 2619, marked for identification.)

Q.    What's been mark as Richards Exhibit 5    05:27:20 is an email chain and an attachment.  The email chain is bearing Bates number CBS 2609 to 2611, and the attachment CBS 2612 through 2619.

Ms. Richards, this is an email from you to Ms. Cottone dated December 31st, 2021; correct?    05:27:43

A.    Yes.

Q.    Got it.  And in the email you write, Hi, Maria.  Here's another example of the copy editing.

A few minutes ago you testified that in    05:27:57 addition to the text messages that are embedded within your complaint and your memory you also relied on some emails that you forwarded to HR for purposes of your complaint.  Is this one of those emails?    05:28:14

A.    Yes.

Q.    What did you believe this signified that you thought you should send it to HR?

A.    May I have a moment to review it?

Q.    Sure.    05:28:26

Page 252

Richards

A.    I haven't seen it in a while.

(Pause.)

A.    Okay.

Q.    So what's the significance of this          05:29:53
email such that you decided to forward it to
Ms. Cottone?

A.    I sent this to Ms. Cottone because this
is the what I would say is rather small and
nitpicky edits that Alex would make on a document    05:30:11
that I would send her as soon as possible.  There
are very few references to things that I had done
wrong.  In bold is what she -- I believe she was
editing; like I missed a hyphen two times, and
capitalizations, an apostrophe.                      05:30:37

Q.    In the email that you -- the top email
from Ms. Poolos to you on December 22nd, 2021, is
there anything in that email that you allege shows
Ms. Poolos being hostile towards you?

A.    This was embedded in a very challenging  05:31:04
time.  So as we sit here today, it may not seem as
though it's hostile, but everything felt very
hostile to me.

Q.    Anything specific you can recall as you
sit here now?                                        05:31:22

Page 253

Richards

A.    As I said in my original complaint when she would say things like take another crack at it is something I referenced.

Q.    What was your concern about that language?                                05:31:34

A.    It was just an example about how no matter -- I felt no matter what I did it was -- nothing was ever good enough.  Any sort of teeny, tiny thing that I did was going to be looked at as never -- never good enough, never satisfying enough.                                05:31:54

        (Richards Exhibit 6, emails with attachment, Bates-stamped CBS 7755 through 7769, marked for identification.)                                05:32:43

Q.    What's been marked as Richards Exhibit 6 is a one-page email chain and includes an attachment, bearing Bates number CBS 7755 through 7769.

        Is this, Ms. Richards, another --                                05:33:01
strike that.

        For the record, this is an email from you -- the top email is from you to Maria Cottone dated 12/31/21; is that correct?

A.    Yes.                                05:33:13

Page 254

Richards

Q.    And the subject there is example of excessive correcting.  Is that the subject that you assigned to it, to the email?

A.    I believe so, yes.                          05:33:23

Q.    And is this another example of an email you sent to Ms. Cottone, another example of the Ms. Poolos's mistreatment?

A.    This was an example for that point, yes.                                               05:33:41

Q.    Which point?

A.    The point that she is at this point in our relationship of working together, nitpicking very small, tiny things.

Q.    Okay.                                      05:33:52

And other than Exhibit 5 and Exhibit 6, were there other emails you forwarded to HR regarding Ms. Poolos's mistreatment of you?

A.    I don't remember if there were others.

Q.    Do you recall if you had a discussion   05:34:17 with Renee Balducci on December 31st before the new year, 2021?

A.    I don't remember every day that I talked to her.

Q.    How many times did you talk to          05:34:29

Page 255

Richards

Ms. Balducci in connection with the issues related to Ms. Poolos?

A.    I don't remember how many times.

Q.    Was it more than five times?    05:34:36

A.    I don't remember.

Q.    Was it more than once?

A.    Yes.

Q.    And I believe you testified earlier about a conversation you had with Ms. Simon either  05:34:46 December 30th or December 31st about being exhausted.  Am I correct?

A.    Yes.

Q.    So tell me everything you remember about what you said and what she said during that  05:34:58 discussion.

A.    What I remember is that she had reached out to me and I talked to her on the phone.  And I told her that that I was really burnt out and exhausted and asked if it was okay if I took a  05:35:14 break.  She said that that was fine.

Q.    Anything else you recall about that discussion?

A.    I don't remember.

Q.    At what point in the day did you have  05:35:26

Page 256

Richards

that discussion with Ms. Simon, do you recall?

A.    I don't remember what time of day that was.

Q.    Did Ms. Simon say that she would speak    05:35:38
to Alex about it?

A.    I don't remember.

Q.    Did Ms. Simon say that you should discuss with Ms. Poolos?

A.    I don't remember.    05:35:49

Q.    And do you know if Ms. Poolos worked on December 31st for the whole day?

A.    I don't remember.

Q.    What were you working on at that time?

A.    I believe -- especially looking back at    05:36:05
some of this, I believe I was working on background interviews and my notes to get to her.

Q.    Was there someone that was being covered named Jonathan Franks?

A.    What do you mean, "being covered"?    05:36:23

Q.    Well, strike that.

Was there an interview planned with Jonathan Franks?

A.    There may have been a background call at some point that was going to happen with him.    05:36:31

Page 257

Richards

I don't remember.

Q.    And was he part of the story that you were working on, the American hostage story?

A.    I don't remember to what extent, but we    05:36:47 had a list of about 12 to 15 people, and he was -- he was one of the people we were going to talk to.

Q.    And was there a plan to interview him on January 5th?

A.    I don't remember.    05:36:59

Q.    And was there a plan to have a shoot on January 7th at this time?

A.    I don't remember what was planned or not.

Q.    Did you have any concerns as of    05:37:12 December 31st that you were behind in preparing materials to send to Ms. Stahl in connection with the American hostage story?

A.    I was deeply focused on trying to get all of the work that I had to get done done.  I    05:37:30 remember being very overwhelmed by dealing with all of the stress of going to HR and the stress of trying to keep up with everything that she wanted me to do.

Q.    And did Alex in late December express    05:37:58

Page 258

Richards

concern to you that the two of you were behind in preparing materials to get to Ms. Stahl in time for an upcoming interview or shoot?

A.    I don't remember specifically.          05:38:13

Q.    Did you in fact take a break in late December?

ATTORNEY ZUCKERMAN:  Objection.

A.    What do you mean by "a break"?

Q.    You spoke to Ms. Simon about being          05:38:30 exhausted, and I think your testimony -- and you can correct me if I'm wrong -- is that you asked her if it would be okay to take time off or take a break.  Do I have that right?

A.    She said I could take the rest of the          05:38:42 afternoon off.

Q.    And did you in fact take the rest of the afternoon off?

A.    I did.

Q.    And did you tell Ms. Poolos?          05:38:48

A.    I don't remember if I did.

Q.    When did you resume working after taking that break?

A.    I don't remember.

Q.    Did you work on New Year's Day, which          05:38:57

Page 259

                    Richards

was I think the Saturday?

A.    I don't remember.

Q.    Did you communicate with Ms. Poolos on
New Year's Day?                                   05:39:08

A.    I don't remember.

Q.    Did you communicate with Poolos on
Sunday, January 2nd?

A.    I don't remember.

Q.    Did you do any work on January 2nd?    05:39:13

A.    I don't remember.

Q.    And did you communicate with Ms. Poolos
on January 3rd, which would have been Monday?

A.    I don't remember.

Q.    Did you do any work on January 3rd?    05:39:24

A.    I don't remember.

Q.    After you took the break that
afternoon, did Ms. Poolos send you any emails
asking you to do work?

A.    I don't remember.                           05:39:47

Q.    Okay.

      (Richards Exhibit 7, emails, Bates-
      stamped CBS 772 to 73, marked for
      identification.)

Q.    Okay.  What's been marked as Richards    05:40:23

Page 260

Richards

Exhibit 7 is an email chain bearing Bates numbers
CBS 772 to 73.  The first email in the exchange --
it's an email exchange between Ms. Richards and
Ms. Poolos that are all dated December 31st, 2021.    05:40:39
          After you have had a chance to review
it, let me know, Ms. Richards.

A.    Okay.

          (Pause.)

A.    Okay.                                            05:41:52

Q.    So I want to focus on the second email
from the top from you to Ms. Poolos dated December
31st, 2021.  In it you write, I'm extremely
drained.  I need a break.  I need to step away for
the afternoon to regroup before next week.  I'm      05:42:04
not well or okay with how I am being treated.
          Do you see that text?

A.    I do.

Q.    Did you draft this email?

A.    Yes.                                            05:42:12

Q.    And did you get any suggestions from
anyone about what to say in this email?

A.    I don't remember specifically, but I
vaguely remember Tanya telling me that I should
just let Alex know that I need a break and that      05:42:23

Page 261

Richards

it's okay for me to take the afternoon.

Q.    Do you know if at this point in time Ms. Poolos was aware that you had made a complaint?  Do you know if she was aware?    05:42:37

A.    I do not believe she was aware at this time.

Q.    Do you know if Ms. Poolos knew about the discussion that you and Ms. Simon had in which Ms. Simon had said it was okay for you to take the  05:42:48 afternoon off?

A.    I don't think she was aware of that, but I don't know.

Q.    Okay.  In the top email from Ms. Poolos to you dated also December 31st, Ms. Poolos  05:43:00 writes, Please call me if you wish to discuss.

Do you see that?

A.    Yes.

Q.    Okay.  Did you call Ms. Poolos to discuss your email?    05:43:11

A.    I don't believe so.

Q.    And then Ms. Ms. Poolos wrote, Otherwise just send me all your notes so I can go through it all today.

Do you see that text?    05:43:24

Page 262

Richards

A.   I do.

Q.   Do you know which notes Ms. Poolos was referring to?

A.   She would have been likely referring to whatever background interviews I had done.

I would also like to ask the time stamp, is the time stamp on her email correct?  It was at 7:50 p.m.?

Q.   I don't know.  These were produced by your lawyers.  I can't tell you.

A.   About five hours later.

Q.   I don't know.

A.   It's a question.

Q.   I don't know.  The answer is you'd have to ask your lawyers.

A.   Okay.

Q.   Did you send your notes that Ms. Poolos requests in Exhibit 7 to her?

A.   I don't remember.

Can we take a very short break?

ATTORNEY IADEVAIA:  Yes, we can take a break.

THE VIDEOGRAPHER:  We are off the record.  The time on the video monitor is 5:44

Page 263

Richards

p.m.

(Recess taken from 5:44 to 6:04.)

THE VIDEOGRAPHER:  We are now back on the record.  The time on the video monitor is  06:05:03 6:04 p.m.

(Richards Exhibit 8, emails, Bates-stamped CBS 7770 to 7771, marked for identification.)

Q.    What's been marked as Richards Exhibit  06:05:26 8 is an email chain bearing Bates number CBS 7770 to 7771.

(Discussion off the record.)

Q.    So, Ms. Richards, if you could take a look at this email chain, and then I just have a  06:06:15 couple questions.

A.    Am I looking at the right thing?  Did we do this?

Q.    No --

ATTORNEY ZUCKERMAN:  Is it 7770 on the  06:06:37 bottom?

THE WITNESS:  Yeah.

Q.    It's a different email.

A.    Oh, okay.  Yeah, I'm ready.

Q.    Okay.  So the second to top email, that  06:06:44

Page 264

Richards

is the email we went through before the break on
December 31st from you to Ms. Poolos, notifying
her that you need a break and that you're going to
step away for the afternoon; correct?                06:06:59
        A.    Yes.
        Q.    The email at the top, though, is a
different email from Ms. Poolos, different than
what we were looking at in Exhibit 7; correct?
You can look -- you can compare them if you'd like  06:07:12
to.
        A.    You're saying this top is different
than that top?
        Q.    Correct.
        A.    Yes.                                    06:07:19
        Q.    In that email Ms. Poolos writes to you:
I'm sorry you feel that way.  I'm not sure how I
am mistreating you, so please do spell it out for
me.
              Do you see that text?                  06:07:29
        A.    I do.
        Q.    And did you spell it out for Ms. Poolos
in response to this email?
        A.    I don't remember.
        Q.    And then Ms. Poolos writes, I can't not 06:07:34

Page 265

Richards

tell you your work needs copy editing when it does.  I've tried to offer you some solutions, an extra set of eyes, and more time.

Do you see that text?                          06:07:46

A.    I do.

Q.    And was it true that Ms. Poolos had offered an extra set of eyes to you as an option in connection with copy editing?

A.    Yes.                                       06:07:56

Q.    And did she offer to potentially get some assistance from either Tanya Simon or Bill Owens' executive assistant?

A.    I don't remember.  It's possible.

Q.    And is it true that Ms. Poolos had      06:08:13
offered more time to do the write-ups, as she writes here?

A.    Yes.

Q.    And then Ms. Poolos writes, At this point maybe you should send me all your rough   06:08:28
notes.  I will clean up all.  You don't need to do anything for the research note; I'll do it.

Do you see that text?

A.    I do.

Q.    And did you send Ms. Poolos your rough  06:08:37

Page 266

Richards

notes?

A.    I don't remember.

Q.    Did you do any additional work on the
research note that Ms. Poolos a referring to here?    06:08:47

A.    I don't remember.

Q.    And then going back to the question
about an extra set of eyes and whether -- I had
asked if Ms. Poolos had offered the assistance
from either Bill or Tanya's assistant.    06:09:06

Did Ms. Poolos offer to help or help
from Lesley's assistant, someone named Wren?

A.    Yes.

Q.    Did you ever take her up on that offer?

A.    I don't remember.    06:09:25

I would like to add that this was all
during the time when I -- we had had that sort of
breaking point conversation close to when all of
this was happening, and I had the feeling that she
was suspicious of me maybe reporting something    06:09:46
about her.

And so I feel like this whole era of
her cracking down on these nitpicky things and
then explicitly offering help was sort of like an
ability to put in writing that I was either, like,    06:10:02

Page 267

Richards

struggling and that she's offering help to me.

Q.    And what's your basis for saying that you believe that Ms. Poolos thought that you had made a complaint by this point?                    06:10:23

A.    Well, our relationship had gotten to a very strained point at this point.  Because of that, specifically relating to that breaking point conversation that we had around me traveling over the weekend, like I was -- I had expressed how I    06:10:43 was having a really difficult time so...

Q.    But to your knowledge no one had told Ms. Poolos at this point that you had in fact made a complaint; correct?

A.    I don't know.                              06:11:03

Q.    Do you have any reason to think they did?

A.    Any reason to think what?

Q.    That someone had told Ms. Poolos?  Did anyone -- strike that.                            06:11:09

Did anyone tell you as of December 31st that Ms. Poolos had been notified of your complaint?

A.    I don't recall someone telling me that she knew about my complaint at that point.      06:11:19

Page 268

Richards

Q.   At some point did you forward your written complaint that we went through and that you originally sent to HR, did you forward that to Tanya Simon?                                                    06:11:34

A.   I did.

Q.   And why did you send it to Ms. Simon?

A.   I vaguely remember talking to her and saying that I had submitted the written complaint and I could forward it to her, and so I did.       06:11:46

Q.   After the communications you had with Ms. Simon on the 31st, what was the next communication you had with either HR or Ms. Simon or Mr. Owens about your complaint against Ms. Poolos?                                                06:12:18

A.   I don't remember what the next date was that I talked to them.

Q.   Do you recall the next communication that you had?

A.   Shortly after they would have let me       06:12:28 know that Alex had been spoken to by Bill and Tanya.

Q.   And I think you testified about that discussion earlier.  Was that a discussion that you had with HR or was that a discussion with Bill  06:12:41

Page 269

Richards

and Tanya?

A.    That was a discussion I had with HR.

Q.    And specifically was that Renee Balducci?                                          06:12:49

A.    I believe so, yes.

Q.    And what did Ms. Balducci tell you about Ms. Simon and Mr. Owens speaking to Alex?

A.    I remember it was brief.  She was mostly just letting me know that they had spoken   06:13:02 to Alex and that she was aware of my complaint.

Q.    That Alex was aware of it?

A.    Yes.

Q.    Anything else you recall about that discussion?                                          06:13:19

A.    I don't remember more details.

Q.    Did you have any discussions with Tanya about Tanya and Bill's discussion with Alex regarding your complaint?

A.    I don't remember.                               06:13:27

Q.    Did you have any discussions with Bill about Tanya and Bill speaking to Alex about your complaint?

A.    I don't remember.

Q.    At some point did you learn that        06:13:39

Page 270

Richards

Ms. Poolos had reached out to Mr. Bronstein directly?

A.   Yes.

Q.   When did you learn that?                06:13:46

A.   I learned that I believe it was on January 6th.

Q.   Okay.  How did you learn that?

A.   He let me know.

Q.   Who's the "he"?                         06:14:01

A.   Scott let me know that he had spoken with Alex.

Q.   Were you aware that Ms. Poolos had texted Mr. Bronstein before they had a phone call?

          ATTORNEY ZUCKERMAN:  Objection.    06:14:11

A.   I don't remember when I learned about that she had texted him to talk to him.

Q.   Did you learn about it before you knew about the phone call?

A.   Did I learn about what?               06:14:31

Q.   That Ms. Poolos had texted Mr. Bronstein.

          ATTORNEY ZUCKERMAN:  Objection.

A.   Can you -- can you further expand the timeline you're asking me about?  What are you   06:14:40

Page 271

Richards

asking me?

Q.    You said you learned about a phone call with Mr. Bronstein and Ms. Poolos on January 6th; is that right?                                        06:14:48

A.    Yes.

Q.    Okay.  And when did that phone call take place?

A.    It had to have been around -- very close to around the 6th if not on the 6th.        06:14:56

Q.    Okay.  And my question is were you aware that Alex had texted Mr. Bronstein before you became aware of the phone call on the 6th or around the 6th.

ATTORNEY ZUCKERMAN:  Objection.          06:15:14

You can answer.

THE WITNESS:  Sorry, will you repeat his question.

(Record read.)

THE WITNESS:  I believe I knew that she  06:15:41
had texted him.  I don't know when or what day
it was.  But I knew she was wanting to talk to
him at some point.

Q.    And how did you know that?

A.    He told me.                                06:15:57

Page 272

Richards

Q.    Mr. Bronstein told you?

A.    Yes.

Q.    And what did Mr. Bronstein tell you about Alex reaching out to him?                06:16:04

A.    I remember him saying that she -- Alex had reached out to try and talk to Scott at some point.

Q.    Did he say when she had reached out to him?                06:16:17

A.    I don't remember.

Q.    And did he say anything about the substance of her reaching out, the communications?

A.    He said that she reached out to try and talk to him.  I don't remember to what detail.        06:16:30

Q.    And how did Scott tell you about this?

A.    About the phone call?

Q.    No, no, Alex's effort to reach out to him before the phone call.

A.    I don't remember if he told me over the    06:16:49 phone or over text message.  He somehow let me know that she had reached out to him, and I remember being absolutely utterly shocked.

Q.    And if you communicated with Mr. Bronstein about Alex reaching out before the    06:17:12

Page 273

Richards

phone call via text, you don't have those text

messages anymore; correct?

A.    No, I do not.

Q.    Because they were deleted?                06:17:19

A.    Yes, as a function of the settings on

my phone.

Q.    Did you notify anyone at CBS that

Ms. Poolos had reached out to Mr. Bronstein before

you found out about the phone call?                06:17:44

A.    I don't remember.  I don't think so.

Q.    How come?

A.    Because they hadn't spoken.  I don't

know.

Q.    You said you were shocked --                06:17:54

correct? -- when you found out that Alex was

attempting to communicate with Mr. Bronstein?

A.    Yes.

Q.    But you decided you wouldn't talk to HR

about it?                06:18:03

A.    I didn't at the time.

Q.    And did you tell Ms. Simon about Alex's

efforts to get in touch with Mr. Bronstein?

A.    Prior to the phone call?

Q.    Yes.                06:18:21

Page 274

Richards

A.    I don't think so.

Q.    Did you tell Mr. Owens?

A.    I don't think so.

Q.    And is there any reason you didn't?    06:18:29

A.    I don't know.

Q.    Why were you shocked when you learned that Ms. Poolos had reached out to Mr. Bronstein before the phone call?

A.    Because it's a weird thing to do.    06:18:48

Q.    What do you mean, "it's a weird thing to do"?  What does that mean?

A.    In my -- when I was sitting there and hearing that the person that I work for is -- that I'm having all these issues with is reaching out    06:19:13 to my job reference, that was alarming to me.

Q.    Did you take any steps to try to stop Ms. Poolos from contact -- speaking to Mr. Bronstein?

A.    No.    06:19:30

Q.    Did anyone at CBS take any steps to prevent Ms. Poolos from speaking to Mr. Bronstein before she in fact had the call?

A.    That's not something I could be aware of.  I don't know.    06:19:43

Page 275

Richards

Q.   Did anyone say that to you, that they had taken that step or any steps?

A.   No.

Q.   Did you and Mr. Bronstein communicate   06:19:52 about whether Mr. Bronstein would speak to Ms. Poolos before the call happened?

A.   He let me know that she reached out and he was expecting her at some point to call him.

Q.   Was there any other communication about   06:20:09 the anticipated call?

A.   Not that I remember.

Q.   Did you say to Mr. Bronstein that you didn't want him to make the call?

A.   I don't remember.   06:20:20

Q.   Did Mr. Bronstein ask you your opinion as to whether he should call Ms. Poolos?

A.   I don't remember what we talked about.

Q.   Do you remember anything about those discussions?   06:20:35

A.   No.

Q.   Do you have notes of any of those discussions?

A.   No.

Q.   To the extent that those communications   06:20:40

Page 276

Richards

with Mr. Bronstein took place via texts, those texts have been deleted; correct?

A.    Yes, as a setting on my phone.

Q.    Did you communicate with Mr. Bronstein 06:21:00 before he had the call with Ms. Poolos about recording their conversation?

A.    I don't -- I don't think so.  I don't remember.

Q.    Do you know if Mr. Bronstein recorded 06:21:13 the discussion?

A.    I don't know.

Q.    Did he ever tell you that he recorded it?

A.    No.                                      06:21:23

Q.    Did he ever tell you that he did not record it?

A.    I don't remember.

Q.    Did you ask Mr. Bronstein to record the discussion?                                06:21:36

A.    I don't remember asking him to do that.

Q.    Did you and Mr. Bronstein discuss Mr. Bronstein taking notes of the discussion between him and Alex?

A.    I remember him telling me that he took 06:21:45

Page 277

Richards

notes after the fact.  I don't remember anything before.

Q.    So it's possible he did, but you don't recall?                                                    06:21:55

A.    I'm saying I don't know.

Q.    Don't know.

Did you become aware that Ms. -- that Bill and Tanya had spoken to Ms. Poolos before Ms. Poolos's call with Mr. Bronstein?        06:22:19

ATTORNEY ZUCKERMAN:  Objection.

