# EXHIBIT I

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

_____

ALEXANDRA POOLOS,

       Plaintiff,

   v.                 Case No.

PARAMOUNT GLOBAL; CBS         1:23-cv-08896(GHW)

BROADCASTING, INC.; and CBS    (HJR)

NEWS, INC.,

       Defendants.

_____

    VIDEOTAPED DEPOSITION OF MICHAEL RODERICK

DATE:          Friday, May 30, 2025

TIME:          10:08 a.m.

LOCATION:      Davis Wright Tremaine LLP

              1251 Avenue of the Americas, 21st

              Floor

              New York, NY 10020

REPORTED BY:  Jaime Meneses

JOB NO.:      7402037

PAGES 196-197, 225-226, 228-234, 238-244, 251-269

ARE CONFIDENTIAL AND BOUND SEPARATELY.

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF ALEXANDRA POOLOS:

JEREMIAH J. IADEVAIA, ESQUIRE

JAMES BAGLEY, ESQUIRE

Vladeck Raskin & Clark P.C.

111 Broadway

New York, NY 10006

jiadevaia@vladeck.com

(212) 403-7323

ON BEHALF OF DEFENDANTS PARAMOUNT GLOBAL, CBS

BROADCASTING, INC., AND CBS NEWS, INC.:

LYLE S. ZUCKERMAN, ESQUIRE

MICHAEL LEONE LYNCH, ESQUIRE

Davis Wright Tremaine LLP

1251 Avenue of the Americas, 21st Floor

New York, NY 10020

lylezuckerman@dwt.com

(212) 402-4028

ALSO PRESENT:

Danya Ahmed, In-House Counsel, Paramount Global

(by videoconference)

Paul Baker, Videographer

I N D E X

EXAMINATION:                                          PAGE

    By Mr. Iadevaia                                  8


                    E X H I B I T S

NO.                 DESCRIPTION                       PAGE

Roderick:

Exhibit 1    Preventing Sexual Harassment
             Deck                                     61

Exhibit 2    Oh, The Places You'll Go Deck     63

Exhibit 3    CBS Non-Discrimination and
             Anit-Harassment Policy           69

Exhibit 4    Summons and Complaint            181

Exhibit 5    Confidential (bound separately) 196

Exhibit 6    Affidavit of Jose Andino         211

Exhibit 7    Confidental (bound separately)  224

Exhibit 8    Confidential (bound separately) 227

Exhibit 9    Confidential (bound separately) 238

Exhibit 10   Confidential (bound separately) 251

Exhibit 11   Confidential (bound separately) 266

           QUESTIONS INSTRUCTED NOT TO ANSWER

                  PAGE        LINE

                  172          5

                  199          18

QUESTIONS INSTRUCTED NOT TO ANSWER (Cont'd)

| PAGE | LINE |
|------|------|
| 211 | 13 |
| 214 | 9 |
| 222 | 7 |
| 224 | 4 |
| 224 | 18 |
| 229 | 12 |
| 230 | 19 |
| 234 | 10 |
| 235 | 25 |
| 237 | 15 |
| 244 | 14 |
| 246 | 2 |
| 246 | 23 |
| 255 | 24 |
| 256 | 23 |
| 258 | 20 |
| 259 | 16 |
| 273 | 16 |
| 281 | 7 |

M. RODERICK

THE REPORTER: Good morning. My name is Jaime Meneses. I'm the reporter assigned by Veritext to take the record of this proceeding. We're now on the record at 10:08 a.m.

This is the deposition of Michael Roderick taken in the matter of Alexandra Poolos vs. Paramount Global, CBS Broadcasting, Inc., and CBS News, Inc. taken on May the 30th, 2025, at the offices of Davis Wright Tremaine at the address of 1251 Avenue of Americas, 6th Avenue, 21st floor, New York, New York, 10020.

I'm a notary authorized to take acknowledgement and administer oaths in New York.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

    - is intended for all uses permitted

M. RODERICK

under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

- shall constitute written stipulation of such.

At this time will everyone in attendance please identify yourself for the record, beginning to my left.

MR. LYNCH: Michael Lynch of Davis Wright Tremaine for the defendants.

MR. ZUCKERMAN: Lyle Zuckerman, Davis Wright Tremaine for the defendants.

MR. IADEVAIA: Jeremiah Iadevaia of the firm Vladeck Raskin & Clark on behalf of the plaintiff.

MR. BAGLEY: James Bagley, also of the firm Vladeck Raskin & Clark, on behalf of the plaintiff.

THE VIDEOGRAPHER: Paul Baker, videographer with Veritext Legal Solutions.

THE REPORTER: We have two other parties. If they could kindly introduce

M. RODERICK

their name into the record.

MR. RODERICK: Michael Roderick, vice president, employee relations, Paramount Global.

THE REPORTER: Can someone stipulate that we have somebody also present on Zoom?

MR. ZUCKERMAN: Yes. Danya Ahmed, who's in-house counsel for Paramount Global.

THE REPORTER: Thank you. And now hearing no objection, I will now swear in the witness.

Please raise your right hand.

WHEREUPON,

MICHAEL RODERICK,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: Thank you.

Counsel, you may proceed.

//

//

M. RODERICK

EXAMINATION

BY MR. IADEVAIA:

Q    Okay.  Good morning, Mr. Roderick.  As I just said, my name is Jeremiah Iadevaia.  I am with my colleague.  We are here on behalf of the plaintiff, Alexandra Poolos, in this matter against Paramount and CBS.

Mr. Roderick, have you ever had your deposition taken before?

A    Yes.

Q    How many times?

A    Once.

Q    And how long ago was that?

A    2013 or 2014.

Q    And was it an employment matter?

A    Yes.

Q    And were you working at CBS or Paramount at the time?

A    No.

Q    Who were you working for then?

A    McGraw Hill Publishing.

Q    And generally, what were the nature of the allegations at issue in that

M. RODERICK

matter?

A    I don't recall specifically.

Q    Okay.  Was it a discrimination case, do you know?

A    I don't recall.

Q    Okay.  And at the time, what was your job at McGraw Hill?

A    Director, employee relations.

Q    All right.  Even though you've had your deposition before, I'm going to go through a couple of ground rules that'll hopefully make today easier.

This is going to be a question and answer session.  The questions and answers will be recorded by the court reporter who is in the room with us.  As a result, I'll need verbal answers from you, which means no nods or gestures.  Those can't be recorded by the court reporter. Does that make sense?

A    Yes.

Q    Okay.  During the day, I ask that you let me finish my questions, and I will do my best to let you finish your

M. RODERICK

answers.  That way the court reporter can accurately report what we say.  Is that okay?

A    Yes.

Q    Okay.  If you don't understand any of my questions, please just let me know, and I'll do my best to rephrase it. Does that work okay for you?

A    Yes.

Q    During the day, we'll take periodic breaks.  But if at any time you need a break, just let me know.  Unless there's a question pending, it would be no problem to take a break.  Do you understand?

A    Yes.

Q    Okay.  Mr. Roderick, are you on any medication today that would affect your ability to testify truthfully and accurately?

A    No.

Q    And is there any reason, you know of, that you cannot testify truthfully and accurately today?

M. RODERICK

A    No.

Q    Did you do anything to prepare for today's deposition?

A    Yes.

Q    What did you do?

A    I met with two -- three attorneys.

Q    Okay.  Did you have one meeting or multiple meetings with your attorneys for the purposes of prepping for today's deposition?

A    I believe there was two meetings.

Q    Okay.  When was the first of these meetings?

A    I don't recall.

Q    Was it within the last month?

A    No.

Q    Was it within the last couple of months, last two months?

A    No.

Q    Was it in 2025?

A    Yes.

Q    And who was present for -- well

M. RODERICK

strike that.  How did the meeting take place?  Was it by phone, Zoom, in person?

A    Zoom.

Q    And who was present?

A    Michael Lynch.  I believe Danya Ahmed.

Q    And yourself, of course.

A    Yes.

Q    Anybody else?

A    No.

Q    And approximately how long was that meeting?

A    I don't recall.

Q    Was it more than an hour?

A    I don't recall.

MR. ZUCKERMAN:  You know, I'm sorry. I'm just concerned about a privilege issue, because I think he's recalling a meeting that wasn't preparation for today's deposition.

MR. IADEVAIA:  Okay.

MR. ZUCKERMAN:  It was for another purpose, which would be privileged, so.

MR. IADEVAIA:  Do you want to talk to

M. RODERICK

the witness for a second then, before I ask more questions?

MR. ZUCKERMAN:  Yeah, if you don't mind.

MR. IADEVAIA:  It's fine.

MR. ZUCKERMAN:  It'll just take 30 seconds.

MR. IADEVAIA:  That's fine.

THE REPORTER:  We're off the record. Time is 10:15.

(Off the record.)

THE REPORTER:  We're back on the record.  Time is 10:17.

BY MR. IADEVAIA:

Q    Mr. Roderick, we were just talking about a meeting that you had initially identified as a meeting for preparation for a deposition.  Now that you had a chance to speak to Counsel, was that meeting that happened in 2025 that you were just describing for purposes of preparing for today's deposition?

A    No.  It wasn't.

Q    Okay.  So is your testimony that

M. RODERICK

you've had one meeting with Counsel for the purposes of preparing for today's deposition?

A    Yes.

Q    Okay.  And when did that meeting happen?

A    Yesterday.

Q    Okay.  And what was the format, phone, Zoom, in person?

A    Zoom.

Q    And who was present for yesterday's Zoom preparation meeting?

A    Michael Lynch, Lyle, and Danya Ahmed.

Q    And outside of you, was there anybody else present?

A    No.

Q    And about how long was that meeting?

A    Approximately three hours.

Q    And during the meeting, did you review any documents?

A    Yes.

Q    What documents did you review?

M. RODERICK

A    A couple of emails, two closure letters.

Q    And the emails that you reviewed, were they emails where you were either a recipient or a sender of the email?

A    I don't recall.

Q    Okay.  Do you recall if there were any emails that you reviewed yesterday, in preparation for today's deposition, in which you were not part of the email communication either as a sender or a recipient?

A    I -- I'm sorry.  I don't understand the question.

Q    Sure.  Let me ask again.  Did you review any emails yesterday, as part of preparation for today, in which you were neither the sender nor the recipient?

A    I don't recall.

Q    And was the emails that you reviewed related to a complaint that ▮▮▮▮▮▮ ▮▮▮▮▮▮ made?

A    Yes.

M. RODERICK

Q    And was that a complaint that was made against Michael Gavshon?

A    Yes.

Q    Were there any materials that you looked at yesterday in preparation for the deposition that were not related to Ms. ███████ complaint?

A    No.

Q    And you said that yesterday you reviewed two closure letters; correct?

A    Yes.

Q    And were those closure letters that you had drafted?

A    Yes.

Q    And were they the closure letters that were provided in connection with Ms. ███████ complaint against Mr. Gavshon?

A    Yes.

Q    Okay.  Outside of the meeting that you had with Counsel yesterday to prepare for today's deposition, have you done anything else to prepare for today's deposition?

M. RODERICK

A     No.

Q     Did you review any documents in preparation for today's deposition outside of the meeting you had with Counsel yesterday?

A     No.

Q     Have you discussed today's deposition with anyone other than Counsel?

A     No.

Q     Have you discussed today's deposition with Renee Balducci?

A     No.

Q     Have you discussed this lawsuit with Renee Balducci?

A     No.

Q     Have you discussed today's deposition with Maria Cottone?

A     No.

Q     Have you discussed this lawsuit with Maria?

A     No.

Q     Have you discussed today's deposition with Cindy Glasgow?

A     No.

M. RODERICK

Q    Have you discussed this lawsuit with Ms. Glasgow?

A    No.

Q    Have you discussed this deposition with Bill Owens?

A    No.

Q    Have you discussed this lawsuit with Mr. Owens?

A    No.

Q    Okay.  Are you aware that there have been depositions taken in this matter before today?

A    Yes.

Q    Have you reviewed any transcripts of those depositions?

A    No.

Q    Okay.  Do you have any knowledge of what Ms. Poolos is claiming in this lawsuit?

A    No.

Q    Have you read the lawsuit that Ms. Poolos filed?

A    No.

Q    And I think I asked you the

M. RODERICK

question before, whether outside of Counsel, have you spoken to anybody about today's deposition?  And I think your answer was no; correct?  Do I have that right?

A    Can you repeat the question?

Q    Sure.  I think I asked before, but let me just ask again.  Outside of Counsel, have you spoken to anybody else about today's deposition?

A    No.

Q    Okay.  Outside of whatever conversations you may have had with Counsel about this lawsuit, have you spoken to anyone else about this lawsuit?

A    No.

Q    Did you attend college?

A    Yes.

Q    Where did you attend college?

A    University of Massachusetts Amherst.

Q    That's where I went, too.  When approximately did you go to UMass Amherst?

A    From 1976, graduated in 1980.

M. RODERICK

Q    And did you receive a degree, and if so, what was your degree?

A    A bachelor's -- yes, bachelor's degree.

Q    And was it in any particular -- was it a bachelor's of arts, of science, something else?

A    BS.

Q    In what?

A    Hospitality, restaurant, travel administration.

Q    Okay.  And did you attend any college or university after graduating from UMass Amherst?

A    Yes.

Q    Where did you go?

A    School of Visual Arts.

Q    And when did you go there?

A    '86 and -- and '87.

Q    Did you graduate from the School of Visual Arts?

A    No.

Q    Did you attend any other college or university other than the UMass Amherst

M. RODERICK

and School of Visual Arts?

A    No.

Q    Do you have any professional certifications?

A    Yes.

Q    What professional certifications do you have?

A    I have a black belt in -- gosh, I'm sorry.

Q    It's okay.

A    Six Sigma -- I'm drawing a blank.  I'm sorry.  But I have a -- I have a black belt certification in business process management, Lean Six Sigma.

Q    Okay.  Any other professional certifications?

A    I don't recall.

Q    Okay.  I think, when you identified yourself, you said that you're currently working for Paramount Global; correct?

A    Yes.

Q    Okay.  And your job?  What's your title there currently?

M. RODERICK

A    Vice president, employee relations.

Q    And how long have you worked for Paramount Global?

A    June will make seven years.

Q    So as of June of 2025, you will have been at Paramount for seven years?

A    Yes.

Q    Okay.  Would that mean that you started there in 2018, if I'm doing my math right?

A    Well, no, 2019.  Because in June, that'll make my seventh year.

Q    Okay.  So you started in June of 2019; correct?

A    Yes

Q    Okay.  Did you start as a VP in employee relations?

A    Yes.

Q    And at the time, what was the corporate entity that you worked for in June of 2019?

A    CBS.

Q    Okay.  And before you joined CBS

M. RODERICK

in June of 2019, what was your job?

A    Vice president, employee relations, BNP Paribas.

Q    And for how long did you work at BNP Paribas?

A    Six months.

Q    From approximately when to when?

A    January 2019 to June 2019.

Q    And during your time at BNP, who did you report to?  I don't need the name, just the title, if you recall?

A    I don't recall.

Q    Generally, what were your responsibilities at BNP?

A    Conducting -- conducting timely thorough investigations, managing performance management, managing position eliminations.

Q    And at BNP, you say, "conducting timely and thorough investigations."  Were there specific kinds of investigations that you worked on?

A    All -- all types of investigations.

M. RODERICK

Q    Were they investigations involving employees at BNP?

A    Yes.

Q    Okay.  Where did you work before you were at BNP?

A    S&P Global.

Q    And how long did you work at S&P Global?

A    16 and a half years.

Q    And approximately from when to when?

A    2001 -- I don't recall.  2001, 2002.

Q    Okay.  Until?

A    Until December of 2018.

Q    Got it.  And what was your job when you started at S&P Global?

A    When I started, I was director, human resources.

Q    And did your title change during the time you were at S&P Global?

A    Yes.

Q    And how so?  You can just tell me the other titles you had.

                    M. RODERICK

A     Director, employee relations.

Q     Any other titles?

A     No.

Q     Okay.  As director of HR,
generally, what were your responsibilities
at S&P?

A     Overseeing a variety of
functions including recruitment, talent
acquisition/recruitment, employee
relations, overall people management.

Q     And generally, what were your
responsibilities as director within
employee relations at S&P Global?

A     Conducting timely and thorough
investigations, managing performance.

Q     Earlier you had testified that
you participated in a deposition while you
worked for McGraw Hill.  Was McGraw Hill
part of S&P Global?

A     McGraw Hill, at one point while
I was employed, owned S&P Global and other
entities -- entities.

Q     Okay.  Where did you work before
S&P Global?

M. RODERICK

A    The former Arthur Anderson.

Q    And what was your job there?

A    Director, human resources.

Q    And for how long did you work at Arthur Anderson?

A    I don't recall.  Less than two years.

Q    And generally, what were your responsibilities at Arthur Anderson?

A    People management.

Q    Where were you before Arthur Anderson?

A    Goldman Sachs.

Q    What was your job at Goldman Sachs?

A    Talent acquisition.

Q    And what was your title there? Was it talent acquisition?

A    I was a consultant.

Q    When you say -- were you an employee of Goldman Sachs at the time?

A    No.  I was employed by a firm.

Q    And what firm were you employed by?

M. RODERICK

A   I don't recall.

Q   Okay.  And through that firm, you did work for Goldman Sachs?

A   Exclusively.

Q   Exclusively, got it.  And approximately how long did you provide services to Goldman Sachs as a consultant?

A   One year.

Q   Okay.  And before Goldman Sachs, where were you?

A   The former Bank of Tokyo Mitsubishi.

Q   And what was your job there?

A   Vice president, human resources.

Q   And for how long were you at Bank of Tokyo Mitsubishi?

A   Approximately 10 years.

Q   And generally, what were your responsibilities in that job?

A   Talent acquisition, people management, performance management, organizational development, employee relations.

Q   Okay.  And where were you before

M.  RODERICK

Tokyo Mitsubishi?

A    Ogilvy and Mather.

Q    How long were you at Ogilvy, approximately?

A    Two years.

Q    And what was your job there?

A    Overall, people management.

Q    What was your title?

A    I don't recall.

Q    Did you have a job within HR?

A    Yes.

Q    What was your first HR-related job?

A    Dunfey Atlanta Hotel.

Q    And when was that, approximately?

A    1980.

Q    And since then, have you worked in either HR roles or employee relation roles?

A    My entire career.

Q    Okay.  How come you left S&P?

A    Personal and professional development.

M. RODERICK

Q    Okay.  When you say personal --
I don't want to get into any level of
detail, but what what do you mean by
professional development?

A    Career growth.

Q    Did you leave S&P voluntarily?

A    Yes.

Q    And at the time that you left
S&P, had you already obtained the job at
BNP?

A    Yes.

Q    And how come you were at BNP for
such a short amount of time?

A    To join CBS.

Q    Did you have an offer from CBS
at the time that you left BNP?

A    Yes.

Q    All right.  So focusing on the
CBS employment, when you started in -- I
think you said June of 2019; correct?

A    Yes.

Q    And I believe you said, but
correct me if I'm wrong, your title was VP
of employee relations?

M. RODERICK

A    VP, employee relations.

Q    When you started, who did you report to?

A    Hazel Mayers.

Q    And what was Ms. Mayers's position at the time?

A    She was the head of employee relations and compliance.

Q    Do you know if Ms. Mayers is a lawyer or was a lawyer at the time?

A    Yes.

Q    And when you joined CBS, was employee relations a new group?

A    Yes.

Q    There at the company, at CBS?

A    Yes.

Q    Okay.  How many other VPs of employee relations were there at the time you joined?

A    One.

Q    And who was that?

A    Jennifer Baker.

Q    And do you know how long Ms. Baker had been within employee relations

M. RODERICK

at the time you joined?  Did she just get there as well, or had she been there for some amount of time?

A    I don't know.

Q    And generally, what were your responsibilities when you joined in June of 2019 as VP of employee relations at CBS?

A    Conducting timely and thorough investigations.

Q    Did you have any other responsibilities?

A    No.

Q    When you joined, was there anybody else who was in the group other than you, Ms. Baker, and Hazel?

A    Yes.

Q    Who else was in the group?

A    Sonia.  I don't recall her last name.  Elizabeth.  I don't recall her last name.

Q    Anybody else?

A    Yes.

Q    Who else?

M. RODERICK

A     An administrator.

Q     Anybody else?

A     No.

Q     And what was Sonia's job?

A     I don't know.

Q     What was Elizabeth's job?

A     I don't know.

Q     Who do you -- was there any time it changed that you were reporting directly to Hazel?

