

EXHIBIT J

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------x

ALEXANDRA POOLOS,

Plaintiff,

-against- Case No. 1:23:-cv-08896

PARAMOUNT GLOBAL; CBS BROADCASTING, INC.; and CBS NEWS, INC.,

Defendants.

-------------------------------------------x

EXAMINATION BEFORE TRIAL of Tanya Simon, taken by the Plaintiff, pursuant to Notice, held at the offices of Vladeck, Raskin & Clark, P.C., 111 Broadway, Suite 1505, New York, New York 10006 on January 28, 2025, at 10:21 a.m., before a Notary Public of the State of New York.

A P P E A R A N C E S:

VLADECK, RASKIN & CLARK, P.C.
Attorneys for Plaintiff
111 Broadway, Suite 1505
New York, New York 10006
(212)403-7300
BY: JEREMIAH IADEVAIA, ESQ.
Jiadevaia@vladeck.com
JAMES BAGLEY, ESQ.

DAVIS WRIGHT TREMAINE LLP
Attorneys for Defendant
1251 Avenue of the Americas, 21st Floor
New York, New York 10020-1104
(212)489-8230
BY: LYLE ZUCKERMAN, ESQ.
Lylezuckerman@dwt.com
MICHAEL LYNCH, ESQ.

ALSO PRESENT:

ALEXANDRA POOLOS, PLAINTIFF

CARLOS KING, VIDEOGRAPHER, VERITEXT LEGAL SERVICES

DANYA AHMED, ESQ., PARAMOUNT GLOBAL - Via Zoom

S T I P U L A T I O N S:

IT IS STIPULATED AND AGREED by and between the attorneys for the respective parties herein, and in compliance with Rule 221 of the Uniform Rules for the Trial Courts:

THAT the parties recognize the provision of Rule 3115 subdivisions (b), (c) and/or (d). All objections made at a deposition shall be noted by the officer before whom the deposition is taken, and the answer shall be given and the deposition shall proceed subject to the objections and to the right of a person to apply for appropriate relief pursuant to Article 31 of the C.P.L.R.;

THAT every objection raised during a deposition shall be stated succinctly and framed so as not to suggest an answer to the deponent and, at the request of the questioning attorney, shall include a clear statement as to any defect in form or other basis of error or irregularity. Except to the extent permitted by CPLR Rule 3115 or by this rule, during the course of the examination persons in attendance shall not make statements or comments that interfere with the questioning.

THAT a deponent shall answer all questions at a deposition, except (i) to preserve a privilege or right of confidentiality, (ii) to enforce a limitation set forth in an order of a court, or (iii) when the question is plainly improper and would, if answered, cause significant prejudice to any person. An attorney shall not direct a deponent not to answer except as provided in CPLR Rule 3115 or this subdivision. Any refusal to answer or direction not to answer shall be accompanied by a succinct and clear statement on the basis therefore. If the deponent does not answer a question, the examining party shall have the right to complete the remainder of the deposition.

THAT an attorney shall not interrupt the deposition for the purpose of communicating with the deponent unless all parties consent or the communication is made for the purpose of determining whether the question should not be answered on the grounds set forth in Section 221.2 of these rules, and, in such event, the reason for the communication shall be stated for the record succinctly and clearly.

THAT the failure to object to any question or to move to strike any testimony at this examination shall not be a bar or waiver to make such objection or motion at the time of the trial of this action, and is hereby reserved; and

THAT this examination may be signed and sworn to by the witness examined herein before any Notary Public, but the failure to do so or to return the original of the examination to the attorney on whose behalf the examination is taken, shall not be deemed a waiver of the rights provided by Rule 3116 and 3117 of the C.P.L.R, and shall be controlled thereby; and

THAT the certification and filing of the original of this examination are hereby waived.

THE VIDEOGRAPHER: Good morning. We're going on the record at 10:21 a.m. on January 28, 2025. Please note that the microphones are sensitive and may pick up noises and private conversations. Please mute your phones at this time. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit Number 1 of the video-recorded deposition of Tanya Simon taken by counsel for plaintiffs in the matter of Alexandra Poolos v. Paramount Global, filed in the United States District Court, Southern District of New York, Case Number 1:23:-cv-08896 (GHW)(JLC).

The location of this deposition is 111 Broadway, New York, New York. My name is Carlos King, representing Veritext, and I'm the videographer. The court reporter is --

THE REPORTER: Teneja Soltau.

THE VIDEOGRAPHER: -- also representing Veritext. I'm not authorized to administer an oath. I'm not related to

any party in this action. I'm not financially interested in the outcome. If there are any objections to the proceedings, please state them at the time of your appearance. Counsel and all present, including on Zoom, will state their appearance and affiliations for the record, beginning with noticing attorney.

MR. IADEVAIA: Good morning. My name is Jeremiah Iadevaia, and here with me is James Bagley on behalf of the plaintiff, of the firm Vladeck, Raskin & Clark. Also present is the plaintiff, Alexandra Poolos.

MR. ZUCKERMAN: Good morning, Lyle Zuckerman from Davis Wright Tremaine on behalf of the defendants, here together with my colleague Michael Lynch.

MR. IADEVAIA: And, Danya, you have to announce yourself.

MR. ZUCKERMAN: Oh, I'm sorry. We have in-house counsel, Danya Ahmed, is viewing by Zoom or some other teleconference application.

THE VIDEOGRAPHER: Can the court reporter please swear in or affirm the

witness.

T A N Y A   S I M O N, the witness herein, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

THE REPORTER: Can I have your full name and address?

THE WITNESS: Tanya Simon, 400 West End Ave, 11A. New York, New York 10024.

EXAMINATION BY
MR. IADEVAIA:

Q. Good morning, Ms. Simon. As I just said a moment ago, my name is Jeremiah Iadevaia. I'm one of the lawyers for the plaintiff, Alexandra Poolos, in this matter against CBS and Paramount.

Ms. Simon, have you ever had your deposition taken before today?

A. No.

Q. Okay. So you have a sense of how the day is going to go, I'm going to go through just a couple of basic ground rules. It's a question-and-answer session. I'll be asking questions, you'll be giving answers. As a result, what I need from you are verbal answers. The court

reporter cannot get down nods or shakes of the head. Does that make sense?

A. It does.

Q. Okay. The questions and answers will be recorded by the court reporter, so that means, as much as possible, please let me finish my questions so that the court reporter can get it down and I'll do my best not to interrupt you while you give an answer. Otherwise, the transcript will be muddled. Does that make sense?

A. It does.

Q. Okay. If at any point you don't understand a question that I ask, please let me know, okay, and I'll do my best to rephrase it. Is that okay?

A. Yes.

Q. During the day we'll take periodic breaks. But if you need a break at any point in time, just let me know. And unless a question is pending, we'll be able to accommodate it. Understood?

A. Yes.

Q. Are you on my medication today that would affect your ability to testify truthfully and accurately?

A. No.

Q. And is there any reason that you know of

that you cannot testify truthfully and accurately today?

A. No.

Q. Did you do anything to prepare for today's deposition?

A. I met with counsel yesterday for deposition prep.

Q. Okay. Other than the meeting yesterday with counsel, did you have any other meetings with counsel to prepare for today's deposition?

A. No.

Q. And how long was the meeting yesterday?

A. Five hours -- four or five hours.

Q. And who was present?

A. Lyle and Michael.

Q. Anybody else?

A. And Danya, on some sort of virtual link.

Q. Anybody else?

A. No.

Q. Okay. And other than the meeting -- and was the meeting in person or some other means?

A. It was in person.

Q. Okay. Other than the meeting you had yesterday with counsel, did you do anything else to prepare for today's deposition?

A.	No.
Q.	Did you review any documents to prepare for today's deposition?
A.	I reviewed some documents with counsel.
Q.	And what documents did you review?
A.	A number of emails and texts.
Q.	Okay.  And do you know whether the emails that you reviewed, have they been produced in this case to my law firm, do you know?
A.	I don't know.  My understanding is yes.
Q.	Okay.  And the text messages that you reviewed to prepare for today's deposition, to your knowledge, were those text messages produced to my law firm?
A.	Yes.
Q.	Did you discuss today's deposition with Bill Owens?
A.	No.
Q.	Did you discuss today's deposition with Lesley Stahl?
A.	No.
Q.	Did you discuss today's deposition with Claudia Weinstein?
A.	No.
Q.	Did you discuss today's deposition with

Renee Balducci?

A. No.

Q. Did you discuss today's deposition with anyone other than your spouse and counsel?

A. No.

Q. Do you have any knowledge of Ms. Poolos's claims in this lawsuit?

A. Yes.

Q. What's your understanding of the claims?

A. My understanding of her claims is that she was wrongfully terminated.

Q. And do you have any other understanding other than she claims wrongful termination?

A. And claims discrimination.

Q. And do you understand what kind of discrimination she's alleging?

A. Yes.

Q. And what is your understanding?

A. My understanding is that it's gender discrimination.

Q. Okay. Any other understanding of Ms. Poolos's claims in this case other than what you've testified to?

A. No.

Q. Where do you currently work?

A. At 60 Minutes.
Q. And how long have you been at 60 Minutes?
A. I have been at 60 Minutes since '99 or 2000.
Q. That's a long time.
A. Yes.
Q. What's your current title there?
A. Executive editor.
Q. And when did you become executive editor?
A. In April of 2019.
Q. And is that -- that's an executive editor for 60 Minutes specifically?
A. Yes.
Q. And you said 2019?
A. Yes.
Q. Okay. And who do you report to currently?
A. I report to Bill Owens.
Q. Do you report to anybody else?
A. No.
Q. And have you reported to Mr. Owens directly since you moved into the executive editor role?
A. Yes.
Q. And what is Mr. Owen's title?
A. He's the executive producer.
Q. For what show or shows?

A. For 60 Minutes.
Q. Is he the executive producer for any other shows?
A. Currently -- I'm not sure of his title. He's overseeing a launch of the Evening News.
Q. When did he take that on, do you know?
A. Within the last few months.
Q. Okay. When you became executive editor in 2019, what were your duties, generally?
A. My duties were to approve story pitches, to help vet stories editorially once they were in the screening room, to manage some day-to-day things in the office, and to oversee associate producers.
Q. Okay. When you say "approve story pitches," what do you mean by that?
A. At 60 Minutes, when producing teams or correspondents want to do a story, they submit a written pitch, and I read that pitch and decide whether or not I think it's a story worth doing. Then Bill Owens reads the pitch and he decides, and those that we both say yes to are approved.
Q. And who submits the pitches?
A. Typically it's the producer or that person's associate producer. It depends on who physically types it up and submits it.

Q. Okay. You also mentioned that you vet stories from an editorial perspective. Do I have that correct?
A. Yes.
Q. And what do you mean by that?
A. Once a story is completely shot and scripted and edited, the senior staff screens it and gives feedback.
Q. When you say "senior staff," who are you referring to?
A. It's Bill Owens, myself, Claudia Weinstein, Debbie De Luca. And there was a senior producer who's no longer there who was part of that process. His name was Frank Devine.
Q. Okay. Claudia Weinstein, does she work for 60 Minutes currently?
A. She does.
Q. And what's her title?
A. Her title, I believe, is executive story editor.
Q. And what does she do in her role?
A. In her role, she reads all of the raw transcripts of every interview that's conducted for a 60 Minutes piece. And during the screening and vetting process, she assesses whether a given

subject is portrayed accurately and fairly, and completely based on what's taken place in the interviews.

Q. Does anyone report directly to Ms. Weinstein?

A. No, not currently.

Q. Okay. And does Ms. Weinstein have oversight of the 60 Minutes producers?

A. No.

Q. And does she have oversight of the APs for 60 Minutes?

A. No.

Q. And does Ms. Weinstein participate in the evaluation process for producers for 60 Minutes?

A. Not directly, no.

Q. What do you mean by that?

A. She doesn't review them. She, as being part of the screening process, evaluates stories. And so in that regard, her opinions are relevant.

Q. Got it. And what is Debbie De Luca's position or title?

A. Her title, I believe, is senior broadcast producer.

Q. And what does Ms. De Luca do at the show?

A. Her job is to put together -- she has --

she has oversight of the control room. So when the show is being assembled, she makes sure the pieces are the right length, that everything is where it's supposed to be. She oversees the studio introductions that the correspondents do, and she attends screenings and gives feedback on stories.

Q. And does anyone report directly to Ms. De Luca?

A. The broadcast associates report directly to her. And there's one other woman who reports directly to her whose title I'm not actually sure of.

Q. What's her name?

A. Her name is Rebecca Chertok Gonsalves.

Q. Does Ms. De Luca, to your knowledge, work for any shows at CBS other than 60 Minutes?

A. She does not.

Q. And Ms. Weinstein, does she work for any other shows?

A. She does not.

Q. You mentioned Frank Devine. Mr. Devine no longer works for CBS, correct?

A. Correct.

Q. When did he leave, approximately?

A. He retired at the end of our last season

so -- and -- over the summer.

Q. Got it. And when does the 60 Minutes season run? When does it start and when does it end?

A. It typically starts in mid-September, typically around the third week of September, and typically ends the Sunday be- -- a week before Memorial Day.

Q. A week before. So in late May?

A. Yeah, not Memorial Day Sunday. The week prior to that.

Q. Okay. And what happens during the summer -- well, actually, strike that.

Do you work during the summer for 60 Minutes?

A. We do.

Q. What kind of work are you doing in the summer?

A. We are prepping stories for the following season --

Q. Mm-hmm.

A. -- and -- that's largely what we do, is we get stories ready for the fall.

Q. Going back to your position as executive editor at 60 Minutes, does anyone directly report

to you?

A. The associate producers directly report to me.

Q. And does -- are the associate producers all assigned to teams at 60 Minutes, or not all of them?

A. Yes.

Q. Okay.

A. Yes.

Q. And when I say "teams," do you understand what I mean by that?

A. I do.

Q. And what do you understand that to mean?

A. I understand that to mean a correspondent and a producer.

Q. And the APs, do they also report to the producers or the correspondents or only to you?

A. They also report to the correspondents and the producers on their team.

Q. How many APs are there at 60 Minutes currently?

A. Maybe in the 20s.

Q. And do --

A. I don't -- I'm actually not totally sure. But roughly.

Q. Got it.

And do the correspondents have multiple producers?

A. They do.

Q. And do the producers all have APs?

A. Yes.

Q. And do some producers have multiple APs or just one?

A. No. Just one.

Q. Is part of one of your jobs to evaluate the performance of APs?

A. Yes.

Q. And are there formal reviews that take place at 60 Minutes?

A. There are.

Q. And how often do they happen?

A. They are annual, I believe.

Q. Are there midyear reviews?

A. We're -- they're midseason for us.

Q. Midseason?

A. Yes.

Q. Understand.

So there are midseason reviews as well as annual reviews?

A. They just take place at the midseason mark.

Q. Got it. Once a year.
And what factors do you consider in evaluating the performance of APs?
A. I consider their reporting and research skills. We consider their ability to coordinate logistics smoothly on a shoot.
Q. Anything else?
A. Their organizational skills, their ability to pitch stories, their general work ethic.
Q. Anything else?
A. Communication skills.
Q. Anything else?
A. Their general abilities as a journalist reporter.
Q. Anything else?
A. No, that's largely it.
Q. Got it.
And in evaluating the performance of APs, do you consider whether any of the segments that they've worked on have won awards? Is that a factor?
A. Not really.
Q. And why not?
A. Because I think the same amount of work goes into something -- or the same amount of work

should go into something regardless of whether it's won an award.

Q. If a segment that they've worked on has won an award, is that a positive?

MR. ZUCKERMAN: Objection to form.

Q. Do you consider that to be positive? You can answer.

A. No.

Q. Who is responsible for evaluating the performance of producers at 60 Minutes?

A. Bill Owens.

Q. And do you have any role in evaluating the performance of producers at 60 Minutes?

A. No.

Q. Does Mr. Owens conduct formal reviews of producers?

A. Yes.

Q. And does that also happen on an annual basis?

A. It's the same -- same time, the same process.

Q. As it is for APs?

A. Yes.

Q. And do you know or have any sense of what factors Mr. Owens takes into account when

evaluating the performance of producers?

A. I think you should ask him.

Q. Yeah, but my question is do you know of anything he takes into account?

A. Yes.

Q. And what do you know?

A. Productivity.

Q. Okay. What else?

A. Quality of work.

Q. Okay. What else?

A. Ability to stay within budget.

Q. What else?

A. Originality of ideas.

Q. What else?

A. That's all that I'm aware of.

Q. When you say "productivity," what do you mean?

A. The number of stories that you turn out per season.

Q. And when you say "turn out," are you referring to stories that are aired or are you referring to something else?

A. Stories that are aired -- completed and aired.

Q. And are there quotas that 60 Minutes has

for producers to have stories that they turn out?
A. The expectation is that they have three to four, with the preference being four.
Q. Okay. And what's the basis for saying that's the expectation?
MR. ZUCKERMAN: Objection to form.
You can answer. You can answer.
A. It's based on the number of story slots we have each season, the number of stories each correspondent is expected to do, so it's a calculation.
Q. And are the -- the three to four expectation, is that communicated to the producers?
A. Yes.
Q. And how is it communicated?
A. I believe it's communicated in the review process. It's something that's also -- it's well-known on the floor.
Q. Is it in writing anywhere, to your knowledge?
A. I don't know.
Q. And in evaluating producers, do you know whether or not Mr. Owens considers whether any of the segments have received awards?
A. I don't know.

Q. Do you have a bio page on the 60 Minutes website?
A. I don't actually know.
Q. You don't know.
And do you have any bios that you're aware of, of yourself, that you've reviewed and were put out for marketing purposes?
A. I believe there was a bio written when I got the job as executive editor.
Q. And in that bio were there any references to awards for pieces or segments that you've worked on over the years?
A. I believe so, but I'm not sure.
Q. You're not sure.
Before -- well, actually, strike that.
Have your responsibilities as executive editor changed in a material way since you assumed the role in 2019?
A. I think I've taken on a little more responsibility because I've been there longer and gained more experience.
Q. Anything specific you can identify in terms of taking on more responsibility?
A. I've started doing what are called teases that appear on the top of the broadcast, when you

do an excerpt or a piece, as 60 Minutes opens.

Q. Anything else?

A. No.

Q. Before you were executive editor at 60 Minutes, what was your job at the show?

A. Prior to that I was a senior producer at 60 Minutes.

Q. And for approximately how long were you a senior producer there?

A. Three years.

Q. And what did you do as a senior producer?

A. I was a senior producer for a time of our digital team. And, also, we had a sports show called 60 Minutes Sports, and I did that for about a year.

Q. When you did the digital team work and the sports show work, did you do them at the same time or at separate times?

A. I don't remember. There may have been some overlap.

Q. And on the digital team, what did you do as the senior producer?

A. I ran the day-to-day, making sure things got turned in on time and that people knew their assignments. And we came up with story ideas to

complement the broadcast, and I ran the personnel there.

Q. Did anyone directly report to you on the digital team?

A. There were a number of people who reported to me on the digital team.

Q. And could you give me the titles of the folks who reported to you?

A. One was either a digital associate producer or producer -- I'm not sure what her title was then -- and another was an editor -- two editors.

Q. The editors that you're referring to, did they only work for 60 Minutes or did they work for other shows?

A. They only worked for 60 Minutes Overtime, which was our digital show -- is our digital show.

Q. And then when you were on the sports show as a senior producer, what were your responsibilities?

A. Helping approve pitches, helping vet stories and running the day-to-day, making sure people were out shooting stories when they were supposed to be. Keeping the pipeline going.

Q. Did anyone directly report to you in that job?

A. Not really.
Q. What do you mean, "not really"?
A. It was sort of a logistics, day-to-day job. I didn't review anybody at the time. There wasn't a formal reporting structure to me.
Q. What was the role that you had before senior producer?
A. I was a producer.
Q. And approximately how long were you a producer?
A. Approximately, give or take, 10 years.
Q. And, actually, I want to go back to the time you were a senior producer.
A. Mm-hmm.
Q. On the digital team, who did you report to?
A. I reported to Bill Owens and Jeff Fager.
Q. What was Mr. Owen's title at that time?
A. He was executive editor of 60 Minutes.
Q. And Mr. Fager?
A. Executive producer of 60 Minutes.
Q. Did he have any other titles at that time?
A. He was also chairman of CBS News, Fager was.
Q. Mr. Fager no longer works for CBS, correct?
A. Correct.

Q. And when did he leave?
A. 2018 or 2019.
Q. Shortly before Mr. Owens became executive producer of 60 Minutes?
A. Yes.
Q. And before you became executive editor of 60 Minutes?
A. Yes.
Q. Got it.
And what is your understanding of the circumstances as to why Mr. Fager left?
A. My understanding was that he was terminated because he threatened to retaliate against an Evening News reporter who was reporting on allegations against him.
Q. What allegations was that reporter reporting on, to your knowledge?
A. That he engaged in mis- -- I guess, bad behavior, misconduct.
Q. Do you know specifically what kind of bad behavior, misconduct?
A. Largely inappropriate behavior at, you know, holiday parties and socially.
Q. Was it of a sexual nature, the allegations?
A. Yes.

Q. And do you know any specifics of the allegations against him?
A. No.
Q. Do you know if he was accused of touching women without consent?
A. I believe so.
Q. What's the basis of your knowledge that there were allegations of inappropriate sexual misconduct?
A. They were written about, published in the press.
Q. Did you have any say or input as to whether Mr. Fager would continue to work for 60 Minutes?
A. No.
Q. Okay. When you were a producer -- and I think you said it was over approximately 10 years; is that right?
A. Yes.
Q. And that was for 60 Minutes?
A. That was for 60 Minutes.
Q. And exclusively?
A. Yes.
Q. Okay. During that time, who did you report to? And if it changed, just let me know.
A. It did change. In the beginning I reported

to -- I'm trying to think who was in what role when -- Don Hewitt was the executive producer. For some of that time, Phil Scheffler was his number 2, and Patti Hassler was his number 2 -- the executive editor was his number 2, and then Bill Owens.

Q. And as a producer, were you on a team or teams?

A. I was initially on a team. And I became what's known as a floating producer.

Q. So let's start when you were initially on a team, whose team were you on?

A. Ed Bradley.

Q. So Mr. Bradley was the correspondent?

A. He was.

Q. And was there an AP that worked with you?

A. Not in the beginning.

Q. Did that change?

A. That did change.

Q. And how did it change?

A. I hired an associate producer.

Q. Who did you hire?

A. His name was Andrew Metz.

Q. Is Mr. Metz still at 60 Minutes?

A. He's not.

Q. Was he ever promoted to producer?

A. Yes.
Q. Why did he leave 60 Minutes, do you know?
A. He got a bigger job at FRONTLINE at PBS.
Q. Okay. When you were a producer, did you ever work for any other correspondent other than Mr. Bradley?
A. I did.
Q. And who else?
A. I worked for Lesley Stahl. I worked for Steve Kroft. I worked for Katie Couric. I worked for Charlie Rose. I worked for Bob Simon. And I'm just thinking if I'm missing anyone. Norah O'Donnell, I did some stories with. I think that's it.
Q. Were you on any of the correspondent's teams that you just mentioned, or were you working with them in your capacity as a floater?
A. I was working with them in my capacity as a floater.
Q. Approximately how many years were you in the floater job role?
A. From 2006 on, because Ed Bradley died in 2006.
Q. So once Mr. Bradley had passed away, you were no longer on his team?

A. Correct.
Q. And you moved to the floater position?
A. Correct.
Q. How many stories did you do with Ms. Stahl as a producer?
A. Maybe four.
Q. And how would you describe working with Ms. Stahl?
A. Good.
Q. Were there times where Ms. Stahl yelled at you?
A. No.
Q. Do you believe Ms. Stahl had a bad temper?
A. No.
Q. Okay. When you were a producer under other than Mr. Metz, did you have anybody else serve in an AP role?
A. I did.
Q. And who was that?
A. Her name is Nichole Marks, M-A-R-K-S.
Q. And does Ms. Marks still work for CBS?
A. She does.
Q. And what's her job?
A. She's a producer at 60 Minutes. She was promoted.

Q. And does Ms. Marks work for a correspondent?
A. She works mainly for Anderson Cooper but contributes a few stories to other correspondents as needed.
Q. Before you were a producer, what was your job at 60 Minutes?
A. I was an associate producer.
Q. And is it okay to refer to that job as an AP?
A. Yes.
Q. Okay. And approximately how many years were you in an AP role?
A. Six or seven.
Q. So I want to go back for a minute.
A. Mm-hmm.
Q. You mentioned Bob Simon. Bob Simon is your dad, correct?
A. Was my dad.
Q. Was your dad --
A. Yes.
Q. -- and he passed away?
A. Yes.
Q. And when you joined the show, your dad was on the show as well at that time?

A. He was on the show in a contributing capacity, not as a full-time correspondent, I believe.
Q. When you were an AP, were you on any team or teams?
A. I was. Ed Bradley's team.
Q. Were you on any other teams other than Mr. Bradley's?
A. No.
Q. And what did you do as an AP?
A. I researched stories. I reported stories. I found interview subjects to be interviewed. I wrote interview questions. I participated in the writing of the script. I submitted budgets. I did logistics for shoots.
Q. Anything else you can think of?
A. No. Fact-checking. Sorry.
Q. Fact-checking?
A. Yes.
Q. Is copywriting part of the duties of an AP?
A. What do you mean by "copywriting"?
Q. I'll withdraw the question.
All right. As an AP, were there ever evenings that you had to work?
A. Yes.

Q. Were there ever weekends that you had to work?
A. Yes.
Q. And were there holidays that you ever worked on?
A. Yes.
Q. And as a producer, did you ever have to work nights?
A. Yes.
Q. Weekends?
A. Yes.
Q. And holidays?
A. Yes.
Q. And as a senior producer, did you have to work nights?
A. Yes.
Q. And weekends?
A. Yes.
Q. And holidays?
A. Yes.
Q. And as an AP, did the number of hours you have to work, was it affected at all by whether a segment was going to air?
A. Yes.
Q. And how was it affected?

A. To the extent that if we were on a deadline, then we would have to work to meet the deadline.
Q. And does that mean you'd work more than other times?
A. Well, typically as a piece is going into the final stages of production, you'd work to ensure that everything gets done.
Q. And is the time period sort of immediately before a segment airs a particularly busy time?
A. It can be.
Q. What do you mean, "it can be"?
A. Typically in the days leading to air, you -- the producer and the AP make sure that the fact-checking is in order. They make sure that all the pictures are correct. Oftentimes you go through a final screening process. It depends on the kind of story it is.
Q. What do you mean by that?
A. If it is a -- what we call a crash, which is something with a very tight turnaround because it's a, you know, headline story, then it's a lot more compressed in that time.
If it's a feature story that has a longer lead time, then it can get more stretched out.

Q. And after a story airs, is there any work that happens on the segment?

A. Sometimes.

Q. And what do you mean by that?

A. Sometimes you have to finalize rights and clearances which is the process by which we secure footage.

Sometimes if there has been an error or at least a complaint by a subject in the piece, sometimes you have to work to respond to that or at least answer questions from management about the story.

It's case by case. Oftentimes there's nothing.

Q. And when you say that there are busy periods, how many hours a day are you typically -- are you talking about with a particularly busy period?

A. It depends.

Q. Okay. Have you ever worked a 12-hour day as a producer?

A. Yes.

Q. Have you ever worked a 15-hour day as a producer?

A. I'm sure I have.

Q. Have you ever worked an all-nighter as a producer?
A. No.
Q. And as a producer, were there times where you didn't have days off for multiple weeks?
A. Yes.
Q. And as a producer, were there times when you didn't have days off for a month?
A. I don't remember.
Q. In your job as an AP, were there ever instances where a producer yelled at you?
A. Yes.
Q. And who yelled at you?
A. His name was Michael Radutzky.
Q. Were you ever on Mr. Radutzky's team?
A. Yes.
Q. And for what period of time were you on his team?
A. From the time that I started at 60 Minutes until mid-2006-ish.
Q. So were you doing this at the same time that you were on Mr. Bradley's team?
A. Yes.
Q. You were doing it simultaneously?
A. Yes. He was Ed's producer, and I was his

AP.

Q. And during the period that you were AP and Mr. Radutzky was producer, were there any other APs working with Mr. Radutzky?

A. No.

Q. Okay. And how often did Mr. Radutzky yell at you?

A. I don't recall.

Q. Would you say it was on a regular basis?

A. In cycles.

Q. But did those cycles occur throughout the time that you were his AP?

A. Yes.

Q. Did he ever swear at you?

A. Yes.

Q. Did he ever make comments that you believed were derogatory based on being a woman?

A. No.

Q. Did he ever insult you?

A. No.

Q. Did you ever complain about Mr. Radutzky?

A. Yes.

Q. And who did you complain to?

A. I complained to Patti Hassler.

Q. Did you complain to anybody else?

A. No.
Q. When you complained to Ms. Hassler, what was her job?
A. She was the executive editor.
Q. And at that point in time, she reported to Mr. Hewitt?
A. No. She reported to Jeff Fager.
Q. And how many times, approximately, did you complain to Ms. Hassler about Mr. Radutzky?
A. Once.
Q. And approximately when did that happen?
A. I would say approximately 2005, 2006.
Q. And what did you complain about to Ms. Hassler?
A. That he had been verbally -- I don't want to use the word "abusive" -- just verbally out of bounds, that he had a temper, and that he sort of didn't have any boundaries in terms of constant, constant calling and...
Q. Did you give any examples to Ms. Hassler of Mr. Radutzky's temper?
A. I don't remember.
Q. Did you give any examples of Mr. Radutzky verbally making comments that you considered out of bounds?

A. I don't remember.

Q. What did Mr. Radutzky say to you that you consider out of bounds?

A. He was just a yeller. He got very worked up during stressful stories. I don't remember specific comments that he said.

Q. And to your knowledge, did Ms. Hassler take any steps in response to your complaint?

A. My understanding is she spoke with Michael.

Q. Anything else that you're aware of?

A. Nope.

Q. And did you continue working for Mr. Radutzky after you made the complaint?

A. I did.

Q. And do you know if there was any disciplinary action taken against Mr. Radutzky based on your complaint?

A. I don't.

Q. Do you know if there were other complaints against Mr. Radutzky besides the one that you've just testified to?

A. Yes. But I don't know if they were formal complaints.

Q. What other complaints are you aware of about Mr. Radutzky?

A. There was another guy on our team who Michael had yelled at. The associate producer who preceded me, he had asked to leave Michael's team because of his conduct and their working relationship.
Q. Any other complaints you're aware of against Mr. Radutzky?
A. No. Just general -- just behavior, but nothing -- no formal complaints.
Q. What do you mean, "general behavior"?
A. Just people talking amongst themselves about him.
Q. Would you consider it widely known that Mr. Radutzky was a difficult producer to work with when he was there?
A. Yes.
Q. Did anyone ever describe him to you as abusive?
A. I don't recall the use of those words in particular.
Q. You said another guy on the team made a complaint that -- after Michael had yelled at him. Who was the person who made the complaint?
A. His name is Sam Hornblower.
Q. And what was his title at the time?

A.     I believe he was a broadcast associate.

(Reporter clarification.)

THE WITNESS:  Hornblower, H-O-R-N-B-L-O-W-E-R.

Q.     And how do you know Mr. Hornblower had made a complaint?

A.     We were working together on a story.

Q.     And what did Mr. Hornblower complain about, to your knowledge?

A.     Just that Michael was angry and yelling and stressed about the story.

Q.     Okay.  And the AP who asked to leave the team, who was that person?

A.     His name was Trevor Nelson.

Q.     And how do you know that Mr. Nelson asked to leave the team due to Mr. Radutzky's conduct?

A.     Because Mr. Nelson told me.

Q.     Do you know someone named ████ █████

A.     Yes.

Q.     Did ████ █████ work for 60 Minutes?

A.     She did.

Q.     And what was her job there?

A.     She was in charge of booking a lot of our entertainment-related stories and publishing, if we did a story about a book or an author.  She

maintained all of those contacts.

Q. And do you know approximately when Ms. [redacted] stopped working for 60 Minutes?

A. I don't remember exactly.

Q. You and she overlapped, though, your tenures, correct?

A. We did. We did, yeah.

Q. For -- for multiple years?

A. Yes. Yes. Yes.

Q. Are you aware of any complaints that Ms. [redacted] made about Mr. Radutzky?

A. She did.

Q. And what are you aware of?

A. That she made one.

Q. And what do you know about the complaint?

A. Nothing.

Q. And how do you know she made a complaint?

A. Because, I believe, at one point HR might have called me.

Q. And approximately when did HR call you about Ms. [redacted] complaint?

A. I'm not sure. Before 2020, I think.

Q. And who at HR called you?

A. I don't remember.

Q. Tell me everything you remember about that

conversation.

A. I remember that in her complaint she had described an incident that she said that I was involved in, but I had no knowledge of that incident.

