# EXHIBIT L

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

ALEXANDRA POOLOS,                    )
                                     )
            Plaintiff,               )
                                     )
        vs.                          )    No. 1:23-cv-08896
                                     )        (GHW)(HJR)
PARAMOUNT GLOBAL; CBS                )
BROADCASTING, INC.; and             )
CBS NEWS, INC.,                      )
                                     )
            Defendants.              )
------------------------             )

February 11, 2025

10:24 a.m.

Deposition of CYNTHIA GLASGOW, held at the offices of Vladeck, Raskin & Clark, P.C., 111 Broadway, Suite 1505, New York, New York, before Laurie A. Collins, a Registered Professional Reporter and Notary Public of the State of New York.

A P P E A R A N C E S:

        VLADECK, RASKIN & CLARK, P.C.

        Attorneys for Plaintiff

                111 Broadway, Suite 1505

                New York, New York 10006

        BY:    JEREMIAH IADEVAIA, ESQ.

                    jiadevaia@vladeck.com

                BRANDON WHITE, ESQ.

                    bwhite@vladeck.com


        DAVIS WRIGHT TREMAINE LLP

        Attorneys for Defendants

                1251 Avenue of the Americas

                New York, New York 10020

        BY:    MICHAEL LEONE LYNCH, ESQ.

                    michaellynch@dwt.com


ALSO PRESENT:

        DANYA AHMED, ESQ. (Paramount)

        ALEXANDRA POOLOS

C Y N T H I A   G L A S G O W ,

    called as a witness, having been duly sworn

    by the notary public, was examined and

    testified as follows:

EXAMINATION BY

ATTORNEY IADEVAIA:

    Q.    Good morning, Ms. Glasgow.  My name is Jeremiah Iadevaia.  I'm here with my colleague, Brandon White.  My firm represents Alex Poolos in this matter against Paramount and CBS News, among other entities.

    Have you ever had your deposition taken before?

    A.    I have one time.

    Q.    Okay.  And when was that, approximately?

    A.    More than 20 years ago, maybe closer to 25 years ago.

    Q.    Got it.

    And was it a matter in which there was an employment case at issue or some other kind of case?

    A.    It was I believe an employment case.

    Q.    Got it.

Glasgow

Q. And were you a witness in your capacity as an HR employee?

A. No.

Q. Okay. Were you -- what was your status in that case?

A. I was a witness -- I was an associate at a law firm who had been working on a case. And there was -- after I had left the firm, there was some discovery dispute going on about the case, and I was called in as a witness regarding that dispute.

Q. Got it.

And as a lawyer -- you are -- am I correct you're not a practicing lawyer?

A. I am not.

Q. But you did graduate from law school?

A. Yes.

Q. Okay. And during -- and there was a period when you did practice law; correct?

A. Yes.

Q. And during that time did you participate in depositions?

A. Yes.

Q. Approximately how many? More than ten?

Glasgow

A.    Dozens.

Q.    Dozens.

A.    Yeah.

Q.    Okay.  So you have some sense of how the day is going to go today; right?

A.    Yes.

Q.    I will just for the record go through a couple of basic ground rules so we have a baseline understanding.

This is going to be a question-and-answer session.  I'll ask the questions and ask you to respond to them.  The questions and answers will be recorded by the court reporter to my right.  So it's important that you do your best to let me finish my question, and I'll do my best I let you finish your answer so we don't interrupt each other.  Does that make sense?

A.    It does.

Q.    Also I'll need verbal answers, so no nods of the head or gestures.  Otherwise there's nothing for the court reporter to write down.  Is that okay?

A.    Yes.

Q.    During the day we will take breaks

Glasgow

periodically. If at any time you need a break, just let me know. And as long as a question is not pending, there's no problem in taking a break. Understood?

A. Yes.

Q. Are you on any medication today that would affect your ability to testify truthfully and accurately?

A. No.

Q. Do you know of any reason that you are unable or would be unable to testify truthfully and accurately today?

A. No.

Q. Are you represented by counsel today?

A. Yes.

Q. And is it Mr. Lynch from the law firm Davis Wright & Tremaine who is present?

A. Yes.

Q. Did you do anything to prepare for today's deposition?

A. Yes.

Q. What did you do to prepare today?

A. I met with Mr. Lynch.

Q. Okay. When did you -- how many times

Page 7

Glasgow

did you meet with Mr. Lynch?

A. Once.

Q. And when did you meet with him?

A. Yesterday.

Q. And did you meet with him in person?

A. Yes.

Q. And where did you meet?

A. At his offices.

Q. And was anybody else present?

A. No.

Q. And approximately how long did you meet
with Mr. Lynch?

A. Two, two and a half hours.

Q. And during that meeting did you review
any documents?

A. I did.

Q. What documents did you review?

A. It was emails and attachments to emails
and some things like that.

Q. And the emails that you reviewed, were
you either the sender or recipient of the emails
that you took a look at yesterday?

A. Yes.

Q. Were there any emails that you reviewed

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Glasgow

in which you were neither the sender nor recipient?

A.    Not that I recall.

Q.    Did you look at any documents other than emails and attachments to emails?

A.    Yes.

Q.    What else did you review?

A.    I believe some policy documents.

Q.    What policy documents did you review?

A.    The Paramount or ViacomCBS business conduct statement, I believe.

Q.    Any other policy documents?

A.    Not that I recall now.

Q.    Outside of what you've testified to -- emails, attachments to emails, and policy documents -- did you review any other documents yesterday?  I'm sorry, the day that you met with Mr. Lynch?

A.    Yeah, I believe I reviewed the complaint.

Q.    Which complaint are you referring to?

A.    The complaint that Ms. Poolos filed against Paramount.

Q.    In this lawsuit?

Glasgow

A.   In this lawsuit, yes.

Q.   Got it.

Did you review any other materials?

A.   I don't recall.

Q.   Other than meeting with Mr. Lynch and reviewing documents during that meeting, did you do anything else to prepare for today's deposition?

A.   No.

Q.   Did you discuss today's deposition with anyone other than counsel or a spouse?

A.   I let the team that works for me now and my boss know that I'd be out of the office to attend a deposition.

Q.   Did you discuss the deposition with anyone else?

A.   No.

Q.   Have you reviewed any of the transcripts from other depositions taken in this matter?

A.   No.

Q.   Have you had any conversations with anyone at CBS about your deposition?

A.   No.

Glasgow

Q.    Have you spoken to Tanya Simon?

A.    No.

Q.    Have you spoken to Renee Balducci?

A.    No.

Q.    You said that you reviewed Ms. Poolos's lawsuit in preparation for today's deposition; correct?

A.    Yes.

Q.    What is your understanding of Ms. Poolos's claims in this lawsuit?

A.    That she's filed a wrongful termination claim.

Q.    Do you have an understanding as to anything more specific than that she filed a wrongful termination claim?

A.    That it's against CBS/Paramount.

Q.    Let me ask you another way.  Do you know if Ms. Poolos is alleging discrimination in this lawsuit?

A.    I believe she's alleging gender discrimination in there.

Q.    It's in the filing that you reviewed; correct?

A.    Yes.

Glasgow

Q. Before you reviewed the filing to prepare for today's deposition, had you reviewed it previously?

A. I believe I reviewed it or maybe a draft at some point before I left the company, before I left Paramount.

Q. And why did you review it then?

A. I don't remember.

Q. You mentioned that you left Paramount; correct?

A. Yes.

Q. Okay. When did you leave?

A. Late April/early May of '23. Get my dates. Just thinking for a second if I have that right. Yes, '23.

Q. You mentioned you're currently working. Where do you work currently?

A. AMC Networks.

Q. What is your job there?

A. SVP HR of AMC Networks.

Q. And how long have you worked there?

A. Oh, two or three months.

Q. So you started approximately when?

A. November of '24.

Glasgow

Q.    And did you start as a senior vice president?  Was that your position when you began there?

A.    Yes.

Q.    Who do you report to?

A.    Name or title?

Q.    You can just tell me title.

A.    EVP of HR.

Q.    And it's been the same person since you started; correct?

A.    Yes.

Q.    Generally what are your responsibilities in your current position at AMC Networks?

A.    I oversee for the company the HR business partner function, the talent acquisition function, the talent management function, learning and development, and HR operations.

ATTORNEY IADEVAIA:  Can you read back the answer.

(Record read.)

Q.    What do you mean by "business partner function"?

A.    The company, as many companies do, have

Glasgow

HR business partners that are the connection to the clients for most of the day-to-day HR work.

Q. And when you say that the company has someone in -- so there's actually a person whose job is HR business partner?

A. There's three -- three or four -- one, two, three -- four people that are HR business partners for domestic AMC Networks.

Q. Got it. Okay.

And then you mentioned talent acquisition. Does that mean recruiting folks?

A. Yes, yes.

Q. You mentioned learning and development. What does that refer to?

A. Training, that sort of thing, for employees.

Q. And what kinds of training do you do?

A. I do management training, whatever kinds of skills training the business might request for their employees, that type of thing.

Q. When you say "management training," what do you mean?

A. How to be a more effective manager, how to have performance conversations, how to do

Glasgow

performance evaluations, that type of thing.

Q. Does part of management training include how to deal with employees who are difficult?

A. I have not attended all of the trainings that that team does. It very well might be. I don't know.

Q. You mentioned HR operations. What is that?

A. That's managing the people systems that manages all the employee information for the company.

Q. The systems, meaning like electronic systems --

A. Yes.

Q. -- information technology systems?

A. Yes, information systems. Yes. Sorry.

Q. That's okay.

Do you have a LinkedIn page?

A. I do.

Q. Okay. And on your LinkedIn page do you describe that you are highly skilled in certain areas?

A. I think I do.

Glasgow

Q. And one of those areas includes crisis management?

A. Yes.

Q. What's crisis management?

A. Any type of issue that comes up that is impacting a business or employees that causes concern or crisis within the organization.

Q. Got it.

Does the areas that you describe yourself as highly skilled include change management?

A. Yes.

Q. What is change management?

A. Managing large-scale change that happens within an organization or to an organization.

Q. And is your role primarily when there's the necessity of change management as it relates to staff and personnel or does it include other -- well, does it include staff and personnel?

ATTORNEY LYNCH: Objection to form.

A. Yes, sometimes.

Q. Okay. What else does it include?

A. Organizational change, it could involve

Glasgow

mergers, acquisitions, business strategy changes.

Q.    And do you describe yourself on the LinkedIn page as highly skilled in policy and process development?

A.    I believe so.

Q.    And what does policy and process development mean?

A.    Coming up with policies and processes for an organization.

Q.    What kind of policies are you referring to?

A.    It could be a lot of things.  If you would like an example or two, it could be performance management policies, it could be leave policies, it could be work model policies, it could be a lot of things.  There's a lot of policies within HR.

Q.    Could it include antidiscrimination policies?

A.    It might.  I think I would normally as an HR person not be developing those policies as much as helping implement those policies that are developed maybe by legal or others.

Q.    And what about policies related to the

Glasgow

discipline of employees?

A.    It could relate to that.

Q.    And what about policies related to conducting investigations?

A.    It could mean that.

Q.    Did you work anywhere between the time you left Paramount and you joined AMC Networks?

A.    No.

Q.    For how long did you work for Paramount?

A.    21 years, Paramount and its predecessors, Viacom and then ViacomCBS.

Q.    You mentioned its predecessors.  When did Viacom become Paramount, approximately, do you know?

A.    I don't remember when the rebrand happened from Viacom CBS to Paramount.  It was while I was still there, but I don't remember the date.

Q.    Got it.

And what was your last job at Paramount?

A.    SVP of HR for CBS News, CBS TV stations, and CBS News digital.

Glasgow

Q. And for approximately how long were you in that role?

A. Sorry, I'm trying to think when it expanded to include CBS News. I mean, probably a couple of years. Yeah, approximately two years.

Q. So about some point in 2021 to when you left in 2023?

A. That sounds right.

Q. And who did you report to at the end? Who was your last job?

A. The EVP of HR for Paramount.

Q. And who was that person at the time?

A. Whitney Delich.

Q. How do you spell her last name?

A. D-E-L-I-C-H.

Q. And how long did you report to Ms. Delich?

A. I reported to her a couple of times during my time at Paramount. This last time, it was from about 2019 until I left, so it was about five years. And then I had a stint from around 2011 to 2015 that I reported to her.

Q. When you served as SVP within HR for news -- CBS News, TV stations, and digital,

Glasgow

generally what were your responsibilities?

A.    I oversaw the HR business partner function for the news, TV stations, and news digital division of Paramount.

Q.    Did you have any other responsibilities?

A.    I mean, basically to implement the HR policies and procedures from Paramount within that division.

Q.    The division manager news, TV stations, and digital?

A.    Yes.

Q.    And when you say "digital," what does that refer to?

A.    There was a news digital group.

Q.    And this is all within CBS?

A.    Yes.

Q.    And when you say "TV station," what do you mean by that?

A.    The CBS-owned-and-operated television stations.

Q.    And then when you refer to CBS News, what are you referring to there?

A.    CBS network news, the news bureaus and

Glasgow

the new shows.

Q.     What are news bureaus?

A.     The news -- the locations around the country and world where CBS News has news-gathering resources.

Q.     During the time that you were SVP within HR, that two-year period, approximately '21 to -- 2021 to 2023, did your responsibilities change in a material way or were they more or less the same?

A.     More or less the same.

Q.     And you reported to Ms. Delich that whole time; correct?

A.     Yes.

Q.     When you started in that role, who reported directly to you?

A.     I had two VPs from the CBS News side: Renee Balducci and Montrese Sampson.  I had a vice president for the news digital group:  Allison Woods.  I had three vice presidents from the TV station side:  Wendy Charest, Jessica Hurst, and Enrique Carvajal.  I believe that was his last name.  I just had a little blank there for a moment.

Glasgow

Q.    And you said on the digital side Allison Woods?

A.    Yes.

Q.    On the news side you mentioned Renee Balducci and Montrese Sampson?

A.    Yes.

Q.    What was Ms. Balducci's job when she reported to you?

A.    Vice president, human resources.

Q.    And what were her responsibilities as you understood them?

A.    She was -- oversaw the HR function for the New York-based news teams, news operations teams, the CBS News shows other than those based out of D.C.

Q.    So Ms. Balducci did not have responsibility for the D.C.-based CBS News shows?

A.    She did not.

Q.    And approximately how many shows did that include for Ms. Balducci?

A.    I'm going to have to think for a minute.

Q.    That's okay.  Take your time.

A.    It might have been three.  I might be

Glasgow

forgetting a show or two. Not sure.

Q. What were the shows?

A. I'm remembering 60 Minutes, 48 Hours, the weekend news shows, and I'm not sure if I'm forgetting something else.

Q. Did Ms. Balducci have responsibilities for the Evening News, the CBS Evening News?

A. Not for the most part. That was based out of D.C. She did work on them some because there were some New York employees that worked on that show. But that was -- she was not the primary HR point of contact for them.

Q. And approximately how many employees did that encompass with those three shows?

A. I don't know.

Q. Did Ms. Balducci's responsibilities include the CBS Morning or CBS Morning show?

A. Yes. That was the big one I forgot.

Q. Did her responsibilities include the Sunday Morning show?

A. Yes.

Q. And when you say that Ms. Balducci was responsible for overseeing HR function for the New York-based shows that we've just talked about,

Glasgow

what does that mean?

A. She managed an HR team that supported those business units.

Q. And how many folks were on her team?

A. Maybe three or four.

Q. And who were they?

A. There was some turnover. When I left, there was Ada, whose last name is escaping me. I am blanking on the names of the director that was under her. We had a digital HR manager, and I'm blanking on her name right now.

Q. Was Ada assigned to specific shows or did she have responsibilities for all the shows that Ms. Balducci had responsibility for?

A. I'm not sure. I believe all.

Q. And when you say "HR function" -- I'm talking specifically now during that two-year period -- what do you mean by that? What is the HR function -- what did the HR function do at CBS News during that time?

A. Work on any people-related changes that had to happen, helped implement company processes such as performance management, worked with the talent acquisition team on hiring, worked with the

Glasgow

business on decisions about how to manage their human capital resources, worked with employees on any concerns or complaints, worked with leaders on management issues, that type of thing.

Q. During this two-year period, did you have responsibilities -- did your responsibilities include training employees?

A. No.

Q. Were you involved in designing or developing training?

A. Not during that period.

Q. Were you involved at all in implementing training?

A. No.

Q. Who or what group at CBS News during that -- or for CBS News during that time had responsibility for providing training to employees?

A. Usually the trainings were developed by our learning and development team. There could be compliance-related trainings that came from the Paramount compliance group. And if there were more specific trainings, often the HR business partner -- if we couldn't get that from our

Glasgow

internal group, we might engage an outside vendor to do some trainings.

Q.    And during that two-year period, what trainings did -- were provided by CBS News to its employees?

A.    I don't remember the specifics.

Q.    Do you remember any?

A.    I remember we did some management training for employees, just like new managers, how to be better managers.  I remember there was a training for leaders or managers who worked with union groups on just basic labor relations.

I know that there were some required compliance trainings that were run by, like I said, the company's compliance group.  And there were probably some other trainings in there that I'm just not recalling right now.

Q.    Were there trainings for CBS's antidiscrimination policy or policies?

A.    I think that was part of the compliance trainings, yes.

Q.    What else was covered in the compliance trainings?

A.    Everything in our business conduct

Glasgow

statement.

Q.    Was it an annual training or did the training happen on some other frequency?

A.    I believe it was annual.

Q.    And who was required to take the training?

A.    I believe all of our regular employees.

Q.    Meaning everyone at Paramount or everyone within your group or who are you referring to there?

A.    I believe it was everyone from Paramount.

Q.    And how were the trainings given?  Were they online?  Were they in person?  Some other way?

A.    Online.

Q.    Were the training materials prepared by CBS or were they from someone outside CBS, do you know?

A.    I don't know.

Q.    When I say "CBS," I mean Paramount more generally, so let me ask the question again.

Were the materials prepared by Paramount or a group within Paramount or from

Glasgow

someone outside?

A.    I don't know.

Q.    And did you have any responsibility during that two-year period of reviewing -- I mean other than taking the trainings, did you have any responsibilities in connection with those trainings?

A.    I believe sometimes we would -- if we learned employees hadn't taken the training, we might help follow up with either the employee or their managers to make sure they did it.

Q.    Was there any training provided specifically to HR employees?

A.    What do you mean and when?

Q.    I'm talking -- again I just want to focus on the two-year period that you were SVP within -- overseeing CBS News, digital TV stations, okay, so that time frame.

Was there specific trainings or were there specific trainings provided to HR employees?

A.    There might have been, but I'm not sure.  I don't remember.

Q.    During that two-year period, were there any trainings provided to HR employees about

Glasgow

conducting investigations?

A.    I don't remember specific trainings on that topic.

Q.    Was there any written materials provided to human resources about conducting investigations?

A.    I'm not sure.

Q.    Was there any guidance given to HR employees about how to conduct investigations?

A.    There would be guidance from myself, if they were on my team; there would be guidance from our legal department; and/or there would be guidance from our employee relations function.

Q.    Was there any written guidance that you're aware of?

A.    I don't know.

Q.    When you say that you could provide guidance to the folks who reported to you about investigations, what do you mean by that?

A.    I mean if there was an investigation that I needed to be aware of, I could and usually would be kept up-to-date on what was happening with it and be part of, again, amongst maybe with legal and our employee relations team, giving

Glasgow

guidance on how the investigation could be or should be conducted.

Q. Do you have experience conducting HR investigations?

A. I do.

Q. Tell me about that experience, please.

A. I have conducted or been part of teams that conducted more investigations than I can recall and recount right now.

Q. I don't need specific names or anything, but can you give me the subject matter areas that you've been part of in terms of investigations?

A. I can give you some that I remember. I'm sure I will not remember them all. But it was investigations regarding harassment, investigations regarding bullying, investigations regarding discriminatory treatment, investigations regarding employee -- alleged employee theft, investigations regarding conflicts of interest. Many, many things that again I'm probably not remembering right now.

Q. Did you ever participant in investigations related to allegations of

Glasgow

retaliation?

A. Yes.

Q. The investigations you just listed -- and I know it's not a comprehensive list; you're just telling me what you can remember -- were those investigations that you participated in, did they occur during the time that you worked at Paramount and its predecessors?

A. Most of them. I had some in my prior job as a lawyer. I was involved in investigations when I practiced law.

Q. You mentioned employee relations. During this two-year period when you were SVP of the group that we've been talking about, did CBS -- or did Paramount have an employee relations group?

A. We did.

Q. Okay. And what was the difference between the employee relations group and the HR group?

A. You mean with relation to investigations?

Q. No -- strike that.

What is the -- what was the function of

Glasgow

the employee relations group at Paramount during that two-year period, as you understand it?

A.    They were tasked with conducting employee relations matters, investigations, in partnership with -- usually in partnership with HR and with our legal department.

Q.    And was employee relations a separate department from HR during that time?

A.    Yes.

Q.    And did anyone in employee relations during that two-year period report to you?

A.    No.

Q.    Who ran employee relations when you were in HR during this two-year period?

ATTORNEY LYNCH:  Objection.

Q.    Do you know who the head of the group was?

A.    My understanding is it reported up through the editor of employment law.

Q.    Going back to my questions related to trainings for a minute, was there any trainings offered to managers about how to manage employees?

A.    Yes.

Q.    And what were those trainings?

Glasgow

A.    I don't remember all of them.

Q.    Do you remember any of them?

A.    I remember there were various essentials of management courses offered.  There were various how to have performance in difficult conversations with employees, that type of thing.

Q.    Were those -- any of those trainings mandatory?

A.    Not that I'm aware of.

Q.    Were there trainings offered on how to -- or strategies for disciplining employees?

A.    Probably.  Can't remember for sure what those were.

Q.    And to your knowledge were they mandatory for managers?

A.    Not in most instances.

Q.    What do you mean, "not in most instances"?

A.    I have a recollection of a couple of times when I would work with groups that would say, Hey, we want to implement all new managers going through certain trainings.  And sometimes we would put something like that in place to make it semimandatory, but for the most part it was

Glasgow

offered I believe as requested.

Q. During the time -- the two-year period -- again focusing on that time frame -- was there a formal performance management process for the employees within the groups that you oversaw?

A. Yes.

Q. And what was that?

A. It might have changed sort of exactly the format during the two years I was there, but there was a performance review process that I think included at least at some point during the two years -- it may not have been in place the whole time -- midyear check-ins and an end-of-year valuations.

Q. And was the process the same throughout the groups you oversaw or did it vary?

A. We actually were -- created a version -- worked on a version specific for news, CBS News, at the request of the then president, and I don't remember if it actually got implemented before I left or not.

Q. Who was the president you're referring to?

A. Neeraj Khemlani.

Glasgow

Q.   Did you have any reporting obligations to the CBS News president during that two-year period?

A.   No.

Q.   During the two-year period, did HR have responsibilities for conducting investigations?

A.   Sometimes yes.

Q.   Okay.  Under what circumstances were they responsible for conducting investigations?

A.   If there was an investigation -- if there was a complaint issued -- made by an employee, HR would be involved in looking into that complaint.  But sometimes employee relations would be more involved; sometimes it would be HR more involved.

Q.   And when HR was involved in looking at these complaints, what was their involvement?

A.   It would depend on the complaint, but in general they would look into the complaint. Usually they would make legal aware, take some guidance from legal about how to conduct the investigation, and/or employee relations.

Q.   And how was it determined whether HR or employee relations or some other groups would

Glasgow

handle an investigation?

A.    It would depend on the circumstances, the type of complaint, how many resources were needed to do it, sometimes bandwidth.

Q.    When you say "bandwidth," whose bandwidth are you referring to?

A.    Perhaps the HR business partner or the employee relations partner.

Q.    Meaning how busy the HR business partner employee relations partner was at the time that the complaint was made?

A.    Yeah, who -- yeah, sometimes that -- sometimes that would play into the decision.

Q.    Okay.  You said that resources could affect which group was responsible for conducting an investigation.  What did you mean by that?

A.    Did I say that?  I honestly don't remember what I said.

Q.    Okay.  Well, other than bandwidth were there any resources that would affect who conducted the investigation?

A.    Well, it would depend on how big of an investigation it was -- right? -- how many people were involved, how many interviews might need to

Glasgow

happen, how much work was it.  So that would play into who was involved with it.

Q.   You also said that the type of complaint affected who conducted the investigation.  What did you mean by that?

A.   Again, I can't remember exactly what I said, but it would depend on -- it was a bit of depending on what the issue was might impact whether an HR business partner handled it or it was primarily driven by someone in the employee relations group.

Q.   Were there certain types of complaints that employee relations handled?

A.   They -- honestly, HR and employee relations handled many of the same type of complaints.

Q.   When you say "handled the same type of complaints," you mean including the investigation function of a complaint?

A.   Yes.

Q.   Who made the decision as to whether it was employee relations or employee relations who would handle a complaint?

A.   It would vary depending on the matter,

Glasgow

but sometimes it would be the head of employment law would have a say in it.  Usually a joint decision, maybe myself or my boss and/or the editor of employment law.

Q.    During the time that you were in this role -- we're talking the SVP role -- for a two-year period, did HR handle any investigations?

A.    Yes.

Q.    Approximately how many, for the groups that you oversaw?

A.    I do not know.

Q.    Was it more than ten?

A.    Probably.

Q.    Was it more --

A.    Yes.

Q.    -- than 50?

A.    I don't know.

Q.    Did any of those investigations that HR took a lead on as opposed to employee relations include claims of discrimination or violation of CBS's antidiscrimination policy?

ATTORNEY LYNCH:  Objection.

A.    I don't know.

Q.    Was it the case that employee relations

Glasgow

handled most of the investigations related to concerns or complaints of violations of Paramount's antidiscrimination policy?

ATTORNEY LYNCH:  Objection.

A.    I don't know.

Q.    I don't know if I asked this question already, so sorry if I did.  But during that two-year period when you were SVP overseeing CBS News, digital, and TV stations, did your responsibilities materially or significantly change?

A.    No.

Q.    They were more or less the same the whole time?

A.    During that period, yes.

Q.    During that two-year period, were you or your team involved at all in taking disciplinary action against employees within the groups you oversaw?

A.    Yes.

Q.    What kinds of disciplinary action was taken during that time?

A.    I imagine termination decisions, termination actions, suspension actions, paid

Glasgow

suspensions, performance warnings.  That's what I'm recalling now.

Q.    During that two-year period, were there times -- well, strike that.

During that two-year period, did Paramount have the ability to issue -- you mentioned warnings; right?  Let me start again.

You mentioned warnings a minute ago -- correct? -- as the type of disciplinary action that happened during that two-year period; correct?

A.    Yes.

Q.    Did Paramount have written versus oral warnings?  Was there that distinction?

A.    We would do both.

Q.    Okay.  And what was an oral warning? What's an oral warning when you were at Paramount? What did that consist of?

A.    In general it would just be verbally telling an employee whatever the issue was and what the warning was about.  I mean, my recollection is in most cases we probably wrote those.  If it was -- if it was more official, they were put in writing.  But of course a verbal

Glasgow

component went along with it.

