# EXHIBIT M

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

————————————————————

ALEXANDRA POOLOS,

      Plaintiff,

  v.                        Case No.

PARAMOUNT GLOBAL; CBS          23 Civ. 08896 (GW)

BROADCASTING, INC.; and CBS    (HJR)

NEWS, INC.,

      Defendants.

————————————————————

VIDEOTAPED DEPOSITION OF

30(b)(6) CORPORATE REPRESENTATIVE FOR

CBS NEWS, INC. - RENEE BALDUCCI

DATE:         Monday, June 2, 2025

TIME:         11:53 a.m.

LOCATION:     Remote Proceeding

               Massapequa, NY 11758

REPORTED BY:  Ralph Fornoles

               Jessica Moy

JOB NO.:      7407160

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF ALEXANDRA POOLOS:

    JAMES BAGLEY, ESQUIRE (by videoconference)

    Vladeck Raskin & Clark P.C.

    111 Broadway

    New York, NY 10006

    jbagley@vladeck.com

    (212) 403-7300


    JEREMIAH J. IADEVAIA, ESQUIRE (by

    videoconference)

    Vladeck Raskin & Clark P.C.

    111 Broadway

    New York, NY 10006

    jiadevaia@vladeck.com

    (212) 403-7323


    BRANDON WHITE, ESQUIRE (by videoconference)

    Vladeck Raskin & Clark P.C.

    111 Broadway

    New York, NY 10006

    bwhite@vladeck.com

    (212) 403-7300

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANTS PARAMOUNT GLOBAL; CBS

BROADCASTING, INC.; AND CBS NEWS, INC.:

LYLE ZUCKERMAN, ESQUIRE (by videoconference)

Davis Wright Tremaine LLP

1251 Avenue of the Americas, 21st Floor

New York, NY 10020

lylezuckerman@dwt.com

MICHAEL LEONE LYNCH, ESQUIRE (by

videoconference)

Davis Wright Tremaine LLP

1251 Avenue of the Americas, 21st Floor

New York, NY 10020

michaellynch@dwt.com

(212) 489-8230

ALSO PRESENT:

Alexandra Poolos, Plaintiff

Lee Bowry, Videographer, Cambridge Video

Productions (by videoconference)

                         I N D E X

EXAMINATION:                                    PAGE

     By Mr. Bagley                              10


                        E X H I B I T S

NO.                 DESCRIPTION                 PAGE

30(b)(6):

Exhibit 1        30(b)(6) Court Order        14

Exhibit 2        Affidavit of Jennifer Baker  22

Exhibit 3        Affidavit of Renee Balducci  22

Exhibit 4        Bates Stamps CBS 8245-8286   61

Exhibit 5        CBS Staff Agreement, Bates

                 Stamps CBS 8807-8818         68


          QUESTIONS INSTRUCTED NOT TO ANSWER

                    PAGE        LINE

                     23          23

                     24          11

                     31           8

                     32           8

                     32          15

                     32          23

                     34          10

                     34          18

                     35           2

I N D E X (Cont'd)

QUESTIONS INSTRUCTED NOT TO ANSWER (Cont'd)

| PAGE | LINE |
|------|------|
| 35 | 10 |
| 36 | 10 |
| 38 | 25 |
| 42 | 13 |
| 42 | 20 |
| 44 | 7 |
| 45 | 15 |
| 46 | 12 |
| 47 | 22 |
| 59 | 16 |
| 59 | 25 |
| 60 | 7 |
| 60 | 11 |
| 60 | 19 |
| 61 | 2 |
| 61 | 7 |
| 64 | 8 |
| 65 | 9 |
| 65 | 20 |
| 66 | 16 |
| 66 | 25 |
| 67 | 9 |

I N D E X (Cont'd)

QUESTIONS INSTRUCTED NOT TO ANSWER (Cont'd)

| PAGE | LINE |
|------|------|
| 67 | 15 |
| 67 | 19 |
| 68 | 2 |
| 68 | 25 |
| 69 | 23 |
| 70 | 6 |
| 70 | 14 |
| 71 | 7 |
| 71 | 17 |
| 71 | 24 |
| 72 | 15 |
| 72 | 22 |
| 73 | 4 |
| 73 | 9 |
| 73 | 15 |
| 74 | 2 |
| 75 | 19 |
| 76 | 24 |
| 77 | 7 |
| 77 | 17 |
| 82 | 21 |
| 83 | 2 |

I N D E X (Cont'd)

QUESTIONS INSTRUCTED NOT TO ANSWER (Cont'd)

| PAGE | LINE |
|------|------|
| 88 | 4 |
| 88 | 20 |
| 89 | 9 |
| 89 | 14 |
| 89 | 19 |
| 89 | 24 |
| 90 | 12 |
| 91 | 13 |
| 91 | 20 |
| 91 | 25 |
| 94 | 11 |
| 96 | 6 |
| 96 | 12 |
| 96 | 19 |
| 99 | 17 |

R. BALDUCCI

THE REPORTER: Good morning. My name is Ralph Fornoles. I'm the reporter assigned by Veritext to take the record of this proceeding. We are now on the record at 11:53 a.m.

This is the deposition of Renee Balducci, taken in the matter of Alexandra Poolos vs. Paramount Global and others on June 2, 2025.

I'm a notary authorized to take acknowledgements and administer oaths in the state of New York. Parties agree that I will swear in the witness remotely.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

R. BALDUCCI

- shall constitute written stipulation of such.

At this time, will everyone in attendance please identify yourself for the record?

MR. BAGLEY: Yes. My name is James Bagley from the law firm Vladeck Raskin & Clark.

I'm here with my colleagues Brandon White and Jeremiah Iadevaia, also of the law firm Vladeck Raskin & Clark.

And also in the room with us is the plaintiff in this matter, Alexandra Poolos.

MR. ZUCKERMAN: Lyle Zuckerman from the law firm of Davis Wright Tremaine on behalf of the defendants. And I'm attending with my colleague, Michael Lynch.

THE VIDEOGRAPHER: Lee Bowry, videographer with Veritext.

MS. BALDUCCI: Renee Balducci, Paramount Global.

THE REPORTER: Michael, if you could

R. BALDUCCI

just identify yourself again.

MR. LYNCH: And Michael Lynch of Davis Wright Tremaine for the defendants.

THE REPORTER: Thank you. And I'm Ralph Fornoles. I'm the court reporter.

Hearing no objection, I will now swear in the witness.

Renee, if you could just please raise your right hand visibly on the screen. Thank you.

WHEREUPON,

RENEE BALDUCCI, called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: Thank you.

You can proceed, Counsel.

THE WITNESS: Sure.

EXAMINATION

BY MR. BAGLEY:

Q    Hi, Ms. Balducci. Like I just said, my name is James Bagley. Thank you for being here.

R. BALDUCCI

Can you confirm for me your current title?

A    Sure.  My title -- my title is Vice President Human Resources for Paramount Global.

Q    And are you human resources for a particular division or business unit under Paramount Global?

A    I am, yes.

Q    And what is that?

A    Presently I support the advertising sales division.

Q    And how long have you worked for Paramount Global?

A    For Paramount Global, well, about 17 years in totality.  That was in three different stints.

Q    Okay.  And in the most recent stint?

A    Most recently I rejoined the company in March of 2022.

Q    Okay.  And in what role were you when you rejoined in in March of 2022?

A    I was the Vice President of

R. BALDUCCI

Human Resources for CBS News and Stations.

Q    Okay.  And today you are testifying as a corporate representative of CBS News, Inc.  Do you know what that means?

A    I do.  And that's correct.

Q    And if I ask you any questions that you feel you can't answer in a representative capacity on behalf of CBS, will you let me know?

A    I will, yes.

Q    Did you do anything to prepare for this deposition?

A    I had a meeting with my counsel.

Q    How many times?  Just the one?

A    One.

Q    And when was that?

A    Friday, last Friday.

Q    And about how long did that meeting last?

A    I don't -- I don't recall specifically.  Maybe an hour or so.

Q    Was that in person, via Zoom?  How did that meeting take place?

R. BALDUCCI

A     That was via Zoom.

Q     And who was on the Zoom call with you?

A     Lyle Zuckerman and Michael Lynch.

Q     Anybody else?

A     Danya Ahmed was joined for part of our call.

Q     Did you meet with anybody at CBS to prepare for this deposition?

A     I did not.

Q     Did you consult with anybody else in order to prepare for this deposition?

A     No, absolutely not.

Q     Did you review any documents in preparation for this deposition?

A     Only the affidavits.

Q     Understood.  And is there anybody in the room with you now?

A     There is not.

Q     Are you looking at any documents right now?

A     I have the affidavits handy

R. BALDUCCI

should I need them.

Q    Understood.  Okay.  I would like to mark as 30(b)(6) Exhibit 1 a court order dated April 7, 2025.

        (30(b)(6) Exhibit 1 was marked
        for identification.)

        Can you please let me know when you can see that in Exhibit Share?

A    Okay.

