

EXHIBIT P

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ALEXANDRA POOLOS,

            Charging Party,            Charge No.:

   - against -

PARAMOUNT GLOBAL & CBS
BROADCASTING, INC.,

            Respondents.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

STATE OF NEW YORK   )
                   ) ss.:
COUNTY OF NEW YORK  )

1.      I am the Charging Party in this matter and I submit this affidavit in support of my charge of gender discrimination. I believe that the Respondents Paramount Global and CBS Broadcasting, Inc. ("CBS" or "Respondents") discriminated against me because I am a woman.[1]

<u>Background</u>

2.      I received a B.A. with honors in History from Wesleyan University in 1997. Thereafter, I received a prestigious Bollinger Fellowship to study political science at Columbia University Graduate School of Journalism and, ultimately, an M.A. from there in 2006.

3.      I am an accomplished, award-winning Producer with a 25 year-long career in journalism. During my career, I have reported stories all over the world, including the United States, the former Yugoslavia, Rwanda, Russia, Iran, Japan, Gabon, Kenya, China, and Nigeria.

---

[1] Effective November 28, 2022, the parties entered into a tolling agreement regarding my claims, including my discrimination claims. The parties' tolling agreement terminated on January 3, 2023.

I have reported from warzones, police states, natural disaster sites, and, generally, the world's most dangerous places.

4.     Before joining CBS News, I worked as a Correspondent, Reporter, Editor, and Producer for prominent media organizations, including Newsday, Radio Free Europe/Radio Liberty, Frontline/World, WNYC, and CNN.  I have also reported for The Wall Street Journal, The Christian Science Monitor, ABC News, and the American Prospect.

5.     At Radio Free Europe/Radio Liberty in Prague, I worked as a Correspondent and Editor.  I reported news for an audience of 26 million that included coverage of the Kosovo conflict and the fall of Slobodan Milosevic.

6.     I worked for the Wall Street Journal Europe from Brussels, where I reported news and analysis on the Balkans and expansion of the European Union.

7.     I was the Managing Editor of Women's eNews, an award-winning nonprofit news service.  I supervised the Washington bureau chief and over 100 freelance reporters; participated in strategic planning; developed a series on African women in power; and traveled to Rwanda to report on development a decade after the genocide.  My work was featured on NPR's Talk of the Nation.

8.     I was a Reporter and Producer for Frontline/World, a national public television series that focused on international issues, including covering countries and cultures rarely seen on American television.  My work included an investigation on the transfer of Uighur Guantanamo detainees to Albania; a series on the crackdown on human rights and the independent press in Russia; and the decline of democracy in Kyrgyzstan.

9.     At CNN, I was an Editorial Producer for Anderson Cooper 360 ("AC360") and CNN International.  At AC360, I served as one of the show's top Editorial Producers and

2

PI. 000153 (Confidential)

produced interviews and stories on a range of topics, including the Arab Spring protests; the 2010 Haitian earthquake; and an exclusive interview with a high-ranking member of a Mexican drug cartel. I also produced on location coverage of the tsunami in Japan, the BP oil spill, and tornados in Missouri.

10. Before joining CBS, I received prestigious awards for my work, including two Emmy awards and two Peabody awards. I also was a finalist for a Dart Award for Excellence in Coverage of Trauma. I also received two Nation Institute Investigative grants and a Pulitzer Center Reporting Fellowship.

## My Career at 60 Minutes

11. Paramount Global is a Delaware Corporation that is headquartered in New York. Paramount Global is a merged entity of CBS and Viacom and a media conglomerate operating around the world. In or around February 2022, ViacomCBS, Inc. changed its name to Paramount Global.

12. CBS Broadcasting, Inc. is a commercial broadcast television company, headquartered in New York, New York. On information and belief, CBS Broadcasting is a wholly owned subsidiary of Paramount Global.

13. CBS News, the news and information division of CBS Broadcasting, is headquartered in New York and has over 500 employees.

14. 60 Minutes, currently in its 54th season, is an American television news magazine broadcast on CBS. 60 Minutes is widely regarded as the pinnacle of broadcast news and investigative journalism.

15. CBS News' website describes 60 Minutes, which premiered on CBS in 1968, as the "most successful broadcast in television history." 60 Minutes has won more Emmy Awards

3

Pl. 000154 (Confidential)

than any other primetime broadcast, including a special Lifetime Achievement Emmy, and over its tenure has won every major broadcast journalism award. The news magazine show has finished among Nielsen's annual top-10 list for 23 consecutive seasons, which is a record.

16. I joined 60 Minutes in October 2011 as an Associate Producer working on stories for Correspondent Lesley Stahl ("Stahl"). Stahl, who joined the program over 30 years ago, is, according to the CBS News website among "one of America's most honored and experienced broadcast journalists."

17. In May 2018, CBS promoted me to Producer. I was one of the few Associate Producers promoted to Producer at 60 Minutes. Indeed, during my tenure, management routinely advised Associate Producers that there was no path to promotion.

18. My work included investigations and in-depth news stories about survivors of Boko Haram (a portrait of a group of young women who survived kidnapping by Boko Haram and who returned to school after years of captivity); female soccer players in Iran; China's real estate market; mobile money in Kenya; the Russian activist group Pussy Riot; transgender health issues; and an investigation into the Paris terror attacks.

19. I broke significant news on several occasions, including an investigation into Russian agent Maria Butina ("Butina"), who was accused of trying to influence United States policies for the Kremlin. I was able to achieve unprecedented access for the segment. I secured an exclusive on camera interview of Butina while she was in federal prison. Before the Butina interview, on information and belief, 60 Minutes had not been able to report from a federal prison for over a decade.

