# EXHIBIT LLL

Case 1:23-cv-08896-GHW-HJR    Document 300-66    Filed 02/09/26    Page 2 of 29

**NEW YORK STATE SUPREME COURT**
**NEW YORK COUNTY**

-------------------------------------------------------------- X

CASSANDRA VINOGRAD,                          :
                                                                     :
                  Plaintiff,               :     Civil Action No.
                                                                     :
         v.                                        :     **COMPLAINT**
                                                                     :
CBS BROADCASTING, INC.,                     :     **Jury Trial Demanded**
                                                                     :
                 Defendant.             :

-------------------------------------------------------------- X

      Plaintiff Cassandra Vinograd ("Plaintiff"), by and through her undersigned counsel, Wigdor LLP, as and for her Complaint in this action against Defendant CBS Broadcasting Inc. ("CBS" or the "Company"), hereby alleges as follows:

### CBS Still Protects Its Powerful Men: Nothing Has Changed

      1.     In December 2019 CBS remains committed to insulating and protecting powerful men – the "talent" – at the expense of its female employees.  Despite paying lip service about purging men that behave badly and assuring female employees that their voices will be heard, respected and underlined, this case shows that nothing has changed and legitimate progress towards eliminating sexual harassment at CBS remains elusive.

      2.     In June 2019, nine months after the scandal-led departure of Jeff Fager ("Fager"), the longtime executive producer of 60 Minutes, Cassandra ("Cassie") Vinograd was hired as an associate producer to work exclusively under 60 Minutes senior producer Michael Gavshon ("Gavshon").  Gavshon, age 63, is considered one of the network's preeminent producers, having

Case 1:23-cv-08896-GHW-HJR    Document 300-66    Filed 02/09/26    Page 3 of 29

written and produced more than 150 segments and received nine Emmy Awards and multiple other prestigious honors.[1]

3.    In September 2019, just days after the one year anniversary of Fager's exit, Cassie Vinograd, almost thirty years younger than Gavshon and his sole associate producer, emailed senior executives and the general counsel, to describe her serious concerns regarding "highly inappropriate, unprofessional and upsetting events" involving Gavshon. Understanding the power held by Gavshon, in this same email she wrote, "I would like an investigation and protection from retaliation."[2]

4.    Sadly, an impartial investigation or protection from retaliation is the last thing CBS provided to Cassie.  In the ensuing days, through a series of swift moving events, Cassie was ostracized, isolated and penalized for calling out what she perceived as inappropriate conduct by Gavshon.  Gavshon quickly removed her from all stories in production, including a segment she had pitched and performed the majority of the work on.  In deference to Gavshon, CBS executives did nothing to stop his blatant retaliation. Worse, senior executives ratified his personal vendetta by willingly sending temporary associate producers to replace Cassie and work with Gavshon.

5.    For the last two and a half months, Cassie sits alone in her office with no work to do while her coworkers are left to wonder what _Cassie may have done_ to cause such a horrible predicament.

---

[1]    As discussed _infra_, Gavshon is an old-guard member of CBS having worked for CBS for more than 30 years.  Closely aligned with Bob Simon, a powerful CBS correspondent, Gavshon helped mentor Simon's daughter, Tanya Simon, who is now the executive editor at 60 Minutes. Originally hired by Don Hewitt to work on 60 Minutes, Gavshon worked with Jeff Fager for years.

[2]    Also, in September 2018, CBS announced the names of 18 groups, including Times Up, that would share in CBS's $20 million donation stemming from the exit of its chief executive Les Moonves, following allegations of sexual misconduct.

2

Case 1:23-cv-08896-GHW-HJR    Document 300-66    Filed 02/09/26    Page 4 of 29

6.     Disgracefully, shortly after she complained, a male in CBS's Human Resources ("HR") department told Cassie that she had better stay silent about Gavshon and fall into line or soon the story would shift to rumors maligning her character.  Michael Roderick, a vice president in employee relations, told Cassie that:

> "CBS is a media company....What happens, as you know, is it becomes **gossip** and **before you know it twenty people are talking about it and its gossip and you are having an affair**...out of respect for you...Keep this confidential."

Such blatant retaliation is abhorrent.  Historically, women opted to stay silent about gender-based misconduct out of fear of precisely the type of retribution that CBS now is inflicting on Cassie Vinograd. CBS's purported stand about valuing female employees' voices is meaningless.

7.     Clearly, at CBS doing the right thing, indeed, whether it will comply with our discrimination laws as is required depends on the power level of "who" is involved. Unsurprisingly, the appointment of a woman to lead the company yielded no meaningful change. It takes more than symbolic leadership changes to rework decades of boys only clubs.  When Susan Zirinsky took charge in January, she promised:

> "The #MeToo movement isn't behind us, it's alongside us in our thinking. There will be a new and more powerful human resources person in the news division that is working on culture change. It's really important to me to have an environment where there is transparency, **where you can talk**, where there are reactions based on actions."[3]

8.     As the allegations reveal, there is no culture change or increase in transparency at CBS.  To the contrary, the notion that female employees have access to an HR department "where [they] can talk," is absurd.

