UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ALEXANDRA POOLOS,

                    Plaintiff,

         - against -

PARAMOUNT GLOBAL, CBS
BROADCASTING, INC., and CBS NEWS,
INC.,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No. 1:23-cv-08896

Oral Argument Requested

=================================================================
## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
=================================================================

VLADECK, RASKIN & CLARK, P.C.
Attorneys for Plaintiff
111 Broadway, Suite 1505
New York, New York 10006
(212) 403-7300

Of Counsel:
      Jeremiah Iadevaia
      Brandon White
      James Bagley

**TABLE OF CONTENTS**

FACTS ............................................................................................................................... 1

ARGUMENT ................................................................................................................... 10

   I.      SUMMARY JUDGMENT STANDARD ............................................................ 10

      A.   Title VII Gender Discrimination – Motivating Factor ................................... 11

      B.   Title VII Retaliation – But-For ..................................................................... 11

      C.   NYSHRL & NYCHRL – Treating Less Well ............................................... 12

   III.    JURY COULD FIND GENDER DISCRIMINATION ...................................... 12

      A.   Defendants Discriminated Against Plaintiff Due to Her Gender .................. 12

         1.   Gender Bias Was Widespread and a Commonly Accepted Practice ......................... 13

         2.   Defendants' Preferential Treatment of Male Comparators ....................................... 16

            a.   Male Producers and Editors Were Similarly Situated ........................................... 16

            b.   Poolos Is Comparable Despite Defendants' Biased Conclusions ......................... 20

      B.   Defendant's Reason For Firing Plaintiff Is Pretextual .................................... 22

         1.   Defendants' Explanations Are Not Credible ............................................................. 23

         2.   Defendants' Failure to Follow Policies Shows Bias .................................................. 25

      C.   Defendants' Other Arguments Do Not Justify Dismissal ............................. 29

   IV.    JURY COULD FIND RETALIAITON ............................................................ 30

   V.     JURY COULD FIND VIOLATIONS OF NYSHRL & NYCHRL ................................ 31

   VI.    JURY COULD FIND CONTRACT BREACH AND WAGE DEDUCTION ............. 32

CONCLUSION ................................................................................................................. 33

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Austin v. Phone2Action, Inc.,
    2023 WL 6201409 (E.D.N.Y. Sept. 22, 2023) ........................................................................15

Bagley v. J.P. Morgan Chase & Co.,
    2012 WL 2866266 (S.D.N.Y. July 12, 2012) .........................................................................25

Banks v. Gen. Motors, LLC,
    81 F.4th 242 (2d Cir. 2023) ..........................................................................................10, 11, 12

Bart v. Golub Corp.,
    96 F.4th 566 (2d Cir. 2024) ....................................................................................10, 11, 12, 13

Bennett v. Health Mgmt. Sys., Inc.,
    936 N.Y.S.2d 112 (1st Dep't 2011) ......................................................................................31

Benoit v. Com. Cap. Corp.,
    2008 WL 3911007 (S.D.N.Y. Aug. 25, 2008)........................................................................32

Berube v. Great Atl. & Pac. Tea Co.,
    348 F. App'x 684 (2d Cir. 2009) ...........................................................................................19

Birner v. Kensington Vanguard Holdings, LLC,
    2025 WL 963311 (S.D.N.Y. Mar. 31, 2025)..........................................................................33

Bivens. v Inst. for Cmty. Living, Inc.,
    2015 WL 1782290 (S.D.N.Y. Apr. 17, 2015).........................................................................29

Bogle v. Conn. Dep't of Mental Health & Addiction Servs.,
    2025 WL 1786072 (D. Conn. June 27, 2025)..........................................................................28

Brown v. Waterbury Bd. of Educ.,
    247 F. Supp. 3d 196 (D. Conn. 2017)................................................................................18, 21

Chambers v. TRM Copy Ctrs. Corp.,
    43 F.3d 29 (2d Cir. 1994) ......................................................................................................11

Chertkova v. Conn. Gen. Life Ins. Co.,
    92 F.3d 81 (2d Cir. 1996) ......................................................................................................23

Cobb v. Am. Urban Radio Networks LLC,
    2025 WL 641437 (S.D.N.Y. Feb. 27, 2025)..........................................................................32

Dall v. St. Catherine of Siena Med. Ctr.,
 966 F. Supp. 2d 167 (E.D.N.Y. 2013) ..................................................................................22

In re Dana Corp.,
 574 F.3d 129 (2d Cir. 2009)..................................................................................................11

Danzer v. Norden Sys., Inc.,
 151 F.3d 50 (2d Cir. 1998)....................................................................................................14

Davis v. Metro N. Commuter R.R.,
 2025 WL 2780704 (S.D.N.Y. Sept. 29, 2025).......................................................................19

Doyle v. Mid-Hudson Valley Fed. Credit Union,
 2023 WL 4297192 (S.D.N.Y. June 30, 2023) .......................................................................23

Edelman v. NYU Langone Health Sys.,
 141 F.4th 28 (2d Cir. 2025) ..................................................................................................12

Ercegovich v. Goodyear Tire & Rubber Co.,
 154 F.3d 344 (6th Cir. 1998) ................................................................................................14

FF Venture Cap. LLC v. Adam J. Plotkin, Rdwc, LLC,
 2024 WL 1995154 (N.Y. Sup. Ct. May 05, 2024)................................................................33

Gorzynski v. JetBlue Airways Corp.,
 596 F.3d 93 (2d Cir. 2010)..............................................................................................17, 30

Graham v. Long Island R.R.,
 230 F.3d 34 (2d Cir. 2000)..............................................................................................16, 30

Hicks v. Baines,
 593 F.3d 159 (2d Cir. 2010)............................................................................................14, 30

Holcomb v. Iona Coll.,
 521 F.3d 130 (2d Cir. 2008)..................................................................................................29

Hosain-Bhuiyan v. Barr Lab'ys, Inc.,
 2019 WL 3740614 (S.D.N.Y. Aug. 8, 2019)........................................................................32

Hunt v. Tektronix, Inc.,
 952 F. Supp. 998 (W.D.N.Y. 1997)......................................................................................14

Iqbal v. Teva Pharms. USA, Inc.,
 2017 WL 6729190 (S.D.N.Y. Dec. 28, 2017) ......................................................................32

Kaytor v. Elec. Boat Corp.,
 609 F.3d 537 (2d Cir. 2010)..................................................................................................10

King v. Aramark Servs., Inc.,
   96 F.4th 546 (2d Cir. 2024) ...................................................................16, 17, 23, 27

Kreinik v. Showbran Photo, Inc.,
   2003 WL 22339268 (S.D.N.Y. Oct. 14, 2003) ........................................................31

Kronisch v. United States,
   150 F.3d 112 (2d Cir. 1998)......................................................................................27

Kwan v. Andalex Grp. LLC,
   737 F.3d 834 (2d Cir. 2013)................................................................................12, 23

Littlejohn v. City of N.Y.,
   795 F.3d 297 (2d Cir. 2015)......................................................................................15

Mandel v. Rofe,
   2012 WL 1981453 (S.D.N.Y. May 31, 2012) ..........................................................30

Matusick v. Erie Cnty. Water Auth.,
   757 F.3d 31 (2d Cir. 2014).........................................................................................16

McGrath v. Arroyo,
   2019 WL 3754459 (E.D.N.Y. Aug. 8, 2019)............................................................30

Mihalik v. Credit Agricole Cheuvreux, N. Am., Inc.,
   715 F.3d 102 (2d Cir. 2013)................................................................................12, 31

Moll v. Telecaster Res. Grp., Inc.,
   94 F.4th 218 (2d Cir. 2024) ......................................................................................11

Mugavero v. Arms Acres, Inc.,
   2009 WL 1904548 (S.D.N.Y. July 1, 2009) ............................................................25

Musante v. Mohawk Valley Cmty. Coll.,
   270 F. Supp. 3d 564 (N.D.N.Y. 2017)......................................................................20

Nat'l R.R. Passenger Corp. v. Morgan,
   536 U.S. 101 (2002)...................................................................................................15

Neu v. Amelia US LLC,
   208 N.Y.S.3d 183 (1st Dep't 2024) ..........................................................................33

O'Diah v. Yogo Oasis,
   954 F. Supp. 2d 261 (S.D.N.Y. 2013).......................................................................29

Osekavage v. Sam's E., Inc.,
   619 F. Supp. 3d 379 (S.D.N.Y. 2022).......................................................................29

Port Auth. Officer 47708 v. Port Auth. of N.Y. & N.J.,
    2018 WL 3489569 (E.D.N.Y. July 19, 2018).................................................................21

Radwan v. Manuel,
    55 F.4th 101 (2d Cir. 2022) ......................................................................................16, 17

Redd v. N.Y. Div. of Parole,
    678 F.3d 166 (2d Cir. 2012)..........................................................................................10

Reeves v. Sanderson Plumbing Prods., Inc.,
    530 U.S. 133 (2000)...........................................................................................11, 23, 25

Sandiford v. City of N.Y. Dep't of Educ.,
    943 N.Y.S.2d 48 (1st Dep't 2012) .................................................................................11

Sandler v. Montefiore Health Sys., Inc.,
    2018 WL 4636835 (S.D.N.Y. Sept. 27, 2018).............................................................32

Sassaman v. Gamache,
    566 F.3d 307 (2d Cir. 2009)..........................................................................................13

Schoenadel v. YouGov Am. Inc.,
    2025 WL 371089 (S.D.N.Y. Feb. 3, 2025)...................................................................29

Scholem v. Acadia Realty Ltd. P'ship,
    45 Misc. 3d 562 (N.Y. Sup. 2014).................................................................................32

Senno v. Elmsford Union Free Sch. Dist,
    812 F. Supp. 2d 454 (S.D.N.Y. 2011)...........................................................................18

Setelius v. Nat'l Grid Elec. Servs. LLC,
    2014 WL 4773975 (E.D.N.Y. Sept. 24, 2014) .......................................................21, 22

Slattery v Swiss Reins. Am. Corp.,
    248 F.3d 87 (2d Cir. 2001)............................................................................................13

