UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ALEXANDRA POOLOS,

                Plaintiff,

      - against -

PARAMOUNT GLOBAL, CBS BROADCASTING,
INC., and CBS NEWS, INC.,

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

23 Civ. 08896 (GHW)(HJR)

DECLARATION OF
ALEXANDRA POOLOS

I, ALEXANDRA POOLOS, hereby declare under penalty of perjury, pursuant to Title 28 U.S.C. § 1746, as follows:

1.     I am the Plaintiff in the above-captioned matter.

### Job History/Background

2.     I received a B.A. with honors in History from Wesleyan University in 1997.

3.     I received a Bollinger Fellowship to study political science at Columbia University Graduate School of Journalism, receiving an M.A. in 2006.

4.     During my career, I reported stories all over the world, including the United States, the former Yugoslavia, Rwanda, Russia, Iran, Japan, Gabon, Kenya, China, and Nigeria.

5.     I have reported from war zones, police states, natural disaster sites, and, generally, the world's most dangerous places.

6.     Before joining CBS News, I worked as a Correspondent, Reporter, Editor, and Producer for prominent media organizations, including Newsday, Radio Free Europe/Radio Liberty, Frontline/World, WNYC, and CNN. I received prestigious awards for my work, including two Emmy awards and two Peabody awards.

1

#10018871

7.      I have also reported for <u>The Wall Street Journal</u>, <u>The Christian Science Monitor</u>, ABC News, and the American Prospect. At Radio Free Europe/Radio Liberty in Prague, I worked as a Correspondent and Editor, reporting news for an audience of 26 million that included coverage of the Kosovo conflict and the fall of Slobodan Milosevic. I also worked for <u>The Wall Street Journal</u> from Brussels, where I reported news and analysis on the Balkans and expansion of the European Union. I was the Managing Editor of Women's eNews, an award-winning nonprofit news service. I was a Reporter and Producer for Frontline/World, a national public television series that focused on international issues, including covering countries and cultures rarely seen on American television.

8.      At CNN, I was an Editorial Producer for Anderson Cooper 360 ("AC360") and CNN International.

9.      After working as an Associate Producer ("AP") at <u>60 Minutes</u> for more than six years, in May 2018, I was promoted to Producer, a rare achievement at <u>60 Minutes</u> where there is little upward mobility for APs and Producers.

10.      My work at <u>60 Minutes</u> included investigations and in-depth news stories about survivors of Boko Haram (a portrait of a group of young women who survived kidnapping by Boko Haram and who returned to school after years of captivity); female soccer players in Iran; China's real estate market; mobile money in Kenya; the Russian activist group Pussy Riot; transgender health issues; and the Paris terror attacks. I broke significant news on several occasions, including an investigation into Russian agent Maria Butina ("Butina"), who was accused of trying to influence United States policies for the Kremlin. I was able to achieve unprecedented access for the segment and secured an exclusive on camera interview of Butina

2

#10018871

while she was in federal prison. Before the Butina interview, on information and belief, 60 Minutes had not been able to report from a federal prison for over a decade.

11.     On multiple occasions, I produced interviews with Russian opposition leader Alexey Navalny ("Navalny"), which included securing (i) in 2017, Navalny's first major, televised interview with an American journalist in Russia and (ii) in 2020, his first televised interview in Germany after surviving a poisoning using the chemical weapon Novichok. For the 2020 Navalny interview, I successfully traveled with Correspondent Lesley Stahl ("Stahl") to Germany at a time when the country had blocked all travelers from the United States due to Covid restrictions.

12.     I regularly received positive feedback regarding my performance.

13.     On multiple occasions, then-Executive Producer of 60 Minutes Jeff Fager ("Fager") complimented my work. In 2013, after 60 Minutes aired my first co-produced story, Fager wrote to the team responsible for the story, including myself: "That was another incredible story.  I loved it.  What a year you've had."  Fager told me that my story about Iran in November 2016 was "terrific" and said it was one of the "best pieces" from Iran in the show's history.

14.     After I was promoted in or around 2018, Fager told me that he had no doubt I would be a "great" Producer.

15.     Stahl told me that she "trusted" my news judgment, one of the highest compliments a Producer can receive from a Correspondent. Stahl also said that I produced some of her favorite stories of her career, including the segment about "The Chibok Girls," and described my investigation for the Butina story as "fantastic" and a "classic" 60 Minutes story.