A.    Can you say that again?  Did I what?

Q.    Did you become aware -- strike that.

ATTORNEY IADEVAIA:  Can you read back my question.  Thank you.                          06:22:33

(Record read.)

A.    Yes.

Q.    I'm sorry, I can't remember if I asked this before, but did you ever tell anyone at CBS that you had spoken to Mr. Bronstein in the fall    06:23:05 of 2021 about Ms. Poolos?

A.    I don't remember.

(Richards Exhibit 9, emails, Bates-stamped CBS 7809 to 7810, marked for identification.)                                        06:23:56

Page 278

Richards

Q.    What's been marked as Richards Exhibit 9 is a multipage email dated CBS 7809 to 7810.

Let me know once you've had a chance to review it.                                          06:24:14

(Pause.)

A.    Okay.

Q.    Okay.  So starting at the second page, 7810, this is an email I think we talked about earlier today.  The bottom email, the first in the 06:25:13 chain, is from you to Maria Cottone dated December 30, 2021.  And this is where you forward -- or send your written complaint to Ms. Cottone; correct?

A.    Yes.                                          06:25:27

Q.    In the next email, the above one, also December 30th, Ms. Cottone is writing to you and Ms. Balducci, notifying you she's going to be -- Ms. Cottone is going to be out of the office on some kind of vacation and that you should be in 06:25:42 touch with HR; correct?  I mean with Renee?

A.    Yes.

Q.    And on the first page on December 31st, 2021, at 1 o'clock, 1:01 p.m., the email from you to Maria and Renee, you write, Renee:  I'm very 06:26:04

Page 279

Richards

sorry to bother you.  I am in need of guidance and support.  Is there someone I can talk to today?

And Ms. Balducci responds to you and Ms. Cottone and says, Hi, Collette.  I'm available 06:26:17 for the next 30 minutes.  Feel free to call me at 917...and lists a phone number.

Did you speak to Ms. Balducci after this email on December 31st, 2021?

A.    I believe so.                            06:26:32

Q.    And what did you discuss with her?

A.    I remember talking to her about how I was struggling with everything that was going on and I was feeling very drained and stressed and I desperately needed a break and I didn't know what 06:26:52 to do because of the situation.  So I was reaching out to her to ask how to handle, saying I needed a break.

Q.    And what did Ms. Balducci say to you?

A.    I remember her saying that that was 06:27:06 okay and that it's okay for me to stand up to Alex and to hold my ground and say that it's okay -- or say that I'm not okay and that's perfectly permissible.

Q.    Did she say anything else during this 06:27:25

Page 280

Richards

call?

A.    Not that I remember.

Q.    Did Ms. Balducci suggest that you call Tanya Simon?                                      06:27:33

A.    I don't remember that happening.

Q.    Did Ms. Balducci say it was okay for you to take a break that you were looking for?

A.    I don't remember.

Q.    Did Ms. Balducci say that she would      06:27:42 talk to Ms. Poolos about the concern you raised?

A.    I don't remember.

Q.    Okay.  In the email above from -- it's from you to Renee Balducci and it's dated January 4, 2022, and you sent it at 9:11 a.m.  Do you see      06:28:05 all that?

A.    I do.

Q.    And it's an email that you directed to Ms. Balducci and Ms. Cottone; correct?

A.    Yes.                                      06:28:17

Q.    And in the email you say, Good morning, Renee.  Thank you so much for your guidance and support on Friday.  I just wanted to let you know I have two calls this morning that should be done by 10:30 but other than that I'm reachable.  I      06:28:32

Page 281

Richards

look forward to hearing from you on what is happening from here.  And you say, my cell is, and you give a phone number.

Q.    Did you have a conversation with            06:28:44
Ms. Balducci on January 4th?

A.    I don't remember; but I imagine that I did, but I don't remember.

Q.    Do you remember what you discussed generally?                                          06:28:56

A.    I don't remember.

Q.    Did you speak to Ms. Cottone on January 4th?

A.    I really don't remember.

Q.    On January 5th, which is the next day    06:29:05
and the next email up at 10:11, you send an email to Renee Balducci and Maria Cottone.  You say, Hi, Renee.  I have a kind of bizarre update to share with you.  Please let me know if you have a moment sometime.                                         06:29:21

Do you see that text?

A.    Yes.

Q.    Renee responds and says, Call me, and gives her phone number.

Do you see that text?                       06:29:29

Page 282

Richards

A.    I do.

Q.    What was the bizarre update?

A.    I believe this was after Alex had called me after she had been spoken to by Bill and Tanya.  And she very explicitly had said that, in what I felt was a very chilling tone to send a message, that she had spoken to Bill and Tanya, she knows I raised a complaint, and they heard her side of the story and she can tell me that and that's it, something to that effect.                    06:29:37    06:30:07

Q.    So that's what you told Renee about in terms of the bizarre update?

A.    Yes.

Q.    Do you know if the call that you had with Alex, was that on January 6th?                    06:30:24

A.    I don't know how that call with Alex could have been on January 6th if I was emailing her on January 5th.

Q.    Was there another, quote/unquote, bizarre update you were sharing with Ms. Balducci?                    06:30:39

A.    There was the update that happened later that I needed to tell her about.

Q.    Are you talking about the phone call between Alex and Scott Bronstein?                    06:30:55

Page 283

Richards

A.    Yes.

Q.    Right.  But that call -- you didn't notify CBS about that call until January 7th; correct?                                          06:31:03

A.    Right.

Q.    So that was before this email on January 5th in which you said to Renee that you had a bizarre update?

A.    I did.                                        06:31:10

Q.    I'm sorry?  I think the question was that was before -- strike that.

On January 5th, 2022, you were not aware of a phone -- strike that.

At the time you sent this email at      06:31:26 10:11 a.m. on January 5th, 2022, were you aware of the phone call between Alex and Scott Bronstein?

A.    No.

Q.    Had the phone call even taken place, to your knowledge?                                    06:31:39

A.    I don't think the phone call had taken place at that point.

Q.    As of January 5th, 2022, at 10:11 a.m., do you know if Tanya and Bill had even met with Ms. Poolos?                                      06:31:48

Page 284

Richards

A.    I believe so, yes.

Q.    Okay.  And what's the basis of that belief?

A.    Because the update I needed to share    06:31:55
with Renee was the phone call I got from Alex
telling me that Bill and Tanya had spoken to her.

Q.    As of January 5th, 2022, at 10:11 a.m.,
were you aware that Ms. Poolos had reached out to
Scott Bronstein?                                 06:32:15

A.    I don't remember.

Q.    Was the bizarre update that you gave to
Ms. Poolos on January 5th, 2022, was that bizarre
update notifying her that you knew that Alex had
reached out to Mr. Bronstein?                    06:32:30

A.    I don't remember.

Q.    Is it possible?

ATTORNEY ZUCKERMAN:  Objection.

A.    Can you ask it again?

Q.    Yeah.  I'm just asking is it possible    06:32:39
that the bizarre update that you shared with
Ms. Balducci in connection with this email was
that Ms. Poolos had reached out to Mr. Bronstein.

ATTORNEY ZUCKERMAN:  Objection.

A.    I remember having a phone call with      06:32:58

Page 285

Richards

Alex that I wanted to tell Renee about, and that's my memory.

Q.    We'll go through it in a minute, and we can come back to the exhibit.  But the phone call    06:33:11 that you're referring -- the phone call you're referring to, was that a phone call that you secretly recorded?

A.    Yes.

Q.    And why did you secretly record that    06:33:19 conversation?

A.    Because I made a decision that I was going to record conversations with her after I had reported to HR.

Q.    Is that recording currently stored on    06:33:32 your cell phone?

A.    It's on my work phone.

Q.    It's on your work phone.

And is there a particular place it's stored on your work phone?    06:33:44

A.    It's in a voice memo.

Q.    Did you create that voice memo?

ATTORNEY ZUCKERMAN:  Objection.

Q.    Why don't you explain to me what a voice memo is.    06:33:56

Page 286

Richards

A.    I recorded the call by having the voice memo app play while I was on speakerphone with her so I could hear.

Q.    And is the voice memo located in a file 06:34:14 or an app or is it sort of freestanding on the phone?

A.    It's in the voice memo app.

Q.    And are there other recordings in the voice memo app?    06:34:27

A.    Yes.

ATTORNEY ZUCKERMAN:  Objection.

Q.    And are there recordings that you made of Alex Poolos in the voice memo app?

A.    Yes.    06:34:36

Q.    Did you find out that Bill and Tanya had spoken to Alex before or after you had the phone call that you secretly recorded of Alex?

ATTORNEY ZUCKERMAN:  Objection.

A.    I believe I was told by HR that they 06:35:40 were going to speak to her.  They spoke to her. And then she called me to tell me they spoke to her.  That is my memory.

Q.    And at that point in the sequence did you have the discussion about continuing to work 06:36:05

Page 287

Richards

with Alex?  Was that at the time that you found out that Bill and Tanya were going to speak to Alex or was it some other point?

ATTORNEY ZUCKERMAN:  Objection.    06:36:19

A.    I don't understand the question.

Q.    Sure.  Okay.  I think you testified earlier -- and you can correct me if I'm wrong -- that at some point you were told that Bill and    06:36:35 Tanya were going to speak or had spoken to Alex and that they wanted to know if you were going to be able to try it out continuing to work with Alex.

Do I have that correct or am I wrong?

A.    Yes, at some point that happened.    06:36:49

Q.    And my question is did that happen at the same time you were told that -- by HR that Bill and Tanya were going to speak to Alex or did it happen at another point.

A.    I don't remember the exact timeline of    06:37:07 all of these different discussions.  I know that at one point they asked me if I would be willing to work with her, which I said earlier that I was very skeptical about that but that I would try. And then I think it happened again after she was    06:37:31

Page 288

Richards

spoken to.  I think they -- again, I don't remember the timeline of how many times we talked about this.

Q.    Did anyone tell you that the reason    06:37:43
that Alex had called you was because she had been asked to do so by Bill?

ATTORNEY ZUCKERMAN:  Objection.

A.    Can you rephrase that?

Q.    Yeah, sure.  Did anyone tell you that    06:38:10
the reason Alex called you in the conversation that you recorded, that the reason she called you was because Bill had asked her to do so?

A.    She may have said that on the call.  I don't remember.    06:38:21

Q.    And did you find out from anyone other than Ms. Poolos that Bill had asked Ms. Poolos to make the call to you?

A.    I don't think -- I don't have a memory of anyone telling me that.    06:38:32

Q.    And did you provide a copy of the recording that you made of your call with Alex to anyone at CBS?

A.    I don't remember if I sent it to HR or not.    06:38:49

Page 289

Richards

Q.    Did you tell HR about the call?

A.    Yes.

Q.    Did you tell Tanya Simon about the call?                                                  06:38:59

A.    I don't remember if I did.

Q.    Did you tell Bill Owens about the call?

A.    I don't remember.

Q.    And what did you say to HR about the call?                                                06:39:05

A.    I said that she called me and that she was letting me know that HR spoke to her and that Bill got her side of the story.  And I felt like it was a chilling kind of experience.  I just wanted them to be aware of anything related to    06:39:30 this.

Q.    Did you think it was important that they be aware of anything related to the concerns you had about Ms. Poolos?

A.    Yes.                                                                                       06:39:48

Q.    Why did you think it was important?

A.    Because this was a very serious and completely distressing matter so...

Q.    Do you know that Bill Owens met with Alex about your complaint the second time on          06:40:03

Page 290

Richards

January 6th?

ATTORNEY ZUCKERMAN:  Objection.

A.    I don't know if I know that.

Q.    Do you recall anyone telling you that?   06:40:14

A.    I don't -- I don't think so.

Q.    And are you aware that on January 6th that Mr. Owens sent an email to Alex Poolos summarizing discussions he had had with her about your complaint?                              06:40:30

ATTORNEY ZUCKERMAN:  Objection.

A.    I don't know anything about that.

Q.    Did you ever see a copy of that email?

A.    I have not.

ATTORNEY ZUCKERMAN:  Objection.      06:40:36

Q.    Did anyone ever show you a copy of the email?

ATTORNEY ZUCKERMAN:  Objection.

A.    No.

Q.    Did you do work with Alex in early   06:40:50 January 2022 before she was suspended?

A.    I think looking at these emails I see that I had a call on January 4th.  I don't remember if she was on that call with me or not. I don't remember what work we may have done.   06:41:14

Page 291

Richards

Q.    Did you exchange emails with Ms. Poolos during this period about the American hostages story?

A.    It's possible.  I don't remember them.    06:41:24

Q.    And outside of the phone call -- the phone call that you described as chilling, was there any instances in early January in which you allege that Ms. Poolos mistreated you?

ATTORNEY ZUCKERMAN:  Objection.    06:41:44

A.    Will you say it again?

Q.    Sure.  I'm wondering if between -- in early January before Ms. Poolos was suspended do you allege that Ms. Poolos engaged in any conduct that you believe constitutes mistreatment.    06:42:06

ATTORNEY ZUCKERMAN:  Objection.

A.    I did not raise further claims in January.

Q.    You didn't raise any additional allegations that Ms. Poolos had engaged in    06:42:16 misconduct towards you in early January?  Is that what you're saying or am I misunderstanding?

A.    We're completely glossing over the fact that she called Scott Bronstein?

Q.    I'm talking about before the Scott    06:42:31

Page 292

Richards

Bronstein phone call.

A.    I don't think that I raised further concerns prior to that other than alerting them to this phone call.                                    06:42:45

Q.    During that time frame did she yell at you?

A.    I don't -- I don't remember.

Q.    Did she act in a way that you believed was unreasonable towards you?                           06:42:51

ATTORNEY ZUCKERMAN:  Objection.

A.    I don't remember.

Q.    Did she harass you?

ATTORNEY ZUCKERMAN:  Objection.

A.    No.                                             06:43:00

(Richards Exhibit 10, emails, Bates-stamped CBS 3155, marked for identification.)

Q.    Okay.  What's been marked as Richards Exhibit 10 is a one-page email chain bearing Bates number CBS 3155.                                     06:43:49

A.    Okay.

Q.    You've had a chance to review the document?  Or take your time.  Let me know when you're ready.

(Pause.)                                             06:44:14

Page 293

Richards

A.    Okay.

Q.    The bottom email is an email from Ms. Poolos to you dated January 6, 2022.  Do you see that?                                                06:44:26

A.    Yes.

Q.    Okay.  And then in the email above it's your response to Ms. Poolos, also dated January 6th, 2022.  Do you see that?

A.    I do.                                                06:44:36

Q.    And then above that Ms. Poolos writes an email to you dated January 6th, 2022.  She writes, Need to update you on something Jason just said.  Are you free?

       Do you see that?                                    06:44:48

A.    Yes.

Q.    And then you write, Yes, I'm free, also January 6th, 2022; correct?

A.    Yes.

Q.    Is this a phone call you had with       06:44:55
Ms. Poolos that you recorded?

A.    I don't -- I don't know.

Q.    Is it possible that it is that call?

       ATTORNEY ZUCKERMAN:  Objection?  Strike that.                                                    06:45:05

Page 294

Richards

A.    That phone call referring to what?

Q.    Did you speak to Ms. Poolos on January 6th?

A.    I don't know.                                    06:45:11

Q.    Did you speak to her by phone?

ATTORNEY ZUCKERMAN:  Objection.

A.    I don't know.  I don't remember.

Q.    One question:  Outside of the phone call that you described as chilling, did you have   06:45:39 any other phone calls with Ms. Poolos in early January before she was suspended?

ATTORNEY ZUCKERMAN:  Objection.

A.    I don't remember exact dates, but we were continuing on with our work.  So it's      06:45:50 possible we could have talked on the phone.

        (Richards Exhibit 11, transcript of
        discussion between Richards and Poolos,
        Bates-stamped CBS 7965 through 7968, marked
        for identification.)                           06:46:25

Q.    Okay.  What's been marked as Richards Exhibit 11 is a transcript that's been provided by Veritext bearing the Bates number CBS 7965 through 7968.

        Ms. Richards, if you could take a            06:46:40

Page 295

Richards

minute to review the transcript, and then we can talk.

(Pause.)

THE WITNESS:  Okay.                          06:46:55

Q.    Is this the conversation with Ms. Poolos that you've described as chilling that you recorded?  Is it a transcript of that discussion?

A.    It appears to be.                       06:47:02

Q.    Okay.  And do you know if there was a portion of that discussion that you had with Ms. Poolos that's captured by this transcript that's not on the recording that you made?

A.    Can you rephrase that?  What?          06:47:16

Q.    Yeah, sure.  I'm asking if there was a portion of your -- strike that.

The recording that you made of the discussion with Ms. Poolos in January of 2022, does that recording capture the entire          06:47:28 conversation or only part of it?

A.    Based on my memory of that, I believe that I -- we started talking, and then I started recording as soon as I could.  So it picked up in the middle of conversation.                    06:47:45

Page 296

Richards

Q.   Did you review this transcript in preparation for today's deposition?

A.   No.

Q.   And you can take your time to review    06:48:05
the transcript, but can you tell me what you recall discussing with Ms. Poolos that's not covered by the transcript?

A.   I don't remember the specifics.

Q.   And looking at the transcript, is there    06:48:18
anything in particular that's reflected in the transcript that you believe is chilling?

A.   Yeah.

Q.   And what aspect of this conversation reflected in the transcript do you believe is    06:48:42
chilling?

A.   The way that she spoke to me, saying they let me know that you went to HR, asked me for my -- and then Bill asked me for my version of things, which I shared.  And he just said that I    06:48:56
should let you know that I had this conversation with them.

She was -- so I got the impression she was letting me know that she gave her version and Bill wanted -- was wanting that from her and that    06:49:19

Page 297

Richards

he wanted me to know -- or she wanted to know that

I should know that Bill had her version of things.

It was a stern reminder that -- of who

she is in general.                                                06:49:46

Q.    What do you mean by that?

A.    She -- I remember -- I remember when...

(Pause.)

A.    This to me felt like a message that I

should be scared.                                                06:50:35

Q.    A message from Ms. Poolos that you

should be scared?

A.    Yes.

Q.    And was it the words she said, the

tone, or something else?                                         06:50:45

A.    Both.

Q.    And Alex says, According to the

transcript, on line 16:  And so he just said I

should let you know that I had this conversation

with them.                                                       06:51:03

Do you see that?

A.    Yes.

Q.    And do you have any reason to believe

that Ms. Poolos was not telling the truth there?

ATTORNEY ZUCKERMAN:  Objection.                                  06:51:13

Page 298

Richards

A.    No.

Q.    When is the last time you listened to that recording?

A.    I think I listened to it a few days    06:51:53
ago.  Maybe it was yesterday.  Recently.

Q.    Did you listen to it with your lawyers during the meeting that you testified to earlier?

A.    No.

Q.    Why did you listen to it either    06:52:10
yesterday or a couple days ago?

A.    I knew I had to deal with this, and I just listened to it to remember how horrific all of it was.

Q.    And when you said you knew you had to    06:52:44
deal with this, you mean today's deposition?

A.    Yeah.

Q.    I think I asked you earlier, but I'll ask again.  Did you do anything other than meet with counsel and listen to that recording to    06:52:54
prepare for today's deposition?

ATTORNEY ZUCKERMAN:  Objection.

A.    I didn't view that as preparing.

Q.    Did you do anything else to refresh your memory because you knew you had to deal with    06:53:02

Page 299

Richards

the deposition?

ATTORNEY ZUCKERMAN:  Objection.

A.    No.

Q.    Did you review any other materials    06:53:09
beyond what you've testified to today?

A.    No.

Q.    Did anyone in HR tell you that --
following Bill and Tanya speaking to Alex that
your complaint was then closed?                06:53:24

A.    No.

Q.    Did HR say that to you?

A.    I don't know why they would say it
was -- it was closed.  I don't remember that.

Q.    Did they say that they had -- that they  06:53:40
were done addressing your complaint?

A.    I don't remember that being a
conversation.

ATTORNEY IADEVAIA:  We can take a short
break now.                                     06:54:01

ATTORNEY ZUCKERMAN:  Sure.

THE VIDEOGRAPHER:  We are now off the
record.  The time on the video monitor is 6:53
p.m.

(Recess taken from 6:53 to 7:12.)    07:12:56

Page 300

Richards

THE VIDEOGRAPHER:  We are now back on
the record.  The time on the video monitor is
7:12 p.m.

Q.    Ms. Richards, before the break we were    07:13:11
looking at what's been marked as Richards Exhibit
11, the transcript.  And on page 2 of that exhibit
Ms. Poolos says to you, according to the
transcript:  Okay.  That sounds good.  So just
wanted to let you know that I talked --            07:13:27
ATTORNEY ZUCKERMAN:  Sorry, can you
give me a line?  I apologize.  Oh, I'm sorry,
line 5?
ATTORNEY IADEVAIA:  Line 5.
ATTORNEY ZUCKERMAN:  Okay.                 07:13:35
Q.    Line 5 says, Okay.  From Ms. Poolos,
okay.  That sounds good.  So just wanted to let
you know that I talked to Bill and Tanya
yesterday.
Do you see that?                           07:13:45
A.    Yeah.
Q.    Does anything in this transcript,
including the line I just pointed out to you,
refresh your memory as to whether the discussion
that you had with Ms. Poolos was on January 5th or  07:13:55

Page 301

Richards

January 6th?

A.    Yeah, she's clearly saying it was yesterday.

Q.    So is it likely, then, that you had    07:14:11
your phone call with Ms. Poolos that you recorded on January 6th?

A.    I don't remember what day.

Q.    All right.  And if we can just take a look at Exhibit 9 again.    07:14:37

A.    Uh-huh.

Q.    And this is the email chain between you and Ms. Balducci and Ms. Cottone.

A.    I'm sorry --

Q.    Yeah, it's okay.  Exhibit 9.    07:14:55

A.    Uh-huh.

Q.    This is the email chain we talked about earlier in which you talked to Renee Balducci that you had a kind of bizarre update to share with her.  Do you see that?    07:15:11

A.    Yeah.

Q.    Any of the materials we've looked at since refresh your memory as to what you believed was the bizarre update?

ATTORNEY ZUCKERMAN:  Objection.    07:15:23

Page 302

Richards

A.    I don't remember exactly the timeline. There were many different phone calls, all very close together, but I remember telling Renee about Alex telling me that she had talked to HR.  I don't remember when.                                    07:15:44

Q.    You remember telling Renee that you -- that you had had a call with Ms. Poolos in which Ms. Poolos told you she had spoken to Bill and Tanya?                                                07:16:02

A.    I told Renee that at some point.

Q.    Okay.  Is it possible that the bizarre update that you shared with Ms. Balducci on January 5th was that you had become aware that Ms. Poolos had reached out to Scott Bronstein?    07:16:16

ATTORNEY ZUCKERMAN:  Objection.