A     I don't understand your question.

Q     Sure.  Fair enough.  Who do you currently report to directly?

A     Jennifer Baker.

Q     When did you start reporting to Ms. Baker, approximately?

A     I don't recall.

Q     Do you know, was it this year?

A     No.

Q     Was it last year?

A     I don't recall.

Q     Other than Hazel and Ms. Baker, have you reported to anyone else directly

M. RODERICK

at CBS or Paramount?

A    Yes.

Q    Who else?

A    Jennifer Gordon.

Q    Anyone else?

A    No.

Q    So am I correct that you reported to Hazel for some amount of time, then Ms. Gordon, and now Ms. Baker.  Is that right?

A    Yes.

Q    At the time that you reported to Ms. Gordon, what was her title?

A    Vice president, employee relations.

Q    So she had the same title as you?

A    Yes.

Q    And what is Ms. Baker's title?

A    Senior vice president, employee relations.

Q    And are there other VPs of employee relations currently working within the group beyond you?

M. RODERICK

A    No.

Q    Does Ms. Gordon still work for Paramount?

A    No.

Q    Do you know when she left?

A    No.

Q    To your knowledge, does Ms. Baker conduct investigations currently? Is that part of her job?

A    Yes.

Q    Outside of you -- and you currently conduct investigations within employee relations?

A    Yes.

Q    Outside of you and Ms. Baker, is there anybody else within employee relations who conducts investigations?

A    Yes.

Q    Who else?

A    Michael Perez.

Q    Anyone else?

A    Viviana Maldonado.

Q    Anyone else?

A    No.

M. RODERICK

Q    And what's Mr. Perez's title?

A    I don't recall.

Q    And does he report to Ms. Baker directly?

A    Yes.

Q    And Ms. Maldonado -- is that the name?  Did I get that correct?

A    Yes.

Q    Does she report to Ms. Baker?

A    Yes.

Q    And do you know her title?

A    No.

Q    You said that when you joined CBS in June of 2019, your responsibility was conducting timely and thorough investigations; correct?

A    Yes.

Q    Have your responsibilities changed over time?

A    No.

Q    When you say that you are responsible for conducting timely and thorough investigations, what do you mean by that?

212-267-6868                www.veritext.com                516-608-2400

M. RODERICK

A    I don't understand your question.

Q    Okay.  When you say, "timely investigations," what do you mean by timely?

A    Exactly what Webster would -- would define timely.

Q    And what do you understand that to mean?

A    Timely, efficiently, effectively.

Q    And, "timely," you mean as quickly as possible?

A    I --

MR. ZUCKERMAN:  Objection.

Go ahead.  You can answer.

THE WITNESS:  I do not mean as quickly as possible.

BY MR. IADEVAIA:

Q    Okay.  Timely means what, then? It means efficiently and effectively?

A    Yes.

Q    Okay.  And when you say "efficiently," what does that mean?

M. RODERICK

A  Thoroughly.

Q  Well, and that was the other word you've used a couple of times.  When you say, "thoroughly," what does that mean?

MR. ZUCKERMAN:  Objection.

You can answer.

BY MR. IADEVAIA:

Q  You can answer.

MR. ZUCKERMAN:  You can answer.

THE WITNESS:  Could you repeat the question?

BY MR. IADEVAIA:

Q  Sure.  You said your responsibilities since you've joined CBS has to been to conduct timely and thorough investigations; correct?

A  Yes.

Q  What do you mean by thorough?

A  Complete.

Q  Okay.  And what do you do in order to make sure an investigation that you conduct is complete?

MR. ZUCKERMAN:  Objection.

M. RODERICK

You can answer. Just for the record, unless I instruct you not to answer, you should feel free to answer even though I'm objecting to the question.

THE WITNESS: Okay.

Could you repeat the question?

BY MR. IADEVAIA:

Q Sure. When you say -- I think you testified that by thorough you mean complete. And my question is: What do you do to ensure that your investigations are complete?

A I adhere to internal protocols in conducting timely and thorough investigations.

Q And what protocols are you referring to?

A Internal protocols as it relates to conducting internal investigations.

Q Are the protocols you're referring to in writing?

A No.

Q Okay. So how are you aware of these protocols?

M. RODERICK

A    Internal meetings, communication with the employee relations team.

Q    And are the protocols you're referring to the same protocols for every investigation?  Or are they different?

A    I don't understand your question.

Q    Sure.  The protocols that you're referring to, are the protocols -- is there a standard set of protocols that you understand to adhere to when conducting investigations?

A    I don't understand your question.

Q    Okay.  What are the protocols for conducting investigations?

A    Gather facts, conduct analysis, determine steps to resolve.

Q    And are there any other protocols you're referring to when you use that term, "protocols"?

A    It depends on the investigation. To clarify, no two complaints are identical.

M. RODERICK

Q    What are ways, for your purposes of your investigation, that you go about gathering facts?  And I realize it's not always the same.  I'm asking for examples.

A    Conduct interviews with those relevant to the complaint.

Q    Anything else?

A    Every investigation is different, because every complaint is different.

Q    Okay.  I understand that.  How long have you been at CBS?  You said since 2019; right?

A    June 2019.

Q    And during that time, approximately how many investigations have you done?

A    I do not know.

Q    Is it more than a hundred?

A    I believe so.

Q    And in terms of gathering information, again with the understanding that investigations vary depending on the complaint, you said that you conduct

M. RODERICK

interviews relevant to the complaint. What other things have you done in doing these investigations to gather facts?

MR. ZUCKERMAN:  Objection.

BY MR. IADEVAIA:

Q    You can answer.

A    Review relevant documents.

Q    Anything else?

A    Depends on the scope of the complaint.

Q    Who defines the scope of the complaint?

A    The lead investigator.

Q    And when you do investigations, are you the lead investigator or someone else?  Or does it vary?

A    It varies.

Q    Have you been the lead investigator on investigations of complaints at CBS and Paramount?

A    Yes.

Q    Can you give me approximation of, for the investigations you've done, how often you are the lead investigator

M. RODERICK

versus not?

A     Can you repeat the question?

Q     Sure.  Just trying to get a sense.  For the investigations that you've done, how often are you the lead investigator?  Just a rough estimate.  I'm not asking for anything exact.

A     I would say close to all of my investigations.

Q     How many investigations have you not been the lead investigator of?

A     I don't recall.

Q     In those instances, who was the lead investigator?

A     I don't recall.

Q     Was it another investigator within employee relations?  Or was it someone outside of employee relations?

A     I don't recall.

Q     Were there times where there was a lead investigator who was a lawyer at an external law firm?

A     I don't recall.

Q     Okay.  When you're the lead

M. RODERICK

investigator in the investigations that you've conducted at CBS and Paramount, how do you go about defining the scope of the complaint and the investigation?

MR. ZUCKERMAN: Objection.

THE WITNESS: It's based on the information provided in the complaint.

BY MR. IADEVAIA:

Q And how does it come about that you get investigations assigned to you?

A The head of the group assigns cases.

Q So currently that would be Ms. Baker?

A Yes.

Q And before that, Ms. Gordon, and before that, Hazel?

A Yes.

Q And has that process been the same throughout the time you've been at CBS, in terms of the assignment of investigations?

A Yes.

Q And for most of the

M. RODERICK

investigations that you've conducted, have you been the only investigator?  Or are there times where there's multiple investigators?

A    I don't recall.

Q    Most of the -- strike that. What percentage of the investigations you do would you say you're the sole investigator?  Again, a rough estimate.

A    I do not know.

Q    Is it more than half?

A    I do not know.

Q    And when you do your investigations, and you are collecting information and deciding on documents to review when that comes up; how do you go about figuring out what documents to look at, if any?

A    Based on the complaint.

Q    Any other sources for you to figure out what information you look at, if you look at any?

MR. ZUCKERMAN:  Objection.

//

M. RODERICK

BY MR. IADEVAIA:

Q    Besides the complaint itself?

A    I don't understand your question.

Q    When you say you look at a complaint, is the complaint -- by the time it makes it to you, is the complaint in writing?

A    It could be.

Q    There are times where you're assigned an investigation, and the complaint is not in writing.  Does that also happened?

A    Yes.  Every complaint is different.

Q    Okay.  All right.  When you conduct investigations, do you have a particular practice that you follow?

A    Yes.

Q    What's your practice?

A    Depends on the nature of the complaint.

Q    Are there things that you consistently do when you conduct

M. RODERICK

investigations?

MR. ZUCKERMAN: Objection.

THE WITNESS: Yes.

BY MR. IADEVAIA:

Q    What are those?

A    I gather the facts, conduct an analysis, determine resolution.

Q    When you say, "conduct an analysis," what do you mean by that?

A    Review the facts gathered.

Q    And other than reviewing the facts gathered, is there anything else you do to conduct an analysis?

A    Review documents and other information provided during the course of fact gathering.

Q    Anything else?

A    Depends on the nature of the complaint.

Q    Okay.  When you say that you then make a determination about how to proceed, what do you mean by that?

A    I don't believe that's what I said.

M. RODERICK

Q    Okay.  What did you say?  Sorry.

A    I don't recall.

Q    You mentioned gather facts, conduct analysis, and you said something about determination.  Sorry if I misspoke.

A    Determine resolution.

Q    Resolution.  What do you mean by, "determine resolution"?

A    Based on the facts gathered, determine the resolve.

Q    And when you are conducting investigations, do you make the determination of the resolution yourself?

A    No.

Q    Who do you make the determination with?

A    The determination is made by the senior leader working with the relevant HR business partner and the employment attorney.

Q    And in investigations that you conduct, do you make recommendations as to the appropriate resolution?

A    Depends on the nature of the

M. RODERICK

investigation along with the findings.

Q    Outside -- well, you've described your responsibilities within employee relations as conducting thorough and prompt investigations; correct?

A    No.

Q    Okay.  So just tell me, then, what your responsibilities are within employee relations?

A    To conduct timely and thorough investigations.

Q    Sorry.  Okay, understood.  Does employee relations do anything for CBS and Paramount -- do anything beyond conduct the timely and thorough investigations?

A    I do not know.

Q    Are you aware of anything else?

A    I do not know.

Q    Okay.  And what is your understanding of what HR does at Paramount as opposed to what employee relations does?

A    Could you repeat the question?

Q    Sure.  What's the relationship

M. RODERICK

between employee relations and human resources at Paramount?

A    Business partnership.

Q    Is employee relations part of the human resources department at Paramount?

A    No.

Q    What is your understanding as to what human resources does at Paramount?

A    Provide people management support to assigned business functions.

Q    Anything else you understand HR to do at Paramount?

A    No.

Q    In your job as an investigator within employee relations, do you ever work with human resources?

A    Yes.

Q    How so?

A    It depends on the nature of the complaint.

Q    Give me some examples, please.

MR. ZUCKERMAN:  Objection.

THE WITNESS:  Could you repeat the

M. RODERICK

question?

BY MR. IADEVAIA:

Q     Sure.  I'm asking for examples of how you, in your role as an investigator within employee relations, work with human resources.

A     Depending on the nature of the complaint, the lead investigator may speak to the HR business partner about either the complainant or the subject.

Q     Any other ways in which you've worked with HR in conducting investigations at CBS?

A     Yes.

Q     What other ways?

A     Providing resources, ie, crew list information.

Q     Anything else?

A     I don't recall.

Q     When you say, "providing resources," who's providing resources to who?

A     Depends on what is requested. Traditionally the HR business partner is

M. RODERICK

providing information to the lead investigator.

Q    And by, "lead investigator," you're referring to the person in employee relations, correct, who's leading the investigation?

A    If the employee relations person is conducting the investigation, yes.

Q    And I think you -- did I get this right?  Did you say crew list?

A    For productions, crew list.

Q    What is a crew list?

A    Directory.

Q    Like an employee directory?

A    A directory of the crew who are working on the production.

Q    When you say, "production," you're talking about production of a TV show?  Production of what?

A    A movie, television show, anything that's streamed.

Q    Are there times, since you've been at CBS and Paramount, that human resources is the lead on an employee-

M. RODERICK

related investigation as opposed to employee relations?

MR. ZUCKERMAN: Objection.

You can answer.

THE WITNESS: Yes.

BY MR. IADEVAIA:

Q    And how does it come about that HR takes the lead on investigation versus employee relations?

MR. ZUCKERMAN: Objection.

THE WITNESS: I am not involved in that decision process.

BY MR. IADEVAIA:

Q    Do you have any understanding as to how it's decided whether HR versus employee relations will take the lead on an employee investigation?

MR. ZUCKERMAN: Objection.

THE WITNESS: No.

BY MR. IADEVAIA:

Q    When you conduct investigations, is legal always involved?

A    Yes.

Q    Have there been any

M. RODERICK

Q investigations that you've conducted where legal was not involved?

A No.

Q Since you have been at CBS, have you received trainings provided by CBS?

A Yes.

Q What trainings have you received?

A Proskauer conducted comprehensive training fourth quarter 2019, I believe.

Q And was that training in person, online, something else, the Proskauer training?

A In person.

Q And did you personally attend that training?

A Yes.

Q And what was the training that Proskauer provided?

A Overall, a thorough comprehensive review on how to conduct internal investigations.

Q Okay. And was this training

M. RODERICK

specifically for a specific group of employees at CBS?

A    I don't recall.

Q    Do you know if your colleagues from employee relations also attended this training in 2019?

A    Yes.

Q    Do you know if anyone from HR, human resources, attended this training in 2019?

A    I don't recall.

Q    And was the training mandatory for you?

A    Yes.

Q    And how did you know it was mandatory?  Did someone tell you?

A    I don't recall.

Q    And during the training, were there written materials?

A    Yes.

Q    And what was the format of those written materials?  Was there a slideshow or something else?

A    I don't recall, other than a

M. RODERICK

deck being provided.

Q   And was the deck reviewed with you as part of the training?

A   The deck was reviewed with all participants who attended the session.

Q   And were there written materials given to you to keep after the training was completed?

A   Yes.

Q   And was the written materials the deck that had been shared with all the participants?  Or was it something else?

A   The deck.

Q   And was a hard copy given to you?  Or was it shared with you electronically or both?

A   I don't recall.

Q   Have you looked at the training materials that you received from that Proskauer-led training since the training itself?

A   Yes.

Q   Do you still have a copy of the materials?

M. RODERICK

A    Yes.

Q    Do you have a hard copy, a paper copy?

A    Yes.

Q    Do you have an electronic copy?

A    I don't recall.

Q    And did you attend any other trainings that were led by Proskauer, outside the one you've just testified to?

A    Yes.

Q    What other trainings did you attend led by Proskauer?

A    Throughout my tenure at S&P Global over the 16 and a half years, I attended several trainings led by Proskauer.

Q    And, sorry, my question wasn't clear.  Focused on the time since you've been at CBS, have you attended any other Proskauer-led trainings beyond the one that you've testified to?

A    No.

Q    And to your knowledge, did Proskauer conduct the training that you

M. RODERICK

attended in the fourth quarter of 2019 at any other point in time at CBS since you've been there?

A     I don't understand your question.

Q     My question is whether or not Proskauer conducted that training at other points in time since you've been at CBS, beyond what you've testified to?

A     I don't know.

Q     Outside of the Proskauer training you testified to, have you received other trainings since you've been at CBS?

A     Yes.

Q     What other trainings have you received?

A     At Cornell ILR online, investigative training.  I do not recall the specific title.

Q     And how many times did you participate in the Cornell ILR investigative training that you just described?

M. RODERICK

A    I don't recall.

Q    Was it more than once?

A    I don't recall.

Q    And when did you take that training?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  I don't recall.

BY MR. IADEVAIA:

Q    But it's been since you've been at CBS; correct?

A    Yes.

Q    And was this training provided by CBS?

A    No.

Q    Was it mandated by CBS?

A    No.

Q    What led you to do this training?

A    I'm a professional.  I'm always seeking to enhance my skills and knowledge.

Q    So this was voluntary training that you did for professional development?

A    Yes.

M. RODERICK

Q    Is there any other trainings that you've taken since you've been at CBS, besides the ones you've testified to?

A    Continual on-the-job training working with various employment attorneys.

Q    When you say that, you don't mean that you've sat down for a formal training session; correct?

A    I don't know what you mean by formal.

Q    Okay.  When you say, "on-the-job training," what do you mean by that?

A    Working alongside colleagues who are knowledgeable subject matter experts in my field, working daily.

Q    Outside of what you've testified to, are there any other trainings you've received since you've been at CBS?

A    Yes.

Q    What are the other trainings?

A    Yearly anti-harassment training.

Q    Anything else?

A    I don't recall.

Q    Beyond what you've testified to,

M. RODERICK

have you received any training since being at CBS about conducting investigations?

A    I don't -- I don't understand your question.

Q    Beyond what you've testified to, have you received any trainings about how to conduct investigations at CBS?

A    Not to my knowledge.

Q    Okay.  The annual anti-harassment training that you referred to, is that a mandatory training as a CBS employee, Paramount employee?

A    Yes.

Q    And how is it conducted?

A    I believe traditionally online.

Q    And when you've taken -- go ahead.  Go ahead.  I thought you were going to say something.

A    I'm sorry.

Q    No.  When you've taken the training, has it been online?

A    Yes.

Q    And is this training, to your knowledge, required of all employees at

M. RODERICK

Paramount?  Or is it something specific for employee relations?

A    All employees.

MR. IADEVAIA:  All right.  Why don't we mark this as Roderick Exhibit 1, 8839.

(Roderick Exhibit 1 was marked for identification.)

We're going to have to give this to you to ask the court reporter to mark.  On that.  Here's a copy.

THE WITNESS:  Thank you.

MR. IADEVAIA:  Okay.  I'll just say, for the record, what's been marked as Roderick Exhibit 1 is a multi-page deck bearing Bates numbers CBS8839 through 9016.

BY MR. IADEVAIA:

Q    Mr. Roderick, do you recognize what's been marked as Roderick Exhibit 1?

A    It looks like the online -- the deck for -- associated with the online training.

Q    The online training being the anti-harassment training that you just

M. RODERICK

testified to?

A     Yes.

Q     Okay.  And you see on the very first page it says "Preventing Sexual Harassment, NY edition."  Do you see that header?

A     Yes.

Q     Okay.  And in the left-hand corner it says "VIA954-A80EN."  Do you see that?

A     Yes.

Q     Do you have any idea what that's a reference to?

A     No.

Q     And on that first page, it says "NY edition" in parentheses after the title "Preventing Sexual Harassment."  Do you know if that stands for New York edition?  Do you have any idea?

A     Could you repeat the question?

Q     Sure.  The "NY edition," where it says that at the top of the page, do you know if that stands for New York?

A     Do I know whether or not it

M. RODERICK

stands for?

Q    Yeah.

A    I don't know definitively.  I am assuming NY is associated with New York.

Q    Did you have any role in designing this training?

A    No.

Q    Okay.  Did you have any role or input in putting it together in any way, the training?

A    No.

Q    No?  Okay.

A    No.

MR. IADEVAIA:  Okay.  If we could do 9278, please.  No.  That one's mine. That's okay.

THE WITNESS:  Thank you.

MR. IADEVAIA:  Okay.  What's been marked as Roderick Exhibit 2 appears to be a multi-page deck bearing Bates numbers CBS9278 through 9396.

(Roderick Exhibit 2 was marked for identification.)

//

M. RODERICK

BY MR. IADEVAIA:

Q    Mr. Roderick, do you recognize what's been marked as Exhibit 2?

A    Yes.

Q    What is it?

A    The deck associated with the in-house training provided by -- in-person training provided by Proskauer to CBS employees, Q4 2019.

Q    And is this the deck associated with the Proskauer training that you testified to earlier today?  You can take your time to look at it.  It's okay.

A    Yes.

Q    The answer is yes?  It is?

A    No.  Yes, you -- you said I could look at the -- take my --

Q    Yeah, sure.  Please.

A    So I'm saying yes.  I should have said okay.

Q    That's okay.

A    Yes, in response to your question.

Q    Yes, this is the deck associated

M. RODERICK

with the training that you received from Proskauer in the fourth quarter of 2019; correct?

A    I believe so.  Yes.

Q    Okay.  And you said that you have a hard copy still of materials from that training.  Is the hard copy you have this deck or a copy of this deck?

A    I can't say definitively.  There may be one page different that I'm not aware of.  So to my recollection, this is the similar deck to what I was provided to -- provided with in Q4 2019.  I believe it's, but I can't say definitively.  Because I can't go through every page and reconcile with what I have.