Q. And were you told what the incident was?

A. I think in general terms.

Q. What were you told?

A. I don't -- it was something where I was in the room or involved in some episode, but I don't remember what that was.

Q. And at the time that HR reached out to you, was Ms. [redacted] still working for 60 Minutes?

A. I don't believe so.

Q. She had left already?

A. I believe so.

Q. Do you know whether Ms. [redacted] made a complaint that Mr. Radutzky had touched her?

A. I believe so.

Q. And are you aware that Ms. [redacted] had made a complaint that Mr. Radutzky had twisted her wrist or her arm?

A. I believe so.

Q. And are you aware that Ms. [redacted] had made a complaint that Mr. Radutzky had thrown something

at her?

A. I believe so.

Q. And do you know what Ms. [REDACTED] alleged Mr. Radutzky had thrown at her?

A. No.

Q. And when you say that you believe that Ms. [REDACTED] had alleged that Mr. Radutzky had twisted her arm or her wrist, what are you basing that off?

A. I don't remember if it was something that I read or whether it was word of mouth.

Q. Did the HR person say that to you?

A. Not that I recall.

Q. And did the HR person say to you that Ms. [REDACTED] had alleged that Mr. Radutzky had thrown something at her?

A. I don't recall.

Q. Do you know whether Ms. [REDACTED] alleged that she had raised concerns about this incident to Mr. Fager?

A. I don't recall.

Q. And do you know -- did anyone tell you that Ms. [REDACTED] had alleged that Mr. Fager told Ms. [REDACTED] to apologize to Mr. Radutzky?

A. I don't remember specifically.

Q. Do you remember generally?
A. I remember reading -- I don't know if that case -- if her complaint was written about somewhere that I might have read that. I didn't hear it from anyone specifically, that I remember.
Q. Were you moved off of Mr. Radutzky's team at your request?
A. Eventually.
Q. And when did that happen?
A. Sometime later, in the first few years after Ed Bradley died, a number of producers worked together on a unit that had been formed that Michael oversaw.
Q. What was that unit?
A. I think it was called the Radzutsky unit.
Q. Was the Radutzky unit formed shortly -- around the time or shortly after Mr. Bradley had passed away?
A. I believe so.
Q. I'm sorry, when did Mr. Bradley pass away?
A. In 2006, I believe, in November.
Q. How for long did you work within the Radutzky unit?
A. Just a few years.
Q. Okay. And at that point in time, you were

still an AP, or had you --

A. I was a producer.

Q. You were a producer?

A. Yes. Yes.

Q. Okay. And approximately how many other producers worked within the Radutzky unit?

A. Two or three, maybe.

Q. And at that point, who did Mr. Radutzky report to?

A. Jeff Fager.

Q. And at what point did Mr. Owens become executive editor at 60 Minutes?

A. That, I don't know, I'm afraid.

Q. Was Mr. Owens executive editor during the period that you worked within the Radutzky unit?

A. I don't remember.

Q. And at some point you stopped working within the Radutzky unit?

A. Yes.

Q. And how did that come about?

A. I think the Radutzky unit was sort of dissolved because it wasn't -- there was sort of no need for it.

Q. Did you stop working before it was dissolved, or as a result of it being dissolved --

stopped working for the Radutzky unit?
A. As a -- as a result that had been tapering off.
Q. Did you ever ask to be transferred away from working with Mr. Radutzky?
A. I had a conversation, once, exploring that possibility.
Q. With whom?
A. I believe with -- I believe with Jeff at one point.
Q. Mr. Fager?
A. Yes.
Q. Approximately when did you have that discussion?
A. In the 2010s, I think, around in that time frame.
Q. And can you tell me everything you remember about that discussion, please?
A. I believe I told him I didn't think the Radutzky unit was efficient in the way that 60 Minutes is structured and that I would like to work outside of it.
Q. What did Mr. Fager say?
A. I don't recall.
Q. Did you end up transferring at that time?

A. Then the unit just sort of went away. It just stopped functioning as a unit.
Q. Did you say to Mr. Fager that you wanted to transfer because you didn't like how Mr. Radutzky behaved?
A. No.
Q. Did you ever ask to transfer away from working with Mr. Radutzky because of his conduct?
A. I had a conversation with Ed Bradley about it, once, about what the possibilities would be.
Q. And in talking to Mr. Bradley about that, did you describe to Mr. Bradley the conduct that was concerning to you of Mr. Radutzky?
A. In general terms.
Q. Was Mr. Bradley aware of Mr. Radutzky's conduct?
MR. ZUCKERMAN: Objection.
THE WITNESS: Oh, sorry.
MR. ZUCKERMAN: No, no. You can answer.
A. To some extent.
Q. And what was the result of the conversation you had with Mr. Bradley about potential opportunities not working with Mr. Radutzky?
A. Sorry, could you repeat that?

Q. Yeah, I'm just asking what was the result of that conversation.
A. I believe he had a conversation with Michael, and I continued working for him.
Q. Continued working for Mr. Radutzky?
A. Right, for Radutzky.
Q. Does Mr. Radutzky still work for CBS?
A. He does not.
Q. And approximately when did he stop working for CBS?
A. I believe it was around 2018, '19, in that time frame.
Q. And why did Mr. Radutzky leave CBS, if you know?
A. I don't know.
Q. Was he fired?
A. I don't know.
Q. Okay.

MR. IADEVAIA: All right. I think I'd like to take a break, if that's okay with everybody.

MR. ZUCKERMAN: Yeah, that's fine.

THE VIDEOGRAPHER: The time is 11:18 a.m., and this marks the end of Media Unit Number 1.

(Whereupon, a recess was taken at this time.)

THE VIDEOGRAPHER: The time is 11:47 p.m. -- I mean a.m., and this begins with Media Unit Number 2.

BY MR. IADEVAIA:

Q. Ms. Simon, other than Mr. Radzutsky, was there anyone else at 60 Minutes who has yelled at you?

A. No.

Q. Did Jeff Fager ever yell at you?

A. No.

Q. Has Bill Owens ever yelled at you?

A. No.

Q. Did -- going back to Mr. Radzutsky for just a second --

A. Mm-hmm.

Q. -- did Mr. Radzutsky, to your knowledge, did he have, like, a rolly suitcase with wheels on it that he would bring around that contained pills?

A. Yes.

Q. And what is your understanding of what that was?

A. He took a lot of vitamins and supplements and a whole host of things.

Q. Did you understand that the suitcase included, like, pharmaceutical medications?
A. Some.
Q. Some.
And was there a name for that bag that he brought around?
A. Not to my knowledge.
Q. You testified, I believe earlier, that you got a call from HR at some point related to an incident that Ms. [redacted] had alleged and said you were present for. Do I have that correct?
A. Yes.
Q. And were you present for the incident that Ms. [redacted] alleged?
A. To my recollection, no.
Q. Okay. And you said that you didn't remember when that call came in, but you think it was before 2020; is that right?
A. I believe so.
Q. Was it before or after you were executive editor at 60 Minutes?
A. I'm not entirely sure. I believe before, but I'm not entirely sure.
Q. Okay. And do you know what prompted HR to reach out to you in that moment? I mean, I know

you said that Ms. [redacted] had made an allegation that you were present for this incident, but was something happening that led HR to reach out to you in that moment?

MR. ZUCKERMAN: Objection.

You can answer.

A. My understanding at the time was that they were going through her allegations and asking people about them if they were named in the -- in her allegations.

Q. Allegations made by Ms. [redacted]?

A. Right. Right, right.

Q. And your belief is that Ms. [redacted] at that time was not actually working at CBS?

A. I don't believe she was.

Q. Okay. Is there someone who works for 60 Minutes named Michael Gavshon?

A. Yes.

Q. And what is his job there?

A. He's a producer at 60 Minutes.

Q. How long has he been at 60 Minutes?

A. He has been at 60 Minutes many, many years. Twenty-plus, I believe.

Q. Was he there when you joined?

A. Yes.

Q. Was he a producer at the time?
A. Yes.
Q. And is he part of a team currently?
A. Yes.
Q. And whose team is he on?
A. He splits between Jon Wertheim and Anderson Cooper.
Q. And are you friends with Mr. Gavshon?
A. Yes.
Q. Do you socialize outside of work?
A. Yes.
Q. And do you have any -- let me just ask more directly.
Is he a godparent to any of your children?
A. No.
Q. And are you a godparent to any of his?
A. No.
Q. Was there a book published celebrating 60 Minutes at some point?
A. Yes.
Q. And when did the book come out?
A. The book I believe came out in 2018. It was to commemorate the 50th anniversary, and so that math makes sense.
Q. Got it.

And did you have any involvement in working on the book?

A. Yes.

Q. What was your involvement?

A. I did some of the research for the book.

Q. Got it.

And how did it come about that you were working on the book?

A. Alison Pepper, who was Jeff Fager's assistant, asked me to work on the book with him.

Q. With Mr. Fager?

A. With Jeff Fager, yes.

Q. And was that the plan at the outset of putting together the book, or did that develop in the middle of putting together the book?

A. At the outset.

Q. At the outset?

A. I think when he learned that he would be -- when he decided to write the book.

Q. Got it.

Who's Richard Zoglin? Do you know who that is?

A. No.

Q. Was there someone hired to write the book who ended up not writing the book?

A. To my understanding, yes, but I don't know his name.
Q. Okay. It could be Richard Zoglin, but you don't know?
A. It could be.
Q. Did the person who was hired to write the book, did that person complete the book?
A. No.
Q. Do you know why?
A. No.
Q. Do you know if Mr. Fager asked him to no longer work on the project?
A. I don't know.
Q. Had you heard from anyone that Mr. Fager asked that person not to finish the book because the person was focusing too much on the negative at 60 Minutes?
A. I believe I read that somewhere.
Q. Did anyone ever say that to you?
A. No.
Q. Did anyone ever say to you that Mr. Fager asked this person not to write the book anymore because he was focusing too much on the mistreatment of women at 60 Minutes?
A. I read that, but no one told me that

directly.

Q. During your time working at 60 Minutes, have you ever been interviewed in connection with any investigations about gender discrimination?

MR. ZUCKERMAN: I'm going to object to that question.

You can answer.

A. I don't believe so.

Q. Okay. Have you ever been interviewed in connection with any investigations about sexual harassment?

A. I don't believe so.

Q. Have you ever been interviewed as part of an HR investigation at 60 Minutes?

A. Yes.

Q. How many?

A. Two that I can think of off the top of my head -- three. Possibly others.

Q. Okay. So for the first one -- or for one of the three that you can remember, approximately when did that happen?

A. During the time that I was senior producer for the digital team. So, pre-2019.

Q. Okay. And who interviewed you?

A. I believe it was Maria Cottone.

Q. Who is Maria Cottone?
A. She was the HR person who was assigned at the time on 60 Minutes.
Q. Is she not in that role anymore?
A. No, she's not.
Q. Is she at CBS still?
A. I don't know. I believe so, but I don't know.
Q. And do you know approximately when she stopped being in that HR role for 60 Minutes?
A. No. There was a lot of change and moving around and people assigned to different departments, so I don't know.
Q. Do you remember when those changes happened?
A. Probably 2019 and beyond.
Q. Okay. And the meeting that you had -- or the interview that you did with Maria Cottone when you were senior producer at digital, was that in person, over the phone?
A. In person.
Q. And who else was there -- or strike that.
Who was there?
A. Maria Cottone.
Q. And you?

A. And me.
Q. Just the two of you?
A. Yes.
Q. Okay. And what did she interview you about?
A. She interviewed me because some of the members of that team had been complaining about the woman who was the sort of on-air person on digital, and they were complaining about her treatment of them. And Maria was talking to me about what they had said and what they had said in part to me.
Q. Who was the person they were complaining about?
A. Ann Silvio is her name.
Q. And was any action taken against Ms. Silvio in connection with these complaints, to your knowledge?
A. She was spoken to, and she has since left.
Q. Was she fired?
A. I don't know, technically.
Q. Was she let go in connection with these complaints, to your knowledge?
A. I don't know.
Q. And what was the information that, I guess -- yeah, what information did you

supposedly have that you were told by others that Ms. Cottone was asking about?

A. They had complained about her demeanor. They had complained about they felt undermined. They complained that she was never happy with their work. They complained about her doing things at the last minute and just adding more and more to their plates. Largely her demeanor and the way she treated them.

Q. Got it.

And at the time that you had this meeting, who was the executive producer of 60 Minutes?

A. Jeff Fager.

Q. And was Mr. Owens the executive editor?

A. Yes.

Q. All right. Could you tell me about the -- I guess just take one of the other remaining instances where you participated in the investigation. Tell me about it, please.

A. Well, I was a part of Alex's situation with HR regarding Collette.

Q. C-O-L-L-E-T-T-E?

A. Mm-hmm.

Q. We'll get to that after.

Okay. And then the third situation?

A. There have been ongoing issues between one of our camera people and the person on our team who manages all the camera people and books our crews.
Q. Okay. Who is the camera person?
A. His name is Mark LaGanga.
Q. And who was the person on the team?
A. Her name is Ann Marie Kross.
Q. And Mr. LaGanga, is he a -- does he work only for 60 Minutes or work for other shows?
A. He works mostly for 60 Minutes. He's a 60 Minutes staff cameraman.
Q. What other shows does he work for, do you know?
A. I think occasionally, when needed, he's done stuff for Sunday Morning, for 60 Minutes Overtime, but primarily 60 Minutes.
Q. And Ann Marie Kross, does she currently work at 60 Minutes?
A. Yes.
Q. What's her job?
A. She coordinates and oversees all of our staff and freelance camera crews. She books them. She schedules them. She deals with their pay when they report their hours. She helps maintain their gear.

Q. And does she work exclusively for 60 Minutes?
A. Yes.
Q. Does she report to Mr. Owens directly?
A. Yes.
Q. So what's the nature of the ongoing issues?
A. Issues about scheduling, issues about overtime pay, issues about how to calculate hours worked, issues about assignments.
Q. And who was complaining in this dynamic?
A. At this point, both.
Q. And what has 60 Minutes done -- strike that.
Have you done anything in response to these concerns?
MR. ZUCKERMAN: Objection.
Q. You can answer.
A. I have brought them to HR.
Q. Anything else?
A. No. That's it.
Q. What steps has HR taken, if you know?
A. HR has, to my understanding, been in touch with our labor relations people since Marcus --
THE VIDEOGRAPHER: Excuse me.
Ms. Simon, can you please move the can?

THE WITNESS: Sorry.

Q. Anything else that you're aware of that HR has done?

A. No.

Q. Okay. Are you aware that the New York attorney general's office announced that it had secured a $30 million settlement from CBS and Les Moonves in 2022?

A. Yes.

Q. And do you have any knowledge as to what the basis of that settlement was?

A. No, not beyond what was reported in the newspapers.

Q. And what did you understand to be reported in newspapers?

A. My understanding was it was -- I'm not sure if it was sexual harassment or inappropriate behavior. I'm not sure what the term was, but sexual in nature.

Q. To your knowledge, did the attorney general's office conduct any investigation into CBS before the settlement was announced?

A. I have no idea.

Q. Did you participate in any AG-led investigation?

A. No.
Q. Are you familiar with a law firm called Debevoise & Plimpton?
A. Yes.
Q. And are you familiar with a law firm Covington & Burling?
A. Yes.
Q. To your knowledge, did Debevoise and Covington conduct an investigation -- an internal investigation concerning CBS?
A. Based on what I read.
Q. Did you play any role in that investigation?
A. I don't recall.
Q. Were you ever interviewed by a lawyer from Debevoise?
A. I don't recall if it was a lawyer from Debevoise. I was interviewed by a lawyer. I can't remember what specific thing it was for.
Q. Mm-hmm. And what was your understanding of the purpose of the investigation?
A. That CBS had --
MR. ZUCKERMAN: Just, you know, can we stop? I need to consult with the witness about whether it's privileged or

not privileged here. I don't know the answer to that question.

MR. IADEVAIA: Sure. You guys can talk.

MR. ZUCKERMAN: You know, I might need Danya as well. So I don't know if can I move this or --

MR. IADEVAIA: We can step out.

THE VIDEOGRAPHER: The time is 12:05 p.m. We are off the record.

(Whereupon, a recess was taken at this time.)

THE VIDEOGRAPHER: The time is 12:14 p.m., and we're back on the record.

MR. ZUCKERMAN: Our understanding is that those are internal, privileged investigations. The fact of the investigation may have become public at some point but not the, you know, the details of it, and certainly not the nature of the interviews, the subject matters, or any other, you know, fact or circumstance concerning those investigations, so we're going to ask you not to inquire into them.

MR. IADEVAIA: Well, I'm going to

ask questions, and then you can direct the witness not to answer.

MR. ZUCKERMAN: You know, it's not really my burden to do that. It's your burden ethically not to ask questions that you --

MR. IADEVAIA: You can raise that --

MR. ZUCKERMAN: Let me just put it on the record. I'm not scolding you. I just want it on the record.

I'm not going to raise it with the judge.

MR. IADEVAIA: Okay.

MR. ZUCKERMAN: I'm telling you not to ask questions that you now know will delve into the attorney-client privilege. You do so at your own risk. I will absolutely instruct the witness not to answer. But when I say I'm not taking it up with the judge, what I mean is I'm not reserving that question for the judge.

I'm instructing her not to answer those questions, and I will take up with the judge your conduct today if that's what

I need to do.

MR. IADEVAIA: Great. I appreciate your threats. I don't think it's productive to do that. I can ask questions. I don't think that asking somebody if they were interviewed is privileged. Okay?

And so the threat that you made I think is inappropriate --

MR. ZUCKERMAN: It's not a threat.

MR. IADEVAIA: Yes, you just made a threat.

MR. ZUCKERMAN: It's a threat to you because you know what you're doing -- now that you've been instructed that it's an attorney-client privilege matter, you know what you're doing is improper.

MR. IADEVAIA: And I'd ask you not to make threats. Okay?

BY MR. IADEVAIA:

Q. Okay, Ms. Simon, what is your understanding of the purpose of the investigation that was conducted by Debevoise & Plimpton?

MR. ZUCKERMAN: I'm instructing the witness not to answer the question.

Q. Do you have any understanding of what the purpose of the investigation that Debevoise & Plimpton conducted outside of anything you've learned from counsel?

MR. ZUCKERMAN: I'm instructing the witness not to answer the question unless you just want to regurgitate what you've read in the newspapers.

Q. Yes, you can answer in any way that you know, other than through counsel.

MR. ZUCKERMAN: No, it's not just through counsel. Okay. The scope of the attorney-client privilege goes beyond counsel. You may have heard things from the executive who's within the scope of the privilege, And that matter would be privileged.

Do not discuss anything that you've been told in connection with this investigation that came from anyone in position at your employer.

If he wants to waste time asking you what you read in The New York Times, that's up to him.

BY MR. IADEVAIA:

Q. Do you know anything about the scope of the investigation that Debevoise & Plimpton and Covington & Burling conducted outside of what you were told either by counsel or by employees at 60 Minutes -- I mean at CBS?

MR. ZUCKERMAN: Objection.

You can answer.

A. That there was an internal investigation being conducted into the culture at CBS News.

Q. And what culture -- what did you understand "culture" to refer to?

MR. ZUCKERMAN: Objection. Again, limiting your testimony to -- I don't know what this is right now. Is it your review of the press coverage?

A. According to the press, it was reviewed -- there had been allegations of sexual harassment, and it was following that --

Q. Following --

A. -- following those allegations.

Q. And based on anything outside the scope of what your counsel has directed you not to answer, did you understand that that inquiry looked into 60 Minutes?

MR. ZUCKERMAN: Objection to that question.

Do not answer that question.

MR. IADEVAIA: On what grounds? I said outside of the scope of what you've instructed her -- the sources that you've instructed her not to reveal information from.

MR. ZUCKERMAN: What was the rest of the question?

(Whereupon, the record was read by the reporter.)

MR. ZUCKERMAN: Only answer if you can be a hundred-percent certain --

(Simultaneous speakers.)

MR. ZUCKERMAN: Let me get this on the record.

This is not a matter of leading the witness. This is a matter of privilege.

MR. IADEVAIA: You've already given the instruction.

MR. ZUCKERMAN: No. Don't answer the question, then. If he's not going to let me instruct you further, don't answer the question.

Q. Your lawyer has instructed you not to answer any of these questions to the extent that you learned the information from lawyers for CBS or from anyone within CBS.

So my question is, outside of those sources, did you have any understanding that the investigation that Debevoise & Plimpton and Covington & Burling were conducting looked at 60 Minutes specifically?

A. I don't know.

Q. Okay. And in the context of that investigation, did you provide any materials to the investigators?

MR. ZUCKERMAN: Objection.

Don't answer the question.

MR. IADEVAIA: And the objection is on what grounds?

MR. ZUCKERMAN: Privilege.

MR. IADEVAIA: It's privilege as to whether someone provided materials?

MR. ZUCKERMAN: Yes.

MR. IADEVAIA: Even though I'm not asking what the materials were?

MR. ZUCKERMAN: Yes.

MR. IADEVAIA: Okay. We disagree.

Q. Did you ever learn about the conclusions of the investigation? Again, following your lawyer's instruction, I'm not asking if you learned it from sources within CBS or lawyers.

MR. ZUCKERMAN: Don't answer the question.

Objection.

MR. IADEVAIA: Why? I'm giving the instruction that you gave.

MR. ZUCKERMAN: If she learned about what the conclusion was from a source other than a privileged conversation?

MR. IADEVAIA: Correct.

MR. ZUCKERMAN: Okay.

A. I don't remember what I learned, from where.

Q. Okay. During your tenure at CBS, has CBS had an antidiscrimination policy?

A. I believe so.

Q. Okay. And do you know if that policy is in writing?

A. I believe so.

Q. Have you ever seen the policy?

A. I'm sure I have. I don't recall when I last saw it.

Q. Do you get training on the policy?
A. We get multiple kinds of trainings.
Q. Okay. Do you get training specifically on antidiscrimination?
A. I believe so.
Q. And does that training happen on an annual basis?
A. I don't recall the frequency.
Q. And the trainings that you've received, are they -- have you ever received an in-person training on the antidiscrimination policies?
A. No.
Q. Have you ever received an online training on the antidiscrimination policies?
A. Yes.
Q. And after you complete the training, are you required to certify that you've done so?
A. When you finish the training, a certificate pops up saying that you've completed the training.
Q. And is the training that you've received CBS-specific training?
A. It's CBS, or Paramount now.
Q. And under the antidiscrimination policy, what is your understanding of what kind of conduct is prohibited?

A. Discriminating against people based on gender and race is prohibited.

Q. Any other understanding beyond that?

A. Other protected groups.

Q. And what are other protected groups you're aware of?

A. Based on sexuality.

Q. Anything else?

A. I said gender, right?

Q. You did.

A. Ethnicity.

Q. Anything else?

A. Not that I can think of.

Q. To your knowledge, does CBS have any policies as it relates to retaliation in connection with discrimination?

A. Yes.

Q. And what is that policy? What's your understanding of that?

A. That retaliation is forbidden.

Q. What kind of retaliation is forbidden, to your knowledge?

A. Retaliation against somebody who makes a complaint.

Q. Any kind of complaint in particular?

A. I think including but not limited to HR complaints and -- I think any kind of complaint, but I think the focus was on HR complaints.
Q. Okay. And when you say "HR complaints," what do you mean by that?
A. If somebody files a complaint with HR about inappropriate behavior or anything going on in the workforce, that kind of complaint.
Q. What is your understanding of the -- well, strike that.
To your knowledge, is there a procedure at CBS for -- or at Paramount for reporting concerns about discrimination?
A. I believe one route is to notify HR, and I believe there is -- one can report, I suppose, to one's manager and to HR.
Q. And is the procedure for reporting complaints of discrimination covered in the training that you received?
A. I believe that the reporting procedure has covered all sorts of reporting, and it was not limited to discrimination.
Q. Does 60 Minutes have something called blue sheets?
A. Yes.

Q. What are blue sheets?
A. Blue sheets are story pitches.
Q. And how do blue sheets get used in the story process at 60 Minutes?
A. They're the first step in the approval process when a producer or a correspondent have a story idea. They type it up and submit it into a database that Bill Owens and I review on a periodic basis.
Q. And you had testified earlier about pitches needing approval from both you and Mr. Owens, correct?
A. Yes.
Q. And is your approval -- do you approve based on the information that's contained within this database or does something else go into it?
A. It's based on -- first of all, do we think it's a good story that 60 Minutes should do. We make sure it doesn't conflict with any other stories that are going on. So if somebody else has pitched it previously and it's an active pitch, then it doesn't go forward.
Q. As part of the story process, does 60 Minutes receive input from individuals outside of the 60 Minutes group?

A. We do get pitched stories by a number of different groups.
Q. So you mean individuals from other shows?
A. Not from other shows, but a publisher might tell us about an upcoming book or an entertainment publicist might pitch their client, an actor, a performer, a musician. Sometimes other PR firms will pitch us stories about clients of theirs.
Q. Once a story is further along in the process --
A. Mm-hmm.
Q. -- is there any review done by individuals within CBS but outside of 60 Minutes?
A. Those reviews are done at the end of the vetting process. The final screening of a piece has a -- typically a vice president from the news division signs off on it as a final check.
Q. And is there a specific vice president at CBS now who has that job, or are there multiple individuals who could do that?
A. Currently it's a woman who is the head of standards for CBS News, and I believe she has a vice president title.
Q. What's her name?
A. Her name is Claudia Milne, M-I-L-N-E.

Q. And since you've been executive editor, have there been times when either Ms. Milne or anybody who is in that role has flagged concerns or given input overall into a segment?

A. They occasionally give input or flag a standards issue.

Q. Outside of what you just testified to, are there other circumstances in which someone outside of 60 Minutes but within CBS News are involved in the story process?

A. On some stories, the CBS News lawyers are involved.

Q. Any other circumstances?

A. In terms of vetting a story or just in part of the process?

Q. At any point as part of the story process?

A. No, I don't believe so. I mean, outside -- our, like, publicity team looks at the pieces so they will know what might be the best part of a piece to promote. But in terms of editorial vetting, no.

Q. During your time as executive editor, have employees come to you at 60 Minutes with complaints about other employees?

A. Yes.

Q. And how often has that happened?
A. A handful of times. Not frequently.
Q. Okay. Can you tell me the times that you recall that happening?
A. I recall, as I had mentioned before, Ann Marie Kross complaining about Mark LaGanga. I recall Collette Richards complaining about Alexandra Poolos. I recall people complaining about our -- the editor who oversees the editors. I recall producers not being satisfied with their associate producers.
Q. Other instances?
A. I'm sure, but not that I can remember right now.
Q. Okay. You mentioned that people complained about the editor who oversees other editors.
A. Mm-hmm.
Q. Who is that editor?
A. His name is Matt Richman.
Q. When did you receive complaints about Mr. Richman?
A. In the last 2 years, I believe.
Q. And who made complaints about Mr. Richman?
A. An assortment of producers complained about his, for lack of a better word, people skills.

Q. What did they say about his, for lack of a better word, people skills?
A. That the way in which he interacted with them could be condescending and a little snippy, and that they didn't like the way he went about assigning editors.
Q. And who communicated -- well, did you receive one or multiple complaints about Mr. Richman?
A. A few. They weren't formal complaints.
Q. And who made those complaints, formal or informal?
A. Some of the producers on the show did.
Q. "On the show" meaning 60 Minutes?
A. On 60 Minutes, yes.
Q. And who were those producers?
A. One person was Shari Finkelstein.
Q. Who else?
A. One person was Kara Vaccaro.
Q. Who else?
A. I'm thinking. I don't recall specific names of others.
Q. Were there others, though?
A. Yeah. Yeah.
Q. Okay. What did Miss -- how many times did

you talk to Ms. Finkelstein about concerns she had related to Mr. Richman?

A. Just once.

Q. When did that happen?

A. In the last couple of years.

Q. And did she do it in writing, or was this a conversation or something --

A. A conversation.

Q. Did you have it by phone or in person?

A. I don't recall.

Q. Or in some other manner?

A. It was a conversation, but I don't remember if it was in person or on the phone.

Q. Okay. And what did Ms. Finkelstein say?

A. That she felt that he was sort of judgmental of her working process and how long it took, and that he was just sort of abrasive and snippy when she went through the process of requesting an editor.

Q. And what did you say?

A. I told her that I would -- I believe she also said that she had gotten feedback that he had, in a meeting with other editors, noted that she was slow and that they didn't have to work with her.

Q. So her understanding was that in a meeting

with other editors, that he said that she was slow and they didn't have to work with Ms. Finkelstein?

A. Something to that effect.

Q. And what's Ms. Finkelstein's position?

A. She's a producer.

Q. At 60 Minutes?

A. Yes.

Q. What else did Ms. Finkelstein say about Mr. Richman during this discussion?

A. That was all.

Q. And what did you say in response, if anything?

A. I told her that he -- that I would talk to him about his discretion talking to other editors, but that he follows a very strict protocol when it comes to assigning editors and he does everything by the book, and he takes great pains to not give preferential treatment to producers and he offers everyone the option of all the editors that are available. And just like some producers have favorite editors, some editors have favorite producers, and some people don't work as well as together as others.

Q. And you said this to Mrs. Finkelstein in this discussion?

A.     Yes.
Q.     What was the basis for your comments that he follows a strict protocol?
A.     Because I have almost weekly discussions with him over which stories need to be assigned editors, and he shows me the editors he offers to each producer.
Q.     Were you concerned by anything Ms. Finkelstein had identified to you as concerns she had?
A.     The concern that I had was her claim that he had said things about her in a meeting of other editors.
Q.     Was it the fact that he was talking about her or the substance of what --
A.     The substance.
Q.     The substance being that she's slow and that editors didn't have to work with her?
A.     That she takes a long time on her pieces, and if editors didn't want to, they didn't have to work with her.
Q.     And why was the substance concerning to you?
A.     It was concerning to me because it was concerning to her, and she believed that she was

disparaging her.

Q. Do you think it's appropriate for an editor in a supervisory position to tell other editors they don't have to work with a producer at 60 Minutes?

A. No.

Q. Did you talk to Mr. Richman about this discussion?

A. I did.

Q. And when did you talk to him?

A. In the weeks following my conversation with Shari.

Q. And what did you say during that discussion?

A. I told him that she was upset and that he should be mindful of how he presents things to the editors on his team.

Q. Did you say anything else to him?

A. Not that I can recall.

Q. What did he say, if anything, during this discussion?

A. I believe that he was apologetic.

Q. Anything else?

A. It was his belief that editors didn't always like being tied up in an edit room for so

long, so he felt like he was just giving them the option of not feeling like they had to accept every piece that they were requested on.

Q. During the discussion that you had with Mr. Richman, did you specifically say to him that Ms. Finkelstein had complained that he had made a comment to other editors that they didn't have to work with her?

A. Yes.

Q. And did he say that he made the comment or denied making the comment?

A. I don't recall.

Q. Do you think it's important if he said it or didn't say it?

A. I don't -- it's probably not appropriate to say in a public setting.

Q. Well, is it appropriate for editors to refuse to work with 60 Minutes producers?

A. Sometimes it is, and there are producers who don't want to work with certain editors, and we try to match up people who are compatible and who work well together. It goes both ways.

Q. Got it.

And how many people does Mr. Richman oversee?

A. A team of editors that -- I don't know. 15, maybe. I'm guessing at that number.

Q. And does -- do those editors only work for 60 Minutes, or do they work for other shows too?

A. They work just for 60 Minutes.

Q. Who does Mr. Richman report to?

A. Bill Owens.

Q. Did you discuss with Mr. Owens the concerns that Ms. Finkelstein had raised?

A. I believe I let him know.

Q. What did you let him know?

A. That she had come and raised this with me.

Q. Did you let him know that she had raised anything specifically?

A. I believe I told him what she had told me, and I told him that I would talk to Matt.

Q. And did you do this -- did you have one or more than one conversation with Mr. Owens about the concerns Ms. Finkelstein had raised to you about Mr. Richman?

A. Just one.

Q. And was -- how was that conversation had? Was it in person? Was it over the phone, some other way?

A. I don't recall.

Q. Was it in writing?
A. No.
Q. And what did Mr. Owens say to you after you described what Ms. Finkelstein had said to you about Mr. Richman?
A. I believe he said it was good that I was talking to Matt.
Q. Did you talk to HR about Ms. Finkelstein's concerns?
A. I don't remember, honestly.
Q. Okay. You said that -- and did you take any other steps in connection with Ms. Finkelstein's concerns other than what you've testified to?
A. No.
Q. Okay. Did you -- I think you testified that someone else -- Kara Vacarro raised concerns to you about Mr. Richman; is that correct?
A. Yes.
Q. And what is -- is Ms. Vaccaro still working for CBS?
A. She is.
Q. And what's her job there?
A. She is a planning producer.
Q. And approximately what -- how many

conversations did you have with Ms. Vaccaro about concerns she had about Mr. Richman?

A. Just one.

Q. And how was that conversation had? What was the manner?

A. It was in my office.

Q. And what did Ms. Vaccaro say to you about Mr. Richman?

A. She just didn't appreciate his tone when she requested an editor, and he told her that the person that she wanted wasn't available and she could just get started writing her script without an editor, because people did that all the time.

Or, sorry, not that people did it all the time, that a producer he was currently working had written her script before getting into the edit room.