Q.    In terms of written warnings, was there a form that Paramount used, a standard form?

A.    I can't remember.  I think we -- I don't remember.

Q.    When an employee was issued a written warning, what did that consist of?

A.    It would depend on the warning.

Q.    What do you mean by that?

A.    Well, there would be the content of whatever the issue was that the employee was being warned about.  There would be probably a description of what the issue was and a description of what needed to change and a statement of what the outcomes would be if the issue or behavior did not change.

Q.    And before issuing an employee a written warning, was there a process that a manager needed to go through?

A.    The process depended on the circumstance.  There was not a super rigid process.  What might happen leading up to a written warning would depend on the issue and circumstances.

Glasgow

Q.      Were there any written materials related to managers issuing warnings to employees?

A.      I don't know.  Not that I recall.

Q.      Were there any trainings provided to managers about issuing written warnings?

A.      That might have been included in some of the manager training.  I don't remember.

Q.      And the manager training that you -- when you say "manager training," you're referring to the manager training you testified to about earlier; is that right?

A.      Yes.

Q.      Before a manager issued a written warning, was there any obligation on the part of the manager to speak to HR?

A.      My expectation would be that no written warning would be issued to an employee without HR being involved.

Q.      Was there any requirement that the manager speak to or consult with legal?

ATTORNEY LYNCH:  Objection.

A.      My expectation would be in many cases if there was a written warning legal would be consulted.

Glasgow

Q.    When you say "many cases," why did you say that?

A.    Because if it's a pretty standard performance issue where a manager is giving performance feedback and warnings about the outcome should the performance not improve, that might not be something that needs to be reviewed by legal.

Q.    When you say it's your expectation that before a manager issues a written warning that they would consult with HR, did you communicate that expectation with the managers within the groups you oversaw?

A.    I don't remember if I had the need to communicate it.  It was just the practice.

Q.    Was it the practice at the time that you started in that role?

A.    I believe so.

Q.    Did you or anyone on your team ever communicate that expectation to managers within the groups you oversaw?

A.    It probably came up when there were -- if a discussion about a warning came up.  I don't know -- I can't recall a specific time, but that's

Glasgow

my expectation, that it's probably come up.

Q.   And when a manager issued a written warning, was the written warning reviewed by HR before it was issued?

A.   That would be my expectation of the process, yes.

Q.   And how, if at all, was that expectation communicated to the managers that were within the groups you oversaw?

A.   When the managers were working with the HR team about any performance or behavioral issue.

Q.   And in those circumstances did HR make decisions ever about what type of disciplinary action to take against an employee?

A.   HR would have recommendations, guidance, for managers and leaders.

Q.   And how were those recommendations and guidance conveyed to the managers?

A.   It would depend on the issue and the circumstance.

Q.   Were there times where the recommendations or guidance were provided to the managers in writing?

A.   Probably, possibly.

Glasgow

Q.    And were there times when the recommendations or guidance were conveyed to the managers orally?

A.    Yes.

Q.    And when were they conveyed in writing versus orally?

ATTORNEY LYNCH:  Objection.

A.    I don't remember the distinction and when that would happen and what the circumstances were.

Q.    And focusing again on that two-year period, was there a process that your HR team members were supposed to go through in discussing disciplinary action against employees within the groups you oversaw?

A.    Sorry, can you --

Q.    Sure.  So was there a process that was used during the time that you oversaw HR for those groups for your team members to implement disciplinary action?

A.    I don't know if this is exactly answering your question, but my expectation for my team was that if the disciplinary action was termination that I would be involved in that

Glasgow

decision and made aware of that decision.

If the disciplinary action was something else, depending on the circumstances and sort of severity of the issue, I may or may not be looped in prior to that disciplinary action being taken.

Q. And how were your expectations as it related to disciplinary action conveyed to your team?

A. Verbally and probably via email at some point, not sure. Actually it might not have been an email. It probably was just verbally.

Q. Was there a time when you conveyed that information specifically that you can recall?

A. I remember that I conveyed it. I do not remember when and how often and exactly what the circumstances were.

Q. When HR was handling -- taking the lead on conducting an investigation related to an employee complaint, what was the process that your team followed?

A. Again, the process could vary depending on the circumstances but most of the time it would involve letting legal know, getting advice from

Glasgow

our legal department.

Most of the time it would involve perhaps a discussion about whether it should be handled primarily by HR or if our employee relations colleagues should be brought into it.

Yeah, I'm not sure what other process you specifically want to talk about.

Q. In terms of conducting investigations, was there a process or practice within HR during that two-year period for how to do the investigations?

ATTORNEY LYNCH: Objection.

A. There were some standards about how to do them. There were some guidance and rules for us about how to do investigations.

Q. And what were those standards?

A. I may not be recalling all of them. One was to act quickly so that employees knew that we were hearing their complaint and taking their complaint seriously. One was to work to keep the complaint confidential to the extent that we could.

It was important for HR to make the employee coming forward with the complaint feel

Glasgow

safe in doing so and to reassure that employee that no adverse action would be taken against the employee for making the complaint.

We would look into understanding who needed to be talked to to gather information. We would get as much information from the complainant as we could and make decisions about who outside the complainant needed to be part of the investigation.

We would always work to make sure that the complainant heard back from us that the investigation was handled and was completed. We would not necessarily tell the complainant what the outcome was, just that we had taken steps that we deemed necessary to solve the problem.

We would instruct everyone involved in the investigation to keep it confidential. We would conduct everyone involved with the conversation, especially the person the subject of the complaint, that there was to be absolutely no retaliation and any form of retaliation would likely result in them losing their job.

We would document as legal advised us to. We would stay connected to our legal partners

Glasgow

and usually come back to a leader of the group to make a final decision of the outcome from the investigation.

That's probably not an exhaustive list, but that's just the things that I'm thinking of now that were part of our practices.

Q. You said act quickly. Why was acting quickly important?

A. Because I did not want employees thinking they made a complaint and it went into a black hole. I wanted employees who made complaints to know that we heard them and we were taking action. And if there was something going on that was harmful or detrimental to the employee, I did not want it to linger longer than it had to.

Q. And you mentioned work to keep the investigation or complaint as confidential as possible. Do I have that correct?

ATTORNEY LYNCH: Objection.

A. I don't remember if that is exactly how I worded it but --

Q. Well, please phrase it how you would say it.

Glasgow

A.    Our goal was always to keep any complaint confidential to the extent we could.

Q.    Was that important?

A.    Absolutely.

Q.    And why?

A.    For many reasons, more than I can probably list here, but one, we did not want the complainant to have his or her personal business and this complaint shared with others.  It could be detrimental to them, embarrassing to them, harmful to them.

Also to protect the person about whom the complaint was made.  Don't necessarily want any more people knowing that the complaint -- that the person that is the subject of the complaint is being investigated more than absolutely necessary to conduct the complaint.

And we wanted to get accurate information, so we didn't want people talking about it and swaying each other's participation.

Q.    When you say "accurate information," was getting accurate information an important part of the process?

A.    Essential.

Glasgow

Q.    Essential.  And how come you say that?

A.    Because we -- these investigations are important.  They involve people's livelihood.  They involved people's experience at work, their well-being.  We want to come to the correct outcome, so we want to get all the information that we can, and accurate information, to make the best decision that we can.

Q.    In determining who needed to be talked to as part of the investigation, how did HR go about doing that?

A.    Again, it would depend on the investigation and the circumstance.  We would, again, usually consult with our legal partners, make some joint decisions about who had information that was relevant and that could -- that had information that was important for us in coming to an outcome.

Q.    Was it the goal to identify -- in figuring out who to talk to, was it important to identify who had relevant information?  Was that an important part of the investigation?

ATTORNEY LYNCH:  Objection.

A.    To the extent that we could.

Glasgow

Q.     And how would you figure out who would have relevant information?  What's the process in doing that or what were the ways to do that?

ATTORNEY LYNCH:  Objection.

A.     Again, that completely depends on the complaint and circumstances.  It could be that the complainant gave us people who were witnesses or who had relevant information.  It could be that we had information from documents that would let us know who might have relevant information.  It could be that the person that was the subject of the complaint had people -- witnesses that he or she thought had relevant information.

It could come from many different sources.

Q.     You mentioned documents.  How did HR decide what documents to review as part of the investigations, if any?

A.     It would -- whatever was in front of us that would seem like a document that would have relevant information.  Again, it would really depend on circumstances.  But if there was any documentation that we felt was relevant for us to understand what happened, we would try to get

Glasgow

ahold of that and review that.  But I can't -- I can't think of specifically like a single process related to the documents.

Q.    Would it be typical to ask the person who made the complaint whether they thought there were relevant documents that the investigator should look at?

A.    Yeah, yes.

Q.    And would it be typical to ask the person who was the subject of the complaint if there are any documents that would be relevant to the investigation?

A.    Probably.

Q.    You mentioned one sort of disciplinary action that could be taken was suspension or -- well, a suspension, I believe is what you referred to.

A.    Yes.

Q.    Under what circumstances did HR recommend or in fact implement a suspension?

ATTORNEY LYNCH:  Objection.

A.    There's not one specific circumstance that would warrant that.  It would really depend on what the issue was.

Glasgow

Q.    Were there suspensions made during the time you oversaw the group in that two-year period?

A.    Yes.

Q.    And approximately how many?

A.    I'm going to guess less than five. Could be wrong about that, but I believe two to five, something along those lines.

Q.    And what were those circumstances?

A.    I can't remember them all, but it would usually involve where we felt it was in the best interest of either the complainant or witnesses that the person subject to the complaint not be in the office and not be working with other people specifically in some instances the complainant themselves.

Or if anything else about the complaint was -- the seriousness of it warranted us feeling like the person subject to this complaint and investigation should not be working for us right now.

Q.    And who made decisions about whether to suspend someone?  Was it HR?  Was it the managers who made the decision?

Glasgow

A.    It was usually someone in the management team, the senior leader in the management chain, with advice from HR.

Q.    Okay.  The two to five times that a suspension occurred during that two-year period, what were -- you don't have to give me names, but what were the specific circumstances?

A.    Again, I might not remember them all. One was the circumstance at issue in this lawsuit. I'm remembering another that was a harassment complaint that the person subject to the complaint was put on suspension while we conducted the investigation.

I think there was another where a leader was suspended while we conducted an investigation that had to do with -- ay yai yai, I'm trying to remember that one.  I think it was complaints from their direct reports, and so, again, it felt like this person should not be here directly in contact with the people that had been complaining about the person while we do the investigation.

Q.    So you mentioned this lawsuit, a harassment complaint, and the leader that you just

Glasgow

mentioned.  Any others that you can recall?

A.    Not right now.  There could be others.
I just cannot recall right now.

Q.    And the harassment complaint you
referred to, that second situation, was that --
what kind of harassment was at issue in that
matter?

A.    That was sexual harassment.

Q.    And the harasser, was it somebody in --
alleged harasser, was that someone in a
supervisory position?

A.    It was.

Q.    Was it someone who worked for 60
Minutes?

A.    No.

Q.    What ended up happening to the person
who was accused of harassment in that case?

A.    He was terminated.

Q.    Was he terminated as a -- due to the
complaints that were made of sexual harassment?

A.    Yes.

Q.    The third scenario or situation you
mentioned, the leader who was suspended, what were
the nature of the complaints made by that person's

Glasgow

direct reports?

A.    I can't remember exactly.  Sorry, I cannot remember exactly.

Q.    Did they involve sexual harassment?

A.    They did not.

Q.    Did they involve alleged violations of Paramount's antidiscrimination policy?

A.    I do not think so, but I'm not sure.

Q.    You just have no memory of what the complaints were?

A.    I remember it was several things, issues from the team members reporting to this leader that were having serious concerns with the leadership and management.  And we looked into some things and had the person stay on while we did it.  I honestly cannot remember the specifics of what the issues were.

Q.    Do you recall approximately how many of their direct reports made complaints?

A.    A few.

Q.    And why was that particular person put on a leave during -- well, why was that person put on a leave or suspended?

A.    I can't remember exactly, but I believe

Glasgow

it was because we felt that the investigation would be conducted more accurately and effectively if the person were not in the office managing the teams involved.

Q. Did the decision to place that person on a suspension relate at all to the seriousness of the complaints against the person?

A. Probably. Again, I'm having a hard time remembering all of the details of that.

Q. And what was the outcome of that investigation?

A. I believe that person was terminated, and I believe it was at least partially driven by the investigation.

Q. Did that person work at 60 Minutes?

A. No.

Q. The two to five times -- and I know you're approximating, and I'm not trying to hold you to that --

A. Okay.

Q. -- but the two to five times you mentioned of instances where employees were suspended during the two-year period we've been discussing, did that include suspensions where

Glasgow

there was only HR -- where HR led the investigation or did that also include where employee relations led the investigation?

ATTORNEY LYNCH: Objection.

A. I'm not sure. I'm not sure.

Q. Well, let me ask a better way, which is were there instances beyond what you testified to in which employee relations led the investigation where an employee was suspended?

A. Probably.

Q. Any that you remember?

A. I believe the harassment one I mentioned, probably employee relations was involved. I do not remember for sure, and I do not remember if it was, quote/unquote, led by employee relations versus HR. I do not remember.

Q. Okay. Are there any other instances of employee suspensions that took place during that two-year period that you recall beyond what you've testified to?

A. Not that I can recall right now.

Q. During that two-year period was -- were managers able to counsel employees when there were concerns?

Glasgow

A.     What do you mean were they able to --

Q.     Let me strike that.

So other than verbal warnings, written warnings, suspensions, and firings, were there any other actions that a manager could take when the manager had concerns about either behavior issues or performance problems with their employees?

A.     There are a lot of ways they could manage performance issues.  It could be talking to the employee, giving them feedback.  It could be getting some support from HR on talking to the employee.  It could be many things.

Q.     Focusing on behavioral concerns as opposed to performance issues, were there other things managers can do beyond warning -- giving an oral or written warning, a suspension, or a firing?

A.     It depends on the severity of the behavioral issues.  So, again, they could give -- suggest training, we could do coaching, we could do other things to address poor leadership or poor management or poor behavior.  It just truly depends on the circumstances and the severely of the issues.

Glasgow

Q.    So there were lesser steps a manager could take when addressing behavioral issues, lesser than issuing a warning or suspending someone or firing them; correct?

A.    Depending on what the behavioral issues were -- that's a pretty broad term -- but yes.

ATTORNEY IADEVAIA:  We've been going over an hour.  Why don't we take a five-minute break.

(Recess taken from 11:34 to 11:55.)

Q.    In terms of the individuals you referenced that you recalled had been suspended, the person who had been accused of sexual harassment, did that person work for one of CBS News's shows?

A.    Yes.

Q.    What show?

A.    48 Hours, I believe, I believe.

Q.    What was that person's position?

A.    I don't remember.

Q.    Were they a producer?

A.    I don't remember.

Q.    During the two-year period that we've been discussing in which you were the SVP in this

Glasgow

job, about 2021 to 2023, was there a single CBS News president or did that change either -- at some point during your tenure?

A. For my entire tenure, there were two presidents that co-led the CBS TV stations, news digital, and CBS News division.

Q. That was Neeraj?

A. Yes.

Q. And who was the other person?

A. Wendy McMahon.

Q. And did Neeraj and Ms. McMahon split up responsibilities for what they managed, to your knowledge, or the groups they managed?

A. They -- my understanding was they split up sort of the day-to-day operations but partnered on overall strategy for the division. So Wendy focused day-to-day more on the TV stations part of the division. Neeraj focused day-to-day on the network news side of the division. And news digital was a bit more split between the two of them.

Q. Did you have regular meetings with Ms. McMahon?

A. Yes.

Glasgow

Q. And did you have regular meetings with Neeraj?

A. Yes.

Q. Were they regular meetings where they were both present or were they separate regular meetings?

A. Usually separate, sometimes together.

Q. Got it.

And how often did you meet with Neeraj? Was it once a week or was it some other time frame?

A. I had a weekly with him and also met -- one-on-one and then joined weekly leadership meetings that he ran.

Q. And Ms. McMahon, was it similar?

A. Yes.

Q. You said leadership meetings that Neeraj ran. Who else was present at those leadership meetings?

A. Other department heads for CBS News.

Q. Was anybody from 60 Minutes present at those meetings?

A. No.

Q. Just so I have an understanding, some

Glasgow

sense, what were the positions or titles or if you can give me names of the people who did go to those meetings?  When you say "department heads," what do you mean?

A.    I mean it was the head of finance for the division, the CFO.  It was the head of operations for the division.  It was the head of news gathering for the division.  It was the assignment editor, national editor, and the head of talent strategy.

That is who I am remembering right now.

Q.    And in your weekly one-on-ones with Neeraj, did you discuss with him ever employment matters?

ATTORNEY LYNCH:  Objection.

A.    Sometimes.

Q.    Did you ever discuss with him investigations that HR was involved in?

A.    It would depend.  Sometimes.  Not all of them.

Q.    Did you discuss with Neeraj decisions to fire employees within the groups you oversaw?

A.    Sometimes.

Q.    And when you did discuss with him

Glasgow

employment matters, why were you discussing them with him?

ATTORNEY LYNCH: Objection.

A. It would depend on the matter. I mean, my job required me obviously to talk with him about employment matters. Sometimes I'm giving him a heads-up. Sometimes I'm giving him input on things.

Q. The issue you -- or the situation you mentioned when there was a leader who was suspended based on multiple complaints from direct reports, did that person work for a news show?

A. No.

Q. So what was that person's job?

A. I believe it was on the TV station side of the organization.

Q. What did they do on the TV station side?

A. I believe this was a general manager.

Q. Were they a general manager for a specific TV station or multiple TV stations?

A. For a specific TV station.

Q. Earlier you provided some testimony about what I think you described as standards,

                    Glasgow

guidance, and rules related to investigations.  Do you recall that testimony generally?

A.     Generally.

Q.     Was there anything in writing about the standards, guidance, and rules that you referred to?

ATTORNEY LYNCH:  Objection.

A.     I don't know.

Q.     You don't know or you don't remember? I mean, when you were the SVP of HR, you would have been aware of anything in writing about investigations related to, you know, responsibilities for HR; correct?

ATTORNEY LYNCH:  Objection.

A.     I do not remember if there was.

Q.     You went through various points:  To act quickly, you wanted to make sure the complainant felt safe and reassured that there would be no adverse action.  I mean, you gave a bunch of whether they're standards, guidance, or rules, you went through a bunch of those criteria -- correct? -- or elements?

A.     I listed --

ATTORNEY LYNCH:  Objection.

Glasgow

Q. Go ahead.

A. I listed some elements of the process that I remember and recalling right now off the top of my head.

Q. Your testimony is you don't know if some or any of them were in writing; correct?

A. Correct.

Q. And were these elements conveyed to your team members?

A. Yes.

Q. And how were they conveyed to your team members?

A. They could be conveyed verbally as situations arose or if we were talking bigger picture about work we were doing.

Q. Were they conveyed by you? In other words, did you tell folks who reported to you: These are my expectations?

A. Most of the senior-level HR business partners that worked for me had a great deal of experience doing these types of investigations, so I didn't feel like I had to tell them directly and teach them this. They came to me with this experience. But there would be situations where

Glasgow

I'm sure we talked about it and I laid out my expectations as well.

Q.    I think one of those elements you mentioned is an instruction to keep the investigation or the complaint confidential.  Do I have that right?

A.    To keep the investigation and complaint confidential to the extent that we can.

Q.    Right.  But also in -- strike that.

Let me ask it this way:  Was it part of the practice or process to instruct the person to -- about which the complaint had made to keep the complaint confidential?

A.    Yes.

Q.    And who was responsible for providing that instruction?

A.    Again, depending on the circumstances, it would probably be the person dealing with -- we're talking about the subject of the complaint; correct?

Q.    Yes, correct.

A.    The person talking to or dealing with the subject of the complaint would convey that expectation.

Glasgow

Q.    So who could that include when you say "the person dealing with the subject of the complaint"?  Who might that include?

A.    It could include someone from HR.  It could include someone from employee relations group.

Q.    Anybody else?

A.    I mean, I guess maybe someone from legal, possibly.

Q.    And would anyone else receive that instruction or direction, other than the subject of the complaint, to keep the substance of the complaint or the investigation confidential?

A.    Everyone involved in the investigation, everyone talked to as part of the investigation, contacted as part of the investigation.

Q.    Including potential witnesses?

A.    Yes.

Q.    People that HR or employee relations talked to?

A.    Yes.

Q.    And would the instruction to keep confidential the complaint and the investigation, would that ever be conveyed to the individual,

Glasgow

whether it's somebody who is interviewed or the subject of the complaint, would that ever be conveyed in writing?

A.    Possibly.

Q.    Was there any practice of doing it in writing?

A.    Again, it depends on the investigation. It would be conveyed in whatever way in the moment felt the most effective.

Q.    In terms of the instruction absolutely no retaliation, I think the words you used, first of all, who would be giving that instruction or directive?  Who would be the person responsible for doing that?

A.    It could be anybody involved in the investigation that had contact with anyone being -- that was the subject of the investigation or interviewed as part of it.

Q.    And who are the folks who could do that or would do that?  Strike that.

Who are the individuals who would be responsible for doing that?  You said anybody involved, but who do you mean?

A.    I mean whoever from HR or employee

Glasgow

relations was conducting the investigation or involved in the investigation would be sharing that expectation.

Q.     And the person who would be receiving that instruction or directive, who would that be?

A.     Anyone involved in the investigation.

Q.     So does that include the person who's the subject of the complaint?

A.     Yes.

Q.     Okay.  Who else might it involve?

A.     Maybe witnesses.  If we want to make sure that no one that is aware of the investigation and might not be happy with it, we don't want them to take any actions.

Q.     Okay.  Do you consider the instruction absolutely no retaliation to be an important instruction to give the subject of the complaint?

A.     It's in our policy.  It should be very clear to anyone who is within the company that that's an expectation.  But I do think it is a good practice to remind anyone involved in the investigation of that expectation.  I don't expect that's the only way they should know that, but I do think it's a good practice to remind them.

Glasgow

Q.     And why do you think it's a good practice?

A.     Because it's an incredibly important element of our investigation process to ensure -- and it's a very critical policy for the company.

Q.     Why is that?  Why do you say it's an important element of the investigation?

A.     Because we want to do everything we can to ensure employees feel comfortable making complaints and coming forward, and we do not tolerate or want to have any adverse action or retaliation taken against someone who makes a complaint or someone who participates in an investigation in a different way.

Q.     And is it important to remind the subject of the complaint about this requirement or policy?

A.     I think it's a good practice.

Q.     And why is that?

A.     Because it's an important element of our investigation and our policies.

Q.     The instruction to keep information confidential, is that in your view -- when I say "information," I mean the complaint or the

Glasgow

investigation.  Is that an important element of HR's investigation, to you?  Do you think that was important?

ATTORNEY LYNCH:  Objection.

A.    Sorry --

Q.    Let me ask again.

A.    Okay.

Q.    Sure.  We've talked a little bit about an element of the investigation is for whoever's handling the investigation, whether HR or employee relations, to give an instruction to keep the investigation and the complaint confidential, including to the subject of the complaint; is that correct?

A.    I got a little lost.  Are you asking if that's --

Q.    That's an element that you've testified to -- right? -- of an investigation, to instruct the subject of a complaint to keep the investigation and the complaint confidential?

A.    I cannot remember exactly what I said, but I do think it's an important element to take steps during an investigation to make sure anyone involved in it is keeping it confidential, yes.

Glasgow

Q.     Okay.  And why do you think that's important?

A.     For many reasons, probably more than I will state here, but because these are sensitive matters, we don't want retaliation, we don't want information about these sensitive subjects getting out to other employees.  It could be harmful for anyone involved in the investigation for others to know it's going on.

It could also affect the outcome of the investigation and us getting accurate information from the investigation.

Q.     Was it your expectation during that two-year period that the folks who reported to you would give that instruction, whenever they were conducting investigations, to the subject of the complaint?

A.     I expected people involved in these investigations to do everything they could to make sure it was kept confidential, yes.

Q.     Did that include giving instructions about -- giving an instruction to the subject of the complaint to keep the investigation and the complaint confidential?

Glasgow

A.    I believe it would be expectation to give that instruction to anyone involved in the investigation.

Q.    I know, but I'm asking a very specific question.  Okay?  So please do your best to answer it, which is was it important to give that instruction to the subject of the complaint.

A.    I would prefer it's given to the subject of the complaint, yes.

Q.    And it was your expectation that the folks on your HR team would do so; correct?

A.    Yes.

Q.    As part of the investigation, when there was a complaint made about another employee, was part of the process speaking to the subject of the complaint?

ATTORNEY LYNCH:  Objection.

A.    Sorry, say that again.

Q.    Sure.  As part of the process of conducting HR investigations, was part of that process, one of the steps, speaking directly to the subject of the complaint?

A.    That would normally be part of the process, yes.

Page 75

Glasgow

Q.   Were there times where an investigation was conducted in which an employee made a complaint about another employee in which there was not a discussion with the subject of the complaint?

A.   Not that I can recall.

Q.   To your knowledge were there instances where HR was involved in providing counsel or support to a manager and a manager told the subject of a complaint not to speak to HR?

ATTORNEY LYNCH:  Objection.

A.   Sorry.

Q.   Let me do it again.

A.   Sure.

Q.   Are you aware of any times during that two-year period in which a manager told an employee not to speak to HR in connection with an HR complaint?

A.   I can't recall that right now, no.

Q.   How soon after a complaint is made against another employee or after a complaint had been made against another employee was it typical to speak to the subject of the complaint?

A.   There's not a typical time.  It would

Glasgow

completely depend on the circumstances.

Q.    And is there a practice in how quickly to do it?

A.    Truly depending on the circumstances.

Q.    Okay.  And so what are the factors that might affect doing it more quickly or waiting?

A.    Usually depending on what we thought would lead us to the best information gathering.

Q.    And what are those factors that inform that decision?

A.    Whether we think it's best to get information from the subject of the complaint right away, if we think it's best to gather information from other witnesses first.  That's a sample, but, yeah, it really depends on the circumstances.

Q.    Were there times where HR was involved in investigations where the subject of the complaint was not notified for multiple weeks that a complaint had been made?

A.    I don't know.

Q.    Were there times where the subject of the complaint was not made aware of a complaint when multiple days had gone by?

Glasgow

A.    Probably, yes.

Q.    Are you aware of any circumstances where the subject of a complaint was not notified within a month of the complaint being made?

A.    I don't know.

Q.    During that two-year period we've been discussing, were there instances of employees being fired that fell -- that worked within the groups that you oversaw?

A.    Yes.

Q.    How many times?

A.    I do not know.

Q.    Was it more than five times?

A.    Yes.

Q.    Was it more than ten times?

A.    Yes.

Q.    Was it more than 20?

A.    Probably.  If by "fired" you mean involuntarily terminated, we make the decision for them to leave, yes.

Q.    The number probably more than 20, does that include layoffs?

A.    Yes.

Q.    During the two-year period, were there

Glasgow

instances where employees were fired for breaching policy?

A. Yes.

Q. How many times did that happen?

A. I don't know.

Q. Was it more than five times?

A. Yes.

Q. Was it more than ten times?

A. Probably.

Q. Was it more than 20 times?

A. I'm not sure.

Q. Okay. So please tell me the circumstances that you remember where someone was fired for breaching policy.

A. This is going way back; and I do not remember all of them, and I don't remember the specifics.

So -- say that again, circumstances for each one that I can remember?