Q    It may be in the other folder, if you remember.  There were two links this morning.  I think it will be in the separate folder if that makes sense.

A    Hang on a second.  I'm trying to figure out what this is.  I don't -- hold on a second.  I don't -- I'm not supposed to have this; am I?

Q    You should.  In the -- one of the two folders that you received access to this morning, this should be visible to you.

A    All right.  So I had to move on to some other calls.  I don't have that immediately in front of me.  I'm trying to

R. BALDUCCI

see if I can find that link.

Q    That's good.  Can -- you can take your time.

MR. BAGLEY:  Lyle, can you see it?

MR. ZUCKERMAN:  I can see it on the screen, yeah.

MR. BAGLEY:  Do you know if you have access to it in Exhibit Share?  I'm trying to figure out if --

MR. ZUCKERMAN:  I have access to nothing in my Exhibit Share.

MR. BAGLEY:  Can you check again please?  I'm sorry.  I just -- I want to be sure that this isn't a tech issue and this is just --

MR. LYNCH:  No, this is Michael.  I have it in my Exhibit Share.

MR. BAGLEY:  Thanks, Michael.

THE WITNESS:  Okay.  It just came through for me.  I -- I was able to get it.  I'm ready to proceed.

BY MR. BAGLEY:

Q    Great.  Thank you.  Okay.  So now you can see the document?

R. BALDUCCI

A   Yes.

Q   Okay.  All right.  Have you seen this document before?

A   I don't -- I don't think so.  I mean, maybe I -- I don't know.  I'd have to look at it closely.

Q   Well, I am representing to you that it is a court order, as I said, dated April 7, 2025.  And it sets forth the scope of today's 30(b)(6) deposition.  Is that okay?

A   Okay.  Yeah.

Q   If you can go to page 2, please, you'll see a paragraph numbered 1.  And it says "Defendant shall provide a 30(b)(6) witness on whether there was any written guidance as referenced in the agreement with the New York Attorney General's Office."  Do you see that?

A   Yes.

Q   Did I read that correctly?

A   Yes, I see it.

Q   Are you prepared to testify on that topic?

R. BALDUCCI

A    Yes, I am.

Q    And the next paragraph, paragraph 2, "Defendant shall provide a 30(b)(6) witness on whether there were any guidelines, policies, or procedures for investigating complaints as referenced in the agreement with the New York Attorney General's Office."  Do you see that?

A    Yes, I do.

Q    And are you prepared to testify on that topic?

A    I am.

Q    Okay.  Next, on page 3, paragraph 6, "Defendant shall provide a 30(b)(6) witness on whether Defendants have provided all complaints against Radutzky, Levine, Croxton, and Richman within the relevant timeframe established in previous discovery disputes and, if so, a general description of the efforts made to find any such complaints."

Do you see that text?

A    I do.

Q    And are you prepared to testify

R. BALDUCCI

on that topic?

A    I am.

Q    And the next one, number 7, "Defendant shall provide a 30(b)(6) witness on whether the named comparators receive severance upon their respective terminations and, if so, the material terms of such severance."  Do you see that?

A    I do.

Q    And are you prepared to testify on that topic?

A    I am.

Q    Next, number 8, "Defendant shall provide a 30(b)(6) witness on when Plaintiff's company phone was wiped of data unless they provide a satisfactory sworn affidavit providing such information beforehand."  Are you prepared to testify on that topic?

A    I am.

Q    Next on page 4, paragraph number 10, "The parties are directed to meet and confer regarding a stipulation concerning

R. BALDUCCI

the foundation for and authenticity of Defendant's position statements to the Equal Opportunity" -- Equal -- it should say "Equal Employment Opportunity Commission."

But it says "Equal Opportunity Employment Commission." Do you see that?

A    Yes.

Q    Are you prepared to testify on that topic?

A    Yes.

Q    Next, topic 11, "Defendant shall provide a 30(b)(6) witness to describe certain information about the separations of Ms. V and Ms. G, i.e., the dates of their separations, the general nature of the separations, and the decision makers involved unless they provide a satisfactory sworn affidavit providing such information beforehand."

Do you see that text?

A    I do.

Q    And are you prepared to testify on that topic?

R. BALDUCCI

A    Yes.

Q    Next, topic 12, "Defendant shall provide a 30(b)(6) witness to identify the 60 Minutes and 60 Minutes+ employees referenced in Exhibit H to Plaintiff's Letter Motion, ECF Number 107 at 153 to 73, unless they provide a satisfactory sworn affidavit providing such information beforehand."

Do you see that text?

A    I do.

Q    And are you prepared to testify on that topic?

A    Yes.

Q    And last, topic 13, "The parties are directed to meet regarding a stipulation concerning foundation for and authenticity of the agreement between CBS and the New York Attorney General."

Do you see that text?

A    Yes.

Q    And are you prepared to testify on that topic?

MR. ZUCKERMAN:  Objection.

R. BALDUCCI

THE WITNESS: Yeah.

Sorry.

MR. ZUCKERMAN: With respect to topics 10 and 13, those aren't topics for testimony. That's a direction to the parties to meet and confer regarding certain matters.

MR. BAGLEY: I understand that. But the idea of meet and confer was to resolve those 30(b)(6) topics via stipulation.

We have sent a draft. It's the last day of discovery. And we have not gotten any indication as to whether the drafts are acceptable.

And since we have the witness here, we thought maybe we could just do it this way.

MR. ZUCKERMAN: All right. Well, our -- my objection stands. Those aren't topics for today's 30(b)(6) deposition in the company's view.

BY MR. BAGLEY:

Q Okay. Next, I would like to introduce 30(b)(6) Exhibit 2.

R. BALDUCCI

(30(b)(6) Exhibit 2 was marked for identification.)

This is an affidavit of Jennifer Baker.  Can you please let me know when you can see it in Exhibit Share?

A    Okay.  It just came through.

Q    Okay.  And I believe you testified earlier that you also have this document in front of you; is that correct?

A    I have this document, yes.

Q    And is everything set forth in this document truthful and accurate?

A    It is.

Q    Okay.  Next I would like to introduce 30(b)(6) Exhibit 3, which is an affidavit by you, Ms. Balducci.

(30(b)(6) Exhibit 3 was marked for identification.)

And again, can you please let me know when you can see that document in Exhibit Share?

A    Yeah.  Okay.  I have it up.

Q    Great.  And as this is an affidavit by you, I assume you're familiar

R. BALDUCCI

with this document?

A    I am.

Q    And is everything set forth in this document truthful and accurate?

A    It is.

Q    Does CBS have a team known as the employee relations team?

MR. ZUCKERMAN:  Objection.  Outside the scope of the 30(b)(6) notice.

I will allow the deponent to answer this question.

THE WITNESS:  Yes, they do.

BY MR. BAGLEY:

Q    What is the role of the employee relations team?

MR. ZUCKERMAN:  Objection.  It's outside the scope of the 30(b)(6) notice. I gave you some latitude to try to figure out perhaps whether there was some relation to one of the questions here. But I don't see it.

I'm instructing the witness not to answer.

And when I say the 30(b)(6) notice, I

R. BALDUCCI

take that back.  It's outside the scope of the protective order issued by Magistrate Judge Ricardo, which is Exhibit 1 in this 30(b)(6) deposition.

BY MR. BAGLEY:

Q    Who determines when the employer relations team is used?

MR. ZUCKERMAN:  Objection.  Outside the scope of the protective order.

I'm instructing the witness not to answer.

MR. BAGLEY:  Topic 1 of the protective order is whether there's any written guidance on when and how the employee relations team is deployed.  I think this is just foundational for asking those questions.

MR. ZUCKERMAN:  My instruction stands.  You can ask the question whether there was any written guidance.

MR. BAGLEY:  I will get there.  Thank you.

MR. ZUCKERMAN:  That's the question that is -- the protective order is limited

R. BALDUCCI

to that question.  That's the question you can ask.

It's also, as with I think every other item in the protective order, 1, 2, 3, 6, 7, 8, 11 and 12, responded to by one of the two affidavits that we provided on behalf of the company, including attachments to those affidavits, which are the documents that some of the protective order items are in reference to, which we were not -- which the company was not required to produce, yet we produced them as attachments to the affidavits.

BY MR. BAGLEY:

Q    Is there written guidance on how the employee relations team is used?

MR. ZUCKERMAN:  Objection.

You can answer that question, Ms. Balducci, to the extent that it's as referenced in the agreement with the New York Attorney General's Office.

THE WITNESS:  The company does -- doesn't possess a written policy written specifically on how -- on employee

R. BALDUCCI
discipline and corrective action.

MR. ZUCKERMAN:  That wasn't the question, Ms. Balducci.

BY MR. BAGLEY:

Q    Is there any written guidance on how the employee relations team is deployed?

A    No.  Nothing that I've seen that provides any specificity on how the employee relations team is deployed.

Q    Is there any written guidance on when the employee relations team is deployed?

MR. ZUCKERMAN:  I couldn't hear the question.  I apologize.

BY MR. BAGLEY:

Q    Is there any written guidance on when the employee relations team is deployed?