20. I produced other exclusive interviews. On multiple occasions, I produced interviews with Russian opposition leader Alexey Navalny ("Navalny"), which included

4

PI. 000155 (Confidential)

securing (i) in 2017, Navalny's first major, televised interview with an American journalist in Russia and (ii) in 2020, his first televised interview in Germany after surviving a poisoning using the chemical weapon Novichok. For the 2020 Navalny interview, I successfully traveled with Stahl to Germany at a time when the country had blocked all travelers from the United States due to Covid restrictions. On the CBS News website, Stahl's bio page prominently features the interviews with Navalny as examples of recent significant stories.

21. I regularly received positive feedback regarding my performance.

22. For example, on multiple occasions, former Executive Producer of <u>60 Minutes</u> Jeff Fager ("Fager") complimented my work, including:

- that in 2013, after <u>60 Minutes</u> aired my first co-produced story, Fager wrote to the team responsible for the story, including me: "That was another incredible story. I loved it. What a year you've have had";

- that my story about Iran in November 2016 was "terrific" and one of the "best pieces" from Iran in the show's history; and

- after promoting me in or around 2018, that he had no doubt I would be a "great" Producer.

23. Stahl gave me perhaps the best endorsement that a Correspondent can give to a Producer. Stahl told me that she "trusted" my news judgment. Stahl also said that I produced some of her favorite stories of her career, including the segment about "The Chibok Girls." Stahl described my investigation for the Butina story as "fantastic" and a "classic" <u>60 Minutes</u> story.

24. The current Executive Producer for <u>60 Minutes</u>, Bill Owens ("Owens"), also praised my work. After the first screening of the story "Revolution in Iran," which I produced, Owens told a room filled with <u>60 Minutes</u> employees that I should be "commended" for my tenacity in developing and producing the story.

5

PI. 000156 (Confidential)

25. In 2019, Owens told me that I regularly "swung for the fences" and admired my tenacity and ambition in pursuing important stories.

26. In 2020, at the final screening of "Putin's Public Enemy," another story that I produced, Owens told me that the piece was excellent and flawlessly delivered despite the many production challenges. On information and belief, another Senior Producer stated that the delivery of the story was "heroic."

27. During my performance review in 2021, Owens told me that I frequently produced the hardest stories at the show, that my work was excellent, that I performed at a high-level, and that I needed minimal supervision.

28. On information and belief, Tanya Simon, the former Executive Editor of 60 Minutes Sports, said that a story I produced should be "the benchmark for sports stories."

29. Senior Producers regularly described my work as rigorous and ground-breaking. After learning that I was leaving 60 Minutes in February 2022, a Senior Producer told me that my hard work always showed up on the screen; that my compassion for my subjects was singular; and that the show would be "poorer without me."

30. I also received praise for being collegial and collaborative. For example, Owens told me on several occasions that he liked me as a person and that I was relatable and down-to-earth. Stahl told me that my upbeat personality made working together easy.

31. My work at 60 Minutes has received numerous awards and other recognition . For example,

- a Gracie Award for "The Chibok Girls" in 2020;

- an Emmy Award for Outstanding Business and Economic Reporting in a News Magazine for "China's Real Estate Bubble" in 2014;

6

Pl. 000157 (Confidential)

- two Emmy nominations for Outstanding Edited Interview and Outstanding Writing for "Putin's Public Enemy" in 2021;

- an Emmy nomination for Outstanding Edited Interview for "The Challenger" in 2018; and

- an Emmy nomination for Outstanding Business and Economic Reporting News Magazine for "The Future of Money" in 2015.

32. During my tenure, CBS Producers typically worked under the terms of a written employment contract. I have been working under such a contract between 2011 and 2022.

33. CBS (and its predecessor companies) and I agreed to numerous contract extensions since my original contract expired. my most recent contract extension was effective May 30, 2021, for a period of three years until May 25, 2024 (the "Agreement").

34. The Agreement provided that if CBS fired me without cause, I was entitled to severance.

35. The Agreement specified that I would not be entitled to severance if I breached any provision of the Agreement, failed to perform my obligations, or was incapacitated. Even though CBS fired me (as described below) and none of these circumstances occurred, CBS has refused to pay me severance.

### CBS Suspends and Fires Me

36. During a virtual meeting on or about January 5, 2022, Owens and 60 Minutes Executive Editor Tanya Simon ("Simon") told me that an Associate Producer that I supervised, Collette Richards ("Richards"), had complained about me. Richards had supposedly asserted that I was a "bully" who did not "respect boundaries." As set forth below, those allegations are meritless.

37. I spoke with Owens about the complaint again on January 6, 2022. After mandating that I send an email confirming that Owens counseled me to be mindful about my

7

Pl. 000158 (Confidential)

tone, Owens stated that the matter was closed and that CBS would take no further action in connection with Richards's complaint.

38. The next day, on or about January 7, 2022, Owens asked to speak with me. During a call, Owens asked me if I had spoken to a CNN Producer, Scott Bronstein ("Bronstein"), about Richards and, if so, whether I had done so to retaliate against Richards. I said that I had spoken to Bronstein but denied retaliating against her. I explained that, over the holiday break, I had reached out to Bronstein for advice about how to handle the problems I was having with Richards as explained below. However, Bronstein and I did not speak until early January 2022. Bronstein and Richards were close friends and had worked together at CNN. Also, Bronstein, a former 60 Minutes employee, had recommended Richards not only for the job at 60 Minutes, but to work specifically with me.

39. For the first time, on the same day on or about January 7, 2022, Human Resources ("HR") reached out to me about Richards's complaint. HR Vice President Renee Balducci ("Balducci") informed me that CBS was suspending me and that my "job was on the line."

40. Balducci spoke to me on or about January 8, 2022. Balducci and I spoke for approximately one hour during our meeting.

41. Balducci told me on January 8 and January 9, 2022, that she would be in touch the following week. Balducci, however, did not follow up with me for almost a month.

42. On or about February 3, 2022, Owens and Balducci told me that CBS was firing me effective immediately. Owens and Balducci pressured me to resign, but I declined to do so.