---

[3]     https://gothamist.com/arts-entertainment/susan-zirinsky-will-be-the-first-woman-to-helm-cbs-news (emphasis added).

Case 1:23-cv-08896-GHW-HJR    Document 300-66    Filed 02/09/26    Page 5 of 29

9.      Because CBS failed to change, Cassie Vinograd is forced to hold CBS accountable through our legal process.  CBS can explain to Cassie Vinograd and the public why it believes rules bend to shape its needs.  In spite of mistaken superiority, CBS is not above the law.

10.     Set forth below is what happened to Cassie Vinograd.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over Defendant CBS pursuant to Civil Practice Law & Rules ("CPLR") § 301 because Defendant CBS is authorized to conduct business throughout New York and has its principal place of business located at 51 West 52nd Street, New York, New York ("NYC Office").  At this same location, Defendant CBS employs hundreds of employees.  Moreover, Defendant CBS employs hundreds of additional individuals throughout the state.

12.     At all relevant times, Defendant CBS continuously and systematically conducted business in New York.  Further, the events giving rise to this action took place at the principal offices for Defendant CBS, located at 51 West 52nd Street, New York, New York.

## PARTIES

13.     Plaintiff Cassandra Vinograd is an associate producer at CBS.  Ms. Vinograd is a United States citizen.  Currently, Ms. Vinograd works for CBS in its office in London, England.

14.     Defendant CBS Broadcasting Inc., a Delaware corporation, is licensed to conduct business under the laws of the State of New York, and has its principal executive office at 51 West 52nd Street, New York, New York.

4

Case 1:23-cv-08896-GHW-HJR   Document 300-66   Filed 02/09/26   Page 6 of 29

## ADMINISTRATIVE PROCEDURES

15.     Following commencement of this action, a copy of this Complaint will be served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

16.     Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

### I.      History of Misogyny at CBS

17.     In the fall of 2017, the power of #MeToo exposed deep-seated problems at CBS. Shockingly, the public learned that for years numerous female employees' complaints about pervasive sexual harassment resulted in no accountability for the harassers but swift retribution for the women.  In fact, the public learned that CBS's *modus operandi* was to insulate and protect male executives and talent while silencing their victims.

18.     When published reports first surfaced that Leslie Moonves ("Moonves"), CBS's former CEO for more than 15 years, was accused of sexually harassing women, including by forcibly touching and kissing female employees during business meetings, William Cohen, a member of the CBS Board of Directors, defended Moonves, proudly affirming during a board meeting that:

> We are going to stay in this meeting until midnight if we need to until we get an agreement that **we stand 100 percent behind our CEO** and there will be no change in his status[.][4]

19.     Arnold Kopelson, another member of CBS's Board of Directors, proclaimed:

---

[4]      https://www.nytimes.com/2018/12/14/business/media/cbs-sexual-harassment-timeline.html (emphasis added) (last accessed December 16, 2019).

Case 1:23-cv-08896-GHW-HJR    Document 300-66    Filed 02/09/26    Page 7 of 29

**I don't care if 30 more women come forward and allege this kind of stuff**. Les [Moonves] is our leader, and it wouldn't change my opinion of him.[5]

20.     In an environment where known sexual harassers received resounding support from the highest reaches of management, bad behavior was not limited to Moonves.   Other prominent CBS men were exposed for their unlawful behavior towards women.   A sampling of the outrageous behavior that women have endured while working at CBS is set forth below:

- Thirty current and former CBS employees told Ronan Farrow, a reporter at The New Yorker, that reprehensible behavior, such as that engaged in and tolerated by Moonves, infected other parts of CBS, including CBS News and 60 Minutes.   Farrow's investigative work showed that CBS's pattern was to obtain promises of blanket silence by the female victims in return for money, and thereafter go on to promote a number of men accused of sexual misconduct.[6]   Farrow's reporting also revealed the following:

- Jeff Fager, the former chairman of CBS News and executive producer for 60 Minutes, was accused of sexual harassment by **19** current and former female employees. Fager was accused of, *inter alia*, getting drunk at company parties and touching female employees inappropriately.[7]

- Fager had a reputation for protecting men accused of misconduct who reported to him.  Specifically, he protected Michael Radutzky, a senior producer at 60 Minutes with a reputation for being "out of control," after he allegedly threatened to throw furniture at a female colleague and twisted the woman's arm behind her back, causing her to scream.   After discouraging the female employee from reporting that incident to HR, Fager allegedly asked the female employee to apologize to Radutzky to avoid conflict in the office.   In response to a request for his comment on the matter, Fager told CBS correspondent, Jericka Duncan,

---

[5]     Id. (emphasis added).

[6]     See https://www.newyorker.com/magazine/2018/08/06/les-moonves-and-cbs-face-allegations-of-sexual-misconduct (last accessed December 16, 2019).

[7]     See id.