Slow v. Prestige Merch. Co.,
    2011 WL 4373516 (E.D.N.Y. Sept. 19, 2011) .............................................................30

Smith v. City of N.Y.,
    697 F. App'x 88 (2d Cir. 2017) .....................................................................................13

Sprint/United Mgmt. Co. v. Mendelsohn,
    552 U.S. 379 (2008).......................................................................................................14

Stratton v. Dep't for the Aging for City of N.Y.,
    132 F.3d 869 (2d Cir. 1997)..........................................................................................22

Temple v. City of N.Y.,
  2010 WL 3824116 (E.D.N.Y. Sept. 23, 2010) ................................................................22, 23

Terry v. Ashcroft,
  336 F.3d 128 (2d Cir. 2003).........................................................................................30

Thaqi v. Wal-Mart Stores E., LP,
  2014 WL 1330925 (E.D.N.Y. Mar. 31, 2014).................................................................27

Tolbert v. Smith,
  790 F.3d 427 (2d Cir. 2015).........................................................................................26

Ulrich v. Soft Drink, Brewery Workers & Delivery Emps.,
  425 F. Supp. 3d 234 (S.D.N.Y. 2019).....................................................................30, 31

Vaughn v. Empire City Casino at Yonkers Raceway,
  2017 WL 3017503 (S.D.N.Y. July 14, 2017) ................................................................29

Vellali v. Yale Univ.,
  2021 WL 5010015 (D. Conn. Oct. 28, 2021) ................................................................13

Vives v. N.Y.C. Dep't of Corr.,
  2019 WL 1386738 (E.D.N.Y. Mar. 27, 2019)................................................................20

Walsh v. N.Y.C. Hous. Auth.,
  828 F.3d 70 (2d Cir. 2016)...........................................................................................11

Watson v. Emblem Health Servs.,
  69 N.Y.S.3d 595 (1st Dep't 2018) ................................................................................12

Weiss v. JPMorgan Chase & Co.,
  332 F. App'x 659 (2d Cir. 2009) ..................................................................................28

Williams v. Bd. of Hudson River/Black River Regulating Dist.,
  2001 WL 1217199 (N.D.N.Y. Sept. 23, 2001)..............................................................31

Wright v. Urb. Outfitters, Inc.,
  2009 WL 10736929 (S.D.N.Y. Nov. 30, 2009)..............................................................13

Zakre v. Norddeutsche Landesbank Girozentrale,
  396 F. Supp. 2d 483 (S.D.N.Y. 2005)...........................................................................13

Zubulake v. UBS Warburg LLC,
  382 F. Supp. 2d 536 (S.D.N.Y. 2005)...........................................................................14

**Statutes**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. ...................................... *passim*

New York State Human Rights Law, N.Y. Executive Law §290 <u>et seq.</u> .............................. *passim*

New York City Human Rights Law, N.Y.C. Admin. Code §8-107 <u>et seq.</u> ............................ *passim*

New York Labor Law, N.Y. Lab. Law §193 ................................................................................1

Alexandra Poolos ("Plaintiff" or "Poolos") submits this Memorandum of Law in Opposition to the Motion for Summary Judgment of Paramount Global, CBS Broadcasting, Inc., and CBS News, Inc. ("Defendants") (Dkt.264-268). Material factual disputes preclude summary judgment on all of Plaintiff's claims.   There is ample support for Poolos's gender discrimination and retaliation claims,[1] including that Defendants repeatedly treated male employees who engaged in far more serious, indeed even unlawful misconduct, much more leniently than Poolos. Moreover, given the disputes about Poolos's underlying conduct, a jury could find that Defendants breached her contract and unlawfully deducted her wages by failing to pay her severance, in violation of New York common law and the New York Labor Law, N.Y. Lab. Law §193.[2]

FACTS

Poolos is an accomplished, award-winning Producer with a 29 year-long journalism career. (Pl.56.1 ¶¶220-232) Plaintiff joined Defendants[3] as an Associate Producer ("AP") for 60 Minutes in 2011.   In May 2018, Defendants promoted Poolos to Producer. (Id. ¶¶6,135,236,250)   Poolos produced stories for Correspondent Lesley Stahl ("Stahl"). (Id. ¶¶4-5,10,13-15,45,237)   From 2008 to 2018, Bill Owens ("Owens"), as Executive Editor, was second in command of the show. (Id. ¶¶2,10,151,210-211)   Between 2019 and 2025, Owens was Executive Producer and Tanya Simon ("Simon") was Executive Editor. (Id. ¶¶11-12,213,217)

---

[1] Plaintiff asserts those claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e et seq.; New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law §290 et seq.; New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §8-107 et seq.

[2] Defendants' Memorandum of Law in Support of Their Summary Judgment Motion is cited as "Def.Br."; Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Facts and Counterstatement of Disputed Facts is cited as "Pl.56.1¶--," and has a more detailed statement of facts.

[3] Defendants undisputedly are joint employers for purposes of this case.  (Pl.56.1 ¶208)

Poolos regularly received positive feedback regarding her performance, including a stellar written review by Owens in 2021. (Pl.56.1 ¶¶242-257)   Poolos worked under three-year agreements. (Id. ¶¶198,259,261) Defendants offered her a renewed contract effective from May 2021 until May 2024 (the "Agreement").  (Id. ¶¶198,259,261)

<u>60 Minutes Hires Richards as an Associate Producer</u>

In October 2020, Collette Richards ("Richards") joined <u>60 Minutes</u> as an AP, reporting to Poolos. (Pl.56.1 ¶¶40,296)  Then-CNN Producer Scott Bronstein ("Bronstein") had recommended Richards for the <u>60 Minutes</u> job. (Id. ¶¶40-42,297)

Poolos had serious concerns about Richards's performance in 2021. (Pl.56.1 ¶¶46-48,299) In late December 2021, the problems with Richards got worse. (Id. ¶¶313-316,320-322)  Poolos did not immediately report her concerns about Richards to management because she did not want to bother Simon during her vacation and was worried that if she reported Richards's conduct to Stahl, CBS would discipline Richards. (Pl.56.1 ¶¶324-325) Instead, Poolos contacted Richards's mentor, friend, and primary job reference Bronstein. (Id. ¶326)  Poolos sought Bronstein's advice about improving her professional relationship with Richards. (Id. ¶328) Poolos and Bronstein exchanged texts, including on December 31, 2021, but were unable to speak over the holidays. (Id. ¶329)

Before January 5, 2022, Poolos attempted to speak to Simon about Richards's performance. (Pl.56.1 ¶¶50,60,337-339)   However, Simon did not speak to Poolos until January 5. (Id. ¶¶340,391)

<u>Richards Complains about Poolos</u>

On December 17, 2021, Richards raised meritless complaints about Poolos to HR and Simon. (Pl.56.1 ¶¶52,63,341,348-374)  Many of the concerns had nothing to do with Poolos and,

2

instead, reflected the challenges of the demanding job. (Id. ¶¶63,348)  Other supposed concerns about purported bullying were fabricated or exaggerated. (Id. ¶¶63,349-374)  Richards secretly recorded 10 calls with Poolos; none supported her allegations. (Id. ¶¶63,372-374)  Immediately after learning about Richards's complaint on December 17, Owens and Simon solicited negative information about Poolos, including contacting Claudia Weinstein ("Weinstein"), Executive Story Editor. (Id. ¶¶23,376-382)  Based on her discussions with Weinstein, Simon purportedly learned of two prior concerns about Poolos. (Id. ¶¶23,376-382)  Even though Simon and Owens reported the purported concerns to Human Resources ("HR"), no one investigated or substantiated them. (Id. ¶¶384,387)

<u>No One Told Poolos About Richards's Complaint for More Than Three Weeks</u>

Richards complained on December 17, 2021 and submitted it in writing  on December 30, 2021. (Pl.56.1 ¶¶52,55,63,341,346-347) Renee Balducci ("Balducci"), HR Vice President, handled Richards' complaint. (Id. ¶54)   Defendants did not investigate Richards's December 2021 complaint. (Id. ¶¶79-80,406) Defendants found no need for direct HR involvement because the dispute was between two employees who were having trouble communicating. (Id. ¶397)

During a January 5, 2022 meeting, Owens and Simon told Poolos that Richards had complained about Poolos "bullying" Richards.  (Pl.56.1 ¶¶63,402-03) This was the first time anyone told Poolos about Richards's December complaint. (Id. ¶¶63,76,391) Poolos raised her concerns about Richards's performance. (Id. ¶¶64,411-412)  No one told Poolos to keep confidential Richards's December 2021 complaint. (Id. ¶¶584-586) When Poolos asked, Owens told her that there was no need to speak with HR.  (Id. ¶¶404-405)

3

<u>Defendants Knew that Poolos Was in Contact with Bronstein</u>

After Defendants decided not to discipline Poolos about Richards's December 2021 complaint, Richards claimed she was "scared" and skeptical of Poolos's ability to continue working with her.  (Pl.56.1 ¶414) Before the Poolos-Bronstein call, Bronstein notified Richards that Poolos had contacted him; Richards had been confiding in Bronstein about Poolos for months. (<u>Id.</u> ¶¶82,416)  Richards then informed HR VP Balducci about Poolos contacting Bronstein. (<u>Id.</u> ¶417)  Nobody tried to stop Poolos from speaking with Bronstein. (<u>Id.</u> ¶¶418-419)  On January 5, 2022, in the evening, Poolos and Bronstein spoke by phone. (Pl.56.1 ¶¶66,103,424)  Poolos told Bronstein that she wanted his advice and they discussed Richards. (<u>Id.</u> ¶¶69,425-431)

<u>Owens Meets With Poolos Again</u>

On January 6, 2022, Poolos spoke with Owens a second time about Richards's December 2021 complaint.  (Pl.56.1 ¶432)  Owens asked for more information about Richards's performance, which Poolos provided. (<u>Id.</u> ¶433)  Owens told Poolos that he was aware of a prior concern  about Poolos and that he would email her concerning their discussions. (<u>Id.</u> ¶437)  He encouraged Poolos to acknowledge that she understood his email and the matter would be closed.  (<u>Id.</u> ¶437)