16.     After the first screening of the story "Revolution in Iran," which I produced, Bill Owens ("Owens")  told a room full of 60 Minutes employees that I should be "commended for all the challenges she overcame in producing [the] great story."

3

#10018871

17.     In 2019, Owens told me that I regularly "swung for the fences" and that he admired my tenacity and ambition in pursuing important stories.

18.     In 2020, at the final screening of "Putin's Public Enemy," another story that I produced, Owens told me that the piece was excellent and flawlessly delivered despite the many production challenges.

19.     While discussing Owens' written performance review of me in 2021, Owens told me that I frequently produced the hardest stories at the show, that my work was excellent, that I performed at a high-level, and that I needed minimal supervision.

20.     I received praise at 60 Minutes for being collegial and collaborative. For example, Owens told me on several occasions that he liked me as a person and that I was relatable and down-to-earth. Stahl told me that my upbeat personality made working together easy.

21.     My work at 60 Minutes has received numerous awards and other recognition including a Gracie Award for "The Chibok Girls" in 2020; an Emmy Award for Outstanding Business and Economic Reporting in a News Magazine for "China's Real Estate Bubble" in 2014; two Emmy nominations for Outstanding Edited Interview and Outstanding Writing for "Putin's Public Enemy" in 2021; an Emmy nomination for Outstanding Edited Interview for "The Challenger" in 2018; and an Emmy nomination for Outstanding Business and Economic Reporting News Magazine for "The Future of Money" in 2015.

22.     During my tenure at 60 Minutes, CBS Producers typically worked under the terms of a written employment contract, and I worked under such a contract between 2011 and 2022. CBS (and its predecessor companies) agreed to numerous contract extensions with me after my original contract expired.

4

#10018871

23. As a Producer, I was responsible for finding and pitching stories, securing interviews, conducting reporting, managing crews, APs, broadcast associates, and editors, as well as overseeing all aspects of travel and logistics.

24. My duties also included supervising fact checking, editing, scriptwriting, legal review, and the collection of third-party materials.

25. I was accountable for all digital output associated with a broadcast piece, including companion digital stories, social media content, and press releases.

26. I was also responsible for all aspects of the editorial process for stories that I worked on.

27. I worked directly with Stahl to manage both my input and her interactions with others during production. I coordinated production and due diligence with show leadership, including Owens, Tanya Simon ("Simon"), and other senior staff.

28. In 2021, Defendants offered me a renewed contract effective from May 30, 2021 for a period of three years until May 25, 2024.

29. Although I no longer reported to Shachar Bar-On ("Bar-On") following my promotion from Associate Producer ("AP") to Producer, Bar-On and I still worked together at Defendants, and Bar-On was more senior than me.

30. Simon testified in this matter that she "heard" secondhand about a complaint by a soundman, claiming that I yelled at him in front of his children. I am unaware of any such complaint.

#10018871

Collette Richards

31.     I hired Collette Richards ("Richards") as an AP. I spoke with a former colleague from CNN, Scott Bronstein ("Bronstein"), who strongly advocated for me to hire Richards. Bronstein was the only reference I spoke with regarding Richards.

32.     Bronstein frequently told me that he adored Richards.

33.     Richards told me in fall 2020 that her wedding would be on May 8, 2021. I did not suggest Richards might need to work on her wedding day. I did not scream at Richards on April 22, 2021, or tell Richards we were allowed to fight.

34.     I had serious concerns about Richards's performance beginning in 2021.

35.     Richards failed to manage the application process for international travel for several 60 Minutes employees and then went out of town for a week before the holidays, which required me to cancel my own holiday plans to address the problem.

36.     Richards knew about an issue with Stahl's passport for weeks but had not alerted me.

37.     Richards repeatedly asked me for time off to drive her dog home on the Saturday before the Trevor Noah story aired or the day the show actually aired on Sunday.  I told Richards that leaving then was not feasible and a highly unusual request at 60 Minutes because she proposed traveling on important days for producing the show and correcting any factual errors in the broadcast that might need to be addressed. When Stahl learned of Richards's request, she told me it was outrageous.

38.     While Richards was setting up a shoot at the Comedy Cellar for a profile on Trevor Noah, the club's manager, who is Trevor Noah's friend, texted Trevor Noah to confirm they were set. I did raise my voice at Richards after learning that the club manager planned to reach out

6

#10018871

directly to Trevor Noah. I apologized and said I was experiencing stress because it was a sensitive booking. I did not say that yelling at people is "who I am."