A.    I don't remember.

Q.    You testified earlier I believe that you became aware that Ms. Poolos and Mr. Bronstein had a call on January 6th, 2022.  Am I correct    07:16:36 about that?

A.    I became aware of when -- that Scott had had a conversation with Alex on January 6th.

Q.    Up to that point in time are there any other conversations that you had with Renee    07:16:59

Page 303

Richards

Balducci that you haven't already testified to?

A.    I --

ATTORNEY ZUCKERMAN:  Objection.

Sorry, go ahead.                              07:17:09

A.    I don't remember all of the calls that I had with Renee and at what point.  I remember speaking to her a couple times over the course of this.

Q.    Is there any calls that you do remember    07:17:22 that you haven't already testified to?

ATTORNEY ZUCKERMAN:  Objection.

A.    None that I can think of.

Q.    Did you have any calls with Tanya Simon about your concerns related to Alex Poolos beyond    07:17:42 what you've already testified to up to the date of this phone call between Alex and Mr. Bronstein?

ATTORNEY ZUCKERMAN:  Objection.

A.    Are you asking me in an open-ended fashion to say some other phone call that I    07:18:02 remember that you have not asked me about?

Q.    Yeah, look, I'm not trying to do -- play any games here, tricks.  I'm trying to make sure that to the extent that you remember phone calls with either Ms. Balducci, Ms. Simon -- and    07:18:16

Page 304

Richards

eventually I'll get to Mr. Owens -- do you recall anything beyond what you've already testified to.

ATTORNEY ZUCKERMAN:  Objection.

Q.    And I want to take it person by person.   07:18:26
So Ms. Balducci is the first person.

A.    Are you asking me about Tanya or Ms. Balducci?

Q.    Ms. Balducci, let's start with her.

A.    I spoke to Renee multiple times   07:18:40
regarding this matter.  We had discussed several substances of those phone conversations.  I don't remember all of the times I talked to her, but I know I talked to her several times as this unfolded.   07:18:57

Q.    Understood.  And my question is do you recall any discussions that you haven't already testified to.

ATTORNEY ZUCKERMAN:  Objection.

A.    We have not yet discussed how I called   07:19:04
her to tell her about the Scott Bronstein/Alex Poolos call.

Q.    Right.  And we'll get to that in just a minute.

Any other conversations that you   07:19:17

Page 305

Richards

haven't testified to yet?

ATTORNEY ZUCKERMAN:  Objection.

Q.    All right.  How did you learn that Ms. Poolos had spoken to Mr. Bronstein?                    07:19:28

A.    We spoke on the phone about it.

Q.    You and Mr. Bronstein?

A.    Yes.

Q.    Okay.  And did you take notes of your discussion with Mr. Bronstein?                    07:19:37

A.    I don't remember taking notes.  It's maybe possible I wrote a couple of things down, but I don't remember specifically.

Q.    And do you have copies of any notes that you took of your conversation with                    07:19:54 Mr. Bronstein in which he told you that he had spoken to Alex Poolos?

ATTORNEY ZUCKERMAN:  Objection.

A.    No.

Q.    Have you looked for any notes?                    07:20:05

A.    Yes.

Q.    And you so far haven't located them?

ATTORNEY ZUCKERMAN:  Objection.

A.    Correct.

Q.    And how long was your call with                    07:20:24

Page 306

Richards

Mr. Bronstein about his call with Ms. Poolos?

A.    I don't know how long it was.

Q.    And was anyone else on the call?

A.    No.                                07:20:34

Q.    And you said he told you about it on January 6th; correct?

A.    Yes.

Q.    Did he say when he had had the call with Ms. Poolos?                      07:20:44

A.    I'm sure he told me when it was.  I don't remember when he said exactly it was.  I remember the contents of the conversation.

Q.    Tell me everything you remember about what Mr. Bronstein said to you during that call.   07:20:57

A.    He told me that she called and told him that I went to HR and that this -- that I was not to be trusted anymore, that I had ruined everything, that I'm some entitled millennial who doesn't want to work, that I'm terrible at my job,  07:21:28 that I went to HR because I can't handle the job.

And I knew -- I knew -- this was the peak of the absolute nightmare that I had lived for so long, and I knew exactly who she was, and I knew -- this is what I was saying when I said I   07:21:59

Page 307

Richards

wanted to be off of her team because I said I was willing to keep working with her but I knew that she would never look at this -- at me going to HR as something that would be a means to have a        07:22:13 better relationship.

I wanted so badly for this nightmare to be over.  This was terrifying because I felt like what on earth am I going to do because she's going to make my life an absolute living hell, more than   07:22:38 it already had been, and she -- I felt like she was punishing me for even thinking that I had the right to speak up about this.

Q.   I'm sorry, I don't want to cut you off, but I also don't want to have you repeat yourself.  07:22:56 What I'm interested -- my question now is what did Mr. Bronstein tell you about the call.  I will give you a chance to tell me what you thought about it.  But if you can tell me what he said.

A.   That's what he told me.  He said she   07:23:10 was saying terrible things about this, that I was terrible at my job and that I went to HR and ruined everything and she couldn't trust me anymore.

Q.   Anything else Mr. Bronstein told you    07:23:29

Page 308

Richards

during your call with him?

A.    This is what I remember.

Q.    Did Mr. Bronstein say anything else
that you can recall?                                    07:23:40

A.    I remember him telling me that he
defended me and said that something to the effect
that I was great at CNN and this was surprising to
hear that they didn't -- he said that they didn't
have problems with me.                                 07:24:06

Q.    Did he say anything else during the
call you and he had?

A.    I remember being very upset about this,
and I asked him like what do I even do with this.
And he said that he told me because he wanted me     07:24:27
to know what she said but he didn't want to be
involved in this.  And I can understand why.

He was asking me to not bring it up
with anyone because, you know -- he didn't want to
get involved.  And I remember saying I would think   07:24:53
about that.  I was just very overwhelmed.  So I
remember him telling me -- I knew that he didn't
want to have to be involved in this any further.

Q.    Just to be clear, he told you that he
did not want to be involved in this any further      07:25:13

Page 309

Richards

during your call?

A.    In relation to me asking him if I should tell someone about this, and he was more hesitant to say -- just for me to know the    07:25:27 information and to not share it.

Q.    Did he ask you not to share the information?

A.    He did.

Q.    And in response to that request, what    07:25:40 did you say to him?

A.    I think I said I would think about it. I don't remember exactly what I said.

Q.    Did you listen in on the call between Scott and Alex?    07:25:54

A.    No.

Q.    You were not on that call?

A.    No.

Q.    Did Mr. Bronstein say anything other than what you've already testified to about --    07:26:04 during the conversation you had with him?

A.    I don't remember if I said, but he told me that he took notes.

Q.    He told you that during this call?

A.    Yeah.    07:26:16

Page 310

Richards

Q.    And what did he say about the notes he took?

A.    I don't remember anything beyond that.

Q.    Anything else he said to you during    07:26:25 this call?

A.    Not that I remember.

Q.    And did you say anything other than what you've already testified to about this call?

A.    Not that I remember.    07:26:31

Q.    And then what happened next in the sequence of events?

A.    I went to sleep, and I woke up at like 5 a.m. or 4 a.m., and I was so overwhelmed.  And I know Scott had asked me not to say anything about    07:26:51 it, but I didn't know how I was supposed to work with this person whose immediate reaction to me even saying something about how awful she had treated me was to go to my job reference and say terrible things about me.    07:27:17

It felt like a punishment immediately. And I felt like I had -- I'm sorry.  I felt like I had no other choice but I felt bad that I had to but I reached out to her and I had to tell her I needed to talk to her immediately when it became a    07:27:40

Page 311

Richards

reasonable hour.  It was very early.  I just sat up thinking about it.  I reached out early and asked to talk to her.

Q.    And how did you reach out to Renee?    07:27:51

A.    I emailed her, I believe.

Q.    Did you send her a text?

A.    I either texted her or I emailed her. I don't remember.

Q.    Do you have a copy of the text if you    07:28:00 sent it by text?

A.    I don't know.

Q.    You don't know?

      Okay.  And this was on January 7th that you reached out to Ms. Balducci?    07:28:12

A.    Yes.  I think I emailed her.

Q.    Do you know if Ms. Balducci was in the office that day?

A.    She was out of the office.

Q.    Where was she, do you know?    07:28:24

A.    I believe she was on vacation.

Q.    Was she skiing?

A.    Yeah, that's right, she was skiing.

Q.    Did she tell you where she was skiing?

A.    I don't remember.  I don't know if she    07:28:35

Page 312

Richards

did.

Q.   Tell me about the discussion that you had with Ms. Balducci.

A.   I called her and I -- this is a       07:28:48
recording that you have now.

Q.   Okay.  But I'm asking you to tell me about the discussion, please.

A.   I called her to tell her that I had spoken to Scott and that -- he told me that Alex       07:29:06 had reached out to him and she said all of these things that I went to HR and that I ruined everything and that I'm an entitled millennial and she can't trust me.

Q.   Anything else you said to Ms. Balducci?   07:29:31

A.   I remember being very distressed and telling her about it and wanting to know what to do about it.

Q.   What did Ms. Balducci say in response to the concerns you raised?       07:29:50

A.   She said I needed to speak to Bill, let him know.

Q.   Did she say anything else?

A.   She said that I needed to tell Bill about it so that he could be made aware and that       07:30:01

Page 313

Richards

she was also at some point going to talk to Bill about it.

Q.    Anything else?

THE REPORTER:  I'm sorry, I didn't hear an answer.  Anything else?

THE WITNESS:  I didn't really say anything.

Q.    Anything else you can recall about that discussion beyond what you testified to?                    07:30:27

A.    I think I covered -- I think I covered it.

Q.    You said that you recorded this discussion with Ms. Balducci?

A.    Yes.                                              07:30:53

Q.    Why did you record it?

A.    Because I wanted to.

Q.    Did you tell Ms. Balducci you were recording the discussion?

A.    No.                                               07:31:01

Q.    Any other times you recorded Ms. Poolos in the recordings, did you tell her that you were recording the discussion?

A.    No.

Q.    When you say you wanted to record it,          07:31:13

Page 314

Richards

why did you want to record it, the conversation with Ms. Balducci?

A.    Because I knew that it was an important conversation.                                    07:31:20

Q.    Did you tell Mr. Bronstein that you were going to call Renee Balducci and report this?

A.    No.

Q.    Did you tell Mr. Bronstein that you were going to record your discussion with        07:31:32 Ms. Balducci?

A.    No.

Q.    At this point in time were you upset because you felt that CBS had not taken sufficient steps in connection with your complaint?        07:31:51

ATTORNEY ZUCKERMAN:  Objection.

A.    I was upset that Alex had gone to this extent.

Q.    What do you mean by that?

A.    That she had called someone outside of    07:32:06 the company, my own job reference, to try and sully my name.

Q.    Before you found out about the phone call between Ms. Poolos and Mr. Bronstein, were you upset at CBS's reaction to the complaint that    07:32:26

Page 315

Richards

you had made?

ATTORNEY ZUCKERMAN:  Objection.

A.    As I have said earlier today, I was willing to continue working with Alex; and I along 07:32:38 the way expressed my concern at her ability to do that and my concern about working together, but I was willing to try.

Q.    Right.  I understand that.  But how did you feel about being asked to try? 07:32:53

ATTORNEY ZUCKERMAN:  Objection.

A.    That's how I felt.

Q.    That you were skeptical that it would work but you were willing to do it?

A.    Yes, that's what I said.  That's your 07:33:06 summary of what I said.

Q.    Well, tell me.  Just tell me, just to make sure we get it right.

A.    I was -- yes, I was not hopeful that it would work out well, but I was willing to try. 07:33:19

Q.    During the call that you had with Renee Balducci -- strike that.

When is the last time you listened to that recording of your call with Ms. Balducci?

A.    I listened to it this morning. 07:33:38

Page 316

Richards

Q.    Did you listen to it yesterday when you were meeting with counsel?

A.    No.

Q.    And is that recording on your work phone?                                                    07:33:47

A.    Yes.

Q.    And is it in the voice memos file that you talked about earlier?

A.    Yes.                                                                                          07:33:57

Q.    And has it been in that voice memos file since you made the recording in January of 2022?

A.    Yes.

Q.    I know you didn't tell Ms. Balducci you were recording her.  Did you ever tell her at some later point that you had recorded that discussion?                                              07:34:18

A.    No.

Q.    Did you tell anyone at CBS that you had recorded that discussion with Ms. Balducci?          07:34:28

A.    I don't think so.

Q.    Okay.  During the conversation with Ms. Balducci, did you reference notes that you had of your discussion with Mr. Bronstein?

ATTORNEY ZUCKERMAN:  Objection.                                                                    07:34:45

Page 317

Richards

A.    In the recording of the call, I referenced that I had notes.  I do not remember -- sitting here today, having notes, and I do not have notes.                                    07:34:58

Q.    Were you being truthful during your conversation with Ms. Balducci?

A.    Yes.

Q.    Was there any information during that call that you had with Ms. Balducci that was     07:35:08 incorrect?

A.    No.

Q.    So is it likely the case then that you referenced notes that you in fact did have notes at the time?                                          07:35:22

ATTORNEY ZUCKERMAN:  Objection.

A.    If I said I had notes at the time, I would have had notes at the time.  As I sit here three years later, I don't remember having notes of it.                                              07:35:35

Q.    Did you tell Ms. Balducci during this call that Scott Bronstein was a friend of yours?

A.    I did say that.

Q.    Was that truthful at the time you said it?                                                  07:35:52

Page 318

Richards

A.   Yeah, he was a work -- a friend, a former colleague, as I also described him.

Q.   But you didn't call him a work friend during that call, did you?   07:35:59

A.   Yeah, I said friend.

Q.   During that call with Ms. Balducci, did you reference -- the one that you recorded -- did you reference the fact that you had previously told Ms. Balducci that you had been in touch with   07:36:14 Mr. Bronstein about Ms. Poolos?

ATTORNEY ZUCKERMAN:  Objection.

A.   I mentioned some sort of prior conversation.

Q.   And you know that because you listened   07:36:29 to the recording; correct?

A.   Correct.

Q.   And what conversation were you referring to?

A.   I don't remember exactly what I'm   07:36:38 referencing there.

Q.   Were you referencing that you had told Ms. Balducci that you were aware that Ms. Poolos had been in touch with Mr. Bronstein before you found out about the phone call?   07:36:56

Page 319

Richards

ATTORNEY ZUCKERMAN:  Objection.

A.    I don't remember.

Q.    Is it possible?

ATTORNEY ZUCKERMAN:  Objection.    07:37:01

A.    I don't remember.

Q.    After you disclosed Mr. Bronstein and Ms. Poolos's phone call to Renee Balducci, what happened next?

A.    Renee told me that I needed to tell    07:37:30 Bill.

Q.    So did you tell Mr. Owens?

A.    I did.  I emailed him that I needed to talk to him.

Q.    And did you speak to him by phone?    07:37:41

A.    I did.

Q.    And how long was that call?

A.    I don't remember how long that call was.

Q.    And who else was on the call?    07:37:47

A.    No one.

Q.    Your understanding, it was just you and Mr. Owens; correct?

A.    That is my understanding.

Q.    Did you record that discussion?    07:37:54

Page 320

Richards

A.    No.

Q.    How come?

A.    I was focused on having the discussion with Bill, and I didn't record it.                    07:38:01

Q.    Okay.  And during your discussion with Mr. Owens, what did you say -- did you talk about your phone call with Mr. Bronstein?

A.    Yes.

Q.    And what did you say about it?                    07:38:14

A.    I told him that I had learned that Alex had reached out after talking to -- after being spoken to by Bill and Tanya that she had reached out to my former work colleague and job reference, Scott Bronstein, to say terrible things about me,                    07:38:38 that I was an entitled millennial and that I had gone to HR and I had ruined everything.

And I told him that I was willing to work with her but at this point I had no idea how I could possibly work with her given that her                    07:39:06 initial reaction to being spoken to by Bill and Tanya is to run outside of the company and speak to the place that I used to work at.

In my perception this was her vindictively trying to ruin me and my career.                    07:39:26

Page 321

Richards

Q.   You said that all to Mr. Owens?

A.   Yes.

Q.   And your understanding of the phone call between Ms. Poolos and Mr. Bronstein was based on what Mr. Bronstein had said to you; correct?     07:39:39

A.   Yes.

Q.   It wasn't based on anything else at that point; correct?     07:39:47

A.   Correct.

Q.   Was there ever a time where you saw Mr. -- you mentioned Mr. Bronstein said he had notes.  Did you ever see those notes?

A.   No.     07:39:58

Q.   Did you ever see any text exchanges between Mr. Bronstein and Ms. Poolos?

A.   No, I don't think so.

Q.   What did Mr. Owens say to you during the call you had that you were just testifying to?     07:40:18

A.   He was mortified that this happened. He felt terrible for what I was going through.  He said that I should stop speaking to her and that I should reach out to him with any questions or issues or anything along the way.     07:40:44

Page 322

Richards

He said that more people would need to get involved at this point and that -- I told him, all I ever wanted was to just work here and have a positive experience, and I've been trying to do that all along.

And he complimented that I had been doing a good job and that he said that it was -- that even Alex had said that I had been doing a great job. And he said that he was going to make it right for me and that it was going to be okay. He was very supportive.

Q. Anything else Mr. Owens said during that call?

A. I don't remember anything else, I don't think.

Q. Do you remember you saying anything else during that call, besides what you've testified to?

A. I don't -- I don't think so.

Q. Did you have a conversation with Renee Balducci at any point about her speaking to Scott Bronstein?

A. Yes, at some point Renee asked me if she could -- if I could put her in touch with

07:41:05

07:41:21

07:41:44

07:41:56

07:42:23

Page 323

Richards

Scott.

Q.    Was it during the call that you recorded or a different call?

A.    A different call.                                07:42:30

Q.    Was it a call or was it in writing that she asked you?

A.    I don't remember.  I think I spoke to her on the phone about it.  I know I had follow-up conversations with her and follow-up emails with    07:42:54 her.  I know that she one way or another asked me to put her in contact with Scott Bronstein.

Q.    Did you text with her after you learned about the phone call between Alex and Scott?

A.    I don't remember what way I                      07:43:12 communicated with her.

Q.    Going back to the call you had with Mr. Owens that you were just testifying to, did you take notes of that discussion?

A.    No.                                              07:43:23

Q.    And what did you do after Ms. Balducci asked you to put her in touch with Mr. Bronstein?

A.    I let Scott know that I was very sorry but I needed to tell them that this happened.  And I felt -- felt bad about that.  But I told him,     07:43:46

Page 324

Richards

and I asked him if he would be willing to talk to them about it.  And he said that he was.

Q.    And how did you communicate this to Mr. Bronstein?                                          07:44:02

A.    On the phone.

Q.    You called him?

A.    I called him or he called me after I asked him if he could talk.  I don't remember exactly when placed the phone call but...          07:44:13

Q.    Did you text him about talking?

A.    I don't remember.

Q.    And did you make notes of your conversation with Mr. Bronstein about whether he would talk to -- whether he would talk to            07:44:26 Ms. Balducci?

A.    No.

Q.    Anything about that discussion beyond what you've already testified, meaning the discussion between you and Mr. Bronstein about him  07:44:37 talking to Ms. Balducci?

A.    I don't remember anything else.

Q.    Okay.  Did you at some point learn that Ms. Poolos had been suspended?

A.    Yes.                                                07:45:00

Page 325

Richards

ATTORNEY ZUCKERMAN:  Objection.

Q.    How did you learn that?

A.    I believe Renee informed me.

Q.    What did she tell you?                    07:45:07

A.    She let me know that Alex had been suspended.

Q.    Did she say anything else?

A.    I don't remember everything she said about it.  I just remember being informed about    07:45:20 that happening.

Q.    Do you remember anything else about your discussion with Ms. Balducci regarding the suspension?

A.    I remember that I asked her, like, what    07:45:28 was going to happen with me.  I was asking questions about who I was going to work with and what I needed to do.

Q.    And who were you asking those questions of?                                              07:45:44

A.    Renee.

Q.    Did you ask those questions of Ms. Simon?

A.    Yes, I also talked to Tanya.

Q.    Did you talk to Bill with those          07:45:51

Page 326

Richards

questions?

A.    I talked to Bill after -- I don't remember exactly when I talked to him, but I had a conversation with Bill at some point after that 07:46:03 conversation I had with him, alerting to him about the Scott Bronstein phone call.  I had spoken with Bill another time about how to move forward.

Q.    The question about how to move forward, was that after Ms. Poolos had been suspended? 07:46:27

A.    I believe so.

Q.    Tell me about the conversation you had with -- it sounds like you -- just to confirm, you had a conversation with Ms. Simon after you learned about the Scott Bronstein call but before 07:46:43 you learned that Ms. Poolos had been suspended; is that right?

            ATTORNEY ZUCKERMAN:  Objection.

A.    Sorry, can you say that again?

Q.    Sure.  Did you have a conversation or 07:46:53 conversations with Ms. Simon on January 7th about what was going to happen to you before you found out that Ms. Poolos was being suspended?

            ATTORNEY ZUCKERMAN:  Objection.

A.    I know I talked to Tanya at some point 07:47:08

Page 327

Richards

about what I would need to do, because work had to continue.  I don't know what day that would have been.

Q.    And did you have any -- strike that.          07:47:17

On January 7th, beyond what you've testified to, do you recall any other discussions with Renee Balducci?

A.    I know that I talked with her about needing to connect her with Scott.  I don't          07:47:41 remember other conversations on that day.

Q.    With Ms. Balducci?

A.    With Ms. Balducci.

Q.    And how did you communicate with Ms. Balducci about connecting her with          07:47:52 Mr. Bronstein?

A.    Either over email or over the phone or over text.  I don't remember.  It could have been a collection of all three of those things.

Q.    Other than what you've testified to, do          07:48:09 you recall any discussions with Ms. Simon?

A.    When?

ATTORNEY ZUCKERMAN:  Objection.

Q.    On the 7th, sorry, on January 7th.

A.    I remember speaking to Tanya about what          07:48:21

Page 328

Richards

I would need to do going forward at that point.  I don't remember if that happened on January 7th or the following week or that weekend.

Q.   And what do you recall about that    07:48:33
discussion, whenever it took place?

A.   At some point I believe Tanya or Lesley let me know that Shari was going to start working on the story, and so they reached out to let me know that that was happening.  I don't know --    07:48:56
remember what day that was.

Q.   And what story are you referring to?

A.   I'm referring to what ultimately was titled the American hostages story and was about Danny Fenster.    07:49:13

Q.   At some point did you learn that Ms. Poolos had been fired?

A.   Yes.

Q.   How did you learn that?

A.   I believe Renee told me.    07:49:25

Q.   What did she tell you?

A.   That she had been fired.

Q.   At any point did you learn about -- strike that.

Did Renee ever tell you that after you    07:49:40

Page 329

Richards

had disclosed the call with Scott Bronstein that HR was conducting an investigation?