Q    But to the best of your knowledge or understanding?  I realize you don't --

A    I -- I believe --

Q    Sorry.  Go ahead.

A    I believe it is.

Q    Okay.

A    However, I cannot say

M. RODERICK

definitively that it is identical to the deck that I received.  Without having the deck to reconcile page by page, I can't say yes definitively.

Q    Okay.  Is there anything in these materials that you don't recall having in the materials that you received from Proskauer?

MR. ZUCKERMAN:  You're asking him to go page by page right now?

MR. IADEVAIA:  No.  It's okay.  I'll withdraw the question.  Fair enough.

BY MR. IADEVAIA:

Q    Okay.  That's all for now. We'll come back to it a little bit later.

A    Okay.

Q    Does Paramount have a anti-discrimination policy currently?

A    Yes.

Q    And are you -- is that policy in writing?

A    Yes.

Q    And has Paramount had an anti-discrimination policy since you joined the

M. RODERICK

company in 2019?

A     Yes.

Q     And are you familiar with that policy?

A     I'm aware of the policy.

Q     And what is your understanding of what the policy says?  And I know you're not a lawyer.  And I'm not asking you to remember word for word, but just to give me a sense.

A     The policy talks about treating people with respect, dignity, and the expectations as part of Paramount Global.

Q     And are you aware of any specific prohibitions on discrimination contained within the anti-discrimination policy?

A     Could you repeat the question?

Q     Sure.  Does the anti-discrimination policy prohibit specific types of discrimination?

A     Yes.

Q     And what is your understanding of the kinds of discrimination are

M. RODERICK

prohibited under the policy?

A    All of the protected classes.

Q    And what are examples of those protected classes, based on your understanding?

A    Race, gender, ethnicity, disability.

Q    And does that anti-discrimination policy prohibit retaliation, to your knowledge?

A    Yes.

Q    And what is your understanding, under the anti-discrimination policy, about prohibitions on retaliation?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  Retaliation is taken seriously at Paramount Global.  It's imperative that employees feel that they have resources available to raise concerns and not be -- receive any type of negative behavior for having raised said concerns.

BY MR. IADEVAIA:

Q    And do you -- have you received training on Paramount's anti-

M. RODERICK

discrimination policy since you've been at CBS or Paramount?

A    Can you repeat the question or rephrase the question please?

Q    Sure.  I'm asking if you've received training specifically related to the anti-discrimination policy at CBS during your tenure there?

A    I -- I attend -- I participate in the yearly anti-harassment training.

Q    Is there any other trainings you attend related to CBS's anti-discrimination policy?

A    Proskauer conducted in-person training, Q4 2019.

Q    And any others?

A    I don't recall.

MR. IADEVAIA:  If we can mark this as Roderick Exhibit 3, 7098.

(Roderick Exhibit 3 was marked for identification.)

THE WITNESS:  Thank you.

MR. IADEVAIA:  What's been marked as Roderick Exhibit 3 is a multi-page

M. RODERICK

document bearing Bates numbers CBS7098 through 7102.

BY MR. IADEVAIA:

Q    Mr. Roderick, you can certainly take your time to look at the document, but do you recognize what's been marked as Exhibit 3?

A    I don't -- I don't know.

Q    Okay.  You see at the top of the first page it says "CBS Non-Discrimination and Anti-Harassment Policy"?

A    Yes.

Q    You see at the bottom of the page it says "REV'D 9/2019."  Do you see that?

A    Yes.

Q    Okay.  Have you -- do you recognize this to be CBS's written Anti-Discrimination and Harassment Policy that was in effect at some point during your employment?

A    I believe so.

Q    You can put that to the side for a second.  We'll come back to it later.

M. RODERICK

Does CBS have a global business conduct statement?

A    BCS, Yes.

Q    BCS stands for business conduct statement?

A    I believe so.  Yes.

Q    Okay.  And do you receive training related to the business conduct statement?  Have you received training related to the business conduct statement since you've been at CBS?

A    All the training provided to me at CBS relates to and is relevant to the BCS.

Q    Okay.  Have you received any training since you've been at CBS that relates specifically to the business conduct statement?

A    I'm just going to repeat the same answer.

Q    Have you ever attended -- you've testified about an anti-harassment training.  You've testified about the Proskauer training.  Have you ever

M. RODERICK

received a training that is specific to the BCS?

A    I'm going to repeat the -- the answer because all training received is relevant, related, connected to the BCS.

Q    Does the BCS prohibit sexual harassment?

A    I believe so.

Q    And does the BCS have other prohibitions beyond harassment?  Does it prohibit other types of conduct?

A    I believe so.

Q    And have you received training for other types of conduct, outside of harassment, that is covered by the BCS?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  Yes, retaliation.

Again, the training that I received at CBS is all relevant, connected to the BCS.

BY MR. IADEVAIA:

Q    Okay.  What I'm trying to understand, though, is you've talked about specific kinds of training that you've received; the Proskauer training, which I

M. RODERICK

think you said was a one-time event; and then you have annual anti-harassment training.

And what I'm trying to understand, is there any other training that you've received, whether in connection with BCS or on any other topic that we haven't already testified to?

MR. ZUCKERMAN: Objection.

THE WITNESS: I don't recall.

BY MR. IADEVAIA:

Q You mentioned anti-retaliation training. Was that separate and apart from the anti-harassment training that you've received? Or was it part of the anti-harassment training?

A Could you rephrase the question?

Q Sure. You testified about an annual mandatory anti-harassment training that you participate in; correct?

A Yes.

Q You also just testified, I believe, that you've received training about CBS's prohibition against

M. RODERICK

retaliation.  Am I correct about that?

A    Associated with the training that I received, that I already shared with you.

Q    Okay.  And which of the trainings are you talking about?

A    All of the trainings that we -- I -- I mentioned, particularly the Proskauer training, Q4 2019.

Q    And as you sit here today, you can't recall any other trainings you've received, beyond what you've testified to; correct?

A    Correct.

MR. IADEVAIA:  All right.  Why don't we take a break.  We've been going for a while.

THE REPORTER:  We're off the record.  The time now is 11:30.

(Off the record.)

THE REPORTER:  And we are back on the record.  The time now is 11:47.

BY MR. IADEVAIA:

Q    Mr. Roderick, I know you're not

M. RODERICK

going to give me every kind of investigation you've ever done at CBS. But can you give me some examples of the types of investigations, the types of complaints that you've looked into?

A     Yes.

Q     What are those?

A     Complaints alleging discrimination, alleging harassment, alleging retaliation, alleging misconduct.

Q     When you say, "discrimination," are you referring to alleged violations of the CBS non-discrimination policy?

A     Yes.

Q     Any other -- do you mean anything else when you say, "complaints alleging discrimination"?

A     No.

Q     And when you say, "harassment," are you referring to alleged violations of the CBS anti-harassment policy?

A     Yes.

Q     Are you referring to anything else?

M. RODERICK

A    No.

Q    And when you say, "retaliation," are you referring to retaliation as set forth in a particular policy or policies?

A    I'm saying there have been numerous complaints investigated where the complainant has alleged retaliation.

Q    And focusing on the investigations you have done, you've participated in, can you give me some examples of what the specifics are of the retaliation claims that you've looked into?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  I can't recall.

BY MR. IADEVAIA:

Q    Can you recall any?

A    I can't recall.

Q    Have you ever conducted an investigation in which someone has alleged that they have been retaliated against for making a complaint of either discrimination or harassment?

A    Yes.

M. RODERICK

Q    Have you ever investigated a retaliation claim that is not based on an allegation of -- let me start again.  Have you ever -- so strike that.  I'm going to start again.  Have you investigated a retaliation claim that is not based on a complaint of discrimination or harassment?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  I don't recall.

BY MR. IADEVAIA:

Q    You said before that you've conducted investigations involving allegations of misconduct.  Outside of alleged violations of the discrimination and harassment policy and any retaliation you've looked into, what other kinds of misconduct have you investigated?

A    Behavioral misconduct, mistreatment.

Q    Any other kind of misconduct?

A    I don't recall.

Q    And when you say, "behavioral," what do you mean?

A    Treatment of others.

M. RODERICK

Q    Can you give me examples of behavioral conduct that you've investigated?

A    I don't recall.

Q    You don't recall a single example?

A    No.

Q    Okay.  Can you give me an example of any investigations you've conducted about the mistreatment of employees?

A    I'm sorry.  Could you repeat the question?

Q    Sure.  When I asked you to identify examples of misconduct that you've investigated outside of discrimination, harassment, or retaliation, you said, "behavioral and mistreatment."

I asked you for an example or any examples of behavior, you said you can't recall.  I'm asking what examples you have of mistreatment investigations you've conducted.

M. RODERICK

A    I can't recall.

Q    Not a single one?

A    No.

Q    Have you specifically conducted investigations into sexual harassment allegations?

A    Yes.

Q    And approximately how many times have you done that?

A    I can't recall.

Q    Is it more than ten times?

A    I can't recall.

Q    Is it less than ten times?

A    I can't recall.

Q    Okay.  And in any of the sexual harassment investigations that you've conducted, have you ever corroborated or substantiated the concerns that the complainant made?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  Yes.

BY MR. IADEVAIA:

Q    Okay.  How many times?

A    I don't recall.

M. RODERICK

Q    More than once?

A    I don't recall.

Q    More than five times?

A    I don't recall.

Q    And in those instances where you confirmed or substantiated sexual harassment allegations, was the person who was accused of the misconduct fired?

A    I don't recall.

Q    Were there any instances in which you confirmed sexual harassment allegations, and the accused was fired?

A    Yes.

Q    How many times can you remember that happening?

A    I don't recall.

Q    Do you recall it happening at least once?

A    I believe so.

Q    Do you recall it happening more than once?

A    I believe so.

Q    Okay.  In the instances that you recall where there were sexual harassment

M. RODERICK

allegations confirmed, and the employee --
the accused was fired, did the accused
work within CBS News?

    A    I don't recall.

    Q    Who were the individuals you
recall that were accused and fired in
connection with a sexual harassment
allegation that you investigated?

    A    I don't recall.

    Q    You don't recall any of the
names?

    A    No.

    Q    Did any instances where this
happened take place in 2025?

    A    I don't recall.

    Q    So we're at the end of May.  Is
it your testimony you don't recall if
you've substantiated allegations of sexual
harassment that resulted in an employee
being fired within the last five months?
You don't recall?

    A    I don't recall.

    Q    Okay.  Are there any instances
of this happening in 2024?

M. RODERICK

A    I don't recall.

Q    Okay.  Have you participated in any investigations of allegations against an employee who works for "60 Minutes"?

A    Yes.

Q    Okay.  And who was the person or people who have made the complaints in those situations?

A    Could you repeat the question?

Q    Sure.  What is the name of the complainant in the situations where you've looked at -- where you've investigated "60 Minutes" complaints?

A    I -- I don't recall the name, but we spoke about this previously.

Q    You're talking about Ms. ██████████

A    Yes.

Q    Okay.  And her complaint was against Mr. Gavshon?

A    Yes.

Q    Have you conducted any other investigations concerning "60 Minutes" employees outside of that one?

M. RODERICK

A     No.

Q     Did you conduct any investigations concerning Jeff Fager?

A     No.

Q     Were you part of any investigations involving Mr. Fager?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  No.

BY MR. IADEVAIA:

Q     You part of any investigations involving Bill Owens?

A     No.

Q     Part of any investigations involving Michael Radutzky?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  No.

BY MR. IADEVAIA:

Q     Were you part of any investigations involving Matt Richman?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  No.

BY MR. IADEVAIA:

Q     Were you part of any investigations involving Alexandra Poolos,

M. RODERICK

the plaintiff in this case?

MR. ZUCKERMAN: Objection.

THE WITNESS: No.

BY MR. IADEVAIA:

Q    Did you conduct any investigation related to Ms. Poolos?

A    No.

Q    Okay.  If you could go back to the Proskauer deck, please.  Which your counsel has, I think, the marked version.  They're over there.

MR. IADEVAIA:  You might want to pass all of the --

Can we mark it as 2?

THE WITNESS:  Thank you.

MR. IADEVAIA:  I think it was marked as Exhibit 2.  Am I correct about that?

MR. ZUCKERMAN:  Yes.

MR. IADEVAIA:  Yeah, okay.

THE REPORTER:  Yes.  Sorry.

MR. IADEVAIA:  That's okay.

BY MR. IADEVAIA:

Q    If you could take a look at the page that has Bates number 9308.  The

M. RODERICK

Bates numbers are at the top of this document.

A     Could you repeat the number, please?

Q     9308.  Okay.  Let me know when you're there.  You can take a second to read.  At the top of the page, I'm sure you see it says "Point number 3, avoiding legal liability."  Do you see that, Mr. Roderick?

A     The header, yes.

Q     Yeah.  And then the second bullet down says "Follow the hallmarks of a good investigation."  Do you see that text?

A     Yes.

Q     Okay.  What -- do you have an opinion as to what the hallmarks of a good investigation is, in your capacity as an investigator within employee relations?

A     Yes.

Q     And what's your opinion as to what the hallmarks are of a good investigation?

M. RODERICK

A    My opinion on some of the hallmarks, not all of the hallmarks, would be conducting an objective investigation, conducting a thorough investigation, conducting a timely investigation, conducting an investigation consistent with internal protocols.

Q    Any other hallmarks?

A    Yes.  As I said, those are some of them, not all of them.

Q    Are there any others that you think can think of as you sit here, beyond what you've testified to?

A    No.  I'm sure there are others. However, as I prefaced it, those are some of the hallmarks.  Those aren't all of the hallmarks.

Q    I understand.  And my question to you is simply what other hallmarks are there to the extent, as you sit here today, you can think of?  If you remember any others beyond what you've testified to, please let me know; okay?

A    Yes.

M. RODERICK

Q    Okay.  When you say, "conduct an objective investigation," what do you mean by objective?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  Focusing on information gathered as part of the fact-gathering process.

BY MR. IADEVAIA:

Q    And why is that a hallmark of a good investigation in your opinion?

A    Because it's fair, and it's objective.  It's free of opinions and any outside influence.

Q    And you've talked a little bit earlier -- strike that.  Earlier today you talked a little bit about thorough investigations.  Can you just say what you mean again, for the record, why a hallmark of a good investigation is a thorough investigation.

A    Could you repeat the question please?

Q    Sure.  What do you mean when you say, "thorough investigation"?

M. RODERICK

A    An investigation that's thorough, that investigates all claims, that reviews all of the examples, all witnesses.  And other relevant parties are spoken with in conjunction with the claim, the allegations.

Q    And why, in your opinion, is that a hallmark of a good investigation?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  It is one of the hallmarks associated with providing the employee with an opportunity to express their concerns and have those concerns thoroughly reviewed in an objective manner.

BY MR. IADEVAIA:

Q    And is a thorough investigation also, in your opinion, important for the person who's been accused, as well as the person who made the complaint?

A    Yes.

Q    And why is that?

A    It is important for all parties, not only the complainant, the subject, as

M. RODERICK

well as the witnesses.

Q    And why is it important for the subject or the accused?

A    All employees at Paramount should be treated with respect, with dignity, and in -- in an equitable manner. If someone is accused, and underline the word accused, they deserve to be treated with respect and dignity, just like the complainant and any other employees at Paramount.

Q    And you said, "underline accused."  Why did you say that?

A    Any fair thorough objective investigation does not come to a conclusion at any time or speculate at any time during the course of an active investigation.

A person is accused of something; at Paramount, we don't come to the conclusion, just because there is a claim, that that claim is substantiated. Which is why we conduct timely thorough investigations for complaints that are

M. RODERICK

raised.

Q   Okay.  You said one of the hallmarks of a good investigation is a timely investigation.  What do you mean by that?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  Timely -- not being fast.  Timely means when a complaint is raised, the complainant should receive a response acknowledging the fact that the complaint has been raised.  I'll repeat: Timely does not mean fast.  It doesn't mean cutting corners.  It doesn't mean overlooking.  It means doing a thorough job, but in a timely manner.

BY MR. IADEVAIA:

Q   In the investigations that you've conducted, from the time you've received the complaint until you've completed the investigation, what is the range of time that has taken for you?

A   Could you repeat the question? I'm sorry.

Q   Sure.  Just trying to

M. RODERICK

understand.  From the time you get a complaint until you complete the investigation, what's the range of time it has taken you to do that, to complete the investigation?

A    I'm just going to insert a word.

Q    Sure.

A    The time that it -- that the investigator receives the complaint, not the time that the complaint goes into the system or goes to HR.

Q    Understood.

A    'Cause I can't -- an investigator can't control that.  The time that I receive a complaint, I believe it's best practice to contact the complainant within 24 to 48 hours.  I believe that is best practice.

Q    And in investigations -- again, focused on when you get the complaint, okay, and when you've concluded your investigation, what is the range of time it has taken you to do that?

MR. ZUCKERMAN:  The duration of the

M. RODERICK

investigation?

MR. IADEVAIA:  That's right.  Yeah.

THE WITNESS:  I don't recall specifically.  It depends on the scope of the investigation.  I said this before. And I'm just going to add, so we have that information.  Every complaint is different.  It depends on the scope of the investigation.  It depends on the scope of the investigation as it relates to when that case is closed.

BY MR. IADEVAIA:

Q    Have there been investigations that you've worked on for over a month?

A    Yes.

Q    And have there been investigations you've worked on that have lasted more than six months?

A    I don't recall.

Q    You testified that a hallmark of a good investigation, in your view, is that it's conducted consistent with internal protocols.  Do I have that correct?

M. RODERICK

A     Yes.

Q     Okay.  And you did testify a little bit earlier about protocols.  Can you just say, so we have it all in one place, what you mean by protocols?

A     Yes.

Q     What do you mean?

A     I mean conducting internal investigations in a -- in a manner consistent with internal protocols that include fact gathering, analysis, and determining the resolve.

Q     And these protocols, are they in writing anywhere, to your knowledge, at CBS?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  No, not to my knowledge.

BY MR. IADEVAIA:

Q     Okay.  And these protocols are protocols that you've discussed with your colleagues within employee relations?

A     Yes.

Q     And that's how you learned about

M. RODERICK

the protocols initially?

A    Yes.

Q    Is there anyone in particular that told you, "These are our protocols for conducting investigations at CBS"?

A    I don't recall.

Q    Who have you discussed these protocols with?

A    My colleagues.

Q    Which ones?

A    All colleagues.

Q    So that includes Ms. Baker?

A    Yes.

Q    That includes Ms. Gordon, when she was there?

A    Yes.

Q    That includes Hazel, when she was there?

A    Yes.

Q    Yeah.  Does Hazel still work for Paramount, do you know?

A    I don't believe so.

Q    Is Ms. Baker an attorney, do you know?

M. RODERICK

A    I do not know.

Q    Okay.  And Ms. Gordon, is she an attorney?

A    I do not know.

Q    Okay.  If you could turn to the next page of Exhibit 2, please, CBS9309. The slide says "Hallmarks of a good investigation, promptly initiated and completed."  Do you see that bullet point?

A    Yes.

Q    Do you agree that promptly initiated and completed is the hallmark of a good investigation?

A    To the extent possible, yes.

Q    And promptly, you understand, means quickly; correct?

        MR. ZUCKERMAN:  Objection.

        THE WITNESS:  I do not -- no.  I do not believe promptly means quickly.

BY MR. IADEVAIA:

Q    Okay.  What do you understand promptly to mean?

A    Expedient, efficiently, effectively.

M. RODERICK

Q    The next bullet point --

A    Not quickly.

Q    Not quickly, okay.  I don't want to cut you off.  Are you --

A    Sorry.  Yes.

Q    No.  Don't be sorry.  I just don't want to interrupt you.  All right. The next bullet point is "Thorough."  It says "no loose ends."  Do you agree that that's a hallmark of a good investigation?

A    Yes.

Q    Okay.  The next bullet point is "Confidentiality maintained to the greatest extent possible."  Do you agree that that's a hallmark of a good investigation?

A    Yes.

Q    Why is, in your view, confidentiality a hallmark of a good investigation?

A    Confidentiality, to the extent possible, is important.  It's consistent with internal protocols.  And it's what we want to ensure, confidentially, to the

M. RODERICK

extent possible, so that employees feel and trust the process.  So they come forward and share concerns.

Q    And is there -- when you conduct investigations, are there any steps you take to, as much as possible, ensure confidentiality?

A    Yes.

Q    And what are those steps?