Q. Did she say anything else to you about Mr. Richman?

A. Just that she didn't appreciate his tone and she told him.

Q. Did she say what she meant by "his tone"?

A. She just thought it was snippy and that her circumstance was much different than the other producer and they were two very different pieces.

Q. Anything else that she said to you?
A. Nope.
Q. And what did you say to her, if anything?
A. I said, "Thank you for telling me. I'm aware that he has," as I said before, "sort of people -- his people skills aren't the warmest."
Q. Did you say anything else to her?
A. No.
Q. Did you talk to Mr. Richman about this discussion you had with Ms. Vaccaro?
A. I did not.
Q. Did you talk to Mr. Owens about this discussion that you had with Ms. Vaccaro?
A. I did not.
Q. Did you talk to HR about this discussion you had with Ms. Vacarro?
A. I did not.
Q. And approximately when did you have this conversation with Ms. Vaccaro?
A. In the last three or four months.
Q. So in 2024?
A. Yes. Yes, yes.
Q. And was the discussion you had with Ms. Vaccaro before or after the discussion you had with Ms. Finkelstein?

A.     After.
Q.     Are you aware of any other complaints against Mr. Richman beyond what you've testified to?
A.     No.
Q.     Are you aware of any complaints against Mr. Richman by Ashley Velie?
A.     I believe she falls in the category when I said other people had raised things and I couldn't remember their names.  I think one of them might have been Ashley.
Q.     Are you aware that there was a group of producers who met and discussed concerns about Mr. Richman?
A.     Yes.
Q.     And how are you aware of that?
A.     Because I believe they told us.
Q.     Who's "they"?
A.     A group of producers, but I don't remember which ones were part of that group.
Q.     How many producers?
A.     I don't know.  A handful.
Q.     Was it five -- was it more than five?
A.     I don't know.
Q.     Was it more than ten?

A. I don't know.
Q. Is it possible that it was more than ten?
A. I don't believe it was, but I don't know for sure.
Q. Is it possible it was more than 20?
A. I don't know.
Q. And how was the information conveyed to you?
A. I believe it was on a Zoom or on a call.
Q. And were you on the Zoom or the call with this group of producers?
A. I believe so.
Q. And what was said about Mr. Richman during this Zoom or phone call?
A. The producers wanted clarity on the process of getting editors assigned to them because many of them felt like they weren't ever getting the person that they wanted, and that they were concerned that he had a system of favoritism.
Q. Did they say anything else?
A. And that they, again, didn't like his tone and thought he was condescending and snippy.
Q. And approximately when did this call take place?
A. Maybe in 2021-ish. I'm not entirely sure.

Q. And was any other -- was Bill Owens on this call?

A. I don't recall.

Q. Was HR on this call?

A. No. I don't believe so.

Q. And what did the producers say beyond what you've testified to, if anything, about Mr. Richman's tone? I think you said, they said he was condescending, he was snippy. Did they say anything else?

A. Not to my recollection.

Q. And did you do anything in response to this call?

A. I believe I had a conversation with Matt to better understand his processes for assigning editors, to see how he went about doing it.

Q. Anything else you did?

A. No.

Q. And did you have one or multiple conversations with Mr. Richman about this call?

A. I don't recall.

Q. And the conversation you do remember having with him, was it in person, was it by phone, was it in writing?

A. I don't think it was in person because I

think we were still in COVID.

Q. Do you think that it was in writing?

A. No. I believe it was either on the phone or by Zoom.

Q. Did you discuss in this conversation with Mr. Richman anything about his tone?

A. I don't remember.

Q. Did the Zoom call that you're referencing happen before or after Ms. Finkelstein's complaint to you?

A. I think before.

Q. Okay. Did you ever talk to HR about this Zoom call concerning Mr. Richman?

A. I believe so.

Q. And who did you speak to at HR?

A. I don't know. The HR partners have changed so much.

Q. Okay. Did you have one conversation or multiple conversations with HR about this Zoom call regarding Mr. Richman?

A. Just one.

Q. And was that -- was that a phone call or some other way of discussing the issue?

A. Well, we have regular meetings, so we just bring them up to speed on what's going on.

Q. And the regular meetings, who attends those?
A. Typically it's myself, Bill Owens, and one or two people from HR.
Q. When Ms. Cottone was in her role, was she one of the HR people who would attend those regular meetings?
A. No.
Q. No?
We haven't talked about Renee Balducci, but does -- did Renee Balducci work in HR?
A. Yes.
Q. Does she currently work in HR for CBS?
MR. ZUCKERMAN: Objection.
A. I believe for the company, but not for CBS News or 60 Minutes.
Q. Got it.
Did she at any point in time work for CBS News in an HR capacity?
A. Yes.
Q. And did she ever attend these regular meetings?
A. Yes. I believe they started with her.
Q. And who else from HR do you recall attending these meetings other than Ms. Balducci?

A. At that time, just her --
Q. Okay.
A. -- with Bill Owens.
Q. Got it.
And did that change over time?
A. Well, it changed over time to the extent that we just had different HR people --
(Simultaneous speakers.)
Q. Sorry.
And who are the other HR people?
A. The two that we're now working with are named William Riddick and Sheila Abner.
Q. When Ms. Balducci was attending those meetings, what was your understanding of her job?
A. That she was an HR representative and that 60 Minutes was one of the shows in her purview.
Q. And do you understand that she worked for CBS News and not 60 Minutes specifically?
A. Yes.
Q. And do you know what other shows were within her purview?
A. I don't.
Q. And Mr. Riddick, does he work for -- does he provide HR services for shows beyond 60 Minutes, to your knowledge?

A. Yes. Yes.
Q. And is the same true for Ms. Abner?
A. Yes.
Q. And so you believe that you spoke to HR during one of these regular meetings about the Zoom call with Mr. Richman; is that right? I mean the Zoom call about Mr. Richman.
A. Yes.
Q. And what did you say during that meeting about the call?
A. I believe I said that I'd had a conversation with producers who wanted to talk to me about the editor booking process, that there were a number of them who felt that they don't get the editors they want, and that they didn't always appreciate his tone.
Q. Did you say anything else?
A. Not that I can recall.
Q. And did you say anything specific about the concerns related to his tone?
A. Just what they had said.
Q. Meaning that some had complained he was condescending?
A. I don't know what words I used.
Q. But that's what you had said was said

during the Zoom call, correct?
A. That idea. I don't know if that specific word was used, but that was, I believe, a characterization.
Q. And to your knowledge, did HR take any action in response to what you told them about the Zoom call?
A. I don't believe so.
Q. And do you know why or why not?
A. I told them that I was going to talk to him to go over the processes to make sure -- or just to understand what they are. And my understanding was they didn't think there was anything particularly for them to do once we were addressing it.
Q. Were you addressing the tone concerns?
A. I was more directing the process to understand what the process was.
Q. You, I think, have said that you've received multiple complaints at this point about Mr. Richman's tone; is that right?
A. Yes.
Q. As you sit here today --
A. Yes. Yes.
Q. -- right, you've had the group call that you've testified to. You don't know how many

producers were on it, but it was multiple. You had the complaint from Ms. Finkelstein, and you had the complaint from Ms. Vaccaro, correct?

A. Yes.

Q. And they all brought up concerns about Mr. Richman's tone, as you've testified to?

A. Correct.

Q. Do you have any basis to believe that Mr. Richman's tone has improved since the concerns you've discussed with him?

A. Yes.

Q. And why do you say that?

A. Well, in part, because I haven't -- nobody has said anything to me in a while and, in part, I -- I'm sometimes copied on emails when he's assigning editors and I haven't seen anything that's concerning. And I'm confident that he is fair in assigning editors and does not have -- he goes out of his way to not be preferential.

Q. Ms. Vaccaro's complaint, you said, was three or four months ago?

A. Mm-hmm.

Q. And to your knowledge, has he received a verbal warning in connection with his conduct?

A. I don't know.

Q. And has he received a written warning, to your knowledge?
A. I don't know.
Q. Do you know if any disciplinary action has been taken against him?
A. I don't know.
MR. IADEVAIA: All right. Do you want to take a lunch break?
MR. ZUCKERMAN: Yes, but if we can keep it brief -- I don't think we need a long one.
MR. IADEVAIA: That's fine.
MR. ZUCKERMAN: A half an hour or so?
THE REPORTER: Can we go off the record?
MR. IADEVAIA: Yeah.
THE VIDEOGRAPHER: The time is 12:57 p.m., and this marks the end of Media Unit Number 2.
(Whereupon, a recess was taken at this time.)
THE VIDEOGRAPHER: The time is 1:51 p.m., and this begins Media Unit Number 3.

BY MR. IADEVAIA:

Q. Ms. Simon, you had mentioned before the lunch break multiple instances in which concerns were raised about Mr. Richman. Do you recall that testimony generally?

A. Yes.

Q. In any of those discussions that you were part of, did anyone ever describe Mr. Richman as being a bully?

A. No.

Q. And did anyone ever say that Mr. Richman had acted in an abusive manner?

A. No.

Q. Did anyone use words like "bully"?

A. No.

Q. Did anyone use words like "abusive"?

A. No.

Q. Okay. Is there somebody who works at 60 Minutes named Draggan Mahailovich?

A. Draggan Mahailovich, yes.

Q. Okay. And what's his job there?

A. He's a producer.

Q. And he works for 60 Minutes?

A. He does.

Q. Okay. And does he report -- what team is

he on?

A. He currently is a floater.

Q. Got it.

And how long has he been at 60 Minutes, do you know?

A. I don't know.

Q. Do you know if he overlapped when Ms. Poolos worked -- did they overlap?

A. Yes.

Q. Did he ever convey concerns to you about Mr. Richman?

A. I don't recall.

Q. Did he ever tell you about other employees' concerns about Mr. Richman?

A. Not that I can recall.

Q. Okay. Did you ever discuss concerns about Mr. Richman with the plaintiff, with Ms. Poolos?

A. Not that I can recall.

Q. Did you ever tell Ms. Poolos that you thought the complaints against Mr. Richman were unfair or a similar word?

A. I don't recall using that word.

Q. Okay. Did you express that word in sum or substance?

A. Not that I can recall.

Q. Did you ever say to anyone that you thought complaints against Mr. Richman were unfair or a similar word?
A. I don't think "unfair" characterizes what I think about them.
Q. Okay. And did you ever say to Ms. Poolos that you believe that folks who work with Mr. Richman need to take into account his personality?
A. I don't recall.
Q. Did you ever say that to anybody about Mr. Richman?
A. Possibly.
Q. Is there someone who works for CBS named David Levine?
A. Yes.
Q. And what is Mr. Levine's job?
A. He's currently an associate producer.
Q. And approximately how long has he worked at 60?
A. I don't know. 10 years, 15 years -- I'm not sure.
Q. Has he had any job at 60 other than associate producer?
A. He's been an associate producer in London

and then in New York. So in that context he's had two different locations. And now, in his role as associate producer, he does a lot of producing, but he still has an associate producer title.

Q. So, as an AP, he's doing some producer work now?

A. Mostly producer work now.

Q. Okay. And when did it become the case that he started to do mostly producer work?

A. I would say within the last two, three years.

Q. Did someone make a decision to have him do more producer work or mostly producer work?

A. Like many APs, he was given the opportunity to produce a piece on his own. And he did a good job with it and the correspondent he worked with, Jon Wertheim, wanted him to keep doing it. And it sort of went on like that.

Q. Do you have any role in deciding whether he would take on producer responsibilities?

A. Not in the decision. I'm aware of whether there are open positions and open heads, but I don't make that final decision.

Q. When you say "open decisions, open heads," what do you mean by that?

A. Like a vacant place on the org chart. There is room to promote someone or hire a new producer.
Q. To promote him from AP to producer?
A. Right, right.
(Reporter clarification.)
Q. And who does Mr. Levine report to?
A. Well, it's sort of split. On the org chart, to me, because he's still technically an AP.
Q. But you said "split," meaning between you and Mr. Owens?
A. In things like the review processes, I do the review and consultation with Bill because Bill screens the pieces that he's producing, so there's some overlap.
Q. Does Mr. Levine work for any other show besides 60 Minutes?
A. He does not.
Q. Are you aware of any complaints against Mr. Levine by CBS employees?
A. Yes.
Q. How many different complaints are you aware of?
A. I'm aware just in broad terms. They haven't been brought to me. More sort of in a

being told about them kind of way, once they'd happened. So I don't even know, honestly, who made them or how many there were.

Q. And what do you recall?

A. That there were instances of him, you know, raising his voice and getting agitated on shoots or in the office.

Q. Okay. And were those concerns raised to you more than once?

A. Well, they weren't raised to me as they were happening. It was just some sort of knowledge that I was given about him, that there had been issues raised.

Q. And who gave you that knowledge?

A. I think Bill Owens.

Q. And approximately when did Mr. Owens tell you this?

A. Sometime after 2019, when I got my job.

Q. After you were elevated to executive editor?

A. Yeah.

Q. And since then has anyone complained to you about Mr. Levine?

A. No one has complained to me about him. Somebody had heard that he had gotten agitated and

lost his cool on a shoot when logistics started going wrong, but nobody came and complained to me about it. It was sort of a hearsay kind of situation.

Q. Okay. How did you find out about this instance?

A. I don't remember who told me. I just -- somebody told me that they had heard this, and so I became aware of it.

Q. And when did the incident take place?

A. In the last year and a half.

Q. And what was the shoot?

A. It was a shoot in Mississippi on a blues story, and I think the character didn't show up or changed plans. And David was stressed and, from what I understand, had sort of an outburst.

Q. When you say "a character didn't show up," what does that mean?

A. I mean the person they were interviewing either didn't show up to the shoot or changed plans on them. Things weren't going as planned.

Q. What did you understand -- or what were you told about his outburst?

A. Just that he got angry, and had nothing more specific than that.

Q. Were you told that he yelled?
A. I think I was just told that he had an outburst and, like, lost it, but didn't -- it wasn't characterized. I don't know what he said or how he said it.
Q. Did you do any other additional inquiry or investigation into this incident?
A. I spoke with him and told him that I had heard this had happened, and that, as he knew, we had heard of other things. And he said that he was aware and he's working on it. And he'd hired a therapist and he was working on it and that it would never happen again.
Q. When did you have that discussion with Mr. Levine?
A. Within the last year, year and a half.
Q. And how did you have that discussion?
A. In person in my office.
Q. Did you take notes during the discussion?
A. No -- or not that I can recall.
Q. Did you tell Mr. Owens about the incident when you had heard about it?
A. I told him about it after I spoke with David.
Q. And the discussion you had with Mr. Owens

about the incident, how did that take place?
A. I don't recall.
Q. Did you take notes of the discussion with Mr. Owens?
A. No.
Q. Did you send anything in email or text message to Mr. Owens about it?
A. I don't remember.
Q. It's possible that you did?
A. It's possible, but I don't -- I don't recall.
Q. Did you talk to HR about this incident?
A. I don't -- I don't believe so.
Q. And why not?
A. Well, for one, nobody complained to me about it. It was a hearsay kind of thing. And I spoke with him directly, and it was my sense that he was dealing with it and knew that he was on notice. He knew that we knew.
Q. Did you issue a written warning to him?
A. No.
Q. Did he get placed on a paid administrative leave?
A. No.
Q. Did he get placed on an unpaid

administrative leave?

A. No.

Q. And he hasn't -- he's not losing his job because of that incident, correct? He's still working there?

A. He's still working there.

Q. And that's about a year, year and a half ago?

A. And I've heard of no other incidents regarding him.

Q. Okay. So I want to talk about the discussion you had with Mr. Levine after hearing about this incident. Can you tell me everything that you said to him, please?

A. I told you what I said to him, which is that I had heard there had been an issue on a shoot, and he said that would never happen again. And he knows that he has to deal with his issues, and that he's seeing a psychiatrist or a therapist and working on it and it would never happen again. And to my knowledge, it hasn't.

Q. And I think you said before that you had told him you had heard of this happening before, correct?

A. Right. I had been told not by anybody who

complained about him but just that there had been an occasion or two where he had been overheard or somebody had said he'd done it. I don't know how it got reported or by whom.

Q. Did you give him anything more specific during the discussion with Mr. Levine?

A. No, because I didn't know the specifics.

Q. And did Mr. Levine -- well, tell me everything Mr. Levine said in response if there's anything other than what you've testified to.

A. What I've -- what I've testified to.

Q. When you said that -- I think you said he sees a therapist. Did he tell you what he sees a therapist for?

A. No, my -- the suggestion was that it was to help him deal with the stress that builds up on -- you know, in his job and other -- you know, I didn't ask. He said he was seeing someone to, quote, deal with it, so that's what I took.

Q. Did you understand him to be saying that he was seeing a therapist to deal with anger management issues?

A. Partially.

Q. Is there someone who works for 60 Minutes named Sharyn Alfonsi?

A. Yes.
Q. And who is she?
A. She's a correspondent.
Q. And does she work exclusively for 60 Minutes, or does she work for other shows?
A. Just 60 Minutes.
Q. And who does she report to?
A. Bill Owens.
Q. And approximately how long has she been on the show?
A. Well, she was there when I got my job, so I would say maybe eight years. I'm not -- I don't know.
Q. And has Ms. Alfonsi, to your knowledge, ever made a complaint about Mr. Levine?
A. Yes. I believe she might have been the person who told me about that incident in Mississippi.
Q. Had she ever raised any other concerns about Mr. Levine?
A. Not to me.
Q. And what did Ms. Alfonsi say beyond what you've already testified to?
A. What I've testified to, and I believe she told me that she also had a talk with him.

Q. And what did she say she said to him?
A. She didn't. She said that she was going to have a talk with him. And I don't know if she did.
Q. And in the conversation you had with Ms. Alfonsi, did she bring up any prior concerns about Mr. Levine's conduct?
A. I don't remember.
Q. Was Ms. Alfonsi in Mississippi at the time this incident took place?
A. She was not.
Q. And was -- was Mr. Levine doing work for Ms. Alfonsi in connection with this Mississippi story?
A. He was not.
Q. Did Ms. Alfonsi tell you how she had heard about this incident?
A. I don't remember. Her assistant was filling -- was playing the associate producer role -- was acting as his associate producer on that story.
Q. And who is that person?
A. Her name was Elizabeth Germino.
Q. And, I'm sorry, what's Ms. Germino's position?
A. She was Sharyn Alfonsi's assistant as well

as Jon Wertheim's assistant, and she occasionally worked on stories, and that's one of the stories she worked on.

Q. Was Ms. Germino in Mississippi during the shoot?

A. Yes.

Q. Is it your understanding that Mr. Levine screamed at Ms. Germino?

A. I don't know the circumstance of his outburst.

Q. And was it Ms. Germino who raised the concerns to Ms. Alfonsi?

A. I don't know.

Q. I think you -- you talked earlier about a producer named Nichole Marks, correct?

A. Mm-hmm.

Q. And she currently works for 60 Minutes; is that right?

A. She does, yes.

Q. And how long has she been there?

A. She came as an associate producer -- I don't know when she started. Maybe in, I don't know, 2012, 2011, 2012. Something like that.

Q. And did Ms. Marks ever complain to you about Mr. Levine?

A. No.
Q. Did you ever hear anyone talk about Ms. Marks having concerns about Mr. Levine?
A. When I said that I had heard that there had been concerns, that, I think, was among them, but I didn't speak with her about that.
Q. Okay. And as it relates to Ms. Marks, what did you hear about Mr. Levine?
A. Nothing specific, that he could be heard raising his voice on the phone.
Q. In conversations with Ms. Marks?
A. It wasn't specified.
Q. Anything else that you were told about Mr. Levine and Ms. Marks?
A. No.
Q. And how did you -- who told you about the concerns that Ms. Marks had?
A. I don't recall who told him. It was something that I heard. I don't remember who told me.
Q. And did you hear about it for the first time when you spoke to Sharyn Alfonsi, or you had heard about that earlier?
A. I had heard about it earlier.
Q. And did you do anything after learning

about this concern Ms. Marks had?
A. I wasn't in my role during that time, so there was nothing for me to do.
Q. And approximately when was that, that you found out?
A. It's just something I sort of knew. I don't know when I found out or who told me.
Q. And when you spoke to Mr. Levine within the last year or year and a half, were you referencing this issue with Ms. Marks as sort of we're aware of prior conduct?
A. Just generally speaking.
Q. You mentioned Jon Wertheim.
A. Mm-hmm.
Q. And, I'm sorry, Mr. Wertheim is a correspondent?
A. A correspondent.
Q. And he reports to Mr. Owens?
A. Yes.
Q. And how long has he been on the show?
A. Same amount of time as Sharyn. They both came over from 60 Minutes Sports. So 2017, '18, something like that.
Q. And did Mr. Wertheim ever complain to you about Mr. Levine?

A. No.

Q. Did anyone ever tell you that Mr. Wertheim had complained about Mr. Levine?

A. No.

Q. Is there someone who works on the show named Will Croxton?

A. Yes.

Q. And what's Mr. Croxton's job?

A. He works on the digital 60 Minutes Overtime team.

Q. And does he have a title that you know of?

A. I believe he's now digital producer.

Q. And who does he report to?

A. He reports to Matt Polevoy.

Q. And who does Mr. Polevoy report to?

A. Bill Owens.

Q. And how long has Mr. Croxton been at CBS?

A. I don't know.

Q. Did he overlap with Ms. Poolos?

A. Yes.

Q. Do you think he's been there for more than 10 years?

A. Yes.

Q. And does Mr. Croxton do work for any show other than 60 Minutes?

A. No. Just 60 Minutes Overtime.

Q. And what's 60 Minutes Overtime?

A. It's a digital companion show to 60 Minutes.

Q. Are you aware of any complaints against Mr. Croxton?

A. I vaguely remember having conversations with Alex Poolos about Will Croxton. And as I testified to before, there were issues on the digital unit when the members of the team were complaining to me about their -- the person they reported to, Ann Silvio.

Q. The issues that you had with the digital unit, though, those were not complaints about Mr. Croxton, were they?

A. They didn't initiate as being complaints about Mr. Croxton. Ann had concerns about his work product and initiative.

Q. Did Ann raise concerns about his temper?

A. Not that I remember.

Q. Did she raise any concerns about his tone?

A. I don't remember. It was a dysfunctional unit at the end, though, so, honestly, I don't know who was raising complaints about whom by the end.

Q. Okay. And you mentioned that you had a

conversation or conversations with Ms. Poolos about Mr. Croxton; is that right?

A. I do, yes.

Q. Okay. How many such discussions did you have with Ms. Poolos?

A. Several, I believe.

Q. When was the first one, approximately?

A. I don't know the date. It was around a story she was producing about a Russian intelligence person named Maria Butina. So whatever year that was, it was around that one.

Q. Okay. What was the discussion you had at that time?

A. He was functioning as her associate producer on the story, and to my recollection she wasn't happy with the quality of his work. She wasn't happy when he took some initiatives to do things on his own. I just don't think she thought that it was working as well as it could with an associate producer, that he might have been, like, out of his league on that story.

Q. Did Ms. Poolos raise any concerns about Mr. Croxton's tone?

A. I know that she put them in the complaint. I don't remember specifically that part of the

conversation beyond, I think, general misunderstandings about how certain parts of the job were supposed to be done. But I don't specifically remember that.

Q. Well, let me ask you a different way.

You said that you had several conversations with Ms. Poolos about Mr. Croxton, correct?

A. Mm-hmm.

Q. Other than what you've testified to, what else did you discuss with her in those conversations about Mr. Croxton?

A. I think I remember she was saying she wasn't sure that she wanted to go forward on the story with him. But he was already on it, so -- you know, they were already working on it. I remember her being uncomfortable that he was, I think, developing a rapport on his own with the main character.

Q. Anything else you recall?

A. Nope.

Q. Did Ms. Poolos raise concerns that -- about Mr. Croxton's temper in any of those discussions?

A. Not that I remember specifically.

Q. Did Ms. Poolos raise concerns that Mr. Croxton was insubordinate?

A. I think when I talk about her concerns about his work product and lack of initiative, I think it's in that context, asking him to do things that maybe he didn't do or follow through on.

Q. Did you ever have a discussion with Ms. Poolos about Mr. Croxton in connection with a story or part of a story dealing with a federal prison?

A. That was that story.

Q. The story that was --

(Simultaneous speakers.)

A. Yes. Yes.

Q. -- Ms. Butina...

And did you ever ask or tell Ms. Poolos that she needed to bring Mr. Croxton into a federal prison?

A. Could you repeat that?

Q. Sure.

Did you ever ask or direct Ms. Poolos to bring Mr. Croxton into a federal prison for the purposes of the segment, the story?

A. Well, if they were interviewing somebody in a federal prison, then it would make sense that her associate producer would go on the shoot. It's not

mandatory, though.

Q. But did you ask her to do that or instruct her to do that?

A. I don't recall.

Q. Did you say to Ms. Poolos, in sum and substance, that you were afraid he would get upset if he could not be there?

A. I don't remember saying that specifically. Associate producers often do get offended or feel left out if they don't get brought along on shoots. So that's not an uncommon reaction for someone to have.

Q. Did you say to Ms. Poolos in sum and substance that he would lose his mind if he could not be present at the shoot in the prison?

A. I don't remember.

Q. Is it possible you said that?

A. It's possible.

Q. Was there ever a discussion you had with Ms. Poolos about whether Mr. Croxton would be the primary associate producer on a story?

A. Well, he was the primary associate producer on the story.

Q. Did you ever have a discussion -- and what story are you talking about? Are you talking

about --

A. The Butina story, yes.

Q. The Butina story.

And did you ever ask Alex to tell Mr. Croxton that, in fact, he would not be the primary associate producer on that story?

A. Possibly, but I don't remember.

Q. Did you say to Ms. Poolos that you wanted Ms. Poolos to be the one to ask him because you were afraid of him getting angry at you?

A. I don't remember that.

Q. Is it possible you said that?

A. I suppose, but I don't remember.

Q. Did you ever say to anyone that you were afraid of Mr. Croxton getting angry?

A. No.

Q. Did you ever say words like that?

A. Not that I remember.

Q. Did you ever have any discussions about Mr. Croxton being hostile with anybody?

A. Outside of the context of the HR investigation that I told you about previously with the digital unit, no.

Q. Okay. And going back to the digital unit and that investigation, what did you say about

Mr. Croxton -- or what did you discuss about Mr. Croxton being hostile?
A. I don't know that it was specifically about him. There was, at that point, hostility all around in that unit because nobody was -- it just wasn't functioning well, which is one of the reasons that I was brought on.
Q. Did you ever get any discussions or get any complaints that Mr. Croxton was challenging to manage?
A. Yes.
Q. By whom?
A. Well, by Ann Silvio, who was his former supervisor.
Q. Anyone else?
A. And -- I wouldn't say hard to manage. No.
Q. Did you have discussions about any challenges related to managing Mr. Croxton with anyone besides Ann Silvio?
A. Yes, with his current supervisor.
Q. And who's that?
A. Matt Polevoy.
Q. How many discussions have you had with Mr. Polevoy about managing Mr. Croxton?
A. Not many. A couple.

Q. And when did those conversations take place?
A. Over the last year and a half or so.
Q. And did you -- the conversations you had, were they in person, over the phone, some combination?
A. Some combination.
Q. Did you take notes of any of those discussions?
A. No.
Q. And tell me everything you recall about those discussions with Mr. Polevoy about managing Mr. Croxton.
A. They were performance-related. He was saying that sometimes it was a scramble to meet a deadline or that he didn't always take enough initiative to get started. There were those kinds of complaints. They weren't about temperament. They were really about initiative and working a little bit more quickly.
Q. And beyond what you've testified to today, did you have any discussions or receive any complaints about Mr. Croxton getting angry?
A. Not that I remember.
Q. And any discussions or complaints about him

not following instructions?
A. Only in the examples that I've given you.
Q. Yeah. And I'm sorry, for these questions, I mean beyond what you've already testified to.
A. No.
Q. And beyond what you've testified to, any discussions or complaints about Mr. Croxton being insubordinate?
A. No.
Q. About him bullying others?
A. No.
Q. About him engaging in any discrimination?
A. No.
Q. And about him retaliating against anyone?
A. No.
Q. Did Mr. Croxton get promoted?
A. He did.
Q. And what was he promoted from and to?
A. He was promoted from a digital producer and editor to a digital producer.
Q. And who made the decision to promote him?
A. Matt Polevoy.
Q. And did you have any involvement in that decision?
A. Yes.

Q. And what was your involvement?
A. He -- Matt kept me apprised of the candidates he'd interviewed. He told me that he gave Will a number of sort of tryout possibilities, to do pieces on his own. And so I kept -- I was sort of kept abreast of the process.
Q. And did you have any input as to whether he should be promoted or not?
A. No.
Q. Did you make any recommendation?
A. No.
Q. And did -- to your knowledge, did Mr. Owens have any input into the promoting decision?
A. I don't know.
Q. And when did the promotion happen?
A. I believe it was sometime in '24.
Q. 2024?
A. Yeah, 2024-ish. It could have been '23. I think it was '24.
Q. Have you ever had a conversation with anybody in HR about Mr. Croxton?
A. To my recollection, not outside of the digital unit issues that arose earlier.
Q. Did you ever have a conversation with -- well, strike that.

Is there someone who works for a show named Rich Bonin?
A. Yes.
Q. And what's his job there?
A. He's a producer.
Q. And does he work exclusively for 60 Minutes?
A. Yes.
Q. And does he report to Mr. Owens?
A. Yes.
Q. And has he been with the show for more than 10 years?
A. Yes.
Q. Did you ever talk to Mr. Bonin about hiring Mr. Croxton as an AP on the broadcast?
A. I recall that Will had applied for some AP positions when they had become open. I don't recall specifically talking to Rich about him.
Q. And were one of the available positions that you recall an AP position with Mr. Bonin?
A. Well, if he -- if -- I mean, he did hire somebody a few years ago, so that would make sense.
Q. And it wasn't Mr. Croxton, correct?
A. He did not hire Mr. Croxton.
Q. And did you ever suggest or recommend or

tell Mr. Bonin not to hire Mr. Croxton as an AP?
A. I don't remember telling him not to hire him. I did not believe that he had the requisite reporting experience to be an AP on the kinds of stories that Rich does.
Q. Did you say that to Mr. Bonin?
A. I don't recall that it was Mr. Bonin, specifically, that I said it to. If that was the person Will interviewed for, then I would have said it to him. If it was another producer, then I would have said it to them. I don't remember who it was, specifically.
Q. Did you ever suggest that a producer not hire Mr. Croxton due to concerns about his temper?
A. No. It was purely his experience.
Q. And did you ever recommend not hiring Mr. Croxton because of his anger -- concerns about his anger?
A. No.
Q. Is there someone who works for the show named Nathalie Sommer?
A. Yes.
Q. And what does she do?
A. She's a producer.
Q. And who does she work for?

A. She works for Jon Wertheim.
Q. And how long has she been on the show, approximately?
A. Well, she was an AP years ago, so a long time. I can't tell you.
Q. Mm-hmm.
A. But at least 10, 15 years.
Q. And in her capacity as a producer, she reports to Mr. Owens?
A. Yes.
Q. And did she ever report to you as an AP, or she's only been a producer?
A. She's only been a producer.
Q. Since you were executive editor?
A. Yes. Yes.
Q. Okay. Did Ms. Sommer ever complain to you about Mr. Croxton?
A. Not that I can recall.
Q. Are you aware of complaints by Ms. Sommer about Mr. Croxton?
A. No.
Q. Are you aware of a complaint by Ms. Sommer that Mr. Croxton slammed a door in her face?
A. I'm not.
Q. We talked about Ms. Alfonsi previously.

A. Mm-hmm.

Q. Has she ever complained to you about Mr. Croxton?

A. No.

Q. Are you aware of any complaints by Ms. Alfonsi about Mr. Croxton?

A. No.

Q. And are you aware of any complaints by Ms. Marks about Mr. Croxton?

A. No.

Q. Did there used to be someone who worked for the show named Ira Rosen?

A. Yes.

MR. ZUCKERMAN: Before we move to the next topic, can we take a break? I mean, it is stifling in here.

MR. IADEVAIA: Sure.

MR. ZUCKERMAN: Just for the record, it is 76 1/2 degrees in the room we're in next door. And it has only 3 people in it and not the equipment. And I notice that your thermostat is busted in here. But this is -- it's getting to the point of being, for me, intolerable.

So I don't know if we can get

someone from the building or some type of temporary unit in here, but it's -- it's rough.

MR. IADEVAIA: I'm sorry for that. Can we go off the record?

THE VIDEOGRAPHER: The time is 2:28 p.m. We're off the record.

(Whereupon, a recess was taken at this time.)

THE VIDEOGRAPHER: The time is 2:50 p.m., and we're back on the record.

BY MR. IADEVAIA:

Q. Ms. Simon, did someone named Ira Rosen used to work for CBS?

A. Yes.

Q. And do you know approximately what period of time he was there?

A. Seemingly forever.

Q. Was he at CBS when you joined?

A. Yes.

Q. And do you know approximately --

A. Actually -- sorry.

Q. That's okay.

A. He took a break at some point to go to ABC and at some point he came back, and I don't know at

which point which happened. But he was certainly there while I was there. I don't know if he was there right when I got there, but he had been before.