Q. Yep.

A. There were investigations on the TV station side that led to some leaders being terminated for company policy violations, at least four or five, maybe more. There was someone in

Glasgow

news who was terminated for repeatedly -- I think it was losing or damaging company equipment to the tune of a lot of money, despite repeated counselings about it. There was the harassment issue I mentioned to you.

There were a lot more that my team handled that maybe I'm not remembering off the top of my head.

There was a news director on the TV station side that was terminated after an investigation for bullying. I believe he was -- he was another one that was suspended I believe while we did the investigation that I did not mention before. That one just came to me.

Those are the ones that are coming to me right now. I am certain there are more.

Q. During that two-year period, was anyone fired for violating the antiretaliation policy or policies at CBS News?

A. Other than the plaintiff here, I can't remember one off the top of my head.

Q. The investigation on the TV station side where you said four or more times someone was fired, was the nature of the policy violation the

Glasgow

same or did they vary?

A.    In some instances they varied.

Q.    So what are the policy violations at issue that you recall on that side of things?

A.    I remember some of them were related to our antidiscrimination policy.  Some of them were related to poor treatment of employees.  I can't -- I can't remember if there's other issues than those that I'm thinking about.  But generally antidiscrimination, perhaps poor treatment/ bullying of employees, and -- that's what I'm recalling.

Q.    And the harassment issue, that was the sexual harassment on the, you think, 48 Hours? That was that person you're referring to?

A.    Yes.

Q.    Had the person who was fired for sexual harassment, had there been any previous complaints about that person?

A.    I don't remember.  I don't think so, but I don't remember for sure.

Q.    Okay.  The news director who you recall being fired for bullying and was suspended -- potentially suspended during an investigation,

Glasgow

when did that happen, approximately, do you recall?  It was sometime during that two-year period?

A.    Yes.

Q.    Okay.  And who made the decision to fire that person, do you recall?

A.    It was TV stations' leadership, so I believe the general manager of that station and HR were involved in that decision.

Q.    And the bullying that took place in that case, what was the nature of it?

A.    Mistreatment of newsroom staff that reported to him.  There was yelling.  I think there was intimidation, making people feel -- belittling team members.

Q.    Was there one complaint or multiple complaints about that person?

A.    Multiple, multiple.

Q.    Were there any complaints -- in connection with that same -- that news director, were there any complaints about violation of antidiscrimination policies?

A.    I don't remember.

Q.    Antiharassment policies?

Glasgow

A.    I don't remember.

Q.    Retaliation?

A.    Not that I remember.

Q.    Do you know whether that individual had received warnings previously?

A.    I don't.

Q.    The individuals that you just mentioned who were fired for breaching policy, do you know if any of them received severance?  Strike that.

Were they offered severance by CBS or by Paramount?

A.    I don't remember.

Q.    During the two-year period, who made decisions as to whether to offer employees severance?

A.    It was usually the business leader with some input and guidance from HR and probably legal partners.

Q.    On the CBS News side of things, who would be the business leader that made that decision?

A.    It would depend on what the issue was and who the individuals involved were.

Q.    You mentioned the employee fired for

Glasgow

alleged sexual harassment.  Do you know if that employee was offered severance?

A.    I don't remember.

Q.    Do you recall who was involved in discussions about whether to offer that employee severance?

A.    No.

Q.    Okay.  The news director that you said was fired for mistreatment of staff and the multiple complaints, was that individual offered severance?

A.    I don't remember.

Q.    And who was involved in deciding whether to offer severance or not?

A.    I don't remember, because I don't remember all the details.  But, again, I would imagine HR had some involvement in the business leader at issue.

Q.    But you don't -- as you sit here today, can't identify who that individual business leader would be?

A.    As I mentioned before, it was probably the general manager of the station.

Q.    The sexual harassment person, who was

Glasgow

that business leader?

A.   I don't know because I didn't handle that one directly.

Q.   Who handled that?

A.   I can't remember.  It might have been Renee Balducci.

Q.   During the two-year period that you were in your SVP role for digital news and TV stations, was HR involved at all in decisions whether to renew contracts of employees?

A.   Yes.

Q.   And what was HR's involvement?

A.   We would work with the individual's managers or business leader to find out from that leader or manager if they wanted to renew a contract.

Q.   And did everyone who worked for the shows on the CBS News side of things to your knowledge have contracts?

A.   No, they didn't.

Q.   Were there only certain positions that did?

A.   Yes.

Q.   And what were those positions?

Glasgow

A.   I don't remember.  They varied by --
they might vary by department, so I do not
remember.

Q.   Was HR at all involved in deciding
whether to renew someone's contract?

A.   It would depend on the circumstances.
Possibly.

Q.   In what situations was HR involved?

A.   One, if the company had a broader
policy about who should or shouldn't be on
contract, HR would apply that policy and give that
recommendation to the business leader based on
what the company's expectations were.

Q.   Other instances?

A.   If HR had information about the
individual's work or performance or something that
we thought the business leader needed to know
making the decision, we would share that.

Q.   Were you involved in any discussions
with Bill Owens at 60 Minutes about whether to
renew employees' contracts?

A.   No.

Q.   Was anyone on your team involved in
those discussions that you remember?

Glasgow

A.    I don't know.

Q.    Did you ever participate in discussions about contract renewals where prior behavior problems were talked about in deciding whether to offer an employee a contract renewal?

ATTORNEY LYNCH:  Objection.

A.    I can't remember specific instance of that.

Q.    Did it ever happen generally, do you remember that?

A.    I can generally imagine and have a recollection there was at some point in my career -- I don't know exactly if it was within these two years -- that part of my discussions with leaders and making contract decisions would have been me giving a point of view about the person's performance/leadership, et cetera, that might be part of the decision.  But I can't remember a specific instance.

Q.    And if you were -- in those -- and I know you can't remember specifics, and I know you don't know if it was that two-year period or some other point.  If you were aware of prior behavioral issues, would that be something you

Glasgow

would discuss with a manager in deciding whether to renew someone's contract?

ATTORNEY LYNCH:  Objection.

A.    Possibly.

Q.    Going back to that two-year period, were you involved in discussions with managers about giving pay increases?

A.    Sometimes.

Q.    And generally what was your role in those discussions?

A.    It depended on the type of role.  For some of the network news roles, contract and pay decisions were handled by the business affairs group, so my team had less involvement.  Some of the roles that were were more handled by HR.

So it would vary depending on the role.  Sometimes a leader would come to me, or HR, and discuss pay for an individual, and we would work with them on it.

Q.    For 60 Minutes producers, when it came to pay issues, was that something that was more handled by HR or by business affairs or both?

A.    More business affairs.

Q.    Why was that?

Glasgow

A.    I don't know.

Q.    When someone had a contract -- strike that.

Were there circumstances where someone was fired within the groups that you oversaw during that two-year period that had a contract?

A.    Yes.

Q.    And in those situations was it necessary to determine if the firing was for cause or without cause?

ATTORNEY LYNCH:  Objection.

A.    Sometimes, yes.

Q.    And what circumstances was it necessary to make that determination?

ATTORNEY LYNCH:  Objection.

A.    Any time someone under contract is terminated and we have to know whether to decide whether to pay out the contract or not.

Q.    And were you involved in those discussions during that two-year period?

A.    Sometimes, yes.

Q.    And what circumstances were you involved?

A.    If it was a termination at a level

Glasgow

where I was directly involved with the senior leader about it versus someone on my team, I would be, like I said, part of the discussions with that leader in a decision about how to handle the termination.

Q. And if one of your team members was handling the situation directly, would it then be your team member who was part of that discussion about whether to call the firing for cause or without cause?

A. It might be. It depends on the circumstances.

Q. So what are the circumstances that might affect it?

A. A lot of things. Every decision to terminate someone, every investigation, is so different. So to sort of give an answer that applies to all is impossible. So it truly depends on the circumstances, the reason for the investigation, the reason for the termination. It might be just who's involved.

Q. And to your knowledge there was nothing in writing about how determinations related to cause would be made? Strike that.

Glasgow

Q. Was there anything in writing about the process or procedure for determining making decisions about whether a firing was for cause or not?

A. I don't know.

Q. You don't know or you don't remember?

ATTORNEY LYNCH: Objection.

A. I don't know. Yeah, I don't know.

Q. Were you aware of anything when you worked there?

A. Not that I can think of right now.

Q. When you were in your position, were you aware of situation where the groups that you oversaw that an employee who had a contract was paid but was not performing services for the company?

A. Explain what you mean by that.

Q. Well, there's instances where someone was paid but they were not actively performing services for the company?

A. Yes.

Q. How many times were you aware of that happening?

A. I don't know. Many.

Glasgow

Q.     Are you familiar with the term "pay to play"?

A.     I am, but those aren't the kind of contracts that I would be very involved in.

Q.     What do you mean by that?

A.     I think the pay -- any kind of pay or play language clause is probably more in the contracts that are handled by business affairs. It wasn't a term of art that I am familiar with being in the executive contracts that I was more closely involved with.

Q.     Were there circumstances in which you were aware in which a manager no longer wanted an employee to perform services and so that employee was instructed not to actively work for the company but they continued to receive payment?

ATTORNEY LYNCH:  Objection.

A.     I'm not sure I fully understand what you're talking about.  Do you mean someone that was terminated and paid out their contract or do you mean something else?

Q.     Well, let's start there.  Were there circumstances under which during that two-year period someone was -- someone was terminated but

Glasgow

paid out under their contract?

A. Yes.

Q. How many times did that happen?

A. I don't know.

Q. Was it more than 20 times?

A. I don't know.

Q. Was it more than ten?

A. Yes, probably.

Q. And what were the circumstances under which that happened?

A. I cannot remember them all. It could be a position elimination, it could be a change in business strategy and we needed a different set of skills for a role. It could be a poor performance. It -- yeah, that sort of thing.

Q. Were there instances that you recall in which an employee was fired for purportedly violating a company policy but was paid out under their contract?

ATTORNEY LYNCH: Objection.

A. I don't remember. I don't know.

Q. Okay. If we can mark as Glasgow Exhibit 007886.

(Pause.)

Glasgow

Q.    Was there someone who reported within your group named Maria Cottone?

A.    I know the name, but she didn't report into my group at the time I was in the role.

Q.    What was your understanding of her job?

A.    During the two years I had news?

Q.    Yeah.

A.    She worked in the HR department but for another group, and I can't remember what group it was.

Q.    During the time that you were SVP of CBS News, including CBS News, did Ms. Cottone provide any services to CBS News programs?

A.    Yeah, we tapped into her for help when our HR team was pretty busy.  And I think there were some times that she worked with some of my team members to help out.

ATTORNEY IADEVAIA:  If we could mark this as Glasgow Exhibit 1, please.

(Glasgow Exhibit 1, document, Bates-stamped CBS 7886, marked for identification.)

Q.    You can take a look, Ms. Glasgow. What's been marked as Glasgow Exhibit 1 is a

Glasgow

one-page document bearing Bates number CBS 7886.

Once you have had a chance to look at it, please let me know.

A.    Okay.  I've looked at it.

Q.    Do you recognize this document?

A.    Nope.

Q.    Have you seen it before today?

A.    I don't know.

Q.    At the top it says human resources contact/CBS News and stations.  Do you see that?

A.    I do.

Q.    Okay.  Then it says Cindy Glasgow, SVP, human resources news and stations.  Do you see that?

A.    I do.

Q.    Okay.  And at some point that was your title; correct?

A.    Probably -- it's not that accurate. Again, it was officially SVP CBS News, digital and TV stations; but shorthand for it, yes.

Q.    Below your name is someone named Karen Jimenez.  She was your executive assistant?

A.    Yes.

Q.    Below that you see the header network

Glasgow

news NY and digital news.  Do you see that?

A.    I do.

Q.    Okay.  And your understanding is NY
stands for New York; correct?

A.    Yes.

Q.    Okay.  Under that is the name Renee
Balducci, and it says VP of human resources.  Do
you see that?

A.    I do.

Q.    Okay.  And Ms. Balducci reported to
you; correct?

A.    Yes.

Q.    And under that is Taylor Gunther,
senior manager, human resources digital news.

Did Taylor Gunther report directly to
you?

A.    No.

Q.    Is Taylor a woman or a man?

A.    A woman.

Q.    Who did Ms. Gunther report to?

A.    Renee Balducci.

Q.    Okay.  Then the next name is Talia
Ritholtz, human resources page.  Do you see that?

A.    I do.

Glasgow

Q.    Did Talia report directly to you?

A.    No.

Q.    Who did Talia report to?

A.    I believe Renee.

Q.    Okay.  Then Maria Cottone is listed as VP HR interim support.  Do you see Maria's name there?

A.    I do.

Q.    What did interim support mean, if you know?

A.    I didn't create this document, so I'm not sure what that was supposed to mean.

Q.    You said that from time to time Ms. Cottone provided help to CBS News; is that right?

A.    Yes.  I think there was a period when we were especially busy that we -- the team -- I didn't directly but I think some of the team tapped into her for help.

Q.    Do you know if Ms. Cottone had previously worked for or provided HR services to CBS News shows?

A.    I know that she had supported some part of CBS News -- I don't know for sure which part --

Glasgow

in the past.

Q. And Ms. Balducci, her responsibilities included providing HR services to 60 Minutes; correct?

A. Yes.

Q. Was that true throughout the whole time that you were in your SVP role or did that change at some point?

A. That changed at some point.

Q. And how did it change?

A. Renee took a job in another part of the company, an HR job in another part of the company.

Q. Do you know approximately when that happened?

A. No, I can't remember.

Q. But it was before you left the company; correct?

A. Yes.

Q. And was Ms. Balducci voluntarily or involuntarily transferred to that other position?

A. Voluntarily.

Q. And do you know what position she moved to?

A. It was an HR position supporting the

Glasgow

revenue groups ad sales.

Q.   And in that position do you know if Ms. Balducci was providing services to more employees or fewer employees than she had provided when she was in her role within CBS News and digital?

A.   The ad sales group is larger than CBS News, so more.

Q.   Did you have regular meetings with Ms. Balducci when she reported directly to you?

A.   Yes.

Q.   How often?

A.   At least weekly in most circumstances, most of the time.

Q.   And were those weekly meetings one-on-ones or did other people attend?

A.   We had weekly one-on-ones.

Q.   Did you ever have bigger meetings, regular meetings, in which Ms. Balducci attended beyond the one-on-ones?

A.   I believe so.

Q.   What were those meetings?

A.   There might be other HR teem meetings.

Q.   And who would attend those meetings?

Glasgow

A.    I can't remember for sure.  I believe I had a team member where I would meet sometimes with the digital team, so maybe Renee and Taylor. I think sometimes I would have meetings with Renee and Montrese as my two -- no, I would have direct report meetings weekly that included all of the VPs that reported to me, which was the network news side, Renee and Montrese, and the TV stations' VPs.

Q.    And how often did you have those meetings?

A.    I think weekly.

Q.    And during your one-on-one meetings, generally what did you talk about with Ms. Balducci?

A.    Whatever was going on at the time that she and/or I felt like we needed to talk about.

Q.    And did that include HR investigations that she was involved in?

A.    It could.

Q.    Did it include situations where there were discussions about taking disciplinary action against employees that fell within her ambit?

A.    It could.

Glasgow

Q. And just to be clear about this -- I think you've already said it, but just to make sure -- Ms. Cottone, did she ever report to you directly or indirectly?

A. No.

Q. Why did you leave Paramount?

A. Because the role that I had, the structure didn't really make sense and my boss and I both realized that the two presidents each needed their own senior leader as opposed to one.

Q. Was the decision to leave voluntarily or involuntarily?

A. It was mutual.

Q. Did you get severance?

A. I did.

Q. When you said that there was a decision made I think between you and your boss -- your boss being Ms. Delich?

A. Delich.

Q. Delich.

A. Yeah.

Q. -- and that each of the presidents needed their own senior leaders, were you at the time functioning as the senior leader for both the

Page 101

Glasgow

presidents?

A. I was.

Q. And was there something that happened that led to that conclusion or belief that there should be separate senior leaders for both?

A. It was -- it was just an accumulation of things, realizing we thought they would have a more cohesive HR strategy and one leader for both of them made sense. But over time it became clear they had different priorities. Sometimes they wanted to do policies and things differently. And it was just becoming more challenging for one person to kind of navigate that and try to create sort of things that scaled across the group.

Q. Before you assumed the SVP role that we've been talking about, what was your job?

A. For about a year prior to that I was SVP of HR just for the TV stations group, which was at the time a separate division of CBS.

Q. And during that time who did you report to?

A. Whitney Delich.

Q. For the entire time?

A. Yes.

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Glasgow

Q.    And you said you were -- you said it was an SVP role?

A.    It was.

Q.    And you said it was about one year you were in that job?

A.    Yes.

Q.    Who was head of TV stations at that time?

A.    Peter Dunn.

Q.    So were you Mr. Dunn's senior HR leader?

A.    I was.

Q.    Generally what were your responsibilities in that job?

A.    Similar to what I stated earlier.  For the TV stations division, I was the lead HR business partner.  I managed the HR team on HR matters and implemented the HR practices and policies for corporate group.

Q.    And was there someone in your equivalent position who handled CBS News shows?

A.    The CBS network news division, yes.

Q.    Who was that?

A.    José Andino.

Page 103

Glasgow

Q. And does Mr. Andino still work for Paramount?

A. I don't think so.

Q. At some point in time was there a decision to have one senior leader in the HR function for both TV stations and CBS News network division?

A. There was a decision when the divisions were combined.

Q. When did that happen, approximately?

A. When did Neeraj come? Spring of '21 was when they came. I believe -- so that's when the division was officially consolidated. I don't believe I took the expanded role until later that summer.

Q. Of 2021?

A. 2021, yes.

Q. And did Mr. Andino continue to work for HR after that merger, or consolidation?

A. He did for a bit. In the months between when it happened in the spring and sometime later that summer, he and I both sort of supported -- he was there in his role for network news. I was still doing the TV stations side of

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Glasgow

the job.

Q.    And when the consolidation took place, was Renee Balducci already providing HR services to CBS News?

A.    Yes.

Q.    What was your job before you had the role of SVP for TV stations?

A.    I was premerger -- pre-Viacom/CBS merger, I worked on the Viacom side.  I was SVP of HR.  I was overseeing the entertainment and youth brands HR function and the COO's teams.

Q.    And for how long approximately were you in that job?

A.    I think about a year.

Q.    And who did you report to?

A.    Whitney Delich.

Q.    And what did you do before that job?

A.    I was SVP of HR for what we called then the entertainment group, which was some of the cable brands:  Comedy Central, TV Land, Paramount Network.  And I might have had some other groups. I can't remember.

Q.    Approximately how long were you in that job?

Glasgow

A. A year or two. There was a lot of change going on at the company so...

Q. Who did you report to?

A. Whitney Delich.

Q. And generally what were your responsibilities in that job?

A. Similar to what I just described but particular for that group, the entertainment group.

Q. What was your job then?

A. SVP of HR for Viacom's kids and family group, which was Nickelodeon and the related Nickelodeon platforms and channels.

Q. And how long were you in that job, approximately?

A. Four or five years.

Q. And who did you report to?

A. Whitney -- no, no, sorry, Scott Mills, who at the time was the chief administrative officer for Viacom.

Q. And generally what did you do in that job?

A. Similar to what I've just described for my other roles but for the kids and family

Glasgow

division of Viacom.

Q.    What was your job before then?

A.    SVP of HR for Viacom corporate and revenue groups.

Q.    How long were you in that job, approximately?

A.    Four years.

Q.    And who did you report to?

A.    Whitney Delich.

Q.    That whole time?

A.    Yes.

Q.    And what were your responsibilities generally?

A.    Similar to what I described before, but it was the HR support for Viacom's corporate groups, legal, content distribution, research, ad sales.  I think that's all of them.  I'm not sure if there were other corporate groups in there.

Q.    What was your job before that?

A.    SVP HR for the entertainment group, which was, again, back to some of the cable brands:  Comedy Central, TV Land, and what was then called Spike TV and Epics, which was a Viacom joint venture.

Glasgow

Q. Approximately how long were you in that role?

A. Three years.

Q. And who did you report to?

A. Catherine Houser.

Q. And what were your responsibilities generally?

A. Similar to what I described before for the cable brands that I just mentioned and the joint venture, Epics joint venture.

Q. What was your job before that?

A. VP of HR for Viacom's music group.

Q. And how long were you in that job, approximately?

A. About two years.

Q. And who did you report to?

A. Catherine Houser.

Q. And what were your responsibilities generally in that job?

A. Headed HR similar to how I described before for the cable brands: MTV, VH1, CMT, maybe Logo.

Q. What was your job previous before that?

A. I was vice president labor and

Glasgow

employment counsel for Viacom.

Q. And how long were you in that job?

A. About five years.

Q. And do you recall which years you're talking about at that point?

A. It was 2001 until 2006.

Q. And who did you report to in that job?

A. The woman who was at the time the head of the employment law group at the time. Her name was Michelle Lopez.

Q. And generally what were your responsibilities? Obviously I'm not asking you to reveal privileged information.

A. Advising counsel the business on employment law matters, negotiate and draft employment contracts, manage employment-related litigation for the company.

Q. And in that capacity were you ever involved in employee firings?

A. Yes.

Q. Including -- when I say employee -- let me ask -- strike that.

Were you involved in situations where employees were accused of violating company

Glasgow

policy?

A.    Yes.

Q.    And were you involved in counseling about disciplinary action, up to and including firing those employees?

A.    Yes.

Q.    Were you involved in situations in which there have been allegations of violations of the antidiscrimination policies?

A.    Probably, yes.

Q.    And were you involved in situations where there have been allegations of violations of antiretaliation policies?

A.    Probably.  I mean, this is 20 years ago, so I can't remember specifics.

Q.    Just a couple more biographical questions and then we can take a break for lunch.

A.    Okay.

Q.    Did you attend college?

A.    I did.

Q.    Where did you go?

A.    University of North Carolina.

Q.    At a specific campus?

A.    Chapel Hill.

Glasgow

Q.    And did you receive a degree from UNC Chapel Hill?

A.    I did.

Q.    What degree?

A.    Bachelor's degree.

Q.    Approximately when did you -- or maybe you'll remember this:  When did you graduate from college?

A.    '91.

Q.    '91.  Okay.

A.    1991.

Q.    Did you attend any school after college?

A.    I attended law school.

Q.    Where did you attend law school?

A.    University of North Carolina, Chapel Hill.

Q.    Did you receive a degree from UNC Chapel Hill law school?

A.    I did.

Q.    What did you receive?

A.    A JD.

Q.    And when did you receive it?

A.    1994.

Glasgow

Q.    Are you currently admitted to any state bars?

A.    I am not.

Q.    Were you ever admitted to any state bars?

A.    Yes, North Carolina.

Q.    Any others?

A.    No.

Q.    And you don't currently practice law; correct?

A.    No.

Q.    All right.  Actually, two more questions.

After law school where did you work?

A.    A law firm in North Carolina.  Petree Stockton was the name of it when I first started, and then it changed names to Kilpatrick Stockton.

Q.    How long were you there, or what years, approximately?  Either way is fine.

A.    It was about five years.

Q.    And what was your title?

A.    Associate.

Q.    Did you work within a particular practice group there?

Glasgow

A.    Focused on employment law.

Q.    And then did you work at any other law firms after Kilpatrick?

A.    I worked for maybe a year or so at Seyfarth Shaw.

Q.    Approximately when was that?

A.    1999.

Q.    And were you an associate there?

A.    Yes.

Q.    And did you work within a particular practice group at Seyfarth?

A.    Focused on employment law.

ATTORNEY IADEVAIA:  Okay.  I think a good time for a lunch break.

(Time noted:  12:57 p.m.)

A F T E R N O O N   S E S S I O N

(Time noted:  1:49 p.m.)

CYNTHIA GLASGOW,

resumed as a witness, having been previously sworn by the notary public, was examined and testified further as follows:

EXAMINATION CONTINUED BY

ATTORNEY IADEVAIA:

Q.    Ms. Glasgow, during your tenure I believe -- strike that.

During the -- I want to focus again on that two-year period when you were SVP of news, digital, and TV stations.  Do you recall that time -- I think you've already testified -- that Paramount had an antidiscrimination policy; correct?

A.    Yes.

Q.    And that policy was in writing?

A.    Yes.

Q.    And were you familiar with the policy at the time that you worked there?

A.    Yes.

Q.    And generally what did the policy say?

A.    That employment decisions and treatment

Glasgow

were not to be based on discriminatory intent, something along those lines.

Q.   Was it your understanding that the antidiscrimination policy prohibited discrimination based on certain individuals' characteristics?

A.   Yes.

Q.   And what are some of those characteristics?

A.   Race, gender, ethnicity, age, sexual orientation, among others.

Q.   And to your knowledge was the policy applicable to all employees at Paramount or were there individual policies for different divisions?

A.   It was applicable to all employees.

Q.   And during that two-year period we've been focused on, did Paramount have an antiretaliation policy?

A.   Yes.

Q.   And what was your understanding of that policy?

A.   That there was to be no retaliation -- it was a violation of policy to retaliate against any employee who made a good faith complaint to

Glasgow

the company.

Q.    And was there a written policy that prohibited retaliation?

A.    Yes.

Q.    And where was that policy contained, if you know?

A.    It might have been contained in multiple places.  I know it was referenced in the business conduct statement, but it could be in other places too.

Q.    To your knowledge does the antidiscrimination policy have an antiretaliation provision or provisions?

A.    I mean, I think -- the antiretaliation policy that I just talked about applied to any complaints made in good faith to the company about employee well-being and discrimination, et cetera.

Q.    And the antiretaliation policy that you're referring to, is it your understanding that that was applicable to all Paramount employees?

A.    Yes.

Q.    You testified earlier about trainings, and I think you testified about trainings in connection with Paramount's business conduct

Glasgow

statement; correct?

A.    I believe I did.

Q.    Yeah.  And whether you did or you didn't, there were I think -- were there annual trainings that employees were mandated to complete related to the business conduct statement?

A.    I believe so.

Q.    As part of that training, did employees get training on the antidiscrimination policy or was there a separate training for antidiscrimination?

A.    I believe it was part of the business conduct training.  I do not know or remember if there was other training about that topic.

Q.    About discrimination?

A.    Yes.

Q.    And the training on the business conduct statement, did that include training for -- related to the antiretaliation policy?

A.    I believe so, yes.

Q.    And are you aware or do you recall any separate training for antiretaliation policy beyond what was part of the overall training under the business conduct statement?

Glasgow

A.    Not that I recall right now.

(Glasgow Exhibit 2, global business conduct statement for ViacomCBS, Bates-stamped CBS 7611 through 7663, marked for identification.)

Q.    Okay.  What's been marked as Glasgow Exhibit 2 is a multipage document bearing Bates number CBS 7611 through 7663.

Ms. Glasgow, do you recognize what's been marked as Exhibit 2?

A.    Yes.

Q.    And what is it?

A.    It's global business conduct statement for ViacomCBS.  It says it's from 2021.

Q.    And the testimony you've given when you've referred to the business conduct statement earlier today, is this what you're referring to?

A.    This or a version of it; right? Different years there might be slightly different versions, but something like this.