A    Not that I have seen.

Q    Okay.  We can go to Exhibit 2, please, on -- I believe it's page 2, paragraph 6 of Ms. Baker's affidavit.

I'm going to skip to the middle.

R. BALDUCCI

But it says "Protocols for HR investigations including guidance on when and how the employee relations team will be deployed" -- and then in parentheses -- "(at CBS 009278 to CBS 009396), referenced in the September 25, 2020, letter agreement with the New York Attorney General's Office."

Do you see that?

A    Yes.  What is your question?

Q    My question is, does this refresh your recollection on whether there is any guidance on how the employee relations team is deployed?

A    So I am aware that there's the Viacom Global Business Practice statement that's referenced here.  Yes.  And that it has -- it does include protocols for investigations.  Yes.

Q    And does it include guidance on when and how the employee relations team will be deployed?

A    It does.

Q    Can you tell me where in that

R. BALDUCCI

document that guidance is located?

MR. ZUCKERMAN:  Objection.  Outside the scope of the protective order.

MR. BAGLEY:  What?  How?

MR. ZUCKERMAN:  The answer -- the question -- the protective order says quite specifically that there's a witness to be provided on whether there's written guidance.

Ms. Balducci told you there was written guidance.  It's also set forth in paragraph 6 of the Baker affidavit to which you're referring -- and there are Bates Stamp numbers -- referencing a document there.

MR. BAGLEY:  Which is different than the document that Ms. Balducci just identified as containing the written guidance.

BY MR. BAGLEY:

Q    So I guess I'm asking does that document also include guidance that is separate from the guidance referenced in Ms. Baker's affidavit?

R. BALDUCCI

A   There are multiple documents -- there are multiple documents that speak to protocols for HR investigations.

Let me actually take a closer look at the affidavit.  Right.  There's the -- we've got a Global Business Practices statement that touches on this.  We've got an EEO policy.

What -- what is the question?  Is -- is there a question?

Q   Yes.  The question is, is there guidance in the Global Business Practices statement on when and how to deploy the employee relations team?

MR. ZUCKERMAN:  Objection.

MR. BAGLEY:  Sorry.  Are you directing her not to answer?

MR. ZUCKERMAN:  I'm not.

THE WITNESS:  Hang on.  There's another document -- there is another document.

I'm not -- I'm not sure exactly.  The CBS 009278, is that the document you're

R. BALDUCCI

talking about?

MR. ZUCKERMAN: If you need to reference the documents, read the documents.

THE WITNESS: Yeah. Give me a second guys.

BY MR. BAGLEY:

Q Okay. So is your testimony that there is written guidance on how -- when and how to employ -- deploy the employee relations team in the document referenced here, CBS 009278 to CBS 009396?

A Yes. That's my testimony.

Q Okay. If we can go to that document, I believe it should be -- should start on page 266 of the exhibits to the -- sorry. Two eight.

Do you recognize what this document is, Ms. Balducci?

A Yes.

Q And what is it?

A This is a -- this is a company training. It's the 009278 that we just discussed.

R. BALDUCCI

Q    And where in this document does the training provide guidance on how to employ the -- deploy the employee relations team?

MR. ZUCKERMAN:  Objection.  It's outside the scope of the protective order.

I'm instructing the witness not to answer.

We obviously have a fundamental disagreement about this judicial order. I'm happy to have a discussion with you all off the record so we don't take up the record about it and see if we can't --

MR. BAGLEY:  Yes, that makes sense. Can we do that?

MR. ZUCKERMAN:  Yeah, let's do that.

THE VIDEOGRAPHER:  All right.  Going off the record.  The time is 12:17 p.m.

(Off the record.)

THE VIDEOGRAPHER:  Back on the record.  The time is 12:42 p.m.

BY MR. BAGLEY:

Q    Okay.  Where in the document does it provide guidance on how to

R. BALDUCCI

employ -- deploy the employee relations team?

MR. ZUCKERMAN: Objection.

THE WITNESS: Okay.

MR. ZUCKERMAN: Objection. Outside the scope of the protective order.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q    Where in the document does the training provide guidance on when to deploy the employee relations team?

MR. ZUCKERMAN: Same objection.

Same instruction.

BY MR. BAGLEY:

Q    Is there any other written guidance on when to deploy the employee relations team?

MR. ZUCKERMAN: One second. Objection. Outside the scope of the protective order.

I'm instructing the witness not to answer.

//

R. BALDUCCI

BY MR. BAGLEY:

Q    This training we've discussed, was this turned over to the Attorney General's Office?

A    Okay.  So hello, I'm coming back here.  I want to make sure I'm answering the question that you asked.

I want to correct my answer that you had asked me before 'cause I think I gave you a confusing answer.  I think I was -- I was kind of answering a different question.

So the protocols for HR investigations, including guidance on how the employee relations team will be deployed, that is the document that we then eventually got to, which is the 009278.  That's the Proskauer training, just so we're all on the same page.

And that's within -- that's noted within the Jen Baker affidavit.

Q    Understood.  Okay.  So yeah.  So we're talking about the Proskauer training.  Was that training turned over

R. BALDUCCI

to the Attorney General's Office?

A    It absolutely was.

Q    Did the Attorney General's Office review the guidance on how to deploy the employee relations team?

MR. ZUCKERMAN:  Objection.  Several objections, but one of which is outside the scope of the protective order.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q    Did the Attorney General's office approve of the guidance on how to deploy the employee relations team?

MR. ZUCKERMAN:  Objection.  Outside the scope of the protective order.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q    Did the Attorney General's Office review the guidance on when to deploy the employee relations team?

MR. ZUCKERMAN:  Objection.  Outside the scope of the protective order.

R. BALDUCCI

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q    Did the Attorney General's Office approve the guidance on when to deploy the employee relations team?

MR. ZUCKERMAN:  Objection.  Outside the scope of the protective order.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q    Moving to topic 2 that we discussed earlier, does CBS have trainings or protocol for HR investigations?

A    The company has protocols for HR investigations.  And we just talked about that Proskauer training.

Q    That's the Proskauer training as well?

A    If I understood your question correctly.

Q    Just that the protocol for the training related to protocol for HR investigations is the Proskauer training

R. BALDUCCI

we've been discussing?

A     Protocols for HR investigations. Yes.

Q     Are there any written guidelines, policies, or procedures for investigations outside of this training?

MR. ZUCKERMAN:  Objection.  Outside the scope of the protective order.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q     Does someone named David Levine work at 60 Minutes?

A     One moment, please.

MR. ZUCKERMAN:  Which subject is this, James?

MR. BAGLEY:  This is 6.

MR. ZUCKERMAN:  Are you asking if that person's currently an employee or ever was an employee?

MR. BAGLEY:  Ever was, I guess.

THE WITNESS:  And the person you're asking about, who is this person you're asking about?

R. BALDUCCI

BY MR. BAGLEY:

Q    David Levine.

A    Is David Levine referenced in one of these affidavits?

MR. ZUCKERMAN:  Don't think to your -- don't think out loud, please. Think to yourself.

THE WITNESS:  You guys are going to have to give me a minute here.

MR. ZUCKERMAN:  Take your time.

BY MR. BAGLEY:

Q    We can go to Exhibit 3 on page 4, paragraph 38:  "The company is not aware of any non-privileged documents sufficient to show complaints against Mr. Radutzky, Mr. Levine, Mr. Croxton, or Mr. Richman within the timeframe established by the Court other than documents that have already been produced by Defendants."

Do you see that?

A    Where -- where are you looking?

Q    This is Exhibit 3, your affidavit, on paragraph 38.

MR. LYNCH:  Is it possible to share

R. BALDUCCI

it on the screen?

MR. BAGLEY: Yeah, we're working on that. Sorry.

While we're waiting, can we ask if we can get a rough of this today, this transcript?

THE REPORTER: I'm going to make a note of that.

You can proceed, Counsel.

MR. BAGLEY: Thank you.

THE WITNESS: Okay. You're asking me about who again? You're asking me about --

BY MR. BAGLEY:

Q David Levine.

A David Levine? Okay. Yes, there is a David Levine that was an employee of CBS News.

Q Have there been any complaints against Mr. Levine between January 1, 2016, and the present?

MR. ZUCKERMAN: Objection. Outside the scope of the 30(b)(6) notice.

I'm instructing the witness not to

R. BALDUCCI

answer.

BY MR. BAGLEY:

Q    Did CBS search for documents reflecting complaints against Mr. Levine between January 1, 2016, and the present?

MR. ZUCKERMAN:  You can answer.

THE WITNESS:  Yes.  The company did.

BY MR. BAGLEY:

Q    What did the company do to search for complaints against Mr. Levine?

A    A number of things.  The company requested documents from the HR business partner team.

The company requested documents from the management of 60 Minutes.  The company requested the personnel files. The company requested and searched -- searched internal databases.

Q    Was one of those internal databases EthicsPoint?

A    You're asking me about a specific database?

Q    Yes.

A    And say it again.  What is the

R. BALDUCCI

database you're asking about?