43. Later that same day, February 3, 2022, I received a memorandum stating that CBS had fired me because I purportedly violated CBS policy by bullying Richards; by retaliating

8

PI. 000159 (Confidential)

against Richards after she complained; by discussing Richards's complaints with others; and by not being truthful. These allegations are false or so exaggerated that bias is the only explanation.

<u>CBS Applies Discriminatory Standards To Me</u>

44. CBS asserts several grounds for firing me. CBS's reasons for firing me are rife with contradictions, inconsistencies, and exaggerations.

A. <u>Richards Had Performance Problems</u>

45. I began supervising Richards in or around October 2020. Richards was then a new Associate Producer.

46. Before Richards joined <u>60 Minutes</u>, I had supervised other Associate Producers. I had good relationships with those Associate Producers and, to my knowledge, they did not make complaints about me. To the contrary, some of those Associate Producers described me as supportive and collaborative.

47. I had serious concerns about Richards's performance.

48. Richards frequently made significant errors in fact-checking. She often fought back when I provided her constructive feedback, including insisting that important facts were correct when they were not and, as Richards admitted, "lash[ing] out" at me when I did not immediately approve of Richards's ideas. Richards also failed to show attention to detail in several aspects of her work, including copy-editing her work.

49. On several occasions, Richards also failed to complete important tasks such as securing necessary footage for a segment, handling the acquisition of third-party material, managing logistics for shoots, and conducting background interviews. As described below, Richards also failed to manage the application process for international travel for several <u>60</u>

9

PI. 000160 (Confidential)

<u>Minutes</u> employees and then went out of town for the holidays. This required me to cancel my own holiday plans to address the problem.

B.     <u>CBS Ignores My Complaints about Richards</u>

50.     Before learning about Richards's complaint on or about January 5, 2022, I attempted to raise concerns about Richards.

51.     On January 3, 2022, I reached out to Executive Editor Simon to discuss my concerns about Richards. Simon stated she was too busy to discuss the concerns that day but promised to speak to me by phone the following day.

52.     On January 4, 2022, Simon cancelled the scheduled call and told me that she needed to speak to both me and Owens.

C.     <u>Richards Made Her Complaint To Cover Up Her Deficiencies</u>

53.     Contrary to Richards's complaint that I was a "bully," on several occasions, Richards expressed appreciation for my support. For example, Richards sent a text message to me thanking me for "having [her] back" and, on another occasion, wrote, "Thank you for your support!" I also defended Richards on multiple occasions, including making complaints on her behalf to other departments (even though I later learned that Richards was criticizing other departments while failing to complete her own work).

54.     While Richards complained that I had no boundaries, in the past, I had gone out of my way to make sure Richards was able to take off time, including instances when doing so jeopardized finalizing segments and airing them. For example, I asked to have the broadcast date for a story delayed so that Richards could take nine days off for her wedding in May 2021. I successfully advocated for Richards to take time off. As a result of delaying the story, I ensured that CBS did not replace Richards with another Associate Producer.

10

PI. 000161 (Confidential)

55. I also helped keep private Richards' vacation request during a critical period for the show so that others would not develop a negative opinion of Richards for making this unusual request. In particular, I was worried that if Stahl learned of the change, she would be upset, would deny Richards the time off, and would develop a negative opinion of her.

56. In late December 2021, however, I was unable to accommodate another instance in which Richards requested to leave town during a critical period at the show. 60 Minutes was planning to air a story about Trevor Noah ("Noah") on or about Sunday, December 19, 2021.

57. Stahl interviewed Noah for the segment and I produced the story. Richards repeatedly asked me for time off to drive home on the Saturday before the Noah story aired; the day the show actually aired on Sunday; or the Monday after it did.

58. I told Richards that leaving then was not feasible because she proposed traveling on important days for producing the show and correcting any factual errors in the broadcast that may need to be addressed.

59. By the standards of 60 Minutes, Richards's request was extraordinary. Indeed, it was commonplace for Correspondents, Producers, and Associate Producers to be intensely working on a segment and making changes during the period immediately before broadcast and immediately following it.

60. I offered as a compromise that Richards instead travel sometime on Tuesday, Wednesday, or Thursday after the show aired. While this would have required me to complete Richards's work on another story, I was trying to resolve the issue. Richards rejected my suggestion.

61. When Richards asked again to take the time off, which she had done several times, and I said she could not because it would interfere with preparing the story for broadcast

11

Pl. 000162 (Confidential)

and addressing concerns post-broadcast, Richards became very upset. Under the circumstances, including Richards's relentless requests, her erratic behavior, and her inflexibility, I believed that I had no choice but to agree that Richards could travel on the day she demanded to do so.

62. Richards left town on the day before the Noah story aired.

63. I then discovered an error for an upcoming story. Stahl and her team members required visas to travel to Russia for a story. After Richards left, Richards told me that Stahl's passport needed to be renewed. Without a passport, Stahl would not get the visa she needed. This is a core responsibility of an Associate Producer that Richards did not handle before leaving for vacation. As a result, I was forced to cancel my own vacation plans to renew Stahl's passport.

64. Following the Noah segment, Richards and I were working together on another story with a tight deadline. I asked Richards to copy edit, a fundamental duty for an Associate Producer, her background interviews more carefully than she had previously so that I could give them to Stahl as research for the story.

65. Richards began to complain that I was not treating her well after I asked her to do her job. I offered Richards additional support, including extending the deadlines and suggesting I have a Broadcast Associate assist her, so that Richards felt less stressed.

66. Shortly thereafter, Richards stopped working. In late December 2021, Richards failed to respond to my requests for Richards to complete her work, hand it over for me to complete, or otherwise communicate with me.