Case 1:23-cv-08896-GHW-HJR    Document 300-66    Filed 02/09/26    Page 8 of 29

to "[b]e careful.  There are people who lost their jobs trying to harm me."[8]

- Habiba Nosheen, a former journalist at 60 Minutes, complained to management that Ira Rosen, a producer for the program, directed numerous sexual comments at her and that he suggested that Ms. Nosheen flirt with sources. Ms. Nosheen met with Fager and Fager assured Ms. Nosheen that she did not have to worry about Rosen harassing other women.  Subsequently, CBS retaliated against Ms. Nosheen by blocking her from future assignments.  Days after Ms. Nosheen complained to Fager, Fager mandated that Ms. Nosheen attend a meeting with him and two of his deputies.  In the meeting, Fager wrongfully criticized Ms. Nosheen's work performance in what Ms. Nosheen interpreted to be an obvious attempt to retaliate against her for making a protected complaint.[9]

- Charlie Rose ("Rose"), former co-anchor for the network's morning show, CBS This Morning, and frequent contributor for 60 Minutes, was accused by numerous female colleagues of egregious sexual harassment that spanned decades.  For example, Rose was accused of *inter alia*, (i) placing his hand on female employees' legs and upper thigh, (ii) exposing his penis to female employees who were working at his residences or traveling with him, (iii) groping a female employee by grabbing her buttocks during a staff party, (iv) calling a 21-year old female employee late at night and early in the morning to describe his fantasies of her swimming naked in his pool, and (v) groping a female colleague's breasts and stomach while she was driving him from his residence in Bellport, New York to Manhattan.[10]

- In December 2018, CBS paid actress Eliza Dushku $9,500,000 to resolve her allegations of sexual assaults that she experienced by Michael Weatherly on the set of CBS series Bull.  In one incident caught on tape, Ms. Dushku fumbled her line, prompting Weatherly to shout, "I will take you over my knee and spank you like a little girl."

---

[8]    See id.
[9]    See id.
[10]   See https://www.washingtonpost.com/investigations/eight-women-say-charlie-rose-sexually-harassed-them--with-nudity-groping-and-lewd-calls/2017/11/20/9b168de8-caec-11e7-8321-481fd63f174d_story.html (last accessed December 16, 2019).

7

Case 1:23-cv-08896-GHW-HJR     Document 300-66     Filed 02/09/26     Page 9 of 29

CBS, settling with Dushku, has allowed Weatherly to reprise his role on Bull.[11]

- In March 2018, Jill Arrington, a former CBS news anchor met with CBS Executives about the renewal of her contract and complained that she was being paid substantially less than her male counterparts. In response to Ms. Arrington's complaints, Steve Mauldin, the former general manager of CBS's Los Angeles stations, stated "Oooh, isn't she tough," and "[t]his one talks more than my wife." As Ms. Arrington was walking out of the meeting, Mauldin told her to "[p]ut on a tennis dress and meet me at the golf club. We'll put you on tape, and you can make some extra money." Later that year, CBS terminated Ms. Arrington's employment citing "budget cuts."[12]

- Leyna Nguyen, a former KCBS-KCAL anchor and 20-year CBS employee, complained in July 2018 about inappropriate comments and unwanted touching by a male colleague to CBS. Although the alleged wrongdoer was let go, CBS paid him severance. The same former CBS employee that assaulted Ms. Nguyen also propositioned Gwendolyn Gatti, CBS's former head of makeup, for sex, slapped Ms. Gatti on her buttocks and asked her about her sex life.[13]

- Michele Gillen, a journalist at an affiliate of CBS and recipient of over two dozen regional Emmy Awards, filed an age and gender discrimination lawsuit in 2018 against CBS claiming that she was subjected to discriminatory comments and overlooked for important projects simply because she is a woman and an older employee. After Ms. Gillen complained to CBS's HR department, CBS removed Ms. Gillen as the anchor of the CBS show "Focus on South Florida."[14]

---

[11]    See https://www.thedailybeast.com/why-is-cbs-bull-back-on-tv-after-a-dollar95-million-sexual-harassment-settlement (last accessed December 16, 2019).

[12]    https://www.latimes.com/entertainment-arts/business/story/2019-12-08/cbs-tv-stations-toxic-culture (last accessed December 16, 2019).

[13]    See id.

[14]    See https://www.miamiherald.com/news/business/article238295563.html (last accessed December 16, 2019). Before Fall 2017, other matters about alleged gender discrimination had surfaced. For example, in 2000, CBS paid $8,000,000 to settle a class action lawsuit brought by 200 female technicians alleging that CBS and its affiliates unlawfully paid them less than their male counterparts, passed them over for promotions in favor of male employees and received

8

Case 1:23-cv-08896-GHW-HJR    Document 300-66    Filed 02/09/26    Page 10 of 29

## II.   CBS's Rebranding Campaign is a Sham

21.    After public attention about its misogynistic culture surfaced, CBS engaged in a massive PR campaign to salvage its tarnished public image and bolster its bottom line.