Owens then sent Poolos an email stating that they talked about Richards's complaint about "your tone and manner, as well as at least one other instance from your time at 60 when this came up, and you have assured me that it won't be a problem going forward." (Pl.56.1 ¶438)  Poolos acknowledged Owens's email.  (<u>Id.</u> ¶439)

<u>January 7, 2022 Events</u>

On January 7, 2022, Richards reported her concerns to Balducci about the Poolos-Bronstein call. (Pl.56.1 ¶¶83,440) Richards asserted that, according to Bronstein, Poolos disparaged her performance and criticized her reporting concerns to HR. (<u>Id.</u> ¶83)

Balducci immediately texted Simon and Owens about Richards's contentions. (Pl.56.1 ¶¶482-484)   Before any investigation, Balducci and Owens decided that Poolos had retaliated against Richards. (<u>Id.</u> ¶¶480-483)  Owens then spoke to Poolos, who acknowledged that she called Bronstein but denied that she retaliated against Richards. (<u>Id.</u> ¶¶457-459,566-569)   Poolos explained why she contacted Bronstein. (<u>Id.</u> ¶460)

On the same day, January 7,  Balducci informed Poolos that CBS was suspending her and that her job was at risk. (Pl.56.1 ¶¶482-484)  Except for Poolos, Balducci has never recommended placing a Paramount employee on administrative leave unless that employee was accused of sexual misconduct. (<u>Id.</u> ¶473) As Executive Producer, Owens had never placed another employee on administrative leave. (<u>Id.</u> ¶474)

<u>HR Investigation</u>

For several weeks, Balducci investigated concerns that Richards raised about Poolos's call with Bronstein. (Pl.56.1 ¶477)  Defendants' investigation, in multiple ways, violated Defendants' policies. (<u>Id.</u> ¶¶109,493-498,505-508) For example, despite assuming that Bronstein had no motive to lie, Defendants did not inquire about possible bias even though Bronstein had been fired from <u>60 Minutes</u>, even though Richards had been confiding in him for months about Poolos, and even though he had a close personal and professional relationship with Richards. (<u>Id.</u> ¶¶82,97,109,456,493-498) These failures are especially significant because witnesses deleted

5

communications. (Id. ¶¶499-504)  As a result of the flawed investigation, Balducci determination about key facts was false. (Id. ¶¶516-518)

Ultimately, based solely on Bronstein's notes and Balducci's call with him, Owens and Balducci purportedly concluded that in her call with Bronstein, Poolos disparaged and retaliated against Richards. (Pl.56.1 ¶¶494,563-64)  Owens made the decision to fire Poolos. (Id. ¶¶109,529)

<u>Defendants Fire Plaintiff</u>

On February 3, 2022, Owens and Balducci told Poolos she was fired. (Pl.56.1 ¶¶90,112-113, 520) Poolos received a letter that Defendants substantiated policy violations, including that Poolos purportedly: retaliated against Richards; discussed Richards's complaints with others in violation of confidentiality obligations; and was not truthful. (Id. ¶528)

Contrary to Defendants' contention, Poolos did not engage in retaliation. (Pl.56.1 ¶¶532-543,548-549)  Before Poolos knew of Richards's December 2021 complaint, she had concerns about Richards and reached out to both Bronstein and Simon. (Id. ¶¶50,59,64,330,338,532) Bronstein did not work for Defendants at the time, he had no control over Richards's employment, and he repeatedly stated that Poolos could not say anything to negatively affect his view of Richards. (Id. ¶¶69-71,426,536)  Poolos also denies that she disparaged Richards during the Bronstein call or criticized her for contacting HR. (Id. ¶¶88,539,561) Defendants credited Bronstein, a man, over Poolos. (Id. ¶¶109,549,563-564)

Nothing even suggests that Poolos lied during the investigation. (Pl.56.1 ¶¶111,558-582) Poolos, a 10-year employee, had never been accused of lying.  (Id. ¶559) Owens and Balducci asserted that Poolos purportedly lied about the contents of her January 5 call with Bronstein, but this conclusion was based solely on crediting Bronstein. (Id. ¶¶109,162,465,530,560-566,575-577) Owens also asserted that Poolos lied about whether she spoke to Bronstein at all, which Owens's

6

own testimony shows is not true. (Id. ¶¶88,565-567) Balducci identified Poolos's additional purported misstatements, including about "who reached out to who" and when that happened. (Id. ¶¶575-582) The evidence Balducci collected during her investigation, however, refutes these conclusions, including by demonstrating that Poolos accurately described the chronology of the Bronstein communications. (Id. ¶¶558-582)

Defendants punished Poolos for discussing Richards's December 2021 complaint when they never instructed her to keep the complaint confidential and other employees openly discussed it. (Pl.56.1 ¶¶583-593) Balducci concedes that Poolos was not fired for violating the confidentiality policy. (Id. ¶¶593) Most significantly, Defendants invented reasons to support the firing decision. (Id. ¶¶111,203,527-528,556-557,560-593) Owens testified that it was "significant to [him] that [Poolos] reached out to . . . Bronstein after she had received . . . our conversation and an email and she acknowledged it." (Id. ¶556) That critical conclusion is false as the undisputed facts show. (Id. ¶¶98,103,424,579,582)

### Defendants' Sexism and Sexual Misconduct

Defendants have a long history of excusing male employees' misconduct, including unlawful conduct. (Pl.56.1 ¶¶602-829) In 2018, several publications exposed the sexual harassment and gender discrimination that CBS permitted to fester for decades. (Id. ¶¶602-609,617-619) According to the press coverage, the highest-level, male executives, including the former CEO Les Moonves ("Moonves") and the former Executive Producer of 60 Minutes Jeff Fager ("Fager"), ran the network in open defiance of the anti-discrimination laws and Defendants' ineffective policies, acting as if they were above the law. (Id. ¶¶602-619)

Following an internal investigation, Defendants announced that Moonves had breached his contract and he would not receive his severance. (Pl.56.1 ¶608) The New York State Attorney

General ("NYAG") investigated CBS's compliance with, inter alia, anti-discrimination laws. (Id. ¶¶620-632) The NYAG made findings, including that Moonves repeatedly sexually harassed women and that there were "systemic problems with CBS's then-existing Human Resources [] structure and its responses to allegations of sexual harassment." (Id. ¶¶623-626,628-632) On November 2, 2022, the NYAG announced a $30.5 million settlement with Defendants and Moonves for concealing sexual assault allegations against Moonves, misleading investors about those allegations, and insider trading. (Id. ¶625) Defendants promised to take steps to prevent and correct for sexual harassment. (Id. ¶¶630-632)

Defendants Applied Different Standards to Male Employees than Female Employees

During Owens's tenure as Executive Editor and Executive Producer, male 60 Minutes employees repeatedly were accused of misconduct, including unlawful harassment, discrimination, and retaliation; no disciplinary action was taken except against former Executive Producer Fager.  (Pl.56.1 ¶¶602-829) By contrast, the women who made complaints, including Habiba █████████████████████████████ and █████████████████████████ were forced to quit. (Id. ¶¶669,701,710,726) Some brought legal actions against Defendants.  (Id. ¶¶164,665,693)

During Owens's tenure as Executive Producer, Defendants have not fired for-cause or suspended a single male 60 Minutes employee. (Pl.56.1 ¶¶89,475,596) Across CBS News, due to the high for-cause standard, Defendants have fired a few employees only for serious misconduct like stealing and sexual harassment. (Id. ¶¶597-598) In contrast to the long unpunished male employees, Poolos was never accused of violating the law. (Id. ¶193) Defendants have declined to take any meaningful disciplinary action in response to serious allegations of male peers' misconduct. (Id. ¶¶144,189,657,668,700,734)

- Gavshon: Between 2019 and 2025, Michael Gavshon ("Gavshon") reported directly to Owens. (Pl.56.1 ¶634) In September 2019, Gavshon sent female AP, ███████, an old photograph of himself urinating on a campfire. (Id. ¶¶163,635-636) Gavshon's penis is visible in the photo. (Id. ¶¶163,636) ███████ complained about the photo and Gavshon's excessive drinking and anger and provided HR a photograph of a drunken Gavshon passed out in her office. (Id. ¶¶637-639) ███████ also alleged that after she made her complaint, Gavshon retaliated against her. (Id. ¶¶ 643-669) Defendants did not investigate ███████ retaliation allegations. (Id. ¶¶164,667) Defendants did not discipline Gavshon. (Id. ¶¶189,668)

- Rosen: Longtime male 60 Minutes Producer, Ira Rosen ("Rosen"), was accused of sexual harassment and retaliation by multiple APs, including ███████ and ███████ (Pl.56.1 ¶¶144-145,189,670-721) Rosen remained at 60 Minutes for over two years after those allegations. (Id. ¶¶146,189,712,714-715) Owens testified that he decided not to renew Rosen's contract in 2019 because Rosen did not "treat[] people well," including ███████ and ███████ two years earlier. (Id. ¶¶145,714) Owens allowed Rosen to remain on "pay or play" status, not working but paid, between July 12, 2019 and the end of his contract on April 4, 2020. (Id. ¶¶143,146,147,715-717)

- Radutzky: A female Senior Producer at 60 Minutes alleged that Michael Radutzky ("Radutzky"), a male Producer, threatened to throw furniture at her and twisted her arm behind her back, causing her to scream. (Pl.56.1 ¶¶192,724) Fager told the female Producer not to inform HR and then asked her to apologize to Radutzky. (Id. ¶729) Radutzky repeatedly yelled at his subordinates, including Simon, and was widely considered difficult to work with. (Id.¶ 730) Defendants did not discipline Radutzky for his blatant misconduct. (Id. ¶734) Defendants elevated Radutzky to Senior Producer supervising a reporting unit. (Id. ¶735) Radutzky accepted a voluntary buyout of his contract and left in 2018. (Id. ¶736)