39.    I encouraged Richards to advocate for herself and told her that if she felt that working with me was not a good fit, she could speak to Simon about working on another team at 60 Minutes and would not be penalized.

40.    Others raised concerns about Richards's performance, including multiple outside parties who made complaints to senior management and another Producer about Richards's volatile temper and lack of professionalism. A vendor threatened to pull his client out of an interview and all of his clients from appearing on 60 Minutes based on his communications with Richards. To my knowledge, no one notified Human Resources ("HR") about those concerns.

41.    Richards alleged that I sent her several text messages on the day of Richards's bridal shower concerning an issue with a cameraman not uploading footage from a shoot and instead sending it via overnight mail. I had previously addressed the same issue with Richards and told Richards that she should not approve of a cameraman delaying sending footage without speaking to me first.

42.    Owens had specifically required that the footage be included in the piece before the next screening, a fact Richards knew. If the footage had been sent by mail, Richards and I would have missed the deadline, and Owens would have been upset. The story involved highly sensitive material, was reviewed at the highest levels of Defendants' management, and Stahl repeatedly pushed to air the story as soon as possible.

43.    On December 16, 2021, I suggested to Richards that we plan to discuss Richards's job performance and how to move forward after the holidays.

#10018871

## Scott Bronstein

44.     I sought Bronstein's advice over the holiday break about how to have a better professional relationship with Richards because they were good friends and I knew Bronstein could give advice in Richards's best interest.

45.     I worked with Bronstein at CNN and believed us to be friends.

46.     During my call with Bronstein on January 5, 2022, I kept the substance of Richards's complaint private and told Bronstein that I believed Richards was unhappy with me. I emphasized that there would be no consequences for Richards at work if she wanted to work with someone else.

47.     I told Bronstein that I believed Richards was struggling to adapt to the challenging environment of 60 Minutes, which was different than CNN, and that Richards's working fully remotely with me as her only colleague was likely isolating for Richards. I expressed sympathy for how unusual it was for Richards to be working remotely for so long.

48.     Bronstein told me that I could never malign Richards to him because he thought so highly of Richards and encouraged me to speak openly with him about Richards's performance. Bronstein told me that there was nothing I could say that would negatively affect his opinion of Richards.

49.     I did not disparage Richards during my call with Bronstein. I did not criticize Richards for speaking to HR.

50.     While I was certainly frustrated with Richards's conduct and her effort, I also spoke positively about Richards, saying that she was well-liked and well-respected by other employees, including Stahl, and expressed sympathy for Richards over her difficulties in adjusting to 60

#10018871

Minutes. I told Bronstein that I hoped to continue working together with Richards and that Richards would have the choice of what she wanted to do.

51. During my January 5, 2022 call with Bronstein, I did not tell Bronstein that I had a "lack of trust" in Richards because she spoke to HR.

52. No one at Defendants warned or directed me not to communicate with Bronstein before my call with him on January 5, 2022.

53. No one at Defendants tried to prevent me from contacting Bronstein before my call with him on January 5, 2022, despite Defendants having knowledge that I was in touch with him.

54. I did not engage in retaliatory conduct against Richards. I planned to call Bronstein before I was aware of the Richards December 2021 Complaint.

55. My purpose in calling Bronstein was not to sabotage or do harm to Richards. I believed that speaking to Bronstein would be a good way to deal with the problems I was having with Richards without jeopardizing Richards's job.

56. Bronstein did not work for Defendants at the time and had no control over Richards's employment.

<u>Meetings with Owens and Human Resources</u>

57. I met with Owens and Simon on January 5, 2022 to discuss Richards's complaints. This was the first time I learned about Richards's complaints about me.

58. On January 5, 2022, at the end of my conversation with Owens and Simon, I specifically asked if I could speak to HR.

59. Owens told me not to reach out to HR and he would get back to me.

60. I had a follow up meeting with Owens the next day on or about January 6 about Richards's concerns.

9

61.     On or about January 6, 2022, I told Owens that I had discussed Richards's complaint with Stahl. Far from criticizing her, Owens expressed his support for me doing so, stating that it was "the right thing to do" for me to tell Stahl and that he had intended to tell me to do so.

62.     At no time during either of those discussions did Simon or Owens tell me not to communicate with others about Richards's concerns.