A.   I don't remember.

Q.   Did anyone tell you at CBS that there was an investigation being conducted after you disclosed the phone call between Alex and Scott Bronstein?

A.   Yes.  I remember being told that there would be an investigation.

Q.   And who told you that?

A.   I don't remember who told me that.

Q.   What did they say about the investigation?

A.   Simply that there was going to be an investigation.  I knew very little about -- about what was going on.

Q.   Did you have any further conversations with Ms. Balducci between the time that Ms. Poolos was suspended and you finding out that Alex had been fired or was going to be fired?

A.   I don't remember having -- maybe I reached out to check in for an update at some point, but I don't remember.

Q.   Did you communicate with anyone outside

Page 330

Richards

of 60 Minutes when you learned -- did you communicate with anyone outside of 60 Minutes about Ms. Poolos being suspended?

A.    I would have told my family and friends    07:51:01 that knew I was going through a hard time.

Q.    Did you tell Scott Bronstein?

A.    I don't remember, but I imagine I would have said that she had been suspended at some point.    07:51:19

Q.    To Mr. Bronstein?

A.    Yes.

Q.    Did you text with him about it?

A.    I don't remember.

Q.    And did anyone tell you what the    07:51:28 results were of the investigation that CBS told you they were conducting?

A.    I remember being told that she was fired.

Q.    Were you told anything else beyond that    07:51:40 she was fired?

A.    I don't remember.

Q.    Were you told the reason or reasons why she was fired?

A.    I don't remember.    07:51:47

Page 331

Richards

Q.    And you said that Renee Balducci told you that Ms. Poolos had been fired; correct?

ATTORNEY ZUCKERMAN:  Objection.

A.    I believe she's the one who did, but I   07:51:57 don't know for certain that it was Renee.

Q.    And when you talked about Ms. Poolos being fired with whomever, whether it was Renee or somebody else, did anyone disclose to you the reason or reasons why Ms. Poolos had been fired?   07:52:13

ATTORNEY ZUCKERMAN:  Objection.

A.    No, I don't remember.

Q.    Did you tell anyone outside of CBS that Ms. Poolos had been fired?

ATTORNEY ZUCKERMAN:  Objection.   07:52:29

A.    Will you ask that again?

Q.    Sure.  Did you tell anyone outside of CBS that Ms. Poolos had been fired?

A.    I would have told my family and friends that knew I was going through this.   07:52:38

Q.    Anybody else?

A.    Outside of...

Q.    CBS.

A.    Not that I remember.

Q.    Did you tell Mr. Bronstein that   07:52:53

Page 332

Richards

Ms. Poolos had been fired?

A.    Oh, yes, at some point I did.

Q.    And how did you communicate with him?

A.    I don't remember how I told him that.    07:53:00

ATTORNEY IADEVAIA:  Why don't we take a short break, because we're almost done.

THE VIDEOGRAPHER:  We are now off the record.  The time on the video monitor is 7:52 p.m.    07:53:14

(Recess taken from 7:52 to 8:05.)

THE VIDEOGRAPHER:  We are now back on the record.  The time on the video monitor is 8:05 p.m.

Q.    Okay.  Just a few more questions,    08:06:10 Ms. Richards.

You had testified earlier that after -- on January 7th after you spoke to Ms. Balducci you had a conversation with Bill Owens by phone; correct?    08:06:25

A.    Yes.

Q.    During that conversation with Mr. Owens, did you disclose to him that you were aware that Alex and Scott had corresponded before the phone call?    08:06:38

Page 333

Richards

A.    I don't remember.

Q.    Moving on to a different topic, how come as of this point you have not given your counsel the recordings that you made of your conversations with Ms. Poolos?    08:06:56

A.    I forgot that I had them.  I remembered that I had the one when she called me after being spoken to by HR because I remember that so specifically.  But I forgot that I had been recording conversations after I reported to HR my complaint.    08:07:19

Q.    And the conversation that you referred to -- that you recorded of you and Alex, a few times you have said she called you after speaking to HR.    08:07:39

Is it correct that HR talked to her at that time?

ATTORNEY ZUCKERMAN:  Objection.

A.    Sorry, what I mean by that is that Bill and Tanya had talked to her.    08:07:49

Q.    Okay.

A.    That's what I mean.

Q.    Okay.  Understood.  Thank you.

Did HR -- did anyone in HR ever tell    08:07:56

Page 334

Richards

you that the investigation that they were

conducting in connection with your complaints --

or -- complaint or complaints should be kept

confidential?                                       08:08:14

A.    I don't remember.

Q.    Did HR ever instruct you not to discuss

your concerns about Alex with anyone else?

A.    I don't remember.

Q.    Did HR ever tell you not to discuss any  08:08:31

investigation it was conducting with anyone else?

A.    I don't remember.

Q.    Were there any discussions with

Ms. Balducci that you can recall as you sit here

today about Ms. Poolos that you have not already   08:09:00

testified to?

ATTORNEY ZUCKERMAN:  Between her and

Ms. Balducci?

ATTORNEY IADEVAIA:  Yeah.

A.    I believe we have discussed everything   08:09:08

that I remember talking to Renee about.  The large

substantive points have been discussed.  They

happened over different phone conversations over

different days that we have discussed.  And as I'm

thinking about it, I don't remember anything else   08:09:46

Page 335

Richards

that we haven't discussed.

Q.    And beyond what you've testified to today, are there any discussions you recall as you sit here now that you had with Tanya Simon about 08:10:04 Ms. Poolos or your concerns about her?

ATTORNEY ZUCKERMAN:  Objection.

A.    I believe we have discussed all of the substantive conversations I remember having with Tanya over the course of this.    08:10:34

Q.    And the same question as it relates to Bill Owens?

A.    Yes, I believe we've discussed all of the substantive conversations that I had with him regarding.    08:10:51

Q.    With Mr. Owens too?

A.    Yeah, with him, Mr. Owens, about the...

Q.    And are there any discussions that you had with Scott Bronstein that you have not already testified to as it relates to Ms. Poolos?    08:11:09

ATTORNEY ZUCKERMAN:  Objection.

A.    I believe I've been asked about and talked about the conversations that I remember having with him.

Q.    With Mr. Bronstein?    08:11:28

Page 336

Richards

A.    With Mr. Bronstein.

ATTORNEY IADEVAIA:  So I don't have any additional questions at this time, but I want to say for the record that we reserve our          08:11:41 right to recall the witness based on the production of -- based on the production of a recording that we received today as well as the witness's testimony that there are additional recordings that have not been          08:11:59 turned over to counsel.

ATTORNEY ZUCKERMAN:  I have no questions.

THE VIDEOGRAPHER:  Okay.  That concludes the testimony today of Ms. Collette  08:12:15 Richards.  We are now off the record.  The time on the video monitor is 8:11 p.m.

(Time noted:  8:11 p.m.)

_____

COLLETTE RICHARDS

Subscribed and sworn to before me this ___ day of _____ 2025.

_____

Notary public

Page 337

C E R T I F I C A T E

STATE OF NEW YORK          )

                          : ss.

COUNTY OF NEW YORK         )

I, LAURIE A. COLLINS, a Registered Professional Reporter and Notary Public within and for the State of New York, do hereby certify:

That COLLETTE RICHARDS, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 6th day of March 2025.

LAURIE A. COLLINS, RPR

Page 338

- - - - - - - - - - I N D E X - - - - - - - - - - -

WITNESS:            EXAMINATION BY:            PAGE

Collette            Attorney Iadevaia              6

Richards

- - - - - - - - - E X H I B I T S - - - - - - - - -

RICHARDS NO.        DESCRIPTION            PAGE

Exhibit 1, résumé of Richards,            55

Bates-stamped CBS 7240

Exhibit 2, text messages, Bates-stamped   123

Bronstein 6

Exhibit 3, email with attachment,         218

Bates-stamped CBS 733 through CBS 7747

Exhibit 4, emails, Bates- stamped CBS     250

7754

Exhibit 5, emails with attachment,        251

Bates-stamped CBS 2609 through 2619

Exhibit 6, emails with attachment,        253

Bates-stamped CBS 7755 through 7769

Exhibit 7, emails, Bates- stamped CBS     259

772 to 73

Exhibit 8, emails, Bates- stamped CBS     263

7770 to 7771

Page 339

Exhibit 9, emails, Bates- stamped CBS        277
7809 to 7810

Exhibit 10, emails, Bates- stamped CBS       292
3155

Exhibit 11, transcript of discussion         294
between Richards and Poolos,
Bates-stamped CBS 7965 through 7968

Page 340

- - - - - - - **E R R A T A   S H E E T** - - - - - -

CASE:  Poolos v. Paramount Global
DEPOSITION DATE:  February 25, 2025
DEPONENT:  Collette Richards

PAGE/LINE(S)           CHANGE                    REASON

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

_____/_____/_____/_____

                    _____
                         COLLETTE RICHARDS
SUBSCRIBED AND SWORN TO BEFORE ME
THIS_____DAY OF_____, 2025.


_____  _____
 NOTARY PUBLIC           DATE COMMISSION EXPIRES

Page 341

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X
ALEXANDRA POOLOS,

PLAINTIFF,

-against-     Case No.:
1:23-cv-08896-GHW-HJR

PARAMOUNT GLOBAL, ET AL.,
DEFENDANT.
-------------------------------------------X

DATE: April 3, 2025
TIME: 6:16 P.M.

CONTINUED VIDEOTAPED DEPOSITION
of the Non-Party Witness, COLLETTE
RICHARDS, taken by the respective parties,
pursuant to a Subpoena and to the Federal
Rules of Civil Procedure, held at the
of6ices of Davis Wright Tremaine, LLP, 1251
Avenue of the Americas, 21st Floor, New
York, New York 10020, before Karyn
Chiusano, a Notary Public of the State of
New York.

Page 342

A P P E A R A N C E S:

VLADECK RASKIN & CLARK P.C.
   Attorneys for the Plaintiff
   ALEXANDRA POOLOS
   111 Broadway ~ Suite 1505
   New York, New York 10006
   BY: JEREMIAH IADEVAIA, ESQ.
   jiadevaia@vladeck.com

DAVIS WRIGHT TREMAINE, LLP
   Attorneys for the Defendants
   PARAMOUNT GLOBAL, ET AL.
   1251 Avenue of the Americas ~ 21st Floor
   New York, New York 10020
   BY: LYLE ZUCKERMAN, ESQ.
       MICHAEL LYNCH, ESQ.
   lylezuckerman@dwt.com
   michaellynch@dwt.com

ALSO PRESENT:
   CHRISTOPHER MANCINI, Videographer
   JAMES BAGLEY
   ALEXANDRIA POOLOS
   BRANDON WHITE
            *        *        *

**Page 343**

**F E D E R A L   S T I P U L A T I O N S**

IT IS HEREBY STIPULATED AND AGREED by and between the counsel for the respective parties herein that the sealing, filing and certification of the within deposition be waived; that the original of the deposition may be signed and sworn to by the witness before anyone authorized to administer an oath, with the same effect as if signed before a Judge of the Court; that an unsigned copy of the deposition may be used with the same force and effect as if signed by the witness, 30 days after service of the original & 1 copy of same upon counsel for the witness.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to form, are reserved to the time of trial.

*   *   *   *

Page 344

* COLLETTE RICHARDS *

THE VIDEOGRAPHER:  The time is 6:16 P.M.

We are now on the record.

MR. IADEVAIA:  Great.

EXAMINATION BY

MR. IADEVAIA:

Q.    Good evening, Ms. Richards.

During -- this is the second day of your deposition.  During the first day, we went through some basic ground rules.

Do you generally remember those?

A.    I think so, yes.

Q.    Okay.  And you understand -- am I correct, that you understand that you are still under oath, as you were during the first day of your deposition?

A.    Yes.

C O L L E T T E    R I C H A R D S, called as a witness, having been previously duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

Page 345

* COLLETTE RICHARDS *

Q.    Have you spoken to anyone, not including counsel, about the first day of your deposition?

A.    No.

Q.    Did you discuss the first day of your deposition with Bill Owens?

A.    No.

Q.    Did you discuss your first day of deposition with Renee Balducci?

A.    No.

Q.    Did you discuss the first day of your deposition with Scott Bronstein?

A.    No.

Q.    And are you aware that Mr. Bronstein had his deposition taken in this matter?

A.    Yes.

Q.    And did you speak to Mr. Bronstein about his deposition?

A.    No.

Q.    And now, your --

      MR. IADEVAIA:   Strike that.

Q.    Are you -- is there any reason that you're aware of that you'd be unable

Page 346

* COLLETTE RICHARDS *

to testify truthfully and accurately today?

A.    No.

Q.    Your counsel has produced to my -- my firm a total of 11 audio recordings that we understand that -- that you made in connection with events relevant to this case.

Is it your understanding that there's 11 audio recordings --

MR. ZUCKERMAN:  Objection.

Q.    -- that you made?

MR. ZUCKERMAN:  Sorry.

A.    I know that there were recordings that were made.

Q.    You just don't know the total number?

A.    I don't know the total number.

Q.    Okay.  And are you aware of who is -- who are a part of -- which person is on the recordings that were produced in this case?

A.    I'm sorry.  Could you clarify that question?

Q.    Sure.

Page 347

* COLLETTE RICHARDS *

I'm asking who was captured on the recordings that were produced in this case that you made?

Do you know?

A.    Yes.

Q.    And who?

A.    Alexandria Poolos and Renee Balducci.

Q.    And there's just one recording of a conversation between you and Ms. Balducci; is that right?

A.    Yes.

Q.    And the other recordings are between you and Ms. Poolos; correct?

A.    Correct.

Q.    And I think we're gonna mark for the record what was produced by your lawyers placeholder documents.

And for each of these placeholder documents, there's a recording that's associated with this.

MR. IADEVAIA:  Please start with CBS 6787, please.

And we will start with Richards

Page 348

* COLLETTE RICHARDS *

12.

I think we left off at 11, please.

(Counsel confer sotto voce.)

(Whereupon, Audio file, Bates CBS 6787 was marked as Richards Exhibit 12 for identification as of this date by the Reporter.)

MR. IADEVAIA:  What's been marked as Richards -- oh, I'm sorry.

I'll wait for you.

You can give it to the witness.

What's been marked as Richards Exhibit 12 is a one-page document, entitled CBS 6787.

It's a cover page with a title "Alex After HR."

And it says:

("MPEG-4 Audio File Enclosed.")

If we can mark as Richards Exhibit 13, please:  CBS 8585.

(Whereupon, Audio file, Bates CBS 8585 was marked as Richards Exhibit 13 for identification as of

Page 349

* COLLETTE RICHARDS *

this date by the Reporter.)

MR. IADEVAIA:  What has been marked as Richards Exhibit 13 is a one-page cover page:  CBS 8585, "PLACEHOLDER" with the title:

"(Acworth 4.m4a.)"

And there is a recording that is associated with it.

If we can mark, as Richards Exhibit 14, CBS 8586, please.

(Whereupon, Audio file, Bates CBS 8586 was marked as Richards Exhibit 14 for identification as of this date by the Reporter.)

MR. IADEVAIA:  What's been marked as Richards Exhibit 14 is a one-page cover page, Bates stamped CBS 8586 with a title:

"PLACEHOLDER (Acworth 5.m4a)."

Let's do 8587.

Thanks.  Thank you.

(Whereupon, Audio file, Bates CBS 8587 was marked as Richards Exhibit 15 for identification as of

Page 350

* COLLETTE RICHARDS *

this date by the Reporter.)

MR. IADEVAIA:  What's been marked as Richards Exhibit 15 is a one-page document:

"PLACEHOLDER (Acworth 6.m4a)," CBS 8587.

MR. IADEVAIA:  Let's do 8588, please.

(Counsel confer sotto voce.)

MR. IADEVAIA:  Did I give you this one?

What's -- oh, I'm sorry.

(Whereupon, Audio file, Bates CBS 8688 was marked as Richards Exhibit 16 for identification as of this date by the Reporter.)

MR. IADEVAIA:  What's been marked as Richards Exhibit 16 is a one-page document bearing Bates Number CBS 8588.

Stating "PLACEHOLDER (Dunlavin Dr 2.m4a)."

If we can mark 8589.

(Whereupon, Audio file, Bates

Page 351

* COLLETTE RICHARDS *

CBS 8589 was marked as Richards Exhibit 17 for identification as of this date by the Reporter.)

MR. IADEVAIA:  Okay.  What has been marked as Exhibit 17 is a one-page document bearing Bates Number CBS 8589, with the title:

"PLACEHOLDER (Dunlavin Drive)," or "(Dr 3.m34a)" [sic].

If we can mark 8590.

(Whereupon, Audio File, Bates CBS 8590 was marked as Richards Exhibit 18 for identification as of this date by the Reporter.)

MR. IADEVAIA:  What's been marked as Richards Exhibit 18 is a one-page document, CBS 8590, that states:

"PLACEHOLDER (Dunlavin Dr 4.m4a)."

If we can mark 8591.

(Whereupon, Audio file, Bates CBS 8591 was marked as Richards Exhibit 19 for identification as of

Page 352

* COLLETTE RICHARDS *

this date by the Reporter.)

MR. IADEVAIA:  What's been marked as Richards Exhibit 19 is a one-page document, CBS 8591, that states:

"PLACEHOLDER (Dunlavin Dr 5.m4a)."

If we can mark CBS 8592.

(Whereupon, Audio file, Bates CBS 8592 was marked as Richards Exhibit 20 for identification as of this date by the Reporter.)

MR. IADEVAIA:  What's been marked as Richards Exhibit 20 is a one-page document, CBS 8592, with a "PLACEHOLDER (Dunlavin Dr 11.m4a)."

If we can do 8593, please.

(Whereupon, Audio file, Bates CBS 8593 was marked as Richards Exhibit 21 for identification as of this date by the Reporter.)

MR. IADEVAIA:  What's been marked as Richards Exhibit 21 is a one-page document bearing Bates

Page 353

* COLLETTE RICHARDS *

Number CBS 8593, which states:

"PLACEHOLDER (The Baseball Center NYC 2.m4a)."

And lastly, if we can mark CBS 8540.

(Whereupon, Audio file, Bates CBS 8540 was marked as Richards Exhibit 22 for identification as of this date by the Reporter.)

MR. IADEVAIA:  And what's been marked as Richards Exhibit 22 is a one-page document bearing Bates Number CBS 8540, states:

"PLACEHOLDER (The Baseball Center NYC.m4a)."

Q.    Ms. Richards, if you can look at the first exhibit that was given to you, Exhibit 12, please.

A.    Okay.

Q.    And that exhibit says:

"Alex After HR."

Is -- is that the name of a recording that you made of a conversation you had with Ms. Poolos?

Page 354

* COLLETTE RICHARDS *

A.    Yes.

Q.    Okay.  And do you know how it got the title "Alex After HR"?

A.    I made that the title.

Q.    Okay.  And when did you make it; around the time that you made the recording or more recently?

A.    I don't remember.

Q.    All right.

And if we look at Richards -- and -- and exhibit -- the recording, "Alex After HR," that's a recording that is stored on your work phone; is that correct?

A.    Yes.

Q.    And it's stored in the "Voice Memos" app on your work phone?

A.    I believe that's what the app is called:  Is "Voice Memos".

Q.    And it's still currently there; correct?

A.    Yes.

Q.    And if we can take a look at Exhibit 13, please.

Exhibit 13 says the name of the

Page 355

* COLLETTE RICHARDS *

file called "Acworth."

Did I say that correctly?

A.    Yes.

It's Acworth.

Q.    And it's Acworth 4.

It -- do you know -- did you assign the title "Acworth 4" to this recording?

A.    The app automatically generates a title based on location.

Q.    Okay.  And where is Acworth?

A.    In Georgia.

Q.    And at the time that you made this recording, were you in Georgia?

A.    Yes.

Q.    And do you know approximately when you made the -- the recording?

A.    I don't know the date of it.

Q.    Do you know the month?

A.    I don't know.

Q.    Was it December, 2021, when you were at home for the holidays in December of 2021?

A.    I don't remember what it was,

Page 356

* COLLETTE RICHARDS *

based looking at just this title.

Q.    Okay.  And did you make recordings of Ms. Poolos before December of 2021?

A.    I don't think so.

Q.    And did you make recordings of -- of a conversation that you had with Ms. Poolos after January of 2022?

A.    Can you -- can you rephrase that?

Q.    Sure.

I'm asking whether you made recordings of conversations you had with Ms. Poolos after January of 2022.

A.    After January, as in, like, that whole month?

Q.    Yeah.

After the month of January.

A.    No.

Q.    So, all the recordings that you have of conversations with Ms. Poolos were made sometime between December of 2021 and January of 2022?

A.    Yes.

Page 357

* COLLETTE RICHARDS *

Q.    Okay.  All right.

If we take a look at Exhibit 14, please.

It has that same title:

"Acworth."

And then instead of 4, it's the number 5.

So, is it your understanding that this recording was made while you were in Acworth, Georgia?

A.    Yes.

Q.    Okay.  And do you recognize this title as the title of one of the recordings you have of a conversation with Ms. Poolos?

A.    Yes.

Q.    If we take a look at Exhibit 15, please.

And the document says:

"Acworth 6."

Does that mean that this was a recording that you made while you were in Acworth, Georgia?

A.    Yes.

Page 358

* COLLETTE RICHARDS *

Q.    And is this also a recording you made of a conversation you had with Ms. Poolos?

A.    Yes.

Q.    Okay.  If we take a look at Exhibit 16, please.

It says:

"Dunlavin Dr 2."

What is the reference to "Dunlavin," if you know?

A.    That is the address:  Dunlavin Drive.

Q.    Dunlavin Drive.

And were you at -- on Dunlavin Drive at the time that you made this recording?

A.    Yes.

Q.    And do you recognize this as the title of a recording that you made of a conversation with Ms. Poolos?

A.    Yes.

Q.    Okay.  And if we can take a look at 17, please.

And it says:

Page 359

* COLLETTE RICHARDS *

"Dunlavin Dr 3."

Is it your understanding that at the time that you made this recording you were on Dun- -- Dun- -- Dunlavin Drive?

A.    Yes.

Q.    And is this a title you recognize as -- as the title of a recording you have of a conversation with Ms. Poolos?

A.    Yes.

Q.    And if we look at 18.

It says:

"Dunlavin Dr 4."

Does that also mean you were on Dunlavin Drive at the time you made the recording?

A.    Yes.

Q.    And is this the title of a recording you made of a conversation with Ms. Poolos?

A.    Yes.

Q.    All right.  And looking at Exhibit 19.

It also says:

"Dunlavin Dr."

Page 360

* COLLETTE RICHARDS *

This time 5.