A    Depending upon the case, I will manage expectations with every person spoken to as part of the investigation and share with them what confidentiality means, to the extent possible -- what confidentiality, to the extent possible, means.  And only speak to those who are associated and relevant to the investigation.

Q    Meaning you say that to the individuals you're meeting with as part of the investigation?

A    I talk about confidentiality, to the extent possible.  That's what I share with the folks spoken with.

M. RODERICK

Q    Okay.  So when you meet with a witness, do you ever give instructions for them to keep the substance of what you're discussing confidential?

A    I provide guidelines and request on keeping things confidential.  I can't make that mandatory.  I can't control that.  But I do share with them what the expectations are, as it relates to participating in an investigation.

Q    And does that apply not only to the person who made the complaint, but also individuals who may have knowledge? Is it the same, or is it different?

A    It applies to everyone associated with an investigation.

Q    And that would include the person who was accused as well?

A    Yes.

Q    Okay.  If you look at the next bullet point on 9309, it says "Impartial, fair, and respectful."  Do you agree that the hallmarks of a good investigation include being impartial, fair, and

M. RODERICK

respectful?

A    Yes.

Q    And when you were speaking earlier about conducting an objective investigation, is impartial, fair, and respectful part of it?

MR. ZUCKERMAN:  Objection.

BY MR. IADEVAIA:

Q    What do you understand impartial, fair, and respectful to mean, in the context of an investigation?

A    Exactly how Webster would define impartial, fair, respectful.  Being objective, not allowing personal opinions to impact the investigation.

Leads right into the next bullet, "Ensuring the conclusions are based solely on the evidence, the facts gathered, not on personal opinions." Those are some of the things associated with impartial, fair, and respectful.

Q    And if you look at the next bullet point, it says "In compliance with law and policy."  Do you see that bullet

M. RODERICK

point?

A    Yes.

Q    Do you agree that that's a hallmark of a good investigation?

A    Yes.

Q    And are there any specific policies at CBS or Paramount, since you've been there, that deal with conducting investigations?

A    Could you repeat the question?

Q    Sure.

A    Sorry.

Q    Just asking if there's any written policies, you're aware of since being at CBS, about conducting investigations?

A    The business conduct -- yes.

Q    And what is it?

A    The business conduct statement.

Q    But what does it say about conducting investigations?  I know you're not -- I'm not asking you to remember word for word.  But generally, what's your understanding of what it says?

M. RODERICK

A   I believe it talks about the overall process associated with conducting internal investigations, including resources available for someone to -- any employee -- or not -- anyone to raise a concern.  And that all investigations will be -- all complaints will be thoroughly and timely conducted and reviewed.

Q   Any other policies, you're aware of, about conducting investigations?

A   I don't recall.

Q   Okay.  If you could take a look at page CBS9330 using, again, that top Bates number.  It says at the top "Conducting the interview."  Are you on that page?

A   Yes.  Yes.

Q   Great.  So under the header "Conducting the interview," it says "Key facts to be elicited."  And then it says "chronology of incidents."  Do you see that text?

A   Yes.

Q   Okay.  Do you agree that one of

M. RODERICK

the key facts to be elicited in investigating a complaint is the chronology of incidents?

A    Yes.

Q    And when you conduct your investigations, what are ways in which you go about determining the chronology of incidents?

A    By asking specific information as it relates to the claims, including examples being provided.

Q    And who do you ask in compiling that information?

A    Anyone associated with the investigation that I'm speaking with.

Q    So that could include the complaining party, witnesses, and the accused?

A    All parties, yes.

Q    Okay.  All right.  And then in the next bullet point, it says "All relevant witnesses."  Do you agree that that's a key fact to be elicited when conducting an interview?

M. RODERICK

A    Yes.

Q    And that's a question that you would pose to the complainant, I assume. Are there people you think -- well, strike that. How do you go about determining who the relevant witnesses are for an investigation?

A    By asking questions.

Q    And you ask all the parties involved. Is that right?

A    Yes.

Q    Okay. And then in the next bullet point, it says "Reporting work and personal relationships of witnesses." Do you see that text?

A    Yes.

Q    Did I read it correctly?

A    I believe so. Yes.

Q    Okay. Do you agree that that's a key fact to be elicited as part of an investigation, or key facts?

A    Yes.

Q    Okay. And how do you go about eliciting that information in the

M. RODERICK

investigations you conduct?

A    By asking questions.

Q    And when you say, "asking questions," who are you asking questions of to get that information?

A    All parties associated with the investigation.

Q    And that would include the complainant, any witnesses, and the accused?

A    Yes.

Q    And in your view, why is it important to understand the reporting relationships of witnesses?

A    It's part of being thorough.

Q    And what about work relationships?  Why is that a key fact or set of facts?

A    It's part of being thorough in conducting a thorough and complete investigation.

Q    And what about personal relationships?  Why is that a key fact or facts to elicit?

M. RODERICK

A    It's part of conducting a thorough investigation.

Q    And do you think knowing the reporting work and personal relationships of witnesses is helpful in assessing credibility of witnesses?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  It depends on the nature of the complaint.

BY MR. IADEVAIA:

Q    Outside of asking the witnesses questions to try to understand the nature of the relationships, the key relationships, is there anything else you do or have done, in investigations that you conduct, in order to determine the relationships?

A    The working relationships?  I'm sorry.

Q    Yeah.  We'll start with working relationships.  Sure.

A    Yes.

Q    What else?

A    Reviewing organizational charts;

M. RODERICK

reviewing crew list, if it's a production.

Q    Anything else you can think of?

A    Depends on the nature of the complaint and where the complaint -- well, where business unit the complaint is associated with.

Q    And in terms of eliciting information about the personal relationships of witnesses, outside of asking questions, is there anything else you have done, in investigations you've conducted, to find out that information?

A    I don't recall.

Q    Okay.  In the next bullet point, it says on 9330 "The work history of accused and key witnesses."  Do you see that text?  Did I read it correctly?

A    Yes.  I see it.  Yes.  You read it correctly.

Q    And do you believe that is, in your opinion, a key fact or set of facts to be elicited during an investigation?

A    Yes.

Q    And what do you understand "work

M. RODERICK

history" to refer to?  What does it mean?

A    Such things as date of hire; job title; job responsibilities; reporting -- reporting relationships, ie, org chart; and any other relevant information, depending on the nature of the complaint.

Q    In conducting investigations, do you look into whether there's been prior allegations against the employee who's being accused?

A    Yes.

Q    And why do you do that?

A    In an effort to ensure a thorough objective investigation is conducted.

Q    And how is it that prior complaints are part of the conducting a thorough investigation?  Or strike that. Why is it that considering prior complaints is part of a thorough investigation?

A    By definition, ensuring there are no loose ends in an effort to obtain a

M. RODERICK

complete picture, figuratively speaking, of course.

Q    And how do you go about determining whether there's been prior complaints against someone accused in an investigation you're conducting?

A    I ask questions.

Q    Who do you ask?

A    The relevant HR business partner.

Q    Are there any other ways that you look into whether there's been prior complaints against an accused person?

A    Yes.

Q    What other -- the other ways?

A    By speaking -- depending on the nature of the complaint, by speaking with the relevant senior leaders associated with the complaint.

Q    Anything else?

A    I don't recall.

Q    Is there any database at CBS, that you have access to, where you can determine or look up if there's been prior

M. RODERICK

complaints against an accused?

A    Yes.

Q    What's that database?

A    It's called EthicsPoint.  One word.

Q    And is that a digital database, electronic?

A    It's a online system.  Yes.

Q    And do you have to log into it?

A    One has to log into it.  Yes.

Q    And so you have password and username, you personally, to log into the system?

A    Yes.

Q    And to your knowledge, is that system available to anyone in employee relations?

A    Yes.

Q    Is it available to HR employees?

A    No.

Q    Is it available to anyone outside of employee relations?

A    Yes.

Q    What category or class of

M. RODERICK

employees?

A    Compliance.

Q    What about legal?

A    I do not know.

Q    Any other groups, outside of employee relations and compliance, that has access to the EthicsPoint system?

A    I do not know.

Q    And what information is contained within the database that you can access?

MR. ZUCKERMAN:  Objection.

BY MR. IADEVAIA:

Q    The EthicsPoint, I'm talking about specifically.

A    Name of the complainant; date of complaint; name of the alleged wrongdoer, ie, subject; summary of the complaint, the allegation.  Sorry.

Q    It's okay.

A    Status of the complaint, ie, open/closed; date closed; substantiated status, substantiated/unsubstantiated; action taken as part of the resolve.

Page 111

M. RODERICK

There may be other fields that I can't recall.

Q    And when you are assigned an investigation, do you always look at the EthicsPoint system to see if there's been prior complaints against the accused?

A    Yes.

Q    And do you look at the system to see if the person who's made a complaint has made prior complaints?

A    Yes.

Q    Is one of your responsibilities to input information into that system for investigations that you conduct?

A    Yes.

Q    And do you do that every time that you are assigned an investigation, input the information into the EthicsPoint system?

A    No.

Q    Okay.  In what circumstances are you not inputting that information?

A    The system is open to non-employees and employees.  There are times

M. RODERICK

when employees submit their complaint directly into the system. In those scenarios, I do not go in and reenter what's already entered.

Q   Will you update that information as the investigation proceeds within the system?

A   Yes.

Q   Even for those that you didn't create the complaint, correct, in the system?

A   Yes.

Q   Okay. Has this system existed the entire time you've been at CBS?

A   Yes.

Q   So when you started, there was an EthicsPoint system; correct?

A   Yes.

Q   And did it work more or less the same as it works now?

A   Yes.

Q   And did you have the same or similar process of checking the EthicsPoint system, when you're assigned

M. RODERICK

an investigation, to determine if there had been prior complaints against an accused?  Has that more or less been your practice throughout your time?

A    Yes.  Yes.

Q    In conducting investigations, do you ever review the personnel file of the accused as part of your investigation?

A    I don't recall.

Q    Outside of the EthicsPoint system, is there any other system, that you have access to, that would reflect or does reflect prior complaints against employees?

A    Not to my knowledge.

Q    Is there any other place, that you have access to, that contains information about disciplinary action that has been taken against an employee, outside of the EthicsPoint system?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  Not to my knowledge.

BY MR. IADEVAIA:

Q    And to your knowledge, does

M. RODERICK

human resources have access to a different system or systems containing information about complaints against employees?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  Not to my knowledge.

BY MR. IADEVAIA:

Q    To your knowledge, does HR have access to any systems that would contain information about discipline against CBS or Paramount employees?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  Not to my knowledge.

BY MR. IADEVAIA:

Q    Okay.  If we could look at the next page, 9331, please.  Let me know when you're there, Mr. Roderick.

A    9331, yes.

Q    Okay.  At the top it says "Conducting the interview, overall tips." Do you see that?

A    Yes.

Q    Okay.  When you conduct your interviews -- well, strike that.  The second bullet point says "Maintain

M. RODERICK

impartiality and be objective."  Do you see that text?

A    Yes.

Q    Okay.  And when you conduct interviews, is it important, from your perspective, to maintain impartiality?

A    Yes.

Q    And be objective?

A    Yes.

Q    Okay.  The next bullet point says "Discuss confidentiality."  Do you make a point of doing that during the interviews that you conduct?

A    Yes.

Q    And is that consistent with what you've said to me earlier today, that you talk about maintaining confidentiality as much as possible with the parties that you meet with as part of investigations?

A    To clarify, I said confidentiality to the extent possible.

Q    To the extent possible.

A    Yes.

Q    Got it.  And that's consistent

M. RODERICK

with your prior testimony that you make requests -- you give guidance about confidentiality when you meet with complainants and those accused and witnesses; correct?

A    Yes.

Q    On the fifth bullet point, it says "Discuss the company's anti-retaliation policy and legal obligations." Do you see that text?

A    Yes.

Q    Okay.  During the interviews that you conduct, do you discuss the company's anti-retaliation policy?

A    Yes.

Q    Do you do that for all interviews that you conduct?

A    Yes.

Q    And what do you say during those interviews about the company's anti-retaliation policy?

A    Not verbatim.  Something to the effect of:  "In my introductory email to you, I outlined the company's non-

M. RODERICK

retaliation policy.  I just want to share with you:  If anyone from the company were to reach out to you to talk about any aspect of what we're about to discuss, please don't feel compelled to share.

"However, let me know.  Please don't feel compelled to share any information.  However, please let me know immediately, so I can address it."  I say that at the beginning of a -- a interview, and I say that at the end of the interview.

Q    Do you ever, in your interviews, warn the people you're meeting with, the parties you're meeting with, not to retaliate against a complainant?

A    I share with them the company's non-retaliation policy.  I sometimes give examples of what retaliation could look like.  And I let them know the importance of not discussing this with anyone at the company.

Q    And when you share the anti-retaliation policy, are you sharing that

M. RODERICK

with anyone you meet with regardless of whether they're the complainant or the accused?

A    With everyone interviewed in conjunction with an investigation of a complaint.

Q    And do you think it's important to tell the accused about the company's anti-retaliation policy as part of your investigation?

A    Yes.

Q    And why is that?

A    In an effort to ensure the employee feels comfortable sharing information relevant to an investigation, it's important that they know that they are -- there are guidelines associated with anyone who were to mistreat, retaliate, engage in any inappropriate conversation, discussions, or behavior, simply because someone is participating in an investigation.

Q    And do you think, in your interviews, it's important for the person

M. RODERICK

who's been accused to be aware of the anti-retaliation policy, so they're on notice not to retaliate?

A    I think it's -- yes.  I think it's important that the alleged wrongdoer is aware of what the expectations are, being someone who is accused.  However, I also inform them:  Even though they are being accused, no one should be talking to them about the investigation.

An alleged -- the -- the non-retaliation policy applies to all employees, whether you are being accused, you're the complainant, or you're a witness.

Q    And regardless of whether you're the complainant or the accused or a witness, the non-retaliation policy, as you understand it, prohibits them from engaging in retaliation and protects them from retaliation.  Is that right?

A    The non-retaliation policy -- yes.  That is right.

Q    And is the -- I think you said

M. RODERICK

in your interviews, you always do this. You talk about the retaliation policy, and you talk about confidentiality. Is that part of the protocols that you refer to earlier?

A    The non-retaliation policy, yes.

Q    Yeah. And is it your understanding that anyone in employee relations who's conducting investigations should be providing notification or some information about the company's anti-retaliation policy when doing these interviews?

A    Yes.

Q    Okay. And then in terms of what you've said about confidentiality, is it your understanding that any person in employee relations who is doing these interviews should notify the party they're meeting with about confidentiality in that way?

A    Could you repeat the question?

Q    Sure. I'm just wondering. Is it part of the protocols that you referred

M. RODERICK

to earlier that investigators in employee relations provide the information about confidentiality that you've described for us today?

A    Confidentiality, to the extent possible, yes.

Q    Okay.  And if we could go to the next page, 9332.  At the top it says "Conducting the interview, initial info for interviewee."  Do you see that at the top?  Yeah.  You can take that off, of course.

A    Could you repeat the number, the reference number?

Q    Sure.  9332.

A    Yes.

Q    Okay.  And it says at the top "Conducting the interview, initial info for interviewee."  Do you see that?

A    Yes.

Q    Okay.  When you are conducting the interviews that you conduct, do you, as this bullet point says, advise the interviewee of purpose of interview?

M. RODERICK

A    Yes.

Q    Okay.  Do you explain the process?

A    Yes.

Q    Do you discuss confidentiality?

A    I discuss confidentiality, to the extent possible.  Yes.

Q    Okay.  Skipping one of the bullet points, do you advise the interviewee that CBS does not tolerate retaliation?

A    Yes.

Q    Okay.  Thanks.  If you could take a look at 9336, please.  At the top of the page, it says "Interviewing the accused."  Do you see that?

A    Yes.

Q    Okay.  When you're interviewing individuals who are the subject of an accusation as part of an investigation, do you, as bullet point 2 here says, reference policies prohibiting discrimination and retaliation?

A    Yes.

M. RODERICK

Q    And do you instruct the accused not to contact the complainant?

A    Yes.

Q    And why do you do that?

A    I want to manage expectations, focusing on the nature of the claims. It's important in managing expectations that the alleged wrongdoer knows what is expected of him or her.  This ensures the integrity of the investigation.  I recognize people are human.  And a lot of times, being human, we want to apologize to the alleged -- to the complainant.

We don't want that to happen during the course of an investigation. So, again, in an effort to manage expectations, I share with the accused, the alleged wrongdoer, what is acceptable in terms of speaking to the complainant.

Q    Okay.  Thanks.  If you could take a look at 9342, please.  At the top of the page, it says "Point number 9, credibility determinations."  Do you see that?

M. RODERICK

A    Yes.

Q    Okay.  And there's several bullet points on this page.  I want to focus on the one that says "History of honesty or dishonesty."  Do you see that?

A    Yes.

Q    And then it says "Past record, any priors?"  Do you see that?

A    Yes.

Q    Okay.  Is there any way for you, as an investigator, to determine whether someone who's been accused of something has a history of being honest or dishonest?

A    Yes.

Q    And what way or ways can you do that?

A    One of the ways is to speak to the investigator associated with the previous complaint, to get a sense of -- of the findings, the information regarding the investigation, and also whether or not they believe the person was credible.

Q    Any other ways?

M. RODERICK

A     Not to my knowledge.

Q     When you're -- in your job as an investigator, do you need to make credibility determinations?

A     Yes.

Q     And what are the ways in which you go about making credibility determinations?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  There are a variety of ways.

BY MR. IADEVAIA:

Q     Can you give me examples?

A     The manner in which the individual is providing information; whether or not they are being cooperative; if the information being provided is not consistent with what witnesses have provided.  Those are three examples of many -- one can assess one's credibility.

Q     Anything else you can think of, as you sit here today?

A     Not at this moment, no.

Q     All right.  I think the last

M. RODERICK

page that we're going to look at at this document.  If you could take a look at 9348.  At the top of the page, it says "Common investigation mistakes."  And then there's a number of bullet points.  The second bullet, "promising complete confidentiality," do you see that bullet point?

A     Yes.

Q     Okay.  Do you believe it is a mistake in an investigation to promise complete confidentiality?

A     Yes.

Q     And how come?

A     We can't control what others may do, number one.  Which is why we say confidentiality, to the extent possible. During the course of an investigation, if I were to tell someone this is completely confidential, that's not consistent with how we conduct internal investigations.

For example, I will often meet with the employment attorney associated with this case.  So if I am telling

M. RODERICK

someone I am -- this is completely confidential, I am misrepresenting the truth.  Because I am going to be sharing this information with the assigned employment attorney.

Q    And if you look further down, the last bullet point, it says, as an example of investigation mistakes, "Failing to examine potential bias," and then in parentheses "personal agenda of witnesses."

A    Sorry.  Thank you.

Q    Do you want me to read it again?

A    No.  No.  No.  I'm sorry.  Thank you.

Q    That's okay.

A    Yeah.  Sorry.

Q    Yeah.  Take your time.

A    Yes.

Q    Do you believe that it's a mistake in an investigation not to examine potential biases?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  I think it's important

M. RODERICK

in an investigation to examine potential biases.  Failure to do so would be a mistake.

BY MR. IADEVAIA:

Q    Okay.  And what do you understand potential biases to mean, in the context of conducting investigations?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  It could be that person A and person B had a personal consensual relationship at one point.  It could be a lot of microaggressions associated with a relationship, with why a person has raised a concern.  There are a variety of examples, but those are two that come to mind.

BY MR. IADEVAIA:

Q    Okay.  And in parentheses it says "personal agenda of witnesses."  When you conduct investigations, do you explore the potential personal agenda of witnesses?

A    Yes.

Q    And do you think it's important

M. RODERICK

to do that?

A     Yes.

Q     And why is that?

A     It's part of conducting a thorough, a fair investigation.  You want to explore all areas, and you want to ensure there are no loose ends.

Q     Got it.  Okay.  If we could take a look again -- I mean, I'm done with this document.  You won't have to look at it again today.  I promise.  Thank you.

A     Thank you.

Q     If you could look at Exhibit 3 again, which should be in that stack. It's the smallest one.  This is the document that says "CBS Non-Discrimination and Anti-Harassment Policy."

A     Yes.

Q     And if you could take a look at page CBS7101.  It's at the bottom of this document.

A     Yes.

Q     Okay.  And if you look under the header "The Investigation."

M. RODERICK

A    Yes.

Q    It says "Any reported allegations of harassment, discrimination, or retaliation will be investigated fairly promptly thoroughly and impartially by the human resources Department, CBS's compliance department, or another appropriate party in a manner that provides all parties appropriate due process and reaches conclusions based on the evidence collected."  Do you see that text?