Q. Got it.

And do you know approximately when he left CBS?

A. Sometime in 2019 after Bill took over -- after Bill Owens took over.

Q. And what were the circumstances of Mr. Rosen's departure?

A. I'm not certain on the circumstances. Just Bill arrived and Ira left not long after.

Q. Do you know if Mr. Rosen left voluntarily or involuntarily?

A. Not beyond speculation.

Q. Were you involved in any discussions about --

A. No.

Q. -- keeping Mr. Rosen?

A. No.

Q. Okay. What was Mr. Rosen's job at CBS?

A. He was a producer for 60 Minutes.

Q. And when you and he overlapped, who did Mr. Rosen report to?

A. Bill Owens, and Jeff Fager previous to Bill, and Don Hewitt previous to Jeff.
Q. So whoever was in the executive producer role?
A. Yes. Yes.
Q. Got it.
And was there a period of time when Mr. Rosen was a producer at 60 Minutes and Mr. Owens was the executive editor at 60 Minutes?
A. Yes.
Q. To your knowledge, did Mr. Rosen do work for any show at CBS other than 60 Minutes?
A. Not to my knowledge, no.
Q. Are you aware of any complaints against Mr. Rosen by CBS employees?
A. Yes.
Q. What complaints are you aware of?
A. There was one complaint that I was aware of from his associate producer.
Q. And who is that person?
A. Her first name was [redacted] I don't know -- I don't remember her last name.
Q. Is it [redacted]
A. Yes.
Q. And you said Ms. [redacted] was Mr. Rosen's

AP; is that right?

A. Yes.

Q. And do you know for what years approximately she was his AP?

A. She wasn't his AP anymore at the time that he left, so previous -- previous to his departure, she stopped working for him. I'm not sure what the actual time frame was.

Q. During the period that Ms. [redacted] was Mr. Rosen's AP, do you know who she reported to?

A. I believe she would have reported to Bill Owens at that time, possibly Patti Hassler before him, depending on how long she was there.

Q. And what is your understanding of Ms. [redacted] complaints -- or complaint or complaints against Mr. Rosen?

A. Just what I read in the press about it.

Q. And what did you read in the press?

A. That she wore a dress and he asked her to twirl in it to see how it looked.

Q. Did you ever hear that Ms. -- that Ms. [redacted] had complained that Mr. Rosen had touched her without her consent?

MR. ZUCKERMAN: Objection, form.

You can answer.

A. I didn't hear anything beyond what was in the papers, and I don't remember that specific complaint or allegation.
Q. And are you aware that Ms. [redacted] filed a complaint against CBS with the Equal Employment Opportunity Commission?
A. Yes.
Q. And how are you aware of that?
A. I read it.
Q. You read it in the press?
A. Yes.
Q. Okay. Did you discuss it with anybody at CBS?
A. I don't think so, no.
Q. Did you discuss any of Ms. [redacted] complaints with anyone at CBS?
A. No.
Q. Did you ever read the EEOC filing that Ms. [redacted] made against CBS?
A. Possibly. Certainly a description of it in the press. I don't recall if I read the actual complaint.
Q. And Ms. [redacted] no longer works for CBS, correct?
A. Correct.

Q. Do you know about the circumstances of her departure?
A. I don't.
Q. Are you aware of any other complaints against Mr. Rosen?
A. I'm not.
Q. Are you aware of a complaint against Mr. Rosen by [REDACTED] [REDACTED]
A. I know she was his AP. I don't recall that she complained about him.
Q. Okay. Does Ms. [REDACTED] currently work for CBS?
A. She does not.
Q. Do you know approximately when she did?
A. Like mid-2000s, I think.
Q. And did you ever speak to [REDACTED] about any concerns she had related to Mr. Rosen?
A. I did not.
Q. Do you know how long you worked with Ms. Poolos at 60 Minutes, how long you overlapped with each other?
A. I don't know what year she started.
Q. Do you know what her position was when she started?
A. When she started?

Q. Yeah.
A. She, to my understanding, was an associate producer.
Q. Got it.
And can you remind me, when did you go from associate producer to producer?
A. In sort of the 2007-ish kind of range.
Q. And when Ms. Poolos joined CBS, do you know, was she part of a team?
A. She was part of a team.
Q. And what team was she part of?
A. Lesley Stahl's team.
Q. And do you know which producer she worked with?
A. Shachar Bar-On.
Q. During the time Ms. Poolos worked for CBS, was she promoted, to your knowledge?
A. Yes.
Q. And what was she promoted to?
A. Producer.
Q. And do you know what year she was promoted to producer?
A. I don't.
Q. Was it before you became executive editor?
A. I believe so, yes. Yes.

Q. Did you have any input in the decision whether to promote Ms. Poolos or not?
A. No. No.
Q. Since you've been executive editor, how many APs have been promoted to producer?
A. So, since 2019?
Q. Yeah.
A. Okay. Let me think about that for a minute.
Q. Sure.
A. I'm going down the personnel list. I can think of at least three off the top of my head, others who are producing without having a formal promotion yet.
Q. Okay. Who are the three that you can think of off the top of your head?
A. Lucy Hatcher, Natalie Peel, P-E-E-L, though she had been an associate producer, left and then came back as a producer, so -- and she left before getting promoted, if you want to be technical about it.
(Court reporter clarification.)
A. Oh, sorry. He left to go produce somewhere else, and then came back to us as a producer, so she left before getting promoted.

I said Lucy. Ayesha Siddiqi. I know there's somebody else. I need to just think who that is.
Q. We can come back to it. If you remember, just let me know.
A. Yeah. Yeah, I will.
Q. Before being promoted to producer, how long had Lucy been at the show, do you know?
A. At least -- at least five or six years, I believe.
Q. And what about Natalie Peel?
A. She had been there for a good amount of time. She went to NBC, and then she came back as a producer.
Q. So she's the person that was not promoted by CBS, correct?
A. Well, she was promoted by us, because when she left us, she was an AP and when she came back we made her a producer, but she had left in between.
And Ayesha Siddiqi had been an AP. First we promoted her to be a producer on a digital show that we'd started, and then she was promoted to producer on the Sunday show.
Q. How long had she been at the show before

her promotion?

A. I don't know when she started, honestly.

Q. And what -- is there a process for an AP who wants to be promoted to producer to go through for that to happen?

A. Yes.

Q. And what's that process?

A. Typically they produce a story, or a few, on their own in their capacity as an AP. They figure out a convenient time to do it, with the sign-off of the producer they're working with and obviously the correspondent, because that correspondent typically is the correspondent they do it with.

And depending on how that goes and depending on whether there are any open slots, you know, depending on a lot of factors, it can happen.

Q. And do you think it's prestigious to be a producer at 60 Minutes?

A. I do.

Q. Why do you think it's prestigious?

A. I think it's a highly -- it's a highly successful, highly admired show that does very good journalism, and there aren't that many shows left that do those kinds of stories.

Q. Do you have any idea who made the decision to promote Ms. Poolos to producer?
A. I don't.
Q. When -- strike that.
Are the producers at 60 Minutes, currently in producer roles, do they have contracts?
A. Yes.
Q. And are those contracts for a specific period of time?
A. Yes.
Q. And are you involved at all in whether to renew or not renew the contracts of producers?
A. No.
Q. Do you know who makes those decisions?
A. Bill Owens.
Q. Anyone else you know of?
A. I would imagine he speaks to the correspondents on whose team the producers are.
Q. And since you've been executive editor, have you been involved in any discussions about whether to renew a producer's contract for 60 Minutes?
A. Yes.
Q. And whose -- which producers?
A. A producer named Katherine Davis, a

producer named Sam Hornblower. We're currently having conversations about certain people.

Q. In terms of Ms. Davis, what role did you have in that process?

A. In terms of decision-making?

Q. Yeah.

A. No role.

Q. Okay. And were you involved in discussions about whether to renew or not renew her contract?

A. Yes.

Q. And did you give a recommendation or any input as to your view as to whether the contract should be renewed?

A. No.

Q. And was her contract renewed?

A. Well, she's no longer there. I don't know whether it was a contract renewal or -- I don't know the -- technically how she left, but she's no longer there.

Q. And were you involved in any discussions about her performance around the time of the contract renewal?

A. Yes, about her productivity.

Q. Okay. And what were those discussions?

A. That she wasn't productive.

Q. And did that have anything to do with the decision not to renew her, if you know?
A. Yes.
Q. And how do you know that?
A. Because one of the things I did was count up how many stories she'd done, and it was way below the bar.
And I was on a call with her and with Bill Owens, or on a Zoom, rather, where he spoke with her about her performance, and it was entirely about performance and productivity.
Q. Did Ms. Davis, to your knowledge, ever make a complaint of discrimination?
A. I don't know. I don't believe so.
Q. And during the time that you were executive editor -- if I asked this, I apologize -- but was Ms. Poolos's contract renewed?
A. I don't know.
Q. Were you involved in any discussions about whether to renew Ms. Poolos's contract?
A. No, not that I'm aware of -- not that I remember, rather.
Q. And do you know who made the decision to renew --
A. Bill Owens.

Q. -- Ms. Poolos's contract?
A. Sorry.
Bill Owens makes the decisions about renewing producer contracts.
Q. Okay.
MR. IADEVAIA: I'm going to mark a document. Could we get one, two -- we can mark this as Simon's Exhibit 1, please.
(Simon Exhibit 1, CBS1-CBS12, was marked for identification.)
Q. So what's been marked as, for the record, Simon's Exhibit 1 is a document Bates-stamped CBS 1 through CBS 12.
And if you look at the top, it says "CBS News, Inc., Staff Agreement."
Do you see that?
A. Yes.
Q. And then it says, "Agreement made as of May 30, 2021, by and between CBS News, Inc.," and then there's an address, "and Alexandra Poolos."
Do you see that text?
A. Yes.
Q. Okay. And if you need a second to look at it. But do you understand this to be Ms. Poolos's contract with CBS News?

A. Yes.

MR. ZUCKERMAN: Objection.

Q. And as I read, the date is May 30th, 2021, correct?

A. Yes.

Q. Okay. So at that point in time, you were executive editor for 60 Minutes?

A. Yes.

Q. And does this at all refresh your recollection as to whether you were involved in discussions about whether to renew Ms. Poolos's contract?

A. No.

Q. Okay. And did you have discussions with Mr. Owens about Ms. Poolos's performance in 2021, do you recall?

A. I don't recall if it was in 2021, specifically. We had discussions about her productivity. I had discussions with Lesley Stahl about her performance and productivity.

Q. And when did you have those discussions?

A. I believe sometime in 2021 time frame.

Q. Okay. And you don't recall if it was before or after Ms. Poolos's contract was renewed?

A. I don't recall.

Q. And May 30th would have been after the completion of that season, correct?
A. Yes.
Q. So as of May 30th, 2021, Mr. Owens and others at 60 Minutes would have been aware of Ms. Poolos's productivity, correct?
A. Yes.
Q. For that season, that prior season?
A. Yes.
Q. All right. You said you had discussions with Mr. Owens about Ms. Poolos's performance. Tell me about those discussions.
A. I don't remember them being extensive discussions. It was just on our radar when producers underperformed in terms of the number of stories they produced. We kept track of how many stories each producer did, and she was consistently under that number.
Q. And did you ever communicate any concerns about Ms. Poolos's production to her?
A. I did.
Q. You did? And how many times did you do that?
A. I believe once.
Q. And when did you do that?

A. I believe that it was -- I'm not entirely sure. It might have been around the time she was interviewing AP candidates. I don't know when it was. I know that I had the conversation with her.

Q. Okay. And I think you said you spoke to Ms. Stahl about Ms. Poolos's performance, right?

A. Yes.

Q. How many times did you have a discussion with Ms. Stahl about Ms. Poolos's performance?

A. Once.

Q. And when was that?

A. It was sometime in 2021.

Q. And what was the discussion?

A. Lesley had called me to say that she wasn't happy with Alex's productivity, she didn't produce enough stories, and the stories that she did produce took too much work by Lesley in the edit room, that the scripts required too much assistance and it took too long.

Q. And do you know if Ms. Stahl spoke to Ms. Poolos about this concern -- or these concerns?

A. I don't know. She asked me if I would say something.

Q. And was that the reason you spoke to Ms. Poolos?

A. Yes, I believe so.
Q. Okay. Any other discussions you had about Ms. Poolos's performance beyond what you've testified to?
A. With Bill and Lesley?
Q. With anyone.
A. Not formal conversations, you know, like that.
Q. Did you have any discussions with Ms. Poolos about her performance other than the productivity one you've just described?
A. In terms -- we're talking performance. Can you explain what you mean?
Q. Well, what's the hesitation? Did you have other kinds of concerns about Ms. Poolos that you don't think qualify as performance?
A. I had one conversation with her that I'm not sure qualifies as performance. It could qualify more as temperament or work style.
Q. And when was that?
A. At the time that she was interviewing candidates to be her associate producer.
Q. Okay. Who was present for that conversation?
A. Just the two of us.

(Reporter clarification.)

A. Sorry.

Just the two of us.

Q. And how did you have that conversation?

A. On the phone.

Q. And what did you -- what did you say? What did Ms. Poolos say?

A. I recall it being a very friendly conversation and I just gave her sort of the guidance to be mindful of not being as sort of top-down in her treatment of her APs. There was a sense of rigidity, and as she was hiring someone new, to be mindful of not being as -- the only way I can think of it is sort of top-down.

Q. And you said this conversation you had with her around the time that you -- that Ms. Poolos hired Ms. Richards?

A. Was in the process of interviewing candidates where ultimately she hired Collette.

Q. And before you had the discussion with Ms. Poolos, had you spoken to Mr. Owens about your feedback?

A. I don't believe so. But I'm not sure it was. I don't remember.

Q. And had you spoken to HR about these

concerns?

A. I don't -- I think that I did, to make sure it was okay for me to raise something and how to raise it.

Q. And who did you speak to at HR?

A. It was either HR or the people in recruiting. I don't remember. I think it was HR. It would have been either Maria or Renee at that point, I think.

Q. And what do you think you said to either Maria, Renee, or recruiting?

A. I believe I asked if it was okay to give that kind of feedback.

Q. And what were you told?

A. I believe I was told yes, since I gave it.

Q. Got it.

And is that feedback that you gave to Ms. Poolos in writing anywhere?

A. No. I don't believe so.

Q. And was there any other time you had any discussions with Ms. Poolos about that type of feedback or her performance other than what you've testified to?

A. No, not that I recall.

Q. Okay. And what was the basis for that

feedback that you gave around the time that Ms. Poolos was filling her AP open position?

A. I think it was based partly on conversations I had had with her, based on what she was looking for in an AP and how she ran her team, and partly what I had heard about her and how she ran her team.

Q. Okay. What had you heard about Ms. Poolos? And we're talking as of the time frame that you had this discussion with her.

A. Yes. Yes.

That she was very rigid, that APs who worked with her didn't feel like they had any flexibility or independence, and that it was a very, as I mentioned before, sort of top-down relationship.

Q. Did you speak to any APs directly that expressed those concerns?

A. I don't recall if I spoke to APs directly or if it was, you know, reputational and heard it. I don't remember.

Q. Do you remember any specific conversations you had where you learned the information about Ms. Poolos being either rigid or lack of flexibility with her APs or top-down approach?

A. Well, I recall conversations about it after the fact, but I don't know what specific conversations I had, you know, leading up to it. But I do think a good amount of it came from her and her description of how -- you know, what she expected from her APs.

Q. What did she expect?

A. That they be there at a certain time, that they check in with her all the time, that they not talk to Lesley without her being there. It just seemed a little more sort of controlling than I guess I was used to.

Q. When Ms. Poolos was an AP, did you work with her?

A. No.

Q. And when she was a producer, did you work with her?

A. Once I became executive editor, then I would have been involved in, you know, vetting her stories and approving them, so in that context. And then during the hiring process, we consulted, and for some other things, too.

Q. Did you think any of the stories that she produced or was part of producing as either an AP or a producer were good?

A. Yes. Absolutely.
Q. Which stories did you think were good?
A. I thought that her -- the story she did about women soccer players in Iran was really good. She did that for 60 Minutes Sports. I thought her story about -- stories about Navalny, Alexei Navalny, were really good and really prescient.
(Reporter clarification.)
Q. Any other stories that you thought were good?
A. I thought that her story about -- I thought her story about Maria Butina was good and original.
Q. Any others?
A. Not that stand out.
Q. Did she do a story about -- and I may be mispronouncing this -- The Chibok Girls?
A. Mm-hmm.
Q. Yeah? Was that -- do you think she did a good job on that story -- strike that.
Do you think the story came out well?
A. I thought it was fine.
Q. Talking about the Iran soccer story, did you make a comment to the effect of -- that the story was the benchmark for sports stories?
A. I don't know if I used that word, but it

was a really good sports story.

Q. Were there some times that you made negative -- and I want to focus on the period of when you were executive editor and forward.

A. Mm-hmm.

Q. Were there times that you made negative comments about Ms. Poolos to individuals who worked for 60 Minutes, not including Mr. Owens or HR, because we went through that?

A. I guess it depends what you mean by "negative."

Q. Okay. Well, did you ever make any comments that you think of as negative about Ms. Poolos to Claudia Weinstein?

A. Such as?

Q. I'm just asking if you recall doing that.

A. I recall having conversations with her about her productivity, and her process often being messy and complicated, and a story not being particularly good in my view.

Q. What story was that?

A. I believe it was the story about Trevor Noah.

Q. And that was a story that Ms. Poolos did at the end of 2021?

A. If you say so. I don't remember, there have been so many stories, but I believe that it must have been around then, yeah -- yes.

Q. Was it to your knowledge or memory --

A. Yes.

Q. -- the last story Ms. Poolos had, that aired before she was fired?

A. Yes. Yes, yes, the end of 2021 makes sense. December, I think.

Q. And do you recall, was there someone who used to work for 60 Minutes named Katie Spikes?

A. Yes.

Q. And do you recall ever making negative comments about Ms. Poolos to Ms. Spikes?

A. I don't recall what I said. Katie Spikes told me on a number of occasions that Trevor Noah's publicist found Alex to be exasperating and frustrating and didn't want to work with her again.

Q. And did Ms. Spikes have any supervisory responsibilities over Ms. Poolos?

A. No.

Q. And did Ms. Weinstein have any supervisory responsibilities over Ms. Poolos?

A. Only in an editorial sense, as part of the vetting process, and reading all of her transcripts

and being able to suggest changes and alterations and issues of fairness.

Q. Did any of the stories that Ms. Poolos produced or served as an AP on win awards?

A. I'm sure.

Q. And did any -- were any nominated for awards?

A. I'm sure.

Q. Who is Collette Richards?

A. Collette Richards is an AP at 60 Minutes now, who was hired by Alex to be her AP.

Q. And is Collette -- Ms. Richards, is she on a team currently?

A. She is.

Q. And whose team is she on?

A. She's still on Lesley's team.

Q. And does she work with a specific producer?

A. Yes.

Q. And who is that?

A. She works with Shari Finkelstein.

Q. And has that been the case since Ms. Poolos was fired?

A. I don't know if -- it wasn't immediate. Shari's AP, at the time, left to go take another job in documentaries. She was more interested in

that.

So Shari went through a process of hiring a new AP but had worked with Collette on a story that she had taken over after Alex left. And they had worked well together, and she was impressed and liked her and was inclined to hire her as her AP.

Q. And does Ms. Richards, as an AP, report to you?

A. Yes.

Q. And she also reports to Ms. Finkelstein --

A. Yes.

Q. -- and Ms. Stahl?

A. Yes.

Q. And what do you think of Ms. Richards' performance?

A. It's been very good. I, during her last performance review, consulted with Shari to get feedback from her, and it was all incredibly positive. She was beyond happy with her.

Q. Did Ms. Richards ever complain to you about anyone at CBS?

A. She complained to me about Alex Poolos.

Q. Other than --

A. Oh, other than?

Q. No, no. Sorry, I didn't mean to cut you

off. Go ahead.

A. No. I mean, she complained to me about Alex Poolos.

Q. Okay. Did she ever complain to you about anyone other than Ms. Poolos?

A. No.

Q. Are you aware of any other complaints by Ms. Richards about anyone at CBS beyond Ms. Poolos?

A. No.

Q. Do you know whether Ms. Poolos had made a complaint about Ann Marie Kross on behalf of Ms. Richards?

A. A complaint?

Q. Yeah.

A. No.

Q. Are you aware of Ms. Poolos raising a concern in connection with Ann Maria Kross on Ms. Richards' behalf?

A. Well, I read it in her complaint, somewhere in that context. I don't recall the circumstances of it, though.

MR. ZUCKERMAN: I'm sorry, can we just -- can we just confirm with the witness that when she said "complaint" --

Q. You mean the lawsuit?

A. Sorry. Sorry. Yes, I mean the lawsuit. Sorry.
Q. That's okay.
Outside of the lawsuit, do you recall Ms. Poolos -- or learning that Ms. Poolos had raised a concern in connection with Ann Marie Kross on Ms. Richards' behalf?
A. Well, I don't recall. But now that I've read it in the lawsuit, I don't -- nothing specific. I mean, I remember maybe, but I couldn't tell you what it was. It didn't sound unfamiliar to me, but it didn't jog a specific memory.
Q. And are you aware or have you been told outside of the lawsuit, okay, about Ms. Poolos making a complaint or raising a concern on Ms. Richards' behalf about the rights team at CBS News?
A. Can you say that again?
Q. Yeah. Let me do it again.
Are you aware of a complaint or concern that Ms. Poolos made on Ms. Richards' behalf to Claudia Richards?
A. To Claudia Weinstein?
Q. Claudia Weinstein? Yeah, Claudia Weinstein.

A. No.
Q. Are you aware of a concern or a complaint that Ms. Poolos raised on behalf of Ms. Richards related to the rights team?
A. I'm not aware of Alex making a complaint on behalf of Ms. Richards in relation to the rights team, but I remember there being issues with some of the rights but not in the context of a complaint she made on Ms. Richards' behalf.
Q. And what are you aware of as it relates to the rights team?
A. That on one of the pieces, there was a last-minute credit that had to be sorted out, that there was a ball dropped on another case -- on another piece. I don't really remember the details, but -- I don't remember a specific complaint, like, in support of Collette.
Q. Going back for a second, did you ever have a conversation with Ms. Poolos about her concerns about Ann Marie's treatment of Ms. Richards?
A. I recall having a conversation with her about Ann Marie. I don't recall it being about Ms. Richards, but it could have been.
Q. What do you recall about the conversation you had with Ms. Poolos about Ann Marie?

A. I think something about her sort of gruff attitude, bedside manner kind of way of talking. But I don't remember it being specific to Collette.
Q. Have you ever received any complaints about Ms. Richards?
A. Not since I was on a Zoom with Bill and Alex Poolos, when she complained about her to us.
Q. Okay. Other than any concerns or complaints Ms. Poolos made about Ms. Richards, are you aware of any other complaints or concerns about Ms. Richards?
A. I'm not.
Q. And what did Ms. Poolos say about Ms. Richards when she was raising her concerns?
A. She was raising her concerns to us when we called a Zoom with her to inform her that Collette has raised -- made allegations about her and the environment that she created.
So we told Alex that Collette had said that Alex was bullying, and that she had no boundaries, and that it was an untenable work situation.
And Alex had said that Collette's performance was subpar, that her work product or her performance on the Trevor Noah piece was disappointing, that she wasn't sort of making the

effort that she could, that there had been issues around wanting to drive home in December for the Christmas holidays, and that she just generally wasn't impressed with her performance or her work ethic.

Q. Did Ms. Poolos raise concerns about Ms. Richards' fact-checking?

A. She raised concerns about her copyediting, not her fact-checking.

Q. What did Ms. Poolos say about her copyediting?

A. That she had to make corrections.

Q. That Ms. Poolos had to make corrections of Ms. Richards' work?

A. Yes.

Q. Have you -- has anyone else raised concerns about Ms. Richards' copyediting?

A. No.

Q. Okay. Did Ms. Poolos raise concerns that Ms. Richards failed to secure footage for a segment?

A. I believe she said something about a ball being dropped on a rights and clearances issue. I don't recall the specifics or if she even gave us the specifics.

Q. And did Ms. Poolos raise concerns about Ms. Richards handling the acquisition of third-party material?
A. I think in the context of -- I don't recall beyond the context of an instance where there was a ball dropped.
Q. Did Ms. Poolos raise a concern about Ms. Richards managing logistics for shoots?
A. I don't recall.
Q. Did Ms. Poolos raise concerns about Ms. Richards' work on conducting background interviews?
A. I don't recall.
Q. Has Ms. Finkelstein raised any concerns about Ms. Richards' performance?
A. She has not.
Q. Are you aware of a complaint made by someone named Jason Rezin (phonetic) about Ms. Richards?
A. No.
Q. Are you aware of a concern that Jason Rezin raised to Shari Finkelstein about Ms. Richards?
A. Can you tell me who Jason Rezin is?
Q. I'll come back to it. I don't -- I don't know his position.

But are you aware of any complaints about Ms. Richards from -- sources for a story?

A. I wouldn't qualify it as a complaint. I would say that at the time that they were -- we were transitioning the story from one producer to another, from what I remember, one of the publicists involved was confused about who was working on the story and why Alex wasn't.

Q. Who was the publicist?

A. I don't know his name, but it's possible that it was that person.

Q. Is it Barney Gimbel?

A. Oh, that sounds more familiar, yeah.

Q. Okay. And how did you find out about Mr. Gimbel's concern or confusion, as you put it?

A. I eventually spoke to him to say that the story was changing hands and -- and that it was just probably a confusing time, and I would imagine Collette didn't really know what to say.

Q. Did Mr. Gimbel call you or did you call him?

A. I was reaching out to him to sort of be the transfer of the piece.

Q. And what did Mr. Gimbel say to you, to the extent you remember?

A. To the extent that I remember, he said that he was confused about why Collette was saying that she was the person that he would be dealing with from now on. And I explained that Alex was out and was unable to finish the piece, and that we were assigning another producer to it. And I don't recall whether as of that conversation, we had the new producer or whether I told him I would connect them when we had sorted out who it was.
Q. Was Mr. Gimbel -- did he express that he was angry, to you, in this call?
A. Not that I can recall.
Q. Did he express that he was frustrated?
A. Probably frustrated.
Q. And what, if anything, did Mr. Gimbel say about what Ms. Richards had told him about Ms. Poolos and why she wasn't working on the story?
A. I don't recall him saying anything about why she wasn't working on the story. I just recall him saying she told him that she was the person he should be dealing with.
Q. Did Mr. Gimbel tell you that he thought Ms. Richards had been unprofessional in communication with him?
A. I don't think the word was

"unprofessional." I think maybe a little confused.

Q. And did Mr. Gimbel tell you that -- strike that.

Did Mr. Gimbel make any threats that he was going to pull the story and all of his clients from 60 Minutes during this call?

A. I don't recall.

Q. Would you have remembered that if he said it?

MR. ZUCKERMAN: Objection.

A. I can speculate. Not necessarily, because it didn't happen, so...

Q. Because what didn't happen?

A. He didn't pull his clients and the piece went on.

Q. Okay. Is it possible that he threatened to pull his clients?

A. I don't know.

Q. Did he tell you that he was made to believe that Ms. Poolos had been fired?

A. I do not remember that. I remember him asking me if she was sick, and I said that she was okay.

Q. And at that time, Ms. Poolos was on a paid administrative leave; is that right?

A. I believe so, yes.
Q. And after speaking to Mr. Gimbel, did you take any additional steps in regards to whatever he had expressed to you during the call?
A. I don't recall. I know that I connected him with Shari Finkelstein at some point, so I must have spoken to him again and told him that she was taking the lead, and she was the producer, and he could deal with her.
Q. During the conversation you had with Mr. Gimbel did he say in sum or substance that he did not want to speak with Ms. Richards anymore?
A. I don't recall.
Q. Did you discuss the call you had with Mr. Gimbel with anybody in HR?
A. I don't recall whether I talked about it with HR. I think I reported back to Bill that I had spoken to Mr. Gimbel and we were in the process of handing the story over to Shari so that she could be fully briefed by him and brought up to speed on where things were at on the story.
Q. Did you say anything else to Mr. Owens about that discussion with Mr. Gimbel?
A. I don't remember.
Q. Okay. You testified that Ms. Richards made

a complaint about Ms. Poolos, correct?
A. Yes.
Q. And when was the first time that you learned about Ms. Richards complaining about Ms. Poolos?
A. When she called me to complain.
Q. Who called you?
A. Collette Richards called me.
Q. And approximately when did Ms. Richards call you?
A. Sometime in December -- mid-December.
Q. Was it December of 2021?
A. Yes.
Q. And you said mid-December?
A. Yes.
Q. And you said it was a call. Was there anyone else on the call besides you and Ms. Richards?
A. No.
Q. And did Ms. Richards ever make a written complaint, to your knowledge?
A. She did.
Q. And did you -- when did you see that written complaint?
A. She sent it to me and I -- sometime after

we talked, but I don't know the date.

Q. So in the call that you had with Ms. Richards in mid-December of 2021, tell me everything you remember about that discussion.

A. She told me that she was having a really hard time working with Alex and that it took a lot for her to call me. And she wasn't sure, you know, how to go about it and how I'd react, but that she felt that she was sort of at her wit's end, and that Alex created such a toxic environment that she didn't want to work with her anymore.

She was crying, said that Alex was unrelenting, yelling at her, berating her, putting her down, just wouldn't ever stop calling and asking for things. She never had a weekend off, whatever she did was never good enough, that it was hot and cold, and that she did not want to work with her anymore.

She said that there had been arguments about whether she could drive down to wherever her family is in the south -- I believe Atlanta -- on a weekend. There had been arguments about her wedding, and that she just felt she couldn't do it anymore.

Q. Anything else you recall about what

Ms. Richards said during this call?

A. That she believed that Alex was abusive towards her.

Q. Anything else?

A. That Alex -- that Collette, on the particular story they were working on at that time, had done the lion's share of the background calls and was doing a huge volume of work. Alex was on very few of them and -- and criticized her, you know, typos, and was copyediting but not contributing substantially to the actual work or the calls, and that she just, I think, felt burnt out.

Q. Anything else?

A. No. All along those lines.

Q. What did you say to Ms. Richards during this call?

A. I listened, mostly. Mainly I remember listening. I told her that nobody should have to work in an environment they consider to be hostile or toxic, that what she was saying was concerning and that I would raise it with HR, which she had told me she'd already done. She had already placed a call to them or sent an email, I'm not sure which. So she had already reached out to HR. She

had not heard back from them at that point.

And I told her that I needed to figure out, you know, just the idea of switching teams, that that wasn't something I had an immediate answer for, and that I would consult, you know, with Bill, with HR, and that we would all -- that I would circle back.

Q. Anything else that you said to Ms. Richards during this call?

A. Not that I remember, specifically.

Q. Do you remember how long the discussion was with Ms. Richards?

A. I don't.

Q. How did you leave it at the end of the call with Ms. Richards, or how was it left?

A. That I would contact HR, talk to Bill, and let her know about next steps and how we would proceed.

Q. Did Ms. Richards accuse Ms. Poolos of unlawful discrimination during this call?

A. I don't recall her using those words.

Q. At any point in time did Ms. Richards accuse Ms. Poolos of unlawful discrimination?

A. Not that I recall in those words.

Q. Do you understand that Ms. Richards ever

made a complaint of unlawful discrimination against Ms. Poolos?

A. To my knowledge, not using those particular words.

Q. Well, I'm asking based on what you know about Ms. Richards' complaints --

A. Mm-hmm.

Q. -- do you understand anything Ms. Richards complained about to be a complaint of unlawful discrimination?

MR. ZUCKERMAN: Objection.

You can answer.

A. I'm not sure I understand, though, what -- her complaints were about bullying and the hostile work environment and somebody who she believed was being abusive. Did she use the words "unlawful discrimination"? No. Does that behavior qualify as unlawful discrimination? I don't know.

Q. To your knowledge, did Ms. Richards accuse Ms. Poolos of any conduct that would be illegal under the law?

MR. ZUCKERMAN: Objection.

Q. You can answer.

MR. ZUCKERMAN: You can answer.

A. I don't know what would be illegal and what

wouldn't be illegal in the behavior that she was describing.

Q. Did you ever have any conversations with anyone about whether the conduct that Ms. Poolos was accused of engaging in by Ms. Richards was illegal?

MR. ZUCKERMAN: Except for lawyers.

Q. Except for lawyers, yes.

A. Except for lawyers?

Q. Yes.

A. In terms of illegal, no.

Q. Did you have a discussion with Ms. Poolos about Ms. Richards' concerns or complaint?

A. In January, yes.

Q. And how come you didn't talk to Ms. Poolos before January?

A. I called -- the first call I made was to Bill Owens to tell him what had happened. I then emailed HR. HR then took up the matter. And at that point, it was in their hands.