Q.    And is for the period -- it says for 2021; correct?

A.    Yes, that's what it says.

Q.    And is it within Exhibit 2 that we

Glasgow

would find the antiretaliation policy that you were referring to?

A.   Probably.  Give me a moment.

Q.   Sure.

(Pause.)

A.   There's a reference to it on CBS 007623.

Q.   That's page 13 of the document?

A.   I don't know that I can read the page -- oh, yes, yes, page 13.

Q.   It says speaking up and seeking guidance --

A.   Yes.

Q.   -- at the top of the page.

A.   Yes.

Then there is the following page, which is page 14 of the statement, 007624, that talks about speaking up and the nonretaliation policy.

Q.   Okay.

A.   And I do not know -- I can read through it -- it might be referenced elsewhere.  I can't remember for sure.

(Pause.)

A.   I think -- I'm not -- in my perusal,

Glasgow

I'm not seeing it anywhere else.  It could be
somewhere else.  I'm not sure.

Q.    But the policy that you were testifying
to earlier today, the antiretaliation policy, is
that encompassed within -- is that the policy
that's reflected on page 14 of the document 7624?

A.    The page refers to our nonretaliation
policy, yes.

Q.    Okay.  Are you aware of any other place
in writing where the nonretaliation policy is
located?

A.    Not off the top of my head, but it very
well could be in other documents.  I don't know.

Q.    But nothing you can think of; correct?

A.    Nothing I can think of right now.

Q.    Okay.  I think that's it for this
document.

        (Glasgow Exhibit 3, CBS
    nondiscrimination and antiharassment policy,
    Bates-stamped CBS 7098 through 7102, marked
    for identification.)

Q.    All right.  Ms. Glasgow, you can take a
minute to look at the document.  What's been
marked as Glasgow Exhibit 3 is a multipage

Glasgow

document bearing Bates number CBS 7098 through 7102.

A.    Okay.

Q.    Do you recognize what's been marked as Glasgow Exhibit 3?

A.    I don't know that I've seen this document before.

Q.    Okay.  At the top of the document it says CBS nondiscrimination and antiharassment policy.  Do you see that?

A.    I do.

Q.    And do you know whether this policy was in effect during the two-year period you were SVP that we've been talking about?

A.    It's dated 2019, which would be pre the ViacomCBS merger.  So I do not know if this policy itself was still in effect postmerger, which is when I was in that role.

ATTORNEY IADEVAIA:  If we can mark this as Glasgow Exhibit 4, please.

(Glasgow Exhibit 4, position statement from Davis Wright, marked for identification.)

Q.    Okay.  If you could take a look at the document.  It's a very long document.  I'm going

Glasgow

to focus you on a particular part of the document, but I'll state for the record what's been marked as Glasgow Exhibit 4 is a position statement that the law firm Davis Wright & Tremaine submitted to the Equal Employment Opportunity Commission.  And it's in letter form, and it's dated May 5th, 2023.

ATTORNEY LYNCH:  I would just like to the add for the record that this document doesn't have any Bates numbers on it, just to note that.

ATTORNEY IADEVAIA:  Okay.

Q.  If you could please take a look at -- actually, strike that.

Were you at all involved in the submission of Paramount or CBS's position statement to the EEOC in this matter?

A.  I don't remember.  It's dated shortly after I left the company, so I don't remember.

Q.  And if you could flip toward the back of the document, there's exhibits starting with Exhibit A.  You're there.  And if you could turn the page, please.  Okay.  So I want to talk about Exhibit A, and I guess my first question is -- and you can read through it -- but do you recognize

Glasgow

this document.

A.    It looks familiar.  I can't say for sure if this exact document I've seen before, but it looks familiar.

Q.    And it says at the top the nondiscrimination and antiharassment policy, and there's a header that says Paramount.  Do you see that?

A.    I do.

Q.    And was this policy or a similar policy in effect when you were in your SVP role that we've been discussing?

A.    I don't know.  I assume some version of this, but I do not know exactly when this was in place in this particular document.  So I don't know.

Q.    Okay.  And if you if you take a look at page 5 of the document on Exhibit A, please.  It has page numbers on the bottom.

A.    Okay.

Q.    There's a point header that says the investigation.  Do you see that --

A.    I do.

Q.    -- in bold?

Glasgow

A.    I do.

Q.    And I ask that you read through this section -- it's three paragraphs -- and let me know if your memory is that was in effect during the time you were SVP.

(Pause.)

A.    Okay.  I've read it.

Q.    So my question was was this portion of the policy, which is called the investigation, in effect during the time you were SVP.

A.    I don't know if this particular language and policy was in effect.  It describes a process that is generally what I was aware of was our process.  But I can't say for sure if this particular document with this particular language was, quote/unquote, in effect.

Q.    Okay.  Now, the description provided here is found within the antidiscrimination and harassment policy -- right? -- what we've --

A.    Within a nondiscrimination and antiharassment policy, yes.

Q.    The specifications about the investigation, were those specifications of investigations applicable to investigations

Glasgow

conducted outside of the discrimination and harassment context?

ATTORNEY LYNCH: Objection.

A. I don't know.

Q. Well, I think you said that you don't recall if this specific policy was in effect during the time you were SVP; correct?

A. Right.

Q. But you do say that this is how you believe investigations generally should be conducted; is that right?

A. It's my understanding this is generally the process we followed in how we conducted investigations, yes.

Q. When you were in your role of SVP?

A. Yes.

Q. And was it generally the process followed whether -- was the process limited to discrimination claims for investigations?

A. Our investigation process would really depend on what the complaint was and what the issue was. So this process, a similar process to this, very well may have been followed for any kind of complaint and even beyond

Glasgow

antidiscrimination.

Q.   Okay.  It says that -- referring specifically to the policy, it says that allegations will be investigated fairly, immediately, thoroughly, and impartially.

Do you see that?

A.   Yes, I see that.

Q.   Okay.  So for any type of investigation that HR conducted, whether discrimination or otherwise, was it your expectation that the investigation would be conducted fairly?

A.   Yes.

Q.   And was it your expectation it would be conducted immediately?

A.   To the extent we could, yes.

Q.   And thoroughly, was that your expectation?

A.   Yes.

Q.   And impartially?

A.   Yes.

Q.   In the context of conducting investigations, what's your understanding of impartially?  What's that mean?

A.   With an intent to get to the truth of

Glasgow

the investigation.

Q. Do you think it's important when conducting investigations that the -- I'm again focused on the period when you were SVP. Did you think it was important that the investigations be conducted without bias in favor of one side versus the other?

A. Lots of different kinds of investigations, but, yes, I would hope and expect that the investigation was done impartially and without bias.

Q. And how come? Why would that matter?

A. To have a more proper investigation.

Q. And when you say "more proper," what do you mean?

A. To more likely get to the truth of the investigation and come up with the right outcome.

Q. Okay. If you look further down in the paragraph, it says, Upon receipt of the complaint -- do you see that? It's about five or six lines down.

A. Yep.

Q. -- the designated investigator will conduct a prompt review of the allegations.

Glasgow

Do you see that?

A. I do.

Q. Was that your expectation as to how all HR investigations would be conducted during the two-year period we've been referring to?

A. All investigations is pretty broad. So, again, how we handled each investigation would depend on what the complaint was, what the issue was. So I can't -- I can't say that I had specific expectations for all investigations. So -- yeah, I don't know exactly how to answer your question.

Q. Okay. Were there investigations that you conducted that you didn't think should be conducted promptly?

A. We would conduct them -- no, we would conduct them as promptly as made sense given the situation, yes.

Q. Then it says, The investigation may include but is not limited to individual interviews with the complainant, other parties involved, and, where necessary, with individuals who may have observed the alleged conduct or may have other relevant knowledge.

Glasgow

Do you see that text?

A.    I do.

Q.    Did I read it accurately?

A.    I believe so.

Q.    And was it your expectation that the investigations that HR conducted during the time you were SVP of the group you led would be conducted in that manner?

A.    My expectation was, yes, some version of those steps would be taken in most investigations, yes.

Q.    And if you take a look at the last sentence of that first paragraph it says, As part of its investigation, Paramount will review relevant documents, if any, which may include, without limitation, emails and text messages.

Did I read that correctly?

A.    Yes, I see that sentence.

Q.    Was it your expectation when you were SVP that the HR investigations would follow that practice?

A.    My expectation was that if there were relevant documentation we would review it as part of the investigation.

Glasgow

Q.    Was it your expectation that it was part of the responsibility of the investigator to figure out if there was relevant documentation?

A.    Could I back up to the answer I gave before?

Q.    Of course.

A.    If there were relevant documents that we were aware of, I would expect that they would be reviewed as part of the investigation.

Sorry, can you repeat your new question?

Q.    Sure.  So then the question is what responsibility did the investigator have to determine if there were relevant documents.

A.    As part of their investigation, if they became aware of the existence of relevant documentation, that we would try to get those documents and review them.

Q.    In order to determine or become aware of documents, would you expect that the HR investigator would ask the individuals involved if they had documents that they believed were applicable?

ATTORNEY LYNCH:  Objection.

Glasgow

A. They might ask that.

Q. In what circumstances wouldn't they ask that?

A. I don't know if they were getting -- if they were getting information from the individual and nothing was necessarily raised that prompted a specific ask for documents.

Q. In the second paragraph the policy says, Each complainant will be notified following the completion of the investigation and will be advised of the results of the investigation, whether corrective action was taken, and the right to file a complaint externally.

Did I read that correctly?

A. Yes.

Q. And you see that text?

A. I do.

Q. Was that your expectation or understanding as to how HR conducted investigations during the time you were in your SVP position?

A. My expectation was that people who brought a complaint would hear back that we had taken -- done the investigation, hear back that we

Glasgow

took action. I don't know that my practice was to state the corrective action but more just to let the person know that we had taken steps that we felt were appropriate.

Q. And if you take a look at the next section called responsive action. Do you see that bolded header?

A. I do.

Q. If you could take a look at that, and then I just have one question there.

(Pause.)

A. Okay. I see it.

Q. Okay. So looking at the second sentence: Responsive action may include, for example, training, referral to counseling, monitoring of the offender, and/or disciplinary action, such as warnings, reprimands, withholding of a promotion or pay increase, prospective reduction of wages, demotion, reassignment, temporary suspension without pay, or termination as Paramount believes appropriate under the circumstances.

Do you see that text?

A. I do.

Page 132

Glasgow

Q.    Okay.  And during the time that you were in your SVP position, was it your understanding that these responsive actions were available in the event that there was a violation of the antidiscrimination and harassment policy?

ATTORNEY LYNCH:  Objection.

A.    This list -- I don't remember seeing this specific document in this language, but these to me ring true of options that you have in a corrective action in response to an investigation.

Q.    And was that true for situations where there was not an alleged violation of the antidiscrimination policy?

A.    I'm sorry, what do you mean by that?

Q.    Are these actions or were these actions also a possible response in the event of an alleged breach of policy but not discrimination?

A.    Yeah, they could be.

Q.    During the two-year period we've been talking about, if an employee wanted to make a complaint against another employee, what was the process for doing so?

A.    The process was spelled out in our business conduct statement, and we sometimes would

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Glasgow

take other opportunities to remind employees of
the process, which was basically to speak up, come
to either your direct manager, if that felt the
appropriate avenue.

If you didn't feel comfortable coming
to your direct manager, you could or should go to
anyone in your management team.  If you did not
feel comfortable going to anyone within your
management chain, you could go to anyone within
the HR department.

If for some reason you also had options
to go to the legal department or anyone that
worked in the company's compliance department.  Or
you could make a anonymous complaint through our
open line.

Q.    When employees made complaints, did
they have to be in writing?  Was there any
requirement that the complaint be in writing?

A.    No.

Q.    Oral complaints were acceptable; is
that right?

A.    Yes.  We wanted the information however
we got it.

Q.    And if you received oral complaints was

Glasgow

the person who made the complaint asked to put anything in writing?

A. I don't know. They might be, depending on the circumstances.

Q. What circumstances might they be?

A. Just depending on whoever was handling the matter, if they felt there was some value in having it put in writing.

Q. Were there circumstances where you were aware of an oral complaint and you suggested or asked the complaining person to put it in writing?

A. Probably. I can't remember off the top of my head. I've handled a lot, so I'm not sure. But if it's helpful and gives additional information, I might have.

Q. And helpful in what sense? What do you mean by that?

A. Just making sure we have all the information from the individual, if we think we'll get the information more clearly if it's in writing, things like that.

Q. Was there any guidance, policy, or practice in writing for HR employees about how to handle or receive complaints?

Glasgow

A.    I'm not sure what you mean.  There were the policies I just described about all the ways employees were encouraged to make their complaints, and HR was one of those avenues to them.

Q.    Outside of the stuff that we've already gone through.

A.    Not -- not that I can think of right now.

Q.    And I think I asked you this, but just to make sure.  Was there any training provided to the HR folks about conducting investigations?

A.    I feel like -- I can't remember off the top of my head a specific one.  I feel like during my time at the company there were sometimes when maybe employment law or someone did some trainings.  I honestly can't remember for sure. So there could have been.  I'm not sure.

Q.    So once a complaint is received by HR, what happened next in the process?  An employee complaint.

A.    What happens next could really depend on what the complaint was.

Q.    Does HR conduct investigations of all

Glasgow

complaints that it receives during the time you worked there?

A.    My expectation was that HR would look into -- an investigation can mean a lot of things, but would look into the complaint as appropriate.

Q.    What do you mean, "as appropriate"?

A.    Meaning how they look into it, what we do, what the investigation, quote/unquote, is, whatever was the appropriate way to look into the issue given what the complaint was and all the circumstances.

Q.    And who makes that determination?

A.    Depends on what the situation is.

Q.    So what are some of the factors?

A.    Depends on who is taking in the complaint.  It depends on what the complaint is. It could be that the HR individual makes the determination.  Or it could be they escalate it to someone in their management chain to get guidance.

Q.    Are there any written materials -- whether it's policies or practices or guidance -- for HR to consult with to determine how to handle a specific complaint that they get?

ATTORNEY LYNCH:  Objection.

Glasgow

A. Could you say that again?

Q. Sure.

ATTORNEY IADEVAIA: Can you repeat the question, please.

(Record read.)

A. So you're asking for specifically written materials, not guidance?

Q. Yeah, I'm asking right now for written materials.

A. There might be something that our employee relations team had in writing. I'm honestly not sure.

Q. Okay. And you've distinguished between written materials and I assume oral guidance; correct?

A. I wanted to make sure I was answering your question correctly, yes.

Q. I think you testified earlier in terms of oral guidance the HR folks could go to you, they could go to employee relations, they could go to legal; is that right?

A. The HR professionals on my team could do any of those things to get guidance on how to handle.

Glasgow

Q. Was there any other resources for them in terms of guidance?

A. They might. At times we would work with someone in our compliance department. Some investigations we worked directly with the compliance -- Viacom, ViacomCBS, Paramount, compliance group.

Q. Any other resources?

A. Not that I'm thinking of right now.

Q. Were you ever involved in an investigation during this period of time that we've been discussing in which someone was interviewed who did not work for CBS or for Paramount?

A. Yes.

Q. How many times did that happen?

A. Oh, I'd say a few. I can't for sure, but I'd say a handful.

Q. And what were those circumstances?

A. I think there was an investigation about behavior where we would interview prior employees of the company. I think there was a situation where we were investigating something and I think there was a vendor that had

Glasgow

information.  Things like that.

I'm having a hard time thinking through all the investigations I was part of during that time, but that's some examples.

Q.    And in terms of talking to prior employees, was the circumstance that the prior employees had worked with the subject of the complaint or what were those circumstances?

A.    I think it was that they had relevant information about someone.  They might have had experience with or relevant information about someone involved in the investigation.

Q.    When a complaint was made and made it to HR, who was notified about the complaint?

ATTORNEY LYNCH:  Objection.

A.    It would depend on what the complaint was and what the situation was.

Q.    So what are some of the factors that might affect who was notified?

A.    We would only notify the people that we felt needed to know about the complaint.  That was the driving factor.

Q.    Okay.  And who were the people that -- strike that.

Glasgow

Were the managers of the employee notified when a complaint was made?

A. Which employee?

Q. The employee who's making the complaint.

A. It would depend on the circumstances. If it might not be appropriate to do that, it might be necessary to do that. Again, we would only notify the people that we felt it was appropriate to know.

Q. And at some point the subject of the complaint would be notified; correct?

A. Yes.

Q. And when did that happen?

A. It would depend on the circumstances.

Q. And what factors might affect when the person was notified -- the subject?

A. How quickly we could get the information that we felt was necessary when we had the conversation with the subject, timing, people's availability, what timing we thought was most advantageous for getting the most accurate information from the subject of the complaint. If we needed to find or look for more documents and

Glasgow

have that information before we spoke to the
subject.  A lot of things.

Q.    Once an investigation was completed,
what happened next?

A.    Usually -- again, it would so depend on
the circumstances, but it could be that there was
some decision about what the outcome would be, if
there needed to be any corrective measures taken.

Q.    And who made the decisions about
corrective measures?

A.    It usually would be someone in the
management chain, a business leader of the
impacted group with some input and guidance from
HR and probably legal.

Q.    And were there circumstances where HR
made the decision?

A.    HR usually is giving a point of view
and guidance on what the decision should be.

Q.    There are times during this two-year
period where HR made a recommendation and that
recommendation was not accepted?

A.    Probably.

Q.    Can you think of any?

A.    Not off the top of my head.

Glasgow

Q. And were there times when legal made a decision as opposed to just giving advice or guidance?

A. I mean, my understanding was the role of legal and HR was to give the guidance and counsel. The ultimate decision was made by the business leader.

Q. Understood. And my question is slightly different, if there was an instance in which you can recall during that time where legal made the decision.

A. I don't know. Not that I can recall right now.

Q. Outside of what you've already testified to, are you aware of other complaints made against CBS News employees during the time -- during this two-year period that we've been talking about?

A. Not that I can think of off the top of my head.

Q. To your knowledge did HR conduct an investigation in connection with Ms. Poolos?

A. Yes.

Q. Okay. You also testified about an

Glasgow

investigation related to an employee accused of harassment; correct?

A.     Yes.

Q.     Were there any other investigations that took place of CBS News employees during the two-year period we've been discussing?

A.     I believe so.

Q.     What do you recall?

A.     I'm having vague recollections of some complaints about other individuals in the news department that were looked into.  I can't remember all the details about them.  It was people on my team that managed them most directly, but I'm vaguely remembering a couple others.

And I have a more vague sense that there were others that I'm just not recalling at the moment.

Q.     Okay.  And you said complaints about other individuals in the news department that people on your team managed.  Who on your team managed those?

A.     I'm thinking about a couple that I believe were managed more directly by Montrese Sampson on my team.

Glasgow

Q.    And what were the allegations in those situations?

A.    I believe there was some allegation of some bullying or kind of inappropriate treatment of colleagues and coworkers.  I believe there was one that was a discrimination complaint that an executive was making decisions based on discriminatory factors, is a couple that I'm remembering.  There were a couple that were about sort of bullying/inappropriate treatment of colleagues and team members.

Q.    Mr. Sampson?

A.    Ms. Sampson.

Q.    Ms. Sampson.  Sorry.

A.    Yeah.

Q.    Ms. Sampson, what group or groups did she provide HR services to?

A.    Our news bureaus outside of New York.  Maybe all of our news bureaus, but primarily our D.C. bureau and our other news bureaus.

Q.    Outside of those instances you just testified to, are there any others involving investigations of CBS News employees that you can recall?

Glasgow

A.    So we're talking CBS News, not TV stations or news digital?

Q.    Correct.

A.    Possibly.  Honestly, possibly and probably, but just not that are coming to me at the moment.

Q.    At the moment the only two you can recall is the one involving Ms. Poolos and the one involving sexual harassment allegations against the person who worked for you think 48 Hours?

A.    No, and then the other two that I just mentioned that were from our D.C. bureau.  And, like I said, there are probably others that are just not coming to me right now.

Q.    Are you aware of any interviews related to complaints of gender discrimination involving a CBS News employee, beyond what you've already testified to?  I don't need you to repeat yourself.

A.    Not that I'm thinking of right now.

Q.    And beyond what you've already testified to, are you aware of any investigations conducted concerning complaints of sexual harassment involving a CBS News employee?

Glasgow

A.     Not that I'm thinking of right now.

Q.     When considering disciplinary action to take in connection with an employee who was accused of violating policy, what factors did you think were relevant in determining the appropriate action?

ATTORNEY LYNCH:  Objection.

A.     Those factors are going to vary depending on what the circumstances are.

Q.     Understood.  But could you give me some factors?

A.     One of the top factors is what's going to fix the issue, what discipline step, if any, is needed to address the underlying concern and make sure it doesn't keep happening.

We might consider how severe the behavior or action was that was the subject of the complaint, the investigation.  We might consider the likelihood of future issues from the individual that was the subject of the complaint, how likely we felt it was to happen again.

We might consider what the impact on the organization would be if they were aware that this behavior had happened and what the message

Glasgow

would be and -- based on how we handle it, to the org that was aware of some issue.

Those are some things.  There's other factors, but that's what's coming to me in the moment.

Q.    Okay.  Anything else you can recall right now?

A.    Had it happened before.  I don't know if I mentioned that.  Was this the first time the individual had had an issue or had a complaint about him or her.

Sorry, was the question specifically about termination or any disciplinary action?

Q.    Any disciplinary action.

A.    It might depend on, yeah, just the person's role and what made sense given, again, sort of how we're going to make sure that corrective action is taken so...

Q.    How would you go about figuring out or assessing the likelihood of future issues?

A.    I don't know.  Depending on what happened, what we learned in the investigation, whether the individual seemed remorseful, whether the individual was truthful in the investigation,

Glasgow

which would give us more faith that they understood the seriousness of what they did and wouldn't do it again, whether there was a pattern of that kind of behavior which might lead us to believe it was not just a one-off thing but a pattern that was less likely to be corrected with less severe disciplinary action, some things like that.

Q.    And in determining whether the conduct at issue had happened before, what did you look at for that?

A.    It would vary depending on what the circumstances were, but we would likely look into whether any complaints had been made to the company about the individual.

Sometimes it would come out in the investigation itself that we wouldn't be aware of prior behavior until we did an investigation and then it would open up a flood gate of more people sharing their experiences.

Q.    And in determining whether it had happened before -- well, strike that.

In determining the level of discipline, would it matter if there had been an HR complaint

Glasgow

before, about the person?

A.    It could be a factor, depending on the circumstances.

Q.    What might affect whether it's a factor or not?

A.    Depending on what the complaint is about that you're investigating, depending on what the prior HR complaint was, and all circumstances surrounding those things.

Q.    And was it relevant whether the person had previously received some kind of disciplinary action?

A.    It would likely be.  If the disciplinary action -- it likely could be, especially if the disciplinary action were related to the same topic of this investigation and this behavior.

Q.    In other words -- and I'm just using an example -- if someone had received disciplinary action for showing up late a number of times and they showed up late again, determining what the appropriate action would be the fifth time it happened, the prior sort of disciplinary action would matter?

Glasgow

A.    The prior disciplinary action would matter, yes.  It could matter in what the next appropriate disciplinary action would be.

Q.    In terms of trying to figure out if there had been prior complaints, what are ways for investigators to look into that, or what were ways for investigators to look into that?

ATTORNEY LYNCH:  Objection.

A.    I think at times investigations we were aware of we would see if there is HR files on the complaint.  We might check with our colleagues either in legal or employee relations.  We might check with other colleagues within HR.

At the time I came in to CBS, the CBS News role, I was relatively new to CBS.  Like I said, I had come from the Viacom side.  So I would often have to, yeah, sort of learn and understand where information was kept about any prior employee issues.

Q.    And what did you learn and understand during the time you were in that role?

A.    That we would look in employees' files or talk to the HR team or legal team that had been around for a period of time to find out what files

Glasgow

or information there were about the individual.

Q.    Outside of talking to legal, talking to others in HR, looking in the files, I assume like the personnel files --

A.    Right.

Q.    -- and HR files --

A.    Right.

Q.    -- were there other ways that investigators determined if there had been prior complaints?

A.    Prior complaints?  We probably would check with our compliance team, the ViacomCBS/ Paramount compliance team, see if they had any information.  I can't think off the top of my head what other steps might be.

Q.    And I just want to be clear, when I'm talking about complaints, I mean in the informal sense too.  So let me ask it --

A.    Okay.

Q.    -- what were the ways that HR could look at concerns about -- prior concerns about the subject of the complaint, outside of whatever you've just described?

A.    We might talk to, if appropriate,

Glasgow

former managers of individuals that are part of the complaint. We might -- just maybe whatever -- if we learned something in the investigation that made us think there were prior issues or complaints, we would just follow wherever that information led us to try to find out more.

Q. And if you learned that information not in a formal sense from a file or talking to your colleagues in HR or in legal but sort of following the lead, what was the process to figure out if there had been prior complaints?

ATTORNEY LYNCH: Objection.

A. I don't know that there was a process any different than what I just explained.

Q. Do you know of any situations where HR, in conducting an investigation, relied on information from coworkers of the subject of the complaint to determine that there had been prior complaints?

A. I don't know.

Q. If something came out as part of an investigation or concern that, you know -- and not something formal that the subject of a complaint had engaged in prior misconduct, what kind of

Glasgow

steps would you have expected your team members to engage in to figure out whether there was any basis for those concerns?

ATTORNEY LYNCH: Objection.

A. Okay. Sorry. Can you help me understand who --

Q. Sure. That's fair.

I think you said that sometimes there won't be any sort of formal accounting for a complaint; correct?

A. I don't know. We would look at the formal that we had, and if we had information that there was otherwise relevant, we would follow that. But...

Q. Sure.

A. Yeah.

Q. There were instances I think you testified to where information about prior actions could come out through the investigation itself that's not contained within files, et cetera; right?

A. It could, yes.

Q. I think you said that then the investigator would sort of follow through to

Glasgow

figure out the significance of that information; is that fair?

A.    That would likely be what the investigator would do, yes.

Q.    My question is what is your expectation of how the investigator would go about doing that.

A.    Honestly, it really -- I know I keep saying this, but it's because the investigations are so varied and the issues are so varied.  It would depend on what the subject of the investigation was, what information led the investigator to think there might be prior acts, what they were.  You know, it's really -- it just depends on a lot of factors.

Q.    Were there instances during this time we're talking about in which employees falling within the groups that you provided HR services to received oral warnings that you're aware of?

A.    Oral warnings or counselings, yes, sure, there were.

Q.    Do you remember any specifically?

A.    Honestly, not -- not specifically, but I know there were.

Q.    Do you recall any instances where that

Glasgow

happened for a 60 Minutes employee?

A.     I know that the plaintiff in this case received some oral counseling, verbal counseling, about something that -- I can't think off the top of my head if somebody else at 60 Minutes, so I'm not sure.

Q.     For managers who are considering or believe may be appropriate to take some corrective action against an employee, are there any -- were there any resources for those managers?

A.     If a manager was thinking of corrective action, they would usually discuss that with HR and possibly legal.

Q.     Any other resources?

A.     If the corrective action was in relation to an investigation, it could be the employee relations group as well.

Q.     Any others?

A.     Not that I'm thinking of right now.

Q.     Anything in writing that you're aware of for managers?

A.     I don't know.  I don't know.

Q.     And I think you testified earlier during your tenure in this two-year period that

Glasgow

there were situations in which employees received written warnings as a form of corrective action; correct?