Q    EthicsPoint.

A    EthicsPoint.  Is there a
document that I can reference where the
company has confirmed exactly -- exactly
which systems they used?

MR. ZUCKERMAN:  If you don't recall
which one or don't know, just say, "I
don't recall," or "I don't know."

We could always supplement an
affidavit or have you supplement your
testimony.

THE WITNESS:  Yeah, I don't want
to -- I don't want to speak out of turn.
I'm not -- I'm not sure exactly if that
was the name of the system.

BY MR. BAGLEY:

Q    Did CBS locate any documents
reflecting complaints against Mr. Levine
between January 1, 2016, and the present?

A    We did not.

Q    Did CBS locate any privileged
documents reflecting or sufficient to show
complaints against Mr. Levine that were

R. BALDUCCI

not produced because of that privilege?

A    No.

MR. ZUCKERMAN:  Objection.

BY MR. BAGLEY:

Q    Has someone named Will Croxton ever worked at CBS?

A    Yes.

Q    Have there been any complaints against Mr. Croxton between January 1, 2016, and the present?

MR. ZUCKERMAN:  Objection.

BY MR. BAGLEY:

Q    Did CBS search for documents reflecting complaints against Mr. Croxton?

MR. ZUCKERMAN:  You can answer.

THE WITNESS:  Yes.

BY MR. BAGLEY:

Q    And what did CBS do to search for complaints against Mr. Croxton?

A    A multitude of things. We -- the -- the company requested information from the HR team, the 60 Minutes management team, personnel files, internal databases, ESI documents.

R. BALDUCCI

Q    Are you reading from your affidavit and answering that question?

A    I am.  I want to make sure I get it right.  And we've gone to such length to put this together.

Q    Did CBS locate any documents reflecting complaints against Mr. Croxton between January 1, 2016, and the present?

MR. ZUCKERMAN:  Objection.

MR. BAGLEY:  Are you directing her not to answer?

MR. ZUCKERMAN:  I am.

BY MR. BAGLEY:

Q    Did CBS locate any privileged documents reflecting or sufficient to show complaints against Mr. Croxton that were not produced because of that privilege?

MR. ZUCKERMAN:  Objection.

I'm instructing her not to answer.

BY MR. BAGLEY:

Q    Has someone named Matthew Richman ever worked at 60 Minutes?

A    Yes.

(Off the record.)

R. BALDUCCI

THE VIDEOGRAPHER: We are back on the record at 1:01 p.m.

MR. BAGLEY: Okay. Pursuant to our discussion off the record, I'm going to re-ask a couple questions.

BY MR. BAGLEY:

Q   Did CBS locate any documents reflecting complaints against Mr. Levine dated between January 1, 2016, and the present?

A   We did not.

Q   Did CBS locate any documents reflecting complaints against Mr. Croxton between January 21 -- January 1, 2016, and the present?

A   They did not.

Q   Did CBS locate any documents reflecting complaints against Mr. Richman between January 1, 2016, and the present?

A   They did not.

Q   And I apologize if I already asked this. But I'm not sure if I did.

Are there any privileged documents reflecting or sufficient to show

R. BALDUCCI

complaints against Mr. Richman that were not produced because of that privilege?

MR. ZUCKERMAN: Objection.

MR. BAGLEY: Are you directing her not to answer?

MR. ZUCKERMAN: Yes.

BY MR. BAGLEY:

Q    Has someone named Michael Radutzky ever worked at CBS?

A    Yes.

Q    Have there been any complaints against Mr. Radutzky between January 1, 2015, and the present?

A    There were not.

Q    Did CBS search for documents reflecting complaints against Mr. Radutzky?

A    Yes, the company did.

Q    What did CBS do to search for complaints against Mr. Radutzky?

A    A host of things including reaching out to the human resources department, requesting documents from the 60 Minutes management team, requesting the

R. BALDUCCI

personnel files, checking databases.

Q    And are you reading from your affidavit when answering that question?

A    I'm referencing it, yes.

Q    Did CBS locate any documents reflecting complaints against Mr. Radutzky between January 1, 2015, and the present?

A    No.

Q    Are there any privileged documents reflecting or sufficient to show complaints against Mr. Radutzky that were not produced because of that privilege?

MR. ZUCKERMAN:  Objection.

Instructing the witness not to answer.

BY MR. BAGLEY:

Q    We can go back to Exhibit 3, which is your affidavit.

Paragraph 38, again, on page 4, it reads "The company is not aware of any non-privileged documents sufficient to show complaints against Mr. Radutzky, Mr. Levine, Mr. Croxton, or Mr. Richman within the timeframes established by the Court

R. BALDUCCI

other than documents that have already

been produced by Defendants."

Did I read that correctly?

A    Yes.

Q    So where you specified

non-privileged documents, are there any

privileged documents that would be

responsive to it?

MR. ZUCKERMAN:  Objection.  Outside

the scope of the protective order.

I'm instructing the witness not to

answer.

BY MR. BAGLEY:

Q    Moving on to topic 7, is Mr.

Levine still employed by CBS?

A    I don't know.  I -- I've -- I

have -- I've moved to a different

division, so I can't answer that.

Q    Is Mr. Croxton still employed by

CBS?

MR. ZUCKERMAN:  Objection.  Outside

the scope.

MR. BAGLEY:  It's not outside the

scope.  Topic 7 allows us to ask whether

R. BALDUCCI

the named comparators have received severance.

And it's relevant to the question of whether they received severance or if they're still employed.

THE WITNESS: They have -- well, okay. So they -- hold on a second. Give me a second. I have a lot of stuff in front of me here.

They are not -- he is not employed.

BY MR. BAGLEY:

Q    Is Mr. Richman still employed by CBS?

MR. ZUCKERMAN: Again, this is outside the scope of the -- I thought maybe you were going somewhere with this that would be responsive or in line, I should say, with the protective order. I don't understand the scope of these in terms of the protected order.

So I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q    Has someone named Shachar Bar-On

R. BALDUCCI

Q    ever worked for CBS?

A    Yes.

Q    Has he received severance from CDS?

MR. ZUCKERMAN:  Objection.

You can answer.

THE WITNESS:  No -- no, he has not.

BY MR. BAGLEY:

Q    Has someone named Michael Gavshon ever worked for CBS?

A    Michael Gavshon?  One moment, please.  Can you say the name again?

Q    Michael Gavshon.

A    I am not familiar off the top of my head with Michael Gavshon.  But that doesn't mean he didn't work for the company.

MR. ZUCKERMAN:  Oh, I was on mute. I'm sorry.

I objected on the basis that it was outside the scope of the 30(b)(6) notice.

BY MR. BAGLEY:

Q    Is Mr. Radutzky still employed by CBS?

R. BALDUCCI

MR. ZUCKERMAN: I apologize. When I said "notice," I meant to say the protective order.

All these questions about who's employed, who's not employed are outside the scope of the protective order.

The question for the witness is limited to whether the named comparators received severance.

They may have received severance and came back to the company. They may have left the company and not received severance.

The question is simply whether they received severance as dictated by the protective order.

MR. BAGLEY: Disagree with your contentions about the scope, and I'm not going to keep repeating that.

I just want it noted for the record that we don't agree that the scope is as limited as you say. But I'll move on.

BY MR. BAGLEY:

Q    Did Mr. Radutzky and CBS reach

R. BALDUCCI

an agreement concerning his departure from the company?

MR. ZUCKERMAN: Objection. Outside the scope of the protective order.

MR. BAGLEY: What? I don't see how that's outside the scope of the protective order.

MR. ZUCKERMAN: Oh, did you say "Radutzky"?

MR. BAGLEY: Yes.

MR. ZUCKERMAN: I apologize. Go ahead.

MR. BAGLEY: Yeah. Okay.

THE WITNESS: Yes, Michael Radutzky did reach an agreement with the company.

BY MR. BAGLEY:

Q And what were the terms of that agreement?

MR. ZUCKERMAN: Objection. That's outside the scope of the protective order plus it's -- the voluntary buyout agreement is exact -- is attached as Exhibit H to Ms. Balducci's deposition. So you have the document, and it speaks

R. BALDUCCI

for itself.

MR. BAGLEY: Topic 7 reads "Defendant shall provide a 30(b)(6) witness on whether the named comparators received severance upon their respective terminations and, if so, the material terms of such severance."

MR. ZUCKERMAN: Yeah. Which we provided the actual document to you as Exhibit H to Ms. Balducci's affidavit. So you have --

MR. BAGLEY: The Court is very clear in its order on which of these topics could be addressed in affidavit form.

This is not one of them. And the document that was provided is redacted with respect to the material terms of the severance. So it does not address the topic.

MR. ZUCKERMAN: What's the question?

MR. BAGLEY: The question is what were the material terms of Mr. Radutzky's severance or agreement with the company concerning his departure.

R. BALDUCCI

THE WITNESS:  You want me to answer this?

MR. ZUCKERMAN:  Take your time.

THE WITNESS:  Yeah, I would want to take a minute to --

MR. ZUCKERMAN:  The exhibit is attached.