67. At the time, Richards and I had an exclusive interview with an American hostage recently released from a prison in Myanmar, which was scheduled for January 5, 2022. Richards

12

PI. 000163 (Confidential)

and I were on a deadline and behind schedule to submit materials to Stahl for review before the interview. Richards's insubordination jeopardized this important story.

68. I did not immediately report my concerns about Richards because I did not want to bother Executive Editor Simon during her vacation and was worried that if I reported Richards's conduct to Stahl, CBS would take disciplinary action against Richards.

69. Instead, as described below, I reached out to Richards's mentor, friend, and primary job reference CNN producer Bronstein. Due to the holidays, Bronstein and I did not speak until early January.

70. Managers at 60 Minutes agreed that Richards had performance problems and that her complaints against me were baseless.

71. For example, during the virtual call with Owens and Simon on or about January 5, 2022, Owens expressed that he was deeply troubled by my performance assessment of Richards and agreed with my concerns.

72. The next day, on or about January 6, 2022, Owens asked for more information about Richards's performance. I told Owens that Richards had not participated in training that 60 Minutes offered for its new Associate Producers. Owens said that Richards's decision was unacceptable and asked me to begin documenting Richards's performance problems.

73. Also, during the same discussion on or about January 6, 2022, Owens told me that I would not have to meet with HR about Richards's complaint, that he did not want me walking on eggshells, and that Richards had made a complaint because she wanted to change teams. Owens also dismissed the complaint as a millennial issue.

13

D.    I Did Not Retaliate Against Richards

74.    I did not engage in retaliatory conduct against Richards.

75.    Owens and Balducci criticized me for speaking to CNN Producer Bronstein about Richards after CBS advised me of the complaint.

76.    However, contrary to their assertion, I reached out to Bronstein first well before I knew Richards had complained about me to management.  Before Richards's complaint about me, in late December 2021, I contacted Bronstein, a former 60 Minutes employee and the primary reference for Richards that helped her land the job.

77.    Bronstein had called me when Richards was interviewing at 60 Minutes with a different Producer and told me that he thought Richards was a better fit for me than the other Producer.  Bronstein frequently told me that he adored Richards.

78.    I had sought Bronstein's advice over the holiday break about how to have a better professional relationship with Richards.  While Bronstein and I exchanged text messages, we were unable to speak over the holidays.  After the holidays, in early January 2022, Bronstein exchanged text messages with me letting me know he was available to speak.  To follow up from my earlier outreach in December 2021, I called Bronstein on or about January 5, 2022.

79.    CBS also exaggerated the significance of my discussion with Bronstein. While CBS primarily relies on this call as a basis for firing me, neither Richards nor CBS have accused me of unlawful retaliation.  Instead, CBS asserts that I violated policies by purportedly telling Bronstein that I was "disappointed" with, and lacked trust in, Richards because Richards spoke to HR about her concerns.

80.    As Owens acknowledged, it would be nonsensical for me to attempt to retaliate against Richards through Bronstein when I knew that Richards and Bronstein were close friends

14

frequently in contact with each other, Bronstein had told me on multiple occasions that he adored Richards, and Bronstein had served as her primary reference for her job. Indeed, at the start of the call, Bronstein told me that I could never malign Richards to him because he thought so highly of Richards.

81. CBS also accuses me of making negative comments about Richardson's performance. During their discussion on January 5, 2022, while I was certainly frustrated with Richardson's conduct and her effort, I also spoke positively about Richards, saying that she was well-liked by other employees, including Stahl, and expressed sympathy for Richards over her difficulties in adjusting to 60 Minutes. I also told Bronstein that I hoped that Richards and I could continue working together and that Richards would have the choice of what she wanted to do.

82. Also, I discouraged others from retaliating against Richards.

83. For example, on or about January 5, 2022, I told Stahl about Richards's complaint. In response, Stahl stated that she was "outraged" and that Richards should have spoken to her first before raising concerns outside of the team.

84. Stahl told me that she wanted to remove Richards from her team. I said that Stahl should not remove Richards because it might be perceived as retaliatory and that they should instead allow the process to proceed.

85. Stahl also said that she "respected" me for not having formally complained about her former supervisor, male Producer Shachar Bar-On ("Bar-On"), and, instead, had "focus[ed] on [my] work."

15

E.     CBS Claims That I Was Untruthful

86.     CBS accused me of lying during the investigation. The February 3, 2022 report sent to me about my firing, however, did not provide a single example of me being untruthful during the investigation.

87.     Moreover, in determining that I purportedly lied during the investigation, as described below, CBS relied on a third party, Bronstein. In contrast, CBS disregarded the information that I, a 10-year employee, attempted to provide.

F.     I Was Not Instructed to Keep the Complaints Against Me Confidential

88.     The February 3, 2022 report also asserts that I violated CBS policy by discussing Richards's complaint with others.

89.     I was not aware of any obligation to maintain confidentiality of Richards's complaint.

90.     As set forth above, on or about January 5, 2022, Simon and Owens told me about Richards's complaint and I had a follow up meeting with Owens the next day on or about January 6 about Richards's concerns. At no time during either of those discussions did Simon or Owens tell me not to communicate with others about Richards's concerns.

91.     To the contrary, on or about January 6, 2022, I told Owens that I had discussed Richards's complaint with Stahl. Far from criticizing me, Owens expressed his support for me doing so. Owens stated that it was "the right thing to do" for me to tell Stahl and that he had intended to tell me to do so.

92.     Nor did HR provide any instructions to me about Richards's concerns on January 5 and 6, 2022, including, but not limited to, directions about what I could disclose to others. I heard nothing from HR until late in the day on January 7, 2022.

16

Pl. 000167 (Confidential)

93. I asked to speak to HR earlier, but Owens told me not to do so. On January 5, 2022, at the end of my conversation with Owens and Simon, I specifically asked if I could speak to HR. Owens told me not to reach out to HR and he would get back to me.