22.    CBS told the public and its employees that it was "committed" to providing female employees a safe work environment free from harassment and free from retaliation for speaking up.  For example, in July 2018, in response to Ronan Farrow's article, CBS said:

> CBS is very mindful of all workplace issues and takes each report of misconduct very seriously. We do not believe, however, that the picture of our company created in *The New Yorker* represents a larger organization that does its best to treat its tens of thousands of employees with dignity and respect. We are seeing vigorous discourse in our country about equality, inclusion, and safety in the workplace, and CBS is committed to being part of the solution to those important issues.[15]

23.    CBS wants the public to believe that it takes the #MeToo movement seriously and has cleaned house by removing harassers from the workplace.[16]  This was the message senior executives gave to Cassie during her interview process.  Tanya Simon and Deborah DeLuca told Cassie that it was a "great time to be joining CBS" because CBS "got rid of all the assholes."

24.    Duped by its self-serving PR campaign and representations from executives, Cassie Vinograd learned the hard way that CBS is doing nothing to change.  Retaliation remains

---

less overtime than male employees.  They also alleged that they were routinely subjected to a hostile work environment, sexual harassment and retaliation.  See Beckmann v. CBS, Inc., 192 F.R.D. 608 (D. Minn. 2000).

[15]    https://www.newyorker.com/magazine/2018/08/06/les-moonves-and-cbs-face-allegations-of-sexual-misconduct (last accessed December 16, 2019).

[16]    Numerous media outlets reported that during the course of an investigation of CBS by outside law firms to examine accusations of sexual misconduct made by multiple women against Leslie Moonves, the outside lawyers issued an investigation report that said CBS, when faced with instances of wrongdoing, had a tendency to protect itself at the expense of victims.

9

the go-to default when women dare contact HR or senior executives about what they believe is improper, unprofessional or inappropriate conduct.

## III.  Cassie Vinograd Reports Her Concerns About Gavshon

25.      Shortly after Cassie began working for Gavshon, she became aware that he drank alcohol often and excessively.  Although Gavshon drank openly in the office and out in the field in front of CBS employees, no one said anything about it.  Cassie quickly realized that Gavshon had been doing this for years, and employees were expected to tolerate him in a drunken state, even when he became belligerent or passed out drunk in her office.

26.      Within two months of starting at CBS, Cassie witnessed too many instances of Gavshon's excessive drinking to list here.  However, by way of example only, during a two-week trip to Hungary to film a segment, on many days Gavshon started drinking by lunch and would continue drinking the rest of the workday into the evening.  Gavshon often consumed so much alcohol that Cassie and other employees would have to repeat things to him as well as decipher his slurred words.

27.      On a number of occasions, Cassie contacted her husband to express her worry about Gavshon's drunken state, including to tell him that Gavshon had started drinking before noon and she was worried about the rest of the day, or to say that he had turned belligerent.  She texted him a photo of Gavshon passed out in her office.  Cassie became more upset and worried after spending the two weeks with Gavshon from around September 8 to September 21, and witnessing the level of alcohol abuse.  As a new employee, and cognizant of the reverence Gavshon received at CBS, she was afraid to say anything about it at CBS.

Case 1:23-cv-08896-GHW-HJR   Document 300-66   Filed 02/09/26   Page 12 of 29

28.      Things changed, however, when one night after the Hungary trip, Gavshon texted Cassie an old photo of Gavshon and some friends urinating on what appeared to be smoldering coal.



29.      When she saw the photo appear on her phone, Cassie was disgusted, uncomfortable and scared.  Gavshon controlled her fate at CBS.

11

30.     Regardless of the photo being of Gavshon in much younger days, it was creepy and gross to receive a picture of her boss's penis and urine stream.  She did not find it appropriate that the photo included another man alongside Gavshon who also was holding his penis and urinating.

31.     Shocked, Cassie did not respond to Gavshon's text.

32.     More than an hour later, Cassie received another unsolicited text from Gavshon. Incredulously, Gavshon said he was "sorry" he sent Cassie the photo because **Gavshon meant to send it to his sister instead**.



33.     There is no explanation for Gavshon's texts.  Regardless if he was drunk and sent it to Cassie by "mistake" when really it was meant for his own sister, or if he sent it to her hoping

Case 1:23-cv-08896-GHW-HJR    Document 300-66    Filed 02/09/26    Page 14 of 29

that Cassie would ratify the inappropriateness by saying it was "funny" or some such comment that would open the door to Gavshon's ability to send her more photos in the future, it was not ok.