- Bar-On: Poolos's former male supervisor, 60 Minutes Producer Shachar Bar-On ("Bar-On"), emotionally abused and sexually harassed her for years. (Pl.56.1 ¶¶126,129,132-133,136,737-739,778-813,816-829) Poolos complained about some of Bar-On's mistreatment in 2017 but CBS discouraged her raising additional complaints. (Id. ¶¶132-133, 739,814-828) Poolos raised additional concerns in 2022. Bar-On still works for CBS. (Id. ¶¶165,167)

- Levine: David Levine ("Levine") is a man, who was an AP for 60 Minutes. (Pl.56.1 ¶¶171,740) He reported to Owens and Simon. (Id. ¶742) Several employees complained about Levine, including about his serious anger displays often directed at women. (Id. ¶¶174-175,743-754) Even though there were multiple incidents and complaints, no action was taken. (Id. ¶¶174-175,743-754) To the contrary, Owens rewarded Levine, including promoting him to Producer in 2025. (Id. ¶¶174,740,754)

- Richman: Matthew Richman ("Richman") is a male Senior Editor responsible for supervising other Editors at 60 Minutes and reported directly to Owens. (Pl.56.1 ¶¶ 181,184,755-756) Richman sent abusive emails and repeatedly made inappropriate

9

comments. (Id. ¶¶183,757) Numerous Producers organized meetings to raise concerns about Richman's behavior. They reported those concerns to Owens and Simon. (Id. ¶¶758-762) Thereafter, female Producers made additional complaints about Richman, including that he disparaged a Producer in front of several employees. (Id.¶¶762-771) No action was taken. (Id. ¶¶183-184,768)

CBS Retaliated Against Poolos

After Poolos was fired, she complained about the prior discrimination and retaliation. (Pl.56.1 ¶¶125-128,830) Defendants purportedly investigated her concerns about Bar-On. (Id. ¶¶129,167,831-835) In finding that "the Company was unable to substantiate [] Poolos's allegations," Defendants relied on the investigator's finding that Bar-On was "credible." (Id. ¶¶129,136,167,835) Plaintiff later provided contemporaneous notes of her interactions with Bar-On, which Defendants did not consider. (Id. ¶¶129,136,167,778)

Defendants' adverse treatment of Poolos continued even after her firing. (Pl.56.1 ¶¶836-843) After receiving notice of her intent to pursue legal claims, Defendants intentionally maligned Poolos, including soliciting negative information to damage her reputation; conducting a retaliatory investigation; and removing her stories from awards competition. (Id. ¶¶129,136, 836-843)

ARGUMENT

## I. SUMMARY JUDGMENT STANDARD

"Summary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit." Redd v. N.Y. Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012) (internal quotations and citations omitted); see Bart v. Golub Corp., 96 F.4th 566, 569-70 (2d Cir. 2024); Banks v. Gen. Motors, LLC, 81 F.4th 242, 258 (2d Cir. 2023). The Court "may not . . . consider the record in piecemeal fashion . . . rather, it must review all of the evidence . . . ." Kaytor

10

v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010) (quotations omitted).[4] The evidence must be assessed "in the light most favorable" to the non-movant, drawing "all reasonable inferences in favor of the nonmoving party." Moll, 94 F.4th at 226-27 (quotation omitted). A court may not give credence to the moving party's evidence unless it comes from "disinterested witnesses" and is neither contradicted nor impeached. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000) (quotations omitted).[5] "[A]n extra measure of caution is merited before granting . . . summary judgment in a discrimination action because direct evidence of discriminatory intent is rare." Moll, 94 F.4th at 228 (quotations omitted).

Under the NYCHRL and now the amended NYSHRL, a court "must" deny summary judgment if the "plaintiff responds with some evidence that at least one of the reasons proffered by defendant is false, misleading[,] or incomplete." Sandiford v. City of N.Y. Dep't of Educ., 943 N.Y.S.2d 48, 51 (1st Dep't 2012) (quotations omitted).

II.    GENDER DISCRIMINATION AND RETALIATION STANDARDS

A. Title VII Gender Discrimination – Motivating Factor

To prevail on her Title VII gender discrimination claims, Plaintiff must establish that she has "suffered an adverse job action under circumstances giving rise to an inference of discrimination." Banks, 81 F.4th at 269 (internal quotations and citations omitted). Ultimately, Plaintiff can prevail by showing that gender was a "motivating factor" in the adverse action. Bart, 96 F.4th at 567.

B. Title VII Retaliation – But-For

---

[4] Accord Moll v. Telecaster Res. Grp., Inc., 94 F.4th 218, 227 (2d Cir. 2024); Walsh v. N.Y.C. Hous. Auth., 828 F.3d 70, 76 (2d Cir. 2016).

[5] See In re Dana Corp., 574 F.3d 129, 152-53 (2d Cir. 2009); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 38 (2d Cir. 1994).

Under Title VII (for retaliation claims only), a violation occurs when protected conduct was a "but-for" cause of negative action.  Edelman v. NYU Langone Health Sys., 141 F.4th 28, 51 (2d Cir. 2025).  "'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the [dismissal] would not have occurred in the absence of the retaliatory motive."  Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013).  As the Supreme Court made clear, often there is "more than one 'but-for' cause of an adverse employment action." Banks, 81 F.4th at 275.

C.  NYSHRL & NYCHRL – Treating Less Well

Under the NYSHRL & NYCHRL,[6] the employer is liable where it merely treated the employee "less well, at least in part for a discriminatory reason." Mihalik v. Credit Agricole Cheuvreux, N. Am., Inc., 715 F.3d 102, 110 & n.8 (2d Cir. 2013). Defendants "bear[] the burden of showing that, based on the evidence before the court and drawing all reasonable inferences in plaintiff's favor, no jury could find defendant liable under any of the evidentiary routes: under the McDonnell Douglas test, or as one of a number of mixed motives, by direct or circumstantial evidence." Watson v. Emblem Health Servs., 69 N.Y.S.3d 595, 598 (1st Dep't 2018).

III.    JURY COULD FIND GENDER DISCRIMINATION

A.    Defendants Discriminated Against Plaintiff Due to Her Gender

There is no dispute that Plaintiff satisfies three of her prima facie requirements: she is a woman; she worked at Defendants for more than 10 years; and Defendants fired her. (Pl.56.1 ¶¶90,109,113,549); Bart, 96 F.4th at 570. Defendants argue, however, that Poolos cannot show an

---

[6] Defendants ignore amendments to the NYSHRL (Def.Br. 12), which specify that after the 2019 amendments, "the NYSHRL now mirrors the standards applicable to the NYCHRL." Edelman, 141 F.4th at 49 (quotations omitted).

inference of discrimination. (Def.Br. 12-15) To the contrary, the record contains extensive evidence that satisfies Poolos's "minimal" burden. Sassaman v. Gamache, 566 F.3d 307, 312 (2d Cir. 2009); see also Bart, 96 F.4th at 570 (burden "is not onerous").

    1.  Gender Bias Was Widespread and a Commonly Accepted Practice[7]

Defendants' treatment of Poolos must be placed in the context of their discriminatory culture, which Defendants completely ignore.[8] In 2017 and 2018, numerous publications exposed the years of rampant gender discrimination at CBS, including 60 Minutes; the NYAG found "systematic problems with CBS's then-existing HR structure and its responses to sexual harassment"; and found that former CBS CEO Moonves had engaged in repeated sexual misconduct. (Pl.56.1 ¶¶617-632) Defendants ultimately admitted the misconduct when it concluded that Moonves had breached his contract and denied his robust severance payment. (Pl.56.1¶608) It was too little and too late. As the Second Circuit has recognized, "When a major company executive speaks, 'everybody listens' in the corporate hierarchy." Slattery v Swiss Reins.

---

[7] Defendants may erroneously object to certain evidence, including press, NYAG materials, and some comparator evidence as inadmissible hearsay. As an initial matter, much of this evidence is not being offered for the truth of the matter asserted. For example, this evidence shows that Defendants had notice of widespread allegations of discrimination and harassment as of the time of the complaints against male comparators, press, and investigations. The ways Defendants responded to such knowledge, including whether and why they took action and/or followed their policies, is relevant to bias and pretext. See Wright v. Urb. Outfitters, Inc., 2009 WL 10736929, at *4 (S.D.N.Y. Nov. 30, 2009); Vellali v. Yale Univ., 2021 WL 5010015, at *2 (D. Conn. Oct. 28, 2021). Even if evidence is hearsay, the question is not whether an exhibit or testimony would be admissible at trial, but whether the content could be presented in an admissible form. Smith v. City of N.Y., 697 F. App'x 88, 89 (2d Cir. 2017). There is no reason to believe that the women who made complaints cannot be called to testify at trial and/or that the government investigation materials would be subject to hearsay exceptions. Vellali, 2021 WL 5010015, at *2.

[8] See Zakre v. Norddeutsche Landesbank Girozentrale, 396 F. Supp. 2d 483, 508 (S.D.N.Y. 2005) ("A jury could find that the exclusionary culture fostered by [high-level executive] evidenced a biased attitude toward women.").

Am. Corp., 248 F.3d 87, 92-93 (2d Cir. 2001).[9] A jury could find that Moonves's repeated sexual misconduct paved the way for male executives to act with impunity, and they did.

There is ample evidence of widespread gender discrimination at 60 Minutes when Owens served as both Executive Editor and Executive Producer. Numerous women including, female APs ███████████████████████ and Senior Producer ███████ accused men of sexual harassment, other gender-biased misconduct, and retaliation. (Pl.56.1 ¶¶602-829)[10] The women had no choice but to quit while the men they complained about, including Gavshon, Rosen, and Radutzky, continued to work for Defendants. (Pl.56.1 ¶¶666,669,701,710,712,726,735)[11]

While there were different offenders at 60 Minutes, the common thread was management, including Fager and Owens. Defendants' assertion that the same circumstances apply to Fager's and Poolos's dismissals (Def.Br. 13-14) demonstrates that they have learned nothing despite the accusations, NYAG investigation, and lawsuits. Defendants fired Fager in 2018, but only after 19

---

[9] See also Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 355 (6th Cir. 1998) (Retail Sales Division head "was in a position to shape the attitudes, policies, and decisions of the divisions'[] managers, including [decisionmakers]."); Danzer v. Norden Sys., Inc., 151 F.3d 50, 55 (2d Cir. 1998) (supervisor's discriminatory "comments [to plaintiff] reflected company policy" and constituted bias evidence); Hunt v. Tektronix, Inc., 952 F. Supp. 998, 1006 (W.D.N.Y. 1997)) ("'[A] supervisor's statement about the employer's employment practices or managerial policy is relevant to show the corporate culture in which a company makes its employment decision, and may be used to build a circumstantial case of discrimination.'") (quoting Brewer v. Quaker State Oil Refin. Corp., 72 F.3d 326, 333 (3d Cir.1995)).