63.     HR also did not provide any guidance to me about Richards's concerns on January 5 and 6, 2022, including, but not limited to, directions about what I could disclose to others. I heard nothing from HR until late in the day on January 7, 2022, after I spoke to Bronstein.

64.     I never denied to Owens that I had a call with Bronstein. I denied that I "trashed" Richards.

65.     I did not lie about what I said to Bronstein.

66.     I had not been instructed to and was not aware of any obligation to maintain confidentiality with respect to Richards's complaint.

67.     It took weeks for anyone to contact me after Richards told HR and management that she was having trouble with me.

68.     On January 8, 2022, Renee Balducci ("Balducci") interviewed me. I made an audio recording of the interview using my iPhone, a copy of which is being provided to the Court and marked as Exhibit GGG. I understand that the recording has been produced to Defendants in this matter.

69.     During that call, I told Balducci several times that I had been instructed not to speak to HR about Richards's complaint.

#10018871

70.     During my January 8, 2022 interview with Balducci, my repeating something that my husband said was not a way of intimating that Bronstein called me.

71.     Balducci did not speak with me again after the initial interview. I also made multiple requests to speak to Balducci's manager Glasgow. When I asked Balducci why no one followed up with me about the investigation, Balducci said that there was no reason to do so because she had spoken to Bronstein. Balducci never showed me the notes that Bronstein provided to Balducci. No one asked me whether I had my own notes reflecting my conversation and communications with Bronstein.

72.     Defendants never showed me the notes that Bronstein provided to Balducci until they were produced in this matter.

73.     No one from Defendants asked me if I had my own notes reflecting my conversation and communications with Bronstein.

74.     On January 7, 2022, Owens acknowledged that it would be nonsensical for me to attempt to retaliate against Richards through Bronstein when I knew that Richards and Bronstein were close friends frequently in contact with each other, Bronstein had told me on multiple occasions that he adored Richards, and Bronstein had served as Richards's primary reference for her job.

75.     I attended the depositions of Tanya Simon in this matter.  Simon testified during her deposition that I was placed on leave because Owens had instructed me not to disparage Richards and then, in violation of Owens's directive, I disparaged Richards to Bronstein. I had never been given the instruction that Simon references nor did I disobey Owen's directive.

11

Stahl

76.    Stahl never asked me what had happened in connection with my call with Bronstein.

77.    On or about January 5, 2022, I told Stahl about Richards's complaint. In response, Stahl stated that she was "outraged," and that Richards should have spoken to her first before raising concerns outside of the team.

78.    Stahl told me that she wanted to "get rid of" Richards and remove Richards from her team.

79.    I advised Stahl not to remove Richards because it might be perceived as retaliatory and that she should instead allow the process to proceed.

80.    Stahl also said that she "respected" me for not having formally complained about my former supervisor, male Producer Bar-On, and, instead, had "focus[ed] on my work."

Firing

81.    On or about February 3, 2022, Owens and Balducci told me that CBS was firing me effective immediately.

82.    During the firing meeting on February 3, 2022, Owens and Balducci tried to pressure me into resigning. As an enticement to resign, Balducci proposed that I write an email that Balducci would approve to say good-bye to Senior Producers. Owens said it would be "much better" for me if I resigned and that I should listen to Balducci. I asked for a day to consider the suggestion, but Balducci refused and set a 4:00 p.m. deadline that same day. I did not agree to resign.

83.    Defendants have not accused me of unlawful harassment, discrimination, or retaliation.

12

#10018871

84. My suspension and firing from Defendants significantly affected my life, career, and mental health in a negative way.

85. Before the events involving Richards and my discussion with Bronstein, I had no issues with HR.

86. Defendants refused to pay me severance when they fired me.

87. Defendants' adverse treatment of me continued even after my firing.

88. I attended depositions and reviewed transcripts in this matter. During depositions in this matter, to the best of my knowledge, no one testified that Defendants fired me for purportedly violating any supposed obligation to keep confidential Richards's complaint.

89. I understand Defendants' employees have made negative comments about me to others in the industry outside of Defendants. I understand that Defendants have made such comments after I raised protected complaints.

90. Based on statements Defendants made in their Position Statement, it is clear that Defendants used their purported investigation into my sexual harassment allegations against my former supervisor Bar-On to attack me, including by soliciting positive statements about him and bolstering his own unfounded criticisms of me. While Defendants were eager to share the purported results of their investigation attacking me, Defendants did not provide interview notes or witness statements to support these comments.