Is this a conversation -- is this the title of the conversation that you had with Ms. Poolos?

Is this the title of a recording that you have of a conversation with Ms. Poolos?

A.    Yes.

Q.    Okay.  And then if we look at Exhibit 20.

"Dunlavin Dr 11."

Is that the title of a audio recording you have of a conversation with Ms. Poolos?

A.    Yes.

Q.    Okay.  And if we look at 21, please.

It says:

"The Baseball Center NYC 2."

What is the reference to the "Baseball Center"?

A.    That is where the app picked up me physically being close to.

Q.    Okay.  And were you actually at

Page 361

* COLLETTE RICHARDS *

the place -- a place called "The Baseball Center" at the time that you made this recording?

A.    No.

My apartment was near that.

Q.    Okay.  And did you make this recording in New York City?

A.    Yes.

Q.    Okay.  And do you recognize this title as the title of an audio recording of a conversation you had with Ms. Poolos?

A.    I don't know if this one, specifically, based on this title, is my conversation with Renee Balducci or if it's my conversation with Alex Poolos, based on the title of this.

Q.    Okay.  Fair enough.

But it's either one of those individuals; correct?

It's either a conversation you had with Ms. Balducci or a conversation you had with Ms. Poolos?

A.    Yes.

Page 362

* COLLETTE RICHARDS *

Q.    Okay.  And if we look at Exhibit 22, please.

The title of the file is:

"The Baseball Center NYC."

Do you know if this is the title of a conver- -- of a -- of a recording of a conversation you had either with Ms. Poolos or Ms. Balducci?

A.    Yes.

This would have to be either Renee Balducci or Alex Poolos.

Q.    Thank you.

Have you checked your work phone since the deposition that we had on Day 1 to see if there are any other recordings beyond the ones that we just went through of conversations you had with Ms. Poolos?

A.    There are no more recordings.

Q.    And how -- how do you know that?

A.    I checked.

Q.    So, you listened to all of the --

Page 363

* COLLETTE RICHARDS *

MR. IADEVAIA:  Strike that.

Q.    Do you have recordings, other than the ones we just discussed, in the Voice Memo app on your work phone?

A.    That are related to this?

Q.    No.  Just generally.

A.    Yes.

Q.    Okay.  And did you listen to all of them, to figure out if any of them relate to this case?

A.    No.

Q.    Okay.  How did you determine whether some of the recordings related to the case and some didn't?

A.    Because I listened to all of the ones that were from this period of time.

And I confirmed, in this period of time, that I turned over all of the recordings that were related to this.

Q.    Okay.  And this "period of time," just to be clear for the record:

What -- what's that period you're referring to?

Page 364

* COLLETTE RICHARDS *

A.    The period after I filed or I went to HR initially.

Q.    Okay.  And until when?

A.    Until I last spoke to Alex, in January.

Q.    And what was the date when you last spoke to Alex?

A.    I don't remember the la- -- the date.

It's the beginning of January.

Q.    When you were reviewing these recordings, did you know the last time that you spoke to Alex?  Ms. Poolos.

Do you know the exact date?

A.    No.

Q.    And when you were reviewing --

MR. IADEVAIA:  Strike that.

Q.    And when you say after you went to HR, when did you go to HR with your concerns?

A.    In December.

Q.    Did you know the exact date when that happened?

A.    I don't remember.

Case 1:23-cv-08896-GHW-HJR    Document 300-8    Filed 02/09/26    Page 366 of 446

Page 365

* COLLETTE RICHARDS *

Q.   And when you were listening to these recordings and identifying which ones were responsive and which ones were not, did you know the date?  The exact date?

A.   No.

But I knew the time frame.

I -- I listened to everything and I turned over everything that I found.

Q.   Okay.  And did you ever make any audio recordings of discussions you had with Bill Owens?

A.   No.

Q.   With Tanya Simon?

A.   No.

Q.   With Maria Cottone?

A.   No.

Q.   With anyone in HR, other than Renee Balducci?

A.   No.

Q.   With Scott Bronstein?

A.   No.

Q.   Are you aware of any audio recordings that you made that could be related to this case that have been

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 366

* COLLETTE RICHARDS *

deleted?

MR. ZUCKERMAN:  Objection.

A.    No.

Q.    Are you aware of any recordings that you had with Alex Poolos that have been deleted?

A.    No.

Q.    With Bill Owens?

A.    No.

Q.    With Tanya Simon?

A.    No.

Q.    With Maria Cottone?

A.    No.

Q.    Excuse me.

With Renee Balducci?

A.    No.

Q.    With Scott Bronstein?

A.    No.

Q.    When is the last time that you listened to the audio recordings that you gave to your lawyers?

A.    I listened to them when I sent them to them that day.

Q.    Okay.  And what month -- was

Page 367

* COLLETTE RICHARDS *

that in March?

A.    It would have been around whenever the first of my deposition was.

Q.    Got it.

And was it after your deposition that you listened to them?

A.    Yes.

Q.    Did any of the recordings that you gave to your lawyers, for purposes of this case, did you give any of those recordings to CBS before Alex was fired?

A.    No.

Q.    And how come you didn't give any of the recordings to CBS before Alex was fired?

MR. ZUCKERMAN:  Objection.

A.    I didn't -- I don't know.

Q.    And did you give your recording of your discussion with Ray -- Renee Balducci to CBS before Alex was fired?

A.    No.

Q.    Did you give the re- -- did you tell -- did you tell Renee that you were recording the discussion that you had with

Page 368

* COLLETTE RICHARDS *

her that you, in fact, recorded?

A.    No.

Q.    And how come?

How come you didn't tell her?

A.    I just didn't.

Q.    And why didn't you give the recording to CBS?

A.    I just didn't.

Q.    In any of the recordings that you made of conversations you had with Alex, are you contending that she was being abusive to you?

MR. ZUCKERMAN:  Objection.

A.    What do you mean?

Q.    Well, you made a complaint against Alex Poolos; correct?

A.    Yes.

Q.    And you made -- you -- you -- you put it in writing, at some point, you submitted it to CBS' Human Resources Department; correct?

A.    My written complaint?

Q.    Yes.

A.    Yes.

Page 369

* COLLETTE RICHARDS *

I did that.

Q.    And in that complaint, you made a number of allegations against Ms. Poolos; correct?

A.    Yes.

Q.    And including you allege that she yelled at you repeatedly or frequently.

And you can tell me if there's a different word to characterize it.

A.    In -- in general sum and substance, that is the nature of my complaint.

Q.    On any of the recordings that you made of Ms. Poolos, is she yelling at you?

MR. ZUCKERMAN:  Objection.

A.    No.

Q.    In any of the recordings that you made of conversations with Ms. Poolos, is she gai- -- engaged in conduct that you believe constitutes harassment?

A.    I don't think so, no.

Q.    In any of the recordings you made of Ms. Poolos, do you contend that

Page 370

* COLLETTE RICHARDS *

Ms. Poolos engaged in any of the conduct that is the subject of your written complaint to HR?

A.    Can you rephrase that, though?

Q.    Sure.

A.    I'm sorry.

Q.    In your --

MR. IADEVAIA:  I'll strike the question and I'll ask another question.

Q.    In the recordings you made of conversations with Ms. Poolos, do you allege or contend that she engaged in retaliation in those conversations?

MR. ZUCKERMAN:  Objection.

A.    Look, I made the decision that after I went to HR with my complaint, that I was very nervous and felt like I needed to, like, protect myself.

And so, I decided to record phone conversations that I made with her after that, after I went to HR.

Q.    Right.  I understand.

But I guess my question is

Page 371

* COLLETTE RICHARDS *

whether any of the conduct that you identified as being a problem by Ms. Poolos, are they reflected in any of the conversations that you recorded of her?

A.    The conversations that I recorded of her were not examples of her being the worst she's ever been to me.

Q.    And in the recordings that you made of Ms. Poolos, do you contend that she was demeaning towards you?

A.    Can you use a different word than "contend"?

Is there a different way that you can describe that?

Like, what do you mean?

Q.    Do -- do -- do you take the position that she was being demeaning towards you?

A.    In all of the recordings?

Q.    In any of them.

A.    That she sent -- that -- that I made?

MR. ZUCKERMAN:  Objection.

Q.    Yes.  You can answer.

Page 372

* COLLETTE RICHARDS *

A.   Sorry.  Can we start that over?

Q.   Sure.

My question is whether you take the position that Ms. Poolos was demeaning towards you in any of the recordings you made of conversations with her?

A.   In those recordings?  No.

Q.   The -- well, let's be more specific.

So, if you take a look at Exhibit 12, 13 and 14, please.

(Witness complies.)

Q.   They're all --

MR. IADEVAIA:  I'm sorry, not 12.

Q.   13, 14 and 15.

MR. IADEVAIA:  My apologies.

Q.   They're all named -- they all start with the -- the files all start with the name "Acworth."

It's Acworth 4, 5 and 6.

Is that correct?

Do you see that?

A.   Yes.

Page 373

* COLLETTE RICHARDS *

I see that.

Q.   Okay.  Was there -- or is -- has there ever been, on your phone, a file called, in the Voice Memo app, called "Acworth 1"?

A.   I don't know what all of the file names are on my phone; but the way that I would use this app was when I was doing background calls for work.

I would record those calls for my background calls, oftentimes, and then I would rename the file to whatever corresponding phone call background conversation for work I was having.  So...

Other files would be named "Acworth" whatever, and then I would change the name of it so I would remember which -- which interview it was or whatever.

Q.   And do you know if you still have, on your phone, a file called "Acworth 2"?

A.   I don't know.

Q.   And when you were reviewing your phone, did you see a file called

Page 374

* COLLETTE RICHARDS *

"Acworth 2"?

A.    I don't remember.

Q.    And do you have a file in your phone called -- currently called "Acworth 3"?

A.    I do not know.

MR. IADEVAIA:  If we can mark CBS 8540.

(Counsel confer sotto voce.)

MR. IADEVAIA:  If we can mark this as -- oh, we already did.

Great.

Q.    All right.  If you can take a look at Exhibit 22, please.

A.    Okay.

Q.    So, this is the file that is -- I believe it's "The Baseball Center NYC" is the title on the document.

And I think this is your conversation with Ms. Balducci.

The conversation you had with Ms. Balducci was on January 7th; correct?

A.    I don't remember.

Q.    Was it the first time that you

* COLLETTE RICHARDS *

told Ms. Balducci about Alex's call with Scott?

MR. ZUCKERMAN:  Objection.

A.    I -- I don't remember a -- exactly.  I -- I don't remember.

Q.    Okay.  Did you -- how many -- you only recorded Ms. Balducci once; correct?

A.    Yes.

Q.    And what do you recall about that recording?

A.    I told her about Alex reaching out to Scott.

Q.    Had you spoken to Ms. Balducci by phone before the conversation that's reflected in the recording of Ms. Balducci?

MR. ZUCKERMAN:  Objection.

A.    I talked to Renee on the phone before.  I don't know about what.

Q.    Had you talked to Ms. Balducci previously about Alex's call with Scott on the phone?

A.    I don't remember.

Q.    And you just -- you don't

Page 376

* COLLETTE RICHARDS *

remember --

A.    Yeah.

I -- honestly, I'm sorry. Like, this was three years ago.  I don't remember.

Q.    Does the amount of time past affect -- affect your memory, generally speaking?

A.    No.

Q.    No?

Just in this one instance --

MR. ZUCKERMAN:  Objection.

Q.    -- with this one phone call?

A.    It's a minor detail, I am trying to remember.

Q.    Okay.  So, recording HR is a minor -- a minor detail?

MR. ZUCKERMAN:  Objection.

Q.    It's a question.

MR. IADEVAIA:  Can we get the transcript marked?

Q.    You can answer.

A.    Can you say it again?

MR. IADEVAIA:  Could you repeat

Page 377

* COLLETTE RICHARDS *

the question?

(Whereupon, the referred to question was read back by the court reporter:

"QUESTION:  Okay.  So, recording HR is a minor detail?")

A.    I don't think it's a minor detail what I was going through.

I'm talking about when I started speaking to someone and remembering the order and dates and everything or -- it's the details I'm talking about.

Q.    Have you ever recorded a conversation with HR beyond the one that you did of your discussion with Ms. Balducci?

A.    No.

Q.    Okay.

MR. IADEVAIA:  If we can mark this as Richards Exhibit 23, please.

(Whereupon, transcript of a recording, Bates PL3011 to 3023 was marked as Richards Exhibit 23 for identification as of this date by the

Page 378

* COLLETTE RICHARDS *

Reporter.)

MR. IADEVAIA:  What has been marked as Richards Exhibit 23 is a transcript bearing Bates Numbers PL 3011 to 3023.

Q.    And Ms. Richards, my question to you is whether this is a transcript of the recording of the discussion that you had with Ms. Balducci?

(Witness reviews document.)

MR. ZUCKERMAN:  Ob- -- A, objection.

But B, I just want to vote -- note for the record that we -- while we haven't had an opportunity to exhaustively review every word of the transcript, there -- there are errors in the transcript.

I will just point out two quickly, on Page 2.

There's an entry for Renee Balducci, on Line 22, reportedly saying the word "exactly."

We haven't heard that word.

Page 379

* COLLETTE RICHARDS *

And then, up on the page, on page -- I'm sorry, same page, 2, Line 7, there's a sentence purportedly uttered by Renee Balducci.

She was reaching out to, T-O-O, yes, period.

We don't hear the word as too, T-O-O; we hear it as to T-O.

MR. IADEVAIA:  Okay.

MR. ZUCKERMAN:  And just to keep it on the same part of the transcript, Jeremiah, we -- we had an occasion to look back at what's been marked as Richards Exhibit 11.

MR. IADEVAIA:  Okay.

MR. ZUCKERMAN:  And...

MR. IADEVAIA:  But that's not marked today or was it marked today?

MR. ZUCKERMAN:  It was marked on 2/25.

MR. IADEVAIA:  Okay.

MR. ZUCKERMAN:  It was the last -- final exhibit of the day, I think.

Page 380

* COLLETTE RICHARDS *

MR. IADEVAIA:  Well, I -- I -- I would ask that we deal with this at another time because I have limited time on the record.

MR. ZUCKERMAN:  I'll -- I'll give you an extra two minutes.

MR. IADEVAIA:  Okay.

MR. ZUCKERMAN:  I --I -- how do you feel about that?

MR. IADEVAIA:  Okay.

MR. ZUCKERMAN:  Because it's material, which is on Page 2 -- so Richards Exhibit 11 is transcript produced by CBS.

And on Page 2 of that transcript, Line 7, I'll read the sentence that starts at Line 6, purportedly a statement by Alexandria Poolos:

"So, just wanted to let you know that I talked to Bill and Tanya yesterday."

We have reviewed that tape in depth and we believe that word is not

Page 381

* COLLETTE RICHARDS *

"yesterday," but that word is "today."

But just so that -- now it's all in one place on the transcript, today, as to at least some errors in these transcripts and maybe the parties can get together and -- and ensure their accuracy before they're used in a court proceeding.

MR. IADEVAIA:  Okay.  I -- we reserve all rights.

This is being raised right now for the first time.

Q.    Okay.  Looking at exhibit -- what's been marked as Exhibit 23, with the corrections that -- or contentions of corrections that your counsel has pointed out, do you recognize this as being a transcript of the recording of the discussion that you had with Ms. Balducci?

A.    Yes.

Q.    Okay.  And in this conversation, if you take a look at Page 2 of Exhibit 23, Line 3, the transcript says

Page 382

* COLLETTE RICHARDS *

that you said:

"COLLETTE RICHARDS:  Okay.  So I wanted to tell you that immediately -- remember the person I was telling you that -- at CNN."

Do you see that text?

A.    I see that text.

Q.    Okay.  And Ms. Balducci responds:

"RENEE BALDUCCI:  Yes, yes. She was reaching out too, yes."

And then you speak and you say that someone at CNN had received a telephone call from Ms. Poolos. I know I'm summarizing the next piece of this, but:  Is that accurate?

(Witness reviews document.)

A.    Yes.

You're summarizing.

Q.    Okay.  And so, having a chance to look at this, does it refresh your memory as to whether the recording you made of the conversation with Ms. Balducci was the first time that you had talked on the

Page 383

* COLLETTE RICHARDS *

phone with Ms. Balducci about Alex's call with Scott?

A.    I'm sorry.  That is just really confusing, how you're phrasing that.

Can you re- -- please, repeat that?

Q.    My question is whether or not this refreshes your memory that the recording that you made of the conversation with Renee Balducci was the first time you notified Renee, by phone, of Alex's call with Scott?

MR. ZUCKERMAN:  Objection.

A.    This is a transcript of me talking to Renee, telling her what I had just learned.

Q.    And is that the first time you told Renee on the phone about what you had learned related to a phone call that Alex and Scott had had?

(Witness reviews document.)

A.    Yes.

This is me talking to Renee.

Q.    That's not the question.

Page 384

* COLLETTE RICHARDS *

My question is:  Is it -- does it reflect the first time that you told Ms. Balducci about Alex's call with Scott?

MR. ZUCKERMAN:  Objection.

A.    Yes.

This is me talking to Renee about -- this is me telling Renee about Alex having that conversation with Scott.

Q.    And had you had a telephone call with Ms. Balducci prior to this call about Alex talking to Scott?

A.    I don't remember.

Q.    You don't remember?

Why -- why don't you read the transcript?

MR. IADEVAIA:  I mean, I think we're just gonna have to go to the Judge, to get more time.

MR. ZUCKERMAN:  You know, you -- I don't know what -- what you ate for lunch today, but I've never seen you act like this before with a witness, honestly.

MR. IADEVAIA:  Let's go off the

Page 385

* COLLETTE RICHARDS *

record, please.

MR. ZUCKERMAN:  Just because the -- ju- -- no.

MR. IADEVAIA:  Yeah.

MR. ZUCKERMAN:  Okay.

MR. IADEVAIA:  I'm going off the record.

I'm not wasting my time, while you make a speaking objection.

MR. ZUCKERMAN:  Well, you're berating the witness on the record.

MR. IADEVAIA:  I'm berating her?

THE VIDEOGRAPHER:  Do you want to go off the record?

MR. IADEVAIA:  Yes.

MR. ZUCKERMAN:  No.

We don't want to go off.

MR. IADEVAIA:  Yes.  Go off.

MR. ZUCKERMAN:  Then we're not having this conversation off the record, I'll tell you that.

MR. IADEVAIA:  That's fine.  Okay.

Page 386

* COLLETTE RICHARDS *

MR. ZUCKERMAN:  And we're not gonna have a 20-minute caucus or anything like that, either.

MR. IADEVAIA:  I don't -- I don't care if we have a 20-minute caucus.

MR. ZUCKERMAN:  No.

We're not having a 20-minute caucus.

MR. IADEVAIA:  Okay.

MR. ZUCKERMAN:  So, we're -- we're gonna stay here -- it was a 70 minutes [sic], I gave you an extra two, that's 72.

We're gonna stay for 80 minutes from the time you came in the door, which you were late, and then we're gonna end.

And then, you absolutely can go to the judge about it.  But because the witness doesn't remember something, you move on to the next question.

MR. IADEVAIA:  Uh-huh.  Got it.

Page 387

* COLLETTE RICHARDS *

Enough with the speaking objection.

MR. ZUCKERMAN:  I'm not -- it's not an objection.

MR. IADEVAIA:  Yes, you are.

All right.  Well, you can't testify for the witness.

You can't --

MR. ZUCKERMAN:  Nor did I do that.

MR. IADEVAIA:  -- direct her to testify --

MR. ZUCKERMAN:  I'm warning you on the record:

We are leaving after 80 minutes.

MR. IADEVAIA:  Warning me? Threats?

MR. ZUCKERMAN:  You spent eight minutes marking documents that could've been premarked.

MR. IADEVAIA:  Okay.

MR. ZUCKERMAN:  You're wasting your own time.

* COLLETTE RICHARDS *

MR. IADEVAIA:  That's -- that's fine.  I'm not saying there's any --

(Cross-talk.)

MR. ZUCKERMAN:  We'll be back in five minutes --

(Cross-talk.)

MR. IADEVAIA:  -- that anyone else is at --

MR. ZUCKERMAN:  -- we'll be back in five minutes and if you're not here, I'm starting the clock.

MR. IADEVAIA:  Okay, Lyle.

MR. LYNCH:  Are we off the record?

THE VIDEOGRAPHER:  The time is 6:55 P.M.

We are now off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:  The time is 7:03 P.M.

We are now on the record.

Q.    Okay, Ms. Richards.  Continuing with Exhibit 13.

Page 389

* COLLETTE RICHARDS *

Actually, before we do that:

At some point, in January of 2022, you learned that Alex Poolos had spoken on the phone with Scott Bronstein; correct?

A.    Yes.

Q.    And was that phone call on January 5, 2022?

Is that your understanding?

A.    I don't remember the exact date.

Q.    Okay.  And after that phone call with Ms. -- the -- the phone call that Ms. Poolos and Mr. Bronstein had, did Mr. Bronstein then tell you about that call?

A.    Yes.

Q.    And how soon after the call did he tell you?

A.    I don't remember.

Q.    Okay.  And then at some point, you notified CBS about the phone call that Ms. Poolos and Mr. Bronstein had had, as reported to you by Mr. Bronstein; is that

Page 390

* COLLETTE RICHARDS *

correct?

A.    Yes.

Q.    And who did you first notify, at CBS, about the phone call between Ms. Poolos and Mr. Bronstein?

A.    Renee Balducci.

Q.    And how did you -- what form did you notify her; did you do it by e-mail, text or phone, or some other way?

A.    I e-mailed her that I needed to speak to her and I spoke to her on the phone.

Q.    Okay.  And what's been marked as Exhibit 23, is this a transcript of the recording you made of the discussion you had with Ms. Balducci about the Bronstein phone call?

A.    Yes.

Q.    And is this the -- the phone call you just testified to a minute ago, or 30 seconds ago, when you first notified CBS about the Bronstein and Ms. Poolos phone call?

A.    Yes.

Page 391

* COLLETTE RICHARDS *

Q.    Okay.  And if you take --
and -- why did you record your discussion
with Ms. Balducci?

MR. ZUCKERMAN:  Objection to
form.

A.    I decided to.

Q.    Did you record it because you
were upset that CBS had not taken
sufficient steps to address your complaint
against Ms. Poolos?

A.    No.

Q.    Did you record it because you
were frustrated that CBS had asked you to
keep working with Ms. Poolos after you had
made your written complaint to Human
Resources?

A.    No.

Q.    Other than your testimony that
because you wanted to, is there any other
explanation for why you recorded your
discussion with Ms. Balducci?

MR. ZUCKERMAN:  Objection.