A    Yes.

Q    Did I read it correctly?

A    Yes.

Q    When you were testifying earlier about policies regarding conducting investigations, is this an example of the written policies you were referring to or not?

A    I never mentioned written policies associated with conducting an internal investigation.  I believe I used the word, consistently, as protocols.

M. RODERICK

Q   Okay.  Do you understand this text to be consistent with the protocols you've been discussing today?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  Could you repeat the question, please?

BY MR. IADEVAIA:

Q   Sure.  I'll ask a different way.

A   Sure.

Q   The the text here says that "Allegations of harassment, discrimination, or retaliation will be investigated fairly."  Do you see that?

A   Yes.

Q   Do you think it's important to conduct investigations fairly?

A   Yes.

Q   Do you think it's important to conduct investigations promptly, as that term is used there?

A   Promptly.  Not fast, but promptly.

Q   Okay.  Do you think it's important to conduct investigations

M. RODERICK

thoroughly?

A    Yes.

Q    Impartially?

A    Yes.

Q    Okay.  There's a reference in here that's -- part of the sentence says "that provides all parties due process." Do you see that text?

A    Appropriate due process.

Q    Appropriate due process.

A    Yes.

Q    Okay.  And when you conduct investigations, do you provide all parties appropriate due process?

A    Yes.

Q    And what does that mean for the investigations you do?

A    I don't understand the term, "what does that mean for the investigations that I do?"

Q    Okay.  You said that you attempt to provide all parties in the investigations you do with appropriate due process.  Is that correct?

M. RODERICK

A    Yes.

Q    Okay.  What does that mean for your investigations?  How do you go about accomplishing that goal?

A    By conducting thorough timely investigations in an objective manner, regardless of the role that the person plays, ie, complainant, subject/alleged wrongdoer, or witnesses.

Q    That's it for that document. Upon completing an investigation, are there times, in matters you've been involved in, in which disciplinary action is taken against the accused based on the investigation that you've conducted?

A    Yes.

Q    And what kinds of disciplinary action have been taken in connection with investigations that you've conducted?

A    Several.

Q    Please tell me those that you recall?

A    Written warning; coaching -- coaching; handwritten warning; stern

M. RODERICK

closure letter outlining expectations, similar to a written warning, but not a written warning; termination.  Those are some of the -- some of the actions associated with corrective discipline, but not all of them.

Q    Okay.  Understood.  And to your knowledge -- and I think you testified earlier, but please correct me if I'm wrong.  The decision about whether to take corrective action and if so -- let's strike that.  Who makes the decision about whether to take corrective action?

A    The business leader associated with the complaint.

Q    Okay.  And who makes the decision -- if corrective action is going to be made, who makes the decision about what corrective action to use?

A    The business leader.

Q    In terms of deciding whether to take corrective action, what role, if any, do you play in that process?

A    I am not the decision maker

M. RODERICK

associated with the resolve.

Q     Understood.  But do you play --
do you have any involvement?

A     That's too nebulous.  Could --
could you, please --

Q     Sure.  Do you make
recommendations?

A     On occasion.

Q     Have there been occasions where
you've made recommendations, and those
recommendations have not been followed by
the business leader?

A     I don't recall.

Q     You mentioned one possible
disciplinary or corrective action is a
written warning; correct?

A     Yes.

Q     Does a written warning have a
specific format it has to follow at CBS?

A     Not that I am aware of.

Q     And in the instances where
there's been written warning issued
following an investigation you've
conducted, did you play any role in

M. RODERICK

preparing the written warning?

A    Yes.

Q    Have you ever drafted a written warning?

A    Yes.

Q    How many times?  And not an exact number.

A    I don't recall.

Q    More than ten times, you think?

A    I don't recall.

Q    Okay.  Is there certain information that you make sure to include in any written warning that you've drafted?

A    It depends on the circumstance.

Q    Okay.  When an employee, in matters you've been involved in, receives a written warning, does it say "This is a written warning" on the document?

A    It may.

Q    Okay.  In the instances where you've been involved, where there's a written warning, what's the purpose of the written warning?

M. RODERICK

MR. ZUCKERMAN:  Objection.

THE WITNESS:  Depends on the circumstances.

BY MR. IADEVAIA:

Q    In your experience, what have been the purposes of written warnings?

A    To provide the alleged wrongdoer with documented information as to the conclusion of an investigation, the findings of the investigation/conclusions, along with what the expectations are going forward, in an effort to ensure the corroborated or substantiated behavior does not repeat itself.

Q    Are there circumstances, you've been involved in, where following an investigation, someone is fired without having previously received a written warning?

A    I'm sorry.  Could you repeat the question?

Q    Sure.  Are there circumstances, you've been involved in, where an employee is fired when they haven't previously

M. RODERICK

received a written warning?

A    Yes.

Q    How many times did that happen?

A    I do not recall.

Q    Can you recall it happening -- I assume you said yes because you recall it happening at least once?

A    Yes.

Q    Do you recall it happening more than once?

A    I don't recall.

Q    Okay.  What is the one instance that you remember?

A    I can share with you the claim and what was corroborated.  I cannot provide you with the names.

Q    Okay.  We'll start with the claim and what was corroborated, please?

A    Workplace violence.

Q    And what was corroborated?

MR. ZUCKERMAN:  Just be careful not to disclose the contents of a privileged investigation.  So you can talk about the closure document and what's in the closure

M. RODERICK

document.  And you can talk about the complaint that came in from the employee.

THE WITNESS:  The complaint alleged a manager, a supervisor, of engaging in workplace violence on more than one occasion.  More than one person --

MR. ZUCKERMAN:  Don't reveal the --

THE WITNESS:  Sorry.

MR. ZUCKERMAN:  Yeah.

THE WITNESS:  I apologize.  We corroborated, we substantiated the claim.  A decision was made to terminate the alleged wrongdoer.

BY MR. IADEVAIA:

Q    Okay.  The complaint of workplace violence that you investigated, that initiated the investigation, did it give examples of the workplace violence?

A    Yes.

Q    And what's an example?

MR. ZUCKERMAN:  Again, limiting to the intake, initial complaint is fine.

THE WITNESS:  Physically shoving a subordinate on more than one occasion.

M. RODERICK

That was the claim that was corroborated.

BY MR. IADEVAIA:

Q    Okay.  And did this involve somebody who worked at "60 Minutes," whether it's the complainant or the accused?

A    No.

Q    Did it involve somebody who worked for CBS News?

A    I don't recall.

Q    Okay.  Outside of that example, do you recall any other instance in which an employee was fired who had not previously received a written warning?

A    I do not recall.

Q    Okay.  You mentioned earlier that one form of corrective action is coaching; correct?

A    Yes.

Q    And you've been involved in situations where you conduct an investigation, and following the investigation someone receives coaching; correct?

M. RODERICK

A    Yes.

Q    And who provides that coaching? Is it you?  Is it the employee relations person?  Or is it somebody else?

A    It's someone else.

Q    And who is that?

A    It depends on the circumstance.

Q    Is it sometimes somebody in human resources, in your experience?

A    I don't recall.

Q    Is it the business leaders sometimes, in your experience?

A    I don't recall.

Q    Okay.  And when someone receives coaching following an investigation, does the coaching get documented in any CBS system?

A    I do not know.

Q    When you've done these investigations and coaching has resulted as a result of the investigation, do you input that into the EthicsPoint system you referenced earlier?

A    No.

M. RODERICK

Q When someone receives a written warning following the investigations you've conducted, does that get input into the EthicsPoint system?

A The fact that the person is being provided with a written warning is documented in EthicsPoint. I would like to go back, because I misinterpreted your first question, prior question.

Q Sure. Yeah.

A Executive coaching is indicated in the system, that that is the resolve.

Q Understood. Thank you for clarifying. When you say, "executive coaching," what does that mean?

A Executive coaching or coaching is exactly what it says. An executive coach is an outside -- can be an outside vendor whose responsibility is many. One including providing targeted executive coaching to individuals in -- like I said, in targeted areas. That is what I believe is an executive coach's function.

Q Okay. The fact that an employee

M. RODERICK

has received a written warning, has it always been the case, during your tenure at CBS, that that information was entered into the -- is it EthicsPoint system?

A    EthicsPoint, yes.

Q    Has it always been the case that that was entered, since you've been there?

A    I believe so.

Q    And is the same true for executive coaching?

A    I believe so.

Q    Okay.  Before you testified that one option for disciplinary or corrective action is a stern closure letter, but not a written warning.  Do I have that correct?

A    Yes.

Q    What is the difference between a stern closure letter and a written warning?

A    It's exactly what it says.  So a closure letter will provide the results of the investigation along with specific expectations of the -- for the alleged

M. RODERICK

wrongdoer going forward.

A written warning traditionally will indicate, in the memo that is provided by the senior leader to the alleged wrongdoer, that this is a written warning based on the investigation findings, outlining specific examples, including language to include: Further -- further examples of this behavior could result in further disciplinary action up to and including termination. That's not verbatim.

Q    Understood. So the written warning, when one is issued, is separate and apart from a closure letter?

A    It can be.

Q    Are there times where the written warning is part of the closure letter?

A    It could be.

Q    Okay. And that includes instances where you've been involved?

A    I don't recall.

Q    All right. Are you aware of any

M. RODERICK

policies at CBS about managers taking corrective action against employees?

MR. ZUCKERMAN: Note my objection.

THE WITNESS: I don't recall.

BY MR. IADEVAIA:

Q     Are you aware of any guidance or written materials from managers to use or consult when considering taking disciplinary action against an employee?

A     I don't recall.

Q     Are there any written materials for you, as a member of employee relations, when considering disciplinary action that might be taken against an employee?

MR. ZUCKERMAN: Objection.

THE WITNESS: Could you rephrase the question?

BY MR. IADEVAIA:

Q     Sure.

A     I don't understand.

Q     Is there any guidance for you? Because sometimes you say you make recommendations about corrective action.

M. RODERICK

Is there any written guidance for you, at CBS, related to disciplinary actions against employees?

A    I don't know.

Q    In those circumstances where you've made recommendations for disciplinary action, what factors do you consider in deciding which action is appropriate?

A    Based on the allegations that are substantiated, coupled with any historical information for similar, like, cases.  Again, I just want to remind you that there are no two -- there are no two cases that are identical.

Q    In employee relation -- in your job as an investigator, are there instances where you have placed an employee on administrative leave pending an investigation?

A    Yes.

Q    And as the investigator, are you empowered to do that?  Or is that a decision that someone else has to make?

M. RODERICK

A    I am not empowered to do that solely.

Q    Okay.  So what's the approval process for that to happen?

A    I don't know if there's a -- there's a written process.  When I hear process, I think of something written.  Traditionally, it is ultimately the business leader's decision.  But the recommendation will be made in conjunction with the investigator, the employment attorney, and the relevant HR business partner.

Q    And what is the purpose of an administrative leave pending the results of an investigation?

A    It could be because the claim is alleging behavior that we do not want to repeat itself.  If it's substantiated, ie, workplace violence, we want to protect and ensure the safety of all employees.  Workplace violence could be -- a claim of workplace violence could be a scenario resulting in the alleged wrongdoer being

M. RODERICK

placed on administrative leave.

Q    What are other scenarios where administrative leave may be appropriate pending the investigation?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  Could be allegations of fraud, embezzlement.  Could be a claim of assault.

BY MR. IADEVAIA:

Q    Any other scenarios?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  There could be.  But that -- those are the scenarios that I can reference now.

BY MR. IADEVAIA:

Q    Have you ever been involved in an investigation where an employee was placed on administrative leave pending the results of the investigation?

A    Yes.

Q    How many times?

A    I don't recall.

Q    Is it more than ten times?

A    I don't recall.

M. RODERICK

Q    Was it more -- but it did happen.  It's happened at least once, is your testimony?

A    Yes.

Q    Okay.  Can you tell me the instances where it happened?

MR. ZUCKERMAN:  Again, Just heed my instruction previously.

THE WITNESS:  Okay.  A claim of assault on a production was made.  Prior to my conducting an investigation, a decision was made, as outlined before in your previous question, to -- and it was agreed upon that the alleged wrongdoer would be placed on leave during the investigation.

BY MR. IADEVAIA:

Q    Did this involve a "60 Minutes" person, whether the complainant or the accuser?

A    No.

Q    Did it involve somebody who worked within CBS News?

A    No.

M. RODERICK

Q    Okay.  And what was the nature of the assault, as reflected in the complaint that came in?

A    The complaint alleged the alleged wrongdoer of assaulting another crew member on the production.

Q    Did the complaint give any details about the nature of the assault?

A    Yes.

Q    What were those details?

A    I don't recall.

Q    Was it a sexual assault, as reported in the complaint?

A    Yes.

Q    Are there other instances of investigations, that you have been involved in, in which the accused is placed on an administrative leave pending the investigation?

A    Yes.

Q    Okay.  What else do you recall, beyond what you just testified to?

A    I don't recall.

Q    You don't recall the specifics

M. RODERICK

of any other times?

A    No.

Q    Were there any instances, that you were involved in, where the accused was placed on administrative leave that did not involve violence?

A    I don't recall.

Q    Were there any instances involving administrative leave, that you were involved in, where there was fraud or embezzlement?

A    The claim of fraud or embezzlement.

Q    Yeah, the allegation.

A    Yes.

Q    Okay.  How many times does that happen?

A    I don't recall.

Q    But it was at least one time?

A    Yes.

Q    Was it more than one time, that you can remember as you sit here?

A    I don't recall.

Q    Okay.  And then the one instance

M. RODERICK

that you do recall, did you make a recommendation that the employee be placed on administrative leave?

A    A recommendation was made.  I don't recall who made the recommendation.

Q    Okay.  So you, I think, have testified to an instance of alleged sexual assault and alleged fraud.  Are there any other situations, as you sit here today, you can remember where you conducted an investigation, and there was an administrative leave pending the results of the investigation?

A    I don't recall.

Q    Okay.  When an employee is placed on administrative leave, are they paid?  Or are they not paid?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  To my knowledge, they are paid.

MR. IADEVAIA:  Okay.  Let me come back to this.  Yeah.  Okay.  I think I'm going to move into something else.  Does it make sense to take lunch now?

M. RODERICK

THE REPORTER:  Going off the record?

MR. IADEVAIA:  Yup.  Thank you.

THE REPORTER:  Off the record.  The time is 1:15.

(Off the record.)

THE REPORTER:  And we are back on the record.  The time now is 2:09.

BY MR. IADEVAIA:

Q    Mr. Roderick, before the lunch break, we had been talking about different options in terms of corrective action that can be taken against an employee.  I had a question.  You mentioned written warnings. Are there oral warnings at CBS and Paramount?

A    I don't know.

Q    Have you ever been involved in a situation where, as a result of an investigation you did, that the action taken against an employee was an oral warning?

A    I don't believe so.

Q    And in the EthicsPoint system that you testified about earlier, have you

M. RODERICK

ever seen a notation that an employee received an oral warning?

A    I don't believe so.

Q    You, before, had talked about executive coaching.  Is coaching, without the executive part, but coaching by a manager to an employee; is that an available corrective action for someone at Paramount?

A    Yes.

Q    And have you been involved in situations where, as a result of an investigation, there was coaching given to an employee as a corrective action?

A    I don't recall.

Q    And can you recall, in the EthicsPoint system, ever seeing a notation that an employee received coaching, not executive coaching, but coaching?

A    I don't recall.

Q    Have you ever recommended, following one of your investigations, that a business leader engage in coaching of the accused, not executive coaching, but

M. RODERICK

coaching?

A    I don't recall.

Q    And the EthicsPoint system that you referenced, for an employee -- is there a particular date at which the company started the EthicsPoint system, that you're aware of?

A    I can't say definitively.  I believe it was the second quarter of 2019.

Q    So right before you got there?

A    Yes.

Q    Okay.  Or right around when you got there, something like that?

A    Right around, yes.

Q    Okay.  And for longer-term employees, employees who were still there but were there before 2019, if they had disciplinary history, would that be reflected in the EthicsPoint system?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  I don't know.

MR. ZUCKERMAN:  You're good.

THE WITNESS:  Sorry.

MR. ZUCKERMAN:  It was a late

M. RODERICK

objection.  It was my fault.

THE WITNESS:  Sorry.  I don't know.

BY MR. IADEVAIA:

Q    Okay.  Are you aware of an investigation that the New York State Attorney General's Office conducted into CBS?

A    No.

Q    Did you participate in any way in an investigation that the New York State Attorney General's Office conducted into CBS?

A    No.

Q    Okay.  I think I asked you this before, but just for the sake of completeness, have you ever met Alexandra Poolos, the plaintiff in this case?

A    Have I ever met her?

Q    Yeah.

A    Or him, sorry.

Q    Her.

A    Her, sorry.

Q    Yeah.

A    No.

M. RODERICK

Q    Okay.  Have you ever communicated in any way, whether in writing or over the phone, with Ms. Poolos?

A    No.

Q    Do you have any knowledge of what her job was when she worked at Paramount/CBS?

A    No.

Q    Have you ever spoken to Bill Owens about Ms. Poolos?

A    No.

Q    Have you ever spoken to Bill Owens?

A    Yes.

Q    Did you ever speak to Tanya Simon about Alexandra Poolos?

A    No.

Q    Did you ever speak to Collette Richards about Alexandra Poolos?

A    No.

Q    Did you ever speak to Renee Balducci about Alexandra Poolos?

A    No.

M. RODERICK

Q    Cindy Glasgow?

A    No.

Q    Maria Cottone?

A    No.

Q    Outside of any conversations you may have had had with Counsel, have you ever had any discussions, and today's deposition, about Alexandra Poolos?

A    No.

Q    You said that you have had discussions with Bill Owens before.  Have you spoken to him about an investigation or investigations that you've conducted?

A    Don't recall.

Q    What do you recall about communicating with him?

A    In 2019, I was introduced to him by one of the HR business partners.  As part of being new -- so I was introduced to him.

Q    Because you had recently joined the company?

A    Yes.

Q    Not because -- not in connection

                              M. RODERICK
with an investigation that you were
conducting?

A    Yes.

Q    Okay.  Do you know of an
employee at CBS Paramount named Collette
Richards?

A    No.

Q    Have you ever been involved in
any investigation involving Ms. Richards?

A    No.

Q    Whether she's the complaining
party or the accused or a witness, have
you ever had any interactions in an
investigation about her or with her?

A    No.

Q    Have you ever spoken to Bill
Owens about Ms. Richards?

A    No.

Q    Tanya Simon?

A    No.

Q    Maria Cottone?

A    No.

Q    Renee Balducci?

A    No.

M. RODERICK

Q    Cindy Glasgow?

A    No.

Q    Outside of anything you may have learned from Counsel, are you aware of any complaints that Ms. Richards made about Ms. Poolos?

A    No.

Q    Are you aware that Ms. Poolos was placed on administrative leave during her employment at CBS?

A    No.

Q    Are you aware of any investigation about Ms. Poolos or into Ms. Poolos?

A    No.

Q    Did you ever speak with anybody in employee relations about Ms. Poolos?

A    No.

Q    Did you ever speak with anybody in HR about Ms. Poolos?

A    No.

Q    And outside of anything you might've learned from Counsel, are you aware that Ms. Poolos was fired from CBS?

M. RODERICK

A    No.

Q    Did you have anything to do with Ms. Poolos's firing?

A    No.

Q    Okay.  Are you familiar with an employee at CBS Paramount named Shachar Bar-On?

A    No.

Q    Were you involved in any investigation concerning allegations against Mr. Bar-On, at any point since you've been at CBS?

A    No.

Q    Are you aware that Jennifer Gordon, your former colleague, conducted an investigation related to complaints that Ms. Poolos had made about Mr. Bar-On?

A    No.

Q    Did you participate in any discussions with Ms. Gordon about complaints related to Mr. Bar-On?

A    No.

Q    Are you ever involved in the submission of any filings with the EEOC on

M. RODERICK

behalf of CBS or Paramount?

A    No.

Q    Have you ever reviewed a position statement that CBS/Paramount has submitted to the EEOC before it was submitted?

A    I don't recall.

Q    Did you review any submissions that CBS or Paramount made to the EEOC related to Alexandra Poolos?

A    No.

Q    Do you know -- are you familiar with an employee at the company named Matt Richman?

A    No.

Q    Have you ever conducted an investigation concerning Mr. Richman?

A    I don't believe so.  No.