Q. Did you discuss with Mr. Owens communicating with Ms. Poolos about the complaint before January?

A. I don't recall having that -- I don't recall about whether it would have been before

January.

Q. Did you further explore transferring Ms. Richards to a different team?

A. Not at -- no, I did not. The first thing that we wanted to do was let HR do what they do.

Q. What do you mean by that?

A. They needed to -- they were going to conduct some sort of query or investigation, I suppose. They said that they would reach out to Collette.

I did not put into motion any attempt to find a different team for her at that point. There wasn't an obvious solution, and I didn't want to do anything before the matter had been discussed and dealt with through their channel -- through the HR channels.

Q. So you said that your first call was to Mr. Owens; is that right?

A. Yes.

Q. And was it the same day or a different day?

A. The same day.

Q. And did you speak to Mr. Owens by phone or some other way?

A. By phone.

Q. And tell me about that discussion,

everything you remember he said and you said.
A. I called him to say that I had just gotten a very troubling call from Collette, who was very emotional and crying, and describing what she said was abusive conduct by Alex, that she said she didn't want to work with her anymore, that it was toxic. It was just to bring him in the loop to what had happened, and he said, "Make sure to tell HR," which I did.
Q. Anything else you remember about that discussion?
A. No.
Q. Before you reached out to Mr. Owens, did you contact Claudia Weinstein about Ms. Richards' complaint?
A. Before I talked to Bill Owens?
Q. Yeah.
A. I don't believe so.
Q. And before you talked to HR, did you -- or communicate with HR about Ms. Richards' complaint, did you talk to Ms. Weinstein?
A. I don't believe so -- or I don't remember.
Q. Did you -- other than speaking to Mr. Owens and, I guess, talking to HR, did you talk to anybody else about Ms. Richards' complaint in

December of 2021?

A. I don't know.

Q. Did you talk about Ms. Richards' complaint with anyone other than Mr. Owens or HR at any point in time?

A. I spoke with Claudia Weinstein not about the complaint but about some prior conduct.

Q. What -- and how did you speak to Ms. Weinstein about this?

A. Partially on text.

Q. And how else?

A. Possibly in person. But I don't recall specifics.

Q. And what did you and Ms. Weinstein talk about?

A. Well, I couldn't remember who Alex's AP had been before Collette. At some point HR had asked me whether I knew if there had been issues before. And since I hadn't been in the job that long, I wasn't aware of anything specific.

Q. And so you reached out to Ms. Weinstein?

A. Mm-hmm -- yes.

Q. So tell me everything you remember about those communications with Ms. Weinstein.

A. I remember asking her if she remembered who

Alex's AP was before Collette. And she said it was Sarah Turcotte, and that Sarah would cry almost every day that she was working with Alex, that there was some issue where she hadn't let Sarah take her -- I don't know if it was her kid to kindergarten or her son to the doctor, and so she was unhappy in that role.

She mentioned an occasion in which somebody from rights and clearances complained that Alex had yelled at them inappropriately. And I believe Claudia reported that, at the time, to Jeff Fager, and either he or Claudia, from what I understand, told Alex that she had to apologize to that person.

Q. Anything else?

A. And she talked about her from her perspective, whenever her -- when Alex's pieces were going into the final stages of production, there always seemed to be complications, whether it was with rights and clearances or other things.

Q. That's what Ms. Weinstein said to you?

A. Yeah.

Q. And just to be clear --

A. Yes.

Q. -- it was Ms. Weinstein who told you about someone complaining from rights and clearance,

correct?

A. Yes.

Q. And it was Ms. Weinstein who told you that she'd reported it to Mr. Fager?

A. I believe so, yes.

Q. And it was Ms. Weinstein who said that Mr. Fager had told Ms. Poolos to apologize?

A. I'm not clear whether Mr. Fager said that Alex should apologize or whether Claudia told Jeff that she told Alex to apologize, but he was made aware.

Q. Okay. Did Ms. Weinstein share anything else with you beyond what you've testified to in this conversation or --

A. Beyond rights and clearances issues, she talked about her productivity, and how from her perspective, Lesley didn't always seem fully prepared in the interviews that she was doing on Alex's pieces.

Q. Anything else Ms. Weinstein said?

A. Not that I remember.

Q. Do you know whether anyone told Ms. Poolos that Ms. Turcotte had cried every day, quote/unquote?

A. I don't know. That was before my time in

my job.

Q. And did you do any inquiry or investigation to find out whether that was true or not?

A. I did not.

Q. Did you speak to Ms. Turcotte about Ms. Poolos being -- when Ms. Poolos was a producer and she was an AP?

A. I did not, from what I remember.

Q. Does Ms. Turcotte still work for 60 Minutes?

A. She does.

Q. What's her job?

A. She's an associate producer.

Q. Does she work on a team?

A. She does.

Q. What team?

A. Scott Pelley.

Q. All right. I'm going to show you a document we can mark as Exhibit 2.

(Simon Exhibit 2, CBS8093-CBS8095, was marked for identification.)

MR. IADEVAIA: For the record, what's been marked as Simon's Exhibit 2 appears to be a text exchange Bates-stamped CBS 8093 through 8095.

Q. Ms. Simon, if you can take a minute to look at this, and then I'll ask you some questions about it. Let me know once you've had a chance.
A. I'm ready.
Q. Okay. Great.
So do you recognize this text exchange?
A. Yes.
Q. And what is it?
A. It's a text exchange between me and Claudia Weinstein.
Q. Okay. And you can see the texts are dated December 17, 2021?
A. Yes.
Q. Okay. And I think that is true for the entire text exchange. Do you see that on the second and third pages?
A. Yes.
Q. Okay. If you look down, there's a text that says, "She may have had one."
Do you see that text?
A. Yes.
Q. And in the left-hand side, it says, "TP," and then it says, "Tanya personal."
Do you see that?
A. Yes.

Q. Okay. So do you understand this to be a text from you?
A. Yes.
Q. And the "personal," is that a reference to your personal cell phone?
A. Yes.
Q. Do you also have a CBS-issued cell phone?
A. I do.
Q. Okay. And so in this text, it says, "Her AP just called me with full-on complaint about her behavior."
Do you see that text?
A. Yes.
Q. Did I read that correctly?
A. Yes.
Q. Okay. And are you here telling Ms. Weinstein that Ms. Richards had just complained to you about Ms. Poolos?
A. Yes.
Q. Okay. And given how you wrote this email -- or, I'm sorry, strike that.
Does this refresh your recollection that Ms. Richards complained to you on December 17th, 2021?
A. It refreshes my memory that this text was

sent after she complained to me, so I assume it was on December 17th.

Q. And in the text, you say, "Her AP just called me --"

A. Right.

Q. "-- with full-on complaint."

Do you see that?

A. Yes.

Q. Okay. And the word "just" suggests that you had recently spoken to Ms. Richards; is that right?

A. Correct. Yes.

Q. And do you know if you had sent this text to Ms. Weinstein before you had spoken or after you had spoken to Mr. Owens?

A. I don't recall, but possibly after.

Q. Okay. And do you know if you sent this text exchange with Ms. Weinstein before or after you had contacted HR related to Ms. Richards' complaint?

A. I don't remember.

Q. And at the very top of the text exchange, the first text in this series, you say, "Do you remember who Alex worked with before Collette?"

Do you see that text?

A. Yes.
Q. Okay. And why were you reaching out to Ms. Weinstein with that question?
A. Either I believe that -- I don't know if the times are all -- I believe that when I had spoken to Bill, he had said, you know, "Do you know if there had been other complaints? Is this, like, the first we're hearing of this," kind of thing. And then I couldn't remember who she had worked with before, so I couldn't remember -- I didn't remember if there had been other complaints.
Q. So your testimony is that you reached out to Ms. Weinstein at Mr. Owen's prompting?
A. He didn't tell me to reach out to her. He asked if I knew -- I believe he asked me generally if I knew who came before Alex and if there had been issues. And I didn't know the answer to that, and I thought Claudia might.
Q. And you just said "who came before Alex," but you mean who came before Ms. Richards, correct?
A. My apologies. Yes.
Q. Yeah. That's okay.
Ms. Weinstein responds, "You have blocked it because it was so troubling. Sarah Turcotte."
Do you see that text?

A. Yes.
Q. And you wrote, "Seriously," and three question marks. Do you see that?
A. Yes.
Q. What did you mean when you wrote "seriously"?
A. I'm speculating, but I suppose it meant that I had absolutely no recollection of that.
Q. Before this complaint by Ms. Richards, had you ever received a complaint by an AP about a producer?
A. Not something at this level, apart from the digital team that I told you about already.
Q. Okay. Since you were executive editor, what other complaints had you received from APs about producers?
A. You'll have to give me a moment to think.
Q. Sure.
A. Nothing is jumping to mind about anything hugely substantive. Nothing that comes to mind immediately.
Q. Okay. If you remember, let us know, please.
A. I will. I will.
Q. Had Ms. Richards ever complained to you

about Ms. Poolos before this mid-December complaint?

A. I don't believe so.

Q. And had you received complaints from other APs about Ms. Poolos before Ms. Richards' complaint?

A. Not directly from APs about her.

Q. Did you receive them indirectly?

A. I had heard about instances.

Q. What were those instances you heard about?

A. I heard that she lost her temper and yelled at an associate producer in Iran on the soccer story.

I heard that a soundman said that she's the only producer he wouldn't work with anymore because she yelled at him in front of his children and he thought that it was humiliating.

I heard about the HR -- not HR, sorry -- the rights and clearances situation.

I clearly heard about Sarah Turcotte.

I can't think of others.

Q. Had you heard about Sarah Turcotte before this text exchange reflected in Exhibit 2?

A. Not that I can recall with any specificity.

Q. Did you hear about the rights and clearance

issue before speaking to Ms. Weinstein?

A. No.

Q. And had you heard about the soundman issue that you just testified to before Ms. Richards' complaint in December of 2021?

A. Sort of to the extent that it was sort of known on the floor, but I don't know specifically how I heard about it or who told me.

Q. And the soccer story where you had heard that Ms. Poolos had lost her temper, were you aware of that at the time that Ms. Richards had made her complaint?

A. I believe so, yes.

Q. And where did you learn that from?

A. I don't recall who -- I might have heard it from -- I think I heard it from Katie Spikes.

Q. In the text exchange, on the next page, 8094, you wrote, "Yup, I'm taking to HR after this screening."

Do you see that?

A. Yes.

Q. Okay. Why did you tell Ms. Weinstein that you were taking the complaint to HR?

A. Because that was the procedure, I imagined.

Q. Well, was it -- when you say it's a

procedure, what procedure are you referring to?
A. Upon receipt of such a serious and emotional complaint, I felt that I needed to forward that to HR.
Q. And was it part of the procedure to tell Ms. Weinstein that you were going to send it to HR?
A. Not part of the formal procedure, no.
Q. Was it part of the informal procedure?
A. Probably not.
Q. And why were you having this conversation with Ms. Weinstein about Ms. Richards' complaint?
A. Partly because I was wondering whether this was something that had happened before, and Claudia seemed to be in a position to know. Partly I was so troubled by it, but no other reason than that.
Q. Did Ms. Weinstein run -- conduct the investigation into Ms. Richards' complaint?
A. No.
Q. Did Ms. Weinstein make any decisions about Ms. Poolos's employment?
A. No.
Q. And could you have asked Ms. Weinstein about prior concerns related to Ms. Poolos without disclosing that Ms. Richards had made a complaint?
A. I could have.

Q. And why didn't you?
A. I didn't.
Q. I'm sorry?
A. I just didn't.
(Reporter request.)
MR. IADEVAIA: Just one more question about this document, and then I'm happy to take a break. Okay.
(Unintelligible crosstalk.)
Q. And on that same page, the second page of Exhibit 2, you wrote to Ms. Weinstein, "Collette, she screamed at her when she said she didn't work on her wedding day."
Do you see that text?
A. Yes.
Q. Okay. There might be a typo in there. Can you explain what you meant by that? Or maybe there's not a typo. I just want an explanation.
A. My understanding of that is to say Collette said Alex screamed at her when she, Collette, didn't want to work on her wedding day.
Q. And is that what Ms. Richards told you on the call that you had with her that was likely on December 17th, 2021?
A. Yes.

Q. And do you know in the written complaint, did Ms. Richards raise a concern or make an allegation that Ms. Poolos had screamed at Ms. Richards because Ms. Richards didn't want to work on her wedding day?

A. I don't recall whether she said she screamed. I recall that she said she was upset that she might not be able to work on her wedding day.

Q. And at the time you were sharing Ms. Richards' complaint in this text exchange with Ms. Weinstein, had you done any investigation to figure out whether what Ms. Richards had told you was accurate?

A. No, not that I recall.

MR. IADEVAIA: I think we can take a break now.

THE VIDEOGRAPHER: The time is 4:06 p.m., and this marks the end of Media Unit Number 3.

(Whereupon, a recess was taken at this time.)

(Simon Exhibit 3, CBS2297-CBS2298, was marked for identification.)

THE VIDEOGRAPHER: The time is

4:34 p.m., and this begins Media Unit Number 4.

BY MR. IADEVAIA:

Q. What's been marked during the break as Simons Exhibit 3 is an email chain Bates-stamped CBS 2297 to 2298.

Ms. Simon, do you recognize Exhibit 3?

A. Yes.

Q. And what is it?

A. It is the email that I sent to Renee Balducci in HR, on which I copied Bill Owens, informing her that Collette Richards had just called to complain.

Q. And is this the first time that you notified anyone in HR about Ms. Richards' complaint?

A. Yes.

Q. And it starts with that bottom email --

A. Yes.

Q. -- on December 17, 2021, at 2:40 p.m.?

A. Yes.

Q. Okay. And there's a -- so you mention Renee Balducci, and then later on in the email chain, Maria Cottone is added, correct?

A. Correct.

Q. And what was the relationship between Ms. Balducci and Ms. Cottone at that time?
A. I don't -- I don't know. I think Maria either had been the 60 Minutes HR person for a while, and I think at this point she was no longer, but she was helping or, you know, worked for Renee in some capacity.
Q. Do you know if Ms. Cottone was more junior to Ms. Balducci?
A. I believe she was.
Q. And Ms. -- we talked before about Ms. Balducci was a CBS News HR person whose oversight included 60 Minutes, correct?
A. Correct.
Q. And other shows --
A. Correct.
Q. -- at that time. And do you know, was the same true for Ms. Cottone, that she had -- well, first of all, she was a CBS News employee, correct?
A. She had been. I don't know at this point whether she was still formally overseeing CBS News shows or whether she had moved to a different column, but was, you know, pitching in here, because I had not been dealing with her in a while.
Q. Okay. And when Ms. Cottone was fully

immersed in 60 Minutes work, was it your understanding that she was a CBS News HR person?

A. Yes.

Q. And did she provide HR services to other shows beyond 60 Minutes?

A. I believe so.

Q. Okay. That's it for that exhibit.

Okay. And we're going to mark as Simon Exhibit 4, CBS 8105.

(Simon Exhibit 4, Bates CBS8105, was marked for identification.)

MR. IADEVAIA: Okay. For the record, what's been marked as Exhibit 4 is a one-page text exchange with the Bates number CBS 8105.

Q. And it appears to be a text exchange between the witness and Mr. Owens.

Is that accurate? Is that what it looks like to you?

A. Yes.

Q. Okay. In the text that is dated December 28, 2021, the witness wrote, "I spoke to Maria Cottone. No big headline. Legal will get involved, and Maria and I will need to speak to Alex. But everyone, legal and Maria, on vacation

for the next 2 weeks."
Do you see that text?
A. I do.
Q. Did you, in fact, speak with Ms. Cottone before you sent this text?
A. I don't recall speaking to her, but I assume that I did since I said in the text that I did.
Q. Okay. And do you have any memory of what that discussion was?
A. No.
Q. And you wrote "no big headline."
What did you mean by that?
A. I don't recall. But I assume I meant things were happening incrementally and there was no big headline, no huge action being taken or anything.
Q. And you wrote "legal will get involved."
What was your basis for saying that?
A. Based on the way the text is written, my sense is that Maria Cottone informed me that legal will get involved and that she and I would speak at some point to Alex. I did not call legal to get them involved.
Q. But you don't have an independent

recollection of the discussion you had with Ms. Cottone around December 28, 2021?

A. I do not.

Q. And in the text, you wrote, "I will need to speak to Alex."

Do you see that text?

A. Yes.

Q. Well, it says --

A. Maria and I --

Q. -- "Maria and I will need to speak to Alex."

Do you see that text?

A. I do.

Q. Okay. And did you and Maria ever speak to Ms. Poolos together?

A. I don't believe we did.

Q. And you did not end up speaking to Ms. Poolos about Ms. Richards' complaint until January, correct?

A. Correct.

Q. And do you remember what day in January you spoke to Ms. Poolos for the first time about Ms. Richards' complaint?

A. I believe it was in early January.

MR. IADEVAIA: I guess we should

mark these as two separate exhibits.

(Simon Exhibit 5, CBS7774, was marked for identification.)

(Simon Exhibit 6, CBS7775-7788, was marked for identification.)

MR. IADEVAIA: For the record, what's been marked as Simon CBS 5 is a one-page email chain bearing the Bates number CBS 7774, and what is marked as Exhibit 6 is a document that starts with CBS 775 and goes through 7788.

Q. If we can look at Exhibit 5 first, in the -- this is an email exchange between you and Ms. Richards on December 31st, 2021, correct?

A. Correct.

Q. And in the bottom email, you write to Ms. Richards that you wanted to call -- you say, "Hi, Collette, I wanted to call you to check in but can't seem to find your number."

Do you see that text?

A. I do.

Q. Okay. At this point, as of December 31st, 2021, you had not spoken to Ms. Poolos about Ms. Richards' complaint, correct?

A. Correct.

Q. And, to your knowledge, had Mr. Owens spoken to Ms. Poolos about Ms. Richards' complaint as of this date?
A. I don't believe so.
Q. And had HR had that conversation with Ms. Poolos?
A. That, I don't know.
Q. In the top email from Ms. Richards to you, Ms. Richards writes, "Thank you for your continued support and guidance. I've attached what I compiled for HR in case you want to review sometime."
Do you see that?
A. I do.
Q. And if you look at the top of the email, it says "CR Report.pdf."
Do you see that?
A. Yes.
Q. And I think what's attached as Exhibit 6 is the attachment to the email. Do you recognize it as such?
A. Yes.
Q. And when Ms. Richards sent you the report -- or this complaint, did you read it?
A. I believe so.

Q. Do you recall specifically when you read it?
A. I don't recall specifically when I read it.
Q. Got it.
And had you seen a written complaint from Ms. Richards before this December 31st email and attachment?
A. I don't believe I had.
Q. And after getting this report, did you do any kind of investigation or inquiry on your own to find out whether the allegations Ms. Richards had made were accurate?
A. I don't recall.
Q. Okay. I want you to take a look at Exhibit 6, if we can focus on that document for a couple of minutes.
A. Mm-hmm.
Q. If you take a look on the first page -- hold on. Just give me one second please -- where it says, in that middle of the first sentence, it says, "By assigning me intense workloads to accomplish in unreasonable timelines, often over weekends and holidays..."
Do you see that text?
MR. ZUCKERMAN: How many lines down

is it?
Q. Oh, sorry. I wasn't clear. If you look under the header General Overview --
A. Mm-hmm.
Q. -- in that first sentence -- you can take a look at that sentence. I just had a couple of questions about it.
A. Got it. Yes, I see it.
Q. Was that unusual in your experience at 60 Minutes that a producer would assign intense workloads to accomplish in what an AP believed was unreasonable timelines?
A. I think it depends on somebody's interpretation of unreasonable timeline.
Q. Okay. And the comment "often over weekends and holidays," was that unusual or atypical at 60 Minutes, that an AP had to work over weekends and holidays?
A. It could happen. It does happen.
Q. The next sentence says, "She lies and manipulates situations to paint things in her favor." It then says, "Alex capitalizes and weaponizes my isolation by telling me this is just how things are."
Do you see that text?

A. I do.

Q. And the assigning of intense workloads and unreasonable timelines over weekends and holidays, do you think that is the way things are at 60 Minutes, or not?

MR. ZUCKERMAN: Objection.

You can answer.

A. I think that if there is a need to work over a weekend or a holiday because you have a deadline, or you're shooting a story, or you have shot multiple stories back to back and you have no time in between to do them, then that happens, depending on what story it is, when it's airing, when you're shooting it.

When you're not shooting many stories, I don't know that there's a consistent need to work over weekends and holidays.

Q. If you look under General Overview, in -- I think it's the second paragraph of that section that starts with "She pressures me to overly contact..."

Do you see that start of the paragraph?

A. I do.

Q. Okay. And in the third sentence Ms. Richards writes, "She tells me to call, text,

and email colleagues and sources until they pick up the phone or answer."

Do you see that sentence?

A. I do.

Q. Do you think there's anything unusual or atypical about if Ms. Poolos had in fact said that, asked Ms. Richards to do those things?

MR. ZUCKERMAN: Objection to form.

You can answer.

A. I think it depends on the context and the situation.

Q. Is it unusual in your experience for a reporter to call, text, and email sources until they pick up?

A. Not necessarily.

Q. And then at the bottom of the first page, it says, "I am requesting to be removed from her team as soon as possible."

Do you see that text?

A. I do.

Q. And I think you testified earlier that Ms. Richards had said she wanted to switch teams during that call on December 17th; is that right?

A. Or said she didn't want to work with Alex anymore, one or the other, but the end result was

the same.

Q. Got it.

And at that point in time -- now we're talking December 30th --

A. Mm-hmm.

Q. -- 2021 -- or December 31st, 2021, had you engaged in any discussions about moving Ms. Richards to another team?

A. No. At that point, no.

Q. Okay. Did you, in your conversations -- any conversations you had with Ms. Richards in December or January of 2021, into January of -- so December 2021 into January 2022 --

A. Mm-hmm.

Q. -- did you ever ask Ms. Richards if she had had positive experiences working with Ms. Poolos?

A. I don't recall if I asked her that question.

Q. Did you ever ask her if she -- if Ms. Richards had sent text messages to Ms. Poolos indicating that she appreciated Ms. Poolos?

A. I don't remember asking that.

Q. Do you know if Ms. Richards ever sent a text to Ms. Poolos -- a text message thanking Ms. Poolos for having Ms. Richards' back?

A. No.
Q. I'm sorry?
A. Sorry, no. You asked me if I'm aware that --
Q. Yeah, that --
A. Was I aware at the time that she sent it? No.
Q. Are you aware now?
A. You just read it to me, so...
Q. Are you -- were you aware -- strike that.
Did you ever ask Ms. Richards if she ever sent any text messages to Ms. Poolos thanking her for her support or words to that effect?
A. Not that I can recall.
Q. I think you -- we talked earlier about concern that Ms. Richards raised relating to her wedding day and how Ms. Poolos was treating her. Is that correct? Was there some issue there?
A. Yes.
Q. Okay. You don't have to look at the exhibit anymore.
Let me ask, when does -- we talked before about the 60 Minutes season runs between, I think you said, September until almost the end of May?
A. Yes.

Q. Okay. And do you know when Ms. Richards got married?

A. I believe it was in April or May.

Q. Was it during the season?

A. Yes.

Q. And we're talking 2021 when Ms. Richards got married -- May 2021?

A. I think that that makes sense. Yeah.

Q. Are you aware of any other circumstances where an AP got married during the season of 60 Minutes?

A. I got married during a season of 60 Minutes. A current associate producer just got married during a season on 60 minutes. My associate -- my assistant last year got married during the season. It happens.

Q. Okay. And did you take time off around the time you got married?

A. I did.

Q. And were there any segments that you were working on that were set to air around the time of your wedding?

A. I completed them before my wedding.

Q. And the other APs that you just referenced who got married during the season, do you know if

there were segments that were airing around the time of their wedding that they were working on?
A. There were segments airing around the -- they were still working on segments at the time that they got married. In one case, one segment was scheduled to air around a honeymoon. So, yes.
Q. And what happened with that segment that was going to air around the honeymoon, did the person take their honeymoon?
A. The person took their honeymoon.
Q. In connection with Ms. Richards' wedding, in your view did Ms. Poolos do anything to protect her, to protect Ms. Richards?
A. I don't want to speculate about her motives.
Q. Okay. Did you have conversations with Ms. Poolos about the timing of Ms. Richards' wedding?
A. Yes.
Q. And did you have it around the time that this was taking place, that the wedding was happening?
A. In the -- yeah, in the general time frame, yes, beforehand.
Q. And what were those discussions?

A. From my recollection, she was nervous that Collette wouldn't be able to -- that the piece they were doing on transgender healthcare would run while Collette was on -- I think specifically that it might run the weekend she was getting married, and that that was complicated and it would be super helpful if we didn't run it that weekend, and she didn't want Lesley to know because she thought Lesley would freak out and was there anything we could do about the air date, and sort of along those lines.
Q. Got it.
And did you think that when Ms. Poolos was discussing this with you that Ms. Poolos was being unreasonable in some way?
A. I think it was reasonable to be concerned that somebody might not be available the actual weekend a piece is airing. I don't think it's anything to get angry about. And I did say that we would -- I would keep that in mind as we figured out an air date. There was no date that this piece had to air. So I didn't -- I didn't think a huge amount of it, on its face, at that first conversation.
Q. When Ms. Poolos talked to you about it, was

she angry?

A. She sounded frustrated and nervous and not wanting to tell Lesley, to -- sort of figuring -- figuring out how to maneuver this without Lesley finding out.

Q. And what did you think about her concerns related to Ms. Stahl?

MR. ZUCKERMAN: Objection.

You can answer.

A. You know, sometimes when correspondents get into a work mode, they just want to get their piece on the air. I thought it was silly that Lesley didn't know that her AP was getting married and when she was getting married. And my understanding is eventually she did know.

Q. And how did she find out?

A. I don't know whether -- how Collette or Alex told her.

Q. Did Ms. Poolos send you a draft of the communication to send to Ms. Stahl about Ms. Richards getting married?

A. I don't remember.

Q. And when you say -- I think you said before that Ms. Poolos had expressed concern to you that if Ms. Stahl found out, that Ms. Stahl may freak

out. Did you say that, more or less?

A. Yeah, I thought -- possibly, yeah, I mean, something to that effect.

Q. And was it your understanding that Ms. Poolos was concerned that Ms. Stahl would be upset about delaying the air date of a segment?

A. My sense more was that she would just be upset that there was any sort of, like, hiccup or issue. I don't know that Lesley would have thought about the segment being delayed.

Q. Okay. Did Ms. Poolos tell you that she was worried that Ms. Stahl would be upset if Ms. Stahl knew that a segment's air date was being delayed?

A. My sense was that was -- she was worried about Lesley's reaction, which was the reason she was having the conversation with me in the first place.

Q. Okay. And did Ms. Poolos tell you that partly what she was trying to do was to ensure that Ms. Richards was not replaced as the AP for the story?

A. I don't recall her saying that. It's possible.

Q. In Ms. Richards' concerns that she raised to you, did she raise concerns about taking time

off around the airing of the Trevor Noah segment?

A. She didn't ask me about taking time off. She said that, that weekend, she needed to drive home for the Christmas holidays to see her family and that she would be fully plugged in and able to do whatever responsibilities came her way, you know, by phone and text and email and such.

Q. Did Ms. Richards tell you that she wanted the time to drive then specifically to bring her dog so that it was convenient for her husband?

A. I don't recall the dog. I recall that the -- my recollection was that the husband had to go over the weekend because he worked or something. I don't recall the dog being part of this.

Q. And did Ms. Richards tell you that Ms. Poolos had attempted to offer alternative options for -- to accommodate Ms. Richards' travel plans?

A. I don't recall what she said those options were other than not doing it that weekend.

Q. And did Ms. Richards tell you that Ms. -- that she had asked Ms. Poolos at least three times about traveling when she wanted to travel?

A. Sorry, could you repeat that?

Q. Sure. Let me back up a little.

Did you understand when in relation to the air date for the Trevor Noah segment that Ms. Richards wanted to travel?

A. My understanding is and my recollection is she wanted to travel the weekend that the piece was airing.

Q. Did you understand that Ms. Richards had proposed traveling on the day of the segment airing, itself?

A. I wasn't sure if it was the day before or the day of.

Q. Would it be unusual for an AP to be traveling on the day that one of their segments aired?

A. Not necessarily.

Q. Okay. And do you know that Ms. Richards asked to travel on the day after the segment had aired?

A. Again, I'm not aware of what days she was requesting to travel and in what order. I know it was around the time. My understanding was it was the weekend. I'm not aware of the other day, the Monday.

Q. And would it be unusual for an AP to be

traveling the day after a segment has aired?

A. No.

Q. No? And why do you say that?

A. Because the segment would have aired already, so I don't believe -- producers and APs are away all the time after a piece has aired. They might be shooting another story. They might be researching another story. Oftentimes they are away when their stories air.

And a lot of the things that they might have to do after a story aired are things that can be done on the phone, that can be done on email. Typically they would involve, you know, a complaint that needs to be looked into. And I don't think anybody expected that to happen on an entertainment profile.

Q. Do you know that Ms. Stahl later called Ms. Richards' request to travel on those days outrageous?

A. I was not aware.

Q. And are you aware that before Ms. Poolos was aware of Ms. Richards' complaint, that she had signed off on Ms. Richards traveling as she requested?

A. I'm not aware of who signed off on what,

when.

Q. Well, one of the complaints that Ms. Richards had made was about Ms. Poolos and traveling around the holidays, correct?

A. Correct.

Q. And are you aware that Ms. Poolos eventually agreed to let Ms. Richards travel?

A. My sense is that she eventually agreed but not after much, much discussion about it.

Q. I'm sorry, I don't understand what you mean by that.

A. That she did not automatically say, yes, that's fine. My sense was that it was fraught and that eventually she said, fine, you can go.

Q. And do you consider it to be Ms. Poolos's fault for the interaction being fraught?

A. I can't speak to the interaction. I wasn't there.

Q. When you were evaluating Ms. Richards' complaint, assuming what Ms. Richards was saying was truthful, did you believe that how Ms. Poolos had handled the situation was improper?

MR. ZUCKERMAN: Objection.

You can answer.

A. Well, I wasn't there. It seemed to me it

was sort of a little -- overkill a little bit. I don't think there's anything that Collette couldn't have done on the drive down on that kind of story.

Q. And in terms of making that assessment, did you ask Ms. Poolos her view?

MR. ZUCKERMAN: Just objection to the foundation of the question. I apologize.

You can answer, though. Go ahead.

A. I don't think so.

Q. Do you know if Ms. Poolos, in December of 2021, had to cancel her own holiday vacation plans due to an error by Ms. Richards?

A. I was not aware at the time. I have since learned that.

Q. And how did you learn it?

A. I read it in the lawsuit.

Q. Do you know whether that's true or it's not true?

A. I don't know.

Q. To your knowledge, was there a time that Ms. Richards stopped doing work for Ms. Poolos?

A. I don't know. I don't know whether she stopped after she made the complaint.

Q. Did you ever tell Ms. Richards that it was

okay to stop doing work with Ms. Poolos?
A. I don't recall.
Q. Okay.
MR. IADEVAIA: If we can mark as Simon Exhibit 7, I think, 8106.
(Simon Exhibit 7, CBS8106, was marked for identification.)
MR. IADEVAIA: For the record, what's been marked as Exhibit 7 is a one-page text exchange Bates-stamped CBS 8106.
Q. Once you have a chance to look at it, please let me know.
A. Yes.
Q. Okay. Do you recognize this document?
A. Well, I recognize that my name is on it. So in that regard, it looks like a text thread.
Q. Do you recognize the number at the top, (917)471-1533?
A. I don't know whose that is.
Q. Do you know if it's Renee Balducci's text --
(Simultaneous speakers.)
MR. ZUCKERMAN: Let him finish the question.

A. Sorry.

Q. Is it Renee Balducci's phone number?

A. Possibly. I don't know her phone number by heart. But if you tell me that it is, then, it is.

Q. What was your -- at this time, what was your relationship with Renee Balducci?

A. She was the head of the -- she was the head HR rep overseeing 60 Minutes.

Q. Was she a friend of yours? Would you consider her a friend?

A. No.

Q. Okay. In the top text, it says, "Hey there, heads up, you guys have issues brewing with Alexandra Poolos."

Do you see that?

A. Yes.

Q. And then the next text says, "Her AP is miserable. I'm going to reach out to Bill."

Do you see those texts?

A. I do.

Q. Okay. And do you have any understanding based on those texts as to who the texter is who was texting you -- the person texting you?

A. Well, it sounds like it's -- it sounds like it's Renee.

Q. Okay. Had you ever received a text message from Ms. Balducci about another employee that was similar to this one?

A. We had texted. I don't believe anything like at this level.

Q. Mm-hmm. And then if you look further down, there's a text from you that says, "I just spoke with Collette."

Do you see that text?

A. Mm-hmm, I do.

Q. And it says -- or you wrote, "She hasn't had a second to breathe this break. They have a shoot January 7th, and she asked me if it was okay for her to tell Alex she needs to take a break this afternoon. I said absolutely, set the boundaries, and it's NY Eve."