A.    Yes.

Q.    Yes?

A.    Yes.

Q.    Okay.  What was the purpose of giving the employee a written warning?

ATTORNEY LYNCH:  Objection.

A.    It would depend on what the warning was about and what the circumstances were.  So it could be that it was to clarify what the expectations were going forward.

Q.    Anything else it could be?

A.    Generally the intent is to make sure the employee understands what the consequences are if they don't change course or do whatever it is that they are told the expectations are.

Q.    I think you mentioned before that there were instances during your tenure in that role in which employees had been suspended; is that right?  And there were three or four that you could recall.

A.    Instances where employees were put on

Glasgow

paid leave/suspension while we investigated an issue, yes.

Q.   Were there ever instances in which, as a disciplinary or corrective action, an employee was placed on an unpaid leave?

A.   I don't know.  Possibly, but I don't know.

Q.   And I think you've testified earlier today about the purpose of administrative leave, but if there's anything you want to add to it or want to say beyond what you've already testified to.

ATTORNEY LYNCH:  Objection.

A.   I don't know.  No, not that I can think of right now.

Q.   Before an employee was fired at -- during your tenure -- and I'm talking about the groups that you provided HR services for -- was there a requirement that HR be involved prefiring?

A.   For our employees, HR was involved in all firings, meaning it really wasn't an avenue for managers to fire someone without HR being involved.

Q.   And what was HR's involvement in that

Glasgow

process?

A.    It would depend on the circumstances.

Q.    Do you mean the type of firing it is?

A.    I mean the involvement depends on the circumstances for the termination.

Q.    So focusing on involuntary terminations for breach of policy, what was HR's involvement?

A.    In the decision to terminate or you mean the actual logistics of terminating someone?

Q.    I'm not interested in the logistics.

A.    Okay.

Q.    In the decision to terminate.

A.    The HR team or individual that was involved in the matter would give recommendations about what the outcome should be, which might include termination.

Q.    And during your tenure was there any time when HR recommended that an employee be fired but the employee was not fired?

A.    I don't know.

Q.    Is it that you don't know or you don't recall?

A.    I don't recall right now.

Q.    Because I think you testified earlier

Glasgow

that any time a termination was being considered you would personally be involved; correct?

ATTORNEY LYNCH:  Objection.

A.    I had asked -- I don't know if it always happened, especially when I first came into the role, but I had expressed to my team that I would like to be involved and know before termination decisions happened.  I don't know for sure that always happened.

But I cannot recall right now a situation where HR's advice to the business leader was to terminate an employee and that advice was not followed.  It could have happened, but I just don't recall right now.

Q.    And were there any instances in which HR had recommended something other than a firing but the employee was in fact fired?

ATTORNEY LYNCH:  Objection.

A.    Possibly.

Q.    Do you recall any instances?

A.    I can't recall right now.

Q.    During the period we've been focused on, did your group use something called a termination memo?

Glasgow

A.    I don't know.  They could have used some kind of memo.  That doesn't ring a bell with me right now.

Q.    And for managers considering firing an employee or wanting to fire an employee, what resources did those managers have to consult with for purposes of making that decision?

A.    You know, I've completely forgotten, as I've been talking about these decisions, that we have a large union population.  So oftentimes our labor relations team and union representatives were very involved in all of these decisions.  So I have not mentioned that before as resource/input onto these decisions, but that very often was a critical input.

Q.    Yeah, and just to be clear, I'm not asking questions about the union workforce.

A.    Okay.

Q.    Understand that that's subject to sort of different practices.

A.    Okay.

Q.    But focusing on the nonunionized workforce, when managers were considering firing an employee for breach of policy, what resources

Glasgow

did those managers have?

A.    I don't know all the resources they had, but certainly I know they had the HR team and function as a resource, they had the legal group as a resource, they had the employee relations team as a resource, they had all the written policies and training that they were a part of and aware of.

There could be others, but that's -- that's the top ones that come to mind.

Q.    During the time that you were in your position as SVP over this two-year period we've been discussing, were you aware of an investigation being conducted by the attorney general's office, New York Attorney General's Office?

A.    I was not.

Q.    Were you aware -- and this could be from anywhere; it could be from public statements -- that in late 2022 the New York AG's office announced that it had secured an over $30 million settlement from CBS and Les Moonves?

A.    I heard that in the press, yes.

Q.    Okay.  Did you know about that through

Glasgow

your job, through your work at the time?

A.     No.

Q.     Did you participate at all in the investigation that the New York Attorney General's Office conducted?

A.     No.

Q.     Did you prepare any materials for the AG's office?

A.     No.

Q.     I know you've testified to obviously Ms. Poolos's case and complaint against her, and investigation.  Outside of that investigation or complaint, did you have any connection or dealings with Ms. Poolos?

A.     I don't think so.

Q.     How did you become aware of the investigation involving Ms. Poolos?

A.     I became aware when Renee Balducci reached out to me to share with me that she had learned that an employee -- she had counseled someone, Ms. Poolos, about -- or she had been counseled about a complaint made by an employee and that she, Renee, had learned that Ms. Poolos had reached out to a third party to disparage the

Glasgow

person who made the complaint and that she needed to look into that.

Q.   Were you made aware of any complaint against Ms. Poolos before Ms. Balducci reached out to you as you just described?

A.   I don't think so.  It's possible that Renee had mentioned something to me prior to that, but I don't remember that, if she had.  I don't know.

Q.   And do you know who the employee was that made the complaint against Ms. Poolos?

A.   Collette.  I think the last name is Richards.

Q.   Before Ms. Richards' concerns were raised, were you aware of any contentious or complaints about Ms. Poolos?

A.   No.

Q.   Had you had any discussions with anybody on your team about Ms. Poolos prior to Ms. Richards making her complaint?

A.   I don't know.  I don't think so.

Q.   Had you had discussions with Bill -- strike that.

You know who Bill Owens is?

Glasgow

A.    I do.

Q.    And during the time you were in the SVP position, what was Mr. Owens' role?

A.    Executive producer for 60 Minutes.

Q.    And 60 Minutes was within CBS News, which was within the group or groups that you oversaw for HR purposes; correct?

A.    Yes.

Q.    And did you have any discussions with Mr. Owens about Ms. Poolos before Ms. Richards' complaint?

A.    Not that I know of, no.

Q.    Do you know someone named Tanya Simon?

A.    I do.

Q.    And was she at 60 Minutes when you were in your SVP role that we have been discussing?

A.    Yes.

Q.    What was her job?

A.    I can't remember her title, but she was -- I thought of her as Bill's right hand.  But I can't remember her title off the top of my head.

Q.    Did you have any discussions with Ms. Simon about Ms. Poolos prior to Ms. Richards' complaint?

Glasgow

A.    No.

Q.    Outside of the issues in connection with Ms. Richards' complaint, are you aware of any other complaints against Ms. Poolos?

A.    I'm not, including -- just to be clear, I wasn't aware of Ms. Richards' complaint until the matter happened with the conversation with the third party.  So I was not made aware of the initial complaint originally; I was made aware of the whole situation once that action had happened. But I don't -- I don't recall having any other conversations about Ms. Poolos prior to that.

Q.    Got it.

I assume you had no role in Ms. Poolos's hiring; correct?

A.    That's correct.

Q.    What is your understanding of what her job was at the time she was let go?

A.    I think a producer at 60 Minutes.

Q.    And do you know anything about who she worked with at 60 Minutes?

A.    I don't remember the details, no.

Q.    Did you know at any point?

A.    I mean, at the time this was going on,

Glasgow

I'm sure there were other names I was aware of, but I can't remember any of that right now.

Q.   Do you know whether Ms. Poolos had a contract while she was employed at CBS or Paramount?

A.   I have a recollection that she might have, but I'm not 1,000 percent sure about that.

Q.   Were you ever part of any discussions about whether to renew Poolos's contract?

A.   To renew it?

Q.   Yeah.

A.   Not that I remember, no.

Q.   And do you know that Ms. Poolos's contract was reviewed around May of 2021?

A.   I did not know that.

Q.   To the best of your memory, you had no involvement in that contract renewal; correct?

A.   Correct.

Q.   Did you have any discussions with Ms. Balducci about it?

A.   Not that I recall.  And these were the types of contracts that were primarily driven by business affairs more than HR.  So that's not that surprising to me that I would not have had

Glasgow

conversations about it.

Q.   Do you know whether Ms. Poolos during her time at 60 Minutes had been promoted?

A.   I don't know.

Q.   Did anyone ever tell you that?

ATTORNEY LYNCH:   Objection.

A.   I don't know.

Q.   You don't remember or you don't know?

A.   I do not remember.

Q.   Did you ever review any performance evaluations of Ms. Poolos?

A.   I don't think I did.

Q.   Did you ever have any discussion with anyone at all about Ms. Poolos's job performance?

A.   Not that I can recall now.

Q.   Did Ms. Balducci ever say anything to you about Ms. Poolos?  I'm sorry, strike that.

Did Ms. Balducci ever say anything to you about Poolos's performance?

A.   "Performance" is kind of broad.  We obviously talked about the issues that led to the investigation, et cetera.  Do you mean something other than that?

Q.   Yeah, about her job performance, how

Glasgow

she did her job.

A. I don't remember.

Q. Did you ever have any discussions with Maria Cottone about Ms. Poolos?

A. I don't think so.

Q. Did you have any discussions with Bill Owens about Ms. Poolos?

A. I believe there were group discussions that included Bill at some point after I became aware of the issues that are the subject of this lawsuit.

Q. Outside of those group discussions, did you have any discussions with Mr. Owens about Ms. Poolos?

A. I don't think so.

Q. Did you have any discussions with Ms. Simon about Ms. Poolos?

A. Not that I can recall.

Q. Was Ms. Simon part of those group discussions that Mr. Owens was part of?

A. I don't think so.

Q. Who was or were part of those discussions?

A. I believe it was myself, Renee, Bill,

Glasgow

and probably someone from legal.

(Glasgow Exhibit 5, spreadsheet, Bates-stamped CBS 43, marked for identification.)

Q.     So for the record what's been marked as Exhibit 5 is a two-page spreadsheet bearing Bates number CBS 43.

If you could take just a minute to look at the document, please.  Let me know once you do.

(Pause.)

A.     Okay.

Q.     Have you ever seen this document before today?

A.     I don't think so.

Q.     And do you recognize the format of this document?

A.     I mean, printed out in this manner in a spreadsheet, not necessarily, but it appears to be some printout from our performance review system.

Q.     And my understanding is that if you look at the second page the top -- or the second row is Ms. Poolos's self-evaluation and then the bottom is Mr. Owens' feedback related to Ms. Poolos's performance.

Glasgow

Have you seen -- whether in this form or any other, have you seen Mr. Owens' feedback related to Ms. Poolos's 2021 performance?

A. No, I don't think so.

Q. As you sit here today, do you know how long Ms. Poolos worked for Paramount or its predecessor entities?

A. I don't.

Q. Did you know at any point?

A. I might have when I was more involved in the issue at hand. I don't recall for sure.

Q. Was the length of Ms. Poolos's employment a factor in any recommendations that HR made about, you know, what to do with Ms. Poolos's employment?

A. I don't recall. I don't recall. I remember that -- I remember that the main focus was, when I was involved, was the retaliation allegations. I don't remember if her length of employment came up.

Q. Have you ever spoken directly to Ms. Poolos?

A. I don't think so.

Q. Have you ever spoken directly to

Glasgow

Collette Richards?

A.    I don't think so.

Q.    During the time you were in the job we've been discussing, did you -- were there any complaints you're aware of related to Ms. Richards?

A.    Not that I can think of.

Q.    Were you aware of any concerns raised about Ms. Richards?

A.    I don't know.  I don't think so.

Q.    Did you have any role in Ms. Richards being hired at Paramount?

A.    No.

Q.    What is your understanding of what Ms. Richards' job was at the time of the investigation and complaint about Ms. Poolos?

A.    I can't remember for sure.  Maybe she was an AP.  I'm not a 1,000 percent sure.

Q.    What do you understand AP to mean?

A.    Associate producer.

Q.    For 60 Minutes?

A.    At 60 Minutes, yes.

Q.    Do you have an understanding of who she worked for?

Glasgow

A. My understanding is she worked with the plaintiff. I'm not sure who else she worked with.

Q. And did you ever take a look at any performance reviews done for Ms. Richards?

A. I don't think so.

Q. Do you know if Ms. Richards had any kind of contract with Paramount or CBS News?

A. I don't know.

Q. Outside of Ms. Richards' complaint and the investigation, did you have any conversations with Bill Owens about Ms. Richards?

A. I don't think so.

Q. And the same question for Ms. Simon?

A. No, don't think so.

Q. Ms. Cottone?

A. No.

Q. Renee Balducci?

A. Sorry, outside the situation that is the subject of the lawsuit here.

Q. Correct.

A. Not that I remember. I don't know. Could have. I don't know.

Q. Do you know of any complaint that Ms. Poolos made about Ms. Richards?

Glasgow

A. My understanding is I heard from maybe Renee or somehow when I was getting more up to speed on this that somehow it was coming out that Ms. Poolos had some sort of frustrations with Ms. Richards' performance.

Q. And what were you told about those frustrations?

A. I don't remember.

Q. And who told you about them?

A. I don't remember. Somehow I became aware of that when all of this was coming to my attention.

Q. Were you aware of any concerns that Ms. Poolos had that Ms. Richards stopped doing work at some point?

A. It doesn't ring a well with me, so I'm not sure.

Q. When you were at Paramount, were you aware of an employee named Shari Finkelstein or Finkelstein?

A. I don't know.

Q. You don't remember?

A. I don't remember. If I was ever aware of that name, I don't know.

Glasgow

Q. Have you ever heard of the name Barney Gimbel?

A. It's not ringing a bell for me right now.

Q. Any awareness of any complaint or complaints Mr. Gimbel made about Ms. Richards?

A. Not that I'm aware of now.

Q. Are you aware of somebody named Jason Rezaian, Rezaian?

A. I don't know. I'm trying to think if that name rings a bell for me; if it does, I don't know who it is or I don't have any specific recollection about that person.

Q. Are you aware of any complaints by a PR group or PR person about Ms. Richards?

A. No.

Q. Are you aware of any complaints or concerns about Ms. Richards by a Washington Post columnist?

A. No.

Q. Have you ever been aware of any complaints or concerns about Ms. Richards by another associate producer?

A. I don't know of it now. I don't know

Glasgow

if I became aware of anything back when I was in the role.  But not that I'm recalling right now.

Q.    Any awareness of any concerns or complaints that Ms. Richards had refused training offered to her?

A.    I don't know.  Not that I recall right now.

Q.    Any awareness of complaints or concerns that Ms. Richards had been rude to another employee?

A.    Not that I -- it's not ringing a bell for me.

ATTORNEY IADEVAIA:  Okay.  Why don't we take a break.

(Recess taken from 3:12 to 3:33.)

Q.    Ms. Glasgow, I think you testified earlier that to the best of your memory the first time you became aware of Ms. Poolos and Ms. Richards was when Ms. Balducci told you about the phone call that Ms. Poolos had made to a third party; is that right?

A.    Yes.

Q.    And when did Ms. Balducci bring this to your attention, approximately?

Glasgow

A.    I believe it was early January of '22, and I believe it was right around the time that she became aware of that happening.

Q.    And how did she inform you of this?

A.    She called me.

Q.    Was there anybody else on the call besides the two of you?

A.    I don't think so.

Q.    And do you recall what day she called you?

A.    I don't, off the top of my head.

Q.    Do you know if it was a weekend or weekday?

A.    I don't know for sure.

Q.    And what did she tell you during this call?  Please tell me everything you remember.

A.    Okay.  I do not remember it specifically, or all of it.  I remember the gist was to let me know that there was an issue, that she, Renee -- and I think she might have even had to give me the back story about Collette.

I don't think at that point I even knew that Collette had made any kind of complaint about Ms. Poolos.  I think Renee had to give me a quick

Glasgow

back story, something along the lines of an employee came to HR with a complaint and we just found out that the subject of the complaint -- I don't remember the details of what she told me, but the gist was had been in touch with a third party and had made disparaging remarks about the complainant and that it appears this was in retaliation for the complaint and she wanted to make me aware.

There might have been more than that, but that's my recollection of the gist of the conversation.

Q. Do you have any memory of the length of the call you had with Ms. Balducci?

A. I don't know.

Q. Okay. What did Ms. Balducci tell you about the complaint that Ms. Richards had made?

A. I don't remember specifically. I have a vague recollection that she shared that it was -- actually, I don't remember what she told me about the underlying complaint in that call.

Q. And what did Ms. Balducci say to you about Ms. Poolos's call to a third party?

A. I don't remember exactly what she told

Glasgow

me in that call. I became aware later, as I became more involved in the issue, more details about the call. I don't recall the exact thing she told me.

I believe in that call she let me know it was someone from CNN, a former manager of Ms. Richards. I believe she told me the gist of that the conversation was somehow disparaging of Ms. Richards.

And I think she asked me or wanted to run by me her thoughts that we should -- we needed to look into the matter immediately. And I think she was asking my sign-off on a recommendation to suspend Ms. Poolos while we looked into the retaliation concern.

Q. So the call you had with Ms. Balducci was before Ms. Poolos had been fired; correct?

A. Yes.

Q. And it was before Ms. Poolos had been placed on a paid leave of absence; correct?

A. Yes.

Q. Did Ms. Balducci say what the basis was for her belief that Ms. Poolos had made disparaging comments to a third party about

Glasgow

Ms. Richards?

A.    I don't remember exactly what she told me in that call.

Q.    Did Ms. Balducci tell you her basis for believing that Ms. Poolos had retaliated against Ms. Richards?

ATTORNEY LYNCH:  Objection.

A.    Again, I don't remember the specifics of the call, every bit of it, and I don't remember how much of this is what I became aware of on that call versus how much I became aware of as this investigation happened and I became involved.

I believe in that call she shared that we had heard from this producer and that he had shared information from a conversation he had had with Ms. Poolos.  I don't remember exactly how much detail she gave me.

Yeah, I just don't remember exactly what was said in that call, but that's what I can recall.

Q.    Did Ms. Balducci tell you that she had spoken to the third party as of the time she had this call with you?

A.    I don't remember.

Glasgow

Q. Is there anything you haven't testified to about that call that you remember?

A. I believe in that call I gave Renee my support for the decision, based on whatever it was that Renee shared with me, that I supported a decision to put the plaintiff on administrative paid leave while we looked into the retaliation complaint.

Yeah, that's what I'm recalling at the moment.

Q. What was the basis for your support?

A. I believe -- again, this is going back a while. I believe that I was of -- one, I was very concerned to hear that that had happened, very upset to hear that that had happened in response to an employee coming to HR with a good faith complaint.

I very much wanted to take quick and decisive action to look into the complaint of retaliation and that -- I can't remember everything that played into my support of that decision, but those were some of the things that I remember being in my mind.

Q. Do you know if Ms. Balducci had spoken

Glasgow

to Ms. Poolos about this conversation at the time that you and her spoke in the conversation you're describing?

A.    I can't remember right now.

Q.    Do you know if Ms. Balducci had spoken to Ms. Richards about this conversation at the time she spoke to you?

A.    I don't remember.

Q.    Has Ms. Balducci concluded that in fact Ms. Poolos had made disparaging comments when she called you?

ATTORNEY LYNCH:  Objection.

A.    I don't know what she concluded.  I know she knew about the call, she had heard about it, and she was very concerned, as she conveyed to me.

Q.    At the time of this phone call, had you read Ms. Richards' complaint that sort of -- the underlying complaint that Ms. Richards had made against Ms. Poolos?

A.    I don't believe so.

Q.    And I think you've already testified but just to be clear, during this call with Ms. Balducci, did she describe what Ms. Richards

Glasgow

had complained about?

A.    I'm not sure.

Q.    I think your testimony is that this was one of three or four times in which an employee had been placed on paid administrative leave during your tenure as SVP over news and digital; is that right?

A.    To the best of my recollection.  I am honestly not sure how many times that happened during my tenure.

Q.    But you do recall that the employee who was accused of sexual harassment was placed on a paid administrative leave; correct?

A.    I'm not exactly 1,000 percent sure of that.  I think so, but I do not know for sure all the details of that, or I can't recall all the details of that one.

Q.    Did Ms. Balducci explain to you why she thought, because I think -- let me take a step back.

I think your testimony was that Ms. Balducci was asking for your sign-off on placing Ms. Poolos on an administrative leave; is that correct?

Glasgow

ATTORNEY LYNCH:  Objection.

A.    She was alerting me and asking for whether I supported her recommendation -- some version of her recommendation that Ms. Poolos be put on administrative leave.

Q.    And did Ms. Balducci explain to you the reason for her recommendation?

A.    I don't remember.  She must have, but I do not remember the details of that.

Q.    And before Ms. Balducci placed -- strike that.

Before Ms. Poolos was placed on administrative leave, did you review any documents related to this issue?

A.    I don't know.

Q.    You mean you don't remember?

A.    Yeah, I don't remember whether I did or not.

Q.    Do you recall if Renee Balducci had previously recommended placing an employee on administrative leave?

A.    I don't recall.

Q.    I think you said that one of the reasons you supported the recommendation to place

Glasgow

Ms. Poolos on leave was to take quick and decisive action involving a retaliation. Do I have that right? You can fix it if I said it incorrectly.

A.    Yeah, I don't remember exactly what I said, but my thinking was it was a serious issue and that we needed to take quick and decisive action.

Q.    And why was quick and decisive action needed?

A.    Because retaliation against an employee for bringing a good faith complaint is a very serious issue. Any form of retaliation is likely to dissuade an employee or future employees from coming forward with complaints. We did not want any further retaliatory actions to take place that would affect Ms. Richards.

So those are some of the reasons. There might be more, but those are some.

Q.    Was it possible for Ms. Poolos to continue working as a producer and not further allegedly retaliate against Ms. Richards?

ATTORNEY LYNCH:  Objection.

A.    I don't know, which is why I wanted to -- I was supportive of taking the step of

Glasgow

recommending that she not be in the workplace while we looked into it.

Q.    And with Ms. Poolos not in the workplace, what did that help achieve in terms of the investigation, if anything?

A.    In my mind it would lessen the likelihood that Ms. Richards felt further retaliation and that it would lessen the likelihood that more retaliatory actions were taken against her.

And it would make our investigation probably more effective that we didn't have Ms. Poolos in the workplace while we were trying to get to the bottom of what happened.

Q.    And what's the basis for saying that it would make the investigation more effective?

A.    It might make it more effective; and if it would -- might make it more effective, that's the path I would prefer to take.

Q.    And how would it make it more effective?  What possible ways could it be to have Ms. Poolos suspended that it would make the investigation more effective?

A.    That the person at the subject of the

Glasgow

complaint is not in the workplace, sometimes it can make it more likely that employees feel safe talking and coming forward and sharing their concerns.

Sometimes when an employee that's the subject of a complaint is around and an employee knows that they're going to have to face that person immediately, it might make the individual less likely to tell the truth.

I did not know where all the investigation would take us, so I wanted to do anything I could -- or supported the decision to do anything we could to make the investigation more effective.

Q. To your knowledge at the point that Ms. Balducci is raising these issues and proposing suspending Ms. Poolos, had Ms. Richards been uncomfortable raising complaints to Ms. Balducci?

A. I don't know.

Q. Did Ms. Richards raise a concern that you were told about that Ms. Poolos stopped or tried to stop Ms. Richards from making complaints?

ATTORNEY LYNCH: Objection.

A. I don't know.

Glasgow

Q. At this point in time were you aware of any prior complaints against Ms. Poolos before Ms. Richards?

A. I don't know that I was.

Q. And did Ms. Balducci explain to you what -- in what way Ms. Poolos had retaliated or allegedly retaliated against Ms. Richards?

A. You mean in that initial phone call?

Q. Yeah.

A. Like I said, I can't 1,000 percent say how much detail I got in that phone call versus what I became aware of later. But I believe Renee told me at least the basics that this producer, the CNN producer, had heard from her, that she had made disparaging remarks about Collette.

There might have been more in that conversation. I honestly can't remember. But it was enough to make me feel that we needed to take some quick and immediate action and take that complaint of retaliation very seriously.

Q. And at that point in time did Ms. Balducci say anything about Bill Owens?

ATTORNEY LYNCH: Objection.

A. I don't remember. We probably would

Glasgow

have discussed what Bill -- you know, what Bill's point of view was, what he wanted to do, but I cannot remember.

Q. So what happened next in connection with this situation?

A. Honestly, I do not remember exactly what happened next.

Q. Do you recall any other parts of the sequence of events?

A. There was -- I remember Renee -- and I'm not sure exactly who else was involved in it -- conducted an investigation into the retaliation concerns and that there was an outcome from that investigation and then some decisions were made related to that investigation.

Q. Okay. Do you know whether Ms. Balducci had conducted any kind of investigation before she looked into these issues with the phone call and supposed retaliation?

A. Investigation about what?

Q. About Ms. Richards or Ms. Poolos.

A. I became aware at some point -- again, I can't recall if it was in that call or later -- that Renee had been involved in managing through

Glasgow

some complaint that -- the underlying complaint, that there was -- she had done some work in connection with responding to the underlying complaint from Ms. Richards about Ms. Poolos.

Q.     What did you understand at any point in 2022 what Ms. Balducci did in connection with the underlying complaint?

A.     I don't know that I ever had the specific details about the underlying complaint.

Q.     Well, putting aside the details of the complaint itself, my question is what work do you understand Ms. Balducci did in connection with the underlying complaint, not the substance of the complaint but what Ms. Balducci did in connection with it.

A.     I'm not -- I'm not sure that I actually know what all she did in relation to that underlying complaint.

Q.     Would that be at all relevant in making decisions or making recommendations about Ms. Poolos's employment?

A.     What I considered more relevant than the underlying complaint was the retaliation complaint.  In my mind retaliation against a good

Page 190

Glasgow

faith complaint is very serious regardless of the underlying complaint, the retaliation part of it, that I was focused on.

Q. So what do you understand the steps that Ms. Balducci took to investigate the retaliation concerns?

A. My understanding is that she spoke to Ms. Richards, that she spoke at length with Ms. Poolos, that we gathered information from the third party, that she reviewed notes of the conversation from the third party.

That's what I'm recalling off the top of my head. There might have been other people she spoke to and other things she did, but those are the things I'm remembering right now.

Q. And how did you learn that Ms. Balducci spoke to Ms. Richards?

A. I probably heard that -- actually, I don't know for sure. I think she spoke to Ms. Richards about the retaliation concerns. I do not remember exactly what that was, when that happened, and when I became aware of it.

Q. And do you recall generally what Ms. Richards told Ms. Balducci about the

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Glasgow

retaliation concerns?

A.    Not right now I don't, no.

Q.    Okay.  You said that you understood that Ms. Balducci spoke to Ms. Poolos; correct?

A.    Yes.

Q.    Do you know how many times they spoke about these retaliation issues?

A.    I don't.

Q.    Did you know at the time in 2022 how many times they spoke?

A.    I probably did.

Q.    And how did you find out that Ms. Balducci had spoken to Ms. Poolos?

A.    I don't know for sure.  I know that she emailed me some summary of things.  I know she probably told me in some of our conversations about these events.  I can't say for sure what the conversations were or when they happened or the exact content of those conversations.