THE WITNESS:  -- to pull back up exactly.  I've looked at it, but I would want to reacquaint myself with it.  I know they reached a voluntary buyout agreement.

Okay.  I mean, this is dense -- this is dense.  You're asking me specifically what about the terms?

BY MR. BAGLEY:

Q    We can get more specific if you like.

Was there a monetary payment as part of the terms of that agreement to Mr. --

A    It was a voluntary buyout.

THE REPORTER:  I'm sorry.  To Mr. who?  I'm sorry.  I didn't hear.

MR. BAGLEY:  To Mr. Radutzky.

R. BALDUCCI

THE REPORTER: And your answer, Ms. Balducci?

THE WITNESS: Yes, there was. It was a voluntary buyout.

BY MR. BAGLEY:

Q And how much was the payment to Mr. Radutzky?

A That --

MR. LYNCH: This is --

THE WITNESS: You want me to answer this?

MR. LYNCH: I object. We redacted the amount of severance based on the party's agreement to -- previously to have any compensation including in the personnel files that we produced redacted.

But if we want to talk off the record about whether we could revisit that determination, we'd be happy to.

MR. BAGLEY: I mean, I don't necessarily need you to un-redact it in the document.

I think I'm asking the witness to answer how much it was, which is within

R. BALDUCCI

the scope of topic 7.  I believe the witness should be prepared to answer.

MR. LYNCH:  Again, we redacted that information based on a previous agreement that we reached with you.  But if you want to revisit that agreement that we had with you --

MR. BAGLEY:  Can you tell me what agreement that is?

MR. LYNCH:  Originally back at the beginning of discovery in this case when we originally were given your proposed ESI search terms that resulted in nearly 400,000 documents or hits, we agreed that we would provide certain --

THE VIDEOGRAPHER:  I'm sorry.  We just lost the witness.  Somebody removed the spotlight.  I just need to make an adjustment there.

Was that the court reporter that did that?

THE REPORTER:  I apologize.  It must have been me because I'm having trouble seeing who is speaking at the same time

R. BALDUCCI

because the witness -- I meant to just remove it on my screen alone. I apologize for that.

THE VIDEOGRAPHER: Okay. Thank you.

THE REPORTER: Sorry, Lee.

MR. LYNCH: So as I was saying, when we made an agreement earlier in discovery in this case about comparator discovery including what Defendants would agree to provide, we agreed that we could provide comparative discovery.

But the compensation terms, including in personnel files, would all be redacted.

But if you want to have a discussion outside in the caucus, we'd be happy to do so.

MR. BAGLEY: I can't speak to whether the agreement says what you're claiming it does. I don't know what you're referencing.

But even if it says what you say it does, this is not -- I'm not asking for an unredacted document.

I'm asking for the witness to testify

R. BALDUCCI

in accordance with the scope of what the Court has ordered.

I don't see how whatever agreement you're referencing would supersede this court order.

MR. LYNCH:  Again, you have our response.  So if you want to move along, you can move along.  Or we can have a caucus.

MR. BAGLEY:  Should we just take lunch now?

MR. IADEVAIA:  Yeah.

MR. BAGLEY:  Can we go off the record please?

THE VIDEOGRAPHER:  Going off the record.  The time is 1:15 p.m.

(Off the record.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 2:01 p.m.

MR. BAGLEY:  Okay.  Before I restart the questioning, I just wanted to say, it is clear to us that the witness is not prepared to answer some questions that are within even the scope of the narrowest

R. BALDUCCI

reading of the order.  So -- and it's costing us money to be here.

So what we're prepared to do, if this is what you prefer, is we can adjourn right now for today on the condition that we get an agreement that we will bring the witness back.

We can move jointly for an extension for the limited purpose of completing this deposition.

And then we can get on the phone tomorrow and try to see if we can work out some of these disagreements about the scope.

And whatever we can't, we can put in a letter to the Court.  But, you know, just for now, I mean, I'm not sure how productive this is.

And it's costing everyone money.  So I don't know if you guys want to think about that or if you have a response.

MR. ZUCKERMAN:  Well, first response would be if this is something you could have called us about instead of ambush us

R. BALDUCCI

with it on the record.

But second of all, I think you should proceed. And let's allow the witness to testify.

MR. BAGLEY: Okay. Yeah. And sorry, Jessica. Would it be possible to get a transcript with timestamps?

THE REPORTER: Yes.

MR. BAGLEY: Okay. Great. Thank you.

BY MR. BAGLEY:

Q So I believe, Ms. Balducci, we were speaking about the voluntary buyout agreement for Mr. Radutzky referencing your affidavit. Is that right?

A That is right.

Q Okay. And what were the material -- or I'm sorry. What was the amount of the payment referenced in that agreement?

A She received -- or Radutzky received a voluntary buyout payment in the amount of one fourteen -- 114,441 and 88 cents.

R. BALDUCCI

Q    And were there any other material terms of that severance, in other words, anything else that he received of value as a result of that agreement?

A    No, we -- we provided that amount in exchange for a general release of claims to the company.  But that was the benefit.

Q    And this voluntary buyout agreement, was this a standard voluntary buyout agreement offered to several people at the company?

MR. ZUCKERMAN:  Objection.  Outside the scope of the 30(b)(6) notice.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q    Who else was the voluntary buyout agreement offered to?

MR. ZUCKERMAN:  Objection.  Clearly outside the scope of the 30(b)(6) notice.

I'm sorry.  I keep saying "notice." I meant to say protective order.

I'm instructing the witness not to

R. BALDUCCI

answer.

BY MR. BAGLEY:

Q     What was the criteria for those who were offered the buyout?

MR. ZUCKERMAN:  Same objection.

Same instruction.

BY MR. BAGLEY:

Q     Who made the decision to offer the buyout to Mr. Radutzky?

MR. ZUCKERMAN:  Same instruction.

Same objection.

BY MR. BAGLEY:

Q     Okay.  I'll move on.

Did someone named Ira Rosen ever work for CBS?

MR. ZUCKERMAN:  Objection.  Outside the scope of the 30(b)(6) notice.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q     When did Mr. Rosen's employment with CBS end?

MR. ZUCKERMAN:  One second.  Same objection.

R. BALDUCCI

Same instruction

BY MR. BAGLEY:

Q    Was Mr. Rosen's last day of work July 11, 2019, with CBS?

MR. ZUCKERMAN:  Same objection.

Same instruction.

BY MR. BAGLEY:

Q    I'd like to introduce Exhibit -- I believe we are on -- at Number 4.

(30(b)(6) Exhibit 4 was marked for identification.)

Okay.  This is a document produced by your attorneys, Bates Stamps CBS 8245 through 8286.  Can you let me know when you can see it in Exhibit Share.

MR. ZUCKERMAN:  Are you able to screen share, James?  I --

MR. BAGLEY:  I think --

MR. ZUCKERMAN:  Yeah.

THE WITNESS:  I can see this document.

MR. ZUCKERMAN:  What were the Bates Stamps numbers again, James?

R. BALDUCCI

MR. BAGLEY: It starts at CBS 008245 and goes through CBS 008286. But we are going to be focused on the first page, 8245.

BY MR. BAGLEY:

Q   Ms. Balducci, can you see the document?

A   I can.

Q   Have you seen it before?

A   I have not.

Q   Okay. Have you seen a document like this before, in other words, an employee data change form?

A   I have.

Q   If you look towards the bottom, there is a section that appears to be labeled "Remarks."

On the second line, it says "Severance information will be circulated at a later date on a revised EDCF." Do you see that?

A   I can see that.

Q   Was severance information circulated to Mr. Rosen at a later date?

R. BALDUCCI

MR. ZUCKERMAN: Objection. The 30(b)(6) protective order restricts the testimony of the witness to whether or not certain people received severance.

MR. BAGLEY: And this question is directly relevant to whether he received severance.

MR. ZUCKERMAN: It doesn't -- you can ask the witness whether or not people received severance.

But to ask her to start interpreting HR documents is outside the scope of the protective order.

MR. BAGLEY: I did not ask her to interpret anything. I asked if severance information was circulated to Mr. Rosen at a later date as it says on the document.

MR. ZUCKERMAN: So is your question whether Mr. Rosen received severance?

MR. BAGLEY: My question is whether he received severance information as referenced in this document. Yes.

MR. ZUCKERMAN: I don't know what severance information means. The 30(b)(6)

R. BALDUCCI

notice is limited to severance. If we ran -- I mean, maybe it's just semantics.

MR. BAGLEY: Are you directing the witness not to answer on the basis that I asked about severance information and not severance?

MR. ZUCKERMAN: Well, I think I'm directing the witness not to answer on the basis that you're showing her a document and rather than just asking the simple question whether or not or who received severance within the name comparators.

MR. BAGLEY: Okay. But you are directing her not to answer the question?

MR. ZUCKERMAN: Yeah. You're asking what -- you're asking a different question than what's set forth in the 30(b)(6) protective order.

MR. BAGLEY: Understood.