<u>CBS's Bogus Investigation and Other Improper Conduct</u>

94. CBS's investigation concerning my conduct was biased. CBS failed to follow its procedures and, as set forth below, treat me as it had similarly situated male employees accused of far more egregious misconduct.

95. At the outset of the investigation, the investigator, Balducci, made clear that she was not interested in hearing from me. When I described my concerns about Richards's performance, Balducci ignored them or defended Richards. For example, in response to my statements that I offered Richards extra help and more time to improve her copy editing, Balducci criticized me for having done so via email. Balducci stated that she expected managers to have those discussions over the phone.

96. Incredibly, Balducci also said that I should accept that Richards did not have the ability to do copy editing and instead focus on what Richards did well. Copy editing was one of Richards's duties and a basic skill for any professional journalist.

97. Balducci levied other unjustified criticism against me. Balducci scolded me for not calling her when I learned about Richards's complaint. Certainly, it is not incumbent on me, who had been accused of wrongdoing, to reach out to HR. In any event, I had wanted to call Balducci but Simon and Owens had specifically instructed me not to do so. Yet Balducci refused to accept my explanation.

98. I repeatedly offered email communications and text messages to counter Richards's false statements, including messages that demonstrated that I cared about Richards's

17

PI. 000168 (Confidential)

well-being and health. CBS, including Balducci, however, refused to consider my evidence. In contrast, as set forth below, Balducci not only considered Bronstein's notes and text messages when firing me, she primarily relied on them in making the decision.

99. CBS's reason for suspending and firing me has shifted. On or about January 7, 2022, Balducci refused to tell me the reason for my suspension even though I repeatedly asked to know why CBS had suddenly suspended me. When I asked if it related to my conversation with Bronstein, Balducci unequivocally said "no" and stated that the suspension was based on other issues that had come to CBS's attention that were "much more serious." CBS, however, never accused me of engaging in other misconduct. Moreover, during the January 8, 2022 interview, Balducci made clear that the reason for the suspension was only about my discussion with Bronstein.

100. There are other examples of inconsistent information shared with me. For example, during my call with Owens and Simon on or about January 5, 2022, they made it seem as though Richards had gone directly to HR and not spoken to them first. However, Balducci told me that Richards had spoken to Owens and Simon first. Also, Owens told me that Richards had asked to be transitioned to a new team not working with me. Balducci, however, told me that was not the case and that Richards had no intention to move teams.

101. CBS failed to follow its procedures in conducting the investigation. It took several days for HR to contact me about Richards's complaint and no one gave me instructions in the interim not to discuss the complaint with anyone else. Yet CBS fired me for not complying with those rules, which it failed to share with me.

102. Also, rather than act promptly, CBS took nearly a month to conduct its so-called investigation. During the meeting on or about January 8, 2022 and by email the next day on

18

PI. 000169 (Confidential)

January 9, 2022, Balducci told me that she would "reconnect" with me the following week. After the January 9, 2022 email, however, Balducci had zero contact with me until February 3, 2022, when CBS fired me. There was no explanation for the delay and CBS never gave me another opportunity to respond to the allegations and purported evidence against me.

103. In an email to Balducci on January 8, 2022, I requested to speak with Balducci's supervisor Cynthia Glasgow ("Glasgow"). On January 9, 2022, Balducci responded that Glasgow was aware of my circumstances and copied me on the email. That same day, on January 9, 2022, I asked again to speak to Glasgow, who was now part of the email exchange. Glasgow ignored me and never replied to me.

104. CBS credited Bronstein, a third party, over me even though I had worked for the company for more than a decade. On February 3, 2022, Balducci told me that in making the decision to fire me, Balducci relied on notes that CNN Producer Bronstein purportedly created and screenshots of his text messages. Balducci told me that Bronstein sent these materials to her three or four days after I spoke to him. When I asked Balducci why no one followed up with me about the investigation, Balducci said that there was no reason to do so because she had spoken to Bronstein. CBS never showed me the notes that Bronstein provided to Balducci nor asked me whether I had my own notes reflecting my conversation and communications with Bronstein.

105. Balducci also was wrong about key facts. For example, during the firing meeting on February 3, 2022, Balducci emphasized that she had copies of the text messages between Bronstein and me. On information and belief, Balducci mentioned the text messages as evidence I had been untruthful about contacting Bronstein first. To the contrary, during the investigation, I candidly told Owens and Balducci that I had spoken to Bronstein about Richards and that I had contacted him before I was aware of Richards's complaint. If Balducci had spoken to me a

19

Pl. 000170 (Confidential)

second time, she would have understood that I had not misrepresented the sequence of the events.

106. During the firing meeting on February 3, 2022, Owens and Balducci tried to pressure me into resigning because, on information and belief, if I did so, CBS would have no obligation to pay severance and pursuing legal claims would be more challenging.

107. After telling me that CBS was firing me, Balducci told me I could "resign" instead. As an enticement to resign, Balducci proposed that I write an email that Balducci would approve to say good-bye to Senior Producers. Owens said it would be "much better" for me if I resigned and that I should listen to Balducci. I asked for a day to consider the suggestion, but Balducci refused and set a 4:00 p.m. deadline that same day. I did not agree to resign.

<u>CBS's Long History of Sexism and Sexual Misconduct</u>

108. This was the first time that I had ever been accused of violating company policies in the course of my more than 10 years of employment.

109. I am not aware of CBS firing other <u>60 Minutes</u> employees based on a single complaint from a subordinate about behavior that was not alleged to constitute unlawful discrimination or retaliation.

110. To the contrary, CBS has a long history of shielding men from answering for their misconduct, including unlawful conduct. Sexism and misogyny defined the workplace of CBS, including CBS News, over many years.