34.    These late-night texts coupled with her concern about his drinking, knowing that her future work required many days and nights of travel alone with Gavshon, caused Cassie to send the following email to NYC executives at CBS:

> **From:** Cassandra Vinograd cassandravinograd@gmail.com
> **Sent:** Monday, September 30, 2019 9:56 AM
> **To:** Matos, Benjamin <Benjamin.Matos@cbs.com>; Zirinsky, Susan <SZP@cbsnews.com>; Franco, Laura <Laura.Franco@cbs.com>; Mayers, Hazel-Ann <Hazel-Ann.Mayers@cbs.com>
> **Subject:** Confidential: Incidents at Work
>
> Two highly inappropriate, unprofessional and upsetting events have occurred at work. I would like to tell you what happened and show you documentation as soon as possible. However, I need your assistance and would like for this to be kept confidential until we've had a chance to talk. I would like an investigation and protection from retaliation.
>
> Based on what has taken place, it is impossible for me to do a professional job and go into the office every day. I fear the events might not be properly investigated or reviewed in London given how small the team is and how close people are to the pricivpal [sic] involved, which is why I've come to you. I've reviewed the Code of Conduct, which is why I'm copying in the Head Ethics Officer.
>
> Again, I'd like your help looking into this and ensuring I'm protected from retaliation. Please contact me as soon as possible.[17]

35.    Later that day, Cassie had a call with Roderick and Benjamin Matos ("Matos"). They discussed the photo and Gavshon's text about his sister. Cassie told Roderick and Matos

---

[17]    Laura Franco is an executive vice president and general counsel at CBS. Hazel-Ann Mayers is an executive vice president and CBS's chief business ethics and compliance officer.

Case 1:23-cv-08896-GHW-HJR    Document 300-66    Filed 02/09/26    Page 15 of 29

that the incident was unsettling and she had concerns about reporting to Gavshon. She also complained about Gavshon's excessive drinking. Indeed, Cassie told them that Gavshon's drinking was unprofessional, inappropriate and made it difficult for her to perform her job.

36. Roderick and Matos claimed that CBS's NYC office would investigate Gavshon's conduct.

## IV. CBS's Immediate Response is to Retaliate

37. Roderick and Matos outrageously advised Cassie that if she was uncomfortable working with Gavshon, _she_ should be the one to stay home and avoid the workplace. Tellingly, Roderick and Matos did not even suggest the possibility of suspending Gavshon pending the investigation. As a result, Cassie had to stay home while Gavshon continued to work and interact with his colleagues as if nothing had happened. Roderick also unbelievably instructed Ms. Vinograd to text message Gavshon and tell him that she would be out sick the rest of the week, forcing her to lie to her harasser to allow him to believe that it was business as usual.

38. This conduct – forcing Ms. Vinograd to disappear from the workplace without explanation – was clearly designed to harm her professional reputation and damage her in the eyes of her coworkers.

i. October 2, 2019

39. Disturbed by CBS's lack of response, Cassie emailed Roderick again on October 2, 2019 and complained about Gavshon's sexual harassment and her _de facto_ suspension:

> I wanted to follow up on our conversation today during which I explained again the circumstances underlying the sexual harassment complaint (filed and detailed to you on Monday) and also **expressed my surprise that I had been advised by HR and Compliance to say I'm sick and stay home from work -- with the result that I have effectively been suspended, while the person who harassed me (and for whom I have photo proof of said harassment) is still at the office.**

14

Case 1:23-cv-08896-GHW-HJR     Document 300-66     Filed 02/09/26     Page 16 of 29

That's contrary to what I understood were the policies at CBS regarding sexual harassment. ***I am truly distressed to find myself in the situation of being ready, willing and able to work and yet not feeling comfortable to be in the same room as the person who was repeatedly drunk on the job and which culminated in him sending me a photograph of him and his penis.*** I wanted to reiterate per our phone conversation that, as you know, I'm not sick -- but I do not feel comfortable going to work directly with him as a supervisor.

***I would like to know when I can return to work without feeling uncomfortable.***

(emphasis added).

40. To date, Roderick has failed to reply to this email.

41. On October 4, 2019, Cassie spoke to Roderick for the third time in a matter of days about Gavshon. She repeated that she was eager to get back to work but was uncomfortable working directly with Gavshon.

42. On October 8, 2019, she returned to the office because Roderick assured her that Gavshon would not be in the office during the alleged investigation. Two days later at the office, when her phone rang, she answered and Gavshon was on the line. She was terrified and not prepared for the wave of nausea and anxiety that came over her when she heard his voice. Cassie felt certain that she was unable to be alone in a room with Gavshon, and passed her concerns on to Roderick and Matos. She sent them the following email with the subject line "Shaking":

**From:** Cassandra Vinograd <cassandravinograd@gmail.com>
**Date:** October 10, 2019 at 11:32:23 GMT+1
**To:** "Roderick, Michael Garry" <Michael.Roderick@cbs.com>, "Matos, Benjamin"<Benjamin.matos@cbs.com>
**Subject:** Shaking

Michael and Ben,

15

Case 1:23-cv-08896-GHW-HJR   Document 300-66   Filed 02/09/26   Page 17 of 29

> Am a bit shaken up. I just answered the 60 Minutes line and it was
> Michael. He said he was looking for Diana Calvert. It caught me
> really off guard -- I blurted out that she was not in, then hung up
> the phone. It was surprising and also made me very nervous and
> uncomfortable. My hands are still shaking. I did not think I would
> be hearing his voice; I thought when you said he would not be at
> the office during the pendency of the investigation meant/ensured I
> would not have to interact with him.