[10] See Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 387–88 (2008) (evidence of discrimination against other employees may be admissible even when the actor had no role in the adverse employment action against plaintiff); Zubulake v. UBS Warburg LLC, 382 F. Supp. 2d 536, 544-45 (S.D.N.Y. 2005) ("'As a general rule, the testimony of other employees about their treatment by the defendant is relevant to the issue of the employer's discriminatory intent.'").

[11] Hicks v. Baines, 593 F.3d 159, 170 (2d Cir. 2010) (proof of causation can be shown by "'circumstantial evidence such as disparate treatment of fellow employees [in same protected class].'") (quoting Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)).

14

women reported that Fager allowed harassment in the news division; six said that he touched them without consent; and he explicitly threatened the job of a CBS reporter. (Pl.56.1 ¶¶ 191,192,193,613,614-619,772-773)

In addition to Fager, at 60 Minutes, Owens either supervised the men accused of misconduct or the complainants.  (Pl.56.1 ¶¶151,173,634,670,702,742) For example, ███████ who then reported to Owens, claimed constructive discharge after she repeatedly sought Owens's help to stop Rosen's misconduct. (Pl.56.1 ¶¶670-702) Defendants not only rejected her claims, but they also attacked her. (Pl.56.1 ¶¶697-698,703-705)[12]  Poolos alleged sexual harassment by her then supervisor Bar-On[13] and that sexist comments were commonplace, including Owens's repeatedly telling Poolos that she was a "good girl"; Stahl's encouraging Poolos to use her body to secure stories and accusing ████████ of fabricating allegations to get "money"; and Bar-On's telling Poolos she would have to quit and move in with her family if she became a single mom and that he hired only women as APs because they are more subordinate than men. (Pl.56.1¶¶126,129,132-133,136,138,737-739,775-776,778-813,816-829)[14]

A jury could find that this pattern of mistreatment shows discrimination.

---

[12] See Austin v. Phone2Action, Inc., 2023 WL 6201409, at *5 (E.D.N.Y. Sept. 22, 2023) (discriminatory conduct toward other women supported pretext).

[13] Even if such misconduct is time-barred, it is "relevant background evidence." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 112-23 (2002) (quotations omitted).

[14] Littlejohn v. City of N.Y., 795 F.3d 297, 312 (2d Cir. 2015) ("An inference of discrimination can arise from . . . invidious comments about others in the employee's protected group[.]") (quotations omitted).

2.      Defendants' Preferential Treatment of Male Comparators

Contrary to Defendants' argument (Def.Br. 13-15), Defendants' differential treatment of Poolos and her similarly situated male peers, permits a juror to infer that Defendants' adverse treatment of Poolos was based on her sex. "Whether two employees are similarly situated ordinarily presents a question of fact for the jury." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000); see also Radwan v. Manuel, 55 F.4th 101, 132 (2d Cir. 2022) (same). "[W]e [have] made it clear that this rule does not require a precise identicality between comparators and the plaintiff." Matusick v. Erie Cnty. Water Auth., 757 F.3d 31, 54 (2d Cir. 2014). "[F]or such evidence to be probative, and therefore to support a jury verdict, there must only be an objectively identifiable basis for comparability." King v. Aramark Servs., Inc., 96 F.4th 546, 563 (2d Cir. 2024) (quoting Matusick, 757 F.3d at 54).  The comparison of purported misconduct is based on "(1) whether the plaintiff and those [s]he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." Graham, 230 F.3d at 40.

a.      Male Producers and Editors Were Similarly Situated

There are numerous instances in which Defendants treated similarly situated men differently than Poolos, including Producers Gavshon, Rosen, Radutzky, and Bar-On; former AP and current Producer Levine; and Editor Richman. (Pl.56.1¶¶ 602-771,774-829) Like Poolos, each had the same supervisors including first Fager and later Owens. (Pl.56.1 ¶¶151,173,634,670,702,742)[15] Also, those men and Poolos performed the same or substantially

---

[15] The male comparators all reported to both Fager and Owens except Radutzky, who left Defendants in May 2018. (Pl.56.1 ¶736)  Contrary to Second Circuit authority, Defendants contend that this alone means Radutzky is not similarly situated to Poolos. Radwan, 55 F.4th at 136 ("This 'same decisionmaker' requirement has never existed in this Circuit.").  When Radutzky engaged in repeated misconduct, Owens was second in command of 60 Minutes and certainly a juror could

16

similar jobs; all worked for 60 Minutes as producers or editors. (Pl.56.1 ¶¶633, 658,670,722,735,737,740-41,755)   They were subject to the same standards, including prohibitions against discrimination, sexual harassment, retaliation, bullying, and other harassing conduct.   (Pl.56.1 ¶¶285,283) Thus, these individuals were similarly situated in all material respects.   King, 96 F.4th at 563 (despite some differences, "male direct reports shared enough commonalities with [the plaintiff]," including "similar titles," "similar responsibilities," and "directly report[ing] to [the same supervisor]," that they could "serve as adequate comparators").[16] However, Defendants repeatedly applied significantly more lenient standards to them.

Some of Poolos's male peers engaged in far more egregious misconduct.   Poolos purportedly bullied her AP, disparaged her AP for complaining, and was not truthful about the disparagement. (Pl.56.1 ¶¶111,528,560-561,564-565)   By contrast, women accused Gavshon, Rosen, Bar-On, and Radutzky of sexual harassment, gender bias, and retaliation. (Pl.56.1 ¶¶633-739,774-829)   In contrast to Poolos's alleged misconduct, her male comparators' behavior was unlawful and, in the case of Gavshon and Rosen, led to legal filings against Defendants. (Pl.56.1 ¶¶661-665,693,701)   In other instances, the purported misconduct was of a similar nature, but more severe than Poolos's. (Pl.56.1 ¶¶740-771) More than a dozen employees raised concerns that Richman was abusive towards staff and that Levine verbally assaulted colleagues on multiple occasions. (Pl.56.1¶¶740-771)   See Radwan, 55 F.4th at 138 (rejecting contention that plaintiff "was required to demonstrate that a proposed comparator committed the exact same misconduct

---

find that he knew of Defendants' treatment of Radutzky.   Id. at 137 ("[T]he 'same decisionmaker' factor may be less important where those who disciplined the plaintiff were well-aware of the disciplined meted out to [her] comparator.").

[16] Cf. Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 109 n.7 (2d Cir. 2010) ("Although an employee's position is relevant to the analysis, employees need not be of the exact same rank to be considered 'similarly situated.'").

as she did"); <u>Brown v. Waterbury Bd. of Educ.</u>, 247 F. Supp. 3d 196, 210 (D. Conn. 2017) (juror could conclude that comparators were similarly situated to plaintiff where they were "accused of engaging in 'comparable conduct'"); <u>Senno v. Elmsford Union Free Sch. Dist</u>, 812 F. Supp. 2d 454, 476 (S.D.N.Y. 2011) (evidence of bias where comparator "engaged in conduct similar. . . if not more egregious than [plaintiff's]").

Defendants at every step subjected Poolos to a different process than it did her male peers despite assertions that the men engaged in similar or more serious misconduct. (Pl.56.1 ¶¶111,663-771,774-829)    Management reported Poolos to HR after Richards complained; Defendants investigated Poolos's purported misconduct; and Defendants placed her on administrative leave. (Pl.56.1 ¶¶89,105-106,342,461-462,477)   Defendants did no such thing to the men accused of wrongdoing.   For Richman, Levine, and Gavshon (as it relates to his retaliation), there was no report to HR and no investigation. (Pl.56.1 ¶¶164,667,750,753,761,768)   For those subject to an investigation, including Gavshon (as to his sexual harassment and excessive drinking), Rosen, and Bar-on, Defendants never placed them on an administrative leave.    (Pl.56.1 ¶¶145,164,641,685,700,827)

Many of the men were repeat offenders and, in some cases, following oral admonishments, engaged in further policy and legal violations. (Pl.56.1 ¶¶174,633,675,706,720,731-732,751,768-769)   At least two women accused Rosen of sexual harassment and retaliation; there were several subsequent complaints about Richman's abusive conduct; Levine engaged in additional misconduct and suffered no consequences after Owens previously warned him; and Radutzky was a well-known offender subject to numerous complaints. (Pl.56.1 ¶¶174,633,675,706,720,731-732,751,768-769)  Defendants warned Gavshon that his engaging in similar conduct in the future would result in "formal disciplinary proceedings." (Pl.56.1¶¶654-655)████████ accused Gavshon

of other mistreatment, including retaliation but nothing happened to him. (Pl.56.1 ¶¶661-68) <u>Cf.</u> <u>Davis v. Metro N. Commuter R.R.</u>, 2025 WL 2780704, at *22 (S.D.N.Y. Sept. 29, 2025) (finding that "the overall pattern" of discipline that comparator received could lead to bias inference).