91. Defendants did not approve my stories for consideration for industry awards after I made protected complaints about her firing.

92. Throughout my employment at 60 Minutes, I am not aware of Defendants refusing to submit a story for Emmy consideration due to budgets.

13

#10018871

Docusign Envelope ID: 73603536-55F5-4324-B992-FA333CCD9B54

93.     In addition, Defendants stated that they would submit stories I produced for a Front Page award on February 23, 2022.

94.     The employee at Defendants responsible for making such submissions, Sara Kuzmarov, told me on February 23, 2022 that she would provide me with instructions for making the submission.  She never did so and, as a result, I do not believe that my story was submitted for a Front Page award consideration.  Thereafter, Defendants did not give me a producer credit for another story in social media posts.

95.     To the best of my knowledge, the decision to promote Ayesha Siddiqi to 60 Minutes Producer was made in late March 2022.

96.     Matthew Magratten, Jack Weingart, Nicole Young, Kate Morris, Ben Finley, Moises Velasquez-Manoff, and Jen Baik are close friends of mine.

Bar-On

97.     Many of the complaints I raised related to Bar-On's treatment of me were in private.

98.     On or about January 13, 2017, I complained about Bar-On's abusive behavior to Senior Producer Alison Pepper ("Pepper"), who acted as an assistant to then-Executive Producer Fager.

99.     I described Bar-On's behavior as abusive. I also told Pepper that Bar-On's abuse was causing my hair to fall out, an unprecedented health issue that my doctor believed was caused by "acute stress." For example, at the time, I discovered several bald spots on my scalp.

100.    I created an audio recording of that discussion with Pepper using my iPhone, a copy of which is being provided to the Court and has been marked as Exhibit FFF.  I understand that the recording has been produced to Defendants in this matter.

14

#10018871

101.    Owens did not offer any other options such as reporting Bar-On to HR or him speaking to Bar-On or Stahl.

102.    Bar-On's mistreatment of me was widely known at 60 Minutes. For example, after I screened my first solo-produced story in 2013, Fager commented that I must feel good to be "unhinged" from Bar-On, alluding to his abusive behavior.

103.    During my employment at 60 Minutes, Defendants forced me to face sexual harassment. For example, when I interviewed for my job at 60 Minutes, sexual harassment was so commonplace that in my job interview with Stahl, Stahl asked me if I would use my body to secure stories.  On at least one occasion during My employment, Stahl instructed me to use my "feminine charms" or to "flirt" to assist with a story. I have never heard a Correspondent suggest that a man use his body to get a story.

104.    My former male supervisor, 60 Minutes Producer Bar-On emotionally abused and sexually harassed me for years. I complained about some of Bar-On's mistreatment. However, CBS discouraged me from raising additional complaints and Bar-On still works for CBS.

105.    Bar-On once told me that he had blamed me for issues with the delivery of a story to protect a male editor who was actually responsible.

106.    Bar-On also told me that he bought pornography off the street during a work trip to Washington, D.C. with Stahl.

<u>Other Producers</u>

107.    A "pay or play" status is when an employer agrees to pay an employee but not use his or her services. I was not offered any such arrangement.

108.    Fager was the Executive Producer of 60 Minutes from 2004 to September 2018, when, CBS fired Fager amid similar allegations of sexual harassment and misconduct.

15

#10018871

109.    Defendants, under Owen's leadership, let go of multiple individuals while I was at 60 Minutes. Among others, the following individuals were let go: Photographer/Producer Richard Butler; Associate Producer Alex Diamond; Associate Producer Vanessa Fica; Director Alicia Flaum; Associate Producer Megan Nichols; Co-Producer Aarthi Rajarman; Producer Howard Rosenberg; Producer Ruth Streeter; and Associate Producer ▮▮▮▮▮ I addition, I understand that ▮▮▮▮ ▮▮▮▮ ("▮▮▮▮ resigned after raising discrimination and retaliation complaints.

110.    During Owens' tenure as 60 Minutes Executive Producer, the following individuals were involuntarily separated from 60 Minutes: Producer Katherine Davis; AP Julie Holstein; Senior Story AP Jenifer DePriest; AP Tad Lascari; AP Kate Morris; AP Jennifer Marz; Senior Producer Digital Ann Silvio.

111.    It was well-known that sexual harassment and other forms of sexism were commonplace at 60 Minutes during the period Don Hewitt ("Hewitt") was the show's Executive Producer.