A.    I, at the time, felt it was
important.

Page 392

* COLLETTE RICHARDS *

Q.    And why did you think it was "important" at the time?

A.    Because I was very scared.

Q.    So what were you "scared" of?

A.    I was scared because all along, I was terrified about going to HR, in the first place, and I was scared about what -- what Alex would -- would do, once she learned that I had gone to HR and -- this was a really difficult time.

Q.    And your concerns about -- whatever concerns you had about what Ms. Poolos would do, how did that effect your decision to record the conversation you had with Ms. Balducci?

A.    I don't know.

Q.    Any other explanation as to why you recorded the conversation with Ms. Balducci, other than what you testified to?

A.    No.

Q.    If you take a look on page -- we are on Page 2, and you take -- starting with Line 3, which is a statement

Page 393

* COLLETTE RICHARDS *

attributed to you.

And the transcript reads:

"Okay.  So I wanted to tell you that immediately.  Remember the person I was telling you that, at CNN."

Did -- do you see that text?

A.    I see that text.

Q.    And are you referring there to Mr. Bronstein?

A.    Yes.

Q.    And then Ms. Balducci, according to the transcript, says:

"Yes, yes.  She was reaching out too, yes."

Do you see that text?

A.    I see that text.

Q.    And did you understand that Ms. Balducci was indicating to you that she had understood that Alex had reached out to Scott Bronstein?

MR. ZUCKERMAN:  Objection.

A.    I see what the text is referring to.

Q.    And what is it referring to?

Page 394

* COLLETTE RICHARDS *

MR. ZUCKERMAN:  Objection.

A.    What is your question?

Q.    Sure.

So, what do you understand Ms. Balducci to be saying here, on Page 2, Line 6 and Line 7:

"Yes.  Yes.  She was reaching out too, yes"?

MR. ZUCKERMAN:  Objection.

The transcript is an error there.

MR. IADEVAIA:  Stop it.

Lyle, stop it.

MR. ZUCKERMAN:  Please don't yell at me, number one, and raise your voice like that.

And number two, you are asking a question about a line in the transcript that we think is erroneous.

I'm just trying to protect the transcript.

MR. IADEVAIA:  You've already made your record on that.

Page 395

* COLLETTE RICHARDS *

And the difference is the word T-O-O and T-O.

So, the witness has heard you give that instruction and constantly interrupting is wasting time.

MR. ZUCKERMAN:  I understand you -- that you're just trying to make a record about time wasting, but it's not gonna work.

So, why don't you just move on?

MR. IADEVAIA:  Move on from what?  I asked a question.

MR. ZUCKERMAN:  And I objected; and let her answer.

MR. IADEVAIA:  And you gave a speaking objection again.

Q.    Okay.  Ms. Richards, the line on -- the lines, on Page 2, Lines 6 and 7, Ms. Balducci says:

"Yes.  Yes.  She was reaching out too, yes."

And my question is:  What do you understand Ms. Balducci to be referring to there?

Page 396

* COLLETTE RICHARDS *

MR. ZUCKERMAN:  Objection.

A.     She's referring to my statement above.

Q.     And I believe, during the first day of your deposition, you testified that you acknowledge that you had had conversations with Renee Balducci in which you had alerted her to Alex reaching out to Bronstein before they had their phone call.

Do you recall that testimony?

MR. ZUCKERMAN:  Objection.

A.     I don't remember saying that.

Q.     No?  You don't remember.

Okay.  Did you have a prior conversation, prior to what's reflected in Exhibit 23, with Renee Balducci, in which you alerted her to Alex reaching out to Mr. Bronstein before they had their call?

A.     I do not remember.

Q.     You don't remember?

A.     I do not.

Q.     Okay.  Did you speak with Renee Balducci about Alex reaching out to Scott Bronstein before they had their call on

Page 397

* COLLETTE RICHARDS *

January 5, 2022?

A.    I do not.

I really do not remember.

Q.    Okay.  Do you recall having any discussions at all with Renee Balducci about Alex reaching out to Scott Bronstein before Alex spoke to Mr. Bronstein on January 5th?

A.    I don't remember.

Q.    Did you ever ask Renee Balducci to stop Alex Poolos from further contacting Mr. Bronstein after you learned that Ms. Poolos had been in touch with him before the call on January 5th?

A.    I don't remember.

Q.    Okay.  Did Renee Balducci -- before the call between Scott and Alex, on January 5th, did Renee Balducci, to your knowledge, take any steps to stop Alex Poolos from speaking to Mr. Bronstein?

A.    I am unaware.

Q.    Did you ever ask Renee Balducci to take any action to prevent Alex Poolos from contacting Scott Bronstein before the

Page 398

* COLLETTE RICHARDS *

call between Mr. Bronstein and Alex Poolos?

MR. ZUCKERMAN:  Objection.

A.    I don't remember ever doing that.

Q.    Did you ever tell Bill --

MR. IADEVAIA:  Strike that.

Q.    Did you tell Bill Owens that Alex had reached out to Scott Bronstein before Alex had her call with Mr. Bronstein?

MR. ZUCKERMAN:  Objection.

A.    No.

Q.    Did you tell Tanya Simon about Alex reaching out to Scott Bronstein before Alex had a call with Mr. Bronstein?

MR. ZUCKERMAN:  Objection.

A.    No.

Q.    If you can take a look at Page 3, of Exhibit 23, please.

(Witness complies.)

Q.    And take a look at Line -- starting with Line 6.

Renee Balducci, according to the transcript, says:

Page 399

* COLLETTE RICHARDS *

"RENEE BALDUCCI:  Okay.  And what else went on in that conversation?"

And you respond, according to the transcript:

"COLLETTE RICHARDS:  Let me see, from my notes.  Hang on."

Do you see that text?

A.    Yes, I see that.

Q.    Okay.  And the "notes" that you are referring to there, are they handwritten notes or typed notes or something else?

A.    I don't remember.

Q.    And during the first day of your deposition, do you recall that you testified that you no longer have the notes?

A.    I don't remember what I said during my deposition.

Q.    Okay.  Do you have those notes?

A.    No.

Q.    Since the first day of your deposition, have you looked for those notes?

Page 400

* COLLETTE RICHARDS *

A.    Yes.

Q.    And what did you do to look for them?

A.    I looked in notebooks.

Q.    Do you have notebooks that go back to 2022?

A.    Not anymore.

Q.    Okay.  So, did you ha- -- do you have notebooks that go back to 2021?

A.    No.

Q.    Okay.  The notebooks that -- did you have a -- a notebook that you kept in 2022 or multiple notebooks?

A.    I had notebooks for work.

Q.    Were the notes that you're referring to here, in Exhibit 23, kept in any notebooks you had for work?

A.    No.

      I couldn't find it.

Q.    Where were they kept?

A.    Where was what kept?

Q.    The notes that you took, as reflected in Exhibit 23.

A.    I don't know.

Page 401

* COLLETTE RICHARDS *

Q.    And when did you get rid of the notes that are reflected in Exhibit 23?

MR. ZUCKERMAN:  Objection.

A.    I have no idea.

Q.    And you said you made efforts to look for them.

Where -- where -- where did you look?

MR. ZUCKERMAN:  Objection.

A.    The --

Q.    Is there -- go ahead.

A.    The notebooks that I have still.

Q.    And where do you keep those notebooks?

A.    In my apartment.

Q.    And are -- are those notebooks notebooks -- note -- do those notebooks contain notes related to work stuff, personal stuff or both?

A.    Work stuff.

Q.    And so -- and you said you keep them in your apartment?

A.    Yes.

Page 402

* COLLETTE RICHARDS *

Q. Not at work?

A. They're in my apartment.

Q. Okay. And the notebooks that you currently have in your apartment, what's the earliest-dated note that you have?

A. I don't know.

Q. Do you have notes from 2023?

A. I don't know.

Q. When did you look for these notes, the notes referenced in Exhibit 23?

A. Some time after my deposition.

Q. Okay. And did you notice the dates of any of the notes that you were looking for -- looking through?

A. I was looking at notebooks that had various dates on them. I did not find this -- I did not find this note.

Q. And other than looking through these notebooks, did you do anything else to locate these notes referred to in Exhibit 23?

A. No.

Q. Okay. I am also looking on

Page 403

* COLLETTE RICHARDS *

Page 2- -- Page 3, Line 21, which is the statement by you, according to the transcript.

It states:

"Why would she reach out to my job reference who she hasn't talked to in months immediately after talking to HR?"

Do you see that text in the transcript?

A.    Yes, I see that.

Q.    And in this statement, where you say "she," are you referring to Ms. Poolos?

A.    Yes.

Q.    And is the reference to "my job reference" Mr. Bronstein?

A.    Yes.

Q.    And at the time that you made this comment, were you aware --

MR. IADEVAIA:  Strike that.

Q.    At the time that you made this comment, you were aware that Ms. Poolos had been in touch with Mr. Bronstein as of late December and early January; correct?

Page 404

* COLLETTE RICHARDS *

A.    I'm a little confused by the timeline that you're saying.

Q.    Okay.  My question is whether you were aware, as of the time that you made this comment, as reflected in Exhibit 23, that Ms. Poolos had been in touch with Mr. Bronstein prior to her having the phone call with him; is that right?

A.    I don't see how what you're asking me about is related to this specific thing that I'm saying.

Q.    Okay.  You say to Ms. Balducci, who she -- you say about Ms. Poolos:

"She hasn't talked to in months."

Referring to Ms. Poolos not having spoken to Mr. Bronstein; is that right?

Is that what you mean there?

You used the line who --
according to the transcript, you say:

"Who she hasn't talked to in months."

Do you see that text?

Page 405

* COLLETTE RICHARDS *

A.    I do.

Q.    And you're saying there that Ms. Poolos hasn't talked to Mr. Bronstein in months.

Is that -- is that -- am I understanding that text correctly?

A.    That is what I said.

Q.    Yeah.

And at that point in time, you knew that Ms. Poolos had been in touch with Mr. Bronstein within the last few days; correct?

MR. ZUCKERMAN:  Objection.

A.    I don't know.

Q.    You don't know?  Okay.

And in this transcript, you say that Ms. Poolos spoke to Mr. Bronstein immediately after talking to HR.

Do I have that correct?

A.    Yes.

That's what this transcript says.

Q.    Okay.  And is that what you said to Ms. Balducci?

Page 406

* COLLETTE RICHARDS *

A.    Yes.

Q.    Okay.  And had -- do you know if, as of this point in time, Ms. Poolos had had a conversation with HR?

MR. ZUCKERMAN:  Objection.

A.    What?

MR. IADEVAIA:  Can you repeat the question, please?

(Whereupon, the referred to question was read back by the Reporter:

"QUESTION:  Okay.  And had -- do you know if, as of this point in time, Ms. Poolos had had a conversation with HR?")

A.    Yes.

Q.    And how did you know that?

A.    Because Alex told me that she had spoken to Bill and Tanya.  Or Bill and Tanya had spoken to Alex, she told me that.

Q.    Okay.  But this is a reference to speaking to HR.

Bill and Tanya are not in HR; correct?

Page 407

* COLLETTE RICHARDS *

A.    Correct.

Q.    And so had -- to your knowledge, as of the time that you made this comment, were you -- were you told or were you under the belief, or the impression, that Ms. Poolos had spoken to HR?

A.    I don't know.

I'm generally speaking about how Alex had been spoken to.

Q.    What do you mean by that?

A.    Related to me raising a complaint with HR that Alex had been spoken to and I'm relaying that sentiment, in general, that I raised a complaint and she had been spoken to.

Q.    Did anyone tell you, as of the time of -- of this phone call with Ms. Balducci, that HR had spoken to Alex?

A.    I don't remember.

Q.    Anyone ever tell you that HR had spoken to Alex before Alex had her phone call with Mr. Bronstein?

A.    I don't know.

Page 408

* COLLETTE RICHARDS *

Q.    Okay.  If you look at Page 4, of Exhibit 23, please.

(Witness complies.)

Q.    And I direct you to Line 13, please, where Renee Balducci is speaking.

And according to the transcript, Ms. Balducci said:

"RENEE BALDUCCI:  And then I want you to try to take as much emotion out of it as possible, and just say to him, you know -- you know, you know that I've been having some challenges with my manager. It's been going on for some time.  I did have, obviously, have a conversation with RENEE BALDUCCI and Tanya, and I understood that, you know, that she would -- it would be a conversation with Alex, and in hopes of, you know, helping her under- -- you know, bringing to her attention these..."

And then according to the transcript you interject and say:

"COLLETTE RICHARDS:  Yeah."

And then Ms. Balducci continues:

Page 409

* COLLETTE RICHARDS *

"RENEE BALDUCCI:  -- these issues that she needs to correct, and that we just -- you know, I was to give her the benefit of the doubt, and you know, just you know, kind of proceed from there. Right."

Do you see that text that I read, on Pages 4 and 5?

A.    I do.

Q.    Okay.  Ms. Balducci, in the transcript, refers to a conversation with Re- -- with her and Tanya and you.

Did you ever have such a conversation with the three of you?

A.    With Renee Balducci and Tanya and myself?

Q.    Correct.

A.    I don't remember.

Q.    And looking on Page 5, Ms. Balducci, on Line 2, says:

"I was to give her the benefit of the doubt."

My question is:  Did anyone ever ask you to give Alex the benefit of

Page 410

* COLLETTE RICHARDS *

the doubt?

A.    I don't remember.

Q.    Did anyone tell you or direct you to give Alex the benefit of the doubt?

A.    I don't remember that.

Q.    And did you have conversations with anybody at CBS about giving Alex the benefit of the doubt?

A.    I don't remember.

MR. IADEVAIA:  Why don't we play this recording?

Yeah.

So, we're going to play a recording, for the record, that is labeled Ace -- "Acworth 5" and it is -- corresponds to CBS 8586, which, I believe, was previously marked as -- 8586, Exhibit 15.

Yeah.  That would be great.

It's just two minutes; right?

(Audio playing in background.)

Q.    Ms. Richards, that's a recording of a conversation between you and Ms. Poolos; correct?

Page 411

* COLLETTE RICHARDS *

A.    Yes.

Q.    And you made that recording while you were in Georgia; is that right?

A.    Yes.

Q.    And you -- you made the recording while you were there some time between mid-December of 2021 and early January of 2022; right?

A.    Yes.

Q.    And in terms of the timing, do you know whether you made that recording before or after Christmas?

A.    I don't remember.

Q.    And why did you make that recording?

A.    Because it was a conversation that I was having with Alex after I had gone to HR and that was what I was doing.

Q.    Recording the discussions that you had with Ms. Poolos?

A.    Yes.

Q.    And what were you discussing in that recording with Ms. Poolos, generally speaking?

Page 412

* COLLETTE RICHARDS *

A.    Generally speaking, we were talking about things related to a Russia visa.

Q.    And what were the issues with -- related to the Russian visa?

A.    We were talking about getting documents together.

Q.    Documents for what purpose?

A.    To resubmit, or renew, the visas that we were trying to get for Russia.  I don't remember what stage we were in at that time.

Q.    And did you have conversations with Ms. Poolos around that time because Ms. Poolos was concerned that CBS would not be able to obtain the visas it needed to do a story in a timely way?

A.    I don't remember exactly what all was going on.

Q.    Okay.

MR. IADEVAIA:  Let's just do one more recording.

We can do CBS 8589, which is Dun- -- Dunlavin Dr 4 -- 3.

Page 413

* COLLETTE RICHARDS *

(Audio playing in background.)

MR. IADEVAIA:  So, for the record:  That was a ten-second recording or thereabout ten seconds.

Q.    This is a recording of a conversation between you and Alex; correct?

A.    Yeah.

Q.    And because it has the title Dun- -- "Dunlavin Dr."

That was a recording you made while you were in Georgia; correct?

A.    Yes.

Q.    And do you have any idea why the recording was so short?

A.    I do not know.

Q.    Do you know why it was cut off in the middle of the discussion?

A.    I don't.

MR. ZUCKERMAN:  Objection.

MR. IADEVAIA:  If we could listen to Dunlavin Dr 11.

(Audio playing in background.)

Q.    Is that a recording of the discussion that you had as -- what we just

Page 414

* COLLETTE RICHARDS *

played for you, a recording of a discussion that you had with Ms. Poolos?

A.    Yes.

Q.    And a recording that you created; correct?

A.    Yes.

Q.    And the title is:

"Dunlavin Dr 11."

So, does that mean that you made the recording while you were in Georgia?

A.    Yes.

Q.    And does it sound to you, from the recording, as though the recording starts at the end of a conversation?

MR. ZUCKERMAN:  Objection.

A.    It sounds like the end of a conversation.

Q.    And do you have any idea why the recording is only of the end of a discussion?

A.    I have no idea.

Q.    Do you have any idea what was discussed before the recording starts?

Page 415

* COLLETTE RICHARDS *

A.    I don't know.

Q.    Okay.

MR. IADEVAIA:  I think we are just about done.

Can we just get a one-minute break, please?

MR. ZUCKERMAN:  Yes, sir.

THE VIDEOGRAPHER:  The time is 7:33 P.M.

We are now off the record.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER:  The time is 7:38 P.M.

We are now on the record.

Q.    In the -- Ms. Richards, in the recordings that you made of conversations with Ms. Poolos that have been produced in this case, would you describe her demeanor towards you as being nice?

MR. ZUCKERMAN:  Objection.

A.    No.

Q.    How would you describe it?

A.    Cordial.

Page 416

* COLLETTE RICHARDS *

Q.    Do you think that was unusual?

MR. ZUCKERMAN:  Objection.

A.    I think she was being cordial in those moments.

Q.    And I'm asking if that was unusual in your experience in dealing with Ms. Poolos when you were her AP?

A.    There were certainly a lot of times where it was very volatile and there were also moments where she could be cordial.

Q.    And the recordings that you made of discussions of -- with Ms. Poolos, do you believe that they were representative of your -- of her interactions with you generally or not representative?

A.    Not representative, generally.

Q.    And how so?

A.    There were many, many times that she was very unprofessional with me, where she raised her voice, where she yelled at me, where she ranted, that happened over the course of my time working

Page 417

* COLLETTE RICHARDS *

with her.

Q.    And do you allege that Ms. Poolos did so during phone calls she had with you --

A.    Yes.

Q.    -- that were -- where she acted in the way you just described to me?

A.    Yes.

Q.    Is the reason that you didn't return the recordings over to CBS because they didn't substantiate the complaints that you had made about Ms. Poolos?

MR. ZUCKERMAN:  Objection.

A.    No.

MR. IADEVAIA:  I think that is all that --

Is there anything else?

All right.  I think we are done.

THE VIDEOGRAPHER:  The time is 7:40 P.M.

We are now off the record.

MR. LYNCH:  Can we have a rough?

**Page 418**

* COLLETTE RICHARDS *

MR. IADEVAIA:  We would like a rough, as well.

THE COURT REPORTER:  Would you like a copy of the transcript, as well, Mr. Lynch?

MR. LYNCH:  Yes, please.

(Whereupon, at 7:40 P.M., the Examination of this witness was concluded.)

°         °         °         °

Page 419

* COLLETTE RICHARDS *

D E C L A R A T I O N

I hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony.

I FURTHER CERTIFY that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified hereinbefore.

_____

COLLETTE RICHARDS

Subscribed and sworn to before me this _____ day of _____ 20___.

_____

NOTARY PUBLIC

Page 420

* COLLETTE RICHARDS *

E X H I B I T S

RICHARDS EXHIBITS

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 12 | Audio file, Bates CBS 6787 | 348 |
| Exhibit 13 | Audio file, Bates CBS 8585 | 348 |
| Exhibit 14 | Audio file, Bates CBS 8586 | 349 |
| Exhibit 15 | Audio file, Bates CBS 8587 | 349 |
| Exhibit 16 | Audio file, Bates CBS 8688 | 350 |
| Exhibit 17 | Audio file, Bates CBS 8589 | 350 |
| Exhibit 18 | Audio File, Bates CBS 8590 | 351 |
| Exhibit 19 | Audio file, Bates CBS 8591 | 351 |
| Exhibit 20 | Audio file, Bates CBS 8592 | 352 |
| Exhibit 21 | Audio file, Bates CBS 8593 | 352 |
| Exhibit 22 | Audio file, Bates CBS 8540 | 353 |
| Exhibit 23 | Transcript of a recording, Bates PL3011 to 3023 | 377 |

(Exhibits retained by Court Reporter.)

Page 421

* COLLETTE RICHARDS *

I N D E X


EXAMINATION BY                              PAGE

MR. IADEVAIA                                344



INFORMATION AND/OR DOCUMENTS REQUESTED

INFORMATION AND/OR DOCUMENTS          PAGE

(None)




QUESTIONS MARKED FOR RULINGS

PAGE LINE QUESTION

(None)

Page 422

* COLLETTE RICHARDS *

C E R T I F I C A T E

STATE OF NEW YORK        )

                         :   SS.:

COUNTY OF NEW YORK       )


        I, KARYN CHIUSANO, a Notary Public for and within the State of New York, do hereby certify:

        That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

        I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of April, 2025.


_____
        KARYN CHIUSANO

Page 423

**ERRATA SHEET**
**VERITEXT/NEW YORK REPORTING, LLC**

CASE NAME: Poolos, Alexandra v. Paramount Global, Et Al.
DATE OF DEPOSITION: 4/3/2025
WITNESSES' NAME: Collette Richards

 PAGE    LINE (S)         CHANGE              REASON
____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

                                    _____
                                    Collette Richards
SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____, 20__.