Q    Have you had any conversations with your colleagues in employee relations or human resources about Mr. Richman?

A    No.

Q    Are you familiar with an employee at the company named David

M. RODERICK

Levine?

A    No.

Q    Have you ever been part of an investigation related to Mr. Levine?

A    No.

Q    And have you ever had any conversations with your colleagues in employee relations or human resources about Mr. Levine?

A    No.

Q    Are you familiar with an employee named Will Croxton?

A    No.

Q    Have you ever been involved in an investigation concerning Mr. Croxton?

A    No.

Q    Have you ever had any discussions with your employee relations or human resources colleagues about Mr. Croxton?

A    No.

Q    Are you familiar with an employee named Michael Radutzky?

A    No.

M. RODERICK

Q    Have you ever been involved in an investigation concerning Mr. Radutzky?

A    No.

Q    Have you ever had conversations with any of your colleagues in employee relations or human resources about Mr. Radutzky?

A    No.

Q    Are you familiar with a former employee of CBS named Vicky Gordon?

A    No.

Q    Are you aware of any complaints that Vicky Gordon made about Mr. Radutzky?

A    No.

Q    Are you aware of any complaints by any CBS -- strike that.  Are you aware of any complaints by a "60 Minutes" employee that Mr. Radutzky twisted a female employee's arm?  Have you ever heard that?

A    No.

Q    Are you aware of a complaint by a "60 Minutes" employee that Mr. Radutzky threw something at another CBS employee?

M. RODERICK

A    No.

Q    Do you know a former CBS employee named Ira Rosen?

A    No.

Q    Were you ever -- did you ever participate in any way in an investigation concerning Mr. Rosen?

A    No.

Q    Did you have any discussions with your colleagues in employee relations or human resources about Mr. Rosen?

A    No.

Q    Are you aware of a former CBS employee named ██████ ████████

A    No.

Q    Were you ever involved in any way in an investigation concerning complaints that Ms. ████████ had made?

A    No.

Q    Did you ever have any conversations with any of your colleagues in employee relations or human resources about Ms. ████████

A    No.

M. RODERICK

Q   Do you know a former -- are you familiar with a former CBS employee named ██████████ ████████████

A   No.

Q   Have you ever been involved in an investigation that in any way relates to Ms. ██████████

A   No.

Q   Have you had any discussions with your colleagues in employee relations or human resources about Ms. ██████████

A   No.

Q   Are you familiar with an employee named Rich Bonin?

A   No.

Q   Have you ever participated in an investigation in any way concerning Mr. Bonin?

A   No.

Q   Are you aware of any complaints against Mr. Bonin?

A   No.

Q   Have you ever had a discussion with any of your human resources or

M. RODERICK

employee relations colleagues about Mr. Bonin?

A     No.

Q     Are you familiar with an employee named Dan Bussell?

A     No.

Q     Have you ever been involved in any investigation concerning Mr. Bussell?

A     No.

Q     Have you ever had conversations about Mr. Bussell with any of your colleagues in employee relations or human resources?

A     No.

Q     Are you familiar with an employee named Jennifer DePriest?

A     Nope.  No, sorry.

Q     Okay.  Are you aware of any complaints by Ms. DePriest?

A     No.

Q     Are you familiar with a former employee named Vanessa Fica, F-I-C-A?

A     No.

Q     Are you aware of any complaints

M. RODERICK

by Ms. Fica?

A    No.

Q    Are you familiar with an employee named Katherine Davis?

A    No.

Q    Have you ever conducted any investigations concerning Ms. Davis?

A    No.

Q    Are you familiar with an employee named Sarah Turcotte?

A    No.

Q    And did you ever conduct an investigation concerning Ms. Turcotte?

A    No.

Q    Are you familiar with a CBS/Paramount employee named Neeraj Khenlani?

A    I don't believe so.

Q    I don't know what his current status is.  But at one point, he was, I believe, the co-president of CBS News.

A    Yes.  Yes.  Sorry.  I apologize. Yes.

Q    Did you ever conduct any

M. RODERICK

investigation related to Mr. Khenlani?

A    I don't recall.

Q    So it's possible you did, but you're not sure?

A    I'm going to say no.

Q    Are you aware of any investigations related to Mr. Khenlani?

A    No.

Q    And did you have any discussions about concerns or complaints about Mr. Khenlani with anyone other than to the extent you did Counsel?

A    No.

Q    Did you ever have any interactions with Mr. Khenlani?

A    I don't recall.

Q    You testified earlier that you did investigate a complaint made by ███████ ███████ correct?

A    Yes.

Q    And that complaint, she made about Michael Gavshon.  Is that right?

A    Yes.

Q    And do you know if Mr.

M. RODERICK

Gavshon -- at the time that Ms. ███████ made the complaint, was she a CBS employee?

A    Yes.

Q    And what was her job?

A    I don't recall.

Q    Do you know if she worked for "60 Minutes"?

A    Yes.

Q    And do you know if she was an associate producer?

A    I don't recall.

Q    And do you know if she still works for CBS?

A    No.  I don't know.

Q    You don't know.  Do you have any knowledge about her departure from CBS?

A    No.

Q    Mr. Gavshon, at the time of Ms. ███████ complaint about him, was he a employee of CBS?

A    Yes.

Q    And what was his job?

A    I don't recall.

M. RODERICK

Q    Was he a producer for "60 Minutes"?

A    I don't recall.

Q    Do you know if he worked for "60 Minutes" at that time?

A    Yes.

Q    You know he did.  Okay.  And does Mr. Gavshon still work for the company?

A    I do not know.

Q    Outside of Ms. ███████ complaint about Mr. Gavshon, are you aware of any other complaints against him in connection with his employment at CBS?

A    I am not aware.

Q    As part of the investigation that you conducted, did you learn of other complaints against Mr. Gavshon?

MR. ZUCKERMAN:  Objection.

You're saying in the course of that investigation?

MR. IADEVAIA:  You're saying that's privileged?

MR. ZUCKERMAN:  Yeah.

M. RODERICK

MR. IADEVAIA: Okay. All right. So you're directing the witness not to answer?

MR. ZUCKERMAN: Yes.

MR. IADEVAIA: Just for the record?

MR. ZUCKERMAN: Yes.

BY MR. IADEVAIA:

Q Okay. At the time that you conducted your investigation related to Ms. ███████ complaint, who did Mr. Gavshon report to?

A I don't recall.

Q Did he report to Bill Owens?

A I don't recall.

Q And when did Ms. ███████ make her complaint? When did you become aware of her complaint?

A In 2019. I'm going to say either the third or the fourth quarter.

Q So not long after you had started at CBS; correct? You started in June --

A It depends on how you define not long.

M. RODERICK

Q    Fair enough.  But within a few months of when you started at --

A    If it were -- if it were the third quarter, that's within a few months.  If it was in the fourth quarter, I wouldn't say that was in a few months.

Q    Okay.  All right.  What did Ms. ███████ complain about related to Mr. Gavshon?

A    There was an allegation that he sent her an inappropriate picture via text.  There was an allegation that he engaged in excessive drinking on, I believe, two occasions; was -- was part of the allegations.  Her allegations, sorry.

Q    Were there any other allegations that she made?

A    I don't recall.

Q    And the inappropriate picture, did Ms. ███████ refer to that as sexual harassment?

MR. ZUCKERMAN:  Again, just to remind you, do not reveal the discussions that you had in the context or during the

M. RODERICK

course of, I'll say, the investigation. Just refer to the intake complaint.

THE WITNESS: Okay.

MR. ZUCKERMAN: But feel free to answer that in that way.

THE WITNESS: I don't recall.

BY MR. IADEVAIA:

Q    Did Ms. -- you mentioned that Ms. ███████ complained that Mr. Gavshon excessively drank on two occasions; correct?

A    She alleged.

Q    She alleged, yeah.

A    Yes.

Q    That was part of her complaint?

A    Yes.

Q    Did she allege that there was other instances of excessive drinking beyond the two?

MR. ZUCKERMAN: Same instruction.

THE WITNESS: I don't recall.

BY MR. IADEVAIA:

Q    Did Ms. ███████ allege that Mr. Gavshon retaliated against her after she

M. RODERICK

made her complaint about him?

MR. ZUCKERMAN:  Same instruction.

THE WITNESS:  I don't recall.

BY MR. IADEVAIA:

Q    The photo that Ms. ███████
complained about.  Did you ever see it?

A    Yes.

Q    And what did the photo contain?

A    I recall a group of students.  I
believe they were outside.  I recall
textbooks.  I believe they may have been
urinating on the books.

Q    Okay.  And was Mr. Gavshon in
the photo?

A    Yes.

Q    And are you able to see Mr.
Gavshon's penis in the photo?

A    I -- I don't -- I don't recall.
I don't believe so.

Q    Could you see any male genitalia
in the photo?

A    I don't believe so.

Q    Is there anything else you
recall about the photo, beyond what you've

M. RODERICK

testified to?

A    No.

Q    Did Ms. ████████ complain that Mr. Gavshon had engaged in irresponsible and excessive drinking that affected his ability to perform his job?

MR. ZUCKERMAN:  Same instruction.

THE WITNESS:  I don't recall.

BY MR. IADEVAIA:

Q    I believe you testified, but just to be clear, did you conduct an investigation into any of Ms. █████████ complaints?

A    Yes.

Q    And what did you specifically look at?

MR. ZUCKERMAN:  Objection.  I think you need to be more specific with that question, or it's going to invade the privilege.

BY MR. IADEVAIA:

Q    Okay.  Did you investigate her concern related to the photo?

A    Yes.

M. RODERICK

Q    Did you investigate her concern or allegations of excessive drinking?

A    Yes.

Q    Did you investigate any other concerns that she raised?

A    Can you rephrase that?

Q    Did you ever investigate any concerns she raised about retaliation?

A    I don't recall.

Q    Was there any other concerns, other than the ones you've testified to, that you looked into on behalf of Ms. ███████ into Mr. Gavshon?

A    I don't recall.

Q    What was the result of your investigation concerning Ms. ███████ complaint related to the photo?

A    We substantiated the claim that he sent the picture to her via text.  We did not substantiate the claim of excessive drinking.

Q    Were there any other conclusions reached, other than the two you just mentioned?

M. RODERICK

MR. ZUCKERMAN: Objection.

THE WITNESS: I don't recall.

BY MR. IADEVAIA:

Q Was there any -- did Mr. Gavshon dispute that he had sent the photo to Ms. ███████

MR. ZUCKERMAN: Objection. That would be asking for the discussions between Mr. Roderick and Mr. Gavshon in the course of the investigation.

MR. IADEVAIA: I don't think totally, but I understand.

BY MR. IADEVAIA:

Q So I'll show you a document about that after, I guess. And in connection with the part of the claim that was substantiated, was there any corrective action taken against Mr. Gavshon?

A I don't recall.

Q Was he fired?

A I don't recall.

Q Did he receive a written warning?

M. RODERICK

A     I don't recall.

Q     Did he receive counseling? Not -- well, did he receive executive coaching?

A     I don't recall.

Q     Did he receive counseling from management?

A     I don't recall.

Q     During the investigation that you conducted, was Mr. Gavshon placed on an administrative leave?

A     I don't recall.

Q     Did Ms. ███████ complain that Mr. Gavshon stripped her of work responsibilities in retaliation for her complaint about him?

MR. ZUCKERMAN:  Same instruction.

THE WITNESS:  Not to my knowledge.

BY MR. IADEVAIA:

Q     Did Ms. ███████ complain that Mr. Gavshon removed her from segments, that she either originated or had played a role in developing, in retaliation for her complaints about him?

M. RODERICK

MR. ZUCKERMAN: Same instruction.

THE WITNESS: I don't recall.

BY MR. IADEVAIA:

Q    Did Ms. ▇▇▇▇▇▇ allege, that as a result of the complaints that she made about Mr. Gavshon, that other employees at CBS avoided her?

MR. ZUCKERMAN: Same instruction.

THE WITNESS: I don't recall.

BY MR. IADEVAIA:

Q    Did Ms. ▇▇▇▇▇▇ allege that Mr. Gavshon started using two young women to perform some of her responsibilities in retaliation for her complaint against him?

MR. ZUCKERMAN: Same instruction.

THE WITNESS: I don't recall.

BY MR. IADEVAIA:

Q    Are you aware that Ms. ▇▇▇▇▇▇ filed a lawsuit against CBS after she had made her complaint about Mr. Gavshon?

A    I am not aware.

Q    Did you ever read the lawsuit?

A    No.  I am not aware of a lawsuit.

212-267-6868          www.veritext.com          516-608-2400

M. RODERICK

Q   And to your knowledge, did CBS take any disciplinary action against Mr. Gavshon in response to the allegations in Ms. ███████ lawsuit?

A   Not to my knowledge.

Q   Did you conduct any investigation into Mr. Gavshon after Ms. ██████ filed her lawsuit?

A   No.

MR. IADEVAIA:  Okay.  If we could mark -- if we could pull this.  Mark it --  what are we -- are we up to 5?

MR. ZUCKERMAN:  Four, I believe.

(Roderick Exhibit 4 was marked for identification.)

BY MR. IADEVAIA:

Q   Okay.  Take a minute to look through it, at least to familiarize yourself with the document.  We're going to walk through it in a minute.

What's been marked as Exhibit 4 is a multi-page document that is the Summons and the Complaint that Ms. ██████ filed against CBS Broadcasting,

M. RODERICK

Inc. dated December 17, 2019.  And at the top, there's the stamp of the index number and date received through the New York State Court filing system.

So I know you just testified a minute ago that you were unaware of the lawsuit that Ms. ████ filed.  If you could just take a minute to look at this, and just see if it refreshes your memory, if your testimony is still you've never seen this before.

A    I don't believe I've seen this before.

Q    If you could take a look at -- it's page 4 of the exhibit.  At the very bottom it says 4 of 29.  And paragraph 6, which is at the top of the page, do you see that paragraph?

A    Yes.

Q    Okay.  If you could read it. I'm going to ask you a couple of questions.  Okay.  Ms. ████ alleges in paragraph 6 that you said to her:  "CBS is a media company.  What happens, as you

M. RODERICK

know, is it becomes gossip.  And before you know it, 20 people are talking about it, and it's gossip, and you are having an affair.  Out of respect for you, keep this confidential."  Do you see the text I just read?

A    Yes.  I see the text you just read.

Q    Okay.  Did you say that to Ms. ████████

A    I don't believe I said that. It's not consistent in the manner in which I speak.

Q    Okay.  Did you say anything similar to that?  I know the text is quoted, but did you say anything similar to that?

A    I don't believe so.

Q    If you could look at page 11 of Exhibit 4, please, and specifically paragraph 26.

A    I'm sorry.  Could you repeat the page?

Q    Sure, of course.  Page 11.

M. RODERICK

A    I'm on page 11.

Q    Okay.  And paragraph 26.

A    That's not page 11.

Q    You have to look at the page right below.  I'm sorry.  There's two different page numbers.  The page that says 11 of 29.

A    Yes.

Q    Okay.  Paragraph 26.

A    Twenty-six.

Q    Once you've read it, let me know.

A    I've read it.

Q    Okay.  In paragraph 26, Ms. ███████ alleges "Within two months of starting at CBS, Cassie" -- which is Ms. ███████ first name -- "witnessed too many instances of Gavshon's excessive drinking to list here."  Do you see that text?

A    I do.

Q    Okay.  Did Ms. ███████ allege to you that she had witnessed too many instances of Mr. Gavshon's excessive

M. RODERICK

drinking?

MR. ZUCKERMAN:  Objection.

Same instruction.

THE WITNESS:  I don't recall.

BY MR. IADEVAIA:

Q    The paragraph goes on to say "By way of example only, during a two-week trip to Hungary to film a segment, on many days Gavshon started drinking by lunch and would continue drinking the rest of the workday into the evening."  Do you see that text?

A    I see that text.  Yes.

Q    Did Ms. █████████ make that complaint, that allegation to you?

MR. ZUCKERMAN:  Objection.

Same instruction.

THE WITNESS:  I don't recall.

BY MR. IADEVAIA:

Q    Okay.  And in 26, Ms. ████████ alleges that "Mr. Gavshon often consumed so much alcohol that Cassie and other employees would have to repeat things to him as well as decipher his slurred

M. RODERICK

words."  Do you see that text?

A    Yes.  I see that text.

Q    Okay.  Did Ms. ████████ raise that concern to you?

MR. ZUCKERMAN:  Objection.

Same instruction.

THE WITNESS:  I don't recall.

BY MR. IADEVAIA:

Q    You mentioned that there were -- you recalled Ms. ████████ raising concerns about two instances of Mr. Gavshon excessively drinking.  Do I have that correct?

A    Yes.

Q    Was one of those instances related to the Hungary Trip?

MR. ZUCKERMAN:  Objection.

Same instruction.

THE WITNESS:  I don't recall.

BY MR. IADEVAIA:

Q    Okay.  If we go to the next page, please, page 12 of 29.  Okay. Paragraph 28.  Ms. ████████ alleges "Things changed, however, when one night

M. RODERICK

after the Hungary trip, Mr. Gavshon texted Cassie an old photo of Gavshon and some friends urinating on what appeared to be smoldering coal." Do you see that text?

A    Yes.  I see that text.

Q    Okay.  Below it is a photo; correct?

A    That is correct.

Q    And is this the photo that you testified about earlier, that Ms. ███████ had complained about to you?

A    I believe so.

Q    And the photo that you were describing earlier today, is this the photo that you had seen?  Is that the same photo?

A    I believe it is.  I can't say definitively, but I believe so.

Q    Okay.  And when you testified earlier that employee relations substantiated that Mr. Gavshon had sent the photo to Ms. ████████ was it this photo that you substantiated was sent?

A    Could you rephrase that, please?

M. RODERICK

I'm sorry.

Q    Sure.  I just want to confirm when you say that it was substantiated that Ms. Gavshon had sent a photo to Ms. ▮▮▮▮▮▮▮▮  was it this photo?

A    It was based on the photo that was provided during the course of the investigation.  I believe it's this photo.  Once again, I'll repeat, I can't say definitively it was this photo.  But I believe it was this photo.

Q    Okay.  If you could turn to page 14 of 29 in paragraph 34, please.

A    Could you repeat the paragraph, please?

Q    Yep, of course, 34.

A    Sorry.  Thank you.

Q    You've had a chance to review?

A    Yes.

Q    Okay.  So 34 says "These late-night texts coupled with her concern about his drinking, knowing that her future required many days and nights of travel alone with Gavshon, caused Cassie to send

M. RODERICK

the following email to NYC executives at CBS."  And then below that is the text of an email that Ms. ████████ is purportedly quoting.  Do you see all of that?

A    Yes.  I do.

Q    Okay.  The executives that Ms. ████████ says she sent the email to include Benjamin Matos.  Do you see that name there?

A    I do see that name.  Yes.

Q    Okay.  Does Mr. Matos still work for CBS?

A    I don't believe so.

Q    Did he at the time of this email, which is dated September 30, 2019?

A    Yes.

Q    And what was his job?

A    He was a human -- excuse me.  He was a human resources business partner.

Q    And did you end up working with Mr. Matos in connection with your investigation of Ms. ████████ complaints?

A    Yes.

M. RODERICK

Q    Did you work with Mr. Matos on any other investigations during the time you and he both worked at CBS?

A    Yes.

Q    How many others, approximately?

A    I don't recall.

Q    Did any of the investigations you worked on with with Mr. Matos involve sexual harassment allegations?

A    Yes.

Q    And did any of the investigations you worked on with Mr. Matos involve retaliation allegations?

A    I don't recall.

Q    How many sexual harassment investigations do you recall conducting with Mr. Matos?

A    I don't recall.

Q    Do you recall at least one?

A    Yes.

Q    And do you recall one other than whatever is going on with Ms. ▮▮▮▮▮▮▮ complaint?

A    Yes.

M. RODERICK

Q    Okay.  And in that one, what was the outcome of that investigation?

A    The employee was terminated.

Q    And did that investigation involve a "60 Minutes" employee?

A    No.

Q    Did it involve a CBS News employee?

A    Yes.

Q    And what year was that in?

A    I don't recall.

Q    Was it after your investigation concerning Ms. ███████ complaints?

A    I don't recall.

Q    And what were the nature of the sexual harassment allegations made by the complainant as reflected in the complaint that was initially submitted?

MR. ZUCKERMAN:  You can answer.

THE WITNESS:  Sexual assault, forced -- unwanted sexual conversation -- communication, I apologize.  And forcible sexual contact in the workplace.