Do you see that text?

A. I do.

Q. And NY Eve is New Year's Eve?

A. I would imagine, yes.

Q. Right. It's December 31st, 2021?

A. Yes.

Q. Okay. Did you talk to Alex, Ms. Poolos, before saying to Collette that it was okay for Collette to say that she needed a break?

A. I don't believe so.

Q. And did you speak to Ms. Stahl about Collette taking a break before saying it was okay to take a break?

A. For an afternoon, no, I did not.

Q. And do you know whether Ms. Poolos was working over the weekend after that afternoon, I mean, when she was --

A. I have no idea.

Q. And do you know if Ms. Richards was available or responding to Ms. Poolos reaching out the next day after this, so, let's say, January 1st?

A. I don't know.

Q. And do you know whether Ms. Richards was reaching out or responding to Ms. Poolos on January 2nd?

A. I don't know.

Q. And in that text there's a reference, "I just spoke with Collette," meaning you had just spoken with Collette.

A. Correct.

Q. Do you recall that discussion?

A. It varied, generally.

Q. What do you remember, if anything, beyond

what's in the text?

A. Nothing beyond what's in the text.

Q. Okay.

A. Just the general gist of it.

Q. And Ms. Richards had told you in the call she had, according to this text, that Ms. Poolos and Ms. Richards had a shoot planned for January 7th, correct?

A. Correct.

Q. And that was about eight days -- seven or eight days from the date of this text, right?

A. Correct.

Q. Was there any other occasion you can recall where you told an AP it was okay to take a break without first discussing it with the producer they were working with?

A. Well, I've never gotten a request that was in this context. People, if they come and tell me they need to take an afternoon off, I do think that people can manage their time. And if they think they can take an afternoon off, they can take an afternoon off. But typically they've sorted out their schedule with their producer. In that case, that didn't seem to be happening here.

(Reporter clarification.)

MR. IADEVAIA: If we can mark 8109, please. Mark this as Exhibit 8, I think. Thanks.

(Simon Exhibit 8, CBS8109, was marked for identification.)

Q. Okay. What's been marked as Simon Exhibit 18 is a one-paged text thread Bates-stamped CBS 8109.

Do you recognize this text exchange, Ms. Simon?

A. Yes.

Q. And is it an exchange between you and Mr. Owens?

A. Yes.

Q. And it's dated -- the three texts that show up here are dated December 31st, 2021, correct?

A. Yes.

Q. And in the text, in your -- the top text, you write -- among other things, you write, "I just had a long talk with Renee about Alex and Collette."

Do you see that text?

A. I do.

Q. Okay. Do you recall the discussion that you had with Renee around the time of this text?

A. Not specifically. I had calls on and off with HR. They were bringing me up to speed on things.
Q. Okay. So before January, tell me everything you remember about those calls even if you can't remember specifically which day those calls happened.
A. I don't remember the specific call other than -- I mean, the other text that Renee sent said that Collette was miserable, so I assume the call was more detail about that.
Q. And the Renee, just to be clear, that's Renee Balducci, correct?
A. Yes.
Q. Before Ms. Richards -- before anyone shared Ms. Richards' complaint with Ms. Poolos, did Ms. Poolos reach out to talk to you about Ms. Richards?
A. I believe that she did.
Q. And --
A. But can I correct that?
Q. Sure. Go ahead.
A. I believe that she reached out to me. I don't recall if it was specifically about Ms. Richards.

Q. And did you speak to Ms. Poolos before -- before you disclosed the -- Ms. Richards' complaint to her?
A. I did not.
Q. And how come?
A. My recollection is I thought that it was an HR matter, that they were handling things. And I wanted to make sure that what I did was in line with that and figure out who should be talking to whom.
Q. Did you think it was -- well, strike that.
MR. IADEVAIA: Can we mark as Exhibit 9, 2902.
(Simon Exhibit 9, CBS2902-2903, was marked for identification.)
Q. So what's been marked as Simon Exhibit 9 is a two-paged email chain bearing Bates number CBS 2902 to 2903.
And, Ms. Simon, do you recognize what's been marked as Exhibit 9?
MR. ZUCKERMAN: If you need a moment to read through it --
Q. Yes, please, take your time.
A. Can I read this, please?
MR. ZUCKERMAN: Yeah, can we go off

the record for three minutes but stay here, because there's been some contact with the Court and I want to see if we can get back to them.

MR. IADEVAIA: In our case?

MR. ZUCKERMAN: Yes.

MR. IADEVAIA: Okay.

THE VIDEOGRAPHER: Off the record?

MR. IADEVAIA: Sure.

THE VIDEOGRAPHER: The time is 5:15 p.m. We're off the record.

(Whereupon, a discussion was held off the record.)

THE VIDEOGRAPHER: The time is 5:17 p.m. We're back on the record.

BY MR. IADEVAIA:

Q. Okay. Ms. Simon, if you could, take a look at the first email in the chain that sort of starts at the bottom of the page, but really the text is on the second page. And it's an email from Ms. Poolos to you dated January 3rd, 2022, correct?

A. Correct.

Q. And in that email, among other things, Ms. Poolos says, "And some things have come up with Collette that I'd like your advice on."

Do you see that?

A. I do see that.

Q. So is this Ms. Poolos reaching out to you to ask to talk to you about Ms. Richards?

A. It would appear that it's that, among other things. I was the person who dealt with all of the COVID protocols throughout the entire pandemic, so I dealt with a lot of that as well.

Q. Right. But Ms. Poolos is saying to you she does want to talk to you about Ms. Richards, correct?

A. Correct.

Q. Okay. And this January 3rd is before you and Mr. Owens had shared Ms. Richards' complaint with Ms. Poolos, correct?

A. Correct.

Q. And in response, you write, "I'm running around today, in and out of appointments, but will have more time to talk tomorrow."

Do you see that text?

A. I do.

Q. Okay. So did you talk to Ms. Poolos on January 3rd, 2022?

A. I did not.

Q. And did you talk to her on January 4th,

2022?

A. I don't believe I did.

Q. And why not on January 4th?

A. I believe -- I believe I was given guidance that Bill and I needed to talk to her together.

Q. And would you expect that if you had spoken to Ms. Poolos on either January 3rd or January 4th that Ms. Poolos would have expressed concerns to you about Ms. Richards' performance?

MR. ZUCKERMAN: Objection.

A. I don't know what she was calling to tell me.

Q. And you said that you had received guidance that it should be you and Bill Owens talking to Ms. Poolos about Ms. Richards' complaint; is that correct?

A. Correct.

Q. And who gave you that guidance?

A. I believe HR.

Q. And anyone in particular in HR?

A. Renee Balducci.

Q. And did she explain why?

A. I think she believed that Bill Owens, as the EP -- these were serious allegations, he oversees the producers, Alex was a producer, and

that she should be involved.

Q. Is that what she said to you?

A. I don't know if she said those specific words, but that was my understanding.

Q. Did you tell Ms. Balducci that Ms. Poolos had reached out to you?

A. I don't recall. Possibly.

Q. Did you tell Ms. Balducci that Ms. Poolos had reached out to you specifically to talk about Ms. Richards?

A. I don't recall, but possibly.

MR. IADEVAIA: Okay. If we could mark as Exhibit 10, 8118, please.

(Simon Exhibit 10, CBS8118-8119, was marked for identification.)

Q. Ms. Simon, if you can, take a minute to review what's been marked as Exhibit 10.

MR. IADEVAIA: For the record, it's a two-page text exchange Bates-stamped CBS 8118 to 8119.

A. Mm-hmm.

Q. Let me know once you've had a chance to review it.

A. I read it.

Q. Okay. And did I just say this is a text

exchange between you and Mr. Owens, correct?
A. Correct.
Q. And the texts are all dated January 4th, 2022, correct?
A. Correct.
Q. And on the texts, Mr. Owens says, "Am I on the wrong Zoom?" And you say, "You know, trying to dial in." And Bill, further down says, "Renee is here."
Do you see all those texts?
A. I do.
Q. Do you recall having a Zoom meeting with Mr. Owens, Ms. Balducci, and yourself on January 24th, 2022?
A. Generally, yes.
Q. Okay. And what do you recall discussing during that meeting?
A. I recall discussing that we needed to have a conversation with Alex and tell her of the allegations and hear her side of it.
Q. And do you recall anything else about that Zoom meeting with Ms. Balducci and Mr. Owens?
A. I don't.
Q. Okay. And was a call then scheduled with Ms. Poolos?

A. It appears so.

Q. But you don't have an independent recollection?

A. No. No.

Q. Okay. And on the first page of Exhibit 10, there's a text from you that says, "Let's chat for a minute before you reach out to Alex. I had a thought about that and other things not urgent."

Do you see that text?

A. I do.

Q. Do you have any memory as to what you -- what your thought was about Alex?

A. I have no idea.

Q. And do you have any understanding or memory of what "other things" means?

A. No.

Q. Okay.

MR. IADEVAIA: All right. If we can mark as Exhibit 11, CBS 3095.

(Simon Exhibit 11, CBS3095, was marked for identification.)

Q. What's been marked as Exhibit 11 is a calendar invite Bates-stamped CBS 3095.

And, Ms. Simon, do you see that this is a calendar invite for a meeting among you, Mr. Owens,

and Ms. Poolos?

Do you see that?

A. I do.

Q. And that the meeting is scheduled to take place on January 5th, 2022?

A. Yes.

Q. Okay. And do you know if, in fact, you had that meeting with Mr. Owens and Ms. Poolos on January 5th, 2022?

A. Yes.

Q. And was that meeting by Zoom or was it in person or some other way?

A. It was by Zoom.

Q. And what was the purpose of the meeting as you understand it?

A. As I understand, that the purpose was to tell Alex about Collette's complaint, to tell her that that kind of behavior isn't tolerated, and to hear her out.

MR. IADEVAIA: Okay. If we can mark as Exhibit 12, CBS 8122.

(Simon Exhibit 12, CBS8122, was marked for identification.)

Q. What's been marked as Exhibit 12 is a one-page text exchange Bates-stamped CBS 8122. It

appears to be a text exchange between Ms. Simon and Claudia Weinstein.

Ms. Simon, this is you texting with Ms. Weinstein, correct?

A. Mm-hmm.

Q. And in the top text, the last sentence, you wrote, "On a less sweet note, can you remind me who the R&C person is that Alex yelled at?"

Do you see that?

A. I do see that.

Q. Okay. And why were you reaching out to -- why did you send that text to Ms. Weinstein?

A. I don't recall specifically. HR was conducting an investigation, so it's possible they were trying to piece together things that had happened in the past.

Q. Did you share with HR any information that Ms. Weinstein had shared with you about purported prior concerns related to Ms. Poolos?

A. I don't recall how much specificity I got in, but I believe they asked me and I told them what I knew.

Q. And did you tell them that you had been told the information by Ms. Weinstein?

A. I don't know if I specifically told them it

was her. I would tell them if it wasn't something that had been a direct complaint to me.

Q. And did you tell Ms. Balducci that you had solicited information from Ms. Weinstein about past complaints related to Ms. Poolos?

A. I don't remember.

Q. In the text exchange, Ms. Weinstein says -- in response to your text, can you -- your text was, "Can you remind me who the R&C person is that Alex yelled at" and Ms. Weinstein wrote, "I think it was Aieska Hoyos, who left CBS News and then came back to do a slightly different R&C type job."

And then Ms. Weinstein writes, "Want me to ask Josh Ravitz to confirm that it was Aieska. I would be careful in what I say and ask for confidentiality. I think he's had his own share of bad experiences with her."

Do you see that text?

A. I do.

Q. And then you wrote, "No, it's okay. Thanks. I'm pretty sure it was her."

Do you see that text?

A. I do.

Q. Did you ever do any investigation to figure out if that was correct, that it was --

A. I don't believe so. I think the name was familiar to me that she had been in rights and clearances.

Q. Further down, Ms. Weinstein writes, "Would appreciate an update on the Alex P. situation. Not urgent, of course."

Do you see that?

A. I do.

Q. And then you wrote, "I'll call you later."

Do you see that text?

A. I do.

Q. And did you speak to Ms. Weinstein about the Alexandra Poolos situation around January 25, 2022?

A. I don't remember speaking with her.

Q. And did you give Ms. Weinstein an update on the situation?

A. I don't recall.

Q. And was there any work reason why Ms. Weinstein needed to know what was happening with Ms. Poolos's -- the complaint against Ms. Poolos on January 5th, 2022?

A. Only to the extent that she needs to keep track of what stories are being shot because she reads all of the transcripts. So if there was a

change in schedule, she would need to know that.

Q. When you say "a change in schedule," what do you mean by that?

A. If a story is no longer being -- is no going forward or being delayed.

Q. Was Ms. Poolos still working for CBS at the time of this text exchange?

A. I believe so, yes.

Q. Was she on an administrative leave at that point in time?

A. I don't believe so.

Q. Was there any reason for Ms. Weinstein to have a concern that Ms. Poolos wouldn't be working and continuing with whatever story she was doing as of January 5, 2022?

A. No. But there might have been a shift in the schedule because of the COVID situation, so I don't know what she was aware of and wasn't aware of.

Q. When Ms. Weinstein asked for an update on the Alex P. situation, do you understand her to be asking you about COVID schedule situation?

A. I'm not sure what she's asking about.

Q. Do you think she was asking about anything other than the complaint that Ms. Richards had made

that you had told her about?

A. I think you can ask her.

Q. Okay. And you don't recall the discussion that you had with Ms. Weinstein after these texts?

A. I don't recall -- I don't recall that I did have one with her.

Q. You don't even know if you did have one?

A. Right.

Q. Okay. You and Mr. Owens and Ms. Poolos met by -- virtually on January 5th, 2022, correct?

A. Yes.

Q. And do you recall when that meeting took place, what time of day?

A. Well, according to the Zoom invite, it took place at 12:30.

Q. Okay. Do you have an independent recollection of that?

A. No.

Q. Okay. And could you just tell me everything you recall that was discussed at that meeting, please.

A. I recall that Bill told Alex that Collette had made some concerning allegations that she was being bullied, that there were no boundaries, and that he told Alex that that kind of behavior

couldn't continue and we need to treat people with respect.

Q. Anything else you recall about what was said during that meeting?

A. I recall that then Alex, I believe, talked about performance concerns that she had about Collette.

Q. And what performance concerns did Ms. Poolos raise during this meeting?

A. That her performance was subpar, that her performance on the Trevor Noah story was disappointing, that she had dropped the ball on a rights and clearances issue, that she wasn't giving it her all, I believe, and, I believe, she talked about the drive down to Atlanta in December.

Q. Anything else you remember Ms. --

A. Not that I remember.

Q. Just got to let me finish.

A. Oh, sorry.

Q. That's no problem.

Anything else you remember about what Ms. Poolos said during this meeting regarding Ms. Richards' performance?

MR. ZUCKERMAN: Objection.

A. I don't.

Q. What else was said during the meeting beyond what you've testified to?
A. I believe that Bill said to Alex that those performance concerns were troubling and that he would look into them, I think he said, but that those performance concerns were troubling.
Q. The performance concerns Ms. Poolos had raised about Ms. Richards --
A. Yes.
Q. -- were troubling?
A. Yes.
Q. Anything else you recall being said or discussed during this meeting?
A. I seem to recall it sort of ending with Bill saying, like, let's just, you know, keep treating people well in the workplace, you know, we need people to treat each other with respect.
Q. Anything else you recall?
A. Not that I recall.
Q. Do you recall Ms. Poolos saying about Ms. Richards that Ms. Richards often became upset if she didn't get her way on personal requests?
A. I don't recall that.
Q. And do you recall during this meeting Mr. Owens telling Ms. Poolos that Ms. Richards had

said many positive things about Ms. Poolos?
A. I don't remember that.
Q. During the meeting, did Mr. Owens say to Ms. Poolos that she needed to keep Ms. Richards' complaint confidential?
A. I don't recall.
Q. Did you say to Ms. Poolos during this meeting that she needed to keep Ms. Richards' complaint confidential?
A. I don't recall.
Q. To your knowledge, as of January 5th, 2022, had anyone said to Ms. Poolos not to discuss Ms. Richards' complaint with anyone?
A. I don't know, because the only conversation I had was on January 5th.
Q. And you don't recall that coming up during the meeting you've just testified to, correct?
A. I don't recall whether it did or didn't.
Q. To your knowledge, did Mr. Owens look into the performance concerns that Ms. Poolos had identified for Ms. Richards?
A. I don't know.
Q. Did you look into those performance concerns?
A. In the immediate time, no, I don't believe

I did.

Q. During the meeting that -- you know, the meeting you've been testifying to, on January 5th, was there any discussion about whether Ms. Poolos should speak to human resources?

A. Of whether Ms. Poolos should speak to human resources?

Q. Correct.

A. I don't recall that coming up.

Q. Did Ms. Poolos ask whether she should speak to human resources? Did she ask you or Bill that question?

A. I don't remember.

Q. And did Ms. Poolos ask whether she could speak to human resources?

A. I don't remember.

Q. Do you recall if you said to Ms. Poolos during this meeting that she should not speak to HR?

A. I don't recall saying that.

Q. Do you recall if Mr. Owens said for Ms. Poolos not to speak to HR?

A. I do not.

Q. Following the January 5th, 2022, meeting with Ms. Poolos, do you know whether human

resources reached out to Ms. Poolos?

A. I don't know what the time frame was for their, like -- for the -- for their intake call with her or -- I'm not sure what you're asking.

Q. To your knowledge, did HR ever give instructions to Ms. Poolos, as of January 5th about Ms. Richards' complaint?

MR. ZUCKERMAN: Objection.

You can answer.

A. I wasn't on any calls with HR and Alex, so I don't know what was said.

Q. Did you consider the conversation that you and Mr. Owens had with Ms. Poolos on January 5th, 2022, to be formal disciplinary action against Ms. Poolos under CBS policies?

A. I don't know.

Q. Before the January 5th meeting, had you had conversations with HR or Mr. Owens about whether the meeting you were having with Ms. Poolos on January 5th was to give her or issue some type of formal disciplinary action?

A. My understanding was that it was to make her aware of the complaint and to tell her to stop behaving that way.

Q. And this was, just to be clear, the first

time you had spoken to Ms. Poolos about Ms. Richards' allegations, correct?

A. Correct.

Q. And is it the first time, to your knowledge, that Mr. Owens had spoken to Ms. Poolos about Ms. Richards' allegations?

A. To my knowledge.

Q. After your meeting with Ms. Poolos on January 5th, did you have discussions with Mr. Owens, just the two of you, about that meeting, to debrief or talk about next steps?

A. It's possible, but I don't know, specifically.

Q. And did you have a conversation with Renee Balducci to debrief her and talk about next steps after that meeting on January 5th?

A. I don't know if it was right after that meeting. I don't recall.

Q. Well, what happened next after that meeting with Ms. Poolos?

A. My recollection is that Bill had another conversation with Alex the day after or the following day. I was not part of that call.

MR. IADEVAIA: Okay. Can we mark as Simon Exhibit 13, 8524 [sic].

(Unintelligible crosstalk.)

Q. And the conversation on January 6th that Mr. Owens had with Ms. Poolos that you were not part of, was there a discussion with HR before Mr. Owens had that call?

A. I -- I believe so.

MR. IADEVAIA: Okay. If we could mark, then -- I guess we didn't mark the last one -- as 13, CBS 8125.

(Simon Exhibit 13, CBS8125, was marked for identification.)

Q. So what's been marked as Simon Exhibit 13 is a one-page text exchange bearing Bates Number CBS 8125.

Once you have a chance to look at it, please let me know, Ms. Simon.

A. I have.

Q. In the third text, Mr. Owens writes, "Talked to Alex. Will send follow-up email now."

Do you have any understanding as to what email Mr. Owens is referring to there?

A. No.

Q. Did Mr. Owens, to your knowledge, send an email to Ms. Poolos confirming that there had been discussions with her related to Ms. Richards'

complaint?

A. I see here that he said he was sending a follow-up email. I don't know what -- who is he -- what email he's talking about, like, what it said.

Q. Okay. And in his text he said he talked to Alex. Did he tell you what he talked to Alex about?

A. Well, he says in his text that she had more concerns about Collette, so that's what I presume.

Q. Do you have any independent memory --

A. No.

Q. -- of Mr. Owens telling you beyond what's in the text message?

A. No.

Q. Okay. Yeah, you -- Mr. Owens wrote, "She has more concerns about C. I heard her out."

And then you write, "Did you mention that we've heard this about her before?"

Do you see that text?

A. I do.

Q. What did you mean by that text?

A. I believe I meant, did you mention to Alex that we have heard about these kinds of behavioral and temperament issues before.

Q. Meaning that, did Mr. Owens advise

Ms. Poolos that management had heard about concerns related to Ms. Poolos in the past?

A. Yes.

Q. And during the meeting that you had on January 5th that you were a part of, was there any discussion with Ms. Poolos about prior concerns?

A. I don't recall. I don't believe so.

MR. IADEVAIA: If we could mark as 14, CBS 3149, please.

(Simon Exhibit 14, CBS3149, was marked for identification.)

Q. Okay. What's been marked as CBS 3149 -- or, I'm sorry, Exhibit 14 is an email chain with Bates Number CBS 314.

The bottom email is from Mr. Owens to Ms. Poolos and then the top email is from Ms. Poolos to Mr. Owens.

If you take a second to read it, we can talk once you do.

A. I've read it.

Q. Okay. Do you know whose idea it was to send this email to Ms. Poolos?

A. I do not.

Q. Was it your idea?

A. No.

Q. Did you have -- would you participate in any discussions about Mr. Owens sending this email to Ms. Poolos?
A. Not that I recall, no.
Q. Did you see a draft of this email before Mr. Owens sent it to Ms. Poolos?
A. I don't believe so.
Q. Okay. Did you have any discussions with -- were you part of any discussions with Mr. Owens and/or HR as of January 6th in which you talked about taking formal disciplinary action against Ms. Poolos?
A. At this stage, right here?
Q. Yeah.
A. No.
Q. Had you been part of any discussions about firing Ms. Poolos as of this time, January 6th?
A. No.
Q. And had you been part of any discussions as of January 6th about placing Ms. Poolos on a leave of absence?
A. No, I had not.
Q. And on January 5th, during the meeting that you participated in with Mr. Owens and Ms. Poolos, was there any discussion at that meeting about

sending Ms. Poolos an email confirming the discussion?

A. Not that I recall.

Q. Did Mr. Owens tell you about Ms. Stahl calling him in connection with Ms. Richards' complaint against Ms. Poolos?

MR. ZUCKERMAN: Objection.

You can answer.

A. I don't know whether he told me specifically or whether it came up on a call with HR, but I believe I knew that she had spoken with him.

Q. And what is -- what is your understanding of that discussion Mr. Owens and Ms. Stahl had?

A. My vague recollection was that Lesley wished that Collette hadn't gone to HR.

Q. What else do you remember about that discussion?

A. That was the gist of it.

Q. Did Mr. Owens tell you that Ms. Stahl was angry about Ms. Richards' complaint?

A. I think angry that it had gone all the way to HR.

Q. And did Mr. Owens say whether Ms. Stahl explained why she was angry that it had gone all

the way to HR?
A. I don't remember.
Q. Did Mr. Owens say that Ms. Stahl had said that she wanted Ms. Richards off her team?
A. I don't remember that.
Q. Did Mr. Owens say that Ms. Stahl was appalled by Ms. Richards' performance issues?
A. I don't remember performance coming up.
Q. And did Mr. Owens say that Ms. Poolos had convinced Ms. Stahl not to remove Ms. Richards from her team?
A. I don't remember that.
Q. Okay. On -- strike that.
Did you at some point learn that Ms. Poolos had spoken to Scott Bronstein?
A. Yes.
Q. When did you learn that?
A. I learned that in the day or days after the January 6th call, I believe.
Q. And how did you learn it?
A. I believe Renee Balducci.
Q. What did Ms. Balducci say to you?
A. I believe she said that she had learned that Alex had reached out to Scott Bronstein, who had been Collette's boss at CNN, and who was her

primary reference, and that she had, like, basically trashed her and complained about her.
Q. That Ms. Poolos had purportedly complained about or trashed Ms. Richards?
A. Yes.
MR. ZUCKERMAN: Objection.
Q. At the time that Ms. Balducci shared this with you, do you know whether she had spoken to Ms. Poolos about the phone call with Mr. Bronstein?
A. I don't know.
Q. And do you know whether Mr. Owens had spoken to Ms. Poolos about her call with Mr. Bronstein?
A. I don't know.
Q. Did you discuss the call -- Alex's call with Mr. Bronstein with anyone other than HR or Mr. Owens?
A. Not that I know of.
Q. Did you talk to Ms. Weinstein once you found out about the phone call that Alex had had with Mr. Bronstein?
A. I don't know.
Q. You testified, I think, just a couple -- or a minute ago that Mr. Bronstein had been Ms. Richards' supervisor at CNN; is that right?

A. Correct.
Q. Did you -- at the time of this, did you know Mr. Bronstein? We're talking January 7, 2022.
A. I had met him maybe 20, 25 years earlier. He had been a 60 Minutes either producer or associate producer before I started at 60 Minutes.
Q. And do you have any understanding as to why he left 60 Minutes?
A. No.
Q. Do you know if he left voluntarily or involuntarily?
A. I have no idea.
Q. And what was your understanding of the relationship between Mr. Bronstein and Ms. Richards as of the time that you learned about this phone call between Alex and Mr. Bronstein?
A. My understanding from Renee Balducci was that he -- she had been -- he had been her boss, he had recommended her for the job, and he thought highly of her, and that he let her know that he had gotten these -- I don't know if they were messages or phone calls, from Alex.
Q. Do you know whether Mr. Bronstein and Ms. Richards, at the time of the call that Ms. Poolos had, were close friends?

A. I don't know.
Q. Did you ever ask Ms. Richards if they were close friends?
A. I don't believe I discussed it with her.
Q. Did you ever discuss that with Ms. Balducci, whether Mr. Bronstein and Ms. Richards were close friends?
A. Not that I recall.
Q. Do you know -- did you do any inquiry to figure out how frequently Mr. Bronstein and Ms. Richards corresponded with each other?
A. Not that I can recall.
Q. And do you know if HR ever looked into that?
A. I don't know.
Q. Did you ever ask Ms. Weinstein if she knew Scott Bronstein?
A. Possibly. But I don't recall.
Q. Did anyone from CBS tell you the circumstances of Mr. Bronstein's departure from CBS?
A. Not that I recall. It was long, long before I got there.
MR. IADEVAIA: If we can mark as Exhibit 14 [sic], 8128, please.

(Simon Exhibit 15, CBS8128, was marked for identification.)

MR. IADEVAIA: 15. Sorry.

Q. What's been marked as Exhibit 15 is a one-page text exchange Bates-stamped CBS 8128, and this says that it's a text exchange between Bill Owens, Tanya personal, and that same 917 number we discussed earlier.

In the top text message, the 917 number, which I think we believe is Renee Balducci, says, "Heads up, Alex Poolos, after speaking with you, Bill, called Collette's PLS manager at CNN, her reference when she came here, told him Collette is terrible at her job, told him she told you as much, Bilk" -- I assume that's Bill -- "referred to Collette as a millennial who went to HR to solve her problems. And I don't want to ruin her career but," and then there's three dots. Then it says, "Bill, I need you to speak to Collette, and then we should talk."

And the next sentence says Alex -- it's misspelled, but I think it's "Alex's actions reflect horrendous judgment and amount to retaliation in my POV."

Do you see all that text?

A. I do.

Q. At the time that Ms. Balducci had sent this text message, do you know whether Ms. Balducci had spoken to Ms. Poolos about the phone call she had with Scott Bronstein?

A. I don't know.

Q. And do you know if Bill Owens had spoken to Ms. Poolos at the time of this text message about the call that Ms. Poolos had with Mr. Bronstein?

A. I don't believe so, because she appears to be informing him of it.

Q. And had you spoken to Ms. Poolos about her call with Mr. Bronstein?

A. No.

Q. And do you read the text from Ms. Balducci as though Ms. Balducci had already concluded that Miss -- Ms. Poolos had had the conversation as reported to her by Ms. Richards?

MR. ZUCKERMAN: Objection.

Q. You can answer.

A. I can't speculate as to what she was thinking.

Q. Okay. It doesn't say anywhere in this text that -- that Ms. Poolos had allegedly said these things to Mr. Bronstein, does it?

MR. ZUCKERMAN: Objection.

A. It does not appear to.

Q. Okay. If we can -- and is this the first time that you had learned about the phone call between Ms. Poolos and Mr. Bronstein?

A. I believe so, yes.

MR. IADEVAIA: All right. If we can mark as Exhibit 16, CBS 8134, please.

Q. What happened after -- to your knowledge, in connection with Ms. Poolos's employment, what happened next after the phone call?

MR. ZUCKERMAN: Objection.

Q. After you found out about the phone call?

A. To my understanding, Bill had a conversation with both Collette and Alex, separately.

Q. And how do you know that he had those conversations?

A. I remember that he had them, and he also says so in this text chain.

Q. And did you -- what did Mr. Owens say about what Ms. Poolos had said about the Mr. Bronstein discussion?

A. Sorry, could you repeat that?

Q. Yeah. What did Mr. Owens say that

Ms. Poolos had said about her conversation with Mr. Bronstein?

A. My recollection is much what he says here, that she maintained that she had reached out to him just to get insight into Collette because he had been the one to, I guess, refer her or recommend her.

Q. Other than what's in this text, do you have any independent recollection of Bill, Mr. Owens, telling you what Alex had said to him?

A. No. It was all this.

Q. Okay. And "this" is --

A. This --

Q. -- Exhibit 15, correct?

A. Correct.

Q. Yeah. Okay. And did Mr. Owens tell you what Ms. Richards had said to him about that call?

A. I don't recall that, particularly.

Q. Okay. What happened after Mr. Owens had his discussion with Ms. Poolos in terms of Ms. Poolos's employment?

A. My understanding is that -- my understanding is that there was then more contact with Mr. Bronstein or the timeline wasn't right. And at some point after that, she was put on

administrative leave.
Q. Were you involved in any of the discussions about whether to put Ms. Poolos on administrative leave or not?
A. I was on the calls when the discussions were had. They were less discussions and more sort of opinions, I guess, or findings.
Q. What was discussed as to the reason to place Ms. Poolos on a leave of absence?
A. My recollection was that she had been told to not disparage Collette, that she had then disparaged Collette. And that, in their view, was retaliation. And she had disobeyed something Bill had told her, and that she hadn't been truthful about either what she said or the timeline.
Q. Okay. Who, to your knowledge, told Ms. Poolos not to disparage Ms. Richards?
A. My understanding is that Bill had told her that.
Q. And had Mr. Owens said that during the January 5th meeting that you attended, to Ms. Poolos?
A. No. My recollection is that that had come up when he had spoken with her about this call or this communication she'd had with Scott.

Q. That when Mr. Owens spoke to Ms. Poolos about her call with Mr. Bronstein, he had said you can't -- you shouldn't be or can't disparage Ms. Richards?

MR. ZUCKERMAN: Objection.

Q. Is that what you mean?

A. That's my understanding, yes.

Q. And do you have any knowledge of Ms. Poolos disparaging Ms. Richards separate and apart from the phone call that she had with Mr. Bronstein?

A. My recollection is that there were either notes or text messages.

Q. Notes or text messages between who?

A. Of her -- I believe of her communications with Bronstein.

Q. And notes or text messages of communications after her initial call with Mr. Bronstein?

MR. ZUCKERMAN: Objection.

You can answer.

A. I believe so.

Q. And your understanding is that Ms. Poolos was suspended because she disobeyed Mr. Owens' directive not to disparage Mr. Bronstein?

MR. ZUCKERMAN: Objection. It's

been asked and answered.

A. You can answer.

Q. Can you repeat that?

MR. IADEVAIA: Do you mind repeating it back?

(Whereupon, the record was read by the reporter.)

Q. Fair enough.

A. Okay.

Q. Is it your understanding that Ms. Poolos was placed on administrative leave because she disobeyed Mr. Owens' instructions not to disparage Ms. Richards?

A. That was my understanding, and that it was considered retaliation.

Q. And you said that you participated in phone calls in which the administrative leave was discussed.

Were these phone calls before Ms. Poolos was put on administrative leave or after she had been put on administrative leave?

A. I believe they were before we were being told that the decision had been made that she should be put on administrative leave.

Q. And who made the decision -- who do you

understand made the decision?
A. It was communicated to me by Renee Balducci. I don't know who made the ultimate decision.
Q. Do you know if Mr. Owens made the decision?
A. I don't believe he made the decision.
Q. And why do you say that?
A. Because I don't believe he was the person investigating the conduct or the incident.
Q. Is it your understanding that either someone from HR or legal had made the decision?
A. That's my understanding.
Q. Okay.
THE REPORTER: Before we go off the record, is it okay if counsel will state their orders on the record?
MR. IADEVAIA: We're most definitely ordering. I just have to talk with my folks about how quickly we want the transcript. Is it okay for me to email you?
MR. ZUCKERMAN: How have you guys been working it out? Are we ordering for the other party?
MR. IADEVAIA: I don't think we've

done that up to now. I mean, there's only been one deposition.