Q.    What do you recall Ms. Balducci saying to you about her conversation with Ms. Poolos?

ATTORNEY LYNCH:  Objection.

A.    Not a lot.  I know that they talked at length, but I don't remember details that Renee

Glasgow

shared with me about the conversation. I think --
I mean, I have a recollection that she was sharing
with me -- I have some recollection that part of
the concern was that what Ms. Poolos was sharing
did not seem credible and did not align with what
we were hearing in the investigation.

I remember that that was part of what
Renee shared with me was our feeling that she was
not being truthful. And so I'm sure that that
came out of the conversation she had directly with
Ms. Poolos. I can't remember what else.

Q.    Nothing else you can recall?

A.    Not off the top of my head the details
of that or anything else, no.

Q.    You've said multiple times that your
understanding is Ms. Balducci spoke to Ms. Poolos
at length. Do I have that correct?

A.    That's my understanding.

Q.    What's the basis of that?

A.    What I just remember being my
understanding at the time. So I don't know if
that was -- if that was based on something Renee
told me directly, if it was from some information
she shared with me in a summary. I cannot

Glasgow

remember.

Q.   You said that Ms. Balducci told you that part of her -- or part of the concern was that Ms. Poolos did not seem credible and what she was saying did not align with what was being found in the investigation.  Do I have that correct?

A.   Yes, somehow that -- I remember that being part of what I heard regarding the investigation, yes.

Q.   Did Ms. Balducci tell you in what way or ways Ms. Poolos was not credible?

A.   I'm sure she did at the time.

Q.   Do you have any memory of what that is now?

A.   I don't know that I remember the specifics.  I think it was what we were hearing from the third party was -- what Ms. Poolos was telling us was being contradicted by the third party.

I have a recollection that -- also it was contradicted by some other materials or something else we got from the third party.  And I cannot remember what else.  I'm sure she told me in much greater detail than what played into her

Glasgow

conclusion that Ms. Poolos was not being truthful in the investigation in my understanding of that.

Q. So the not being truthful came from, as you recall, the differences in terms of how Ms. Poolos described the conversation and how the third party described the conversation?

ATTORNEY LYNCH: Objection.

A. It wasn't only that. I think there was more to it than that.

Q. What else was there?

A. I don't remember off the top of my head. I think there were -- there were other things. I just can't remember what they were.

Q. Any sense of it at all?

A. I think -- I think it was the conversation that they didn't match up. I think there was a review of notes. I think there was a review of texts and other things like that that, again, supported what the third party told us and contradicted what Ms. Poolos told us. But I don't remember what all of those materials were.

Q. Were the notes the notes that the third party made?

A. They might be. I think so.

Glasgow

Q.   Were you aware of any other notes?

A.   Not that I can think of right now.

Q.   And the text messages, are you talking about text messages between Ms. Poolos and the third party?

A.   I believe so.

Q.   Are there any other text messages you're talking about?

A.   Not that I can think of right now.

Q.   And the third party, who is that person?

A.   It was someone who was a producer for CNN and I believe had been a former either colleague or boss of Ms. Richards.

Q.   Do you know his name?

A.   I believe his first name was Scott.

Q.   Do you know his last name?

A.   Not off the top of my head.

Q.   Was it Scott Bronstein?

A.   That sounds right, yeah.

Q.   Did you have any discussions with Ms. Balducci about the relationship between Mr. Bronstein and Ms. Richards?

A.   Probably.  I'm sure it came up as we

Glasgow

were talking about who this person was, why was this person getting a call, why was this person involved, how did we get this information from this person. I'm sure it was discussed at the time.

Q. Do you recall any specifics of those discussions?

A. No.

Q. At any point in time in 2022, what did you learn about the relationship between Mr. Bronstein and Ms. Richards?

A. I'm not really sure. Again, I think my understanding was he was either a prior boss or colleague of Ms. Richards, but I cannot remember for sure in more details than that.

Q. Do you know if Ms. Poolos had communicated with Mr. Bronstein prior to all of this in late 2021/early 2022?

A. I don't know.

Q. Do you know if Mr. Bronstein had ever worked for 60 Minutes before?

A. I don't know that now. I don't know if I knew one way or the other at the time.

Q. Do you know if Mr. Bronstein had been

Glasgow

fired from 60 Minutes?

A.    I do not know that.

Q.    Did you personally do any sort of inquiry or investigation to figure out what the relationship was between Mr. Bronstein and Ms. Richards?

A.    I did not personally do any investigation into this matter.

Q.    Do you know if Ms. Balducci did any investigation into the nature of the relationship between Mr. Bronstein and Ms. Richards?

A.    I don't know.

Q.    At any point in time in 2021 or 2022 did anyone tell you that Ms. Poolos had lied to them in the past before these incidents?

A.    I don't know.

Q.    Are you aware of any allegations that Ms. Poolos had lied to anyone at 60 Minutes?

A.    I don't know.

Q.    Did anyone say anything to you along those lines?

ATTORNEY LYNCH:  Objection.

A.    I don't remember if they did or not.  I don't remember that happening, but I couldn't tell

Glasgow

you for sure.

Q. And are you aware of any -- it doesn't matter if it was then, now -- any allegations that Ms. Poolos had retaliated against an employee in the past, before Ms. Richards?

A. No, I don't know of any.

Q. Did anyone ever tell you that Ms. Poolos had denied having the phone call at all with Mr. Bronstein?

A. I don't recall it was that she denied having it, that she -- her statements about what happened in the conversation and how the conversation came to be and what was said was different than what our information showed.

Q. Did anyone ever tell you that Mr. Bronstein has had a very close personal relationship with Ms. Richards?

A. Very close personal relationship. I don't know. Not that I recall.

Q. I think you answered this, but just to be clear, did you play any role in Ms. Balducci's investigation of these purported retaliation concerns?

ATTORNEY LYNCH: Objection, asked and

Glasgow

answered.

A.    She did the investigation and kept me I think apprised of what was going on.  I did not take the investigation steps myself.  And I cannot remember if she had -- I can't remember if she was getting any kind of advice or otherwise.  But I did not do the investigation.

Q.    Did you give her suggestions for how to conduct the investigation?

A.    I cannot remember that I did.

Q.    Did you give her any instructions or directives in connection with the investigation?

A.    I believe everything I was hearing from her led me to believe that she was conducting the investigation appropriately and getting advice and guidance as needed from legal.  So I didn't -- I don't remember feeling the need to get in and, like, state certain things for her to do.  It seemed like she was taking the appropriate steps.

Q.    At some point Ms. Balducci completed her investigation; is that correct?

A.    Yes.

Q.    And what did she conclude as part of that investigation?

Glasgow

A.    I believe that the investigation -- our conclusion from the investigation was that Ms. Poolos had taken retaliatory action against Ms. Richards related to Ms. Richards' complaint about her behavior and that she had not been forthcoming and truthful with us during the investigation.

Q.    Anything else?

A.    I think that was the gist of it.  There might have been more I'm not remembering right now.  That's my recollection of the gist or at least the main points that I recollect from the investigation conclusions.

Q.    And in terms of Ms. Poolos supposedly not being truthful or forthcoming during the investigation, is there anything other than what you've already testified to?

A.    There could be but not that I'm recollecting right now.

Q.    And in terms of Ms. Poolos -- the finding that Ms. Poolos had retaliated against Richards following her complaint about Ms. Poolos's behavior, what is your understanding of the basis of that conclusion?

Glasgow

A.    The basis for that conclusion was that this conversation happened.  What we learned was conveyed in the conversation, the timing of the conversation, and what we learned in the investigation and how she handled the investigation.

Q.    What do you mean "what was conveyed in the investigation"?

A.    What we learned was conveyed from Ms. Poolos to this third party in -- gosh, I can't remember if it was more than one conversation.  I know that there was -- there might have been more than one.  I'm remembering at least one.  I don't know if there was more than that.

But what was conveyed from Ms. Poolos to this third party about Ms. Richards, which was disparaging, which expressed concern and unhappiness that she had gone to HR, that -- what else?  Yeah, that's the gist.

Q.    Anything else you can recall that the investigations purportedly revealed about the substance of the conversation or conversations Ms. Poolos had with Mr. Bronstein?

A.    I don't remember more detail at the

Glasgow

moment.  There was more, but I can't remember more.  That was -- that was the impression that I remember about what we learned and in the conversation or conversations, plural.  Again, I can't remember if there was more than one.

Q.    You mentioned that the investigation revealed some concerns about timing.  What did you mean by that?

A.    That it had gone pretty quickly from Ms. Poolos hearing from her managers that given some counseling about how she managed Ms. Richards and that pretty soon if not immediately after that is when the conversation happened with the third party in which she made disparaging comments about the third -- excuse me, about Ms. Richards and expressed her unhappiness with the fact that she had gone to HR.

Q.    So when you say "timing" in that circumstance, what you mean is how quickly Ms. Poolos had this call versus when she found out about the complaint?

A.    I mean the fact that it happened immediately after or very soon after she had gotten this counseling was notable.  At least to

Glasgow

me it was notable.

Q.    How come?

A.    Because it kind of -- it supported the finding that, like, she was reaching out to this person in response to -- or at least having this conversation with this third party in response to -- because of her unhappiness with finding out that Ms. Richards had made a complaint about her.

Q.    You mentioned following some counseling.  What counseling are you referring to?

A.    I believe that Ms. Poolos's manager had some conversation, possibly more than one, about her management of Ms. Richards and some counseling to manage differently or address some concerns.

Q.    And how did you learn about the timing?

A.    At some point during this investigation.  I do not remember exactly when or how I heard about that.

Q.    At the time we're talking early 2022, did Ms. Balducci tell you that Ms. Poolos had reached out to Mr. Bronstein before she was aware of the complaint against her?

A.    I don't remember.

Q.    Would that have affected your

Glasgow

assessment of the situation?

A.    I don't know.

Q.    Did anyone tell you that Ms. -- I asked if Ms. Balducci had told you, but let me be broader.  Did anyone tell you that Ms. Poolos had reached out to Mr. Bronstein before she became aware of Ms. Richards' complaint?

A.    I might have become aware of that at some point during the investigation.  I honestly don't remember for sure.

Q.    Did you become aware at any point in 2022 that before Ms. Poolos was aware of Ms. Richards' complaint Ms. Poolos had reached out to Tanya Simon to discuss concerns about Ms. Richards?

A.    I don't know.

Q.    You don't know or you don't remember? I think it's probably that you don't -- well, which is it?

ATTORNEY LYNCH:  Objection.

A.    Can you ask the question one more time?

Q.    Sure.  What I'm trying to figure out is were you aware at any point in time that Ms. Poolos had reached out to Ms. Simon to discuss

Glasgow

performance concerns about Ms. Richards before Ms. Richards' complaint, before she knew about Ms. Richards' complaint.

A.    I do not know if I had that information at the time or if I knew that.  I don't know.

Q.    Would knowing that affect anything you did, making decisions about Ms. Poolos's employment or recommendations?

ATTORNEY LYNCH:  Objection.

A.    I don't know.

Q.    After the investigation was -- well, as part of what Ms. Balducci's investigation, did she make a recommendation?

A.    I can't remember if she made a recommendation or if we together, after reviewing all the information from the investigation, came up with the recommendation together.  I honestly can't remember.

Q.    Whether it was with Ms. Balducci alone or if you and her came up with a recommendation together?

A.    Right, I can't remember.

Q.    What was the recommendation?

A.    That Ms. Poolos be terminated.

Glasgow

Q.   And approximately when did that recommendation get -- approximately when did Ms. Balducci alone or with you make that recommendation or come up with that recommendation?

A.   I don't remember.

Q.   And what was the basis for that recommendation?

A.   I can't speak for Renee.  My thought was that retaliation was -- this -- any instance of retaliation was an incredibly serious violation of our company policy; and that given that there was the retaliation and that the plaintiff had apparently not been truthful with us during the investigation, those things together warranted termination.

I came into this role very much with a sort of goal to really make sure employees felt safe coming forward with any complaints or concerns they had.  So any instance of a manager retaliating against an employee for doing just that to me was a very serious matter and could warrant termination.

Q.   In this instance you believe

Glasgow

termination was in fact warranted?

A. I did.

Q. Are there any other instances during the two-year period we're talking about where you became aware of alleged retaliation beyond Ms. Poolos and Ms. Richards?

A. I don't know.

Q. You would have known -- well, strike that.

My question is were you aware of any, so I think you mean you don't recall; right?

A. Yeah, I don't recall. I honestly can't -- there were so many things going on in those two years, I cannot recall.

Q. During the time that you were in the role that you were in, were you aware of any complaints against Neeraj?

A. Neeraj Khemlani, the president?

Q. Yeah.

A. I was aware of some concerns, employee concerns, about him, yes.

Q. What were those concerns?

A. A lot of people struggled with his management style and working for him.

Glasgow

Q.    Any other concerns?

A.    I think that was -- that was most of what it was.  It was just his management style and some people just didn't do well with it and had concerns about it.

Q.    Did anyone complain about discrimination by him?

A.    I don't remember that.

Q.    Did anyone raise concerns that he retaliated against them?

A.    No, I never heard that.

Q.    Did you investigate any concerns about Neeraj?

A.    I know that there was some investigation that happened.  I did not lead that investigation or wasn't part of that.

Q.    Do you know who did?

A.    I believe my boss, Whitney Delich, and maybe probably in connection with someone from legal.

Q.    Do you know what the conclusion of the investigation was?

A.    No.

Q.    Was Neeraj still the copresident at the

Glasgow

time of CBS News when you left?

A.     Yes.

Q.     Before there was a recommendation by HR to fire Ms. Poolos, had you participated in any discussions about firing her?

A.     Sorry, say that again.

Q.     Sure.  So at some point you say that either Ms. Balducci or you and Ms. Balducci came up with the recommendation to fire Ms. Poolos; correct?

A.     I know that we agreed that we thought that was the right outcome of the investigation, whether you call it a recommendation or just our belief of what the outcome should be, yes.

Q.     And my question is before you came to that belief or recommendation were you a participant in any discussions about firing Ms. Poolos.

A.     I was part of some discussions beyond just Renee.  I don't remember if those happened before Renee and I came to our understanding or after.  I don't know.

Q.     Were you part of any discussions at any point about whether to take some lesser action

Glasgow

against Ms. Poolos lesser than firing her?

A.    I'm sure we discussed what all the options could be.  I don't remember the particulars.  But I remember that at least my point of view after what I learned was I felt comfortable with termination being the outcome.

Q.    During the period from when you first became aware of these purported retaliation concerns and Ms. Balducci finishing her investigation, did you participate in any discussions about firing Ms. Poolos?

ATTORNEY LYNCH:  Other than discussions with counsel?

ATTORNEY IADEVAIA:  Sure, other than conversations with counsel.

A.    I don't remember.  Prior to her concluding the investigation?  I know I had other conversations.  I just don't remember if they were -- when exactly they happened in connection with the investigation that she was doing.

Q.    I think you had conversations with Mr. Owens about this matter; correct?

A.    I believe I did.

Q.    Okay.  And what -- do you remember any

Glasgow

specific conversations you had where he was a participant?

A. I remember generally that there was at least one group conversations with Renee and me and him, maybe someone else, but I don't remember if it was just one conversation or more than one.

Q. What do you recall about that discussion?

A. Not a lot. Honestly, not a lot. I remember we had conversations about it. I remember Bill being supportive of and in agreement that termination was the right outcome.

Q. And how did he express that support?

A. I can't remember. I'm sure it was in the conversation itself. I don't remember exactly what he said. But I do remember that he supported it.

Q. Were you part of a discussion in which the results of Ms. Balducci's investigation were presented to Mr. Owens?

ATTORNEY LYNCH: And I just want to caution the witness if counsel was present at this meeting that we're talking about that you shouldn't be discussing the contents of that

Glasgow

meeting.

A.   Okay.  I don't remember.  Probably, but I do not remember for sure.

Q.   You don't remember what?

A.   I don't remember if I was present in a meeting -- I remember having conversations -- that Bill was part of conversations about this.  When you say investigation findings were presented, I don't remember if it was something where all of the details of the investigation were discussed with him or if it was just a summary conversation. I just cannot remember.

Q.   What do you recall about the discussion or discussions you had in which Mr. Owens expressed support for firing Ms. Poolos?

A.   Not a lot.

Q.   Did Mr. Owens explain the basis of his support?

A.   I don't remember.

Q.   And was it that Ms. Balducci or you told Mr. Owens that you recommended firing Ms. Poolos or something else?

A.   I don't remember.

Q.   Other than what you've testified to, do

Glasgow

you recall anything else about discussions involving Mr. Owens about this situation with Ms. Poolos?

A.    Not that I can recall right now.

Q.    Was there anything that would refresh your memory?

A.    I don't know.  Not that I can think of right now.

Q.    Do you know if anybody else within HR beyond Ms. Balducci participated in the -- or conducted the investigation about this issue?

A.    I can't remember.

Q.    At some point during the administrative leave, did Ms. Poolos raise concerns about Ms. Balducci?

A.    I don't remember.

Q.    Did Ms. Poolos raise concerns about the fact that she was on a leave?

A.    The fact that who was on a leave?

Q.    That she had been put on a leave.

A.    I believe she expressed unhappiness about the decision, yes.

Q.    What else do you recall her saying?

A.    Not much else right now.

Glasgow

Q.   Did Ms. Poolos ask to speak with you?

A.   I think she did ask Ms. Balducci to speak with me.

Q.   Meaning -- I'm just going to use first names for a second.

A.   Okay.

Q.   Alex asked Renee to speak with you; correct?

A.   I believe so, yeah.

Q.   And what did Renee say about it?

A.   I believe Renee just told her I was -- I can't remember exactly what the exchange was, but I believe whatever it was Renee assured her that Renee's supervisor, which was me, was aware of the situation and knew what was going on in case the issue was do other people understand what's going on.

Q.   Why didn't you ever speak to Ms. Poolos?

A.   I remember at the time thinking there's an investigation going on, I don't want to insert myself into this investigation, I will let it take its course, and I just didn't think it was particularly productive for me to insert myself at

Glasgow

the time.

Q. Did Ms. Balducci ever tell you that Alex had said that she had been told not to speak to HR when she found out about Collette's complaint?

ATTORNEY LYNCH: Objection.

A. Sorry, I lost the thread of who --

Q. Did Renee tell you that Alex had told her that she had been instructed not to talk to HR?

A. I don't remember.

Q. Who made the decision to fire Alex?

A. It was ultimately Bill's decision, Bill Owens.

Q. When you say "ultimately," what do you mean by that?

A. I mean it was ultimately -- it was Bill's decision.

Q. If Mr. Owens had disagreed with the recommendation that you and Ms. Balducci had made, could he have gone a different path?

ATTORNEY LYNCH: Objection.

A. He could have disagreed with us, yes.

Q. And what would the significance of his

Glasgow

disagreement be?

A. I don't know what the -- what do you mean, "the significance"?

Q. Well, would it have affected whether Ms. Poolos would have been fired?

A. Yeah, probably.

Q. So Mr. Owens had the ability to override the recommendation that HR made?

A. It was -- like I said, it was Bill's decision to make with advice and input from HR and others. But it was his decision.

Q. Was there any part of Ms. Balducci's investigation that looked into Ms. Richards' bullying allegations?

A. Which -- investigation --

Q. Any knowledge. Let me ask another question. Did Ms. Balducci conduct any kind of investigation into Ms. Richards' bullying allegations?

A. I don't know. I don't know the details of what happened with that.

Q. The conclusion was, as I understand it, that Ms. Poolos's conduct constituted a breach of the Company's policies; correct?

Glasgow

A. Yes.

Q. Both based on the finding of purported retaliation and not being forthcoming in the investigation; correct?

A. Correct.

Q. Are there any other breaches of policy that Ms. Poolos purportedly engaged in beyond those?

A. I don't remember. Those are the two that stick out to me. I don't remember if there was more than that.

Q. To your knowledge was Ms. Poolos accused of breaching the company's antidiscrimination policy?

ATTORNEY LYNCH: Objection.

A. I don't know. I don't recall that.

Q. Do you know whether any of the conduct that Ms. Poolos was accused of would be a violation of any laws?

ATTORNEY LYNCH: Objection.

A. I don't know.

Q. When you say you don't know, what do you mean you don't know? Do you think that lying in an investigation is a violation of the law?

Glasgow

ATTORNEY LYNCH:  Objection.

A.    I'm saying I don't know of everything that came out in the investigation.  I don't remember everything that was part of the allegations about her and everything that happened in the investigation, and I'm not right now sort of ticking through all the relevant various laws that could apply here.  So I don't know.

My focus was more on violation of the company policy.  That's what I was focused on during -- when this investigation was happening.  And that's what I recollect driving my decision -- or, excuse me, my recommendation of what the outcome should be.

(Pause.)

(Glasgow Exhibit 6, emails, Bates-stamped CBS 7818 to 7819, marked for identification.)

Q.    If you could take a look at the document, please.  What's been marked as Glasgow Exhibit 6 is an email chain bearing Bates numbers CBS 7818 to 7819.

(Pause.)

A.    Okay.

Glasgow

Q. Was this one of the documents that you reviewed in preparing for today's deposition?

A. It was.

Q. And if you take a look at the bottom email, it's from Ms. Poolos to Ms. Balducci dated January 8th, 2022, copying Paul Julian. Do you see that?

A. I do.

Q. And you're not a recipient of the email; correct -- the initial email, the one from January 8th; correct?

A. It doesn't look like it.

Q. But Ms. Balducci forwards it to you, and that's reflected at the top the following day on January 9, 2022, forwards to you and to Ms. Ahmed; correct?

A. That's what it looks like, yes.

Q. Before Ms. Poolos -- I mean, I'm sorry, before Ms. Balducci forwarded this email to you, did you have a conversation with Ms. Balducci about the email?

A. I don't remember.

Q. Did you have a conversation with Ms. Balducci about the email at any point in time?

Glasgow

A.    Probably, but I don't remember exactly when and if I knew what the content was.

Q.    Do you remember anything generally about it?

A.    I don't.  I'm just assuming I probably would have, but I can't remember for sure.

Q.    As of the time that Ms. Balducci sent you this email, had you had discussion or discussions with her about this situation?

A.    I believe -- I'm pretty sure that the phone call that I referenced earlier in my testimony happened before this email made its way to me.  And we might have had other discussions; I just honestly can't remember.

Q.    And at the time Ms. Balducci sent this to you or around the time, did you review Ms. Poolos's email?

A.    Sorry, which email?  This one attached?

Q.    Yeah, the bottom email here.

A.    Oh, I'm sure I did.

Q.    Was there anything in Ms. Poolos's email that was troubling to you?

A.    I don't remember what I thought about -- I don't remember at the time if anything

Glasgow

jumped out at me as troubling.

Q.    In Ms. Poolos's email she says that --
let me just find the line.  Give me one second.

In the second paragraph it starts with
"in our call."  Do you see that at the bottom of
the page?

A.    I do.

Q.    You denied at first saying my job was
in jeopardy yesterday.

Did I read that correctly?

A.    In our call you denied at first saying
my job was in jeopardy yesterday, yes.

Q.    Did you have a conversation with
Ms. Balducci about Ms. Poolos's concern?

A.    I don't remember.

Q.    As you sit here today, do you have any
reaction to that statement by Ms. Poolos?

A.    No, because I don't know what happened
in that conversation.  So, no, I'm not having any
reaction right now.

Q.    And then in the next sentence
Ms. Poolos wrote, You didn't respond to the idea
that you had acted prematurely in suspending me
and having me pulled off this piece.

Glasgow

Do you see that text?

A.   I do.

Q.   Did you have a discussion with Ms. Balducci about that concern raised by Ms. Poolos?

A.   I don't remember.

Q.   And as you sit here -- actually, strike that.

Do you understand what Ms. Poolos meant by saying "having me pulled off this piece"?  Do you have any idea what that means?

A.   I'm assuming that when she was put on this leave while we investigated there was a piece that she was working on that she couldn't work on, but I'm not a hundred percent sure about that.

Q.   Ms. Poolos writes as well that -- she writes, And damaging my reputation by revealing that to the people I work with without evidence based on a secondhand account made by the complainant.

Do you see that text?

A.   I do.

Q.   Did you discuss with -- at any point in time with Ms. Balducci the fact that the

Glasgow

information about the phone call came from a third party?

A.    Sorry, say that again.

Q.    Sure.  Let me try again.

Did you ever have a conversation with Ms. Balducci about the fact that the information about the phone call that Ms. Poolos had had come from Mr. Bronstein, who was a third party?

A.    We had conversations about the call with the third party, yes.

Q.    Did you ever have conversations about relying on what a third party was saying versus relying on what an employee was saying?

A.    We had conversations about what we heard from Mr. Bronstein, and we had conversations about what Ms. Poolos had told us.

Q.    And was there ever any discussion about the significance of one version of events coming from an employee and one version coming from a third party?

ATTORNEY LYNCH:  Objection.

A.    We had various conversations about trying to get to the bottom of what had happened and what was the more credible information that we

Glasgow

had.  I do not remember the specifics of how many times we had these conversations, but I know we discussed the credibility of what we were hearing from Ms. Poolos versus the credibility of what we were hearing from the third party.

Q.    In the email Ms. Poolos writes in the next sentence:  I also am upset that you told me yesterday there were more issues that had come up but today you made it clear there were no other issues.

Do you see that text?

A.    I do.

Q.    Did you ever discuss that concern -- Ms. Poolos's concern as reflected in that sentence with Ms. Balducci?

A.    I don't remember.

Q.    And on the next page, 7819, Ms. Poolos wrote, Collette is being taken as facts without giving me the courtesy of an interview.

Did you discuss that concern with Ms. Balducci?

A.    I don't remember.

Q.    And then Ms. Poolos says, I want this to be escalated to your manager.

Glasgow

Do you see that text?

A.    I do.

Q.    I think you testified before, but do you recall discussing with Ms. Balducci whether you would speak directly to Ms. Poolos?

A.    I don't remember specifically.  I probably did, but I don't know for sure.

ATTORNEY IADEVAIA:  Okay.  If we can mark as 7 -- if we can mark CBS 3421, please.

(Glasgow Exhibit 7, emails, Bates-stamped CBS 3241, marked for identification.)

Q.    So please take a minute to read it. What's been marked as Glasgow Exhibit 7 is a one-page email chain bearing Bates numbers CBS 3241.

(Pause.)

A.    Okay.

Q.    Do you recognize what's been marked as Exhibit 7?

A.    I see that it's an email thread and that I'm copied on the email thread.

Q.    Yeah.  And the first email, the bottom email of the email thread, is the email we were just discussing -- correct? -- from Ms. Poolos to

Glasgow

Ms. Balducci that's reflected in Exhibit 6?

A.    Yes.

Q.    And then Exhibit 7, the top email is Ms. Balducci's response to the email that Ms. Poolos had spent on January 8th; correct?

A.    That's what it looks like, yes.

Q.    And the email Ms. Balducci sent is dated January 9th, 2022, and you are copied on the response; right?

A.    Yes.

Q.    Did you help draft this response?

A.    I don't remember.

Q.    And in the email Ms. Balducci writes, Alex:  As I told you on Friday evening and again last night, the concerns raised are serious.

Do you see that, that sentence, that text?