BY MR. BAGLEY:

Q    Okay. If you look above the remarks section, there is a section that says "Term." Do you see that?

A    I do.

R. BALDUCCI

Q    Do you see where it says "Last date worked, 7/11/19"?

A    I do.

Q    Does that mean that Mr. Rosen's last date worked was July 11, 2019?

MR. ZUCKERMAN:  Objection.  Again, outside the scope of the 30(b)(6) notice.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q    And then moving a box to the left, do you see where it says "Term date, 4/4/20"?

A    I do.

Q    Does that mean that Mr. Rosen's -- the date of his termination was April 4, 2020?

MR. ZUCKERMAN:  Same question.

Same instruction.

These were documents available to you that you could have asked of other witnesses in this case.

This witness has not been -- this witness is not going to be testifying

R. BALDUCCI

about anything outside of the protective order issued by the Court.

BY MR. BAGLEY:

Q    Moving back to the remarks section, the top line says:  "Artist last day in the office is 7/11/2019.  Artist will be on Pay or Play commencing 7/12/2019 until 4/4/2020."  Do you see that text?

A    I do.

Q    What does Pay or Play mean?

MR. ZUCKERMAN:  Objection.  Outside the scope of the 30(b)(6) protective order.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q    Did Rosen receive any compensation from CBS after his last working?

MR. ZUCKERMAN:  Objection.  Outside the scope of the 30(b)(6) protective order.

I'm instructing the witness not to

R. BALDUCCI

answer.

BY MR. BAGLEY:

Q    Was Rosen paid through April 4th, 2020?

MR. ZUCKERMAN:  Objection.  Outside the scope of the 30(b)(6) protective order.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q    Was Rosen working between July 11, 2019, and April 4, 2020?

MR. ZUCKERMAN:  Same objection.

Same instruction.

BY MR. BAGLEY:

Q    Did Rosen have a contract at the time of his separation from CBS?

MR. ZUCKERMAN:  Same instruction.

Same objection.

BY MR. BAGLEY:

Q    Was April 4, 2020, the last day of the second year of Mr. Rosen's contract with CBS at the time of his departure?

MR. ZUCKERMAN:  Same objection.

R. BALDUCCI

Same instruction

BY MR. BAGLEY:

Q    Okay.  I'd like to introduce what I think will be Exhibit 5.

(30(b)(6) Exhibit 5 was marked for identification.)

This is a document produced by your attorneys, starts at CBS 008807 and goes through CBS 008818.

Can you let me know when you see it in Exhibit Share?  Are you able to see the document, Ms. Balducci?

A    I can.

Q    Do you recognize this document?

A    I recognize it as a staff agreement.

Q    And that staff agreement is between Ira Rosen and CBS News, Inc.  Is that correct?

A    Yes.

MR. ZUCKERMAN:  Objection.  This is outside the scope of the 30(b)(6) protective order.

I'm instructing the witness not to

R. BALDUCCI

answer.

BY MR. BAGLEY:

Q    On page 3, there's a paragraph 3.  Can we turn to that?  Section 3(a)(ii), "During the second contract year commencing April 7, 2019: 1/52nd of" -- and then there's some redacted text -- "per week, of which amount" -- and then there's more redacted text -- "per week shall be deemed to be Artist's Benefit Base."

And then section (iii), "During the third contract year commencing April 5, 2020: 1/52nd of" -- section of the above paragraph.  Do you see that text?

A    I do.

Q    Was Rosen paid for the remaining eight months of his contract after he stopped working in July 2019?

MR. ZUCKERMAN:  Objection.  Outside the scope of the protective order.

I'm instructing the witness not to answer.

//

R. BALDUCCI

BY MR. BAGLEY:

Q    What was Rosen's base salary?

MR. ZUCKERMAN:  Objection.  Outside the scope of the protective order.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q    How much did Mr. Rosen get paid for the time he was not working between July 11, 2019, and April 4, 2020?

MR. ZUCKERMAN:  Objection.  Outside the scope of the protective order.

I'm instructing the witness not to answer.

You referred before, Mr. Bagley, to attorneys' fees being expended in a wasteful manner.

And continuously asking questions outside of the protective order is the definition of wasteful.

BY MR. BAGLEY:

Q    Did Mr. Rosen receive severance at the time of his departure from CBS?

A    He did not.

R. BALDUCCI

Q    Did Mr. Rosen receive any settlement payment at the time of his departure from CBS?

MR. ZUCKERMAN:  Objection.  Outside the scope of the protective order.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q    I'll move to the next topic. This is topic 8 now concerning when Plaintiff's phone had its data erased. Does CBS issue phones to its employees?

MR. ZUCKERMAN:  Objection.  Outside the scope of the 30(b)(6) witness -- of 30(b)(6) protective order.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q    Does CBS require employees to return CBS-issued phones when their employment ends?

MR. ZUCKERMAN:  Same objection. Same instruction.

Plus we provided an affidavit that is

R. BALDUCCI

sufficient to provide the information that was sought in the 30(b)(6) notice as provided in the 30(b)(6) protective order.

MR. BAGLEY: We disagree as to the sufficiency of what has been presented in the affidavit.

BY MR. BAGLEY:

Q    Once CBS has collected a phone from an employee who is leaving, who is responsible for deleting the data from the phone?

MR. ZUCKERMAN: Objection. Outside the scope.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q    Who is responsible for having possession of the device itself after an employer returns a phone?

MR. ZUCKERMAN: Same objection.

Same instruction.

BY MR. BAGLEY:

Q    Does CBS keep records of who each device belonged to at the time of

R. BALDUCCI

their employment?

MR. ZUCKERMAN:  Same objection.

Same instruction.

BY MR. BAGLEY:

Q    Does CBS keep records of when cell phones are issued to each employee?

MR. ZUCKERMAN:  Same objection.

Same instruction.

BY MR. BAGLEY:

Q    Does CBS keep records of when the data from a phone that has been returned was deleted?

MR. ZUCKERMAN:  Same objection.

Same instruction.

MR. BAGLEY:  Again, I'm not going to keep repeating.  But we disagree with your assessment of the scope of the protective order.

BY MR. BAGLEY:

Q    When the plaintiff, Alex Poolos, worked for CBS, did she have a CBS-issued phone?

MR. ZUCKERMAN:  Objection.  Outside the scope of the protective order.

R. BALDUCCI

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q    When Ms. Poolos's employment ended, did she return that phone to CBS?

A    Yes, she did.

Q    When did she return that phone?

MR. ZUCKERMAN:  It's outside the scope of the protective order.

But I'll let the witness answer if she's able to do so.

THE WITNESS:  Yeah, I mean I've -- I know that she returned it.  I have actually the date that she returned it.

Give me one moment so that I can get it correct.  She returned -- Alex returned her phone on February 11, 2022.

BY MR. BAGLEY:

Q    When did CBS delete the data from that phone?

A    Alex handed in her phone on February 11th.  On the 24th, the IT department contacted her to request her password so that they can open and reset

R. BALDUCCI

the phone.

I know that on that same day, Alex did provide that information.  We are -- you know, the practice would typically to -- to be -- to handle those things pretty quickly.

I can't tell you exactly when they wiped the phone.  But I don't have any -- yeah, I can't tell you exactly when they wiped the phone.

I would -- I would imagine that they did it pretty quickly after they got that information from her.

Q    Who deleted the data from that phone?

MR. ZUCKERMAN:  Objection.  Outside the scope.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q    Okay.  We can turn back to Exhibit 3.  That is your affidavit.  If we can go to Exhibit -- I believe it's Exhibit J.  I'm going to double check

R. BALDUCCI

that.  Exhibit I.  No, I apologize.  It was J.  This would be at page 477 to 78.

A   Wait.  Which exhibit are we at?

Q   Sorry.  Exhibit J.

A   Exhibit J.

Q   It should be the last exhibit. It should be the second and third to last pages, something like that.

Do you see where we are, Ms. Balducci?

A   I do.

Q   Okay.  And do you see an email from Richard dos Santos on February 9, 2022, where, at the bottom of that email, it reads:  "Do not wipe the device yourself.  As per corporate policy, we need to get clearance to wipe it"?

A   I do see this.

Q   Okay.  What is that corporate policy?

MR. ZUCKERMAN:  Objection.  Outside the scope.

I'm instructing the witness not to answer.

R. BALDUCCI

BY MR. BAGLEY:

Q    What is required to get clearance to wipe the phone?

MR. ZUCKERMAN:  Objection.  Outside the scope.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q    Could you give examples of situations in which an employee whose employment had ended would return a phone but there would not be clearance to wipe it per that corporate policy?

MR. ZUCKERMAN:  Objection.  Outside the scope.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q    A little further up, I believe this is on the previous page.  Yvonne Shaw on February 24, 2022, sent an email to Alex Poolos that says:  "IT department need your password to open and reset the phone.  Please provide.  They are copied

R. BALDUCCI

on this note."  Do you see that?

    A    I'm trying to find that one.
This is from February --

    Q    -- 24, 2022.

    A    Yes.  I mean, I see it.