111. Several publications, including <u>The New Yorker</u> magazine, <u>The New York Times</u>, and <u>The Washington Post</u>, exposed the sexual harassment and gender discrimination that CBS permitted to fester unabated for decades. From the highest levels of the company, male executives and senior managers, including the former Chief Executive Officer ("CEO") Leslie

20

PI. 000171 (Confidential)

Moonves ("Moonves") and the former Executive Producer of 60 Minutes Fager, ran the network in open defiance of the anti-discrimination laws and CBS's anti-discrimination policy, acting as if they were above the law.

112. The New Yorker magazine detailed the gender-based toxic culture at CBS through two articles in July and September 2018. Following the first article, CBS hired outside counsel to investigate the allegations of gender bias and sexual harassment. After completing the investigation in or around November 2018, a copy of outside counsel's draft written report, which is 59 pages, was leaked to The New York Times.

113. The New Yorker articles reported that at least 12 women had accused Moonves, the long-time head of CBS, of sexual misconduct. The New Yorker magazine's July article stated that four women "described forcible touching or kissing during business meetings"; two claimed that "Moonves physically intimidated them or threatened to derail their careers"; and that several women said that Moonves "became cold or hostile after they rejected his advances, and that they believed their careers suffered as a result." Moonves resigned shortly after the magazine published its second article.

114. According to The New York Times, outside counsel's draft report states that Moonves "'engaged in multiple acts of serious nonconsensual sexual misconduct in and outside of the workplace, before and after he came to CBS in 1995.'" The New York Times further reported that outside counsel found that Moonves "'received oral sex from at least [four] CBS employees under circumstances that sound transactional and improper to the extent that there was no hint of any relationship, romance, or reciprocity . . . .'"

115. Before the articles in The New Yorker, CBS had already been forced to fire Charlie Rose ("Rose") in 2017. Rose had served as co-anchor of CBS This Morning since 2012

21

Pl. 000172 (Confidential)

and a correspondent for 60 Minutes. The Washington Post reported that eight women at PBS, where Rose hosted a talk show, had accused Rose of "making lewd phone calls, walking around naked in their presence, or groping their breasts, buttocks or genital areas." The Washington Post subsequent to Rose's firing reported that an "additional 27 women – 14 CBS News employees and 13 who worked with him elsewhere – said Rose sexually harassed them."

116. 60 Minutes followed the example set at the highest level of the company and emerged as the breeding ground for the network's misogynistic culture. As The New Yorker's July 2018 article stated, "[30] current and former employees of CBS [said] that such behavior [against women] extended from Moonves to important parts of the corporation, including CBS News and '60 Minutes.'" That same article reported: "During Moonves's tenure, men at CBS News who were accused of sexual misconduct were promoted, even as the company paid settlements to women with complaints." Also, on or about November 2, 2022, the New York Attorney General announced that she had secured $30.5 million from CBS and Moonves for concealing sexual assault allegations against Moonves, misleading investors about those allegations, and insider trading.

117. It was well-known that sexual harassment and other forms of sexism were commonplace at 60 Minutes during the period Don Hewitt ("Hewitt") was the show's Executive Producer. Among many other examples, Hewitt fired correspondent Meredith Vieira ("Vieira") in 1991 on the basis of gender. Vieira worked as a correspondent on the show from 1989 to 1993. She asked Hewitt to allow her to remain working only part-time after the birth of her second child. Rejecting Vieira's request, Hewitt fired her. He later commented on her firing in an interview: "I need someone who can pull his or her own weight." Unsurprisingly, in 2018, Viera said that, during her time at 60 Minutes, "[t]here was sexism, for sure."

22

118. A female employee also accused Hewitt of repeatedly sexual assaulting her around the same time as Hewitt dismissed Vieira. According to The New York Times, CBS paid the employee a settlement of over $5 million in the years following the accusation.

119. Hewitt's successor as head of 60 Minutes continued the tradition of gender discrimination and sexual harassment. Fager, who ultimately spent 36 years at CBS, replaced Hewitt as Executive Producer of 60 Minutes in 2004. In September 2018, CBS fired Fager amid similar allegations of sexual harassment and misconduct as had faced Hewitt.

120. CBS attributed the termination of Fager's employment to a threatening text message that he had sent to a national correspondent for CBS News who was covering allegations against him of sexual misconduct. The message read: "If you repeat these false accusations without any of your own reporting to back them up, you will be responsible for harming me. Be careful. There are people who lost their jobs trying to harm me and if you pass on these damaging claims without your own reporting to back them up that will become a serious problem." According to CBS, Fager's clear threat violated company policy.

121. But alongside Fager's text message, the same article in The New Yorker magazine that exposed Moonves's mistreatment of women had also reported that "[n]ineteen current and former employees told [the magazine] that Jeff Fager . . . allowed harassment in the [news] division." Additionally, "[s]ix former employees told [the magazine] that Fager, while inebriated at company parties, would touch employees in ways that made them uncomfortable." Moreover, The New Yorker reported that Fager protected other men "accused of misconduct, including men who reported to him."

122. According to the New York Times, the draft report stated that "Mr. Fager had behaved inappropriately with colleagues in several instances."

23

Pl. 000174 (Confidential)

<u>CBS Applies Different Standards to Male Employees than Female Employees</u>

123. CBS routinely applies different standards to male employees, including Producers, than it does to female employees, including me.

124. Several male <u>60 Minutes</u> Producers have been the subject of complaints based on abusive and sexist behavior and, in some cases, sexual harassment. To my knowledge, none were suspended or fired in response to those complaints even though many of the allegations were corroborated based on documentary evidence and witness accounts.