43.     Roderick and Matos responded by telling her that Jose Andino ("Andino"), HR
from NYC, would be stopping by her office shortly to speak to her.  Andino never stopped by,
and Cassie spoke to Andino only during a telephone call in which Cassie was informed that CBS
cleared Gavshon of any wrongdoing.

ii.     October 11, 2019: CBS "Clears" Gavshon of any Inappropriate Conduct

44.     On October 11, 2019, Roderick told Cassie that HR conducted an investigation
and concluded that Gavshon meant to send the photo to his sister and that it was a mistake that
Cassie received it.  She also was told that CBS failed to "corroborate" her allegations about
Gavshon's excessive drinking.  Roderick showed her a memorandum of their internal
conclusions:

> Based on the investigation, we are able to corroborate that Michael
> mistakenly sent the photo to you on the evening of Thursday,
> September 26, 2019.  We have seen the image which Michael sent
> to you and the subsequent messages which he sent, apologising for
> the fact that he sent it to you.  This is clearly a photo that should
> not have been shared with you.  Michael has assured us that he sent
> the photo to you by accident and that he was appalled and
> embarrassed for inadvertently doing so. ***We accept his explanation
> that he sent this photo to you entirely by accident and believe that
> this was an isolated incident with no malicious intent on the part
> of Michael.***

(emphasis added).

16

Case 1:23-cv-08896-GHW-HJR    Document 300-66    Filed 02/09/26    Page 18 of 29

44. At the same time that CBS decided to "**accept his explanation**," it unilaterally decided that because Gavshon apologized, the incident was resolved and Cassie must return to work as if nothing happened. The memorandum reads:

> Regardless of the surrounding circumstances, however, Michael accepts that it was entirely inappropriate for him to send you that photo and, further, that the content of the photo was not appropriate to be shared with any work colleague. *No employee of CBS should be put in a position where they are made to feel upset or distressed as a result of receiving inappropriate material from any other CBS employee, not least their line manager*, and the fact that this happened in your case is something for which Michael has apologised.

(emphasis added).

45. The claim that CBS understands that Cassie should not be in a position where she is "made to feel upset or distressed" is meaningless based on what happened. In CBS's opinion, with the "investigation" complete and Gavshon cleared, Cassie simply should return to work.

46. Such an expectation was unreasonable because by that time Gavshon was fully aware that Cassie had sent the photo and his text to senior executives in NYC, complained that she considered it sexual harassment and also complained about his alcohol abuse. Gavshon, a man used to respect and power, was forced to undergo an internal investigation about his behavior by a young, junior subordinate, who was expected to feel grateful for the opportunity to work for him.

47. Gavshon was angry. Unconstrained by CBS, he lashed out at his accuser.

48. Despite telling CBS about the panic and fear she felt about the idea of being alone with Gavshon, after the investigation's conclusions, CBS shockingly told Cassie that it was *her responsibility* to work with her harasser to "repair" their relationship. Inexplicably, CBS told her

17

Case 1:23-cv-08896-GHW-HJR   Document 300-66   Filed 02/09/26   Page 19 of 29

that she and Gavshon should meet face-to-face and try to "work through" things. In essence, HR was not going to repair anything.

49.     Cassie was speechless. She knew the feigned good intentions by CBS meant she was on her own to navigate the situation with Gavshon. She also knew that Gavshon already made his decision to retaliate. That same day, Gavshon took steps to exclude Cassie from ongoing projects and, contrary to prior practice, made travel arrangements to the NYC office for a segment screening for himself only, excluding Cassie. In Gavshon's mind, Cassie was already done as his associate producer.

## V.     Ongoing and Relentless Retaliation

50.     Rather than find a solution for Cassie, CBS allowed Gavshon to engage in horrific retaliation that continues through the present. Despite her many pleas to HR, CBS offered her no guidance beyond its statement to work it out herself. For example, emails such as the one below to Roderick and Matos about what to say to coworkers went unanswered:

> Hi,
> What am I supposed to do in this situation? It's clearly still business as usual. I do *not* want to be communicating with him but I don't want it to seem like I'm shirking my job responsibilities.

51.     Before she reported Gavshon's reprehensible behavior, Cassie excelled as an associate producer at 60 Minutes. She received nothing but positive feedback and was involved in every aspect of the production process, including researching stories, filming stories, drafting scripts for segments, casting and communicating with sources, staff, correspondents, camera people, crew, management, editors, assistants and travel teams.

52.     After the investigation, she was stripped of all her work responsibilities.  CBS has failed to give Cassie a single assignment.  Further, she is consistently excluded from work meetings, calls and emails.

53.     Gavshon ceased sending her any information about ongoing stories.  Gavshon and CBS removed Cassie from segments that she either originated or played a significant role in developing, including segments related to Hungary, Brexit and Kenya.  Meanwhile, Gavshon continues to work on the Hungary and Kenya stories and benefit from the work Cassie put into those segments.  Gavshon finished the Brexit story without allowing Cassie to perform any further work on it.