Defendants did not even take disciplinary action against any male comparators. (Pl.56.1¶¶666-668,700,734) Radutzky accepted a voluntary buyout and left Defendants. (Pl.56.1¶736) Bar-On, Richman, and Levine still work for Defendants. (Pl.56.1 ¶¶739-740,768) As for Gavshon, there was irrefutable documentation of his policy breaches, including sending a picture with his genitals to a female AP. (Pl.56.1 ¶¶163,189,641)    While Defendants found Gavshon's conduct was "inappropriate," Defendants did not discipline Gavshon and he continues to work there. (Pl.56.1 ¶¶163,189,635,641)

Defendants contend erroneously (Def.Br. 13-14) that Rosen was treated the same as Poolos because Owens fired him.  A juror could reject this contention because Rosen actively worked for Defendants for two years after complaints about him; Owens did not fire Rosen, but instead did not renew Rosen's contract and coded it as a mutual separation; when Owens notified Rosen of his decision, Owens did not immediately end his employment and instead moved Rosen to "pay or play status" for nine months of salary and benefits without having to work; and Owens designated Rosen eligible for severance, inconsistent with a for-cause firing.   (Pl.56.1 ¶¶712,715-719,721)

In contrast to their treatment of men, Defendants fired Poolos without any lesser discipline. (Pl.56.1 ¶¶90,510,527-528) <u>See</u> <u>Berube v. Great Atl. & Pac. Tea Co.</u>, 348 F. App'x 684, 686 (2d Cir. 2009) (discriminatory intent where "younger, similarly-situated employees received progressive discipline for transgressions of comparable seriousness while [plaintiff] did not"). Defendants did not place her on pay or play status, allow her to complete her contract despite

19

having several years left on the deal, offer her a buyout, or designate her eligible for severance. (Pl.56.1 ¶¶264,715-718,721)

b.    Poolos Is Comparable Despite Defendants' Biased Conclusions

Defendants cannot (Def.Br. 13-14) distinguish Poolos from her male colleagues because they purportedly found that she had lied during the investigation and engaged in retaliation and that her male peers did not. Defendants unsuccessfully try to obscure the central issue here: that they treated Poolos less favorably, even though her purported misconduct was less severe than that of her male colleagues, and Defendants fired her and not them. Musante v. Mohawk Valley Cmty. Coll., 270 F. Supp. 3d 564, 578 (N.D.N.Y. 2017) (denying summary judgment were plaintiff "denie[d] engaging in the misconduct described in the students' complaints" and asserted that those complaints were "the pretextual vehicle through which [employer] ultimately effected his termination").

For most of Poolos's male comparators, management did not even report them to HR nor was there any investigation and therefore no contention that they were lying as part of an inquiry. (Pl.56.1 ¶¶164,667,750,753,761,768)  While some of these men were accused of retaliation, for Gavshon, at a minimum, no one evaluated whether he had violated Defendants' policies. (Pl.56.1 ¶¶164,667)  A jury could find bias in Defendants' failure even to "initiate" an investigation against her male comparators; Defendants' lenience in advance meant Defendants would make no allegations of untruthfulness or retaliation against the men. Vives v. N.Y.C. Dep't of Corr., 2019 WL 1386738, at *15 (E.D.N.Y. Mar. 27, 2019) (defendant's "failure to initiate termination proceedings against [p]laintiff's comparators with similar absences, supports [p]laintiff's claims that she was treated differently").

20

Defendants' rejecting out-of-hand Plaintiff's statements but consistently crediting her male comparators is evidence of gender bias. Defendants' purported conclusion that Plaintiff lied and engaged in retaliation is based almost exclusively on the representations of Bronstein, a man Defendants fired from 60 Minutes and Richards's close confidant. (Pl.56.1 ¶¶456,551)   Owens and Balducci credited Bronstein even though Poolos had worked for Defendants for over 10 years, never been accused of retaliation or lying, and no disciplinary record. (Pl.56.1 ¶¶259,343) Defendants made much different credibility assessments for Poolos's male comparators. Defendants were quick to trust them, including accepting Gavshon's incredible explanation that he intended to send his sister a picture featuring his penis; excusing Levine because he was seeking therapy for anger management; dismissing Richman's abuse as a personality quirk; and crediting Rosen despite repeated sexual harassment allegations. (Pl.56.1 ¶¶144,163,174,653,696,749-750,761)   Defendants made much of Bronstein's supposedly taking notes of his call with Poolos but when Plaintiff presented contemporaneous notes about Bar-On's sexual harassment, Defendants ignored them and accepted Bar-On's denials. (Pl.56.1 ¶¶129,136,139,167,494,548,563-564,778,780-786,800-813)

Courts have held that defendants "cannot rebut the assertion that Plaintiff and . . . the proposed comparator[s][] are similarly situated merely by its subjective conclusions based on an internal investigation." Setelius v. Nat'l Grid Elec. Servs. LLC, 2014 WL 4773975, at *13 (E.D.N.Y. Sept. 24, 2014);[17] see Brown, 247 F. Supp. 3d at 210–11 (despite Defendants

---

[17] The Court in Setelius ultimately granted summary judgment due to the lack of other evidence of pretext and bias. Id. at *16-19.  Here, by contrast, there is ample evidence of both.  For example, not only did the male comparators get lesser or no sanctions for more serious violations, but they got lesser or no sanctions for wrongdoing that disadvantaged women employees.  For similar reasons, Defendants' case (Def.Br. 18) is inapposite. Port Auth. Officer 47708 v. Port Auth. of N.Y. & N.J., 2018 WL 3489569, at *11 (E.D.N.Y. July 19, 2018) ("no evidence of other women being subjected to harsher treatment than their male counterparts").

21

purportedly investigating and concluding that complaints against a purported comparator lacked merit, whether that comparator and plaintiff were similarly situated was for jury).

Here, there are a "number of disputed facts" as to the "seriousness" of Plaintiff's alleged misconduct as compared to her male counterparts. Dall v. St. Catherine of Siena Med. Ctr., 966 F. Supp. 2d 167, 185 (E.D.N.Y. 2013). Plaintiff testified that she did not engage in retaliation or lying. (Pl.56.1 ¶¶532-542,561,562-564) See Setelius, 2014 WL 4773975, at *13 (where there were disputes about comparator's and plaintiff's alleged misconduct, "[defendant's] conclusion [was] not a substitute for a jury determination of whether [p]laintiff and her proposed comparator were similarly situated").

Even if Defendants had a reasonable basis to believe that Plaintiff had engaged in such misconduct, which they did not, a jury could find that Defendants' decision to fire Poolos for a first-time offense reflects gender-bias. Plaintiff's purported conduct does not constitute legal violations; she initially contacted Bronstein before she knew of Richards's complaint; and Poolos's purportedly offensive comments were to Bronstein, who had no control over Richards's employment and assured Plaintiff that nothing she said would affect his view of Richards. (Pl.56.1 ¶¶69-71,426,536) See Temple v. City of N.Y., 2010 WL 3824116, at *8 (E.D.N.Y. Sept. 23, 2010) (finding that while the plaintiff's employer concluded that "[p]laintiff's conduct was more egregious than that of her comparators, factual issues concerning comparable conduct . . . are appropriately resolved by a jury").

### B.    Defendant's Reason For Firing Plaintiff Is Pretextual

Defendants' justification for firing Poolos – because she purportedly retaliated against Richards and was untruthful during the investigation (Pl.56.1 ¶¶81,111,528-530,557) – does not withstand scrutiny. Pretext can "constitute powerful evidence of discrimination." Stratton v. Dep't

for the Aging for City of N.Y., 132 F.3d 869, 879 (2d Cir. 1997) (quotation omitted). Thus, an employee can prove gender bias "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate non[-bias] reasons for its action." Kwan, 737 F.3d at 846 (retaliation case). "Also probative are whether the employee believed the conduct was permissible and any procedural irregularities." King, 96 F.4th at 565. "The Second Circuit has reject[ed] any categorial rule requiring . . . plaintiffs to offer, in addition to their prima facie case and evidence of pretext, further evidence that [] discrimination was the actual motivation in order to satisfy their burden." Doyle v. Mid-Hudson Valley Fed. Credit Union, 2023 WL 4297192, at *7 (S.D.N.Y. June 30, 2023) (quotations omitted).

### 1.    Defendants' Explanations Are Not Credible

In addition to the biased differential treatment,[18] much evidence casts doubt on Defendants' purported non-discriminatory reason for firing Plaintiff. A jury could find that because Defendants knew Plaintiff's call to Bronstein did not warrant firing her, they manufactured additional justifications. Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 93 (2d Cir. 1996) (factfinder could determine employer "was creating a record aimed at rationalizing plaintiff's termination").

Before Poolos's call on January 5, 2022, Richards undisputedly told Balducci that Poolos had been in touch with Bronstein. (Pl.56.1 ¶¶68,417)  Despite knowing this, Defendants did nothing to stop Poolos from further contacting him. (Pl.56.1 ¶¶68,418-419)  A jury could find that Balducci's advanced knowledge about Poolos's outreach to Bronstein and her failure to prevent

---

[18] Reeves, 530 U.S. at 143 (same evidence supporting plaintiff's prima facie case shows pretext); Temple, 2010 WL 3824116, at *10 (pretext where evidence showed that employer "routinely overlooked misconduct committed by Caucasian employees, but would not hesitate to formally charge [the plaintiff] with disciplinary infractions").

23

the call is evidence that Poolos's conduct could not justify firing for-cause a 10-year plus employee with no prior disciplinary action.

Defendants attack Poolos for supposedly lying, but the contemporaneous documentation shows pretext. Contrary to Owens's assertion that Poolos initially denied having any call with Bronstein, neither his text immediately after he spoke with Poolos nor Balducci's investigation summary referred to the purported lie. (Pl.56.1 ¶¶570-573) Balducci also falsely asserts that Poolos lied about the sequence leading to the call with Bronstein. (Pl.56.1 ¶¶576-582) The text messages, however, confirm Poolos accurately told Owens and Balducci that she initiated contact with Bronstein in late December 2021 before she learned about Richards's complaint; and that she spoke to Bronstein on January 5, 2022. (Pl.56.1 ¶¶578-582) Poolos's recording directly contradicts what Balducci described as the "main lie"; it conclusively establishes that Poolos did not tell Balducci that Bronstein called her. (Pl.56.1 ¶¶98,102,579)

Defendants falsely accused Plaintiff of breaching the purported policy requiring employees to keep pending investigations confidential. (Pl.56.1 ¶¶111,203,407,583,584) Defendants do not cite any such policy. (Pl.56.1 ¶¶111,203) While investigators allegedly must instruct complaining witnesses about confidentiality, Defendants failed to do so before Poolos's call with Bronstein. Defendants no longer rely on the purported confidentiality breach to justify firing Plaintiff (Pl.56.1 ¶¶111,292-293,592-593), which a jury could find as an admission the accusation was baseless.