112.    During my employment, several 60 Minutes staffers complained to me about the abusive behavior of Michael Gavshon ("Gavshon"), a longtime male Producer for 60 Minutes, including that he had a bad temper and was often intoxicated.

113.    One staffer told me that Tanya Simon said Gavshon had frequently had sexual relationships with his subordinates and that management eventually limited him to working with male associate producers.

114.    On one occasion, Gavshon yelled at me because I had inadvertently spoken to a source that he frequently used.

16

#10018871

115.    I spoke to a former 60 Minutes staffer who had been assigned to work with Gavshon after ███████ was removed from his stories.  The staffer, a woman, said that he frequently was intoxicated during work calls.  She also told me that she complained about Gavshon to Simon and told Simon that she was not comfortable working with him any longer given his alleged mistreatment of ███████ Simon did not direct the employee to Human Resources nor reassign her to work with someone else.

116.    Stahl told me that ███████ was fabricating her allegations against Gavshon to get "money." Stahl also said she did not believe that Gavshon did anything wrong and that Vinograd was trying to destroy his career.

117.    Michael Radutzky ("Radutzky") was a Producer and then Senior Producer at 60 Minutes. Throughout Radutzky's employment, I understand that he reported to Fager and Owens. Multiple 60 Minutes employees have told me that Radutzky frequently had a suitcase with wheels that contained pills, which he frequently pushed around the office.

118.    David Levine ("Levine"), a man, was an AP for 60 Minutes. While Levine was an Associate Producer at the time of my firing, 60 Minutes treated him as a solo Producer. I understand that Levine has since been promoted to Producer.

119.    Multiple 60 Minutes employees raised complaints about Senior Editor Matthew Richman's ("Richman") abusive conduct while I was at 60 Minutes.

120.    Several Producers, including me, have raised concerns about Senior Editor Richman's behavior, including his abusive behavior.

121.    Ashley Velie, a 60 Minutes Producer organized a meeting of at least 12 Producers in or around Spring 2021. During the meeting, many Producers complained about Richman's abusive conduct.

17

#10018871

Docusign Envelope ID: 73603536-55F5-4324-B992-FA333CCD9B54

122.     Following this meeting, a Producer submitted a group complaint to Bill Owens and Tanya Simon about Richman's conduct, including his abusive conduct.

123.     To my knowledge, no one took action in response to the concerns that Producers, including me, raised about Richman's conduct.

124.     Thereafter, I spoke with Simon and asked about management's response to the group's complaints about Richman. Simon told me that she and Owens did not plan to take action because this was "just Richman's personality" or words to that effect. She said the complaints were unfair and that the Producers needed to account for his personality.

Documents

125.     During my employment at 60 Minutes, I exchanged some text messages with Tanya Simon.  I took the screen shots of text messages between Simon and me, which is attached to my counsel's declaration as Exhibit TT. I understand that my counsel produced the screenshot attached as Exhibit TT to Defendants in this matter.

126.     The handwritten notes attached to my counsel's declaration as Exhibits CCC, DDD, and EEE were prepared by me.  In 2016 and 2017, I kept a handwritten journal that I stored in multiple notebooks. I made those notes at the time of the events described in the journal or shortly thereafter.   For purposes of this case, I reviewed those journals and, to the extent they contained information relevant to this matter, I understand those materials were produced to Defendants.

127.     During my employment, I exchanged text messages with Bar-On, including those attached to my counsel's Declaration as Exhibit MMM.  I understand the text messages were produced to Defendants in this matter.

18

#10018871

128.    I exchanged text messages with Bar-On during my employment at 60 Minutes, including those attached to my counsel's declaration as Exhibit EEEEE.  I understand that those text messages were produced to Defendants in this matter

129.    I have prepared a resume that I use for seeking work. I update my resume from time to time.  I understand that resume was produced to Defendants in this matter.  I prepared the resume attached to my counsel's declaration as Exhibit VVV.

130.    I took the screen shots of text messages between Richards and me that were sent during my employment, which is attached to my counsel's declaration as Exhibits CCCC and DDDD. I understand that my counsel produced the screenshot Attached as Exhibits CCCC and DDDD to Defendants in this matter.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on February 9, 2025, in Brooklyn, New York.


DocuSigned by:

*Alexandra Poolos*

327B5BD44C934DD...

Alexandra Poolos

#10018871