_____         _____
(NOTARY PUBLIC)              MY COMMISSION EXPIRES:

**[& - 6]**                                                      Page 1

**&**

**&** 342:4 343:17

**0**

**08896** 341:6

**1**

**1** 343:17 362:16 373:6
**10006** 342:6
**10020** 341:22 342:11
**11** 346:5,10 348:3 360:12 379:15 380:14 413:22 414:9
**11.m4a** 352:17
**111** 342:5
**12** 348:2,8,15 353:19 372:12 372:16 420:8
**1251** 341:20 342:10
**13** 348:22,25 349:4 354:24 354:25 372:12 372:17 388:25 408:5 420:9
**14** 349:11,14,17 357:4 372:12 372:17 420:10
**14th** 422:20
**15** 349:25 350:4 357:19

372:17 410:19 420:11
**1505** 342:5
**16** 350:16,19 358:7 420:12
**17** 351:3,6 358:24 420:13
**18** 351:14,17 359:11 420:14
**18034** 422:22
**19** 351:25 352:4 359:23 420:15
**1:23** 341:6

**2**

**2** 358:9 360:20 373:22 374:2 378:21 379:3 380:13,16 381:24 392:24 394:6 395:19 403:2 409:21
**2.m4a** 350:23 353:4
**2/25** 379:21
**20** 352:12,15 360:11 386:3,6 386:9 419:19 420:16 423:22
**2021** 355:22,24 356:5,23 400:10 411:8

**2022** 356:9,15 356:24 389:4,9 397:2 400:7,14 411:9
**2023** 402:9
**2025** 341:11 422:20
**21** 352:21,24 360:17 403:2 420:17
**21st** 341:21 342:10
**22** 353:9,12 362:3 374:15 378:23 420:18
**23** 377:21,24 378:4 381:16 381:25 390:15 396:17 398:20 400:17,24 401:3 402:12 402:23 404:7 408:3 420:19

**3**

**3** 341:11 359:2 374:6 381:25 392:25 398:20 403:2 412:25
**3.m34a** 351:10
**30** 343:16 390:22
**3011** 378:6

**3023** 377:23 378:6 420:20
**344** 421:5
**348** 420:8,9
**349** 420:10,11
**350** 420:12,13
**351** 420:14,15
**352** 420:16,17
**353** 420:18
**377** 420:20

**4**

**4** 348:20 355:6 355:8 357:7 359:13 372:22 408:2 409:9 412:25
**4.m4a** 351:21
**4.m4a.** 349:7
**4/3/2025** 423:3

**5**

**5** 357:8 360:2 372:22 389:9 397:2 409:9,20 410:16
**5.m4a** 349:20 352:8
**5th** 397:9,15,19

**6**

**6** 357:21 372:22 380:18 394:7 395:19 398:23

**[6.m4a - app]**

**6.m4a** 350:6
**6787** 347:24
  348:7,16 420:8
**6:16** 341:12
  344:3
**6:55** 388:17

**7**

**7** 379:4 380:17
  394:7 395:19
**70** 386:13
**72** 386:15
**7:03** 388:22
**7:33** 415:10
**7:38** 415:15
**7:40** 417:22
  418:8
**7th** 374:23

**8**

**80** 386:16
  387:16
**8540** 353:6,8,14
  374:9 420:18
**8585** 348:22,24
  349:5 420:9
**8586** 349:11,13
  349:19 410:17
  410:19 420:10
**8587** 349:21,24
  350:7 420:11
**8588** 350:8,21
**8589** 350:24
  351:2,8 412:24
  420:13

**8590** 351:11,13
  351:18 420:14
**8591** 351:22,24
  352:5 420:15
**8592** 352:9,11
  352:16 420:16
**8593** 352:18,20
  353:2 420:17
**8688** 350:15
  420:12

**a**

**able** 412:17
**above** 396:4
  419:6
**absolutely**
  386:20
**abusive** 368:13
**accuracy** 381:9
**accurate**
  382:17
**accurately**
  346:2
**ace** 410:16
**acknowledge**
  396:7
**act** 384:23
**acted** 417:7
**action** 397:24
  422:16
**actually** 360:25
  389:2
**acworth** 349:7
  349:20 350:6

355:2,5,6,8,12
357:6,11,21,24
372:21,22
373:6,17,21
374:2,5 410:16
**address** 358:12
  391:10
**administer**
  343:11
**affect** 376:8,8
**ago** 376:5
  390:21,22
**agreed** 343:5
  343:20
**ahead** 401:12
**al** 341:8 342:10
  423:2
**alerted** 396:9
  396:18
**alex** 348:18
  353:22 354:4
  354:12 361:17
  362:12 364:5,8
  364:14 366:6
  367:12,15,21
  368:12,17
  375:13 383:20
  384:9,12 389:4
  392:9 393:20
  396:9,18,24
  397:7,8,12,18
  397:20,24
  398:2,9,10,15
  398:16 406:19

406:21 407:11
407:14,20,23
407:23 408:18
409:25 410:5,8
411:18 413:7
**alex's** 375:2,22
  383:2,12 384:4
**alexandra**
  341:3 342:5
  423:2
**alexandria**
  342:18 347:8
  380:19
**allegations**
  369:4
**allege** 369:7
  370:14 417:3
**americas**
  341:21 342:10
**amount** 376:7
**answer** 371:25
  376:23 395:15
**anybody** 410:8
**anymore** 400:8
**ap** 416:8
**apartment**
  361:6 401:17
  401:24 402:3,5
**apologies**
  372:18
**app** 354:17,18
  355:10 360:23
  363:5 373:5,9

**[approximately - bronstein]**                                      Page 3

**approximately** 355:17

**april** 341:11 422:20

**asked** 391:14 395:13

**asking** 347:2 356:13 394:18 404:11 416:6

**assign** 355:8

**associated** 347:22 349:9

**ate** 384:21

**attention** 408:20

**attorneys** 342:4 342:9

**attributed** 393:2

**audio** 346:5,10 348:6,20,23 349:12,23 350:14,25 351:12,23 352:10,19 353:7 360:13 361:11 365:11 365:23 366:21 410:22 413:2 413:23 420:8,9 420:10,11,12 420:13,14,15 420:16,17,18

**authorized** 343:11

**automatically** 355:10

**avenue** 341:21 342:10

**aware** 345:15 345:25 346:19 365:23 366:5 403:20,23 404:5

**b**

**b** 378:14 420:2

**back** 377:4 379:14 388:5 388:11 400:7 400:10 406:11

**background** 373:10,12,14 410:22 413:2 413:23

**bagley** 342:18

**balducci** 345:10 347:9 347:12 361:16 361:23 362:9 362:12 365:19 366:16 367:21 374:21,23 375:2,8,15,17 375:21 377:17 378:10,23 379:5 381:21

382:9,11,24 383:2,11 384:4 384:11 390:7 390:17 391:4 391:22 392:16 392:20 393:12 393:19 394:6 395:20,24 396:8,17,24 397:6,11,17,19 397:23 398:24 399:2 404:13 405:25 407:20 408:6,8,9,16,24 409:2,11,16,21

**baseball** 353:3 353:15 360:20 360:22 361:2 362:5 374:18

**based** 355:11 356:2 361:15 361:17

**basic** 344:11

**bates** 348:6,23 349:12,18,23 350:14,20,25 351:7,12,23 352:10,19,25 353:7,13 377:23 378:5 420:8,9,10,11 420:12,13,14 420:15,16,17 420:18,20

**bearing** 350:20 351:7 352:25 353:13 378:5

**beginning** 364:11

**belief** 407:6

**believe** 354:18 369:22 374:18 380:25 396:5 410:18 416:15

**benefit** 409:5 409:22,25 410:5,9

**berating** 385:12,13

**beyond** 362:17 377:15

**bill** 345:7 365:12 366:9 380:22 398:6,8 406:20,20,24

**blood** 422:16

**brandon** 342:19

**break** 415:7

**brief** 388:19

**bringing** 408:20

**broadway** 342:5

**bronstein** 345:13,16,20 365:21 366:18 389:5,15,16,24

**[bronstein - collette]**                                    Page 4

389:25 390:6
390:17,23
393:10,21
396:10,19,25
397:7,8,13,21
397:25 398:2,9
398:11,15,16
403:17,24
404:8,18 405:4
405:12,18
407:24

**c**

**c** 342:2 344:21
344:21 419:2
422:2,2
**call** 373:14
375:2,22
376:14 382:15
383:2,12,20
384:4,11,11
389:8,14,14,17
389:19,23
390:5,18,21,24
396:10,19,25
397:15,18
398:2,10,16
404:9 407:19
407:24
**called** 344:22
354:19 355:2
361:2 373:5,5
373:21,25
374:5,5

**calls** 373:10,11
373:12 417:4
**captured** 347:2
**care** 386:6
**case** 341:6
346:8,22 347:4
363:11,15
365:25 367:11
415:20 423:2
**caucus** 386:3,7
386:10
**cbs** 347:24
348:7,16,22,24
349:5,11,13,19
349:24 350:7
350:15,21
351:2,8,13,18
351:24 352:5,9
352:11,16,20
353:2,5,8,14
367:12,15,21
368:8,21 374:9
380:15 389:23
390:5,22 391:9
391:14 410:8
410:17 412:16
412:24 417:11
420:8,9,10,11
420:12,13,14
420:15,16,17
420:18
**center** 353:4,16
360:20,22
361:3 362:5

374:18
**certainly** 416:9
**certification**
343:8
**certify** 419:4,8
422:9,14
**challenges**
408:13
**chance** 382:21
**change** 373:17
423:5
**characterize**
369:10
**checked** 362:14
362:23
**chiusano**
341:23 422:7
422:23
**christmas**
411:13
**christopher**
342:17
**city** 361:8
**civil** 341:19
**clarify** 346:23
**clark** 342:4
**clear** 363:23
**clock** 388:12
**close** 360:24
**cnn** 382:6,14
393:6
**collette** 341:16
344:1 345:1
346:1 347:1

348:1 349:1
350:1 351:1
352:1 353:1
354:1 355:1
356:1 357:1
358:1 359:1
360:1 361:1
362:1 363:1
364:1 365:1
366:1 367:1
368:1 369:1
370:1 371:1
372:1 373:1
374:1 375:1
376:1 377:1
378:1 379:1
380:1 381:1
382:1,3 383:1
384:1 385:1
386:1 387:1
388:1 389:1
390:1 391:1
392:1 393:1
394:1 395:1
396:1 397:1
398:1 399:1,6
400:1 401:1
402:1 403:1
404:1 405:1
406:1 407:1
408:1,23 409:1
410:1 411:1
412:1 413:1
414:1 415:1

**[collette - created]**                                                    Page 5

416:1 417:1
418:1 419:1,15
420:1 421:1
422:1 423:3,21
**come** 367:14
368:4,5
**comment**
403:20,23
404:6 407:5
**commission**
423:25
**complaint**
368:16,23
369:3,13 370:4
370:18 391:10
391:16 407:14
407:16
**complaints**
417:12
**complies**
372:13 398:21
408:4
**concerned**
412:16
**concerns**
364:21 392:12
392:13
**concluded**
418:10
**conduct** 369:21
370:2 371:2
**confer** 348:5
350:10 374:10

**confirmed**
363:19
**confused** 404:2
**confusing**
383:5
**connection**
346:7
**constantly**
395:5
**constitutes**
369:22
**contacting**
397:12,25
**contain** 401:20
**contend** 369:25
370:14 371:10
371:13
**contending**
368:12
**contentions**
381:17
**continued**
341:15
**continues**
408:25
**continuing**
388:24
**conver** 362:7
**conversation**
347:11 353:24
356:8 357:15
358:3,21 359:9
359:19 360:3,4
360:7,14

361:12,16,17
361:22,23
362:8 373:15
374:21,22
375:16 377:15
381:24 382:24
383:10 384:9
385:22 392:15
392:19 396:16
399:3 406:5,16
408:15,18
409:12,15
410:24 411:17
413:7 414:16
414:19
**conversations**
356:14,22
362:18 368:11
369:20 370:13
370:15,22
371:5,6 372:7
396:8 410:7
412:14 415:18
**copy** 343:14,17
418:5
**cordial** 415:25
416:4,12
**correct** 344:17
347:15,16
354:14,21
361:21 368:17
368:22 369:5
372:23 374:23
375:9 389:6

390:2 403:25
405:13,20
406:25 407:2
409:3,18
410:25 413:7
413:12 414:6
419:9
**corrections**
381:17,18
**correctly** 355:3
405:7
**corresponding**
373:14
**corresponds**
410:17
**cottone** 365:16
366:13
**could've**
387:22
**counsel** 343:6
343:17 345:3
346:4 348:5
350:10 374:10
381:18
**county** 422:5
**course** 416:25
**court** 341:2
343:13 377:4
381:10 418:4
420:22
**cover** 348:17
349:5,18
**created** 414:6

**[cross - duly]**                                                    Page 6

**cross** 388:4,7
**currently**
  354:20 374:5
  402:5
**cut** 413:17
**cv** 341:6

**d**

**d** 343:2 344:21
  419:2 421:2
**date** 341:11
  348:9 349:2,15
  350:2,17 351:4
  351:15 352:2
  352:13,22
  353:10 355:19
  364:7,10,15,23
  365:5,5 377:25
  389:12 423:3
**dated** 402:6
**dates** 377:12
  402:15,18
**davis** 341:20
  342:9
**day** 344:10,11
  344:19 345:3,6
  345:9,12
  362:16 366:24
  379:24 396:6
  399:15,23
  419:19 422:20
  423:22
**days** 343:16
  405:12

**deal** 380:3
**dealing** 416:7
**december**
  355:22,23
  356:4,23
  364:22 403:25
  411:8
**decided** 370:21
  391:7
**decision** 370:17
  392:15
**defendant**
  341:9
**defendants**
  342:9
**deleted** 366:2,7
**demeaning**
  371:11,18
  372:5
**demeanor**
  415:20
**department**
  368:22
**deposition**
  341:15 343:8,9
  343:14 344:10
  344:19 345:4,7
  345:10,13,16
  345:20 362:15
  367:4,7 396:6
  399:16,20,24
  402:13 423:3
**depth** 380:25

**describe**
  371:15 415:20
  415:24
**described**
  417:8
**description**
  420:7
**detail** 376:15
  376:18 377:7,9
**details** 377:13
**determine**
  363:13
**difference**
  395:2
**different**
  369:10 371:12
  371:14
**difficult** 392:11
**direct** 387:12
  408:5 410:4
**discuss** 345:6,9
  345:12
**discussed** 363:4
  414:25
**discussing**
  411:23
**discussion**
  367:20,25
  377:16 378:9
  381:21 390:16
  391:3,22
  413:18,25
  414:2,22

**discussions**
  365:11 397:6
  411:20 416:14
**district** 341:2,2
**document**
  348:15 350:5
  350:20 351:7
  351:18 352:5
  352:16,25
  353:13 357:20
  374:19 378:11
  382:18 383:22
**documents**
  347:19,21
  387:21 412:8,9
  421:8,9
**doing** 373:10
  398:4 411:19
**door** 386:17
**doubt** 409:5,23
  410:2,5,9
**dr** 350:23
  351:10,20
  352:7,17 358:9
  359:2,13,25
  360:12 412:25
  413:10,22
  414:9
**drive** 351:9
  358:13,14,16
  359:5,15
**duly** 344:23
  419:5 422:11

**[dun - find]**

**dun** 359:5,5
  412:25 413:10
**dunlavin**
  350:22 351:9
  351:20 352:7
  352:17 358:9
  358:11,12,14
  358:15 359:2,5
  359:13,15,25
  360:12 412:25
  413:10,22
  414:9
**dwt.com**
  342:12,13

**e**

**e** 342:2,2 343:2
  343:2 344:21
  344:21 390:10
  390:11 419:2
  420:2 421:2
  422:2,2
**earliest** 402:6
**early** 403:25
  411:8
**effect** 343:12
  343:15 392:14
**efforts** 401:6
**eight** 387:20
**either** 361:20
  361:22 362:8
  362:11 386:4
**emotion** 408:10

**enclosed**
  348:20
**engaged** 369:21
  370:2,14
**ensure** 381:9
**entitled** 348:16
**entry** 378:22
**errata** 423:1
**erroneous**
  394:21
**error** 394:11
**errors** 378:18
  381:6
**esq** 342:6,11,12
**et** 341:8 342:10
  423:2
**evening** 344:8
**events** 346:7
**exact** 364:15,23
  365:5 389:11
**exactly** 375:6
  378:24 412:19
**examination**
  344:6 418:9
  421:4 422:10
  422:12
**examined**
  344:24
**examples** 371:7
**except** 343:21
**excuse** 366:15
**exhaustively**
  378:17

**exhibit** 348:8
  348:15,22,25
  349:4,11,14,17
  349:25 350:4
  350:16,19
  351:3,6,14,17
  351:25 352:4
  352:12,15,21
  352:24 353:9
  353:12,18,19
  353:21 354:12
  354:24,25
  357:3,18 358:7
  359:23 360:11
  362:3 372:12
  374:15 377:21
  377:24 378:4
  379:15,24
  380:14 381:15
  381:16,25
  388:25 390:15
  396:17 398:20
  400:17,24
  401:3 402:12
  402:23 404:6
  408:3 410:19
  420:6,6,8,9,10
  420:11,12,13
  420:14,15,16
  420:17,18,19
**exhibits** 420:4
  420:22
**experience**
  416:7

**expires** 423:25
**explanation**
  391:21 392:18
**extra** 380:7
  386:14

**f**

**f** 343:2 422:2
**fact** 368:2
**fair** 361:19
**federal** 341:18
**feel** 380:10
**felt** 370:19
  391:24
**figure** 363:10
**file** 348:6,20,23
  349:12,23
  350:14,25
  351:12,23
  352:10,19
  353:7 355:2
  362:4 373:4,8
  373:13,21,25
  374:4,17 420:8
  420:9,10,11,12
  420:13,14,15
  420:16,17,18
**filed** 364:2
**files** 372:20
  373:16
**filing** 343:7
**final** 379:24
**find** 400:20
  402:18,19

**fine** 385:24 388:3
**fired** 367:12,16 367:21
**firm** 346:5
**first** 344:10,19 345:3,6,9,12 353:18 367:4 374:25 381:14 382:25 383:11 383:18 384:3 390:4,22 392:8 396:5 399:15 399:23 419:5
**five** 388:6,11
**floor** 341:21 342:10
**follows** 344:25
**force** 343:15
**foregoing** 419:8
**form** 343:21 390:8 391:6
**forth** 422:11
**found** 365:9
**frame** 365:7
**frequently** 369:8
**frustrated** 391:14
**further** 343:20 397:12 419:8 422:14

**g**

**gai** 369:21
**general** 369:11 407:16
**generally** 344:13 363:7 376:8 407:10 411:24 412:2 416:17,19
**generates** 355:10
**georgia** 355:13 355:15 357:11 357:24 411:4 413:12 414:12
**getting** 412:7
**ghw** 341:6
**give** 348:13 350:11 367:11 367:14,19,23 368:7 380:7 395:5 409:4,22 409:25 410:5
**given** 353:18 419:10 422:13
**giving** 410:8
**global** 341:8 342:10 423:2
**go** 364:20 384:18,25 385:16,19,20 386:20 400:6 400:10 401:12

**going** 377:9 385:7 392:7 408:14 410:14 412:20
**gonna** 347:17 384:18 386:3 386:13,16,19 395:10
**good** 344:8
**great** 344:5 374:13 410:20
**ground** 344:11
**guess** 370:25

**h**

**h** 344:21 420:2
**ha** 400:9
**hand** 422:20
**handwritten** 399:12
**hang** 399:7
**happened** 364:24 416:25
**harassment** 369:22
**hear** 379:8,9
**heard** 378:25 395:4
**held** 341:19
**helping** 408:19
**hereinbefore** 419:11 422:11
**hereunto** 422:19

**hjr** 341:6
**holidays** 355:23
**home** 355:23
**honestly** 376:4 384:24
**hopes** 408:18
**hr** 348:18 353:22 354:4 354:13 364:3 364:20,20 365:18 370:4 370:18,23 376:17 377:7 377:15 392:7 392:10 403:8 405:19 406:5 406:16,23,24 407:8,14,20,22 411:19
**huh** 386:25
**human** 368:21 391:16

**i**

**iadevaia** 342:6 344:5,7 345:23 347:23 348:10 349:3,16 350:3 350:8,11,18 351:5,16 352:3 352:14,23 353:11 363:2 364:18 370:9

| | | | |
|---|---|---|---|
| 372:15,18 374:8,11 376:21,25 377:20 378:3 379:10,16,18 379:22 380:2,8 380:11 381:11 384:17,25 385:5,7,13,17 385:20,24 386:5,11,25 387:6,12,18,23 388:2,8,13 394:13,24 395:12,16 398:7 403:21 406:8 410:11 412:22 413:3 413:21 415:4 417:16 418:2 421:5 **idea** 401:5 413:14 414:20 414:23,24 **identification** 348:8,25 349:14,25 350:16 351:3 351:14,25 352:12,21 353:9 377:25 **identified** 371:3 | **identifying** 365:3 **immediately** 382:4 393:5 403:8 405:19 **important** 391:25 392:3 **impression** 407:7 **including** 345:3 369:7 **indicating** 393:19 **individuals** 361:21 **information** 421:8,9 **initially** 364:3 **instance** 376:12 **instruction** 395:5 **interactions** 416:17 **interested** 422:17 **interject** 408:22 **interrupting** 395:6 **interview** 373:19 **issues** 409:3 412:5 | **j** <br> **james** 342:18 **january** 356:9 356:15,16,19 356:24 364:6 364:11 374:23 389:3,9 397:2 397:9,15,19 403:25 411:9 **jeremiah** 342:6 379:13 **jiadevaia** 342:7 **job** 403:7,16 **ju** 385:4 **judge** 343:13 384:19 386:21 <br> **k** <br> **karyn** 341:22 422:7,23 **keep** 379:12 391:15 401:15 401:23 **kept** 400:13,17 400:21,22 **kind** 409:6 **knew** 365:7 405:11 **know** 346:14 346:16,18 347:5 354:3 355:7,17,19,20 355:21 358:11 361:14 362:6 | 362:21 364:13 364:15,23 365:5 367:18 373:7,20,23 374:7 375:20 380:22 382:16 384:20,21 392:17 400:25 402:8,10 405:15,16 406:3,14,18 407:9,25 408:12,12,12 408:17,19,20 409:4,5,6 411:12 413:16 413:17 415:2 **knowledge** 397:20 407:4 <br> **l** <br> **l** 343:2,2 344:21,21 419:2 **la** 364:9 **labeled** 410:16 **lastly** 353:5 **late** 386:18 403:24 **lawyers** 347:19 366:22 367:10 **learned** 383:17 383:20 389:4 392:10 397:13 |

**leaving** 387:16
**left** 348:3
**limited** 380:4
**line** 378:23
　379:3 380:17
　380:18 381:25
　392:25 394:7,7
　394:19 395:18
　398:22,23
　403:2 404:21
　408:5 409:21
　421:14 423:5
**lines** 395:19,19
**listen** 363:9
　413:22
**listened** 362:24
　363:16 365:8
　366:21,23
　367:7
**listening** 365:2
**little** 404:2
**llc** 423:1
**llp** 341:20
　342:9
**locate** 402:22
**location** 355:11
**longer** 399:17
**look** 353:17
　354:11,23
　357:3,18 358:6
　358:24 359:11
　360:10,17
　362:2 370:17
　372:11 374:15

379:14 381:24
382:22 392:23
398:19,22
400:3 401:7,9
402:11 408:2
**looked** 399:24
　400:5
**looking** 356:2
　359:22 381:15
　402:16,16,17
　402:20,25
　409:20
**lot** 416:9
**lunch** 384:22
**lyle** 342:11
　388:13 394:14
**lylezuckerman**
　342:12
**lynch** 342:12
　388:14 417:24
　418:6,7

**m**

**made** 346:7,12
346:15 347:4
353:24 354:5,7
355:14,18
356:13,23
357:10,23
358:3,16,20
359:4,15,19
361:3 365:24
368:11,16,19
369:3,15,20,25