//

M. RODERICK

BY MR. IADEVAIA:

Q    And as part of that investigation, was the accused put on an administrative leave pending the outcome?

A    Yes.

Q    Is that one of the investigations you referred to earlier, when you gave me a couple of examples of situations where there had been an administrative leave?  Or is this a different example?

A    I don't know.  I can't recall that question being asked and what I was thinking at that time.  In terms of cases, I can't remember what I was thinking.

Q    And who was the business leader that you dealt with in that matter?  In the matter we've been talking about, where you say there was an allegation of sexual assault, unwanted sexual comments, and forcible sexual contact?

A    I don't recall.

Q    Going back to Exhibit 4 and looking at this paragraph 34, there's a

M. RODERICK

reference to Susan Zirinsky.  What was Ms. Zirinsky's position as of September 30, 2019?

A    I don't recall.  I would be speculating.  So I don't recall specifically her title.

Q    Okay.  There's a reference to -- this email was sent to Laura Franco.  Who is that?

A    I don't recall.

Q    Okay.  And then a reference to Hazel Ann Mayers or Mayers, M-A-Y-E-R-S.  Who's that?

A    She was the senior executive for employee relations and compliance.

Q    And was that the case as of September 30, 2019?

A    Yes.

Q    And so this is Hazel Mayers, who you referenced earlier as someone, for a time, you reported directly to; correct?

A    Yes.

Q    Okay.  In this quoted text, Ms. █████████ says:  "Two highly inappropriate

M. RODERICK

unprofessional and upsetting events have occurred at work. I'd like to tell you what happened and show you documentation as soon as possible.

"However, I need your assistance and would like for this to be kept confidential until we've had a chance to talk. I would like an investigation and protection from retaliation." Do you see that text?

A    Yes.

Q    Okay. And is this the complaint that led you to conduct an investigation?

A    I believe so. Yes.

Q    And I'm just going to show it to you.

MR. IADEVAIA:  If we could mark 8451. This is one that's been previously marked as attorneys' eyes only. So I don't remember what the instructions were for Veritext. Do you all?

MR. BAGLEY:  If there are any -- well, I guess the plaintiff is not here, so -- I believe.

M. RODERICK

MR. IADEVAIA:  Right.

MR. BAGLEY:  But it'll be designated as highly confidential and separate.

THE REPORTER:  This portion?  Okay. Just kindly let me know when you want that to end.

MR. IADEVAIA:  Yeah, sure.  Do our best to remember.

THE REPORTER:  Please proceed.

(Nonconfidential portion of transcript ends.)

//
//
//
//
//
//
//
//
//
//
//
//
//

**CONFIDENTIAL**

**(Confidential portion of**

**transcript begins.)**

CONFIDENTIAL

(Confidential portion of transcript ends.)

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

M. RODERICK

(Nonconfidential portion of

transcript begins.)

BY MR. IADEVAIA:

Q    Okay.  Going back to Exhibit 4,

you can put that to the side for now.

Exhibit 4 is the lawsuit.  Okay.  Moving

on to paragraph 35, Ms. ███████ alleges:

"Later that day, ██████ had a call with

Roderick and Benjamin Matos.  They

discussed the photo and Gavshon's text

about his sister.

"Cassie told Roderick and Matos

that the incident was unsettling, and she

had concerns about reporting to Gavshon.

She also complained about Gavshon's

excessive drinking.  Indeed, ██████ told

them that Gavshon's drinking was

unprofessional, inappropriate, and made it

difficult for her to perform her job."  Do

you see that text?

A    Yes.  I see the text.

Q    Okay.  So starting on that first

sentence on paragraph 45, is it true that

Ms. ██████ had a call with you and

M. RODERICK

Benjamin Matos on or about September 30, 2019?

A    Just to clarify, it's item 35, not 45.

Q    Yeah.  Sorry.  Yeah.

A    No.  Don't -- no worries.  So repeat the question.

Q    Sure.  Did you have a phone call with Ms. ████████ and Mr. Matos on or about September 30, 2019?

A    I believe so.

Q    And Ms. ████████ alleges that during that call you discussed the photo and Gavshon's text about his sister.  Is that true?

MR. ZUCKERMAN:  Objection.

Instructing you not to answer.

MR. IADEVAIA:  I don't see how that could be privileged, if it's part of a public filing.

MR. ZUCKERMAN:  We've had this debate, I think, in court.  So I'm not going to revisit the ruling on this, for sure.  And I don't know what actions, if

M. RODERICK

any, were taken to preserve the privilege.

Just because someone may have breached the privilege at one point, doesn't make it -- inappropriately breached the privilege, doesn't make it game for further breach forever.

MR. IADEVAIA: Well, if CBS took no steps to fix that purported breach, I think it would be deemed waived. I don't think this issue has been covered in court. Is there something specific you're referring to?

MR. ZUCKERMAN: I don't have a clear recollection of, obviously, what was said in court. But we've been in court multiple times about the investigations, including this investigation. This is a document that you've had since the beginning of the lawsuit.

If you wanted to raise an issue about whether or not the Gavshon investigation was privileged or that privilege was waived, there was plenty of opportunity for Plaintiff to do so. I'm not going to

M. RODERICK

waive it here.

MR. IADEVAIA:  All right.  Well, look.  I think we probably need to take a break and try the Court, because otherwise we're just going to have to make a request to bring back the witness.

I disagree with the characterization. I think in our email communications about this, we were clear that we believe that allegations that were contained in the Complaint by Ms. ▮▮▮▮ were not privileged.  And even if they were, the privilege was waived.  And no one did anything to address that.

MR. ZUCKERMAN:  If the allegation in the Complaint is utterly untrue or didn't happen, right, then there's no waiver.

MR. IADEVAIA:  Well, he did say the call -- I'm not sure I understand.  He said the call happened.

MR. ZUCKERMAN:  A call happened. There's no question about that.  The fact that a call happened is not privileged. But if someone -- if the plaintiff in this

M. RODERICK

case, Ms. ██████ claims that she said X. And in fact she never said X, then there was no breach of the privilege.

MR. IADEVAIA: Well, but then there's no privilege, because there was nothing that existed to claim privilege to or attached privilege to.

MR. ZUCKERMAN: But asking the witness to confirm whether or not X was said, if it wasn't said, is asking him to testify about the substance of an attorney-client privileged investigation. My point is: You don't have enough information to know whether or not there's a waiver.

MR. IADEVAIA: Well, I have a publicly-filed lawsuit that --

MR. ZUCKERMAN: It's an allegation by one party. Where's the answer? Was it denied? Was the allegation denied? Is there deposition testimony to reflect whether or not this was something that was said in the course of the investigation? And is there evidence that CBS waived the

M. RODERICK

privilege?  Ms. ███████ can't waive the privilege for CBS.

MR. IADEVAIA:  No.  But if CBS believed that these communications were privileged, it was incumbent upon them to take steps to rectify the problem.  And failure to do so for six years would constitute waiver.

MR. ZUCKERMAN:  Well, this is an argument that you all could have made in the course of this case going back I don't know how long.  We have been in court more times on this case than on any case I've had in 30 years of my career.

We have repeatedly talked about the privileged nature of the internal investigations.  There was a motion about the privileged nature of the internal investigations.  If you wanted to raise a waiver argument, that was the time to do it.

And I'm certainly not going to consent to litigating this issue on a telephone call with the court at three

M. RODERICK

o'clock on Friday, without having the ability to brief it, without having the ability to consult with my client.

MR. IADEVAIA: This is an issue that we raised in emails. We took a clear position on it. And so I -- we've never litigated. No one has made any motions about the scope of privilege or any privilege related to this particular investigation.

I am acknowledging, without waiver of any arguments, that certain types of communications are subject to privilege. You have objected and directed the witness not to answer a couple of questions. I have not pushed back on that. But something that is in a public filing is clearly -- I mean, even if there was privilege, it's waived.

MR. ZUCKERMAN: We were directed by the Court to produce certain emails in connection with the Gavshon complaint, which recognizes that other information and documents are privileged. That was

M. RODERICK

your time to raise this, in that proceeding before the Court.

So even if you're right, which you're not, you've waived your ability to make the argument at this point. So I'm not -- I don't think we need to further debate it. If you want to call the Court, that's your option if you want.

MR. IADEVAIA: We will call the Court, because we have the witness here. It's not efficient to have to try to bring back a witness. And I don't understand at all the argument that because certain documents were ordered to be produced, there was some implicit finding of privilege. I mean, that's not how privilege works.

And it wasn't the basis of any of the court's rulings related to this particular investigation. The basis of that ruling was considerations of relevance and proportionality, as we understand it.

So we very much disagree with that, and we don't see how anybody could claim

M. RODERICK

privilege over information that is publicly available.  So I will continue, and you can direct the witness not to answer.

MR. ZUCKERMAN:  It's not information -- this is an allegation by a plaintiff.  If it is untrue, if every word in there is untrue, by way of just hyperbolic example only, then for you to then -- it's not a waiver of the privilege.  But for you to ask the witness whether it's true is a waiver of the privilege.  It's privileged.

And I really would prefer -- you can do what you want.  But I would prefer, now that you are on notice that we are making a privilege objection, that you not continue to ask questions that would be invasive of that privilege.  If you want to call the judge, feel free to call the judge.

MR. IADEVAIA:  Okay.  So why don't we take a break and do that then.

THE REPORTER:  We're off the record.

M. RODERICK

Time now is 3:10.

(Off the record.)

THE REPORTER:  We are back on the record.  Time now is 3:28.

MR. IADEVAIA:  Okay.  So for the record, we called or we tried to call chambers.  There must be new security measures in place, because you can't call chambers directly anymore.  But we were able, through an intermediary, to notify the Court that we had had a dispute during a deposition.

The Court asked that we send a letter.  So we will be sending a letter later today, as soon as we can get one out, to the Court.  We've -- obviously have a disagreement on this issue.  We don't need to continue to go back and forth on it, in order to complete as much as we can today.

But I am going to ask my questions, because I need my record.  Obviously, you can instruct the witness however you instruct him.

M. RODERICK

BY MR. IADEVAIA:

Q   Okay.  So the question I had asked is whether the allegations contained in paragraph 35 accurately reflect the phone call that you, Mr. Matos, and Ms. ████████ had on or about September 30, 2019?

MR. ZUCKERMAN:  Objection, privilege.

Do not answer the question.

BY MR. IADEVAIA:

Q   Okay.  Paragraph 36.  Ms. ████████ alleges that you and Mr. Matos claimed to her that CBS's New York City office would investigate Mr. Gavshon's conduct.  And my question is:  Is that accurate?

MR. ZUCKERMAN:  I don't see that as privileged.

You can answer that question.

THE WITNESS:  I would say -- I will say that is not accurate.  What we told her is that we would conduct an investigation of her allegations regarding Mr. Gavshon.

M. RODERICK

BY MR. IADEVAIA:

Q    Okay.  And you, in fact, conducted an investigation into Ms. ███████ concerns about Mr. Gavshon; correct?

A    Yes.

Q    Okay.  And who conducted that investigation in addition to you, if anyone?

MR. ZUCKERMAN:  You can answer.

THE WITNESS:  Ben Matos and myself.

BY MR. IADEVAIA:

Q    Was there anyone else who conducted the investigation?

A    I would need you to clarify, "conduct" the -- about investigation, please.

Q    Okay.  As part of the investigation, did you interview any witnesses?

A    Yes.

Q    Okay.  Did anyone else from CBS interview witnesses as part of this investigation besides you?

M. RODERICK

A    Yes.

Q    Who else?

A    Ben Matos.

Q    Anyone else?

A    No.

Q    And who did you interview as part of this investigation?

MR. ZUCKERMAN:  You can answer.

THE WITNESS:  We interviewed the complainant.  We interviewed the subject. We interviewed any witnesses identified during the course of the investigation.

BY MR. IADEVAIA:

Q    Okay.  The complainant was Ms. ███████ correct?

A    Yes.

Q    The subject was Mr. Gavshon?

A    Yes.

Q    And what witnesses did you and/or Mr. Matos interview?

MR. ZUCKERMAN:  I just ask that the names, to the extent you remember them, are marked confidential in the record.

MR. IADEVAIA:  No objection.

M. RODERICK

THE WITNESS:  I don't recall the names of the individuals identified as potential witnesses that were spoken to.

BY MR. IADEVAIA:

Q    Did you review any documents in connection with this investigation?

MR. ZUCKERMAN:  You can answer.

THE WITNESS:  Yes.

BY MR. IADEVAIA:

Q    What documents did you review?

MR. ZUCKERMAN:  Hold on.  I'm instructing you not to answer on the basis of privilege.

MR. IADEVAIA:  Okay.  I'm going to mark this.

We're up to 6?

THE REPORTER:  Yeah.  Thanks.

(Roderick Exhibit 6 was marked for identification.)

THE WITNESS:  Thank you.

MR. IADEVAIA:  Okay.  For the record, what's been marked as Roderick Exhibit 6 is a affidavit filed by CBS -- an affidavit of Jose Andino filed by CBS in

M. RODERICK

connection with the ████████ CBS lawsuit. And it is available in the New York State website. And at the top of the document, you'll see an index number stamp and a received by the New York State Court ECF system stamp.

BY MR. IADEVAIA:

Q    Mr. Roderick, have you ever seen this affidavit before today?

A    I don't believe so. No.

Q    Did you work with somebody at CBS named Jose Andino?

A    Jose Andino was a colleague at CBS.

Q    Does he still work at CBS?

A    Not to my knowledge.

Q    And what was his job when you worked with him?

A    I believe he was a senior vice president or a senior leader in human resources.

Q    Okay. In paragraph 3 of Mr. Andino's affidavit, he states "In June 2019, the United Kingdom branch of CBS

M. RODERICK

News hired ████████ ████████ as a staff associate producer in its London bureau located," and then it gives an address. Do you see that text?

A    Yes.

Q    Do you know if it's true that CBS News hired Ms. ████████ in June of 2019?

A    I do not know.

Q    And if you turn to the next page, page 2, Mr. Andino says that "████████ formally entered into an employment contract on June 13, 2019, a true and correct copy of which is attached hereto as Exhibit A."  Do you see that text?

A    Yes.

Q    Okay.  And if you could turn to Exhibit A, which is a few pages into the document.  And if you look at the next page after Exhibit A, after the cover page Exhibit A, it says "Employment Contract." Do you see that?

A    Yes.

M. RODERICK

Q    Okay.  And it appears to be Ms.
███████████  employment agreement.  Have you seen this before?

A    No.  I have not.

Q    Okay.  As part of your investigation, you didn't review it?

MR. ZUCKERMAN:  Objection.

Don't answer.

BY MR. IADEVAIA:

Q    All right.  If you take a look at -- go back to the affidavit itself and turn to page 3, please.  On paragraph 14, Mr. Andino says "On October 30th, 2019, ████████  notified CBS of allegations of improper conduct by Gavshon."  Do you see that text?

A    I see the -- yes.

Q    Okay.  And to your knowledge, is that a true statement?

A    I don't know.

Q    Okay.  Then in paragraph 15, Mr. Andino says "CBS representatives based in London and New York City participated in an investigation of ████████  allegations

M. RODERICK

against Gavshon."  Do you see that text?

A     Yes.

Q     And is that a true statement?

A     I don't know.  And also it depends on what is meant by "participated in an investigation."

Q     Okay.  You had identified previously that you and Mr. Matos participated or conducted the investigation; correct?

A     Yes.

Q     Mr. Matos, was he based in New York City at the time?

A     Yes.

Q     Okay.  Were there any CBS representatives based in London who participated in the investigation of Ms. ███████████ allegations?

A     Could you clarify what is meant by "participated"?

Q     Played a role in the investigation.

A     Apologies.  It's still too nebulous for me to respond.

M. RODERICK

Q    Okay.  Are there any London-based employees who played a role in the investigation of Ms. ███████ allegations?

A    I don't recall.

Q    Okay.  Was there someone with a last name Shelton who played a role in the investigation?

A    I don't recall.

Q    Did you ever work with someone named Claire Shelton?

A    I -- I don't recall.

Q    Paragraph 16 of Mr. Andino's affidavit says that:  "On October 7, 2019, CBS Corporation vice president, employee relations, Michael G. Roderick in New York City conducted a telephonic interview of Gavshon who was in London at the time.  Shelton also participated in person from London."  Do you see that text?

A    Yes.

Q    Okay.  Is it true that on October 7th that you conducted a telephonic interview of Mr. Gavshon?

M. RODERICK

A     I don't recall the date.

Q     Okay.  But you did interview Mr. Gavshon; correct?

A     We interviewed the subject of the complaint.  Yes.

Q     And when you say, "we," you mean who?

A     Benjamin Matos and myself.

Q     Okay.  And did you do so telephonically?

A     Yes.

Q     Okay.  And the assertion made by Mr. Andino is that Shelton also participated in person from London.  Is that accurate?

A     I believe so.  And I want to go back to my response previously.  Because I'm now recalling who I believe Claire Shelton may be.

Q     Okay.

A     She may be the human resources business partner in London at the time.  I can't say definitively; I just want to clarify my response.

M. RODERICK

Q   Yeah.  If you look at page 2, paragraph 7, going back a page, Mr. Andino says in paragraph 7.  He refers to London bureau human resources representative Claire Shelton.

A   Okay.  Thank you.

Q   Okay.  In paragraph 17 on page 3, Mr. Andino asserts that:  "On October 7, 2019, that Roderick, in New York City, conducted telephonic interviews of London bureau chief Andy Clarke and London bureau deputy chief Deborah Thompson, while they were in London.  Shelton also participated in person from London."  Do you see that text?

A   Yes.

Q   Okay.  And did you interview London bureau chief Andy Clarke as part of this investigation?

A   I don't recall.

Q   Okay.  And did you interview London bureau deputy chief Deborah Thompson as part of this investigation?

A   I don't recall.

M. RODERICK

Q    And do you have any reason to believe that Mr. Andino is not accurately reflecting that you interviewed Mr. Clarke?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  I know -- I have no way of answering that question.

BY MR. IADEVAIA:

Q    Okay.  In paragraph 18, the assertion is that "On October 7, 2019, Roderick, in New York City, emailed ██████████ to inform her that Gavshon would not be at the London bureau for the balance of the investigation."  Do you see that text?

A    I see the -- yes.

Q    Okay.  Is that accurate?

A    I don't recall.

Q    Did you ever email Ms. ████████ whether it was on October 7th or another day, to tell her that Mr. Gavshon would not be at the London bureau for the balance of the investigation?

A    I don't recall.

M. RODERICK

Q    Did you ever tell her that?

A    I don't recall.

Q    Do you know whether Mr. Gavshon was placed on an administrative leave in connection with this investigation?

A    I don't recall.

Q    Okay.  And in paragraph -- well, strike that.  Do you know whether, during the investigation that you conducted, Mr. Gavshon continued to perform work for CBS?

A    I don't recall.

Q    Paragraph 19 of Mr. Andino's affidavit states that:  "On October 11, 2019, I personally met with ██████ in London to discuss the results of the investigation.  Roderick and CBS News vice president, human resources, Benjamin Matos participated in the meeting by telephone from New York."  Do you see that text?

A    Yes.

Q    Okay.  Did you join Mr. Matos and participate by telephone in a call as Mr. Andino describes here?

A    I don't recall.

M. RODERICK

Q   Do you remember, whether it was on October 11, 2019 or any other day, having a meeting by telephone with Ms. ▮▮▮▮▮▮ in which you discussed the results of the investigation?

A   I don't recall.

Q   Going back to Exhibit 4, please, the lawsuit.  All right.  And if you could take a look at page 15 of 29 in paragraph 37.  And if you could read that paragraph, please.

MR. ZUCKERMAN:  We can move it along.  I'm going to object to questions about discussions during the course of the investigation.

MR. IADEVAIA:  I know.

BY MR. IADEVAIA:

Q   In paragraph 37, Ms. ▮▮▮▮▮▮ alleges that "Roderick and Matos outrageously advised Cassie that if she was uncomfortable working with Gavshon, she should be the one to stay home and avoid the workplace."  Do you see that text?

M. RODERICK

A     Yes.

Q     Okay.  Did you advise her to stay home and avoid the workplace?

MR. ZUCKERMAN:  If you're just trying to build a record, I've already given it to you, Counselor.  I'm instructing the witness not to answer any question that would reveal the investigatory discussions, the substance of the investigation.  As opposed to what we have all agreed is not privileged, which is the initial complaint that comes in and the conclusion of the investigation.