(Whereupon, a discussion was held off the record.)

THE VIDEOGRAPHER: We're going off the record at 6:08 p.m., and this concludes today's testimony of Tanya Simon. The total number of media units was four and will be retained by Veritext.

(Time noted: 6:08 p.m.)

_____________________________

TANYA SIMON

Subscribed and sworn to before me this ________ day of ________ 20__.

_________________________________

Notary Public

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Tanya Simon | Mr. Iadevaia | 7 |

EXHIBITS

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | BATES CBS1-CBS12 | 145 |
| Exhibit 2 | BATES CBS8093-CBS8095 | 180 |
| Exhibit 3 | BATES CBS2297-CBS2298 | 190 |
| Exhibit 4 | BATES CBS8105 | 193 |
| Exhibit 5 | BATES CBS7774 | 196 |
| Exhibit 6 | BATES CBS7775-7788 | 196 |
| Exhibit 7 | BATES CBS8106 | 214 |
| Exhibit 8 | BATES CBS8109 | 219 |
| Exhibit 9 | BATES CBS2902-2903 | 221 |
| Exhibit 10 | BATES CBS8118-8119 | 225 |
| Exhibit 11 | BATES CBS3095 | 227 |
| Exhibit 12 | BATES CBS8122 | 228 |
| Exhibit 13 | BATES CBS8125 | 240 |
| Exhibit 14 | BATES CBS3149 | 242 |
| Exhibit 15 | BATES CBS8128 | 249 |

C E R T I F I C A T E

I, TENEJA SOLTAU, hereby certify that the Examination Before Trial of TANYA SIMON was held before me on the 28th day of January, 2025; that said witness was duly sworn before the commencement of her testimony; that the testimony was taken stenographically by myself and then transcribed by myself; that the party was represented by counsel as appears herein;

That the within transcript is a true record of the Examination Before Trial of said witness;

That I am not connected by blood or marriage with any of the parties; that I am not interested directly or indirectly in the outcome of this matter; that I am not in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of February, 2025.

Teneja Soltau

TENEJA SOLTAU

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS

CASE NAME: Poolos v. Paramount

DATE OF DEPOSITION: January 28, 2025

WITNESS'S NAME: Tanya Simon

| PAGE | LINE (S) | CHANGE | REASON |
| --- | --- | --- | --- |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

_________________

TANYA SIMON

SUBSCRIBED AND SWORN TO BEFORE ME

THIS ____ DAY OF ____________, 20__.

________________ ______________________

(NOTARY PUBLIC) MY COMMISSION EXPIRES:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALEXANDRA POOLOS, )
)
Plaintiff, )
)
vs. ) No. 1:23-cv-08896
) (GHW)(HJR)
PARAMOUNT GLOBAL; CBS )
BROADCASTING, INC.; and )
CBS NEWS, INC., )
)
Defendants. )
------------------------ )

March 11, 2025
4:56 p.m.

Continued deposition of TANYA SIMON, held at the offices of Davis Wright Tremaine LLP, 1251 Avenue of the Americas, New York, New York, before Laurie A. Collins, a Registered Professional Reporter and Notary Public of the State of New York.

A P P E A R A N C E S:

VLADECK, RASKIN & CLARK, P.C.
Attorneys for Plaintiff
111 Broadway, Suite 1505
New York, New York 10006
BY: JEREMIAH IADEVAIA, ESQ.
jiadevaia@vladeck.com
BRANDON WHITE, ESQ.
bwhite@vladeck.com
JAMES BAGLEY, ESQ.
jbagley@vladeck.com

DAVIS WRIGHT TREMAINE LLP
Attorneys for Defendants
1251 Avenue of the Americas
New York, New York 10020
BY: MICHAEL LEONE LYNCH, ESQ.
michaellynch@dwt.com

ALSO PRESENT:
DANYA AHMED, ESQ. (Paramount)
ALEXANDRA POOLOS
RASHEL PORTALES, Videographer

THE VIDEOGRAPHER: Good afternoon. We're going on the record, and the time is 4:56 p.m. on March 11th, 2025.

Please note that the microphones are 04:56:29 sensitive and may pick up whispering and private conversations.

Please mute your phones at this time.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit number 1 in the video recorded deposition of Tanya Simon taken by counsel for plaintiff in the matter of Alexandra Poolos versus Paramount Global, et 04:56:54 al., filed in Davis Wright Tremaine LLP, Case Number 1:23-cv-088969(GHW)(JLC).

The location of the deposition is 1251 Avenue of the Americas, twenty-first floor, New York, New York 10020. 04:57:22

My name is Rashel Portales representing Veritext, and I'm the videographer. The court reporter is Laurie Collins, representing Veritext.

I am not authorized to administer an 04:57:36

Simon

oath. I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any observations to proceeding, please state them at the time of your appearance. 04:57:46

The appearances will appear in the stenographic record.

T A N Y A   S I M O N ,

resumed as a witness, having been previously sworn by the notary public, was examined and testified further as follows:

EXAMINATION CONTINUED BY

ATTORNEY IADEVAIA: 04:58:00

Q. Good afternoon, Ms. Simon. This is, as you know, the second day of your deposition. You went to my offices previously a month so give or take for the first day; correct?

A. Correct. 04:58:17

Q. And do you understand that you are still under oath from the first day of your deposition?

A. I do.

Q. Have you reviewed the transcript of the 04:58:23

Simon

first day of your deposition?

A. I have not.

Q. Have you discussed with anyone at 60 Minutes the first day of your deposition? 04:58:33

A. I have not.

Q. Have you discussed with anyone, not including counsel or any spouse, your first day of deposition?

A. I have not. 04:58:42

Q. Do you have a CBS-issued phone?

A. I do, yes.

Q. Do you use that phone for work?

A. I do.

Q. And what's the number on that phone, do you know? 04:58:51

A. I don't. It's 646. It's my 646 number.

Q. And do you have a personal phone?

A. I do. 04:59:02

Q. And do you use it for work?

A. For calls.

Q. For calls?

A. Yeah, and text, and text, yeah.

Q. Do you ever text folks that you work 04:59:09

Simon

with using your personal phone?

A. Yes.

Q. And what are the last four digits of that number? 04:59:15

A. 2674.

Q. At some point in this case did you get a notification from your lawyers to preserve documents for the purposes of this case?

A. Yes. 04:59:32

Q. When approximately did you get that notification?

A. I don't know.

Q. Do you know if it was before or after Ms. Poolos filed the lawsuit? 04:59:38

A. I don't recall.

Q. I believe during the first day of your deposition you testified about a meeting that you and Bill had with Alex on January 5th, 2022. Do you recall that meeting? 04:59:57

A. Yes.

Q. And it was during this meeting that Bill and you told Alex for the first time that Collette had made a complaint against her; correct? 05:00:09

Simon

A. Correct.

Q. Did you say anything during that meeting? Do you recall saying anything?

A. I don't recall. 05:00:18

Q. Did you make notes of the conversation with Alex on January 5th?

A. I believe I did.

Q. And did you make handwritten notes?

A. I believe so. 05:00:31

Q. Was it your practice to make handwritten notes of meetings?

A. Often, yes.

Q. And where -- strike that.

I'm going to show you what I think are 05:00:39 the notes.

ATTORNEY IADEVAIA: We're going to start with Exhibit 16.

(Simon Exhibit 16, notes of Simon, Bates-stamped CBS 8524, marked for identification.)

Q. For the record, what's been marked as Simon Exhibit 16 is a one-page document bearing Bates number CBS 8524.

Ms. Simon, obviously take your time to 05:01:24

Simon

review, but my first question is do you recognize what's been marked as Simon Exhibit 16.

A. Yes.

Q. What is it? 05:01:34

A. Notes of mine.

Q. And are these notes that you took of the meeting with Alex Poolos on January 5th, 2022?

A. Yes, above the line. See where I drew a line? 05:01:47

Q. Yeah. Just to be clear for the record, there are multiple lines on this page, but there appears to be a line drawn below the phrase "number-one promoter" and above "got related." Is that the line you're referring to? 05:02:01

A. Yes.

Q. Okay. So above the line, those are your notes of the discussion with Alex Poolos on January 5th; correct?

A. Yes. 05:02:09

Q. And if you look, on the left-hand side at the top it says BO colon.

Does the BO stand for Bill Owens?

A. Yes.

Q. And were you writing down following 05:02:21

that colon what Bill said during the meeting?

A. I believe so, yes.

Q. Does it say, no respect for professional boundaries? Did I read that correctly? 05:02:33

A. Yes.

Q. And what was Mr. Owens saying about no respect for professional boundaries?

A. My recollection is that he was telling Alex about Collette's complaint and that Alex showed no respect for professional boundaries and that Collette said she had been bullying her. 05:02:41

Q. Am I correct, then, that Bill in that first line -- no respect for professional boundaries/bullying -- is summarizing Collette's complaint against Alex? 05:03:04

A. That's my recollection, yes.

Q. The next line says, has to be respectful. 05:03:16

Is this something that Bill said?

A. Yes.

Q. Okay. And tell me what you recall -- what -- the context of him saying that.

A. My recollection is that the context was 05:03:26

Simon

that we work in an environment where we're all expected to be respectful.

Q. Below that line there's a line of notes that says, dash, start-up par performance. 05:03:39

Was that something Mr. Owens had said or Ms. Poolos or someone else said?

A. My recollection is the rest of the notes on this paper above that line are notes on what Alex said in response to Collette's complaint 05:04:02 and what Bill had told her.

Q. So this note indicates that Alex had said that Collette's performance was subpar?

A. Yes.

Q. Okay. And then to the right it says, 05:04:16 suggest a conversation.

Do you know what that's a note about? Well, first of all, did I read that correctly?

A. You did read that correctly, and I don't specifically recall, no. 05:04:32

Q. Then on the next line it says, Trevor Noah piece disappointment.

Did I read that correctly?

A. You did, yes.

Q. And was that something Ms. Poolos said 05:04:41

about Ms. Richards or about something else?

A. I believe it's what she said about Ms. Richards.

Q. Her performance in connection with the Trevor Noah piece? 05:04:51

A. I believe so.

Q. Below that it says, not giving it her all.

Did I read that correctly? 05:05:00

A. Yes.

Q. And is that something Alex said about Ms. Richards?

A. Yes.

Q. And below that it says, number-one promoter. 05:05:05

Do you see that?

A. Uh-huh.

Q. And I read it correctly?

A. Yes. 05:05:11

Q. And what is that note about?

A. My recollection is that Alex said she was Collette's number-one promoter.

Q. And not that Bill said that Alex was Collette's number-one promoter; correct? 05:05:23

Simon

A. That's my recollection, correct, yes.

Q. All right. Moving to the right side of the page, we already talked about "suggest a conversation." Is it possible that Bill said in response to Alex raising concerns about Collette's performance that Bill said, Why don't you have a conversation with Collette about these things or no? 05:05:32

ATTORNEY LYNCH: Objection. 05:05:47

A. I don't recall.

Q. Don't recall. Okay.

Then there's a note that I think says drive to ATL. First of all, is that drive?

A. Yes. 05:05:56

Q. And then ATL, does that stand for Atlanta?

A. Yes.

Q. What is that note about?

A. My recollection is that Collette had wanted and had driven to Atlanta the weekend that the Trevor Noah piece was airing. 05:06:07

Q. Was that a comment that Alex referenced that you were taking a note of or something else?

A. I believe it was a comment that Alex 05:06:24

Simon

referenced.

Q. All right. And then I can't read the next note below. What does that say?

A. It says, do social media. 05:06:32

Q. And do you have any idea what that's a reference to?

A. The associate producers and the producers in the days leading up to a piece have to approve -- read and approve all of the social 05:06:44 media that our social media team writes. So typically the associate producer takes a first pass at that.

Q. Got it.

And was this a comment that Alex made 05:06:58 or someone else?

A. I believe it's a comment that Alex made.

Q. Do you recall the context of what she was saying there? 05:07:07

A. I think she was explaining what either Collette did on the drive to Atlanta or would have had to do on the drive to Atlanta.

Q. Okay. Then below that it says, broadcast producer: footage issue, dropped ball. 05:07:23

Simon

Did I read that correctly?

A. Yes.

Q. First of all, who made that comment that you're taking a note of there? 05:07:35

A. Alex.

Q. Okay. And what was the context of her comment?

A. She was explaining that there had been -- Collette had had a bridal shower during 05:07:48 the time that they were shooting a different story, not Trevor Noah. And during her bridal shower she and Alex were in constant cell -- like text communication about a footage issue that had taken place. And Alex believed that Collette had 05:08:12 dropped the ball on that during her bridal shower.

Q. And did Alex explain during this meeting on January 5th specifically the way that she believed Ms. Richards had dropped the ball?

A. I don't recall. 05:08:30

Q. And then everything else that is below the text we just went through, that is for a different meeting?

A. Completely different meeting.

Q. Outside of what's in these notes and 05:08:42

Simon

what you've just testify to in giving additional explanation, is there anything else you recall that was discussed during the meeting?

A. No. 05:08:53

(Simon Exhibit 17, text messages, Bates-stamped CBS 8134 to 35, marked for identification.)

Q. Okay. What's been marked as Simon Exhibit 17 is a two-page text thread bearing Bates 05:09:52 number CBS 8134 to 35.

Ms. Simon, let me know once you've completed review of the document, please.

(Pause.)

A. Okay. 05:10:49

Q. So for the record -- and you can confirm this, please, Ms. Simon -- the text messages are between you and Mr. Owens; correct?

A. Correct.

Q. And they're all dated January 7, 2022; 05:10:59 is that right?

A. Correct.

Q. And do you know whether these text messages were sent and received by you after you were aware that Alex had spoken to Scott Bronstein 05:11:15

Simon

at CNN?

A. I don't know about the ones that are earlier in the day. Certainly it looks like at 10 p.m. I knew about him. 05:11:43

Q. Got it. I wasn't to focus, actually, on that second page --

A. Okay.

Q. -- 135, and the second text from the top that you sent to Mr. Owens on January 7th. 05:11:59 You wrote, She doesn't want to work on the story, says after what just happened she can't work with her anymore, wanted to know if she should be canceling things, and I said no, it's Lesley's story, you can't cancel it, but she made clear she 05:12:18 won't work on it.

Do you see that text?

A. I do.

Q. Is the "she" you are referring to in this particular text a reference to Collette? 05:12:28

A. Yes.

Q. And did Ms. Richards on January 7, 2022, after notifying 60 Minutes folks that Alex spoke to Mr. Bronstein, did she tell you that she didn't want to work on a story? 05:12:49

Simon

ATTORNEY LYNCH: Objection.

A. I don't specifically recall, but the texts would indicate that.

Q. Was that the first time that Collette had said she didn't want to work with Alex? 05:13:02

A. In the first time that Collette called me with her complaint in December, she had said that she couldn't keep working in this -- in this situation and that it couldn't go on like this. This was the first time she specifically said she wouldn't work on a story. 05:13:33

Q. Do you know what story she was working on then?

A. This was a story about hostages, more or less. 05:13:47

Q. It was a story that she was working on behalf of Lesley Stahl; correct?

A. Correct, yes.

Q. Okay. And then in the bottom text from you to Mr. Owens, you wrote, When you have a minute, I need to fill you in on my call -- actually, strike that. 05:14:09

Before we talk about this, up to this point, meaning up to the point of the text I just 05:14:22

Simon

went through with you, had you been aware that Alex was placed on administrative leave?

A. I don't recall when I found that out.

Q. And then below in the next text, the last text in this string, you wrote, When you have a minute, I need to fill you in on my call with Renee. She spoke to the guy in question at CNN, Scott Bronstein (did you know him). She says his recollection of the conversation aligns more with what Collette reported. 05:14:39 05:14:57

Did I read that correctly?

A. You did.

Q. What did Renee tell you about her conversation with Scott Bronstein? 05:15:07

A. I recall very loosely that she said Scott had been concerned or disturbed at the phone call that he got from Alex.

Q. Anything else you recall about that discussion? 05:15:34

A. That she had been trashing Collette. Those are my words. That was the gist of it.

Q. That's what Renee reported to you of what Mr. Bronstein had said to her; correct?

A. That's what I recall, correct. 05:15:48

Simon

Q. Was it surprising to you that the version that Scott Bronstein reported to Renee that was then shared with you would be consistent with what Collette had said? 05:16:05

A. I didn't really think about it that way.

Q. At the time that Collette raised her concerns about this phone call, according to Collette the only basis for her having those views 05:16:23 was supposedly what Mr. Bronstein had said to her; right?

ATTORNEY LYNCH: Objection.

A. Sorry, could you repeat that?

Q. Sure, sure. 05:16:33

When Ms. Richards initially -- well, strike that.

How did you find out about the call that Alex had with Scott Bronstein?

A. I -- I don't recall whether -- sorry, 05:16:51 go ahead.

Q. No, no, no. Please go ahead. I cut you off.

A. I don't recall whether Renee told me or Collette told me. 05:17:02

Simon

Q. Got it. Okay.

And at the time that Collette shared the phone call, either directly with you or to Renee, what was your understanding of the basis of Collette's knowledge that the phone call had taken place? 05:17:13

A. My understanding was that Scott Bronstein had called Collette to tell her that he had gotten this call from Alex. 05:17:24

Q. And you're asking Bill for a phone call in that exhibit. Did you speak to Bill after that text message?

A. I don't recall.

Q. Did you become aware at some point that Ms. Poolos had texted Scott Bronstein before the phone call? 05:18:14

ATTORNEY LYNCH: Objection.

Q. It's not in the exhibit. It's just a question for you. 05:18:27

A. At some point I became aware of it.

Q. And how did you become aware of it?

A. I believe Renee told me at some point.

Q. What did Renee say about it?

A. That Alex had been texting him 05:18:43

Simon

beforehand.

Q. And did Renee say anything about the substance of the text messages?

A. Not that I recall specifically beyond her wanting to -- beyond Alex wanting to talk to Scott about Collette. 05:18:55

Q. And did Renee say anything else to you about those text messages beyond what you just testified to? 05:19:08

A. No.

Q. Did you know that Collette had been in touch with Mr. Bronstein for months before the phone call to complain about Alex?

ATTORNEY LYNCH: Objection. 05:19:26

A. No.

Q. Do you know that Collette made multiple secret recordings of conversations that she had with Alex?

A. No. 05:19:46

Q. Did you know that Collette secretly recorded a conversation that she had with Renee Balducci?

A. No.

Q. In any of the conversations you had 05:19:56

Simon

with Collette about her concerns related to Alex, she never told you about recordings; is that right?

A. That's correct. 05:20:05

Q. And in any of the conversations you had with Ms. Richards about her concerns related to Alex, did Ms. Richards ever tell you that she had been in touch with Mr. Bronstein months before Alex's call specifically regarding her concerns 05:20:25 about Alex?

ATTORNEY LYNCH: Objection.

A. Not that I recall.

Q. And did Collette tell you that she knew that Alex had reached out to Scott Bronstein 05:20:41 before Alex had her call with him?

A. Not that I recall.

Q. Did Renee Balducci tell you that? Let me ask it again.

Did Renee Balducci tell you that 05:20:57 Collette was aware that Alex had texted with Scott Bronstein before Alex had her phone call with him?

A. I don't recall her telling me that Collette was aware of that. As I have said earlier, Renee told me that she, Renee, was aware 05:21:19

Simon

there had been text communication before.

Q. Did Renee ever tell you that she was aware of the text communication between Alex and Scott before the phone call took place, meaning 05:21:30 Renee's knowledge of the text exchange? Did Renee ever tell you that she was aware they had been texting before she learned about the phone call?

ATTORNEY LYNCH: Objection.

A. I don't -- I'm sorry. 05:21:45

Q. Yeah, it's okay. It's okay. Let me try one more time.

A. Yeah.

Q. So I'm really asking about Renee's knowledge and what she told you. I know she 05:21:53 became aware at some point about text exchanges between Scott Bronstein and Alex that predate the phone call.

What I'm asking is did Renee ever tell you that she knew that they had been in touch 05:22:06 before the call took place, meaning she found out about the communications prior to the call happening?

ATTORNEY LYNCH: Objection.

A. I don't recall. 05:22:15

Simon

Sorry.

ATTORNEY IADEVAIA: If we could mark this as 18.

(Simon Exhibit 18, text messages, Bates-stamped CBS 8133, marked for identification.)

Q. If you could take a look at what has been marked as Simon Exhibit 18, please.

I will say for the record it is a one-page text exchange bearing CBS 8133. 05:22:35

(Pause.)

Q. So at the top it says it's a text exchange between Renee, and then there's a 646 number. Is this your CBS work number? 05:23:10

A. Yes, that's my number.

Q. So this is a text exchange between you and Renee Balducci, and all the texts are dated January 7th, 2022; correct?

A. Correct. 05:23:23

Q. In the top text you write to Renee: I need guidance on an update with Collette. She and Alex have a shoot next week, and Collette told me she can't work with Alex and doesn't want to go. Is Maria Cottone back? If not, we can discuss 05:23:36

Simon

tomorrow.

Did I read that correctly?

A. Yes.

Q. So you're advising Renee Balducci via this text that Collette had told you that she doesn't want to work on this story with Alex; right? 05:23:41

A. Correct.

Q. And do you know, as of the time you sent that text, whether Ms. Poolos had been placed on administrative leave? 05:23:53

A. I don't know.

Q. Then Renee writes a couple texts down: Yeah, we can discuss. Give me an hour. 05:24:06

And then further down you send Renee Alex's cell phone.

Do you see that? Do you see all that text?

A. I do. 05:24:18

Q. Why did you send Renee Alex's cell phone number?

A. I don't recall sending it to her. She must have asked for it.

Q. And then you write, I brought Bill up 05:24:31

Simon

to speed. Renee writes, Can you talk? And you say, Yeah.

Do you know whether in these discussions with -- well, strike that. 05:24:40

Did you speak to Renee at some point on January 7th following these texts or around the time you sent these texts?

A. I don't recall a conversation. I might have. 05:25:00

Q. And did Ms. Balducci tell you, one of these potential conversations, that CBS was placing Ms. Poolos on administrative leave?

A. I was told at some point. I don't know whether that was the time that I was told. 05:25:19

Q. And where you wrote, I brought Bill up to speed, were you bringing Bill up to speed about Alex being placed on a paid administrative leave?

A. I don't remember.

Q. All right. We're done with that 05:25:43 exhibit for now.

During the time you've been executive editor at 60 Minutes, which I think you testified before started in 2019? Do I have that correct?

A. Correct. 05:26:00

Simon

Q. It was after or around the same time that Bill was promoted to be executive producer?

A. Correct.

Q. During that time, outside of Alex Poolos has any other 60 Minutes employee been placed on a paid administrative leave? 05:26:07

A. Not that I'm aware of or that I can recall.

Q. Before you became executive editor but worked at the show for some amount of time, are you aware of any other -- are you aware of any employees of 60 Minutes who were placed on a paid administrative leave? 05:26:34

A. I don't know. 05:26:48

Q. And were you ever told the reason that Ms. Poolos was placed on a paid administrative leave?

A. My recollection is that it was in light of her communication with Scott Bronstein, which was perceived to be retaliatory against Collette. 05:27:17

Q. And did you understand that the leave was a punishment for having done so or something else?

A. My understanding, that it was a leave 05:27:31

Simon

while the case was being -- while the incident was being investigated.

Q. And was that understanding based on something that Renee told you or somebody else? 05:27:39

A. I believe it was Renee who explained the process to me.

(Pause.)

ATTORNEY IADEVAIA: If we could mark this as Exhibit 19, please. 05:28:26

(Simon Exhibit 19, text messages, Bates-stamped CBS 8145 through 8147, marked for identification.)

Q. Okay. For -- please take a look, Ms. Simon. 05:28:35

For the record, what has been marked as Simon Exhibit 19 is multipage text thread bearing Bates numbers CBS 8145 through 8147.

(Pause.)

Q. You've had a chance to review? 05:29:30

A. Yes.

Q. So for the record these are text messages between you, Mr. Owens, and I believe Renee Balducci, and they're all dated January 8th, 2022. Is that your understanding? 05:29:42

Simon

A. Yes. I don't know whose number the 917-471 is. If you know that that's Renee's, then I believe you.

Q. Yeah, I believe it's Renee's phone. 05:29:57

A. Okay. Okay.

Q. At this point by January 8th, 2022, had Ms. Poolos been placed on a paid administrative leave?

A. Yes, I believe so. 05:30:12

Q. Can you tell that based on the text that you're reading here?

A. Yes.

Q. Yeah.

A. Okay. 05:30:18

Q. And was it decided at some point that someone named Shari Finkelstein would take over a story that Ms. Poolos was working on?

A. Yes.

Q. And what story was that? 05:30:32

A. This was the story about hostage policy.

Q. Got it.

And if you look at the last page of Exhibit 19 -- actually, you know what, just for 05:30:42

Simon

full context, if we go back one page. Look at the bottom text from Bill on January 8th, 2022. It says at 3:52 p.m. It says T: Did you tell her about Shari? And then on the next page you wrote, 05:31:07 I told her that was being discussed, but I don't know if Lesley has spoken to Shari yet. Do you?

And then you wrote, I need to call -- and there's a name blocked out -- somebody's PR guy, because he now knows Alex isn't going on the 05:31:27 shoot and she's not answering his emails/texts and he wants to know what's going on.

Do you see that text?

A. I do.

Q. Did I read it correctly? 05:31:39

A. Yes.

Q. And do you know who the PR guy is you're referring to here?

A. One of the characters in the story, but I don't recall that person's name. 05:31:48

Q. Was it Barney Gimbel? Was that the PR person?

A. I think so.

Q. At some point did you have a conversation with Barney? 05:31:55

Simon

A. I did.

Q. And do you know before your conversation did Collette have a conversation with him? 05:32:02

A. That was my understanding, yes.

Q. In the conversation you had with Barney, did he complain to you about his conversation with Collette?

A. I remember him telling me he was confused after his conversation with her because she told him that he should deal with her now. And he didn't have an established relationship with her, and so he wanted to know what was happening. 05:32:17 05:32:35

Q. Your memory of the discussion you had with Barney, did he make any complaint of any kind? I know you testified he was confused, but did he complain at all?

ATTORNEY LYNCH: Objection. 05:32:47

A. I think he complained that he wasn't getting explanation for what was happening and didn't know her.

Q. Didn't know Collette?

A. Collette, particularly, yeah. 05:33:07

Simon

Q. Did he say to you that Collette had said that Alex's job was in jeopardy or something to that effect?

ATTORNEY LYNCH: Objection. 05:33:17

A. No, he did not.

Q. Do you know during the period that Alex was on an administrative leave if she did any work for 60 Minutes?

A. On the -- on one of the days in this 05:33:38 time frame, she and I texted a couple of times so that I could get, like, a status report from her and contact names and sort of who was who in the story, just so I could be brought up to speed. And that was just a few text exchanges. That's 05:33:57 all that I'm aware of.

Q. Do you know whether Lesley Stahl asked Alex to do work on the hostages story?

A. I do not know.

Q. At any point in time did you give -- we 05:34:16 don't necessarily need the exhibit anymore. I'm asking a different set of questions.

At any point in time did you give Collette guidance about how to talk about Alex being on a leave? 05:34:27

Simon

A. I recall her -- I recall being told that none of us could say anything about that. So we just were told to say Alex was out.

Q. And who told you not to say anything? 05:34:45

A. Renee gave me guidance on what to say to people.

Q. And did you give that guidance to Collette?

A. I don't recall specifically. 05:34:56

Q. Do you know if Renee gave Collette that guidance directly?

A. I don't know whether she did.

Q. In any communication you had with Alex after she was on the paid administrative leave, 05:35:09 did Alex specifically ask you to be in touch with Barney?

A. I don't recall, but it's possible.

Q. And do you know how it came about that Collette had a conversation with Barney? 05:35:25

A. I don't recall other than they had a shoot coming up.

Q. Did you ask Collette to make a call to Barney?

A. Not that I recall -- or I don't recall. 05:35:42

Simon

Q. When approximately was Alex fired or told she was being fired?

A. I don't know that date.

Q. Okay. Does February 3rd sound approximately right? 05:35:58

A. Sure.

Q. Okay. Between the time -- during the period that she was on administrative leave, do you have any understanding of what was going on at CBS to consider the allegations that had been made against Alex? 05:36:08

ATTORNEY LYNCH: Objection.

A. My understanding is that there was an investigation or an inquiry being conducted. 05:36:28

Q. Do you know who was conducting that investigation?

A. My understanding was HR was doing it in conjunction, I think, with legal.

Q. And who in HR was handling the investigation? 05:36:46

A. My knowledge was Renee was.

Q. Ms. Balducci?

A. Balducci, yes.

Q. Do you know what steps Ms. Balducci 05:36:56

Simon

took in connection with her investigation?

A. I don't recall beyond what we have discussed already.

Q. Do you know if she met with Alex? 05:37:09

A. My understanding is they had a conversation. I don't know if it was a meeting.

Q. And did Renee ever tell you about that discussion that she had with Alex?

A. In very loose terms, I believe. 05:37:36

Q. And what did she say?

A. I don't recall the specifics. I remember her saying she had a conversation with Alex.

Q. You don't remember anything else she 05:38:00 said about it?

A. Not specifics, no.

Q. Specifically, other than they had a conversation?

A. My recollection is that Alex had a 05:38:06 different interpretation of her call with Scott Bronstein.

Q. Did Renee tell you what Alex's description of the phone call she had with Scott was? 05:38:23

Simon

A. I believe it was that -- I believe Alex had said something along the lines of she was calling him to see if any of what she was witnessing with Collette made sense, that she was sort of checking to see if there was something she needed to know about her, is my recollection. 05:38:43

Q. Do you recall anything else about what Renee told you about her discussion with Alex?

A. No. 05:38:57

Q. Did you ever have a conversation with Alex about the phone call she had with Scott Bronstein?

A. No.

Q. Do you know whether anyone other than Renee had a discussion with Alex about her call with Scott Bronstein? 05:39:07

A. I don't know.

Q. To your knowledge did Bill Owens speak to Alex about her discussion with Scott Bronstein? 05:39:21

A. Not on the call that I was on with them. Do you mean other --

Q. Yeah, when you say the call you were on, that was on January 5th; right?

A. Right, right. 05:39:37

Simon

Q. So there was no discussion about Scott Bronstein?

A. Right. That's what I thought you were asking. 05:39:41

Q. No. I'm asking subsequent to that January 5th meeting after the allegation came to light that Alex had spoken to Scott Bronstein and purportedly disparaged Collette to him, do you know if Bill Owens spoke to Alex about that phone call. 05:39:52

A. I actually don't recall if he did.

Q. And the question maybe wasn't phrased great --

A. Yeah. 05:40:24

Q. -- so just to be clear, did Bill ever tell you that he had spoken to Alex about her phone call with Scott Bronstein?

A. I don't recall.

Q. Did Alex ever raise concerns that you're aware of about being suspended -- 05:40:57

ATTORNEY LYNCH: Objection.

Q. Or being placed on a paid administrative leave?

A. Not to me. 05:41:12

Simon

Q. Okay. Were you aware of any concerns that she raised?

A. No.

Q. Did Alex to your knowledge ever raise concerns that being on a paid administrative leave was hurting her reputation? 05:41:17

A. I don't recall.

(Simon Exhibit 20, text messages, Bates-stamped CBS 8157, marked for identification.)

Q. What's been marked as Simon Exhibit 20 is a one-page text thread bearing Bates numbers CBS 8157.

Let me know once you've reviewed it, please. 05:42:13

A. I've reviewed it.

Q. According to the document, this is a text exchange between Bill and you, and all the texts are dated January 10th, 2022; correct? 05:42:23

A. Correct.

Q. At the top text -- actually, I'm going to just skip. Hold on.

In the third text you wrote on January 10th to Bill: Do you want me to join the 5 p.m. 05:42:40

Simon

with Renee in the event other things are discussed? Bill wrote back: Sure. I spoke to her at length yesterday. You wrote, Will you fill me in later? And Bill wrote, Sure. It was more ticktock around Alex, et cetera. 05:42:55

Did I read that text correctly?

A. Yes.

Q. What's the phrase "ticktock," do you know? 05:43:05

A. I think chronology.

Q. And did you speak to Bill after this text about ticktock around Alex?

A. I don't recall.

Q. And at this point in time Alex was on the paid administrative leave; correct? 05:43:19

A. Correct, yeah.

Q. Do you recall any discussions you had with Bill Owens about Alex between when Alex was placed on the paid administrative leave and when she was fired? 05:43:36

A. Yes.

Q. And what do you recall?

A. I recall -- and I don't know the time frame. I recall him telling me that he had had a 05:43:48

Simon

conversation with her at which point he told her -- actually, I don't know if this was before she was put on leave. At some point he went through the chronology of texts and her phone call to Scott Bronstein, but I don't know when I had that conversation with him. 05:44:16

Q. Okay. So you're recalling that at some point you had a conversation with Bill Owens -- you don't remember if it was pre or post the paid administrative leave -- regarding his review of the chronology of the text and phone call between Alex and Scott? 05:44:32

A. I think it was post administrative leave. 05:44:51

Q. Was it your understanding that Bill had directly reviewed a chronology?

A. My understanding was that he had been filled in by Renee and/or others about what they understood the chronology to be based on their findings or investigation. 05:45:09

Q. And what did Bill say about the chronology other than he had been filled in?

A. I believe at some point he had sort of told Alex that the matter was settled and he was 05:45:43

Simon

disappointed that after that she had called Scott Bronstein.