A.    I do.

Q.    Did you agree with Ms. Balducci or do you agree with Ms. Balducci that the concerns that were raised about Ms. Poolos were serious?

A.    I absolutely agreed the concerns about retaliation against Ms. Richards based on her complaint were serious, yes.

Glasgow

Q.    And even though the concerns were serious, you declined to speak to Ms. Poolos; correct?

ATTORNEY LYNCH:  Objection.

A.    As I said before, I knew there was an investigation going on.  I knew that conversations were happening with her and others.  And I did not think it was productive for me to insert myself in it.

Q.    In her email Ms. Balducci says, In line with company policies, the investigation will include a review of the facts and interviews with you and with others that may have knowledge of the situation.

Do you see that text?

A.    I do.

Q.    Which policy or policies was Ms. Balducci referring to, if you know?

A.    I'm not sure.

Q.    Do you know of any policies that would be applicable here?

A.    Maybe the antiretaliation policy and our business conduct statement and how we handle complaints and concerns.  It could be that.

Glasgow

Q.     Do you know when Ms. Poolos was told she was being placed on a paid administrative leave?

A.     I can't remember.

Q.     And do you know when Ms. Poolos was told that the investigation was completed and that she was fired?

A.     I can't remember.

Q.     Do you know whether it was days that passed?  weeks that passed?  more time?

A.     I think it was -- I'm not exactly sure.

Q.     In the email toward the bottom of Ms. Balducci's emails she writes, My manager, Cindy Glasgow, is up to speed and copied here.

Do you see that text?

A.     I do.

Q.     Was that accurate at the time?  Were you caught up to speed at that time?

A.     I'm not sure.  I think I was.  At least I knew about the situation, so I think so.

Q.     And then Ms. Balducci writes, I will reconnect with you -- to Ms. Poolos -- with you next week.

Do you see that text?

Glasgow

A.    I do.

Q.    Do you know if Ms. Balducci reconnected with Ms. Poolos the following week?

A.    I don't know.

Q.    Do you know why she wouldn't have reached out to her the following week?

ATTORNEY LYNCH:  Objection.

A.    I don't know.

ATTORNEY IADEVAIA:  Would we mark as Exhibit 8 CBS 3428, please.

(Glasgow Exhibit 8, emails, Bates-stamped CBS 3828 to 3249, marked for identification.)

Q.    What's been marked as Glasgow Exhibit 8 is a two-page email thread Bates-stamped CBS 3828 to 3249.

Let me know once you've had a chance to take a look.

(Pause.)

A.    Okay.

Q.    So the bottom two emails in the email thread, those are the two emails that we've just been discussing that are reflected in Exhibit 6 and 7; correct?

Glasgow

A.    Yes.

Q.    So Exhibit 8 is an email from Ms. Poolos to Ms. Balducci and to you as well as Paul Julian, and it's dated January 9, 2022.  And do you understand this to be a response to Ms. Balducci's email that we just went through?

A.    It looks like it's a response from Ms. Poolos to Renee, yes.

Q.    And in the email Ms. Poolos writes, My request that this be escalated to your manager was a direct request to speak with her about this situation as soon as possible.  I do not feel I have been given due process before extreme actions were taken.  The effects on me have been extreme to say the least.

Do you see that text?

A.    I do.

Q.    Did you get this email on January 9th, 2022, or thereabouts?

A.    I don't remember for sure, but I believe I did.

Q.    And what was your reaction to getting the email?

A.    I don't remember.

Glasgow

Q. Did you have a discussion with Ms. Balducci about this email?

A. I might have. I don't remember.

Q. In response to this email, you did not reach out to Ms. Poolos; correct?

A. No, I didn't.

Q. As you sit here today, what is your resection to her concern that she wasn't given due process before being suspended?

A. That's not my recollection of how it went. I did not feel that she had not been given due process. I don't remember much more than that.

Q. Do you recall what process Ms. Poolos was given presuspension?

A. I don't recall.

Q. Do you know whether Ms. Poolos offered to provide Ms. Balducci with additional information in support of her defense against Ms. Richards' complaint?

A. I don't know.

Q. Do you know if there was any offer -- strike that.

Do you know if Ms. Balducci accepted

Glasgow

Ms. Poolos's offer to provide information -- strike that.

Do you know if Ms. Balducci ignored or disregarded any offers by Ms. Poolos to provide additional information to support her defenses?

A.    I don't know.

Q.    Do you know if Ms. Poolos -- I'm sorry, strike that.

Do you know if Ms. Balducci ever spoke directly to Ms. Poolos before suspending her?

A.    I don't remember.

Q.    Are you aware of any situations where an employee was suspended before HR had talked to the employee about the allegations that were the basis for suspension?

ATTORNEY LYNCH:  Objection.

A.    I'm not sure.

Q.    You don't recall any situation like that or you don't have any memory whatsoever?

A.    I recall that there are situations where employees have been suspended pending investigation.  I cannot recall specifically what steps happened prior to that suspension.

ATTORNEY IADEVAIA:  Okay.  If we can

Glasgow

mark CBS 7827 as Exhibit 9, please.

THE WITNESS: I could use a bathroom break.

ATTORNEY IADEVAIA: Okay.

THE WITNESS: If we're going to be timetable power through --

ATTORNEY IADEVAIA: No, this is a good time for a break.

THE WITNESS: Okay.

(Recess taken from 4:53 to 5:08.)

Q. Outside of my concerns that Ms. Poolos had raised or has raised, are you aware of any complaints made against Ms. Balducci?

A. No.

Q. Are you aware of any concerns about Ms. Balducci?

A. Concerns meaning what?

Q. Concerns about Ms. Balducci -- how she conducted investigations.

A. Not that I'm aware of.

Q. When you were in your position at Paramount, what we've been focused on, were you aware of an employee named Shachar Bar-On?

A. I don't know.

Glasgow

Q.    Were you aware of any complaints or concerns about Mr. Bar-On?

A.    Not that I can think of now.

Q.    Were you aware that Ms. Poolos had made complaints about Mr. Bar-On?

A.    I don't know if I was aware of that at the time.  I can't recollect that now.

Q.    Do you know if the company conducted investigation after Ms. Poolos was let go concerning complaints that she had made against Mr. Bar-On?

A.    I remember there was someone that she made some complaints about and that there was an investigation done into those complaints after -- either after she was suspended -- I think after she terminated.  I just don't recollect the name off the top of my head, but if that's who you're talking about, maybe that's who I'm remembering.

Q.    Do you remember who conducted that investigation?

A.    I'm not sure.  I think -- I'm not sure.

Q.    Do you know someone named Jennifer Gordon?

A.    Yes.

Glasgow

Q. And who was that?

A. She was someone in our employee relations group.

Q. And do you know if she conducted the investigation into the concerns that were looked at after Ms. Poolos had left?

A. That sounds -- that sounds right. I'm not 1,000 percent sure, but that's sort of ringing true to me.

Q. Did you have any role in that investigation?

A. I think I had a role in -- I didn't conduct the investigation. But, again, I think I was made aware of the investigation. I think I had a role in agreeing that we should look into the allegations and conduct an investigation. I think I was made aware of the investigation as it was happening and what the findings were, but I just can't remember particulars.

Q. Do you know who Ms. Gordon spoke to as part of her investigation?

A. I don't remember right now. I probably knew at the time, but I can't remember now.

Q. Did you have any involvement in who

Glasgow

Ms. ███████ spoke to?

A.    I don't know.  I don't think so.  I can't remember.

Q.    Do you know if Ms. ███████ reviewed any documents in connection with her investigation?

A.    I don't know.

Q.    Did you have any role in determining which documents Ms. ███████ would look at in whole or in part?

ATTORNEY LYNCH:  Objection.

A.    Not that I remember, but I can't say for sure.  Like I said, my recollection of it all is not crystal clear.

Q.    And what were the findings -- I think you said you knew about the findings.  What were the findings?

A.    I don't remember specifically what the findings were.  I remember we -- there was an investigation conducted.  I cannot remember right now what the findings were.

Q.    Do you know a 60 Minutes employee named Matt Richmond?

A.    Not right now.  No, I don't know who that is.

Glasgow

Q.   Were you aware of any complaints against Mr. Richmond when you were at Paramount?

A.   Not that I can recollect now.

Q.   Were you aware of any complaints against a senior editor at 60 Minutes?

A.   I don't know.  Not that I can recollect now.  I don't know if I was aware of anything at the time, but not now.

Q.   Do you know an employee named Ashley Velie at 60 Minutes?

A.   Not right now, no.

Q.   Were you aware of any complaints by Ms. Velie during the time she worked at 60 Minutes?

A.   I don't know if I was aware of anything at the time.  I can't remember anything right now.

Q.   Are you aware of any complaints by 60 Minutes employee Kara Vaccaro?

A.   Not right now I'm not.

Q.   When you say "not right now," you mean you're not recalling anything as you sit here now; correct?

A.   Right.

Q.   Are you aware of any complaints by

Glasgow

Shari Finkelstein or Finkelstein?

A. Not right now I'm not.

Q. Do you know of an employee at 60 Minutes named David Levine?

A. That name sounds familiar.

Q. Do you know what his job was or is at 60 Minutes?

A. I can't recall right now, no.

Q. Are you aware of any complaints involving Mr. Levine?

A. I'm not aware right now.

Q. Were you aware when you worked at the company?

A. I don't recall if I was or not.

Q. You said that the name David Levine is familiar. In what way is it familiar?

A. I don't know. It just rings a bell for me. I don't know anything beyond that.

Q. Do you know of a correspondent on 60 Minutes named Sharyn Alfonsi?

A. I know of her.

Q. Are you aware of any complaints or concerns that she raised when she was -- when you were at the company?

Glasgow

A.    No, not that I'm aware of.

Q.    Are you aware of any concerns or complaints that Ms. Alfonsi raised about Mr. Levine?

A.    I'm not.

Q.    Do you know of an employee named Nicole Marks?

A.    Not right now, no.

Q.    Are you aware of any concerns Ms. Marks made?

A.    I am not.

Q.    Do you know a correspondent named Jon Wertheim?

A.    I know the name.

Q.    Are you aware of any concerns or complaints Mr. Wertheim made during the time you were at the company?

A.    No.

Q.    Are you aware or know of an employee at 60 Minutes named Will Croxton?

A.    The name rings a bell.

Q.    In what way does the name ring a bell?

A.    I don't know.  It just sounds familiar. A lot of times in HR I see names and know names.

Glasgow

They might just be still in my brain for many reasons, so I don't know.

Q.   Did you ever have any discussions about Mr. Croxton when you were working for Paramount?

A.   I don't remember.

Q.   Did you have any discussions about Mr. Richmond when you worked at Paramount?

A.   Not that I remember.

Q.   Did you have any discussions about David Levine when you worked at Paramount?

A.   I'm not sure.  I don't remember.

Q.   Do you know a name of someone -- a former 60 Minutes employee named Michael Radutzky?

A.   I don't know, no.

Q.   Did you ever have any conversations when you worked at Paramount about Mr. Radutzky?

A.   I can't remember.

Q.   Former 60 Minutes employee, do you know of █████████████

A.   No.

Q.   Did you ever have any discussions when you were at Paramount about Ms. ██████████

A.   I don't know.  Not that I can recall.

Q.   Do you know of an employee or former

Glasgow

employee of 60 Minutes named Ira Rosen?

A.     That name sounds familiar.

Q.     And in what way does it sound familiar?

A.     I can't remember.

Q.     During the time you were at Paramount, did you have any discussions about Mr. Rosen?

A.     I don't know.  Not that I recall.

Q.     Are you or were you aware of any complaints about Mr. Rosen, or concerns about him?

A.     I don't know.  Not that I'm recalling right now.

Q.     Do you know of a 60 Minutes employee named Michael Gavshon?

A.     Not ringing a bell for me right now.

Q.     Did you ever have any discussions about Mr. Gavshon when you worked at Paramount?

A.     Not that I know of right now.

Q.     Are you aware of a lawsuit that was filed against 60 -- well, against CBS by ███████ ███████

A.     I don't know, no.

Q.     During the time you worked at Paramount, were you ever part of -- or any predecessor entity were you ever part of any

Glasgow

discussions about Mr. Gavshon sending a picture to Ms. ██████████

A.   Not that I'm recalling right now.

Q.   Are you aware of any CBS -- 60 Minutes producer sending a picture to an associate producer in which his genitals are visible?

A.   I do not remember that.

Q.   Do you know of an employee of 60 Minutes named Rich Bonin?

A.   That name sounds familiar.

Q.   In what way does it sound familiar?

A.   Again, it just sounds like a name that I believe I have ever seen or heard before, but I cannot remember more than that at the moment.

Q.   Did you participate in any discussions about Mr. Bonin when you worked at the company?

A.   I'm not sure.  Not that I remember now.

Q.   Do you recall any complaints or concerns about Mr. Bonin when you worked for the company?

A.   Not that I'm recalling right now.

Q.   Do you recall an employee at 60 Minutes named Dan Bussell?

A.   Not right now, no.

Glasgow

Q. Do you recall ever having conversation about Mr. Bussell during the time you worked at the company?

A. Not that I can recall.

Q. Do you recall any complaints about Mr. Bussell when you worked at the company?

A. Not that I recall, no.

Q. Okay.

ATTORNEY IADEVAIA: If we could mark what are we up to?

THE REPORTER: 9.

ATTORNEY IADEVAIA: 7827.

(Glasgow Exhibit 9, email with attachments, Bates-stamped CBS 7827 to CBS 7857, marked for identification.)

Q. You should take a minute to look through the document.

A. Yeah.

Q. What's been marked as Exhibit 9 is a cover email and then several attachments. The cover -- the span of the Bates range, for the record, is CBS 7827 to CBS 7857.

(Pause.)

A. Okay. Should I -- this is a long

Glasgow

document. Should I read all of it right now or just let you refer me to --

Q. I'm going to ask you specific questions.

A. Okay.

Q. If you at that point want to look at the document before you answer me, you can do that.

A. Okay.

Q. I'm not going to ask you -- I'm going to ask you questions about this summary. I'm not going to ask you questions about the next exhibit or attachment, which is Ms. Richards' complaint.

A. Okay. Okay.

Q. But I'm fine with you saying, Hey, I need a second to review this more carefully before you answer, if you want to do it that way.

A. Okay.

Q. Just to confirm for the record, the cover email is from Ms. Balducci to you and Ms. Ahmed, and it is dated January 9, 2022. Do you see that?

A. I do.

Q. And the subject is Alex Poolos

Glasgow

conversation history 1/9, and there appears to be some kind of link indicating there is some attachment.  Do you see that?

A.    I do.

Q.    Do you have any knowledge as to why Ms. Balducci sent this to you?

A.    To keep me apprised of what was going on with the matter at hand.

Q.    Did you ask her to send you a document like this?

A.    I can't remember.

Q.    Was it part of the typical process for someone on your team in HR to send you a summary or compilation like Ms. Balducci does here?

ATTORNEY LYNCH:  Objection.

A.    It could be sometimes.  Different team members got me up to speed in different ways.

Q.    So if we could take a look at the first page, which is the Attachment 7A2A.  At the top it says, Alex Poolos issue (R. Balducci notes).  Do you see that?

A.    I do.

Q.    During the time that you were at 60 Minutes, was there a system, electronic system or

Glasgow

information system, for HR individuals to type in notes of work that they were doing?

A.    I think the team members would keep their notes in different ways.  There wasn't like one specific platform or method of doing that.

Q.    All right.  The top note from Ms. Balducci dated December 17th in that first bullet point Ms. Balducci writes, Tanya informs me that Collette Richards, associate producer, 60 Minutes, called her to complain about her producer, Alex Poolos.  Mentioned Collette also reached out to HR.

Do you see that?

A.    I do.

Q.    I think your testimony earlier -- but just in case this refreshes your memory at all -- was that you were not aware of Ms. Richards' complaint in December of 2021; is that correct?

A.    Not that I can recall now.

Q.    And then the next entry on 12/30 says, email from M. Cottone to Danya and me regarding, and then it's blacked out.

But obviously your name is not mentioned in that note; correct?

Glasgow

A.    Correct.

Q.    On 12/31 the note says, Collette reaches out to me asking to speak.  She is upset. She shares that she's burnt out, feels mistreated by her manager, and needs help.  I offer guidance around how we'll handle.  I'll loop Bill, get his POV.  If needed, he will talk to Alex and give her the benefit of the doubt that her interactions with Collette will improve.

Do you see that text?

A.    I do.

Q.    Okay.  And you can look at all these bullet points on 12/31, but your testimony remains that you don't remember speaking to Balducci around December -- the end of December about Ms. Richards or Ms. Poolos; correct?

A.    I don't.  My recollection is that -- this sort of issue where someone is wanting some guidance on how to deal with a manager wouldn't necessarily be raised to me.

Q.    And why is that?

A.    Because a VP like Renee is perfectly capable of handling that.  So I may or may not become aware of things like this.  But I don't

Glasgow

think I was of this until the time I testified about earlier when I got the call from her.

Q. And then it says on January 3rd -- and I believe now we're in year 2022 -- Alex reaches out to Tanya to get guidance on how to manage Collette.

Do you see that?

A. I do.

Q. And Ms. Balducci appears to be noting that as of January 3rd Ms. Poolos was reaching out to Tanya Simon about Collette Richards; right?

A. I assume so. I don't know.

Q. On January 4th Ms. Balducci says -- her notes say, Tanya says let's have a conversation. And then there's a note there at 7:38 p.m. Alex Poolos follows up with Scott asking to speak. Scott says it's late; let's talk later.

Do you see that text?

ATTORNEY LYNCH: Objection. I just want to point out you missed: Tanya says let's have a conversation tomorrow. You missed the word "tomorrow."

ATTORNEY IADEVAIA: Sorry. I stand corrected.

Glasgow

Q.    Do you see that text?

A.    I do.

Q.    At the time that Ms. Balducci sent this to you -- which if you look at the cover email is January 9th, 2022 -- did you look at what she sent to you?

A.    I believe so, yeah.

Q.    And as part of that you would have reviewed this summary that Ms. Balducci provided?

A.    I believe so.

Q.    And where Ms. Balducci writes, Scott asking to speak, do you know if that's a reference to Scott Bronstein?

A.    You mean the reference to where Alex follows up with Scott asking to speak?

Q.    Correct, yes.

A.    My understanding is that's Scott Bronstein, yes.

Q.    And do you know as of January 4th whether Ms. Poolos was told about Ms. Richards' complaint?

A.    I don't know.

Q.    On January 5th Ms. Balducci writes, 11:22 a.m. Alex follows up again with Scott,

Glasgow

asking to talk that afternoon.

Do you see that text?

A.    I do.

Q.    And then at 12:30 p.m. the note says,
Bill Owens and Tanya speak with Alex about the
concerns Collette raised.  Bill mentions a concern
about bullying boundaries and hectoring.

Do you see that text?

A.    I do.

Q.    Do you know whether January 5th was the
first time anyone had told Ms. Poolos about
Ms. Richards' complaint?

A.    I'm not sure.

Q.    The notes we just went through, though,
that Ms. Balducci made, there's no indication that
there was a conversation with Ms. Poolos before
then, is there?

ATTORNEY LYNCH:  Objection.

A.    In these notes there's no note that
says that we, HR, spoke with Ms. Poolos.  Yeah, so
I don't see anything referencing that.

Q.    Do you have any understanding as to why
Ms. Poolos would not find out about the complaint
against her for the period between December 17th

Glasgow

and January 5th?

ATTORNEY LYNCH:  Objection.

A.    No, it depends -- like I said, it just depends on the circumstances of the issue.  So I don't know all the reasons for that timing.

Q.    Did you ask Ms. Balducci at any point why the timing was the way it was in this summary?

A.    I don't know.

Q.    Do you think between -- I don't know the exact amount of time that passed, but it's more than two weeks.  Do you think that's a long time to go before notifying the subject of the complaint that a complaint has been made?

A.    To notify the subject of a complaint --

Q.    That a complaint has been made.

A.    I think it totally depends on the circumstances when the appropriate time is to let the subject of the complaint no.

Q.    Have you participated in investigations in which multiple weeks have gone by before the subject of the complaint is made aware of the complaint?

A.    Possibly.

Q.    Do you remember any as you sit here

Glasgow

today?

A.      I remember lots of investigations.  I do not remember the specific timing for all of them between when I became aware of the complaint and the subject knew.  So I do not know for sure.

Q.      And the entry on January 5th says that -- at 12:30 p.m. -- Mr. Owens and Ms. Simon speak with Ms. Poolos about the concerns that Ms. Richards raised; correct?  Do you see that?

A.      I see that.

Q.      And there's no mention that HR met with Ms. Poolos on the 5th -- right? -- that HR -- that Ms. Balducci was part of that January 5th meeting; correct?

A.      It doesn't mention that here, no.

Q.      Are you aware of any meeting that Ms. Balducci had with Ms. Poolos before January 5th?

A.      I don't know.

Q.      Do you know whether in the meeting on January 5th that -- whether anyone said to Ms. Poolos that she needed to keep the complaint that Ms. Richards raised confidential?

A.      I think my understanding was that Renee

Glasgow

and/or Bill did, but I don't remember when or how I came aware of that.

Q.   And you're saying at the January 5th meeting?

A.   I'm not sure, but I feel like at some point.  I don't know for sure exactly who did it or when.

Q.   Do you think it was significant when someone said that to Ms. Poolos?

A.   I don't know.

Q.   What don't you know?

ATTORNEY LYNCH:  Objection.

A.   Significant?  I don't know exactly what you mean.

Q.   Well, do you think it's important?

A.   I think it was probably told to her.  I would prefer it was told to her, so, yeah, I think it's important.

Q.   Why would you prefer it was told to her?

A.   Because, as I mentioned before, when we do investigations we try to keep matters confidential.  I don't even know if this was -- at this point -- also I'm getting things confused.  I

Glasgow

don't know what point this was in any investigation.  But if there is an investigation, I think it's important to tell people involved to keep it confidential and not to talk about it.

Q.    Is it possible that at this point in time on January 5th there was not actually an investigation happening?

A.    No, I mean, Renee was looking into some concerns about -- that Collette had raised about Ms. Poolos.  So there was a complaint made.  And I don't know whether you call it an investigation or something else, but there was -- HR was taking action based on that complaint.

Q.    And the action that HR had taken at this point did not involve speaking to Ms. Poolos directly; right?

A.    I don't know.  Based on what's here, I don't see that.

Q.    The next entry:  1 p.m. Renee, Bill, Tanya weekly call.  Bill relays details of his conversation with Alex.  I ask Bill to follow up again with Alex the following day and point out that this is not the first time a complaint about her interactions with other employees, i.e., Sarah

Glasgow

Turkard [sic] complaint and issue with members of the rights team.  I ask that he document their conversation in writing to ensure no misunderstanding about expectations.

Do you see that text?

A.    I do.

Q.    Did I read it correctly?

A.    I believe so.

Q.    Did Ms. Balducci talk to you at all about her discussion with Mr. Owens and Ms. Simon following their meeting with Ms. Poolos on the 5th?

A.    I don't remember.

Q.    Did you give guidance, suggestion, or instruction to Ms. Balducci to ask her -- to Ms. Balducci to ask Mr. Owens to speak again with Ms. Poolos after January 5th?

ATTORNEY LYNCH:  Objection.

A.    Not that I recall.  I don't know.

Q.    And did you give instruction, suggestion, or direction to Ms. Balducci that Mr. Owens should send a follow-up email to Ms. Poolos?

A.    I don't think so.  I don't think I was

Glasgow

brought into the loop at this point because, again, it was -- it was a matter that Renee was handling, and I don't remember being brought into it at this point.

Q. And do you have any understanding as to the basis of Ms. Balducci's note here that says this is not the first time a complaint about her interactions with other employees? Do you have any knowledge of the basis for that?

A. I don't.

Q. Do you know if there was anything in Ms. Poolos's HR file or personnel file noting prior complaints against her?

A. I don't.

Q. After you got this document, did you talk to Ms. Balducci about Ms. Poolos's prior interactions with other employees?

A. I don't remember.

Q. Do you know of an employee named Sarah Turkard?

A. Not right now, no.

Q. Do you know if there's an employee at 60 Minutes named Sarah Turcotte?

A. I don't know.

Glasgow

Q.    Do you know if Ms. Balducci's note here that there had been prior complaints by Ms. Turkard and an issue with members of the rights team, where that came from?  Do you have any idea?

A.    I don't.

Q.    Do you know if that information came from Tanya Simon?

A.    I don't.

Q.    Do you know if Tanya Simon learned that information from Claudia Weinstein?

A.    I don't.

Q.    Is Ms. Weinstein an employee at 60 Minutes or was she when you were there?

A.    I don't know.

Q.    Is it typical of managers to get history of prior complaints from another employee?

ATTORNEY LYNCH:  Objection.

A.    I don't know.

Q.    That last sentence that Ms. Balducci writes on January 5th:  I ask that he document their conversation in writing to ensure no misunderstanding about expectations.

Do you see that sentence?

Glasgow

A.    I do.

Q.    Was that typical practice during the time, you know, you were in your SVP position, to send an email to document about expectations?

A.    There's not a typical practice because it just truly depends on circumstances.  So it could be done sometimes.

Q.    Do you understand from these notes that there was any corrective action at that point being taken against Ms. Poolos?

ATTORNEY LYNCH:  Objection.

A.    My understanding, whether it's based on these notes or just what I recall, is that no, at this point this was just a counseling to her to try to improve the dynamic and the management between her and Ms. Richards.  I don't remember it being any disciplinary action considered.

Q.    And then the next bullet point, 5:38 p.m., Scott texts Alex, offering to talk.

Do you see that text -- that --

A.    Wait.

Q.    Sorry, at the bottom of the page, the last bullet point.

A.    I do see that.

Glasgow

Q. And then on the next page, 5:42 p.m., the note says, Alex called Scott Bronstein, and there's a phone number. They talked for 17 minutes. See screenshots. That includes Scott's notes from the call, text exchange, and screenshot of incoming call.

Do you see that text?

A. I do.

Q. When you were referring earlier to documents, you mentioned text messages. Are these -- the reference here the texts you were referring to or something else?

A. It's probably these.

Q. Okay. And Scott's notes from the call, were those the notes you were referring to earlier?

A. Probably.

Q. Is there any other notes that you're aware of?

A. Not that I can recall, assuming these are within those attachments are what I remember seeing.

Q. We're going to go through them, so you'll have a chance to take a look and tell me.

Glasgow

A.    Okay.

Q.    Are you aware of any other call that Ms. Poolos had with Mr. Bronstein other than this one on January 5th?

A.    I don't remember.

Q.    Okay.  Then it says, On January 6th, 1:17 p.m.:  Bill follows up with an email to Alex recapping their conversations from 1/5 and 1/6.  See attached.

Do you see that text?

A.    I do.

Q.    So according to this note Bill followed up -- Mr. Owens followed up based on Ms. Balducci's instruction that we had read in the notes for January 5th; correct?

A.    That's what it says, yes.

Q.    Do you know whether in the follow-up that Mr. Owens had with Ms. Poolos on the 6th or in the email that he sent to her did he instruct her to keep Ms. Richards' complaint confidential?