    Q    And also on February 24, 2022,
Ms. Poolos sends an email with a passcode
in response to that email.  Do you see
that?

    A    Yes, I do.

    Q    Turning back to your affidavit
on page 6, paragraph 45, I'll give you a
minute to get there.

         Paragraph 45 reads:  "The
company does not possess a document to
reflect the exact date Plaintiff's
company-issued cell phone was reset, i.e.
wiped.

         "But it appears that it was
reset expeditiously after Plaintiff
provided her password as is the ordinary
course."  Did I read that correctly?

    A    You did.

    Q    What is your basis for saying

R. BALDUCCI

that it appears the phone was reset expeditiously?

A    So I can see that they've had an exchange where they're asking for information.

They're -- they're focused on this.  She's responding, providing the information that's been requested.

There's no other documentation that the company was able to find that tells us when it was cleared or that there -- we have no reason to think that there would've been a delay in that.

Q    What is your basis for saying there's no reason to think there would be a delay?

MR. ZUCKERMAN:  Objection.  Asked and answered.

You can answer again.

THE WITNESS:  It really -- there's no documentation that tells me.  I have no reason to believe, there's no documentation, no evidence to suggest that it wasn't handled that day; right?

R. BALDUCCI

They were focused on it.  They asked for the information.  She gave it.  I would -- I can only assume that they -- they handled it that day.

BY MR. BAGLEY:

Q     When you say "It appears that it was reset expeditiously after Plaintiff provided her password as is the ordinary course," what do you mean when you say "as is the ordinary course"?

A     What I mean is that it would be typical practice that the IT department handles these things expeditiously when they -- you know, when they get this -- when they get the phone, they wipe it.

If they need to get the password, they ask for the password. Practice is typically that you would move quickly.

Q     What is your basis for saying that the practice is typically that they would move quickly?

A     I don't have anything that tells

R. BALDUCCI

me that they didn't do that.  And so that is the basis for my response.

Q   So why do you believe they moved quickly?

MR. ZUCKERMAN:  Objection.  It's outside the scope of the protective order.  I'll allow the witness to answer but not on behalf of the company.

THE WITNESS:  Yeah, I mean from my opinion, why wouldn't they; right?  They're -- somebody's doing their job.

They're trying to clear the phone.  They're focused on it.  They ask the question, "What's the password?"  They get the password back.  I can only imagine they then acted on it.

BY MR. BAGLEY:

Q   My question is, in the -- in your capacity as a corporate representative, what basis is there to believe that the IT department moved quickly after Alex provided her password?

MR. ZUCKERMAN:  Asked and answered.  It's also outside the scope of the

R. BALDUCCI

30(b)(6) protective order.

Now I'll let her answer to the extent she's going to repeat the same answer she's been giving you for the last few minutes.

THE WITNESS: Yes. Standard practice would be that the IT department would work expeditiously.

And they would -- they would handle things as quickly as they could. And I have no evidence to suggest -- I've seen no evidence to suggest otherwise.

BY MR. BAGLEY:

Q Is there a policy on how quickly they would move after receiving a password?

MR. ZUCKERMAN: Objection. Outside the scope of the 30(b)(6) protective order.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q What is that policy?

MR. ZUCKERMAN: Same objection.

R. BALDUCCI

Same instruction.

I've allowed this to continue in terms of the questioning based on the email that you sent us prior to this deposition for trying to understand why you even needed the deposition in light of the protective order and the affidavits that were provided in response to the 30(b)(6) notice as protected by the protective order.

And I think you've gotten your answers. You've received your answers to the issue that was posed in the email to us.

And that's as far as we're willing to stray beyond what's in the protective order.

MR. BAGLEY: Again, we disagree with your characterization of what was provided in the affidavit.

The protective order requires that the company provide information about when the phone was wiped.

The affidavit does not include

R. BALDUCCI

information on when the phone was wiped.
It includes conclusory statements
about -- with assumptions as to how long
it would take to wipe it.

And I'm asking to determine if there
is any basis for those statements in the
affidavit.

MR. ZUCKERMAN:  And she's provided
you that response.

BY MR. BAGLEY:

Q      Moving on to the next paragraph,
paragraph 46 reads "The following day,
February 25, 2022, Plaintiff's Counsel
made a complaint by phone call to the
company and a legal hold was issued within
ten days."  Do you see that text?

A      I do.

Q      What is your basis for saying "a
legal hold was issued within ten days"?

A      That's the company's practice.

Q      Do you have any basis to say
that the practice was followed in this
particular case?

A      I'm sure if we went back, we

R. BALDUCCI

could find documentation.  There's a -- there's a -- that the legal hold was communicated.

Q    My question is, right now, do you have any basis to say that the practice was followed in this case?

A    Yes.

Q    What is that basis?

A    The company did put a legal hold on within ten days.

Q    And what is your basis for saying that?

A    Because it was communicated.

Q    To whom was it communicated?

MR. ZUCKERMAN:  Objection.

THE WITNESS:  To any part -- the part --

MR. ZUCKERMAN:  No.

Objection.  I -- can we come back to that, James?  I need to think about that.

MR. BAGLEY:  Okay.

MR. ZUCKERMAN:  There's privilege issues around that and as well as it being a little too far outside of even the scope

R. BALDUCCI

of the email that you sent to us in connection with additional questions you wanted to ask beyond the scope of the protective order.

MR. BAGLEY:  We can come back to that.

MR. ZUCKERMAN:  Okay.

BY MR. BAGLEY:

Q    Paragraph 47 reads "There is no information to suggest that Plaintiff's company-issued cell phone was wiped after the legal hold was issued."  Do you see that?

A    Yes, I do.

Q    What is your basis for that statement?

MR. ZUCKERMAN:  Also --

THE REPORTER:  I'm sorry.  You got cut off there, Counsel.  I can't hear you.

MR. ZUCKERMAN:  Sorry.  I said objection.  Asked and answered.

But you can answer again.

THE WITNESS:  I have been presented with no evidence or information to suggest

R. BALDUCCI

that it was wiped after the legal hold was issued. That is the basis for that statement.

BY MR. BAGLEY:

Q Does the company know the date on which the phone was wiped?

A The company does not.

Q Outside of the emails attached as Exhibit J to your affidavit, does the company have any documents reflecting the date on which the phone was reset?

MR. ZUCKERMAN: I'm going to object to it.

But you can answer.

THE WITNESS: No, not to my knowledge.

MR. BAGLEY: Okay. I think we have to come back to the previous question now, Lyle. Is that all right?

MR. ZUCKERMAN: Yeah. My position is that the custodians of the litigation hold -- the designation of those custodians are outside the scope of the 30(b)(6) protective order.

R. BALDUCCI

MR. BAGLEY: So you're instructing the witness not to answer that question?

MR. ZUCKERMAN: Yes.

BY MR. BAGLEY:

Q Okay. Moving on to topic 11, if I can go back to Exhibit 3 -- that's your affidavit -- at paragraph 36, which is on page 4.

That paragraph reads ███ ███ voluntarily resigned effective October 20, 2015." Did I read that correctly?

A You did.

Q Did CBS and Ms. ███ reach an agreement concerning her voluntary resignation?

MR. ZUCKERMAN: Objection. Outside the scope of the protective order.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q Did that agreement include any sort of post-compensation payment?

MR. ZUCKERMAN: Objection. Assumes

R. BALDUCCI

facts not in evidence and is outside the scope of the 30(b)(6) protective order.

BY MR. BAGLEY:

Q    Was any such payment consideration for a release of any legal claims Ms. ███ may have had?

MR. ZUCKERMAN:  Same objection.

Same instruction.

BY MR. BAGLEY:

Q    Did Ms. ███ ever assert claims of discrimination against CBS?

MR. ZUCKERMAN:  Same objection.

Same instruction.

BY MR. BAGLEY:

Q    Did Ms. ███ ever assert claims of harassment against CBS?

MR. ZUCKERMAN:  Same objection.

Same instruction.

BY MR. BAGLEY:

Q    Did Ms. ███ ever assert claims of retaliation against CBS?

MR. ZUCKERMAN:  Same objection.

Same instruction.

//

R. BALDUCCI

BY MR. BAGLEY:

Q   The next paragraph in Exhibit 3 reads "███████  ███████  voluntarily resigned effective June 2, 2020."  Do you see that?

A   I do.

Q   Did CBS and Ms. ███████  reach an agreement concerning her voluntary resignation?

MR. ZUCKERMAN:  Same objection.

Same instruction.

BY MR. BAGLEY:

Q   Did that agreement --

MR. ZUCKERMAN:  Topic 11 protective order states that we are to provide a 30(b)(6) witness to describe the dates of these folks' separations and the general nature of their separations.

It's set forth in the affidavit.  If you want to ask her to repeat what's in the affidavit, feel free.

But anything beyond that, it's outside the scope of the 30(b)(6) protective order.

R. BALDUCCI

MR. BAGLEY:  Our position is that the nature of the separations includes whether the voluntary resignations were pursuant to any sort of agreement.