125. For example:

a. Shachar Bar-On: As set forth below, my former male supervisor, <u>60 Minutes</u> Producer Bar-On, emotionally abused and sexually harassed me for years. CBS discouraged me from raising complaints. Bar-On still works for CBS.

b. Ira Rosen: Another longtime male Producer for <u>60 Minutes</u>, Ira Rosen ("Rosen"), was accused of sexually harassing his Associate Producer Habiba Nosheen ("Nosheen"). Nosheen alleged that she complained to management that Rosen had subjected her to numerous sexual comments and suggested that she flirt with sources. On information and belief, other women also reported that Rosen had engaged in similar misconduct. Nosheen, who filed a complaint with the Equal Employment Opportunity Commission, alleged that after she complained about Rosen, CBS removed her from assignments and subjected her to baseless criticisms. To my knowledge, CBS did not suspend or fire Rosen.

c. Michael Radutzky: A female Senior Producer at <u>60 Minutes</u> alleged that Michael Radutzky ("Radutzky"), a male Producer, threatened to throw furniture at her and twisted her arm behind her back, causing her to scream. On information and belief, Fager was aware of the incident, stated he would address the matter with Radutzky directly, and told the

24

female Producer not to inform HR. Fager then asked the female Producer to apologize to Radutzky. CBS did not fire or otherwise discipline Radutzky for his blatant misconduct, including, physical assault against a female employee.

d. Michael Gavshon: It was well known that Michael Gavshon ("Gavshon"), a longtime male Producer for 60 Minutes, was frequently abusive towards staff. In 2019, Gavshon sent an old photograph via text message of himself and a friend urinating on a campfire to a female Associate Producer Cassandra Vinograd ("Vinograd"). Gavshon's penis was visible in the picture. Vinograd reported the incident to Human Resources and Susan Zirinsky, the then President of CBS. Vinograd also reported Gavshon's excessive drinking and violent temper. On information and belief, Vinograd provided to HR a photograph of Gavshon passed out in her office as a result of drinking too much. Vinograd alleged that Gavshon retaliated against her for her protected complaints, including stripping her of all work responsibilities. To my knowledge, CBS did not suspend Gavshon for a single day even though there was photographic evidence that he engaged in inappropriate conduct. Instead, on information and belief, CBS permitted Gavshon to continue working and gave him counseling for his substance abuse. CBS accepted Gavshon's explanation that he sent her the photograph of his penis while urinating "by accident." Reflecting CBS's biased view, Stahl told me that the Associate Producer was fabricating the allegations against Gavshon to get "money." Stahl also said she did not believe that Gavshon did anything wrong and that Vinograd was trying to destroy his career. Vinograd filed a lawsuit against CBS based on this mistreatment.

e. David Levine: David Levine ("Levine") is currently a male Associate Producer for 60 Minutes. Several female employees have complained about Levine, including about his serious anger problems often directed at women. On information and belief, Levine

Pl. 000176 (Confidential)

yelled at a junior female employee, which caused her to cry. On information and belief, Correspondent Sharyn Alfonsi complained about Levine to Owens. On information and belief, CBS did not punish Levine. To the contrary, Owens and others have rewarded Levine. For example, in 2021 and 2022, CBS allowed Levine to solo produce several stories, which is often the opportunity offered to Associate Producers who management is considering for promotion to Producer.

        f.      Will Croxton: Will Croxton ("Croxton") is a Producer and Editor for <u>60 Minutes Overtime</u>. It was widely known that Croxton had a serious temper and would on occasion act insubordinate and hostile. On one occasion, Executive Editor Simon told me to inform Croxton that he would no longer be the lead Associate Producer on one of my stories and instead would be in a supporting Associate Producer role. Simon told me that she was afraid of Croxton getting angry at her and appreciated me handling the matter. Simon also told me that Croxton refused to follow instructions regularly. On information and belief, on another occasion, Croxton slammed the door in the face of a female producer at whom he was angry. CBS repeatedly looked the other way when it came to complaints about Croxton and his behavioral problems.

        g.      Matthew Richman: Matthew Richman ("Richman") is a Senior Editor responsible for supervising other Editors. On information and belief, several Editors and Producers have raised concerns about his behavior. On information and belief, Ashley Velee, a female Producer, organized a group of Producers to make a complaint about Richman to Owens and Simon. During a Zoom call that I was part of, several Producers complained about Richman's abusive conduct. Simon later told me that the complaints were unfair and that the Producers needed to account for his personality.

26

Pl. 000177 (Confidential)

## A Male Supervisor Harasses and Abuses Me

126. I worked for 60 Minutes Producer Bar-On from 2011 to 2017.

127. Bar-On repeatedly subjected me to emotional abuse and sexual harassment over the course of several years. I kept contemporaneous notes regarding Bar-On's misconduct.

128. Bar-On regularly demeaned and insulted me. For example, Bar-On frequently yelled and, sometimes, screamed at me and threatened to fire me.

129. I tried repeatedly to stop the mistreatment, but Bar-On was sometimes hostile toward me and, on other occasions, he was dismissive. For example:

   a. In September 2016, Bar-On told me to get over it when I asked him to stop yelling at me;

   b. In September 2016, Bar-On blamed me for his abusive conduct, claiming that he was trying to yell less frequently, but that I kept causing problems;

   c. On or about September 6, 2016, Bar-On accused me of complaining constantly and said I overreacted;

   d. On or about September 28, 2016, after Bar-On yelled at me, I began crying; he told me to stop "overreacting"; and

   e. When I asked Bar-On to be more respectful in October 2016, he called me "snide."

130. Bar-On acknowledged his abusive conduct towards me. For example, on or about February 28, 2013, Bar-On wrote in an email to me that he was apologizing for his "outburst" because it "was uncalled for" and he promised to "work on it." Far from improving his treatment of me, he continued to sexual harass and verbally abuse me.

131. Bar-On tried to sabotage my work. He regularly cut me out of important communications and excluded me from meetings. He also blocked me from advancing at 60 Minutes, including by failing to properly give me co-producer credit for segments where I made

27

Pl. 000178 (Confidential)

substantial contributions. Bar-On also pressured me to accept blame for his errors even though I was not at fault for the problems.