54.     Coworkers question why she is not participating in ongoing segments while CBS expects her to say nothing about her allegations about Gavshon or the "investigation." As a result, employees now avoid Cassie and exclude her from all communications, as if she committed wrongdoing.  Helplessly, she is forced to sit in silence while Gavshon operates exactly as he did before she dared to speak up.

55.     Recently, Gavshon started using two young women (one in her 20s and the other in her 30s) to perform some of Cassie's responsibilities, including Tanya Simon's administrative assistant.  During a work trip before September 26, Cassie and Gavshon were working from a hotel's private lounge as Gavshon preferred because he had unlimited access to alcohol. Gavshon left to take a call and returned to the lounge and said that he had shouted at this young assistant, who was a "fucking idiot" because she could not arrange a "fucking conference call." In his drunken state, Gavshon bragged to Cassie that this young woman needed to know who she was "dealing with."  Cassie also is aware that Gavshon, while drunk, has berated a female assistant to Jon Wertheim.

19

56.     Undoubtedly, after witnessing the mistreatment of Cassie, these women will fear speaking out.

57.     Expecting her to say nothing about what happened – all for the benefit of Gavshon and CBS – to her detriment is the opposite of transparency about employee complaints of perceived discrimination.

58.     In sum, CBS's response to Cassie's protected speech is appalling.

**VI.     The NYC Office Controls the Work of 60 Minutes Employees**

59.     Prior to joining CBS, Cassie Vinograd established herself as a highly respected member of the journalism industry and worked at some of the most formative news outlets in the country, including NBC News, the Associated Press and the Wall Street Journal.

60.     In early 2019, discussions began between Cassie and CBS about a position as an associate producer, under Gavshon, for 60 Minutes. It was understood that Gavshon worked from CBS's London office and that Cassie was expected to work there also.

61.     Cassie interviewed at CBS's NYC office with Deborah DeLuca, a senior broadcast producer at 60 Minutes, and Tanya Simon,[18] the executive editor for 60 Minutes. On April 24, 2019, she interviewed via Skype with Gavshon. Thereafter, Cassie had an in-person interview with Gavshon in NYC.

62.     On June 13, 2019, she accepted CBS's offer. Upon information and belief, Ms. Simon and Bill Owens, the executive producer for 60 Minutes based in NYC, approved her hire.

63.     The details of her employment terms were worked out between Cassie and Frank Gonzalez, a vice president of business affairs for CBS who works in the NYC office. During

---

[18]     Ms. Simon is the daughter of Bob Simon, a legend at CBS. Notably, Mr. Simon and Gavshon were extremely close friends for over 30 years. Tanya Simon and Gavshon have worked together on countless segments for 60 Minutes.

discussions, Gonzalez repeatedly told Ms. Vinograd that CBS's NYC legal team needed to approve of her terms of employment.

64. After the terms of Cassie's employment were finalized, Bruce Chin, CBS's Human Resources ("HR") Coordinator located in NYC, contacted Ms. Vinograd and informed her that Melissa McKeon and Mariana Neff would be her HR contacts. Ms. McKeon and Ms. Neff both work out of CBS's NYC office.

65. Ms. Vinograd attended training and onboarding at the NYC office.

66. Before the retaliation and the stripping of her duties, Cassie's role involved researching and pitching segments to run on 60 Minutes. She interviewed sources for current and potential segments, drafted budgets and handled pre-production and production logistics.

67. In connection with 60 Minutes, production teams, which include producers and associate producers, originate and develop ideas for segments. Production teams are assigned correspondents. CBS executives in NYC assigned Anderson Cooper and Jon Wertheim to Gavshon's, and therefore Cassie's, production team.

68. In her role as an associate producer, Cassie was involved in all aspects of the production process, including segment origination, pitching segments to CBS executives and filming segments. For example, for the segment origination process, she filed "blue sheets" on CBS's online portal. Blue sheets are form documents that outline a proposal for a 60 Minutes segment. After she submitted a blue sheet proposal, CBS executives in the NYC office would review the proposal and decide whether to approve or reject the proposal. During her time at CBS, Cassie submitted numerous blue sheet proposals that were reviewed by CBS executives in NYC.

Case 1:23-cv-08896-GHW-HJR    Document 300-66    Filed 02/09/26    Page 23 of 29

69.     After CBS executives approved her blue sheet proposal, Cassie would submit a proposed production budget for the approved segment to Ms. Simon and Yvonne Shaw, a CBS Unit Manager who works out of the NYC office.  After Ms. Simon and Ms. Shaw approved her proposed budget, Cassie and her production team would begin producing the segment for 60 Minutes.  Specifically, Cassie and her team would develop a timeline for the production process, coordinate travel arrangements, request crew members, conduct research and film the segment. All requests for crew members and all expenses had to be approved by CBS executives in NYC, including Ms. Shaw.  Cassie regularly communicated with Ms. Shaw.

70.     During the production process, Cassie was required to be in contact with correspondents assigned to her production team.  As part of those responsibilities, Cassie regularly talked with the staff for Mr. Cooper and Mr. Wertheim to get them up to speed on segments and inform them of the status of production.  Mr. Cooper, Mr. Wertheim and their staffs are all located in NYC.