Defendants have distorted the timeline and fabricated events to justify their actions against Poolos. Simon falsely asserted that Defendants placed Poolos on an administrative leave because Poolos violated Owens's instruction not to disparage Richards to Bronstein. (Pl.56.1 ¶¶89,469,557) Both Owens and Simon further testified that Defendants fired Poolos because she called Bronstein after Owens had told her the matter was closed. (Pl.56.1 ¶¶556-557) Objective evidence

24

contradicts their testimony. Poolos never received an instruction or warning not to disparage Richards, and she spoke to Bronstein before Owens sent his January 6 email purportedly ending the matter. (Pl.56.1 ¶¶68,418-419,424,556-557)

Other inconsistencies support pretext. In a false attempt to show Poolos received some progressive discipline before her firing, Defendants' EEOC Position Statement misrepresented that HR investigated Richards's December 2021 complaint and Plaintiff received a verbal warning on January 5, 2022.[19] (Pl.56.1 ¶¶79-80,406) None of this is true. Balducci testified that there was no investigation into Richards's December 2021 complaint; and that the meeting on January 5 with Poolos was not disciplinary. (Pl.56.1 ¶¶79-80,395-396,400-401,406) Such mendacity is persuasive evidence that Defendants' justifications are a pretext for discrimination. See Reeves, 530 U.S. at 147.

### 2.    Defendants' Failure to Follow Policies Shows Bias

Poolos can show pretext based on Defendants' failure to comply with their policies and procedures. See Bagley v. J.P. Morgan Chase & Co., 2012 WL 2866266, at *15 (S.D.N.Y. July 12, 2012).

As for Richards's December 2021 complaint, there were several irregularities. Defendants waited nearly three weeks to tell Poolos. (Pl.56.1 ¶¶391-392) Owens believed that he must have met with Poolos about the complaint in December 2021, even though Defendants actually did not tell her until January 5. (Pl.56.1 ¶¶391,507) Management and HR took steps that further caused strife and undermined Poolos, including authorizing Richards to take time off work despite an important deadline and without notifying Plaintiff. (Pl.56.1 ¶393) Defendants held Poolos

---

[19] Mugavero v. Arms Acres, Inc., 2009 WL 1904548, at *4 (S.D.N.Y. July 1, 2009) ("Defendants' position statements—if offered by Plaintiff—are not hearsay because they are admissions.")

accountable for purportedly breaching confidentiality and non-retaliation rules that were not shared with her in connection with Richards's complaint. (Pl.56.1 ¶¶68,418-419,584-586) Defendants will assert that Plaintiff should have been aware of those prohibitions, but a jury could find that Defendants could not stretch those alleged to include Plaintiff's interaction with Bronstein when he was not Richards's employer, had no control over Richards's job, and repeatedly said that he "adored" Richards.  (Pl.56.1 ¶¶40,42,68,70-71,536,538)   Owens's January 6, 2022 email counseling Poolos was based on two concerns from multiple years earlier and were never substantiated or investigated.  (Pl.56.1 ¶¶384-387,438) Defendants' efforts on summary judgment to manufacture a pattern of misconduct by referring to other purported concerns not considered in early 2022 also shows pretext. (Pl.56.1 ¶¶23-24,26-28,30-38)

Other evidence that Balducci's investigation was inadequate under Defendants' policies supports Plaintiff's assertions of pretext.[20]  The narrow-scope investigation took nearly a month to complete. (Pl.56.1 ¶¶90,477,508-510)   Nor was it impartial as both Balducci and Owens, before speaking to Poolos or Bronstein, concluded that Poolos had retaliated against Richards, and Balducci repeatedly and expressly advocated for Richards. (Pl.56.1 ¶¶480-489)

Further deviations from CBS policy include Balducci's not considering critical materials, such as Plaintiff's communications concerning Richards and not asking Poolos if she made notes of the Bronstein call. (Pl.56.1 ¶¶105,492-493,554)  Both Owens and Balducci credited Bronstein over Poolos, but neither considered his motivation for fabricating his discussion with Poolos. (Pl.56.1 ¶¶109,494,497-498) Defendants' investigation materials state that "personal relationships of witnesses" are a "key fact" to be elicited, yet no one sought to discover this information. (Pl.56.1

---

[20] Tolbert v. Smith, 790 F.3d 427, 438 (2d Cir. 2015) ("Departures from procedural regularity, such as a failure to collect all available evidence, can raise a question as to the good faith of the process where the departure may reasonably affect the decision.") (quotations omitted).

¶¶109,289,494,497-498,632)  Thus, a jury could find that Bronstein, Richards's friend, mentor, and confidant, was trying to help Richards oust Poolos because Richards was unhappy that Defendants had not disciplined Poolos following the December 2021 complaint or moved Richards to another team. (Pl.56.1 ¶¶42,414,456)   Instead, without conducting any such inquiry, Balducci deemed Bronstein a "whistleblower" who "put himself on the line"; and a "neutral and professional third-party" because she assumed he was a "respected journalist."   (Pl.56.1 ¶¶495-496) Compounding Defendants' failure to obtain reasonably available materials during the investigation is the destruction of evidence. (Pl.56.1 ¶¶499-504)  Indeed, as Plaintiff argued in memorandum of law in support of motion for spoliation sanctions, Defendants' spoliation is another basis to deny summary judgment.[21]

Multiple errors and omissions fill Balducci's summary, which Defendants relied on to fire Plaintiff. (Pl.56.1 ¶¶516-518,573)   Balducci asserts that Poolos's purported misrepresentation about who contacted whom is critical, but Balducci's notes list the wrong sequencing for the key day January 5, 2022. (Pl.56.1 ¶516)   Balducci could have, but did not, confirm this information, including by speaking with Poolos again. (Pl.56.1 ¶¶517-518)[22] Balducci's summary omits any suggestion that she knew before the Poolos-Bronstein January 5 call that Poolos had tried to contact Bronstein. (Pl.56.1¶417)  A jury may find that Balducci deliberately hid that she did not try to stop  Poolos before that conversation happened.

---

[21] Dkt.289 at 24-25 (citing Wood v. Pittsford Cent. Sch. Dist., 2008 WL 5120494, at *2 (2d Cir. Dec. 8, 2008); Kronisch v. United States, 150 F.3d 112, 128 (2d Cir. 1998); Thaqi v. Wal-Mart Stores E., LP, 2014 WL 1330925, at *6 (E.D.N.Y. Mar. 31, 2014).

[22] King, 96 F.4th at 565 (evidence of pretext where, contrary to policy, investigator failed to speak to plaintiff and where, if the investigator had done so, might have heard plaintiff's version of events and plaintiff may not have been fired).

27

Defendants' policy violations and failure to carefully investigate Poolos's situation are especially troubling given their history of bias-related problems. (Pl.56.1 ¶¶602-632)   After the NYAG findings, <u>inter alia</u>, that Defendants had systematic problems with HR and its responses to sexual harassment allegations, Defendants represented that they took steps to prevent harassment and gender-based discrimination, including purportedly revising policies and developing trainings for HR investigations. (Pl.56.1 ¶¶629,639)   Yet when it came to Poolos, at every step of the process, Defendants failed to live up to their promises.   (Pl.56.1¶¶ 90,109,289,477,480-489,494,497-498,508-510,632)   In the face of such scrutiny and purported reform, Defendants' policy breaches are further evidence of pretext.

In other ways, Defendants deviated from their standard practices.[23]   Poolos received no progressive discipline before Defendants fired her. (Pl.56.1 ¶¶90,510,527-528) Across CBS News, during a multiyear period, Poolos was one of the few employees who Defendants placed on an administrative leave and fired for-cause.   (Pl.56.1 ¶¶89,185,472-476,596-598)   The other employees subject to similar disciplinary action had received warnings, been the subject of multiple complaints, and/or engaged in unlawful conduct. (Pl.56.1 ¶¶89,185,472-476,596-598) No one at <u>60 Minutes</u> under Owens had faced the fate Poolos did.  (Pl.56.1 ¶¶474-476)

Thus, a jury could find pretext and therefore summary judgment should be denied. <u>Bogle v. Conn. Dep't of Mental Health & Addiction Servs.</u>, 2025 WL 1786072, at *9 (D. Conn. June 27, 2025) (pretext where internal investigation did not review evidence and no progressive discipline);

---

[23] <u>Weiss v. JPMorgan Chase & Co.</u>, 332 F. App'x 659, 664 (2d Cir. 2009) (pretext "[w]here an employer's 'deviat[ion] from its normal decisionmaking procedures' resulted in . . . employment decision") (quoting <u>Stern v. Trs. of Colum. Univ. in City of N.Y.</u>, 131 F.3d 305, 313-14 (2d Cir. 1997)).

Vaughn v. Empire City Casino at Yonkers Raceway, 2017 WL 3017503, at *19 (S.D.N.Y. July 14, 2017).

        C.        Defendants' Other Arguments Do Not Justify Dismissal

Contrary to Defendants' argument (Def.Br. 12), the same actor defense does not warrant summary judgment. "[T]he same-actor inference is just that—an inference—and not a hard-and-fast rule." Bivens. v Inst. for Cmty. Living, Inc., 2015 WL 1782290, at *10 (S.D.N.Y. Apr. 17, 2015). While Owens fired Plaintiff, Owens did not make the earlier decisions to hire and promote by himself or at all. (Pl.56.1 ¶¶3,8) Moreover, "[t]he same actor inference is generally not a sufficient basis to grant summary judgement for the employer, at least when the employee has proffered evidence of pretext.'" Osekavage v. Sam's E., Inc., 619 F. Supp. 3d 379, 393 (S.D.N.Y. 2022) (quotations omitted); accord O'Diah v. Yogo Oasis, 954 F. Supp. 2d 261, 274-75 (S.D.N.Y. 2013); Schoenadel v. YouGov Am. Inc., 2025 WL 371089, at *8 (S.D.N.Y. Feb. 3, 2025) (plaintiff "put in enough evidence . . . on the question of pretext" to rebut same-actor inference).