370:12,17,22
371:10,23
372:7 382:23
383:10 390:16
391:16 394:25
401:6 403:19
403:22 404:6
407:4 411:3,6
411:12 413:11
414:11 415:18
416:14 417:13
**mail** 390:10
**mailed** 390:11
**make** 354:6
　356:3,7 361:7
　365:10 385:10
　395:9 411:15
**manager**
　408:13
**mancini** 342:17
**march** 367:2
**maria** 365:16
　366:13
**mark** 347:17
　348:21 349:10
　350:24 351:11
　351:22 352:9
　353:5 374:8,11
　377:20
**marked** 348:7
　348:11,14,24
　349:4,13,17,24
　350:4,15,19
　351:2,6,13,17

351:24 352:4
352:11,15,20
352:24 353:8
353:12 376:22
377:24 378:4
379:15,19,19
379:20 381:16
390:14 410:18
421:13
**marking**
　387:21
**marriage**
　422:16
**material**
　380:13
**matter** 345:17
　422:18
**mean** 357:22
　359:14 368:15
　371:16 384:17
　404:20 407:12
　414:10
**memo** 363:5
　373:5
**memory** 376:8
　382:23 383:9
**memos** 354:17
　354:19
**michael** 342:12
**michaellynch**
　342:13
**mid** 411:8
**middle** 413:18

**[minor - okay]**

**minor** 376:15 376:18,18 377:7,8

**minute** 386:3,6 386:9 390:21 415:6

**minutes** 380:7 386:14,16 387:17,21 388:6,11 410:21

**moments** 416:5 416:11

**month** 355:20 356:17,19 366:25

**months** 403:8 404:16,24 405:5

**move** 386:23 395:11,12

**mpeg** 348:20

**multiple** 400:14

**n**

**n** 342:2 343:2 419:2 421:2

**name** 353:23 354:25 372:21 373:18 423:2,3

**named** 372:19 373:16

**names** 373:8

**nature** 369:12

**near** 361:6

**needed** 370:19 390:11 412:17

**needs** 409:3

**nervous** 370:19

**never** 384:22

**new** 341:2,21 341:22,24 342:6,6,11,11 344:24 361:8 422:4,5,8 423:1

**nice** 415:21

**non** 341:16

**notary** 341:23 344:23 419:22 422:7 423:25

**note** 378:15 401:19 402:6 402:19

**notebook** 400:13

**notebooks** 400:5,6,10,12 400:14,15,18 401:13,16,18 401:19,19 402:4,17,21

**notes** 399:7,10 399:12,12,18 399:21,25 400:16,23

401:3,20 402:9 402:12,12,15 402:22

**notice** 402:14

**notified** 383:12 389:23 390:22

**notify** 390:4,9

**number** 346:17 346:18 350:21 351:8 353:2,14 357:8 369:4 394:16,18 420:7

**numbers** 378:5

**nyc** 353:4 360:20 362:5 374:18

**nyc.m4a** 353:16

**o**

**o** 343:2 344:21 379:6,6,9,9,9 395:3,3,3 419:2

**oath** 343:12 344:18

**ob** 378:12

**objected** 395:14

**objection** 346:11 366:3 367:17 368:14 369:17 370:16

371:24 375:4 375:18 376:13 376:19 378:13 383:14 384:5 385:10 387:3,5 391:5,23 393:22 394:2 394:10 395:17 396:2,12 398:3 398:12,17 401:4,10 405:14 406:6 413:20 414:17 415:22 416:3 417:14

**objections** 343:21

**obtain** 412:17

**obviously** 408:15

**occasion** 379:14

**of6ices** 341:20

**oftentimes** 373:12

**oh** 348:11 350:13 374:12

**okay** 344:16 346:19 351:5 353:20 354:3,6 355:12 356:3 357:2,13 358:6 358:23 360:10 360:17,25

361:7,10,19
362:2 363:9,13
363:22 364:4
365:10 366:25
373:3 374:16
375:7 376:17
377:6,19
379:10,16,22
380:8,11
381:11,15,23
382:3,9,21
385:6,25
386:11 387:23
388:13,24
389:13,22
390:14 391:2
393:4 395:18
396:15,23
397:5,17 399:2
399:10,21
400:9,12 402:4
402:14,25
404:4,13
405:16,24
406:3,13,22
408:2 409:11
412:21 415:3

**once** 375:8
392:9

**ones** 362:17
363:4,17 365:3
365:4

**opportunity**
378:16

**order** 377:12
**original** 343:9
343:17
**outcome**
422:17
**owens** 345:7
365:12 366:9
398:8
**own** 387:25

**p**

**p** 342:2,2 343:2
**p.c.** 342:4
**p.m.** 341:12
344:3 388:17
388:22 415:10
415:15 417:22
418:8
**page** 348:15,17
349:5,5,18,18
350:5,20 351:7
351:18 352:5
352:16,25
353:13 378:21
379:2,3,3
380:13,16
381:24 392:23
392:24 394:6
395:19 398:19
403:2,2 408:2
409:20 420:6
421:4,9,14
423:5

**pages** 409:9
**paramount**
341:8 342:10
423:2
**part** 346:20
379:12
**parties** 341:17
343:7 381:8
422:15
**party** 341:16
**past** 376:7
**period** 363:17
363:19,22,24
364:2 379:7
**person** 346:20
382:5 393:5
**personal**
401:21
**phone** 354:14
354:17 362:15
363:5 370:22
373:4,8,14,21
373:25 374:5
375:16,19,23
376:14 383:2
383:12,19,20
389:5,8,13,14
389:23 390:5
390:10,13,18
390:20,23
396:10 404:8
407:19,24
417:4

**phrasing** 383:5
**physically**
360:24
**picked** 360:23
**piece** 382:16
**pl** 378:5
**pl3011** 377:23
420:20
**place** 361:2,2
381:5 392:8
419:11
**placeholder**
347:19,21
349:6,20 350:6
350:22 351:9
351:20 352:7
352:17 353:3
353:15
**plaintiff** 341:4
342:4
**play** 410:12,14
**played** 414:2
**playing** 410:22
413:2,23
**please** 347:23
347:24 348:4
348:22 349:11
350:9 352:18
353:19 354:24
357:4,19 358:7
358:24 360:18
362:3 372:12
374:15 377:21
383:6 385:2

**[please - record]** Page 13

394:15 398:20 406:9 408:3,6 415:7 418:7

**point** 368:20 378:20 389:3 389:22 405:10 406:4,14

**pointed** 381:18

**poolos** 341:3 342:5,18 347:8 347:15 353:25 356:4,9,15,22 357:16 358:4 358:21 359:9 359:20 360:5,8 360:15 361:13 361:17,24 362:9,12,19 364:14 366:6 368:17 369:4 369:15,20,25 370:2,13 371:4 371:10 372:5 380:20 382:15 389:4,15,24 390:6,23 391:11,15 392:14 397:12 397:14,21,24 398:2 403:14 403:23 404:7 404:14,17 405:4,11,18 406:4,15 407:7

410:25 411:21 411:24 412:15 412:16 414:3 415:19 416:8 416:14 417:4 417:13 423:2

**position** 371:18 372:5

**possible** 408:11

**premarked** 387:22

**present** 342:17

**prevent** 397:24

**previously** 344:22 375:22 410:18

**prior** 384:11 396:15,16 404:8

**problem** 371:3

**procedure** 341:19

**proceed** 409:6

**proceeding** 381:10

**produced** 346:4,21 347:3 347:18 380:15 415:19

**protect** 370:20 394:22

**public** 341:23 344:23 419:22 422:7 423:25

**purportedly** 379:4 380:19

**purpose** 412:9

**purposes** 367:10

**pursuant** 341:18

**put** 368:20

**q**

**question** 346:24 370:10 370:11,25 372:4 376:20 377:2,4,6 378:7 383:8,25 384:2 386:24 394:3,19 395:13,23 404:4 406:9,11 406:13 409:24 421:14

**questions** 421:13

**quickly** 378:21

**r**

**r** 342:2 343:2 344:21,21 419:2 422:2

**raise** 394:16

**raised** 381:13 407:16 416:23

**raising** 407:13

**ranted** 416:24

**raskin** 342:4

**ray** 367:20

**reach** 403:6

**reached** 393:20 398:9

**reaching** 375:13 379:6 382:12 393:14 394:8 395:21 396:9,18,24 397:7 398:15

**read** 377:4 380:17 384:15 406:11 409:9

**reads** 393:3

**really** 383:4 392:11 397:4

**reason** 345:24 417:10 423:5

**recall** 375:11 396:11 397:5 399:16

**received** 382:14

**recently** 354:8

**recess** 388:19 415:12

**recognize** 357:13 358:19 359:8 361:10 381:19

**record** 344:4 347:18 363:23

**[record - reportedly]**

370:21 373:11
378:15 380:5
385:2,8,12,16
385:23 387:15
388:15,18,23
391:3,8,13
392:15 394:25
395:9 410:15
413:4 415:11
415:16 417:23
422:12
**recorded** 368:2
371:5,7 375:8
377:14 391:21
392:19
**recording**
347:10,21
349:8 353:24
354:8,12,13
355:9,15,18
357:10,23
358:2,17,20
359:4,8,16,19
360:7,14 361:4
361:8,12 362:8
367:19,25
368:8 375:12
375:17 376:17
377:7,23 378:9
381:20 382:23
383:10 390:16
410:12,15,24
411:3,7,12,16
411:20,24

412:23 413:5,6
413:11,15,24
414:2,5,11,15
414:15,21,25
420:19
**recordings**
346:6,10,15,21
347:3,14 356:4
356:7,14,21
357:15 362:17
362:20 363:3
363:14,21
364:13 365:3
365:11,24
366:5,21 367:9
367:12,15
368:10 369:14
369:19,24
370:12 371:9
371:20 372:6,8
415:18 416:13
417:11
**reference**
358:10 360:21
403:7,16,17
406:22
**referenced**
402:12
**referred** 377:3
402:22 406:10
**referring**
363:25 393:9
393:24,25
395:24 396:3

399:11 400:17
403:13 404:17
**refers** 409:12
**reflect** 384:3
**reflected** 371:4
375:17 396:16
400:24 401:3
404:6
**refresh** 382:22
**refreshes** 383:9
**relate** 363:11
**related** 363:6
363:14,21
365:25 383:20
401:20 404:11
407:13 412:3,6
422:15
**relaying** 407:15
**relevant** 346:7
**remember**
344:13 354:9
355:25 364:9
364:25 373:18
374:3,24 375:5
375:6,24 376:2
376:6,16 382:5
384:13,14
386:22 389:11
389:21 393:5
396:13,14,20
396:21 397:4
397:10,16
398:4 399:14
399:19 407:21

409:19 410:3,6
410:10 411:14
412:12,19
**remembering**
377:11
**rename** 373:13
**renee** 345:10
347:8 361:16
362:12 365:19
366:16 367:20
367:24 375:19
378:22 379:5
382:11 383:11
383:12,16,19
383:24 384:7,8
390:7 396:8,17
396:23 397:6
397:11,17,19
397:23 398:24
399:2 408:6,9
408:16 409:2
409:16
**renew** 412:10
**repeat** 376:25
383:6 406:8
**repeatedly**
369:8
**rephrase**
356:10 370:5
**reported**
389:25
**reportedly**
378:23

| | | | |
|---|---|---|---|
| **reporter** 348:9 349:2,15 350:2 350:17 351:4 351:15 352:2 352:13,22 353:10 377:5 378:2 406:12 418:4 420:22 | **review** 378:17 | 377:24 378:1,4 378:7 379:1,15 380:1,14 381:1 382:1,3 383:1 384:1 385:1 386:1 387:1 388:1,24 389:1 390:1 391:1 392:1 393:1 394:1 395:1,18 396:1 397:1 398:1 399:1,6 400:1 401:1 402:1 403:1 404:1 405:1 406:1 407:1 408:1,23 409:1 410:1,23 411:1 412:1 413:1 414:1 415:1,17 416:1 417:1 418:1 419:1,15 420:1,4 421:1 422:1 423:3,21 | **rough** 417:25 418:3 |
| | **reviewed** 380:24 | | **rules** 341:19 344:12 |
| | **reviewing** 364:12,17 373:24 | | **rulings** 421:13 |
| | **reviews** 378:11 382:18 383:22 | | **russia** 412:3,12 |
| **reporting** 423:1 | **richards** 341:17 344:1,8 345:1 346:1 347:1,25 348:1 348:7,11,14,21 348:24 349:1,4 349:10,13,17 349:24 350:1,4 350:15,19 351:1,2,13,17 351:24 352:1,4 352:11,15,20 352:24 353:1,8 353:12,17 354:1,11 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1 373:1 374:1 375:1 376:1 377:1,21 | | **russian** 412:6 |
| **representative** 416:16,18,19 | | | **s** |
| **requested** 421:8 | | | **s** 342:2 343:2,2 344:21 420:2 423:5 |
| **reserve** 381:12 | | | **saying** 378:24 388:3 394:6 396:13 404:3 404:12 405:3 |
| **reserved** 343:22 | | | **says** 348:19 353:21 354:25 357:20 358:8 358:25 359:12 359:24 360:19 381:25 393:13 395:20 398:25 405:23 409:21 |
| **resources** 368:21 391:17 | | | |
| **respective** 341:17 343:6 | | | |
| **respond** 399:4 | | | |
| **responds** 382:10 | | | |
| **responsive** 365:4 | | **rid** 401:2 | **scared** 392:4,5 392:6,8 |
| **resubmit** 412:10 | | **right** 347:12 354:10 357:2 359:22 370:24 374:14 381:13 387:7 404:9,19 409:7 410:21 411:4,9 417:19 | **scott** 345:13 365:21 366:18 375:3,14,22 383:3,13,21 384:4,9,12 389:5 393:21 396:24 397:7 397:18,25 |
| **retained** 420:22 | | | |
| **retaliation** 370:15 | | **rights** 381:12 | |
| **return** 417:11 | | | |

**[scott - t]**

398:9,15
**sealing** 343:7
**second** 344:9
  413:4
**seconds** 390:22
  413:5
**see** 362:16
  372:24 373:2
  373:25 382:7,8
  393:7,8,16,17
  393:23 399:7,8
  399:9 403:9,11
  404:10,25
  409:8
**seen** 384:22
**sent** 366:23
  371:22
**sentence** 379:4
  380:18
**sentiment**
  407:15
**service** 343:16
**set** 422:11,20
**sheet** 423:1
**short** 413:15
  415:12
**sic** 351:10
  386:14
**signature**
  422:22
**signed** 343:10
  343:12,15
**simon** 365:14
  366:11 398:14

**sir** 415:8
**soon** 389:19
**sorry** 346:13,23
  348:11 350:13
  370:7 372:2,15
  376:4 379:3
  383:4
**sotto** 348:5
  350:10 374:10
**sound** 414:14
**sounds** 414:18
**southern** 341:2
**speak** 345:19
  382:13 390:12
  396:23
**speaking** 376:9
  377:11 385:10
  387:2 395:17
  397:21 406:23
  407:10 408:6
  411:25 412:2
**specific** 372:10
  404:11
**specifically**
  361:15
**specified**
  419:11
**spent** 387:20
**spoke** 364:5,8
  364:14 390:12
  397:8 405:18
**spoken** 345:2
  375:15 389:5
  404:18 406:20

406:21 407:7
  407:11,14,17
  407:20,23
**ss** 422:4
**stage** 412:12
**stamped**
  349:18
**start** 347:23,25
  372:2,20,20
**started** 377:11
**starting** 388:12
  392:24 398:23
**starts** 380:18
  414:16,25
**state** 341:23
  344:23 422:4,8
**statement**
  380:19 392:25
  396:3 403:3,12
**states** 341:2
  351:19 352:6
  353:2,14 403:5
**stating** 350:22
**stay** 386:13,16
**steps** 391:10
  397:20
**stipulated**
  343:5,20
**stop** 394:13,14
  397:12,20
**stored** 354:14
  354:16
**story** 412:18

**strike** 345:23
  363:2 364:18
  370:9 398:7
  403:21
**stuff** 401:20,21
  401:22
**subject** 370:3
**submitted**
  368:21
**subpoena**
  341:18
**subscribed**
  419:18 423:22
**substance**
  369:12
**substantiate**
  417:12
**sufficient**
  391:10
**suite** 342:5
**sum** 369:11
**summarizing**
  382:16,20
**sure** 346:25
  356:12 370:6
  372:3 394:4
**sworn** 343:10
  344:23 419:5
  419:18 422:11
  423:22

**t**

**t** 343:2,2
  344:21,21

**[t - total]** Page 17

379:6,9,9 395:3,3 419:2 420:2 422:2,2

**take** 354:23 357:3,18 358:6 358:23 371:17 372:4,11 374:14 381:24 391:2 392:23 392:24 397:20 397:24 398:19 398:22 408:10

**taken** 341:17 345:16 388:20 391:9 415:13

**talk** 388:4,7

**talked** 375:19 375:21 380:22 382:25 403:7 404:15,23 405:4

**talking** 377:10 377:13 383:16 383:24 384:7 384:12 403:8 405:19 412:3,7

**tanya** 365:14 366:11 380:22 398:14 406:20 406:21,24 408:16 409:13 409:16

**tape** 380:24

**telephone** 382:15 384:10

**tell** 367:24,24 368:5 369:9 382:4 385:23 389:16,20 393:4 398:6,8 398:14 407:18 407:22 410:4

**telling** 382:5 383:16 384:8 393:6

**ten** 413:4,5

**terms** 411:11

**terrified** 392:7

**testified** 344:24 390:21 392:20 396:6 399:17

**testify** 346:2 387:8,13 419:5

**testimony** 391:19 396:11 419:6,10 422:13

**text** 382:7,8 390:10 393:7,8 393:16,17,23 399:8 403:9 404:25 405:7 409:8

**thank** 349:22 362:13

**thanks** 349:22

**thereabout** 413:5

**thing** 404:12

**things** 412:3

**think** 344:15 347:17 348:3 356:6 369:23 374:20 377:8 379:25 384:17 392:2 394:20 415:4 416:2,4 417:16,19

**threats** 387:19

**three** 376:5 409:15

**time** 341:12 343:22 344:2 354:7 355:14 358:16 359:4 359:15 360:2 361:3 363:18 363:20,23 364:13 365:7 366:20 374:25 376:7 380:4,5 381:14 382:25 383:11,18 384:3,19 385:9 386:17 387:25 388:16,21 391:24 392:3 392:11 395:6,9 402:13 403:19 403:22 404:5

405:10 406:4 406:15 407:4 407:19 408:14 411:7 412:13 412:15 415:9 415:14 416:25 417:21 419:10

**timeline** 404:3

**timely** 412:18

**times** 416:10,21

**timing** 411:11

**title** 348:17 349:6,19 351:8 354:4,5 355:8 355:11 356:2 357:5,14,14 358:20 359:7,8 359:18 360:4,6 360:13 361:11 361:11,15,18 362:4,7 374:19 413:9 414:8

**today** 346:2 379:19,19 381:3,6 384:22

**together** 381:8 412:8

**told** 375:2,13 383:19 384:3 406:19,21 407:5

**took** 400:23

**total** 346:5,16 346:18

**[touch - witness]**

**touch** 397:14 403:24 404:7 405:11

**towards** 371:11 371:19 372:6 415:21

**transcript** 376:22 377:22 378:5,8,18,19 379:13 380:14 380:17 381:5 381:20,25 383:15 384:16 390:15 393:3 393:13 394:11 394:20,23 398:25 399:5 403:4,10 404:22 405:17 405:22 408:8 408:22 409:12 418:5 419:9,9 420:19

**transcripts** 381:7

**tremaine** 341:20 342:9

**trial** 343:22

**true** 419:9 422:12

**truth** 419:5

**truthfully** 346:2

**try** 408:10

**trying** 376:16 394:22 395:8 412:11

**turned** 363:20 365:9

**two** 378:20 380:7 386:15 394:18 410:21

**typed** 399:12

**u**

**u** 343:2

**uh** 386:25

**unable** 345:25

**unaware** 397:22

**under** 344:18 407:6 408:19

**understand** 344:16,17 346:6 370:24 393:18 394:5 395:7,24

**understanding** 346:9 357:9 359:3 389:10 405:7

**understood** 393:20 408:16

**united** 341:2

**unprofessional** 416:22

**unsigned** 343:14

**unusual** 416:2 416:7

**upset** 391:9

**use** 371:12 373:9

**used** 343:14 381:10 404:21

**uttered** 379:5

**v**

**v** 423:2

**various** 402:18

**veritext** 423:1

**videographer** 342:17 344:2 385:15 388:16 388:21 415:9 415:14 417:21

**videotaped** 341:15

**visa** 412:4,6

**visas** 412:11,17

**vladeck** 342:4

**vladeck.com** 342:7

**voce** 348:5 350:10 374:10

**voice** 354:16,19 363:5 373:5 394:17 416:23

**volatile** 416:10

**vote** 378:14

**w**

**wait** 348:12

**waived** 343:9

**want** 378:14 385:15,19 408:10

**wanted** 380:21 382:4 391:20 393:4

**warning** 387:14,18

**wasting** 385:9 387:24 395:6,9

**way** 371:14 373:8 390:10 412:18 417:8 422:17

**went** 344:11 362:18 364:3 364:19 370:18 370:23 399:3

**whereof** 422:19

**white** 342:19

**witness** 341:16 343:10,16,18 344:22 348:13 372:13 378:11 382:18 383:22 384:24 385:12 386:22 387:8 395:4 398:21 408:4 418:9

**[witness - zuckerman]**

422:10,13,19
**witnesses'**
 423:3
**word** 369:10
 371:12 378:17
 378:24,25
 379:8 380:25
 381:2 395:2
**work** 354:14,17
 362:14 363:5
 373:10,15
 395:10 400:15
 400:18 401:20
 401:22 402:2
**working**
 391:15 416:25
**worst** 371:8
**wright** 341:20
 342:9
**writing** 368:20
**written** 368:23
 370:3 391:16

**x**

**x** 341:3,9 420:2
 421:2

**y**

**yeah** 356:18
 376:3 385:5
 405:9 408:23
 410:13,20
 413:8
**years** 376:5

**yell** 394:16
**yelled** 369:8
 416:24
**yelling** 369:15
**yesterday**
 380:23 381:2
**york** 341:2,22
 341:22,24
 342:6,6,11,11
 344:24 361:8
 422:4,5,8
 423:1

**z**

**zuckerman**
 342:11 346:11
 346:13 366:3
 367:17 368:14
 369:17 370:16
 371:24 375:4
 375:18 376:13
 376:19 378:12
 379:11,17,20
 379:23 380:6,9
 380:12 383:14
 384:5,20 385:3
 385:6,11,18,21
 386:2,8,12
 387:4,10,14,20
 387:24 388:5
 388:10 391:5
 391:23 393:22
 394:2,10,15
 395:7,14 396:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.