That's my instruction.  You have it on the record.  You could take that to the Court.  I don't think we have to waste time asking questions you know I'm going to object to.  And frankly, if we do prevail, and it's privileged, you're treading on thin ice asking questions that are invasive of the privilege.

MR. IADEVAIA:  I really don't appreciate the threat.  I'm not doing anything unethical.  We have a good-faith

M. RODERICK

dispute about whether this is privileged or not.

I don't -- I can't even begin to understand the distinction between the emails that Defendants were ordered to produce, which are communications during this investigation, and these that are reflected in this document.

But in any event, I've had judges say, "You can only ask the questions you specifically raised during the deposition."  And I do not want there to be a waiver argument; that because I didn't ask the question, I am prevented from raising that issue or following up if we were to prevail.

BY MR. IADEVAIA:

Q    Okay.  Ms. ████████ asserts that "Roderick and Matos," in paragraph 37, "did not even suggest the possibility of suspending Gavshon pending the investigation."  And my question is:  Did you ever say to Ms. ████████ raise the possibility of Mr. Gavshon being placed on

M. RODERICK

an administrative leave?

MR. ZUCKERMAN: Objection, attorney-client privilege. I'm instructing the witness not to answer.

BY MR. IADEVAIA:

Q    Okay. Further in 37, Ms. ███████ alleges "Roderick also unbelievably instructed Ms. ███████ to text message Gavshon and tell him that she would be out sick the rest of the week." Do you see that text?

A    Yes.

Q    Okay. Did you ask or suggest or instruct Ms. ███████ to text message Mr. Gavshon and tell him that Ms. ███████ would be out sick the rest of the week?

MR. ZUCKERMAN: Objection, privilege.

MR. IADEVAIA: Okay. If we look at -- if we can mark this document as Exhibit 7.

(Roderick Exhibit 7 was marked for identification.)

(Nonconfidential portion of transcript ends.)

CONFIDENTIAL

(Confidential portion of

transcript begins.)

CONFIDENTIAL



(Confidential portion of

transcript ends.)

//

//

//

//

M. RODERICK

(Nonconfidential portion of

transcript begins.)

BY MR. IADEVAIA:

Q    Okay.  Going back to Exhibit 4,

looking at paragraph 39, which is the

bottom of the page 15 of 29.  Okay.  In

this paragraph, Ms. ▮▮▮▮▮▮ alleges

"Disturbed by CBS's lack of response,

Cassie emailed Roderick again on October

2, 2019, and complained about Gavshon's

sexual harassment and her de facto

suspension," and then purports to quote

text from from the email.

Ms. Roderick, did Ms. ▮▮▮▮▮▮

send this email to you on or about October

2, 2019?

A    I don't recall.

MR. IADEVAIA:  Why don't we mark this

one Exhibit 8.

(Roderick Exhibit 8 was marked

for identification.)

(Nonconfidential portion of

transcript ends.)

//

CONFIDENTIAL

(Confidential portion of

transcript begins.)

**CONFIDENTIAL**



**CONFIDENTIAL**



**CONFIDENTIAL**



**C O N F I D E N T I A L**



CONFIDENTIAL



CONFIDENTIAL



(Confidential portion of

transcript ends.)

//

//

//

//

//

//

//

//

//

//

M. RODERICK

(Nonconfidential portion of

transcript begins.)

BY MR. IADEVAIA:

Q     Okay.  Going back to Exhibit 4,

please.  And turning to page 15 -- or 16

of 29, rather.  And in paragraph 40, Ms.

██████████ alleges that in response to her

email dated October 2, 2019, as of the

date of her court filing, which was

December 17, 2019, you had not replied to

the email.  My question is:  Is that

accurate?

A     I don't recall.  I don't recall.

Q     Okay.  In paragraph 41, Ms.

██████████ alleges that on October 4, 2019,

she spoke to you for the third time in a

matter of days about Mr. Gavshon.  She

repeated that she was eager to get back to

work but was uncomfortable working

directly with him.  My question is:  Is

that accurate that that happened?

MR. ZUCKERMAN:  You can respond to

whether the first sentence of paragraph 41

is true.  And I'm directing you not to

M. RODERICK

answer with respect to the second sentence.

THE WITNESS:  I don't recall.

BY MR. IADEVAIA:

Q    You don't recall if, on October 4th, you spoke to Ms. ▮▮▮▮▮  Is that right?

A    Yes.

Q    Yeah.  You don't recall.  Okay. If you look at paragraph 42, Ms. ▮▮▮▮▮ alleges on October 8, 2019, she returned to the office.  Do you see that text?

A    Yes.

Q    Is that accurate?

A    I don't recall.

Q    Whether it was on October 8th or any other time, was there a date when Ms. ▮▮▮▮▮ returned to the office following her complaint on September 30th?

MR. ZUCKERMAN:  Objection.

You can answer.

THE WITNESS:  I don't recall.

BY MR. IADEVAIA:

Q    Did Ms. ▮▮▮▮▮ take any kind

M. RODERICK

of leave of absence after she filed her complaint on September 30th?

A    I don't recall.

Q    And did Ms. ███████ after filing her complaint on September 30th, work remotely for any period of time?

A    I don't recall.

Q    Paragraph 42 goes on to allege that Roderick assured her that Gavshon would not be in the office during the alleged investigation.  My question is: Did you ever make that assurance or representation to Ms. ███████

MR. ZUCKERMAN:  Objection, privilege.

MR. IADEVAIA:  Okay.  Why don't we just skip to the email.  If we could do CBS8822, please.

This is going to be attorneys' eyes only again.

THE REPORTER:  We're up to 9.

MR. IADEVAIA:  Okay.

THE WITNESS:  Thank you.

(Nonconfidential portion of transcript ends.)

CONFIDENTIAL

(Confidential portion of

transcript begins.)



CONFIDENTIAL

CONFIDENTIAL

CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL

CONFIDENTIAL



(Confidential portion of

transcript ends.)

//

//

//

//

//

//

M. RODERICK

(Nonconfidential portion of

transcript begins.)

BY MR. IADEVAIA:

Q    Look at paragraph 43, please.

Okay.  Ms. ███████ alleges in paragraph

43 that in response to the email that we

just went over, dated October 10, 2019,

that Roderick and Matos responded by

telling her that Jose Andino, HR from NYC,

would be stopping by her office shortly to

speak to her.  Do you see that text?

A    Yes.

Q    Okay.  Is that accurate?

MR. ZUCKERMAN:  Again, I think to the

extent the question is whether Mr.

Roderick spoke or met with the plaintiff

in this lawsuit at particular times, fair

game.

But, again, the way this allegation

is written in the complaint, it assumes

the prior facts.  And those prior facts

are the subject of the privilege dispute.

So if there's a different way to ask the

question, that may be a solution here.

M. RODERICK

But if not, I'm objecting on basis of privilege.

MR. IADEVAIA: Okay. I understand that for the question I just asked, the witness has been directed not to answer. I'll try a different question.

BY MR. IADEVAIA:

Q Which is that: Mr. Roderick, did you tell Ms. ███████ at any point during your investigation, that Mr. Andino from HR would come to her office?

MR. ZUCKERMAN: Again, the fact of whether someone from the company spoke to this person is not privileged, but what they said to her is within the scope of the privilege, in our view.

MR. IADEVAIA: And my -- right. And we obviously disagree. And I think my question was at the substance of a communication. So as I understand it then, you're directing him not to answer?

MR. ZUCKERMAN: Yes.

BY MR. IADEVAIA:

Q Okay. In paragraph 44, Ms.

M. RODERICK

██████ alleges that "On October 11, 2019, Roderick told ██████ that HR conducted an investigation and concluded that Gavshon meant to send the photo to his sister, and that it was a mistake that ██████ received it." Do you see that text?

A    Yes.

Q    Did you have a conversation with Ms. ██████ in which you said that HR had concluded that Gavshon meant to send the photo at issue to his sister?

MR. ZUCKERMAN:  To the extent you're asking for the conclusion of the investigation, which is contained within another document produced in this case, which is referred to generally as, like, a closure letter, we don't have an objection to that, on that basis.

BY MR. IADEVAIA:

Q    Okay.  So I think your lawyer is saying you can answer that question.  I think.

MR. ZUCKERMAN:  Yes.

M. RODERICK

THE WITNESS: I don't recall.

BY MR. IADEVAIA:

Q And did you ever tell Ms. ███████ that the investigation had concluded, that it was a mistake that Gavshon had sent the photo to her?

MR. ZUCKERMAN: Again as part of delivering the conclusion to the investigation to Ms. ███████ in whatever form or forms you provided that, you can answer the question.

THE WITNESS: Yes.

BY MR. IADEVAIA:

Q You did say that to Ms. ███████

A I provided the information to her regarding the findings of the investigation in a closure letter.

Q And as part of -- did you present the findings to her in person? Or the written findings, how did you convey those findings to her?

A I don't recall.

Q The closure letter, which we'll

M. RODERICK

look at in a moment -- was there a closure letter in this matter?

A    I believe so.

Q    And did you prepare that closure letter?

A    The closure letters are not solely prepared by one individual.  I believe I prepared a draft.  And others, consistent with our internal protocol, weighed in and provided their recommended edits of the final closure letter to be provided to either the subject or the complainant.

Q    Okay.  We'll go through that in a minute.  Did you have a conversation with Ms. ███████ about the findings of the investigation?

A    Could you please define conversation, so I'm able to answer the question.

Q    Did you have a verbal or oral discussion with Ms. ███████ about the investigation's findings?

A    I don't recall.

M. RODERICK

MR. IADEVAIA:  Why don't we mark the closure memo, 8452, please.  This is, again, attorneys' eyes only.

THE WITNESS:  Thank you.

MR. IADEVAIA:  Are we up to Exhibit 10?  Okay.

(Nonconfidential portion of transcript ends.)

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

**CONFIDENTIAL**

(Confidential portion of

transcript begins.)



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



//

CONFIDENTIAL

BY MR. IADEVAIA:

    Q    Okay.  Then the investigation memo says



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL







CONFIDENTIAL



(Confidential portion of

transcript ends.)

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

M. RODERICK

(Nonconfidential portion of
transcript begins.)

MR. IADEVAIA:  I probably have less
than a half hour of questions.  So want to
just take a quick break, because we've
been going for a while?

MR. ZUCKERMAN:  Yeah.  That's fine.

THE REPORTER:  We're off the record.
The time now is 4:43.

(Off the record.)

THE REPORTER:  And we are back on the
record.  Time now is 5:06.

BY MR. IADEVAIA:

Q    Okay.  Mr. Roderick, the
remaining questions I have are all based
on Exhibit 4, the Complaint, the lawsuit.
So if you don't mind getting that in front
of you.  Okay.  And if you can turn to
page 19 of 29 of that document, and we're
going to look at paragraph 49.

And in the third sentence, Ms.
█████████ alleges that the same day she was
told the results of the investigation,
that Gavshon took steps to exclude her

M. RODERICK

from ongoing projects.  And contrary to prior practice, made travel arrangements to the NYC office for a segment screening for himself only, excluding Cassie.  Do you see that text?

Q    Yes.

Q    Okay.  Did Ms. ███████ ever raise those concerns to you?

MR. ZUCKERMAN:  You can answer.

THE WITNESS:  Not to my knowledge.

BY MR. IADEVAIA:

Q    Okay.  And did you have a discussion with anyone, not including Counsel, about the concerns that Ms. ███████ alleges in paragraph 49?

MR. ZUCKERMAN:  This is post the close of the investigation; correct?

MR. IADEVAIA:  That's my understanding.

MR. ZUCKERMAN:  Yeah.  Okay.  On that -- yeah.

THE WITNESS:  So I'm sorry.  Could you repeat the question?

//

M. RODERICK

BY MR. IADEVAIA:

Q    Sure.  Did you ever have any discussion with anybody at CBS, not including Counsel, about the allegations that Ms. ████████ makes here in 49 that we just went over; Gavshon taking steps to exclude her from ongoing projects and making travel arrangements to the New York City office for a segment screening for himself only, excluding her?

A    As I stated previously, I was not made aware of this.  Therefore, I could not have a conversation about something I'm not aware of.

Q    Okay.  And after the Complaint, the lawsuit was filed, which was December 17, 2019, according to Exhibit 4; did anyone at CBS, not including Counsel, have a discussion with you about the concerns that Ms. ████████ raising here in paragraph 49?

A    I don't recall.

Q    Okay.  And to your knowledge, did anyone at CBS, after the filing of

M. RODERICK

this lawsuit, look into the concerns set forth in this paragraph 49?

A    I do not know.

Q    Okay.  If we could look at paragraph 51.  In that paragraph on the same page, Ms. ████████ alleges that before she reported Mr. Gavshon's behavior, she excelled as an associate producer at "60 Minutes".  Do you see that text?

A    Yes.

Q    As part of your investigation, did you ever look into Ms. ████████ performance?

MR. ZUCKERMAN:  Objection, privileged.

BY MR. IADEVAIA:

Q    Okay.  At any point after the investigation that you conducted, did you look into Ms. ████████ performance?

MR. ZUCKERMAN:  After the investigation, so you can answer.

THE WITNESS:  After the investigation, did I look into her

M. RODERICK

performance?

BY MR. IADEVAIA:

Q    Performance, yeah.

A    No.

Q    Okay.  And when we say after the investigation, we're referring to the investigation that concluded by your closure memo dated October 11, 2019.  Is that understood?  Is that agreeable?

A    Yes.

Q    Okay.  If you look at paragraph 52, Ms. ████████ alleges that after the investigation, she was stripped of all her work responsibilities.  Do you see that text?  Did I read it correctly?

A    Yes.  I see the text.  Yes.  I believe you read it correctly.

Q    Did Ms. ████████ ever raise that concern to you directly?

A    Not to my knowledge.

Q    Okay.  Did you have any discussions about that concern, articulated in paragraph 52, with anyone at CBS, not including Counsel?

M. RODERICK

A     If I'm not aware of -- of something, I cannot have a discussion about it, logistically.

Q     So the answer is no, you didn't?

A     Based on my previous response of not recalling this item in -- item 52, yes.  The answer is no.

Q     Okay.  I mean, I think we're getting at the same thing.  But just to be clear, I think my question was whether Ms. ███████ had raised a concern to you.  My second question was:  Did you have a discussion with anybody about this concern, not including Counsel?

A     Right.  That's how I understood it, and that's how I responded.

Q     Your response is you don't recall or you didn't?  I'm sorry.

A     I have no knowledge of what's mentioned in item 52.  Therefore, I cannot have a conversation about something that I have no knowledge about.

Q     Okay.  And after this Complaint was filed, then, am I correct that no one

M. RODERICK

asked you to look into the concern articulated in paragraph 52; correct?

A     That is correct.

Q     Okay.  And to your knowledge, did anyone look into the concern that's articulated in paragraph 52 by Ms. ████████

A     I have no knowledge of that.

Q     Okay.  And then in that same paragraph, Ms. ████████ alleges that she is consistently excluded from work meetings, calls, and emails.  Do you have any -- did Ms. ████████ ever raise that concern to you?

A     Item 53, is that what you said?

Q     No.  The third sentence in paragraph 52.

A     So do I have any knowledge of that?  Was that the question?

Q     Did Ms. ████████ ever articulate that concern to you directly?

A     Not to my knowledge.

Q     Okay.  And have you ever had any discussions about that concern with

M. RODERICK

anybody at CBS, not including Counsel?

A    I don't believe so.  No.

Q    And did anyone ever ask you to investigate that concern as articulated by Ms. ████████

A    Not to my knowledge.

Q    All right.  In paragraph 53, Ms. ████████ alleges Gavshon ceased sending her any information about ongoing stories. Do you see that text?

A    Yes.

Q    Okay.  And did you ever conduct an investigation into that concern, as articulated by Ms. ████████ in this paragraph?

A    Not to my knowledge.

Q    And did anyone ever ask you to do so?

A    Not to my knowledge.

Q    And did, to your knowledge, anyone look into that concern articulated by Ms. ████████

A    Not to my knowledge.

Q    And rather than going through

M. RODERICK

each line in paragraph 53, are your answers the same for each of those sentences? I mean, you can read them. Take your time. But I don't want to just ask you about each one, if I can avoid it.

A     I have no knowledge.

Q     No knowledge of any of those allegations?

A     In item 53.

Q     Okay. And to your knowledge, you're not aware of any investigation conducted concerning those allegations in 53; correct?

A     I am not aware. Correct.

Q     Okay. I'm taking a look at paragraph 54. If you could read that, and then I'll just ask you the same couple of questions. Let me know once you finish.

A     I finished.

Q     Okay. Did Ms. ███████ raise any of the concerns described in paragraph 54 to you directly

MR. ZUCKERMAN:  Post investigation?

MR. IADEVAIA:  Post investigation,

M. RODERICK

yep.

THE WITNESS:  Not to my knowledge.

BY MR. IADEVAIA:

Q    Okay.  And did you have discussions with anyone at CBS about the allegations contained within paragraph 54, not including Counsel?

A    Not to my knowledge.

Q    And was there, to your knowledge, any investigation done in connection with any of the allegations contained within paragraph 54?

A    No, not to my knowledge.

Q    And I'll ask you to take a look at paragraph 55, please.  And let me know once you've read it.

A    I read it.

Q    Okay.  And my question is:  Did Ms. ██████ ever raise to you directly any of the concerns that are described in paragraph 55?

A    Not to my knowledge.

Q    Okay.  And my question is:  Did you have discussions with anyone at CBS,

M. RODERICK

not including Counsel, about any of the allegations in paragraph 55?

A     Not to my knowledge.

Q     And are you aware of any investigation that CBS did into the allegations that Ms. ███████ makes as reflected in paragraph 55?

A     Not to my knowledge.

Q     And in paragraph 61, you can see the text that Ms. ███████ alleges "Cassie interviewed at CBS's NYC office with Deborah DeLuca, a senior broadcast producer at "60 Minutes," and Tanya Simon."  And you see there's a footnote there, footnote 18?

A     Yes.  Yes.  I see it.

Q     Okay.  And then if you look below, footnote 18 says "Ms. Simon is the daughter of Bob Simon, a legend at CBS," and then "Notably, Mr. Simon and Gavshon were extremely close friends for over 30 years."  Do you see that text?

A     Yes.  I see the text.

Q     Okay.  Did you look into Mr.

M. RODERICK

Gavshon's either -- look into any personal relationships that he had or considered personal relationships that he had with other CBS employees during your investigation?

MR. ZUCKERMAN: Objection, privileged.

BY MR. IADEVAIA:

Q    Okay.  And then lastly, Tanya Simon -- the last sentence of that footnote, "Tanya Simon and Gavshon have worked together on countless segments for '60 Minutes.'"  Do you see that text?

A    Yes.

Q    Do you know whether that's true or it's not true?

MR. ZUCKERMAN: Outside the course of the investigation, do you know if that's true or not true; is how I'm instructing you to answer the question.

THE WITNESS: I do not know.

MR. IADEVAIA: Okay.  And for the record, my question was broader than that, but the witness was so instructed.

M. RODERICK

BY MR. IADEVAIA:

Q    Okay.  And I think you testified about this earlier.  But just to make sure, did you have any role in connection with Ms. ███████ leaving CBS?

A    No.

MR. IADEVAIA:  All right.  I mean, subject to the dispute about privilege and the questions that the witness was directed not to answer, we are finished for today.  As we've said, though, we intend to raise that dispute with the Court.  And therefore reserve our right, subject to court order, to recall the witness.  Thank you.

THE REPORTER:  Thank you.  We are now officially off the record.  Time now is 5:20.

(Whereupon, at 5:20 p.m., the proceeding was concluded.)

_____
Michael Roderick

Subscribed and sworn to before me this _____ day of _____, 2025.

_____, Notary Public

CERTIFICATE OF DEPOSITION OFFICER

I, JAIME MENESES, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

JAIME MENESES

Notary Public in and for the

State of New York

CERTIFICATE OF TRANSCRIBER

I, COREY MICHENER, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

COREY MICHENER

**ERRATA SHEET**
**VERITEXT/NEW YORK REPORTING, LLC**

CASE NAME: Poolos, Alexandra v. Paramount Global, Et Al.
DATE OF DEPOSITION: 5/30/2025
WITNESSES' NAME: Michael Roderick

PAGE     LINE (S)            CHANGE                    REASON
____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

                                    _____
                                    Michael Roderick

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF _____, 20__.


_____          _____
(NOTARY PUBLIC)                MY COMMISSION EXPIRES:

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.