Q. He said that to you.

A. If my chronology is correct. 05:45:52

Q. And your testimony is that you recall Mr. Owens saying that to you?

A. At some point, yes.

Q. You don't remember when he said that to you? 05:46:04

A. No.

Q. And what else did Mr. Owens say about the chronology other than what you've testified to?

A. That's what I remember. 05:46:09

Q. During the period Ms. Poolos was on leave before she was let go, did you have any discussions with Renee Balducci about the matter?

A. I was occasionally given updates.

Q. Directly by Ms. Balducci? 05:46:35

A. Correct.

Q. And how many times did she give you updates?

A. I don't recall. We had relatively frequent HR, you know, weekly meetings, so I don't 05:46:47

Simon

know how many times.

Q. Did you take notes during the HR meetings that you had?

A. Not really, no. 05:46:56

Q. And what did Ms. Balducci tell you when she gave you those updates?

A. I don't recall the specific conversations. They were just bringing up to speed on where things were at. That was -- I was 05:47:16 in a listening capacity, so it was just bringing us up to speed.

Q. And you say "us." You mean you and Bill?

A. If there were more of it. Sometimes I 05:47:30 think Bill was on, if it was our regular HR calls, we did them with her together.

Q. Do you have any recollection of any substance discussed with Renee during this period of time? 05:47:41

ATTORNEY LYNCH: Objection.

Q. Let me ask again.

During the period that Ms. Poolos was on a leave, so meaning before she got fired, do you have a memory of anything you specifically 05:47:52

Simon

discussed with Ms. Balducci?

A. Beyond the Scott Bronstein texts and phone call, no.

Q. Okay. What did you discuss with Ms. Balducci about the Scott Bronstein text and call? 05:48:05

A. She described, at some point in this time frame, the phone call that Alex had put in to him and his recollection of that call. And she said that he had taken notes of that call. 05:48:29

Q. Anything else you recall about discussions you had related to Alex during this time frame?

A. No. 05:48:45

Q. Did you ever see the notes that Mr. Bronstein took?

A. I don't believe I did.

Q. And what, if anything, did Ms. Balducci say about his notes, about Mr. Bronstein's notes? 05:48:59

A. I think she characterized him as being disturbed by the call.

Q. Anything else you recall?

A. No.

Q. This is the same call you were 05:49:17

Simon

testifying about earlier today; right?

A. Correct, correct.

Q. You don't recall other discussions beyond that one? 05:49:26

A. No, just that, that one call, yes.

Q. At some point Alex -- there was a decision that Alex's employment would end; correct?

A. Correct. 05:49:44

Q. And who made that decision?

A. My understanding is that Bill made the final decision based on the -- what HR had discovered in their inquiry.

Q. What was the basis for that 05:50:06 understanding?

A. Sorry?

Q. What was the basis for your understanding that Bill had made the final decision based on HR's findings? Did someone tell 05:50:16 you that?

A. I'm trying to remember whether I was on a call when they were discussed. I believe Bill told me after the fact that that was a decision that he had made. 05:50:32

Simon

Q. And was anybody else on that call that you had with Bill when he told you about the decision?
A. No. 05:50:42
Q. And did he tell you what the findings were by HR?
A. I remember him telling me what his understanding was, which was that HR found that the outreach and the conversation with Scott 05:51:07 Bronstein was retaliatory and in that regard a violation of company policy and that he felt that Alex had lied to him after one of their conversations when he told her the matter was closed and then she went on and called Scott. 05:51:34
That's my recollection.
Q. And did Bill say to you what Alex had supposedly lied to him about?
A. I believe about the timeline or the nature of her call to Scott Bronstein. 05:51:50
Q. Did he say what the lie was about the timeline?
A. I don't recall.
Q. Did he say what the lie was about the nature? 05:52:03

Simon

A. I don't remember specifically.

Q. Are you aware of any allegation that Ms. Poolos lied about something other than what she had said to Scott Bronstein during the call? 05:52:16

ATTORNEY LYNCH: Objection.

A. I'm not.

Q. Do you know that Alex had asked more than once to speak to Ms. Balducci's manager?

ATTORNEY LYNCH: Objection. 05:52:44

A. I read that in the complaint. I wasn't aware at the time.

Q. Do you know that Ms. Poolos asserted that the investigation that HR -- that Ms. Balducci was conducting she believed was 05:52:59 biased?

A. No.

(Simon Exhibit 21, text messages, Bates-stamped CBS 8167, marked for identification.) 05:53:32

Q. Okay. What's been marked as Simon Exhibit 21 is a one-page text exchange bearing Bates number CBS 8167.

Let me know once you've had a chance to review it. 05:53:48

Simon

A. I've read it.

Q. Is this a text exchange between you and Mr. Owens?

A. Uh-huh. 05:53:59

Q. I just need a yes or no, sorry.

A. Yes, yes. Sorry.

Q. That's okay.

At the top there's a 646 number. Again, that's your work number; correct? 05:54:07

A. That is.

Q. These are all texts between you and Mr. Owens on January 18th; correct?

A. Correct.

Q. And if you look at the second-to-last 05:54:15 text message from you, you wrote -- among other things you wrote, I spoke to Renee for a few minutes. She expects there will be a resolution decision re Alex at the end of the week. She spoke to Jack and needs to speak to Lesley. 05:54:34

Did I read that correctly?

A. Correct.

Q. When you said that she expects there will be a resolution decision regarding Alex, what did you mean by that? 05:54:46

Simon

A. My sense is that they were investigating/conducting some sort of inquiry and that they would have their results of that.

Q. And you specifically used the term "decision." Did you mean that you understood that Renee was going to make -- or HR was going to make a decision about whether Alex was going to keep working at CBS? 05:55:05

ATTORNEY LYNCH: Objection. 05:55:18

A. No, not without Bill being a part of it.

Q. Why did you use that term "decision"?

A. I don't know. Maybe not a wise word.

Q. Did Renee speak to Lesley as part of her investigation, to your knowledge? 05:55:44

A. My understanding is yes.

Q. Is it based on this text?

A. Yes.

Q. Do you have any independent recollection of being told that Renee spoke to Ms. Stahl? 05:55:58

A. I believe so.

Q. And what do you recall -- first of all, who told you? Was it Ms. Balducci or someone 05:56:08

Simon

else?

A. I don't remember.

Q. What do you recall about that discussion or being told about that discussion? 05:56:14

A. I remember being told that it was going to happen. I don't remember anything about the discussion.

Q. You testified just a couple of minutes ago about a phone call you had with Bill Owens in 05:56:33 which he had told you a decision had been made to fire Alex Poolos; correct?

A. Correct.

Q. Did you have any other discussions about firing Alex Poolos other than the one you've 05:56:42 testified to?

A. I don't recall specifically whether there were group conversations that I was a part of. But I was more a listener. I was not a participant in terms of being actively involved or 05:57:07 giving my thoughts or, you know, feedback. There may have been conversations.

Q. That you were part of in which you were listening about the discussion as to whether to fire Ms. Poolos or not? 05:57:22

Simon

A. In which we were getting updates on the case more than a discussion about whether to fire her.

Q. Did you make any kind of recommendation in connection with a decision as to whether to fire Ms. Poolos? 05:57:34

A. No.

Q. Were you part of any discussions in which a lesser form of disciplinary action to take against Ms. Poolos was discussed? 05:57:42

A. I don't remember specifically.

Q. Do you remember generally?

A. No.

Q. Were you part of any discussions about whether to issue Ms. Poolos a written warning in connection with her phone call with Scott Bronstein? 05:57:58

A. I don't remember.

Q. Were you part of any discussion about whether to issue Ms. Poolos a verbal warning in connection with her phone call with Scott Bronstein? 05:58:10

A. I don't remember.

Q. You testified about your conversation 05:58:28

Simon

with Bill Owens in which he told you about the decision. Did you participate in any -- strike that.

Did you participate in any discussions 05:58:38 about whether to fire Ms. Poolos or not?

A. I believe in the context of being brought up to speed on where things were, but I didn't give any advice in that regard.

Q. And who was part of that discussion? 05:59:05 Was it one discussion or multiple discussions?

A. I don't remember.

Q. And who was part of the discussion or discussions you're referring to?

A. I believe Bill and Renee. I don't know 05:59:16 if there were other participants.

Q. And what do you recall about that discussion or discussions?

A. Just very loosely being brought up to speed on what the findings -- what they had 05:59:29 learned throughout their -- the course of the HR investigation.

Q. Is that the conversation or conversations you testified about already?

A. I think they were ongoing, so I can't 05:59:44

Simon

tell you which one happened when.

Q. Do you recall anything about those discussions beyond what you've already testified to? 05:59:52

A. No.

Q. In what way was Ms. Poolos's -- whether she was going to be fired or not discussed during those update meetings or meeting?

ATTORNEY LYNCH: Objection. 06:00:11

A. I believe there was reference to conversations being had about what a range of options could be.

Q. And what were the range of options?

A. I don't recall them specifically 06:00:29 being -- I don't recall what was laid out.

Q. Do you recall generally what was laid out?

A. No.

Q. Were the range of options meaning the 06:00:38 steps that could be taken against Ms. Poolos?

A. Correct.

Q. And were there a range of options discussed -- part of the range of options, did it include things other than firing Ms. Poolos? 06:00:51

Simon

A. I don't recall.

Q. During any of the discussions that you had -- or you were a part of, rather, was there a decision made about which of the options that CBS would use? 06:01:09

ATTORNEY LYNCH: Objection.

A. Not that I recall.

Q. Was there a discussion about why -- were you a part of any discussions about why not -- why CBS was not going to use an option that is lesser than firing Alex? 06:01:22

A. I don't recall that.

Q. During the time that you've been executive editor, has anyone else been fired from 60 Minutes for a breach of policy? 06:01:39

ATTORNEY LYNCH: Objection.

A. I'm thinking about that.

Q. Yeah, that's okay.

(Pause.) 06:02:20

A. I don't believe so.

Q. And during the time you worked at 60 Minutes before becoming executive editor, are you aware of any employees being fired for breaching company policy? 06:02:44

Simon

ATTORNEY LYNCH: Objection.

A. I don't know. I wouldn't have been privy to any specifics.

Q. Just so we're clear, what is -- you had testified before -- 06:03:03

A. Can I correct myself?

Q. Yes, of course. Fine.

A. I'm sorry. Jeff Fager was fired. My understanding was that was for a breach of policy 06:03:17 for threatening a reporter who was doing a story about his behavior.

Q. And the behavior at issue with respect to Jeff Fager was what? What was the story that that reporter was covering? 06:03:34

A. It was in light of the Me Too movement, so it was those sorts of claims.

Q. Meaning sexual harassment allegations against Mr. Fager?

A. I don't know if they rose to that 06:03:49 level, but in that general -- that was the time frame that it was happening in.

Q. Do you know anything about the allegations against Mr. Fager?

A. Just what I had read in the papers. 06:04:03

Simon

Q. And the threat that Mr. Fager made against the reporter, was that threat he made in writing?

A. It was I believe either a text or an email. 06:04:16

Q. That he had sent to the reporter; correct?

A. Correct.

Q. Do you know whether Alex was offered severance after she was let go? 06:04:23

A. I don't recall.

Q. Were you part of any discussions as to whether Alex would be offered severance?

A. I don't remember being part of any. 06:05:02

Q. Did you have any understanding at a later time whether she was in fact offered severance?

A. I don't remember.

Q. Do you know whether Alex had a contract at the time that she was fired? 06:05:13

A. All producers have contracts, so I'm assuming.

Q. Do you know whether Ms. Poolos's firing was considered by CBS to be a firing for cause? 06:05:27

Simon

ATTORNEY LYNCH: Objection.

A. That was my understanding.

Q. What was your understanding based on?

A. Based on the issue of retaliation. 06:05:37

Q. Meaning that you were told that there was a finding that Ms. Poolos had engaged in retaliation?

A. Correct.

Q. And therefore her contract was terminated based on cause, is your understanding? 06:05:48

A. That's my understanding.

Q. And where did that come from?

A. That came from calls with Bill and/or Renee discussing the findings of the investigation. 06:06:00

Q. Meaning the findings being that the findings were that Ms. Poolos had engaged in retaliation?

A. Correct. 06:06:10

Q. In any of those calls, though, did you specifically discuss whether Alex would be fired for cause, as that term was defined in her contract?

A. I don't recall talking about her 06:06:20

Simon

contract in any way.

Q. So you've testified that Bill told you that Alex was fired because of a finding that she had retaliated against Collette; correct? 06:06:35

A. Correct.

Q. And that was based -- your understanding is that was based on her having a phone call with Scott Bronstein in which she purportedly disparaged Collette; correct? 06:06:45

A. Correct.

Q. Was there any other understanding you have as to retaliation that Alex supposedly engaged in?

A. Not that I recall, no. 06:06:57

Q. And you also testified that Bill said that he believed that Alex had been not truthful; correct?

A. Correct.

Q. And your understanding is that was 06:07:09 another basis for firing Alex?

A. That it wasn't a base but it was something that he considered, that she had lied or disobeyed. I'm not sure which word he used. But that was something that weighed on him. 06:07:29

Simon

Q. Got it. Weighed on him in making his decision?

A. Correct.

Q. As you sit here today, you don't remember if or what the lie -- well, strike that. 06:07:36

Do you remember -- strike that. Let me ask it again.

As you sit here today, do you recall if Bill Owens told you in what way that Alex either lied to him or disobeyed him? 06:07:50

ATTORNEY LYNCH: Objection.

A. Do you mean how did he tell me or what was the specific of what --

Q. What the specifics were. 06:08:00

A. My understanding, again, was that it had to do with the chronology of their conversations and then Alex subsequently calling Scott and then lying about it, I think.

Q. And the chronology meaning that Bill had had discussions with Alex before she reached out to Scott Bronstein? 06:08:22

A. Correct.

Q. And had said essentially that the matter was closed and then she called him? 06:08:36

Simon

A. Correct.

Q. Is this what Bill told you when you spoke to him about the issue?

A. That's my recollection. 06:08:45

ATTORNEY LYNCH: Objection.

Q. Outside of what you've just testified to, the retaliation and the lying/disobeying, was there any other grounds that Bill cited to you as a reason that Alex was fired? 06:08:58

A. No.

Q. And did you learn from anyone else any other reasons that Alex was fired outside of what you've already testified to?

A. No. 06:09:09

ATTORNEY LYNCH: Counsel, we have less than 20 minutes on the record.

ATTORNEY IADEVAIA: All right. Thanks for letting me know.

THE WITNESS: Can I take a quick break? 06:09:19

ATTORNEY IADEVAIA: Of course.

THE VIDEOGRAPHER: We're going off the record. This is the end of media number 1, and the time is 6:09 p.m.

(Recess taken from 6:09 to 6:18.) 06:18:11

Simon

THE VIDEOGRAPHER: This is the beginning of media number 2. We're going on the record, and the time is 6:18 p.m.

Q. Ms. Simon, we talked about Michael Gavshon during the first day of your deposition briefly, and he is currently a producer at 60 Minutes; correct? 06:18:30

A. Correct.

Q. And he's been at 60 Minutes for some amount of time; correct? 06:18:45

A. Correct.

Q. Are you aware of any complaints against him during his employment at CBS?

A. I was aware of one complaint against him. 06:18:55

Q. And what complaint were you aware of?

A. I believe we discussed last time his associate producer had filed a complaint because he erroneously sent her a photograph of himself as a child in the nude. 06:19:16

Q. And the AP, is that [redacted] [redacted]

A. Yes.

Q. And you said that he sent a picture of himself as a child in the nude. Do you know how 06:19:34

Simon

old he was in that photo?

A. I don't.

Q. Was he a teenager?

A. I don't know. 06:19:41

Q. And other than complaining about the photo, did Ms. [redacted] make any -- raise any other concerns about Mr. Gavshon?

ATTORNEY LYNCH: Objection.

A. I believe in the complaint that she filed she did. Not to me directly. She never did. 06:19:59

Q. Did she make any complaints to you directly?

A. No. 06:20:12

Q. Did you ever have any conversations with Ms. [redacted] about Mr. Gavshon?

A. No.

Q. Did Ms. [redacted] to your knowledge, raise a complaint at CBS about Mr. Gavshon's excessive drinking? 06:20:21

A. I'm aware it was in the complaint that she filed. I don't know that she told anybody at CBS.

Q. And the complaint that she filed, 06:20:39

Simon

you're talking about lawsuit that she brought?

A. Yes, correct, sorry.

Q. To your knowledge was there an investigation that CBS conducted concerning Ms. [redacted] concerns about Mr. Gavshon? 06:20:50

A. I believe there was an investigation about the photograph, but I don't know about the other allegations.

Q. In addition to any allegations she may have made about Mr. Gavshon drinking excessively, what other allegations, if any, did she make about Mr. Gavshon in the lawsuit? 06:21:13

A. I don't remember.

Q. Did Ms. [redacted] make any allegations about retaliation? 06:21:29

ATTORNEY LYNCH: Objection.

A. I don't remember.

Q. Do you know if she made allegations of retaliation in her lawsuit? 06:21:41

A. Oh, I thought you were asking about the lawsuit.

Q. I just wanted to be as specific as possible.

A. Oh. I don't remember. 06:21:49

Simon

Q. And at the time that Ms. [redacted] raised her concerns, were you the executive editor at 60 Minutes?

A. Could you tell me what year she filed the lawsuit? 06:22:02

ATTORNEY IADEVAIA: If we could mark this as Exhibit 22.

(Simon Exhibit 22, [redacted] v. CBS summons, marked for identification.) 06:22:36

Q. What's been marked as Exhibit 22 is a multipage document from the New York Supreme Court website which appears to be the lawsuit that Ms. [redacted] filed against CBS Broadcasting, Inc.

Have you seen this filing before today, Ms. Simon? 06:22:57

A. I believe so.

Q. Did you see it around the time that it was filed?

A. I believe so. 06:23:09

Q. And at that -- it says that it was filed on December 17th, 2019. Do you see that at the top of the first page? If you look on the very first page.

A. Oh, the cover page. 06:23:23

Simon

Q. Yeah, the cover page.

A. Yes, yes.

Q. If you look, this document is called the summons, and there's a date, and it says December 17th, 2019. Do you see that? 06:23:28

A. Yes.

Q. And at that time were you the executive editor for 60 Minutes?

A. Yes. 06:23:37

Q. And the APs reported to you; correct?

A. Yes.

Q. And that would include Ms. [redacted]

A. Correct.

Q. Did you ever have any discussions with -- you already testified you did not discuss Ms. [redacted] concerns with her; correct? 06:23:46

A. Correct.

Q. Did you have any discussions with Mr. Gavshon about Ms. [redacted] concerns? 06:24:00

A. He admitted -- he let us know about the photograph, the error, the email mistake and photograph, for which he apologized. I believe that was before this was filed. I don't know when he sent that photograph, but I believe it was 06:24:31

Simon

before this.

Q. And you said he let us know about the photograph. Who's the "us"?

A. Well, I know that he let me know, and I 06:24:46 believe he let Bill know or I -- or I let Bill know. I don't remember.

Q. Do you know if he let you know before Ms. [redacted] had made an internal complaint at CBS? 06:25:06

A. My recollection is that he let me know about it right when it happened, I believe.

Q. How did he let you know? What was the form of him letting you know?

A. I believe he called me. 06:25:20

Q. And was it just the two of you on that call?

A. I believe so.

Q. And what did he say?

A. That his -- that one of his best 06:25:36 friends from childhood had died, and he was sending photographs to his sister, I believe, of their friend who had died, the childhood friend. And in the course of sending her pictures for the memorial service, he accidentally sent one of the 06:25:57

Simon

pictures to Cassie.

And I don't know if Cassie got multiple pictures or just this picture, but she was sent this picture. And it was of Michael and his two 06:26:11 childhood friends as kids naked.

Q. And is Mr. Gavshon's penis visible in the photo?

A. I believe so.

Q. And Mr. Gavshon's explanation was that 06:26:37 he was sending this to family or friends in connection with putting together some in memoriam?

ATTORNEY LYNCH: Objection.

A. That's my recollection.

Q. Do you know if he sent any other photos 06:26:51 to Ms. [redacted] around the time he sent this photo?

A. I don't know.

Q. So he told you what had happened during this call. Did he say anything else to you? 06:27:06

A. I believe he said that he had apologized to her, that it was uncomfortable, that he felt horrible, and that it was unintentional.

Q. And do you know if he told you that he apologized before or after -- well, strike that. 06:27:27

Simon

Did he say whether after getting this photo if she communicated with him?

A. I don't remember.

Q. And did he say whether he had apologized in response to something that she had said to him about the photo or not or did he not say anything? 06:27:39

ATTORNEY LYNCH: Objection.

A. I don't remember. 06:27:49

Q. Did you have any other discussions with Mr. Gavshon about concerns that Ms. [redacted] raised about him?

A. I believe so.

Q. How many other discussions? 06:28:15

A. I don't recall.

Q. And who was part of those discussions?

A. I don't remember if other people were on the phone or not.

Q. So it may have been just you and Mr. Gavshon or there may have been others? 06:28:34

A. Correct.

Q. And what do you recall about the discussion or discussions you had with Mr. Gavshon? 06:28:46

Simon

ATTORNEY LYNCH: And I'm going to direct the witness not to share the contents of any communication if counsel or investigators were present. 06:28:51

THE WITNESS: I don't recall if they were.

Q. So we would ask that you give your answer, what you remember.

A. I recall his distress about the picture 06:29:07 and -- mainly his distress about the picture and his distress that there was a lawsuit filed and his name was public and it was embarrassing.

Q. So this other conversation you recall happened with Mr. Gavshon after the lawsuit was 06:29:38 filed?

A. I believe so.

Q. Do you know if CBS conducted an investigation into Ms. [redacted] concerns?

A. I don't know. 06:29:52

Q. Did you participate in any such investigation?

A. I don't remember.

Q. Do you know if there was any action taken against Mr. Gavshon in connection with any 06:30:08

Simon

concerns that Ms. [REDACTED] raised?

A. I don't know.

Q. Were you part of any discussions about whether to take any action against Mr. Gavshon in 06:30:16 connection with Ms. [REDACTED] concerns?

A. I don't believe so.

Q. Were you part of any discussion about whether Mr. Gavshon should be fired?

A. I don't believe so. 06:30:34

Q. Were you part of any discussions about whether Mr. Gavshon should be placed on a paid leave of absence?

A. I don't believe so.

Q. Were you part of any discussions about 06:30:43 whether Mr. Gavshon should be given a verbal warning?

A. I don't believe so.

Q. Were you a part of any discussions about whether Mr. Gavshon should receive a written 06:30:50 warning?

A. I don't believe so.

Q. Are you aware of allegations by Ms. [REDACTED] that Mr. Gavshon stripped her of work responsibilities? 06:31:06

Simon

ATTORNEY LYNCH: Objection.

A. I don't recall that.

Q. Are you aware of any allegations that Ms. [redacted] made that Mr. Gavshon removed her 06:31:15 from segments that she had originated or played a role in developing?

ATTORNEY LYNCH: Objection.

A. I don't know about that.

Q. Are you aware of any allegations by 06:31:26 Ms. [redacted] that other employees avoided her after she made complaint about Mr. Gavshon?

ATTORNEY LYNCH: Objection.

A. I don't remember that.

Q. Are you aware of any allegation by 06:31:46 Ms. [redacted] that Mr. Gavshon started using two other young women to perform some of her duties?

ATTORNEY LYNCH: Objection.

A. Sorry, could you repeat that?

Q. Are you aware of any allegations by 06:32:04 Ms. [redacted] that Mr. Gavshon started using two other women to perform some of her duties?

ATTORNEY LYNCH: Same objection.

A. I don't recall.

Q. When you were an -- since you've been 06:32:17

Simon

executive editor, have you had an administrative assistant?

A. Yes.

Q. And has it been the same person or has it changed? 06:32:29

A. It's changed.

Q. So who was your administrative assistant when you first started in the role?

A. I had one named Sheena Samu. I don't know if she was the first one, but she was towards the beginning. 06:32:44

Q. And who else have you had in that position in addition to Sheena?

A. Then I've had Eliza Costas. And she was recently promoted, so I have a few NYU assistant named Mimi Lamarre. 06:33:00

Q. Did Sheena ever provide help to Mr. Gavshon after Ms. [redacted] raised concerns about him? 06:33:24

ATTORNEY LYNCH: Objection.

A. Possibly. The assistants serve as broad associates on the show, so sometimes they participated in some tasks.

Q. If you could take a look at Exhibit 22 06:33:36

Simon

and go to page 20 of 2. It's page 19 of the complaint.

A. Yeah.

Q. If you could take a look at paragraph 55. Once you've read it, please let me know. 06:33:47

(Pause.)

A. Okay.

Q. In that first sentence of 55 it says that Ms. [redacted] alleges recently Gavshon started using two young women, one in her twenties and the other in her thirties, to perform some of Cassie's responsibilities, including Tanya Simon's administrative assistant. 06:34:09

Do you see that text? 06:34:24

A. Yes.

Q. Did I read that correctly?

A. Yes.

Q. Do you know whether that was true or not true? 06:34:28

A. It's possible that he had the broadcast associates helping on the story. I can't speak to whether they were doing Cassie's responsibilities or broadcast associate responsibilities.

Q. And further down -- well, let me just 06:34:48

Simon

read the next sentence. During a work trip before December 26, Cassie and Gavshon were working from a hotel's private lounge as Gavshon preferred because he had unlimited access to alcohol. 06:35:00 Gavshon left to take a call and returned to the lounge and said that he had shouted at this young assistant who was a fucking idiot because she could not arrange a fucking conference call.

Do you see that text? Did I read that 06:35:15 correctly?

A. You did.

Q. Are you aware of this -- of Mr. Gavshon -- of this allegation involving Mr. Gavshon? 06:35:26

A. I'm aware of it because it's in the complaint.

Q. And you're reading it now?

A. Yes.

Q. Do you have any other awareness of the 06:35:32 allegation?

A. I don't believe so.

Q. Were you ever told that Mr. Gavshon had referred to an assistant as a fucking idiot?

A. I don't believe that I knew that before 06:35:51

Simon

this lawsuit was filed.

Q. And did you do any inquiry to find out if it were true after the lawsuit was filed and you looked at this lawsuit? 06:36:05

A. I don't recall.

Q. Did you ever ask Mr. Gavshon if that had happened?

A. I don't remember in that specific one, no. 06:36:16

Q. And did your assistant ever tell you that Mr. Gavshon had yelled at her?

A. Not that I remember.

Q. Did your assistant tell you that Mr. Gavshon had called her a fucking idiot? 06:36:29

A. Not that I remember.

Q. In the next sentence it says, In his drunken state, Gavshon bragged to Cassie that this young woman needed to know who she was dealing with. 06:36:46

Did I read that accurately?

A. Yes.

Q. Before the lawsuit were you aware of any allegation that Mr. Gavshon had said to your assistant that she needed to know who she was 06:36:57

Simon

dealing with?

ATTORNEY LYNCH: Objection.

A. No.

Q. Were you aware of this allegation as described here before the lawsuit? 06:37:00

A. No, not that I recall.

Q. And during this time that Ms. [redacted] made her complaint about Mr. Gavshon, did your responsibilities include assigning APs to do work? 06:37:27

A. No, because the APs worked with the producers that they worked with. So I didn't assign on a day-to-day what work they were doing.

Q. But if there was an AP who -- -- well, strike that.

During this time did you assign any APs to work for Mr. Gavshon?

A. Did I assign any -- he had an AP so...

Q. Right. And that AP was Ms. [redacted]

A. Right. 06:38:09

Q. And Ms. [redacted] raises concerns that her work was being given to others.

My question is did you have any responsibility or -- strike that.

Did you in fact assign work that 06:38:18

Simon

Ms. [REDACTED] would ordinarily provide to Mr. Gavshon to anybody else?

A. As I said, it wasn't unusual for a broadcast associate to participate in a story. I don't know whether I asked Sheena to, whether he asked anybody to. 06:38:29

Broadcast associates work on every story, so I don't know in what capacity the young woman she says were performing her responsibilities. I don't know what they were doing specifically. 06:38:46

Q. Is there someone who works at 60 Minutes named Kate Morris?

A. Yes. 06:38:57

Q. And is she an AP?

A. She was an AP.

Q. Was she an AP at this time in December of 2019?

A. Yes. 06:39:06

Q. Was Kate Morris sent to work on a story with Mr. Gavshon in Africa?

A. I believe she was.

Q. And was it at the time that Ms. [REDACTED] was still working for CBS? 06:39:20

Simon

A. I don't know.

Q. Was Ms. Morris sent to Africa to work with Mr. Gavshon instead of [REDACTED] [REDACTED]

ATTORNEY LYNCH: Objection. 06:39:32

A. She was sent to work on a story with Mr. Gavshon, and if she was, Cassie wasn't. I don't recall -- I don't recall whether it was instead of. I don't recall whether Cassie was still working with Michael. 06:39:50

Q. Before Ms. [REDACTED] raised concerns about Mr. Gavshon, were you aware of any complaints about Ms. [REDACTED] work?

A. No.

Q. Were you involved in any discussions 06:40:13 about Ms. [REDACTED] no longer working with Mr. Gavshon, before her complaints?

A. No, I understand. I don't recall specifically. My recollection is that she wasn't working with him after -- you mean after the 06:40:30 lawsuit.

Q. No, no, no, no. Let me just clarify.

Before Ms. [REDACTED] raised any concerns about Mr. Gavshon, were you part of any discussions about Ms. [REDACTED] no longer working 06:40:46

Simon

with Mr. Gavshon?

A. No.

Q. Were you aware of any complaints by Mr. Gavshon about Ms. [redacted] -- 06:40:56

A. No.

Q. -- at any point in time?

A. No.

ATTORNEY LYNCH: Counsel, we've now surpassed seven hours on the record. 06:41:04

ATTORNEY IADEVAIA: Okay. Let me just see if I have one more question.

(Pause.)

ATTORNEY IADEVAIA: Okay. I think we're done. 06:41:31

(Continued on following page.)

Simon

THE VIDEOGRAPHER: We're off the record at 6:41 p.m., and this concludes today's testimony given by Tanya Simon. The total number of media used was two and will be 06:41:44 retained by Veritext.

(Time noted: 6:41 p.m.)

____________________

TANYA SIMON

Subscribed and sworn to before me this ___ day of __________ 2025.

_________________________________

Notary public

C E R T I F I C A T E

STATE OF NEW YORK )

: ss.

COUNTY OF NEW YORK )

I, LAURIE A. COLLINS, a Registered Professional Reporter and Notary Public within and for the State of New York, do hereby certify:

That TANYA SIMON, the witness whose continued deposition is hereinbefore set forth, was previously duly sworn and that such continued deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of March 2025.

LAURIE A. COLLINS, RPR

- - - - - - - - - - - - I N D E X - - - - - - - - - - - -


| WITNESS: | EXAMINATION BY: | PAGE |
|---|---|---|
| Tanya Simon | Attorney Iadevaia | 264 |


- - - - - - - - - - E X H I B I T S - - - - - - - - - -


| SIMON NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 16, notes of Simon, Bates-stamped CBS 8524 | | 267 |
| Exhibit 17, text messages, Bates-stamped CBS 8134 to 35 | | 275 |
| Exhibit 18, text messages, Bates-stamped CBS 8133 | | 284 |
| Exhibit 19, text messages, Bates-stamped CBS 8145 through 8147 | | 288 |
| Exhibit 20, text messages, Bates-stamped CBS 8157 | | 298 |
| Exhibit 21, text messages, Bates-stamped CBS 8167 | | 306 |
| Exhibit 22, [redacted] v. CBS summons | | 323 |

- - - - - - - E R R A T A   S H E E T - - - - - - -

CASE: Poolos v. Paramount Global
DEPOSITION DATE: March 11, 2025
DEPONENT: Tanya Simon

PAGE/LINE(S) CHANGE REASON

____/_______/_____________________/_______________

____/_______/_____________________/_______________

____/_______/_____________________/_______________

____/_______/_____________________/_______________

____/_______/_____________________/_______________

____/_______/_____________________/_______________

____/_______/_____________________/_______________

____/_______/_____________________/_______________

____/_______/_____________________/_______________

____/_______/_____________________/_______________

____/_______/_____________________/_______________

____/_______/_____________________/_______________

____/_______/_____________________/_______________

________________________
TANYA SIMON

SUBSCRIBED AND SWORN TO BEFORE ME
THIS______DAY OF_______________, 2025.

_____________________ _______________________
NOTARY PUBLIC DATE COMMISSION EXPIRES

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.