A.    I don't know.

Q.    Did you ever ask Ms. Balducci if he did?

A.    I don't remember.

Glasgow

Q. Okay. Now we move on to January 7th. At 8 a.m., according to the note, Collette reaches out to me via email and text. She knows I'm taking the day off. And while she feels badly for reaching out, she has an urgent need to talk and prefers to talk to me directly as opposed to another member of the HR team.

Do you see that?

A. I do.

Q. And then the note says, I called Collette. She shares that her old boss, Scott Bronstein, has informed her that Alex reached out to him after Bill spoke to her, saying she is terrible at her job and went to HR, thereby creating a nightmare where Alex can't trust her. He is uncomfortable about the things Alex told him.

Do you see that bullet point? Did I read it correctly?

A. I see that, yes.

Q. The next bullet point says, I advised Collette to reach out to Bill. I promised to also ping Bill and alert him --

A. Wait. I think you skipped a bullet.

Glasgow

Q.   I did.  I'm sorry.  I apologize.
You're right, the third bullet says, Collette, who
had been willing to give Alex the benefit of the
doubt that things would improve after Bill's
feedback, now feels unsafe and that Alex is
deliberately trying to harm her because she made a
complaint.

Do you see that bullet point?

A.   I do.

Q.   Do you have any knowledge as to whether
Collette was purportedly willing to give Alex the
benefit of the doubt?

A.   I don't know.

Q.   If you go down to 6:30 p.m., that
bullet point.

A.   Okay.

Q.   I called Alex and placed her on paid
administrative leave pending the results of our
investigation.  On that call Alex insists she
doesn't want to harm Collette.  And while she did
reach out to someone named Scott, she raises this.
I don't probe.  She didn't say anything defamatory
about Collette.

Do you see that bullet point?

Glasgow

A.    I do.

Q.    It's your testimony that before Alex was placed on administrative leave that Renee had spoken to you; correct?

A.    I think so, yeah.

Q.    And is it likely that you spoke to Renee on January 7th?

A.    Probably.

Q.    Based on these notes?

A.    Yeah, probably.

Q.    And to the best of your memory, there was no conversation with Renee about this situation before that -- before January 7th?

A.    Not that I recall.

Q.    If you take a look at the next page, which is 7830, there is a bold header that says RV notes from call with Scott Bronstein.  Do you see that?

A.    Yes.

Q.    Okay.  And if you take a look -- strike that.

Do you know if these notes were -- did Ms. Balducci tell you that she made these notes after speaking with Mr. Bronstein?

Glasgow

A.   I don't remember.

Q.   And if you look at the next page, which is 7831, in bold it says, RV convo with Alex Poolos, 5:45 p.m. to 6:55 p.m. on Saturday 1/8.

Do you see that header?

A.   I do.

Q.   And do you recall having a conversation with Ms. Balducci after she spoke to Ms. Poolos about the substance of that discussion?

A.   At some point.  I don't remember when.

Q.   And what do you recall about that discussion?

A.   Not a whole lot.

Q.   What do you recall if -- what parts do you remember, if anything?

A.   If I can look at this, maybe it will --

Q.   Go ahead.  Take a look, please.

A.   -- help me remember.

(Pause.)

A.   Okay.  Sorry, what was the question again?

Q.   That's okay.  I think the idea was you were going to review those notes to see if it refreshed your recollection as to anything

Glasgow

Ms. Balducci said to you about her conversation with Ms. Poolos on January 8th.

A. I mean, I know in some conversations -- I don't remember how many there were -- I spoke with Renee -- it could have been one-on-one; could have been groups -- about all of the work she had done on the investigation. And I remember some parts of this her sharing with me this conversation with Ms. Poolos along with her conversation with Mr. Bronstein, et cetera.

Q. Okay. Anything specific about those discussions that you recall? And I know it may have been one or multiple.

A. Yeah. Just that she told me that Ms. Poolos denied saying some of the things to Mr. Bronstein that Mr. Bronstein shared, that there was some discrepancy about how the conversation was -- or the connection between the two of them was initiated.

And there was some discrepancy between Ms. Poolos's version of events and what we heard from Mr. Bronstein and saw otherwise about who called whom. Things like that.

Q. Outside of the substance of that

Glasgow

discussion and who initiated and who called whom, were there any other discrepancies that Ms. Balducci had identified for you?

A.    I don't remember.

Q.    Okay.  If you take a look at the next page, that is Ms. Richards written complaint about Ms. Poolos, and it is dated 12/31 -- I'm sorry, 12/30/21.  Do you see that?

A.    I do.

Q.    And did you review this complaint at the time that Ms. Balducci sent it to you on January 9th, 2022?

A.    I don't remember.  Probably.  As I was reviewing all of the materials, I probably did.

Q.    Your testimony is you don't recall seeing it before this point; correct?

A.    Yes, correct.

Q.    Okay.  If you could turn several pages in to the number -- to the page that's Bates-numbered CBS 7848, please.

A.    Okay.

Q.    So at the top it says from Renee Balducci to Renee Balducci dated January 9, 2022, and then below that there appear to be -- there

Glasgow

are images of handwritten notes.  Do you see that?

A.    I do.

Q.    Is it your understanding that these are notes that Mr. Bronstein took?

A.    I believe so.

Q.    And did you look at them on or about January 9th, 2022?

A.    I believe I looked at them at the same time I was reviewing all the materials in this email from Renee.

Q.    Okay.  And if you go to page bearing Bates number 7850, which is a couple of pages later, another email from Ms. Balducci to Ms. Balducci dated January 9, 2022.  And there appear to be images of handwritten notes embedded within the document.  Do you see those notes?

A.    I do.  I can't read them in this, but I see them.

Q.    We have a better image we're going to show you in a second.

A.    Okay.

Q.    Is it your understanding these were Mr. Bronstein's notes that Mr. Bronstein provided to Ms. Balducci?

Glasgow

A. I believe so.

ATTORNEY IADEVAIA: So why don't we mark the native versions of these documents. So let's start with 748 to 49.

(Glasgow Exhibit 10, email with attachment, Bates-stamped 748 to 49, marked for identification.)

Q. So in that larger document you were just looking at, Exhibit 9, if you could go back to that for one second and then put it next to the Exhibit 10 that I just gave you. What's for the record been marked as Exhibit 10 is an email from Ms. Balducci to Ms. Balducci dated January 9th, 2022. It's several pages, including -- and it includes pictures of handwritten notes.

If you look at that bigger document and specifically at page 7848.

A. Okay.

Q. Are you on that page? That's where we were before?

A. I am, yeah.

Q. Does this appear to be -- Exhibit 10 and that page, does that appear to be the messages that are part of Exhibit 9? I'll represent -- you

Glasgow

can check, but there are five images in both.

A.    Yeah, it appears to be.

Q.    This is a better quality image, which is why I am showing it to you.  Are these the notes that Ms. Balducci sent to you on January 9, 2022?

A.    I believe so.

Q.    And was it your understanding at the time that these were Mr. Bronstein's handwritten notes?

A.    I believe so.

Q.    And did you have any understanding of what the notes were of, Mr. Bronstein's notes were of?

A.    Of his -- I believe of his conversation with Ms. Poolos.

Q.    And do you know was that conversation that was in Ms. Balducci's notes, that took place on January 5th?

A.    I'd have to look back.  There's the timeline?  I believe so.

Q.    Okay.  Got it.

ATTORNEY IADEVAIA:  And if we can mark as Exhibit 11 the native images corresponding

Glasgow

with CBS 7850.

(Glasgow Exhibit 11, email with attachment, Bates-stamped CBS 7850, marked for identification.)

Q.    And I'll ask you to do just the same excise, which is do these appear to be -- what's been marked as Exhibit 11 is an email from Ms. Balducci to Ms. Balducci dated January 9, 2022, and it has two images of handwritten notes. Does that match with the document Bates-stamped 7850 to 51?

A.    It appears to be, yes.

Q.    Sorry, just 7850.  My apologies.

And is it your understanding that these are also, what's in Exhibit 11, Mr. Bronstein's handwritten notes?

A.    I believe so.

Q.    And they're his handwritten notes purportedly of the conversation that he had with Ms. Poolos on the 5th?

A.    I believe so.

Q.    Outside of the handwritten notes reflected in Exhibits 10 and 11, are you aware of any other notes that were considered in connection

Glasgow

with the situation we've been talking about?

ATTORNEY LYNCH:  Objection.

A.    I mean, there were Renee's notes of her interviews.  There -- I'm not sure what else.

Q.    Are you aware of any other notes by Mr. Bronstein beyond these, 10 and 11?

A.    Not that I can think of right now.

Q.    Okay.  And are you aware of any other -- strike that.

Let's take a look at -- going back to Exhibit 9, please.

A.    Okay.

Q.    That's the bigger document.  If you could go to the page that's Bates-stamped 7851, which is towards the end of the document.

A.    Yes.

Q.    Again for the record, what it says is an email from Ms. Balducci to Ms. Balducci dated January 9th, 2022.  And if you look at the next page, 7852, again an email from Ms. Balducci to Ms. Balducci dated January 9th, 2022, do you see that?

A.    I do.

Q.    And then next page is text that is very

Glasgow

large and basically incomprehensible; correct?

A.    I see some large text.  This says FaceTime email mobile and has a mobile number.

Q.    On the next page, skipping ahead to 7855, please.

A.    Okay.

Q.    That again is Ms. Balducci to herself dated January 9, 2022.  And on the page after there's some very large text that is basically incomprehensible.  Do you see that?

A.    I see some picture text, yes.

ATTORNEY IADEVAIA:  If we could mark the native versions.  Start with 52 to 54, please.  Mark this as Exhibit 12, please.  I think we're up to 12.

(Glasgow Exhibit 12, email with attachment, Bates-stamped 52 to 54, marked for identification.)

Q.    What's been marked as Exhibit 12 is an email from Renee to Renee dated January 9th, 2022, and attached is -- if you could look at the second page of that document, there appears to be a notation of a call with Ms. Poolos.  Do you see that?

Glasgow

A.    I do.

Q.    And it's dated January 5th, 2022, the call, and it says the call was at 5:42 p.m. and it was 17 minutes.  Do you see all that information?

A.    I do.

Q.    Do you have any understanding as to what this is?

A.    I believe this is a screenshot from Mr. Bronstein's phone, documenting details about the phone call between himself and Ms. Poolos.

Q.    Got it.

And did Ms. Balducci send this to you on -- as part of her January 9th packet?

A.    I believe so.

ATTORNEY IADEVAIA:  If we could mark a native versions of 7851 to 57, please.  Mark this as Exhibit 13.

(Glasgow Exhibit 13, email with attachment, Bates-stamped CBS 7851 to 54, marked for identification.)

Q.    What's been marked as Glasgow Exhibit 13 is the native version of CBS 7851 -- I said 57 but I didn't mean that.  51 to 54.  Again it's an email from Ms. Balducci to herself dated January

Glasgow

9, 2022. Do you have any understanding as to what this is, Ms. Glasgow?

A. A screenshot of a text exchange I believe between Scott Bronstein and Poolos.

Q. Got it.

And the top text is dated December 31st; is that right?

A. Yes.

Q. And as it appears on this text thread, does it look like Ms. Poolos is reaching out to Mr. Bronstein on December 31st?

A. Yes.

Q. Is it your understanding that the texts on the left are from Ms. Poolos and the text in blue on the right are from Mr. Bronstein?

A. It looks that way.

Q. And in the text Ms. Poolos is saying, Hi, Scott. I hope this finds you well. Wondering if you had a few minutes to chat.

Do you see that?

A. I do.

Q. And Ms. Poolos appears to have sent this text message to Mr. Bronstein before she met with Mr. Owens and Ms. Simon on January 5th;

Glasgow

correct?

A.    Could I interrupt for a second?  I'm getting a phone call for one of my kids.  My husband is out of town.  I didn't expect to be here this late.  Do you mind if I take 20 seconds to get my phone?  I don't want to take a long break.

ATTORNEY IADEVAIA:  That's fine.

THE WITNESS:  I don't want to take long.

ATTORNEY IADEVAIA:  We're almost done.

(Pause.)

(Glasgow Exhibit 14, email, marked for identification.)

Q.    Just while you were away just to speed things up, we marked as Exhibit 14, which you were handed, which is another email from Ms. Balducci to herself dated January 9, 2022.

So you should have in front of you both Exhibits 13 and 14.

A.    I do.

Q.    Okay.  And 13 you identified as understanding to be a screenshot of a text exchange between Ms. Poolos and Mr. Bronstein;

Glasgow

correct?

A.    Yes.

Q.    And Exhibit 14, is that the same thing
or -- strike that.

What would you say that is?  What is
your understanding of what that is?

A.    It looks like it might be a
continuation of screenshots with the text exchange
between the two of them.

Q.    Would you review these text exchanges
at the time or around the time that Ms. Balducci
sent them to you on January 9th, 2022?

A.    I believe so.

Q.    And the text exchanges -- and you can
look at both of them at the same time -- they show
that Ms. Poolos had reached out to Mr. Bronstein
before her meeting with Mr. Owens on January 5th;
correct?

A.    Sorry, say that again.  She reached out
before January 5th?

Q.    Yes.

A.    Yes, it does.

Q.    According to the text thread in Exhibit
13, the first time she reached out to him was

Glasgow

December 31st; right?

A.    Yeah, yes.

Q.    And on Exhibit 14 it says on Tuesday that Ms. Poolos sent a text to Mr. Bronstein saying, Is it too late for you?

Do you see that text?

A.    I do.

Q.    And if you look further down on Wednesday at 11:22 a.m., it says, Hi.  Maybe later this afternoon can work.

Do you see that text?

A.    I do.

Q.    And is it your understanding, based on what we've looked at before, that that was a text from Mr. Bronstein to Ms. Poolos?

A.    I think so.

Q.    And it says Wednesday.  It doesn't say the date on it.  But that's the first text that was sent, according to this thread, on Wednesday between the two of them; right?

A.    It looks like it.

Q.    Outside of the text messages reflected in Exhibits 13 and 14, did you review any other texts related to the investigation Ms. Balducci

Glasgow

was conducting?

A.    I don't recall.  Just I remember what was in the email that was Exhibit 9.  Am I right about that?

Q.    Exhibit 9, yeah.

A.    Yeah.

Q.    And outside of what's in Exhibit 9, do you recall reviewing any other documentation related to Ms. Balducci's investigation?

A.    I don't remember.

Q.    You had mentioned before interview notes that Ms. Balducci had made.  Are you aware of any interview notes other than what's in Exhibit 9?

A.    No.

Q.    Other than what's contained in Exhibit 9 that we've just gone through in admittedly painstaking detail, are you aware of any other evidence that Ms. Balducci obtained or acquired in connection with her investigation?

A.    I mean, what's contained in the email is a summary -- notes and summaries in some of it.  I don't recall if there's anything outside of what she summarized here.

Glasgow

Q.   Do you know as part of Ms. Balducci's investigation if she spoke to any associate producers beyond Ms. Poolos?  I'm sorry, beyond Ms. Richards?

A.   I don't know.

Q.   Do you know if she spoke to an associate producer named Jack Weingart?

A.   I don't know.

Q.   Do you know if she spoke to someone named Kate Morris as part of her investigation?

A.   I don't know.

Q.   At the time that you were considering Ms. Poolos's employment status, did you believe it was relevant or important that Ms. Poolos had reached out to Mr. Bronstein before knowing about Collette's complaint?

ATTORNEY LYNCH:  Objection.

A.   I remember knowing -- I think I remember that being in the mix, but I remember that the conclusion that I drew from everything was that she had initiated that phone call with him on that day, she had made the phone call, and that the conversation had happened along the lines of the notes that Mr. Bronstein had and that the

Glasgow

things were said in that conversation.

So I remember reviewing that timeline and such, but I don't -- I don't know that -- I don't know that I'm answering your question exactly the way you intend.

Q. Okay. What was -- strike that.

Outside of Mr. Bronstein's recollection of that discussion on January 5th and his notes, was there anything else that the company relied on in crediting what Mr. Bronstein said about the discussion and not crediting Ms. Poolos's version?

ATTORNEY LYNCH: Objection.

A. I don't remember -- I remember that what I was hearing about what we heard from Ms. Poolos versus Scott Bronstein was that -- I don't remember the details but that she was sharing things that contradicted both what the notes and text exchange showed and were contrary to what we heard from Mr. Bronstein.

I don't remember everything that went into that assessment, but it was the things in here. I don't remember what else it was.

Q. Anything else you can recall outside of the things in Exhibit 9?

Glasgow

A.     There may have been things that Renee told me when we talked.  It could be that were maybe a little more flavor or context to what was in these notes.  I can't say for sure.  I know she discussed with me her conversations.  We had verbal conversations about it in addition to what was in this email.  So there could be other things they she told me that I'm just not remembering right now.

Q.     But as you sit here now, you're not recalling anything else?

A.     I recall -- nothing other than we both came to the conclusion that we were not getting the full truth from Ms. Poolos.  I don't remember everything that went into us coming to that conclusion.  But I can't recall anything specifically outside of what we've already looked at and discussed.

Q.     And there was nothing in Exhibit 9 that refreshed your memory as to anything else -- correct? -- beyond what you've testified to and what we've reviewed?

A.     Not right now, no.

Q.     All right.  I think just one more

Glasgow

exhibit.

ATTORNEY IADEVAIA: If we could mark as Exhibit 15, 7865, please.

Q. Let me ask right before we mark it: Do you know if Ms. Poolos was ever shown Mr. Bronstein's notes?

A. I don't know.

Q. Did anyone ever ask Ms. Poolos if she had notes of her discussion with Mr. Bronstein?

A. I don't know.

Q. If you were conducting the investigation, would you have asked for that?

ATTORNEY LYNCH: Objection.

A. I don't know. I might have thought about it; I might not have. I don't know.

(Glasgow Exhibit 15, email with attachment, Bates-stamped CBS 7865 to 7867, marked for identification.)

Q. So what's been marked as Exhibit 15 is a cover email from Ms. Balducci to Ms. Glasgow and an attachment bearing Bates number CBS 7865 to 7867.

Let me know once you've had a chance to look at it, Ms. Glasgow.

Glasgow

(Pause.)

A.    Okay.

Q.    Starting that first page, the cover email.  The email from Ms. Balducci to you states that attached is the investigation closure letter to support Alex Poolos's separation from CBS News.

Do you see that?

A.    I do.

Q.    And was an investigation closure letter standard or typical when HR conducted investigations?

ATTORNEY LYNCH:  Objection.

A.    It depended on the nature of the investigation, but it was not uncommon to have one.

Q.    And did you ask Ms. Balducci to prepare the investigation closure letter?

A.    I don't recall.

Q.    Do you know if anyone did or if Ms. Balducci just did it on her own?

A.    I don't know.  My guess is she did not do it on her own, probably got some advice, but I don't know for sure.

Q.    It says in the second sentence:  Bill,

Glasgow

Tanya, and Danya have approved this letter.

Do you see that text?

A.    Hold on.

Q.    Sure.

A.    Is it in the cover --

Q.    Yep, the second sentence.

A.    Oh, yeah.  I see that.

Q.    Is it your understanding at the time this was sent to you that a decision to fire Ms. Poolos had already been made?

A.    It looks like it.

Q.    And were you involved at all in discussing the investigation closure letter with Bill Owens, Tanya Simon, or -- Bill Owens or Tanya Simon?

A.    I believe I was involved in discussing it with Bill.  I don't remember discussing it with Tanya.

Q.    And what was your discussion with Mr. Owens?

A.    I can't remember.

Q.    You don't remember any parts of it?

A.    Honestly, I don't remember.  Probably reviewing this and giving our point of view that

Glasgow

termination was the right decision, but I do not remember the conversation specifically.

Q.    And in the next paragraph Ms. Balducci writes, Unless you have concerns, Bill and I will speak with Alex this week to close the investigation and message her termination.

Do you see that text?

A.    I do.

Q.    Did you express any concerns to Ms. Balducci about the closure letter that's attached to Exhibit 15?

A.    I don't believe so.

Q.    And if you look at the attachment, it's dated January 26th, 2022, to Ms. Poolos from Renee Balducci.  Did you review this document around the time it was sent to you?

A.    I believe so.

Q.    Did you have any role in drafting this document?

A.    Not that I recall.

Q.    Did you make any suggested edits or revisions?

A.    Not that I recall.

Q.    And if you disagreed with anything that

Glasgow

Ms. Balducci had put in the letter, would you have said so to Ms. Balducci?

ATTORNEY LYNCH: Objection.

A. If I had reviewed it and something -- and I had input or disagreement with something in it, I probably would have raised that with her.

Q. Did you speak to Ms. Balducci about Tanya Simon's view of whether firing Ms. -- strike that.

Did you ever have a conversation with Ms. Balducci about Tanya Simon's view of firing Ms. Poolos?

A. I don't remember.

Q. If you take a look in the closure letter, in the third paragraph it says, Based on the investigation, we substantiated that company policies were violated.

Do you see that?

A. I do.

Q. Specifically it was corroborated that after you were counseled about your bullying conduct toward the AP you then made negative statements about the AP and her performance...

Do you see that text?

Glasgow

A.    I do.

Q.    ...as well as negative comments about the AP speaking to HR about her concerns...

Do you see that text?

A.    I do.

Q.    ...including but not limited to expressing disappointment about the AP's reporting her concerns and your lack of trust in her as a result.

Do you see that text?

A.    I do.

Q.    Then Ms. Balducci writes in this letter:  This conduct violates the company's nonretaliation policy which protects an employee's right to raise a good faith complaint to human resources.

Do you see that text?

A.    I do.

Q.    And did you agree that the findings of the investigation supported the conclusion that Ms. Poolos had violated the nonretaliation policy?

A.    I did.

Q.    And was that based on anything other than what you've testified to today?

Glasgow

A.   I don't know.  Like I said, there might have been other conversations that I had with Renee that had more context.  I do not remember.

Q.   But there's nothing you can recall; correct?

A.   There's nothing that I can recall right now specifically.

Q.   Is there anything you think would refresh your memory about anything you're not able to recall right now?

A.   Not that I can think of, no.

Q.   Okay.  Then the letter says, and to have such complaint be kept confidential to the extent reasonably possible.

Do you see that text?

A.   I do.

Q.   Do you believe, based on the findings of the investigation that you're aware of, that Ms. Poolos violated the -- I don't know -- requirement or practice of keeping complaints confidential to the extent reasonably possible?

ATTORNEY LYNCH:  Objection.

A.   It became apparent during the investigation that she had discussed the complaint

Glasgow

with other people.

Q.     And do you know whether Ms. Poolos was ever told before she discussed the complaint with Mr. Bronstein as to whether to keep the complaint confidential?

ATTORNEY LYNCH:  Objection.

A.     My assumption was that she was.  I didn't do it, so I don't know for sure.

Q.     And what was your assumption based on?

A.     How we would normally handle these sorts of matters.

Q.     And when you say that, what do you mean?

A.     I mean that most of the time when we're investigating employee complaints we advise all people involved in the investigation to keep the matter confidential.

Q.     And do you know at the time that Ms. Poolos was communicating with Mr. Bronstein was there an investigation underway?

A.     We had -- Renee had looked into a complaint by Ms. Richards about Ms. Poolos.

Q.     And as of the time Ms. Poolos spoke to Mr. Bronstein, your knowledge is -- you don't know

Glasgow

whether Ms. Poolos had had a conversation with HR by that time?

A. Sorry.

Q. Say it again?

A. Yes, please.

Q. Do you know if Ms. Poolos had had a conversation with HR at the time she spoke to Mr. Bronstein?

A. I don't know. I was more focused in this on the retaliation and the not being truthful in the investigation. That was more of what I'm recollecting about the findings of the investigation.

Q. So your focus was not on whether Ms. Poolos had kept the complaint confidential?

A. I just don't remember having specific conversations focused on that topic.

Q. But you didn't object to it being included in this letter; correct?

ATTORNEY LYNCH: Objection.

A. Not that I recall.

Q. Then the letter says, Finally, we determined that you were not truthful during the investigation. All employees are required to be

Glasgow

truthful and forthcoming in an investigation, and that is particularly important for anyone in a supervisory position.

Do you see that text?

A.    I do.

Q.    And I read it correctly?

A.    I believe so.

Q.    And outside of what you've testified to today, is there any basis -- other basis to believe that Ms. Poolos was not truthful during the investigation?

A.    It was a long time ago.  I can't recall every conversation and everything I heard about this matter.  I'm not recalling anything else at the moment.  But I can't say for sure that there wasn't more that went into at least my conclusion on that topic.

ATTORNEY IADEVAIA:  I think that is it but let me just talk.  We'll be two minutes.

(Recess taken from 6:24 to 6:31.)

(Continued on following page.)

Glasgow

ATTORNEY IADEVAIA:  We have no further questions.  Thank you very much.

ATTORNEY LYNCH:  And defendants have no questions.

(Time noted:  6:31 p.m.)

_____

CYNTHIA GLASGOW

Subscribed and sworn to before me this ___ day of _____ 2025.

_____

C E R T I F I C A T E

STATE OF NEW YORK          )

                           : ss.

COUNTY OF NEW YORK         )


        I, LAURIE A. COLLINS, a Registered Professional Reporter and Notary Public within and for the State of New York, do hereby certify:

        That CYNTHIA GLASGOW, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

        I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto set my hand this 21st day of February 2025.


                    LAURIE A. COLLINS, RPR

- - - - - - - - - I N D E X - - - - - - - - - - -

WITNESS:                EXAMINATION BY:          PAGE
Cynthia Glasgow    Attorney Iadevaia                3

- - - - - - - - - E X H I B I T S - - - - - - - -
GLASGOW NO.          DESCRIPTION          PAGE

Exhibit 1 , document, Bates-stamped CBS     93
7886
Exhibit 2 , global business conduct         117
statement for ViacomCBS, Bates-stamped
CBS 7611 through 7663
Exhibit 3 , CBS nondiscrimination and       119
antiharassment policy, Bates-stamped
CBS 7098 through 7102
Exhibit 4 , position statement from         120
Davis Wright
Exhibit 5 , spreadsheet, Bates-stamped      169
CBS 43
Exhibit 6 , emails, Bates- stamped CBS      218
7818 to 7819
Exhibit 7 , emails, Bates- stamped CBS      225
3241
Exhibit 8 , emails, Bates- stamped CBS      229

3828 to 3249

Exhibit 9 , email with attachments,        243

Bates-stamped CBS 7827 to CBS 7857

Exhibit 10 , email with attachment,        268

Bates-stamped 748 to 49

Exhibit 11 , email with attachment,        270

Bates-stamped CBS 7850

Exhibit 12 , email with attachment,        272

Bates-stamped 52 to 54

Exhibit 13 , email with attachment,        273

Bates-stamped CBS 7851 to 54

Exhibit 14 , email                          275

Exhibit 15 , email with attachment,        282

Bates-stamped CBS 7865 to 7867

- - - - - - - E R R A T A   S H E E T - - - - - -

CASE:  Poolos v. Paramount Global
DEPOSITION DATE:  February 11, 2025
DEPONENT:  Cynthia Glasgow

PAGE/LINE(S)            CHANGE                    REASON

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____

____/_____/_____/_____



                    _____
                          CYNTHIA GLASGOW
SUBSCRIBED AND SWORN TO BEFORE ME
THIS_____DAY OF_____, 2025.


_____    _____
NOTARY PUBLIC            DATE COMMISSION EXPIRES

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS

## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.