BY MR. BAGLEY:

Q    Did that agreement include any sort of post compensation payment?

MR. ZUCKERMAN:  Objection.  Assumes facts not in evidence.  And it's outside the scope of the 30(b)(6) protective order.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q    Was there any such payment consideration for release of any legal claims Ms. ███████ may have had?

MR. ZUCKERMAN:  Same objection.
Same instruction.

BY MR. BAGLEY:

Q    Did Ms. ███████ assert claims of discrimination against CBS?

MR. ZUCKERMAN:  Same objection.
Same instruction.

R. BALDUCCI

BY MR. BAGLEY:

Q   Okay.  The next topic is topic 12.

Oh, yeah.  Wait.  What time is it?  Do you need to take your call?

A   Are we at 2:30?

Q   It is 2:30.  I apologize.

A   Yeah.  Hold on a minute.  What? Yes, I'm sorry.  I got to jump for this. I should be free again at like 3:15.

Q   Okay.  We can --

A   Thank you.  Thank you for catching that.

THE VIDEOGRAPHER:  All right.  Going off the record.  The time is 2:35 p.m. This is the end of media unit one.

(Off the record.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 3:17 p.m.  This is the beginning of media unit two.

BY MR. BAGLEY:

Q   Okay, Ms. Balducci.  We can turn back to Exhibit 2, which is the affidavit of Jen Baker.  On page 2, paragraph

Page 93

R. BALDUCCI

4 -- I'll give you a minute to get there.

Okay.  That reads "The identities of the 60 Minutes employees referenced in the table of complaints are as follows: former Producer Alexandra Poolos (Complainant) and Producer Shachar Bar-On (Subject)."  Did I read that correctly?

A    You did.

Q    And the table of complaints, that's what's contained in Exhibit A to this affidavit; is that correct?

A    That's correct.

Q    Okay.  So can we go to what I believe should be page 16?  I have not been the best with page numbers today. But it's CBS 008699.  Can you let me know when you're there please?

A    I'm there.

Q    Okay.  Is the complaint that the plaintiff in this case, Alex Poolos, made against Shachar Bar-On recorded on this page?

A    Yes, it is.

212-267-6868          www.veritext.com          516-608-2400

R. BALDUCCI

Q    Is it the claim in Row E?

A    Yes, it is.

Q    Okay.  Great.  Just a couple more.

Did the company submit a position statement to the EEOC in connection with the claims in this case?

MR. ZUCKERMAN:  Objection.  Outside the scope.

I'm instructing the witness not to answer.

BY MR. BAGLEY:

Q    Who at the company authorized the company's attorney to submit the position statement to the EEOC in this matter?

MR. ZUCKERMAN:  For the record, the Vladeck firm has proposed a stipulation on this issue that we're going to provide a response to shortly after this deposition that hopefully resolves the issue they're trying to get at in their questions to the witness on this topic.

MR. BAGLEY:  I mean, I think that's

R. BALDUCCI

okay with us if you're going to get us a stipulation that'll resolve this.

And the -- obviously, if you haven't figured it out, the next one was going to be topic 13.

So if you're -- if you can get those stipulations back to us in a way that we're pretty sure we could get it resolved today, you know, with it being the last day of discovery, I mean, I think that's okay with us.

MR. ZUCKERMAN: Yeah, you'll have it within a very short period after we conclude this deposition.

MR. BAGLEY: Okay. I mean, I think you should ask the question.

MR. ZUCKERMAN: Same with topic 13.

MR. BAGLEY: Yeah.

BY MR. BAGLEY:

Q    Is there an agreement between CBS and the Attorney General's Office that has been produced in this matter?

MR. ZUCKERMAN: Are you asking the attorneys?

R. BALDUCCI

MR. BAGLEY:  Sorry.  No, I'm asking the witness.

MR. ZUCKERMAN:  Oh, objection.  Same objection.

Same instruction as all day.

BY MR. BAGLEY:

Q    Who prepared the agreement on behalf of CBS, the agreement between the CBS and the Attorney General's Office?

MR. ZUCKERMAN:  Same objection.

Same instruction.

BY MR. BAGLEY:

Q    And who authorized the law firm WilmerHale to sign the agreement between CBS and the Attorney General's Office on the company's behalf?

MR. ZUCKERMAN:  Same objection.

Same instruction.

BY MR. BAGLEY:

Q    Okay.  And then I just have one more question.

Going back to the severance or voluntary buyout agreement that Mr. Radutzky received, you testified that it

R. BALDUCCI

was in -- the payment was in the amount of $114,441 and 88 cents.  Is that correct?

A     That's correct.

Q     And was that number based on some sort of formula?

A     It was.

Q     Can you tell me what that formula was?

A     I have to go back.  It's -- it's listed in his agreement.  It's based on his -- a certain number of days and his benefits base.  One moment, please.  Yeah, it was -- give me one second.  Okay.

MR. ZUCKERMAN:  Outside the scope of the protective order.

But I'll allow the witness to answer not on behalf of the company.

THE WITNESS:  Okay -- okay.  So yes, that -- that amount was based off of 40.5 weeks and 3 days of the benefit-based salary -- of his benefit based salary.

MR. BAGLEY:  Sorry.  Are we waiting on me or --

THE WITNESS:  Is there a question?

R. BALDUCCI

BY MR. BAGLEY:

Q   Yeah.  Asked -- I asked if you could tell me what benefit-based salary meant.

I don't know if there was an objection.

A   Oh, that question.  I don't think that question came through.  I'm sorry.  Did --

Q   I'm sorry.

A   Did I miss that?

THE WITNESS:  Did you guys hear that question?

MR. ZUCKERMAN:  I think you were on mute, James, for that question.

MR. BAGLEY:  Yeah, that sounds like me.

BY MR. BAGLEY:

Q   Okay.  Can you tell me what benefit-based salary means, please?

MR. ZUCKERMAN:  Objection.  Outside the scope.

I'll let the witness answer in her own individual capacity.

R. BALDUCCI

THE WITNESS: Yeah, it's a -- it's a figure that the -- it's a dollar amount that the -- it's really -- it's something that the business affairs teams -- it's a concept that they've created and a construct that they bring in to these deals.

BY MR. BAGLEY:

Q    Can you tell me how it would relate to a base salary that does not have the benefit descriptor in front of it?

MR. ZUCKERMAN: Objection. I gave you a little bit of latitude, but it's just too far outside the scope of the protective order.

I'm instructing the witness not to answer.

MR. BAGLEY: Understood. Can we take a five-minute break? I think I'm almost done.

MR. ZUCKERMAN: Sure.

THE VIDEOGRAPHER: All right. Going off the record. The time is 3:27 p.m.

(Off the record.)

R. BALDUCCI

THE VIDEOGRAPHER:  We are back on the record.  The time is 3:32 p.m.

BY MR. BAGLEY:

Q    Sorry.  If we can go back to the page we were looking at in the Baker affidavit in the table of complaints in Exhibit A on that same page, 869..

A    8699?

Q    Yes.  The Baker affidavit identifies 60 Minutes+ employees referenced in the table of complaints; is that correct?

A    Yes, it does.

Q    And are -- is the complaint relevant to those identities located on the page you're looking at right now?

A    It is, yes.

Q    Is that the claim labeled D?

A    Yes, it is.

MR. BAGLEY:  Okay.  Thank you.  No more questions subject to the issues that we've raised.

THE VIDEOGRAPHER:  Mr. Zuckerman, nothing from you?

R. BALDUCCI

MR. ZUCKERMAN: Nothing from us. Thank you.

THE VIDEOGRAPHER: All right. We are off the record at 3:33 p.m.

And this concludes today's testimony given by Renee Balducci testifying as a corporate representative for Paramount Global. The total number of media used was two and will be retained by Veritext.

THE REPORTER: Thank you. And still on the written transcript record.

I just need to confirm that, Mr. Bagley, your office will be ordering the original and a copy of today's transcript; correct?

MR. IADEVAIA: We're -- this is Jeremiah for the plaintiff. We would like a rough. And then a copy and original of the transcript is fine.

THE REPORTER: Okay. I'll reach out to Veritext with the quote for the rough. And someone will be in touch with you about that.

Okay. And then, Mr. Lynch, you

R. BALDUCCI

mentioned that your officer would like to order a copy of the transcript as well?

MR. LYNCH:  Yes, that's correct.

THE REPORTER:  Thank you.

We can go off the written transcript record at 3:35 p.m.

(Signature waived.)

(Whereupon, at 3:35 p.m., the proceeding was concluded.)

CERTIFICATE OF DEPOSITION OFFICER

I, RALPH FORNOLES, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

RALPH FORNOLES

Notary Public in and for the

State of New York

CERTIFICATE OF DEPOSITION OFFICER

I, JESSICA MOY, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

JESSICA MOY
Notary Public in and for the
State of New York

CERTIFICATE OF TRANSCRIBER

I, ANDREW TINGLEY-BARRAZA, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

*Andrew Tingley*

ANDREW TINGLEY-BARRAZA

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.