132. Bar-On made sexist comments to me. For example, he told me on several occasions that he would never hire a man as an Associate Producer because men were less likely to tolerate not getting credit for their work and women were more likely to be subordinate as compared to men.

133. Bar-On sexually harassed me. For example, during a work trip to Italy, Bar-On, who was intoxicated, hit on me and pressured me to come to his hotel room.

134. Bar-On regularly commented about my body and weight. He encouraged me to "stay" at certain weights and told me which clothes accented my body. For example, on or about September 22, 2016, at the Emmy Awards ceremony, Bar-On commented on my dress and its fit. Bar-On told me that my shoes made my legs look good.

135. Bar-On also made derogatory comments about the physical appearance of other women. For example, he regularly mocked Stahl's face and body and referred to her as "disgusting" and a "see you next Tuesday" (which was a euphemism for "cunt").

136. Bar-On told me on two occasions, including once in front of another employee, that he watched pornography on his work computer. Bar-On told me that he bought pornography off the street during a work trip to Washington, D.C. with Stahl. He told me that he had been watching the pornography on his work computer one night. He said that the next morning he was extremely anxious because Stahl asked to use his laptop at the airport and he was unsure if he had closed the window with the pornography.

137. In March 2016, I informed Bar-On that I was pregnant. He responded that I needed to make a major change if I had the baby, including quitting my job at 60 Minutes. He

28

explained that it would be "impossible" for me to keep working at <u>60 Minutes</u> as a single mother and that I should move home with my parents in Cleveland or live with my brother in Seattle. Bar-On also said that at my age I should quit because I would probably never have another chance to be a mother.

138.    Bar-On made inappropriate and vulgar sexual comments about women in front of me. For example, on or about August 5, 2016, in response to a male employee's request to borrow his copy of a <u>Vanity Fair</u> featuring Margot Robbie on the cover, Bar-On made a joke about masturbation. Bar-On told the other employee that "yes," he could borrow the magazine, but not to return it with "sticky" pages. The magazine was still in plastic and Bar-On also kept joking about how it was time to "take the wrapper off," meaning not wear a condom. I asked repeatedly for him to stop. He refused.

139.    On the same day that Bar-On made a joke about masturbation, August 5, 2016, I told Bar-On that I wanted to have a more professional relationship and asked him to stop yelling at me, threatening to fire me, and making inappropriate comments. Bar-On responded that I sounded "bitter."

140.    Also, on or about August 29, 2016, Bar-On and Producer Keith Sharman ("Sharman") joked in front of me in Bar-On's office about actress Natalie Portman and her "little" body parts, plainly referencing her breasts. They also talked about a story Sharman was working on about actor Nate Parker ("Parker") and covering up rape. Bar-On repeatedly laughed about the story. I, who was uncomfortable, tried to change the topic, but Bar-On would not let me. At one point, Sharman said, "It's like we are in one of those bad CBS videos," meaning they were a textbook example of harassment and how not to behave.

29

Pl. 000180 (Confidential)

141. In or around October 2016, Bar-On made a joke about rape. In my office, Bar-On and I discussed multiple topics including Pussy Riot, a Russian feminist protest rock band, and Parker, the actor accused of raping a female student. Bar-On joked about Parker saying, "talk about a Pussy Riot."

142. On or about March 7, 2017, Bar-On described to me an interaction he had with Stahl. Bar-On said that Stahl knocked on his office door, which was closed. When he met Stahl, Stahl asked him what he was doing with the door closed. Bar-On joked that he wanted to tell Stahl that he was in the office masturbating. I told Bar-On that his comment made me uncomfortable.

<u>CBS Ignores My Complaints</u>

143. On or about January 13, 2017, I complained about Bar-On's abusive behavior to Senior Producer Alison Pepper ("Pepper"). I expressed that I was worried about speaking out against him because I was concerned that it would harm my career.

144. I also told Pepper that Bar-On's abuse was causing me to experience "extreme health issues." For example, at the time, I had discovered several bald spots on my scalp.

145. Pepper made excuses for Bar-On's misconduct. She said that individuals become more casual in the workplace after working together for many years.

146. When I responded that screaming at your subordinates was not casual behavior, Pepper threatened me. Pepper stated that I could ask to transfer off the team. I did not want to stop working with Stahl, who was at the time one of the most senior and well-respected Correspondents on the show, because I was worried that doing so would negatively affect my career, including it would derail my opportunity for a promotion.

30

Pl. 000181 (Confidential)

147. Pepper shared my complaint with then-Executive Editor Owens, who later met with me.

148. During the meeting between Owens and me, we discussed comments Bar-On had made in front of Owens, including that Bar-On did not care if I "got [myself] killed" on assignment in Iran.

149. Owens told me that he was not surprised by my complaints about Bar-On's behavior, since he believed that Bar-On had a mood disorder.

150. Owens said that I could transfer to another team, but that I would be unable to continue working with Stahl as an Associate Producer. Owens also said that I needed to tell Stahl directly that I wanted to transfer due to Bar-On's behavior. Thus, Owens placed the burden on me to give up my role or have a difficult conversation with Stahl, either of which could have hurt my career.

151. Owens did not offer any other options such as Owens's reporting Bar-On to HR or Owens's speaking to Bar-On or Stahl. Neither Owens nor anyone else at CBS ever investigated my complaint against Bar-On.

152. As set forth above, Stahl complimented me for not formally raising my complaints about Bar-On.

31

PI. 000182 (Confidential)

## CONCLUSION

153.    For the foregoing reasons, I believe that CBS has discriminated against me because of my gender.

_____
ALEXANDRA POOLOS

Sworn to before me this
_3_ th Day of January 2023

_____
Notary Public

Emily G. Bass
Notary Public of the State of New York
Registration No. 02BA6442195
Commission Expires 10/11/2026

Pl. 000183 (Confidential)