71.     Throughout the production process, Cassie was required to send hard drives containing content for a segment to Matt Richman, a 60 Minutes editor who works in NYC. After the hard drives were delivered to NYC, CBS's NYC office loads the content from the hard drives to CBS's computer system.  After he reviewed the segment content Cassie sent to him, Mr. Richman assigned an editor to work with Cassie and her production team.  All of CBS's editors for 60 Minutes work out of its NYC office.   Towards the end of the production process, CBS sends the editor from its NYC office to London to work with Cassie and Gavshon team to finalize the segment.

Case 1:23-cv-08896-GHW-HJR    Document 300-66    Filed 02/09/26    Page 24 of 29

72.     After the editor approves the segment, CBS requires Cassie to fly to NYC for screenings of the segment with CBS executives, including Ms. Simon, Mr. Owens and Claudia Weinstein, a Story Editor for 60 Minutes.

73.     Subsequently, Cassie sends an annotated script for the segment to CBS's NYC office so that Ms. Weinstein and Jennifer DuPrest can review.

74.     Cassie and Gavshon also communicate with Josh Ravitz, a CBS employee who works in the Rights and Clearances department in NYC, so that Mr. Ravitz can approve CBS's use of any outside content.

75.     Before a segment is aired, Cassie must get CBS's NYC-based social media team up to speed on the segment so that social media posts can be coordinated with the airing of the segment.  Finally, the completed segment is delivered to Ms. DeLuca in NYC and the CBS executives in NYC decide when the segment will air.

76.     Control of 60 Minutes is exercised from the CBS office located in NYC. Gavshon, and Cassie before she was removed from all work, is required to run all substantive work product through executives in CBS's NYC office.  All editing, budgeting and coordination of segments is run through employees at CBS's NYC office.  In addition to travelling to other countries to film segments, Gavshon and Cassie were expected to regularly travel to CBS's NYC office for work meetings and screenings.

**<u>FIRST CAUSE OF ACTION</u>**
**(Gender Discrimination under the New York State Human Rights Law,**
**N.Y. Exec. Law §§ 290 *et seq*. ("NYSHRL"))**
***Against Defendant CBS***

77.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

23

Case 1:23-cv-08896-GHW-HJR    Document 300-66    Filed 02/09/26    Page 25 of 29

78.     Defendant has discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by denying her the opportunity to work in an employment setting free of unlawful discrimination.

79.     Defendant has discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment.

80.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

81.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

82.     Defendant's unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
#### *Against Defendant CBS*

83.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

84.     By the actions described above, among others, Defendant violated the NYSHRL in that it unlawfully retaliated against Plaintiff for her engagement in protected activities and her

Case 1:23-cv-08896-GHW-HJR    Document 300-66    Filed 02/09/26    Page 26 of 29

opposition to Defendant's unlawful conduct in violation of the NYSHRL, including, *inter alia*, by engaging in conduct reasonably likely to dissuade and/or deter Plaintiff and others from engaging in protected acts.

85.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

86.    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

87.    Defendant's unlawful and retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Gender Discrimination under New York City Human Rights Law,**
**N.Y.C. Admin. Code §§ 8-101 *et seq*. ("NYCHRL"))**
***Against Defendant CBS***

88.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

89.    Defendant has discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by denying her the opportunity to work in an employment setting free of unlawful discrimination.

25

Case 1:23-cv-08896-GHW-HJR   Document 300-66   Filed 02/09/26   Page 27 of 29

90.     Defendant has discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by, *inter alia*, fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment.

91.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

92.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

93.     Defendant's unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)
#### *Against Defendant CBS*

94.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

95.     By the actions described above, among others, Defendant violated the NYCHRL in that they unlawfully retaliated against Plaintiff for her engagement in protected activities and her opposition to the unlawful conduct of Defendant in violation of the NYCHRL, including, *inter alia*, by engaging in conduct reasonably likely to dissuade and/or deter Plaintiff and others from engaging in protected acts.

Case 1:23-cv-08896-GHW-HJR    Document 300-66    Filed 02/09/26    Page 28 of 29

96.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

97.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

98.     Defendant's unlawful and retaliatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against the Defendant, containing the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendant described herein violate the laws of the State and City of New York;

B.      An award of damages in the amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

C.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, emotional pain and suffering and any other physical and mental injuries;

    D.      An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

    E.      An award of punitive damages;

    F.      Reinstatement;

    G.      An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and,

    H.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: December 17, 2019
      New York, New York                Respectfully submitted,

                                **WIGDOR LLP**

                                By: _____
                                    Jeanne M. Christensen
                                    Taylor J. Crabill

                                85 Fifth Avenue
                                New York, NY 10003
                                Telephone: (212) 257-6800
                                Facsimile: (212) 257-6845
                                jchristensen@wigdorlaw.com
                                tcrabill@wigdorlaw.com

                                *Attorneys for Plaintiff*

28