Defendants' assertion that dismissal is warranted because Defendants replaced Plaintiff with a woman (Def.Br. 14) also should be rejected. Defendants have presented no evidence about Plaintiff's purported replacement beyond Plaintiff's testimony that she believed a woman had been promoted from AP to Producer on Stahl's team. For example, there is no evidence who made the decision and certainly no basis to assert that Owens solely appointed Plaintiff's replacement. (Pl.56.1 ¶115) The Executive Producer, the Executive Editor, and the Correspondent who will work with the new Producer likely made that decision collectively. (Pl.56.1¶18) For other reasons, this defense fails. A jury could find that Defendants appointed Plaintiff's replacement after Plaintiff had complained about unlawful discrimination (Pl.56.1¶¶115) to conceal its prior actions. Holcomb v. Iona Coll., 521 F.3d 130, 143 (2d Cir. 2008) (curative measures do not prove past

29

discrimination did not occur); see also Graham, 230 F.3d at 43 ("Since Title VII's principal focus is on protecting individuals, rather than a protected class as a whole, an employer may not escape liability for discriminating against a given employee on the basis of race simply because it can prove it treated other members of the employee's group favorably.").

IV.    JURY COULD FIND RETALIAITON

Poolos's retaliation[24] claims should proceed to trial.[25] It is well settled that asserting discrimination claims constitutes protected activity.[26] Defendants removal of Poolos's work from award consideration, taking away credit for a story, and retaliatory investigation (Pl.56.1 ¶¶836-843) are adverse actions.[27]  The close temporal proximity, within at most a couple of months, between Poolos' discrimination complaint and Defendants' actions establish causation.[28]  On February 25, 2022, Plaintiff alleged discrimination; Defendants refused to submit her story for Emmy and other award consideration in or around March 2022, removed her credit for another

---

[24] Defendants erroneously contend  (Def.Br. 19) that Plaintiff  did not exhaust her retaliation claims. Those claims, in part, are based on conduct that Plaintiff learned about after her  EEOC filing, including Defendants' retaliatory investigation into her complaints against Bar-On.  See Terry v. Ashcroft, 336 F.3d 128, 151 (2d Cir. 2003) (recognizing exceptions to exhaustion requirement).  In any event,  Plaintiff's NYSHRL and NYCHRL retaliation claims do not require exhaustion.  Slow v. Prestige Merch. Co., 2011 WL 4373516, at *3 (E.D.N.Y. Sept. 19, 2011).

[25] To prove retaliation one must show "(1) participation in a protected activity; (2) . . . kn[owledge] of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Hicks, 593 F.3d at 164 (quotations omitted).

[26] See Mandel v. Rofe, 2012 WL 1981453, at *5 (S.D.N.Y. May 31, 2012).

[27] See McGrath v. Arroyo, 2019 WL 3754459, at *12 (E.D.N.Y. Aug. 8, 2019) (on motion to dismiss, denying a prestigious medal plaintiff would otherwise have received constituted adverse action); Ulrich v. Soft Drink, Brewery Workers & Delivery Emps., 425 F. Supp. 3d 234, 242 (S.D.N.Y. 2019) (plaintiff plausibly stated claim based on retaliatory investigation).

[28] See Gorzynski, 596 F.3d at 110-11 (five-month gap between protected activity and adverse action not too attenuated).

story, and completed their retaliatory Bar-On investigation by May 2022.  (Pl.56.1 ¶¶838,841-843)

Defendants do not address the merits of Plaintiff's retaliation claim based on removing her awards consideration and story credit; therefore, Defendants fail to meet their "burden of production" and that claim must survive summary judgment.  Williams v. Bd. of Hudson River/Black River Regulating Dist., 2001 WL 1217199, at *8 (N.D.N.Y. Sept. 23, 2001) (defendants failed to meet burden of production when they were vague about their justification).

A jury could find that the explanation concerning the Emmy submission is pretext as 60 Minutes did not during her tenure refuse to submit stories for such awards based on budget. (Pl.56.1 ¶841) As to the retaliatory investigation, contrary to Defendants' argument (Def.Br. 20-21), Defendant's gratuitous attacks against Plaintiff harmed her reputation. (Pl.56.1 ¶¶837-839) A juror could find that a reasonable employee may be "dissuade[d] from making or supporting a charge of discrimination" based on Defendants' solicitation of negative information about Plaintiff from 60 Minutes colleagues and effort to denigrate her professionally.   Ulrich, 425 F. Supp. 3d at 242 (quotations omitted); see Kreinik v. Showbran Photo, Inc., 2003 WL 22339268, at *7 (S.D.N.Y. Oct. 14, 2003) (counterclaims went "beyond" a "simple breach of contract and related claims" to affect plaintiff's "personal and professional reputation and [ ] his ongoing efforts to create and maintain his own business").

V.     JURY COULD FIND VIOLATIONS OF NYSHRL & NYCHRL

Poolos's NYSHRL and NYCHRL claims must be analyzed "separately and independently" from her federal claims.  Mihalik, 715 F.3d at 109.  Even if "conduct is not actionable under federal" law, it may still support liability under the NYSHRL and NYCHRL. Id. Because "discrimination shall play no role in decisions relating to employment," even "partial discrimination" is prohibited.  Bennett v. Health Mgmt. Sys., Inc., 936 N.Y.S.2d 112, 120 (1st Dep't 2011) (quotations omitted).

31

Defendants mention the NYCHRL standard (Def.Br. 12), but do not separately argue that Plaintiff's NYSHRL and NYCHRL gender discrimination and retaliation claims fail. That omission constitutes a concession that precludes summary judgment. See Cobb v. Am. Urban Radio Networks LLC, 2025 WL 641437, at *3 n.2 (S.D.N.Y. Feb. 27, 2025) ("[A]n argument omitted in a party's opening brief, and raised for the first time on reply, is waived."). Also, for reasons outlined above, Plaintiff readily satisfies the federal law standards and, therefore, succeeds under the more lenient NYSHRL and NYCHRL. See Sandler v. Montefiore Health Sys., Inc., 2018 WL 4636835, at *9 n.5 (S.D.N.Y. Sept. 27, 2018).

## VI.    JURY COULD FIND CONTRACT BREACH AND WAGE DEDUCTION

Defendants' arguments (Def.Br. 23-26) for dismissing Plaintiff's contract and NYLL claims fail. Absent Plaintiff's breach, the Agreement requires Defendants to pay Plaintiff severance for involuntary dismissal. (Pl.56.1 ¶¶262-63)  Defendants erroneously assert that, as a matter of law, Poolos had no right to severance because Defendants fired her for breaching their policies. As shown above, however, there are numerous disputed facts about Plaintiff's conduct. Accordingly, as Defendants' cases recognize (Def.Br. 24-25), a juror could find that Plaintiff did not breach policies and therefore Defendants owe Plaintiff severance. Benoit v. Com. Cap. Corp., 2008 WL 3911007, *6 (S.D.N.Y. Aug. 25, 2008) (collecting cases) (Whether an employee was terminated for cause is generally a question of fact when the employee denies the underlying conduct.).[29]

---

[29] Defendants' cases involve no disputed facts concerning the employee's conduct. See, e.g., See, e.g., Iqbal v. Teva Pharms. USA, Inc., 2017 WL 6729190, at *3 (S.D.N.Y. Dec. 28, 2017) (plaintiff's "underlying conduct [was] undisputed" and violated several company policies); Hosain-Bhuiyan v. Barr Lab'ys, Inc., 2019 WL 3740614, at *5 (S.D.N.Y. Aug. 8, 2019) (same); Scholem v. Acadia Realty Ltd. P'ship, 45 Misc. 3d 562, 567–68 (N.Y. Sup. 2014) (same).

Because Plaintiff's contract claim survives summary judgment, her NYLL claim should as well.  NYLL "prohibits any unauthorized 'deductions' from an employee's wages." FF Venture Cap. LLC v. Adam J. Plotkin, Rdwc, LLC, 2024 WL 1995154, at *1 (N.Y. Sup. Ct. May 05, 2024). Wages as defined by the NYLL include severance; wholesale withholding thereof is an unlawful deduction under Section 193. See id.; see also Neu v. Amelia US LLC, 208 N.Y.S.3d 183, 184 (1st Dep't 2024) (holding that employee stated NYLL claim predicated on failure to pay severance); Birner v. Kensington Vanguard Holdings, LLC, 2025 WL 963311, at *5 (S.D.N.Y. Mar. 31, 2025).

Because Plaintiff has a right to severance, Defendants' withholding  (Pl.56.1 ¶264) violates the NYLL. See, e.g., Neu, 208 N.Y.S.3d at 184; FF Venture Cap., 2024 WL 1995154, at *1.

CONCLUSION

Defendants' motion for summary judgment should be denied in its entirety.


Dated:  New York, New York
        February 9, 2026


                                        VLADECK, RASKIN & CLARK, P.C.


                            By:    _____
                                   Jeremiah Iadevaia
                                   Brandon White
                                   James Bagley
                                   Attorneys for Plaintiff
                                   111 Broadway, Suite 1505
                                   New York New York 10006
                                   212-403-7300

33

## CERTIFICATION OF WORD COUNT

I hereby certify that the word count of this memorandum of law complies with the word count limitations of Local Civil Rule 7.1, as modified by this Court's February 9, 2026 Order. (Feb. 9, 2026 Dkt. Entry) According to the word-processing system used to prepare this memorandum of law, the total word count for all printed text exclusive of the material omitted under Local Civil Rule 7.1 is 9,750 words.

Dated: New York, New York
       February 9, 2026

VLADECK, RASKIN & CLARK, P.C.

By: _____

Jeremiah Iadevaia
Brandon White
James Bagley
Attorneys for Plaintiff
111 Broadway, Suite 1505
New York, New York 10006

34